# **<u>Exhibit 1</u>**

**TO: Clerk's Office**
**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**



**APPLICATION FOR LEAVE**
**TO FILE DOCUMENT UNDER SEAL**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IN THE MATTER OF THE SEARCH OF AN
APPLE IPHONE 11 PRO MAX WITH IMEI
NUMBER ▮▮▮▮▮▮▮1839

21-MJ-1442
Docket Number

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

SUBMITTED BY: Plaintiff____ Defendant____ DOJ ✓
Name: Jonathan Siegel
Firm Name: U.S. Attorney's Office - EDNY
Address: __271 Cadman Plaza East__
__Brooklyn, New York  11201__
Phone Number: 718-254-6293
E-Mail Address: Jonathan.Siegel@usdoj.gov

INDICATE UPON THE PUBLIC DOCKET SHEET: YES ____   NO ✓
**If yes, state description of document to be entered on docket sheet:**

_____

_____

_____

**A) If pursuant to a prior Court Order**:
Docket Number of Case in Which Entered:_____
Judge/Magistrate Judge:_____
Date Entered:_____

**B) If a new application,** the statute, regulation, or other legal basis that authorizes filing under seal

Ongoing investigation
_____
_____

**ORDERED SEALED AND PLACED IN THE CLERK'S OFFICE,**
**AND MAY NOT BE UNSEALED UNLESS ORDERED BY**
**THE COURT.**

DATED:  Brooklyn              , NEW YORK
December 29, 2021     *Marcia M. Henry*
_____
**HON. MARCIA M. HENRY, U.S. MAGISTRATE JUDGE**

RECEIVED IN CLERK'S OFFICE December ____, 2021
_____
DATE

**MANDATORY CERTIFICATION OF SERVICE**:
**A.)** ___ A copy of this application either has been or will be promptly served upon all parties to this action, **B.)** ___ Service is excused by 31 U.S.C. 3730(b), or by the following other statute or regulation:_____; or **C.)** ✓ _This is a criminal document submitted, and flight public safety, or security are significant concerns. (Check one)

December 29, 2021          /R Si____
_____          _____
DATE                      SIGNATURE

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>AN APPLE IPHONE 11 PRO MAX WITH IMEI<br>NUMBER ████████1839 | )<br>)<br>)      Case No.      21-MJ-1442<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____New York_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____January 12, 2022_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____the Duty Magistrate Judge_____ .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☑ until, the facts justifying, the later specific date of _____12/29/2022_____ .

Date and time issued:      December 29, 2021 @ 4:55 p.m.      *Marcia M. Henry*
                                                                                                               *Judge's signature*

City and state:      Brooklyn, New York      Hon. Marcia M. Henry      U.S.M.J.
                                                                               *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  21-MJ-1442 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

        I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:  _____


_____
*Executing officer's signature*


_____
*Printed name and title*

## ATTACHMENT A
*Person or property to be searched*

The "Subject Device" is an Apple iPhone 11 Pro Max with IMEI number ██████████1839 that is expected to be brought into the Eastern District of New York on or about December 31, 2021, by Bruce Garelick when he arrives at John F. Kennedy International Airport.

During the execution of the warrant, law enforcement personnel are authorized to search the person of Bruce Garelick and any luggage within his possession, custody, or control in order to seize the Subject Device.

During the execution of the warrant, law enforcement personnel are authorized to obtain from Bruce Garelick the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock the Subject Device, including to (1) press or swipe the fingers (including thumbs) of Garelick to the fingerprint scanner of the Subject Device; and/or (2) hold the Subject Device in front of the face of Garelick to activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

**ATTACHMENT B**
*Property to be seized*

Following seizure of the Subject Device and/or the creation of a forensic image copy, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant. The items to be seized from the Subject Device consist of the following evidence, fruits, and instrumentalities of violations 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5 (insider trading securities fraud); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1348 (insider trading securities fraud); and aiding and abetting and conspiring to commit these offenses in violation of 18 U.S.C. §§ 2 (aiding and abetting), 371 (conspiracy), and 1349 (conspiracy) (together, the "Subject Offenses") described as follows:

a. Evidence sufficient to establish the user of the Subject Device at times relevant to the Subject Offenses consisting of registration information, access logs, device information, user photographs, contact information, payment information, and other personally identifiable information.

b. Evidence of knowledge of the prohibition against insider trading in securities.

c. Evidence relating to Digital World Acquisition Corporation ("DWAC") including, but not limited to its business combination with Trump Media & Technology Group ("Trump Media"), Trump Media Group Corp., or other potential combination targets (or the lack thereof).

d. Evidence relating to Bruce Garelick's knowledge of the fact that information about DWAC and/or Trump Media was confidential and/or non-public.

e. Evidence relating to the conveyance of material non-public information ("MNPI") regarding DWAC, Trump Media, Trump Media Group Corp., or other potential combination targets (or the lack thereof).

f. Evidence relating to Trump Media, including news about Trump Media.

g. Evidence of Bruce Garelick's ownership and control over brokerage accounts, and history of trading securities.

h. Evidence relating to trading in units, warrants, or shares of DWAC.

i. Communications with Patrick Orlando, members of the board of directors of DWAC, Michael Shvartsman, Gerald Shvartsman, Ray Corral, Anton Postolnikov, Eric Hannelius, Adrian Lopez Torres, Javier Lopez Lopez, or any other individual who traded in DWAC units, stock, or warrants.

1

j.  Evidence of the existence of relationships between Bruce Garelick, Patrick Orlando, members of the board of directors of DWAC, Michael Shvartsman, Gerald Shvartsman, Ray Corral, Anton Postolnikov, Eric Hannelius, Adrian Lopez Torres, Javier Lopez Lopez, or any other individual who traded in DWAC units, stock, or warrants.

k.  Evidence reflecting the state of mind of (i) individuals involved in trading in the units, warrants, or shares of DWAC; and (ii) individuals possessing, or having access to, MNPI regarding the business combination between DWAC and Trump Media.

l.  Evidence of the receipt, transfer, disposition or location of funds raised through the commission of the Subject Offenses.

m.  Evidence of efforts to conceal the commission of the Subject Offenses and evade detection by law enforcement and/or regulatory agencies.

n.  Evidence of the geographic location of the user of the Subject Device, as well as other electronic devices used, including records of or information about Internet Protocol addresses used in connection with the Subject Device.

o.  Evidence of passwords or other information needed to access the Subject Device.

p.  Evidence relating to other accounts, devices, or physical premises in which evidence of the commission of the Subject Offenses may be found.

The items to be seized, to the extent they are dated, will be limited to those sent, received, created, edited, or deleted on or after January 1, 2021.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

2

SDNY_01_00818988

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in this Attachment.  However, law enforcement personnel are authorized to conduct a complete review of all the ESI from the Subject Device if necessary to evaluate its contents and to locate all data responsive to the warrant.

