# **<u>Exhibit 5</u>**

# UNITED STATES DISTRICT COURT

for the

District of Rhode Island

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 22-SW-196 PAS |
| One Apple iPhone 11 Pro Max with IMEI number ▮▮▮▮▮▮1839, and further described below. | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ District of _____ Rhode Island _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2, 371, 1001, 1343, 1348, 1349; 15 U.S.C. 77x, 78j(b), & 78ff; and 17 U.S.C. 240.10b-5. | Making false statements to the U.S. Securities and Exchange Commission ("SEC"), making false and misleading statements in an SEC registration statement, conspiring to defraud the SEC, securities fraud and wire fraud relating to insider trading, conspiring to commit those offenses, and aiding and abetting the commission of those offenses. |

The application is based on these facts:

Please see attached Affidavit of Special Agent Marc Troiano with the Federal Bureau of Investigation ("FBI").

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Marc Troiano ~ FBI
_____
*Printed name and title*

**Sworn telephonically and signed electronically**
Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____  *(specify reliable electronic means).*

Date:  June 14, 2022                      _____
*Judge's signature*

City and state:  Providence, Rhode Island          Patricia A. Sullivan, US Magistrate Judge
_____
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

IN THE MATTER OF THE SEARCH OF

An Apple iPhone 11 Pro Max with
IMEI number ████████1839

Case No.: 22-SW-196 PAS

**TO BE FILED UNDER SEAL**

### AFFIDAVIT IN SUPPORT OF AN
### APPLICATION UNDER RULE 41 FOR A
### WARRANT TO SEARCH AND SEIZE

I, Marc Troiano, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed for approximately six years.  I am currently assigned to an FBI squad focused on investigating complex financial crimes, including securities frauds, commodities frauds, and wire frauds. As part of my work at the FBI, I have received training regarding ways in which these crimes are committed, participated in numerous investigations of such offenses, conducted physical and electronic surveillance, participated in the execution of search warrants (including warrants to search for electronic evidence) and reviews of electronic communications and other electronic evidence, and made and participated in arrests of individuals who have committed such offenses.  Through my training and experience, I have become familiar with (among other things) ways in which such offenses are perpetrated and in which cellphone and other electronic communications are used to further such criminal activities.

2.      I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search an Apple iPhone 11 Pro Max with IMEI number ████████1839 (the "Subject Device"), which is believed to be in the possession of

BRUCE GARELICK, for the items and information described in accompanying Attachments. This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

3.    As is described below, based on records provided by AT&T, the Subject Device is believed to be owned by BRUCE GARELICK. GARELICK is believed to reside at his home at ███████████████████ Providence, Rhode Island 02908.  Accordingly, as discussed below, the applied-for warrant would authorize the seizure and search of the Subject Device, and would permit law enforcement agents to search GARELICK's person or enter his residence solely for the limited purpose of seizing the Subject Device.

4.    On or about June 6, 2022, the Honorable Sarah Cave, United States Magistrate Judge for the Southern District of New York, authorized a warrant and order for cellphone location information for, among other things, the Subject Device.  Based on my review of the cellphone location data produced by the telephone service providers servicing the Subject Device, I have learned that the Subject Device is presently located in the District of Rhode Island.

5.    The items to be seized are the evidence, fruits, and instrumentalities of violations of making false statements to the United States Securities and Exchange Commission ("SEC"), making false and misleading statements in an SEC registration statement, conspiring to defraud the SEC, securities fraud and wire fraud relating to insider trading, conspiring to commit those

offenses, and aiding and abetting the commission of those offenses, in violation of Title 18, United States Code, Sections 2, 371, 1001, 1343, 1348, 1349 and Title 15, United States Code, Sections 77x, 78j(b), and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5 (collectively, the "Subject Offenses"), as described in Attachment B, which is incorporated herein by reference.

## PROBABLE CAUSE

### Overview of Probable Cause

6.        The FBI and the United States Attorney's Office for the Southern District of New York are investigating two categories of potential violations of the securities laws relating to Digital World Acquisition Corporation ("DWAC"), a special purpose acquisition company ("SPAC"),[1] the shares of which were publicly traded on the Nasdaq stock market beginning on or about September 3, 2021.

a.   First, the FBI is investigating whether DWAC made false statements in its Form S-1 registration that was filed with the SEC.  Specifically, in May, July, and August 2021, DWAC stated, as is required by SEC rules relating to SPACs, that DWAC had not selected or had any substantive discussions with business combination targets.  In fact, however, it appears that prior to those statements being made and submitted to the SEC, DWAC and its officers had substantive discussions with Trump Media & Technology Group ("Trump Media"), a media and technology company founded in February 2021 by former United States President Donald J. Trump, which DWAC later publicly announced on or about October 20, 2021, as its business combination target. These SEC filings were signed by Patrick Orlando, the chief executive officer of DWAC, among others, and therefore there is probable cause to believe that he made false statements in filings with

---

[1] A special purpose acquisition company, also known as a "blank check company," is a publicly traded company created for the purpose of acquiring or merging with an existing private company, thus making it public without going through the traditional initial public offering process.

the SEC.  Additionally, as is discussed below, there is probable cause to believe that BRUCE GARELICK, who is a board member of DWAC, had knowledge of DWAC's discussions with Trump Media before those discussions were disclosed publicly.

b.   Second, the FBI is investigating insider trading in DWAC's stock and warrants based on material non-public information about DWAC's planned acquisition of Trump Media, which at the time was not publicly known.  Specifically, GARELICK and one of his business partners, Michael Shvartsman, learned material non-public information about DWAC's planned acquisition of Trump Media, and then traded on the basis of that information and tipped other individuals that they knew.  It appears that GARELICK learned this information in connection with Orlando's solicitation of investments in DWAC and/or as part of GARELICK's role on DWAC's board.  It also appears that GARELICK and Michael Shvartsman, both of whom were bound by DWAC confidentiality provisions, then tipped other individuals including Michael Shvartsman's brother, one of the brother's employees, and other individuals about DWAC's planned acquisition so that those individuals could purchase DWAC stock and warrants and then sell them after DWAC's announcement about its business combination with Trump Media. Accordingly, there is probable cause to believe that GARELICK, among others, traded on the basis of material non-public information from DWAC.

c.   As is described below, there is probable cause to believe that GARELICK used the Subject Device to communicate about DWAC and trading in the stock, and therefore there is probable cause to believe that the Subject Device contains evidence of the Subject Offenses.

<u>Background on DWAC's Business Combination with Trump Media</u>

7.   Based on my review of publicly available information, including but not limited to my review of filings made with the SEC, as well as documents produced by DWAC and by certain

individuals to the SEC, I have learned, among other things, the following about the business combination between DWAC and Trump Media:

a.  On or about December 11, 2020, DWAC was formed in Delaware.

b.  On or about May 26, 2021, DWAC filed a Form S-1 registration statement with the SEC. The Form S-1 stated that DWAC was "a newly organized blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses." DWAC's initial Form S-1 stated that DWAC intended to focus its search for a business combination target on "middle-market emerging growth technology-focused companies in the Americas, in SaaS and Technology or Fintech and Financial Services sector."

c.  DWAC's Form S-1 identified Orlando as the chairman and chief executive officer of DWAC.  According to the registration statement, Orlando is experienced in launching SPACs, and had previously served as a director and executive for the SPACs Yunhong International, Benessere Capital Acquisition Corporation, and Maquia Capital Acquisition Corporation.

d.  Under SEC rules, a SPAC – such as DWAC – may not identify a specific target company prior to the closing of its initial public offering. Consistent with that rule, DWAC's May 26, 2021, Form S-1 registration statement, as well as amended Form S-1 registration statements filed on July 26, 2021, August 10, 2021, August 20, 2021, August 30, 2021, and August 31, 2021, stated that DWAC had "not selected any specific business combination target and [had] not, nor [had] anyone on [its] behalf, initiated any substantive discussions, directly or indirectly, with any business combination target."  Additionally, DWAC's August 10 amended registration statement stated that DWAC had "not contacted any of the prospective target businesses that Benessere Capital Acquisition Corporation or Maquia Capital Acquisition Corporation had considered and rejected."  As noted above, Orlando was an executive at that time for both Benessere Capital

Acquisition Corporation and Maquia Capital Acquisition Corporation.  Each of the registration statements was signed by Orlando.

      e.   On or about September 2, 2021, DWAC filed a Form 8-A registering securities with the SEC. On the same day, DWAC announced in a press release that it priced its initial public offering of $250 million, consisting of 25,000,000 units,[2] at $10.00 per unit, and that the units would be listed on the Nasdaq stock exchange the following day. The announcement stated that EF Hutton, a division of Benchmark Investments, LLC, was acting as sole book running manager for the offering, which means that if an individual wanted to purchase shares from the initial public offering at the offering's price—in other words, not on the public, secondary market—the shares had to be purchased through EF Hutton.

      f.   On or about September 3, 2021, DWAC started trading publicly on the Nasdaq stock exchange.

      g.   On or about September 13, 2021, DWAC signed a confidentiality agreement (the "Confidentiality Agreement") with Trump Media Group Corp., noting that the parties were engaging in discussions about a possible business combination transaction and agreeing not to disclose any information regarding a possible transaction between the parties. In the Confidentiality Agreement, Trump Media Group Corp. "acknowledge[d] and agree[d] that some of the Confidential Information of DWAC and Transaction Information may be considered 'material non-public information' for purposes of the federal securities laws."

      h.   On or about September 27, 2021, DWAC issued a press release and filed a Form 8-K announcing that its units could be split and traded separately starting on September 30, 2021. On or about September 30, 2021, DWAC units were split, and the shares of Class A common stock

---

[2] A "unit" consists of one share of the company's Class A common stock and one half of one redeemable warrant. Each warrant entitled the holder thereof to purchase one share of Class A common stock at a price of $11.50 per share.

and warrants started trading separately on the Nasdaq under the symbols "DWAC" and "DWACW," respectively.

      i.   On or about October 20, 2021, at approximately 8:16 p.m., Liz Harrington, a spokesperson for former President Trump, posted a press release to Twitter announcing the merger of DWAC and Trump Media. The press release stated that Trump Media and DWAC had entered into a "definitive merger agreement, providing for a business combination that w[ould] result in [Trump Media] becoming a publicly listed company[.]" The release stated that the transaction valued Trump Media at as much as $1.7 billion. The release included a quote from former President Trump, who was identified as Chairman of Trump Media. The following day, DWAC filed a Form 8-K related to the merger, which attached the October 20, 2021 press release announcing the business combination between DWAC and Trump Media.

      j.   Based on my review of public sources and news articles, it does not appear that there was any public reporting about a merger between DWAC and Trump Media until the day the business combination was announced: October 20, 2021, in the evening.

      k.   Prior to the announcement of the business combination between DWAC and Trump Media, shares and units of DWAC were priced at approximately $10 per unit or share, and warrants were priced at approximately $0.50 per warrant. Following the public announcement, DWAC shares peaked at approximately $175 per share, warrants peaked at approximately $79 per warrant, and units peaked at approximately $142 per unit.

      l.   On or about May 15, 2022, DWAC and Trump Media filed an S-4 merger registration statement with the SEC.  As of June 4, 2022, DWAC shares are trading at approximately $44 per share, DWAC warrants are trading at approximately $11 per warrant, and DWAC units are trading at approximately $49 per unit.

<u>False Statements Regarding DWAC's Business Combination Target</u>

8.     As discussed above, in its registration statements between May 26, 2021, and August 31, 2021, DWAC stated that it had "not selected any specific business combination target and [had] not, nor [had] anyone on [its] behalf, initiated any substantive discussions, directly or indirectly, with any business combination target."  However, for the reasons set forth below, there is probable cause to believe that, contrary to representations in the registration statement, Patrick Orlando, on behalf of DWAC, engaged in substantive discussions with Trump Media about a business combination between the two entities at or before the time those statements were made in SEC filings.  Specifically, I have learned, among other things, the following:

a.     In or about February or March 2021, it appears that Orlando began discussions with former President Trump, and/or his agents, about taking Trump Media public through a SPAC. According to the *New York Times*, a confidential investor deck apparently reviewed by the publication indicates that as of in or around March 2021, Orlando and Trump Media were engaged in discussions about taking Trump Media public via a SPAC. Consistent with that reporting, I have reviewed a text message produced to the SEC by Orlando, dated on or about February 24, 2021, in which Orlando said to Andrew Litinsky, a representative of Trump Media: "Thanks for the meeting.  Let's connect tomorrow."  I have also reviewed a WhatsApp message sent by Orlando to Rodrigo Veloso, a DWAC board member, dated on or about March 17, 2021, in which Orlando stated that Litinsky was "coming today" and then sent a document titled "TMG Progress Report 3.17.21.docx."  On or about March 18, 2021, which was the subsequent day, Litinsky sent a WhatsApp message to Orlando stating: "I'm with President" and "Can we chat real quick."

b.     According to the *New York Times*, in April 2021 there was a video conference call among representatives of Trump Media, Orlando, and Veloso.[3]  From my review of messages

---

[3] These facts have not yet been independently verified by the Government. According to the article, a representative of Trump Media confirmed the call to the *New York Times* but said it

obtained by the SEC, I have learned that in or around April 2021 Orlando and Veloso were discussing merging a SPAC with Trump Media. For instance, on or about April 1, 2021, Veloso sent a WhatsApp message to Orlando stating: "Let's merge with TMG."  Orlando responded, "Let's make sure the plan is fully baked . . . ."  On or about April 11, 2021, Orlando sent a WhatsApp message to Veloso stating: "We have a plan b that seems like a lot of work but I can get you good exposure.  I don't mind putting in the work and looks like it has a chance."  Based on my participation in this investigation, I believe that "plan b" refers to using DWAC's SPAC to merge with Trump Media, as opposed to using Orlando's other SPAC called Benessere Capital Acquisition Corporation.

  c. From my review of records obtained by the SEC, I have learned that on or about June 4, 2021, Benessere Capital Acquisition Corporation and Trump Media signed a "letter of intent" concerning a potential business combination.  The "letter of intent" stated that Orlando, who was one of the signers, agreed to be personally liable for a fee of $1,000,000 if Benessere and Trump Media failed to enter into a merger by a specified time, *unless* Orlando were to "propose to [Trump Media] an alternative special purpose acquisition corporation with combination terms that are acceptable to [Trump Media] . . . and such terms are ultimately accepted by [Trump Media]."

  d. On or about September 14, 2021, and September 17, 2021, DWAC prepared a draft letter of intent with Trump Media Group Corp.[4]  The letter of intent contains a provision regarding exclusivity, stating in sum and substance that neither party would enter into discussions,

---

was "strictly discussions between Trump Media and Benessere Capital Acquisitions," another SPAC that Orlando had previously run.

