# Exhibit 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 22 MAG 4631

In the Matter of A Warrant for All
Content and Other Information
Associated with the Email Account
bruce@rocketonecapital.com,
Maintained at Premises Controlled by
Google, LLC, USAO Reference No.
2021R01007

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

### Agent Affidavit in Support of Application for Search Warrants
### for Stored Electronic Communications

STATE OF NEW YORK       )
                                            ) ss.
COUNTY OF NEW YORK  )

MARC TROIANO, Special Agent, Federal Bureau of Investigation ("FBI"), being duly

sworn, deposes and states:

## I. Introduction

### A. Affiant

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI").  As such, I am

a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure

41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly

authorized by the Attorney General to request a search warrant.  I have been a Special Agent with

the FBI for approximately six years.  I am assigned to a squad in the FBI's New York Field Office

that investigates securities fraud and other white-collar offenses.  During my tenure with the FBI,

I have participated in the investigations of numerous frauds, including securities fraud and insider

trading, and have conducted physical and electronic surveillance and the execution of search

warrants, including email search warrants.  Through my training, education, and experience, I have

become familiar with the manner in which insider trading is committed.

**B.  The Providers, the Subject Accounts and the Subject Offenses**

2.  I make this affidavit in support of an application for a search warrant pursuant to 18 U.S.C. § 2703 for all content and other information associated with the email account bruce@rocketonecapital.com (the "Subject Account") maintained by Google LLC ("Google"), headquartered in California.  The information to be searched is described in the following paragraphs and in Attachments A and B to the proposed warrant.

3.  There is probable cause to believe that the Subject Account contains evidence, fruits, and instrumentalities of securities fraud and wire fraud relating to insider trading, conspiring to commit those offenses, aiding and abetting the commission of those offenses, making false statements to the Securities and Exchange Commission ("SEC"), making false and misleading statements in an SEC registration statement, and conspiring to defraud the SEC, in violation of Title 18, United States Code, Sections 2, 371, 1001, 1343, 1348, 1349 and Title 15, United States Code, Sections 77x, 78j(b), and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5 (collectively, the "Subject Offenses").  This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI").  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**C.  Services and Records of the Providers**

4.  I have learned the following about Google:

2

a.   Google is a United States company that offers email services to the public.   In particular, Google allows subscribers to maintain email accounts under the free email domain name gmail.com. Additionally, Google allows individuals and entities to maintain email accounts under enterprise or G Suite domain names. If a subscribing individual or enterprise customer controls a domain name, such as the domain name "xyzbusiness.com," Google enables the individual or enterprise subscriber to host any email address under this domain name (*e.g.*, "john@xyzbusiness.com"), on servers operated by Google. A subscriber using Google's services can access his or her email account from any computer connected to the Internet.

b.   Google maintains the following records and information with respect to every subscriber account:

i.   *Email contents*.   Google allows subscribers to maintain email accounts under the domain name "gmail.com."   Like other online email providers, any email (which can include attachments such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form in the account, is maintained on Google's servers unless and until the subscriber deletes the email.  If the subscriber does not delete the email, it can remain on Google's computers indefinitely.  Even if the subscriber deletes the email, it may continue to be available on Google's servers for a certain period of time.

ii.   *Contacts*.  Google also allows subscribers to maintain the equivalent of an address book, called "Contacts," comprising email addresses and other contact information of other email users.

iii.   *Subscriber and billing information.*   Google collects and maintains (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, and alternate email addresses.   Google also maintains

3

SDNY_01_00819181

records concerning the date on which the account was created, the Internet protocol ("IP") address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of services utilized by the subscriber. Additionally, for paying subscribers, Google maintains records of the subscriber's means and source of payment, including any credit card or bank account number.

      iv.   *Transactional information.* Google also typically retains certain transactional information about the use of each account on its system. This information can include records of login (*i.e.*, session) times and durations and the methods used to connect to the account (such as logging into the account through Google's website).

      v.   *Web & App Activity, Search, Chrome, and Browsing History.* Google maintains a history of a subscriber's websites visited, devices used, applications (or "apps") used, Google search query history, Chrome usage, and browsing records. For some accounts, Google maintains "My Activity" records for a subscriber, which include records of web searches, image searches, video searches, news browsing, map activity, and analytics on the account.

      vi.   *Google Drive Content.* Google also provides account holders access to "Google Drive" which enables users to back up documents, images, chat history, emails, and other files. A user can access content stored on Google Drive by logging into his or her Google account through any computer or other electronic device that is connected to the Internet. Users can also share files stored on Google Drive with others, allowing them to view, comment, and/or edit the files.

      vii.   *Google Docs.* Google provides users with the ability to write, edit, and collaborate on various documents with other Google users through a service called "Google Docs."

SDNY_01_00819182

Users can use Google Docs to create online documents that can be stored on or saved to the user's Google Drive.

   viii. *Google Photos*.  Google provides users with a certain amount of free storage for photographs, through a service called Google Photos, which allows users to manually store photographs and videos, and which automatically uploads photographs and videos taken by registered mobile devices.  Google also retains the metadata—or data that provides information about the data in question, such as the time and date of creation, the author or creator, the means of its creation, the purpose of the data, among other data—for photos and videos that are uploaded to Google, including to Google Photos.  This metadata includes what is known as exchangeable image file format (or "exif") data, and can include GPS location information for where a photo or video was taken.

   ix. *Google Calendar*.  Google provides users with an online calendar, in which they can add appointments, events, and reminders, which are synchronized across registered computers and mobile devices.  Users can share their calendars with other users, allowing the maintenance of joint calendars.

   x. *Google Chats and Google Hangouts content*.  Google allows subscribers to engage in "chat" sessions in an instant messaging format with other Google users, the transcripts of which are generally stored in a user's e-mail content.  Similarly, Google allows users to engage in enhanced chat sessions, called Hangouts, which permit the sharing of additional content such as videos, sounds, and images.  In general, Hangouts content is stored separately from a user's e-mail and chat content.

   xi. *Google Voice*. Google Voice is a telecommunications service provided by Google over the Internet, and can be configured to be used to make phone calls between computers,

5

SDNY_01_00819183

using voice over IP ("VoIP") connections, or can be configured to be used from existing cellular telephone devices. Google Voice users register Google Voice accounts to an existing Google email account. Users have the ability to configure their Google Voice account to accept calls to an existing landline or cell phone number, or to purchase new telephone numbers, as long as they are available, for a fee from Google. Users can use Google Voice to send or receive SMS messages, commonly referred to as "text messages." A Google Voice user can send a text message from a computer to any cellular telephone, and any text messages which are received by the Google Voice account are available in the user's email inbox, in the account linked to the Google Voice account. Google offers a voicemail service for Google Voice customers. When an incoming call to a Google Voice number is unanswered, the caller may leave a voice message. A copy of the recording, as well as a transcription of the recording are forwarded to the Google Voice user's email account that is linked to the Google Voice account.

    xii. *Location History data*.  Google maintains recent location data, collected periodically, from mobile devices that are logged into or have used applications (or "apps") or services provided by Google.  For example, Google collects information collected from GPS, Wi-Fi networks, cell site locations, and mobile networks to estimate a user's location.  Google apps and services also allow for location reporting, which allows Google to periodically store and use a device's most recent location data in connection with a Google account.

    xiii. *Google Payments*.  Google allows for the storage of payment information associated with a Google account, including credit cards and bank accounts, and contains information about all transactions made with a Google account, allowing for the payment for goods (such as those purchased through Google Shopping) and bills, among other features.

SDNY_01_00819184

xiv. *Device Information.* Google collects and maintains information identifying devices (including both computers and mobile devices) used to access accounts, including, for example, device serial number, a GUID or Global Unique Identifier, a phone number, MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI").

xv. *Linked Accounts.* Google maintains records of whether the user of an account has other accounts that share the same recovery SMS number or secondary email address. Google also uses features to track the activity of users of their accounts, including whether or not the user of an account accesses other accounts at Google using the same computer, or accesses accounts maintained by other companies while logged into an account. One of the ways it does that is by using cookies, a string of characters stored on the user's computer or web browser that is recognized by Google when a computer visits Google's site or logs into an account.

xvi. *Android Device Backups.* Android device users can use Google Drive to backup certain data from their devices. By default, Google regularly backs up the following data from Pixel phones (which are phones made by Google that use the Android operating system) to its online servers:  smartphone application data, call history, device settings, contacts, calendar, SMS, photos, and video. For users that subscribe to Google's cloud storage service, Google One, they can opt to back up all the data from their device to Google Drive.

