O5h2Gar1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,              New York, N.Y.

 4              v.                           23 Cr. 307 (LJL)

 5    BRUCE GARELICK,

 6              Defendant.

 7    ------------------------------x       Conference

 8                                          April 17, 2024
                                           10:10 a.m.
 9

10    Before:

11                    HON. LEWIS J. LIMAN,

12                                          District Judge

13

14
                          APPEARANCES
15
      DAMIAN WILLIAMS
16        United States Attorney for the
          Southern District of New York
17    BY:  ELIZABETH A. HANFT
          MATTHEW R. SHAHABIAN
18        DANIEL G. NESSIM
          Assistant United States Attorneys
19

20    SHAPIRO ARATO BACH, LLP
          Attorney for Defendant Garelick
21    BY:  ALEXANDRA  A. E. SHAPIRO
          JONATHAN BACH
22        JULIAN S. BROD
          JASON A. DRISCOLL
23

24    Also Present:

25    Special Agent Marc Troiano, FBI
```

O5h2Gar1

1           (Case called)

2           THE DEPUTY CLERK:  Starting with counsel for the

3   government, please state your appearance for the record.

4           MR. SHAHABIAN:  Good morning, your Honor.  Matt

5   Shahabian, appearing for the government, and with me at counsel

6   table is Elizabeth Hanft and Daniel Nessim, as well as Special

7   Agent Mark Troiano from the F.B.I.

8           THE COURT:  Good morning.

9           MS. SHAPIRO:  Good morning, your Honor.  Alexandra

10  Shapiro, and with me at counsel table are Jonathan Bach,

11  Julian Brod, and Jason Driscoll and our client, Mr. Garelick,

12  seated to my left.

13          THE COURT:  Good morning.

14          Okay.  We are here for the final pretrial conference.

15  The trial is scheduled to start on the 29th.  I thought I would

16  go through some preliminaries with you, then I may want to have

17  some argument with respect to the motions *in limine* and try to

18  resolve as many of them as possible today, and then entertain

19  any questions the parties have or any points that they want to

20  raise.

21          At this point I would expect that the government has

22  already produced its witness list and list of exhibits, and I

23  will want to hear something about the  witnesses as well.

24          So in terms of logistics, my plan is we will start

25  first thing on April 29 with jury selection.  You should all be

1   here at 9:00 in the morning.  I will get to, in a moment, and

2   after I hear from counsel for the defense, whether we will use

3   a jury questionnaire.  I will tell you right now that I am

4   predisposed against it, but I will hear from the defense with

5   respect to it.

6          But we will select a jury on the morning of the 29th.

7   My plan, unless anybody persuades me otherwise, is to select

8   14 jurors, so the 12 jurors plus two alternates, and the

9   parties will have -- the defense will have ten peremptory

10  challenges and the government six peremptory challenges with

11  respect to the jurors and then one each with respect to the

12  alternates.

13         We will sit every day from 9 until 5, taking a

14  mid-morning break and a mid-afternoon break which will probably

15  be somewhere from 10 to 15 minutes, and then the customary

16  lunch break for about an hour at around 1:00.

17         My plan is to ask you to be able to address some

18  questions with respect to the charge probably after the first

19  day of trial, and then there may need to be some continued

20  argument with respect to the charge before we get to the final

21  charge conference.

22         I would like the parties to use the overhead projector

23  rather than to approach the witness with exhibits.  I wouldn't

24  expect that there would be any reason to do it otherwise in

25  this case.  When I say the overhead projector, I don't mean to

O5h2Gar1

exclude counsel using their laptop to project exhibits. You

have both tried a number of cases in this courtroom. If you

need practice with respect to the technology, work it out with

my courtroom deputy, but my expectation is that until an

exhibit is received into evidence, it is only displayed to the

Court, opposing counsel and, if appropriate, to the witness.

How long does the government want for its opening

statement?

MR. SHAHABIAN: No more than 20 minutes, your Honor.

THE COURT: Ms. Shapiro, Mr. Bach?

MR. BACH: We anticipate less than an hour, probably

closer to 20 minutes. I haven't drafted the opening statement

yet, so I don't know.

THE COURT: I would ask both sides to try to keep it

to 30 minutes. If you need more than 30 minutes, let me know,

but I would hope that you would be able to keep it to 30

minutes.

That's what I've got in terms of the preliminaries. I

gather the issue of 404(b) evidence is now moot. Is that

right, Mr. Shahabian?

MR. SHAHABIAN: That's correct, your Honor.

THE COURT: So the motion with respect to 404(b)

evidence is denied as moot since the government is not going to

offer evidence with respect to the failure to file a tax return

with respect to the trades at issue.

O5h2Gar1

1          Mr. Bach or Ms. Shapiro or Mr. Brod, do you want to

2     try to convince me with respect to the jury questionnaire.

3          MS. SHAPIRO:  Mr. Brod is going to address that, your

4     Honor.

5          THE COURT:  Okay.

6          MR. BROD:  I will take a shot at that, Judge.

7          Judge, I don't want to replay the points that are

8     already in the papers and didn't convince you so far, but I

9     just wanted to respond to several points that the government

10    made in their letter.

11         The first point regards efficiency and, in our view,

12    this is not an inefficient means of selecting a jury.  In fact,

13    quite the opposite.  It allows the parties to review the

14    responses, if necessary, overnight, the parties can agree on

15    joint strikes, and there are inevitably a number of jurors both

16    parties will agree should not sit, and then jury selection will

17    proceed either, if it's possible to review the questionnaires,

18    during the first day or the following day.

19         And I would note that Ms. Shapiro and I tried a case

20    in this courthouse several years ago in front of Judge Wood

21    where Judge Wood ordered the use of a questionnaire which I

22    think at the time both parties found hugely useful.  We were

23    able to excuse a number of jurors by essentially joint strike

24    just going over it overnight and then proceed to ordinary jury

25    selection the following day.

O5h2Gar1

1    The government's second point is that the defense is

2    trying to politicize the trial.  Quite the opposite.  There

3    are, I think, two or three questions in the questionnaire that

4    relate to whether jurors could be fair to somebody who was

5    associated with a company that became what is now known as

6    Truth Social.  This is a highly politicized, indeed, somewhat

7    febrile atmosphere.

8         THE COURT:  Somewhat what atmosphere?

9         MR. BACH:  I said febrile, but it's a highly

10   politicized, highly divisive atmosphere at the moment.

11   Mr. Trump will be on trial across the street.  I just don't

12   think I need to belabor the point that there will be certain

13   jurors who --

14        THE COURT:  You may need to belabor the point because

15   aside from the fact that Mr. Trump's name may be mentioned and

16   the name of the target was Trump Media, how do you expect

17   whether a juror likes or dislikes Mr. Trump to be relevant in

18   this case.

19        MR. BROD:  Judge, even -- and we just received the

20   government's proposed exhibits, proposed exhibits late last

21   night, so we haven't reviewed all of them, but even just

22   flicking through them it is clear that there will be

23   photographs of Mr. Trump signing documents.

24        This is the SPAC that injected approximately 300

25   million into the company that became Truth Social.  There have

O5h2Gar1

1  been very, very extensive -- there has been very extensive

2  media coverage of the way in which the SPAC enabled

3  Truth Social to become a public company, the way in which it

4  may put billions of dollars . . .

5          (Counsel confer)

6          MR. BROD:  The way in which it put billions of

7  dollars, or may put billions of dollars, into the pockets of

8  the former president.

9          And I would note that news coverage has been

10 continuing right up until yesterday.  In fact, as I was coming

11 home from the office yesterday -- as I was coming home from the

12 office yesterday, the front of the business section was a story

13 about the continuing decline of the DJT stock because the

14 company had made SEC filings showing that it was going to

15 permit warrant holders to exercise their warrants.

16         The government's witness list indicates they are going

17 to call Andy Dean Litinsky, who was one of the two original

18 founders of Trump Media, extensively involved in discussions

19 throughout this relevant period, essentially for the Trump side

20 of this.  So the idea that Trump won't be a focus of this trial

21 is simply wrong.

22         So I just don't think the Court can overlook the fact

23 that this is not an ordinary insider trading case.  It's not

24 ordinary because most insider trading cases involve stocks that

25 nobody cares about and defendants who nobody has heard about.

O5h2Gar1

1    In this case, we have a stock that is very much in the news and

2    will be in the news probably every day, at least every week, up

3    until the point of trial and not just the *Financial Times* or

4    the *Wall Street Journal*, but CBS, ABC.  If you Google the stock

5    today, you will see innumerable stories.

