O4T1GAR1

1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK

2  ------------------------------x

3  UNITED STATES OF AMERICA,        New York, N.Y.

4          v.               23 Cr. 307 (LJL)

5  BRUCE GARELICK,

6             Defendant.

7  ------------------------------x    Trial

8                             April 29, 2024
                             9:20 a.m.

9

10  Before:

11               HON. LEWIS J. LIMAN,

12                           District Judge
                            and a Jury

13

14                   APPEARANCES

15

    DAMIAN WILLIAMS
16        United States Attorney for the
        Southern District of New York
17  BY:  ELIZABETH A. HANFT
        MATTHEW R. SHAHABIAN
18        DANIEL G. NESSIM
        Assistant United States Attorneys
19

    SHAPIRO ARATO BACH, LLP
20        Attorney for Defendant Garelick
    BY:  ALEXANDRA  A. E. SHAPIRO
21        JONATHAN BACH
        JULIAN S. BROD
22        JASON A. DRISCOLL

23  Also Present:

24  Special Agent Marc Troiano, FBI
    Paralegal Specialist Grant Bianco, USAO
25  Philip K. Anthony, DecisionQuest
    Sophie Payne

O4T1GAR1

1          (Case called)

2          THE DEPUTY CLERK:  Starting with counsel for the

3   government, please state your appearance for the record.

4          MS. HANFT:  Good morning, your Honor.  Elizabeth

5   Hanft, Matthew Shahabian, and Danny Nessim for the government.

6   We're joined at counsel table by Special Agent Marc Troiano of

7   the FBI and paralegal specialist Grant Bianco with the U.S.

8   Attorney's Office.

9          THE COURT:  Good morning.

10         MR. BACH:  Good morning, your Honor.  Jonathan Bach,

11  Alexandra Shapiro——

12         THE COURT:  Mr. Bach, you have to talk a little bit

13  louder.

14         MR. BACH:  Jonathan Bach, Alexandra Shapiro, Julian

15  Brod, and Jason Driscoll for the defendant Bruce Garelick, and

16  assisting us for this portion of the trial only is Philip

17  Anthony.

18         THE COURT:  Good morning.

19         All right.  We're waiting for the jury pool to come

20  up.  Before they do, a couple of preliminary matters to

21  discuss.

22         Let me start again.  My microphone is now working.

23         So we're waiting for the jury pool.  We should have

24  them at about 10:00, I think not before then.  There are a

25  couple of preliminary matters to go over with the parties.

1    We distributed our proposed voir dire to the parties

2    last week.  In that proposed voir dire, at a couple of places,

3    it states that I am going to seat 36 jurors for the purposes of

4    voir dire and select four alternates.  That's a mistake.  My

5    plan is to have two alternates, and therefore it means that we

6    will qualify 34 jurors.  So I will make that change as I

7    deliver the voir dire.

8         Second, I did receive from the defense some objections

9    and suggestions with respect to the voir dire.  I have adopted

10   the language that would add to question 4 "both oral and

11   written communications in direct messages."  I've denied the

12   other proposed changes to the voir dire.  I found the language

13   to be confusing and not necessary to ensure that we have a fair

14   and impartial jury.

15        The parties requested that we start with opening

16   statements tomorrow.  Is that correct, Ms. Hanft?

17        MS. HANFT:  Yes, your Honor.

18        THE COURT:  And Mr. Bach?

19        MR. BACH:  Correct.

20        THE COURT:  So what I propose to do, unless there is

21   an objection, is to wait until tomorrow morning to swear the

22   jury, at the end of the day today, after we have our 12 jurors

23   and our two alternates, to give them the instructions with

24   respect to conduct as jurors——in other words, the instructions

25   about communicating with others on the case and not to research

O4T1GAR1

1  and the like that are reflected in my preliminary instructions.

2  But I will not have them sworn and I will not otherwise give

3  the preliminary instructions.  Any objection to that,

4  Ms. Hanft?

5          MS. HANFT:  No, your Honor, not from the government.

6          THE COURT:  Mr. Bach?

7          MR. BACH:  No, your Honor.

8          THE COURT:  Okay.  I think that takes care of it with

9  respect to the voir dire, unless there's anything else from the

10 defense.

11         MR. BACH:  Just one question on procedure.  We

12 received your direction on how the peremptories will be

13 exercised.  If either party does not exercise peremptories in a

14 round, are they deemed waived or can they be reserved for a

15 later round?

16         THE COURT:  Ms. Hanft, do you have a view on that?

17         MS. HANFT:  The government's position is they should

18 then be waived for that round.

19         THE COURT:  That would be my instinct.  I mean, of

20 course if you elect for the jury not to exercise a peremptory

21 challenge, you'll still have your peremptory challenges with

22 respect to the alternates, but your peremptory is waived with

23 respect to that round.

24         Okay.  Anything else, Ms. Hanft, on the voir dire?

25         MS. HANFT:  Your Honor, there are two other names that

1    the government would like to add to the list.  We circulated a

2    list to the Court over the weekend.  Did the Court receive that

3    list?

4                THE COURT:  I did.

5                MS. HANFT:  We'd like to add E.F. Hutton and

6    Benchmark.

7                THE COURT:  E.F. Hutton and Benchmark?  All right.

8    Let me mention one thing with respect to names and then let me

9    ask some questions about that.

10               On the names, we had prepared the voir dire and the

11   questionnaire, more importantly, before we received the list of

12   names from the government yesterday.  So what we have done on

13   the questionnaire is to add to the back of the questionnaire

14   the names that we received from the government yesterday that

15   we had not previously received, and what I intend to do is when

16   we get to the relevant question, which is at 33, "Do you, a

17   family member, or close friend know any of these individuals,"

18   I will read through the names that are in question 33 of the

19   questionnaire and then I will direct them to the final page of

20   the questionnaire packet, which has the additional names that

21   were added on Sunday.  I think that that takes care of it.

