```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,              New York, N.Y.

 4            v.                            23 Cr. 307 (LJL)

 5   BRUCE GARELICK,

 6                  Defendant.

 7   ------------------------------x        Trial

 8                                          April 30, 2024
                                            9:21 a.m.
 9

10   Before:

11                     HON. LEWIS J. LIMAN,

12                                          District Judge
                                              and a Jury
13

14                          APPEARANCES
15
     DAMIAN WILLIAMS
16        United States Attorney for the
          Southern District of New York
17   BY:  ELIZABETH A. HANFT
          MATTHEW R. SHAHABIAN
18        DANIEL G. NESSIM
          Assistant United States Attorneys
19
     SHAPIRO ARATO BACH, LLP
20        Attorney for Defendant Garelick
     BY:  ALEXANDRA  A. E. SHAPIRO
21        JONATHAN BACH
          JULIAN S. BROD
22        JASON A. DRISCOLL

23   Also Present:

24   Special Agent Marc Troiano, FBI
     Paralegal Specialist Grant Bianco, USAO
25   Philip K. Anthony, DecisionQuest
     Sophie Payne
```

1           (Trial resumed; jury not present)

2           THE COURT:  Good morning, everybody.

3           Does the government wish to respond to the letter I

4    received from Ms. Shapiro this morning?

5           MR. SHAHABIAN:  Yes, your Honor.

6           The government's position is while we believe the

7    Court has picked fair and impartial jurors thus far and

8    qualified a panel that we could proceed with, this is in the

9    Court's discretion.  We don't see anything in Schilling that

10   says jurors need to be excused.  But, given where we are in the

11   trial, there's been no openings, there's no prejudice yet, the

12   government is not opposed to the defendant's suggestion of

13   striking the 12 jurors who said they heard the comment, even

14   though they could be fair and impartial, and picking additional

15   jurors while we're still in the middle of voir dire.

16          THE COURT:  I don't know if that was exactly

17   Ms. Shapiro's proposal.  I think, as I understand Ms. Shapiro's

18   proposal, it was to strike all of the jurors for cause.

19          Did I understand, Ms. Shapiro, your request correctly?

20          MS. SHAPIRO:  Your Honor, our request is that the

21   Court strike the entire panel and start over.  We noted at the

22   end of the letter, as an alternative, the Court is not willing

23   to do that.  At the very least, we should do what Mr. Shahabian

24   just described, strike the 12 jurors that indicated they

25   remembered the comment.

1        I did want to add, very briefly, just a note, we just

2   received the transcript, which we didn't have the benefit of

3   last night.  I started looking at it.  I noticed a couple of

4   things that I wanted to put on the record for your

5   consideration.

6        THE COURT:  Give me one moment.  I want to pull up my

7   copy of the transcript as you're talking if you're going to

8   refer to it.  It would be helpful for me to have it up in front

9   of me.

10       Before you do that, just give me one moment.

11       (Pause)

12       All right.  Go ahead.

13       MS. SHAPIRO:  I haven't had a chance to read through

14  it, but I read about 10 pages before your Honor came out.

15       What I wanted to mention is that, as the Court will

16  recall, at some point during the examination, the Court started

17  to ask people, who said they didn't remember, a couple of

18  followup questions, including, do you remember whether the

19  juror said anything about the individuals associated with this

20  case.  In a number of instances, that seemed to prod people,

21  who initially had indicated they didn't remember any substance,

22  to say things like, I think they said two people were convicted

23  or two people pled guilty.  The transcript, I wanted to point

24  out, bears that out.

25       THE COURT:  I'm sorry.  Try to speak up or speak into

the microphone.  If it's easier for you to do it while sitting

down, that's fine, but it may be easier to hold up the

microphone.

MS. SHAPIRO:  That's fine.  Is this better?

THE COURT:  Yes.  Thank you.

MS. SHAPIRO:  So, for instance, on page 170, I think

that was when the Court began the process.

THE COURT:  Okay.

MS. SHAPIRO:  The first juror indicated she didn't

remember anything.  At that point, the Court hadn't yet started

using that followup question, which I think seemed to prod at

least a number of the jurors to remember it.  The same thing

occurred regarding juror No. 3, on page 173, as well as juror

No. 6 on page 176.  It was, I believe, the first time the Court

started asking that followup question was with respect to juror

No. 12 on page 183.

The reason I wanted to supplement the record with that

point is obviously we don't know if those first, I guess, of

the first 11 jurors, the ones who indicated they didn't

remember anything, if they actually might have remembered what

we were trying to figure out whether they remembered had they

been asked that followup question.

So I just wanted to point that out just to illustrate

why we're concerned with the entire pool.

THE COURT:  Let me respond to that, because I did ask

that followup question, but I asked it when I did for a reason.
The first couple of jurors indicated that they didn't hear
anything about it.  As the fact finder, I was in the position
to judge the demeanor of the jurors and when followup inquiry
was appropriate.

With respect to the juror that you're pointing out
where I asked the followup questions — I just went to the
portion of the transcript to refresh my recollection — that was
a juror who, when I asked the open-ended question, said the
juror thought that the juror heard something and identified the
particular juror at issue.  That juror then went on, when I
said do you remember what she said or she heard or saw, said,
not really.  And then I asked, do you remember anything about
what she said.  The juror said, I just heard that she heard
something on the case or read something, but I really, like,
didn't pay attention.

Given those somewhat ambiguous answers, particularly
the "not really" and the indication that the juror had heard
something, it was appropriate in that case to follow up and to
ask more questions.  I didn't ask that question about the
individuals in the case as a routine matter because it wasn't
appropriate as a routine matter to ask somebody who didn't
remember hearing anything, the question, well, did you hear
anything about the individuals.  Just so you understand my
thinking, that was what my thinking is.

1          Let me ask you, Ms. Shapiro, which of the jurors, by

2   number, are you now asking me to strike?  And then I can make a

3   judgment based on my review of the transcript.

4          MS. SHAPIRO:  I'll need to check this against the

5   transcript, but based on --

6          THE COURT:  If you want time to look at the

7   transcript, I can step off the bench for 10 minutes while you

8   look at it.  I don't want to put you in a position of having to

9   answer the question right on the spot if 10 minutes will help

10  you.

11         MS. SHAPIRO:  Just one moment.

12         I think my notes are probably accurate, so I'm happy

13  to give the Court the numbers and doublecheck it later.

14         THE COURT:  I'm going to hold you to the numbers, so

15  if you want the 10 minutes, take it now.

16         MS. SHAPIRO:  Okay.  That's fine, your Honor.

17         THE COURT:  I'll come back at 9:40.

18         (Recess)

19         Ms. Shapiro, give me your numbers.

20         MS. HANFT:  Your Honor, I think potential jurors are

21  in the room.

22         THE COURT:  Let's have the parties come up to sidebar.

23         (At the sidebar)

24         Before Ms. Shapiro gives the numbers for the jurors

25  who were qualified yesterday, we're going to have them wait in

1  courtroom 15.  I realize some of them will be subject to the

2  challenge that Ms. Shapiro is now going to make.

3          The new jurors are ready whenever we're ready, but

4  they're not going to be called up to the courtroom until I say

5  that we're ready.  When we do jury selection --

6          THE DEFENDANT:  Your Honor, I think the TV monitor

7  might be showing the transcript.

8          THE COURT:  Waiting until Mr. Brod comes back.

9          MS. HANFT:  We put the screens down so nobody can see

10 them.

11         THE COURT:  Mr. Brod is now back with us.

12         When we do have the new jurors, we're going to be

13 seating them in seats 1 through whatever the last number is

14 that we've got jurors.  Once they are qualified, they will take

15 the seat of the excused juror.  So, in other words, if we've

16 excused juror No. 4, but not jurors No. 1, 2, and 3, we're not

17 going to put the new juror right now in seat No. 4.  The new

18 juror is going to be in seat No. 1 and then Mr. Fishman will

19 seat the jurors in their appropriate place just as we would if

20 we were exercising any challenges for cause yesterday.

21         Ms. Shapiro, let me hear from you.

22         MS. SHAPIRO:  We doublechecked the list, and the

23 numbers that I have of the individuals who indicated they heard

24 the comment, the substance of the comments by the other juror

25 are No. 2, No. 5, No. 7, No. 9, No. 21, 22, 27, 28, 29, 30, 31,

1     and 34.  That's not including the ones that were excused.

2             THE COURT:  I'm going to review the transcript and my

3     notes and I'll have you come back up to sidebar in a moment.

4             (Pause)

5             MR. DRISCOLL:  Your Honor, there's a juror, who I

6     believe was sitting in the panel, saying outside that one of

7     her answers from yesterday has changed and she needs to inform

8     you.

9             THE COURT:  Okay.  I'm instructing my staff to see

10    what number juror that is and we'll bring ha juror up to

11    sidebar.

12            THE DEPUTY CLERK:  Okay.  Do you want to do that now?

13    I don't want to miss what you rule on first.

14            THE COURT:  Mr. Seymour can let that juror know.

15            I do grant all of Ms. Shapiro's strikes for cause.  So

16    jurors No. 2, 5, 7, 9, 21, 22, 27, 28, 29, 30, 31, 34 will be

17    stricken for cause.

18            I should also inform the parties that my deputy

19    received a note from juror No. 27 about a hardship.  So I might

20    have been prepared to strike that juror for the hardship, but I

21    don't need to consider that because I'm striking her based on

22    the answer that she gave.

23            The parties are free to inspect the note from the

24    juror.

25            If you wait up here, we'll see who the juror is.

1           THE DEPUTY CLERK:  It's juror No. 1.  The juror
2    returned back downstairs.
3           THE COURT:  So juror No. 1 had something she wanted to
4    bring to our attention.  We're getting her.
5           (Pause)
6           Good morning.  You wanted to bring something to my
7    attention?
8           JUROR:  Yes.  This is just regarding yesterday's final
9    question.  I know said I didn't remember at the time.  It was a
10   lot of pressure, a lot of eyes in the room, so I genuinely
11   didn't, but as I was by myself yesterday, going home, I
12   remembered something regarding that question.
13          THE COURT:  The other juror?
14          JUROR:  Yes, the other jurors.  I don't remember
15   exactly, but it was something along the lines of some other
16   people who were involved pleaded guilty.  I don't remember if
17   that's true or not.
18          I don't think it's going to affect my impartialness,
19   but I wanted to let you all know and to put that on the record
20   before anything.  I just wanted to be truthful and honest.  I
21   don't want anybody going through trial and think I don't
22   actually know.  I don't want to withhold anything.
23          THE COURT:  Thank you very much.  Let me ask you to
24   step back for just one moment.
25          I assume you would like me to strike her?

1          MS. SHAPIRO:  Yes, your Honor.  And I just want to

2     reiterate I think what just happened sort of proves the point

3     in the letter that we can't really be sure that other jurors,

4     who at the time you inquired initially didn't remember, might

5     not remember later, especially if they see something else.  So

6     we'll renew the original motion, as well.

7          THE COURT:  I'm going to strike juror No. 1 for cause.

8          I'm going to deny the request of selecting an entirely

9     new jury.  I'll give you my reasonings later in the proceeding

10    so as not to delay things.

11         What I intend to do absent objection is have my

12    courtroom deputy inform the jurors who have been stricken that

13    they have been stricken and that they should return to the jury

14    room.  I don't see a need to bring them back up into the

15    courtroom just to formally tell them that.  The remaining

16    jurors will stay in courtroom 15 and then we'll bring up the

17    new jury pool here and fill the seats.

18         Any objection to that, Ms. Shapiro?

19         MS. SHAPIRO:  No, your Honor.

20         (In open court)

21         THE COURT:  I think while we're waiting for the

22    potential jurors, and while there are no jurors in the

23    courtroom, there are a couple legal matters it seems to me we

24    can discuss.

25         One procedural matter is I gather with respect to the

1    witness Suissa, for whom I signed an immunity order, that

2    witness is going to be testifying probably not today, but

3    tomorrow.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4U1GAR2

1      MR. SHAHABIAN:  So, your Honor, we informed the

2  defense this morning that we may be pushing Mr. Suissa to

3  Thursday because he's local and we're arranging travel

4  schedules.  We do anticipate another witness, Mr. Wachter, will

5  be testifying tomorrow, potentially, depending how the rest of

6  the day goes, also pursuant to an immunity order, so I

7  think—as well as Adrian Lopez Torres, so the same procedural

8  issue is—

9      THE COURT:  And I think procedurally—I'll hear from

10  the parties, but what my intent would be is to have the witness

11  invoke outside of the presence of the jury, then the order

12  becomes effective and then the witness would testify, be

13  subject to examination, cross-examination about the order that

14  they're testifying pursuant to.  Mr. Bach, any views?

15      MR. BACH:  I don't have any objection to that.  I note

16  that one of the government's new witnesses, Mr. Wachter,

17  probably has the same issue.

18      THE COURT:  And I would follow the same procedure with

19  respect to all of the immunized witnesses.

20      MR. BACH:  And in terms of the schedule, there are two

21  new names on the list.  We got a list of five names this

22  morning.  I think it's now down to four.  But let's not deal

23  with that now.  Let's see where we are later today in terms of

24  the schedule.

25      THE COURT:  Okay.  I'm all for you telling me there

1    might be an issue but I'm not going to press it right now.  But

2    I'm not foreclosing you.

3              MR. BACH:  No, no.  It's just that there are new

4    names.  And I understand the government's doing the best they

5    can, and we'll do the best we can.

6              THE COURT:  Okay.  Mr. Brod is about to whisper

7    something to you.

8              MR. BACH:  I received his wise counsel, and thank you.

9    We're good.

10             THE COURT:  Okay.  I think, Ms. Shapiro, you wanted to

11   raise some issues with respect to what the government has

12   characterized as the alternative tipper theory.

13             MS. SHAPIRO:  Yes, your Honor.

14             So I wanted to sort of follow up on the discussion

15   that we started yesterday about that.  I want to be clear,

16   first of all, with the Court, and make sure the Court

17   understands that our defense here is not just a reasonable

18   doubt defense; we are intending to present affirmative proof

19   that Mr. Garelick acted in good faith.  And the evidence in

20   question relating to this alternative tipper theory is

21   absolutely crucial to our defense as to the tipping crime

22   that's been alleged here, and we cannot get a fair trial

23   without it.  We need to present evidence that tips to the other

24   individuals whom the government is alleging are co-conspirator

25   tippees came from others.  The government——

O4U1GAR2

1           THE COURT:  Hold on for a second.

2           MS. SHAPIRO:  Government's submission in their letter

3    is actually wrong on multiple fronts.  The premise of the

4    letter seems to be that we intend to introduce inadmissible

5    hearsay.  That is false.  It is wrong.  Much of the evidence

6    that they even mention in the letter is in the same category as

7    the government's documents.  They're business records that we

8    and the government are stipulating to, such as phone records,

9    trading records, and the like.

10          In addition, the government mentioned some other

11   documents that are not hearsay, such as emails between

12   Mr. Postolnikov and Ben Reed.  Ben Reed is a witness.  We don't

13   believe that any communications we may introduce there will be

14   hearsay.  They relate to Postolnikov's trades and plans to

15   trade.

16          But most importantly, your Honor, there's no

17   requirement in the law here for a pretrial proffer, and indeed,

18   the government cites no case requiring one.  The only case they

19   cite is the Gupta case.  Gupta does not stand for the

20   proposition that before the trial begins, defense counsel is

21   obliged to proffer as to, you know, what their theory is as to

22   why certain evidence is admissible.  Moreover, so in Gupta, the

23   objections occurred during the course of the trial, and the

24   district court held that the documents that the defendant was

25   attempting to introduce were hearsay and that they couldn't be

1    introduced without a witness to lay foundation, and the

2    appellate court upheld that as an appropriate use of the

3    district court's discretion because of the lack of foundation,

4    the absence of explanatory testimony, and the fact that the

5    materials were replete with hearsay.  In this case, it is

6    totally different.  We intend to lay a proper foundation with

7    witnesses.  We shouldn't have to vouch pretrial, or at all, for

8    our good faith in that regard.  The Court can rule as the trial

9    unfolds.  The Court can consider——if there's an objection that

10   we haven't laid a proper foundation, or that something is

11   hearsay, which we don't anticipate, the Court can rule on the

12   objection at the time.  And I respectfully submit that the

13   process that the government is asking the Court to undertake

14   here is extraordinary and unprecedented, and it's not at all

15   supported by Gupta.

16       I also just want to point out that the nature of much

17   of the evidence that we may seek to introduce, such as these

18   telephone records and the trading records, are precisely the

19   types of allegedly circumstantial evidence that the government

20   intends to introduce as to Mr. Garelick.  And there's no reason

21   that we shouldn't be allowed to do the same if we lay a proper

22   foundation with witnesses, as we intend to do.

23       Lastly, I just want to urge the Court that if, for

24   whatever reason, despite what I've said, the Court insists on a

25   proffer, we think it's absolutely critical that we be given the

O4U1GAR2

1    opportunity at the appropriate time to provide that proffer to

2    the Court in a sealed proceeding. After you hear it, you can

3    decide whether it needs to be unsealed, or whether you believe

4    that the Court needs to consult with the government and ask the

5    government questions about what we've disclosed to your Honor,

6    but—and also, I think if you require a proffer at any point

7    during the trial, it will enable you to understand the

8    prejudice that would be caused to the defense if we had to

9    reveal it in open court to the government before a single

10   witness has taken the stand.

11           THE COURT: Why isn't the appropriate way for me to

12   think about this a Rule 104(c) way of thinking about it, which

13   is that before evidence is introduced and if there's an

14   objection on any evidentiary ground, including on 403 grounds,

15   it's within the Court's discretion to have—the rule refers to

16   a hearing, but the rule also says that you can do it in all

17   kinds of different ways, including through a proffer. It's

18   pretty routine, if there is an objection to evidence on 403

19   grounds, for the Court to say to counsel, show me why this is

20   relevant and show me, what evidence do you expect to offer that

21   is going to demonstrate that the probative value is greater

22   than the prejudicial impact in terms of confusing the jury?

23           MS. SHAPIRO: There are two reasons, your Honor. One,

24   the Court has no context in which to consider this particular

25   set of issues. This isn't a Daubert hearing or something like

O4U1GAR2

1    that.  There's been no testimony, and we need to hear the

2    direct testimony of these witnesses; we need to ask——try to ask

3    foundational questions on cross.  The Court would have to

4    conduct an entire mini trial with these witnesses before

5    conducting the actual trial, as a practical matter.  I

6    can't——don't think the government has cited a single case in

7    which that procedure was used pretrial for something like this,

8    your Honor.  And I think that it is tremendously unfair and

9    would cause unbelievable prejudice if we had to proffer this.

10   And also, we don't know exactly how this is going to unfold

11   because we haven't heard the direct.  We've seen 3500.  Some of

12   the witnesses changed their testimony throughout the 3500.  We

13   have to see what the direct is and proceed.

14         And I just want to reiterate that counsel

15   shouldn't——we should not have to vouch for our good faith.

16   This is a very serious matter.  Both——all of the lawyers at

17   this table, especially Mr. Bach and I, have decades of

18   experience in this courthouse.  I think your Honor is familiar

19   with our bona fides in that regard.  And we're not going to ask

20   improper questions without a foundation.  And the Court can

21   rule at the time.

22         THE COURT:  Let me push you on a couple of things.

23   Let me make an observation and then push you on a couple of

24   things.

25         First of all, I don't understand the issue to be good

1    faith.  I'm presuming good faith of all counsel.  I'm also

2    presuming that each side is adhering to its ethical obligations

3    to represent its client vigorously within the bounds of the law

4    and within the bounds of what the law could potentially permit.

5    But that does not relieve me of my obligation to make a

6    judgment with respect to the admissibility of evidence, for

7    example.  You might be right in certain instances that evidence

8    is admissible.  But I still can't just defer to you, and I'm

9    not going to defer to the government.  That's my observation.