SDNY_01_00818989

WK:JRS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN THE MATTER OF AN APPLICATION
FOR A SEARCH WARRANT FOR:

AN APPLE IPHONE 11 PRO MAX WITH
IMEI NUMBER ████████1839

**TO BE FILED UNDER SEAL**

AFFIDAVIT IN SUPPORT
OF APPLICATION FOR A SEARCH
WARRANT

No. 21-MJ-1442

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

MARC TROIANO, Special Agent, Federal Bureau of Investigation, being duly sworn,

deposes and states:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for a warrant to seize and search AN APPLE IPHONE 11 PRO MAX WITH

IMEI NUMBER ████████1839[1] (the "SUBJECT DEVICE"), which is further described in

Attachment A, and to seize the things described in Attachment B.

2.      I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since

2015.  As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of

Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal

laws and duly authorized by the Attorney General to request a search warrant.  During my tenure

with the FBI, I have participated in investigations of securities fraud and insider trading, and I have

---

[1] Based on subscriber information provided by AT&T pursuant to a subpoena, the Subject Device is subscribed to in the name of Bruce Garelick and is associated with the telephone number ████████5950 (the "Garelick Cellphone Number").

1

conducted physical and electronic surveillance, and executed search warrants. Through my training, education, and experience, I have become familiar with the manner in which insider trading is committed.

3.    This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## **PROBABLE CAUSE**

### Introduction

4.    The FBI and the United States Attorney's Office for the Southern District of New York are investigating an insider trading scheme in securities of Digital World Acquisition Corporation ("DWAC"), a special purpose acquisition company ("SPAC")[2], the shares of which were publicly traded on the Nasdaq stock market beginning on or about September 3, 2021. On or about October 20, 2021, DWAC and Trump Media & Technology Group ("Trump Media"), a media and technology company founded in February 2021 by former United States President Donald J. Trump, announced that they had entered into a definitive merger agreement that would

---

[2] A special purpose acquisition company, also known as a "blank check company," is a publicly traded company created for the purpose of acquiring or merging with an existing private company, thus making it public without going through the traditional initial public offering process.

SDNY_01_00818991

combine the two entities, allowing Trump Media to become a publicly-traded company. The investigation relates to trading in DWAC stock in September and October 2021 based on material nonpublic information about its planned merger with Trump Media.  As set forth below, there is probable cause to believe that Bruce Garelick, a DWAC director, and other individuals who appear to be affiliated with or known to him, purchased DWAC stock after learning non-public information about its planned merger with Trump Media, and sold the stock shortly after the merger was announced, in violation of Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2 (securities fraud / insider trading); Title 18, United States Code, Section 371 (conspiracy to commit securities fraud / insider trading); Title 18, United States Code, Sections 1343 and 2 (wire fraud / insider trading); Title 18, United States Code, Sections 1348 and 2 (securities fraud / insider trading) and Title 18, United States Code, Section 1349 (conspiracy to commit wire fraud / insider trading) (collectively, the "Subject Offenses").

<u>Probable Cause Regarding Bruce Garelick's Commission of the Subject Offenses</u>

5.      Based on my review of publicly available information, including but not limited to my review of filings made with the United States Securities and Exchange Commission ("SEC"), as well as documents produced by DWAC to the SEC, I have learned, among other things, the following about the business combination between DWAC and Trump Media:

a.   On or about December 11, 2020, DWAC was formed in Delaware, and on or about February 8, 2021, Trump Media was formed in Delaware.

b.   According to the *New York Times*, based on a confidential investor deck apparently reviewed by the publication, in or around March 2021, if not earlier, Patrick Orlando, who had previously launched SPACs, began discussions with former President Trump about taking

SDNY_01_00818992

Trump Media public through a SPAC.[3] Additionally, according to the *New York Times*, in April 2021 there was a video conference call among representatives of Trump Media, Orlando, and another individual who later became a board member of DWAC.[4]

       c.  On or about May 26, 2021, DWAC filed a Form S-1 registration statement with the SEC. The Form S-1 stated that DWAC was "a newly organized blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses." The Form S-1 also stated that DWAC had "not selected any specific business combination target and [had] not, nor [had] anyone on [its] behalf, initiated any substantive discussions, directly or indirectly, with any business combination target." Orlando was identified as the CEO and Chairman of DWAC. Although the Form S-1 identified director nominees, Bruce Garelick was not identified.

       d.  On or about July 8, 2021, DWAC filed an amended Form S-1 registration statement with the SEC, identifying Bruce J. Garelick as a director nominee. According to the Form S-1, Garelick is a "venture capitalist/entrepreneur/c-level executive and disruptive technology investing enthusiast" who currently serves as the chief strategy office of Rocket One Capital. As with the May 26 filing, the amended Form S-1 filing stated that DWAC had "not selected any specific business combination target" and had not "engaged in any substantive discussions, directly or indirectly, with any business combination target." DWAC filed additional amended Form S-1 registration statements on July 26, 2021, August 10, 2021, August 20, 2021, August 30, 2021, and August 31, 2021, which contained the same statement that DWAC had not

---

[3] These facts have not yet been independently verified by the Government.

[4] These facts have not yet been independently verified by the Government. According to the article, a representative of Trump Media confirmed the call to the *New York Times* but said it was "strictly discussions between Trump Media and Benessere Capital Acquisitions," another SPAC that Orlando had previously run.

SDNY_01_00818993

selected a specific business combination target or engaged in substantive discussions with any target. Under SEC rules, a SPAC may not identify a specific target company prior to the closing of its initial public offering.

e.   According to reporting in the *New York Times*, "[b]y the summer [of 2021], people affiliated with Trump Media were signaling in conversations with Wall Street financiers that they were nearing a deal to merge with a SPAC."[5]

f.   On or about September 2, 2021, DWAC filed a Form 8-A registering securities with the SEC. On the same day, DWAC announced in a press release that it priced its initial public offering of $250 million, consisting of 25,000,000 units,[6] at $10.00 per unit, and that the units would be listed on the Nasdaq stock exchange the following day. The announcement stated that EF Hutton, a division of Benchmark Investments, LLC, was acting as sole book running manager for the offering, which means that if an individual wanted to purchase shares from the initial public offering at the offering's price—in other words, not on the public, secondary market—the shares had to be purchased through EF Hutton.

g.   On or about September 2, 2021, Garelick officially became a director of DWAC. As a director, Garelick was subject to DWAC's Code of Ethics, which required, among other things, that he maintain the confidentiality of information entrusted to him by DWAC. The Code of Ethics also provided that "[e]mployees, officers and directors must not trade in securities

---

[5] These facts have not yet been independently verified by the Government, and it is not clear whether DWAC was the special purpose acquisition vehicle referenced by people affiliated with Trump Media. In particular, it is possible that these discussions related to Benessere Corporation, which, as noted, is another SPAC associated with Orlando.