 [4] Based on the materials provided by DWAC, it is unclear on what day the draft letter of intent was sent to Trump Media. The letter of intent purports to have been countersigned by former President Trump on September 22, 2021.

negotiations, or transactions with any other company or investor for a period of thirty days. It also stated that Trump Media Group Corp. "acknowledge[d] and agree[d] that some of the confidential information of [DWAC] (including [the letter of intent]) may be considered 'material non-public information' for purposes of the federal securities laws."

<u>Insider Trading in DWAC Stock</u>

9.      As discussed below, there is probable cause to believe that in connection with Orlando's solicitation of investment into DWAC, he disclosed material non-public information about the planned, but at that time secret, business combination with Trump Media. It appears that after Orlando disclosed that information to individuals associated with Rocket One Capital, a venture capital firm, those individuals traded on the basis of the material non-public information. Specifically, based on my review of emails obtained pursuant to a judicially-authorized search warrant to Google, text messages obtained pursuant to a judicially-authorized search warrant to Apple for certain iCloud accounts, and records produced by the SEC, as well as publicly-available information, I have learned the following:

a.      According to public sources as well as materials provided by the SEC, Rocket One Capital is a venture capital firm based in Miami, Florida, which specializes in investing in early-stage companies.  Michael Shvartsman is the chief executive officer of Rocket One Capital, GARELICK is the chief strategy officer, and Eric Hannelius is also affiliated with the firm. Michael Shvartsman's brother is Gerald Shvartsman, who appears to be the owner of Source Furniture in Miami, Florida, which appears to be a furniture supply store.

b.      In or about June 2021, it appears that Orlando met with GARELICK, on behalf of Rocket One Capital, about investing in the DWAC SPAC.  Specifically, based on my review of text messages obtained pursuant to a judicially-authorized search of Orlando's Apple iCloud account, I have learned that on or about June 18, 2021, Orlando received a text message from Marc

Wachter, who appears to be involved in the SPACs that Orlando was working on. The message stated: "Important meeting today with the Shvartsman brothers…. They are definitely interested in Renco deal also but we will focus the majority of the meeting on DWAC. Think of what kind of sweetheart deal you could offer them to invest/raise a significant portion. That will likely make all the difference." Based on my review of emails obtained from Google pursuant to a judicially-authorized search warrant, I have learned that on or about June 21, 2021, GARELICK emailed Orlando at his Benessere Capital email account thanking him for meeting the prior week and writing: "We very much appreciate the magnitude of what you are building…..and plan to move forward with an investment. We are also putting together an investment syndicate of like minded friends to join us." On the same day, GARELICK emailed an individual named Eric Hannelius: "I've attached the SPAC prospectus. . . . however, it doesn't say anything about Trump. (can't yet) / I am setting up a call with Patrick Orlando (CEO) for tomorrow afternoon . . . ." GARELICK also texted Michael Shvartsman on June 21, 2021: "FYI – Patrick Orlando call tomorrow at 3pm. Please let me know Ojus and your brothers email addresses. . . . so I can include them on the invites." The next day, on or about June 22, 2021, according to a Google Meet calendar invite, Orlando had a virtual meeting with GARELICK, Michael Shvartsman, and Hannelius, as well as other individuals including Michael Shvartsman's brother, Gerald Shvartsman. The title on the calendar event said it was "Rocket One/DWAC SPAC – intro to other prospective investors."

        c.    On or about June 25, 2021, Wachter texted Orlando: "Just spoke to Gerald Shvartsman. He told me their all coming in for at least $3M." On or about June 28, 2021, GARELICK emailed Horacio Cruz, who works with Orlando, about completing paperwork to be a director on an unspecified board. (As noted below, GARELICK subsequently became a director on DWAC's board.) In the email, GARELICK stated that he and "Michael" (Shvartsman) had "discussed with Patrick [Orlando] a ROFR [right of first refusal] on future payment processing

needs for the Trump Media Group." In response, Orlando emailed: "For clarity, we really like TMG, but there is absolutely no guarantee that we will close that deal or any other. TMG is just one of many companies in our pipeline of deals but we have had no substantive discussion with TMG with respect to DWAC as we can't until after the IPO. We are a SPAC and cannot guarantee we will combine with anyone because no deal can be made until after IPO." GARELICK responded that his mention of the "potential target" was his "own speculation regarding that potential target" and that he "did not mean to infer in any way that a definitive target had been engaged/contracted by you or your SPAC."

      d.  On or about July 8, 2021, DWAC filed an amended Form S-1 registration statement with the SEC, identifying GARELICK as a director nominee. On or about September 2, 2021, GARELICK officially became a director of DWAC. As a director, GARELICK was subject to DWAC's Code of Ethics, which required, among other things, that he maintain the confidentiality of information entrusted to him by DWAC. The Code of Ethics also provided that "[e]mployees, officers and directors must not trade in securities of a company while in possession of material non-public information regarding that company," and that it is "illegal to 'tip' or pass on inside information to any other person who might make an investment decision based on that information or pass the information to third parties."[5]

      e.  On or about August 30, 2021, Michael Shvartsman opened a brokerage account in the name of Rocket One Capital, LLC. On or about September 2, 2021, the Rocket One Capital account was funded and on September 3, 2021, the first day of trading for DWAC units, Rocket One Capital purchased 14,500 units of DWAC.

---

[5] The Code of Ethics also stated that DWAC "has an Insider Trading Policy, which sets forth obligations in respect of trading in the Company's securities." Based on my conversations with SEC attorneys, I understand that DWAC has represented through counsel that a separate "Insider Trading Policy" does not yet exist.

f.   On or about September 3, 2021, using an account at Fidelity in his name, GARELICK purchased a total of 610 units of DWAC at prices ranging from $10.01 to $10.02 per unit.[6] On September 10, 2021, GARELICK purchased 300 units of DWAC at $10.02 per share. On or about September 17, 2021, using his Fidelity account, GARELICK purchased a total of 410 units of DWAC at $10.05 per unit.  On or about September 20, 2021, using his Fidelity account, GARELICK purchased 900 units of DWAC at prices ranging from $10.03 to $10.04 per unit.

g.   On or about September 21, 2021, starting at approximately 12:32 p.m., DWAC held a meeting of its board of directors over Zoom. Meeting minutes produced by DWAC show that GARELICK attended the meeting. According to those minutes, "[m]anagement introduced potential initial pipeline of targets," including Trump Media and several other companies. The minutes also stated that the "[c]onsensus of the board [was] to follow up/negotiate and execute LOIs [letters of intent] with TMG [Trump Media], Global Oculus/Bittrex, and Wag! so that we may conduct deeper due diligence."[7]  On or about September 21, 2021, shortly before the start of the board meeting, using his Fidelity account, GARELICK purchased a total of 1,800 units of DWAC at approximately $10.05 per unit.

h.   On or about September 22, 2021, Orlando sent an update to the board of directors through WhatsApp regarding each of the potential acquisition targets. With respect to Trump Media, Orlando wrote: "[W]e had a great meeting and are have [sic] a follow up session very soon,

---

[6] Because September 3, 2021, was the first day of trading, it is possible GARELICK purchased DWAC units because he was excited about the business and not because he knew of material non-public information. GARELICK, however, did not buy units from EF Hutton, the sole book running manager for the initial offering, but instead through his Fidelity account on the secondary market.

[7] On or about September 20, 2021, DWAC and Global Oculus signed a non-binding letter of intent restricting Global Oculus's, but not DWAC's, ability to negotiate other business combination transactions. Two days later, as discussed herein, DWAC signed an exclusive letter of intent with Trump Media Group Corp.

we have gotten great traction on lowering the Enterprise Value of the target but are getting pushback on the flexibility to be unilaterally exclusive." Orlando asked the other directors whether they would agree to 30-day exclusivity with Trump Media. The directors responded that they were in favor of entering into an exclusivity period with Trump Media and GARELICK wrote, "I am enthusiastically in favor to advance with TMG [Trump Media] under the stated terms."  On or about September 23, 2021, using his Fidelity account, Garelick purchased a total of 1,300 units of DWAC at approximately $10.07 per unit.

     i.   On or about September 29, 2021, Orlando messaged the board of directors, including GARELICK and Veloso, on the encrypted messaging application WhatsApp and wrote, in pertinent part, "We have a few updates and due diligence is kicking into high gear. TMG [Trump Media] wants to close on October 14th."  On or about October 1, 2021, Rocket One Capital purchased approximately 227,915 DWAC warrants; on or about October 4, 2021, Rocket One Capital purchased approximately 1,641,731 DWAC warrants; and on or about October 5, 2021, Rocket One Capital purchased approximately 130,354 warrants.

     j.   As noted above, on or about October 20, 2021, at approximately 8:16 p.m., a spokesperson for former President Trump posted a press release to Twitter announcing the merger of DWAC and Trump Media.  After the merger with Trump Media was announced, GARELICK sold all of his shares of DWAC in his Fidelity account for share prices ranging from $14.30 to $19.23.[8]  GARELICK also sold all the DWAC warrants in his Fidelity account.  In total, GARELICK made approximately $49,702 in profit on these sales.

     k.   From my training and experience, I have learned that federal securities regulations require certain individuals, such as officers and directors, to report purchases, sales, and holdings

---

[8] After DWAC allowed its shareholders to split units into shares and warrants, GARELICK requested that Fidelity divide all his units into shares and warrants of DWAC. Fidelity did so before GARELICK sold his holdings in DWAC.

of their company's securities to the SEC by filing Forms 3 and 4. Company insiders, such as officers and directors, must file a Form 3 to initially disclose their ownership of the company's securities within ten days of becoming an insider. When an insider executes a transaction, he or she must file a Form 4 within two days, which discloses the transaction to the public. From my review of SEC filings, I have learned that notwithstanding the fact that GARELICK was a director of DWAC during part of the period when he was trading, he did not file a Form 3 or Form 4 for any of his purchases or sales of DWAC units or shares.

l.     On or about October 21 and 22, 2021, Rocket One Capital sold off its shares in DWAC for approximately $18.4 million in realized profit. The Rocket One Capital account was not used for any other trading.