7

**D. Jurisdiction and Authority to Issue Warrant**

5.   Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Providers, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

6.   A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

7.   When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3).  Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation.  18 U.S.C. § 2705(b).

## II.  Probable Cause

### A. Probable Cause Regarding the Commission of the Subject Offenses

8.   I respectfully submit that probable cause exists to believe that BRUCE GARELICK, among other individuals identified below,[1] has committed the Subject Offenses and that his email account will contain evidence of the commission of the Subject Offenses.

---

[1] The term "Target Subjects" refers to Patrick Orlando, Bruce Garelick, Michael Shvartsman, Gerald Shvartsman, Raymond Corral, Anton Postolnikov, Adrian Lopez Torres, Javier Lopez Lopez, Eric Hannelius, and Allen Beyer.

SDNY_01_00819186

<u>Background</u>

9.    The FBI and the United States Attorney's Office for the Southern District of New York are investigating an insider trading scheme in securities of Digital World Acquisition Corporation ("DWAC"), a special purpose acquisition company ("SPAC")[2], the shares of which were publicly traded on the Nasdaq stock market beginning on or about September 3, 2021. On or about October 20, 2021, DWAC and Trump Media & Technology Group ("Trump Media"), a media and technology company founded in February 2021 by former United States President Donald J. Trump, announced that they had entered into a definitive merger agreement that would combine the two entities, allowing Trump Media to become a publicly-traded company. The investigation relates to the truthfulness of disclosures in public filings by DWAC, as well as trading in DWAC stock in September and October 2021 based on material non-public information about its planned merger with Trump Media.  As set forth below, there is probable cause to believe that PATRICK ORLANDO, the chief executive officer of DWAC, made false statements in filings with the SEC by falsely stating that DWAC had not selected a specific merger target, nor had any substantive discussions with such a target, even though DWAC was in negotiations with Trump Media and other entities at the time. Additionally, there is probable cause to believe that BRUCE GARELICK, a DWAC director, and other individuals who appear to be affiliated with or known to GARELICK, purchased DWAC stock after learning non-public information about its planned merger with Trump Media, and sold the stock shortly after the merger was announced.

---

[2] A special purpose acquisition company, also known as a "blank check company," is a publicly traded company created for the purpose of acquiring or merging with an existing private company, thus making it public without going through the traditional initial public offering process.

SDNY_01_00819187

10. Based on my review of publicly available information, including but not limited to my review of filings made with the SEC, as well as documents produced by DWAC and by certain individuals to the SEC, I have learned, among other things, the following about the business combination between DWAC and Trump Media:

a.   On or about December 11, 2020, DWAC was formed in Delaware, and on or about February 8, 2021, Trump Media was formed in Delaware.

b.   According to the *New York Times*, based on a confidential investor deck apparently reviewed by the publication, in or around March 2021, if not earlier, ORLANDO, who had previously launched SPACs, began discussions with former President Trump about taking Trump Media public through a SPAC.  Additionally, according to the *New York Times*, in April 2021 there was a video conference call among representatives of Trump Media, ORLANDO, and another individual who later became a board member of DWAC.[3]  Based on my review of materials produced by DWAC to the SEC, it appears that ORLANDO was communicating with representatives of Trump Media, via email, text message, and in person, at least as early as February 2021 and in April 2021, and that Veloso, another DWAC director, was in attendance for more than one of those meetings.

c.   On or about May 26, 2021, DWAC filed a Form S-1 registration statement with the SEC. The Form S-1 stated that DWAC was "a newly organized blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses." The Form S-1 also

---

[3] These facts have not yet been independently verified by the Government. According to the article, a representative of Trump Media confirmed the call to the *New York Times* but said it was "strictly discussions between Trump Media and Benessere Capital Acquisitions," another SPAC that Orlando had previously run.

SDNY_01_00819188

stated that DWAC had "not selected any specific business combination target and [had] not, nor [had] anyone on [its] behalf, initiated any substantive discussions, directly or indirectly, with any business combination target." Under SEC rules, a SPAC may not identify a specific target company prior to the closing of its initial public offering. ORLANDO, who was identified as the CEO and Chairman of DWAC, signed the registration statement. Although the Form S-1 identified director nominees, GARELICK was not identified.

      d.   On or about July 8, 2021, DWAC filed an amended Form S-1 registration statement with the SEC, identifying GARELICK as a director nominee. According to the Form S-1, GARELICK is a "venture capitalist/entrepreneur/c-level executive and disruptive technology investing enthusiast" who currently serves as the chief strategy office of Rocket One Capital. As with the May 26 filing, the amended Form S-1 filing stated that DWAC had "not selected any specific business combination target" and had not "engaged in any substantive discussions, directly or indirectly, with any business combination target." DWAC filed additional amended Form S-1 registration statements on July 26, 2021, August 10, 2021[4], August 20, 2021, August 30, 2021, and August 31, 2021, which contained the same statement that DWAC had not selected a specific business combination target or engaged in substantive discussions with any target. The amended registration statements were signed by ORLANDO.

---

[4] DWAC's July 10 amended S-1 added that DWAC had "not contacted any of the prospective target businesses that Benessere Capital Acquisition Corporation or Maquia Capital Acquisition Corporation [prior SPACs with which ORLANDO had been involved] had considered and rejected."

SDNY_01_00819189

e.   According to reporting in the *New York Times*, "[b]y the summer [of 2021], people affiliated with Trump Media were signaling in conversations with Wall Street financiers that they were nearing a deal to merge with a SPAC."[5]

f.   On or about September 2, 2021, DWAC filed a Form 8-A registering securities with the SEC. On the same day, DWAC announced in a press release that it priced its initial public offering of $250 million, consisting of 25,000,000 units,[6] at $10.00 per unit, and that the units would be listed on the Nasdaq stock exchange the following day. The announcement stated that EF Hutton, a division of Benchmark Investments, LLC, was acting as sole book running manager for the offering, which means that if an individual wanted to purchase shares from the initial public offering at the offering's price—in other words, not on the public, secondary market—the shares had to be purchased through EF Hutton.

g.   On or about September 2, 2021, GARELICK officially became a director of DWAC. As a director, GARELICK was subject to DWAC's Code of Ethics, which required, among other things, that he maintain the confidentiality of information entrusted to him by DWAC. The Code of Ethics also provided that "[e]mployees, officers and directors must not trade in securities of a company while in possession of material non-public information regarding that company," and that it is "illegal to 'tip' or pass on inside information to any other person who might make an investment decision based on that information or pass the information to third parties." The Code of Ethics stated that DWAC "has an Insider Trading Policy, which sets forth

---

[5] These facts have not yet been independently verified by the Government, and it is not clear whether DWAC was the special purpose acquisition vehicle referenced by people affiliated with Trump Media. In particular, it is possible that these discussions related to Benessere Corporation, which, as noted, is another SPAC associated with Orlando.

[6] A "unit" consists of one share of the company's Class A common stock and one half of one redeemable warrant. Each warrant entitled the holder thereof to purchase one share of Class A common stock at a price of $11.50 per share.