6            And then, of course, the defendant, rightly or

7    wrongly, will be associated with this company.  So I would say

8    your Honor we will have a number of jurors who will hear Trump,

9    they will hear insider trading, and they will say, well, that's

10   it, I hardly need to hear more.

11           THE COURT:  Let me hear from the government.

12           MS. HANFT:  Yes.  Thank you, your Honor.

13           The government submits that the Court is entirely

14   capable of sussing out such potential prejudice in an ordinary

15   oral *voir dire* in this case.  Very, very high publicity cases

16   in this district happen all the time and the Courts

17   primarily --

18           THE COURT:  Let me focus you, Ms. Hanft.

19           Can you respond to Mr. Brod's argument that Mr. Trump

20   and Truth Social will be a focus in this trial and that

21   therefore I need to ask questions about Truth Social and

22   Mr. Trump?  And how was Mr. Trump and the target going to play

23   a role in this case?

24           MS. HANFT:  I think your Honor had it right in that,

25   of course, it will come up, Truth Social and Trump Media &

O5h2Gar1

Technology Group will come up because, of course, that was the

target of DWAC and the SPAC, but it is collateral to the case.

There will be some testimony, for example, of -- you

know, Mr. Brod mentioned that we will call Andy Litinsky who

was one of the founders of Trump Media.  But Trump himself will

play a very, very minor role in the trial, and so we submit

that that evidence is collateral and will be very limited and

that it is not a focal point at all of the trial.

THE COURT:  What if -- Mr. Bach, sit down.  You will

have an opportunity to speak.  Actually, Mr. Brod will have an

opportunity to speak.  So why don't you pass whatever you were

going to say in a note to him.

Ms. Hanft, what do you have to say about the notion

that if a potential juror might think, well, the IPO was

funneling money to Mr. Trump and I don't like Mr. Trump, and

Mr. Garelick was involved in something that funneled money, in

fact, he invested in a vehicle that funneled money to

Mr. Trump, helped enrich Mr. Trump, the argument might be made

and therefore that juror might be biased in this case against

Mr. Garelick with respect to the insider trading charges.

MS. HANFT:  Well, first of all, your Honor --

THE COURT:  It might be, therefore, not just bias, but

unable to be fair and impartial.

MS. HANFT:  Yes.  Your Honor, I think that's certainly

a question that the Court could ask at *voir dire*, but I don't

O5h2Gar1

1  think it's the extreme -- sort of the extreme remedy of a jury

2  questionnaire is necessary here.

3          There is nothing particularly unusual or explosive

4  about this case as compared to many other cases that have been

5  tried in this district where the Courts have not employed a

6  jury questionnaire.  Mr. Brod cited to just one circumstance

7  and represented that both parties were quite pleased with the

8  outcome, and I don't know on what basis he is speaking for the

9  government, but --

10          THE COURT:  Frankly, that's a little bit irrelevant to

11  me, because there are plenty of cases where judges are very

12  happy not using questionnaires and everybody is quite happy

13  with it anyway.  So you don't need to respond.

14          MS. HANFT:  And I think the point is, Judge, it's just

15  very clear that this will prolong jury selection.  That's the

16  government's main point.  And Mr. Brod even essentially

17  conceded as much by pointing out that we will likely need to

18  at least review the questionnaires overnight.  This will at

19  least make jury selection last two days.  Your Honor was

20  speaking as if, you know, trial would proceed on day one, and

21  so we think that a jury questionnaire just unnecessarily

22  prolongs the process here and is completely not necessary.

23          THE COURT:  All right.  Mr. Brod, you have whatever

24  you were going to say.

25          Sorry, Ms. Hanft.

O5h2Gar1

1          MS. HANFT:  One other thing I wanted to say in

2     response to the Court's question, which is that the

3     government's witnesses will of course also -- we will be

4     calling witnesses who sat on the board of DWAC.  We will be

5     calling a witness who is one of the founders of Trump Media &

6     Technology Group.  So, you know, obviously to the extent some

7     juror inappropriately discredits the defendant here, perhaps

8     they would do the same for the witnesses.  So we submit that it

9     is important to, of course, weed out any juror who can't be

10    fair and impartial, but we don't think a jury questionnaire is

11    necessary.

12          THE COURT:  Okay.  Mr. Brod.

13          MS. HANFT:  Just one moment, your Honor.  I'm sorry.

14          (Counsel confer)

15          MS. HANFT:  Thank you, your Honor.

16          THE COURT:  Mr. Brod, before you speak, I should make

17    it clear, if there is any doubt, that my expectation is with

18    respect to arguments, one lawyer is going to argue for each

19    side and with respect to objections and questioning witnesses,

20    one lawyer for each side.  So there is not going to be a

21    cacophony of objections from whichever side is not asking the

22    questions, just the lawyer who is responsible for that

23    particular witness.  That rule will continue.

24          MR. BACH:  I apologize.  I know the custom, and if I

25    misstep, apologies to the Court and to Mr. Brod.

1          MR. BROD:  Understood, Judge.

2          So this is going to be a trial, Judge,

3    notwithstanding what Ms. Hanft said, in which the jurors are

4    going to hear about Trump from day one through whenever we

5    finish a week later.  Witness after witness is going to come

6    in and talk about a venture, several ventures which were aimed

7    at and which ultimately resulted in a SPAC that merged in

8    Truth Social.  The jurors are going to see evidence in the form

9    of e-mails and messages that Mr. Garelick was excited to be

10   associated with this venture.  It goes without saying that in

11   this political environment and perhaps particularly in this

12   district, there are going to be jurors who cannot simply be

13   fair.

14          Anecdotally, as I was going to work yesterday, I ran

15   into a neighbor who said, What are you working on?  I said,

16   It's the insider trading case that came out of the Trump SPAC.

17   And his words to me, knowing nothing else about the case, Well,

18   that's probably an open-and-shut case.

19          So we think a questionnaire, which is different from

20   *voir dire* and in a crucial way --

21          THE COURT:  Did they think it was open and shut for

22   you or for the government?

23          MR. BROD:  Well, Judge, I would be speculating and

24   making an assumption if I inquired into it, but I'm pretty

25   clear that he thought the combination of insider trading, high

O5h2Gar1

1    finance, which some people have a prejudice against --

2              THE COURT:  I thought your friends had greater

3    confidence in you, but I got the argument.

4              MR. BROD:  One last point, which is, questionnaires

5    are different from *voir dire* in a crucial respect, which is

6    that jurors can, in semi privacy, reflect on the questions and

7    give their full answers.  We think that particularly in this

8    case a questionnaire will allow us to pick a fair jury so that

9    Mr. Garelick can receive the fair trial that he deserves.

10             THE COURT:  Okay.  All right.  I'm going to deny the

11   request for a questionnaire, but I am going to gear my *voir*

12   *dire* to the concerns that the parties have addressed and I'm

13   going to solicit the parties' help with respect to that.

14             I am denying the request for the questionnaire for

15   several reasons.

16             First, it will prolong the *voir dire*;

17             Second, in my judgment, a questionnaire is not

18   necessary to determine whether a juror can be fair and

19   impartial in this case, and the questions that I ask should be

20   sufficient to determine whether the jurors are fair and

21   impartial.

22             The third point ties into the second point, which is

23   that, in determining whether a juror can be fair and impartial,

24   it's been my experience, and I think the experience of other

25   judges in this Court, that the best way to do so, while also

O5h2Gar1

1  ensuring a fair cross-section, is to ask questions directly to

2  the jurors.  Questionnaires present dangers other than the one

3  of delay, and it does tie into the point that Mr. Brod just

4  made.  It is not unheard of for jurors to want to get out of

5  jury service.  A juror questionnaire does provide a ready and

6  easy opportunity for a person who might be clever to try to get

7  out of jury duty when a person who is either less clever or

8  perhaps a little bit less willing to be duplicitous might not

9  be able to do that, and it is just an equalizing way of being

10  able to ask every juror straight-on questions that are designed

11  to suss out to determine whether a juror can be fair and

12  impartial.

13      That said, there are a couple of things that I plan to

14  do, absent convincing objection, to address the concerns that

15  Mr. Brod mentioned.

16      I usually give an instruction after I select the jury

17  about access to the media and I usually also tell the jurors

18  that as part of my preliminary instructions before we even get

19  to questioning the jurors.  I have in mind giving the jurors --

20  telling the jurors as part of my questioning that one of the

21  instructions that I am going to give them is that during the

22  course of the trial if they are selected as a juror they are

23  not to communicate with anybody about the case, even close

24  friends or family, and they are not to do any research about

25  the case or any issues in the case, including by going on

O5h2Gar1

1   social media or the Internet, and to ask whether any juror

2   would have trouble following that instruction.  I would expect

3   that the jurors will all say no, that they will not have

4   trouble.  If a juror said yes, that would, in my mind, provide

5   grounds for excusing the juror.  And simply asking the question

6   is intended to reinforce the point that jurors are going to be

7   instructed not to look at anything.  The wording of the

8   question I will work out.