22               With respect to E.F. Hutton and Benchmark, Ms. Hanft,

23   I'm hesitant.  I don't think that fits within the "Do you know

24   any of these individuals," and it's hard to imagine anybody,

25   you know, being unfair because they've heard the name E.F.

O4T1GAR1

1    Hutton or what further examination I would do.

2            MS. HANFT:  Understood, your Honor.  I think if it's

3    going to stand out in a strange way, I think it's probably fine

4    and we'll withdraw that request.

5            THE COURT:  Let me ask Mr. Bach.  Do you want me to

6    question the jurors about E.F. Hutton and Benchmark?

7            MR. BACH:  No.  We don't think it's necessary.

8            THE COURT:  All right.  So I'm not going to do that.

9            Okay.  I received the motion to quash the "if, as, and

10   when" subpoena.  I'm not going to entertain argument with

11   respect to that now.  What I am going to do is direct the

12   parties to meet and confer and to send me a letter tonight, and

13   I'll entertain from the parties what time tonight, as long as

14   it's not too late, to identify any portions of the "if, as, and

15   when" subpoena that require me to make a decision.  Ms. Hanft,

16   how long do you need to meet and confer and to——it's a short

17   trial day today.

18           MS. HANFT:  Your Honor, would 9 p.m. work for the

19   Court?

20           THE COURT:  Mr. Bach, does that work for you?

21           MS. SHAPIRO:  That's fine.

22           THE COURT:  Okay.  All right.  By 9 p.m.

23           On the charge, I received from the defense their

24   further objections and their letter, which was very helpful.

25   If we've got time at the end of the day today, I'll hear from

O4T1GAR1

1  the government with respect to any items that they wish to

2  bring to my attention, and then what I anticipate doing is at

3  some point during the trial, probably not today, permitting the

4  parties to argue with respect to specific requests as to which

5  it would be helpful for me to have argument, which I will let

6  the parties know.

7           I do anticipate in this case, absent objection, giving

8  the jury hard copies of my instructions for them to follow

9  along as I deliver the charge, at the conclusion of the trial.

10  Ms. Shapiro, Mr. Bach, do you have any objection to me doing

11  that?

12           MS. SHAPIRO:  Your Honor, we don't object.  The only

13  thing—this may sound like an odd request, but—

14           THE COURT:  Try to speak into the microphone.  Maybe

15  lift up the microphone.

16           MS. SHAPIRO:  Sorry.

17           This may sound like an odd request, but we had—we

18  would ask that the Court consider, if it is going to do that,

19  removing the headings and the table of contents for the

20  following reason:  We are involved in another case in which,

21  after the verdict, a number of jurors spoke to the media, and

22  it seems pretty clear that they were confused because they

23  relied on the headings and the table of contents as trumping

24  like the actual language.  So that's the only request we would

25  make, if the Court is inclined to provide the written charge to

1    the jurors.

2         THE COURT:  I think that's a reasonable request.

3    Ms. Hanft or Mr. Shahabian?

4         MR. SHAHABIAN:  I don't know that I have a strong view

5    one way or another right now.  I guess giving the jurors——the

6    current charge numbers about 50 pages.  If they're trying to

7    find a particular instruction, it might be difficult.  Maybe if

8    there are particular issues with the language in the headings,

9    we can——we're fine toning it down or writing it in a way where

10   people aren't going to be relying on that over the actual

11   instructions, but an index is certainly going to be helpful.

12        THE COURT:  Why don't the two of you talk about it.

13   If you don't come to an agreement, I'm inclined to agree with

14   Ms. Shapiro's point.  I don't ordinarily read the headings when

15   I give the charge, and for that reason, I think her objection

16   is well taken that what goes into the jury room need not have

17   the headings, and certainly if they're reading along, they're

18   going to be reading along what I'm saying, which doesn't have

19   the headings, but I understand your point, Mr. Shahabian, and

20   if the parties come to an agreement on it, then I'll give

21   something with an index.

22        MR. SHAHABIAN:  Understood, your Honor.

23        And one proposal that the government would suggest is

24   an additional instruction that the index or table of contents

25   are not instructions and they're guides, but the instructions

O4T1GAR1

1     are, you know, what the Court actually tells the jurors.

2              THE COURT:  I would do that if they get the index and

3     the headings.

4              Okay.  I am prepared to rule with respect to

5     Mr. Garelick's additional motion *in limine*.  I'll give you the

6     rulings there.

7              First, Mr. Garelick's motion to preclude evidence of

8     his past employers' compliance policies and practices is

9     denied.  "As the Supreme Court has observed, '[t]he Rules'

10    basic standard of relevance . . . is a liberal one.'"  *United*

11    *States v. Kaplan*, 490 F.3d 110, 121 (2d Cir. 2007) (quoting

12    *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 587 (1993).

13    Evidence is relevant, and thus presumptively admissible, if it

14    tends to make any fact of consequence "more or less probable

15    than it would be without the evidence."  Fed. R. Evid. 401(a).