10         My question is the following:  You've put a lot of

11   weight on the notion that the defense should not be required to

12   make a proffer pretrial.  You've said that several times,

13   pretrial.  In your view, would it make a difference if I

14   required you to make the proffer after opening statements and

15   after trial has commenced?

16         MS. SHAPIRO:  I don't think the opening statements are

17   the issue, your Honor.  I think the issue is, we'd be happy

18   to——may I consult.

19         The point is that we don't want to do it before their

20   witnesses have testified, so I don't think the opening

21   statements are going to make a difference in that regard.

22   We're still not going to have heard what the government's

23   witnesses are going to say so that we can figure out how to

24   establish a foundation, to the extent some of this is going to

25   come up in the cross and during the government's case.

1    THE COURT:  So I'm going to put to the side your

2  references to pretrial, because it doesn't seem to me that your

3  argument is really based upon it being pretrial.

4    MS. SHAPIRO:  Well, your Honor, let me put it a

5  different way.  I don't want to get caught in a little "gotcha"

6  game about——

7    THE COURT:  I don't either, but actually, I think it

8  does make a difference whether something is pretrial or not

9  pretrial.  So——

10    MS. SHAPIRO:  Well, your Honor——

11    MS. HANFT:  Your Honor, individuals have entered the

12  courtroom.

13    THE COURT:  And they've left.

14    MS. HANFT:  Okay.

15    THE COURT:  And they weren't in the courtroom during

16  any of the argument.  I've been vigilant about that.

17    MS. SHAPIRO:  We're prepared to make a very

18  substantial and comprehensive proffer to the Court.  We think

19  it's more appropriate to do at a later point when there's——in

20  the context of testimony.  We've already discussed yesterday

21  the fact that, to the extent this is going to be mentioned in

22  the opening, it's going to be very brief, and that's obviously

23  at our peril.  So if that's mentioned and then the Court

24  ultimately, erroneously, excludes the evidence, you know, then

25  the government will take advantage of that in summation.

O4U1GAR2

1    THE COURT:  And I agreed with your argument yesterday

2    on that point.

3    MS. SHAPIRO:  The other thing I just want to point

4    out—just a moment, your Honor.

5    Mr. Bach has pointed out that I should just be clear

6    to the Court that the proffer that we could make is not just as

7    to one piece of evidence, it's not as to a small portion of the

8    case, it is essentially our principal defense of the tipping

9    charge.

10    THE COURT:  I'm presuming by—

11    MS. SHAPIRO:  Comprehensive.

12    THE COURT:  I'm presuming by what you've said and also

13    from what I've heard from the government that this defense, if

14    it's a defense—and I'm not prejudging that question—will come

15    in like most theories do, bit by bit, and that there will be

16    some evidence that comes in through some witnesses and some

17    evidence that comes in through other witnesses.  Is that fair?

18    MS. SHAPIRO:  That's correct, your Honor, and that's

19    one of the reasons I think the idea of holding a 104 hearing

20    really doesn't make sense, because we'd have to have some

21    witnesses there and try to lay a foundation; it would be a

22    whole mini trial.

23    The other thing I just want to—

24    THE COURT:  And I'm not talking about a whole 104

25    hearing, but I infer from 104 and the flexibility that 104

1    provides that if a court can hold a hearing outside the

2    presence of the jury, a court can also require a proffer of

3    what the witnesses would testify if there was a hearing.  So

4    when you say a full 104 hearing, I don't have that at all in my

5    mind, just so we're clear.

6         But I interrupted you, Ms. Shapiro.

7         MS. SHAPIRO:  Well, what I was going to point out,

8    just so your Honor understands——which I'm not sure, it may

9    already be clear to the Court, but——one of the individuals that

10   we believe was likely to have been involved in some of the tips

11   to Mr. Gerald Shvartsman in particular is an unindicted

12   co-conspirator, and so I just wanted to make sure the Court

13   understood that, so we're not just, you know, making this stuff

14   up.  It's not crazy.  It's really based on evidence.  And——but

15   I just don't think that it's fair to require us, in front of

16   the government, when they're in a position to go back and talk

17   to their witnesses and tell them everything we've told you

18   about what it is we're trying to prove, that we have to——that

19   we need to do that.  And there's really——I would just urge the

20   Court again, if you really think this is——it's critical that

21   you hear all of these details, we are happy to provide it in

22   camera, the Court can decide after hearing it what, if

23   anything, it needs to hear from the government.  It's

24   just——it's going to kill the defense if you require us to make

25   a comprehensive proffer of everything we're trying to prove in

1    front of the government.

2           THE COURT:  Let me ask you this question.  When the

3    government offers evidence and I have to make judgments about

4    401, 403, and the like, I'm able to do that against an

5    indictment, and if the indictment doesn't have enough

6    information, there are bills of particulars, and I can make

7    judgments about whether evidence is relevant because I know

8    what the theory is.  Understandably, there's no similar

9    document from the defense.  In the absence of there being some

10   form of a proffer, how do I make the judgments about 401 and

11   403 and other evidentiary issues?

12          MS. SHAPIRO:  Well, your Honor can do that in the

13   context of the evidence.

14          THE COURT:  Yes, but I'm judging the evidence against

15   some argument or some theory, and if I don't know what it's

16   relevant to——

17          MS. SHAPIRO:  Well, your Honor, it's clear what it's

18   relevant to.  There are——the government has alleged that

19   Mr. Garelick tipped material nonpublic information to other

20   individuals who traded on it, and——the reason it's

21   obviously——it's obviously relevant if those individuals traded

22   on tips——and we believe some of them did——they traded based on

23   tips that were provided by other individuals, that's obviously

24   relevant.

25          THE COURT:  But don't I need to know who the alleged

O4U1GAR2

1  tipper is in the theory of the defense?

2          MS. SHAPIRO:  Why?

3          THE COURT:  Because, for example, some trading records

4  or telephone records might be relevant if they are between the

5  alleged tipper and the person who traded.  If they're telephone

6  records between somebody who didn't have access to the

7  information in the first place but they just happened to be

8  telephone records to a person who traded, then those telephone

9  records might not be relevant.  So that's one reason why I need

10 to know it.

11         MS. SHAPIRO:  Can I just consult with my colleagues

12 for one moment.

13         Some of the telephone records and the trading records,

14 if not all of them——although my colleagues will correct me if

15 I'm wrong——relate to the unindicted co-conspirators.

16         THE COURT:  Okay.  And maybe you all know who the,

17 quote, unindicted co-conspirator——

18         MS. SHAPIRO:  Sorry.  His name is Anton Postolnikov.

19         THE COURT:  And the theory, I take it, is that

20 Mr. Postolnikov is the source of the information and the

21 tipper?

22         MR. BACH:  Judge, I'm sorry to keep interrupting, but

23 we have kind of a division of labor between legal argument and

24 factual recitation.

25         We're not prepared to proffer that point.  We believe

O4U1GAR2

1    Mr. Postolnikov is right in the center of the action here.  But

2    if the Court demands a proffer, it's richer than that.

3              THE COURT:  It's?

4              MS. SHAPIRO:  Richer than that.

5              THE COURT:  I thought you were going to say Richard.

6    But it's richer.  Okay.  I assumed that it was richer.

7              MS. SHAPIRO:  What I was going to say, your Honor, I

8    understand what you said about the fact that you have a

9    charging document, but I would just point out, for

10   instance——and I know we're going to litigate this during the

11   trial and your Honor's made a preliminary ruling, but for

12   instance, your Honor preliminarily ruled that these hearsay

13   communications of these downstream tippees are coming into

14   evidence, even though you've heard no evidence linking

15   Mr. Garelick to the alleged conspiracy that the government

16   claims those hearsay documents, hearsay statements were made in

17   furtherance of.  So there really isn't a difference here.

18   Presumably, when the evidence comes in on that issue, the

19   government will either prove the conditional relevance, and

20   that will be fine, or they won't, and then the evidence will

21   have to be stricken.  And this is not, you know——so

22   there's——obviously the reason you don't have a charging

23   instrument from us is because we're not the government.  And

24   that's just not how criminal trials work.  You know, the one

25   thing we have going is surprise.  All the other rules go

O4U1GAR2

1    against us.  They get to do the investigation, they have access

2    to all kinds of information, witnesses that we don't have

3    access to.  The one thing the defendant has is the element of

4    surprise and the ability to cross-examine witnesses who don't

5    know what they're going to get cross-examined on, and if the

6    Court requires us to make a proffer of essentially our entire

7    defense to the tipping allegations, it will destroy our ability

8    to obtain a fair trial for Mr. Garelick.

9              THE COURT:  Okay.  So at what point does your theory

10   of the defense become apparent, in closing statements?

11             MS. SHAPIRO:  No, your Honor.  I think it will

12   become——hold on one second.

13             THE COURT:  And Ms. Shapiro, I'll let you answer that

14   question, and then I'm told we're ready with the jurors.

15             MS. SHAPIRO:  Your Honor, we don't know the witness

16   order yet, but I think it will become apparent, depending on

17   the order of the witnesses, during——after one of the witnesses'

18   direct.

19             THE COURT:  Okay.  All right.  I'll hear from the

20   government later with respect to this.  I'm going to step off

21   the bench and my deputy will bring in the jurors.

22             (Recess)

23

24

25

O4UCgar3

1              AFTERNOON SESSION

2                 2:27 p.m.

3        (In open court; jury not present)

4        THE COURT:  The Court is prepared to rule on the

5   government's motion in limine to prohibit cross examination of

6   Andrew Litinsky about his recording of certain remarks by

7   Patrick Orlando.  In those remarks, Mr. Orlando said he and

8   Mr. Litinsky could "talk hypothetically" about a merger between

9   Trump Media Group and one of Mr. Orlando's SPACs, contrary to

10  SEC rules forbidding SPACs from engaging in merger discussions

11  prior to going public.  The defense submits that those remarks

12  are relevant for two reasons:  First, the defense contends that

13  those remarks undermine Mr. Orlando's credibility; second, the

14  defense argues that his remarks, because they were hedged and

15  hypothetical, are relevant to the materiality of the merger

16  information Mr. Garelick received.

17        The recording is not admissible to prove Mr. Orlando's

18  character for untruthfulness.  He is not expected to be a

19  witness and no statements from him are contemplated to be

20  offered for their truth.  In any event, the recording would be

21  improper extrinsic evidence under Federal Rule of Evidence

22  608(b).

23        To the extent the defense instead offers that evidence

24  to show that the merger information Mr. Garelick received was

25  not material, any conceivable relevance is outweighed by the

O4UCgar3

1    risk of unfair prejudice and distraction of the jury.  The

2    defense can inquire with Mr. Litinsky into the status of DWAC's

3    potential merger with Trump Media Group and all of the relevant

4    times.  That evidence would be relevant.  But evidence that

5    Mr. Litinsky spoke and guarded in caveated language when

6    speaking to Mr. Orlando outside the presence of Mr. Garelick or

7    suggested that the two could describe their negotiations in

8    caveated language is of minimal, if any probative value.  What

9    is relevant is the status of the negotiations.

10            The minimal probative value of Mr. Orlando's recorded

11    remarks pales in comparison to the significant prejudice that

12    would result from introducing them.  That evidence would

13    confuse the issues — misleading jurors into focusing on

14    Mr. Orlando's potential violation of SEC rules regarding SPAC

15    merger negotiations — and waste time in light of the far more

16    relevant testimony the parties can otherwise elicit regarding

17    how advanced negotiations between Mr. Orlando's SPACs and the

18    Trump Media Group were at any given time.

19            The Court therefore grants the government's motion in

20    limine to exclude cross examination of Mr. Litinsky on his

21    recording of Mr. Orlando.

22            Any reason we shouldn't bring in the jury from the

23    government's perspective?

24            MS. HANFT:  No, your Honor.

25            THE COURT:  Mr. Bach.

O4UCgar3

1          MR. BACH:  No, your Honor.

2          THE COURT:  Let's bring in the jury.

3          (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Welcome back, members of the jury.  I hope

3    you all had a good lunch.

4          When you enter the courtroom, you're free to take your

5    seats.  You do not need to wait for me to say that you may be

6    seated.  Everybody else does have to wait, but you don't have

7    to wait.

8          Now that you have been sworn, I will give you some

9    preliminary instructions to guide you in your participation in

10   the trial.

11         To begin with, you are here to administer justice in

12   this case according to the law and the evidence.  You are to

13   perform this task with complete fairness and impartiality, and

14   without bias, prejudice, or sympathy for or against any of the

15   parties.

16         It will be your duty to find from the evidence what

17   the facts are.  You, and you alone, will be the judges of the

18   facts.  You will then have to apply those facts to the law as

19   the Court will give it to you.  You must follow that law

20   whether you agree with it or not.  Nothing the Court may say or

21   do during the trial is intended to indicate or should be taken

22   by you as indicating what your verdict should be.

23         The evidence from which you will find the facts will

24   consist of the testimony of witnesses, documents and other

25   things received into the record as exhibits, as well as any

O4UCgar3

1    facts that the parties agree to, or stipulate to, or that the

2    Court may instruct you to find.

3         Certain things are not evidence and must not be

4    considered by you.  I will list them for you now.

5         First, statements, arguments, and questions by lawyers

6    are not evidence.  Nor are my own statements to you evidence.

7    Only the answers given by the witnesses and the documents

8    admitted as exhibits are evidence.

9         Second, objections to questions are not evidence.  The

10   lawyers have an obligation to their clients to make an

11   objection when they believe being offered is improper under the

12   rules of evidence.  You should not be influenced by the Court's

13   ruling on an objection.  If the objection is sustained, ignore

14   the question.  If it is overruled, treat the answer like any

15   other.  If you are instructed that some item of evidence is

16   received for a limited purpose only, you must follow that

17   instruction.

18        Third, testimony that the Court has excluded or told

19   you to disregard is not evidence and must not be considered.

20        Finally, anything you may have seen or heard outside

21   the courtroom is not evidence and must be disregarded.  You are

22   to decide the case solely on the evidence presented here in the

23   courtroom.

24        When you are determining the facts, keep in mind that

25   there are two kinds of evidence: direct and circumstantial.

O4UCgar3

Direct evidence is direct proof of a fact such as the testimony
of an eyewitness.  Circumstantial evidence is proof of facts
from which you may infer or conclude that other facts exist.
The word "infer" or the expression to draw an inference means
to find that a fact exists from proof of another fact.  An
inference is to be drawn only if it is logical and reasonable
to do so and not by speculation or guesswork.

In deciding whether to draw an inference, you must
look at and consider all of the facts in light of reason,
common sense, and experience.  Whether a given inference is or
is not to be drawn is entirely a matter for you, the jury, to
decide.  Circumstantial evidence does not necessarily prove
less than direct evidence, nor does it necessarily prove more.

Here is an example to help you think about the
difference between direct and circumstantial evidence.  Assume
that when you came into the courthouse this morning the sun was
shining and it was a nice day outdoors.  Also assume the
courtroom blinds were drawn and you could not look outside.
Assume further that as you were sitting here, someone walked in
with an umbrella that was dripping wet.  Then, a few moments
later, somebody else walked in with a raincoat that was also
dripping wet.

Now, because you could not look outside the courtroom
and you could not see whether it was raining, and because no
witnesses testified that it is raining, you would have no

O4UCgar3

1    direct evidence of the fact that it was raining.  But on the

2    combination of facts that I've asked you to assume, it would be

3    reasonable and logical for you to conclude that it was raining.

4        That is all there is to circumstantial evidence.  You

5    infer on the basis of reason, experience, and common sense from

6    one established fact the existence or nonexistence of some

7    other fact.  I will give you further instructions on these as

8    well as other matters at the end of the case, but keep in mind

9    that you may consider both kinds of evidence.

10       One of your most important tasks as jurors is to

11   evaluate the credibility of the witnesses who will testify

12   before you.  That is, how truthful and believable they are.

13   Listen carefully as each witness testifies during both direct

14   and cross examination, and consider whether the witness is

15   telling the truth.  It will be up to you to decide which

16   witnesses to believe, which witnesses not to believe, and how

17   much of any witness's testimony to accept or reject.

18       Now, how do you decide what to believe and what not to

19   believe?  You are to listen to the witnesses, observe their

20   testimony, and then decide as you would decide such questions

21   in your own life.  Did they know what they were talking about?

22   Were they candid, honest, open, and truthful?  Did they have a

23   reason to falsify, exaggerate, or distort their testimony?

24   Sometimes it is not what a witness says, but how he or she says

25   it that may give you a clue as to whether or not to accept that

1    witness's version of an incident or an event as credible or

2    believable.

3         In short, the way a witness testifies may play an

4    important part in your reaching a judgment as to whether or not

5    you can accept the witness's testimony as reliable.

6         Now, let me reiterate a few words about your conduct

7    as jurors.  This is what I instructed you on before you broke

8    for lunch, but I'll go and instruct you again.

9         First, during the trial, you are not to discuss the

10   case with anyone nor are you to permit anyone to discuss it

11   with you.  This includes posting anything on the internet about

12   the case, whether it be on personal blogs, Facebook, Twitter,

13   X, or Threads.  Until you retire to the jury room at the end of

14   the case to deliberate, you simply are not to talk about this

15   case with anyone, including your spouse or partner, family, or

16   close friends.  Do not even discuss the case with each other,

17   your fellow jurors until you begin your actual deliberations at

18   the end of the trial.

19        Second, please do not, while you are serving as jurors

20   in this trial, have any conversations with the parties, the

21   attorneys, or any witness in this case, whether in the

22   courtroom, in the hallways, in the elevators, outside, or

23   anywhere else.  By this I mean not only to avoid talking about

24   the case, do not talk at all even to say good morning or to

25   acknowledge any of these people.  Someone seeing a juror in

conversation with a party, lawyer, or witness might think that

something improper was being discussed.  So to avoid even the

appearance of impropriety, then avoid any such contact or

conversations.  And I reiterate that I've told the parties,

lawyers, and witnesses that if they pass you in the halls, they

should not even acknowledge your presence.  They do not mean to

be rude, they are simply following my instructions.

Third, do not read or listen to anything outside the

courtroom that relates to this case in any way.  Similarly, you

are not to allow anyone to speak to you about the case.  If you

are approached by anyone to speak about it, politely but firmly

tell them that the Judge has directed you not to do so.  If any

person seeks to contact you about the case, you are required to

report the incident promptly to me by sending me a note through

my deputy, Mr. Fishman.  Also be sure that I am aware if any

person that you know comes into the courtroom.  As I mentioned

earlier, this is a public trial, so that could happen, but it

is important that you do not hear from them what may have

happened in the court while the jury was not present.  If you

should see a friend or relative come into the court, please

send me a note through Mr. Fishman at your first opportunity.

Fourth, do not try to do any research or make any

investigation about the case or the issues presented by the

case.  For example, do not go onto the internet tonight and

research any matters relating to the case.  Do not call up your

O4UCgar3

1    lawyer friends to ask about the type of matters at issue in the

2    case.

3            Fifth, I know that many of you use cellphones,

4    smartphones, social media, the internet, and other tools of

5    technology.  You must not use those tools to communicate

6    electronically with anyone about the case.  That includes your

7    family and friends.  You may not communicate with anyone about

8    the case on your cellphone, which includes smartphones through

9    email, text messaging, Twitter, X, Threads, any blog or

10   website, any internet chatroom, or by way of any other social

11   networking websites, including Facebook, LinkedIn, and YouTube.

12           Finally, do not form any opinion until all the

13   evidence is in.  A case can be presented only step by step,

14   witness by witness until all the evidence is before you.  Keep

15   an open mind until you start your deliberations at the end of

16   the case.

17           You are permitted to take notes during the trial.

18   Mr. Fishman has given each of you a notepad and pen or pencil.

19   Please write your name on the cover of the pad.  If you do take

20   notes, please do so only in these pads.