[6] A "unit" consists of one share of the company's Class A common stock and one half of one redeemable warrant. Each warrant entitled the holder thereof to purchase one share of Class A common stock at a price of $11.50 per share.

SDNY_01_00818994

of a company while in possession of material non-public information regarding that company," and that it is "illegal to 'tip' or pass on inside information to any other person who might make an investment decision based on that information or pass the information to third parties." The Code of Ethics stated that DWAC "has an Insider Trading Policy, which sets forth obligations in respect of trading in the Company's securities." Based on my conversations with SEC attorneys, I understand that DWAC has represented through counsel that a separate "Insider Trading Policy" does not yet exist.

h. On or about September 3, 2021, DWAC started trading publicly on the Nasdaq stock exchange.

i. On or about September 13, 2021, DWAC signed a confidentiality agreement (the "Confidentiality Agreement") with Trump Media Group Corp., noting that the parties were engaging in discussions about a possible business combination transaction and agreeing not to disclose any information regarding a possible transaction between the parties. In the Confidentiality Agreement, Trump Media Group Corp. "acknowledge[d] and agree[d] that some of the Confidential Information of DWAC and Transaction Information may be considered 'material non-public information' for purposes of the federal securities laws."

j. On or about September 14, 2021, and September 17, 2021, DWAC prepared a draft letter of intent with Trump Media Group Corp.[7] The letter of intent contains a provision regarding exclusivity, stating in sum and substance that neither party would enter into discussions, negotiations, or transactions with any other company or investor for a period of thirty days. It also

---

[7] Based on the materials provided by DWAC, it is unclear on what day the draft letter of intent was sent to Trump Media. The letter of intent purports to have been countersigned by former President Trump on September 22, 2021.

SDNY_01_00818995

stated that Trump Media Group Corp. "acknowledge[d] and agree[d] that some of the confidential information of [DWAC] (including [the letter of intent]) may be considered 'material non-public information' for purposes of the federal securities laws."

      k.  On or about September 21, 2021, starting at approximately 12:32 p.m., DWAC held a meeting of its board of directors over Zoom. Meeting minutes produced by DWAC show that Garelick attended the meeting. According to those minutes, "[m]anagement introduced potential initial pipeline of targets," including Trump Media and several other companies. The minutes also stated that the "[c]onsensus of the board [was] to follow up/negotiate and execute LOIs [letters of intent] with TMG [Trump Media], Global Oculus/Bittrex, and Wag! so that we may conduct deeper due diligence."[8]

      l.  On or about September 22, 2021, Orlando sent an update to the board of directors through WhatsApp regarding each of the potential acquisition targets. With respect to Trump Media, Orlando wrote: "[W]e had a great meeting and are have [sic] a follow up session very soon, we have gotten great traction on lowering the Enterprise Value of the target but are getting pushback on the flexibility to be unilaterally exclusive." Orlando asked the other directors whether they would agree to 30-day exclusivity with Trump Media. The directors responded that they were in favor of entering into an exclusivity period with Trump Media and Garelick wrote, "I am enthusiastically in favor to advance with TMG [Trump Media] under the stated terms."

      m.  On or about September 27, 2021, according to press reports, Orlando went to Mar-a-Lago to meet with former President Trump and sign a letter of intent. As noted, the letter

---

[8] On or about September 20, 2021, DWAC and Global Oculus signed a non-binding letter of intent restricting Global Oculus's, but not DWAC's, ability to negotiate other business combination transactions. Two days later, as discussed herein, DWAC signed an exclusive letter of intent with Trump Media Group Corp.

SDNY_01_00818996

of intent, which is dated September 22, 2021, included an exclusivity clause providing that neither DWAC nor Trump Media would enter into discussions, negotiations, or transactions with any other company or investor for a period of thirty days.

n.    On or about September 27, 2021, DWAC issued a press release and filed a Form 8-K announcing that its units could be split and traded separately starting on September 30, 2021.  On or about September 30, 2021, DWAC units were split, and the shares of Class A common stock and warrants started trading separately on the Nasdaq under the symbols "DWAC" and "DWACW," respectively.

o.    On or about September 29, 2021, Orlando messaged the board of directors, including Garelick, on the encrypted messaging application WhatsApp and wrote, in pertinent part, "We have a few updates and due diligence is kicking into high gear. TMG [Trump Media] wants to close on October 14th."

p.    On or about October 19, 2021, from approximately 9:00 p.m. to 9:50 p.m., DWAC held a meeting of its board of directors over Zoom. Meeting minutes produced by DWAC show that Garelick attended the meeting. According to those minutes, at the meeting the directors discussed whether to go ahead with the definitive agreement with Trump Media, and all directors voted in favor of signing the agreement. The minutes also indicate that the following day at 4 p.m. was the "[s]cheduled time to sign the definitive agreement" with Trump Media. The minutes further note that resolutions would be sent to board members via WhatsApp "to confirm unanimous decision to proceed with the signing of the definitive agreement."

q.    On or about October 20, 2021, DWAC's share price closed at $9.96 with a total volume of 697,900.

SDNY_01_00818997

r.   According to the *New York Times*, on or about October 20, 2021, Orlando went to Mar-a-Lago where he met with former President Trump and they signed the deal.[9]

s.   On or about October 20, 2021, at approximately 8:16 p.m., Liz Harrington, a spokesperson for former President Trump, posted a press release to Twitter announcing the merger of DWAC and Trump Media. The press release stated that Trump Media and DWAC had entered into a "definitive merger agreement, providing for a business combination that w[ould] result in [Trump Media] becoming a publicly listed company[.]" The release stated that the transaction valued Trump Media at as much as $1.7 billion. The release included a quote from former President Trump, who was identified as Chairman of Trump Media. The following day, DWAC filed a Form 8K related to the merger, which attached the October 20, 2021 press release announcing the business combination between DWAC and Trump Media.

t.   Prior to the announcement of the business combination between DWAC and Trump Media, shares and units of DWAC were priced at approximately $10 per unit or share, and warrants were priced at approximately $0.50 per warrant. Following the public announcement, DWAC shares peaked at approximately $175 per share, warrants peaked at approximately $79 per warrant, and units peaked at approximately $142 per unit. As of December 27, 2021, DWAC shares are trading at approximately $52 per share, DWAC warrants are trading at approximately $15 per warrant, and DWAC units are trading at approximately $61 per unit.

6.   Based on my review of public sources and news articles, it does not appear that there was any public reporting about a merger between DWAC and Trump Media until the day the business combination was announced: October 20, 2021, in the evening.