10.     Based on my review of brokerage records, telephone records, records from DWAC obtained via subpoena or produced by the SEC, and materials produced pursuant to the judicially authorized search warrants described above, as well as from my review of public sources, there is probable cause to believe that after learning about a planned business combination between DWAC and Trump Media, GARELICK and Michael Shvartsman told one or more other individuals non-public information about DWAC's planned business combination with Trump Media, and that those individuals traded on the basis of that information, and in some cases tipped other individuals who traded in the stock.[9]  Each of the individuals identified below purchased units, shares, and/or warrants of DWAC while it was publicly known as a blank check company (in other words, it did not have a planned combination target), before there was any news about a merger with Trump Media, and then sold those units, shares, or warrants right after the merger announcement. Specifically, I have learned the following:

---

[9] Alternatively, Orlando may have informed some of these individuals directly of the planned business combination between DWAC and Trump Media, and individuals traded on that tip.

a.  As discussed above, it appears that Eric Hannelius is a business partner of Michael Shvartsman.  On or about September 12, 2021, Michael Shvartsman and Hannelius spoke by telephone. On or about September 13, 2021, Hannelius purchased 500 DWAC units. On or about October 4, October 5, and October 6, Michael Shvartsman and Hannelius spoke by telephone. Between in or about October 6 and in or about October 7, 2021, Hannelius bought 11,300 DWAC warrants.  On or about October 21, 2021, Hannelius sold all his holdings in DWAC for a total net profit of $168,206.

b.  As noted above, Gerald Shvartsman is the brother of Michael Shvartsman and owns a furniture store in Miami. On or about August 5, 2021, Gerald Shvartsman opened a brokerage account with Benchmark Investments which was the sole book running manager for DWAC's initial public offering.  On or about August 11, 2021, Gerald Shvartsman wired funds into the account.  Between on or about October 7 and October 18, 2021, Gerald Shvartsman purchased 400,000 warrants of DWAC. On or about October 21 and 22, 2021, Gerald Shvartsman sold all his shares of DWAC for a profit of $5.1 million.

c.  Based on my review of publicly available sources and brokerage records, it appears that Adrian Lopez Torres was an employee at Source Furniture which, as noted above, is owned by Gerald Shvartsman. On or about October 19, 2021, one day before the public announcement of the merger between DWAC and Trump Media, Torres placed an order to purchase DWAC warrants, and on or about October 20, 2021, in the morning, Torres purchased 100,000 DWAC warrants. From my review of records obtained pursuant to a judicially-authorized search warrant on Gerald Shvartsman's iCloud account, I know that on or about October 19, 2021, Torres texted Gerald Shvartsman: "Loaded 100k / Ticker DWACW." Gerald Shvartsman responded with a "thumbs-up" signal.  Later in the conversation, Gerald Shvartsman stated "I'm in for 500k / My brother 2m / And my buddy 10 m," to which Torres responded with a "thumbs-up" signal.  On or

about October 21, 2021, Torres sold the DWAC warrants for a profit of $404,411.  The next day, on or about October 22, 2021, Torres texted Gerald Shvartsman: "Thank you again!"  Gerald Shvartsman responded, "I'm happy for you / I'll be waiting for my commission."

      d.  On or about October 19, 2021, Javier Lopez Lopez, the father of Torres according to broker records, placed an order to purchase DWAC warrants, and on or about October 20, 2021, in the morning, Lopez purchased 40,000 warrants. Based on my review of brokerage records, it appears that Lopez is a technician at a dialysis clinic. On or about October 21 and 22, 2021, Lopez sold his DWAC warrants for a profit of $1.58 million.

      e.  Based on my review of public sources and bank records, I have learned that Anton Postolnikov is a Russian citizen living in Miami, Florida, who appears to be the owner of APLC Investments LLC. Based on my review of telephone records, it appears that Postolnikov knows Orlando, GARELICK, Michael Shvartsman, and Gerald Shvartsman, and communicated with Orlando and Gerald Shvartsman by telephone between September and November 2021. Based on my review pursuant to a judicially authorized search warrant of an email account belonging to Michael Shvartsman, I have learned that, on or about June 24, 2021, GARELICK emailed Postolnikov, copying Michael Shvartsman, the following: "Anton, Good times last night! Following up on that Trump Media Group SPAC we mentioned.  The deal is going to finalize this week.  Please let us know if you are interested in investing. . . ." On or about August 11, 2021, APLC Investments LLC opened an account at Benchmark Investments and wired funds into the account on or about August 12, 2021.  The signatory on the APLC Investments account is Postolnikov.  On or about September 3, 2021, Postolnikov purchased a total of 457,500 units of DWAC. On or about September 8, 2021, Postolnikov purchased 5,000 units of DWAC. On or about October 6, 2021, Postolnikov purchased 510 units of DWAC. On or about October 11, 2021, Postolnikov purchased 20,800 units of DWAC. On or about October 12, 2021, Postolnikov

purchased 100,000 warrants of DWAC.  On or about October 18, 2021, Postolnikov purchased 100,000 warrants of DWAC. On or about October 19, 2021, Postolnikov purchased 74,517 warrants of DWAC. On or about October 20, 2021, Postolnikov purchased 175,000 warrants of DWAC.  During the period in which Postolnikov purchased units and warrants of DWAC, he communicated by telephone with Orlando and Gerald Shvartsman.  From on or about October 21 through on or about October 28, 2021, Postolnikov liquidated substantially all his DWAC holdings for a profit of approximately $22.8 million.

11.     Accordingly, based on the foregoing, there is probable cause to believe that Orlando passed material non-public information about DWAC's plans to merge with Trump Media to Michael Shvartsman, GARELICK, and Eric Hannelius (or Shvartsman or GARELICK passed that information to Hannelius), and all of them appear to have traded on the basis of that information. Additionally it appears that Gerald Shvartsman, Torres, Lopez, and Postolnikov learned the non-public information through a tip and traded on the basis of the non-public information, all in violation of the Subject Offenses.

Probable Cause Regarding the Subject Device

12.     For the reasons set forth below, there is probable cause to believe that the Subject Device will contain evidence of the Subject Offenses and is an instrumentality of the Subject Offenses because it was used in the furtherance of communicating about the commission of the Subject Offenses.

13.     *First*, as discussed above, GARELICK used the Subject Device to communicate about DWAC.  For example, on or about June 21, 2021, GARELICK texted Michael Shvartsman: "FYI – Patrick Orlando call tomorrow at 3pm.  Please let me know Ojus and your brothers email addresses. . . . so I can include them on the invites." Additionally, as cited above, GARELICK used his email account to communicate about DWAC and/or Trump Media with Orlando and

individuals who traded in DWAC stock. Based on my training and experience, I have learned that Apple iPhones can receive email communications. Indeed, users of iPhones typically receive their cloud-based or web-based email through the default Apple email application, or through an email application provided by Google, Microsoft, or Yahoo. Accordingly, there is probable cause to believe that the Subject Device will contain email and text message evidence of the commission of the Subject Offenses.

14.     *Second*, on or about December 29, 2021, the Honorable Marcia M. Henry, United States Magistrate Judge for the Eastern District of New York, authorized a warrant and order to seize the Subject Device. That warrant, and the application and affidavit submitted in support of the warrant, are attached hereto as Exhibit 1. As set forth in the affidavit, there was probable cause to believe that the Subject Device contained evidence of the Subject Offenses. Specifically:

a.     GARELICK appears to have used a WhatsApp account registered to the Subject Device to communicate regarding DWAC, potential business combination targets, and board votes, and therefore the WhatsApp communications with DWAC directors found on the Subject Device are likely to contain evidence of the material non-public information about DWAC to which GARELICK had access. *See* Ex. 1 at ¶ 11(a). For example, on or about September 29, 2021, Patrick Orlando texted the DWAC directors on WhatsApp that "due diligence is kicking into high gear" and that Trump Media "wants to close on October 14th." *Id.* Such communications are evidence of the commission of the Subject Offenses because they will indicate what non-public information GARELICK had when he traded and/or told other individuals to buy DWAC units, shares, or warrants. *Id.*

b.     GARELICK used the Subject Device to exchange phone calls with other individuals involved in the commission of the Subject Offenses, including Orlando, Michael

Shvartsman, Gerald Shvartsman, Raymond Corral, Eric Hannelius, and Anton Postolnikov. *See* Ex. 1 at ¶ 11(c).

c.    The telephone number associated with the Subject Device is registered to GARELICK's Fidelity account, which is the account he used to place trades in DWAC. *See* Ex. 1 at ¶ 11(d). Fidelity brokerage accounts can be viewed on a cellphone using a web browser or Fidelity's application, and based on IP records, it appears that GARELICK used the Subject Device to access his Fidelity account. *Id.* Therefore, there is probable cause to believe that the Subject Device will contain records of GARELICK's trading activity. *Id.*

15.    *Third,* on or about December 31, 2021, GARELICK returned to the United States from international travel and his phone was briefly confiscated for review as he reentered the country. While the Subject Device was in the possession of law enforcement, pursuant to the December 29, 2021, search warrant, an FBI special agent manually reviewed some of the text messages on the Subject Device and took photographs. In order to avoid tipping GARELICK off to the fact that he was under investigation, the FBI returned the Subject Device without fully imaging the cellphone. Additionally, at the time the FBI reviewed GARELICK's device, the WhatsApp application was unavailable. Based on my review of the photographs taken of messages on GARELICK's cellphone, I know that the Subject Device contained the following messages in December 2021, all of which are evidence of GARELICK using the Subject Device to communicate about a potential business combination with Trump Media before that news was public:

a.    On or about June 23, 2021, GARELICK received a text message on the Subject Device from Allen Beyer, which was sent to GARELICK and Michael Shvartsman. The message contained "Thoughts on TMG [Trump Media]" including several questions about whether Trump Media would be a good investment.

b.      On or about June 30, 2021, GARELICK received several text messages on the Subject Device from Allen Beyer, which were sent to GARELICK and Michael Shvartsman. In the messages, Beyer sent a screenshot of a news alert that "The Trump Organization and its CFO are expected to be charged with tax-related crimes by the Manhattan DA Thursday, say people familiar with the matter." Beyer then asked, "Would something like this impact their ability to even take a co public right now." GARELICK responded: "Yes. There is certainly risk the SPAC does not get the Trump media group for a variety of reasons. However, we have downside protection from the structure of the investment."

c.      On or about July 1, 2021, GARELICK used the Subject Device to text Raymond Corral: "Ray. It's Bruce Garelick. Do you still want to speak regarding the SPAC deal? If so, please let me know a good time to call you today." Corral responded: "Yes calling u in 30."

d.      On or about July 8, 2021, Corral texted GARELICK at the number for the Subject Device: "When u going public with the spac. Trump." GARELICK responded: "I think the IPO is scheduled for next week."

16.      In addition to the foregoing, there is probable cause to believe that the Subject Device will contain location information that may be evidence that certain subjects of the investigation were located in the same place at a relevant period in time. Such location information may include cellphone location data, IP records, photographs of locations, and/or calendar entries, and may establish that, for instance, two members of the conspiracy were together at, around, or shortly before the time one member of the conspiracy traded in DWAC stock.

17.      Based on my training and experience, the Subject Device may contain evidence of the device owner's knowledge of the prohibition against insider trading in securities. Such evidence may include emails, texts, or documents discussing insider trading; or web history or

search history relating to insider trading or an individual's state of mind. Such records may also contain evidence of consciousness of guilt following the trading of DWAC stock.

18.     Based on my training and experience, I have learned that individuals engaged in criminal activity often store such records, sometimes for years, as records of past relationships with co-conspirators, to keep track of co-conspirator's contact information, to keep a record of transactions, to store passwords or account information or accounts or devices used in furtherance of the criminal activity, or notes to follow up on other aspects of the scheme.

19.     Based on the foregoing, there is probable cause to believe that the Subject Device contains evidence of the Subject Offenses.  In particular, I believe the Subject Device is likely to contain the following information:

a.   Evidence sufficient to establish the user of the Subject Device at times relevant to the Subject Offenses consisting of registration information, access logs, device information, user photographs, contact information, payment information, and other personally identifiable information.

b.   Evidence of knowledge of the prohibition against insider trading in securities.

c.   Evidence of knowledge of the required disclosures on SEC Form S-1 or other SEC filings related to SPAC transactions.

d.   Evidence relating to DWAC including, but not limited to, its business combination with Trump Media, Trump Media Group Corp., or other potential combination targets (or the lack thereof).

e.   Evidence relating to DWAC's selection of business combination target(s), including, but not limited to, the dates and substance of discussions or negotiations with combination targets, and public filings about DWAC's selection of a business combination target.

f.   Evidence that DWAC's planned business combination with Trump Media was confidential and/or non-public until it was announced in October 2021.

g.   Evidence that DWAC's disclosures on SEC Form S-1 were false or misleading, including evidence that individuals associated with DWAC and Trump Media knew the statements were false or misleading.

h.   Evidence relating to the conveyance of material non-public information regarding DWAC, Trump Media, Trump Media Group Corp., or other potential combination targets (or the lack thereof).

i.   Evidence of the device owner's ownership and control over brokerage accounts, and his history of trading securities.

j.   Evidence relating to trading in units, warrants, or shares of DWAC.

k.   Evidence of the existence of relationships between the device owner, members of the board of directors of DWAC, or any other individual who traded in DWAC units, stock, or warrants.

l.   Evidence relating to Trump Media, including news about Trump Media.

m.   Evidence reflecting the state of mind of (i) individuals involved in trading in the units, warrants, or shares of DWAC, and (ii) individuals possessing, or having access to, material non-public information regarding the business combination between DWAC and Trump Media.

n.   Evidence of the receipt, transfer, disposition, or location of funds raised through the commission of the Subject Offenses.

o.   Evidence of efforts to conceal the commission of the Subject Offenses and evade detection by law enforcement and/or regulatory agencies.

p.   Evidence of the geographic location of the user of the Subject Device.

q.   Evidence of passwords or other information needed to access the Subject Device.

r. Evidence relating to other accounts, devices, or physical premises in which evidence of the commission of the Subject Offense may be found.