SDNY_01_00819190

obligations in respect of trading in the Company's securities." Based on my conversations with SEC attorneys, I understand that DWAC has represented through counsel that a separate "Insider Trading Policy" does not yet exist.

h.   On or about September 3, 2021, DWAC started trading publicly on the Nasdaq stock exchange.

i.   On or about September 13, 2021, DWAC signed a confidentiality agreement (the "Confidentiality Agreement") with Trump Media Group Corp., noting that the parties were engaging in discussions about a possible business combination transaction and agreeing not to disclose any information regarding a possible transaction between the parties. In the Confidentiality Agreement, Trump Media Group Corp. "acknowledge[d] and agree[d] that some of the Confidential Information of DWAC and Transaction Information may be considered 'material non-public information' for purposes of the federal securities laws."

j.   On or about September 14, 2021, and September 17, 2021, DWAC prepared a draft letter of intent with Trump Media Group Corp.[7]  The letter of intent contains a provision regarding exclusivity, stating in sum and substance that neither party would enter into discussions, negotiations, or transactions with any other company or investor for a period of thirty days. It also stated that Trump Media Group Corp. "acknowledge[d] and agree[d] that some of the confidential information of [DWAC] (including [the letter of intent]) may be considered 'material non-public information' for purposes of the federal securities laws."

k.   On or about September 21, 2021, starting at approximately 12:32 p.m., DWAC held a meeting of its board of directors over Zoom. Meeting minutes produced by DWAC show that

---

[7] Based on the materials provided by DWAC, it is unclear on what day the draft letter of intent was sent to Trump Media. The letter of intent purports to have been countersigned by former President Trump on September 22, 2021.

SDNY_01_00819191

GARELICK attended the meeting. According to those minutes, "[m]anagement introduced potential initial pipeline of targets," including Trump Media and several other companies. The minutes also stated that the "[c]onsensus of the board [was] to follow up/negotiate and execute LOIs [letters of intent] with TMG [Trump Media], Global Oculus/Bittrex, and Wag! so that we may conduct deeper due diligence."[8]

l.  On or about September 22, 2021, ORLANDO sent an update to the board of directors through WhatsApp regarding each of the potential acquisition targets. With respect to Trump Media, ORLANDO wrote: "[W]e had a great meeting and are have [sic] a follow up session very soon, we have gotten great traction on lowering the Enterprise Value of the target but are getting pushback on the flexibility to be unilaterally exclusive." ORLANDO asked the other directors whether they would agree to 30-day exclusivity with Trump Media. The directors responded that they were in favor of entering into an exclusivity period with Trump Media and GARELICK wrote, "I am enthusiastically in favor to advance with TMG [Trump Media] under the stated terms."

m.  On or about September 27, 2021, according to press reports, ORLANDO went to Mar-a-Lago to meet with former President Trump and sign a letter of intent. As noted, the letter of intent, which is dated September 22, 2021, included an exclusivity clause providing that neither DWAC nor Trump Media would enter into discussions, negotiations, or transactions with any other company or investor for a period of thirty days.

---

[8] On or about September 20, 2021, DWAC and Global Oculus signed a non-binding letter of intent restricting Global Oculus's, but not DWAC's, ability to negotiate other business combination transactions. Two days later, as discussed herein, DWAC signed an exclusive letter of intent with Trump Media Group Corp.

14

n.   On or about September 27, 2021, DWAC issued a press release and filed a Form 8-K announcing that its units could be split and traded separately starting on September 30, 2021. On or about September 30, 2021, DWAC units were split, and the shares of Class A common stock and warrants started trading separately on the Nasdaq under the symbols "DWAC" and "DWACW," respectively.

o.   On or about September 29, 2021, ORLANDO messaged the board of directors, including GARELICK, on the encrypted messaging application WhatsApp and wrote, in pertinent part, "We have a few updates and due diligence is kicking into high gear. TMG [Trump Media] wants to close on October 14th."

p.   On or about October 19, 2021, from approximately 9:00 p.m. to 9:50 p.m., DWAC held a meeting of its board of directors over Zoom. Meeting minutes produced by DWAC show that GARELICK attended the meeting. According to those minutes, at the meeting the directors discussed whether to go ahead with the definitive agreement with Trump Media, and all directors voted in favor of signing the agreement. The minutes also indicate that the following day at 4 p.m. was the "[s]cheduled time to sign the definitive agreement" with Trump Media. The minutes further note that resolutions would be sent to board members via WhatsApp "to confirm unanimous decision to proceed with the signing of the definitive agreement."

q.   On or about October 20, 2021, DWAC's share price closed at $9.96 with a total volume of 697,900.

r.   According to the *New York Times*, on or about October 20, 2021, ORLANDO went to Mar-a-Lago where he met with former President Trump and they signed the deal.[9]

---

[9] These facts have not yet been independently verified by the Government.

15

s.   On or about October 20, 2021, at approximately 8:16 p.m., Liz Harrington, a spokesperson for former President Trump, posted a press release to Twitter announcing the merger of DWAC and Trump Media. The press release stated that Trump Media and DWAC had entered into a "definitive merger agreement, providing for a business combination that w[ould] result in [Trump Media] becoming a publicly listed company[.]" The release stated that the transaction valued Trump Media at as much as $1.7 billion. The release included a quote from former President Trump, who was identified as Chairman of Trump Media. The following day, DWAC filed a Form 8K related to the merger, which attached the October 20, 2021 press release announcing the business combination between DWAC and Trump Media.

t.   Prior to the announcement of the business combination between DWAC and Trump Media, shares and units of DWAC were priced at approximately $10 per unit or share, and warrants were priced at approximately $0.50 per warrant. Following the public announcement, DWAC shares peaked at approximately $175 per share, warrants peaked at approximately $79 per warrant, and units peaked at approximately $142 per unit.

u.   On or about May 15, 2022, DWAC and Trump Media filed an S-4 merger registration statement with the SEC.

v.   As of May 25, 2022, DWAC shares are trading at approximately $44 per share, DWAC warrants are trading at approximately $12 per warrant, and DWAC units are trading at approximately $54 per unit.

11.   Based on my review of public sources and news articles, it does not appear that there was any public reporting about a merger between DWAC and Trump Media until the day the business combination was announced: October 20, 2021, in the evening.

SDNY_01_00819194

Trades by GARELICK

12.  Based on my review of brokerage records, telephone records, and records from DWAC obtained via subpoena or produced by the SEC, as well as from my review of public sources, there is probable cause to believe that GARELICK traded in DWAC stock on the basis of material non-public information.  Specifically, I have learned the following:

a.  As noted above, on or about July 8, 2021, GARELICK became a director nominee of DWAC, and on or about September 2, 2021, he became an official director of DWAC. Prior to that period, it appears that DWAC was in discussions with Trump Media to enter into a business combination. I have reviewed telephone records for the cellphone number ███████5950, which is subscribed to in the name of "Bruce Garelick" (the "Garelick Cellphone Number").  Based on my review of records for the Garelick Cellphone Number, I have learned that on or about September 1 and September 2, 2021, GARELICK and ORLANDO, who was using the cellphone number ███████1513 (the "Orlando Cellphone Number") had several telephone calls.  Accordingly, there is reason to believe that because of his board role, and conversations with ORLANDO, GARELICK had non-public information about DWAC's potential merger with Trump Media on or before September 2, 2021. On or about September 3, 2021, the first day DWAC units were trading on the Nasdaq, using an account at Fidelity in his name, GARELICK purchased a total of 610 units of DWAC at prices ranging from $10.01 to $10.02 per unit.[10] On September 10, 2021, GARELICK purchased 300 units of DWAC at $10.02 per share.

---

[10] Because September 3, 2021, was the first day of trading, it is possible Garelick purchased DWAC units because he was excited about the business and not because he knew of material non-public information. Garelick, however, did not buy units from EF Hutton, the sole book running manager for the initial offering, but instead through his Fidelity account on the secondary market.