9           The second thing that I intend to ask the jurors, and

10  I'm going to ask the parties' help on this, has to do with the

11  role of Mr. Trump and the fact that the target is named

12  Trump Media and its product is Truth Social.  It seems to me

13  that some of the language that the government put in its

14  opposition about the fact that this is not a case about

15  Mr. Trump and one's views about Mr. Trump and Truth Social and

16  Trump Media are irrelevant to the questions in this case is

17  something that would be important for me to tell the jurors up

18  front and perhaps also to give them that instruction and ask

19  them a question whether there is anything about the fact that

20  the target here was Trump Media and the product was

21  Truth Social that would make it difficult for the juror to be

22  fair and impartial in this case.  The language is sensitive,

23  and I would ask the parties' help with respect to that.

24          So that's what I intend to do.  What I would like is

25  for the parties to meet and confer with respect to proposed

O5h2Gar1

1  language and to let me know Friday at 5 p.m. either their joint

2  proposal or their competing proposals with respect to such

3  language.

4          I also intend to send the parties a copy of my

5  proposed *voir dire*.  My intent is to send that to the parties

6  on April 23 and to ask for any comments and objections by

7  April 25, and then you will hear my rulings with respect to the

8  *voir dire* the morning of jury selection when we all convene.

9          Does that timetable work for the defense?

10         MR. BROD:  Yes, Judge.

11         THE COURT:  And for the government?

12         MS. HANFT:  Yes, your Honor.  Thank you.

13         THE COURT:  Okay.  The next thing are the government's

14  motions *in limine*.  I have got one or two questions for the

15  defense, and then I will hear from the government, which didn't

16  have an opportunity to respond.

17         MR. SHAHABIAN:  Your Honor, before we get to the

18  motions *in limine*, there was a development this morning that

19  relates to the presence-of-counsel motion *in limine*, and I am

20  happy to educate the Court before we go further, or if the

21  Court wanted to go out of order, I can sit down and wait.

22         THE COURT:  Why don't -- that's going to be the next

23  thing after I get to the questions about the F.B.I./DOJ

24  investigation, the pending SEC investigation, the Florida state

25  court, and the SEC settlement.

O5h2Gar1

1          One question for, I guess, the government is the

2     extent to which you need a ruling on that motion right now or

3     whether you are just alerting me to the issue.  Mr. Orlando

4     hasn't testified, and to some extent the question of what is

5     permitted in terms of cross-examination is difficult to answer

6     until we know what he is going to say.

7          MS. HANFT:  Your Honor, the government understands if

8     the Court wants to defer determination of the motion until the

9     point that it is clear what that witness is testifying to.  We

10    have also -- we should let the Court know we alerted defense

11    last night that we may not call Mr. Orlando.  We are currently

12    assessing.  It is relevant to other witnesses, too, to the

13    extent defense wants to question members of the board of

14    directors of DWAC, a few of whom will be testifying, you know,

15    about the -- sort of this disclosure aspect about statements in

16    DWAC's S-1, regarding preselection of a target, so it's

17    relevant to those witnesses, too, but it doesn't seem necessary

18    that the Court make a final ruling right now, and we understand

19    the Court's hesitation to do so.

20         THE COURT:  Mr. Bach, why don't you tell me how, you

21    know, any of the allegations in the state court lawsuit go to

22    bias or to any of the other issues in the case, and the same

23    thing with respect to the SEC order.

24         (Counsel confer)

25         MR. BACH:  So, Judge, Mr. Orlando has been the

O5h2Gar1

1   subject -- I know the Court knows this, but of numerous

2   lawsuits and numerous government investigations and there have

3   been very substantial questions raised about how he presented

4   the SPAC both to the SEC and to potential investors.  One of

5   the questions at the heart of this case is the legitimacy of

6   naming and identifying a probable SPAC target before the SPAC

7   is IPOed.

8            Here, I think the evidence will be clear that

9   Mr. Orlando used Trump again and again as a calling card for

10  this SPAC when he met with potential investors, when he was

11  trying to raise money for it, all pre-IPO, despite the legal

12  prohibitions on having a target before the IPO, legal

13  prohibitions about identifying and disclosing targets at this

14  stage.  And he walked a very fine line, aware that he was

15  dancing with immense legal risks and legal questions hanging

16  over his head.

17           So he would sometimes -- I mean, I don't want to get

18  into the entire defense here, but I think it will be very clear

19  that he tried to justify what he was doing in relation to legal

20  lines that he was clearly aware of and he had at least two

21  SPACs that he was in charge of and pushing at the time.  One

22  was called Benessere and one was called DWAC.

23           And Benessere had, as I understand it, gone well along

24  the path of substantial discussions with Trump Media Group

25  about the possibility of Trump Media Group being a target of

O5h2Gar1

the Benessere SPAC.  I think that's undisputed.  There were

many, many discussions.  It was well in the works.

And when Mr. Orlando put on his DWAC hat, instead of

his Benessere hat, he took the position that DWAC, even though

it was the same guy, the same people, supported by some of the

same consulting groups, he would say DWAC has had no

discussions whatsoever with Trump Media group.  We have had

nothing to do with them because, as a SPAC, we are not allowed

to engage before the IPO.

And he was in charge of the company at the time that

submissions were made to the SEC in which it was said in no

uncertain terms DWAC has had no substantial discussions with

Trump Media Group, and this -- DWAC wound up paying $18 million

in penalties to the SEC based on that fine line.  Because one

can't just say I was talking in one hat when I meant to be

talking under another hat, and the SEC has rejected that.

There is an SEC order, as I understand it, that rejects that.

THE COURT:  I have read the SEC order.  You submitted

it to me.

MR. BACH:  So what the government wants to do here,

it's clearly on the fence, the government is clearly on the

fence about whether they want to call Mr. Orlando I think

because of these issues.  And in a moment we will talk about

why we think it is important to get a ruling now rather than at

trial.  I will address that in a second.

O5h2Gar1

1          But it's very important when -- if they do call

2     Mr. Orlando that we be able to -- if he is just going to stand

3     up and say, This is where I drew the lines, this is how I

4     conducted myself, and we can't show that serious questions have

5     been raised about whether that was compliant and legal, it

6     already presents in a false light.  And at the very least, we

7     should be able to cross-examine him and say, wait a sec.  The

8     SEC is investigating you.  There was a penalty based on that.

9     You were investigated under that.  In fact, you are still under

10    investigation.  So you have to answer your questions in a way

11    that is not necessarily the answer that you might otherwise

12    give, but you are biased in terms of having to articulate a

13    narrative here, you have a motive to articulate a narrative

14    that gets you between Scylla and Charybdis of this host of

15    allegations that have been made against you not only by the

16    government and regulatory organizations, but by other board

17    members and by Trump Media Group and others who have said that

18    your behavior -- and part of our defense --

19          THE COURT:  Let's break this apart a little bit

20    because you have got a whole bunch of different things that you

21    have raised one, that the -- that the government has raised.

22    One is the state court lawsuit.  Everybody in Trump Media is

23    fighting everybody else over the spoils or the diminishing

24    spoils.  There is a whole bunch of stuff in that lawsuit about

25    breach of fiduciary duty and all kinds of stuff that arises

O5h2Gar1

1   after the IPO, after the trades that are at issue in this case,

2   claims that he breached his fiduciary duty because he has

3   demanded more than he is entitled to.

4           I assume that all of that is irrelevant because none

5   of that -- he doesn't have a motive to gear his testimony one

6   way or the other with respect to the -- what's in the state

7   court lawsuit.  I didn't see anything in the state court

8   lawsuit, but maybe you have something that you can point me to

9   where his testimony here might be -- might go one way or the

10  other because of his fear of liability in the state court

11  lawsuit.

12          MR. BACH:  Well, I think there are numerous

13  allegations.  We certainly --

14          THE COURT:  Paragraph of the state court lawsuit.

15  Which one?

16          MR. BACH:  There is one in Florida.  There is one in

17  Delaware.

18          THE COURT:  You gave me the Delaware -- you gave me

19  one of the complaints, so tell me which paragraphs.  I mean --

20          MR. BACH:  I don't know if I can do that on the spot.

21          THE COURT:  Then I can't rule on the spot.

22          MS. HANFT:  Your Honor, I think they may be referring

23  to paragraph 51.