16    Compliance policies and documents from Mr. Garelick's prior

17    employers are relevant under Rule 401 to his state of mind,

18    particularly willfulness, when he engaged in the trading at

19    issue.  The policies tend to make it more likely that, assuming

20    Mr. Garelick traded on material nonpublic information, he did

21    so with a bad purpose to disobey or disregard the law.  While

22    Mr. Garelick suggests that these documents are too old to be

23    relevant, that objection goes to their probative weight rather

24    than their admissibility.  Mr. Garelick also states that he

25    will not contest that he had a general understanding that it

1   was wrong and illegal to trade or tip using material nonpublic

2   information.  But the government is "entitled to prove its case

3   free from any defendant's option to stipulate the evidence

4   away."  *Old Chief v. United States*, 519 U.S. 172, 189 (1997).

5           Mr. Garelick's primary argument against these

6   compliance policies and documents, however, is not based on

7   Rule 401 but rather on Rule 403.  He argues that the policies

8   and documents include overbroad definitions of legal concepts

9   such as confidentiality, tipping, and material nonpublic

10  information.  In short, the concern appears not to be that the

11  documents are irrelevant to showing a bad purpose on the part

12  of Mr. Garelick, but that the jury would be confused into

13  thinking that the policies accurately state the law to be

14  applied by the jury.  The Court can adequately address that

15  risk of confusion by instructing the jury that the documents

16  are being received only for a limited purpose, that they are

17  not a substitute for the law, and that the jury must instead

18  apply the Court's instructions.  *See United States v. Pacilio*,

19  85 F.4th 450, 466 (7th Cir. 2023).  Mr. Garelick argues that

20  such an instruction would require the jury "to perform humanly

21  impossible feats of mental dexterity."  The Court disagrees and

22  notes that several courts within this district have used

23  similar instructions in cases involving compliance policies.

24  *E.g., United States v. Afriyie*, 16 Cr. 377 (Engelmayer, *J.);*

25  *United States v. Walters*, 16 Cr. 338 (Castel, J.); *United*

O4T1GAR1

1  *States v. Stewart*, 15 Cr. 287 (Swain, Chief Judge); *United*

2  *States v. Riley*, 13 Cr. 339 (Caproni, J.); *United States v.*

3  *Martoma*, 12 Cr. 972 (Gardephe, J.).  Finally, while

4  Mr. Garelick cites *United States v. Scop*, 846 F.2d 135 (2d Cir.

5  1988) and *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir.

6  1991), those cases addressed the distinct concerns that arise

7  when an expert witness opines on the meaning of legal concepts.

8  In any event, the reasoning of *Scop* and *Bilzerian* support

9  admitting the policies here subject to a limiting instruction,

10  as both recognized the critical distinction between evidence

11  that supports "ultimate factual conclusions" and that which

12  offers merely "legal conclusions."  *Scop*, 846 F.2d at 139, 142;

13  *accord Bilzerian*, 926 F.2d at 1294.  The Court's instruction

14  will reinforce that distinction and ensure the jury considers

15  the compliance documents and policies solely for the former

16  purpose and not the latter.

17        Second, Mr. Garelick moves to preclude evidence of

18  what DWAC board members and managers considered permissible,

19  material, or nonpublic.  That motion is granted in part and

20  denied in part.  The Court will permit DWAC board members and

21  managers who received similar information to that received by

22  Mr. Garelick at approximately the same time Mr. Garelick did to

23  testify to their understandings as to whether the information

24  was confidential, nonpublic, or important, and to testify to

25  their practices as to how they treated the information.  Under

*United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012) and

*Carpenter v. United States*, 484 U.S. 19 (1987), evidence

regarding "the ways in which other employees may access and use

the information" is relevant to whether the information at

issue is confidential and nonpublic.  693 F.3d at n. 14.  The

Court would permit Mr. Garelick to call board members and DWAC

employees to testify to their understandings that the

information at issue was not confidential, that they could

trade on it, and that they did trade on it.  Such evidence

would tend to undermine the notion that the information at

issue was nonpublic and confidential.  By parity of reasoning,

the government is entitled to offer evidence that other board

members and DWAC employees understood that the information at

issue was confidential and that they could not trade on it.

The proposed testimony also is permissible lay opinion

testimony under Rule 701, in that it would be: rationally based

on the witnesses' firsthand observations at DWAC; probative of

whether DWAC treated the information as confidential; and not

based on scientific, technical, or other specialized knowledge.

On the other hand, the Court will not permit the witnesses to

testify (unless a door is opened) as to whether they believed a

given course of action would be legal or illegal.  Testimony

regarding the purported legality or illegality of an action

would violate the fundamental principle that witnesses cannot

"present testimony in the form of legal conclusions." *Cameron*

1    *v. City of New York*, 598 F.3d 50, 62 (2d Cir. 2010).

2              Finally, Mr. Garelick moves to preclude the government

3    from introducing Government Exhibits 1, 2, and 3, which

4    Mr. Garelick describes as "mugshots" of him, Michael

5    Shvartsman, and Gerald Shvartsman, respectively, from the

6    morning of their arrests.  That motion is granted.  The

7    photographs are recognizable as mugshots.  Even though they do

8    not bear any kind of a legend explicitly linking them to law

9    enforcement, each of the photographs is taken against the same

10   solid background with the individual directly facing the

11   camera.  The common background and framing of the photographs

12   would suggest to an attentive juror that all three individuals

13   were arrested together, thereby undermining the Court's

14   instruction to the jury in this case not to consider or

15   speculate as to why other persons are not presently on trial.

16   Under *United States v. Harrington*, the government "must have a

17   demonstrable need to introduce the photographs."  490 F.2d 487,

18   494 (2d Cir. 1973).  But the government does not contest that

19   it has numerous other photographs of the defendants that it

20   could use for that same purpose and with equal permissible

21   effect.  Moreover, the probative value of these particular

22   photographs is substantially outweighed by their prejudicial

23   impact.