21           Remember that any notes you take are for your use only

22   and they are only to be used as an aid for your memory.  Your

23   memory controls.  If you do take notes, be careful not to get

24   so involved in taking notes that you are not listening to the

25   evidence.  Once you are in your deliberations, if there is a

O4UCgar3

disagreement between one juror's notes and another juror's

notes or between one juror's notes and another juror's

recollection, you can ask the court reporter to read back the

testimony or to have that portion of the transcript sent to

you, for it is the official court transcript that controls, not

any particular juror's notes.

During the course of the trial, exhibits will be

received into evidence.  They will be marked by exhibit number.

If there is an exhibit that you are particularly interested in

seeing during your deliberations, write down the exhibit

number.  At the end of the trial as you begin your

deliberations, we will provide each of you with a list of all

of the witnesses who testified during the trial, as well as a

list of all of the exhibits that have been received into

evidence.

We will now begin the trial.  As I told you earlier,

the trial is expected to be done by the end of next week.  Let

me tell you again about the trial day.  We will begin each day

at 9:00 a.m.  Please be here on time.  To help ensure that we

start on time, please be in the jury room by 8:45 a.m. at the

latest so we can begin without delay.  I will add that a light

breakfast will be available in the jury room each morning at

8:30 a.m.  You're not required to take us up on our

hospitality, but in my experience, many jurors do.  The key

thing is nobody be late because if any of you are late, we will

1  have to wait, for we cannot start unless all of you are here.

2  And all of us, myself, the lawyers, the parties, the witnesses,

3  and your fellow jurors will have to wait.  If we lose 10 or 20

4  minutes every day, we may not be able to get the trial

5  completed on time.  As to the rest of the trial day, we will

6  take our lunch break ordinarily around 1:00 p.m. and have brief

7  midmorning and midafternoon comfort breaks with refreshments

8  provided for you in the afternoon.

9        Let me tell you how the trial will proceed.  First, we

10  will have opening statements.  An attorney for the government

11  will make an opening statement, then an attorney for the

12  defendant will do so.  The opening statements are neither

13  evidence nor argument.  They are simply outlines of what the

14  attorneys believe the evidence will show, and they are given to

15  help you follow the evidence as it is presented.

16        After the opening statements, the government will

17  present its case.  The government will call its witnesses, and

18  after each witness testifies, counsel for the defendant will

19  have an opportunity to examine the witness.  If that witness is

20  also one of the witnesses the defendants will call on, the

21  defendant may also examine that witness on matters relevant to

22  its defense so that the witness does not have to testify twice.

23        Following the government's case, the government will

24  rest, the defendant will then have an opportunity to present a

25  defense case should he choose to do so.  The defendant is under

1    no obligation to present a defense.  The burden remains at all

2    time on the government to prove the elements of each offense

3    beyond a reasonable doubt.  Should the defendant present a

4    defense case, any remaining defense witnesses will testify and

5    the government will have the opportunity to cross examine them.

6            After the evidence is completed and all the sides have

7    rested, the attorneys will give their summations.  This is the

8    opportunity for the lawyers to summarize the evidence and to

9    give their closing arguments.

10           Following the summations, I will give you instructions

11   on the law.  You will then finally retire to deliberate on your

12   verdict.

13           You have a tremendously important task as jurors — it

14   is to determine the facts.  You, and not the Court, are the

15   sole judges of the facts.  The Constitution itself recognizes

16   your unique role in our system of justice.  So please, pay

17   careful attention to the witnesses and the evidence received at

18   trial, as well as my instructions on the law.

19           The government may now present its opening statement.

20           MS. HANFT:  Thank you, your Honor.

21           In the business world, there is no bigger news than a

22   merger, an announcement that two companies are going to

23   combine.  The reason?  When the stock market hears that the

24   companies will merge, the value of the combined company can go

25   way, way up.  So if you know before anyone else that the merger

1    is going to happen, and you are willing to break the law and

2    use inside information, you can make a lot of money, money for

3    yourself and money for anyone you tell.  And that's what that

4    man, the defendant, Bruce Garelick did.  He knew about a merger

5    before the rest of the world.  It was a merger between two

6    companies, a company very few people had heard of called DWAC

7    or Digital World Acquisition Corporation, and a company called

8    Trump Media Group, the company that would launch former

9    President Donald Trump's own social media network.

10          When the merger was announced to the public in October

11   2021, it was big news, but it wasn't news to the defendant.

12   That's because the defendant was on the board of directors of

13   DWAC.  For months he had known the companies might merge.  In

14   fact, he was one of the people who voted for the merger.  The

15   defendant was an insider of DWAC.  Because he was on the board,

16   DWAC trusted him with news that the merger might happen.  And

17   because he was on the board, he had a duty to keep that

18   information confidential.  He had a duty not to use that

19   information to make money in the stock market.  But the

20   defendant betrayed that trust.  He betrayed that trust when he

21   vested in DWAC on the open market for himself, even though he

22   had promised months before in a written agreement that he would

23   keep the news that the companies were considering merging a

24   secret.  And he betrayed that trust again when he tipped off

25   his boss and his friends with information he learned because he

1    was on the board.  He tipped off his boss and friends so that

2    they could all invest in DWAC and make a lot of money.

3           Sure enough, after the merger was announced, the value

4    of the company shot way up and the defendant, his boss, and his

5    friends sold their investments and made millions and millions

6    of dollars.  That's why we are here today, because the

7    defendant abused the trust placed in him as an insider, and

8    used confidential information to trade in the stock market, and

9    to tell his boss and friends to trade in the stock market.

10   That's called insider trading, and it's a federal crime.

11   Insider trading is cheating.  It's using inside information to

12   get illegal advantage that the general public, people who

13   aren't on the inside, never got.

14          This is the government's opening statement.  It's our

15   opportunity to explain to you what the evidence at this trial

16   will show and how we are going to show that the defendant

17   committed insider trading.

18          First, some background on the defendant.  He's a

19   sophisticated businessman.  He's been in the financial industry

20   for years.  He even has a graduate degree in business.  During

21   the time we'll be talking about at this trial, he worked as an

22   executive for an investment company.

23          Here's how the scheme started.  You will hear at the

24   trial that a friend of his boss introduced the defendant, his

25   boss, and his boss's brother to the CEO of DWAC so that they

1   could invest in the company.  DWAC was an unusual kind of

2   company, a company known as a SPAC, or a Special Purpose

3   Acquisition Company.  A SPAC isn't a company the way we usually

4   think of companies, companies that have an actual business.

5   They're what people sometimes call blank check companies.  They

6   do no actual business, but they exist only to find a company to

7   merge with.

8          SPACs go public first, they make themselves available

9   for the public to buy shares on the open market, and then they

10  merge with a private company that does have actual business.

11  The SPAC's goal is to merge with a promising company.  And then

12  the shareholders who bought into the SPAC will own part of the

13  merged company.  The SPAC shares will be very valuable if the

14  SPAC has chosen the right merger target.

15         You'll hear about a key meeting in the summer of 2021.

16  The defendant, his boss, and his boss's brother met with the

17  DWAC CEO who was looking for people to invest in his SPAC.  Not

18  on the open market, the SPAC wasn't public yet, but directly in

19  the company through what are called founder shares, an initial

20  investment to get the SPAC up and running.  They learned at

21  that meeting valuable information, that Donald Trump's social

22  media company was a potential merger target.  DWAC's CEO knew

23  that Trump Media was on the market and looking to merge with a

24  SPAC.  He knew that he had a good shot with Trump Media because

25  he had already personally negotiated with them before while

1    working for a different SPAC.

2            Because they were getting such valuable information,

3    the defendant, his boss, and his boss's brother had to sign

4    written agreements to keep the information a secret.  If it

5    fell into the wrong hands or if it leaked, it could have ruined

6    the deal.  You will see those written agreements at this trial.

7    They said investors who signed them could not reveal

8    information that wasn't public.  They could use what they

9    learned only to decide whether to invest in founder shares of

10   DWAC.  The defendant and his boss and his boss's brother signed

11   those written agreements.  They agreed to keep the information

12   confidential.

13           The defendant and the brothers recruited other people

14   to invest.  They invested themselves too in the founder shares.

15   As a result, the defendant got a seat on the company's board of

16   directors.  As a board member, the defendant was required to

17   keep information he learned about DWAC confidential.  He was

18   not allowed to trade in the company's stock or make other

19   investments on the public market while he had material

20   nonpublic information.  He also wasn't allowed to tip or pass

21   on information to anyone who might invest based on that

22   information.

23           In September 2021, DWAC went public, meaning the

24   public could start making investments in the company.  It was

25   traded over the NASDAQ exchange right here in Manhattan.  Very

1   shortly thereafter, even though he knew all this inside

2   information, what did the defendant do?  Exactly what he wasn't

3   allowed to do.  He bought DWAC shares on the open market.  He

4   invested in DWAC on the open market multiple times in September

5   2021, using that information he had learned and had promised to

6   keep confidential.  When he did that, he cheated the people who

7   sold him their interest in DWAC because members of the public

8   who could buy and sell DWAC shares by that point too, well,

9   they didn't have all the insider and confidential information

10  the defendant had.  They didn't know that their DWAC shares

11  were about to become much more valuable.

12          During that time, DWAC was negotiating its merger with

13  Trump Media.  The business people were exchanging letters,

14  confirming they were negotiating with one another to merge, and

15  they were discussing potential target companies, including

16  Trump Media.  The defendant was at those meetings, he was a

17  part of those conversations, but he bought for himself on the

18  public market one last time and he tipped his boss who began

19  trading in their company's account.  His boss's brother began

20  trading.  His boss's brother's employees began trading.  All of

21  these people invested in DWAC on the public market because they

22  had access to inside information all thanks to the defendant.

23          What happened to their investments?  Exactly what

24  everyone with inside information wanted and expected.  The

25  value went up and they made money.  As I mentioned, when the

1    merger was announced, it was a big deal.  Former president

2    Trump's spokesperson made the announcement on Twitter DWAC and

3    Trump Media had agreed to merge.

4            Now, whatever your view is on the former president, he

5    makes a big splash in the news.  So when the market opened the

6    next day, DWAC's value skyrocketed.  The defendant's money

7    doubled overnight.  The defendant sold his DWAC securities

8    almost immediately.  He made just under $50,000.

9            How much did the defendant's company make because of

10   his boss's investment?  $18 million.  The boss's brother?  He

11   made a cool $5 million all thanks to the valuable tips they got

12   from the defendant.

13           So that's what the evidence at this trial will show,

14   that the defendant committed insider trading, he stole DWAC's

15   confidential information and used it to make money and to tip

16   other people so that they could make money.

17           Now, how are we going to prove it?  First, you'll see

18   documents.  You'll see though signed agreements I mentioned

19   where the defendant promised to keep what he learned

20   confidential.  You'll see phone records, records that show the

21   defendant talking to his boss at important moments in time, at

22   times that align with him learning confidential information,

23   records that show his boss then talking to others who invested

24   in DWAC.  You'll also see trading records.  Those records will

25   show you when and how the defendant, his boss, and his friends

O4UCgar3            Opening - Ms. Hanft

1   made over $22 million buying and selling DWAC securities all

2   thanks to the defendant's inside information.

3           You'll see emails and text messages.  For example,

4   you'll see a message where the defendant tells his boss that he

5   has a DWAC board meeting the next day.  In that same message,

6   what else does he tell his boss?  He says start buying more

7   DWAC stock.  You'll see a message the defendant sent the board

8   two days later telling the board he enthusiastically supported

9   the merger with Trump Media.  You'll see a message where you

10  see the defendant acknowledged he wasn't supposed to trade on

11  inside information because he was on DWAC's board.  He was

12  restricted.  But you'll also see that he didn't actually

13  restrict himself.  He told a friend, "I took one for the team,"

14  but he told someone else, "we made $20 million."  The defendant

15  made money for himself, for his boss, and for his friends all

16  thanks to his inside information.

17          Next, you'll hear the testimony of witnesses.  You'll

18  hear from the person who introduced the defendant and the

19  brothers to DWAC's CEO.  That person was at the meeting where

20  they all learned that Trump Media was a potential target.

21  You'll hear from other DWAC insiders who will tell you about

22  the process in negotiating with Trump Media and other targets.

23  They'll tell you they knew the information was confidential.

24  You'll also hear from someone on the other side who was helping

25  to build Trump Media about how confidential the negotiations

1   were.  Finally, you'll even hear from some people who got the

2   tips that the defendant passed along.  They worked for the

3   defendant's boss's brother, and they made a lot of money too.

4           There's also something you won't see here.  You'll

5   learn that an insider like the defendant has to fill out

6   certain forms when he buys or sells securities in his own

7   company, but you'll learn at this trial that the defendant

8   never filed them.  He hid what he had done.

9           Now, no single document, no single witness here is

10  going to give you the full story.  Instead, the evidence will

11  come in piece by piece.  But at the end of the trial, you will

12  see how all the evidence fits together to show you that the

13  defendant committed insider trading.

14          Also at the end of the trial, we will have a chance to

15  talk to you again.  Between now and then, I'm going to ask you

16  to do three things:  First, pay close attention to the

17  evidence; second, follow Judge Liman's instructions on the law;

18  third, use your common sense, the same common sense you use in

19  your daily lives.  If you do those three things, you will

20  return the only verdict that is consistent with the evidence in

21  this case, that the defendant, Bruce Garelick, is guilty.

22          THE COURT:  Thank you, Ms. Hanft.

23          Now the defense opening statement.  Mr. Bach.

24          MR. BACH:  Thank you, Judge.

25          Good afternoon.  My name is Jonathan Bach, and I have

1    a number of colleagues, Alexander Shapiro, Julian Brod, and

2    Jason Driscoll, Laura McFerrin.  It's our privilege to

3    represent Bruce Garelick.  It's our privilege to represent

4    Bruce Garelick.

5         Bruce Garelick is innocent.  He did not commit insider

6    trading.  He did not commit any crime.  Bruce is an honest and

7    ethical man.  He has worked in the financial world for many,

8    many years.  He has overseen thousands of trades on the stock

9    market.  He has never had a single scrape with the law.  With

10   all of his experience, he is well aware of two things:  Number

11   one, you can't share inside information with other people; and

12   number two, you can't profit on it to make money for yourself.

13        You heard the government's opening statement, that the

14   evidence in this case will be crystal clear that Bruce did not

15   do either of those two things.  Yes, Bruce was a member of the

16   board of directors of a little known company called DWAC.  He

17   handled that job professionally and responsibly.  He was put on

18   that board because of his very strong financial background, and

19   he was put on that board because he could add value, and he

20   never told anybody, not a soul a single thing that he learned

21   as a member of DWAC's board.  He never tipped anybody about any

22   inside information at all.

23        Now, while he was on the board, he bought a small

24   amount of DWAC stock for himself.  He bought it at a time when

25   he believed it was perfectly okay for him to buy it, at a time

1    when he believed he was not in possession of any material

2    inside information.  The evidence in this case will show that

3    as soon as that began to change, as soon as he believed that he

4    was beginning to come close to what might be considered

5    material or important inside information, he stopped and did

6    not buy any more stock for himself.  He drew a line.  He was

7    very conscientious about what he could do and about what he

8    could not do.  He followed the rules.  The evidence will make

9    that very clear.

10            At the end of this case when we're all done, you will

11   be asked to consider Bruce's state of mind.  You will be asked:

12   At any point in time did he do anything that he knew to be

13   wrong?  That's the central question in this case.  What was in

14   his head?  Did he at any point have the mind of a criminal?

15   Did he know something was wrong to do and then go ahead and do

16   it anyway?  The evidence will show, no, he did not.  At all

17   times, Bruce acted in good faith.  He had a clean and honorable

18   state of mind.  He understood himself to be following the

19   rules.  He acted in good faith.

20            Let me step back and tell you a little bit about

21   Bruce.  Bruce graduated from one of the nation's top business

22   schools.  That was about 25 years ago.  After his graduation,

23   he spent decades building his skills in finance.  He worked at

24   a number of investment firms, mainly in the Boston area.  At

25   one point, he came to run his own firm.  He became a very

1    experienced professional, someone who could analyze the stock

2    market mathematically and analytically, not by using any

3    shortcuts, but by using numbers, and math, and analytical

4    skills and analytical tools that he had developed throughout

5    the various stages of his career.  He has always been an

6    extremely hard worker.

7         Let me tell you another thing about Bruce.  When he

8    buys stock for himself, he has always been a very conservative

9    investor.  He buys stocks only in limited amounts.  He invests

10   in a number of different stocks knowing that some may go up and

11   some may go down.  He never lets any one stock count for more

12   than 10 percent of his personal holdings.  He is very careful

13   that way.  When he buys a particular stock, he does not buy it

14   all in one day.  He knows that the price of stock can go up one

15   day and down the next.  So he buys stock on different days to

16   capture the average of those ups and downs.  That's how he

17   invests.  You're going to see that very clearly demonstrated in

18   this case.  He invests carefully, he invests methodically, he

19   invests analytically to limit his risks.  He does not invest

20   based on inside information.

21        Now, let's talk about 2021.  2021 is the year in which

22   all of the events in this case take place.  You can see this

23   nice calendar for the year 2021.  Just a few months before we

24   get to 2021, in August of the prior year, 2020, Bruce started a

25   new job.  He went to work for Michael Shvartsman.  Michael

1    Shvartsman is a very wealthy businessman who owns a number of

2    companies, including Rocket One.  Bruce was hired because of

3    his strong financial background and because of his experience

4    in analyzing financial investments.

5            Michael Shvartsman's offices were based in Florida.

6    Bruce did not join him there.  Instead, like many other people,

7    in the middle of the pandemic, he worked from home.  Bruce's

8    home was in Providence, Rhode Island.  He worked remotely from

9    Providence throughout the entire year 2021, throughout the

10   entire time period relevant to this case.  He traveled to

11   Florida only occasionally.  2021, Bruce was learning a new job

12   with a new boss all while working remotely.

13           So to make up for the distance, Bruce and his boss,

14   Michael Shvartsman, would talk on the phone or by Zoom or by

15   whatever means of communication people working remotely usually

16   communicate by.  They talked a lot.  They talked several times

17   a week, often several times a day.  When they talked, they

18   talked about a number of topics relating to Michael

19   Shvartsman's different businesses.  They talked about matters

20   that required Bruce's strategic and financial advice because

21   Michael ran a number of businesses, he had a family of

22   businesses, and he was thinking about buying additional

23   businesses.  Some of what Michael was doing, some of his

24   business plans involved large financial transactions.  Bruce

25   was working with him on those matters.  That's why they

1    frequently spoke on the phone.  There will be evidence that

2    Bruce and Michael had lots of phone calls, but at the end of

3    this case, you will find that Bruce never told Michael a single

4    thing he learned as a member of DWAC's board.  Bruce kept that

5    information to himself.  He followed the rules.

6            Now, this case begins, in many ways for Bruce, in the

7    middle of 2021 on June 18th.  He had been at his new job less

8    than a year and one day while he was working at home in Rhode

9    Island, he learned that his boss, Michael Shvartsman, wanted

10   him to dial into a meeting that was taking place at Michael's

11   Rocket One offices in Florida.

12           Bruce joined the meeting remotely at some point after

13   it had already gotten started.  He joined through a Skype video

14   connection.  Everyone else who was at the meeting was in

15   Florida in the same room with each other, present in person,

16   but Bruce was participating remotely.

17           Someone named Patrick Orlando was leading the meeting.

18   He was looking for investors in a new SPAC.  Patrick Orlando

19   was at that meeting looking for people to invest in a new SPAC.