---

[9] These facts have not yet been independently verified by the Government.

9

7.   Based on my review of brokerage records, telephone records, and records from DWAC obtained via subpoena or produced by the SEC, as well as from my review of public sources, there is probable cause to believe that Garelick traded in DWAC stock on the basis of material non-public information. Specifically, I have learned the following:

a.   As noted above, on or about July 8, 2021, Garelick became a director nominee of DWAC, and on or about September 2, 2021, he became an official director of DWAC. Prior to that period, it appears that DWAC was in discussions with Trump Media to enter into a business combination. Based on my review of telephone records for the Garelick Cellphone Number, I have learned that on or about September 1 and September 2, 2021, Orlando and Garelick had several telephone calls.  Accordingly, there is reason to believe that because of his board role, and conversations with Orlando, Garelick had non-public information about DWAC's potential merger with Trump Media on or before September 2, 2021. On or about September 3, 2021, the first day DWAC units were trading on the Nasdaq, using an account at Fidelity in his name, Garelick purchased a total of 610 units of DWAC at prices ranging from $10.01 to $10.02 per unit.[10] On September 10, 2021, Garelick purchased 300 units of DWAC at $10.02 per share.

b.   As discussed above, it appears that on or about September 14 and September 17, 2021, DWAC prepared and possibly sent draft letters of intent to Trump Media Group Corp. On or about September 17, 2021, using his Fidelity account, Garelick purchased a total of 410 units of DWAC at $10.05 per unit.  On or about September 20, 2021, using his Fidelity account, Garelick purchased 900 units of DWAC at prices ranging from $10.03 to $10.04 per unit.

---

[10] Because September 3, 2021, was the first day of trading, it is possible Garelick purchased DWAC units because he was excited about the business and not because he knew of material non-public information. Garelick, however, did not buy units from EF Hutton, the sole book running manager for the initial offering, but instead through his Fidelity account on the secondary market.

SDNY_01_00818999

c.   As discussed above, on September 21, 2021, at approximately 12:32 p.m., DWAC held a board meeting at which Garelick was present and discussed potential acquisition targets, including Trump Media. On or about September 21, 2021, shortly before the start of the board meeting, using his Fidelity account, Garelick purchased a total of 1,800 units of DWAC at approximately $10.05 per unit. As discussed above, on September 22, 2021, Orlando provided an update via WhatsApp to the board of directors about a deal with Trump Media progressing.  On or about September 23, 2021, using the same account, Garelick purchased a total of 1,300 units of DWAC at approximately $10.07 per unit.

d.   On or about October 21, 2021, after the merger with Trump Media was announced, Garelick sold all of his shares of DWAC in his Fidelity account for share prices ranging from $14.30 to $19.23.[11]   Garelick also sold all the DWAC warrants in his Fidelity account.  In total, Garelick made approximately $49,702 in profit on these sales.

e.   From my training and experience, I have learned that federal securities regulations require certain individuals, such as officers and directors, to report purchases, sales, and holdings of their company's securities to the SEC by filing Forms 3 and 4. Company insiders, such as officers and directors, must file a Form 3 to initially disclose their ownership of the company's securities within ten days of becoming an insider. When an insider executes a transaction, he or she must file a Form 4 within two days, which discloses the transaction to the public. From my review of SEC filings, I have learned that notwithstanding the fact that Garelick was a director of DWAC during part of the period when he was trading, he did not file a Form 3 or Form 4 for any of his purchases or sales of DWAC units or shares.

---

[11] After DWAC allowed its shareholders to split units into shares and warrants, Garelick requested that Fidelity divide all his units into shares and warrants of DWAC. Fidelity did so before Garelick sold his holdings in DWAC.

11

8. Based on my review of brokerage records, telephone records, and records from DWAC obtained via subpoena or produced by the SEC, as well as from my review of public sources, there is probable cause to believe that Garelick told one or more other individuals non-public information about DWAC's planned business combination with Trump Media, and that those individuals traded on the basis of that information, and in some cases tipped other individuals who traded in the stock. Each of the individuals identified below purchased units, shares, and/or warrants of DWAC while it was publicly known as a blank check company (in other words, it did not have a planned combination target), before there was any news about a merger with Trump Media, and then sold those units, shared, or warrants right after the merger announcement. Specifically, I have learned the following:

*Trades by Rocket One Capital (Michael Shvartsman)*

a. Garelick, as noted above, is chief strategy officer of Rocket One Capital, which is a venture capital firm in Miami, Florida headed by Michael Shvartsman. Based on my review of telephone records, it appears that Garelick (using the Garelick Cellphone Number) and Michael Shvartsman communicate regularly by telephone and text message.

b. On or about August 30, 2021, Michael Shvartsman and Garelick, using the Garelick Cellphone Number, exchanged at least four telephone calls. On the same day, Shvartsman opened a brokerage account in the name of Rocket One Capital, LLC. On or about September 1 and September 2, 2021, Shvartsman and Garelick, using the Garelick Cellphone Number, exchanged multiple telephone calls. On or about September 2, 2021, the Rocket One Capital account was funded and on September 3, 2021, the first day of trading for DWAC units, Rocket One Capital purchased 14,500 units of DWAC.

12

c.   As noted above, by on or about September 27, 2021, if not earlier, DWAC and Trump Media had signed an exclusive letter of intent, and on or about September 29, 2021, Orlando messaged the board of directors, including Garelick, "due diligence is kicking into high gear" on the Trump Media merger. On or about October 1, October 4, and October 5, Michael Shvartsman and Garelick exchanged multiple telephone calls. On or about October 1, 2021, Rocket One Capital purchased approximately 227,915 DWAC warrants; on or about October 4, 2021, Rocket One Capital purchased approximately 1,641,731 DWAC warrants; and on or about October 5, 2021, Rocket One Capital purchased approximately 130,354 warrants.

d.   On or about October 21 and 22, 2021, Rocket One Capital sold off its shares in DWAC for approximately $18.4 million in realized profit. The Rocket One Capital account was not used for any other trading.

*Trades by Gerald Shvartsman*

e.   Based on my review of publicly available information, it appears that Gerald Shvartsman is the brother of Michael Shvartsman. From telephone records, it appears that Michael Shvartsman and Gerald Shvartsman speak nearly daily, and sometimes multiple times per day. Gerald Shvartsman appears to be the owner of Source Furniture in Miami, Florida, which appears to be a furniture supply store.

f.   On or about August 5, 2021, Gerald Shvartsman opened a brokerage account with Benchmark Investments which, as noted above, was the exclusive broker for DWAC's initial public offering. On or about August 11, 2021, Gerald Shvartsman wired funds into the account.

g.   On or about September 3, 2021, Michael Shvartsman and Gerald Shvartsman exchanged telephone calls at approximately 9:09 a.m., 9:20 a.m., 10:52 a.m., 11:03

13

a.m., 11:13 a.m., and 5:05 p.m. On or about September 3, 2021, Gerald Shvartsman purchased 10,800 units of DWAC at approximately 1:22 p.m.

h.    Between on or about October 7 and October 18, 2021, Gerald Shvartsman purchased 400,000 warrants of DWAC.

i.    On or about October 21 and 22, 2021, Gerald Shvartsman sold all of his shares of DWAC for a profit of $5.1 million.