20. Based on my training and experience, I also know that, where electronic devices are used in furtherance of criminal activity, such as the Subject Device, evidence of the criminal activity can often be found months or even years after it occurred. This is typically true because:

a. Electronic files can be stored on an electronic drive for years at little or no cost and users thus have little incentive to delete data that may be useful to consult in the future.

b. Even when a user does choose to delete data, the data can often be recovered months or years later with the appropriate forensic tools. When a file is "deleted" on an electronic device, the data contained in the file does not actually disappear, but instead remains, in "slack space," until it is overwritten by new data that cannot be stored elsewhere on the device. Similarly, files that have been viewed on the Internet are generally downloaded into a temporary Internet directory or "cache," which is only overwritten as the "cache" fills up and is replaced with more recently viewed Internet pages. Thus, the ability to retrieve from an electronic device depends less on when the file was created or viewed than on a particular user's operating system, storage capacity, and user habits.

c. In the event that a user changes electronic devices, the user will typically transfer files from the old device to the new device, so as not to lose data. In addition, users often keep backups of their data on electronic storage media such as thumb drives, flash memory cards, CD-ROMs, or portable hard drives.

21. As set forth in the Attachment, certain categories of materials to be searched, to the extent they are dated, will be limited to those sent, received, created, edited, or delated on or after January 1, 2021, which is approximately around the creation of the SPACs that were in discussions with Trump Media.

22.     In addition to there being probable cause to believe that the Subject Device contains evidence of the Subject Offenses, there is also probable cause to believe that the Subject Device constitutes an instrumentality of the Subject Offenses, because it was used to communicate with co-conspirators in furtherance of the Subject Offenses.

## PROCEDURES FOR EXECUTING WARRANT AND SEARCHING ESI

### Seizure of the Subject Device

23.     Based on my training and experience, people typically take their cellphones with them when they leave their residence.  Cellphones are typically on an individual's person or in their belongings, such as a backpack or purse. When individuals are at their homes, they sometimes do not carry their cellphone around with them.  The applied-for warrant will authorize law enforcement agents to seize the Subject Device.  In the event that a Subject Device is not in plain view and its owner refuses to provide it in response to the warrant, I request authority to allow law enforcement agents to obtain the Subject Device by searching GARELICK's person and belongings and, to the extent necessary, entering GARELICK's residence at ███████████ ███████████ Providence, Rhode Island 02908 for the limited purpose of seizing the Subject Device.

### Unlocking Devices with Biometric Features

24.     I request authority to allow law enforcement agents to obtain from the device owner the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the physical biometric characteristics of the device owner will unlock the device.  This authority is not to compel the device owner to provide a numeric passcode.  The grounds for this request are as follows:

a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint scanners, facial recognition features, and iris recognition features.  Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  For example, this feature is available on certain Android devices and is called "Trusted Face."  During the Trusted Face registration process, the user holds the device in front of his or her face.  The device's front-facing camera then analyzes and records data based on the user's facial characteristics.  The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.  Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

d.  If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises.  For example, on certain Microsoft devices, this feature

is called "Windows Hello."  During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face.  The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises.  The device can then be unlocked if the infrared-sensitive camera detects the registered irises.  Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

f.  As discussed above, there is reason to believe that one or more digital devices will be found during the search.  The passcode or password that would unlock the device subject to search under this warrant currently is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the device, making the use of biometric features necessary to the execution of the search authorized by this warrant.

g.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days.

Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours.  Biometric features from other brands carry similar restrictions.  Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h.   In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device via Touch ID, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.

25.   Due to the foregoing, I respectfully request that the Court authorize that, if law enforcement personnel encounter any device that is subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, law enforcement personnel may obtain from the device owners the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any device, including to (1) press or swipe the fingers (including thumbs) of the device owner to the fingerprint scanner of the device(s); (2) hold the device in front of the face of the device owner to activate the facial recognition feature; and/or (3) hold the device in front of the face of the device owner to activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by the proposed warrants.

Execution of Warrant for ESI

26.     Federal Rule of Criminal Procedure 41(e)(2)(B) provides that a warrant to search for and seize property "may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information . . . for later review."  Consistent with Rule 41, this application requests authorization to seize any computer devices and storage media associated with the Subject Device and transport them to an appropriate law enforcement facility for review. This is typically necessary for a number of reasons:

a.  First, the volume of data on computer devices and storage media is often impractical for law enforcement personnel to review in its entirety at the search location.

b.  Second, because computer data is particularly vulnerable to inadvertent or intentional modification or destruction, computer devices are ideally examined in a controlled environment, such as a law enforcement laboratory, where trained personnel, using specialized software, can make a forensic copy of the storage media that can be subsequently reviewed in a manner that does not change the underlying data.

c.  Third, there are so many types of computer hardware and software in use today that it can be impossible to bring to the search site all of the necessary technical manuals and specialized personnel and equipment potentially required to safely access the underlying computer data.

d.  Fourth, many factors can complicate and prolong recovery of data from a computer device, including the increasingly common use of passwords, encryption, or other features or configurations designed to protect or conceal data on the computer, which often take considerable time and resources for forensic personnel to detect and resolve.

<u>Review of ESI</u>

27.     Following seizure of the Subject Device and any computer devices and storage media associated with the Subject Device and/or the creation of forensic image copies, law

enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained therein for information responsive to the warrant.

28.     In conducting this review, law enforcement personnel may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses.  Such techniques may include, for example:

a.   surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

b.   conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

c.   "scanning" storage areas to discover and possibly recover recently deleted data or deliberately hidden files; and

d.   performing electronic keyword searches through all electronic storage areas to determine the existence and location of data potentially related to the subject matter of the investigation;[10] and

e.   reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

---

[10] Keyword searches alone are typically inadequate to detect all relevant data. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.

f.   Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant.  Depending on the circumstances, however, law enforcement personnel may need to conduct a complete review of all the ESI from seized devices or storage media to evaluate its contents and to locate all data responsive to the warrant.

<u>Return of Electronic Devices and ESI</u>

29.   If the Government determines that the electronic device is no longer necessary to retrieve and preserve the data, and the device itself is not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return the item, upon request.  Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

**CONCLUSION**

30.   Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachments A and B to this affidavit and to the Search and Seizure Warrant.

31.   In light of the confidential nature of the continuing investigation, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrants and affidavit as need be to personnel assisting it in the

investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

_____
MARC TROIANO
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed.
R. Crim. P.  4.1 by **Telephone**. **Sworn telephonically and signed electronically**
*(specify reliable electronic means)*

| June 14, 2022 | |
| --- | --- |
| *Date* | *Judge's signature* |
| **Providence, Rhode Island** | Patricia A. Sullivan, U.S. Magistrate Judge |
| *City and State* | *Printed name and title* |

SDNY_01_00819322

2

2017.08.02

SDNY_01_00819323

## Attachment A

(Description of Property to be Searched)

The property to be searched is an Apple iPhone 11 Pro Max with IMEI number ███████████ 1839 (the "Subject Device").

If necessary to seize the Subject Device, this warrant authorizes the search of Bruce Garelick's person and his personal effects in the immediate vicinity and control of Garelick at the location where the search warrant is executed, including any backpacks, briefcases, purses, and bags. If the Subject Device is located within Garelick's residence and he declines to provide them to law enforcement agents, this warrant authorizes law enforcement agents to enter Garelick's residence located at ████████████████████ Providence, Rhode Island 02908 for the limited purpose of seizing the Subject Device. In lieu of seizing any Subject Device, this warrant also authorizes the copying of such devices or media for later review.

During the execution of the warrant, law enforcement personnel are authorized to obtain from Garelick the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock the Subject Device, including to (1) press or swipe the fingers (including thumbs) of Garelick to the fingerprint scanner of the device; (2) hold the device in front of the face of Garelick to activate the facial recognition feature; and/or (3) hold the device in front of the face of Garelick to activate the iris recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

2022.01.31

**Attachment B**

(Items to Be Seized)

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained on the Subject Device for evidence and instrumentalities of violations of Title 18, United States Code, Sections 2, 371, 1001, 1343, 1348, 1349 and Title 15, United States Code, Sections 77x, 78j(b), and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5 (collectively, the "Subject Offenses"), described as follows:

a.    Evidence sufficient to establish the user(s) of the Subject Device at times relevant to the Subject Offenses consisting of registration information, access logs, device information, user photographs, contact information, payment information, and other personally identifiable information.

b.    Evidence of knowledge of the prohibition against insider trading in securities.

c.    Evidence of knowledge of the required disclosures on SEC Form S-1 or other SEC filings related to SPAC transactions.

d.    Evidence relating to DWAC including, but not limited to, its business combination with Trump Media, Trump Media Group Corp., or other potential combination targets (or the lack thereof), limited to items sent, received, created, or deleted on or after January 1, 2021.

e.    Evidence relating to DWAC's selection of business combination target(s), including, but not limited to, the dates and substance of discussions or negotiations with combination targets, and public filings about DWAC's selection of a business combination target, limited to items sent, received, created, or deleted on or after January 1, 2021.

f.    Evidence that DWAC's planned business combination with Trump Media was confidential and/or non-public until it was announced in October 2021.

g.    Evidence that DWAC's disclosures on SEC Form S-1 were false or misleading, including evidence that individuals associated with DWAC and Trump Media knew the statements were false or misleading, limited to items sent, received, created, or deleted on or after January 1, 2021.

h.    Evidence relating to the conveyance of material non-public information regarding DWAC, Trump Media, Trump Media Group Corp., or other potential combination targets (or the lack thereof), limited to items sent, received, created, or deleted on or after January 1, 2021.

2017.08.02

SDNY_01_00819325

i.      Evidence of the device owner's ownership and control over brokerage accounts, and their history of trading securities.

j.      Evidence relating to trading in units, warrants, or shares of DWAC, limited to items sent, received, created, or deleted on or after January 1, 2021.

k.      Evidence of the existence of relationships between the device owner, members of the board of directors of DWAC, or any other individual who traded in DWAC units, stock, or warrants, limited to items sent, received, created, or deleted on or after January 1, 2021.

l.      Evidence relating to Trump Media, including news about Trump Media, limited to items sent, received, created, or deleted on or after January 1, 2021.

m.      Evidence reflecting the state of mind of (i) individuals involved in trading in the units, warrants, or shares of DWAC, and (ii) individuals possessing, or having access to, material non-public information regarding the business combination between DWAC and Trump Media.

n.      Evidence of the receipt, transfer, disposition, or location of funds raised through the commission of the Subject Offenses.

o.      Evidence of efforts to conceal the commission of the Subject Offenses and evade detection by law enforcement and/or regulatory agencies, limited to items sent, received, created, or deleted on or after January 1, 2021.

p.      Evidence of the geographic location of the user of the Subject Device, limited to items sent, received, created, or deleted on or after January 1, 2021.

q.      Evidence of passwords or other information needed to access the Subject Device.

r.      Evidence relating to other accounts, devices, or physical premises in which evidence of the commission of the Subject Offense may be found.

<u>REVIEW OF ESI</u>

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

2017.08.02

3

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in this Attachment.  However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

4

SDNY_01_00819327

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means      ☑ Original        ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
District of Rhode Island

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>One Apple iPhone 11 Pro Max with<br>IMEI number ████████ 1839,<br>and further described below. | )<br>)<br>)<br>)<br>)<br>)    Case No.  22-SW-196 PAS |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____Rhode Island_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____June 28, 2022_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Patricia A. Sullivan_____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   **12:55 PM, Jun 14, 2022**          _____
*Judge's signature*

City and state:   Providence, Rhode Island          Patricia A. Sullivan, US Magistrate Judge
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>22-SW-196 PAS | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

SDNY_01_00819329

TO: Clerk's Office

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**APPLICATION FOR LEAVE**
**TO FILE DOCUMENT UNDER SEAL**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
IN THE MATTER OF THE SEARCH OF AN
APPLE IPHONE 11 PRO MAX WITH IMEI
NUMBER ▮▮▮▮1839

21-MJ-1442
Docket Number

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

SUBMITTED BY: Plaintiff ___ Defendant ___ DOJ ✓
Name: Jonathan Siegel
Firm Name: U.S. Attorney's Office - EDNY
Address: __271 Cadman Plaza East
___Brooklyn, New York 11201
Phone Number: 718-254-6293
E-Mail Address: Jonathan.Siegel@usdoj.gov

INDICATE UPON THE PUBLIC DOCKET SHEET: YES ___ NO ✓
If yes, state description of document to be entered on docket sheet:
_____
_____
_____

**MANDATORY CERTIFICATION OF SERVICE:**
**A.)** ___ A copy of this application either has been or will be promptly served upon all parties to this action, **B.)** ___ Service is excused by 31 U.S.C. 3730(b), or by the following other statute or regulation: ___; or **C.)** ✓ This is a criminal document submitted, and flight public safety, or security are significant concerns.
(Check one)

December 29, 2021
DATE

_____
SIGNATURE

**A) If pursuant to a prior Court Order:**
Docket Number of Case in Which Entered: _____
Judge/Magistrate Judge: _____
Date Entered: _____

**B) If a new application**, the statute, regulation, or other legal basis that authorizes filing under seal

Ongoing investigation

**ORDERED SEALED AND PLACED IN THE CLERK'S OFFICE, AND MAY NOT BE UNSEALED UNLESS ORDERED BY THE COURT.**

DATED: Brooklyn _____, NEW YORK
December 29, 2021   *Marcia M. Henry*

**HON. MARCIA M. HENRY, U.S. MAGISTRATE JUDGE**

RECEIVED IN CLERK'S OFFICE __December___, 2021
DATE

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>AN APPLE IPHONE 11 PRO MAX WITH IMEI<br>NUMBER ████████1839 | )<br>)<br>)<br>)<br>)<br>)   Case No.   21-MJ-1442 |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____New York_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____January 12, 2022_____ *(not to exceed 14 days)*
❑ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____the Duty Magistrate Judge_____ .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❑ for _____ days *(not to exceed 30)*   ☑ until, the facts justifying, the later specific date of _____12/29/2022_____ .