SDNY_01_00819195

b.   As discussed above, it appears that on or about September 14 and September 17, 2021, DWAC prepared and possibly sent draft letters of intent to Trump Media Group Corp.  On or about September 17, 2021, using his Fidelity account, GARELICK purchased a total of 410 units of DWAC at $10.05 per unit.  On or about September 20, 2021, using his Fidelity account, GARELICK purchased 900 units of DWAC at prices ranging from $10.03 to $10.04 per unit.

c.   As discussed above, on September 21, 2021, at approximately 12:32 p.m., DWAC held a board meeting, at which GARELICK was present, and discussed potential acquisition targets, including Trump Media. On or about September 21, 2021, shortly before the start of the board meeting, using his Fidelity account, GAERLICK purchased a total of 1,800 units of DWAC at approximately $10.05 per unit. As discussed above, on September 22, 2021, ORLANDO provided an update via WhatsApp to the board of directors about a deal with Trump Media progressing.  On or about September 23, 2021, using the same account, GARELICK purchased a total of 1,300 units of DWAC at approximately $10.07 per unit.

d.   On or about October 21, 2021, after the merger with Trump Media was announced, GARELICK sold all of his shares of DWAC in his Fidelity account for share prices ranging from $14.30 to $19.23.[11]   GARELICK also sold all the DWAC warrants in his Fidelity account.  In total, GARELICK made approximately $49,702 in profit on these sales.

e.   From my training and experience, I have learned that federal securities regulations require certain individuals, such as officers and directors, to report purchases, sales, and holdings of their company's securities to the SEC by filing Forms 3 and 4. Company insiders, such as officers and directors, must file a Form 3 to initially disclose their ownership of the company's

---

[11]   After DWAC allowed its shareholders to split units into shares and warrants, GARELICK requested that Fidelity divide all his units into shares and warrants of DWAC. Fidelity did so before GARELICK sold his holdings in DWAC.

SDNY_01_00819196

securities within ten days of becoming an insider. When an insider executes a transaction, he or she must file a Form 4 within two days, which discloses the transaction to the public. From my review of SEC filings, I have learned that notwithstanding the fact that GARELICK was a director of DWAC during part of the period when he was trading, he did not file a Form 3 or Form 4 for any of his purchases or sales of DWAC units or shares.

13. Based on my review of brokerage records, telephone records, and records from DWAC obtained via subpoena or produced by the SEC, as well as from my review of public sources, there is probable cause to believe that GARELICK told one or more other individuals non-public information about DWAC's planned business combination with Trump Media, and that those individuals traded on the basis of that information, and in some cases tipped other individuals who traded in the stock.  Each of the individuals identified below purchased units, shares, and/or warrants of DWAC while it was publicly known as a blank check company (in other words, it did not have a planned combination target), before there was any news about a merger with Trump Media, and then sold those units, shared, or warrants right after the merger announcement. Specifically, I have learned the following:

Trades by Rocket One Capital (MICHAEL SHVARTSMAN)

a.   GARELICK is chief strategy officer of Rocket One Capital, as noted above.  Rocket One Capital is a venture capital firm in Miami, Florida, headed by MICHAEL SHVARTSMAN. Based on my review of telephone records, it appears that GARELICK, using the Garelick Cellphone Number, and MICHAEL SHVARTSMAN communicate regularly by telephone and text message.

b.   On or about August 30, 2021, GARELICK, using the Garelick Cellphone Number, and MICHAEL SHVARTSMAN exchanged at least four telephone calls. On the same day,

19

MICHAEL SHVARTSMAN opened a brokerage account in the name of Rocket One Capital, LLC. On or about September 1 and September 2, 2021, MICHAEL SHVARTSMAN and GARELICK, using the Garelick Cellphone Number, exchanged multiple telephone calls. On or about September 2, 2021, the Rocket One Capital account was funded and on September 3, 2021, the first day of trading for DWAC units, Rocket One Capital purchased 14,500 units of DWAC.

c.   As noted above, by on or about September 27, 2021, if not earlier, DWAC and Trump Media had signed an exclusive letter of intent, and on or about September 29, 2021, ORLANDO messaged the board of directors, including GARELICK, "due diligence is kicking into high gear" on the Trump Media merger. On or about October 1, October 4, and October 5, MICHAEL SHVARTSMAN and GARELICK exchanged multiple telephone calls. On or about October 1, 2021, Rocket One Capital purchased approximately 227,915 DWAC warrants; on or about October 4, 2021, Rocket One Capital purchased approximately 1,641,731 DWAC warrants; and on or about October 5, 2021, Rocket One Capital purchased approximately 130,354 warrants.

d.   On or about October 21 and 22, 2021, Rocket One Capital sold off its shares in DWAC for approximately $18.4 million in realized profit. The Rocket One Capital account was not used for any other trading.

### Trades by GERALD SHVARTSMAN

e.   Based on my review of publicly available information, it appears that GERALD SHVARTSMAN is the brother of MICHAEL SHVARTSMAN. From telephone records, it appears that GERALD SHVARTSMAN uses the telephone number ███████3470 (the "Gerald Shvartsman Number") to speak with MICHAEL SHVARTSMAN nearly daily, and sometimes multiple times per day. GERALD SHVARTSMAN appears to be the owner of Source Furniture in Miami, Florida, which appears to be a furniture supply store.

SDNY_01_00819198

f.  On or about August 5, 2021, GERALD SHVARTSMAN opened a brokerage account with Benchmark Investments which, as noted above, was the sole book running manager for DWAC's initial public offering.  On or about August 11, 2021, GERALD SHVARTSMAN wired funds into the account.

g.  On or about September 3, 2021, MICHAEL SHVARTSMAN and GERALD SHVARTSMAN exchanged telephone calls at approximately 9:09 a.m., 9:20 a.m., 10:52 a.m., 11:03 a.m., 11:13 a.m., and 5:05 p.m.  On or about September 3, 2021, GERALD SHVARTSMAN purchased 10,800 units of DWAC at approximately 1:22 p.m.

h.  Between on or about October 7 and October 18, 2021, GERALD SHVARTSMAN purchased 400,000 warrants of DWAC.

i.  On or about October 21 and 22, 2021, GERALD SHVARTSMAN sold all his shares of DWAC for a profit of $5.1 million.

<u>Trades by RAY CORRAL</u>

j.  Based on my review of public sources, I have learned that RAY CORRAL is associated with MICHAEL SHVARTSMAN, and it appears they are friends.  For example, I have reviewed an image available online of MICHAEL SHVARTSMAN and RAY CORRAL together at what appears to be a social event at The Deck at Island Gardens, a super yacht marina, in February 2016.  From my review of telephone records, including records of the telephone number ████5944 subscribed to Ray Corral (the "Corral Cellphone Number"), it appears that MICHAEL SHVARTSMAN and CORRAL communicate regularly by telephone.  Additionally, it appears from telephone records that CORRAL knows GARELICK, because they appear to have spoken by telephone on or about June 30, July 1, July 9, July 16, and October 21, 2021. It also

SDNY_01_00819199

appears that CORRAL knows GERALD SHVARTSMAN because, according to telephone records, they communicated on July 2, 2021.

k.   On or about August 4, 2021, CORRAL opened an account at Benchmark Investments, and on or about August 10, 2021, he wired funds into the account.

l.   On or about September 3, 2021, at approximately 9:11 a.m., MICHAEL SHVARTSMAN called CORRAL, and the two spoke for several minutes.  On or about the same day, September 3, 2021, at approximately 1:22 p.m., CORRAL purchased 10,740 units of DWAC. MICHAEL SHVARTSMAN and CORRAL spoke several more times in September and early October 2021.

m.   On or about October 21, 2021, CORRAL called MICHAEL SHVARTSMAN. CORRAL again called MICHAEL SHVARTSMAN on or about October 22, 2021. On or about October 21 and October 22, 2021, CORRAL sold all his holdings of DWAC for a profit of $268,342.

<u>Trades by APLC Investments LLC (ANTON POSTOLNIKOV)</u>

n.   Based on my review of public sources and bank records, I have learned that ANTON POSTOLNIKOV is a Russian citizen living in Miami, Florida, who appears to be the owner of APLC Investments LLC. Based on my review of telephone records, it appears that POSTOLNIKOV knows ORLANDO, GARELICK, MICHAEL SHVARTSMAN, GERALD SHVARTSMAN, and RAYMOND CORRAL, and communicated with ORLANDO and GERALD SHVARTSMAN regularly between September and November 2021.

o.   On or about August 11, 2021, APLC Investments LLC opened an account at Benchmark Investments and wired funds into the account on or about August 12, 2021.  The signatory on the APLC Investments account is POSTOLNIKOV.