24          MR. BACH:  Yes.  51 is the one in which this is the --

25  51 is one in which there is an allegation that Mr. Orlando

O5h2Gar1

leaked confidential business information to the press for his

own personal benefit and without benefit to DWAC's shareholders

and that this is the allegation that Mr. Park raised to the

Court the other day.

THE COURT:  I saw that.  It's not clear to me the role

that plays in the state court lawsuit.  I saw that allegation.

MR. BACH:  And --

THE COURT:  So I take it you want to -- if he -- your

point is he has to say that he didn't leak information because

if he did leak information then that would establish -- that

would tend to contribute to liability in the state court case,

is that right?  Just take me through the way in which it -- you

know, this would tend to establish bias that the fear of

collateral liability would tend to influence his answer to a

question.

MR. BACH:  Well, I think -- and, again, there are

allegations in the lawsuit that he was dishonest, that he stole

money, that engaged in a -- we will be judicious in what

questions we ask.  We are not going to bring in everything but

the kitchen sink here.  But I think that in terms of leaking,

in terms of his honesty and credibility --

THE COURT:  So we have got paragraph 51.

MR. BACH:  Paragraph 30, I think I already shared with

the Court, relates to the payment of the $18 million penalty,

so the state court proceedings raise that issue as well.

O5h2Gar1

1          THE COURT:  DWAC decided to pay $18 million?

2          MR. BACH:  Yes.

3          THE COURT:  Did Mr. Orlando -- was he on the board

4    when they's agreed to pay the 18 million?  Does anybody know?

5          MR. BROD:  With leave, Judge, I believe that

6    Mr. Orlando remained on the board and may even officially have

7    remained on the board until just a few weeks ago.  He refused

8    to resign.

9          MS. SHAPIRO:  Your Honor, can I just make a couple of

10   points?  I take your Honor's point about --

11         THE COURT:  You know, Ms. Shapiro, it's not like, you

12   know, you ask everything and Mr. Bach is arguing, so pass him a

13   note.  If you want a ruling, you've got to tell me what

14   specifically.  You can't just say, well, there is a state court

15   lawsuit against him, therefore we get to cross-examine him

16   about everything in the state court lawsuit.  No, we are not

17   going to cross-examine him about everything in the state court

18   lawsuit, but I'm not going to tell you what I am going to

19   cross-examine him about.  So if you want a ruling, you've got

20   to be a little bit more particular.

21         MR. BACH:  Judge, judge, to be honest, I didn't come

22   here expecting to have to recite the particulars of our

23   cross-examination and there is a superabundance of 3500

24   material relating to Mr. Orlando, a huge amount, and we don't

25   even know if the government is now planning to call him.  So

O5h2Gar1

1   it's hard for me to sit here and on the spot recite the

2   specific questions that we have.

3        What we are objecting to is the concept that there is

4   a blanket prohibition against raising these issues.  That seems

5   to us fundamentally unfair and highly unusual.  We understand

6   that the Court can rule on the spot that something is

7   irrelevant or cumulative or unnecessary.  We totally understand

8   that.  I don't want to --

9        THE COURT:  So maybe I can cut this short, Mr. Bach,

10  because now I understand the point a little bit better.  Let me

11  express a preliminary view and then see if there is a response

12  to it.

13       I don't think the law would support a categorical

14  exclusion of cross-examination of Mr. Orlando on the basis that

15  there -- the allegations in the complaint are just allegations.

16  In other words, it does seem to me to be proper

17  cross-examination if Mr. Orlando testifies and if he were to

18  testify in a way that implicates one of the allegations in the

19  state court lawsuit, for example, that -- and if his -- if the

20  evidence is such that the state court lawsuit would expose him

21  to liability if he answered the question here a different way,

22  then it seems to me the defense can say to Mr. Orlando, you

23  know, you are being sued in state court, do you understand you

24  have faced potential liability in that case, it could be huge

25  liability, and you had to answer the question in a particular

O5h2Gar1

way because if you answered it differently, you would be

exposed to monetary liability in that case.  That seems to me

to be potentially subject to 403 proper cross-examination.

Let me see if there is a dispute from the government

with respect to that.  In other words, there is no categorical

exclusion.

MS. HANFT:  I think the way your Honor has articulated

is correct.  The issue is that counsel should at least be able

to proffer a basis for why the specific statement by

Mr. Orlando would expose him to liability.  And so if it's

entirely collateral to what he is testifying about, then there

is no reason to introduce the existence of the civil suit.

THE COURT:  Then the next question is the question of,

Mr. Bach, I assume it's the question of whether you could

cross-examine on the fact that Mr. Orlando was still being

investigated by the SEC.

MR. BACH:  Correct, and whether there are dishonest

statements.

THE COURT:  Well, whether there are dishonest

statements may depend upon what your proffer is with respect to

the dishonest statements.  It may be that that is proper

cross-examination.  It may be that that's not proper

cross-examination.  It's hard to rule on that in a vacuum.

MR. BACH:  Yeah, but in terms of the SEC, I think it

falls within the paradigm that the Court just articulated.

O5h2Gar1

1  Obviously we will have to lay a foundation and it will depend

2  on his direct testimony, but I assume that it will come up

3  either on his direct or on his cross-examination that he is

4  still under investigation by the SEC, that some of the answers

5  he is providing will be at the heart of questions raised in

6  that investigation, and that he has to answer in certain ways

7  in order to spare himself exposure and liability.  I think it's

8  inevitable that that paradigm will come into play here.

9          THE COURT:  I take it what -- but tell me, correct me

10  if I am wrong, is that the paradigm is that the implication is

11  that here he will testify he tried to keep the information

12  confidential, it was confidential, and he didn't leak it all

13  over the place, and you would like to cross-examine him on the

14  fact that if he did leak it all over the place, he is going to

15  expose himself to SEC liability, is that it?

16          MR. BACH:  No.  This has more to do with what I was

17  talking about before.  It has to do with the way that he was

18  promoting the SPAC and using the name Trump Media Group, which

19  will be the central focus of this case.

20          And what you are going to hear, Judge, is there were a

21  series of meetings in which Mr. Orlando spoke to many of the

22  witnesses in this case, many of the people who participated in

23  the founders' round of the SPAC and talked to them about Trump

24  Media Group and he talked, broadly speaking, about Trump Media

25  Group as a target, potential target of the SPAC and he talked

O5h2Gar1

1    about his connections to Trump, and at the same time he has

2    taken the position, even though this is inherently improper and

3    wrong and is not a way that one can promote a SPAC because you

4    can't have a preidentified target, he has taken the position,

5    including in his S-1 and other public filings, and I think this

6    is the subject of the SEC lawsuit, that what he was doing was

7    okay because he was not having any -- he claimed not to be

8    having had any substantive conversations with DWAC.  So he has

9    minimized, minimized and shaded what he did here.

10            THE COURT:  So but because he -- in the SEC

11   investigation, your view is he said he did all of that wearing

12   the Benessere hat and not the DWAC hat --

13            MR. BACH:  For instance, Judge --

14            THE COURT:  No.  Just answer my question, not a --

15            MR. BACH:  That's part A.

16            Part B is that he is going to say:  I downplayed

17   Trump.  I said it was just something in the pipeline.  It

18   wasn't a real -- I didn't present it as a potential target.  He

19   is going to say that, and we don't think that's true.  We think

20   he was pumping up Trump and he made clear it was a potential

21   target and he had ways of doing that and that he has had to toe

22   a different line in the SEC case and in his -- we anticipate he

23   will toe that different line in his courtroom testimony because

24   he is exposed to liability in the SEC case.  He can't admit

25   that he was jumping up and down about Trump.

O5h2Gar1

1          THE COURT:  Why don't you address why you need a

2     ruling now on the hypothetical that Mr. Orlando is going to --

3     may testify before you open because you haven't so far

4     convinced me that I can grant your motion *in limine* without

5     knowing what Mr. Orlando is going to say or how the evidence

6     that you would like to mention would go to his bias.

7          MR. BACH:  Because, Judge -- I understand the Court's

8     question, and I want to educate the Court just a little bit.

9          There is a huge amount of Orlando material that's been

10    presented to us.  He was at the heart and center of this

11    effort.  And we don't know whether the government plans to call

12    him or not.  At 11:30 last night or 10:30 last night, which I

13    didn't see until this morning, after spending a few days

14    preparing, wading through that material, we learn that now they

15    might not be calling him.  Okay?

16         We briefed a 404(b) motion on taxes only to find out

17    that they are withdrawing it.