24              All right.  So that addresses that.

25              On the motion *in limine* that I received from the

1    government over the weekend, is the defense prepared to address

2    that motion while we're waiting for the jury?

3         MR. BACH:  Yes, your Honor.  But can we ask for one

4    point of clarification on your ruling——

5         THE COURT:  Yes.

6         MR. BACH:  ——from the prior motion.  One moment,

7    please.

8         THE COURT:  You can ask, I'm not sure if I will give,

9    but you can certainly ask and I'll consider the request.

10         MR. BACH:  May I consult with my colleagues for a

11    moment.

12         So Judge, we understand the line the Court is drawing

13    between an opinion as to what's confidential and an opinion as

14    to what's legal.  And we just have a question about where

15    something might fall, whether——on which side of that line.

16         So for instance, if the government's witnesses were to

17    testify that they understood that directors can't trade and

18    that was based on their general understanding of the law or

19    that the directors can never trade when they sit on a public

20    company that's actively involved in a stock, that they have an

21    understanding that they can't trade, we believe that such an

22    understanding is, in essence, their understanding, their lay

23    opinion of what the law or the rules are in that circumstance.

24    It's not something other than that.  And therefore, we think

25    that that would be precluded by the Court's ruling.

1      And I have a second point I want to raise.

2      THE COURT:  I think I would prefer to address that

3  question as it comes up, depending on what the government asks.

4      MR. BACH:  Okay.  And then the second point I want to

5  raise with the Court——and this wasn't clear in the letter

6  correspondence, but we've had subsequent correspondence with

7  the government about it since we submitted our brief.  One of

8  the government's anticipated witnesses tomorrow, Mr. Swider, is

9  anticipated to testify that he accidentally purchased one share

10  of DWAC stock.  He was——as I understand it, he was attempting

11  to set up a tracking device on his iPhone to follow the stock's

12  performance, and by opening up that app, he inadvertently

13  purchased a share.  You have to be an owner to track it.  And

14  then his testimony would be, in essence, that he got extremely

15  nervous 'cause he realized he hadn't filled out the proper

16  forms, and he knew he had to fill out these forms and he was

17  nervous.  We just think that this is an idiosyncratic, one-off

18  piece of conduct that's not relevant to the case.  We told the

19  government that we would not cross-examine Mr. Swider on his

20  failure to file forms based on this clearly erroneous, one-off

21  incident, and we asked them if we didn't plan to cross-examine,

22  if they would refrain from eliciting it, because just that

23  piece of conduct doesn't seem relevant to anything in the case.

24  They said they do nevertheless plan to elicit it on direct, and

25  we object.  We think that conduct is the tail wagging the dog.

O4T1GAR1

1    It's just an opportunity for the government to have a director

2    talk about his state of mind, his opinions in an idiosyncratic

3    situation about whether he had obligations, whether he was

4    concerned about the law, and we just don't think——we think it

5    should be excluded from the trial.

6              THE COURT:  Ms. Hanft, do you want to address that?

7              MS. HANFT:  Yes, your Honor.

8              I think that there are actually two issues embedded in

9    Mr. Bach's question.  So one is that the government does

10   anticipate that Mr. Swider will testify about an incident in

11   which he accidentally purchased a DWAC share and sold it right

12   away.  And I anticipate his testimony will be, in part, that

13   he——when asked why he sold it right away and why he was nervous

14   when that happened, will be that he knew he was in possession

15   of confidential information and was not sure yet if he had

16   been, quote, cleansed of that information, if the information

17   was sufficiently public, because this happened after the

18   announcement of the merger, and so the government submits that

19   per *Mahaffy*, *Carpenter*, and the cases cited by the Court, his

20   view on whether the information he received as a board member

21   of DWAC is someone similarly situated to Mr. Garelick is

22   absolutely relevant to how other insiders treated the

23   information they received and to how the company treated the

24   information.  And so the government submits that that should

25   be——that that's admissible.

O4T1GAR1

1        THE COURT:  You said—hold on for a second, Mr. Bach.

2   You'll be given an opportunity.

3        Ms. Hanft, you said that there were two issues

4   embedded.  So what's the second one?

5        MS. HANFT:  Yes.  The second issue I believe is that

6   Mr. Bach is talking about Mr. Swider's failure to file forms,

7   and so I believe what he's referring to is a conversation in

8   which Mr. Swider—it's a text message conversation in which

9   Mr. Swider messages Patrick Orlando and says, could you please

10  ask—something along the lines of, could you please ask

11  attorneys whether—I can't remember exactly, something about

12  whether it's okay to trade, and he says, it should be fine as

13  long as we report it, or something along those lines.  And, you

14  know, to the extent that that part—the Court would like that

15  part redacted or something along those lines, I think the

16  government's point of eliciting this is really as to the

17  former.  And so I think the conversation really corroborates

18  Mr. Swider's testimony, but if the question of reporting the

19  forms is, you know—the Court deems it—the government thinks

20  it should be admissible, but frankly, your Honor, we're happy

21  to redact that part out.

22        THE COURT:  Mr. Bach.

23        MR. BACH:  Did I hear Ms. Hanft correctly that this

24  incident arose after the merger was publicly announced?

25        MS. HANFT:  I believe it was, your Honor.

O4T1GAR1

1          THE COURT:  The trade took place before or it took

2     place right after the merger was announced?

3          MS. HANFT:  I will confirm this, your Honor, but I

4     believe it was——Mr. Swider's trade was on either the 20th or

5     the 21st.