20   Bruce didn't know Patrick Orlando, he had never met him before

21   he joined the call.  During the call, Patrick Orlando referred

22   to the possibility of a deal with Trump Media Group.  Made

23   clear to the people assembled in that room that he had a strong

24   relationship with the former president, that he felt he had a

25   good connection with him, but he also pointed out that any

1   business deal with Trump is only possibility and not something

2   that he could guarantee.  Patrick Orlando used former President

3   Trump's name to pitch his business and boost himself and try

4   and raise money for the SPAC, but at the same time he cautioned

5   any future business with former President Donald Trump was at

6   best uncertain.

7           Bruce was new to the world of SPACs.  Many people were

8   new to the world.  At that time SPACs were not widely used

9   before 2020 and 2021, that's when they came into bogue.  And

10  like many other people, even people who were involved in

11  finance, Bruce had no experience with SPACs at all.

12          After that first meeting on June 18th, Bruce's boss

13  Michael asked him to do two things to follow up.  First, he

14  asked him to help reach out to other potential investors, other

15  people who could, together with Michael Shvartsman, form a

16  larger investment group and, as a group, contribute more money

17  to the SPAC.  That group in the investment world is called a

18  syndicate.  That's just a word for a group of investors who

19  invest together.  So Michael asked Bruce, please help me reach

20  out to other investors to form a group, a larger group of

21  investors.

22          Second, because Michael would be arranging for this

23  large group of investors and for a large amount of money to go

24  into DWAC.  Michael wanted to have one of his employees serve

25  on DWAC's board of directors.  That's not unusual in the

1    financial world.  Investors who make large investments in a

2    company frequently choose a representative to serve on the

3    company's board.  They want someone who can help make sure the

4    company is operating properly and handling matters in a

5    responsible way.  Bruce agreed to serve on DWAC's board.

6    Nothing happened for a while.  You heard about that meeting on

7    June 18th, but there was really no board of director activity

8    at all for Bruce that entire summer, that entire summer of

9    2021.  Things didn't get started until the fall.

10           Let's talk a little bit about the time periods here so

11   that you have them in mind as you hear both sides present their

12   evidence in this case.

13           First, I told you about Bruce helping get the

14   syndicate of other investors together.  You'll see that that

15   happens early on after the meeting, that Bruce reaches out to

16   other people in late June and early July.  His boss Michael

17   gave him a list of names and contacts to reach out to.  All of

18   them were friends of Michael or business associates of Michael.

19   All of them were people who Michael socialized with or people

20   who Michael did business with.  Bruce did not know them nearly

21   as well.  If he knew them at all, he knew them only through his

22   work through Michael.  When he reached out to them, what he

23   told them was fairly straightforward and simple.  He told them

24   about the SPAC opportunity and he told them that Michael

25   planned to invest, and he told them that there was someone

1    named Patrick Orlando that they could speak to for additional

2    information.  You will see that some of these communications,

3    when Bruce is communicating with this list of people and

4    inviting them to have a call with Patrick Orlando, at times he

5    refers to the SPAC as the Trump SPAC for shorthand.  That's

6    what everyone was calling it.  The Trump name was a name that

7    Patrick Orlando used when he was pitching the SPAC to

8    underscore his relationship with former President Trump.  In

9    contacting these other investors, Bruce's main job was to

10   arrange for them to meet with Patrick Orlando.  Orlando would

11   meet with the potential investors to try to interest them in

12   this opportunity, to try to interest them in becoming part of

13   that large investment group, and he would tell them the same

14   things that he said in that initial June 18th, 2021 meeting

15   with Bruce.  He would say, I know Trump, I have strong

16   connections to President Trump.  Trump's company is possibly

17   one of the various merger targets that our SPAC may consider,

18   but nothing is guaranteed.  That would be the pitch that

19   Mr. Orlando would give at these meetings.

20          Now, let's talk about Bruce's role on the board of

21   DWAC.

22          After the investment group was formed, Bruce accepted

23   a seat on DWAC's board of directors.  He had never served on

24   the board of a public company before.  He had worked at

25   investment firms, but serving on the board of a public company

1    was a brand new experience for him.  Although he was brand new,

2    he received no training about being a board member.  Bruce is a

3    experienced financial professional, he's not a lawyer, he

4    doesn't know the details of every rule and regulation, but make

5    no doubt about it, from working in finance, he knew two things,

6    and he knew them loud and clear.  He knew that he could not

7    share confidential inside information that he learned from the

8    board with anyone else, and he knew that he could not trade in

9    the stock market or make money for himself based on inside

10   information.  He followed the rules.  I told you, he purchased

11   a small amount of DWAC stock for himself.  Almost all of those

12   purchases occurred before he ever attended a single board

13   meeting before he had any real involvement in DWAC at all.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1        MR. BACH:  You will learn that he bought DWAC stock

2    when he thought it was appropriate to buy it, and then he

3    stopped buying DWAC stock when he felt he might become exposed

4    to material inside information.  Just as soon as he felt he had

5    reached that point, he stopped and made no more trades.  He

6    stopped on his own.  No one had to tell him to do it, because

7    he follows the rules.

8        At the end of this trial, the evidence will be very

9    clear—Bruce did not engage in insider trading.  He stopped

10   trading.  He policed himself.  And he did that as soon as he

11   understood it would not be appropriate for him to trade

12   anymore.

13       And let me say a few more words about the DWAC stock

14   that Bruce purchased for himself.  This was not a "get rich"

15   scheme for Bruce Garelick.  He had nothing to do with anything

16   of the sort.  You heard millions and millions of dollars, those

17   words being tossed out.  Millions and millions.  Total profits

18   associated with the small investment that Bruce made during the

19   limited time period when he thought it was appropriate, the

20   total that he made was less than $50,000.  That is not a large

21   number for a financial professional like Bruce.  Not money to

22   sneeze at, but it's silly to think that a successful financial

23   professional like Bruce would risk his entire reputation and

24   career for $49,000.

25       Now I said something before, but I want to say it

1    again, because it is so important here.  It is the most

2    important issue you will have to decide.  It is the issue this

3    entire case turns on.  Did Bruce at any time do something that

4    he knew to be wrong?  What was in his head?  That's the issue.

5    The evidence will show that at all times Bruce acted in good

6    faith, that he did not do anything that he knew to be wrong.

7    As you listen to the evidence, ask yourself this question:  Did

8    Bruce act in good faith?

9            And before I sit down, I want to say one more word

10   about tipping, about sharing confidential information with

11   other people.  You're not going to see any evidence that Bruce

12   tipped anybody because he didn't.  Bruce was not a tipper.  But

13   it may well be that other people, other names that you will

14   hear and learn at this trial, were giving tips to and receiving

15   tips from each other.  I will have more to say about that when

16   I talk to you again at the end of this trial, after you have

17   heard all of the evidence.

18           Let me say one thing now, and this is important.  The

19   evidence will show that Bruce was not part of the same social

20   circles as many other people involved in this case.  He was in

21   many ways an outsider.  He was a new employee, working from

22   home.  He lived in Providence, Rhode Island, not in Florida.

23   He was nobody's close friend or buddy.  He didn't have that

24   kind of relationship with anybody else involved.  But the

25   evidence will show that there were other people who were close

1  friends and buddies, people who were very tight with each

2  other, people who shared secrets and confidences, people who

3  trusted each other in unusual ways.  You will learn more about

4  this as the trial unfolds.

5      I urge you to listen carefully to all the evidence.

6  It will come in in bits and pieces, from different witnesses

7  and different documents.  The prosecutors will ask witnesses

8  questions and elicit answers; the defense will do that too.  I

9  urge you to listen to both sides.  Listen carefully to the

10  questions the prosecutors ask and the answers they get.  Look

11  carefully at the documents that they present, and listen

12  carefully to the questions that we ask and the answers that the

13  defense gets.  And look carefully at the documents that we

14  present.

15      Ladies and gentlemen, the evidence will show that

16  Bruce Garelick is an honorable and ethical man who acted in

17  good faith at all times.  Bruce Garelick is innocent.

18      I look forward to talking to you again at the end of

19  this trial.  Thank you very much.

20      THE COURT:  Thank you, Mr. Bach.

21      Members of the jury, it's now 3:35.  My suggestion,

22  unless anybody feels like they need a break, is that we take a

23  stretch break now for about five minutes while you are in the

24  jury box and the government will then call their first witness.

25  Anybody?  Okay.  Let's do a stretch break for five minutes.

1    The government can set up.

2              (Pause)

3              THE COURT:  Okay.  The government can call their first

4    witness.

5              MR. SHAHABIAN:  Thank you, your Honor.  The government

6    calls Andrew Litinsky.

7              THE COURT:  Okay.  Mr. Litinsky can come into the

8    courtroom and take the witness stand.

9              Is that Mr. Litinsky?  You can step forward into the

10   witness box, please.

11             THE WITNESS:  Okay.

12             THE COURT:  Step forward into the witness box and

13   please remain standing.  My deputy will administer the oath.

14             THE DEPUTY CLERK:  Please raise your right hand.

15             (Witness sworn)

16             THE DEPUTY CLERK:  Thank you.  Please state your full

17   name for the record and please spell out your first and last

18   name.

19             THE WITNESS:  Sure.  Andrew, so A-N-D-R-E-W.  I go by

20   Andy, but whatever you want.  And then Dean is my middle name,

21   D-E-A-N, and then Litinsky, L-I-T-I-N-S-K-Y.

22             THE COURT:  All right.  Mr. Litinsky, you can be

23   seated.

24             Counsel, you can inquire.

25             Mr. Litinsky, try to speak into the microphone, and

1    wait for the question to be done before you answer.

2              Go ahead, counsel.

3              MR. SHAHABIAN:  Thank you, your Honor.

4     ANDREW DEAN LITINSKY,

5         called as a witness by the Government,

6         having been duly sworn, testified as follows:

7    DIRECT EXAMINATION

8    BY MR. SHAHABIAN:

9    Q.  Good afternoon, Mr. Litinsky.

10   A.  Good afternoon.

11   Q.  Where do you live?

12   A.  Fort Lauderdale, Florida.

13   Q.  What do you do for a living?

14   A.  I'm the co-founder of Trump Media & Technology Group.

15   Q.  What is Trump Media & Technology Group?

16   A.  Trump Media & Technology Group is the parent corporation of

17   Truth Social, which is an app similar to Twitter, or now known

18   as X, and then the parent company is also supposed to embark on

19   more business lines in addition to Truth Social.

20   Q.  Before co-founding Trump Media & Technology Group, did you

21   have any other business relationships with former president

22   Trump?

23   A.  Yes, I did.  I was a contestant on a game show or a reality

24   show called The Apprentice, and after The Apprentice, I worked

25   for him for a number of years in New York, and then I was the

1    president of his television production company in Los Angeles.

2    Q.  When did you come up with the idea for Trump Media?

3    A.  After he lost the election, so it would have been November

4    of 2020.

5    Q.  What was the idea?

6    A.  The idea was essentially putting the name, image, likeness,

7    or intellectual property rights of the former president into a

8    company and then embarking on a number of business lines, and

9    part of that idea was thinking of financing, of how that

10   company could grow and capitalize itself, and part of that was

11   a SPAC, so I think that idea kind of came part and parcel.

12   Q.  What was your role in Trump Media as the co-founder?

13   A.  Sure.  So I came up with the idea, and then I pitched

14   former president Trump after he left office.  And then as a

15   co-founder, you do, like in any startup, everything from

16   raising money to operations, technology, everything that goes

17   into building a company, HR, everything.

18   Q.  You mentioned raising money.  What were the ideas to raise

19   money to get Trump Media off the ground?

20   A.  Sure.  So we raised some private capital, couple million

21   dollars, and then kind of the big concept was potentially to

22   take the company public, and there are a couple different ways

23   to do that, but the one that I thought could potentially work

24   the best would be a SPAC.

25   Q.  What do you mean by take the company public?

1    A.   Sure.  To turn it into a publicly traded entity, usually

2    traded on the NASDAQ or New York Stock Exchange, in which

3    normal people could invest in the company if they believed in

4    its mission and in its products.

5    Q.   You mentioned there were a couple of ways to take Trump

6    Media public.  What were the ways you were considering?

7    A.   Sure.  So an IPO——initial public offering——is a more

8    traditional route.  Usually with that, multiple investment

9    banks are involved.  SPAC is a different route.  You don't

10   really, in a sense, need an investment bank in that the SPAC

11   has already raised the money and received the listing, so it's

12   a faster way, in theory, to go public.

13   Q.   What is a SPAC?

14   A.   Sure.  So a SPAC is a——stands for special purpose

15   acquisition company.  And I guess the quick idea of what a SPAC

16   is, it has two things that it has to do before its main goal.

17   The two things a SPAC has to do is raise money——let's call it a

18   hundred million dollars a SPAC can raise, some of them raise

19   more, some raise less, but let's say raise a hundred million

20   dollars; and then they have to fill out a ton of paperwork with

21   the Securities and Exchange Commission and they get a listing,

22   if they qualify on the New York Stock Exchange or the NASDAQ.

23   So those are the two keys is raising money and getting a

24   listing.

25            And then its last function is to find an operating

1    partner for a merger, an operating company being a company that

2    makes products or has intellectual property, a functioning

3    company that does things, because this really is like they call

4    it a blank check or shell company because there's cash in a

5    listing; and when they find their operating company, together

6    they merge, and both parties benefit from that merger.

7    Q.  Did you take any steps to try to find a SPAC for Trump

8    Media to merge with?

9    A.  I did.  I approached approximately over a hundred——a

10   hundred different SPACs.

11   Q.  How did you find the SPACs to approach?

12   A.  So when I did this, three and a half years ago, give or

13   take, there was a website database called SPAC Track, and at

14   that time, from my memory, there were about 400 of these SPACs

15   trading on the open markets, looking for a merger partner; and

16   so I went through the database and created a spreadsheet, and

17   then it was a lot of cold calling and cold emails, almost no

18   different than picking up the phone to sell insurance except I

19   was trying to, you know, find a SPAC.

20   Q.  During this process did you meet a man named Patrick

21   Orlando?

22   A.  I did.

23   Q.  How did you come into contact with Mr. Orlando?

24   A.  So on this list of over a hundred SPACs that I contacted,

25   Patrick Orlando was on that list, yeah.

O4U1GAR4                     Litinsky - Direct

1    Q.  When you first met Mr. Orlando, what SPAC was he

2    representing?

3    A.  Benessere Capital Acquisition Group.

4    Q.  Did Trump Media engage in merger negotiations with

5    Benessere?

6    A.  We did, yes.

7            MR. SHAHABIAN:  Mr. Bianco, if we could bring up for

8    the witness Government Exhibit 100.

9    Q.  Do you recognize this, Mr. Litinsky?

10           THE WITNESS:  I apologize.  My monitor, your Honor,

11   is—

12           THE COURT:  Yeah, hold on for a second.

13           THE WITNESS:  Okay.  Ah, it's working.

14   A.  Yes, I do recognize this document.

15   Q.  What is it?

16   A.  This would be an LOI, a letter of intent.  This one is a

17   nonbinding LOI between Benessere Capital and Trump Media Group.

18           THE COURT:  And let me give the jurors an instruction.

19   A number of the jurors have observed that they can't see the

20   document.  That's intentional.  That's deliberate at this

21   point.  You'll observe during the course of the trial that

22   there will be circumstances where one or the other of the

23   lawyers will show the witness a document and ask the witness

24   questions about the document, including whether the witness

25   recognizes it.  And then there may come a moment where the

1    lawyer asks for the document to be received in evidence.  At

2    that point, if I agree that the document should be received in

3    evidence, it will be displayed to you on your monitors, and

4    counsel need not ask permission to have it displayed.  You can

5    then just display it.  But until the document is received in

6    evidence, it won't be displayed for you.  So don't be worried

7    if you don't see it now.  That is intentional.  If a document

8    is received and it's intended to be displayed for you and you

9    don't see it, then please raise your hand.  Sometimes there is

10   a moment of delay before the document shows up on the monitor.

11   But raise your hands just like you did a moment ago and let me

12   know that you're not seeing it.

13            Counsel, you may continue.

14            MR. SHAHABIAN:  Thank you, your Honor.

15            At this time before I offer the exhibit, I'd like to

16   read a portion of a stipulation the parties have entered into.

17            THE COURT:  Okay.  You may do so.

18            The members of the jury should just be aware that a

19   stipulation is just an agreement between the parties as to

20   certain facts or different things that a witness might say.

21            Go ahead, counsel.

22            MR. SHAHABIAN:  This is Joint Exhibit 1.

23            "It is hereby stipulated and agreed by and between the

24   United States of America, by Damian Williams, United States

25   Attorney for the Southern District of New York, Elizabeth

O4U1GAR4                    Litinsky – Direct

1     Hanft, Daniel Nessim, and Matthew Shahabian, assistant United

2     States attorneys, of counsel, and defendant Bruce Garelick, by

3     and through the consent of his attorneys, Jonathan Bach,

4     Alexandra Shapiro, Julian Brod, and Jason Driscoll, that:

5          "1.  Government Exhibits 100, 102, 203, 262, 208, 212,

6     214, and all parts and subdivisions thereof, are true and

7     accurate business records of Benessere Capital Acquisition

8     Corporation.

9          "Government Exhibits 101, 103-122, 124-130, 132-137,

10    and 202, 205, 209, and 211, and Defense Exhibits 171 and 172,

11    and all parts and subdivisions thereof, are true and correct

12    business records of Digital World Acquisition Corporation."

13         The stipulation goes on for other business records,

14    your Honor, that I'm not going to discuss at this point, but

15    the parties stipulate and agree that neither party will raise

16    any objection under Federal Rule of Evidence 901 to the

17    above-referenced exhibits, nor, excepting certain exhibits I

18    haven't numbered, will either party require the testimony of a

19    custodian to lay the foundation required under Federal Rule of

20    Evidence 803(6) or (8), but that all other objections are

21    reserved for and may be raised at trial.

22         And at this time the government is going to offer

23    Government Exhibit 100 as well as Government Exhibits 102, 232,

24    206, 208, 212, 214, 101, 103-122, 124-130, 132-137, and 202,

25    205, 209, and 211 into evidence.

1                THE COURT:  Any objection?

2                MR. BACH:  No objection, your Honor.

3                THE COURT:  Those documents are all received.

4                (Government's Exhibits 100, 102, 203, 232, 206, 208,

5      212, 214, 101, 103-122, 124-130, 132-137, and 202, 205, 209,

6      and 211 received in evidence)

7                THE COURT:  Is the stipulation itself marked as an

8      exhibit?

9                MR. SHAHABIAN:  It is, and the government also offers

10     the stipulation, which is Joint Exhibit 1.

11               THE COURT:  Okay.  Any objection to Joint Exhibit 1?

12               MR. BACH:  No objection.

13               THE COURT:  Joint Exhibit 1 is received.  And you may

14     publish the exhibits that are received in evidence.

15               MR. SHAHABIAN:  Thank you, your Honor.

16               (Joint Exhibit 1 received in evidence)

17               MR. SHAHABIAN:  May we publish Government Exhibit 100?

18               THE COURT:  Yes.

19               Can the jurors see that?

20               All right.  The jurors can see Government Exhibit 100.

21     You may proceed.

22               MR. SHAHABIAN:  Thank you, your Honor.

23     BY MR. SHAHABIAN:

24     Q.  Mr. Litinsky, apologies for the interruption.

25     A.  It's okay.

1    Q.  Now that the jury can see, what is Government Exhibit 100?

2    A.  Sure.  So this would be a nonbinding LOI, or letter of

3    intent, between the SPAC, in this case Benessere Capital, and

4    Trump Media Group, and that's essentially a sign of interest

5    that the SPAC is potentially interested in merging with the

6    operating company, in this case our company, Trump Media Group.