*Trades by Ray Corral*

j.    Based on my review of public sources, I have learned that Ray Corral is associated with Michael Shvartsman, and it appears they are friends.  For example, I have reviewed an image available online of Michael Shvartsman and Ray Corral together at what appears to be a social event at The Deck at Island Gardens, a super yacht marina, in February 2016. From my review of telephone records, it appears that Michael Shvartsman and Corral communicate regularly by telephone. Additionally, it appears from telephone records that Corral knows Garelick, because they appear to have spoken by telephone on or about June 30, July 1, July 9, July 16, and October 21, 2021. It also appears that Corral knows Gerald Shvartsman because, according to telephone records, they communicated on July 2, 2021.

k.    On or about August 4, 2021, Corral opened an account at Benchmark Investments, and on or about August 10, 2021, he wired funds into the account.

l.    On or about September 3, 2021, at approximately 9:11 a.m., Michael Shvartsman called Corral and they spoke for several minutes.  On or about the same day, September 3, 2021, at approximately 1:22 p.m., Corral purchased 10,740 units of DWAC. Michael Shvartsman and Corral spoke several more times in September and early October 2021.

SDNY_01_00819003

m.  On or about October 21, 2021, Corral called Michael Shvartsman. Corral again called Michael Shvartsman on or about October 22, 2021. On or about October 21 and October 22, 2021, Corral sold all his holdings of DWAC for a profit of $268,342.

*Trades by APLC Investments LLC (Anton Postolnikov)*

n.  Based on my review of public sources and bank records, I have learned that Anton Postolnikov is a Russian citizen living in Miami, Florida, who appears to be the owner of APLC Investments LLC. Based on my review of telephone records, it appears that Postolnikov knows Orlando, Garelick, Michael Shvartsman, Gerald Shvartsman, and Raymond Corral, and communicated with Orlando and Gerald Shvartsman regularly between September and November 2021.

o.  On or about August 11, 2021, APLC Investments LLC opened an account at Benchmark Investments and wired funds into the account on or about August 12, 2021. The signatory on the APLC Investments account is Postolnikov.

p.  On or about September 3, 2021, Postolnikov purchased a total of 4,75,110 units of DWAC. On or about September 8, 2021, Postolnikov purchased 5,000 units of DWAC. On or about October 6, 2021, Postolnikov purchased 510 units of DWAC. On or about October 11, 2021, Postolnikov purchased 20,800 units of DWAC. On or about October 12, 2021, Postolnikov purchased 100,000 warrants of DWAC. On or about October 18, 2021, Postolnikov purchased 100,000 warrants of DWAC. On or about October 19, 2021, Postolnikov purchased 74,517 warrants of DWAC. On or about October 20, 2021, Postolnikov purchased 175,000 warrants of DWAC.

q.  During the period in which Postolnikov purchased units and warrants of DWAC, he communicated by telephone with Orlando and Gerald Shvartsman.

SDNY_01_00819004

r.   From on or about October 21 through on or about October 28, 2021, Postolnikov liquidated substantially all of his DWAC holdings for a profit of approximately $22.8 million.

*Trades by Eric Hannelius*

s.   Based on my review of public sources, I have learned that Michael Shvartsman is a partner in multiple businesses with Eric Hannelius. Based on my review of telephone records between Michael Shvartsman and Hannelius, it appears they speak at least once per week. Additionally, from my review of telephone records, it appears that Garelick (using the Garelick Cellphone Number) and Hannelius communicate from time to time by telephone and text message.

t.   On or about September 12, 2021, Michael Shvartsman and Hannelius spoke by telephone. On or about September 13, 2021, Hannelius purchased 500 DWAC units.

u.   On or about October 4, October 5, and October 6, Michael Shvartsman and Hannelius spoke by telephone. Between in or about October 6 and in or about October 7, 2021, Hannelius bought 11,300 DWAC warrants.

v.   On or about October 21, 2021, Hannelius sold all his holdings in DWAC for a total net profit of $168,206.

*Trades by Adrian Lopez Torres and Javier Lopez Lopez*

w.   Based on my review of publicly available sources and brokerage records, it appears that Adrian Lopez Torres ("Torres") was an employee at Source Furniture which, as noted above, is owned by Gerald Shvartsman.

x.   On or about October 19, 2021, one day before the public announcement of the merger between DWAC and Trump Media, Torres placed an order to purchase DWAC

SDNY_01_00819005

warrants, and on or about October 20, 2021, in the morning, Torres purchased 100,000 DWAC warrants.

y.   On or about October 19, 2021, Javier Lopez Lopez ("Lopez"), the father of Torres according to broker records, placed an order to purchase DWAC warrants, and on or about October 20, 2021, in the morning, Lopez purchased 40,000. Based on my review of brokerage records, it appears that Lopez is a technician at a dialysis clinic.

z.   On or about October 21, 2021, Torres sold the DWAC warrants for a profit of $404.411. On or about October 22, 2021, Lopez sold his DWAC warrants for a profit of $1.58 million.

9.   Based on the foregoing, there is probable cause to believe that Garelick knew of material non-public information about DWAC's planned merger with Trump Media, that he traded on the basis of that information, and that he provided that information to his friends and/or associates who then traded on the basis of that information and passed it to their associates, all in violation of the Subject Offenses.

Probable Cause to Believe the Subject Device Contains Evidence of the Subject Offenses

10. First, there is probable cause to believe that Garelick will arrive at John F. Kennedy International Airport ("JFK") on December 31, 2021, and will have the Subject Device on his person or in his luggage when he arrives.

a.   On or about December 22, 2021, I learned from a database available to law enforcement that Garelick had purchased a ticket on December 5, 2021, to travel from JFK Airport to Cancun, Mexico, on December 25, 2021. From my review of information in that database, I have learned that Garelick is scheduled to return to the United States on December 31, 2021, at approximately 7:39 p.m. on JetBlue flight 852.

SDNY_01_00819006

b.   Based on my review of telephone records and databases available to law enforcement, it appears that Garelick has one cellphone, which is the Subject Device registered to the Garelick Cellphone Number.[12]

c.   Based on my training and experience, I have learned that individuals often travel with their cellphones, particularly for trips of a duration of a day or more, and routinely keep a cellphone or cellphones on their person or in their luggage. Accordingly, there is probable cause to believe that Garelick will have the Subject Device with him – either on his person or in his luggage – when he returns to the United States on December 31, 2021.  This application therefore seeks authorization for law enforcement to search the person of Bruce Garelick and any luggage within his possession, custody, or control at the time of the execution of this warrant for the Subject Device, and to seize the Subject Device."