Date and time issued:      December 29, 2021 @ 4:55 p.m.          *Marcia M. Henry*
                                                                                          *Judge's signature*

City and state:      Brooklyn, New York          Hon. Marcia M. Henry          U.S.M.J.
                                                                                  *Printed name and title*

SDNY_01_00819331

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>  21-MJ-1442 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

        I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date:  _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A
*Person or property to be searched*

The "Subject Device" is an Apple iPhone 11 Pro Max with IMEI number ██████████ 1839 that is expected to be brought into the Eastern District of New York on or about December 31, 2021, by Bruce Garelick when he arrives at John F. Kennedy International Airport.

During the execution of the warrant, law enforcement personnel are authorized to search the person of Bruce Garelick and any luggage within his possession, custody, or control in order to seize the Subject Device.

During the execution of the warrant, law enforcement personnel are authorized to obtain from Bruce Garelick the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock the Subject Device, including to (1) press or swipe the fingers (including thumbs) of Garelick to the fingerprint scanner of the Subject Device; and/or (2) hold the Subject Device in front of the face of Garelick to activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

**ATTACHMENT B**
*Property to be seized*

Following seizure of the Subject Device and/or the creation of a forensic image copy, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant. The items to be seized from the Subject Device consist of the following evidence, fruits, and instrumentalities of violations 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5 (insider trading securities fraud); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1348 (insider trading securities fraud); and aiding and abetting and conspiring to commit these offenses in violation of 18 U.S.C. §§ 2 (aiding and abetting), 371 (conspiracy), and 1349 (conspiracy) (together, the "Subject Offenses") described as follows:

a. Evidence sufficient to establish the user of the Subject Device at times relevant to the Subject Offenses consisting of registration information, access logs, device information, user photographs, contact information, payment information, and other personally identifiable information.

b. Evidence of knowledge of the prohibition against insider trading in securities.

c. Evidence relating to Digital World Acquisition Corporation ("DWAC") including, but not limited to its business combination with Trump Media & Technology Group ("Trump Media"), Trump Media Group Corp., or other potential combination targets (or the lack thereof).

d. Evidence relating to Bruce Garelick's knowledge of the fact that information about DWAC and/or Trump Media was confidential and/or non-public.

e. Evidence relating to the conveyance of material non-public information ("MNPI") regarding DWAC, Trump Media, Trump Media Group Corp., or other potential combination targets (or the lack thereof).

f. Evidence relating to Trump Media, including news about Trump Media.

g. Evidence of Bruce Garelick's ownership and control over brokerage accounts, and history of trading securities.

h. Evidence relating to trading in units, warrants, or shares of DWAC.

i. Communications with Patrick Orlando, members of the board of directors of DWAC, Michael Shvartsman, Gerald Shvartsman, Ray Corral, Anton Postolnikov, Eric Hannelius, Adrian Lopez Torres, Javier Lopez Lopez, or any other individual who traded in DWAC units, stock, or warrants.

1

j. Evidence of the existence of relationships between Bruce Garelick, Patrick Orlando, members of the board of directors of DWAC, Michael Shvartsman, Gerald Shvartsman, Ray Corral, Anton Postolnikov, Eric Hannelius, Adrian Lopez Torres, Javier Lopez Lopez, or any other individual who traded in DWAC units, stock, or warrants.

k. Evidence reflecting the state of mind of (i) individuals involved in trading in the units, warrants, or shares of DWAC; and (ii) individuals possessing, or having access to, MNPI regarding the business combination between DWAC and Trump Media.

l. Evidence of the receipt, transfer, disposition or location of funds raised through the commission of the Subject Offenses.

m. Evidence of efforts to conceal the commission of the Subject Offenses and evade detection by law enforcement and/or regulatory agencies.

n. Evidence of the geographic location of the user of the Subject Device, as well as other electronic devices used, including records of or information about Internet Protocol addresses used in connection with the Subject Device.

o. Evidence of passwords or other information needed to access the Subject Device.

p. Evidence relating to other accounts, devices, or physical premises in which evidence of the commission of the Subject Offenses may be found.

The items to be seized, to the extent they are dated, will be limited to those sent, received, created, edited, or deleted on or after January 1, 2021.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

SDNY_01_00819335

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in this Attachment.  However, law enforcement personnel are authorized to conduct a complete review of all the ESI from the Subject Device if necessary to evaluate its contents and to locate all data responsive to the warrant.

SDNY_01_00819336

WK:JRS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN THE MATTER OF AN APPLICATION
FOR A SEARCH WARRANT FOR:

AN APPLE IPHONE 11 PRO MAX WITH
IMEI NUMBER ████████1839

**TO BE FILED UNDER SEAL**

AFFIDAVIT IN SUPPORT
OF APPLICATION FOR A SEARCH
WARRANT

 No. 21-MJ-1442

<u>**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR A
WARRANT TO SEARCH AND SEIZE**</u>

MARC TROIANO, Special Agent, Federal Bureau of Investigation, being duly sworn,

deposes and states:

<u>**INTRODUCTION AND AGENT BACKGROUND**</u>

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for a warrant to seize and search AN APPLE IPHONE 11 PRO MAX WITH

IMEI NUMBER ████████1839[1] (the "SUBJECT DEVICE"), which is further described in

Attachment A, and to seize the things described in Attachment B.

2.      I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since

2015.  As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of

Criminal  Procedure  41(a)(2)(C),  that  is,  a  government  agent  engaged  in  enforcing  the  criminal

laws  and  duly  authorized  by  the  Attorney  General  to  request  a  search  warrant.   During  my  tenure

with the FBI, I have participated in investigations of securities fraud and insider trading, and I have

---

[1] Based on subscriber information provided by AT&T pursuant to a subpoena, the Subject
Device is subscribed to in the name of Bruce Garelick and is associated with the telephone number
████████5950 (the "Garelick Cellphone Number").

1

SDNY_01_00819337

conducted physical and electronic surveillance, and executed search warrants.  Through my training, education, and experience, I have become familiar with the manner in which insider trading is committed.

3.      This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**PROBABLE CAUSE**

Introduction

4.      The FBI and the United States Attorney's Office for the Southern District of New York are investigating an insider trading scheme in securities of Digital World Acquisition Corporation ("DWAC"), a special purpose acquisition company ("SPAC")[2], the shares of which were publicly traded on the Nasdaq stock market beginning on or about September 3, 2021. On or about October 20, 2021, DWAC and Trump Media & Technology Group ("Trump Media"), a media and technology company founded in February 2021 by former United States President Donald J. Trump, announced that they had entered into a definitive merger agreement that would

---

[2] A special purpose acquisition company, also known as a "blank check company," is a publicly traded company created for the purpose of acquiring or merging with an existing private company, thus making it public without going through the traditional initial public offering process.

SDNY_01_00819338

combine the two entities, allowing Trump Media to become a publicly-traded company. The investigation relates to trading in DWAC stock in September and October 2021 based on material nonpublic information about its planned merger with Trump Media.  As set forth below, there is probable cause to believe that Bruce Garelick, a DWAC director, and other individuals who appear to be affiliated with or known to him, purchased DWAC stock after learning non-public information about its planned merger with Trump Media, and sold the stock shortly after the merger was announced, in violation of Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2 (securities fraud / insider trading); Title 18, United States Code, Section 371 (conspiracy to commit securities fraud / insider trading); Title 18, United States Code, Sections 1343 and 2 (wire fraud / insider trading); Title 18, United States Code, Sections 1348 and 2 (securities fraud / insider trading) and Title 18, United States Code, Section 1349 (conspiracy to commit wire fraud / insider trading) (collectively, the "Subject Offenses").

<u>Probable Cause Regarding Bruce Garelick's Commission of the Subject Offenses</u>

5.      Based on my review of publicly available information, including but not limited to my review of filings made with the United States Securities and Exchange Commission ("SEC"), as well as documents produced by DWAC to the SEC, I have learned, among other things, the following about the business combination between DWAC and Trump Media:

a.   On or about December 11, 2020, DWAC was formed in Delaware, and on or about February 8, 2021, Trump Media was formed in Delaware.

b.   According to the *New York Times*, based on a confidential investor deck apparently reviewed by the publication, in or around March 2021, if not earlier, Patrick Orlando, who had previously launched SPACs, began discussions with former President Trump about taking

3

Trump Media public through a SPAC.[3] Additionally, according to the *New York Times*, in April 2021 there was a video conference call among representatives of Trump Media, Orlando, and another individual who later became a board member of DWAC.[4]

       c.  On or about May 26, 2021, DWAC filed a Form S-1 registration statement with the SEC. The Form S-1 stated that DWAC was "a newly organized blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses." The Form S-1 also stated that DWAC had "not selected any specific business combination target and [had] not, nor [had] anyone on [its] behalf, initiated any substantive discussions, directly or indirectly, with any business combination target." Orlando was identified as the CEO and Chairman of DWAC. Although the Form S-1 identified director nominees, Bruce Garelick was not identified.

       d.  On or about July 8, 2021, DWAC filed an amended Form S-1 registration statement with the SEC, identifying Bruce J. Garelick as a director nominee. According to the Form S-1, Garelick is a "venture capitalist/entrepreneur/c-level executive and disruptive technology investing enthusiast" who currently serves as the chief strategy office of Rocket One Capital. As with the May 26 filing, the amended Form S-1 filing stated that DWAC had "not selected any specific business combination target" and had not "engaged in any substantive discussions, directly or indirectly, with any business combination target." DWAC filed additional amended Form S-1 registration statements on July 26, 2021, August 10, 2021, August 20, 2021, August 30, 2021, and August 31, 2021, which contained the same statement that DWAC had not

---

[3] These facts have not yet been independently verified by the Government.

[4] These facts have not yet been independently verified by the Government. According to the article, a representative of Trump Media confirmed the call to the *New York Times* but said it was "strictly discussions between Trump Media and Benessere Capital Acquisitions," another SPAC that Orlando had previously run.

SDNY_01_00819340

selected a specific business combination target or engaged in substantive discussions with any target. Under SEC rules, a SPAC may not identify a specific target company prior to the closing of its initial public offering.

   e.   According to reporting in the *New York Times*, "[b]y the summer [of 2021], people affiliated with Trump Media were signaling in conversations with Wall Street financiers that they were nearing a deal to merge with a SPAC."[5]

   f.   On or about September 2, 2021, DWAC filed a Form 8-A registering securities with the SEC. On the same day, DWAC announced in a press release that it priced its initial public offering of $250 million, consisting of 25,000,000 units,[6] at $10.00 per unit, and that the units would be listed on the Nasdaq stock exchange the following day. The announcement stated that EF Hutton, a division of Benchmark Investments, LLC, was acting as sole book running manager for the offering, which means that if an individual wanted to purchase shares from the initial public offering at the offering's price—in other words, not on the public, secondary market—the shares had to be purchased through EF Hutton.

   g.   On or about September 2, 2021, Garelick officially became a director of DWAC. As a director, Garelick was subject to DWAC's Code of Ethics, which required, among other things, that he maintain the confidentiality of information entrusted to him by DWAC. The Code of Ethics also provided that "[e]mployees, officers and directors must not trade in securities

---

[5] These facts have not yet been independently verified by the Government, and it is not clear whether DWAC was the special purpose acquisition vehicle referenced by people affiliated with Trump Media. In particular, it is possible that these discussions related to Benessere Corporation, which, as noted, is another SPAC associated with Orlando.

[6] A "unit" consists of one share of the company's Class A common stock and one half of one redeemable warrant. Each warrant entitled the holder thereof to purchase one share of Class A common stock at a price of $11.50 per share.

SDNY_01_00819341

of a company while in possession of material non-public information regarding that company," and that it is "illegal to 'tip' or pass on inside information to any other person who might make an investment decision based on that information or pass the information to third parties." The Code of Ethics stated that DWAC "has an Insider Trading Policy, which sets forth obligations in respect of trading in the Company's securities." Based on my conversations with SEC attorneys, I understand that DWAC has represented through counsel that a separate "Insider Trading Policy" does not yet exist.

 h. On or about September 3, 2021, DWAC started trading publicly on the Nasdaq stock exchange.

 i. On or about September 13, 2021, DWAC signed a confidentiality agreement (the "Confidentiality Agreement") with Trump Media Group Corp., noting that the parties were engaging in discussions about a possible business combination transaction and agreeing not to disclose any information regarding a possible transaction between the parties. In the Confidentiality Agreement, Trump Media Group Corp. "acknowledge[d] and agree[d] that some of the Confidential Information of DWAC and Transaction Information may be considered 'material non-public information' for purposes of the federal securities laws."

 j. On or about September 14, 2021, and September 17, 2021, DWAC prepared a draft letter of intent with Trump Media Group Corp.[7] The letter of intent contains a provision regarding exclusivity, stating in sum and substance that neither party would enter into discussions, negotiations, or transactions with any other company or investor for a period of thirty days. It also

---

[7] Based on the materials provided by DWAC, it is unclear on what day the draft letter of intent was sent to Trump Media. The letter of intent purports to have been countersigned by former President Trump on September 22, 2021.