SDNY_01_00819200

p.  On or about September 3, 2021, POSTOLNIKOV purchased a total of 4,75,110 units of DWAC. On or about September 8, 2021, POSTOLNIKOV purchased 5,000 units of DWAC. On or about October 6, 2021, POSTOLNIKOV purchased 510 units of DWAC. On or about October 11, 2021, POSTOLNIKOV purchased 20,800 units of DWAC. On or about October 12, 2021, POSTOLNIKOV purchased 100,000 warrants of DWAC. On or about October 18, 2021, POSTOLNIKOV purchased 100,000 warrants of DWAC. On or about October 19, 2021, POSTOLNIKOV purchased 74,517 warrants of DWAC. On or about October 20, 2021, POSTOLNIKOV purchased 175,000 warrants of DWAC.

q.  During the period in which POSTOLNIKOV purchased units and warrants of DWAC, he communicated by telephone with ORLANDO and GERALD SHVARTSMAN.

r.  From on or about October 21 through on or about October 28, 2021, POSTOLNIKOV liquidated substantially all his DWAC holdings for a profit of approximately $22.8 million.

<u>Trades by Eric Hannelius</u>

s.  Based on my review of public sources, I have learned that MICHAEL SHVARTSMAN is a partner in multiple businesses with Eric Hannelius. Based on my review of telephone records between MICHAEL SHVARTSMAN and Hannelius, it appears they speak at least once per week. Additionally, from my review of telephone records, it appears that GARELICK and Hannelius communicate from time to time by telephone and text message.

t.  On or about September 12, 2021, MICHAEL SHVARTSMAN and Hannelius spoke by telephone. On or about September 13, 2021, Hannelius purchased 500 DWAC units.

23

SDNY_01_00819201

u.   On or about October 4, October 5, and October 6, MICHAEL SHVARTSMAN and Hannelius spoke by telephone. Between in or about October 6 and in or about October 7, 2021, Hannelius bought 11,300 DWAC warrants.

v.   On or about October 21, 2021, Hannelius sold all his holdings in DWAC for a total net profit of $168,206.

<u>Trades by Adrian Lopez Torres and Javier Lopez Lopez</u>

w.   Based on my review of publicly available sources and brokerage records, it appears that Adrian Lopez Torres ("Torres") was an employee at Source Furniture which, as noted above, is owned by GERALD SHVARTSMAN.

x.   On or about October 19, 2021, one day before the public announcement of the merger between DWAC and Trump Media, Torres placed an order to purchase DWAC warrants, and on or about October 20, 2021, in the morning, Torres purchased 100,000 DWAC warrants.

y.   On or about October 19, 2021, Javier Lopez Lopez ("Lopez"), the father of Torres according to broker records, placed an order to purchase DWAC warrants, and on or about October 20, 2021, in the morning, Lopez purchased 40,000. Based on my review of brokerage records, it appears that Lopez is a technician at a dialysis clinic.

z.   On or about October 21, 2021, Torres sold the DWAC warrants for a profit of $404.411. On or about October 22, 2021, Lopez sold his DWAC warrants for a profit of $1.58 million.

14. Based on the foregoing, there is probable cause to believe that ORLANDO made false statements to the SEC in DWAC's filings by falsely representing that DWAC was not negotiating with a SPAC target. Additionally, there is probable cause to believe that GARELICK knew of material non-public information about DWAC's planned merger with Trump Media, that he traded

SDNY_01_00819202

on the basis of that information. There is also probable cause to believe that ORLANDO, GARELICK, and others provided that material non-public information to friends and/or associates, including MICHAEL SHVARTSMAN, GERALD SHVARTSMAN, and RAY CORRAL, among others, who then traded on the basis of that information and passed it to their associates, all in violation of the Subject Offenses.

**B.  Probable Cause Regarding the Subject Account**

15. On or about December 29, 2021, the Honorable Marcia M. Henry of the United States District Court for the Eastern District of New York signed a warrant authorizing the search and seizure of a cellphone in the possession of GARELICK. On or about December 31, 2021, law enforcement agents surreptitiously executed the warrant while GARELICK was reentering the United States at John F. Kennedy Airport upon his return from international travel. Specifically, law enforcement agents seized, reviewed, and returned an iPhone 11 Pro Max registered with the Garelick Cellphone Number. Due to the covert nature of the search and this investigation more broadly, law enforcement agents were unable to obtain an entire forensic image of GARELICK's cellphone.  Instead, an agent reviewed certain contents of the phone manually and took screenshots (the "Garelick Cellphone Screenshots") of selected information, including certain text messages, calendar entries, and contact information determined to be responsive to the warrant. Based on my review of the Garelick Cellphone Screenshots, I have learned the following:

a.   On or about June 21, 2021, GARELICK, using the Garelick Cellphone Number, sent MICHAEL SHVARTSMAN a text message that stated, "FYI – Patrick Orlando call tomorrow at 3pm.  Please let me know Ojus and your brothers email addresses. . . . so I can include them on the invites."

SDNY_01_00819203

b.   On or about June 23, 2021, at 10:22 a.m., an individual saved in GARELICK's phone as "Allen Beyer"[12] sent a text message to GARELICK and MICHAEL SHVARTSMAN in which he wrote the following:

> Thoughts on TMG:
> DT hyped up his "From the Desk of Donald Trump" social platform and it TANKED.  Was an embarrassment.
>
> A President cannot use his public political position for his own personal financial gains.
>
> (Consider: he may run for president but never win.  If Desantis runs on another ticket he would destroy him.  This would allow DT to do whatever he wants and be the best case scenario for this "social media platform.")
>
> Next thing to consider: Is there even a social media platform?  Do they have tech plans/  If they do, what are they and can it be successful out of the gate in terms of adoption by other key political figures/ social media figures?  If it's just an app with Forever Trumpers – this can easily be a bust . . many Americans, even staunch conservative political figures, may not create accounts for obvious-risks to reputation/ not sure Republican Party is going to want to get in bed again with DT unless it's absolutely necessary (thinking for themselves/ party progression)
>
> More thoughts: Michael, do you think we can actually help with tech development (would trump decision- makers go for it?) / ability to reuse components of Joblio
>
> Can you trust this "let's make it happen at all costs-type" dude (forgot his name) to do this the right way and would you ever be associated with this as a "founder" or anything in case it goes up in literal flames?
>
> Best chance is if he becomes just kinda a "behind the scenes/puppet master" of politics and encourages people to use his platform that way . . . if he runs it will be much tougher.
>
> Another thing.  If he uses AWS, Google, all those hosting platforms, he runs the risk of them deplatforming him.
>
> Also he's been hyping up Parler and all those other small ones for so long now . . . same w DJTJ and Eric.  What's gonna differentiate from those?

---

[12] According to a publicly available LinkedIn account for Beyer, he is the Vice President for Strategic Partnerships and a "Venture Partner" at Rocket One Capital.

SDNY_01_00819204

c.   According to GARELICK's calendar on his cellphone, on or about June 28, 2021, there was a call between "DWAC/Rocket One Capital," and then later that day a call between "Mike/Bruce to discuss DWAC terms."

d.   On or about June 30, 2021, at 9:53 a.m., Beyer texted a screenshot of a news alert to GARELICK and MICHAEL SHVARTSMAN, which included the headline: "The Trump Organization and its CFO are expected to be charged with tax-related crimes by the Manhattan DA Thursday, say people familiar with the matter."  Below that screenshot, Beyer wrote, "Fresh off the Wall Street Journal.  Would something like this impact their ability to even take a co public right now."  GARELICK responded, "Yes.  There is certainly risk the SPAC does not get the Trump media group for a variety of reasons However, we have downside protection from the structure of the investment."  Beyer responded, "Buy now pay later[.]  You guys realize what this actually does right?  It Puts the Street Dealer Out of Business."

e.   On or about July 1, 2021, at 10:41 a.m., GARELICK sent a text message to a number stored in his phone as "Ray Corral." The contact card for "Ray Corral" in GARELICK's cellphone lists the Corral Cellphone Number and identifies him as a "friend of Mike S," which appears to be a reference to MICHAEL SHVARTSMAN, and "Joblio prospective investor-Feb 2021." In the text message, GARELICK wrote: "Ray. It's Bruce Garelick.  Do you still want to speak regarding the SPAC deal?  If so, please let me know a good time to call you today."  In response, CORRAL stated, "Yes calling u in 30 / Call please  thank you / Ray@mosaicist.com." In other words, it appears that CORRAL was providing his email address to GARELICK for further communication.