18         We have spent a lot of time and resources on what

19    turns out to be false starts in this case.  And if they are not

20    going to call -- today was -- last night was when they were

21    supposed to present their final witness list.  And if they are

22    not going to call Mr. Orlando, we need to know now because we

23    don't want to spend days and days going through that material,

24    preparing a cross-examination, trying to convince the Court

25    that we can open on it, trying to lay a foundation, if they are

O5h2Gar1

1    not in fact planning to call him.  It's a tremendous amount of

2    work.

3            We are down to one law firm in this case.  We have to

4    cover witnesses that have nothing to do with Bruce Garelick now

5    that relate to the other clients who were formerly part of this

6    process, and it's unfair, just as a matter of time and

7    resources and trial prep, to hear at the last minute that they

8    might not be calling Mr. Orlando, they haven't decided, and

9    that we have to kind of prepare a substantial cross and be able

10   to give the Court a basis for this if they are not planning to

11   call him.  So if they are planning to call him, I understand

12   that the Court prudently wants a little more context before

13   making rulings and the Court has kind of said what its general

14   attitude towards this evidence will be, and I appreciate that.

15   But I think --

16           THE COURT:  I think it's generally consistent with the

17   principles of law --

18           MR. BACH:  Of course.

19           THE COURT:  -- that you laid out but not necessarily

20   with the application.

21           MR. BACH:  Understood.  And Judge, I can't disagree

22   with that.  I mean, I understand where the Court is coming

23   from.

24           What I want to emphasize to the Court is the

25   tremendous amount of work in a very compressed time frame in

O5h2Gar1

1    which we really don't have much time at all.  We have a lot of

2    3500 material.  There are other issues that we want to raise

3    with the Court that have come up, and I just think the witness

4    list was due yesterday.  We should know very fast whether

5    Mr. Orlando is going to testify or not because I would like to

6    write my opening statement.  I want to prepare

7    cross-examinations.  I don't want to do a lot of work on

8    Orlando if he is not going to testify.

9             THE COURT:  Okay.  The motion *in limine* to exclude

10   evidence with respect to the F.B.I./DOJ investigation, the

11   pending SEC investigation, Florida state court lawsuit, and the

12   SEC settlement, I'm going to reserve decision on that.  In

13   other words, I am going to deny the motion *in limine* which asks

14   for a pretrial ruling with respect to those issues because the

15   parties are not entitled to *in limine* rulings and particularly

16   because *in limine* rulings are discouraged in circumstances

17   where the admissibility of the evidence on cross-examination

18   may depend upon what is offered on direct examination.  So I

19   think that that resolves that issue.

20            The next issue is --

21            MS. HANFT:  Your Honor, may I just respond to

22   Mr. Bach's statement because I just want to make clear that the

23   government is acting in good faith.

24            We have been spending our time, as well, preparing

25   witnesses, including Mr. Orlando, and so we, too, have no

O5h2Gar1

1    incentive to waste time on a witness we don't intend to call.

2    In the interests of being totally transparent with defense, we

3    let them know last night that we were not certain that we would

4    call Mr. Orlando.  In parallel with submitting our witness

5    list, we provided that information.  So we were attempting to

6    give defense, you know, as much guidance as we could.  We

7    routinely cut witnesses as we approach trial.  So we are acting

8    in good faith and take issue with any suggestion that we are

9    not.

10             THE COURT:  It's also not unheard of for parties to

11   cut witnesses during the trial after they see how their

12   witnesses have performed.

13             All right, the next issue is -- has to do with the

14   presence of counsel defense and, Mr. Shahabian, you had

15   something to raise on that.

16             MR. SHAHABIAN:  Yes, your Honor.  If I could approach

17   your deputy with a copy of a production we received this

18   morning from Rocket One, I will provide a copy to the defense

19   as well.

20             THE COURT:  Give me one moment to look at it.

21             MR. SHAHABIAN:  Of course, your Honor.

22             THE COURT:  Okay.

23             MR. SHAHABIAN:  So, your Honor, this is the first the

24   government has ever seen this e-mail.  It was previously marked

25   privileged by Rocket One in connection with the original

O5h2Gar1

productions to the SEC and the Department of Justice. This

morning we received this production.

I called counsel for Rocket One and asked was this

inadvertent? Are you waiving privilege that you previously

asserted? The response I received is that they were waiving

privilege just as to this e-mail. I said, Are you sure that

you are raising a selective privilege as to a single e-mail and

to nothing else that you have withheld as privileged?

We then received an e-mail communication saying

actually this document never should have been marked privilege,

and we realized it was inadvertently marked privileged and we

are now producing it to you.

There are still additional documents that Rocket One

has marked as privileged that relate to this conversation,

including notes that appeared to have been taken by Michael

Park after his conversation with Bruce Garelick, that we have

not seen.

This is exactly what the government has been warning

about for months since we first raised the issue of providing

notice of an advice or presence of counsel defense. We raised

it in open court when we were here before your Honor and

defense counsel said they were not intending to raise such a

defense. We briefed a motion *in limine* saying we should

preclude any mention of presence of counsel, given the

representations we have received. And now this morning we

O5h2Gar1

1    received this e-mail from -- of what appears to be a selective

2    waiver of privilege for the first time.

3                (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      MR. SHAHABIAN:  (Continuing)  So what the government

2  is requesting in connection with our motion in limine is,

3  first, a finding that Rocket One has waived its privilege with

4  respect to these communications, and we should obtain the

5  additional communications that they continue to withhold as

6  privileged.

7      We also reiterate our request in the motion in limine

8  that defense should provide a detailed factual proffer of any

9  presence-of-counsel defense they intend to assert at trial,

10  such that the parties have notice and sufficient time to brief

11  for the Court the potential 401 and 403 issues this raises.

12  For example, as the Court is aware, in the Bankman-Fried trial,

13  Judge Kaplan heard the proposed presence-of-counsel defense

14  outside the presence of the jury before making rulings on what

15  could be presented to the jury --

16      THE COURT:  During the course of the trial?

17      MR. SHAHABIAN:  Correct.  But that was after a notice

18  had been given, such that the parties could brief it and

19  discuss the proposed -- discuss the proposed procedure before

20  getting to that issue in the trial.  This is why we've been

21  raising this issue from the beginning, to avoid this kind of

22  late breaking surprise or potentially derail the presentation

23  of evidence to the jury.  So that is why we filed the MIL, and

24  here we are with this morning's production.

25      THE COURT:  So on the request for a ruling that

O4HKGAR2

1     Rocket One has waived, how can I do that without the presence

2     of Rocket One counsel here?  I'm prepared to hold a hearing

3     next week with counsel for Rocket One, if you want to bring on

4     a motion to compel the production of documents that you've

5     subpoenaed, but I don't see how I can do it without

6     Rocket One's counsel being present and having an opportunity to

7     be heard and without there being maybe some briefing.

8             MR. SHAHABIAN:  Yes, your Honor, that's fine.  And we

9     can discuss a proposed schedule with the Court after we talk

10    with counsel for Rocket One.  So with respect to that, I think

11    we'll ask for a prompt ruling on that.

12            In addition, we know the Court has set the deadline

13    for the defense production of exhibits for, I believe it's,

14    this Saturday, and we would anticipate any additional documents

15    they intend to rely on in connection with the

16    presence-of-counsel defense will be produced on Saturday.

17            MS. SHAPIRO:  Your Honor, may I respond?

18            THE COURT:  Yes.

19            MS. SHAPIRO:  I think it's quite clear on the face of

20    this document that this is not privileged.  Mr. Garelick is not

21    asking for any advice of Mr. Park.  He's writing to him in his

22    capacity as his compliance officer.  And Mr. Garelick and his

23    counsel have not been involved, and are not privy to, whatever

24    other documents Mr. Shahabian is referencing that appeared on

25    some privilege log that we've never seen.

O4HKGAR2

1    So I don't think there's any need for additional

2    hearings on this matter.  We don't know what other documents

3    he's even talking about.  And on the face of it, this

4    particular document, which we were aware of, is not privileged.

5    So we don't think there's any need to hold a hearing

6    about waiver.  We're not asserting an advice-of-counsel

7    defense.  We've been very clear on that.  There's no nonsense

8    going on here, and this is just a distraction.  I think this

9    email, which the government now has and which was going to be

10    on our exhibit list, is the only document we're really talking

11    about, and it doesn't represent any advice of counsel.  It's an

12    email Mr. Garelick wrote to the compliance officer.  He's not

13    asking for legal advice.  He's simply informing him of certain

14    facts.

15    THE COURT:  Can you let me know, Ms. Shapiro — and

16    maybe this is a question to Mr. Bach — the extent to which you

17    intend in your opening to raise issues about the presence of

18    counsel.