6          MR. BACH:  Okay.  But then it's even more irrelevant

7     because his nervousness is clearly misplaced once this

8     information is in the public domain.  I think the Court gets a

9     sense of this.  This is not someone sitting at a board meeting

10    where Mr. Garelick is also present, hearing the same kind of

11    direction or information that Mr. Garelick would have heard.

12    This is someone who obviously pushed the wrong button on his

13    phone and got nervous for reasons that were not necessarily

14    justified.

15         THE COURT:  So I think the first portion of this is

16    relevant.  I'm not sure that the anxiety is relevant, and I'll

17    entertain objections with respect to that if that is elicited

18    because that then does tend to go to anxiety about, you know,

19    is the person violating the law.  But as I understand the

20    proffer from the government——and Ms. Hanft will correct me if

21    I'm wrong——the information at issue was information that was

22    derived from the individual in his capacity as a director at

23    the time that the information had not been publicly announced

24    and therefore does go to the question of whether the

25    information at issue was delivered with a mutual understanding

O4T1GAR1

1  that it would be kept confidential.  Am I correct, in terms of

2  the information at issue, that it was information that was

3  delivered to the individual in his capacity as a director prior

4  to the public announcement?

5          MS. HANFT:  When he received the information, yes,

6  your Honor, and so contrary to what Mr. Bach just said, it

7  absolutely is someone similarly situated to Mr. Swider who was

8  sitting in the same board——to Mr. Garelick, who was sitting in

9  the same board meetings and receiving the same information.

10          THE COURT:  Okay.  So you've got my ruling on that,

11  Mr. Bach.

12          MR. BACH:  I understand.  I'm just not sure I

13  understand the chronology.  I thought this incident occurred

14  after the public announcement.

15          THE COURT:  I think I understand it.  So——

16          MR. BACH:  All right.  Okay.

17          THE COURT:  So the question then is, on the

18  government's motions *in limine*, do you want to address those

19  now?  We may have a couple of minutes before the jury arrives.

20  Or we could do it later in the day.  But I would prefer if we

21  could at least get started while we're waiting for the jury.

22          MR. BACH:  Sure.

23          So I think their first motion seeks to preclude any

24  cross-examination of Mr. Litinsky about a conversation he had

25  with Patrick Orlando about——

O4T1GAR1

1          THE COURT:  I assume that's who Witness No. 1 is; is

2   that right?

3          MR. SHAHABIAN:  That's correct.

4          MR. BACH:  Yeah.  And Judge, we haven't heard the

5   direct testimony yet, and the way this issue arose was the

6   government advised us of three small criminal offenses engaged

7   in by some of its witnesses——I think, you know, college

8   drinking or——and Mr. Litinsky apparently may have violated a

9   Florida two-way consent law relating to tape recording another

10  individual.  And they asked us if we plan to cross-examine

11  their witnesses on that.  And we said no; we have no desire to

12  get into these peccadilloes.  We're not going to be

13  cross-examining.  But in the same breath we made clear that of

14  course the defense reserves the right, if there are relevant

15  communications, if there's relevant conduct in the case——we're

16  not going to bring out that this was illegal or anything of the

17  sort, but we're certainly allowed, depending on the direct and

18  the evidence in the case, to cross-examine people about

19  relevant communications.  So it's a little premature because we

20  haven't heard the direct, but we do think that there are

21  compelling evidentiary reasons that we should be allowed to do

22  that.  The appropriate time to have that argument might be

23  after the direct, but——and I certainly don't want to preview

24  for the government what my cross-examination may be, but on

25  that one, it's standard for the defense to be able to examine

O4T1GAR1

 1  people about relevant communications and about the relevant

 2  chronology, without getting into whether they violated the

 3  Florida two-way consent law.

 4          THE COURT:  How long does the government expect that

 5  the testimony of Mr. Litinsky will last, the direct?

 6          MR. SHAHABIAN:  I'd say approximately an hour, your

 7  Honor.

 8          THE COURT:  All right.  Let me hear your argument on

 9  point two.  I may go back to point one.

10          MR. BACH:  Okay.  Judge, the second motion the

11  government made is one that was already discussed with the

12  Court, and that was the question of an email that Mr. Garelick

13  wrote to the compliance officer at Rocket One.

14          THE COURT:  And I think I said as to that that it

15  would have to fit within a hearsay exception.

16          MR. BACH:  Yes, that we'd have to follow the rules of

17  evidence, and just to be clear—I know the Court knows this,

18  but—we're going to follow the rules of evidence.

19          THE COURT:  Well, I assume that you will, and if you

20  don't, I will make you do so to the best extent that I can.

21  But can you tell me how that email would be admissible and

22  would fall within a hearsay exception.

23          MR. BACH:  Sure, Judge, I will tell you that we will

24  follow the rules of evidence.  That's what I will tell you.

25  And if the Court feels we're not following the rules of

O4T1GAR1

1    evidence, it can strike it.  But we've already argued this and

2    we understand the government's points.

3         THE COURT:  Okay.  Do you have anything else to say on

4    point two?

5         MR. BACH:  Again, I think the Court should wait on

6    that and see where we are.  It's not going to—

7         THE COURT:  Why?  Why should I wait?

8         MR. BACH:  Hold on.

9         Judge, we're happy to have an *in camera* conversation

10   about these things.  We understand the hearsay rules.  We

11   think—we talked about that I would not be opening on this, and

12   the government has raised this point again.  I don't know why

13   they're entitled to an anticipatory, kind of advisory opinion

14   on this at this stage.  We, you know, we're entitled to present

15   our case, and we have to do that within the bounds of the law,

16   and within the rules of evidence, and the Court has already

17   addressed this, and I think the Court addressed it properly.