7    Q.  What's the date of this LOI?

8    A.  It says March 10th, and then I see a scratchout for

9    March 12th, so I'm guessing one of those two dates.

10   Q.  You said the word LOI.  What does LOI stand for?

11   A.  Letter of intent.

12          THE COURT:  And it's 2021?

13          THE WITNESS:  Yes, the year 2021.

14   Q.  You mentioned that this was a nonbinding letter of intent.

15   What does that mean?

16   A.  Sure.  So there are two main letters of intent in this

17   world.  One would be nonbinding, which would be a lower level

18   of interest; and then a binding or exclusive LOI, or exclusive

19   letter of intent, would be a much more serious next step in

20   that both parties are just talking to each other exclusively,

21   as opposed to a nonbinding, where the SPAC could have five or

22   ten of them out there; with the exclusive one, they usually

23   just have one partner they're discussing with.

24          MR. SHAHABIAN:  If we could turn, Mr. Bianco, to

25   page 3 of this document, and blow up paragraph 4,

1   Confidentiality.

2   Q.  Do you see the Confidentiality provision in this agreement,

3   Mr. Litinsky?

4   A.  Yes, I do.

5   Q.  I'm not going to ask you to read the whole paragraph.  Was

6   it your understanding that this letter of intent was

7   confidential?

8   A.  Yes, it was.

9   Q.  Why was it confidential?

10  A.  This would be confidential because a SPAC is openly trading

11  on a stock exchange and any knowledge of what company they

12  might merge with could affect the stock price, and so that's

13  why it's kept confidential.

14  Q.  At the time Trump Media was negotiating with Benessere was

15  Benessere a publicly listed company?

16  A.  Yes, it was.

17  Q.  Was this the only letter of intent that Benessere and Trump

18  Media executed?

19  A.  No.  I believe there was another one a couple months later.

20          MR. SHAHABIAN:  Mr. Bianco, could we publish

21  Government Exhibit 102.

22  Q.  What is this document, Mr. Litinsky?

23  A.  So this document, dated June 4, 2021, this would be an

24  exclusive letter of intent, so with the same SPAC, Benessere

25  Capital, and then us being the operating company, Trump Media

1    Group, and once again, the exclusive part of this makes it a

2    more serious letter of intent, that we're getting closer

3    potentially to potentially doing a merger.

4    Q.   What's the date of this letter of intent?

5    A.   Sure.  June 4, 2021.

6    Q.   And you mentioned an exclusive letter of intent.  What did

7    you mean that at this point there was an exclusive letter of

8    intent between the parties?

9    A.   Sure.  So at this point the SPAC Benessere would only be

10   talking to one operating partner and Trump Media Group at this

11   point would only be talking to one other SPAC.  It's just a

12   sign that both parties are seriously interested.  It's not

13   guarantee of a merger but that both parties are serious.

14             MR. SHAHABIAN:  And if we turn to page 3, Mr. Bianco,

15   paragraph 4.

16   Q.   Do you see this confidentiality paragraph, Mr. Litinsky?

17   A.   I do.

18   Q.   Was it your understanding that this letter of intent was

19   also confidential?

20   A.   Yes, it was.

21   Q.   Were the merger negotiations between Benessere and Trump

22   Media generally considered confidential?

23   A.   Yes, I would agree with that.

24   Q.   Why were they confidential at this point?

25   A.   At this point this would be material nonpublic information

1    in the sense that this could affect the stock price and so

2    confidentiality was very important.

3    Q.  And if we go to the next paragraph, paragraph 5,

4    Exclusivity, is this the binding, exclusive part of the

5    agreement you're referring to?

6    A.  Yes, it is.

7    Q.  How long did the parties agree to negotiate exclusively

8    with each other in this document?

9    A.  90 days.

10   Q.  90 days from June of 2021?

11   A.  That would be correct, yes.

12   Q.  And if we turn to page 7 of this document.

13           Who signed the exclusive letter of intent on behalf of

14   Benessere?

15   A.  That would be Patrick Orlando.

16   Q.  And who signed on behalf of Trump Media Group?

17   A.  Former president Trump.

18           MR. SHAHABIAN:  We can take this down, Mr. Bianco.

19   Q.  Did there come a time when Trump Media started negotiating

20   a potential merger with a different SPAC also run by Patrick

21   Orlando?

22   A.  Yes.

23   Q.  What was the other SPAC that Trump Media began negotiating

24   with?

25   A.  Sure.  That would be Digital World Acquisition Group, also

1    known commonly as DWAC.

2    Q.  When did Trump Media begin negotiating with DWAC?

3    A.  That would be after DWAC went public, so approximately

4    early to mid-September of 2021.

5    Q.  Why did Trump Media begin negotiating with a second SPAC

6    run by Mr. Orlando?

7    A.  In the SPAC world, if you're an operating company, you can

8    only speak to a SPAC once they're public, and at that point

9    Digital World had become public and so we entered into

10   negotiations.

11            I would say as to the why, at our company, at

12   least——and I'm sure many companies are different, but at our

13   company, former president Trump was the ultimate

14   decision-maker, so——

15   Q.  Does that mean DWAC was considered a potential option to

16   merge with Trump Media when you started negotiating?

17   A.  I would agree with that.

18   Q.  I'm now going to show you Government Exhibit 124.

19            MR. SHAHABIAN:  If we could publish that, Mr. Bianco.

20   Q.  Do you recognize this document, Mr. Litinsky?

21   A.  I do.

22   Q.  What is this?

23   A.  This would be a confidentiality agreement between Digital

24   World Acquisition and Trump Media Group, and the date,

25   September 13th of 2021.

O4U1GAR4                          Litinsky - Direct

1    Q.  And I think you mentioned this, but who are the parties to

2    this agreement?

3    A.  The parties are Digital World, which would be the publicly

4    traded SPAC on the NASDAQ stock exchange, and Trump Media Group

5    Corp., the private company.

6            MR. SHAHABIAN:  Turn to the last page of this

7    document, Mr. Bianco.

8    Q.  Who signed this document, Mr. Litinsky?

9    A.  Sure.  So this was signed by myself, so Andy Litinsky; Wes

10   Moss, who was a fellow co-founder, also contestant on The

11   Apprentice; and for Digital World, Patrick Orlando's lawyer,

12   and I guess his title was chief operating officer, Alexander

13   Monje or Monje.

14   Q.  Do you see on the signature above your signature where it

15   says Docusigned by?

16   A.  Yes, I do.

17   Q.  Do you know what Docusign is?

18   A.  Yes.  So Docusign would be an application that facilitates

19   the signing of documents.  Sometimes everybody can't be in the

20   same location or sometimes you just have your phone on you, so

21   it's——just functions as a——essentially a universal recording

22   device for signatures with a time, date, and stamp.

23   Q.  Did you use Docusign to sign this document?

24   A.  Yes.

25           MR. SHAHABIAN:  Let's go back to page 1, Mr. Bianco.

1    Q.  Mr. Litinsky, we talked about letters of intent.  Is this a

2    letter of intent?

3    A.  No.  This would be a confidentiality agreement, which most

4    of the times that would predate any type of further——what's the

5    right word——correspondence or information sharing between

6    parties.  First you want to make things confidential and then

7    you share information, and then potentially an LOI if both

8    parties are interested.

9    Q.  What's the purpose of executing a confidentiality agreement

10   before a letter of intent?

11   A.  This is, in my opinion, to protect both parties in the

12   sense that this is sensitive information, especially if

13   anything were to develop further, in my opinion, material

14   nonpublic information.

15              MR. BACH:  Objection.  There's a ruling on this.

16              THE COURT:  Okay.  Members of the jury, when a witness

17   is testifying with respect to what he considers to be material

18   nonpublic information, you should be aware that that's just,

19   you know, what the witness's opinion is.  At the appropriate

20   time I will give you the legal instructions so don't take

21   anything the witness says as an instruction as to law or that

22   the information in fact is material nonpublic information.  At

23   the end of the trial that will be a judgment that you'll have

24   to make as jurors.

25              Go ahead.

O4U1GAR4                    Litinsky – Direct

BY MR. SHAHABIAN:

Q.  So Mr. Litinsky, what's the purpose of entering into a
confidentiality agreement for these two parties at this point?

A.  To protect the information.

Q.  Do you see paragraph 1 of this agreement?

A.  I do.

        MR. SHAHABIAN:  If we could blow this up.

Q.  And this is titled Confidential Information?

A.  Yes.

Q.  If we turn to paragraph 2.  What's the title of this
paragraph?

A.  Confidentiality of Information.

Q.  And if we turn to paragraph 3.

A.  Confidentiality of Transaction.

Q.  Was it your understanding that the negotiations between
DWAC and Trump Media at this point were confidential?

A.  Yes.

Q.  Why were they confidential?

A.  Once again, I'd say the sensitivity of the information,
that it could affect the stock price.

        MR. SHAHABIAN:  If we turn to page 3 of the agreement.
And if we highlight paragraph 8.

Q.  Do you see the paragraph titled Nonpublic Information?

A.  I do.

Q.  And could you read the last sentence of paragraph 8 that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   says, "In addition."

2   A.   Okay.  Got it.  "In addition, the company acknowledges and

3   agrees that some of the confidential information of DWAC and

4   transactional information may be considered material nonpublic

5   information for purposes of the federal securities laws and

6   that the company and its representatives will abide by all

7   securities laws relating to the handling of and acting upon

8   material nonpublic information of or regarding DWAC."

9            MR. SHAHABIAN:  We can take this down, Mr. Bianco.

10  Q.   Did Trump Media enter into a letter of intent with DWAC?

11  A.   Yes, we did.

12           MR. SHAHABIAN:  Publish Government Exhibit 120A.

13  Q.   Do you recognize this document, Mr. Litinsky?

14  A.   I do.

15  Q.   What is this?

16  A.   This would be a letter of intent with Digital World

17  Acquisition, a SPAC, and our private company, Trump Media

18  Group.

19  Q.   What is the date of this letter of intent?

20  A.   September 22nd of 2021.

21  Q.   Do you know if this was an exclusive letter of intent or a

22  nonbinding letter of intent?

23  A.   I believe it to be exclusive, but I'd have to look through

24  the document to be certain.

25           MR. SHAHABIAN:  All right.  Turn to page 4,

1  Mr. Bianco.

2  Q.  Do you see paragraph 6, Mr. Litinsky, titled Exclusivity?

3  A.  I do, yes.  So this would be an exclusive letter of intent,

4  that's correct.

5  Q.  And is an exclusive letter of intent a more serious step or

6  a less serious step in merger negotiations than a nonexclusive

7  agreement?

8  A.  This would be a more serious step.

9          MR. SHAHABIAN:  If we turn back to page 3, Mr. Bianco.

10  Q.  Do you see paragraph 5 titled Confidentiality?

11  A.  I do.

12  Q.  Was it your understanding that this letter of intent was

13  confidential information?

14  A.  Yes, that's correct.

15  Q.  Was the fact that DWAC and Trump Media were negotiating

16  over a potential merger confidential?

17  A.  Yes.

18  Q.  In addition to this agreement, were there any other

19  agreements important to a potential merger that were entered

20  into at about the same time as this one?

21  A.  Yes, I would say the license agreement would be an

22  important agreement.

23  Q.  What was the license agreement?

24  A.  The license agreement would be former president Trump

25  signing his name, image, and likeness and the rights to Trump

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Media Group.

2    Q.  Was a licensing agreement executed?

3    A.  Yes, it was.

4    Q.  Now showing you Government Exhibit 122A.

5              Do you recognize this document, Mr. Litinsky?

6    A.  I do.

7    Q.  What is this?

8    A.  This would be the license agreement, the first one, in

9    September——I think it was September 22nd, but there's no date

10   on this one, but this would be what I just described, which

11   would be former president Trump signing essentially in summary

12   his name, image, and likeness to the company.

13   Q.  I'd now like to show you Government Exhibit 123.  Do you

14   recognize this?

15             MR. SHAHABIAN:  And this shouldn't be published yet,

16   Mr. Bianco.  So just for the——

17             THE COURT:  It can be published to the Court and to

18   defense counsel.

19             MR. SHAHABIAN:  And the witness.

20             THE COURT:  And the witness, of course.

21             MR. SHAHABIAN:  Thank you, your Honor.

22   BY MR. SHAHABIAN:

23   Q.  Do you recognize Government Exhibit 123, Mr. Litinsky?

24   A.  I do.

25   Q.  What is this?

1    A.  This would be a photo, to my memory, this is in a ballroom

2    at Mar-a-Lago, the smaller one.

3    Q.  Before we turn to the photo, just the document itself, what

4    does this appear to be?

5    A.  I apologize.  I see a photo.

6    Q.  If you look at the very top, do you see a number of

7    participants, participants—

8    A.  Oh, yes.  Okay.  I'm sorry.  So I see Patrick Orlando, Andy

9    Dean, so that's my middle name, and Jenny Withers.

10   Q.  Does this look like a text message chain that you were on?

11   A.  Yes, that's correct.

12   Q.  Is it a fair and accurate copy of that text message chain?

13   A.  I believe so, yes.

14           MR. SHAHABIAN:  Government offers Government

15   Exhibit 123.

16           THE COURT:  Any objection?

17           MR. BACH:  No, your Honor.

18           THE COURT:  It's received.

19           (Government's Exhibit 123 received in evidence)

20           MR. SHAHABIAN:  If we could publish this now,

21   Mr. Bianco.

22           Thank you.  If we could blow up the picture.

23   BY MR. SHAHABIAN:

24   Q.  Now that the jury can see, Mr. Litinsky, what are we

25   looking at?

1   A.   Sure.  So this would be in the——Mar-a-Lago has two

2   ballrooms.  This would be the smaller one.  I think they call

3   it the white and gold room, I guess.  And this would be, on the

4   left, at least my left, former president Trump smiling and

5   Patrick Orlando next to him.

6   Q.   What is being photographed here?

7   A.   I believe this would be the LOI that you just showed, to my

8   knowledge.  That's what I think it would be.

9   Q.   Do you remember where the LOI was signed?

10  A.   It would have been in this——in this ballroom.

11         MR. SHAHABIAN:  Could we go to the next page,

12  Mr. Bianco.

13         And if we blow up this picture.

14  Q.   Who's in this picture, Mr. Litinsky?

15  A.   So in the back left would be former president Trump; next

16  to him, Patrick Orlando; next to him, a gentleman by the name

17  of Rodrigo Veloso; I do not know who that woman is; and I

18  believe that's the back of Alex Monje's head, but I can't be

19  certain.

20  Q.   Who is Rodrigo Veloso?

21  A.   I knew Rodrigo as Patrick's business partner, like his

22  maybe close friend and kind of like——kind of brain trust,

23  maybe.

24  Q.   And how about Alex Monje; who is that?

25  A.   I would know that as Patrick's lawyer, yeah, know him as

O4U1GAR4                    Litinsky - Direct

1  Patrick's lawyer.

2           MR. SHAHABIAN:  Could we go to the next page,

3  Mr. Bianco.

4           And blow up that picture at the top of the screen.

5  Q.  Who's in this picture, Mr. Litinsky?

6  A.  So on the left that would be Wes Moss, fellow roommate on

7  The Apprentice and then co-founder of this company; Patrick

8  Orlando in the middle; and then that's me on the right.

9           MR. SHAHABIAN:  And if we go to the last picture,

10  Mr. Bianco.

11  Q.  And who's in this picture, Mr. Litinsky?

12  A.  President Trump on the far left; Patrick Orlando seated

13  next to him; Rodrigo next to Patrick; I do not know who that

14  woman is; and then I believe the woman at the far end is

15  Patrick Orlando's wife.

16           MR. SHAHABIAN:  We can take this down, Mr. Bianco.

17  Q.  Was the signing of the exclusive letter of intent between

18  DWAC and Trump Media Group an important event in the merger

19  negotiations?

20  A.  I would agree with that.

21  Q.  Why?

22  A.  I think any time two companies—and I guess I can speak for

23  ours.  Any time you're entering into an exclusive LOI, it's a

24  serious step on the way to a merger, potentially.  It's not a

25  guarantee, but it could be to a merger, which would be the

1   ultimate goal for a SPAC and for an operating company like

2   ours, you know, a serious thing.

3   Q.  What happened in the negotiations after this letter of

4   intent was signed?

5   A.  From my memory of it, there was very heavy negotiation,

6   multiple law firms, and——I'm ballparking——four to six weeks

7   later, we signed a merger agreement, ballpark.

8   Q.  Did Trump Media provide additional information to DWAC

9   during these merger negotiations?

10  A.  Yes, we did.  We set up what's called a data room.

11  Q.  What's a data room?

12  A.  Sure.  So a data room would be set up by one of the law

13  firms.  I can't remember if it was our law firm or DWAC's law

14  firm that set it up.  But somebody set it up.  And in that, I

15  guess the way to think of it, like a——like a Google Sheets

16  or——it's a virtual storing place of information that's heavily

17  protected because it's serious information, and it's a way for

18  the SPAC to get all the information on a company like ours, who

19  are the personnel, what's the current capital structure, who

20  are the shareholders, how far along is the technology; anything

21  that goes into making a company work would be in that data

22  room.

23  Q.  And you mentioned you don't remember which lawyers set it

24  up.  Who represented Trump Media in these negotiations?

25  A.  Law firm called Nelson Mullins.

1    Q.   Have you heard of the phrase Project USA?

2    A.   I have, yes.

3    Q.   What's Project USA?

4    A.   Project USA, to my knowledge, was a code given the entire

5    deal, maybe to add like a layer of protection.

6    Q.   When you say entire deal, what deal are you referring to?

7    A.   I would say the deal——well, the deal——I would say Trump

8    Media Group, but I think Project USA——I can't be certain, but I

9    think it was DWAC and Trump Media Group specifically, but it

10   could also have been the name that our law firm just referred

11   to as our company.  Something like that.  It was a way to refer

12   to it without calling it the Trump deal, I guess, maybe.

13   Q.   Where was Trump Media's headquarters?

14   A.   There were two headquarters.  There was one in Atlanta,

15   Georgia, and one in Fort Lauderdale, Florida.

16   Q.   Did anyone from DWAC ever visit the Trump Media

17   headquarters during these merger negotiations?

18   A.   Yes.  Patrick Orlando and to my knowledge he brought a

19   couple people with him for both visits.  I was there for both

20   visits, when he visited the Fort Lauderdale office and then the

21   Atlanta, Georgia, office.

22   Q.   What was the purpose of these headquarters visits?

23   A.   It would be to do due diligence on the company.  When a

24   SPAC is making the decision to pick an operating partner, it's

25   their big decision and they want to make sure they make the

1    right one, and so they want to make sure that the things that

2    we're saying are true and that the technology that we have and

3    the people that we have and everything exists and is real, so

4    it's a form of just doing their research.

5    Q.  Did DWAC and Trump Media ultimately enter into a merger

6    agreement?

7    A.  Yes, we did.

8    Q.  When did that happen?

9    A.  Late October, October 20th or 21st, approximately, of 2021.

10   Q.  If we could publish Government Exhibit 128.

11          Do you recognize this document, Mr. Litinsky?

12   A.  I do.

13   Q.  What is it?

14   A.  This is the merger agreement between the two companies,

15   Digital World, a publicly trading SPAC, and Trump Media &

16   Technology Group.

17   Q.  What's the date of this agreement?

18   A.  October 20th of 2021.

19   Q.  Did Trump Media Group change its name to Trump Media &

20   Technology Group?

21   A.  We did.  A couple weeks prior—I'm ballparking, but I think

22   in early October we ran a copyright and trademark search for

23   TMG to make sure that nobody owned it, and somebody did.  It

24   was, of all groups, a comedy group.  And we thought the risk

25   was too great to go to battle with a comedy group, so we added

1    the technology part and became TMTG, and that, you know——I

2    think that took place in early October, from my memory.

3    Q.  How soon after this merger agreement was signed was the

4    merger publicly announced?

5    A.  So from my memory, the merger wasn't signed until after the

6    market closed that day, and then after the market had closed,

7    this would have been signed and then I would say shortly

8    thereafter, give or take an hour or two, the press release

9    would go out on I guess what people call the wire, just a

10   global release of the information.