11. Second, based on my review of records provided by DWAC and Fidelity to the SEC and by AT&T, as well as my training and experience and publicly available information, there is probable cause to believe that the Subject Device will contain evidence of the commission of the Subject Offenses. Specifically:

a.   As described above, members of the board of directors of DWAC used WhatsApp to communicate regarding DWAC, potential merger targets, and board votes, and therefore the WhatsApp communications with directors are likely to contain evidence of the material non-public information about DWAC to which Garelick had access. For example, on or about September 29, 2021, Orlando texted the DWAC directors on WhatsApp that "due diligence is kicking into high gear" and that Trump Media "wants to close on October 14th." Such

_____

[12] Based on my review of telephone records provided by AT&T and records provided by Apple, it appears that there are other cellphone numbers associated with Garelick, but that they belong to other members of his family.

SDNY_01_00819007

communications are evidence of the commission of the Subject Offenses because they will indicate what non-public information Garelick had when he traded and/or told other individuals to buy DWAC units, shares, or warrants.

b.  Additionally, based on my training and experience, it is common for an individual to use a messaging application to communicate with more than one person. Accordingly, there is reason to believe that Garelick used WhatsApp to communicate with other individuals. For instance, there is probable cause to believe that Garelick's WhatsApp account contains communications with individuals in the board of directors chat, such as Orlando, and other individuals about DWAC. Based on my review of records provided by WhatsApp, I have learned that a WhatsApp account associated with the Garelick Cellphone Number is registered to an Apple iPhone 11 Pro Max, which is the make and model of the Subject Device. Based upon my training and experience, I know that WhatsApp messages can remain on electronic devices, such as cellular telephones, for an indefinite period of time. Therefore, there is probable cause to believe that the Subject Device contains WhatsApp communications that are evidence of the Subject Offenses.[13]

c.  Based on my review of telephone records from AT&T, including those discussed above, it appears that Garelick used the Subject Device to communicate with Orlando, Michael Shvartsman, Gerald Shvartsman, Raymond Corral, Eric Hannelius, and Anton Postolnikov by telephone call or text message. Accordingly, there is reason to believe that the

---

[13]  I know from my training and experience that individuals who use an encrypted messaging application, like WhatsApp, will also sometimes use other encrypted messaging applications, like Signal or Telegram, and therefore there is probable cause to believe that if the Subject Device contains other encrypted applications, those applications will contain evidence of the Subject Offenses.

SDNY_01_00819008

Subject Device will contain text messages or call logs that are evidence of the insider trading activity discussed above.

d.   Based on my review of records from Fidelity, I have learned that the Garelick Cellphone Number is registered to Garelick's Fidelity account.[14] Additionally, based on my training, experience, and review of information provided by Fidelity, I know that Fidelity brokerage accounts can be viewed on a cellphone using a web browser or Fidelity's application. Based on my training and experience, it is common for individuals to use brokerage applications because they are often more convenient than logging into a computer to monitor stocks or execute a transaction. Here, from my review of records provided by Fidelity as well as public sources, I have learned that Garelick's Fidelity account was accessed from an IP address associated with an AT&T Wireless account, which suggests that Garelick accessed the Fidelity account from the Subject Device because the service provider on that device is AT&T.[15] Therefore, there is probable cause to believe that Garelick used the Subject Device to access his Fidelity account, and that the Subject Device is likely to contain records of Garelick's trading activity.

e.   Based on my review of records provided by DWAC to the SEC, I have learned, as discussed above, that board meetings for DWAC were conducted on Zoom. Based on my training and experience, Zoom offers a cellphone-based application for conducting video conference calls, and that application typically contains records of prior calling activity. Accordingly, there is reason to believe that the Subject Device may contain records of the DWAC

_____

[14] The Fidelity account was also registered with the phone number ████████2834, which appears to be Garelick's landline number.

[15] The IP addresses associated with AT&T Wireless indicate that either a cellphone using AT&T accessed the account, or that Garelick used his AT&T cellphone to create a mobile hotspot and that a device on that hotspot accessed the account. The Fidelity account was also accessed using an IP address associated with Cox Communications, which is a provider of landline services.

SDNY_01_00819009

board's conference calls, which are relevant to the material non-public information that Garelick knew at certain points in time.

12.   In addition, based on my training and experience investigating other insider trading schemes, cellphones typically contain the following types of evidence relating to the commission of the Subject Offenses:

a.   Cellphones typically contain identifying information about a user of a cellphone, such as registration pages or device information, which can be used to verify the owner and user of a device. Cellphones also typically contain evidence of other accounts and devices belonging to the cellphone user, as well as passwords to access those accounts or devices.

b.   Cellphones typically contain evidence establishing the existence of a relationship between two or more persons that are members of a conspiracy, or who may have tipped each other regarding non-public information about a stock. Such information can include call logs, contact cards, images or videos of the individuals together, voicemails or voice memos, and emails and text messages between or among the individuals. Such information is relevant to establishing the existence of a relationship between members of a conspiracy, their knowledge of each other's activities, and the fact that their relationship was one where they would engage in criminal activity together.

c.   Cellphones often contain documents relevant to the execution of a fraud scheme. Such documents often come in the form of transaction documents, such as brokerage statements, meeting minutes, and deal documents. Documents may also come in the form of emails, such as emails about a transaction or email confirmations about the execution of a trade.

d.   Cellphones typically contain evidence of location, including cellphone location data, IP records, calendar entries, and photographs of locations. Such location information

21

SDNY_01_00819010

may establish that, for instance, two members of a conspiracy were together at, around, or shortly before the time one member of a conspiracy traded in DWAC stock. Similarly, such location information may establish that Garelick or another individual was at a meeting when material non-public information was communicated.

e.  Cellphones typically contain access logs, web histories, and search histories. In insider trading investigations, it is common that such internet histories will contain evidence of the commission of the Subject Offenses. For instance, I am aware of circumstances where a subject of an investigation has searched information about a relevant stock, searched information on the insider trading laws and penalties, and/or searched notable insider trading prosecutions.

f.  Cellphones typically contain records that are months if not years old. Electronic files can be stored on a cellphone for years at little or no cost and users thus have little incentive to delete data that may be useful to consult in the future. It is common for cellphone users to back up their data to the cloud or transfer data when they purchase a new device. Thus, it is common for a cellphone to contain records older than the device itself. In particular, individuals engaged in criminal activity often store such records, sometimes for years, as records of past relationships with co-conspirators, to keep track of co-conspirators' contact information, to keep a record of transactions in furtherance of the criminal activity, or to keep notes to follow up on other aspects of the scheme.