SDNY_01_00819342

stated that Trump Media Group Corp. "acknowledge[d] and agree[d] that some of the confidential information of [DWAC] (including [the letter of intent]) may be considered 'material non-public information' for purposes of the federal securities laws."

k.   On or about September 21, 2021, starting at approximately 12:32 p.m., DWAC held a meeting of its board of directors over Zoom. Meeting minutes produced by DWAC show that Garelick attended the meeting. According to those minutes, "[m]anagement introduced potential initial pipeline of targets," including Trump Media and several other companies. The minutes also stated that the "[c]onsensus of the board [was] to follow up/negotiate and execute LOIs [letters of intent] with TMG [Trump Media], Global Oculus/Bittrex, and Wag! so that we may conduct deeper due diligence."[8]

l.   On or about September 22, 2021, Orlando sent an update to the board of directors through WhatsApp regarding each of the potential acquisition targets. With respect to Trump Media, Orlando wrote: "[W]e had a great meeting and are have [sic] a follow up session very soon, we have gotten great traction on lowering the Enterprise Value of the target but are getting pushback on the flexibility to be unilaterally exclusive." Orlando asked the other directors whether they would agree to 30-day exclusivity with Trump Media. The directors responded that they were in favor of entering into an exclusivity period with Trump Media and Garelick wrote, "I am enthusiastically in favor to advance with TMG [Trump Media] under the stated terms."

m.   On or about September 27, 2021, according to press reports, Orlando went to Mar-a-Lago to meet with former President Trump and sign a letter of intent. As noted, the letter

---

[8] On or about September 20, 2021, DWAC and Global Oculus signed a non-binding letter of intent restricting Global Oculus's, but not DWAC's, ability to negotiate other business combination transactions. Two days later, as discussed herein, DWAC signed an exclusive letter of intent with Trump Media Group Corp.

SDNY_01_00819343

of intent, which is dated September 22, 2021, included an exclusivity clause providing that neither DWAC nor Trump Media would enter into discussions, negotiations, or transactions with any other company or investor for a period of thirty days.

n.   On or about September 27, 2021, DWAC issued a press release and filed a Form 8-K announcing that its units could be split and traded separately starting on September 30, 2021.  On or about September 30, 2021, DWAC units were split, and the shares of Class A common stock and warrants started trading separately on the Nasdaq under the symbols "DWAC" and "DWACW," respectively.

o.   On or about September 29, 2021, Orlando messaged the board of directors, including Garelick, on the encrypted messaging application WhatsApp and wrote, in pertinent part, "We have a few updates and due diligence is kicking into high gear. TMG [Trump Media] wants to close on October 14th."

p.   On or about October 19, 2021, from approximately 9:00 p.m. to 9:50 p.m., DWAC held a meeting of its board of directors over Zoom. Meeting minutes produced by DWAC show that Garelick attended the meeting. According to those minutes, at the meeting the directors discussed whether to go ahead with the definitive agreement with Trump Media, and all directors voted in favor of signing the agreement. The minutes also indicate that the following day at 4 p.m. was the "[s]cheduled time to sign the definitive agreement" with Trump Media. The minutes further note that resolutions would be sent to board members via WhatsApp "to confirm unanimous decision to proceed with the signing of the definitive agreement."

q.   On or about October 20, 2021, DWAC's share price closed at $9.96 with a total volume of 697,900.

SDNY_01_00819344

r.    According to the *New York Times*, on or about October 20, 2021, Orlando went to Mar-a-Lago where he met with former President Trump and they signed the deal.[9]

s.    On or about October 20, 2021, at approximately 8:16 p.m., Liz Harrington, a spokesperson for former President Trump, posted a press release to Twitter announcing the merger of DWAC and Trump Media. The press release stated that Trump Media and DWAC had entered into a "definitive merger agreement, providing for a business combination that w[ould] result in [Trump Media] becoming a publicly listed company[.]" The release stated that the transaction valued Trump Media at as much as $1.7 billion. The release included a quote from former President Trump, who was identified as Chairman of Trump Media. The following day, DWAC filed a Form 8K related to the merger, which attached the October 20, 2021 press release announcing the business combination between DWAC and Trump Media.

t.    Prior to the announcement of the business combination between DWAC and Trump Media, shares and units of DWAC were priced at approximately $10 per unit or share, and warrants were priced at approximately $0.50 per warrant. Following the public announcement, DWAC shares peaked at approximately $175 per share, warrants peaked at approximately $79 per warrant, and units peaked at approximately $142 per unit. As of December 27, 2021, DWAC shares are trading at approximately $52 per share, DWAC warrants are trading at approximately $15 per warrant, and DWAC units are trading at approximately $61 per unit.

6.    Based on my review of public sources and news articles, it does not appear that there was any public reporting about a merger between DWAC and Trump Media until the day the business combination was announced: October 20, 2021, in the evening.

---

[9] These facts have not yet been independently verified by the Government.

9

7.   Based on my review of brokerage records, telephone records, and records from DWAC obtained via subpoena or produced by the SEC, as well as from my review of public sources, there is probable cause to believe that Garelick traded in DWAC stock on the basis of material non-public information. Specifically, I have learned the following:

a.   As noted above, on or about July 8, 2021, Garelick became a director nominee of DWAC, and on or about September 2, 2021, he became an official director of DWAC. Prior to that period, it appears that DWAC was in discussions with Trump Media to enter into a business combination. Based on my review of telephone records for the Garelick Cellphone Number, I have learned that on or about September 1 and September 2, 2021, Orlando and Garelick had several telephone calls.  Accordingly, there is reason to believe that because of his board role, and conversations with Orlando, Garelick had non-public information about DWAC's potential merger with Trump Media on or before September 2, 2021. On or about September 3, 2021, the first day DWAC units were trading on the Nasdaq, using an account at Fidelity in his name, Garelick purchased a total of 610 units of DWAC at prices ranging from $10.01 to $10.02 per unit.[10] On September 10, 2021, Garelick purchased 300 units of DWAC at $10.02 per share.

b.   As discussed above, it appears that on or about September 14 and September 17, 2021, DWAC prepared and possibly sent draft letters of intent to Trump Media Group Corp. On or about September 17, 2021, using his Fidelity account, Garelick purchased a total of 410 units of DWAC at $10.05 per unit.  On or about September 20, 2021, using his Fidelity account, Garelick purchased 900 units of DWAC at prices ranging from $10.03 to $10.04 per unit.

---

[10] Because September 3, 2021, was the first day of trading, it is possible Garelick purchased DWAC units because he was excited about the business and not because he knew of material non-public information. Garelick, however, did not buy units from EF Hutton, the sole book running manager for the initial offering, but instead through his Fidelity account on the secondary market.

SDNY_01_00819346

c.   As discussed above, on September 21, 2021, at approximately 12:32 p.m., DWAC held a board meeting at which Garelick was present and discussed potential acquisition targets, including Trump Media. On or about September 21, 2021, shortly before the start of the board meeting, using his Fidelity account, Garelick purchased a total of 1,800 units of DWAC at approximately $10.05 per unit. As discussed above, on September 22, 2021, Orlando provided an update via WhatsApp to the board of directors about a deal with Trump Media progressing.  On or about September 23, 2021, using the same account, Garelick purchased a total of 1,300 units of DWAC at approximately $10.07 per unit.

d.   On or about October 21, 2021, after the merger with Trump Media was announced, Garelick sold all of his shares of DWAC in his Fidelity account for share prices ranging from $14.30 to $19.23.[11]  Garelick also sold all the DWAC warrants in his Fidelity account.  In total, Garelick made approximately $49,702 in profit on these sales.

e.   From my training and experience, I have learned that federal securities regulations require certain individuals, such as officers and directors, to report purchases, sales, and holdings of their company's securities to the SEC by filing Forms 3 and 4. Company insiders, such as officers and directors, must file a Form 3 to initially disclose their ownership of the company's securities within ten days of becoming an insider. When an insider executes a transaction, he or she must file a Form 4 within two days, which discloses the transaction to the public. From my review of SEC filings, I have learned that notwithstanding the fact that Garelick was a director of DWAC during part of the period when he was trading, he did not file a Form 3 or Form 4 for any of his purchases or sales of DWAC units or shares.

---

[11] After DWAC allowed its shareholders to split units into shares and warrants, Garelick requested that Fidelity divide all his units into shares and warrants of DWAC. Fidelity did so before Garelick sold his holdings in DWAC.

11

8.   Based on my review of brokerage records, telephone records, and records from DWAC obtained via subpoena or produced by the SEC, as well as from my review of public sources, there is probable cause to believe that Garelick told one or more other individuals non-public information about DWAC's planned business combination with Trump Media, and that those individuals traded on the basis of that information, and in some cases tipped other individuals who traded in the stock.  Each of the individuals identified below purchased units, shares, and/or warrants of DWAC while it was publicly known as a blank check company (in other words, it did not have a planned combination target), before there was any news about a merger with Trump Media, and then sold those units, shared, or warrants right after the merger announcement. Specifically, I have learned the following:

*Trades by Rocket One Capital (Michael Shvartsman)*

a.   Garelick, as noted above, is chief strategy officer of Rocket One Capital, which is a venture capital firm in Miami, Florida headed by Michael Shvartsman. Based on my review of telephone records, it appears that Garelick (using the Garelick Cellphone Number) and Michael Shvartsman communicate regularly by telephone and text message.

b.   On or about August 30, 2021, Michael Shvartsman and Garelick, using the Garelick Cellphone Number, exchanged at least four telephone calls. On the same day, Shvartsman opened a brokerage account in the name of Rocket One Capital, LLC. On or about September 1 and September 2, 2021, Shvartsman and Garelick, using the Garelick Cellphone Number, exchanged multiple telephone calls. On or about September 2, 2021, the Rocket One Capital account was funded and on September 3, 2021, the first day of trading for DWAC units, Rocket One Capital purchased 14,500 units of DWAC.

SDNY_01_00819348

c.   As noted above, by on or about September 27, 2021, if not earlier, DWAC and Trump Media had signed an exclusive letter of intent, and on or about September 29, 2021, Orlando messaged the board of directors, including Garelick, "due diligence is kicking into high gear" on the Trump Media merger. On or about October 1, October 4, and October 5, Michael Shvartsman and Garelick exchanged multiple telephone calls. On or about October 1, 2021, Rocket One Capital purchased approximately 227,915 DWAC warrants; on or about October 4, 2021, Rocket One Capital purchased approximately 1,641,731 DWAC warrants; and on or about October 5, 2021, Rocket One Capital purchased approximately 130,354 warrants.

d.   On or about October 21 and 22, 2021, Rocket One Capital sold off its shares in DWAC for approximately $18.4 million in realized profit. The Rocket One Capital account was not used for any other trading.

*Trades by Gerald Shvartsman*

e.   Based on my review of publicly available information, it appears that Gerald Shvartsman is the brother of Michael Shvartsman. From telephone records, it appears that Michael Shvartsman and Gerald Shvartsman speak nearly daily, and sometimes multiple times per day. Gerald Shvartsman appears to be the owner of Source Furniture in Miami, Florida, which appears to be a furniture supply store.

f.   On or about August 5, 2021, Gerald Shvartsman opened a brokerage account with Benchmark Investments which, as noted above, was the exclusive broker for DWAC's initial public offering. On or about August 11, 2021, Gerald Shvartsman wired funds into the account.

g.   On or about September 3, 2021, Michael Shvartsman and Gerald Shvartsman exchanged telephone calls at approximately 9:09 a.m., 9:20 a.m., 10:52 a.m., 11:03

13

SDNY_01_00819349

a.m., 11:13 a.m., and 5:05 p.m. On or about September 3, 2021, Gerald Shvartsman purchased 10,800 units of DWAC at approximately 1:22 p.m.

       h.   Between on or about October 7 and October 18, 2021, Gerald Shvartsman purchased 400,000 warrants of DWAC.

       i.   On or about October 21 and 22, 2021, Gerald Shvartsman sold all of his shares of DWAC for a profit of $5.1 million.

*Trades by Ray Corral*

       j.   Based on my review of public sources, I have learned that Ray Corral is associated with Michael Shvartsman, and it appears they are friends.  For example, I have reviewed an image available online of Michael Shvartsman and Ray Corral together at what appears to be a social event at The Deck at Island Gardens, a super yacht marina, in February 2016. From my review of telephone records, it appears that Michael Shvartsman and Corral communicate regularly by telephone. Additionally, it appears from telephone records that Corral knows Garelick, because they appear to have spoken by telephone on or about June 30, July 1, July 9, July 16, and October 21, 2021. It also appears that Corral knows Gerald Shvartsman because, according to telephone records, they communicated on July 2, 2021.

       k.   On or about August 4, 2021, Corral opened an account at Benchmark Investments, and on or about August 10, 2021, he wired funds into the account.

       l.   On or about September 3, 2021, at approximately 9:11 a.m., Michael Shvartsman called Corral and they spoke for several minutes.  On or about the same day, September 3, 2021, at approximately 1:22 p.m., Corral purchased 10,740 units of DWAC. Michael Shvartsman and Corral spoke several more times in September and early October 2021.