27

f.   On or about July 9, 2021, at 10:26 a.m., CORRAL wrote: "Bruce good morning / When u going public with the spac / Trump." GARELICK responded, "I think the IPO is schedule for next week."

g.   According to GARELICK's cellphone calendar, he had an entry on July 30, 2021, to "email DWAC investors with $5 options + Arcadian schedule." The entry was saved under the calendar for bruce.m45@gmail.com.

h.   On or about August 31, 2021, MICHAEL SHVARTSMAN wrote, "I'll call you back." Later that day, GARELICK said "Just called u back.  Grabbing din with my girl now. Urgent?  Talk later?"  MICHAEL SHVARTSMAN responded, "Nope call later."

i.   On or about September 1, 2021, GARELICK sent a text message to the Orlando Cellphone Number, which is stored in GARELICK's cellphone as "Patrick O," and which based on the conversation that follows, GARELICK understood to be ORLANDO. GARELICK stated, "Patrick – it's Bruce Garelick at Rocket One.  Congrats on the IPO date becoming official!  Let's briefly catch up when you get a minute."

j.   On or about September 2, 2021, at 9:18 a.m., GARELICK wrote, "I spoke to Patrick Orlando.  Not urgent.  We can catch up later."  On or about October 1, 2021, GARELICK sent MICHAEL SHVARTSMAN a screenshot of what appears to be a Yahoo finance lookup of DWAC warrants' trading activity.

k.   According to GARELICK's cellphone calendar, on September 21, 2021, there was a "DWAC Board of Directors Meeting" by Zoom.

l.   According to GARELICK's cellphone calendar, on or about October 18, 2021, there was a DWAC board meeting by Zoom. On or about October 19, 2021, there was a "DWAC

28

Board Meeting" by Zoom. On or about October 20, 2021, a "TMTG Financial Model Discussion" was scheduled to be held by Zoom.

16. On or about February 10, 2022, the Honorable Debra Freeman of the United States District Court for the Southern District of New York signed a warrant authorizing the search of certain email and iCloud accounts, including accounts belonging to GARELICK, ORLANDO, MICHAEL SHVARTSMAN, GERALD SHVARTSMAN, and RAY CORRAL. Based on my review of those materials, I have learned that GARELICK used the Subject Account to communicate about DWAC and appears to have been aware of DWAC's intention to merge with Trump Media months before DWAC filed its S-1. For example:

a. On or about June 21, 20201, GARELICK emailed HANNELIUS from the Subject Account, stating: "Hi Eric, I've attached the SPAC prospectus….however, it doesn't say anything about Trump. (can't yet). I am setting up a call with Patrick Orlando (CEO) for tomorrow afternoon (calendar invite to follow soon.)"

b. On or about June 24, 2021, GARELICK emailed an individual ("Individual-1") from the Subject Account, stating:

> We are finalizing our investment in this SPAC (founders shares and IPO shares). Michael (Rocket One) is inclined to invest $800k, split evenly between the $4 founders shares and the $10 IPO shares.

That same day, Individual-1 emailed GARELICK and asked: "Is this the Trump SPAC? If so, not for me." GARELICK responded, via the Subject Account and copying MICHAEL SHVARTSMAN, "Yes, it is….and no prob. Thanks for letting me know."

c. Also on or about June 24, 2021, GARELICK emailed POSTOLNIKOV from the Subject Account, copying MICHAEL SHVARTSMAN and stating that he was "[f]ollowing up on that Trump Media Group SPAC we mentioned."

29

d.   On or about June 28, 2021, in response to an email from GARELICK using the Subject Account regarding a payment processing deal for Trump Media, ORLANDO sent an email to GARELICK and others, stating, among other things:

> [W]e really like TMG, but there is absolutely no guarantee that we will close that deal or any other.  TMG is just one of many companies in our pipeline of deals but we have had no substantive discussions with TMG with respect to DWAC as we can't until after the IPO.  We are a SPAC and cannot guarantee we will combine with anyone because no deal can be made until after IPO.

e.   Also on or about June 28, 2021, GARELICK sent a calendar invite from the Subject Account to MICHAEL SHVARTSMAN entitled "Mike/Bruce to discuss DWAC terms."

f.   On or about June 21, 2021, HANNELIUS sent an email to GARELICK at the Subject Account and to MICHAEL SHVARTSMAN with the subject line "Trump." The email then asked for GARELICK to "send [HANNELIUS] any info on the opportunity discussed."

g.   On or about July 8, 2021, GERALD SHVARTSMAN sent an email to GARELICK at the Subject Account and to MICHAEL SHVARTSMAN, asking, "so what's the story on the trump deal / are we in or out / where's the docs ?"

17. Based on the foregoing, I submit that there is probable cause to believe that the Subject Account will contain evidence of the commission of the Subject Offenses.  GARELICK's communications are evidence of the commission of the Subject Offenses because they will indicate what non-public information GARELICK had when he traded and/or told other individuals to buy DWAC units, shares, or warrants. They will also indicate GARELICK's awareness regarding DWAC's plans to merge with Trump Media.

SDNY_01_00819208

18. Based on my training and experience investigating other insider trading schemes, and on my review of returns from the search warrants described above, I know that email accounts often contain the following types of evidence relating to the commission of the Subject Offenses:

a.   Email accounts typically contain identifying information that helps to verify the user of an account, as well as evidence of other accounts.  They may also contain passwords to access those accounts or devices.

b.   Email accounts typically contain evidence establishing the existence of a relationship between two or more people that are members of a conspiracy, or who may have tipped each other regarding non-public information about a security.  Such information can include contact information, images, documents, and emails between or among the individuals.  Such information is relevant to establishing the existence of a relationship between members of a conspiracy, their knowledge of each other's activities, and the fact that their relationship was one where they would engage in criminal activity together.

c.   Email accounts often contain documents relevant to the execution of a fraud scheme.  Such documents often come in the form of transaction documents, such as brokerage statements, meeting minutes, and deal documents.  Documents may also come in the form of emails, such as emails about a transaction or email confirmation about the execution of a trade.

d.   Email accounts often contain records of web activity, web history, search history, browsing history, and bookmarks. Such records often contain evidence of an account user's then-existing mental state, and will also often contain evidence of an individual's plans, intentions, and/or knowledge about a course of criminal conduct.

e.   Email accounts may also contain evidence of location, including IP records, calendar invitations or entries, and photographs of locations.  Such location information may

31

establish that, for example, two or more members of a conspiracy were together at, around, or shortly before the time one member of a conspiracy traded in DWAC stock. Similarly, such location information may establish that the Target Subjects were at meetings when material non-public information was communicated.

      f.  Google accounts may also contain backups of Android and Apple devices, which can include each of the types of data set forth above, including emails, text messages, documents, photos, and third-party application data. Accordingly, there is reason to believe that any device backup will contain evidence of the Subject Offenses.

      g.  Based on my training and experience, I know that a VoIP number can be associated with a Google account through the Google Voice service, and records from Google Voice can provide information about communications among co-conspirators. Additionally, from my training and experience, I know that individuals involved in fraud will routinely use VoIP numbers to place telephone calls in a covert manner in order to avoid surveillance by law enforcement.

    19. <u>Temporal Limitation.</u> This application seeks the production of emails from December 11, 2020, the date on which DWAC was formed, through the present. The materials to be seized from the Subject Account will be limited, to the extent they are dated, to those created, sent, received, modified, or deleted on or about December 11, 2020.

    **C. Evidence, Fruits and Instrumentalities**

    20. Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on the Provider's servers associated with the Subject Account will contain evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachments A and B to the proposed warrants.