19    MR. BACH:  I don't believe I plan to refer to counsel.

20    But there are -- not to counsel, no.

21    THE COURT:  Mr. Shahabian, a couple of things:

22    First of all, I think there is some force to what

23    Ms. Shapiro says about this document looking like it's a

24    compliance document and not a privilege document, but I'll

25    permit you to make a motion as against Rocket One and to brief

1     it.

2          But, second, I realize the proposition that if I don't

3     rule right now with respect to privilege issues, it creates the

4     potential for delay in trial.  That is an issue that I grappled

5     with in the *Ray* case.  And it may be that people say that I was

6     wrong in that, and fine in arguing that, but it did reflect a

7     concern, which I do think is well-founded, that the

8     inefficiencies that may be accompanied by late-breaking

9     defenses, as long as it's not here a defense-of-counsel

10    defense, can be addressed by, if necessary, there being a short

11    break in trial, by changing the order of witnesses, by other

12    means, so I'm not requiring the defense to preview their case.

13         So maybe you can address for me, if presence of

14    counsel is not going to come up in opening, and if I now direct

15    Mr. Bach not to mention in his opening the presence of counsel

16    at any of the meetings that are at issue in this case, why I

17    should require them to make a proffer with respect to their

18    theory of defense.

19         MR. SHAHABIAN:  I think that gets us a lot of the way

20    there, your Honor.  I think I just want to flag one thing to

21    preview where I think this could go and why the government is

22    so concerned.

23         I would agree that this email on its face doesn't

24    reference a lawyer, it says compliance officer, but Michael G.

25    Park is the general counsel for Rocket One.  He is not just a

1  compliance officer; he is also a lawyer. And I did not make

2  the privilege call to withhold this as privileged; this was

3  Rocket One's decision to withhold this as privileged.

4        And, on its face -- and the government will plan to

5  object to the introduction of just this email as hearsay, but I

6  could see the world in which, if the defendant were to testify

7  or if he were to call Michael Park as a testifying witness, the

8  issue of Michael Park being a lawyer, such that a

9  presence-of-counsel argument will come up and be presented to

10  the jury, and as courts in this district have noted, even the

11  presence-of-counsel argument risks confusing the jury, even if

12  it's not a strict advice-of-counsel defense, because putting

13  evidence in front of the jury that a lawyer was there, a lawyer

14  was involved, a lawyer was informed, makes it seem like it was

15  legally blessed. And that gives rise to the 403 issues that

16  require this Court to carefully consider it.

17        So that's the government's concern, now that we have

18  this email and we don't know exactly where this is going. I

19  hear the Court's tentative ruling that if we eliminate it from

20  openings, that takes care of the immediate concern, but I just

21  want to preview for the Court that it may not just be this

22  email, and that's what the government is concerned about.

23        THE COURT:  Okay.

24        I do also tend to agree with the way in which

25  Judge Kaplan phrased the issue in Bankman-Fried, I think

O4HKGAR2

1   Judge Kaplan got it exactly right, and that would be the

2   framework that I will apply if this issue comes up.

3           For now, I'm addressing the issue by directing the

4   defendant to do what defense counsel said he was planning to do

5   anyway in his opening, which is not to mention the presence of

6   counsel as part of the defense.

7           MR. BACH:  Can I just have a moment to confer on that?

8           (Pause)

9           MR. BACH:  As the Court knows, I haven't crafted the

10  language of my opening yet, but one thing that I'm considering

11  is saying, you know, that Mr. Garelick policed himself, that he

12  was aware in his mind of what he could and couldn't do, and

13  that he memorialized that in writing.  And I can do that

14  without referring to a compliance officer, I can do that

15  without referring to a lawyer.  I don't think I should be

16  precluded from doing that.  I think that's a fundamental part

17  of the defense here.

18          THE COURT:  If you do that, you're going to run the

19  risk that, unless you've established a foundation for the

20  admission of this exhibit, the government is going to be able

21  to say in their closing, you heard all of these promises made

22  by the defense, and, you know, they didn't live up to their

23  promises.

24          MR. BACH:  I totally understand --

25          THE COURT:  People take risks.

1      MR. BACH:  I totally understand that, and that's why I

2   say I'm still crafting my opening, but I just want to be clear,

3   the line is I can't say and gave it to a lawyer.  That's what

4   the Court is asking me not to do.

5      THE COURT:  You can't say there were lawyers around or

6   that -- you can say what is in his state of mind --

7      MR. BACH:  Okay, okay.

8      THE COURT:  -- but not the presence of counsel.

9      MR. BACH:  I appreciate the clarification.  I just

10  wanted to make it clear.

11      THE COURT:  All right.

12      Mr. Shahabian, I'm out on Monday for Passover.  I'm

13  around all next week in terms of if there needs to be a motion

14  with respect to the Rocket One documents or otherwise.  You can

15  just contact my deputy after consulting with the defense, and

16  we can schedule a conference.

17      MR. SHAHABIAN:  Yes, your Honor.  And we'll advise the

18  Court after we confer with counsel for Rocket One.

19      Just one additional issue — and I recognize that the

20  Court may not be inclined to rule on this, given its ruling —

21  in the Bankman-Fried trial, Judge Kaplan did require pretrial

22  disclosure from the defense with a notice that included

23  description of the contours of a presence-of-counsel or

24  advice-of-counsel defense; disclosing the attorneys involved;

25  the general subject matter of the communications, the format,

O4HKGAR2

1    and the approximate dates and date ranges; whether the

2    defendant is asserting advice-of-counsel or a good-faith

3    defense based on the involvement or presence of counsel; to the

4    extent a formal advice-of-counsel defense is pursued, the

5    information provided to the attorney and the advice, if any,

6    conveyed to the defendant by the attorney; any other

7    individuals present for, or involved with, the communications;

8    to the extent communications are privileged, what type of

9    privilege applies; and all materials supporting the defense, as

10   well as any materials in the defendant's possession that would

11   tend to undermine or impeach the defense.

12           I recognize they've disclaimed advice of counsel, but

13   I think a lot of what Judge Kaplan required to be provided

14   pretrial, either through disclosure of documents or in a

15   written notice, is applicable here, and I think the government

16   would request that the defendant provide such notice by

17   Saturday with its reciprocal discovery deadline.

18           THE COURT:  So was there an objection to that order by

19   Judge Kaplan?

20           MS. SHAPIRO:  Your Honor, with all due respect, I

21   am --

22           THE COURT:  You know the Bankman-Fried case.  I

23   assume --

24           MS. SHAPIRO:  There was an objection, but I expect

25   that that whole sequence of events may well be part of

O4HKGAR2

1    Mr. Bankman-Fried's appeal because the entire nature of the

2    proceeding and the rulings — and I understand what your Honor

3    said about it — but it was rather unprecedented.  And I will

4    say again, for the third or fourth time, and as we indicated in

5    our opposition, there is no advice-of-counsel defense here.

6            THE COURT:  Do you know, Ms. Shapiro, whether there

7    was an objection to the pretrial disclosure of that information

8    in Bankman-Fried?

9            MS. SHAPIRO:  There was.  There was a series of

10   briefs, it was objected to, the judge overruled the objections,

11   and then there was further notice provided in light of the

12   Court's ruling.

13           THE COURT:  Okay.  I'm going to deny the government's

14   request for there to be a proffer of information.  I hold

15   Judge Kaplan in the highest regard, but I'm going to adhere to

16   my previously expressed views.

17           On coconspirator statements, what does the government

18   need on that in limine?

19           MR. SHAHABIAN:  The government will withdraw its

20   request for an in limine ruling on that.

21           THE COURT:  Okay.  All right.

22           And then on the evidence regarding Mr. Garelick's

23   politics, his family background, health, age, or other similar

24   factors unconnected to guilt, Mr. Bach, Ms. Shapiro, Mr. Brod,

25   as I would come to expect, you were not particularly specific

O4HKGAR2

1  in terms of the kinds of information that you wanted to elicit

2  about Mr. Garelick's background.

3         Maybe I should ask the government:  What is it that

4  you are concerned about?  And then I'll ask the defense about

5  their offering it.

6         MR. SHAHABIAN:  I think there are two main concerns,

7  your Honor.

8         One, connected to the jury questionnaire discussion

9  earlier, is, is any sort of argument or suggestion that because

10 of the defendant's politics or association with Trump Media or

11 Trump, that he's being targeted or persecuted or unfairly

12 prosecuted in this case?

13        And then, related to that, the more general concern

14 about arguments about sympathy and background that don't really

15 go to guilt or innocence.