18        THE COURT:  So Mr. Bach, I'm going to do it this way.

19   By the end of the day today, meaning by 9:00, which I think

20   we've all agreed is the end of the day today, if there is legal

21   authority that you want me to consider with respect to the

22   admissibility of this exhibit, you'll let me know what that

23   legal authority is, because I'm entitled to know what your

24   legal authority is, and if you want me to issue an informed

25   decision with respect to the admissibility of it, then you're

O4T1GAR1

1    entitled to give me that legal authority.  So give it to me by

2    9:00 tonight and I will try to give you all an informed ruling.

3              Ms. Hanft.

4              MS. HANFT:  I just want to understand whether Mr. Bach

5    is in fact committing to not opening on that email, because he

6    didn't actually previously commit to that and now he is saying

7    that the Court has——that he's already said that.

8              THE COURT:  I think he is.

9              Mr. Bach?

10             MR. BACH:  Of course.

11             THE COURT:  Okay.  So 9:00 tonight with respect to

12   legal authority.

13             MR. BACH:  Sure.  In response to the government's

14   points, sure.

15             THE COURT:  Okay.  And then are you going to open with

16   respect to an alternative tipping chain, that the tip came from

17   somebody else?

18             MR. BACH:  Well, that's a——the Court is phrasing the

19   question in a certain way.

20             THE COURT:  Okay.

21             MR. BACH:  Our position——our position is that there

22   are certain trades, not all of them, the government in its

23   letter is focusing on some early trades.  I think it says that

24   some of these trades follow a certain chronology.  We're not

25   going to say that all of the trades here are the subject of an

O4T1GAR1

1    alternate tipping scenario.  But we are going to present a

2    defense in this case.  I think that there are trades toward the

3    end of the time frame here that are probably pretty clearly

4    instances of insider trading.  The government is going to have

5    two witnesses testify that they're employees of Gerald

6    Shvartsman and they were tipped by Gerald Shvartsman and they

7    don't know who the source of Gerald Shvartsman's information

8    was.  We are entitled to present competent evidence to show

9    that the source was not Mr. Garelick but somebody else.  That's

10   our defense.  Without that defense, it would be a directed

11   verdict.

12              THE COURT:  Well, no.  I mean, there are two parts of

13   what you said.

14              MR. BACH:  Yes, yes.

15              THE COURT:  One is that you're absolutely entitled to

16   put on the defense that the source was not Mr. Garelick, or,

17   put more precisely, that the government has not shown beyond a

18   reasonable doubt that the source was Mr. Garelick.

19              MR. BACH:  Right, right.

20              THE COURT:  But if you are——if you want to suggest to

21   the jury that the source was somebody else——

22              MR. BACH:  Yes.

23              THE COURT:  ——then you are required to have some form

24   of a factual predicate for that; otherwise, you're just asking

25   the jury to speculate.

1    MR. BACH:  Of course.

2    THE COURT:  So as to that portion——

3    MR. BACH:  Yes.  We will have a very substantial

4 factual predicate for it.  The government, in its letter,

5 relies solely on the *Gupta* case, and the *Gupta* case, the Court

6 of Appeals was concerned about the hearsay nature of the

7 evidence, unchaperoned by any witness testimony, and it was

8 also concerned that the purported alternate tipper, there was

9 no evidence that that alternate tipper had access to the

10 material nonpublic information.  Our defense will be different

11 on both counts.  We will present substantial, competent

12 evidence, including witness testimony, that shows that there

13 was an alternate tipper in this case, and perhaps more than

14 one.  We will do it with a solid evidentiary basis.  It's part

15 of our defense.

16    I will note that when the government applied for

17 search warrant applications in this case, it flagged this issue

18 specifically to the judge.  It noted——and I'm reading a

19 footnote in a search warrant application that was submitted in

20 Rhode Island, where Mr. Garelick——and here's what the footnote

21 says.  "Alternatively, Orlando may have informed some of these

22 individuals directly of the planned business combination

23 between DWAC and Trump Media, and individuals traded on that

24 tip."  So there's certainly enough here for the government to

25 feel compelled to tell a court, in seeking a warrant, that

O4T1GAR1

1   there's an alternative tipper reality here.  And I am

2   prepared——we can go *ex parte*, we can go into chambers, and we

3   will detail for the Court the substantial, competent,

4   nonhearsay witness-based evidence that we'll present, which

5   already distinguishes us from *Gupta*, and we will show,

6   delineate for your Honor that it is based on people who do have

7   access to the material nonpublic information at issue in this

8   case.  They cite no other authority for the very extreme

9   proposition that the defense should be curtailed from

10  introducing this evidence.  Imagine a murder case in which

11  there's a question of alternate suspects, and, sure, the

12  defense is entitled to say to the jury, as your Honor just

13  recited, they haven't proved beyond a reasonable doubt that our

14  client was the murderer and, you know, and there's evidence to

15  suggest that he wasn't.  But it's a much more powerful defense,

16  one that defendants are allowed to present, to say, here is who

17  did it, and there's competent evidence to show you who did it

18  and how it happened.  So it's not just a question of reasonable

19  doubt; it's a question of substantive proof through competent

20  evidence, and that we represent Mr. Garelick.  Mr. Garelick is

21  presumed innocent.  He did not tip anybody.  Especially did

22  not——those later incidents in October can be explained through

23  other evidence.  To preclude us from doing that would hamstring

24  our ability to defend him in very substantial ways.  This is

25  not the *Gupta* case.  It's far from it.  I'm very concerned

1  about detailing the details of our defense here because they

2  can talk to their witnesses before I do it.  I'm happy to do it

3  *in camera*.  But the idea that this is just some baseless,

4  nonevidentiary, speculative hypothesis is wrong, and we think

5  the government doesn't understand its own evidence and its own

6  documents, and when you read their letter, they're saying

7  Mr. Orlando and Mr. Wachter told them certain things and

8  that—as if those are statements that can be taken at face

9  value.  Neither of those witnesses have been cross-examined.