11   Q.  Why was the agreement signed after the market closed?

12   A.  So traditional market hours would be a 9:30 a.m. open and a

13   4 p.m. close.  With information like this being sensitive,

14   you'd want to do it after the market closed, and that's——that's

15   what we did.

16   Q.  How was this merger agreement announced to the public?

17   A.  There was a press release written and approved by both

18   parties, and once the approvals——well, the signature had to

19   happen first after the market closed, then the parties had to

20   approve the press release, and then it would go I guess on the

21   wire, which would be for global distribution, I'm ballparking

22   around 7 p.m. that night.

23          MR. SHAHABIAN:  Now if we could publish Government

24   Exhibit 129E.

25          Do you recognize this document, Mr. Litinsky?

1    A.  I do.

2    Q.  What is this?

3    A.  This would be the official press release announcing the

4    deal after it had been signed.  I would think probably went out

5    around 7 p.m. that evening of October 20th.

6    Q.  Do you see the date on this press release?

7    A.  Yes, October 20th of 2021.

8    Q.  To your knowledge was this the first public announcement of

9    the DWAC-Trump Media merger?

10   A.  Yes, it was.

11   Q.  You said this was announced after the market closed.  The

12   next day, what happened to the stock price of DWAC?

13   A.  Yeah.  So the stock, as most SPACs do, they trade around

14   $10, and then that day, from my memory, the company traded

15   about 500 million shares.  To give a reference point, a company

16   like Walmart or McDonald's would trade 5 to 10 million shares a

17   day.  So this traded about 500 million.  So that was an

18   interesting day.  And then the price you asked, it went from,

19   my memory, about $10 to approximately $45.

20   Q.  To your knowledge was the news that Trump Media and DWAC

21   were going to merge public before this press release was

22   issued?

23   A.  No.  That would have been not public before the press

24   release.

25   Q.  Did you share news of the potential merger or the merger

1    negotiations with anyone not authorized to receive that

2    information?

3    A.  No, I did not.

4    Q.  Why not?

5    A.  It was——

6           MR. BACH:  Objection.

7           THE COURT:  Overruled.

8    A.  It was confidential.  It would be against the rules to do

9    that.

10   Q.  Did you ever trade in the securities of DWAC or Benessere?

11   A.  No, I did not.

12   Q.  Why not?

13   A.  It would be against the rules.

14          MR. BACH:  Objection.  There's a ruling on this.

15          THE COURT:  You have to wait until after an objection

16   is made and I've had an opportunity to rule on it.

17          THE WITNESS:  Sorry.

18          THE COURT:  The objection is overruled, but the

19   witness is not speaking with respect to what the law is.  Go

20   ahead.

21   BY MR. SHAHABIAN:

22   Q.  During the course of these negotiations, Mr. Litinsky, did

23   you interact with every member of the DWAC board of directors?

24   A.  No, I did not.

25   Q.  Did you have any interactions with Bruce Garelick, the

1  defendant?

2  A.  No, I did not.

3  Q.  Have you ever met him?

4  A.  I have not, no.

5  Q.  Are you currently involved in any civil litigation relating

6  to DWAC and Trump Media?

7  A.  Yes, I am.

8  Q.  Does that litigation have anything to do with Bruce

9  Garelick?

10  A.  No, it does not.

11  Q.  Do you want to be here testifying today?

12  A.  No, I do not.

13  Q.  Are you testifying voluntarily or under a subpoena?

14  A.  I'm under subpoena.

15          MR. SHAHABIAN:  If I can have one moment, your Honor?

16          THE COURT:  Okay.

17          MR. SHAHABIAN:  No further questions.

18          THE COURT:  Okay.  Cross-examination.

19          MR. BACH:  Thank you.

20  CROSS EXAMINATION

21  BY MR. BACH:

22  Q.  Good afternoon, Mr. Litinsky.

23  A.  Hi.  How are you.

24  Q.  I'm Jonathan Bach.  I'm Bruce Garelick's lawyer.  You and I

25  have never met before, correct?

1  A.  That's correct, yes.

2  Q.  We have never spoken in any shape, form, or manner.

3  A.  Not to my knowledge, no.

4  Q.  And the same I think you just said with respect to Bruce

5  Garelick.  You've never spoken to him, correct?

6  A.  That's correct.  I have not spoken to him.

7  Q.  You never worked with him in any capacity, correct?

8  A.  That's correct.

9  Q.  And there's nothing that you can share with this jury about

10  Bruce Garelick based on your personal experience; is that fair?

11  A.  Yeah, I would agree with that, yes.

12  Q.  And let's talk about your experience with Trump Media Group

13  for a minute.

14  A.  Sure.

15  Q.  You told us that you came up with the idea for a social

16  media company; is that correct?

17  A.  Well, it was a, with all due respect, a bigger idea than

18  that.  It was not just social media; it would be subscription

19  video on demand, podcasting, and other media and entertainment

20  lines, yes.

21  Q.  And at the time you were familiar with something called

22  SPACs?

23  A.  That's correct, yes.

24  Q.  And you didn't have a ready, go-to SPAC; you had to figure

25  out a SPAC to pursue, correct?

1    A.  I'd agree with that, yes.

2    Q.  And you did that by getting on the internet?

3    A.  That's correct, yes.

4    Q.  And you reached out to over a hundred different SPACs,

5    correct?

6    A.  Give or take, about, yeah.

7    Q.  And you——I think you put it you cold called them on the

8    phone.

9    A.  Yes.

10   Q.  And one person you cold called was named Patrick Orlando.

11   A.  That's correct, yes.

12   Q.  And that was in about February 2021, correct?

13   A.  That——that sounds right, yeah.

14   Q.  And you had never met Mr. Orlando before.

15   A.  No, I had not.

16   Q.  And you literally pulled his name off of the SPAC website,

17   correct?

18   A.  That's correct.

19   Q.  Did you do any digging on his background?

20   A.  At that time, no.

21   Q.  Did you learn how deep his experience in SPACs was or was

22   not?

23   A.  At that time, no.

24   Q.  Did you know whether he had ever, ever once, successfully

25   merged a SPAC with a target operating company?

1  A.  At that time, I would not have known that, no, that

2  information.

3  Q.  Did you come to learn that he had in fact never

4  successfully merged a SPAC with a target operating company at

5  the time that you called him in February 2021?

6  A.  I think I'm aware of that fact, but I would have learned it

7  much later on, yeah.

8  Q.  And did you learn that most of his career had nothing to do

9  with SPACs?

10            MR. SHAHABIAN:  Objection.

11            THE COURT:  Basis?

12            MR. SHAHABIAN:  Relevance.

13            THE COURT:  Overruled on that basis.  Go ahead.

14  A.  I apologize.  What was the question?  I'm sorry.

15  Q.  Did you come to learn that most of his career had nothing

16  to do with SPACs?

17  A.  That sounds correct.

18  Q.  Now at the time, Mr. Litinsky, that you began your

19  discussions with him, he had a SPAC called Benessere Capital

20  Acquisition Corp.; is that correct?

21  A.  That's correct.

22  Q.  Do I have that right?

23  A.  Yes.

24  Q.  And can we——the nickname for that was Bene?

25  A.  To my knowledge, the ticker symbol was B-E-N-E, Bene, Bene.

1   Q.  And in February, Mr. Orlando and an individual named

2   Rodrigo Veloso went to Mar-a-Lago in Florida for a meeting.

3   A.  That's correct, yes.

4   Q.  And they—and Mar-a-Lago, that's Mr. Trump's, president

5   Trump's residence, or one of them, correct?

6   A.  Well, I guess, yeah, it is.

7   Q.  And when Mr. Orlando and Rodrigo Veloso went to Mar-a-Lago,

8   they met with you, right?

9   A.  Yes.

10  Q.  And then they met briefly with former president Trump,

11  right?

12  A.  I would agree with that, yes.

13  Q.  Then after all of you met together, there came a point in

14  time when these documents that we were just shown called LOIs

15  were discussed, correct?

16  A.  I can't remember the exact timing of when things were

17  signed, so it's possible that that meeting may have predated

18  signatures.  I can't be certain.

19  Q.  Okay.  And you were just shown a number of LOIs, and just

20  so we all get the acronym, an LOI is a letter of intent.

21  A.  That's correct.

22  Q.  And that's a standard acronym in business, right?

23  A.  I would agree with that.

24  Q.  And an LOI is a standard form in business, correct?

25  A.  I would agree.

1  Q.  And I think when you were asked questions by Mr. Shahabian,

2  you described it as a sign of interest; it's a sign of interest

3  that two companies have in each other, correct?

4  A.  I would agree.

5  Q.  It's not a commitment to do a merger, correct?

6  A.  I would agree with that.

7  Q.  It's not a commitment to do a deal, right?

8  A.  I would agree.

9  Q.  And Trump Media Group had more than one—over a period of

10  time, Trump Media entered into more than one LOI with Bene,

11  correct?

12  A.  I believe that, yes, that's correct.

13  Q.  Okay.  And none of the LOIs that Trump Media Group entered

14  into with Bene ever led to a merger agreement, correct?

15  A.  Yes, that's correct.

16  Q.  So I think you told us that there was an LOI; the first one

17  was on March 10th or 12th between Bene and Trump Media Group;

18  is that correct?

19  A.  That sounds right, yes.

20          MR. BACH:  And that's already in evidence as

21  Government Exhibit 100.  Can we pull that up, Ms. McFerrin.

22  And can we blow up the first few words of this Government

23  Exhibit 1.

24  Q.  Well, first of all, let's make sure you and I are

25  on—literally on the same page.

1          This is the LOI between Bene and TMG dated March 10th

2     or 12th, 2021, correct?

3     A.  I'd agree, yes.

4     Q.  And am I correct that the first few words say, "This

5     nonbinding letter of intent"?  Do you see that?

6     A.  I'd agree.

7     Q.  And then if you go down, there's a—the number 1 appears.

8     Do you see that?

9     A.  I do.

10    Q.  And in bold print, it says, "No commitment."  Right?

11    A.  I do see that, yes.

12    Q.  And that's just to make clear that no one's committing to

13    anything; this is just a letter of intent, correct?

14    A.  I'd agree.

15    Q.  Okay.  And if you go down to Section 2, you can see, I'll

16    call it legal language, even though, you know, that might be

17    disparaging my profession, but do you see where it says,

18    "Subject to and conditioned upon the negotiation and execution

19    of a definitive agreement"?

20    A.  I do see that.

21    Q.  And that's something different from an LOI, correct?

22    A.  I would agree.

23    Q.  That's something down the road, correct?

24    A.  I would agree.

25          (Continued on next page)

1          MR. BACH:  Ms. McFerran, you can take this down.

2    BY MR. BACH:

3    Q.  This letter of intent did not pan out; correct?

4    A.  I would agree.

5    Q.  Did not result in any merger or any transaction taking

6    place?

7    A.  That would be correct.

8    Q.  After it lapsed, each company went its own separate way;

9    correct?

10   A.  Yes.

11   Q.  TGM went its way and Mr. Orlando's SPAC Bene went its own

12   separate way; correct?

13   A.  I'd agree with that.

14   Q.  Then, months later, we're still in the year 2021, months

15   later Bene and TMG start to talking again; right?

16   A.  That's correct.

17   Q.  On June 4th, they sign another letter of intent; correct?

18   A.  Yes.

19          MR. BACH:  Let's pull that up.  It's already in

20   evidence as Government Exhibit 2.  Let's go just to the

21   headline in section 1.

22   Q.  That says, "no commitment."  Do you see that?

23   A.  Yes.

24   Q.  We saw in the other LOI about subject to and conditioned

25   upon the negotiation and execution of a definitive agreement;

1    right?

2    A.   Yes.

3    Q.   Let's take a look at section 9, termination.  Do you see

4    the headline for section 9, "termination"?

5    A.   I do.

6    Q.   It begins by saying, this LOI can be terminated as follows.

7    Do you see that?

8    A.   I do.

9    Q.   And then it's got -- I'm not going to make you read them,

10   but it's got a number of different ways this LOI could be

11   terminated; correct?

12   A.   I would agree.

13   Q.   But look at subparagraph B.  It says:  "This LOI can be

14   terminated as follows:  By the company in its sole discretion

15   at any time if it no longer desires to pursue the proposed

16   transaction."  Do you see that?

17   A.   I do.

18   Q.   The company, who's the company?

19   A.   In this case, I believe TMG would be the company and the

20   investor would be the SPAC.

21   Q.   So looking at B here, this LOI can be terminated by TMG in

22   its sole discretion at any time if it no longer desires to

23   pursue the proposed transaction; right?

24   A.   Correct.

25   Q.   And you told us a moment ago in response to one of

1   Mr. Shahabian's questions that the ultimate decision maker at

2   TMG is former President Trump; correct?

3   A.  Yes.

4   Q.  And this allows him to walk away; right?

5   A.  I would agree with that.

6   Q.  At any time?

7   A.  I would say that's correct.

8   Q.  Based on his own discretion; correct?

9   A.  I would say that's correct.

10  Q.  And former President Trump sometimes walks away from deals,

11  does he not?

12  A.  I would say that's correct.

13  Q.  And he can make all kinds of demands for deals and then

14  refuse to go forward if they're not met; correct?

15  A.  I would agree with that.

16  Q.  And I don't want to embarrass you, but at one point, he

17  demanded from you that you transfer all of your equity in TMG

18  to his wife Melania?

19          MR. SHAHABIAN:  Objection.

20          MR. BACH:  I'll connect it in a minute.

21          THE COURT:  Overruled.

22  A.  Yes, that something like that occurred, yes.

23  Q.  And he told you, he threatened that he would blow up the

24  deal, he'd walk away from it if you didn't make that transfer;

25  correct?

O4UCgar5                    Litinsky - Cross

1              MR. SHAHABIAN:  Objection.

2              THE COURT:  Let me see you at sidebar.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (At the sidebar)

 2              THE COURT:  Where is this going Mr. Bach

 3              MR. BACH:  I have no more questions at this time.  I'm

 4   going to go to the history of the status of the negotiation and

 5   show what the status of the negotiations was, what Mr. Litinsky

 6   believed was happening with Mr. Trump as the events that

 7   Mr. Shahabian described unfolded.

 8              THE COURT:  Are you going to withdraw your question?

 9              MR. BACH:  No.  The significance of this is that when

10   you have a termination provision, it allows someone in their

11   sole discretion to do it, that this is someone who can be that

12   way and exercise discretion to fault deals all the time.

13   That's what he does.  He testified he was on the apprentice, he

14   shows pictures of Mr. Trump at Mar-a-Lago, he was allowed to

15   offer his opinion about numerous topics.  Those are my only

16   questions on that subject.