13. Based on the foregoing, there is probable cause to believe that the Subject Device contains evidence of the Subject Offenses.  In particular, I believe the Subject Device is likely to contain the following information:

SDNY_01_00819011

a.   Evidence sufficient to establish the user of the Subject Device at times relevant to the Subject Offenses consisting of registration information, access logs, device information, user photographs, contact information, payment information, and other personally identifiable information.

b.   Evidence of knowledge of the prohibition against insider trading in securities.

c.   Evidence relating to DWAC including, but not limited to, its business combination with Trump Media, Trump Media Group Corp., or other potential combination targets (or the lack thereof).

d.   Evidence relating to Garelick's knowledge of the fact that information about DWAC and/or Trump Media was confidential and/or non-public.

e.   Evidence relating to the conveyance of material non-public information ("MNPI") regarding DWAC, Trump Media, Trump Media Group Corp., or other potential combination targets (or the lack thereof).

f.   Evidence relating to Trump Media, including news about Trump Media.

g.   Evidence of Garelick's ownership and control over brokerage accounts, and history of trading securities.

h.   Evidence relating to trading in units, warrants, or shares of DWAC.

i.   Communications with Patrick Orlando, members of the board of directors of DWAC, Michael Shvartsman, Gerald Shvartsman, Ray Corral, Anton Postolnikov, Eric Hannelius, Adrian Lopez Torres, Javier Lopez Lopez, or any other individual who traded in DWAC units, stock, or warrants.

SDNY_01_00819012

j.   Evidence of the existence of relationships between Garelick, Patrick Orlando, members of the board of directors of DWAC, Michael Shvartsman, Gerald Shvartsman, Ray Corral, Anton Postolnikov, Eric Hannelius, Adrian Lopez Torres, Javier Lopez Lopez, or any other individual who traded in DWAC units, stock, or warrants.

k.   Evidence reflecting the state of mind of (i) individuals involved in trading in the units, warrants, or shares of DWAC; and (ii) individuals possessing, or having access to, MNPI regarding the business combination between DWAC and Trump Media.

l.   Evidence of the receipt, transfer, disposition or location of funds raised through the commission of the Subject Offenses.

m.   Evidence of efforts to conceal the commission of the Subject Offenses and evade detection by law enforcement and/or regulatory agencies.

n.   Evidence of the geographic location of the user of the Subject Device, as well as other electronic devices used, including records of or information about Internet Protocol addresses used in connection with the Subject Device.

o.   Evidence of passwords or other information needed to access the Subject Device.

p.   Evidence relating to other accounts, devices, or physical premises in which evidence of the commission of the Subject Offenses may be found.

14. As set forth in the Attachments, the materials to be searched for evidence of the Subject Offenses, to the extent they are dated, will be limited to those sent, received, created, edited, or deleted on or after January 1, 2021 because, according to publicly available information, former President Trump began considering launching a media company that would merge with a special purpose acquisition vehicle around that time.

24

SDNY_01_00819013

15. In addition to there being probable cause to believe that the Subject Device contains evidence of the Subject Offenses, there is also probable cause to believe that the Subject Device constitutes instrumentalities of the Subject Offenses, because it was used to communicate with co-conspirators in furtherance of the Subject Offenses, acquire information necessary to the commission of the Subject Offenses, and/or execute trades in furtherance of the Subject Offenses.

## PROCEDURES FOR SEARCHING ESI

### Unlocking Devices with Biometric Features

16. I request authority to allow law enforcement agents to obtain from Bruce Garelick the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock the Subject Device, if it requires such biometric access and if law enforcement has reasonable suspicion that the physical biometric characteristics of Garelick will unlock the Subject Device.  This authority is not to compel Garelick to provide a numeric passcode.  The grounds for this request are as follows:

a.  I know from my training and experience, as well as from information found in publicly available materials published by Apple, that iPhones offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

SDNY_01_00819014

c.   If a device is equipped with a facial-recognition feature, a user may enable its ability to unlock the device through his or her face.  For example, this feature is available on certain Apple devices and is called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face.  The device's front-facing camera then analyzes and records data based on the user's facial characteristics.  The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.

d.   In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.   The password that would unlock the Subject Device currently is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the Subject Device, making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.   I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period.  For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days.  Thus,

SDNY_01_00819015

in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

17. Due to the foregoing, I respectfully request that the Court authorize that, if the Subject Device may be unlocked using one of the aforementioned biometric features, law enforcement personnel may obtain from Garelick the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock the Subject Device, including to (1) press or swipe the fingers (including thumbs) of Garelick to the fingerprint scanner of the Subject Device; and/or (2) hold the Subject Device in front of the face of Garelick to activate the facial recognition feature, for the purpose of attempting to unlock the Subject Device in order to search the contents as authorized by the proposed warrants.

<u>Execution of Warrant for ESI</u>

18. Federal Rule of Criminal Procedure 41(e)(2)(B) provides that a warrant to search for and seize property "may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information . . . for later review."  Consistent with Rule 41, this application requests authorization to seize the Subject Device and transport it to an appropriate law enforcement facility for review. This is typically necessary for a number of reasons:

a.  First, the volume of data on a cellphone is sometimes impractical for law enforcement personnel to review in its entirety at the search location.

b.  Second, because cellphones are vulnerable to inadvertent or intentional modification or destruction, they are ideally examined in a controlled environment, such as a law enforcement laboratory, where trained personnel, using specialized software, can make a forensic copy of the storage media that can be subsequently reviewed in a manner that does not change the underlying data.

27

c.   Third, many factors can complicate and prolong recovery of data from a cellphone, including the increasingly common use of passwords, encryption, or other features or configurations designed to protect or conceal data on the cellphone, which often take considerable time and resources for forensic personnel to detect and resolve.

<u>Review of ESI</u>

19. Following seizure of the Subject Device and/or the creation of a forensic image copy, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained therein for information responsive to the warrant.

20. In conducting this review, law enforcement personnel may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses.  Such techniques may include, for example:

a.   surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

b.   conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

c.   "scanning" storage areas to discover and possibly recover recently deleted data or deliberately hidden files;

d.   performing electronic keyword searches through all electronic storage areas to determine the existence and location of data potentially related to the subject matter of the investigation; and

SDNY_01_00819017

e.   reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

21. Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant.  Depending on the circumstances, however, law enforcement personnel may need to conduct a complete review of all the ESI from the Subject Device to evaluate its contents and to locate all data responsive to the warrant.