SDNY_01_00819350

m.  On or about October 21, 2021, Corral called Michael Shvartsman. Corral again called Michael Shvartsman on or about October 22, 2021. On or about October 21 and October 22, 2021, Corral sold all his holdings of DWAC for a profit of $268,342.

*Trades by APLC Investments LLC (Anton Postolnikov)*

n.  Based on my review of public sources and bank records, I have learned that Anton Postolnikov is a Russian citizen living in Miami, Florida, who appears to be the owner of APLC Investments LLC. Based on my review of telephone records, it appears that Postolnikov knows Orlando, Garelick, Michael Shvartsman, Gerald Shvartsman, and Raymond Corral, and communicated with Orlando and Gerald Shvartsman regularly between September and November 2021.

o.  On or about August 11, 2021, APLC Investments LLC opened an account at Benchmark Investments and wired funds into the account on or about August 12, 2021. The signatory on the APLC Investments account is Postolnikov.

p.  On or about September 3, 2021, Postolnikov purchased a total of 4,75,110 units of DWAC. On or about September 8, 2021, Postolnikov purchased 5,000 units of DWAC. On or about October 6, 2021, Postolnikov purchased 510 units of DWAC. On or about October 11, 2021, Postolnikov purchased 20,800 units of DWAC. On or about October 12, 2021, Postolnikov purchased 100,000 warrants of DWAC. On or about October 18, 2021, Postolnikov purchased 100,000 warrants of DWAC. On or about October 19, 2021, Postolnikov purchased 74,517 warrants of DWAC. On or about October 20, 2021, Postolnikov purchased 175,000 warrants of DWAC.

q.  During the period in which Postolnikov purchased units and warrants of DWAC, he communicated by telephone with Orlando and Gerald Shvartsman.

SDNY_01_00819351

r. From on or about October 21 through on or about October 28, 2021, Postolnikov liquidated substantially all of his DWAC holdings for a profit of approximately $22.8 million.

*Trades by Eric Hannelius*

s. Based on my review of public sources, I have learned that Michael Shvartsman is a partner in multiple businesses with Eric Hannelius. Based on my review of telephone records between Michael Shvartsman and Hannelius, it appears they speak at least once per week. Additionally, from my review of telephone records, it appears that Garelick (using the Garelick Cellphone Number) and Hannelius communicate from time to time by telephone and text message.

t. On or about September 12, 2021, Michael Shvartsman and Hannelius spoke by telephone. On or about September 13, 2021, Hannelius purchased 500 DWAC units.

u. On or about October 4, October 5, and October 6, Michael Shvartsman and Hannelius spoke by telephone. Between in or about October 6 and in or about October 7, 2021, Hannelius bought 11,300 DWAC warrants.

v. On or about October 21, 2021, Hannelius sold all his holdings in DWAC for a total net profit of $168,206.

*Trades by Adrian Lopez Torres and Javier Lopez Lopez*

w. Based on my review of publicly available sources and brokerage records, it appears that Adrian Lopez Torres ("Torres") was an employee at Source Furniture which, as noted above, is owned by Gerald Shvartsman.

x. On or about October 19, 2021, one day before the public announcement of the merger between DWAC and Trump Media, Torres placed an order to purchase DWAC

16

warrants, and on or about October 20, 2021, in the morning, Torres purchased 100,000 DWAC warrants.

y.   On or about October 19, 2021, Javier Lopez Lopez ("Lopez"), the father of Torres according to broker records, placed an order to purchase DWAC warrants, and on or about October 20, 2021, in the morning, Lopez purchased 40,000. Based on my review of brokerage records, it appears that Lopez is a technician at a dialysis clinic.

z.   On or about October 21, 2021, Torres sold the DWAC warrants for a profit of $404.411. On or about October 22, 2021, Lopez sold his DWAC warrants for a profit of $1.58 million.

9.   Based on the foregoing, there is probable cause to believe that Garelick knew of material non-public information about DWAC's planned merger with Trump Media, that he traded on the basis of that information, and that he provided that information to his friends and/or associates who then traded on the basis of that information and passed it to their associates, all in violation of the Subject Offenses.

Probable Cause to Believe the Subject Device Contains Evidence of the Subject Offenses

10. First, there is probable cause to believe that Garelick will arrive at John F. Kennedy International Airport ("JFK") on December 31, 2021, and will have the Subject Device on his person or in his luggage when he arrives.

a.   On or about December 22, 2021, I learned from a database available to law enforcement that Garelick had purchased a ticket on December 5, 2021, to travel from JFK Airport to Cancun, Mexico, on December 25, 2021. From my review of information in that database, I have learned that Garelick is scheduled to return to the United States on December 31, 2021, at approximately 7:39 p.m. on JetBlue flight 852.

SDNY_01_00819353

b. Based on my review of telephone records and databases available to law enforcement, it appears that Garelick has one cellphone, which is the Subject Device registered to the Garelick Cellphone Number.[12]

c. Based on my training and experience, I have learned that individuals often travel with their cellphones, particularly for trips of a duration of a day or more, and routinely keep a cellphone or cellphones on their person or in their luggage. Accordingly, there is probable cause to believe that Garelick will have the Subject Device with him – either on his person or in his luggage – when he returns to the United States on December 31, 2021. This application therefore seeks authorization for law enforcement to search the person of Bruce Garelick and any luggage within his possession, custody, or control at the time of the execution of this warrant for the Subject Device, and to seize the Subject Device."

11. Second, based on my review of records provided by DWAC and Fidelity to the SEC and by AT&T, as well as my training and experience and publicly available information, there is probable cause to believe that the Subject Device will contain evidence of the commission of the Subject Offenses. Specifically:

a. As described above, members of the board of directors of DWAC used WhatsApp to communicate regarding DWAC, potential merger targets, and board votes, and therefore the WhatsApp communications with directors are likely to contain evidence of the material non-public information about DWAC to which Garelick had access. For example, on or about September 29, 2021, Orlando texted the DWAC directors on WhatsApp that "due diligence is kicking into high gear" and that Trump Media "wants to close on October 14th." Such

---

[12] Based on my review of telephone records provided by AT&T and records provided by Apple, it appears that there are other cellphone numbers associated with Garelick, but that they belong to other members of his family.

SDNY_01_00819354

communications are evidence of the commission of the Subject Offenses because they will indicate what non-public information Garelick had when he traded and/or told other individuals to buy DWAC units, shares, or warrants.

b. Additionally, based on my training and experience, it is common for an individual to use a messaging application to communicate with more than one person. Accordingly, there is reason to believe that Garelick used WhatsApp to communicate with other individuals. For instance, there is probable cause to believe that Garelick's WhatsApp account contains communications with individuals in the board of directors chat, such as Orlando, and other individuals about DWAC. Based on my review of records provided by WhatsApp, I have learned that a WhatsApp account associated with the Garelick Cellphone Number is registered to an Apple iPhone 11 Pro Max, which is the make and model of the Subject Device. Based upon my training and experience, I know that WhatsApp messages can remain on electronic devices, such as cellular telephones, for an indefinite period of time. Therefore, there is probable cause to believe that the Subject Device contains WhatsApp communications that are evidence of the Subject Offenses.[13]

c. Based on my review of telephone records from AT&T, including those discussed above, it appears that Garelick used the Subject Device to communicate with Orlando, Michael Shvartsman, Gerald Shvartsman, Raymond Corral, Eric Hannelius, and Anton Postolnikov by telephone call or text message. Accordingly, there is reason to believe that the

---

[13] I know from my training and experience that individuals who use an encrypted messaging application, like WhatsApp, will also sometimes use other encrypted messaging applications, like Signal or Telegram, and therefore there is probable cause to believe that if the Subject Device contains other encrypted applications, those applications will contain evidence of the Subject Offenses.

SDNY_01_00819355

Subject Device will contain text messages or call logs that are evidence of the insider trading activity discussed above.

      d.  Based on my review of records from Fidelity, I have learned that the Garelick Cellphone Number is registered to Garelick's Fidelity account.[14] Additionally, based on my training, experience, and review of information provided by Fidelity, I know that Fidelity brokerage accounts can be viewed on a cellphone using a web browser or Fidelity's application. Based on my training and experience, it is common for individuals to use brokerage applications because they are often more convenient than logging into a computer to monitor stocks or execute a transaction. Here, from my review of records provided by Fidelity as well as public sources, I have learned that Garelick's Fidelity account was accessed from an IP address associated with an AT&T Wireless account, which suggests that Garelick accessed the Fidelity account from the Subject Device because the service provider on that device is AT&T.[15] Therefore, there is probable cause to believe that Garelick used the Subject Device to access his Fidelity account, and that the Subject Device is likely to contain records of Garelick's trading activity.

      e.  Based on my review of records provided by DWAC to the SEC, I have learned, as discussed above, that board meetings for DWAC were conducted on Zoom. Based on my training and experience, Zoom offers a cellphone-based application for conducting video conference calls, and that application typically contains records of prior calling activity. Accordingly, there is reason to believe that the Subject Device may contain records of the DWAC

---

[14] The Fidelity account was also registered with the phone number ███2834, which appears to be Garelick's landline number.

[15] The IP addresses associated with AT&T Wireless indicate that either a cellphone using AT&T accessed the account, or that Garelick used his AT&T cellphone to create a mobile hotspot and that a device on that hotspot accessed the account. The Fidelity account was also accessed using an IP address associated with Cox Communications, which is a provider of landline services.

SDNY_01_00819356

board's conference calls, which are relevant to the material non-public information that Garelick knew at certain points in time.

12.  In addition, based on my training and experience investigating other insider trading schemes, cellphones typically contain the following types of evidence relating to the commission of the Subject Offenses:

a.  Cellphones typically contain identifying information about a user of a cellphone, such as registration pages or device information, which can be used to verify the owner and user of a device. Cellphones also typically contain evidence of other accounts and devices belonging to the cellphone user, as well as passwords to access those accounts or devices.

b.  Cellphones typically contain evidence establishing the existence of a relationship between two or more persons that are members of a conspiracy, or who may have tipped each other regarding non-public information about a stock. Such information can include call logs, contact cards, images or videos of the individuals together, voicemails or voice memos, and emails and text messages between or among the individuals. Such information is relevant to establishing the existence of a relationship between members of a conspiracy, their knowledge of each other's activities, and the fact that their relationship was one where they would engage in criminal activity together.

c.  Cellphones often contain documents relevant to the execution of a fraud scheme. Such documents often come in the form of transaction documents, such as brokerage statements, meeting minutes, and deal documents. Documents may also come in the form of emails, such as emails about a transaction or email confirmations about the execution of a trade.

d.  Cellphones typically contain evidence of location, including cellphone location data, IP records, calendar entries, and photographs of locations. Such location information

21

may establish that, for instance, two members of a conspiracy were together at, around, or shortly before the time one member of a conspiracy traded in DWAC stock. Similarly, such location information may establish that Garelick or another individual was at a meeting when material non-public information was communicated.

e.   Cellphones typically contain access logs, web histories, and search histories. In insider trading investigations, it is common that such internet histories will contain evidence of the commission of the Subject Offenses. For instance, I am aware of circumstances where a subject of an investigation has searched information about a relevant stock, searched information on the insider trading laws and penalties, and/or searched notable insider trading prosecutions.

f.   Cellphones typically contain records that are months if not years old. Electronic files can be stored on a cellphone for years at little or no cost and users thus have little incentive to delete data that may be useful to consult in the future. It is common for cellphone users to back up their data to the cloud or transfer data when they purchase a new device. Thus, it is common for a cellphone to contain records older than the device itself. In particular, individuals engaged in criminal activity often store such records, sometimes for years, as records of past relationships with co-conspirators, to keep track of co-conspirators' contact information, to keep a record of transactions in furtherance of the criminal activity, or to keep notes to follow up on other aspects of the scheme.

13. Based on the foregoing, there is probable cause to believe that the Subject Device contains evidence of the Subject Offenses.  In particular, I believe the Subject Device is likely to contain the following information:

SDNY_01_00819358

a.  Evidence sufficient to establish the user of the Subject Device at times relevant to the Subject Offenses consisting of registration information, access logs, device information, user photographs, contact information, payment information, and other personally identifiable information.

b.  Evidence of knowledge of the prohibition against insider trading in securities.

c.  Evidence relating to DWAC including, but not limited to, its business combination with Trump Media, Trump Media Group Corp., or other potential combination targets (or the lack thereof).

d.  Evidence relating to Garelick's knowledge of the fact that information about DWAC and/or Trump Media was confidential and/or non-public.

e.  Evidence relating to the conveyance of material non-public information ("MNPI") regarding DWAC, Trump Media, Trump Media Group Corp., or other potential combination targets (or the lack thereof).

f.  Evidence relating to Trump Media, including news about Trump Media.

g.  Evidence of Garelick's ownership and control over brokerage accounts, and history of trading securities.

h.  Evidence relating to trading in units, warrants, or shares of DWAC.

i.  Communications with Patrick Orlando, members of the board of directors of DWAC, Michael Shvartsman, Gerald Shvartsman, Ray Corral, Anton Postolnikov, Eric Hannelius, Adrian Lopez Torres, Javier Lopez Lopez, or any other individual who traded in DWAC units, stock, or warrants.