    21. In particular, I believe the Subject Account is likely to contain the following information:

SDNY_01_00819210

a. Evidence sufficient to establish the user(s) of the Subject Account at times relevant to the Subject Offenses, including photographs, contact information, payment information, and other personally identifiable information;

b. Evidence of knowledge of the prohibition against insider trading in securities;

c. Evidence of knowledge of the required disclosures on SEC Form S-1 or other SEC filings related to SPAC transactions;

d. Evidence of the Target Subjects' knowledge or understanding that DWAC's disclosures on SEC Form S-1 were false or misleading;

e. Evidence relating to DWAC including, but not limited to, its business combination with Trump Media, Trump Media Group Corp., or other potential combination targets (or the lack thereof);

f. Evidence relating to the Target Subjects' knowledge of the fact that information about DWAC and/or Trump Media or Trump Media Group Corp. was confidential and/or non-public;

g. Evidence relating to the conveyance of material non-public information regarding DWAC, Trump Media, Trump Media Group Corp., or other potential combination targets (or the lack thereof);

h. Evidence relating to DWAC's selection of business combination target(s), including, but not limited to, the dates and substance of discussions or negotiations with combination targets, and public filings about DWAC's selection of a business combination target.

i. Evidence of the Target Subjects' ownership and control over brokerage accounts, and their history of trading securities;

j. Evidence relating to trading in units, warrants, or shares of DWAC;

33

SDNY_01_00819211

k.   Communications involving one or more of the Target Subjects, members of the board of directors of DWAC, or any other individual who traded in DWAC units, stock, or warrants;

l.   Evidence of the existence of relationships between the Target Subjects, members of the board of directors of DWAC, or any other individual who traded in DWAC units, stock, or warrants[13];

m.   Evidence relating to Trump Media, including news about Trump Media;

n.   Evidence reflecting the state of mind of (i) individuals involved in trading in the units, warrants, or shares of DWAC, and (ii) individuals possessing, or having access to, material non-public information regarding the business combination between DWAC and Trump Media;

o.   Evidence of the receipt, transfer, disposition, or location of funds raised through the commission of the Subject Offenses;

p.   Evidence of efforts to conceal the commission of the Subject Offenses and evade detection by law enforcement and/or regulatory agencies;

q.   Evidence of the geographic location of the users of the Subject Account;

---

[13] In light of *Dirks v. Securities and Exchange Commission*, 463 U.S. 646 (1983), and its progeny, for insider-trading related violations of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, the Government must in some instances  prove that the tipper receives a "personal benefit" in exchange for the information he or she provides.  One means by which the Government satisfies the requirement that the tipper receive some sort of benefit for the information he or she passes is by establishing that the insider provided information in a manner akin to "mak[ing] a gift of confidential information to a trading relative or friend," *id.* at 664; *see also id.* (noting that, when there is a gift of information to a relative or friend, "[t]he tip and trade resemble trading by the insider himself followed by a gift of the profits to the recipient"), which requires proof of the relationship between tipper and tippee.  Accordingly, any information found in the Subject Account relating to the nature and history of the relationships between the Target Subjects and others involved in any insider-trading scheme constitutes relevant evidence of at least one of the Subject Offenses.

SDNY_01_00819212

r.   Evidence of passwords or other information needed to access the Subject Account or other accounts of the users of the Subject Account;

s.   Evidence relating to other accounts, devices, or physical premises in which evidence of the commission of the Subject Offense may be found; and

t.   Evidence concerning the identities of, and communications with, co-conspirators.

## III.  Review of the Information Obtained Pursuant to the Warrants

22. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of responsive records.  Accordingly, the warrant requested herein will be transmitted to the Provider, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 30 days from the date of service. Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will retain the records and review them for evidence, fruits, and instrumentalities of the Subject Offenses as specified in Section III of Attachments A and B to the proposed warrants.

23. In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all messages within the Subject Account.  This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure.  Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure.  As an initial matter, keyword searches may not work well for instant message data, where words are frequently written in

35

shorthand.   Moreover, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

## IV. Request for Non-Disclosure and Sealing Orders

24. The existence and scope of this ongoing criminal investigation are not publicly known. As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal subjects that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation.  As is set forth above, the Target Subjects of this investigation are known to use computers and electronic communications in furtherance of their activity and thus could easily delete, encrypt, or otherwise conceal such digital evidence from law enforcement were they to learn of the Government's investigation.  *See* 18 U.S.C. § 2705(b)(3). From my experience investigating white-collar crime and securities fraud, I know that individuals who participate in such offenses may alert potential criminal subjects that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation.

25. Accordingly, there is reason to believe that, were the Provider to notify the subscriber or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Provider not to notify any person of the existence of the warrants for a period of one year from issuance, subject to extension upon application to the Court, if necessary.

26. For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government

SDNY_01_00819214

be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

27. Finally, based on my training and experience, I know that Google will request that the Government seek data related to email addresses with an enterprise domain such as @rocketonecapital.com directly from the enterprise, pursuant to the U.S. Department of Justice Policy titled Seeking Enterprise Customer Data Held by Cloud Service Providers, December 2017, available at https://www.justice.gov/criminal-ccips/file/1017511/download. However, @rocketonecapital.com appears to be owned or controlled by MICHAEL SHVARTSMAN and RAY CORRAL, respectively, both of whom are Target Subjects of this investigation. Because they are the apparent owners of the enterprises, notification would almost certainly mean they would be informed of the existence of this search warrant, which could cause them to delete, encrypt, or otherwise conceal the requested data. To the extent either enterprise has outside counsel (none is presently known to the Government), disclosure to outside counsel does not appear to be a viable option because, based on my understanding of professional responsibility rules, such counsel will be required to report such a disclosure to the client. Additionally, it is my understanding that certain materials requested from Google cannot be obtained directly from the enterprise because enterprise account users cannot access or download certain types of data. Therefore, I respectfully request that the proposed order specifically require the Provider to produce enterprise data.

**V. Conclusion**

28. Based on the foregoing, I respectfully request that the Court issue the warrants sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C.

SDNY_01_00819215

§ 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the

relevant provisions of Federal Rule of Criminal Procedure 41.


S/ by the Court with permission
Marc Troiano
Special Agent
FBI

Sworn to before me this
25th day of May, 2022

_____
Honorable Robert W. Lehrburger
United States Magistrate Judge
Southern District of New York

38

SDNY_01_00819216

SDNY_01_00819217

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------

In the Matter of A Warrant for All
Content and Other Information
Associated with the Email Account
bruce@rocketonecapital.com,
Maintained at Premises Controlled by
Google, LLC, USAO Reference No.
2021R01007

---------------------------------------------------------

# 22 MAG 4631

## Search Warrant and Non-Disclosure Order

TO:     Google, LLC ("Provider")

         Federal Bureau of Investigation ("FBI" or "Investigative Agency")

**1. Warrant.** Upon an affidavit of Special Agent Marc Troiano of the FBI, and pursuant to

the provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) and § 2703(c)(1)(A),

and the relevant provisions of Federal Rule of Criminal Procedure 41, the Court hereby finds there

is probable cause to believe the Google account bruce@rocketonecapital.com, maintained at

premises controlled by Google, LLC, contains evidence, fruits, and instrumentalities of crime, all

as specified in Attachment B hereto.  Accordingly, the Provider is hereby directed to provide to

the Investigative Agency, within 30 days of the date of service of this Warrant and Order, the

records specified in Section II of Attachment B hereto, for subsequent review by law enforcement

personnel as authorized in Section III of Attachment B.  Based on the affidavit's representation

that an enterprise whose data is sought pursuant to this warrant appears to be solely controlled by

or closely associated with the target subjects of the Government's investigation, the Provider is

specifically directed to produce data for any enterprise accounts responsive to this Warrant.  The

Government is required to serve a copy of this Warrant and Order on the Provider within 14 days

of the date of issuance.  The Warrant and Order may be served via electronic transmission or any other means through which the Provider is capable of accepting service.