16        THE COURT:  So I'll ask the defense about the second,

17 and then I do have views with respect to -- on the first, it's

18 kind of a challenging issue, Mr. Shahabian, because the jury

19 will see who Mr. Garelick is.  If you want to -- if you want to

20 ask a question about how old he is, I don't particularly know

21 how old he is, but I can probably guess within a range, and the

22 jury will have a view within a range.  And based upon his role

23 in this case, there's going to be some facts in terms of his

24 background and education that I think is just going to

25 necessarily come out.  So why don't we see how that goes.  I

1    get the issue.

2          Mr. Bach, there's not going to be an argument in this

3    case that your client is being prosecuted because this has to

4    do with Trump and Trump Media, and it's a selective prosecution

5    and politically driven, is there?

6          MR. BACH:  That hasn't crossed my mind, Judge, no.

7          THE COURT:  Okay.  Put another way, then, it makes it

8    easy; there's not going to be any kind of argument like that.

9    And if there is, I can step in.

10          Mr. Shahabian, does that take care of it?

11          MR. SHAHABIAN:  Yes, your Honor.

12          And if I could go back to the coconspirator statement.

13    My colleagues informed me I may have jumped the gun, and maybe

14    your Honor is not prepared to rule on this anyways, but we did

15    want to sensitize the Court to the issue of, for example, text

16    messages from coconspirators, such as Gerald Shvartsman, to

17    remote tippees, who then traded on the information, that those

18    are the kinds of statements that the government intends to

19    admit as coconspirator statements in furtherance of the

20    conspiracy.

21          I recognize --

22          THE COURT:  The two that you mentioned being examples

23    of those?

24          MR. SHAHABIAN:  Correct, your Honor.

25          And I think I take the Court's preliminary remarks as,

O4HKGAR2

1    you're not prepared to rule on that until seeing how the

2    evidence comes in, but I did want to flag that for the Court's

3    attention.

4              THE COURT:  Okay.  I am not prepared.  My initial

5    view — but we'll see how it plays out — is that the government

6    has made the sufficient preliminary showing to be able to have

7    the evidence conditionally admitted subject to the *Gainey*

8    procedure that if it has not been established by a

9    preponderance that the statements were made in the course of

10   the conspiracy in furtherance of the conspiracy, then they will

11   be stricken.

12             Is there anything else from the government that we

13   need to address today?

14             MR. SHAHABIAN:  Your Honor, there are no more issues

15   on the motions in limine.  The government does have two other

16   issues to bring up, if now is the appropriate time.

17             THE COURT:  Now is the appropriate time.

18             MR. SHAHABIAN:  The first would be the government

19   requests that the Court allocute Mr. Garelick on the fact of a

20   plea offer having been extended and rejected and proceeding to

21   trial.

22             In addition, as a housekeeping matter, the government

23   would ask if the Court is amenable to, regardless of how long

24   jury selection takes on Monday, having our openings and first

25   witness ready to go Tuesday morning, as we have witnesses

O4HKGAR2

1    coming from out of state and want to try to make definitive

2    travel arrangements.

3         THE COURT:  Okay.

4         And what are the -- refresh me as to the questions I

5    should ask in terms of allocuting Mr. Garelick.

6         MR. SHAHABIAN:  I defer to my colleague, Mr. Nessim.

7         THE COURT:  Maybe Mr. Garelick will also pay

8    attention, to make sure he pays attention, because I'm going to

9    ask Mr. Garelick whether he has been able to follow what the

10   prosecution has said.

11        MR. NESSIM:  Yes, your Honor.

12        We would ask that Mr. Garelick confirm that he

13   received a plea offer extended to his attorneys, dated

14   March 27th of 2024.  That plea offer involved a plea of guilty

15   to Count Two of the superseding indictment, and that,

16   in consideration of that plea, the defendant would not be

17   further prosecuted for the offenses in the indictment.

18        The plea agreement included a guideline stipulation

19   with an applicable guidelines offense level of 27, a criminal

20   history category of I, and a guideline sentencing range of 70

21   to 87 months.

22        Of note, the agreement also included a stipulation

23   under which the government agreed that at sentencing, it would

24   seek a sentence no greater than the lowest end of the

25   guidelines applicable to Mr. Garelick's codefendant,

1    Gerald Shvartsman.

2            Otherwise, there are standard terms in the plea

3    agreement, but those are the major points of the agreement that

4    we would ask the Court confirm Mr. Garelick's understanding.

5            THE COURT:  I also intend to make it clear to

6    Mr. Garelick that if he is convicted after trial, that there is

7    no assurance that the guidelines range that I ultimately will

8    use would be within that 70 to 87 months and that it could

9    potentially be quite higher.

10           MR. NESSIM:  Yes, your Honor.  So we would ask to

11   confirm Mr. Garelick's understanding and that he received that

12   offer, considered it, and rejected it.

13           THE COURT:  Mr. Garelick, were you able to follow what

14   the prosecution said?

15           THE DEFENDANT:  Yes, I believe I was, your Honor.

16           THE COURT:  Okay.

17           And did you, in fact, receive the plea offer of

18   March 27, 2024?

19           THE DEFENDANT:  Yes, I did.  I think my only potential

20   confusion is, is there's some argument whether -- upon the

21   admissibility of that plea agreement into the actual trial?

22           THE COURT:  No.  Why don't you just follow the

23   questions --

24           THE DEFENDANT:  Sure.  I'm sorry.

25           THE COURT:  -- that I'm asking because it doesn't have

O4HKGAR2

1  to do with the admissibility of the plea agreement at trial.

2  But I do want to make sure that you received the plea offer?

3  THE DEFENDANT:  Yes, your Honor, I did.

4  THE COURT:  And you understood that the government was

5  offering you a plea to Count Two of the superseding indictment,

6  and that, in consideration of that plea, if you accepted it,

7  that they would dismiss the other counts against you, and that

8  you would not be further prosecuted for the offenses charged in

9  the indictment and the superseding indictment?

10  You understood that?

11  THE DEFENDANT:  Yes, your Honor, I understood that

12  very well.

13  THE COURT:  Okay.

14  And there was also a guidelines stipulation contained

15  in that plea agreement, which had a guidelines range of 70 to

16  87 months and an agreement by the government that you would not

17  be sentenced to --

18  Mr. Nessim, say it again?

19  MR. NESSIM:  The agreement was the government agreed

20  not to seek a sentence higher than the lower end of the

21  guidelines applicable to Codefendant Gerald Shvartsman.

22  THE COURT:  The government agreed not to seek a

23  sentence higher than the lower end of the guidelines applicable

24  to Gerald Shvartsman; you understood that?

25  THE DEFENDANT:  Yes, your Honor, I understood that.

O4HKGAR2

1          THE COURT:  Okay.

2          And do you understand that by going to trial, first of

3     all, that plea offer is off the table?

4          THE DEFENDANT:  Yes, I understand that.

5          THE COURT:  And that it's quite possible that, after

6     trial, if you end up being convicted, that, first of all, I

7     will calculate the guidelines, and that the guidelines may be

8     quite a bit higher than that to which you were offered in that

9     plea agreement?

10          THE DEFENDANT:  Yes, your Honor, I understand that.

11          THE COURT:  Okay.  And I take it you discussed the

12     plea offer with counsel; is that right?

13          THE DEFENDANT:  Yes, confirmed.

14          THE COURT:  Before you made the decision?

15          THE DEFENDANT:  Correct.

16          THE COURT:  Anything further from the government on

17     that issue?

18          MR. NESSIM:  No, your Honor.

19          THE COURT:  Okay.

20          Any objection from the defense to starting openings on

21     Tuesday morning?

22          MR. BACH:  None, your Honor.

23          THE COURT:  Okay.

24          Anything else from the defense?

25          MS. SHAPIRO:  Yes, your Honor, a few things.

1    We received the government's witness list, as Mr. Bach

2  indicated, late last night, didn't see it really until this

3  morning, and there are a number of people listed that aren't

4  actually people, so we don't even have all the names.  And I

5  want to talk about that a little bit.  I think there were three

6  or four representatives of organizations that are listed.

7    And, in addition, in connection with those, it seems

8  like a few days ago, we received a production and a Rule 404(b)

9  notice that was after the deadline, although the government

10  disclaimed that there was 404(b) evidence, but they referenced

11  404(b) in their letter relating to compliance policies that

12  were put in place by former employers of Mr. Garelick which are

13  more than ten years old.  And we haven't had a chance to fully

14  digest all of this, but we've taken a glance at some of the

15  compliance policies, and we think that they should not be

16  admitted at trial.  They are, as compliance policies often are,

17  vastly overinclusive and not accurate as to the same law that

18  the Court is going to instruct the jury on.