10         (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4TCgar2

          THE COURT:  What I understand them to be saying is

that they're not aware from their investigation of a factual

predicate for your argument that Mr. Orlando or Mr. Wachter

were the alternative source of the information, and you haven't

proffered anything to suggest that they are the alternative

source.  Therefore, putting in front of the jury the argument

that they're the alternative source is calling for the jury to

speculate, putting forward limited information with respect to

that.

          MS. SHAPIRO:  If we had no basis and it were

speculative, I understand the point, but that's not the

situation.  We have no obligation to proffer to them.  That

would really be unfair to require us to lay out our defense

first in order to be able to present it.

          THE COURT:  I don't think you answered my question as

to whether you're going to open --

          MS. SHAPIRO:  I am going to open softly.  I am not

going to identify anyone in the opening, but I'm going to open

softly that there may well be other people who are responsive

that might well be insider trading in this case, and there may

well be tips, and it may well be by others besides Bruce

Garelick.  I think I'm entitled to open on that.  I don't see

how I can be precluded.

          THE COURT:  Let me hear from the government.

Mr. Shahabian.

O4TCgar2

1          MR. SHAHABIAN:  Yes, your Honor.  Would the Court like

2     me to start with this alternate tipping chain issue or start

3     with the first motion?

4          THE COURT:  It's up to you.

5          MR. SHAHABIAN:  I can start with this if it's the

6     current topic of conversation.  This is exactly what came up in

7     Gupta.  If the defense wants to open on a theory that there was

8     another tipper, they're inviting the jury to speculate absent

9     any factual predicate in the record to offer that inference.

10    They're not required to preview their defense for us, but the

11    point of a motion in limine is to avoid poisoning the jury with

12    speculation for which there's not going to be a sufficient

13    factual predicate.

14         What the defense has done is marked a lot of exhibits,

15    hearsay exhibits about trading, text messages, phone calls.  As

16    the government has proffered in its letter, if you line those

17    up, those aren't in support of an alternate tipping chain.  As

18    in the Gupta case, there's no witness the government is aware

19    of who's going to testify and lay a basis for a factual

20    predicate.

21         For example, Mr. Wachter, we anticipate, is going to

22    testify, I introduced the defendant and others to Mr. Orlando

23    in the summer of 2021 to invest in DWAC.  I was not on the

24    board and did not receive any updates on the negotiations.  In

25    fact, I transferred 100,000 shares a week before the merger

O4TCgar2

announcement, not knowing this announcement was coming.  And

so, I lost out on millions because nobody told me, including

Patrick Orlando, what was happening.

So the idea that Mr. Wachter is the source of a tip in

October is frankly ludicrous based on what the government is

aware of.  If there is a factual basis for this alternate

tipping chain, there should be a proffer on it before we start

inviting the jury to speculate on openings on who the tipper

actually is.

THE COURT:  And do you have a view as to whether I

should receive that *ex parte*?

MR. SHAHABIAN:  Yes, your Honor.  I think in order for

there to be a sufficient basis to make a ruling in line with

Gupta, it shouldn't be *ex parte*, it should be on the record.

This isn't a Rule 17(c) subpoena.  This is asking to present

arguments to the jury.

This was raised in the basis of marking exhibits that

appear to be hearsay.  All of these appear to be irrelevant and

a distraction, unless there's some proffer for how they're

going to be tied to an actual theory that's not just

speculation.  It's the same as any other factual proffer for

admitting evidence before it's already before the jury and then

we're trying to unring the bell.

THE COURT:  Let me hear from you on the alternative

tipper.

O4TCgar2

1          MR. SHAHABIAN:  Sorry.  On --

2          THE COURT:  Alternative tipper theory.  I'm sorry.

3     That's what you addressed.  On the Orlando cross examination,

4     cross examination of Litinsky about the Orlando recording.

5          MR. SHAHABIAN:  Yes, your Honor.  And to be clear, we

6     understand the defense isn't going to cross on the Florida

7     two-party consent issue.  That's not what this motion is about.

8     This is a species of what we previously briefed before the

9     final pretrial conference, about confusing the jury with a

10    distracting sideshow on the SEC disclosure violations and

11    whether DWAC had improperly selected Trump Media as the target.

12    We see no basis as to cross examine Mr. Litinsky on this point.

13    It looks like an attempt to impeach Patrick Orlando.  This

14    doesn't seem proper under any theory of impeachment evidence.

15    And so, for that reason, we would ask that it be excluded.

16          Again, these are in limine rulings.  The government is

17    certainly not entitled to in limine rulings, but Mr. Litinsky's

18    going to be our first witness.  The defense knows what he's

19    going to say about this from the 3500 material.  If there's a

20    relevant permissible reason to cross examine on this, I think

21    it's in efficiency to do that now and not once he's on the

22    stand and have a break before cross examination or in the

23    middle of cross examination.

24          THE COURT:  Let me ask you, on the alternative tipper

25    argument, I take it that you have identified the documents at

1    issue that you believe have no permissible purpose and are not

2    admissible.  Is there any reason why you wouldn't let me know

3    what those documents are so that I can address the issue

4    concretely?