17              MR. SHAHABIAN:  Can I respond, your Honor?  This is

18   going to confuse the issue.  These topics happened after the

19   merger agreement was announced.  So it has no bearing on the --

20              MR. BACH:  No, this was not after the merger.

21              MR. SHAHABIAN:  Moreover, there is no proffer

22   Mr. Garelick would have been aware of conversations between

23   Mr. Litinsky --

24              THE COURT:  You can't talk over one another.

25              Let me ask Mr. Bach, when did the conversations occur?
```

1          MR. BACH:  Before, in that summer.  I'm about to get

2     to that summer.  His service agreement was voided.  And so, he

3     was taken out of the picture, he had no contact with Orlando.

4     He was not representing TMG for purposes of the deals with

5     Orlando throughout the summer.  There's a June 18 meeting that

6     Mr. Garelick attended and the government has presented him as a

7     knowledgeable witness of this time period and is trying to --

8     for the proposition that there were no discussions, there were

9     no interactions, but I'm going to show that he had -- he was

10    not at the forefront of this effort, that they voided his

11    service agreement during this point in time.  And so, he was

12    kind of out of the loop.  Then I'm going to pick up in

13    September and cover the same chronology going to the merger

14    agreement.

15         THE COURT:  Just so I understand the proffer, what is

16    the relevance of former President Trump threatening to walk

17    away if the shares were not transferred to his wife?

18         JUROR:  Just the relevance is simply to make the point

19    that when you have an agreement where Mr. Trump can exercise

20    sole discretion to do it, it only means so much.

21         MS. SHAPIRO:  Goes to materiality.

22         THE COURT:  And why is that wrong?  You elicited this

23    was an exclusive agreement.  It's fair for them to say it's

24    exclusive to a point the former president can walk away, and

25    the former president is known to walk away, here's an example.

1              MR. SHAHABIAN:  I think they're fine up until the

2    example.  I mean, this is character evidence.  Reputation

3    generally is fine.

4              THE COURT:  Of the former president?

5              MR. SHAHABIAN:  Yes, your Honor.  And with respect to

6    this witness, one, it's going to confuse the issues because the

7    issues are not his negotiations with Andy Litinsky about the

8    money he was going to pay Litinsky under their contract.  The

9    issue is the status of negotiations between DWAC and Trump

10   Media, which, as the witness testified, didn't occur until

11   September.

12             THE COURT:  Do you expect the witness will testify

13   that the former president would blow up, so to speak, the

14   exclusivity agreement and walk away from the exclusivity

15   agreement if the shares were not transferred?

16             MR. BACH:  This is all right in the 3500 material.

17   The president --

18             THE COURT:  I understand.

19             MR. BACH:  The president was negotiating with other

20   parties during this period of so-called exclusivity.

21   Mr. Litinsky had to convince him to focus on this, even down to

22   the final day of the agreement, and --

23             THE COURT:  I think it goes to materiality.  So the

24   objection is overruled.

25             (Continued on next page)

1              (In open court)

2    BY MR. BACH:

3    Q.  Before the break, we were talking about how, according to

4    subparagraph B, TMG, in its discretion, could terminate the

5    deal; correct?

6    A.  Yes.

7    Q.  But Mr. Orlando didn't have the same flexibility; correct?

8    A.  I'd have to read this.  I'd have to read it I guess.

9    Q.  Well, do you see subparagraph C?

10   A.  Okay.  Yes.

11   Q.  It says:  "By the investor in its sole discretion."  Do you

12   see that?

13   A.  I do.

14   Q.  And that's referring to Mr. Orlando's SPAC, Bene; correct?

15   A.  Yes.

16   Q.  It says:  "By the investor at any time if it no longer

17   desires to pursue the proposed transaction."  Do you see that?

18   A.  I do.

19   Q.  But then, after a semicolon, it says:  "Provided, however."

20   Do you see that?

21   A.  I do.

22   Q.  There were conditions imposed by this LOI if Mr. Orlando

23   wanted to walk away; correct?

24   A.  Yes.

25   Q.  In fact, there was financial pressure put on Mr. Orlando if

1   he walked away under certain circumstances; correct?

2   A.  Yes, that's correct.

3   Q.  He was on the hook for what's called a breakup fee that the

4   parties did not go forward and execute a merger agreement at

5   the end of the day; correct?

6   A.  There may have been other kind of ways out so to speak, but

7   I'd agree with the general sense.

8   Q.  And the breakup fee that Patrick Orlando would have to pay

9   under the terms of this was $1 million; correct?

10  A.  From my memory, that sounds right, yes.

11         MR. BACH:  Ms. McFerran, you can put this down.

12  Q.  I've been asking questions about the June 4th LOI, that's

13  the second LOI between Trump Media Group and Bene; correct?

14  A.  Yes.

15  Q.  Like the first LOI, that one never resulted in any merger

16  agreement and transaction between Bene and TMG?

17  A.  Correct.

18  Q.  The deadline for that one kept getting extended?

19  A.  That's right.

20  Q.  Even with all the extensions, there was no deal ever done

21  between Bene and Trump Media Group?

22  A.  I would agree with that, yes.

23  Q.  By the way, the lawyer -- you mentioned there was a law

24  firm involved called Nelson Mullins that was representing TMG?

25  A.  Yes.

1    Q.  The lawyer at Nelson Mullins who was taking the lead on

2    that was an individual named John Haley; correct?

3    A.  That's correct.

4    Q.  Focusing on all this stuff that we've just been discussing

5    on Bene on the one hand and TMG on the other hand, Bruce

6    Garelick had nothing to do with those negotiations?

7    A.  I really wouldn't know, yeah.

8    Q.  He had nothing to do with Bene at all?

9    A.  Not to my knowledge, no.

10   Q.  Now, there came a time that that LOI we were just talking

11   about was in June, on June 30th, you were told that your

12   company -- you had your own company, right, called — and

13   correct me if I get this wrong, Mr. Litinsky — United Atlantic

14   Ventures; correct?

15   A.  United Atlantic Ventures, that's correct.

16   Q.  And that's your company?

17   A.  My company and Wes Moss, as well.

18   Q.  And Wes Moss was your roommate on The Apprentice?

19   A.  Yes, a long time ago.

20   Q.  You guys remained friends and you had your own company

21   together?

22   A.  Yes.

23   Q.  That was the company you and your friend Wes used to hold

24   your interest in Trump Media Group; right?

25   A.  That's correct.

O4UCgar5                    Litinsky - Cross

1   Q.  And you and Wes owned at least at one point in time a

2   10-percent interest?

3   A.  Well, may I correct that?

4   Q.  Yes.

5   A.  I would say yes, it's a 90/10 split, but former President

6   Trump made us pay his lawyer on the deal, so we got less.  It

7   was 8.6 percent.

8   Q.  Roughly 90/10, maybe he pushed you a little bit?

9   A.  Yeah.

10  Q.  Just to proceed with this chronology, we've had the two

11  LOIs.  Then, on July 30th, members of the Trump family and

12  others tell you that your company, United Atlantic Ventures

13  service agreement with Trump Media group was terminated; right?

14  A.  They did say that, but I disagreed with everything about

15  that.

16  Q.  And they stopped paying you for a period of time?

17  A.  I've never been paid at all.  It's been three and a half

18  years.  So they couldn't stop paying me because I was never

19  paid.

20  Q.  Mr. Trump had an agreement and you were not paid on that

21  agreement; correct?

22          MR. SHAHABIAN:  Objection.

23          MR. BACH:  I'll withdraw the question.

24          THE WITNESS:  I've never taken any cash or salary

25  ever, yes.

1   Q.  When they told you that your service agreement was being

2   terminated, you got upset; right?

3   A.  Well, actually, just to be technically correct, they said

4   it was voided as if it never existed and I vehemently disagree.

5   I'm currently in litigation about that in multiple ways.  It's

6   a long story.

7   Q.  I don't want to get into the whole story and I want to

8   spare you.

9   A.  Okay.  I understand.

10  Q.  But I do want to show you one document.

11          MR. BACH:  Can we, without yet publishing it to the

12  jury, show the witness what we'll mark as Defendant's

13  Exhibit 25 for identification.

14          THE WITNESS:  Oh, these are -- okay.

15          THE COURT:  There's no question that's pending, so

16  don't talk about the document --

17          THE WITNESS:  Oh, no.  I just -- sorry.  It came in.

18  I'm like, okay.  That's all that was.

19  Q.  Do you recognize that document --

20  A.  Can I read it just real quick?

21  Q.  Of course.

22  A.  Okay.

23          (Pause)

24          Yeah, so --

25          THE WITNESS:  May I comment on this or --

1              THE COURT:  I think the question was, do you recognize

2    this document.

3    A.  I do recognize it, yes.

4    Q.  And this is an email that you wrote to yourself on or about

5    August 4th, 2021; correct?

6    A.  Yes.

7              MR. BACH:  We offer it.

8              MR. SHAHABIAN:  Objection.

9              THE COURT:  Sustained.

10             MR. BACH:  Take the document down.

11   Q.  Let me ask you this:  You're familiar with someone named

12   Alan Garten; correct?

13   A.  I know who he is in the sense that he's Trump's lawyer in

14   New York, I would say, but I wouldn't say I have a personal

15   relationship with him.

16   Q.  On or about August 4th, you began to believe that Trump's

17   lawyer in New York and others were starting to blow up your

18   relationship with Mr. Trump; correct?

19   A.  It's more complex, but to some degree, yes, I would agree

20   with that.  It's very complex, but yes.

21   Q.  You emphasized to Mr. Trump and others that with respect to

22   the deal, the LOI with Bene, that Mr. Trump has the ability at

23   any time to cancel it if he wasn't happy?

24   A.  That's correct.  This thing disappeared.  Am I allowed to

25   see it again?

O4UCgar5                    Litinsky - Cross

1         THE COURT:  No.

2         THE WITNESS:  I'm not?  Okay.

3    A.  That's correct, he could cancel it at any time, to my

4    knowledge, yes.

5    Q.  You said that to Mr. Trump, when anger was -- well, I don't

6    want to presume.  At this time, on or around August 4th, one of

7    the things you said in your own defense, so to speak, was, you

8    could walk away from this at any time; correct?

9         MR. SHAHABIAN:  Objection.

10         THE COURT:  Overruled.

11   A.  That sounds correct to me, yes.

12   Q.  During this time period in late summer 2021, starting in

13   August, the Trump organization wasn't putting you on the front

14   lines of any discussions with Bene; correct?

15   A.  I'd agree with that.

16   Q.  The point is there was some conflict between you and TMG at

17   this time; correct?

18   A.  "The Trump organization" I think is a better way to think

19   of it.  The Trump family.

20   Q.  And because of the conflict — we won't dwell on it —

21   between you and the Trump family, other people are dealing with

22   Mr. Orlando and the SPACs beside yourself; correct?

23   A.  I would agree with that.

24   Q.  We're talking about the summer of 2021; correct?

25   A.  That's correct.

1   Q.  And then, when we get to September 2021, whatever the

2   conflict was or whatever the differences were, you're still on

3   the board and back in the picture for Trump Media Group;

4   correct?

5   A.  I would say I thought I was, yes.

6   Q.  At some point, as now we're moving along in the calendar in

7   September, at some point you learn that Patrick Orlando is now

8   involved with another SPAC called DWAC; correct?

9   A.  Correct.

10  Q.  And this is a silly question, but just to be clear, DWAC is

11  a different SPAC from Bene; correct?

12  A.  That's correct.

13  Q.  And your own strong preference at this time was not to do

14  anything with DWAC, but to stick with Bene; correct?

15  A.  I would very much agree with that.

16  Q.  But as we just saw, even with two different LOIs, a deal

17  with Bene never happened; correct?

18  A.  That's correct.

19  Q.  Now, you testified on direct that once DWAC went public,

20  once it IPO'd, there were discussions between TMG and DWAC;

21  correct?

22  A.  That's correct.

23  Q.  Even after DWAC went public, there was uncertainty about

24  whether former President Trump would move forward with any of

25  Orlando's SPACs; correct?

1   A.  I would agree with that.

2   Q.  He was having conversations with other potential partners;

3   correct?

4   A.  I would agree with that.

5   Q.  For instance, would apps like GETTR and Parlor, can you

6   explain to the jury, just give them a quick nutshell what those

7   are.

8   A.  GETTR and Parlor, they would be very similar to Twitter.  I

9   guess they call it X now.  Just similar design.  It's all

10  pretty -- it looks like Twitter.

11  Q.  By the way, former President Trump was dealing with those

12  other potential suiters on his own; correct?

13  A.  Yes.

14  Q.  Without you; correct?

15  A.  Very much so, yes.

16  Q.  And he, despite whatever was going on with DWAC, this

17  agreement, that agreement, he was on multiple tracks throughout

18  this period; correct?

19  A.  I would agree with that.

20  Q.  And then we get to a point where an LOI, we now have an LOI

21  between DWAC and Trump Media Group; correct?

22  A.  Yes.

23  Q.  And the LOI between DWAC and Trump Media Group, just to get

24  the chronology here, was around September 22nd; correct?

25  A.  That sounds right.

1    Q.  And there was some correction with the document and it was

2    finally transmitted over to the DWAC side on September 23rd;

3    correct?

4    A.  I wouldn't know on their side, but that sounds about right.

5    Q.  Let me show you a document.  Let me see if this helps.

6             MR. BACH:  Can we show just the witness -- I have it

7    marked as a Government Exhibit, but can we introduce it as a

8    defense exhibit?  It's Government Exhibit 120.

9             THE COURT:  Members of the jury, I'm going to give the

10   instruction anyway that whoever marked an exhibit or ever

11   introduces an exhibit should be a matter of irrelevance to you

12   when you come to your deliberations.

13            Go ahead, Mr. Bach.

14            MR. BACH:  Can we show the witness Government Exhibit

15   120.

16   Q.  Do you see that?

17   A.  I do see it.

18   Q.  Is this a document that you recognize?

19   A.  Now that it's in front of me, I think, yes.

20   Q.  What is it?

21   A.  This would be John Haley, our attorney, sending the DWAC

22   LOI to Patrick Orlando's attorney.

23            MR. BACH:  Mr. Shahabian has no objection.  In fact,

24   he tells me this document is already in evidence.

25            So let's publish it to the jury.

1          Thank you, Mr. Shahabian.

2    Q.  Do you see at the top, it's from John Haley.  You told us

3    that's the attorney at Nelson Mullins for Trump Media Group?

4    A.  That's correct.

5    Q.  It's sent to Alex Monje, who is the lawyer on the DWAC side

6    here; correct?

7    Q.  And that's on September 23rd; correct?

8    A.  Yes.

9    Q.  And John says, Alex, attached for your records, please find

10   a fully executed copy of the DWAC LOI.  Do you see that?

11   A.  I do.

12   Q.  It says:  "With a correction."  Do you see that?

13   A.  I do.

14   Q.  So there was a correction from whatever preceded this.

15   A.  Okay.

16   Q.  Let's take a look at what's already in evidence as

17   Government Exhibit 120A.  This is the DWAC TMG letter of

18   intent.  Do you see that in front of you?

19   A.  I do.

20   Q.  You see how it says Digital World Acquisition Corp at the

21   top?

22   A.  I do, yes.

23   Q.  It says Trump Media Group Corp. in the address block?

24   A.  Yes.

25   Q.  And then, if you go down to where it says No. 1, do you see

1   No. 1?

2   A.   Yes, I do.

3   Q.   And it says:   "No commitment."  Right?

4   A.   I do.

5   Q.   If you go down to section 2.  Do you see that?

6   A.   I do.

7   Q.   And it says there:   "Subject to and conditioned upon the

8   negotiation and execution of a definitive agreement."  Do you

9   see that?

10   A.   I do.

11   Q.   That's the very same language that was in the two Bene LOIs

12   that never resulted in any deal; correct?

13   A.   That sounds right.

14   Q.   Take a look at section 10.  The caption for section 10 is

15   "Termination."  Do you see that?

16   A.   I do.

17   Q.   Section 10 says:   "This LOI can be terminated as follows."

18   If you look at subparagraph B, it says:   "By the company."

19   That's Trump Media Group; correct?

20   A.   Yes.

21   Q.   "In its sole discretion," correct?

22   A.   Yes.

23   Q.   "At any time" correct?

24   A.   Yes.

25   Q.   "If it no longer desires to pursue the proposed

1  transaction," correct?

2  A.  Yes.

3  Q.  So again, President Trump could, at his own discretion,

4  using his own judgment, walk away at any time; correct?

5          MR. SHAHABIAN:  Objection.  Can I be seen at sidebar,

6  your Honor?

7          THE COURT:  Actually, it is 4:58, so why don't --

8  Mr. Bach, unless you have a different question that you want an

9  answer to conclude the day, we can let the jurors --

10          MR. BACH:  The jurors have been here all day.  I'm

11  happy to resume tomorrow.

12          THE COURT:  Members of the jury, it is now just about

13  5 o'clock.  We're going to conclude for the day.

14          Let me instruct you to be back in the jury room in

15  this courtroom, 15C, by 8:45 tomorrow morning.  We'll have

16  breakfast available for those who want it at 8:30.  Again, my

17  experience, many people do want it.

18          During the evening break, please don't speak to

19  anybody about the case, don't speak to one another about the

20  case, and don't do any research about the case.

21          Have a good evening.  All rise.

22          (Continued on next page)

23

24

25

1        (Jury not present)

2        THE COURT:  The witness can step down and the witness

3    should be back here by 8:45 tomorrow morning, also.

4        (Witness not present)

5        Counsel may be seated.

6        I'd like to give all of you my ruling with respect to

7    the juror issue and I'm prepared to hear from the government

8    with respect to the objection and with respect to the issue

9    that's been called the alternative juror issue.  My hope is

10   that we could do everything in the next half hour.

11       Do the parties need a comfort break or can we go?

12       MR. BACH:  Just in case, our desire is to push forward

13   so we can get to tonight.

14       MR. SHAHABIAN:  That's fine, your Honor.

15       THE COURT:  Let me give you my ruling on Ms. Shapiro's

16   request with respect to the jury.

17       The defense moved by letter brief this morning to

18   dismiss the jurors who were qualified yesterday and to begin

19   voir dire anew.  That motion was based on a comment made by a

20   prospective juror during voir dire yesterday that she had heard

21   in the news that two people had pleaded guilty in this case and

22   that Mr. Garelick was the third person.  Following the comment,

23   the Court conducted extensive voir dire in the robing room

24   individually with each of the jurors who had been qualified to

25   determine whether they had heard the comment, what they had

1    heard, and whether they could put the comment out of their

2    minds and disregard it entirely.  The Court asked questions in

3    a probing manner, but also in a manner that was intended not to

4    give any juror knowledge of information that such juror had not

5    received during jury selection.  The Court thus rejects the

6    argument as unfounded that the inquiry itself caused prejudice.

7    As a result of the voir dire, the Court dismissed for cause

8    three prospective jurors who had heard some form of the comment

9    and who expressed any hesitation with respect to whether they

10   could put the comment out of their minds, erring on the side of

11   caution.  This morning another juror indicated that she had

12   thought about the issue overnight and recalled the comment.

13   The Court also excused that juror.

14          The defense argued that the Court should exercise its

15   discretion to cure any prejudice ex ante by excusing all of the

16   jurors qualified yesterday.  It also argued that, in the

17   alternative, the Court should excuse the 12 remaining jurors

18   who stated that they heard some form of the comment made by the

19   prospective juror.  After reviewing again the transcript of the

20   voir dire, the Court exercised its discretion to remove the 12

21   jurors identified by the defense for cause.  It opted not to,

22   in effect, excuse all of the qualified jurors for cause.

23          "Although publicity about a codefendant's guilty plea

24   calls for inquiry to guard against actual prejudice, it does

25   not ordinarily... warrant an automatic presumption of

1   prejudice."  Skilling v. United States, 561 U.S. 358, 385

2   (2010).  "The issue, as Judge Friendly observed, is 'not the

3   mere fact of jury infiltration... but the nature of what has

4   been infiltrated and the probability of prejudice.'" Manley v.

5   AmBase Corp., 337 F.3d 237, 251 (2d Cir. 2003) (quoting United

6   States ex rel. Owen v. McMann, 435 F.2d 813, 818

7   (2d Cir. 1970).  Instead, a Court must question those jurors to

8   determine whether they can be fair and impartial.  See United

9   States v. Stevens 83 F.3d 60, 66 (2d Cir. 1996).  As the Court

10  framed it in United States v. Schwarz, 283 F.3d 76

11  (2d Cir. 2002), the relevant questions are whether the

12  allegations of exposure to information are true; and (ii) if

13  so, to assess whether the defendant was prejudiced by the

14  exposure to the information.

15          The Court is in the position to judge the exposure to

16  extraneous information.  It occurred in the courtroom.

17  Importantly, the information stated by the prospective juror

18  was not about Mr. Garelick, but was about two other individuals

19  who also had been charged with insider trading.  Unlike in

20  Schwarz and some of the other cases cited by the defense, the

21  statement at issue did not reveal any extraneous information

22  about Mr. Garelick himself.  And the names of the two others

23  were not mentioned.  This is a case where even the defense has

24  stated on numerous circumstances that there are some trades

25  that were unquestionably insider trading by others.  Defense

1    appears not to defend those trades, but to argue that

2    Mr. Garelick was not responsible for them.  Thus, the nature of

3    what was infiltrated was not particularly harmful.  And that

4    point is accent waited by the way in which the remark was

5    made — the juror reported on what she said was a press report,

6    but also acknowledged that press reports might not be true.

7    The comment was also made in an extremely large courtroom

8    filled with many people after the Court had already engaged in

9    lengthy voir dire with other jurors and at a time when, from

10   the Court's observations and from its voir dire of the

11   individual jurors, many of the jurors were not paying attention

12   to the answers given by their fellow jurors.  In any event,

13   based on my individual colloquy with each of the other

14   prospective jurors, I am satisfied that there is no basis for

15   excusal of any of the other qualified jurors for cause.  I had

16   the opportunity to observe the jurors, and when there was a

17   need for a followup question, I asked it.  Many of the jurors

18   testified credibly that they did not hear the statement at all.

19   Other jurors testified that they heard a juror say something

20   about a press report regarding the case, but could not recall

21   what was said.  As I said, from my observations of the context

22   in which the statement was made — one of many during a lengthy

23   period of jury examination when the questions were not directed

24   to the other prospective jurors and when there would have been

25   no reason for them particularly to pay attention — the juror's

1    responses were credible.  Finally, I am satisfied that the

2    Court's further instruction that the jurors should ignore

3    anything they hear from press reports would cure any

4    conceivable prejudice.

5          In short, the Court's "face-to-face opportunity to

6    gauge demeanor and credibility, coupled with information from

7    the questionnaires regarding jurors' backgrounds, opinions, and

8    sources of news, gave the Court a sturdy foundation to assess

9    fitness for jury service."  Skilling, 561 U.S. at 395.  While

10   not all of the information or sources of information, Skilling

11   were present for the Court here, it was in a different form in

12   the form of voir dire that I conducted of the individual

13   jurors.  The stricken juror's isolated remark — which most