<u>Return of the Subject Device and ESI</u>

22. If the Government determines that the Subject Device is no longer necessary to retrieve and preserve the data, and the Subject Device is not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return the items, upon request.  Cellphone data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

**<u>AUTHORIZATION TO SEARCH AT ANY TIME OF DAY OR NIGHT</u>**

23. Because the exact time when Garelick will arrive in the Eastern District of New York is unknown, it may be necessary for law enforcement personnel to execute the requested Search Warrant after daytime hours (between 6:00 a.m. and 10:00 p.m.). Therefore, I respectfully submit good cause exists, pursuant to Fed. R. Crim. P. 41(e)(2)(A)(ii), for authorization to execute the requested search warrant at any time of the day or night.

29

## REQUEST FOR SEALING AND DELAYED NOTICE

24. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the Affidavit and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation and because the targets of the investigation remain at large. Premature disclosure of the contents of this Affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness by encouraging subjects' flight from prosecution, the destruction of evidence, and the tampering with or intimidation of potential witnesses.

25. In addition, I request that the Court authorize law enforcement to delay notice of the Search Warrant to Garelick for a period of one year from the date of the execution of the Search Warrant. As described above, Garelick and the other subjects of this covert investigation appear to be involved in a multimillion-dollar insider trading scheme relating to a transaction that has been covered heavily by the press. The Government intends to execute the search covertly in a manner that will not alert Garelick that the Subject Device is being searched. Thus, disclosure of the requested search warrant would have a significant and negative impact on the continuing investigation and would severely jeopardize its effectiveness by encouraging the subjects' flight from prosecution, engendering the destruction of evidence and the tampering with or intimidation of potential witnesses.  Moreover, the investigation into the insider trading scheme is continuing and is likely to continue for at least a year because it involves a large number of subjects. Accordingly, I submit that Title 18, United States Code, Sections 3103a(b)-(c) permits the Court to order that notice of the execution of the requested Search Warrant be delayed for one-year from

SDNY_01_00819019

the date that the Search Warrant is executed, subject to the government's opportunity to seek an additional delayed notice period upon a showing of good cause. *See* 18 U.S.C. §§ 3103a(b)-(c).

## CONCLUSION

26. I submit that this Affidavit supports probable cause for a warrant to search the SUBJECT DEVICE described in Attachment A and seize the items described in Attachment B. WHEREFORE, I respectfully request, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, that a warrant be issued for the SUBJECT DEVICE described herein and in ATTACHMENT A, authorizing the search and seizure of the items listed in ATTACHMENT B.

Respectfully submitted,

Marc Troiano
Special Agent
Federal Bureau of Investigation

Sworn to before me by telephone
on December _29, 2021

*Marcia M. Henry*

THE HONORABLE MARCIA M. HENRY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

31

SDNY_01_00819020

## ATTACHMENT A
*Person or property to be searched*

The "Subject Device" is an Apple iPhone 11 Pro Max with IMEI number ███████ 1839 that is expected to be brought into the Eastern District of New York on or about December 31, 2021, by Bruce Garelick when he arrives at John F. Kennedy International Airport.

During the execution of the warrant, law enforcement personnel are authorized to search the person of Bruce Garelick and any luggage within his possession, custody, or control in order to seize the Subject Device.

During the execution of the warrant, law enforcement personnel are authorized to obtain from Bruce Garelick the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock the Subject Device, including to (1) press or swipe the fingers (including thumbs) of Garelick to the fingerprint scanner of the Subject Device; and/or (2) hold the Subject Device in front of the face of Garelick to activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

**ATTACHMENT B**
*Property to be seized*

Following seizure of the Subject Device and/or the creation of a forensic image copy, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant. The items to be seized from the Subject Device consist of the following evidence, fruits, and instrumentalities of violations 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5 (insider trading securities fraud); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1348 (insider trading securities fraud); and aiding and abetting and conspiring to commit these offenses in violation of 18 U.S.C. §§ 2 (aiding and abetting), 371 (conspiracy), and 1349 (conspiracy) (together, the "Subject Offenses") described as follows:

a. Evidence sufficient to establish the user of the Subject Device at times relevant to the Subject Offenses consisting of registration information, access logs, device information, user photographs, contact information, payment information, and other personally identifiable information.

b. Evidence of knowledge of the prohibition against insider trading in securities.

c. Evidence relating to Digital World Acquisition Corporation ("DWAC") including, but not limited to its business combination with Trump Media & Technology Group ("Trump Media"), Trump Media Group Corp., or other potential combination targets (or the lack thereof).

d. Evidence relating to Bruce Garelick's knowledge of the fact that information about DWAC and/or Trump Media was confidential and/or non-public.

e. Evidence relating to the conveyance of material non-public information ("MNPI") regarding DWAC, Trump Media, Trump Media Group Corp., or other potential combination targets (or the lack thereof).

f. Evidence relating to Trump Media, including news about Trump Media.

g. Evidence of Bruce Garelick's ownership and control over brokerage accounts, and history of trading securities.

h. Evidence relating to trading in units, warrants, or shares of DWAC.

i. Communications with Patrick Orlando, members of the board of directors of DWAC, Michael Shvartsman, Gerald Shvartsman, Ray Corral, Anton Postolnikov, Eric Hannelius, Adrian Lopez Torres, Javier Lopez Lopez, or any other individual who traded in DWAC units, stock, or warrants.

1

SDNY_01_00819022

j.  Evidence of the existence of relationships between Bruce Garelick, Patrick Orlando, members of the board of directors of DWAC, Michael Shvartsman, Gerald Shvartsman, Ray Corral, Anton Postolnikov, Eric Hannelius, Adrian Lopez Torres, Javier Lopez Lopez, or any other individual who traded in DWAC units, stock, or warrants.

k.  Evidence reflecting the state of mind of (i) individuals involved in trading in the units, warrants, or shares of DWAC; and (ii) individuals possessing, or having access to, MNPI regarding the business combination between DWAC and Trump Media.

l.  Evidence of the receipt, transfer, disposition or location of funds raised through the commission of the Subject Offenses.

m.  Evidence of efforts to conceal the commission of the Subject Offenses and evade detection by law enforcement and/or regulatory agencies.

n.  Evidence of the geographic location of the user of the Subject Device, as well as other electronic devices used, including records of or information about Internet Protocol addresses used in connection with the Subject Device.

o.  Evidence of passwords or other information needed to access the Subject Device.

p.  Evidence relating to other accounts, devices, or physical premises in which evidence of the commission of the Subject Offenses may be found.

The items to be seized, to the extent they are dated, will be limited to those sent, received, created, edited, or deleted on or after January 1, 2021.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

2

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in this Attachment.  However, law enforcement personnel are authorized to conduct a complete review of all the ESI from the Subject Device if necessary to evaluate its contents and to locate all data responsive to the warrant.

SDNY_01_00819024