23

SDNY_01_00819359

j.   Evidence of the existence of relationships between Garelick, Patrick Orlando, members of the board of directors of DWAC, Michael Shvartsman, Gerald Shvartsman, Ray Corral, Anton Postolnikov, Eric Hannelius, Adrian Lopez Torres, Javier Lopez Lopez, or any other individual who traded in DWAC units, stock, or warrants.

k.   Evidence reflecting the state of mind of (i) individuals involved in trading in the units, warrants, or shares of DWAC; and (ii) individuals possessing, or having access to, MNPI regarding the business combination between DWAC and Trump Media.

l.   Evidence of the receipt, transfer, disposition or location of funds raised through the commission of the Subject Offenses.

m.   Evidence of efforts to conceal the commission of the Subject Offenses and evade detection by law enforcement and/or regulatory agencies.

n.   Evidence of the geographic location of the user of the Subject Device, as well as other electronic devices used, including records of or information about Internet Protocol addresses used in connection with the Subject Device.

o.   Evidence of passwords or other information needed to access the Subject Device.

p.   Evidence relating to other accounts, devices, or physical premises in which evidence of the commission of the Subject Offenses may be found.

14. As set forth in the Attachments, the materials to be searched for evidence of the Subject Offenses, to the extent they are dated, will be limited to those sent, received, created, edited, or deleted on or after January 1, 2021 because, according to publicly available information, former President Trump began considering launching a media company that would merge with a special purpose acquisition vehicle around that time.

24

SDNY_01_00819360

15. In addition to there being probable cause to believe that the Subject Device contains evidence of the Subject Offenses, there is also probable cause to believe that the Subject Device constitutes instrumentalities of the Subject Offenses, because it was used to communicate with co-conspirators in furtherance of the Subject Offenses, acquire information necessary to the commission of the Subject Offenses, and/or execute trades in furtherance of the Subject Offenses.

## PROCEDURES FOR SEARCHING ESI

### Unlocking Devices with Biometric Features

16. I request authority to allow law enforcement agents to obtain from Bruce Garelick the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock the Subject Device, if it requires such biometric access and if law enforcement has reasonable suspicion that the physical biometric characteristics of Garelick will unlock the Subject Device. This authority is not to compel Garelick to provide a numeric passcode. The grounds for this request are as follows:

a. I know from my training and experience, as well as from information found in publicly available materials published by Apple, that iPhones offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

25

c.   If a device is equipped with a facial-recognition feature, a user may enable its ability to unlock the device through his or her face.  For example, this feature is available on certain Apple devices and is called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face.  The device's front-facing camera then analyzes and records data based on the user's facial characteristics.  The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.

d.   In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than entering a numeric or alphanumeric passcode or password.  Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.  This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.   The password that would unlock the Subject Device currently is not known to law enforcement.  Thus, law enforcement personnel may not otherwise be able to access the data contained within the Subject Device, making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.   I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled.  This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days.  Thus,

26

in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

17. Due to the foregoing, I respectfully request that the Court authorize that, if the Subject Device may be unlocked using one of the aforementioned biometric features, law enforcement personnel may obtain from Garelick the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock the Subject Device, including to (1) press or swipe the fingers (including thumbs) of Garelick to the fingerprint scanner of the Subject Device; and/or (2) hold the Subject Device in front of the face of Garelick to activate the facial recognition feature, for the purpose of attempting to unlock the Subject Device in order to search the contents as authorized by the proposed warrants.

<u>Execution of Warrant for ESI</u>

18. Federal Rule of Criminal Procedure 41(e)(2)(B) provides that a warrant to search for and seize property "may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information . . . for later review."  Consistent with Rule 41, this application requests authorization to seize the Subject Device and transport it to an appropriate law enforcement facility for review. This is typically necessary for a number of reasons:

a.  First, the volume of data on a cellphone is sometimes impractical for law enforcement personnel to review in its entirety at the search location.

b.  Second, because cellphones are vulnerable to inadvertent or intentional modification or destruction, they are ideally examined in a controlled environment, such as a law enforcement laboratory, where trained personnel, using specialized software, can make a forensic copy of the storage media that can be subsequently reviewed in a manner that does not change the underlying data.

27

SDNY_01_00819363

c.   Third, many factors can complicate and prolong recovery of data from a cellphone, including the increasingly common use of passwords, encryption, or other features or configurations designed to protect or conceal data on the cellphone, which often take considerable time and resources for forensic personnel to detect and resolve.

Review of ESI

19. Following seizure of the Subject Device and/or the creation of a forensic image copy, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained therein for information responsive to the warrant.

20. In conducting this review, law enforcement personnel may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses.  Such techniques may include, for example:

a.   surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

b.   conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

c.   "scanning" storage areas to discover and possibly recover recently deleted data or deliberately hidden files;

d.   performing electronic keyword searches through all electronic storage areas to determine the existence and location of data potentially related to the subject matter of the investigation; and

28

e.   reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

21. Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant.  Depending on the circumstances, however, law enforcement personnel may need to conduct a complete review of all the ESI from the Subject Device to evaluate its contents and to locate all data responsive to the warrant.

<u>Return of the Subject Device and ESI</u>

22. If the Government determines that the Subject Device is no longer necessary to retrieve and preserve the data, and the Subject Device is not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return the items, upon request.  Cellphone data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

**<u>AUTHORIZATION TO SEARCH AT ANY TIME OF DAY OR NIGHT</u>**

23. Because the exact time when Garelick will arrive in the Eastern District of New York is unknown, it may be necessary for law enforcement personnel to execute the requested Search Warrant after daytime hours (between 6:00 a.m. and 10:00 p.m.). Therefore, I respectfully submit good cause exists, pursuant to Fed. R. Crim. P. 41(e)(2)(A)(ii), for authorization to execute the requested search warrant at any time of the day or night.

SDNY_01_00819365

## REQUEST FOR SEALING AND DELAYED NOTICE

24. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the Affidavit and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation and because the targets of the investigation remain at large. Premature disclosure of the contents of this Affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness by encouraging subjects' flight from prosecution, the destruction of evidence, and the tampering with or intimidation of potential witnesses.

25. In addition, I request that the Court authorize law enforcement to delay notice of the Search Warrant to Garelick for a period of one year from the date of the execution of the Search Warrant. As described above, Garelick and the other subjects of this covert investigation appear to be involved in a multimillion-dollar insider trading scheme relating to a transaction that has been covered heavily by the press. The Government intends to execute the search covertly in a manner that will not alert Garelick that the Subject Device is being searched. Thus, disclosure of the requested search warrant would have a significant and negative impact on the continuing investigation and would severely jeopardize its effectiveness by encouraging the subjects' flight from prosecution, engendering the destruction of evidence and the tampering with or intimidation of potential witnesses.  Moreover, the investigation into the insider trading scheme is continuing and is likely to continue for at least a year because it involves a large number of subjects. Accordingly, I submit that Title 18, United States Code, Sections 3103a(b)-(c) permits the Court to order that notice of the execution of the requested Search Warrant be delayed for one-year from

SDNY_01_00819366

the date that the Search Warrant is executed, subject to the government's opportunity to seek an additional delayed notice period upon a showing of good cause. *See* 18 U.S.C. §§ 3103a(b)-(c).

## CONCLUSION

26. I submit that this Affidavit supports probable cause for a warrant to search the SUBJECT DEVICE described in Attachment A and seize the items described in Attachment B. WHEREFORE, I respectfully request, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, that a warrant be issued for the SUBJECT DEVICE described herein and in ATTACHMENT A, authorizing the search and seizure of the items listed in ATTACHMENT B.

Respectfully submitted,

Marc Troiano
Special Agent
Federal Bureau of Investigation

Sworn to before me by telephone
on December 29, 2021

*Marcia M. Henry*

THE HONORABLE MARCIA M. HENRY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

31

## ATTACHMENT A
*Person or property to be searched*

The "Subject Device" is an Apple iPhone 11 Pro Max with IMEI number ███████1839 that is expected to be brought into the Eastern District of New York on or about December 31, 2021, by Bruce Garelick when he arrives at John F. Kennedy International Airport.

During the execution of the warrant, law enforcement personnel are authorized to search the person of Bruce Garelick and any luggage within his possession, custody, or control in order to seize the Subject Device.

During the execution of the warrant, law enforcement personnel are authorized to obtain from Bruce Garelick the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock the Subject Device, including to (1) press or swipe the fingers (including thumbs) of Garelick to the fingerprint scanner of the Subject Device; and/or (2) hold the Subject Device in front of the face of Garelick to activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

**ATTACHMENT B**
*Property to be seized*

Following seizure of the Subject Device and/or the creation of a forensic image copy, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant. The items to be seized from the Subject Device consist of the following evidence, fruits, and instrumentalities of violations 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5 (insider trading securities fraud); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1348 (insider trading securities fraud); and aiding and abetting and conspiring to commit these offenses in violation of 18 U.S.C. §§ 2 (aiding and abetting), 371 (conspiracy), and 1349 (conspiracy) (together, the "Subject Offenses") described as follows:

a. Evidence sufficient to establish the user of the Subject Device at times relevant to the Subject Offenses consisting of registration information, access logs, device information, user photographs, contact information, payment information, and other personally identifiable information.

b. Evidence of knowledge of the prohibition against insider trading in securities.

c. Evidence relating to Digital World Acquisition Corporation ("DWAC") including, but not limited to its business combination with Trump Media & Technology Group ("Trump Media"), Trump Media Group Corp., or other potential combination targets (or the lack thereof).

d. Evidence relating to Bruce Garelick's knowledge of the fact that information about DWAC and/or Trump Media was confidential and/or non-public.

e. Evidence relating to the conveyance of material non-public information ("MNPI") regarding DWAC, Trump Media, Trump Media Group Corp., or other potential combination targets (or the lack thereof).

f. Evidence relating to Trump Media, including news about Trump Media.

g. Evidence of Bruce Garelick's ownership and control over brokerage accounts, and history of trading securities.

h. Evidence relating to trading in units, warrants, or shares of DWAC.

i. Communications with Patrick Orlando, members of the board of directors of DWAC, Michael Shvartsman, Gerald Shvartsman, Ray Corral, Anton Postolnikov, Eric Hannelius, Adrian Lopez Torres, Javier Lopez Lopez, or any other individual who traded in DWAC units, stock, or warrants.

1

j.  Evidence of the existence of relationships between Bruce Garelick, Patrick Orlando, members of the board of directors of DWAC, Michael Shvartsman, Gerald Shvartsman, Ray Corral, Anton Postolnikov, Eric Hannelius, Adrian Lopez Torres, Javier Lopez Lopez, or any other individual who traded in DWAC units, stock, or warrants.

k.  Evidence reflecting the state of mind of (i) individuals involved in trading in the units, warrants, or shares of DWAC; and (ii) individuals possessing, or having access to, MNPI regarding the business combination between DWAC and Trump Media.

l.  Evidence of the receipt, transfer, disposition or location of funds raised through the commission of the Subject Offenses.

m.  Evidence of efforts to conceal the commission of the Subject Offenses and evade detection by law enforcement and/or regulatory agencies.

n.  Evidence of the geographic location of the user of the Subject Device, as well as other electronic devices used, including records of or information about Internet Protocol addresses used in connection with the Subject Device.

o.  Evidence of passwords or other information needed to access the Subject Device.

p.  Evidence relating to other accounts, devices, or physical premises in which evidence of the commission of the Subject Offenses may be found.

The items to be seized, to the extent they are dated, will be limited to those sent, received, created, edited, or deleted on or after January 1, 2021.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

SDNY_01_00819370

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in this Attachment.  However, law enforcement personnel are authorized to conduct a complete review of all the ESI from the Subject Device if necessary to evaluate its contents and to locate all data responsive to the warrant.

SDNY_01_00819371

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

IN RE:  SEARCH WARRANT

SW No.: 22-SW-196 PAS

Filed Under Seal

## **MOTION TO SEAL**

The United States of America, by and through its attorneys, Zachary A. Cunha,

United States Attorney, and Christine D. Lowell, Assistant United States Attorney,

moves that this Motion to Seal and the attached Application for Search Warrant, Search

Warrant, and Supporting Affidavit, be sealed until further Order of this Court.

Respectfully submitted,

UNITED STATES OF AMERICA
By its Attorneys,

ZACHARY A. CUNHA
United States Attorney

Christine D. Lowell
Assistant U.S. Attorney
U.S. Attorney's Office
One Financial Plaza, 17th Floor
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001

SO ORDERED:

_____
PATRICIA A. SULLIVAN
U.S. MAGISTRATE COURT JUDGE
DATE: _____ June 14, 2022 _____

SDNY_01_00819372