**2. Non-Disclosure Order.** Pursuant to 18 U.S.C. § 2705(b), the Court finds that there is reason to believe that notification of the existence of this warrant will result destruction of or tampering with evidence, and/or flight from prosecution, or otherwise will seriously jeopardize an ongoing investigation.  Accordingly, it is hereby ordered that the Provider shall not disclose the existence of this Warrant and Order to the listed subscriber, to an  agent or representative of the enterprise domain, or to any other person for a period of one year from the date of this Order, subject to extension upon application to the Court if necessary, except that Provider may disclose this Warrant and Order to an attorney for Provider for the purpose of receiving legal advice.

**3. Sealing.** It is further ordered that this Warrant and Order, and the Affidavit upon which it was issued, be filed under seal, except that the Government may without further order of this Court serve the Warrant and Order on the Provider; provide copies of the Affidavit or Warrant and Order as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Dated: New York, New York

      May 25, 2022           5:15 pm
      Date Issued              Time Issued

                    _____
                    HON. ROBERT W. LEHRBURGER
                    UNITED STATES MAGISTRATE JUDGE
                    Southern District of New York

SDNY_01_00819219

**Attachment B (Google LLC)**

**I.      Subject Accounts and Execution of Warrant**

This warrant is directed to Google, LLC (the "Provider"), headquartered in California, and applies to all content and other information within the Provider's possession, custody, or control associated with the Google account bruce@rocketonecapital.com (the "Subject Account").

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below.  Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

**II.     Information to be Produced by the Provider**

To the extent within the Provider's possession, custody, or control, the Provider is directed to produce the following information associated with the Subject Account:

a.  *Email content.*  All emails sent to or from, stored in draft form in, or otherwise associated with the Subject Account, including all message content, attachments, and header information (specifically including the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email), limited to items sent, received, created, modified, or deleted between December 11, 2020 and the present.

b.  *Contacts.*  All address book, contact list, or similar information associated with the Subject Account.

c.  *Subscriber and payment information*.  All subscriber and payment information regarding the Subject Account, including but not limited to name, username, address, telephone

number, alternate email addresses, registration IP address, account creation date, account status, length of service, types of services utilized, means and source of payment, and payment history.

d. *Transactional records*. All transactional records associated with the Subject Account, including any IP logs or other records of session times and durations, limited to items sent, received, created, modified, or deleted between December 11, 2020 and the present.

e. *Web & App Activity, Search, Chrome, and Browsing History.* All search history, web browser history, Chrome history, and/or Web & App Activity associated with the Subject Account, limited to items sent, received, created, modified, or deleted between December 11, 2020 and the present.

f. *Google Drive Content*. All Google Drive records associated with the Subject Account, including all documents and other records stored on the Google Drive account, limited to items sent, received, created, modified, or deleted between December 11, 2020 and the present.

g. *Google Docs.* All Google Docs records associated with the Subject Account, including all documents created or stored in Google Docs, limited to items sent, received, created, modified, or deleted between December 11, 2020 and the present.

h. *Google Photos*. All photographs and related metadata stored in Google Photos associated with the Subject Account, limited to items sent, received, created, modified, or deleted between December 11, 2020 and the present.

i. *Google Calendar.* All calendar entries and records associated with the Subject Account, limited to items sent, received, created, modified, or deleted between December 11, 2020 and the present.

SDNY_01_00819221

j.   *Google Chats and Google Hangout.* All chats, messages, and shared content in Google Chats, Google Talk, or Google Hangout associated with the Subject Account, limited to items sent, received, created, modified, or deleted between December 11, 2020 and the present.

k.   *Google Voice.* All records relating to any Google Voice account associated with the Subject Account, including but not limited to registration information, call records, text messages, voicemails, and IP records, limited to items sent, received, created, modified, or deleted between December 11, 2020 and the present.

l.   *Location History.* All location records associated with the Subject Account, limited to items sent, received, created, modified, or deleted between December 11, 2020 and the present.

m.   *Google Payments.* All records of payments and payment information associated with the Subject Account, limited to items sent, received, created, modified, or deleted between December 11, 2020 and the present.

n.   *Device Information.* Any information identifying the device or devices used to access the Subject Account, including a device serial number, a GUID or Global Unique Identifier, a phone number, serial numbers, MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"), and any other information regarding the types of devices used to access the Subject Account.

o.   *Linked Accounts.* Any information identifying accounts that are associated or connected to the Subject Account, including specifically by Cookie, email account, phone number, Google Account ID, Android ID, or other account or device identifier.

3

SDNY_01_00819222

p. *Android Device Backup*. All Android device backups associated with the Subject Account and the contents of those backups, including but not limited to messages, history, file downloads, and preferences.

## III.    Review of Information by the Government

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of securities fraud and wire fraud relating to insider trading, conspiring to commit those offenses, and aiding and abetting the commission of those offenses, making false statements to the Securities and Exchange Commission ("SEC"), making false and misleading statements in an SEC registration statement, and conspiring to defraud the SEC, in violation of Title 18, United States Code, Sections 2, 371, 1001, 1343, 1348, 1349 and Title 15, United States Code, Sections 77x, 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5 (collectively, the "Subject Offenses"), in connection with insider trading and fraudulent disclosure schemes, consisting of the following:

a.    Evidence sufficient to establish the user(s) of the Subject Account at times relevant to the Subject Offenses, including photographs, contact information, payment information, and other personally identifiable information;

b.    Evidence of knowledge of the prohibition against insider trading in securities;

c.    Evidence of knowledge of the required disclosures on SEC Form S-1 or other SEC filings related to SPAC transactions;

d.    Evidence of the Target Subjects' knowledge or understanding that DWAC's disclosures on SEC Form S-1 were false or misleading;

4

SDNY_01_00819223

e.  Evidence relating to DWAC including, but not limited to, its business combination with Trump Media, Trump Media Group Corp., or other potential combination targets (or the lack thereof);

f.  Evidence relating to the Target Subjects' knowledge of the fact that information about DWAC and/or Trump Media or Trump Media Group Corp. was confidential and/or non-public;

g.  Evidence relating to the conveyance of material non-public information regarding DWAC, Trump Media, Trump Media Group Corp., or other potential combination targets (or the lack thereof);

h.  Evidence relating to DWAC's selection of business combination target(s), including, but not limited to, the dates and substance of discussions or negotiations with combination targets, and public filings about DWAC's selection of a business combination target.

i.  Evidence of the Target Subjects' ownership and control over brokerage accounts, and their history of trading securities;

j.  Evidence relating to trading in units, warrants, or shares of DWAC;

k.  Communications involving one or more of the Target Subjects, members of the board of directors of DWAC, or any other individual who traded in DWAC units, stock, or warrants;

l.  Evidence of the existence of relationships between the Target Subjects, members of the board of directors of DWAC, or any other individual who traded in DWAC units, stock, or warrants;

m.  Evidence relating to Trump Media, including news about Trump Media;

SDNY_01_00819224

n.   Evidence reflecting the state of mind of (i) individuals involved in trading in the units, warrants, or shares of DWAC, and (ii) individuals possessing, or having access to, material non-public information regarding the business combination between DWAC and Trump Media;

o.   Evidence of the receipt, transfer, disposition, or location of funds raised through the commission of the Subject Offenses;

p.   Evidence of efforts to conceal the commission of the Subject Offenses and evade detection by law enforcement and/or regulatory agencies;

q.   Evidence of the geographic location of the users of the Subject Account;

r.   Evidence of passwords or other information needed to access the Subject Account or other accounts of the users of the Subject Account;

s.   Evidence relating to other accounts, devices, or physical premises in which evidence of the commission of the Subject Offense may be found; and

t.   Evidence concerning the identities of, and communications with, co-conspirators.

As used in this Attachment, the term "Target Subjects" means Patrick Orlando, Bruce Garelick, Michael Shvartsman, Gerald Shvartsman, Raymond Corral, Anton Postolnikov, Adrian Lopez Torres, Javier Lopez Lopez, Eric Hannelius, and Alan Beyer.

SDNY_01_00819225