19    This is not a case where the defense is not -- where

20  it's going to be disputed that Mr. Garelick is an experienced

21  financial professional, who knew what material nonpublic

22  information was, but these policies, for instance, contain

23  inaccurate definitions about what is materiality, they prohibit

24  any trading on material nonpublic information without

25  discussing duties, personal benefit, various other elements,

O4HKGAR2

1    and they're completely misleading, and it's almost akin to if

2    the Court were to allow a legal expert to tell the jury what

3    the law of insider trading says.

4         So, we think those documents should be excluded.  We

5    don't know what witnesses they plan to call or what testimony

6    they plan to elicit with respect to those issues, they haven't

7    even given us the names, but we think all of that should be

8    excluded.  We're prepared to move in limine, if necessary, file

9    a brief on this, but I wanted to alert the Court to that.

10        There are other issues that have come up in connection

11   with the 3500.  For instance, there are a number of witnesses

12   in the 3500 who make statements about their own understandings

13   about whether you could trade, whether this was material

14   nonpublic information, board members and others, and the issue

15   at this case at trial is going to be what was Mr. Garelick's

16   state of mind, and all of that is irrelevant and subject to

17   Rule 403, confusing, it's going to mislead the jury.

18        So there are other issues.  They produced on their

19   exhibit list this morning, according to my colleagues, mugshots

20   of the Shvartsmans, so now the jury is going to be told that

21   they were arrested and shown their mugshots, and of

22   Mr. Garelick.

23        So to extent the Court could provide a guidance

24   particularly as to this compliance policy issue, because based

25   on the number of witnesses, it looks like the trial is going to

O4HKGAR2

1    be a lot longer, and it's going to be a frolic and detour about

2    past compliance policies at jobs Mr. Garelick held more than

3    ten years ago, and we would like some guidance on that now.  I

4    recognize that I'm just bringing this up now because we just

5    learned about this.

6             THE COURT:  You've raised a whole bunch of things, but

7    it seems like you're focused on the compliance policies.  I'll

8    hear from the government, but, ordinarily, things like

9    compliance policies can be received, and your concern is taken

10   care of by me giving the jury an instruction as to the limited

11   purpose for which the compliance policies were being received,

12   and that with respect to what is material nonpublic

13   information, that is to come from me, in my charge, and not

14   from any compliance policy.

15            MS. SHAPIRO:  I understand that, your Honor, but, with

16   all due respect, I think when you see the policies in this

17   case, you're going to understand why that's just not going to

18   work, and it just simply doesn't make any sense.  We're happy

19   to put in a brief on this.  What I would ask the Court to rule

20   on today is I would ask the Court to direct the government to

21   give us the names of the actual witnesses they plan to call and

22   any 3500, because they have not provided any of that.

23            THE COURT:  So why don't you tell me, since I don't

24   have the witness list, what are the witnesses who are not

25   actually people that you are complaining about?

1          MS. SHAPIRO:  Okay, hold on.  I apologize, your Honor,

2     I saw this on my phone on the way in.  So Adage Capital

3     witness, DTCC witness, Fidelity witness --

4          THE COURT:  Slow down.

5          ATG, is that what you said?

6          MS. SHAPIRO:  Adage, A-d-a-g-e.  It's witness number

7     one on their list.

8          And then number 3, DTCC; number 4, Fidelity.  I expect

9     that Fidelity — the government can correct me if I am wrong —

10    that one is probably related to the trading in this case --

11         THE COURT:  And I would assume the DTCC also is, but,

12    you know...

13         MS. SHAPIRO:  14, Saba Capital witness; and 20, Virtu

14    witness.

15         But, your Honor, we'll put in a letter on these

16    issues.

17         THE COURT:  No, you asked me for a ruling, so I may be

18    able to address it.

19         On DTCC and Fidelity, it sounds to me like those are

20    document custodians.  Is that wrong?  Maybe you can even agree

21    in a stipulation with respect to what comes in from DTCC and

22    Fidelity.  Is it trading records?

23         MR. NESSIM:  Your Honor, I think some of these are

24    just document custodians.  They're all relatively short, you

25    know, corporate witnesses.  We're in the process of identifying

1  the names of these people, and once we have them and 3500

2  material responsive relating to those witnesses, we'll produce

3  that immediately.  We're not trying to hide the ball here.

4  These are all witnesses who will speak to whether these are

5  corporate records or corporate policies or venue-related

6  issues.  And I think all of these witnesses will give brief

7  testimony.  And it's not as if we're sitting on 3500 material,

8  sitting on names that we haven't produced; we're actively in

9  touch with counsel for all these entities to identify the

10  person, and defense counsel will have that effectively as soon

11  as we do.

12         MS. SHAPIRO:  Your Honor, just to be clear, when I

13  said we're going to submit a letter, I meant on the old

14  outdated compliance policies.  And we're going to do that.  We

15  want to protect the record on that, even if your Honor has

16  prejudged it, which I hope you haven't.

17         THE COURT:  I have not prejudged it.

18         MS. SHAPIRO:  Just to be clear, none of this has

19  anything to do with DWAC; it's all old stuff.

20         THE COURT:  I had understood that.

21         MS. SHAPIRO:  I think that's it.  We'll raise the

22  other issues after we have a chance to digest the exhibit list,

23  and we'll put in a letter.

24         THE COURT:  Okay.  All right.

25         MR. BACH:  Can I just confer with the government for

1    one second?

2              (Pause)

3              MR. BACH:  Judge, we're asking for a ruling that the

4    government let us know before opening statements where they are

5    at least leaning in terms of calling Mr. Orlando or not.  He's

6    such an important witness, that, as the Court noted, there are

7    risks in opening statement.  The purpose of a witness list is

8    so that defense counsel can have some notice of witnesses to

9    anticipate at the trial.  There's clearly a lot of time between

10   now and the trial for the government to consider and decide

11   whether to call Mr. Orlando or not, and I think it's only fair

12   that they give us an indication of where they are on that

13   before we open in this case.

14             THE COURT:  What I'm prepared to do is not quite that,

15   but it's to require the government by some date prior to

16   opening statements to indicate to the defense whether they

17   intend to open with the representation that Mr. Orlando is

18   going to be testifying, so that in the defense opening

19   statements, the defense can be prepared to address that, given

20   his importance.

21             And Mr. Shahabian or whoever wants to answer that from

22   the government?

23             MR. NESSIM:  Your Honor, we can say right now that we

24   will not be representing that Mr. Orlando will be testifying in

25   our opening statements.

O4HKGAR2

1          THE COURT:  Okay.

2          That's what I'm prepared to do.  That's the most I'm

3    prepared to do, Mr. Bach.

4          MR. NESSIM:  Your Honor, can I just add one thing to

5    clarify my earlier statement about some of these custodial or

6    corporate witnesses?  The Saba witness is slightly distinct

7    from the purposes I identified.  Saba is a hedge fund that had

8    a position in DWAC's SPAC and sold it once they learned about

9    the merger, once it was publicly announced.  And so they would

10   be testifying as to the nonpublic nature of the merger target,

11   but still sort of the same nature in terms of length of

12   testimony and role.

13         THE COURT:  Who is 20, Virtu?

14         MR. NESSIM:  Virtu is related to some of the

15   counterparties to the trades -- or executing broker, excuse me,

16   on some of the trades that Mr. Garelick placed.

17         THE COURT:  And Adage?

18         MR. NESSIM:  Adage is his prior employer.  That is

19   where the compliance manuals come from.

20         THE COURT:  Okay.

21         I would like the 3500 material from the government in

22   the witness list that was produced.  Maybe you can email me the

23   witness list that was produced on the 3500 material.  As soon

24   as possible, can you get it to me?  It would be useful if you

25   can get it to me in PDFs that are bookmarked so that I can pull

O4HKGAR2

1  it up on my screen and then just click on the bookmark to get

2  to the relevant 3500 material.

3          MR. SHAHABIAN:  We'll take care of that, your Honor.

4          THE COURT:  Anything else from the government?

5          MR. NESSIM:  As we make rolling updates of 3500

6  material, should we also produce that to the Court on a rolling

7  basis?

8          THE COURT:  Yes.

9          Ms. Shapiro?

10         MS. SHAPIRO:  Your Honor, I don't think we have

11  anything else.

12         There is one other matter unrelated to this case that

13  we were hoping after we conclude — we've discussed this with

14  the government, and they're welcome to join us — we wanted to

15  come to the sidebar and raise with your Honor.  It doesn't

16  relate to this case.

17         THE COURT:  Okay.  I'm fine with that.

18         So we're concluded.

19         MS. SHAPIRO:  Thank you, Judge.

20         (Adjourned)

21

22

23

24

25