5            MR. SHAHABIAN:  It would take some time.  We received

6    the defense exhibits recently.  It's a lot of trading records,

7    text message chains, phone records, some of which we wouldn't

8    contest are inadmissible, they're business records, but they

9    seem irrelevant since it would just be inviting speculation

10   from this hearsay theory.  So we can pull them together and

11   submit them to the Court for the Court's review.  I realize

12   this is a little vague, but we just want to be thoughtful about

13   what our objections are to particular pieces of evidence.

14           The reason we wanted to flag this in the motion in

15   limine is precisely to the point Mr. Bach made about opening on

16   this theory, suggesting to the jury not just that the

17   government won't be able to prove that Mr. Garelick was the

18   tipper, but injecting the speculation that there was in fact a

19   second source.  That's what we're really seeking to get a

20   ruling on now.  We can submit all the documents to the Court

21   after court this evening that the defense has produced to us so

22   the Court can see the phone records and trading records and so

23   on, but we're not actually asking for a ruling on particular

24   documents at this moment.

25           THE COURT:  Last question for you before I turn back

O4TCgar2

1   to Mr. Bach.  If, in fact, his opening is as soft as he's

2   represented it to be, which is to the effect of, you may hear

3   evidence that there was an alternative source, keep your minds

4   open.  What's the particular prejudice with respect to that at

5   this point?

6           MR. SHAHABIAN:  I think it's still prejudicial because

7   it goes beyond the typical defense opening of, hold the

8   government to its burden and they need to prove every element.

9   It injects effectively an affirmative defense.  If there's

10  another tipper here and keep your ears peeled for that, and if

11  there's no actual testimony or admissible evidence that's going

12  to come in to support that theory, it's just poisoning the

13  jurors' attention from "jump" without any actual evidence

14  that's going to support the soft promise.

15          THE COURT:  Mr. Bach, on the cross examination of

16  Litinsky, unless you're prepared to make an argument to me or

17  unless a door is opened on the direct examination, I think

18  testimony with respect to the contents of this recording as

19  it's been represented to me is not going to be admissible under

20  Rule 608.  If you want to respond to the government's argument,

21  I'm going to need it before 9 o'clock, I'm going to need it by

22  5 o'clock today, and then I'll give you a ruling on it tomorrow

23  morning.

24          MS. SHAPIRO:  I can make an oral proffer now.  I

25  haven't heard the direct, but if the Court wants to hear the

1  argument now --

2          THE COURT:  Yes.

3          MS. SHAPIRO:  -- as to how it may fit it in.  I think

4  it goes to two points.  I think it goes to the issue of

5  materiality and it goes to the issue of credibility.

6          What happens in that conversation is that Mr. Litinsky

7  is very clear that they should not be discussing --

8          THE COURT:  When you say "credibility," whose

9  credibility?

10          MS. SHAPIRO:  Mr. Orlando.

11          THE COURT:  So let me hear from you on materiality and

12  then you'll tell me why on the basis of the fact that

13  Mr. Orlando is not going to be called as a witness, why

14  evidence going to his credibility would be admissible.  But let

15  me hear from you on materiality.

16          MR. BACH:  On materiality, the context for this

17  conversation is that Mr. Litinsky and his partner are very

18  nervous about discussing the prospect of doing business with a

19  SPAC that has not IPO'd yet.  Mr. Orlando suggests that they

20  can talk hypothetically.  This is how Mr. Orlando spoke about

21  Trump repeatedly.  What Mr. Orlando does is he said -- he

22  dangles the Trump's name as a reality and then he caveats it by

23  saying it's merely hypothetical, that I haven't had any

24  discussions.  There's nothing material here and you're going to

25  see that this is part of a pattern and practice.  And the

government is saying that when Mr. Orlando discusses "Trump,"
that it's substantive information and material and highly
confidential.

I think what is relevant here is what Mr. Orlando is
doing is presenting things merely as hypothetical, he's
qualifying them, he's being clear that he really can't do
anything of substance, hasn't had discussions.  Anything is
hypothetical at that point, that's number one.

But number 2, it does go to Mr. Orlando's
truthfulness, his credibility, because what he's essentially
saying to Mr. Litinsky is let's bend the rules here.  I know
we're not supposed to be talking, but let's talk
hypothetically.  If Mr. Orlando is not a witness in this case,
that's one thing, but we are certainly going to try to
introduce hearsay from Mr. Orlando at this trial.  I think
they're going to present him as a truth teller, as an honest
guy.  They just told you that they're relying on his and
Mr. Wachter's statements, and we don't know if he's going to be
a witness or not.  They have not ruled the out the possibility
that he will testify.

These are the thoughts that I have now, I haven't
heard the direct, but I do think these are issues that are
relevant to the case.  It's not about whether anyone's being
sued by the SEC or not, it's not about whether there are false
statements in the S1, that's not what this is about.  It's

O4TCgar2

1    about how these events unfold in real time and how Mr. Orlando

2    is pitching the idea of this SPAC and his relationship with

3    Trump at this time.  Is it real, is it material, or is it

4    hypothetical and something that's in the air?  And it shows

5    that he can't be trusted, that he plays games, and his word

6    should not be taken at face value.  So that's my proffer on

7    that point.

8            THE COURT:  I'm informed we have the jurors.  So we'll

9    continue the argument on this after we're done with jury

10   selection.  I don't want to keep the potential jurors

11   waiting.Ed.

12           Are they outside, Mr. Fishman?

13           THE DEPUTY CLERK:  They're collecting them outside.

14           THE COURT:  Just give us one moment.

15           The jurors are outside.  I'm going to step off the

16   bench, they'll be brought in, and I'll come back in once

17   they're here.

18           (Adjourned to April 30, 2024 at 9:00 a.m.)

19                         *  *  *

20

21

22

23

24

25