14   prospective jurors did not overhear or recall whatsoever — did

15   not so infect the venire as to require dismissing every

16   prospective juror for cause.  See United States v. Chiarizio,

17   525 F.2d 289, 295 (2d Cir. 1975).

18         What's the basis for the objection, Mr. Shahabian?

19         MR. SHAHABIAN:  The question misstates the document in

20   front of the witness.  To suggest Mr. Trump could walk away at

21   any time when the portion of the agreement that was not shown

22   to the jury immediately, and to see part of that sentence says

23   after the 45-exclusive-day period expires.  And so, it's

24   misleading to suggest to the jury that any party could walk

25   away before that exclusivity period had expired.

1          THE COURT:  If that's the objection, Mr. Bach, I

2    assume you can ask it in a proper way or not ask it, but that

3    seems to me to be a well founded objection.

4          MR. BACH:  I'll take a look at the document and I'll

5    take -- if that's so, I will clarify.

6          THE COURT:  I'll look at the document myself.  There

7    was no answer to the question because we broke before the

8    witness had a chance to answer it.  So there's probably nothing

9    to clarify, but you can think about how you frame the question.

10         Ms. Hanft, are you going to address the issue of the

11   alternative tipper?

12         MR. SHAHABIAN:  I was going to, your Honor.

13         THE COURT:  Mr. Shahabian.

14         MR. SHAHABIAN:  And I recognize we're picking up where

15   we left off from this morning, so I'll try to recap the

16   government's understanding.

17         The defense appears to be suggesting that Anton

18   Postolnikov was in fact the tipper at the end of October, but

19   that proffer alone is the same place we were at in Gupta where

20   they identified Lobe as the potential alternative tipper.  The

21   reason we've moved in limine on this, I think the Litinsky

22   cross examination showed the problem of what's going to happen

23   if we don't get any sort of proffer right now, is they're going

24   to show witnesses documents that perhaps in some cases we

25   haven't seen before.  For example, Defendant's Exhibit 25 was

O4UCgar5                    Litinsky - Cross

1   not one that had been previously produced to us under the

2   defense's Rule 16 or -- and if it was for impeachment purposes,

3   of course they don't have an obligation to produce it, but

4   there's a difference when they're trying to impeach a witness

5   because they said something that is not true and building an

6   affirmative case through the cross examination of the

7   government's witnesses, because they haven't identified a

8   witness other than the defendant, who's actually going to bring

9   this alternative theory to light.

10          So we've got problems under 403, we've got problems

11  under 611 in terms of the scope of the cross exceeding the

12  direct and using leading questions to establish what should be

13  open-ended direct examination questions, as well as determining

14  on-the-fly whether exhibits that are being shown to these

15  witnesses are being offered for impeachment purposes or being

16  offered to affirmatively build the defense's case.

17          Of course, it's in the Courts discretion, as the Court

18  noted, whether to rule in limine, whether to require a proffer

19  now.  The alternative is we're going to be objecting constantly

20  and having constant sidebars.  At that point, the defendant is

21  going to have to proffer what is the purpose for the document,

22  where is this line of questioning going.  It seems to the

23  government entirely inefficient to have to do that piece by

24  piece.  The defense doesn't have a right to trial by ambush,

25  the rules of evidence apply to the defense too.  Disclosure

1    rules apply to the defense too.  We haven't received any 26.2

2    material yet.

3           And so, in order to avoid, frankly, a train wreck of a

4    cross examination where we're going to be doing sidebars every

5    step of the way, the defense should be required to offer some

6    proffer of the basis for how these documents are going to be

7    admitted, how they can be used such that everyone's on notice

8    of where we're going.  The defense has offered this ex parte

9    suggestion.  I think the Court is rightfully skeptical that we

10   did some Westlaw research last night and couldn't find any case

11   where that had been allowed.

12           THE COURT:  There's actually some Ninth Circuit law on

13   point, which tends to frown upon it.

14           MR. SHAHABIAN:  I had my Ninth Circuit restriction on,

15   so that was my mistake.

16           To the point, it's fundamentally at odds with the

17   nature of the rules of evidence and how proceedings unfold at

18   trial.  There's no requirement for the Court to rule in limine,

19   but the defense has to tell us what they're doing before they

20   can admit documents or go down lines of questioning that may be

21   entirely improper.  So, if they're going to impeach, that's one

22   thing, but given how they're framing this, which is to build an

23   affirmative case through cross examination without any sort of

24   proffer, I don't know how we're going to do this efficiently.

25           THE COURT:  Let me ask you a question, Ms. Shapiro,

1    because you are making the point and made the point of the

2    benefit of surprise, but this is also a case in which you've

3    got 3500 material of the witnesses, if the government changes

4    course with a witness --

5          And first of all, there's a lot of reasons why the

6    government would want to refrain from changing course with a

7    witness, but if the government does change course with a

8    witness, you got all of the 3500 materials.  So I'm really not

9    sure what you are afraid of or what I should consider to be the

10   legitimate complaint if I just ask you who the source of the

11   tip is and what your basis is for thinking that that person had

12   access to the material nonpublic information and was the source

13   of the tip.

14         MS. SHAPIRO:  Well, your Honor, can I just respond to

15   Mr. Shahabian, as well?

16         THE COURT:  You can, but I also want you to respond to

17   my question.  You could do both, and I want you to do both.

18         MS. SHAPIRO:  Let me just start.  I'll just start by

19   saying something that the government is well aware of, because

20   these are their statements in the sworn affidavit of Agent

21   Troiano back in December 2021, in his search warrant affidavit.

22   He said, represented to the magistrate that signed that search

23   warrant that -- and this is one example, your Honor.  That

24   Mr. Deposited knows Patrick Orlando, Garelick, Michael

25   Shvartsman and Gerald Shvartsman, and that he communicated with

1   Orlando and Gerald Shvartsman regularly between September and

2   November 2021.  The government specifically represented that

3   during the period in which Postolnikov — who, by the way, is

4   the alleged unnamed coconspirator, CC-1, I believe, is how they

5   refer to him — that during the period in which Postolnikov

6   purchased warrants and warrants of DWAC, he communicated by

7   telephone with Orlando and Gerald Shvartsman.

8           The government has further represented in the June

9   2022 search warrant that Orlando may have informed other

10  individuals directly of the planned business combination

11  between DWAC and Trump Media and individuals traded on that

12  tip.

13          We can give additional details of the evidence that

14  shows that other individuals had access to the information, and

15  I'll let my colleagues present that if your Honor is going to

16  do that, but I think we've seen already in some of the 3500

17  material that some witnesses are already getting pushed in

18  their testimony and they change it.

19          We just think this is not how it works.  Mr. Shahabian

20  basically is accusing us of acting in bad faith, trial by

21  ambush, all sorts of things.  Criminal trials proceed this way,

22  that's how they work.  They don't tell us exactly what they're

23  going to do in their direct.  They disclose the 3500 material

24  and the exhibits.  We have actually disclosed a greater number

25  of Rule 16 materials in these exhibits than is normal in any

1  criminal case.  We have not disclosed documents that we may use

2  purely for impeachment because we're not required by the rules

3  to.  So just because the government doesn't know exactly what's

4  wrong with their story or how we're going to show that there

5  are other potential alternative tippers doesn't mean we have to

6  lay out our whole case.  There's nothing in the rules that

7  requires that, your Honor.

8         THE COURT:  So maybe you can focus on my questions and

9  avoid some of the hyperbole.  You argued forcefully and

10  effectively, and I'm not faulting you for it, but we started

11  earlier with, we don't have to have a full hearing with respect

12  to witnesses and full 401 hearing.  Nobody was asking for that.

13  In any event, if that had been the request, I would have denied

14  it.

15         The point is that in terms of me conducting the trial

16  efficiently, having the proffer with respect to who the

17  alternative sources are, what the basis is for thinking that

18  they were the alternative sources, what the evidence is that

19  you would offer, and why they had access to the MNPI.  Those

20  are the types of questions that were at issue in the Gupta

21  case.  Even if they weren't at issue in the Gupta case, before

22  you introduce a whole lot of evidence saying that somebody else

23  is a tipper, there has to be some foundation in the evidence

24  for why they would support that theory.

25         MS. SHAPIRO:  I understand that, your Honor --

1      THE COURT:  And so, I'm entitled to know that and then

2  you say you're afraid of tipping your hand to them, but it's

3  not impeachment information and you haven't articulated to me

4  what the prejudice would be of answering those questions.

5      MS. SHAPIRO:  First of all, your Honor, I don't want

6  to read it again.  But is your Honor rejecting what I just read

7  from the search warrants?  That comes from a sworn statement of

8  a government agent that the government used to search people's

9  phones.

10     THE COURT:  Maybe then what you are saying to me is

11 that your theory -- maybe you are giving the proffer.  I'm not

12 sure if you're giving the proffer or not.

13     MS. SHAPIRO:  That's part of it.

14     THE COURT:  Part of the theory of the defense is

15 that --

16     MS. SHAPIRO:  Mr. Postolnikov had access to this

17 information and that there's ample evidence that he

18 communicated regularly with Mr. Orlando during the period in

19 September -- between September and November 2021, but

20 particularly in October.

21     THE COURT:  That he communicated with Orlando?

22     MR. BACH:  And Gerald Shvartsman.

23     MS. SHAPIRO:  If you want all the details, I'm going

24 to turn it over to my colleagues, but the prejudice -- let me

25 ask the Court a question.

163

O4UCgar5                    Litinsky - Cross

1      THE COURT:  You started off on, well, here's a basis

2 for us to have this theory of the defense, and then I have to

3 know whether those were just words and, hypothetically, it

4 could be Postolnikov, but that's not our theory of the defense

5 at all, it's just hypothetical.

6      MS. SHAPIRO:  We don't have to prove who committed the

7 crime.  We have to show the jury that there are other people

8 who had access to the information and could have tipped these

9 individuals.  We don't have an obligation to prove exactly who

10 it was who tipped them.  We don't have an ability to immunize

11 Orlando and find out who he shared the information with.  They

12 say they're not calling him.  We don't have any burden, but we

13 do have -- and there's plenty of case law that makes clear that

14 we are entitled to present an alternative theory, but we don't

15 have to prove, it would be great if we could, but --

16      THE COURT:  Just so it's clear, I'm not now

17 foreclosing you from offering that evidence.  What I am

18 considering is the government request that before you offer

19 evidence that would only be relevant with respect to an

20 alternative tipper, that you make a proffer so that I can

21 establish that the evidence is admissible and wouldn't be

22 excludable under Rule 403.  I'll give you a couple more minutes

23 to respond to my question, but I really want you to focus on

24 that question.

25      MR. BACH:  I know you don't --

O4UCgar5                    Litinsky - Cross

1          MS. SHAPIRO:  Don't.

2          Your Honor, what level of detail is the Court

3    requesting?

4          THE COURT:  It's very hard to know without starting,

5    but why don't we start with what you're prepared to do, which

6    what I think will include at least who the tippers are, the

7    alternative tippers are, and what the basis is for thinking

8    they had access to MNPI or that they were in touch with anybody

9    who traded or were the source.

10         MS. SHAPIRO:  Can we have a few minutes, your Honor?

11         THE COURT:  You can.  I'm going to let you go at 5:30

12   because I have another conference at 5:30.

13         MS. SHAPIRO:  It sounds like you want the proffer.  So

14   I guess we'll just have to do it.  I want to be clear on the

15   record.  We object to this process and we think the Court

16   doesn't have the authority to order this level of detail.

17         THE COURT:  And just to be clear, I have not ordered

18   it yet.  I just asked you to answer my questions about the

19   prejudice.

20         MS. SHAPIRO:  The prejudice is that I think I've

21   articulated, but I think if we lay out the details, the

22   government is going to go back and they're going to use it to

23   talk to their witnesses and the witnesses may change their

24   stories.  They're prepping them for the cross in a way that

25   typically never occurs in a criminal case because the

1    government doesn't know what we're planning to do in a typical

2    case, and we think it could impair the truth-telling function

3    of cross examination.

4            THE COURT:  I do want the limited proffer that I

5    indicated.

6            MR. BACH:  Judge, I'm going to give a limited proffer.

7    My concern is that the government is going to push for more and

8    more detail.  I just don't want to be precluded because I'm

9    going to go in baby steps here.  There's a lot that we don't

10   want to reveal.

11           THE COURT:  I understand that.

12           MR. BACH:  I don't mean this in any disparaging way,

13   but we think that they are taking some of their witnesses'

14   interview statements at face value and they shouldn't.  We

15   think that, as they've acknowledged in their own papers, there

16   are alternate sources of confidential information here.  We

17   think they're well aware of at least ought good chunk of this.

18   But yes --

19           THE COURT:  And I think that is frankly in the finest

20   tradition of defense lawyering, to establish that the

21   government is taking witness statements at face value when they

22   shouldn't.  So give me your baby-step proffer.

23           MR. BACH:  So the baby-step proffer is that there are

24   people here who have very close personal relationships and very

25   great incentives to bend the rules with each other, and that

they are talking to each other about the status of DWAC. There is a rich record of telephone correspondence and trading activity that dovetails with the very evidence the government is seeking to introduce against Mr. Garelick.

The timing is explained by some of the same events. There are two witnesses that the government's going to call here that are both employees of Gerald Shvartsman. Gerald Shvartsman is the brother of Michael Shvartsman. On October 18th, which is really toward the end of the chronology here, two days before the merger agreement is signed, Gerald Shvartsman goes to two of his employees and tells them that the merger is about to happen. And both of those -- and he says -- and he texts those employees. And he says, I'm in on it, my brother's in on it, and my buddy is in on it. And that's what he texts these employees. Both of these employees, according to the 3500 material, are going to say they have no idea where Gerald Shvartsman got this information from. But there are, suffice it to say, proceeding in baby steps, that just prior to October 18th, there were in-person meetings or get-togethers -- I want to be very vague about this. There are phone communications, there are in-person gatherings of people who share inside information just before the timing suggests that this is just before Mr. Gerald Shvartsman --

Gerald Shvartsman is at this gathering. There are people involved. Some of the people who are involved in these

1    communications are Mr. Orlando and Mr. Postolnikov and others.

2    The government, in its letter seeking the proffer, says, well,

3    you know, none of this explains the trades that occurred

4    earlier in October, but that's not what our theory addresses.

5    They already are kind of misreading where is this going.

6            So we have a clear foundation that there are

7    interaction, communications, records of those communications

8    between people who have access to the so-called MNPI.  And I

9    don't want to be specific here, but the government writes in

10   its letter that that can't be so because, look at what

11   Mr. Orlando and Mr. Wachter said when they met with the

12   government and weren't under oath.

13           And we are -- and I'm not going to talk about this

14   here.  We are going to expose that as a pure sham on cross

15   examination.  The idea that Marc Wachter -- for instance, Marc

16   Wachter writes an email on October 11th.  Remember, I'm telling

17   you October 18th is when this tip takes place.  And there are

18   meetings and phone calls preceding this, including people who

19   have clear access to the MNPI.  Mr. Wachter writes an email on

20   October 11th, says Orlando is about to announce the news.  They

21   can tell you this is just Jonathan Bach doing crazy things on

22   cross examination and he's going to muck up the trial.  That's

23   an email.  That's an email.  And they asked Mr. Wachter about

24   that.  I don't even want to discuss this because I'm going to

25   cross examine him on this.  But the idea that this doesn't have

O4UCgar5                    Litinsky - Cross

1   a foundation, this doesn't have evidence -- I'm going to stop

2   here, but that's what we're talking about.  We're talking about

3   actual interactions with actual people who are key players in

4   this case who had direct inside information ranging from

5   Mr. Orlando on down to his very close circle of friends and

6   they are wining and dining each other.  They are doing all

7   kinds of illegal business deals with each other, they're

8   bending the rules every step of the way, they're trying to --

9   they've got all kinds of arrangements with Mr. Postolnikov.

10  Mr. Postolnikov is someone who has over a quarter of a billion

11  dollars, and they are just tempted as hell to do whatever they

12  can to keep him happy.  And I just want to stop.  But if they

13  haven't figured that out in their investigation, we think they

14  should have.

15          THE COURT:  So what we're talking about, generally,

16  Postolnikov, Wachter, and Orlando; is that fair?

17          MR. BACH:  Yes.  And those are people who are so close

18  to the flame that to ask for a proffer on this is insulting.

19  This is right at the heart of the case.

20          THE COURT:  It is 5:30.  Just one more question for

21  you, Mr. Bach.  I take it that this is probably not the subject

22  of cross examination for the witness we currently have on the

23  witness stand?

24          MR. BACH:  No.

25          THE COURT:  How much more time do you have with him?

1    MR. BACH:  Not much at all.  I probably could have

2    asked for 10 minutes, but not much at all.

3    THE COURT:  Mr. Shahabian, how much more do you have

4    for this witness?  And who's on deck for tomorrow?  And then if

5    there are evidentiary objections and the like, I can deal with

6    them, but who's on deck for tomorrow?  And how much more time

7    with this witness?

8    MR. SHAHABIAN:  I think with this witness, maybe

9    5 minutes or less on redirect.  Then we have Hartley Wasko,

10   Marc Wachter, Adrian Lopez Torres, Eric Swider, and I think

11   we're hoping that gets us to the end of the day.  We confirmed

12   over the lunch break that Netanel Suissa, who we had previously

13   noticed as a second-day witness or first-day witness, would be

14   available if we still need someone by the end of the day

15   tomorrow.

16   THE COURT:  It sounds like this issue, if it's going

17   to come up in a cross examination, will come up for the first

18   time with Mr. Wachter; is that fair?

19   MR. BACH:  I'm hesitating to say --

20   THE COURT:  I don't know who Mr. Wachter is.  I'm

21   asking Mr. Shahabian, who is Mr. Wasko?

22   MR. SHAHABIAN:  Mr. Wasko is a business associate of

23   Michael Shvartsman and Rocket One, and was introduced by the

24   defendant and Michael Shvartsman and others to DWAC.  He

25   invested in founder shares, as far as the government is aware

1    did not trade, but he was in some of these early pitch meetings

2    in the summer of 2021.

3            THE COURT:  I'll see you all at 9 o'clock tomorrow

4    morning.  If there are any issues to raise with me, you can

5    raise them at 9 o'clock.

6            MR. BACH:  Could I have one quick question.  Was that

7    the four witnesses, is that the order the anticipated order of

8    those witnesses?

9            THE COURT:  Mr. Shahabian can tell you.

10           MR. SHAHABIAN:  Yes.

11           THE COURT:  It is the order?

12           MR. SHAHABIAN:  Yes.

13           THE COURT:  Mr. Shahabian, you wanted a minute?

14           MR. SHAHABIAN:  Yes, your Honor.  I just wanted to,

15   before memories fade from this evening, we're not disputing

16   that Anton Postolnikov traded, we think he also received

17   material nonpublic information, including from Gerald

18   Shvartsman potentially.  But to reverse the tipping chain

19   requires some foundation.  I heard Mr. Bach say, of course they

20   discussed inside information in these communications, which are

21   phone records and an event.  The government's not aware of the

22   basis for that.

23           And to the point about Mr. Wachter, we're not just

24   taking his word for it because he came in and said, I didn't

25   tell anybody.  What he told us and what he's likely to testify

O4UCgar5                    Litinsky - Cross

 1  tomorrow is at the same time all of this was happening,

 2  literally a few days before the merger was announced, he pushed

 3  Patrick Orlando to transfer 100,000 DWAC shares to his friends

 4  so that he could "close a real estate deal," which is to say

 5  is, man, I wish I had known the merger was going to happen

 6  because I lost millions and Patrick Orlando didn't give me a

 7  hint of what is coming.  And that is supported by documentary

 8  evidence of communications where Mr. Wachter is pushing Patrick

 9  Orlando right before the merger, hey, can you authorize this

10  transfer of shares to my buddy as well as the transfer

11  agreement.  These are documents.  These are bases on which to

12  make inferences.  There is no basis, other than Mr. Bach's

13  speculation about the fact that these people met to show that

14  the passing of inside information that way actually happened.

15  Absent any sort of evidence, he's just going to cross examine

16  without a basis to show that there is actually admissible

17  evidence other than his questions that show inside information

18  was passed in that direction.

19          MR. BACH:  I just want to address that.  The idea,

20  this story about Mr. Wachter giving up his shares just before

21  the deal closes——I don't want to have a mini trial about our

22  proffer.

23          THE COURT:  Okay.  And you're starting to do that,

24  Mr. Bach, because I wasn't going to call on you to respond.

25          MR. BACH:  I've never done this before.

1              THE COURT:  And I didn't call on you to respond.

2         All right.  It's 5:30.  We're done.  Have a good

3    evening, everybody.

4              THE DEPUTY CLERK:  All rise.

5              (Adjourned to May 1, 2024, at 9:00 a.m.)

6                             *  *  *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    INDEX OF EXAMINATION

2   Examination of:                            Page

3    ANDREW DEAN LITINSKY

4   Direct By Mr. Shahabian  . . . . . . . . . . .96

5   Cross By Mr. Bach  . . . . . . . . . . . . . 124

6                    GOVERNMENT EXHIBITS

7   Exhibit No.                              Received

8    102, 232, 206, 208, 212, 214, 101,  . . . . . 103

9           103-122, 124-130, 132-137,

10          202, 205, 209, 100, 203, 211

11   123  . . . . . . . . . . . . . . . . . . . 115

12                     JOINT EXHIBITS

13  Exhibit No.                              Received

14   1  . . . . . . . . . . . . . . . . . . . . 103

15

16

17

18

19

20

21

22

23

24

25
```