O511GAR1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

          v.                                 23 Cr. 307 (LJL)

BRUCE GARELICK,

               Defendant.

------------------------------x          Trial

                                         May 1, 2024
                                         9:00 a.m.


Before:

                    HON. LEWIS J. LIMAN,

                                         District Judge
                                          and a Jury


                         APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  ELIZABETH A. HANFT
     MATTHEW R. SHAHABIAN
     DANIEL G. NESSIM
     Assistant United States Attorneys

SHAPIRO ARATO BACH, LLP
     Attorney for Defendant Garelick
BY:  ALEXANDRA  A. E. SHAPIRO
     JONATHAN BACH
     JULIAN S. BROD
     JASON A. DRISCOLL

Also Present:

Special Agent Marc Troiano, FBI
Paralegal Specialist Grant Bianco, USAO

O511GAR1

175

1        (Trial resumed; jury not present)

2        THE COURT:  Okay.  We've got all the jurors, but a

3    couple of things before we bring them in.  It may have gotten

4    lost in the shuffle, but a couple of days ago, I did direct the

5    parties to meet and confer with respect to the if, as, and when

6    subpoena.  I'm not sure whether that has taken place.

7        MS. HANFT:  Yes, your Honor.  We did meet and confer

8    last night.  We didn't submit a letter to the Court because

9    we've had productive discussions and we may not need Court

10   intervention.  Ms. Shapiro can correct me if that's not her

11   point of view, but we had this discussion last night.

12       THE COURT:  Excellent.

13       MS. SHAPIRO:  I think that's——just to correct it

14   slightly, I think the scope of the Court intervention may be

15   narrowed, but I'm not sure we'll agree on everything, but we'll

16   see.  We're continuing the discussions.

17       THE COURT:  Okay.

18       MS. SHAPIRO:  We were going to notify the Court later

19   today.

20       THE COURT:  Okay.  I would encourage you to do so

21   because if you need a ruling, then I'm prepared to give it to

22   you, but I'm not prepared to entertain a whole lot of arguments

23   about the last-minute burden that production would cause if

24   that is because you haven't brought it to my attention earlier.

25   So try to complete the discussions today so that if there is a

O511GAR1

1    need for Court intervention, we can handle it tomorrow.

2              MS. SHAPIRO:  That's fine, your Honor.  I just wanted

3    to make sure it was clear.

4              THE COURT:  Okay.  I also raised with the parties, in

5    particular with the defense, whether the defense would be

6    prepared to stipulate as to certain issues, such as whether the

7    securities at issue were those of a company registered under

8    Section 12 and whether Mr. Garelick had a fiduciary duty to

9    DWAC and its shareholders and whether that was a duty of trust

10   and confidence.  Where do things stand with respect to that,

11   Ms. Shapiro?

12             MS. SHAPIRO:  Your Honor, we are planning to stipulate

13   to those.  We haven't drafted the stipulations yet.

14             THE COURT:  Okay.  Good.

15             On the charge, what I contemplate is that at the end

16   of the day tomorrow, I will hear from the government their

17   position with respect to the defense's objections to my charge

18   and anything that the government wants to bring to my attention

19   with respect to the charge so that I'm in a position on Friday

20   and over the weekend to consider any needed changes to the

21   charge.

22             With respect to the letter I got this morning, I

23   gather Mr. Swider is not going to be among the first couple of

24   witnesses; is that right?

25             MS. HANFT:  That's correct, your Honor, but he will be

O511GAR1

1    testifying today.

2              THE COURT:  So what I think we could do is handle the

3    letter after the jury breaks for lunch; maybe let them go out a

4    little bit early, like 12:45.  Does that make sense from the

5    government's perspective?

6              MS. HANFT:  Yes, your Honor.

7              THE COURT:  From the defense's perspective?

8              MS. SHAPIRO:  Yes, your Honor.  Just the earlier part

9    of the letter, I did——

10             THE COURT:  I have that.  And with respect to the

11   earlier part of the letter, to the extent clarification of my

12   ruling is necessary, it is permissible for witnesses to testify

13   that they understood that the rules did not permit them to

14   trade on the basis of the information that they had with

15   respect to DWAC's merger negotiations with Trump Media.  That's

16   implicit in my ruling with respect to, for example, compliance

17   policies or the confidentiality agreements.  Those impose

18   rules, broadly stated, and in the way witnesses express

19   opinions, the line that I've drawn, and I think the law draws,

20   is that witnesses can't testify that they understood that it

21   would be illegal or that the restrictions come from the law

22   under the Securities Exchange Act because that would be a view,

23   an opinion as to the law.  So that's my clarification.

24             MS. SHAPIRO:  Your Honor, can I just ask two

25   questions.  When you say the rules, which rules are you

O511GAR1

1   referring to that they can testify about; you're talking about

2   the compliance policies and things like that?

3           THE COURT:  You can inquire on cross-examination on

4   the basis of why they say——

5           MS. SHAPIRO:  Well, what if they say, well, I'm

6   talking about the securities laws, and then you'll say——the

7   Court might say, well, we opened the door, or something like

8   that.  We don't want that to happen, obviously.

9           THE COURT:  But if their view and their understanding

10  is that the way in which they were given this information is

11  that it's confidential and that they can't trade on it, then

12  that's permissible.

13          What's your next point?

14          MS. SHAPIRO:  It was a question——well, can we have a

15  standing objection to this so we don't have to jump up every

16  time and object, or is the Court going to insist that we object

17  each time——

18          THE COURT:  Just define what your objection is and

19  then——

20          MS. SHAPIRO:  Well, the objection is the same

21  objection that we moved *in limine*.

22          THE COURT:  But as to somebody testifying with respect

23  to the rules or——

24          MS. SHAPIRO:  The rules, their opinions about whether

25  they could trade, their opinions about whether the information

O511GAR1

1  is material, what directors can do and can't do in terms of

2  trading stock, all of those things.

3      THE COURT:  I think——basically, I think you should

4  object each time because depending on what the testimony is and

5  the way in which it's expressed, I might sustain the objection.

6  So there are some fine lines here.  I don't think witnesses can

7  testify with respect to something being, quote, material.  They

8  can testify that it was important, they considered it to be

9  important information, they considered it to be the kind of

10  information that could move the market, that kind of thing.

11      MS. SHAPIRO:  One thing that perhaps may inform the

12  Court's understanding of this issue that we haven't discussed

13  before is that the evidence is going to show there actually was

14  no training and no rules in place at the relevant time, and

15  that the rules were put in place later, and so if we ask, what

16  rules are you talking about, it's extremely likely that they'll

17  say, it was my understanding of, like, the law.  And so I

18  understand the Court is trying to draw a fine line, but I guess

19  we think it just it's really not a line, because it's clear

20  that what these witnesses are testifying to, at least with

21  respect to the issue of whether they could trade, is a legal

22  opinion.

23      THE COURT:  Okay.  So I think make the objections at

24  the relevant time, I now understand the basis for the

25  objection, and in fact, it may be sustained, again, depending

O511GAR1

1    on the particular question.

2           Is there anything further that the government wants to

3    say with respect to the alternative tipper theory?  I think

4    I've got what I need.

5           MR. BACH:  Just a second.

6           (Pause)

7           MS. SHAPIRO:  We would ask, can the Court ask the

8    government to inform its witnesses that they should not be

9    testifying that the information was material and not use the

10   word "material."

11          THE COURT:  Yes, I will instruct the government to

12   instruct the witnesses to avoid the use of legal terminology,

13   such as "material," or that it would be illegal.

14          MS. HANFT:  Does that include nonpublic?  I just heard

15   Ms. Shapiro——

16          THE COURT:  I said material.  Nonpublic is a different

17   concept because it means that it's not public.  But I said

18   material and I said legal.

19          All right.  Does the government wish to be heard with

20   respect to alternative tipper?

21          Okay.  I can give a ruling with respect to alternative

22   tipper.

23          The Court will allow the defense to attempt to pursue

24   its alternative tipper theory.  In *United States v. Gupta*, the

25   Second Circuit accepted as sound the "legal premise" that

O511GAR1

"another person may have committed the crime with which the

defendant is charged."  747 F.3d at 137 (citing *Holmes v. South

Carolina*, 547 U.S. 319, 327 (2006)).  The Circuit in *Gupta* held

that the district court acted within its discretion in

excluding evidence that the defense asserted would establish

that a person other than the defendant was a tipper on grounds

of relevance and hearsay.  In particular, the district court

excluded evidence that a Goldman Sachs salesperson other than

the defendant had contacted the alleged tippee and told the

alleged tippee that the salesperson had information that was

important and urgent.  The Circuit sustained the district

court's decision because there was no nonhearsay evidence that

the salesperson had access to the relevant confidential

information, in contrast to the extensive evidence that he

would not have had access to such information.

           In this case, as it has been proffered by the defense,

there is nonhearsay evidence, for example, that the putative

alternative tipper (Mr. Wachter) had access to the relevant

confidential information at the relevant time and communicated

with the alleged tippees.  If that is so, and there is a

foundation in the evidence that Wachter in fact had access to

the information at the relevant time and was in touch with the

tippees before and in proximate time to the trades, then that

would be permissible for the defense to pursue.

           To be clear, this is a ruling on conditional relevance

O511GAR1

1  based on the proffer by the defense.  It does not foreclose any

2  argument by the government that any individual item of evidence

3  should be excluded on Rule 403 or hearsay or other grounds, nor

4  the right of the government to argue that the evidence should

5  be stricken should the defense fail to provide a nonspeculative

6  basis for the jury to connect the dots and to establish the

7  relevance of the evidence from the proof at trial.

8         All right.  Do we have the witness ready once the jury

9  comes in?  Is the witness here?

10        MR. SHAHABIAN:  He's in the witness room outside, your

11 Honor.

12        THE COURT:  Any reason we shouldn't put him on the

13 stand right now and then we can call the jury in?

14        MR. SHAHABIAN:  I think there's one issue with the

15 jury that my colleague wanted to raise.

16        MS. HANFT:  Your Honor, I noticed yesterday that Juror

17 No. 7 doesn't have a screen and appeared to be, like, forced to

18 crouch down and go next to the juror next to her to look at the

19 screen.  I wondered if we could reshuffle the jurors so that

20 Juror No. 7 can see the screen more easily.

21        THE COURT:  Sounds like a good point.  Any problem

22 with that from the defense perspective?  I think we're just

23 going to move the jurors one over so that they can all see the

24 screen a little bit more easily.

25        MS. SHAPIRO:  That's fine, your Honor.

1          THE COURT:  Okay.  All right.

2          MR. BACH:  Judge, can I have 30 seconds before you

3     call the jury in?

4          THE COURT:  Just as a comfort break; is that what

5     you're asking for?

6          MR. BACH:  Very well put, your Honor.

7          THE COURT:  All right.  Let's put the witness on the

8     stand and then Mr. Bach can take his 30 seconds, and by the

9     time the witness is on the stand, Mr. Bach will be back and we

10    can call in the jury.

11         (Pause)

12         THE COURT:  All right.  Let's bring in the jury.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Be seated.

3          Welcome back, members of the jury.

4          Mr. Litinsky, you're advised you're still under oath.

5          Counsel, you may continue.

6          THE WITNESS:  Yes.

7     ANDREW DEAN LITINSKY, resumed.

8     DIRECT EXAMINATION

9     BY MR. BACH:

10    Q.  Good morning, Mr. Litinsky.

11    A.  Good morning.

12    Q.  When we left off yesterday, we were talking about the LOI

13    between DWAC on the one hand and Trump Media Group on the other

14    hand, and I was asking you some questions about termination and

15    the walkaway rights that Trump Media Group maintained.  Do you

16    remember that?

17    A.  Yes.

18          MR. BACH:  Can we pull Exhibit 128 back up on the

19    screen.

20    Q.  And Mr. Litinsky, I read to you subsection (b), which talks

21    about how the company, in its sole discretion at any time, if

22    it no longer desires to pursue the proposed transaction, can

23    terminate, correct?

24    A.  That's correct.

25    Q.  And this time, there is a further proviso, correct?

O511GAR1                    Litinsky - Cross

 1   A.  What do you mean by that, sir?

 2   Q.  Well, this time, do you see a couple lines down, it says,

 3   provided, however, that neither the company shall—nor the

 4   investor shall terminate this LOI pursuant to clause (b) or (c)

 5   prior to the expiration of the exclusivity period, correct?

 6   A.  I do see that, yes.

 7   Q.  And there's a 30-day initial exclusivity period here,

 8   correct?

 9   A.  30 days sounds about right, but I'd have to—yeah.

10   Q.  And an option to extend it another—

11   A.  Sounds normal; sounds correct.

12   Q.  Okay.  And those issues, those issues of the extension,

13   those were negotiated down to the wire, correct, to the time

14   this agreement was signed?

15   A.  I would agree with that.

16   Q.  And that's why a corrected version was sent over to DWAC at

17   the last—on—

18   A.  Was that the 45-day, you're talking about, or—

19   Q.  Yes.

20   A.  That makes sense what you're saying.

21          MR. BACH:  Let's pull up 120, Government Exhibit 120

22   again, just so the jury is clear.

23   Q.  Do you see on Government Exhibit 120 here, Mr. Litinsky,

24   the language, it says, with the correction to 20—to 45 days in

25   the exclusivity section?  Do you see that?

1    A.   I do see this, yes.

2    Q.   Is that what you were just referring to?

3    A.   Yes, but it's——I saw this yesterday.  That's what jogged my

4    memory.  I would not have remembered this unless I saw it

5    yesterday.

6    Q.   Okay.  Thank you.

7         MR. BACH:  Okay.  You can put that down, Ms. McFerrin.

8    Q.   Now these negotiations about the LOI, about the correction,

9    about any of these matters, to your knowledge, Mr. Garelick was

10   not a participant in any of those negotiations, correct?

11   A.   To my knowledge, I just wouldn't know.

12   Q.   Well, for instance, you showed us a photograph of people I

13   think at Mar-a-Lago signing this agreement, correct?

14   A.   That's correct.

15   Q.   You showed us——there were several photographs of that,

16   right?

17   A.   That's correct.

18   Q.   Mr. Orlando's wife was there?

19   A.   Yes.

20   Q.   Bruce Garelick wasn't there, right?

21   A.   That's correct.

22   Q.   Okay.  No one was calling him on the phone for his input,

23   correct?

24   A.   I would agree with that.

25   Q.   Okay.  And let's now just talk briefly about after that

1   letter of intent is signed.  The letter of intent you described

2   on direct as having an exclusivity requirement, correct?

3   A.  Yes.

4   Q.  But Mr. Trump was not being exclusive, was he?

5           MR. SHAHABIAN:  Objection.

6           THE COURT:  Basis?

7           MR. SHAHABIAN:  Calls for speculation.

8           THE COURT:  Overruled.  If you know the answer, you

9   can give it.

10  A.   There are things I knew then and then there are things I

11  learned later, as far as his commitment to that exclusivity.

12          THE COURT:  So you're limited to only what you knew

13  then.

14          THE WITNESS:  Then.

15  A.  Well, gosh, you know, this is——I mean, this is three years

16  ago, almost, so I——

17  Q.  Sure.

18  A.  But I get what you're getting at.

19  Q.  He was talking to other people, correct?

20          MR. SHAHABIAN:  Objection.

21          MR. BACH:  Let me back up.

22          THE COURT:  Go ahead, Mr. Bach.  New question.

23  Q.  Okay.  The merger agreement was not signed until

24  October 20th, correct?

25  A.   I agree with that, yes.

O511GAR1                    Litinsky - Cross

1   Q.  And on the very day that Mr. Trump——on that very day,

2   October 20th, you were uncertain about whether or not he would

3   sign the deal, correct?

4   A.  I would agree with that, yes.

5   Q.  And you were uncertain because you understood at that time

6   that DWAC was only one of the deals that he had in the mix at

7   that point in time, correct?

8   A.  I would agree with that, yes.  I had, once again, some

9   knowledge of what he was up to, but the idea that I knew

10  everything that's in former president Trump's brain, I

11  wouldn't, yeah.

12  Q.  Understood.

13  A.  Okay.

14  Q.  But you did know that he took a call from Jason Miller at

15  Gettr right before the signing, correct?

16  A.  Yes, I have——

17              MR. SHAHABIAN:  Objection.

18              THE COURT:  Basis?

19              MR. SHAHABIAN:  Foundation for knowing that the

20  president was speaking with Jason Miller.

21              THE COURT:  Do you want to establish a foundation,

22  Mr. Bach.

23              MR. BACH:  Sure.

24  BY MR. BACH:

25  Q.  You testified yesterday that you had an understanding that

1   Mr. Trump would be talking to Gettr after DWAC went public,

2   correct?

3   A.   That's correct.

4   Q.   And you don't know everything that was on Mr. Trump's mind

5   or on his agenda, correct, but you knew that he was having

6   discussions with Gettr from time to time?

7            MR. SHAHABIAN:  Objection.

8            MR. BACH:  I'll lay a foundation.

9            THE COURT:  Sustained on foundation grounds.

10  Q.   Well, did you know on that day that——the day of the

11  signing, October 20th, that Mr. Trump took a call from Jason

12  Miller?

13  A.   I believe I do have that memory, yes.

14  Q.   Okay.  And in fact, on that final day, Mr. Trump asked to

15  meet with you.

16  A.   That's correct.

17  Q.   And asked to be convinced that this was the way to go,

18  right?

19  A.   That's correct.

20  Q.   And when you left that room, you weren't sure which way he

21  was going to go, correct?

22  A.   I would agree with that.

23  Q.   And as it turned out, he did sign on October 20th, correct?

24  A.   That's correct.

25  Q.   Then the deal, at the close of trading, after the close of

O511GAR1                    Litinsky - Cross

1   the trading day, was announced to the public.

2   A.   Right.  He would have signed and then it would have been

3   announced to the public, that's correct.

4   Q.   Okay.  Now do you know an individual named Eric Swider?

5   A.   I do.

6   Q.   How long have you known Mr. Swider?

7   A.   Eric Swider, I can't remember the exact date when I met

8   him, but he sat on the board of directors of Benessere and

9   DWAC.

10  Q.   Okay.  And can you give us a sense of the time frame, just

11  a rough approximation of when you——

12  A.   Sure.  Ballparking——

13          THE COURT:  Hold on for a second.  Let the lawyer

14  finish the question, and then you can give the answer.

15          I'm not sure, Mr. Bach, that you were done with your

16  question.

17          THE WITNESS:  Sorry.  Okay.

18  Q.   Sure.  Could you please give us a ballpark approximation of

19  when you met Mr. Swider.

20  A.   The summer of 2021.

21  Q.   And did you have dealings with him from time to time

22  through the summer of 2021?

23  A.   Yes, I——I would say less than Patrick Orlando, but yes, I

24  remember some interaction.

25  Q.   And did you have dealings with him after the summer of

O511GAR1                    Litinsky - Cross

1    2021?

2    A.   Summer of 2021.  Well, I have in general dealt with him.

3    I'm sorry.  I don't know how to——could you be a little more

4    specific.  I——

5    Q.   Perhaps you could just give a general sense, without

6    getting into specifics, of what types of interactions you've

7    had with him.

8    A.   So Eric Swider became the new CEO of DWAC, and he——I would

9    say——I met with him in the summer of 2023, and I met with him

10   the beginning of 2024.

11   Q.   And how often did you meet with him?

12   A.   Not often, but——I'm aware of who he is.  I would say I

13   wasn't a frequent, like, guest or friend of his, but I was very

14   aware of his position, and I have met with him, yes.

15   Q.   And you've met with him more than once, correct?

16   A.   I would agree with that, yes.

17   Q.   Okay.  And you've spoken to him on multiple occasions,

18   correct?

19   A.   Yes.

20   Q.   Okay.  Do you have an opinion as to his character for

21   honesty and truthfulness?

22   A.   I do.

23   Q.   What is that opinion, sir?

24   A.   I never like to speak ill of other people, but I have——I'm

25   trying to think——being truthful, not a great opinion, as

O511GAR1                    Litinsky - Redirect

1    evidenced by I am suing him in Delaware.

2    Q.  What is your opinion as to whether he is an honest and

3    truthful person?

4    A.  In my opinion, I would regard him as not an honest person.

5              MR. BACH:  Can I have one moment, your Honor.

6              Thank you very much, Mr. Litinsky.  I have no further

7    questions.

8              THE WITNESS:  Okay.

9              THE COURT:  Redirect examination.

10   REDIRECT EXAMINATION

11   BY MR. SHAHABIAN:

12   Q.  Good morning, Mr. Litinsky.

13   A.  Hi, how are you.

14   Q.  Good.  Thanks for asking.

15             So you remember being asked some questions yesterday

16   and today about the letters of intent that Trump Media executed

17   with Benessere and DWAC?

18   A.  Yes, I do.

19   Q.  I want to start with the Benessere one that Mr. Bach asked

20   you about.

21             MR. SHAHABIAN:  If we could publish Government

22   Exhibit 102.

23   Q.  Do you remember this document, Mr. Litinsky?

24   A.  I do.

25   Q.  Is this the exclusive letter of intent that you discussed

1    yesterday with Mr. Bach?

2    A.  Yes, it is.

3    Q.  And could you remind the jury, what is an exclusive letter

4    of intent?

5    A.  An exclusive letter of intent would be one step further on

6    the commitment side from a nonbinding letter of intent or just

7    a regular letter of intent, so I would say on the degree of

8    seriousness, it would be a letter of intent, an exclusive

9    letter of intent, which could then lead to a merger agreement.

10            MR. SHAHABIAN:  If we turn to page 3 of this document,

11   Mr. Bianco.  And if we can blow up the top of paragraph 5.

12   Sorry.  Exclusivity, say like the first four lines.

13   Q.  Is this the exclusivity provision of this document,

14   Mr. Litinsky?

15   A.  Yes, it is.

16   Q.  How long was the exclusivity period between Benessere and

17   Trump Media in the summer of 2021?

18   A.  This reads 90 days, so that would seem correct.

19   Q.  What does it mean to have an exclusivity period for 90

20   days?

21   A.  In that period, both parties should really, according to

22   the document, be only talking to one another about a potential

23   deal.

24   Q.  DWAC—or, sorry—Benessere agreed to only talk to Trump

25   Media about a potential deal?

O511GAR1                    Litinsky - Redirect

1   A.  Yes.

2   Q.  And Trump Media agreed to only talk with Benessere about a

3   potential deal.

4   A.  I would agree, that's—

5   Q.  That's exclusivity.

6   A.  I would agree with that.

7          MR. SHAHABIAN:  And if we turn to the next page,

8   Mr. Bianco.  And if we highlight paragraph 9.

9   Q.  Do you remember discussing this paragraph about termination

10  with Mr. Bach yesterday?

11  A.  I do.

12  Q.  And do you remember he asked you questions about whether

13  Mr. Trump could just walk away from this agreement?

14  A.  I remember that.

15  Q.  He asked you questions about the breakup fee provision,

16  right?

17  A.  Yeah, yes.

18  Q.  Okay.  I want to ask you about a part that he didn't talk

19  about.

20         MR. SHAHABIAN:  So if we highlight, Mr. Bianco,

21  provided, on line 5, from "provided further that neither the

22  company nor the investor shall terminate this LOI pursuant to

23  clause (b) or (c) prior to the expiration of the exclusivity

24  period."

25  A.  Okay.

1   Q.  Do you see the highlighted portion of this, Mr. Litinsky?

2   A.  I do.

3   Q.  Under this agreement, could Trump Media terminate this

4   letter of intent before the 90-day exclusivity period expired?

5   A.  The reading of this would be no, we could not.

6   Q.  So after the 90 days, it could be terminated.

7   A.  I would agree with that reading, yes.

8   Q.  But not before then.

9   A.  I would agree with that.

10  Q.  Was this agreement ultimately terminated?

11  A.  Yes, it was.

12  Q.  Do you remember Mr. Bach asked you questions about whether

13  Mr. Trump could just unilaterally walk away from the deal?

14  A.  I do remember him asking, yes.

15  Q.  Do you remember if this was a mutual termination or

16  unilateral termination?

17  A.  I—I know because I see it in writing here.  At the time, I

18  would have to look at it in writing, yeah.

19          MR. SHAHABIAN:  Okay.  So if we could publish

20  Government Exhibit 122.

21  Q.  Do you see this document, Mr. Litinsky?

22  A.  I do.

23  Q.  What is this?

24  A.  This would be the termination of Benessere, the SPAC

25  Benessere.

1          MR. SHAHABIAN:  And if we highlight the first

2     paragraph, Mr. Bianco, if we could blow that up.

3     Q.  Do you see, Mr. Litinsky, where it refers to the

4     termination and mutual release agreement with respect to the

5     letter of intent entered into by Benessere, Trump Media, and

6     Patrick Orlando on or about June 4th?

7     A.  I do see that, yes.

8     Q.  What do you understand this document to be?

9     A.  My understanding is that this is just a way that the

10    parties are saying the Benessere deal is being terminated,

11    being released, we're going our separate way in regards to

12    Benessere.

13    Q.  And is that something that Mr. Trump decided unilaterally

14    or was that a mutual termination?

15    A.  That's a good question.  In the sense—

16    Q.  Let me direct your attention to right below.  It says,

17    "Each of the parties hereby agrees to terminate the LOI by

18    mutual agreement as provided under Section—"

19    A.  That's a better way to say it.

20          MR. BACH:  Judge, objection to the leading.

21          THE COURT:  Overruled, but avoid leading.

22          MR. SHAHABIAN:  Yes, your Honor.

23    A.  I do see this, yes.

24    Q.  What does this mean?

25    A.  I—it would be a mutual agreement.  So if asked was it

1    Donald Trump or was it Patrick Orlando, I would say it was

2    mutual, after reading this.

3            MR. SHAHABIAN:  If we could publish Government

4    Exhibit 120.

5            Sorry.  Government Exhibit 128.  Thank you,

6    Mr. Bianco.

7    Q.  Do you remember this document, Mr. Litinsky?

8    A.  Yes, very well.

9    Q.  What is this?

10   A.  This is the merger agreement, or the cover page, at least.

11   Q.  This is the merger agreement that was signed on what date?

12   A.  October 20th of 2021.

13   Q.  And do you recall Mr. Bach asking you on cross-examination

14   this morning questions about Mr. Trump hesitating before

15   signing this agreement?

16   A.  I do, yes.

17   Q.  Was he under a commitment to sign the agreement before he

18   signed it?

19   A.  No, he was not.

20   Q.  Did you discuss any of Mr. Trump's hesitation with Patrick

21   Orlando or anybody on the DWAC side of the merger negotiations?

22   A.  Can you be more specific about that.

23   Q.  Sure.  So on October 20th, you recall Mr. Bach asked you

24   about a conversation you had with Mr. Trump about "why I should

25   sign this agreement"?

1    A.  Yes, that would have been in Mr. Trump's office in

2    Mar-a-Lago, yes.

3    Q.  Did you tell anyone from DWAC about that before he signed

4    the agreement?

5    A.  When you say when I—there was a period of time when I

6    walked down after that meeting and the room was just a bunch of

7    people.  Could I have mentioned my uncertainty?  That's

8    possible, yes.

9    Q.  Did he ultimately sign the agreement?

10   A.  He did, yes.

11   Q.  Did this agreement cause the merger to actually happen?

12   A.  So the merger is subject to SEC and government

13   effectiveness, so I guess it's parsing of words, but I would

14   say yes, this document is both parties signing and telling the

15   world that the intent is to merge, pending typical government

16   approvals.

17   Q.  When did the parties actually merge?

18   A.  When you say merge, do you mean SEC effectiveness of the S4

19   or do you mean merge as a ticker symbol change?  I'm not trying

20   to be difficult; I just—they could mean different things.

21   Q.  Sure.  I mean when they actually became one company; do you

22   know when that happened?

23   A.  I would think the close, which would be the filing of a

24   Delaware certificate.  To my memory, that happened, I think it

25   was 8:19 a.m. on March 25th of 2024.

1    Q.   2024?

2    A.   Yes.

3    Q.   So several years after this was signed.

4    A.   Yes.

5    Q.   Is it possible for a merger agreement to not go through

6    even after an agreement like this is signed?

7    A.   Can you repeat that.

8    Q.   Sure.  Is it possible that an agreement like this would not

9    result in an actual merger until all the approvals are

10   finalized?

11   A.   Right.  There could be all sorts of reasons why something

12   may not close, so to speak, and the listing would change.

13   There could be many things.

14            MR. SHAHABIAN:  If I could have one moment, your

15   Honor.

16            THE COURT:  Okay.

17            MR. SHAHABIAN:  Nothing further, your Honor.

18            THE COURT:  Mr. Bach?

19            MR. BACH:  Yes.  One moment, your Honor.

20   RECROSS EXAMINATION

21   BY MR. BACH:

22   Q.   Very briefly, Mr. Litinsky.

23   A.   I'm at the Court's pleasure.

24   Q.   Thank you.

25            MR. BACH:  Can we pull up Government Exhibit 122

1    again.

2    Q.  Do you recall Mr. Shahabian just asked you some questions

3    about this document?

4    A.  I do, yes.

5    Q.  Do you see the date on top?  It's September 1, 2021?

6    A.  I do, yes.

7    Q.  And by the way, you don't know—

8         MR. BACH:  Can we go down to the bottom of this

9    document.  Can I just see the bottom of the document for a

10   second.  Keep going to the signature page.

11        Can I see the signature page.

12   Q.  Do you know the date on which this document was actually

13   signed?

14   A.  I would think in mid to late September.

15   Q.  Not on September 1st, correct?

16   A.  I believe that's correct.  That's all in the public

17   disclosures, yeah.

18   Q.  And in fact, if you have good eyesight and you look at that

19   little line towards the bottom of the page, do you see where it

20   says 8:40 p.m., September 21, 2021?

21   A.  I do see that.  I don't know if that's when it was

22   transmitted or signed, but I do see that date.

23   Q.  Well, do you have an understanding that this document was

24   actually backdated?

25   A.  I do now, yes.

1  Q.  Okay.  Now earlier today and yesterday, you were asked

2  questions about during this period of exclusivity, whether

3  Mr. Trump was talking to others about a possible deal.

4  A.  I do remember that, yes.

5  Q.  Now did you know that Mr. Orlando was also talking to

6  people about approaching Trump Media Group through an

7  altogether different SPAC?

8            MR. SHAHABIAN:  Objection.

9            THE COURT:  Sustained.

10 Q.  Do you know whether Mr. Orlando was observing and honoring

11 the so-called exclusivity of this agreement?

12           MR. SHAHABIAN:  Objection.

13           THE COURT:  Sustained.

14           MR. BACH:  Could we have just a brief sidebar.

15           THE COURT:  Sure.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. BACH:  I just—I don't understand the basis so

3  it's hard for me to adjust my questioning.  So it might be that

4  there's no adjustment, but I just want to make sure I

5  understand.

6          THE COURT:  Let me hear from Mr. Shahabian.

7          MR. SHAHABIAN:  The objection is it's a combination of

8  foundation and hearsay if he was actually talking to other

9  people.  It depends how the witness knows that.  If that's

10 because he was told that Patrick Orlando was talking to other

11 people, then that's hearsay.  So to ask him does he know

12 something both calls for how he knows that and whether it's

13 admissible.

14         MR. BACH:  Well, I was asking him an open-ended

15 question to that effect to see if there was a foundation for

16 the questions.  I said, do you know whether Mr. Orlando was

17 talking to other people, and if the answer is no, of course I

18 will stop.

19         THE COURT:  If the answer is yes, the next question

20 would be, how do you happen to know that information as to

21 whether he was talking to other people, and then we'll take it

22 piece by piece?

23         MR. BACH:  Yeah.

24         THE COURT:  All right.

25         MR. BACH:  Okay.

1                  (In open court)

2    BY MR. BACH:

3    Q.  Mr. Litinsky, just let me repeat the question.

4    A.  Okay.

5    Q.  Do you know whether Mr. Orlando was talking to other people

6    or other parties during this exclusivity period?

7    A.  When you say other parties, do you mean other operating

8    companies?

9    Q.  Or other——about having other SPACs approach Trump Media

10   Group.

11   A.  I know from my knowledge Patrick Orlando had one futures

12   SPAC, and we only spoke to that SPAC after it became public.

13   Q.  And that SPAC was DWAC, correct?

14   A.  That's correct, yes.

15   Q.  And this was——this document was backdated from

16   September 21, correct?

17   A.  Well, at the bottom here it says September 21; at the top

18   of the document it says September 1st, that's correct.

19   Q.  Were there discussions between DWAC and Trump Media Group

20   during this so-called exclusivity period?

21   A.  So if I may, if you're asking the question between

22   September 1st and September 21st, were there conversations with

23   DWAC, I would say yes in the sense to my memory, DWAC went

24   public approximately September 8th or 9th and after that point

25   is when the negotiations would happen.

1          MR. BACH:  All right.  Thank you, Mr. Litinsky.

2          THE WITNESS:  Sure.

3          THE COURT:  Mr. Shahabian, anything?

4          MR. SHAHABIAN:  No, your Honor.

5          THE COURT:  You're excused a as a witness.  Thank you.

6          THE WITNESS:  Thank you.

7          (witness excused)

8          THE COURT:  The government will call its next witness.

9          MR. NESSIM:  The government calls Hartley Wasko.

10         THE COURT:  Okay.  Mr. Wasko can be brought into the

11    courtroom and take the witness stand.

12         Mr. Wasko, please step forward into the witness box.

13    And remain standing when you enter the witness box.  My deputy

14    will give you the oath.

15         THE DEPUTY CLERK:  Please raise your right hand.

16         (Witness sworn)

17         THE DEPUTY CLERK:  Thank you.  Please state your full

18    name for the record and please spell out your first and last

19    name.

20         THE WITNESS:  Hartley Wasko.

21         THE COURT:  Mr. Wasko, please try to keep your voice

22    up, speak into the microphone, and please make sure to wait

23    until the questioner is done with the question before you

24    answer.

25         THE REPORTER:  Can you spell your name for me.

1           THE WITNESS:  H-A-R-T-L-E-Y, W-A-S-K-O.

2    HARTLEY WASKO,

3         called as a witness by the Government,

4         having been duly sworn, testified as follows:

5    DIRECT EXAMINATION

6    BY MR. NESSIM:

7    Q.  Good morning, Mr. Wasko.

8    A.  Good morning.

9    Q.  In what city do you live?

10   A.  Denver, Colorado.

11   Q.  How old are you?

12   A.  I'm 31.

13   Q.  And what's your educational background?

14   A.  I have a bachelor's degree from the University of Arizona.

15   Q.  What do you currently do for work?

16   A.  I—excuse me.  I manage a family office.

17   Q.  And what does that mean that you manage a family office?

18   A.  It's another vehicle to make investments through, so I

19   manage a portfolio of investments with just a single family's

20   money.

21   Q.  And what's your title?

22   A.  I'm the manager.

23   Q.  What's the name of your company?

24   A.  The Eleven Fund.

25   Q.  And as an investor with the Eleven Fund, what sort of

1   investments do you make?

2   A.   Primarily investments into private companies, either

3   companies that are more robust and well known, that are private

4   and have plans to do an IPO or a path to some M&A, or we get

5   involved in private companies at a much earlier stage and try

6   to help guide them to that path but in a longer time horizon.

7   Q.   You mentioned private companies.  What is a private

8   company?

9   A.   Private company is a business, a company that's not yet

10  listed on the exchange, the NASDAQ and New York Stock Exchange,

11  something of that nature.

12  Q.   You mentioned IPO.  What is an IPO?

13  A.   IPO is an initial public offering, so that's your

14  transition from private to public.

15  Q.   And for approximately how long have you served in this role

16  as an investor?

17  A.   About 11 years.

18  Q.   Are you familiar with the entity Rocket One?

19  A.   I am.

20  Q.   What is that?

21  A.   That's Michael Shvartsman's investment company.

22          MR. NESSIM:  Mr. Bianco, can you please publish just

23  for the witness and the parties what's been marked for

24  identification as Government Exhibit 2.

25  Q.   Mr. Wasko, do you recognize this exhibit?

O511GAR1                     Wasko - Direct

1   A.  Yes.

2            MR. NESSIM:  Your Honor, I believe a juror raised

3   their hand.

4            JUROR:  We cannot see.

5            THE COURT:  As a reminder, you're not intended to see

6   the exhibits until actually I say it's in evidence, so don't

7   worry about it.

8            JUROR:  Sorry.  I forgot.

9            THE COURT:  No, no.  That's okay.

10           Go ahead.

11  BY MR. NESSIM:

12  Q.  What does this exhibit show, Mr. Wasko?

13  A.  It's a picture of Michael Shvartsman.

14  Q.  Is it a fair and accurate depiction of Mr. Shvartsman?

15  A.  Yes.

16           MR. NESSIM:  The government offers Government

17  Exhibit 2.

18           THE COURT:  Any objection?

19           MR. BACH:  None.

20           THE COURT:  All right.  It's received, and it can now

21  be published to the jury.

22           (Government's Exhibit 2 received in evidence)

23           MR. NESSIM:  May I have one moment, your Honor.

24           THE COURT:  Of course.

25           (Continued on next page)

1  BY MR. NESSIM:

2  Q.  Mr. Wasko, you mentioned this is Mr. Shvartsman.  How did

3  you meet Michael Shvartsman?

4  A.  I met Michael through a company we were both mutually

5  invested in, and they introduced us.

6  Q.  What company was that?

7  A.  It's called Gopuff.

8  Q.  Approximately when was that introduction?

9  A.  Mid 2018, I believe.

10  Q.  And why were you introduced to Mr. Shvartsman?

11  A.  Just people that had like-minded interests into what they

12  were looking to invest in.  So people thought that there would

13  be some synergies there for business.

14  Q.  What do you understand about Michael Shvartsman's business

15  line of work?

16  A.  I understand that he's very successful and he has a core

17  focus outside of these investments.  And then my understanding

18  was that, you know, this Rocket was more of a family office for

19  him to invest in other businesses.

20  Q.  From the time that you met Mr. Shvartsman in 2018, what

21  sort of relationship did you develop with him?

22  A.  We became -- so we started investing in one private company

23  alongside each other.  From there, we continued to speak,

24  enhance our relationship.  We became pretty close.  We bounced

25  ideas off each other a lot.  A lot of potential opportunities,

1    always trying to see if we were looking at things a similar way

2    or there was an appetite to invest in something.  And, yeah, an

3    ongoing direct line of communication.

4    Q.  What's the rough type and number of investments that you

5    made alongside Rocket One?

6    A.  A handful.  But somewhere between 5 and 10ish.

7    Q.  In fall of 2021, approximately how frequently were you

8    speaking with Michael Shvartsman?

9    A.  In 2021, we were speaking on a regular basis, multiple

10   times a week, showing each other potential opportunities.

11              MR. NESSIM:  Mr. Bianco, you can take this down

12   please.  Can you publish just for the witness what's been

13   marked as Government Exhibit 1.

14   Q.  Mr. Wasko, do you recognize the person in this photograph?

15   A.  Yes.

16   Q.  Who is it?

17   A.  It's Bruce Garelick.

18   Q.  Is it a fair and accurate depiction of Mr. Garelick.

19   A.  Yes.

20              MR. NESSIM:  The government would offer Government

21   Exhibit 1.

22              MR. BACH:  No objection.

23              THE COURT:  It's received.

24              (Government's Exhibit 1 received in evidence)

25              MR. NESSIM:  Mr. Bianco, we can publish this to the

1    jury please.

2    Q.  Mr. Wasko, how do you know Mr. Garelick?

3    A.  I met him through Michael because he was working with

4    Michael.

5    Q.  Do you see Mr. Garelick in the courtroom today?

6    A.  Yes.

7    Q.  Can you please just identify him based on where he's

8    sitting or an item of clothing that he's wearing.

9    A.  I can't see clothing, but I see him in the back.  There he

10   is.

11           THE COURT:  The record should reflect the witness has

12   identified the defendant.

13   Q.  Mr. Wasko, you mentioned he worked with Michael Shvartsman.

14   Approximately when did you meet him?

15   A.  I met him in 2021, I believe.

16   Q.  In what capacity did he work with Michael Shvartsman?

17   A.  He was the CIO.  That was my understanding, at least, of

18   the investment business.

19   Q.  What does CIO mean?

20   A.  Chief investment officer.  He was really the brains,

21   experience, on a lot of these types of investments and

22   projects.

23   Q.  What sort of context would you interact with Mr. Garelick?

24   A.  Pretty regularly, as well.  I used him to bounce ideas off

25   of, as well, due diligence on potential opportunities semi

O51Cgar2                    Wasko - Direct

1    frequently.  I utilized him for his diligence as much as I

2    could.

3            THE COURT:  Mr. Nessim, your questions previously were

4    what capacity did Michael Shvartsman have.  Michael Shvartsman

5    was the chief investment officer.  Was that what you intended

6    to ask?

7            MR. NESSIM:  No, I'm sorry.  In what capacity did he

8    work with Michael Shvartsman, I thought was the question.

9            THE COURT:  Okay.  Go ahead.

10   Q.   Sorry.  What was Mr. Garelick's role with Michael

11   Shvartsman's business?

12   A.   The chief investment officer.

13   Q.   You and you mentioned you would speak with him frequently

14   and bounce ideas off of him.  What was your impression of

15   Mr. Garelick over the course of those conversations?

16   A.   My impression was he was extremely sharp, extremely

17   experienced, well versed in his process, and just a great mind

18   to be able to work through things with.

19           MR. NESSIM:  Mr. Bianco, you can take this down and

20   please publish just for the witness what's been marked as

21   Government Exhibit 3.

22   Q.   Mr. Wasko, do you recognize the person in this photograph?

23   A.   I do.

24   Q.   Who's that?

25   A.   That's Gerald Shvartsman.

1  Q.  Is that a fair and accurate depiction of Gerald Shvartsman?

2  A.  It is.

3          MR. NESSIM:  The government offers Government

4  Exhibit 3.

5          MR. BACH:  No objection.

6          THE COURT:  Received.

7          (Government's Exhibit 3 received in evidence)

8          MR. NESSIM:  Mr. Bianco, please publish that for the

9  jury.

10  Q.  Mr. Wasko, you mentioned this is Gerald Shvartsman.  How

11  did you meet Gerald Shvartsman?

12  A.  I met him through Michael.

13  Q.  What's the relationship between Michael and Gerald

14  Shvartsman?

15  A.  They're brothers.

16  Q.  And do you know what Gerald Shvartsman does for work?

17  A.  Yes.  He's in the furniture business.

18          MR. NESSIM:  Mr. Bianco, you can take that down,

19  please.

20  Q.  Mr. Wasko, are you familiar with the name Eric Cornelius?

21  A.  I am.

22  Q.  Who is that?

23  A.  Another friend, business associate of Michael's.

24  Q.  Turning your attention to around June of 2021, what, if

25  any, investment opportunity did Michael Shvartsman bring to

1   your attention?

2   A.  The opportunity in June was the opportunity to invest in

3   the founder shares of DWAC, this SPAC.

4   Q.  So just to break down some of that.  You mentioned DWAC.

5   What is DWAC?

6   A.  DWAC was the four letter symbol.  It was digital world

7   acquisition company, I believe.  It's a SPAC that was very

8   prevalent in 2021.  A lot of SPACs were trading in the market.

9   Q.  And what's a SPAC?

10  A.  A SPAC is essentially an empty shell company that has a

11  treasury of capital.  Their job is to find a private company to

12  acquire and merge them into their shell, essentially.

13  Q.  And you mentioned that Michael Shvartsman approached you

14  about a founder share investment.  What are founder shares?

15  A.  Founder shares are an opportunity to invest in that SPAC at

16  an earlier round, which means at a cheaper price.  There was an

17  interesting opportunity given the time in the market.

18  Q.  When Mr. Shvartsman approached you about this deal, what

19  did he tell you about DWAC?

20  A.  He told me that we would have a call and hear the pitch,

21  essentially.

22  Q.  And so, what happened next with relation to a possible

23  investment in DWAC?

24  A.  There was a call scheduled and it was led by the people

25  directly from DWAC.  The person that led the pitch, his name

1    was Patrick Orlando.  We heard out what his plan was.

2    Q.  Approximately when was that call?

3    A.  That was late -- the latter half of June in 2021.

4    Q.  Do you remember who was on that call in addition to

5    yourself and Patrick Orlando?

6    A.  I know Michael was on it.  I know other people were on it,

7    but Michael is the one I know for sure.

8    Q.  What happened during that call?

9    A.  Well, we heard that the target was the Trump social media

10   platform and that, you know, he was very confident in his

11   pitch, that that was really the main target, and he was

12   confident that that was going to be the case.  It was just

13   really about how great of an opportunity this was and we should

14   be excited.

15   Q.  The Trump social media platform, do you know what that

16   company was called?

17   A.  Truth Social.

18   Q.  Do you remember more specifics about what Mr. Orlando was

19   saying or how he was saying it?

20   A.  I mean, he was very confident, like I said, almost -- I

21   mean, arrogant to the point where he was just, like, this was

22   really our target.  And he was convicted that that's the only

23   path forward that they needed to be talking about.

24   Q.  Were other potential targets mentioned during that

25   conversation?

O51Cgar2                    Wasko - Direct

1   A.  I don't remember.

2   Q.  What, if anything, did you sign as part of this meeting or

3   phone call?

4   A.  We signed NDAs.

5           MR. NESSIM:  Mr. Bianco, can you please publish what's

6   in evidence as Government Exhibit 212.  You can just zoom into

7   the top of this agreement, maybe the first two paragraphs.

8   This is a document entitled "Confidentiality Agreement."

9   Q.  Just turning your attention to the first paragraph there --

10          MR. NESSIM:  Mr. Bianco, if you could just highlight

11  that.

12  Q.  Mr. Wasko, who's this confidentiality agreement between?

13  A.  Benessere Capital Acquisition Corp. and myself.

14  Q.  Do you know what Benessere Capital Acquisition Corp. is?

15  A.  Not exactly.  I know it was either a parent company or the

16  affiliated company with DWAC.

17          MR. NESSIM:  Mr. Bianco, can we just turn to the last

18  page of this exhibit, please.

19  Q.  Whose signatures are these on the agreement?

20  A.  Patrick Orlando and myself.

21          MR. NESSIM:  Mr. Bianco, you can take that down,

22  please.

23          Can you please publish what's in evidence as

24  Government Exhibit 211.  Let's just zoom into the top of this,

25  please.

 1          Mr. Bianco, can you take this down for one moment.

 2          Mr. Bianco, you can publish Government Exhibit 211

 3   again.  Let's just zoom into the top here.

 4   Q.  Who is this confidentiality agreement between?

 5   A.  Arc global investments, Digital World Acquisition Corp, and

 6   myself.

 7   Q.  Do you know what ARC Global Investments is?

 8   A.  Yes.  That was the vehicle that the founder shares were

 9   invested into.

10   Q.  And just generally, what are these two agreements that we

11   just looked at?

12   A.  They're confidentiality agreements that essentially are

13   saying you can't talk about what you were just pitched on or

14   heard about or invested in, and you can't circumvent them.

15   It's just -- it's between you and the group on the call,

16   essentially.

17   Q.  Are confidentiality or nondisclosure agreements like this

18   common in your business?

19   A.  Yes.

20          MR. NESSIM:  Mr. Bianco, can you zoom out and turn to

21   the last page of this exhibit.

22   Q.  Who signed this agreement?

23   A.  Patrick Orlando and myself.

24          MR. NESSIM:  Mr. Bianco, we can take this down,

25   please.

O51Cgar2                        Wasko - Direct

1    Q.  Mr. Wasko, what is your understanding of the nature of the

2    information that you learned over the course of this phone

3    call?

4    A.  My understanding was that this company had a plan to

5    acquire Truth Social, and we had the opportunity to invest in

6    the founders round of it.  Really, that was the basis of the

7    call.

8    Q.  What was your understanding about whether that information

9    was something generally available or confidential?

10   A.  It was confidential.

11              MR. NESSIM:  At this time, your Honor, I'd like to

12   offer a stipulation between the parties as joint exhibit 2.  It

13   pertains to email communications.

14              THE COURT:  Okay.

15              MR. NESSIM:  No objection?

16              Is it received, your Honor?

17              THE COURT:  It's received.

18              (Joint Trial Exhibit 2received in evidence)

19              MR. NESSIM:  You can publish this to the jury, please,

20   Mr. Bianco.  I'll take a moment to summarize this.

21              This is a stipulation between the government and

22   Mr. Garelick relating to emails and communications.  I'll just

23   read that, in paragraph 1, a number of communications that are

24   identified there, Government Exhibits 204, 207, 210, 213, and

25   400 through 488 are true and correct copies of email

1    communications, and that the sender, recipient date and time

2    information in those exhibits are true and correct

3    representations of those data fields in the relevant accounts.

4         Mr. Bianco, if you can turn to page 2.  This is signed

5    by the parties, dated April 30th.

6         We can take this down, please.

7         At this time, the government would offer a number of

8    those email exhibits.

9         Mr. Bianco, can you please publish just for the

10   witness and the parties what's been identified as Government

11   Exhibit 409.  If you can zoom into the portion of this page

12   that has "content."

13        The government offers Government Exhibit 409.

14        THE COURT:  Any objection?

15        MR. BACH:  None.

16        THE COURT:  Received.

17        (Government's Exhibit 409 received in evidence)

18        MR. NESSIM:  Let's publish this to the jury, please,

19   Mr. Bianco.

20   Q.  Mr. Wasko, turning your attention to this exhibit on the

21   screen, this is an email.  Who is it from?

22   A.  It's from Bruce Garelick.

23   Q.  What's Mr. Garelick's email address?

24   A.  Bruce@rocketonecapital.com.

25   Q.  Who is it sent to?

1  A.  To myself.

2  Q.  What was the date of this email?

3  A.  June 24th, 2021.

4  Q.  What is the subject line?

5  A.  Heart dash Trump SPAC.

6  Q.  What is Trump SPAC a reference to?  What was your

7  understanding of what a Trump SPAC was a reference to?

8  A.  The founder shares from the call we had.

9  Q.  Why did you understand that Trump SPAC meant that call?

10  A.  Because that was the target from the call.

11  Q.  And then the message here says, Hart, we are finalizing our

12  investment in this SPAC.  Parenthesis, founder shares and IPO

13  shares.  Michael, parenthesis, Rocket One, is inclined to

14  invest 800k split evenly between the $4 founder shares and the

15  $10 IPO shares.  Please let me know if you want to invest in

16  sizing.  Feel free to call me if you want to discuss further.

17  Thanks, Bruce.

18          What's your uncles of what Bruce was asking in this

19  email or Mr. Garelick was asking in this email?

20  A.  He was asking for commitments of interest into the founders

21  share opportunity.  He was explaining what Rocket was prepared

22  to do.

23  Q.  Why was he asking you for your interests?

24  A.  Because I was on that call.

25          MR. BACH:  Objection.

O51Cgar2                    Wasko - Direct

1      THE COURT:  What was your understanding as to why he

2  was asking you.  Go ahead.

3  A.  My understanding was that because I was on the call, if I

4  was interested in participating or not.

5  Q.  What happened next in relation to DWAC after this phone

6  call and email?

7  A.  Afterwards, you know, similar conversations with Michael

8  and/or Bruce, just understanding the opportunity and deciding

9  if I was going to participate or not.

10  Q.  What did you decide to do?

11  A.  I ended up deciding to make the investment and, yeah.

12      MR. NESSIM:  Mr. Bianco, you can take this exhibit

13  down, please.

14  Q.  How did you communicate that you decided to make the

15  investment?

16  A.  I believe both verbally and the email.

17      MR. NESSIM:  Mr. Bianco, can you please pull up just

18  for the witness and parties what's been marked for

19  identification as Government Exhibit 410.

20      Mr. Bianco, can you scroll up to the page 2 of 3,

21  please.

22      MR. BACH:  No objection.

23      THE COURT:  Received.

24      (Government's Exhibit 410 received in evidence)

25      MR. NESSIM:  If you can blow up the portion of this

O51Cgar2                    Wasko – Direct

1    email from the header information to the sign-off from the

2    person --

3              THE COURT:  It's received in evidence.  Do you want it

4    to be published to the jury?

5              MR. NESSIM:  Yes.  Excuse me.  Please publish it,

6    Mr. Bianco.

7    Q.  Mr. Wasko, just turning your attention to this email here.

8    Can you read who sent this email.

9    A.  Horacio Cruz.

10   Q.  What was the date of the email?

11   A.  June 28th, 2021.

12   Q.  Can you read the parties who it was sent to?

13   A.  To patrick Orlando, Bruce Garelick, and it was cc'd to a

14   bunch of people, myself being one of them.

15   Q.  If you can read those names.  Who else was on the cc line?

16   A.  Patrick Orlando, Hartley Wasko, Michael Shvartsman, Natalie

17   Salume, Marc Wachter, Alex Monje, and I believe that's it.

18   Q.  And what's the subject line of the email?

19   A.  Patrick – Rocket One Capital – investment followup.

20   Q.  And the email is addressed, Dear Bruce and Rocket One team.

21   What did you understand that address meant?

22   A.  That it was to everyone from the call, or I'm assuming

23   everyone from the call, that was being introduced from or by

24   Rocket One.

25   Q.  That's the Rocket One team?

1  A.  Right.

2  Q.  The email says, to recap your investment in ARC Global

3  Investments II LLC, 1, 1.5M investment in the sponsor promote

4  at a $4 price per share, resulting in LLC interests equivalent

5  to 375,000 founder shares, parenthesis, class B stock.  Do you

6  know what that means?

7  A.  I believe that just is confirming the total investment for

8  the entire founders share round.

9  Q.  For the Rocket One team?

10  A.  Right.

11  Q.  That's total investment of $1.5 million at a $4 price per

12  share?

13  A.  Right.

14  Q.  And that is equivalent to 375,000 founder shares?

15  A.  That's correct.

16  Q.  And then it has point 2 is bonus of LLC interests

17  equivalent to 50,000 founder shares class B stock.  And then

18  point 3, one board seat on the SPAC.  What did you understand

19  that meant?

20  A.  I understood that meant that a requirement for the

21  investment was to have someone from the Rocket side sit on the

22  board of the SPAC.

23  Q.  Was that board seat actually obtained as part of Rocket

24  One's investment?

25  A.  Yes, by Bruce.

1    Q.  What was by Bruce?

2    A.  He was on the board.  He was the one that took the seat.

3    Q.  And what is your understanding or what was your

4    understanding as to why Mr. Garelick was able to take that

5    seat?

6              MR. BACH:  Objection.  Lack of foundation.  Vague.

7              THE COURT:  Sustained.  Why don't you establish a

8    foundation.

9    Q.  So just to take you back to this email.  Mr. Cruz writes

10   that, to recap your investment, one feature, No. 3, is one

11   board seat on the SPAC.  Did you have any understanding as

12   to --

13             First of all, just to repeat again, what does that

14   mean, one board seat on the SPAC?

15   A.  Means that Rocket could appoint someone to the board as a

16   requirement in order to finalize their investment for the

17   founders round.

18   Q.  Did you have an understanding as to why Rocket or Rocket

19   One was able to appoint someone to the board or why they were

20   able to get this condition?

21   A.  Yes.  I mean, it was -- when you make investments, there's

22   a lot of cases where, you know, you're expecting one thing, but

23   it goes a different way, and this was an added layer of

24   protection to ensure that there was nothing, you know, not that

25   we signed up for that could be going down.  It just is an extra

1   set of eyes to make sure that we were going to be further

2   protected.

3           MR. NESSIM:  Mr. Bianco, you can take this down,

4   please.

5           Can you please just publish for the witness and

6   parties what's been marked as Government Exhibit 433.

7           The government offers Government Exhibit 433.

8           THE COURT:  Any objection, Mr. Bach?

9           MR. BACH:  No.

10          THE COURT:  Received.

11          (Government's Exhibit 433 received in evidence)

12          MR. NESSIM:  Mr. Bianco, can you please publish this

13  to the jury.

14  Q.  Mr. Wasko, who is this email from?

15  A.  From Bruce.

16  Q.  Who is it to?

17  A.  To myself.

18  Q.  What's the date of this email?

19  A.  June 30th, 2021.

20  Q.  Who is in the cc line of this email?

21  A.  Patrick Orlando, Alex Monje, Horacio Cruz, Natalie Salume,

22  Michael Shvartsman.

23  Q.  And what is it that Bruce wrote to you?

24  A.  Hartley, I am pleased to introduce you to the team at

25  Digital World Acquisition Corp.  They will guide you through

1    the investor subscription process.  I have you down for 250K of

2    the founder shares class B stock and 250Kist IPO stock class A.

3    Note you have the option of the $4 class B stock we discussed

4    or alternatively a $5 class B founder stock with a 45-day

5    notice redemption notice.  Difference between the two being

6    some added liquidity in exchange for a higher price.  You can

7    follow up with the DWAC team directly if you have any

8    questions.  Of course, feel free to give me a call if you want

9    to discuss further.  Best, Bruce.

10   Q.  Just turning your attention to the second paragraph of this

11   email.  I have you down for 250K of the founder shares and 250K

12   of the IPO stock.  What does that mean?

13   A.  That was just confirming my investment that I committed to

14   in the founders shares of DWAC.

15   Q.  And what investment did you actually end up making in DWAC?

16   A.  I only ended up doing the founder shares.  I did not end up

17   doing the IPO shares additionally.

18   Q.  And approximately what portion of founder shares or what

19   value of founder shares?

20   A.  250,000.

21         MR. NESSIM:  Mr. Bianco, we can take this exhibit

22   down, please.

23         Can you please publish for the witness and parties

24   what's been marked as Government Exhibit 484.

25         Mr. Bianco, can you turn to the second page, please.

1          MR. BACH:  No objection.

2          THE COURT:  Received.

3          (Government's Exhibit 484 received in evidence)

4          MR. NESSIM:  Mr. Bianco, please publish this for the

5    jury and let's just highlight the top email there.  Not

6    highlight.  Zoom in, please.

7    Q.  Mr. Wasko, who is this email from?

8    A.  From Hartley Wasko, myself.

9    Q.  Who is it to?

10   A.  Alex Monje and Bruce.

11   Q.  What's the date of this email?

12   A.  July 7th, 2021.

13   Q.  Just generally speaking, what is it that you're

14   communicating in this email?

15   A.  I'm confirming the 250,000 into the founder shares at the

16   $5 option.  Then I ask a question about an alternative way of

17   doing the IPO shares which ultimately did not end up happening,

18   which is why I didn't go through with that investment.

19          MR. NESSIM:  Mr. Bianco, you can take this exhibit

20   down, please.

21   Q.  Mr. Wasko, of the founder shares that you invested, do you

22   know whether or not there were any limitations on how you could

23   sell those shares?

24   A.  Well, yes.  Essentially, it was like investing in a private

25   company.  I mean, there was no way to sell them.  And then,

1    until the SPAC merged with the company, there would still be no

2    way.  And so, there was an ongoing lockup, so to speak, on all

3    of your stock.

4    Q.  So you said, first of all, an investment in a private

5    company, there's no way to sell it.  What do you mean by that?

6    A.  I mean there's -- you don't really have your shares.  You

7    just have, you know, your receipt, so to speak.  You can't sell

8    your shares until you actually receive them, and that doesn't

9    happen until it's publicly listed and freely tradeable.

10   Q.  And in this case, did DWAC become publicly listed?

11   A.  It did, but it was not -- it wasn't freely tradeable yet.

12   Q.  Why were your founder shares not freely tradeable after

13   public listing?

14   A.  Because it was contingent upon the SPAC consummating a

15   merger with a private company.

16   Q.  And you mentioned the term "lockup."  What does "lockup"

17   mean in context of stocks?

18   A.  "Lockup" means you're restricted from being able to sell

19   your investment.

20   Q.  Is that a formal restriction or how does that come into

21   play?

22   A.  So, yeah, you don't even have your shares in your account

23   most of the time, at least that I'm aware of when you're locked

24   up.  So, while you can look at it trading on the exchange,

25   there's really nothing actionable you can do.

O51Cgar2                    Wasko – Direct

1    Q.  Do you still own the founder shares of DWAC?

2    A.  Yes.

3    Q.  Are you aware of what the lockup terms are on those shares?

4    A.  Not fluently or exactly, but I know it's going to be a

5    little while longer.

6    Q.  And what, if any, event is what started the clock on your

7    lockup term?

8    A.  So that's the part that I still don't entirely understand.

9    I believe it's when the merger took place and the symbol

10   changes from DWAC to now it's DJT, and that starts the clock.

11   Throughout the process, you know, I wasn't 100 percent sure if

12   that's it, but now I'm fairly certain that's what started the

13   clock.

14   Q.  What are some of the considerations about holding stock

15   that's subject to a lockup term?

16            MR. BACH:  Objection.

17            THE COURT:  Where is this going?  Relevance?

18            MR. NESSIM:  Can I approach, your Honor, and make a

19   proffer on that?

20            THE COURT:  Okay.

21            (Continued on next page)

22

23

24

25

1           (At the sidebar)

2           MR. NESSIM:  Your Honor, the evidence will show that

3    the Rocket One investment team, Mr. Garelick, Mr. Shvartsman

4    were very focused on the liquidity that would come through the

5    open market warrants and investments that they made, and that

6    the lockup terms of the founder shares was a reason why they

7    wanted to diminish their founder share investment and emphasize

8    their market investments.  It provides an explanation of

9    partially the motives for why the insider trading took place

10   and why they wanted to buy the shares on the open market.

11          And so, to explain from an investor who is experienced

12   in investment and shares lockup conditions, sort of the general

13   considerations that you might make while weighing potential

14   investment opportunities subject to lockup conditions is

15   relevant to additional evidence in this case.

16          THE COURT:  What do you expect him to testify to?

17          MR. NESSIM:  I think he'll say generally, when you're

18   weighing a lockup investment, you understand that there's a

19   risk that there's a time when you want to sell the stock for

20   some reason and you can't, and you'll either watch the market

21   run away from you or you'll see the market collapsing and you

22   can't sell it and you're sort of bound by the terms of the

23   lockup.  I'm not sure he'll say it exactly in those words

24   but --

25          MR. BACH:  We object.  He's not here to give his

1    opinions or provide explanatory background.  He can explain his

2    conduct.  The motive for the insider trading is not relevant,

3    certainly not Mr. Shvartsman's insider trading.  I just think

4    this is beyond the scope of relevance in this case.  We should

5    keep this home to the bone.

6            THE COURT:  Overruled.  You can do it.

7            MR. NESSIM:  Thank you.

8            (Continued on next page)

1           (In open court)

2    BY MR. NESSIM:

3    Q.  Mr. Wasko, turning back to lockup conditions.  As an

4    investor what are some of the considerations that you make when

5    assessing an investment subject to lockup conditions.

6    A.  Some considerations I take is really what price you're --

7    what value you're getting involved with at.  When there's a

8    lockup, the assumption, a lot of the times, is it's not going

9    to be where it is by the time your lockup is lifted.  So, some

10   considerations you take are often you want to make sure you

11   have -- you're getting in at a point where you have enough room

12   to where you can watch it and, you know, not pull your hair

13   out.

14   Q.  When you say, "watch it and not pull your hair out," what

15   do you mean by that?

16   A.  Watch it and watch it on the public market exchange, it's

17   coming across CNBC, and you want to be able to probably, you

18   know, sell your position at a certain point, especially when

19   it's up a lot.  So not pull your hair out meaning if it comes

20   down, you're still comfortable knowing that it's profitable in

21   some form or fashion.

22   Q.  Because when there's a lockup, you can't sell --

23           MR. BACH:  Objection.

24           THE COURT:  Sustained.

25           MR. NESSIM:  I'll withdraw it.

1    Q.  Mr. Wasko, are you familiar with the term "warrant" in

2    reference to the stock market?

3    A.  I am.

4    Q.  Just generally speaking, what's a warrant?

5    A.  A warrant is like a free option that is, you know, given to

6    some investments as a way to make the offering more attractive.

7    So it gives you the option to purchase more equity of your

8    original investment at -- most of the time your original pry

9    price at later date.  So if the company does extremely well,

10   you can exercise that option and add more to your position at a

11   lower price.

12   Q.  And what, if anything, did you learn about investing in

13   DWAC warrants specifically?

14   A.  Well, knew that with DWAC, there were warrants that were

15   trading separately, and I know that Michael purchased some or

16   invested in some and, you know, floated the idea that it was

17   smart and a good way to add onto the position.

18   Q.  Sorry.  Who floated that idea?

19   A.  Michael Shvartsman.

20   Q.  Generally, what did he say to you about that?

21   A.  That he likes them, he's going to purchase them, and

22   they're worth taking a look at.

23   Q.  Did you buy DWAC warrants?

24   A.  No.

25   Q.  Why not?

1   A.  Because, I mean, for a few reasons, but being that it

2   wasn't necessarily sure that anything they were saying was

3   actually going to happen, and another because I wasn't really

4   sure about what I could and could not be doing.

5   Q.  Did there come a time when a potential merger target for

6   DWAC was announced?

7   A.  Yes.

8   Q.  Can you walk us through that?  What happened?

9   A.  It was in the morning and on CNBC, the news came out that

10  DWAC was merging with Trump social media platform, and the

11  stock went crazy, it went up a lot.  It was a very exciting

12  morning.  It was a very fun morning.  A lot of high fives,

13  phone calls.  Everyone was pumped up.

14  Q.  When was it that you actually learned that the merger had

15  closed or been finalized?

16  A.  When I saw it on CNBC that day.

17  Q.  And just what happened to the share price that day once it

18  was announced?

19  A.  It went up a lot.

20          MR. NESSIM:  One moment, your Honor.

21  Q.  Were you able to sell your founder shares on the day the

22  price went up, the day of the announcement?

23  A.  No.

24          MR. NESSIM:  Nothing further, your Honor.

25          THE COURT:  Cross examination.

1  CROSS-EXAMINATION

2  BY MR. BACH:

3  Q.  Good midmorning, Mr. Wasko.  I'm Jonathan Bach.  I'm Bruce

4  Garelick's attorney.  I think you testified that you met

5  Michael Shvartsman before you heard the name Bruce Garelick;

6  correct?

7  A.  That's correct.

8  Q.  And that was in mid 2018; correct?

9  A.  That's correct.

10  Q.  And you were impressed by Mr. Shvartsman; correct?

11  A.  Sorry.  Excuse me.  What was the word?

12  Q.  You were impressed by Mr. Shvartsman?

13  A.  Yeah, I was intrigued.

14  Q.  Intrigued enough to continue to do some -- explore some

15  business with him?

16  A.  Absolutely.

17  Q.  And you found him smart and knowledgeable; correct?

18  A.  Yes.

19  Q.  You liked to bounce ideas off of him; correct?

20  A.  Yes.

21  Q.  And this was all before Mr. Garelick had joined him at

22  Rocket One; correct?

23  A.  Yes.

24  Q.  You also would, from time to time, go to Miami and meet

25  socially with Mr. Shvartsman; correct?

1    A.  Correct.

2    Q.  And you were shown a picture of his brother, Gerald;

3    correct?

4    A.  Yes.

5    Q.  Gerald sells furniture, he's not in the investment

6    business; right?

7    A.  As far as I know, yes.

8    Q.  But you recognize Gerald because you met him at some of

9    these social events; correct?

10   A.  Correct.

11   Q.  And you also met another friend of Michael's named Anton

12   Postolnikov; correct?

13   A.  That's correct.

14   Q.  And that was also at a birthday party, a social event;

15   correct?

16   A.  That's correct.

17   Q.  And you, in terms of the business relationship that you

18   developed with Michael Shvartsman, that for the most part

19   involved Mr. Shvartsman investing in opportunities that you

20   arranged; correct?

21   A.  There were both.

22   Q.  For instance, Mr. Shvartsman invested in some of your

23   special purpose vehicles; correct?

24   A.  That's correct.

25   Q.  For example, Airbnb; correct?

1   A.  That's correct.

2   Q.  And again, that was before Mr. Garelick was affiliated with

3   Michael Shvartsman in any shape, manner, or form; correct?

4   A.  That's correct.

5   Q.  And Michael Shvartsman made those investment decisions on

6   his own; correct?

7   A.  As far as I know, yes.

8   Q.  And he was, in fact, quite successful before he started to

9   employ Mr. Garelick; correct?

10  A.  That's my understanding, yes.

11  Q.  And when you came into contact with Mr. Garelick, you were

12  impressed by what he added; correct?

13  A.  Absolutely.

14  Q.  You described his brains and experience just now; correct?

15  A.  Yes.

16  Q.  He added a level of analytic rigor and thinking to the

17  investment process; correct?

18  A.  Agreed.

19  Q.  You and Michael were good at picking ideas, but then he

20  would look at them from an analytical perspective; correct?

21  A.  Yes.

22  Q.  He would crunch numbers?

23  A.  Right.

24  Q.  He would gather information about a public project;

25  correct?

1    A.  Correct.

2    Q.  And he would look at that public information and add value

3    to the thought process that you and Mr. Shvartsman were engaged

4    in; correct?

5    A.  Yes.

6    Q.  And you were impressed by his work?

7    A.  Yes.

8    Q.  Let's go now, move the clock forward to June 2021.

9    Mr. Shvartsman contacts you about a SPAC opportunity then;

10   correct?

11   A.  Correct.

12   Q.  That's just Mr. Shvartsman; correct?

13   A.  That's correct.

14   Q.  And you testified a moment ago that when Mr. Shvartsman

15   raised it with you, you found it an interesting opportunity

16   given the time in the market; correct?

17   A.  Correct.

18   Q.  And the reason it was interesting at that time in the

19   market was because SPACs were trending at that time in the

20   market; correct?

21   A.  That's correct.

22   Q.  And SPACs were something that, a few years before, were not

23   used as frequently; correct?

24   A.  As far as I understand, yes.

25   Q.  But when we get to '20 and '21, SPACs are a phenomenon that

1    everyone's noting; correct?

2    A.   Correct.

3    Q.   And you were intrigued by that; correct?

4    A.   Correct.

5    Q.   And the reason you were intrigued by that was because many

6    SPACs were doing very well; correct?

7    A.   Correct.

8    Q.   In other words, if you got in in the founders round when

9    the SPACs combined with a target operating company and a merger

10   was announced, these SPACs in '20 to '21 seemed to have an

11   incredible track record of performance; correct?

12   A.   I don't know all of them by any means, but yes, they were

13   definitely a successful endeavor during that time period.

14   Q.   And that was public information; correct?

15   A.   Yes.

16   Q.   That was reported about in the trade press; correct?

17   A.   I assume, yes.

18   Q.   As an investor, you knew about that; correct?

19   A.   I did.

20   Q.   Going back to June 2021 when Michael Shvartsman contacted

21   you, what he did was he arranged to get you on the phone with

22   Patrick Orlando; correct?

23   A.   That's right.

24   Q.   And he made arrangements and you did come to speak to

25   Mr. Orlando?

1    A.  Yes.

2    Q.  And that was on June 22; right?

3    A.  I don't know the exact date.

4    Q.  You were shown a confidentiality agreement a few moments

5    ago.

6    A.  Uh-huh.

7    Q.  That was sent to you after the phone call with Mr. Orlando;

8    correct?

9    A.  I'm not 100 percent sure on that, no.

10           MR. BACH:  Let's pull it up.  Can we pull up

11   Government Exhibit 211.

12   Q.  You see what the date is it at the top, June 27?

13   A.  Yes.

14   Q.  Isn't that after your phone call with Mr. Orlando --

15           MR. NESSIM:  Objection.

16           THE COURT:  Basis.

17           MR. NESSIM:  Assumes facts not in evidence.

18           THE COURT:  Overruled.  It's just a question.  Go

19   ahead.

20   A.  Will you repeat the question.

21   Q.  Sure.  Do you see how it says June 27, 2021?

22   A.  Yes.

23   Q.  Is that after your call with Mr. Orlando on or around June

24   22?

25   A.  Yeah, I believe so.

O51Cgar2                    Wasko - Cross

1   Q.  And when you are on the phone with Mr. Orlando, nobody

2   mentioned confidentiality; correct?

3   A.  I don't remember.

4   Q.  Well, let me see if I can refresh your recollection.

5           MR. BACH:  One moment.  I apologize.

6           (Pause)

7           Ms. McFerrin, can you show just the witness,

8   Mr. Wasko, 35157 at page 2, the third full paragraph.

9   Q.  Sir, I'm referring you to the third full paragraph on the

10  page.  Take a minute to read it, including all the way to the

11  very end.

12  A.  I see this.  Again, I don't remember saying it or exactly

13  on the call, but I see it in these notes.

14          THE COURT:  Why don't you wait until there's a

15  question.

16  Q.  Having seen that document, does that now refresh your

17  recollection that no one mentioned confidentiality on the call?

18  A.  Again, I don't remember anyone mentioning a confidentiality

19  agreement.

20  Q.  As you sit here today, you have no recollection of anyone

21  mentioning confidentiality?

22  A.  No.

23  Q.  Is that correct?

24  A.  No, I do not.

25  Q.  And Mr. Orlando was the guy leading the meeting; correct?

O51Cgar2                    Wasko - Cross

1    A.  Correct.

2    Q.  And he talked about some of his plans with respect to Trump

3    Social and Trump Media Group; correct?

4    A.  Correct.

5    Q.  Correct?

6    A.  Correct.

7              THE COURT:  You have to, sir, try to keep your voice

8    up.

9              THE WITNESS:  Correct.

10   Q.  And you listened to everything he had to say; correct?

11   A.  Yes, I tried.

12   Q.  And you thought it was a sales pitch and that the deal

13   could easily not happen; correct?

14   A.  Correct.

15   Q.  In fact, you described him as cocky and confident; correct?

16   A.  Correct.

17   Q.  But you were skeptical; correct?

18   A.  Correct.

19   Q.  And during the call, he also referred to some other backup

20   plans in case his aspirations with Trump Media Group just

21   didn't come through; correct?

22   A.  I believe so.

23   Q.  Now, let me show you Government Exhibit 409.  I think you

24   just saw it a moment ago.  Let me pull it back up on the

25   screen.

1          Do you remember you were shown and asked some

2    questions about this document just a moment ago?

3    A.   Yes.

4    Q.   And this is an email from Bruce Garelick to you on June

5    24th, 2021; correct?

6    A.   Correct.

7    Q.   And you understood the time that Michael was trying to

8    organize a group of investors to invest in DWAC; correct?

9    A.   Correct.

10   Q.   Known as a syndicate of investors; correct?

11   A.   Sure.

12   Q.   You understood that the reason Mr. Garelick was reaching

13   out to you was as part of the effort to find investors to join

14   that group or syndicate?

15   A.   Correct.

16        MR. BACH:  Let's pull back up Government Exhibit 410.

17   Q.   The government showed you this exhibit a moment ago.  Do

18   you remember being asked questions about it?

19   A.   Yes.

20   Q.   And you decided to become a part of that group of

21   investors, investing alongside Michael; correct?

22   A.   That's correct.

23        MR. BACH:  We can take that down.

24   Q.   I think you also mentioned that you came to understand that

25   Mr. Garelick would be offered a seat on the DWAC board;

1   correct?

2   A.  Correct.

3   Q.  And you've been involved in -- I don't know the right

4   phrase, but you've been involved in investment activity for a

5   number of years; correct?

6   A.  Correct.

7   Q.  Venture capital investment?

8   A.  Correct.

9   Q.  Private equity investment?

10  A.  Correct.

11  Q.  It's not uncommon for a large investor to ask to be

12  represented on the board of the company in which they're

13  investing; correct?

14  A.  Correct.

15          MR. BACH:  Let's take a look at Government Exhibit

16  433, which was just on the screen.

17  Q.  This is an email from -- let me just pause.

18          Do you remember being shown this document and asked

19  some questions about it?

20  A.  Yes.

21  Q.  Just to recap, this is from Bruce to you on June 30th,

22  2021.  Do you see that?

23  A.  I do.

24  Q.  And it copies Mr. Orlando and Mr. Shvartsman and some other

25  people.  Do you see that?

1    A.  I do.

2    Q.  And the subject is DWAC SPAC investment paperwork and

3    logistics.  Do you see that?

4    A.  I do.

5    Q.  And you understood that Michael Shvartsman, having made a

6    decision to form this investment group, was tasking

7    Mr. Garelick with handling the logistics and the mechanics;

8    correct?

9    A.  That's correct.

10   Q.  He was employed by Mr. Shvartsman; correct?

11   A.  That's correct.

12   Q.  So he was the one doing the work, coordinating this

13   correspondence; correct?

14   A.  Correct.

15   Q.  And focusing your attention here on the second paragraph,

16   second sentence.  It says:  "Note, you have the option of a $4

17   class B stock we discussed or, alternatively, a $5 class B

18   founders stock with a 45-day notice redemption notice."  Do you

19   see that?

20   A.  I do.

21   Q.  So you understood there was a $4 option and a $5 option;

22   correct?

23   A.  Correct.

24   Q.  And the $5 option, forgive this question, it was more

25   expensive than the $4 option; correct?

1    A.  Correct.

2    Q.  It was another dollar per share; correct?

3    A.  Correct.

4    Q.  Can you tell the jury the difference between why someone

5    would pay $5 instead of $4 in this situation?

6    A.  Well, in this situation, it says the $5 option comes with a

7    45-day redemption notice, which, my understanding of that is

8    within 45 days you can decide to take your funds back at cost

9    and it gives you less risk, which is why you're paying more.

10   Q.  So if you pay more, you get the right to ask for your money

11   back; correct?

12   A.  I think so.

13   Q.  And you understood, did you not, that that $5 price was

14   something that Mr. Shvartsman negotiated for; correct?

15   A.  I don't know.  I don't recall that.

16   Q.  But the $5 price was an added layer of protection, you paid

17   more to get a little more protection; correct?

18   A.  Yes.

19   Q.  Because if you didn't like who the SPAC combined with, it

20   didn't combine with the target you wanted, you wanted to be

21   able to get your money back; correct?

22   A.  Correct.

23   Q.  So you wanted to pay a little extra money to protect

24   against the possibility that there might not be a combination

25   with Trump Media Group; correct?

1    A.  Amongst other reasons, as well, other things could come up,

2    but yes.

3         MR. BACH:  Could we just take a look at Government

4    Exhibit 484, which you were just shown a minute ago.

5    Q.  You were just shown this document a minute ago.  It's from

6    you to Alex Monje on July 7th.  Do you see that?

7    A.  I do.

8    Q.  And this is you saying you wanted to do the $5 option;

9    correct?

10   A.  Correct.

11        MR. BACH:  We can take that down.

12   Q.  So once you decide to go forward with the $5 option, you

13   purchased something called founders shares; correct?

14   A.  Correct.

15   Q.  When you decide to purchase founders shares, you didn't get

16   the shares right away; correct?

17   A.  Correct.

18   Q.  But you got something called a subscription agreement;

19   correct?

20   A.  Correct.

21   Q.  A subscription agreement is a legal document that

22   memorializes your ownership interest in the founders shares;

23   correct?

24   A.  Yes.

25   Q.  And, in other words, I think you testified a moment ago on

1   direct that you get the founder shares at some future point in

2   time, you get the shares themselves; correct?

3   A.  Correct.

4   Q.  But what you've got in your hands until then is this

5   subscription agreement, which essentially says, I'm a

6   subscriber, when the shares come about, I'm going to turn in my

7   subscription and get these shares; correct?

8   A.  Correct.

9   Q.  And when you pay your money, that was a document that you

10  got in your hands, a subscription agreement; correct?

11  A.  I believe so.

12  Q.  And it's your understanding that everyone else -- well,

13  withdrawn.

14        And you also understood that when you obtained these

15  founder shares, you couldn't sell them that day; right?

16  A.  Right.

17  Q.  You couldn't transfer them to someone else that day; right?

18  A.  Correct.

19  Q.  You had to wait a period of time until certain events

20  happened before these could be transferred or traded in any;

21  correct?

22  A.  Yes, I believe so.

23  Q.  So, for instance, if you had a friend that you wanted to

24  sell them to for $100,000 in the next month or so, you couldn't

25  really do that; right?

1    A.  I don't really know, but I can't speak to it.

2    Q.  But your understanding was you couldn't transfer them at

3    the time; right?

4    A.  Right.  I couldn't trade them.

5    Q.  You were also asked some questions on direct examination

6    about warrants; correct?

7    A.  Correct.

8    Q.  And a warrant is a right to buy shares at a future date;

9    correct?

10   A.  I believe so, yes.

11   Q.  It's a right to buy at a future date -- at some point at a

12   future time period; correct?

13   A.  Correct.

14   Q.  At a certain price; correct?

15   A.  Correct.

16   Q.  In other words, if I have a warrant that says at some point

17   in the next five years, I can buy DWAC stock at $10, I can

18   exercise that warrant and pay $10 for DWAC shares at any point

19   in those five years; correct?

20   A.  Correct.

21              (Continued on next page)

22

23

24

25

O511GAR3                    Wasko - Cross

1    BY MR. BACH:

2    Q.  And if DWAC stock is selling at $25 a share, I still get to

3    buy it at $10 because I have a warrant, correct?

4    A.  Correct.

5    Q.  And if DWAC stock is trading at $5, I don't get to buy——I

6    might not buy it because why spend $10 to get a $5 share,

7    correct?

8    A.  Correct.

9    Q.  So a warrant is essentially a bet that at some point over

10   that period of time, the five years, or whatever the period is,

11   that the stock price is going to go above the strike price in

12   the warrant, correct?

13   A.  Correct.

14   Q.  Okay.  And so what an investor thinks about in that context

15   is, do I think that——do I think that the price of the stock

16   over the next period of time is going to be higher than the

17   price I've contracted to in my warrants, correct?

18   A.  Yeah.

19   Q.  And here, in the case of DWAC, the time period for the

20   warrants was five years long, correct?

21   A.  I don't recall.

22   Q.  Okay.  But you discussed with Michael his plans to buy

23   warrants in this stock at some point, correct?

24   A.  Correct.

25   Q.  And he told you that he liked these warrants, right?

1    A.   Right.

2    Q.   And he liked them because of the math; the price that he

3    was buying them at, he thought it was a good bet that the

4    warrants would be a good buy at some point in the next five

5    years, correct?

6    A.   Again, I don't know about the time horizon, but yes, he

7    thought it was a good value.

8    Q.   Okay.  And that was based on his mathematical analysis of

9    the warrants, correct?

10             MR. NESSIM:  Objection.

11             THE COURT:  Sustained.

12   Q.   Do you know what that was based on?

13   A.   No.

14   Q.   Well, you had a number of conversations with him, correct?

15   A.   I mean, in general, or about that specifically?

16   Q.   About warrants.

17   A.   Not—I mean, yeah, couple.

18   Q.   And I think you said a moment ago on direct that you didn't

19   buy warrants, correct?

20   A.   Correct.

21   Q.   One of the reasons you didn't buy warrants is because you

22   weren't sure that this could happen; those were your words,

23   correct?

24   A.   Correct.

25   Q.   Meaning you were still skeptical about this investment,

1    correct?

2    A.   Correct.

3    Q.   Now——

4           THE COURT:  Mr. Bach, how much more do you have on

5    your cross-examination?

6           MR. BACH:  I don't know exactly, but I think about 20

7    minutes.

8           THE COURT:  Okay.  It's now a little bit after 11, so

9    why don't we take our midmorning break for about ten minutes or

10   so, start again at 11:15.

11          During the break, please don't talk about the case

12   amongst yourselves, don't do any investigation about the case.

13   Have a good break.

14          THE DEPUTY CLERK:  All rise.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Okay.  The witness may step down.

3          As a reminder, at 12:45, we'll discuss the other

4    issues from Ms. Shapiro's letter of this morning.  And please

5    try to be back here a couple minutes before 11:15.

6          (Recess)

7          (Jury not present)

8          THE COURT:  All right.  I understand that after the

9    testimony of this witness is done, we'll give the jury a short

10   recess to take care of the invocation by the next witness; is

11   that correct?

12         MR. SHAHABIAN:  That's correct.

13         MR. BACH:  But Judge, just so the Court is aware, I

14   overestimated the length of my examination.  I think I'm pretty

15   much going to be done.

16         THE COURT:  That's happy news.

17         MR. BACH:  Good.

18         THE COURT:  Okay.  Let's bring the jury in.

19         MR. NESSIM:  Should we get the witness on the stand,

20   your Honor?

21         THE COURT:  Yes.  Let's get the witness on the stand

22   first.  Thanks.

23         (Continued on next page)

24

25

O511GAR3

1      (Jury present)

2      THE COURT:  Be seated.

3      All right.  The witness is reminded he's still under

4   oath.

5      Mr. Bach, you may proceed.

6      MR. BACH:  Thank you, Mr. Wasko.  I appreciate your

7   time, and I have no further questions for you.  Thank you.

8      THE COURT:  Okay.  Redirect examination?

9      MR. NESSIM:  No redirect, your Honor.

10      THE COURT:  Okay.  Members of the jury, I actually

11   have a legal matter I need to take up with the parties so I'm

12   going to excuse you back into the jury room for a couple

13   minutes.  It could just be a couple minutes, then we'll have

14   you back in.

15      THE DEPUTY CLERK:  All rise.

16      (Continued on next page)

17

18

19

20

21

22

23

24

25

O511GAR3                    Wachter

1              (Jury not present)

2              THE COURT:  So you're excused as a witness.  You may

3    step down.

4              (Witness excused)

5              THE COURT:  You may be seated.

6              All right.  The government should call its next

7    witness to the stand.

8              Does the government have a copy of the immunity order?

9              MR. SHAHABIAN:  Yes, your Honor.

10             THE COURT:  Do you want to pass that up.

11             MR. SHAHABIAN:  Yes, your Honor.

12             THE COURT:  And will the government then ask the

13   sufficient questions for the witness to invoke, and then I'll

14   direct that the order is effective and that the witness will

15   testify pursuant to the order.

16             MR. SHAHABIAN:  Yes, your Honor.

17             Government calls Marc Wachter.

18             THE COURT:  The witness may be called to the stand.

19             Mr. Shahabian, when the jury is brought back in,

20   you'll go through the same routine of calling the witness to

21   the stand, so he'll still be on the stand, and we will swear

22   him again just so that he is sworn in front of the jury.

23             Sir, you may step forward.

24             Please step into the witness box and remain standing.

25   My courtroom deputy will administer the oath.

O511GAR3                    Wachter

1          THE DEPUTY CLERK:  Please raise your right hand.

2          (Witness sworn)

3          THE DEPUTY CLERK:  Please state your name and spell

4    your first and last name for the record.

5          THE WITNESS:  Marc Wachter.  M-A-R-C, W-A-C-H-T-E-R.

6          THE COURT:  Okay.  Counsel, you may proceed.

7          MR. SHAHABIAN:  Thank you, your Honor.

8     MARC WACHTER,

9       called as a witness by the Government,

10      having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. SHAHABIAN:

13   Q.  Mr. Wachter, good morning.

14   A.  Good morning.

15   Q.  Are you testifying here today pursuant to an immunity

16   order?

17   A.  Yes.

18   Q.  Is that because you believe that the answers you would give

19   during today's proceeding might tend to incriminate you?

20   A.  Yes.

21   Q.  If you were asked any questions without the immunity order,

22   would you invoke your Fifth Amendment rights against

23   self-incrimination?

24   A.  Yes.

25          MR. SHAHABIAN:  Your Honor, I ask that the order

1   become effective and be marked as Court Exhibit 1.

2           THE COURT:  Any objection, Mr. Bach?

3           MR. BACH:  No.

4           THE COURT:  Okay.  The order is declared effective and

5   will be marked as Court Exhibit No. 1.

6           The witness may remain on the stand.

7           Any objection to calling the jury back in?

8           MR. SHAHABIAN:  No, your Honor.

9           THE COURT:  Mr. Bach?

10          MR. BACH:  No, your Honor.

11          THE COURT:  All right.  Let's bring the jury back in.

12          MR. BACH:  I will need some break between the direct

13  and the cross, whenever that is.  There might be a natural

14  break, but——

15          THE COURT:  Hopefully.  We'll see.  We'll try to

16  accommodate that, Mr. Bach.

17          MR. BACH:  A brief one, that's all.  Very brief.

18          MS. SHAPIRO:  30 seconds.

19          (Continued on next page)

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Be seated.

3          All right.  The government should identify their next

4    witness for the record.

5          MR. SHAHABIAN:  Government calls Mark Wachter.

6          THE COURT:  Mr. Wachter, would you please stand up.

7    My deputy will administer the oath to you.

8          (Witness sworn)

9          THE DEPUTY CLERK:  Thank you.  Please state your name

10   for the record.

11         THE COURT:  You can be seated while you do that, and

12   speak into the microphone, please.

13         THE WITNESS:  Marc Wachter.  M-A-R-C, W-A-C-H-T-E-R.

14         THE COURT:  Counsel, you may proceed.

15         Mr. Wachter, please try to keep your voice up, speak

16   into the microphone, and wait until the question is done before

17   you answer.

18         Go ahead, counsel.

19         MR. SHAHABIAN:  Thank you, your Honor.

20    MARC WACHTER,

21        called as a witness by the Government,

22        having been duly sworn, testified as follows:

23   DIRECT EXAMINATION

24   BY MR. SHAHABIAN:

25   Q.  Good morning, Mr. Wachter.

O511GAR3                    Wachter

1    A.   Good morning.

2    Q.   Where do you live?

3    A.   Miami, Florida.

4    Q.   What do you do for a living?

5    A.   I do life insurance and financial planning.

6    Q.   Are you testifying here today because of what is called a

7    compulsion order issued by the Court?

8    A.   Yes.

9    Q.   Does that mean you've been ordered to testify?

10   A.   Yes.

11   Q.   Have you consulted a lawyer to help you understand the

12   compulsion order?

13   A.   Yes.

14   Q.   Under that order, what do you have to do?

15   A.   Tell the truth.

16   Q.   If you do that, are you protected by the compulsion order?

17   A.   Yes.

18   Q.   Do you get immunity from prosecution——

19            MR. BACH:  Objection to the leading nature of the——

20            THE COURT:  Overruled.

21   Q.   Under the compulsion order, do you get protection from

22   prosecution in general or protection from your words on the

23   stand today?

24   A.   I'm not sure I understand the question.

25   Q.   Sure.  Under the compulsion order, are you protected from

1   prosecution 100 percent or does it just protect what you say

2   here in court today?

3   A.   I believe it protects me completely if I tell the truth.

4   Q.   Do you need to tell the truth in order for the compulsion

5   order to apply?

6   A.   Yes.

7   Q.   Does it apply if you're lying?

8   A.   No.

9   Q.   Could you be prosecuted for lying if you do not tell the

10  truth?

11           MR. BACH:  I'm going to object to these questions.

12           THE COURT:  Sustained.  Sustained.  Move on.

13  Q.   Mr. Wachter, have you heard of a company called Digital

14  World Acquisition Corporation?

15  A.   Yes.

16  Q.   How do you know about DWAC?

17  A.   Through my friend Patrick Orlando.

18  Q.   How do you know Patrick Orlando?

19  A.   He's been a friend——client of mine and friend for over ten

20  years.

21  Q.   How did you meet?

22  A.   We met through our wives.  Our wives had met.  We have

23  children almost the same age.  And they met and introduced us.

24  Q.   What was the nature of your friendship over those ten

25  years?

O511GAR3                    Wachter

1    A.  Started out as an insurance client of mine, and then we

2    just built a friendship from there and used to talk about

3    business opportunities with each other from time to time.

4    Q.  What was Patrick Orlando's affiliation with DWAC?

5    A.  He was the founder and chief executive officer.

6    Q.  What is DWAC?

7    A.  DWAC is a——it's a SPAC.

8    Q.  What's a SPAC?

9    A.  SPAC is a special purpose acquisition company.  Yeah.

10   Q.  What's a special purpose acquisition company?

11   A.  Well, my understanding is it's a shell company that's

12   designed for the purpose of finding a target company to——to

13   take it public.

14   Q.  Did you have any role in getting DWAC off the ground?

15   A.  Yes.

16   Q.  What was your role?

17   A.  Making introductions to potential investors and just

18   helping to assist Patrick in whatever I could, just some

19   office——office help here and there.

20   Q.  Was that the first time you'd assisted Mr. Orlando with one

21   of his companies?

22   A.  Well, no.  I——I mean, I——I did the insurance for both him

23   and his partner in the last company that they had, so I did

24   some——some financial planning for them.

25   Q.  Did you have a formal title with DWAC or any of

1    Mr. Orlando's companies?

2    A.   No.

3    Q.   Did you anticipate being compensated in exchange for

4    assisting Mr. Orlando with DWAC?

5    A.   Yes.

6    Q.   How were you going to be compensated?

7    A.   Based on some formula with the amount of—of money he was

8    able to raise that I was able to assist with and additional

9    compensation for just time and effort.

10   Q.   And how were you going to be paid?

11   A.   I was going to be paid in shares, same type of shares that

12   he had, which were restricted shares of—of stock called Class

13   B shares.

14   Q.   Have you heard the term founder shares?

15   A.   Founder shares.  Same thing.

16   Q.   Are founder shares the same thing as the Class B stock you

17   believe you'd be compensated with?

18   A.   I believe it's the same.

19   Q.   Did you have any formal agreement between you and

20   Mr. Orlando or any of his companies for your compensation in

21   exchange for your assistance?

22   A.   No.

23   Q.   What was your understanding then of how you would be

24   compensated?

25   A.   That I would get a percentage of what I was able to help

1    raise and——and some additional compensation or bonus based on

2    time and effort.

3    Q.  And who told you that?

4    A.  Patrick.

5    Q.  Have you received those founder shares yet?

6    A.  No.

7    Q.  When did Mr. Orlando first tell you about DWAC?

8    A.  I believe it was sometime around June of 2021.

9    Q.  What did he tell you?

10   A.  He told me that he was working on a couple of different

11   SPACs, and I had never heard of the term SPAC and so it was the

12   first initial, you know, conversation to understand even what a

13   SPAC was and if I could be helpful to him in any way.

14   Q.  You said he mentioned a couple of different SPACs.  Besides

15   DWAC, do you remember the names of any other SPACs Mr. Orlando

16   told you about?

17   A.  Yes.

18   Q.  What other names?

19   A.  One was called Benessere, another one was called Maquia,

20   and I believe those are the only other two.

21          MR. SHAHABIAN:  I'd now like to publish Government

22   Exhibit 214.

23          If we could blow up the top portion, Mr. Bianco.

24   Q.  Do you recognize Government Exhibit 214, Mr. Wachter?

25   A.  Yes.

O511GAR3                    Wachter

1    Q.   What is it?

2    A.   It's a confidentiality agreement.

3    Q.   Who is it between?

4    A.   It's between Benessere Capital Acquisition Corp. and

5    myself.

6    Q.   And what's the date of this agreement?

7    A.   I don't see the date on here.

8    Q.   If you look at the end of the first line in the beginning——

9    A.   Oh, sorry.  June 2, 2021.

10   Q.   Did you receive this document in 2021?

11   A.   Yes.

12   Q.   Did you sign it?

13   A.   Yes.

14   Q.   What is this?

15   A.   It's confidentiality agreement, meaning that anything that

16   we discuss needs to be kept confidential.

17   Q.   Why did you understand that you needed to sign a

18   confidentiality agreement with Benessere?

19   A.   Well, it was my understanding from Patrick that anyone that

20   he shared any information relating to this SPAC or any other

21   SPAC, that everyone needed to sign a confidentiality agreement

22   to keep——keep information private.

23   Q.   Did Mr. Orlando tell you about any potential merger targets

24   for either Benessere or DWAC?

25   A.   Yes.

O511GAR3          Wachter

1    Q.   What potential targets?

2    A.   Well, one of them was Trump Media & Technology, and there

3    were others.  I mean, there were several others, in many

4    different industries.

5    Q.   Do you remember any of the others?

6    A.   I mean, off the top of my head, no.

7              MR. SHAHABIAN:  We could take this down, Mr. Bianco.

8    Q.   Do you remember what Mr. Orlando told you about Trump

9    Media?

10   A.   Just that he was in discussions with——with them as a

11   potential target for one of his SPACs.

12   Q.   Did you understand that confirmation to be confidential?

13   A.   Yes.

14   Q.   You said earlier that you helped Mr. Orlando by introducing

15   potential investors in DWAC.  What did you mean by that?

16   A.   I meant that I would make——reach out to my contacts and was

17   happy to make introductions for Patrick to present his

18   opportunities.

19   Q.   Was DWAC a publicly listed company when you made those

20   introductions?

21   A.   No.

22   Q.   What was the purpose of finding investors in DWAC at that

23   point?

24   A.   To help Patrick raise money so that he could continue to

25   pursue these op——you know, pursue this——this——these investment

1    opportunities.

2    Q.  Did you participate in meetings with potential investors

3    and Mr. Orlando?

4    A.  Yes.

5    Q.  In connection with those meetings did those investors have

6    to sign any documents?

7    A.  Yes.

8    Q.  What documents?

9    A.  Confidentiality agreements.

10   Q.  Were those confidentiality agreements similar to the one

11   that we just looked at that you signed?

12   A.  I believe so.

13            MR. SHAHABIAN:  If I can now show just for the

14   witness, Mr. Bianco, and counsel, Government Exhibit 504.

15   Q.  Do you see Government Exhibit 504, Mr. Wachter?

16   A.  Yes.

17   Q.  And if I direct your attention to the top of the document,

18   what does this appear to be, generally?

19   A.  Looks to me like a group text.

20   Q.  Are you a participant in this group text?

21   A.  Yes.

22            MR. SHAHABIAN:  We can minimize the blowup,

23   Mr. Bianco.

24            Government offers Government Exhibit 504 pursuant to

25   the Joint Stipulation 2.

1              MR. BACH:  Just a second, please.

2              We object.

3              THE COURT:  You object to it?

4              MR. BACH:  Yes.

5              THE COURT:  On what grounds?

6              MR. BACH:  Hearsay.

7              THE COURT:  What does the stipulation say,

8    Mr. Shahabian?

9              MR. SHAHABIAN:  It doesn't address hearsay.  It just

10   addresses authenticity.

11             I'm happy to come to sidebar if the Court would like

12   to discuss the hearsay objection.

13             THE COURT:  Okay.  You might bring up a physical copy

14   of the exhibit.

15             MR. SHAHABIAN:  Yes, your Honor.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MS. SHAPIRO:  It's the green bubble, on top, the

3     Patrick Orlando discussion.

4          MR. SHAHABIAN:  If I could respond.

5          THE COURT:  Yes.

6          MR. SHAHABIAN:  The statement, "Only of the person

7     under NDA," it's not a statement of truth, it's a command.

8     Commands are not hearsay; therefore, this isn't hearsay.

9          THE COURT:  That seems right to me.

10          MS. SHAPIRO:  Well, your Honor, let me see the text a

11     minute.

12          He's saying, "Am I at liberty to share the potential

13     SPAC target?"  And Orlando is saying that he's only allowed to

14     do that if the person is under NDA.  And the government is

15     going to argue that Orlando is stating that only people who

16     sign an NDA can—this information can only be shared with them,

17     and so that's for the truth of Orlando's statement that only if

18     a person signs the NDA can the information be shared.

19          THE COURT:  I'm going to receive it for the purpose of

20     it being a command, that Mr. Orlando is answering that the

21     information about the SPAC target can be shared only with

22     persons who are under an NDA.  The objection is overruled.

23          (Continued on next page)

24

25

1              (In open court)

2              THE COURT:  All right.  The exhibit is received.

3    Counsel, you may proceed.

4              (Government's Exhibit 504 received in evidence)

5              MR. SHAHABIAN:  If we could publish this, Mr. Bianco.

6              THE COURT:  This is Exhibit 504 that I just received.

7              MR. SHAHABIAN:  And if we could blow up the top

8    portion.

9    BY MR. SHAHABIAN:

10   Q.  Mr. Wachter, now that the jury can see, what is Government

11   Exhibit 504?

12   A.  It's a group text message.

13   Q.  And who are the participants in this group text message?

14   A.  Myself, Rich Santelises, Natalie Salume, or Salume, and

15   Patrick Orlando.

16   Q.  Who is Rich Santelises?

17   A.  He's a friend of mine.

18   Q.  And who is Natalie Salume?

19   A.  Patrick's assistant.

20             MR. SHAHABIAN:  Can we zoom out, Mr. Bianco.  And if

21   we blow up the first message from Rich Santelises.

22   Q.  Could you read the text message, Mr. Wachter.

23   A.  "Am I at liberty to share the 'potential' SPAC target media

24   group name?"

25   Q.  What did you understand this message from Mr. Santelises to

O511GAR3                    Wachter

1   mean?

2   A.   Well, it wasn't from Mr. Santelises.   It was forwarding

3   from a potential investor.   This is from Justin.   "Am I at

4   liberty to share."   I understood that to mean, is he able

5   to—is this person able to share that the potential SPAC, SPAC

6   target media group—I'm assuming they meant Trump Media Group.

7   Q.   What's the date of this message?

8   A.   June 22nd.

9         MR. SHAHABIAN:   We could take this down, Mr. Orlando

10  [sic].

11  Q.   What's the next message in the chain from Mr. Santelises?

12  A.   He's forwarded that and then—and then wrote, "How do I

13  answer that?"

14        MR. SHAHABIAN:   And if we blow up the green—thank

15  you, Mr. Bianco.   If we could blow up the green bubble after.

16        And we could just focus on the third bubble.   We don't

17  need the fourth bubble.

18  Q.   Whose message is in the green bubble, Mr. Wachter?

19  A.   Patrick Orlando.

20  Q.   What does he say in response to this question?

21  A.   "Only of," I guess he meant to say only if, "the person is

22  under NDA.   We just need name and email."

23  Q.   What is an NDA?

24  A.   A nondisclosure agreement.

25  Q.   What did you understand Mr. Orlando's instruction, "only if

1    the person is under NDA," to mean?

2    A.   Meaning——I understand an NDA and a confidentiality

3    agreement to be one and the same, so I assume that that meant

4    they had to sign the confidentiality agreement beforehand.

5            MR. SHAHABIAN:  We can take this down, Mr. Bianco.

6    Q.   I'd like to shift topics, Mr. Wachter.  Do you know Bruce

7    Garelick?

8    A.   No.

9    Q.   Have you met him before?

10   A.   Only through Zoom on the one——I believe it was only on the

11   one time where I made the introductory meeting with——with the

12   Shvartsman brothers.

13   Q.   Could you tell us about that meeting.

14   A.   Well, I came by with Patrick Orlando and Patrick's

15   assistant Natalie, and we came to the office of Michael

16   Shvartsman, and at that meeting were Michael Shvartsman, his

17   brother Gerald Shvartsman, and I believe it was Bruce

18   was——Bruce Garelick was——was by Zoom.

19   Q.   Where was the meeting?

20   A.   In Michael Shvartsman's office in Aventura, Florida.

21   Q.   How did that meeting come about?

22   A.   I had reached out to Gerald Shvartsman, mentioned this

23   potential opportunity; he shared it with his brother, and set

24   up a meeting.

25   Q.   How do you know Gerald Shvartsman?

1  A.  Gerald's been a good friend of mine for at least ten plus

2  years.  He's also an insurance client of mine and just a very

3  close friend.

4  Q.  Did you know Michael Shvartsman before this meeting?

5  A.  Yes.

6  Q.  What was your relationship with Michael Shvartsman?

7  A.  I considered him also a friend, but I didn't know him

8  nearly as well as I knew his younger brother Gerald.

9  Q.  Did you know the name of Michael Shvartsman's company?

10  A.  I don't know if I knew the name then, but I know the name

11  now.

12  Q.  Did you know the—did you learn the defendant's role at

13  Mr. Shvartsman's company during this meeting?

14  A.  Well, I subsequently learned that I believe he's the chief

15  investment officer.  I think I had learned that at the meeting.

16  I just can't say for sure.

17  Q.  Do you remember when the meeting was?

18  A.  I know it was sometime in June of 2021.

19  Q.  What was discussed at this meeting?

20  A.  The potential investment opportunities.

21  Q.  What were the potential investment opportunities?

22  A.  Well, I believe it was primarily focused on DWAC, but it's

23  hard to remember.  It was so many years ago.  But I believe,

24  you know, his other SPACs may have also been mentioned as well.

25  Q.  Do you remember—and when you say "mentioned," who brought

1  up the investment opportunities during the meeting?

2  A.  Patrick.

3  Q.  Mr. Orlando.

4  A.  Yes.

5  Q.  Do you remember what Mr. Orlando said about DWAC as a

6  potential investment opportunity?

7  A.  I——I can't remember the specifics, but he had an investment

8  presentation that he used to give, you know, to any——any

9  meetings about the opportunity and what a SPAC was and what

10 this was and so forth, but in terms of the specifics of what he

11 said, I——I can't remember the details.

12 Q.  Do you remember if any of the potential target names came

13 up during this meeting?

14 A.  Yes.

15 Q.  Which potential targets?

16 A.  Well, for certain, Trump Media & Technology was brought up.

17 He——I believe he did mention other targets, but again, I can't

18 remember those names.

19 Q.  Do you remember anything about what specifically was said

20 about Trump Media during this meeting?

21 A.  That it was a potential target and——yeah, that's——that's——I

22 can't remember specifics.

23 Q.  Do you remember if Mr. Orlando showed the meeting

24 participants any documents relating to Trump Media during the

25 meeting?

1    A.   Yes.

2    Q.   What did he show?

3    A.   He showed them what a——I believe it was an exclusive

4    agreement that he had with Trump Media Group, that my

5    understanding was that it was with his other SPAC, Benessere,

6    but that he had some sort of exclusive agreement that if Trump

7    Media Group was to do a SPAC, they were——they had to do it with

8    Pat——with Pat——Pat——either that company or one of Patrick's

9    companies.

10          MR. SHAHABIAN:  If we could publish Government

11   Exhibit 102, and show page 1.

12   Q.   Do you recognize this document, Mr. Wachter?

13   A.   Yes.

14   Q.   What is this?

15   A.   It's a letter of intent from Trump to president Donald J.

16   Trump.

17   Q.   Who's it from?

18   A.   From Benessere Capital Acquisition Corp.

19   Q.   Was this the document shown at that meeting?

20   A.   I believe so.

21          MR. SHAHABIAN:  If we could show the last page of this

22   document, Mr. Bianco.

23          Or sorry.  Page 7.

24   Q.   Have you seen this page before, Mr. Wachter?

25   A.   Yes.

1   Q.  What is this?

2   A.  It's Donald J. Trump's signature.

3   Q.  Did Mr. Orlando show the signature page during this

4   meeting?

5   A.  I believe he did.

6            MR. SHAHABIAN:  You can take this down, Mr. Bianco.

7   Q.  Do you remember participating in any additional calls with

8   Bruce Garelick and other potential investors in DWAC?

9   A.  Well, I don't really understand the question because I've

10  been involved in other presentations, but you mean with the

11  defendant Bruce involved?  I don't believe so.

12  Q.  You don't remember any other meetings you participated in

13  with Bruce Garelick.

14  A.  No.

15           MR. SHAHABIAN:  If we could bring up for the witness

16  and counsel Government Exhibit 732.

17           And at this point the government would offer Joint

18  Exhibit 3, which is a stipulation between the parties about

19  device and account instructions.

20           THE COURT:  Okay.  Any objection to Joint Exhibit 3,

21  the stipulation, Mr. Bach?

22           MR. BACH:  If it's a stipulation——which stipulation is

23  it?

24           MR. SHAHABIAN:  Joint Exhibit 3, the devices.

25           MR. BACH:  Oh, that's fine.  But we can't quite read

O511GAR3                    Wachter

1    this.

2              THE COURT:  But right now all that's being offered is

3    Joint Exhibit 3, so no objection to Joint Exhibit 3?

4              MR. BACH:  No objection to that, Judge.

5              THE COURT:  Okay.  Joint Exhibit 3 is received.

6              (Joint Exhibit 3 received in evidence)

7              THE COURT:  You can maybe work on the monitor.  Do you

8    want to read Joint Exhibit 3?

9              MR. SHAHABIAN:  Yes, your Honor.

10             THE COURT:  You may do so.

11             MR. BACH:  Judge, we're looking at two things at once

12   here.  Could we just have——

13             MR. SHAHABIAN:  Could we take this down, Mr. Bianco,

14   and we can bring up Joint Exhibit 3.  We'll start with that.

15             So this is a stipulation between the parties that I'll

16   summarize.

17             The government and the defendant agree that certain

18   exhibits are true and correct copies of various items obtained

19   from cellphones or electronic accounts.  At this time I'll read

20   paragraph 4, which says:

21             Government Exhibits 721 through 731——or sorry.

22   Paragraph 3.

23             "Apple offers an iCloud service which allows Apple

24   users the opportunity to store digital data on Apple servers.

25   Apple iCloud users may elect to back up electronic copies of

1    their cellular devices."

2           Paragraph 4.  "Government Exhibits 721-731, 736, and

3    737 are true and correct copies of text message conversations

4    obtained from an Apple iCloud backup stored in Bruce Garelick's

5    Apple iCloud account ('the Garelick iCloud')."

6           And then I'll jump to paragraph 6.

7           "Government Exhibits 732, 733, and 738 are true and

8    correct calendar entries stored on the Garelick iCloud."

9           At this point the government offers Government

10   Exhibit 732.

11          THE COURT:  Any objection to 732?

12          MR. BACH:  I don't──now I need to look at 732.

13          THE COURT:  Okay.  That's fair.

14          MR. BACH:  What we're seeing, it's hard for us to

15   read.

16          MS. SHAPIRO:  Maybe we can scroll down so we can see

17   the rest of it, Mr. Bianco.

18          THE COURT:  You'll have an opportunity, obviously,

19   Mr. Bach, to review the exhibit.

20          MR. BACH:  Thank you.

21          Can we do a brief voir dire.

22          THE COURT:  On what evidentiary issue?

23          MR. BACH:  Whether there's any foundation or relevance

24   to this.

25          THE COURT:  Not on the issue of relevance, and on

O511GAR3                    Wachter

1    foundation, I'm not sure I understand.

2              MR. BACH:  Let us spend five seconds at the sidebar.

3              THE COURT:  Okay.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At the sidebar)

2           THE COURT:  Let me see the exhibit.

3           MR. BACH:  It's a calendar invite, and I think the

4    government wants to offer it as proof that the invited

5    attendees were present, actually present at the meeting, but

6    it's just an invite.  And so we don't know why the invite, you

7    know, is relevant.  They've said to us, when we raised this

8    with them, that there are texts from Mr. Wachter from the

9    meeting that confirm that he's there, that that's perhaps more

10   probative.  But the reason this document is confusing and

11   prejudicial is it suggests that Mr. Garelick is at the meeting.

12           MR. SHAHABIAN:  Maybe——

13           THE COURT:  No.  The objection is overruled.

14           MR. BACH:  He said, he testified——

15           MS. SHAPIRO:  Your Honor, the government told us that

16   he doesn't even remember the meeting, and then to use these

17   documents without following the proper procedures to either

18   refresh his memory or some sort of recollection recorded.

19           THE COURT:  If somebody is invited to a meeting, under

20   *Shepard* and *Hillman*——

21           MS. SHAPIRO:  That's fine, your Honor.

22           THE COURT:  ——it is evidence of——is not evidence of——

23           MS. SHAPIRO:  We understand that, your Honor, but

24   apparently they want to use this to show that the meeting

25   occurred and he and Mr. Garelick were at it, and he doesn't

O511GAR3              Wachter

1  remember that, and that's why we don't think the proper

2  foundation has been laid.

3        THE COURT:  The objection is overruled.  The exhibit

4  can be received for the fact that a meeting was scheduled.

5        MR. BACH:  And that was the voir dire I was

6  requesting, to clarify.

7        THE COURT:  You can then do that on cross-examination.

8  The reason why I didn't permit voir dire on relevance is

9  because that's classic cross-examination.

10       MR. BROD:  Can I just ask one point of clarification.

11       MR. BACH:  No, that's okay.

12       (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          MR. SHAHABIAN:  Your Honor, before the Court receives

3    it, counsel conferred, and the government is just going to

4    offer at this point row 1 of Government Exhibit 732, in case

5    there are objections to additional portions of the document.

6          THE COURT:  Okay.  Row 1 is received.

7          (Government's Exhibit 732, row 1, received in

8    evidence)

9          MR. SHAHABIAN:  If we could publish, Mr. Bianco.

10   BY MR. SHAHABIAN:

11   Q.  Mr. Wachter, do you see this exhibit in front of you?

12   A.  Yes.

13   Q.  Do you see the date and time is June 22, 2021?

14   A.  Yes.

15   Q.  The subject is Rocket One DWAC SPAC Intro to Other

16   Prospective Investors?

17   A.  Yes.

18   Q.  Do you see the first email address,

19   bruce@rocketonecapital.com?  Do you know whose email that is?

20   A.  I assume that's Bruce Garelick.

21   Q.  Do you see approximately halfway down the list of

22   attendees, MW@wealthplanningcenter.com?

23   A.  Yes.

24   Q.  Do you know whose email address that is?

25   A.  That's my email.

1    Q.  And do you see above that, porlando@beneinvest.com?

2    A.  Yes.

3    Q.  And do you see that there are a lot of other participants

4    in this meeting invite as well?

5    A.  Yes.

6    Q.  Hwasko@theelevenfund.com, do you see that below your email

7    address?

8    A.  Yes.

9    Q.  Do you know whose email address that is?

10   A.  Well, I never——I don't believe I ever met or spoke to him,

11   but I believe his name is Harley [sic] Wasko.

12   Q.  Do you remember attending a meeting such as this calendar

13   invitation?

14   A.  No.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1    BY MR. SHAHABIAN:

2    Q.  Do you see the time that this meeting on June 22nd took

3    place?

4    A.  Yes.

5    Q.  What time did it take place?

6    A.  3:30 p.m.  Well, I didn't believe that's the time that it

7    started.  That was the time it was projected to start from this

8    email; right?

9    Q.  I appreciate the correction.

10           The invitation schedule is for 3:30 p.m.; is that

11   correct?

12   A.  Yes.

13           MR. SHAHABIAN:  We can take this down, Mr. Bianco.

14           If we could bring up, just for the witness and

15   counsel, Government Exhibit 502.

16   Q.  Do you recognize Government Exhibit 502, Mr. Wachter?

17   A.  Yes.

18   Q.  Without describing the content, what is it?

19   A.  I'm just sharing with Patrick that I'm taking my kids, what

20   I'm planning to do with my kids for the day.

21           THE COURT:  Just describe it.

22   A.  It's a text message back and forth between Patrick and

23   myself.

24           MR. SHAHABIAN:  If we turn to page 29, Mr. Bianco.

25   Sorry.  Not page 29.  If we go to the next page.  If we could

1    blow up the entry, June 22nd, 2021, at 3:50 p.m.

2                The government offers just this text message from

3    Government Exhibit 502.

4                MR. BACH:  No objection.

5                THE COURT:  Government Exhibit 502, just the text

6    message on June 22nd, 2021, at 3:50 p.m. is received.

7                (Government's Exhibit 502 received in evidence)

8                MR. SHAHABIAN:  If we could publish this, Mr. Bianco.

9    Q.  Do you see this, Mr. Wachter?

10   A.  Yes.

11   Q.  Whose text message is in the green bubble?

12   A.  My text message.

13   Q.  Who are you texting?

14   A.  Patrick Orlando.

15   Q.  Could you read the text message to the jury.

16   A.  I would also mention that if Trump runs for president

17   again, this will likely be a huge boost to TMG.

18   Q.  What is TMG?

19   A.  Trump Media Group.

20   Q.  Do you see the date and time, June 22nd, 2021, 3:50 p.m.?

21   A.  Yes.

22   Q.  Is that during the scheduled calendar invite we just looked

23   at?

24   A.  Yes.

25   Q.  Do you have any memory of discussing Trump Media during a

1    meeting at that scheduled time?

2    A.  No.

3         MR. SHAHABIAN:  You can take this down, Mr. Bianco.

4    Q.  Mr. Wachter, did you learn anything about how successful

5    the Rocket One team was in bringing in investors to DWAC?

6    A.  Yes.

7    Q.  What did you learn?

8    A.  That they became very successful in bringing investors in.

9    Q.  Were you involved in the DWAC Trump Media Group merger

10   negotiations?

11   A.  No.

12   Q.  Were you involved with running the DWAC company after it

13   became public in September 2021?

14   A.  No.

15   Q.  I'd like to shift topics again.

16        After DWAC went public, did you ever transfer some of

17   your interests in DWAC founder shares to anybody else?

18   A.  Yes.

19   Q.  Who did you transfer your interest to?

20   A.  Zoltan Present.

21   Q.  Why did you transfer some of your shares to Zoltan Present?

22   A.  Well, Zoltan -- Zoltan's wife and my wife were best

23   friends.  They were in the process of looking to purchase a new

24   home.  My wife was the real estate broker on that.

25        At the last moment, when they were ready to purchase

1   the home, he didn't qualify, Zoltan didn't qualify for a

2   mortgage because he didn't have enough liquidity in the bank.

3   At that time, I had also heard from Patrick Orlando that DWAC

4   investors -- that he was oversubscribed and he was going to

5   have to return some of their money or give them shares in his

6   other SPACs, and that he would have welcomed somebody returning

7   their shares.

8           So I had the idea that I needed cash, that I would be

9   willing to transfer or sell some of my interests, the same

10  amount that Zoltan -- Zoltan was an investor in the DWAC SPAC.

11  I would transfer the same amount of shares that he purchased

12  for the same amount that he purchased them for, which was

13  $100,000.  Patrick would return his money and renege that

14  transaction.  I drew up a side agreement with Zoltan to

15  transfer my shares.  Zoltan got his money into his account, was

16  able to close on his house.  Then Zoltan had agreed -- we had

17  agreed that within a certainly reasonable time after that, he

18  would then pay me the $100,000 for the interest of shares that

19  I had to transfer back to him.

20  Q.  So to transfer your DWAC founder shares to Zoltan Present,

21  did you need to talk to anybody at DWAC?

22  A.  Yes.

23  Q.  Who did you talk to?

24  A.  Both Patrick Orlando and Alex Monje, who was the legal

25  counsel for Patrick's companies.

1  Q.  When did these discussions take place?

2  A.  In October of 2021.

3  Q.  Was it before or after the Trump Media DWAC merger

4  announcement?

5  A.  Before.

6          MR. SHAHABIAN:  Now showing the witness and counsel

7  Government Exhibit 472.

8          Government offers Government Exhibit 472 pursuant to

9  joint exhibit 2, the email stipulation.

10         MR. BACH:  No objection.

11         THE COURT:  Received.

12         (Government's Exhibit 472 received in evidence)

13         MR. SHAHABIAN:  If we could publish this, Mr. Bianco.

14 Q.  Mr. Wachter, do you see this email?

15 A.  Yes.

16 Q.  Who is it from?

17 A.  It's from me to Zoltan.

18 Q.  Who is Zoltan?

19 A.  Zoltan is the person I was just talking about who was an

20 original investor in DWAC.  He's the one that returned his

21 shares back and made a side deal with me.

22 Q.  What's the date of this email?

23 A.  October 11, 2021.

24 Q.  Who's cc'd on this email?

25 A.  Patrick Orlando, Natalie Salume, and that's it.

1    Q.  Could you read the first paragraph out loud.

2    A.  Good morning, Zoltan.  I spoke with Patrick this morning

3    and he is happy to accommodate returning your $100,000

4    membership interest in DWAC.  This will actually help him out a

5    lot as he is oversubscribed on the deal.  As discussed, you and

6    I will simultaneously make an arrangement for me to transfer

7    $100,000 of my DWAC membership interest in return for a

8    promissory note from you for $100,000.

9              MR. SHAHABIAN:  Your Honor, I think a juror may have

10   an issue with their screen.

11             JUROR:  It's gone off a little bit, but it came back

12   on, so we're good.

13   Q.  What is this paragraph referring to, Mr. Wachter?

14   A.  Exactly what I just talked about, which is that Patrick

15   would return Zoltan's investment in DWAC, and I simultaneously

16   would make a side deal with Zoltan to transfer him my shares of

17   the exact same amount in return for a promissory note for the

18   same amount of money that he had just gotten returned from

19   Patrick.

20   Q.  Let's read the next paragraph.

21   A.  Please confirm, and Patrick and his team will put together

22   the paperwork for the transfer and will help with our

23   documentation between each other.

24             MR. SHAHABIAN:  Your Honor, I think some jurors are

25   having issues with the screens again.

O51Cgar4                          Wachter - Direct

1          JUROR:  It's flickering a little.

2     Q.  What does this paragraph mean --

3          THE COURT:  Hold on for a second.  Let's see if we can

4     solve the problem.

5          MR. SHAHABIAN:  Yes, your Honor.  Is it up on your

6     screen?

7          JUROR:  Yes.

8          THE COURT:  You may proceed.

9     BY MR. SHAHABIAN:

10    Q.  Could you just read the second paragraph again,

11    Mr. Wachter, now that the jurors can see.

12    A.  Please confirm, and Patrick and his team will put together

13    the paperwork for the transfer and will help with our

14    documentation between each other.

15    Q.  What did you mean by, Patrick and his team will put

16    together the paperwork for the transfer?

17    A.  Well, I wasn't going to do this without the assistance of

18    Patrick and his firm because I didn't actually have possession

19    of those shares, so I needed to have an understanding from

20    Patrick and his legal team that we could do this transfer and

21    that they acknowledged what was taking place, and they agreed

22    and were willing to help draft the documentation to make the

23    transfer.

24    Q.  If you could read the last paragraph of the email.

25    A.  Lastly, Patrick will be announcing some DWAC news very soon

1    and is also planning another very attractive founder share

2    raise for his next SPAC.  We will likely be organizing an event

3    around this and, of course, you will be invited.

4    Q.  Do you know what, "Patrick will be announcing some DWAC

5    news very soon" refers to?

6    A.  No.

7    Q.  Do you know what "the very attractive founder share raise

8    for his next SPAC" was?

9    A.  Yes.

10   Q.  Did Mr. Orlando share any news with you about where DWAC

11   was in its merger negotiations with Trump Media in October of

12   2021?

13   A.  No.

14          MR. SHAHABIAN:  We can take this down, Mr. Bianco.

15   Q.  Did you have to have any further followup with Mr. Orlando

16   or his team in order to effectuate this transfer to

17   Mr. Present?

18   A.  Yes.

19   Q.  What did you do?

20   A.  I reached out several times to make sure that this got done

21   because it was very time sensitive for Zoltan to get this deal

22   done.  My wife was the real estate broker, so she was on me

23   quite a bit to push this along to get it done.

24          MR. SHAHABIAN:  If we could go back, Mr. Bianco, to

25   Government Exhibit 502, and just for the witness and counsel.

1    If we go to pages 70 to 71.  Scroll up, Mr. Bianco.  If we go

2    back one more page to page 69.  I know I'm being a little

3    precise here, but can you split the difference, Mr. Bianco,

4    with the bottom of page 69 and the top of page 70, and blow up

5    those two messages from October 12th and October 14.

6             Government offers Government Exhibit, pages 69 and 70

7    of Government Exhibit 502 pursuant to the communications

8    stipulation.

9             THE COURT:  Any objection?

10            MR. BACH:  None.

11            THE COURT:  Those pages are received.

12            (Government's Exhibit 502 received in evidence)

13            during a break, Mr. Shahabian, you and the government

14    might agree to designate the selected pages of 502 that you are

15    offering as, for example, 502A and 502B so that if the jury

16    subsequently wants them, it will be clear what the exhibits

17    are.

18            MR. SHAHABIAN:  Makes perfect sense, your Honor.  We

19    will do that.

20            If we can publish this, Mr. Bianco.

21    BY MR. SHAHABIAN:

22    Q.  Mr. Wachter, now that the jury can see, do you see the two

23    text messages on Government Exhibit 502?

24    A.  Yes.

25    Q.  Who's texting in the green bubble?

O51Cgar4                    Wachter - Direct

1    A.  I am.

2    Q.  Who are you texting?

3    A.  Patrick.

4    Q.  What's the date of the first text message?

5    A.  October 12th, 3:31 p.m.

6    Q.  Could you read the text message out loud.

7    A.  Hey bud, can you please push things along with Alex Monje

8    to return Zoltan's investment.  He needs this cash to close on

9    a house that Anastasia is the broker on.  It's pretty time

10   sensitive.  Thanks.

11   Q.  Who's Anastasia?

12   A.  My wife.

13   Q.  If you could read the second message, what is the date of

14   that message?

15   A.  Two days later, October 14th, 5:39 p.m.

16   Q.  Could you read the substance of the message for the jury.

17   A.  Hey bud, have you made any progress on Zoltan's investment.

18   You promised you would have his money this week and tomorrow is

19   Friday.  Please advise.  Thanks.

20   Q.  What are these text messages about, Mr. Wachter?

21   A.  These text messages are about me pushing Patrick to return

22   Zoltan's money.

23            MR. SHAHABIAN:  You can take this down, Mr. Bianco.

24            If we could show the witness and counsel Government

25   Exhibit 475.

1          The government offers Government Exhibit 475 pursuant

2    to the email stipulation.

3          MR. BACH:  No objection.

4          THE COURT:  475 is received.

5          (Government's Exhibit 475 received in evidence)

6          MR. SHAHABIAN:  If we could publish this, Mr. Bianco.

7    If we start at the top of the email and just highlight the

8    header.

9    Q.  Who are the participants in this email chain, Mr. Wachter?

10   A.  Myself, Zoltan, Patrick Orlando, and Alex Monje.

11   Q.  You see the name, Zoltan Luxhunters?

12   A.  Yes.

13   Q.  Is that the same person as Zoltan Present?

14   A.  Yes.  That's the name of his company.

15   Q.  What's the date of this email?

16   A.  October 15th, 2021.

17   Q.  Could you read the body of the email for the jury.

18   A.  Zoltan, it's from Natalie Salume.  Zoltan, your wire for

19   has been sent for $100,000 return of capital.  Please see wire

20   receipt attached.  Please confirm receipt of funds.  Thanks in

21   advance.  Best regards, Natalie Salume.

22   Q.  What was your understanding of the purpose of this email?

23   A.  To confirm to Zoltan that the money had been wired into his

24   account.

25   Q.  Did you execute the side agreement you mentioned,

1  transferring your shares to Zoltan Present after this money was

2  returned?

3  A.  I don't know if it was right after or right before, but

4  within a very reasonable period of time one way or the other.

5           MR. SHAHABIAN:  If we can show the witness and counsel

6  Government Exhibit 830.

7  Q.  Do you recognize this document, Mr. Wachter?

8  A.  Yes.

9  Q.  What is it?

10 A.  It's an agreement between myself and Zoltan Present.

11 Q.  Is it a fair and accurate copy of that agreement?

12 A.  I believe so.

13          MR. SHAHABIAN:  Government offers Government Exhibit

14 830.

15          THE COURT:  Mr. Bach.

16          MR. BACH:  No objection.

17          THE COURT:  830 is received.

18          (Government's Exhibit 830 received in evidence)

19          MR. SHAHABIAN:  If you can publish, Mr. Bianco.

20 Q.  What is Government Exhibit 830, Mr. Wachter?

21 A.  It's an agreement between Zoltan Present and myself for the

22 transfer of my 22,500 shares of my interest in DWAC to Zoltan.

23 Q.  What's the date of this agreement?

24 A.  October 16th, 2021.

25 Q.  Was the merger between DWAC and Trump Media publicly

1    announced when you entered into this agreement?

2    A.  No.

3    Q.  Did anyone help you prepare this agreement?

4    A.  Yes.

5    Q.  Who helped you?

6    A.  Alex Monje.

7    Q.  Who is Alex Monje?

8    A.  He's counsel for Patrick Orlando.  Well, he's counsel for

9    Patrick's companies, one of them being DWAC.

10   Q.  How soon after you signed this agreement transferring your

11   shares to Zoltan Present was the DWAC Trump Media merger

12   announced?

13   A.  Only a few days away.

14   Q.  What was your reaction when you learned the news?

15   A.  I was very surprised.

16   Q.  Prior to that public announcement, did Patrick Orlando ever

17   tell you that the merger was going to happen or about to be

18   announced?

19   A.  No.

20   Q.  Would you have transferred your $100,000 in DWAC shares to

21   Zoltan Present four days prior to the announcement if you knew

22   this was coming?

23   A.  No.

24   Q.  Why not?

25   A.  Because on paper, those shares were worth about 30 or 40

1    times what I had sold them to Zoltan for.  I found out four

2    days later.

3    Q.  Did Patrick Orlando give you any indication to slow down

4    this agreement or that an announcement was coming before you

5    entered into it?

6    A.  No.

7    Q.  Did you ever learn, prior to the public announcement of the

8    merger, that that announcement was coming?

9    A.  No.

10              MR. SHAHABIAN:  You can take this down, Mr. Bianco.

11   Q.  Mr. Wachter, do you know a person named Anton Postolnikov?

12   A.  Yes.

13   Q.  How do you know Anton Postolnikov?

14   A.  I met Anton at an event at Michael Shvartsman's homes.

15   Q.  Do you remember when you met him?

16   A.  I don't remember the date, but I had learned of his name

17   prior to that from Patrick Orlando, that he had invested in

18   DWAC.

19   Q.  To be clear, by the time you met Anton Postolnikov, to your

20   understanding, had he already invested in DWAC?

21   A.  Yes.

22   Q.  Did you bring him into the DWAC founders share opportunity?

23   A.  No.

24   Q.  Did you know who he was when he invested in DWAC?

25   A.  No.

1   Q.  What was your relationship with Anton Postolnikov in

2   September and October of 2021?

3   A.  We started to become friendly.  I was working on trying to

4   get him a life insurance policy.  And so, we spent quite a bit

5   of time together talking about that.  In addition, I was

6   helping Patrick to present future SPAC opportunities to Anton.

7   Q.  Why were you helping Patrick present future SPAC

8   opportunities to Mr. Postolnikov?

9   A.  Because my relationship with Mr. Postolnikov started to

10  become very friendly and I had developed a good relationship

11  with him.  I thought it was useful to help add credibility to

12  Patrick in those meetings.

13  Q.  Did you meet with Mr. Postolnikov?

14  A.  Yes.

15  Q.  Where did you meet with him?

16  A.  Different places, but I think mainly on Fisher Island where

17  he lived.

18  Q.  Ever talk to him on the phone?

19  A.  Yes.

20  Q.  Text message with him?

21  A.  Yes.

22  Q.  Did you ever discuss DWAC with him?

23  A.  Yes.

24  Q.  What did you discuss about DWAC?

25  A.  Just nothing specific, just general.

1    Q.  Did you ever tell him that a merger announcement between

2    Trump Media and DWAC was coming before it was publicly

3    announced?

4    A.  No.

5    Q.  Did you personally ever trade in DWAC securities?

6    A.  No.

7    Q.  Ever trade in the securities of Benessere?

8    A.  No.

9    Q.  Did you ever delete any of your text messages with Anton

10   Postolnikov?

11   A.  Yes.

12   Q.  Why did you delete messages with Anton Postolnikov?

13   A.  So, during that time I was working on obtaining a very

14   sizeable life insurance policy for Mr. Postolnikov, and during

15   that process, he was asking me a lot of questions, both

16   medications he was taking, financial information.  In addition

17   to that, there were some messages or pictures that were sent

18   back and forth that were really just, you know, friendly guy

19   stuff that I didn't think was a good idea to keep on my phone.

20   With that information from his medical and financial, I didn't

21   think it was a good idea to keep stored on my phone, so I

22   erased it.

23   Q.  Did you ever delete any messages relating to confidential

24   information about the DWAC Trump Media merger?

25   A.  No.

1   Q.  You testified earlier that you understand you have an

2   immunity order in place?

3   A.  Yes.

4   Q.  Did you request immunity in this case because you're

5   concerned you committed insider trading?

6   A.  No.

7   Q.  Did you request immunity because you're concerned you

8   tipped other people confidential information.

9           MR. BACH:  Objection.  Leading.

10          THE COURT:  Overruled.

11  Q.  Did you request immunity because you were concerned you had

12  exposure for tipping confidential information to other people?

13  A.  No.

14  Q.  Did you ever pass confidential nonpublic information about

15  the DWAC Trump Media merger to anyone prior to it being

16  publicly announced?

17  A.  No.

18          MR. SHAHABIAN:  No further questions, your Honor.

19          THE COURT:  Let me see the parties at sidebar.

20          (Continued on next page)

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  Mr. Bach, is there anything you can do for

3     about 10 minutes and then we'll take a break.  I know you asked

4     for a break you do the cross.

5          MR. BACH:  Whatever the Court's pleasure is.  No

6     matter what, I'll need a 30-second comfort break.

7          THE COURT:  I'll give the jury a break now, we'll keep

8     them in the jury box, and you do your cross examination until

9     12:45.

10         MR. BACH:  Okay.

11         (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Members of the jury, we're going to do a

3   short stretch break now and then cross examination will begin.

4   We'll go until 12:45 and then you'll take a little bit of an

5   earlier lunch break, which will continue until 2 o'clock.  So

6   stretch break if you want one.

7          Mr. Bach, if you need to step out, you may do so.

8          THE WITNESS:  Does that mean I can get up, too?

9          THE COURT:  No.  You can stretch if you want to.

10         THE WITNESS:  I can stand up and stretch?

11         THE COURT:  You can stand up and stretch.

12         Mr. Shahabian, I noticed some of your team has left

13  the room.  As soon as Mr. Bach returns, we're going to get

14  started, so they should know that.

15         MR. SHAHABIAN:  I will wrangle them, your Honor.

16         THE COURT:  Your client stepped out.  Again, as soon

17  as Mr. Bach comes back, I want to get started.

18         (Pause)

19         Mr. Brod, where's your client?

20         MR. BROD:  He's out in the --

21         THE COURT:  Can you get him.

22         Mr. Bach, you're going to stay here.  Mr. Brod is

23  going to get him, you're staying here.

24         We've got the defendant here.

25         Mr. Bach, you may proceed.

O51Cgar4                    Wachter - Cross

1              MR. BACH:  Thank you.

2    CROSS-EXAMINATION

3    BY MR. BACH:

4    Q.  Mr. Wachter, before you testified here today, you invoked

5    your Fifth Amendment right not to incriminate yourself;

6    correct?

7    A.  Correct.

8    Q.  And to remain silent; correct?

9    A.  Correct.

10   Q.  And there was then an order compelling you to testify

11   regardless; correct?

12   A.  Correct.

13   Q.  And giving you something called immunity from prosecution;

14   correct?

15   A.  Correct.

16   Q.  Sir, you were just asked some questions about the

17   invocation of your Fifth Amendment right.  Why did you invoke

18   your Fifth Amendment right?

19   A.  I didn't want to have any issues whatsoever regarding any

20   potential securities violations, primarily because I was

21   soliciting potential investors and I just didn't see any reason

22   to testify unless I was compelled to.

23   Q.  You were afraid of crimes associated with securities?

24   A.  Yes.

25   Q.  And you were sufficiently concerned that you invoked your

1   Fifth Amendment right; correct?

2   A.  Correct.

3   Q.  And those crimes associated with securities had to do with

4   the fact that you were promoting securities to people for

5   Patrick Orlando; correct?

6   A.  Correct.

7   Q.  And only certain people are allowed to promote securities;

8   correct?

9   A.  Correct.

10  Q.  And those are people with licenses; correct?

11  A.  Correct.

12  Q.  And you don't have a license; correct?

13  A.  Correct.

14  Q.  And you know that it's unlawful to do that because you're a

15  lawyer; correct?

16  A.  Correct.

17  Q.  And you have a law degree; correct?

18  A.  Yes.

19  Q.  And when you promoted the sale of securities without a

20  license, you knew you were breaking the law; correct?

21  A.  No.  No, I believed I was just making introductions.  I

22  wasn't doing any selling or solicitation whatsoever.

23  Q.  So when you contacted people about investing in a SPAC, you

24  weren't soliciting an investment interest?

25  A.  Well, I guess technically I was, but I wasn't giving any

1    details about the investment.  I was just making introductions.

2    Q.  If you're just making introductions, sir, why did you

3    invoke your Fifth Amendment right?

4    A.  Because I didn't see any downside not to.

5    Q.  Did you have a basis to invoke your Fifth Amendment rights

6    or not?

7    A.  I'm not sure.  I had counsel who advised me.

8    Q.  Did you commit a crime or not?

9    A.  I don't believe I did.

10   Q.  But you were worried enough that you invoked Fifth

11   Amendment rights and required an order compelling you to

12   testify?

13   A.  Correct.

14   Q.  We'll come back to that.  Let's talk about 2021.  Okay?

15   A.  Okay.

16   Q.  In 2021, your finances were tight; correct?

17   A.  Correct.

18   Q.  You had a friend, Mr. Orlando; correct?

19   A.  Correct.

20   Q.  You heard about opportunities to invest; correct?

21   A.  Yes.

22   Q.  And you personally didn't have the means to invest;

23   correct?

24   A.  Correct.

25   Q.  Even when your friend was offering the investment; correct?

1    A.  Yes.

2    Q.  Professionally, you have been a lawyer, but your practice

3    was no longer operational; correct?

4    A.  I hadn't practiced law for many, many years.

5    Q.  And you were in life insurance sales; correct?

6    A.  Correct.

7    Q.  But those life insurance sales weren't generating enough

8    money for you to invest; correct?

9    A.  Correct.

10   Q.  And at some point, you created an entity called the Wealth

11   Planning Center; correct?

12   A.  Well, I had that entity for over 20 years.

13   Q.  And the Wealth Planning Center, that's for you to help

14   other people make plans about how to manage their wealth;

15   correct?

16   A.  Yes.

17   Q.  And you gave them advice on wealth management; correct?

18   A.  Yes.

19   Q.  But even with the benefit of that knowledge, sir, you did

20   not personally have the wealth to invest in any shares of DWAC

21   stock or any other SPAC that Mr. Orlando was offering; correct?

22   A.  Correct.

23   Q.  And you needed money?

24   A.  Yes.

25   Q.  You knew some wealthy people, but you didn't have the money

1  | yourself to get involved in DWAC; correct?

2  | A.  Correct.

3  | Q.  And Mr. Orlando is your friend for over 10 years; correct?

4  | A.  Correct.

5  | Q.  You've described him as your best friend?

6  | A.  Did I describe him as my best friend?

7  | Q.  Maybe you did.

8  | A.  Well, I would say he's a good friend.  I don't know if I

9  | would use the term "best friend."

10 | Q.  And your kids have played together; correct?

11 | A.  Yes.

12 | Q.  Families have gotten together; correct?

13 | A.  Yes.

14 | Q.  He's tried to help you by referring insurance clients to

15 | you; correct?

16 | A.  Correct.

17 | Q.  And you needed money and asked him if you could get

18 | involved with what he was doing with SPACs; correct?

19 | A.  Correct.

20 | Q.  And he needed money, too; correct?

21 |         MR. SHAHABIAN:  Objection.

22 |         THE COURT:  You want to establish a foundation.

23 | Q.  Well, he was raising money -- he was looking for money to

24 | build SPACs; correct?

25 | A.  Correct.

1    Q.  SPACs need money before they go public; right?

2    A.  Correct.

3    Q.  And you knew a number of wealthy people; correct?

4    A.  Correct.

5    Q.  You had run the wealth management center; correct?

6    A.  Wealth Planning Center, yes.

7    Q.  I apologize.  The Wealth Planning Center; correct?

8    A.  Correct.

9    Q.  The plan was for you to use your contacts with wealthy

10   people and introduce them to Mr. Orlando in hope that you would

11   make a little for yourself; correct?

12   A.  Correct.

13   Q.  And your hope was that Mr. Orlando would find a way to pay

14   you back; correct?

15   A.  Correct.

16   Q.  You didn't have a license -- by the way, just pausing.

17   SPACs and founder shares and warrants and units and class B,

18   those are all forms of securities; right?

19   A.  Yes.

20   Q.  And you were going to go talk to people about investing in

21   those securities; correct?

22   A.  No, just make introductions for Patrick to talk about them.

23   Q.  So you weren't going to mention securities when you spoke

24   to them?

25   A.  Well, I mean, I may have, but the idea was just to make

1    introductions and Patrick to do all the presenting.

2    Q.  Didn't you recommend to some of your friends that they

3    invest in these opportunities?

4    A.  No, I didn't recommend that they do.  I said there's an

5    interesting opportunity.  If that's considered recommending,

6    then I'm not sure.

7    Q.  Didn't you say to them, I'm about to invest myself, I

8    suggest you do too?

9    A.  Yes.

10   Q.  Now, first of all, when you said to them that you are going

11   to invest yourself, was that a true statement?

12   A.  Yes, it was.  I was actually originally going to put I

13   think about 10 or $20,000 of my own money, then I thought I

14   would be better served keeping my money and helping him in

15   other ways, making introduction.

16   Q.  Sir, did you have the money at this time to invest or not?

17   A.  Yes.

18   Q.  You told us a moment ago that your funds were tight, you

19   didn't have money?

20   A.  I said I had 10 to $20,000 to invest.  I was broke, but I

21   wasn't tight on cash.

22   Q.  When you recommended to your friends that they invest, was

23   that a recommendation that they invest in securities or was it

24   not?

25   A.  Well, I'm not sure.  That's for, uh, legally to determine.

O51Cgar4                    Wachter - Cross

1   Q.   Now, you were doing this on behalf of your friend,

2   Mr. Orlando; correct?

3   A.   Correct.

4   Q.   There was no contract between you; correct?

5   A.   Correct.

6   Q.   There was no document memorializing this relationship;

7   correct?

8   A.   Correct.

9   Q.   Nothing said in writing you how you would be paid; correct?

10  A.   Correct.

11  Q.   This was completely off the books; right?

12  A.   Yes.

13  Q.   And the reason it was off the books was because it was

14  illegal; correct?

15           MR. SHAHABIAN:  Objection.

16           THE COURT:  Overruled.  It goes to his understanding.

17           You can answer with respect to your understanding and

18  why you did it off the books.

19  A.   I didn't believe it was illegal, I just believed it needed

20  to be done the right way and I could only be compensated for

21  certain things and not for other things, for marketing, for

22  introductions, but not the solicitation of selling a security.

23  Q.   Why didn't you put in writing that you were going around,

24  interesting potential investors in securities opportunities for

25  Mr. Orlando?

O51Cgar4                    Wachter - Cross

1   A.  I just -- I didn't.

2   Q.  There's a reason you didn't; correct?

3   A.  Perhaps.  I can't say what was in my mind at that moment,

4   but we didn't put an agreement together.

5   Q.  It's one of the same reasons that you invoked the Fifth;

6   right?

7   A.  Yes.

8   Q.  Because you were concerned that what you were doing was not

9   legal and could be regarded as unlawful; correct?

10  A.  Correct.

11  Q.  Mr. Orlando was okay with this; right?

12          MR. SHAHABIAN:  Objection.

13          THE COURT:  Overruled.

14  A.  I believe so.

15  Q.  He didn't insist that you have a securities license;

16  correct?

17  A.  Correct.

18  Q.  He knew you didn't have one; correct?

19  A.  Correct.

20  Q.  And he told you, don't worry about that, I'll find a way to

21  take care of it; correct?

22          MR. SHAHABIAN:  Objection.

23          THE COURT:  Sustained.

24  A.  He said --

25          THE COURT:  Sir, the way it works, if there's an

1  objection, you wait.  If I sustain the objection, then the

2  lawyer moves on to another question.  I sustained the

3  objection.

4           Go ahead, Mr. Bach.

5  Q.  What did he say to you?

6           MR. SHAHABIAN:  Objection.

7           THE COURT:  Sustained.

8  Q.  He told you he planned in the future to take care of you;

9  correct?

10  A.  Yes.

11  Q.  And that he planned to find some workaround, even though

12  you didn't have a license; correct?

13  A.  Yes, he used the term "illegal workaround," but yes.

14  Q.  And this legal workaround was never set forth in any legal

15  document between you and him; correct?

16  A.  Correct.

17  Q.  And you were never hired as an employee of DWAC; correct?

18  A.  Correct.

19  Q.  You were never hired as an employee of Benessere; correct?

20  A.  Correct.

21  Q.  You were never hired as an employee of something called the

22  Benessere Investment Group; right?

23  A.  Correct.

24  Q.  You had a verbal understanding with Mr. Orlando; correct?

25  A.  Correct.

O51Cgar4                    Wachter - Cross

1    Q.   And that understanding was somewhat loose; correct?

2    A.   Yes.

3    Q.   You didn't know what the terms were; right?

4    A.   No.

5    Q.   You just had a hope that he would find a workaround;

6    correct?

7    A.   Correct.

8         THE COURT:  Mr. Bach, it's now quarter of 1:00.  Is it

9    a convenient time for us to take our lunch break?

10        MR. BACH:  Yes, Judge.

11        THE COURT:  Members of the jury, as I indicated

12   before, we're going to take a lunch break now until 2 o'clock,

13   but you should be back in the jury room around 10 of 2:00 or so

14   so we can get started promptly.

15        Have a good lunch.  Don't talk about the case with

16   anybody, don't do any research on the case.

17        (Continued on next page)

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  The witness can step down.  You should be

3      here at 10 of 2:00, also.

4           Counsel, you can be seated.

5           Does the government wish to be heard with respect to

6      Ms. Shapiro's letter of this morning with respect to the

7      examination of Mr. Swider?

8           MS. HANFT:  Your Honor, we've informed defense counsel

9      that those particular messages, if defense agrees not to cross

10     on them, we will not introduce them in our case in chief.  My

11     understanding is that Ms. Shapiro wanted to consult with her

12     colleagues and then give us an answer on that.

13          THE COURT:  And that applies to Government Exhibit

14     531, 532, and 533; is that right?

15          MS. HANFT:  I believe so, off the top of my head, your

16     Honor.  We received the letter five minutes before court

17     started.

18          THE COURT:  You can look at my copy.

19          MS. SHAPIRO:  Those were the text messages.  Those are

20     the right numbers.

21          MS. HANFT:  Yes, your Honor, 531, 2, and 3.

22          THE COURT:  Ms. Shapiro, does that take care of the

23     issues?  They're not going to be offered in the case in chief.

24          MS. SHAPIRO:  We haven't had a chance to consult on

25     that.

1          THE COURT:  Why don't you consult quickly.

2          I indicated we would be addressing this at this time

3     and Mr. Swider's examination is coming this afternoon.

4          MR. BACH:  We appreciate that.  We truly are going as

5     fast.

6          MS. SHAPIRO:  So, if we understand the government's

7     position correctly and what they're saying is they won't offer

8     them if we're not planning to cross examine Mr. Swider on

9     whether or not he kept the information confidential, we're

10    happy to make that deal.  I just want to clarify that that's

11    what they're talking about.

12         THE COURT:  Well, as I understood what was said is it

13    may include that, but it was also that the cross examination

14    would not be on 531, 532, and 533.

15         MS. SHAPIRO:  That's correct, obviously because we

16    don't want the exhibits in evidence, correct.

17         MS. HANFT:  Your Honor, I think that's right, except I

18    just want to clarify that Mr. Swider will, as previously

19    discussed, testify that he believed the information that he

20    received as a member of DWAC's board was confidential, was

21    important, and that he could not trade based on it.

22         THE COURT:  I think that takes care of it,

23    Ms. Shapiro.

24         MS. SHAPIRO:  Yes.  Obviously, we already objected to

25    all that and your Honor overruled our objections, so that's

1    correct, your Honor.

2              THE COURT:  Then I think that that takes care --

3              MS. SHAPIRO:  There's one other matter in the

4    letter --

5              THE COURT:  I think that takes care of your points 2,

6    3, 4, and 5, which are all the points with respect to

7    Mr. Swider.

8              MS. SHAPIRO:  I think point 2 was a slightly different

9    point, but I may be getting the numbers wrong.

10             THE COURT:  You're right.  It takes care of 3, 4, and

11   5.  There is the separate question with respect to the mistaken

12   purchase of one share of DWAC.  So let me hear from the

13   government with respect to that.

14             MS. HANFT:  Yes, your Honor.  As we discussed the

15   other day, Mr. Swider will testify that although the

16   announcement of the merger had been made, he knew he was in

17   possession of confidential information and accordingly was not

18   sure if he was -- I think he used the phrase "cleansed of that

19   information," and therefore the purchase, which was accidental,

20   would be permissible.  That is, again, relevant per *Mahaffey*,

21   per *Carpenter*, for reasons we've discussed to the way the

22   information was treated and its confidentiality.

23             THE COURT:  If the purchase takes place on October 21

24   and the decision to purchase is October 21, what's your

25   response to the argument by Ms. Shapiro that it would be

misleading under 403 because it could suggest to the jury that

it's improper for the director of a public company to trade in

its shares, that it's always necessarily improper and always

improper?

MS. HANFT:  I don't think that that's what that

testimony suggests.  I don't believe he's going to say it's

always improper for a director to purchase shares in the

company or anything along those lines, but he will explain that

he didn't know what information that he was in possession of

had been released to the world.  And so, he was concerned about

the trade.

MS. SHAPIRO:  Your Honor, it's also cumulative.  The

403 problem clearly substantially outweighs any minimal

probative value.  And the government is going to elicit from

him what they said they're going to elicit about directors'

duties and so forth.  There's no need to add this additional

level of confusion by a director who seems to have

misunderstood that he couldn't trade and that can create the

suggestion that directors can never trade, which is extremely

prejudicial given our defense and the arguments that the jury

is going to have to grapple with.

THE COURT:  I'm going to overrule that objection.  I

will give a limiting instruction, if you want me to, that could

disabuse the jury of any notion that it's always improper for a

director to trade in the shares of a public company of which he

1   or she is a director.  If there's some language that you think

2   I should give as a limiting instruction, you can go over it

3   with the government first and you can propose it to me.

4          I'll see you a couple minutes before 2:00.

5          Is there anything else?

6          MS. SHAPIRO:  Your Honor, just a quick followup --

7   withdrawn.

8          THE COURT:  Mr. Brod.

9          MR. BROD:  Judge, we would ask for the usual

10  instruction that the prosecution team not confer with the

11  witness during the lunch break as he's on cross.

12         THE COURT:  You want to make sure that the government

13  doesn't confer with the witness while he's on cross.

14         I'll direct the government not to confer with the

15  witness while he's on cross examination.

16         MR. SHAHABIAN:  Of course, your Honor.

17         THE COURT:  Anything else from the government?

18         MR. SHAHABIAN:  I'd just flag on the Court's proposed

19  limiting instruction.  The government's position is, in this

20  particular case, there were agreements executed by directors of

21  DWAC prohibiting them from trading at all absent preclearance

22  from E.F. Hutton.  I think it would be misleading to suggest

23  that to the jury, given the facts of this case.

24         THE COURT:  If there is a limiting instruction that

25  the parties can agree on or one that Ms. Shapiro proposes, I'll

1    consider it and then you can make your argument.  At this

2    point, that point is moot.  I don't think that the government's

3    contention here is that it constitutes insider trading for

4    somebody to trade on the basis of information that has already

5    been publicly disclosed.

6              MR. SHAHABIAN:  No, that's not the government's

7    position.

8              THE COURT:  See you all back here by 2:00 p.m.

9              (Luncheon recess)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O511GAR5                        Wachter - Cross

AFTERNOON SESSION

2:05 p.m.

THE COURT:  Any reason why we can't put the witness on the stand and bring the jury in?

MR. BACH:  No, your Honor.

MR. SHAHABIAN:  No, your Honor.

THE COURT:  All right.  Let's get the witness and we'll bring the jury.

Mr. Fishman, let's bring in the jury.

Sir, step forward into the witness box.

(Jury present)

THE COURT:  Be seated.

Welcome back, members of the jury.

Mr. Bach, you may inquire.

MR. BACH:  Thank you, Judge.

CROSS-EXAMINATION CONTINUED

BY MR. BACH:

Q.  Mr. Wachter, before the break, we were talking about a loose understanding that you had with Mr. Orlando that you would help him recruit wealthy people to invest in return for his planning to take care of you at some point, correct?

A.  Correct.

Q.  And you acted and moved forward on the basis of that loose understanding, correct?

A.  Correct.

1   Q.  And you introduced Mr. Orlando to a number of very wealthy

2   people, correct?

3   A.  Correct.

4   Q.  One of those people was Gerald Shvartsman, correct?

5   A.  Correct.

6   Q.  Gerald Shvartsman is a buddy of yours, correct?

7   A.  Correct.

8   Q.  A very close friend.

9   A.  Correct.

10  Q.  You've known him for over ten years, right?

11  A.  Yes.

12  Q.  You text with him all the time, right?

13  A.  Well, I wouldn't say all the time, but we go through

14  periods, but yes.

15  Q.  He's offered your father-in-law a job, right?

16  A.  Oh, my father-in-law did handyman work, so, yeah, at one

17  point he just wouldn't——he said he had an opportunity for him,

18  yes.

19  Q.  And you and he, Mr. Shvartsman, sometimes have what you

20  refer to as "boys nights out," correct?

21  A.  Well, rarely, but yes.

22  Q.  And boys nights out are when a group of guys go out?

23  A.  I mean, it didn't happen probably more than a couple of

24  times in the last several years——we're both married with kids,

25  but——yes.

1    Q.  And apart from your very close friend Gerald Shvartsman,

2    you were also——you also knew that he had a brother named

3    Michael, correct?

4    A.  Correct.

5    Q.  And Gerald is in the furniture business, correct?

6    A.  Correct.

7    Q.  But you knew that Michael was in the investment business,

8    correct?

9    A.  Correct.

10   Q.  And you arranged to introduce Gerald and Michael Shvartsman

11   to Mr. Orlando, correct?

12   A.  Correct.

13   Q.  And you introduced other people to Mr. Orlando as well.

14   A.  Correct.

15   Q.  And Mr. Shvartsman, whom you introduced, formed a whole

16   group or syndicate of investors for Mr. Orlando, correct?

17   A.  Correct.

18   Q.  And you kept a tally in your head of the approximate amount

19   of money that your recruiting efforts were bringing into this

20   deal, correct?

21   A.  Correct.

22   Q.  And in the founders round, just the founders round——that's

23   the first stage, right?

24   A.  Yes.

25   Q.  The tally in your head was that you brought in more than

1    $5 million worth of founders shares investors, correct?

2    A.  Correct.

3    Q.  And of those, the tally in your head was that one

4    individual, Anton Postolnikov, invested $4.5 million, correct?

5    A.  I don't know the exact number, but that sounds——that sounds

6    about right.

7    Q.  He, Mr. Postolnikov, is a gentleman that you met, correct?

8    A.  Correct.

9    Q.  And he invested above and beyond, far above and beyond what

10   anyone else put into this syndicate, correct?

11   A.  Correct.

12   Q.  And after you arranged these introductions and meetings,

13   you figured in your head that you were owed something in

14   return, correct?

15   A.  Correct.

16   Q.  Let's now talk about what you got in return.

17          DWAC never paid you anything, correct?

18   A.  No.

19   Q.  There's no official DWAC ledger or accounting spreadsheet

20   showing any direct payment to you, correct?

21          MR. SHAHABIAN:  Objection.

22          MR. BACH:  I'll reword it.

23          THE COURT:  Sustained.

24   Q.  To your knowledge, sir, there's no official DWAC document

25   or statement showing any direct payment to you?

O511GAR5                    Wachter - Cross

1          MR. SHAHABIAN:  Objection.

2          THE COURT:  Overruled.

3     A.  Correct.

4     Q.  Mr. Orlando never arranged for you to receive any DWAC

5     shares or securities, correct?

6          MR. SHAHABIAN:  Objection.

7          THE COURT:  Overruled.

8     A.  Can you repeat the question.

9     Q.  You never received any DWAC shares or securities from

10    Mr. Orlando, correct?

11    A.  Correct.

12    Q.  You got no founders shares from him, correct?

13    A.  Correct.

14    Q.  For founders shares, you understood that people who

15    invested in DWAC had to sign something called a subscription

16    agreement, correct?

17    A.  Correct.

18    Q.  And that subscription agreement would memorialize their

19    ownership interests, correct?

20    A.  Correct.

21    Q.  You never signed a subscription agreement, correct?

22    A.  Correct.

23    Q.  If someone went to your house in 2021 and knocked on your

24    door and said, show me something from DWAC that says you own

25    DWAC founders shares, you would have nothing to show them,

1    correct?

2              MR. SHAHABIAN:  Objection.

3              THE COURT:  Let me see you at sidebar.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              THE COURT:  What's the basis of the objection?

3              MR. SHAHABIAN:  Form.  Asking what he would show

4     someone if someone showed up at his door, I mean, this is not

5     proper form of questioning.

6              THE COURT:  It's cross-examination.  You can go ahead.

7              MR. BACH:  Thank you.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2     BY MR. BACH:

3     Q.  Mr. Wachter, let me repeat my question.

4           If I went to your house in 2021—let me reword it.

5           If someone went to your house in 2021, knocked on your

6     door, and said, show me something from DWAC that says you own

7     DWAC founders shares, you would have nothing to show them,

8     correct?

9     A.  Correct.

10    Q.  Now you testified on direct that you gave up your founders

11    shares before the merger announcement, correct?

12    A.  Correct.

13    Q.  Sir, that's all make-believe, isn't it?

14    A.  Yes.

15    Q.  Because you didn't have any shares, correct?

16    A.  Well, I didn't have shares, but I got authorization from,

17    from the counsel of DWAC that I was having shares coming to me

18    and they—they authorized this transaction to be done.

19    Q.  Well, we're going to talk about that.  But you never

20    received any shares, correct?

21    A.  No.

22    Q.  And you didn't have any documents showing that you had

23    shares, correct?

24    A.  Correct.

25    Q.  And so when you say you wish you had held onto your shares

1    until after the announcement, that's a fantasy, right?

2    A.  I wouldn't use the word fantasy.

3    Q.  You didn't have any shares, correct?

4    A.  I had been told I was—had a future interest in those

5    shares.

6    Q.  Now what happened was, you had a friend named Zoltan

7    Person, correct?

8    A.  Correct.

9    Q.  And your wife and his wife were very close, correct?

10   A.  Correct.

11   Q.  And you found a way to get some money for your work, not

12   from DWAC and not from Patrick Orlando but from a third party,

13   correct?

14   A.  Correct.

15   Q.  And that third party was—

16   A.  Excuse me.

17   Q.  —was Zoltan Person, correct?

18   A.  Can you repeat that last part.

19   Q.  That third party was Zoltan Person, correct?

20   A.  Zoltan Present.

21   Q.  I'm sorry.  Thank you.  Zoltan—your friend was named

22   Zoltan Present.

23   A.  Correct.

24   Q.  And this was a way to arrange for you to get paid without

25   Mr. Orlando paying directly, correct?

1    A.  Correct.

2    Q.  This was the work-around that he was planning, correct?

3    A.  No.

4    Q.  Well, this was a way to pay you without any official record

5    from DWAC of any payment to you, correct?

6    A.  That was not the purpose of the transaction.

7    Q.  Okay.  Let's talk about the transaction.

8        You got paid how much, a hundred thousand dollars?

9    A.  Correct.

10   Q.  Who paid you that money?

11   A.  Zoltan.

12   Q.  When did he pay it to you?

13   A.  About a month after the merger announcement.

14   Q.  Okay.  And by the way, even if you had shares, shares would

15   not be transferable or sellable a month after the merger

16   announcement, correct?

17   A.  Well, certainly not sellable.

18   Q.  And the people who had founders shares had to hold onto

19   them, they were restricted, correct?

20   A.  Correct.

21   Q.  But you found a way to monetize the shares that existed in

22   your head before the time that people who had real founders

23   shares could make money on them, correct?

24           MR. SHAHABIAN:  Objection.

25           THE COURT:  Overruled.

1   A.  Yes.

2   Q.  Patrick Orlando knew you were doing that, correct?

3   A.  Correct.

4   Q.  He didn't try and stop you, did he?

5   A.  No.

6   Q.  And it was a lawyer named Alex Manje involved, correct?

7   A.  Correct.

8   Q.  And he knew this was going on?

9   A.  Yes.

10  Q.  He didn't try and stop you, right?

11  A.  No.

12  Q.  And he was the lawyer for Mr. Orlando's SPAC?

13  A.  Yes.

14  Q.  And he blessed this?

15  A.  Yes.

16  Q.  Let's look at the agreement.

17          MR. BACH:  Let's pull up Government Exhibit 830.

18  Q.  You were asked some questions about this by Mr. Shahabian

19  on direct.  Do you remember that?

20  A.  Yes.

21  Q.  And this is an agreement between you on the one hand and

22  your friend Zoltan Present on the other hand, right?

23  A.  Yes.

24  Q.  And it says it's entered into this 16th day of October,

25  correct?

1    A.  Correct.

2    Q.  Now you say that—okay.  So looking at this agreement,

3    there's no signature by Patrick Orlando, correct?

4    A.  Correct.

5    Q.  There's no signature by his attorney Alex Manje, correct?

6    A.  Correct.

7    Q.  This agreement nowhere sets forth any obligation of Patrick

8    Orlando to pay you any money, correct?

9    A.  Correct.

10   Q.  It nowhere sets forth any obligation of DWAC to pay you any

11   money, correct?

12   A.  Correct.

13   Q.  You say that Mr. Manje worked on or reviewed this

14   agreement?

15   A.  Yes.

16   Q.  He's not your lawyer, right?

17   A.  No.

18   Q.  He's the lawyer for DWAC and Mr. Orlando, correct?

19   A.  Yes.

20   Q.  He looked at this agreement to make sure that there was no

21   obligation stated—

22            MR. SHAHABIAN:  Objection.

23            THE COURT:  Sustained.

24   Q.  Did he play a role in drafting this agreement?

25   A.  I believe so.

1    Q.  And he drafted it so that there is no stated obligation by

2    Mr. Orlando or DWAC anywhere on the face of this agreement,

3    correct?

4            MR. SHAHABIAN:  Objection.

5            THE COURT:  Sustained.

6    A.  No.

7            THE COURT:  The objection was sustained, so the answer

8    is stricken.

9            Sir, let me give you the instruction that if I sustain

10   an objection, you don't answer the question.  If I overrule an

11   objection, then you answer the question.

12           Go ahead, Mr. Bach.

13   BY MR. BACH:

14   Q.  And you got a hundred thousand dollars from Zoltan Present

15   about a month after this, correct?

16   A.  Correct.

17           MR. BACH:  And can we go to the first page.

18   Q.  It says, in paragraph 2, "Closing.  Delivery of unit."  Do

19   you see that?

20   A.  Yes.

21   Q.  "Buyer understand and acknowledges that the closing of the

22   sale contemplated by this agreement may be subject to legal

23   restrictions."  Do you see that?

24   A.  Yes.

25   Q.  "Accordingly, the closing shall take place as soon as all

1   such restrictions are no longer in force, it being the intent

2   of the parties that nothing in this agreement shall violate any

3   applicable law."  Do you see that?

4   A.  Yes.

5   Q.  So what was your understanding of the wording here that

6   says, "the closing shall take place as soon as all such

7   restrictions are no longer in force"?

8   A.  That as soon as I was able to receive those shares, they'd

9   be transferred to him and he would——when all legal restrictions

10  no longer applied, the sale would be completed.

11  Q.  In other words, if you had founders shares, they would be

12  restricted like all founders shares, correct?

13  A.  Yes.

14  Q.  And the wording here says that, so as not to violate any

15  applicable law, no closing will take place until the point in

16  time when those restrictions no longer apply, correct?

17  A.  Correct.

18  Q.  But you got paid within a month, correct?

19  A.  Correct.

20  Q.  How did you treat that payment for tax purposes?

21  A.  I'm not exactly sure.  I'd have to check with my

22  accountant.

23  Q.  You didn't report it on your taxes, did you, sir?

24  A.  I'm——I'm not saying I didn't.  I'm saying I'm not sure how

25  the——my accountant reported it.

1    Q.   Were you ever issued a W-2 or a 1099——

2    A.   No.

3    Q.   ——in connection with these funds?

4    A.   No.

5            MR. BACH:  Now we'll take this down.

6    Q.   In addition, Mr. Orlando has paid you some cash, correct?

7    A.   Yes.  Well, actually, let me clarify that.  He's loaned me

8    some cash.

9    Q.   Okay.  When did Mr. Orlando loan you cash, sir?

10   A.   I don't know the dates.

11   Q.   Roughly.

12   A.   Sometime maybe 2022; sometime in 2022.

13   Q.   How much cash did he loan you?

14   A.   I don't know.

15   Q.   You don't have any idea?

16   A.   No.

17   Q.   Is there any document that memorializes that loan?

18   A.   I'm sure there is.  I don't have it.

19   Q.   Did he pay you from his personal funds?

20   A.   I don't believe so.

21   Q.   Did he pay you from DWAC?

22   A.   No, I don't believe so.

23   Q.   Where——tell the jury where he paid you from.

24   A.   I don't know what——

25            MR. SHAHABIAN:  Objection.

1          THE COURT:  Overruled.

2     A.  One of his entities.

3     Q.  He paid you through an entity called Entoro, correct?

4     A.  That I'm not sure about.  Entoro is a securities agency,

5     entity, where Patrick holds his license.

6     Q.  Where what?

7     A.  Patrick holds his securities license with Entoro.

8          MR. BACH:  Can we show the witness DX——Defense

9     Exhibit 75.9.

10    Q.  Do you recognize this?

11    A.  I just see something that says Mark Wachter MSA, four-page

12    document, omitted referral——

13         MR. SHAHABIAN:  Objection.

14         THE COURT:  Don't read it.  You're just being asked if

15    you recognize the document or recognize the message.  But it's

16    not in evidence so you shouldn't read it.

17         MR. BACH:  Can we show Mr. Wachter a little more

18    content here so he can see the——let's show him the fuller

19    Exhibit 75.

20         Apologies.  We're trying to deal with a lengthy——

21    BY MR. BACH:

22    Q.  Showing you what's marked for identification as Defense

23    Exhibit 75.  Do you recognize this as text messages between you

24    and Mr. Orlando?

25    A.  Yes.

1  Q.  Okay.  I want to focus your attention on a portion of them,

2  and I'm going to ask you to look at 75.9.  Do you recognize

3  this as a portion of the texts between you and Mr. Orlando——

4  A.  Yes.

5  Q.  ——on or about February 27, 2022?

6  A.  Yes.

7              MR. BACH:  We offer this.

8              THE COURT:  Any objection?

9              MR. SHAHABIAN:  Objection.  Relevance.

10             THE COURT:  Overruled.

11             (Defendant's Exhibit 75.9 received in evidence)

12             MR. BACH:  Could we please publish 75.9 for the jury.

13             THE COURT:  Are you offering just that portion,

14  Mr. Bach?

15             MR. BACH:  For now, yes.

16             THE COURT:  Okay.  So we'll do the same thing with

17  this exhibit that you're going to do with the other exhibits,

18  and this portion will become Defense Exhibit 75-A.

19             MR. BACH:  Thank you.  And we tried to do that.  We

20  called it 75.9, but we can go to the letters.

21  BY MR. BACH:

22  Q.  Okay.  Mr. Wachter, do you see where this says, "Entoro MSA

23  Wachter four pages document omitted"?  Do you see that?

24  A.  Yes.

25  Q.  And then it says, "Referral fee agreement, Entoro, six

1   pages"?

2   A.  Yes.

3   Q.  Okay.  Mr. Orlando arranged to pay you a referral fee

4   through an entity called Entoro, correct?

5   A.  Yes.

6   Q.  And that was referrals for people who were investing in

7   securities that he was offering, correct?

8   A.  Yes.

9   Q.  And you and he made this arrangement even though you didn't

10  have a license to sell securities, correct?

11  A.  Yes.

12  Q.  And if someone subpoenaed—if someone went to Entoro and

13  asked to see documents and records, they might see this

14  document, correct?

15  A.  Correct.

16  Q.  But if someone went to DWAC and asked to see this document,

17  do you know whether they would see it?

18  A.  I don't know.

19  Q.  This was done, sir, so that there would be no record inside

20  DWAC of the interactions that you were having—

21          THE COURT:  Sustained.

22  A.  No.

23          THE COURT:  Sustained.

24          MR. BACH:  I'll withdraw.

25  Q.  Did you pay taxes—well, how much money did you receive

1    pursuant to this referral fee arrangement?

2    A.  I don't remember what the number is, but you have the

3    referral fee agreement.  It probably says.

4    Q.  And did you pay taxes on it?

5    A.  I believe I did.

6    Q.  Now as you understood it——we can take that down——the more

7    you helped Mr. Orlando, the more he planned to help you,

8    correct?

9    A.  Correct.

10   Q.  And you made as many introductions to wealthy people for

11   him as you could, correct?

12   A.  Correct.

13   Q.  And to make those introductions, first you had to talk to

14   the wealthy people, correct?

15   A.  Correct.

16   Q.  And you had to interest them in Mr. Orlando, correct?

17   A.  Correct.

18   Q.  And so before introducing them to Mr. Orlando, you would go

19   and meet with these wealthy individuals or talk with these

20   wealthy individuals by yourself, correct?

21   A.  Correct.

22   Q.  And when you met with them by yourself, you told them about

23   Mr. Orlando, correct?

24   A.  Correct.

25   Q.  And you told them that——by the way, did you tell them that

1    Mr. Orlando had ever successfully connected a SPAC with a

2    target operating company before?

3    A.  My conversations typically did not get that comprehensive.

4    It was more of teeing up a meeting.

5    Q.  And the way you teed up a meeting was by dangling the name

6    Donald Trump, correct?

7    A.  I wouldn't use that phrase, but certainly was helpful that

8    he had a relationship with Mr. Trump.

9    Q.  And you would talk about that when you got together with

10   wealthy individuals to urge them to meet with Patrick Orlando,

11   correct?

12   A.  Correct.

13   Q.  And that was——you thought that just mentioning the former

14   president's name and Mr. Orlando's relationship with him would

15   be a good way to bring in potential investors, correct?

16   A.  Correct.

17   Q.  And I think you testified on direct that you and

18   Mr. Orlando started having these discussions and this working

19   arrangement in June of 2021, correct?

20   A.  It's the first time he mentioned the SPACs.  I wouldn't say

21   that that was probably the first time that we talked about the

22   business relationship.  I believe I was considering investing

23   myself at that time.

24   Q.  But you said that you and he didn't start discussing Trump

25   Media Group until June, correct?  That's what you said on

1  direct.

2  A.  Yes, but I don't remember when we first had our first

3  meeting.  I thought it was——I thought that was also around

4  June.  So I'm not sure of the exact dates.

5  Q.  Well, you signed an NDA on June 2nd, correct?

6  A.  Correct.  That was originally for me to invest myself.

7  Q.  Okay.  And on direct, you said that you started discussing

8  Trump with Mr. Orlando at the time——at or around the time that

9  you signed this confidentiality agreement, correct?

10            MR. SHAHABIAN:  Objection.

11            THE COURT:  Sustained.

12  Q.  On direct, you said that you and Mr. Orlando began these

13  discussions in June 2021, correct?

14  A.  Correct.

15  Q.  All right.  In fact, sir, you and he began discussing Trump

16  much earlier, correct?

17  A.  No.

18  Q.  Didn't you start discussing this with him in April?

19  A.  I don't know.  I don't know the dates.

20  Q.  Let me show you what's been marked for identification as

21  Government Exhibit 502.

22            MR. BACH:  Could we show just the witness,

23  Ms. McFerrin, Government Exhibit 502 on April——can't tell if

24  it's April 29th or April 30th.  April 29.

25  Q.  Do you see that?

1   A.   Yes.

2   Q.   That's a——that was——those are text messages between you and

3   Mr. Orlando on or around April 29, 2021, correct?

4   A.   Correct.

5           MR. BACH:  We offer it, this page.

6           THE COURT:  Any objection?

7           MR. SHAHABIAN:  Objection.

8           THE COURT:  Basis?

9           MR. SHAHABIAN:  I don't believe the foundation for

10  impeachment has been laid.

11          THE COURT:  Sustained.

12  BY MR. BACH:

13  Q.   Well, on April 29th, Mr. Orlando sent you an article from a

14  publication called zerohedge.com, correct?

15          MR. SHAHABIAN:  Objection.  Misstates the record.

16          MR. BACH:  I'm sorry.

17          THE COURT:  Overruled.

18          MR. BACH:  Let me withdraw that question and reword

19  it.

20  Q.   On April 29th, you sent Mr. Orlando an article that was in

21  a publication called zerohedge.com, correct?

22          MR. SHAHABIAN:  Objection.

23          THE COURT:  Let me see you at sidebar.

24          (Continued on next page)

25

1          (At the sidebar)

2          THE COURT:  Mr. Shahabian.

3          MR. SHAHABIAN:  No foundation has been laid to admit

4     the hearsay, and counsel is now just reading to the jury, and

5     there's been no foundation laid for an adequate impeachment.

6     The questions have been confusing.  The witness said he first

7     talked about the SPAC deals in the summer of 2021 with

8     Mr. Orlando.  Sending him an article from a publication called

9     Zero Hedge is not what he was questioning about, and so to

10    start reading hearsay into the record to suggest an impeachment

11    and offer it for its truth is improper.

12         MR. BACH:  I'm going to show that there's additional

13    communications in April in which he is discussing Trump with

14    Mr. Orlando and others without an NDA.  I'm not offering this

15    in for the truth of what's stated in that Zero Hedge article.

16    It's for the fact that this is what transpired, this is the

17    history, the fact that it was said, that they're having these

18    communications, and I'm going to show that contrary to what he

19    testified to on direct, that starting as early as April, he was

20    beginning to start to pitch people, including SPACs.

21         THE COURT:  Well, I mean, you conflated a couple of

22    things there.

23         I think with respect to impeachment, Mr. Shahabian's

24    point is well taken, that you're not impeaching a statement

25    that he made on direct.

1          What I hear you also saying is that you're trying to

2    offer this as affirmative proof with respect to when the

3    discussions began about the SPAC, and this article doesn't show

4    anything about there being a discussion about a SPAC.

5          MR. BACH:  Well, Judge, I'm going to get to that, and

6    I'm going to show that there were discussions with SPAC.  But I

7    think I'm entitled to tell the story, to show that there

8    is—part of our defense here is that there is a discussion that

9    begins early on between Shvartsman brothers and Mr. Wachter

10   that's independent of—

11         THE COURT:  In early when?

12         MR. BACH:  In April.  Remember that Mr. Garelick is

13   not involved until June 18.  And I think—

14         THE COURT:  I just didn't hear the month you said.

15         MR. BACH:  And I think it's critical to show—I think

16   there's no prejudice to this evidence and it's critical to show

17   that in April, Mr. Wachter is already kind of warming up the

18   audience on these Trump SPACs and talking to Mr. Shvartsman

19   about this, it's being done without NDAs, it's not being

20   treated as confidential, and that's part of our defense, and—

21         THE COURT:  But how is that relevant to the

22   materiality of the exclusivity agreements and the information

23   that is conveyed in June?

24         MR. BACH:  Well, I think also, as part of the

25   relationships that go to the alternative tipping theory, it's

going to show that there are—there is this independent line of

communications and discussions that are separate and apart from

Mr. Garelick, that have to do with Trump and SPACs.  I mean,

we're entitled to present a defense here.

MR. SHAHABIAN:  I just don't think that a foundation

has been laid right now to put this document in.

THE COURT:  I'll permit the line of examination.  I

think you can inquire on that on redirect.

MR. BACH:  Thank you.

(Continued on next page)

1          (In open court)

2    BY MR. BACH:

3    Q.  Mr. Wachter, on April 29th, you sent a text message to

4    Mr. Orlando that forwarded an article published in a

5    publication called zerohedge.com, correct?

6    A.  Correct.

7    Q.  And the title of that article is "Pitch for Trump Media

8    Group values president's brand at $15 billion," correct?

9    A.  Correct.

10   Q.  Then, around the same time, you contacted your very close

11   friend Gerald Shvartsman, you talked to him about SPAC

12   opportunities, correct?

13   A.  Correct.

14   Q.  That wasn't in June, correct?

15   A.  I don't remember when it was, but we met in June, so it had

16   to be sometime prior to when we met.

17   Q.  You hadn't signed an NDA at this point in April, correct?

18   A.  I don't remember the date when I signed the NDA was.

19   Q.  Okay.  And you told—contacted Gerald Shvartsman on

20   April 28th to see if he's interested in learning more about a

21   SPAC opportunity, correct?

22   A.  Correct.

23   Q.  And you told him that you were planning to invest yourself,

24   correct?

25   A.  I'd have to see the text, but sounds very possible.

1              MR. BACH:  Let's show the witness Defense

2       Exhibit 73.3.

3       Q.  Let me know when you're ready, sir.

4       A.  I read it.

5       Q.  Do you recognize that text?

6       A.  Yes.

7       Q.  What is it?

8       A.  Text exchange between myself and Gerald Shvartsman.

9              MR. BACH:  We offer it.

10             MR. SHAHABIAN:  Objection.

11             THE COURT:  Overruled.

12             (Defendant's Exhibit 73.3 received in evidence)

13             MR. BACH:  Could we publish it, please, to the jury.

14             Has it been published?  Thank you.

15      BY MR. BACH:

16      Q.  Referring your attention to the top text on this page, this

17      is a text from you to Gerald.  Do you see that?

18      A.  Yes.

19      Q.  And it says, "Good morning.  Let me know if you are still

20      interested in learning more about the SPAC opportunity.  I'm

21      planning to invest today."  Do you see that?

22      A.  Yes.

23      Q.  Did you invest that day?

24      A.  No.

25      Q.  And then you go on to write, "I think it's worth a look.

1   Would love to know what you and your brother think."  Do you

2   see that?

3   A.  Yes.

4   Q.  And the brother was Michael Shvartsman, correct?

5   A.  Correct.

6   Q.  And you started reaching out to Gerald and Michael about

7   SPAC opportunities in April, correct?

8   A.  At the very end of April, but yes.

9   Q.  And you got together with Gerald——we can take that down,

10  please——you got together with Gerald and Michael Shvartsman

11  before they ever met Mr. Orlando, correct?

12  A.  I'm not aware of that.

13  Q.  Well, you told them about the Trump opportunity before they

14  signed any NDA, correct?

15  A.  I'm not aware of that either.

16  Q.  Well, on June 13, you called Michael Shvartsman on the

17  phone, correct?

18  A.  I——I would have to see a record.  I——I can't recall who I

19  called back from three years ago.

20          MR. BACH:  Can we please show the witness Defense

21  Exhibit 75.2.

22  Q.  Do you see that, sir?

23  A.  Yes.

24  Q.  Take a moment; let me know when you're ready.

25  A.  Okay.

1   Q.  Do you recognize this?

2   A.  Yes.

3   Q.  What is it?

4   A.  It's a text exchange between myself and I'm assuming—I

5   don't see who it's with, but I'm assuming it's with probably

6   Patrick Orlando.

7   Q.  On June 13, 2021, correct?

8   A.  Correct.

9           MR. BACH:  We offer it.

10          MR. SHAHABIAN:  No objection.

11          THE COURT:  Received.

12          (Defendant's Exhibit 75.2 received in evidence)

13          MR. BACH:  Could we publish it to the jury, please.

14  Q.  Take a look at it.  At the top, on June 13th, you write,

15  "Just spoke with Mike Shvartsman.  Told me he's ready to invest

16  in Digital.  Planning to speak with him tomorrow to get him

17  paperwork.  If he does, it's likely his brother Gerald is also

18  coming in too.  Good guys for this and future deals.  Very

19  connected."  Do you see that?

20  A.  Yes.

21  Q.  And then at 3:44, you write, "He's also very smart money."

22  Do you see that?

23  A.  Yes.

24  Q.  What did you mean by that?

25  A.  That he had good connections.

1    Q.  And then just a couple days later, on June 16th, you saw

2    Michael Shvartsman in person, correct?

3    A.  Correct.

4    Q.  Without Mr. Orlando, correct?

5    A.  Well, that, I don't know.

6    Q.  Well, you didn't meet with Michael Shvartsman and Patrick

7    Orlando together until you had the meeting at Rocket One's

8    offices in Florida on June 18th, correct?

9    A.  Yes.

10   Q.  So on June 16th, when you got together with Michael

11   Shvartsman, that was just you and Michael Shvartsman, without

12   Mr. Orlando, correct?

13   A.  I don't——I'm not aware of that meeting.

14   Q.  Okay.  Let me show you Defense Exhibit 86.1.

15          Let me ask you, did you see Michael Shvartsman on the

16   evening of June 16, 2021?

17   A.  The only thing I could remember——I've never had a

18   one-on-one meeting with Michael Shvartsman, ever, so the only

19   thing that I can speculate is that it was a group dinner with a

20   bunch of guys.

21   Q.  Right.  It was a boys night out, correct?

22   A.  Yeah.

23   Q.  Correct?

24   A.  That sounds right.

25   Q.  So this is on June 16th, correct?

1  A.  Correct.

2  Q.  Michael's there, correct?

3  A.  Correct.

4  Q.  Gerald's there, correct?

5  A.  Correct.

6  Q.  And people are having a good time, correct?

7  A.  Correct.

8  Q.  And Mr. Orlando is not there, correct?

9  A.  No.

10  Q.  And you raised DWAC with them, correct?

11  A.  No.

12  Q.  You don't mention to them DWAC?

13  A.  The dinner was a social event.  I believe I knew we were

14  going to be meeting a few days later.

15  Q.  Well, you begin, even before the June 18th meeting,

16  discussing warrants with Michael Shvartsman, correct?

17  A.  I was discussing warrants with him?

18  Q.  Yes.

19  A.  Again, I can't answer these without seeing context.  I need

20  to see the message.  This is three years ago.  I don't know

21  what I said or didn't say.

22  Q.  Didn't you tell Mr. Orlando before the June 18th meeting

23  that Michael Shvartsman was particularly interested in

24  warrants?

25  A.  I may have, but I'd need to see that message.

1    Q.  Okay.  Let me see if I can refresh your recollection.

2    A.  Okay.

3    Q.  Show him Defense Exhibit 75.4.

4    A.  Okay.

5    Q.  Okay.  Now do you recognize this?

6    A.  Excuse me?

7    Q.  Do you recognize this document?

8    A.  Yes.

9    Q.  What is it?

10   A.  Well, it's Patrick saying, "By the way, I can sell warrants

11   and—"

12   Q.  Before you get there—

13   A.  Oh.

14          THE COURT:  Remember, when you're asked, what is the

15   document, don't read it.  Don't read the context.

16   A.  It's a text message exchange between Patrick Orlando and

17   myself.

18          MR. BACH:  We offer it.

19          MR. SHAHABIAN:  Objection.

20          THE COURT:  Overruled.

21          (Defendant's Exhibit 75.4 received in evidence)

22          MR. BACH:  Publish it to the jury, please.

23   Q.  You see this is on June——these are texts between you and

24   Mr. Orlando on June 17th, correct?

25   A.  Correct.

O511GAR5                     Wachter - Cross

1  Q.  That's the day before the meeting at Rocket One, correct?

2  A.  Correct.

3  Q.  And by the way, you've never—the name Bruce Garelick

4  hasn't entered your universe at this point in time, correct?

5  A.  Correct.

6  Q.  And Patrick Orlando writes to you, "By the way, I can sell

7  warrants and warrants package cheaper to Mike."  Do you see

8  that?

9  A.  Yes.

10 Q.  And that's a reference to Michael Shvartsman, correct?

11 A.  Correct.

12 Q.  Because you've told Mr. Orlando that Michael is interested

13 in warrants, correct?

14 A.  I must have.

15 Q.  Then you tell Mr. Orlando that you're setting up a meeting

16 for the next day, correct?

17 A.  Correct.

18 Q.  So before the meeting on June 18th, you had mentioned Trump

19 and Trump Media Group to Michael and Gerald Shvartsman,

20 correct?

21 A.  I believe so.  I can't say with certainty.

22 Q.  And you began discussing the prospect of purchasing

23 warrants with them, correct?

24 A.  I wouldn't use that terminology, but I'm—I assume that he

25 must have said he was interested in warrants and I shared it

1    with Patrick.

2    Q.  And these discussions of Trump and warrants are all before

3    any meeting with Mr. Garelick, correct?

4    A.  Correct.

5    Q.  Now when you were sent that NDA in June, you signed it,

6    correct?

7    A.  Correct.

8    Q.  But you never read it, correct?

9    A.  Well, I can't recall.

10   Q.  Well, you've met with the prosecutors in this case,

11   correct?

12   A.  What's that?

13   Q.  You met with the prosecutors in this case, correct?

14   A.  Yes.

15           MR. BACH:  One moment.

16           I'm sorry.  Just bear with us.

17   Q.  Let me see if I can refresh your recollection.  Do you

18   remember whether or not you read the NDA?

19   A.  No.

20   Q.  Let me see if I can refresh your recollection.  Let me show

21   you——

22           MR. BACH:  Without publishing it to the jury, can we

23   show him, Ms. McFerrin, 3514-07, at the top of page 3.

24   Q.  If you could read that first paragraph all the way down to

25   the bottom.

1              THE COURT:  You're being asked to read it to yourself,

2    not out loud.

3              MR. BACH:  Yes.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. BACH:

2    Q.  Now, does that refresh your recollection about whether or

3    not you read the NDA?

4    A.  I obviously stated at one point --

5            THE COURT:  No.  You're not being asked what you

6    stated.  Does it bring back a memory for you?

7    A.  No, not really.

8    Q.  As you sit here today, can you say whether you actually

9    read the NDA?

10   A.  I can't say for sure.

11   Q.  And you can't say for sure what was or was not allowed to

12   be shared, what information was or was not allowed to be

13   shared; correct?

14   A.  Correct.

15   Q.  You weren't sure what was allowed to be shared or not

16   shared in June 2021; correct?

17   A.  Correct.

18   Q.  Now, after you had met with Michael Shvartsman and texted

19   with Gerald Shvartsman, you arranged for them to meet with

20   Patrick Orlando on June 18th; correct?

21   A.  Correct.

22   Q.  That was at the Rocket One offices in Aventura, Florida?

23   A.  Correct.

24   Q.  And you were in the room, Michael was in the room, Gerald

25   was in the room, and Patrick Orlando was in the room, as well;

1    correct?

2    A.  Correct.

3    Q.  And Bruce Garelick was not in the room; correct?

4    A.  Correct.

5    Q.  And he was not even participating in any way at the

6    beginning of the meeting; correct?

7    A.  Correct.

8    Q.  And at some point during the meeting, he was connected

9    remotely; correct?

10   A.  I believe so.

11   Q.  Do you remember at what point in the meeting he was

12   connected?

13   A.  No.

14   Q.  You said on direct that there was a document shown at the

15   meeting.  Do you remember that?

16   A.  Yes.

17   Q.  Benessere LOI; correct?

18   A.  Correct.

19   Q.  Do you know whether Mr. Garelick joined the meeting before

20   or after that document was shown?

21   A.  I don't know.

22   Q.  At the meeting, there was a discussion about Trump Media

23   Group; correct?

24   A.  Correct.

25   Q.  There was discussion about other potential targets;

1   correct?

2   A.  Correct.

3   Q.  There was discussion about SPACs in general; correct?

4   A.  Correct.

5   Q.  And there was discussion that Michael Shvartsman would try

6   to bring in a group of other investors for the founders shares

7   round; correct?

8   A.  Correct.

9   Q.  And it was understood that, for purposes of forming that

10  investment group, Michael Shvartsman and his team would reach

11  out to some of their contacts, tell them about the SPAC, and

12  arrange for meetings with Mr. Orlando; correct?

13  A.  Correct.

14  Q.  And no one said to them, by the way, don't mention Donald

15  Trump; correct?

16          MR. SHAHABIAN:  Objection.

17          THE COURT:  Sustained.

18  Q.  Do you recall anyone saying at any point in the meeting,

19  when you reach out to investors, do not refer to Trump Media

20  Group or Donald Trump?

21  A.  I can't say for certain.

22  Q.  That meeting, sir, was the only time in your life that you

23  remember having any contact or communication with Bruce

24  Garelick; correct?

25  A.  Correct.

1    Q.  And he wasn't in the room; correct?

2    A.  Correct.

3    Q.  And do you remember if he said anything during the meeting?

4    A.  I don't remember.

5    Q.  And do you know if you could even see him through the video

6    connection?

7    A.  I don't really remember.

8    Q.  You know he didn't live in Florida; correct?

9    A.  I knew he wasn't in Florida at the time, but I didn't know

10   where he lived.

11   Q.  When you went out, Mr. Garelick wasn't in your social

12   circles; correct?

13   A.  Correct.

14   Q.  If there was a boys night out, he was not out with the

15   boys; correct?

16   A.  Correct.

17   Q.  You said on direct that you met Anton Postolnikov around

18   this time; correct?

19          MR. SHAHABIAN:  Objection.  Misstates the testimony.

20          THE COURT:  Sustained.  Also vague.

21          MR. BACH:  I'm sorry.

22   Q.  At some point that summer, you met Mr. Anton Postolnikov;

23   correct?

24   A.  Correct.

25   Q.  And you and he hit it off; right?

O51Cgar6                    Wachter - Cross

1   A.  Correct.

2   Q.  And you were eager to network with him; correct?

3   A.  Correct.

4   Q.  Because you understood he was investing serious money;

5   correct?

6   A.  Correct.

7   Q.  And he was the largest investor in the founders round;

8   correct?

9   A.  As far as I was aware.

10  Q.  And from time to time, you discussed DWAC with him;

11  correct?

12  A.  Correct.

13  Q.  And your friend, Mr. Orlando, wanted to build a

14  relationship with him, too; correct?

15  A.  Correct.

16  Q.  And you were aware that Mr. Orlando would from time to time

17  meet with him without you; correct?

18          MR. SHAHABIAN:  Objection.

19          THE COURT:  Sustained.

20  Q.  From time to time, Mr. Orlando would text you about get

21  togethers --

22          MR. SHAHABIAN:  Objection.

23          THE COURT:  Sustained.

24  Q.  Were you in regular communication with Patrick Orlando

25  during this period?

1   A.  Yes.

2   Q.  Did you have an understanding of whom he socialized with

3   from time to time?

4   A.  Sometimes.

5   Q.  Did you understand that he was socializing with

6   Mr. Postolnikov on occasions?

7           MR. SHAHABIAN:  Objection.

8           THE COURT:  Sustained on hearsay grounds.  There is a

9   way to ask the question, but you haven't gotten it yet.

10          MR. BACH:  I'm only so good, Judge.

11          THE COURT:  I don't know.

12  Q.  He told you from time to time he planned to meet with

13  Mr. Postolnikov; correct?

14  A.  Correct.

15          MR. BACH:  I have a wiser colleague.

16  Q.  And you were interested in being a relationship manager

17  between Mr. Orlando on the one hand and Mr. Shvartsman on the

18  other hand; correct?

19  A.  You said Mr. Shvartsman.

20  Q.  I'm sorry.  Withdrawn.  I'm getting tired.

21          You were interested in being the relationship manager

22  between Mr. Orlando on the one hand and Mr. Postolnikov on the

23  other hand; correct?

24  A.  Correct.

25  Q.  You were also eager to sign up Mr. Postolnikov as one of

1  your life insurance clients; correct?

2  A.  Correct.

3  Q.  Your life insurance business hadn't generated that much

4  cash for you; correct?

5  A.  No.  I can clarify that.

6  Q.  But if you lined up Mr. Postolnikov for life insurance,

7  that would be a nice set of premium payments for you; correct?

8  A.  Yes.

9  Q.  Because you understood that Mr. Postolnikov was worth

10  somewhere in the neighborhood of a quarter of a billion

11  dollars; correct?

12  A.  I don't recall what the number was, but it was significant.

13  I believe it was north of $100 million.  I can't recall offhand

14  what the number was.

15  Q.  If he got life insurance to protect that amount, the

16  premiums would be high; correct?

17  A.  Yes.

18  Q.  And that would be a source of some income for you; correct?

19  A.  Yes.

20  Q.  And you were very interested in getting a piece of that

21  life insurance business from Mr. Postolnikov; correct?

22  A.  Correct.

23  Q.  And Mr. Orlando helped you with that; correct?

24  A.  I'm not sure how to answer that question.  I don't know how

25  he helped me.

1    Q.  Are you familiar with something called irrevocable life

2    insurance trust?

3    A.  Yes.

4    Q.  What is that?

5    A.  It's a trust that's created for the purpose of purchasing

6    life insurance.

7    Q.  And you made a video of the signing of Mr. Postolnikov's

8    irrevocable life insurance trust; correct?

9    A.  Correct.

10   Q.  And on that video, Mr. Orlando was caught on video along

11   with you and Mr. Postolnikov; correct?

12   A.  Correct.

13   Q.  And you understood, I asked you a few moments ago about

14   Mr. Orlando's plans to socialize with Mr. Postolnikov, but you

15   socialized with Mr. Postolnikov, as well; correct?

16   A.  Correct.

17   Q.  So, for instance, on September 15th, you you visited

18   Mr. Postolnikov at his home on Fisher Island; correct?

19   A.  I don't have the dates in front of me, so it's tough for me

20   to answer whether that's a correct statement or not.

21          MR. BACH:  Let me see if I can refresh your

22   recollection.

23          Can we show him 3514-09 at page 5, paragraph 1.

24          Let me show you a different exhibit than the one I

25   just mentioned.  Let me show you what's been marked for

1  identification as Defendant's Exhibit 72.1.

2          I'm going to withdraw this.  I think I can do this in

3  a different way.

4          Can we show Mr. Wachter 72.2, please.

5  Q.  Focusing your attention at the text at the top.

6  A.  Yes.

7  Q.  Do you recognize that?

8  A.  Yes.

9  Q.  What is it?

10  A.  Text exchange between Anton and myself.

11  Q.  On what date?

12  A.  September 16th.

13          MR. BACH:  We offer it.

14          MR. SHAHABIAN:  No objection.

15          THE COURT:  Received.

16          (Defendant's Exhibit 72.2 received in evidence)

17          MR. BACH:  Can we publish it to the jury.

18  Q.  It says, hi, Anton.  This is you texting Anton Postolnikov

19  on September 16th; correct?

20  A.  Correct.

21  Q.  And you say, it was really great hanging out with you and

22  Patrick at Fisher last night.

23          Do you see that?

24  A.  Yes.

25  Q.  That's Patrick Orlando; correct?

1   A.  Yes.

2   Q.  And Fisher is Fisher Island, which is an enclave near

3   Miami; correct?

4   A.  Correct.

5   Q.  And you thank him for his hospitality.

6           Do you see that?

7   A.  Yes.

8   Q.  And you ask him to connect about insurance; correct?

9   A.  Yes.

10  Q.  So you got together with him and Mr. Orlando on September

11  15th; correct?

12  A.  Correct.

13  Q.  Then, on September 24th, 2021, you visited him again at his

14  Fisher Island residence; correct?

15  A.  I don't know the dates, but if you showed me the text that

16  said that I did, I would agree with that.  It would make sense.

17  Q.  Let me show you what's been marked for identification as

18  Defendant's Exhibit 72.3, and refer your attention to those two

19  pages.  Take a look and let me know when you've had a chance.

20          Are you ready, Mr. Wachter?

21  A.  I'm ready.

22  Q.  Referring your attention to the text toward the bottom half

23  of the second page, do you recognize that?

24  A.  Yes.

25  Q.  What is it?

1  A.  It's a text exchange between Anton and myself.

2           MR. BACH:  We offer it.

3           MR. SHAHABIAN:  Objection.  It's being offered to

4  refresh.

5           MR. BACH:  No, we're offering it not to refresh.

6           THE COURT:  Hold on for a second.

7           Sustained.

8           MR. BACH:  Could we have a brief sidebar?

9           THE COURT:  No.  The material in blue is excludable

10  under 803.  You can use it for other purposes, but it looks

11  backwards and not forwards.

12  Q.  Let's go to page 1.  Do you see that text at the bottom of

13  the page?

14  A.  Yes.

15  Q.  Do you recognize it?

16  A.  Yes.

17  Q.  What is it?

18  A.  It's a text exchange between Anton and myself.

19           MR. BACH:  We offer it.

20           THE COURT:  Are you offering it up to what time

21  period?

22           MR. BACH:  This is on September 24th in the evening.

23           THE COURT:  Which messages, Mr. Bach?

24           MR. BACH:  Do you want me to approach?

25           THE COURT:  You could just read out from the

1   timestamp.

2           MR. BACH:  Friday, September 24, at 7:22 p.m.

3           THE COURT:  Just that exchange?

4           MR. BACH:  Yes.

5           THE COURT:  Any objection to that?

6           MR. SHAHABIAN:  No, your Honor.

7           THE COURT:  It's received.

8           (Defendant's Exhibit 72.3 received in evidence)

9           MR. BACH:  Could we publish that to the jury.

10          MR. SHAHABIAN:  Before we publish, if we can make sure

11  the not admitted portions aren't published so they're not on

12  the screen.

13          THE COURT:  Make sure only the admitted portion is

14  shown.

15  Q.  Do you see this is a text from you to Mr. Postolnikov on

16  September 24th that says, hi Anton, we will be at the ferry in

17  about 15 to 20 minutes.

18          Do you see that?

19  A.  Yes.

20  Q.  The ferry is the ferry to Fisher Island; correct?

21  A.  Correct.

22  Q.  And that's where Mr. Postolnikov lives; right?

23  A.  Correct.

24  Q.  And so, you were together with him at his Fisher Island

25  residence on September 24th; correct?

1   A.  I don't know if I was at his residence, but I believe we

2   had dinner on the island with him and his wife that night, my

3   wife and I.

4   Q.  And then on October 7th, you arranged a dinner between

5   yourself and Gerald Shvartsman and Anton Postolnikov; correct?

6   A.  You're asking me questions, but I don't have the context of

7   the dates.  So for me to say correct, I cant be 100 percent

8   certain.

9   Q.  Do you remember at some point after September 24th, 2021,

10  arranging a dinner with Gerald Shvartsman, Michael Shvartsman,

11  yourself, and Anton Postolnikov?

12  A.  No.

13  Q.  And you wanted to enlist Gerald Shvartsman's help in

14  discussing insurance with Mr. Postolnikov; correct?

15  A.  Correct.

16          MR. BACH:  Can we please show just the witness exhibit

17  73 at October 7th, 8:58 a.m.

18  Q.  Do you recognize that text?

19  A.  Yes.

20  Q.  What is it?

21  A.  It's a text exchange between myself and Gerald Shvartsman.

22  Q.  On October 7th?

23  A.  Yes.

24          MR. BACH:  We offer it.

25          MR. SHAHABIAN:  No objection.

1              THE COURT:  It's received.

2              (Defendant's Exhibit 73 received in evidence)

3              MR. BACH:  Can we publish that to the jury, please.

4    Q.  On October 7th, you write to Gerald Shvartsman, hey buddy,

5    how are you?

6              Do you see that?

7    A.  Yes.

8    Q.  Want to organize a dinner with the wives and invite Anton

9    and his wife.  We can also invite your brother?

10             Do you see that?

11   A.  Yes.

12   Q.  And you write, I want to talk more to Anton about the

13   insurance and I thought we can work on this together.  What do

14   you think?

15             Do you see that?

16   A.  Yes.

17   Q.  And what did you mean when you said to Gerald, we can work

18   on this together?

19   A.  I mean he's already an insurance can client of mine, so I

20   thought if he helped, that I would be happy to, you know, offer

21   him something for his help.

22   Q.  Say that again.  I couldn't hear.

23   A.  I was willing to offer something to him for his help for

24   making the original introduction to Anton and to put in a good

25   word because Gerald is already a life insurance client of mine.

1  Q.  When you say you're willing to offer something to Gerald,

2  what do you mean?

3  A.  Just nothing specific, but if he wanted to work on it with

4  me, I'd look out for him in some way, whether it's finding him

5  a client or trying to do something to benefit him.

6  Q.  Gerald is a furniture salesman; correct?

7  A.  Yeah.

8  Q.  You're talking about finding a way to get some money to

9  Gerald; correct?

10  A.  It doesn't necessarily need to be money, but if he could

11  work with it on me, I would certainly appreciate it.

12  Q.  And why did you think having Gerald with Anton at dinner

13  would help you move forward with your plans to provide an

14  insurance policy to Mr. Postolnikov?

15  A.  I could only remember and speculate what I was thinking

16  back then, but I wanted to show respect to Gerald that I know

17  that I met him because of their relationship with Anton.  So it

18  was more of that than anything.  I thought him being a client,

19  it couldn't hurt, but ultimately, we never had a dinner and

20  Gerald didn't help in any way.

21  Q.  So this dinner that you were planning didn't take place?

22  A.  No.

23  Q.  On that date?

24  A.  No.

25  Q.  Now, that text is dated October 7th; correct?

1   A.  Correct.

2           MR. BACH:  Could we put up Government Exhibit 472

3   already in evidence.

4   Q.  This is an email you send on October 11th to Zoltan

5   Present; correct?

6   A.  Correct.

7   Q.  He's the person who your wife and his wife are best

8   friends; correct?

9   A.  Correct.

10  Q.  And you write in the last paragraph, Patrick will be

11  announcing some DWAC news very soon.

12          Do you see that?

13  A.  Yes.

14  Q.  Now, sir, what were you referring to?

15  A.  I don't know.  I've seen this message and I don't know.

16  Patrick would say all the time that he's going to be giving

17  updates.

18  Q.  What would Patrick tell you?

19  A.  He'd say all the time, I'll be sharing with the investors

20  some updates of what's happenings with DWAC.  So I just wrote

21  he was going to be sharing news very soon.

22  Q.  So what was the news?

23  A.  I don't know.

24  Q.  Isn't this nine days before the merger announcement?

25  A.  Yes.

1    Q.   That's on October 11th; correct?

2    A.   Correct.

3    Q.   Five days later on October 16th, you go to a party at Anton

4    Postolnikov's residence on Fisher Island; correct?

5    A.   Again, you ask me these questions, but I don't know the

6    dates.  So you'd have to show me the documentation that I was

7    with him on that date.

8            MR. BACH:  Can we please show the witness Defendant's

9    Exhibit 72.4.

10   Q.   Do you recognize that?

11   A.   Yes.

12   Q.   What is it?

13   A.   It's a text exchange between Anton and myself.

14   Q.   On October 17?

15   A.   Yes.

16           MR. BACH:  We offer it.

17           MR. SHAHABIAN:  I would object to the beginning on the

18   similar backwards-forwards grounds.

19           THE COURT:  Sustained on 803 grounds.

20   Q.   Does this refresh your recollection?

21   A.   Yes.

22   Q.   Does it refresh your recollection that on October 16th, you

23   spent the evening with Mr. Postolnikov?

24   A.   Yes.

25           THE COURT:  By the way, I said 803, but I meant 801.

1    I assume everybody knows what I meant.  Go ahead.

2    Q.  Among the guests that night was Gerald Shvartsman; correct?

3    A.  No.

4              MR. BACH:  I'd like to read a stipulation in the

5    record.

6              Judge, at this time, I'd like to read a portion of a

7    stipulation into the record, joint exhibit 4.

8              THE COURT:  Any objection?

9              MR. SHAHABIAN:  No objection.

10             THE COURT:  Go ahead.

11             MR. BACH:  It is hereby stipulated and agreed by and

12   between the United States of America, by Damian Williams,

13   United States Attorney for the Southern District of New York,

14   Elizabeth Hanft, Daniel Nessim, and Matthew Shahabian,

15   assistant United States attorneys, of counsel, and defendant,

16   Bruce Garelick, by and through the consent of his attorneys

17   Jonathan Bach, Alexandra Shapiro, Julian Brod, and Jason

18   Driscoll, that in the period relevant to the charges in this

19   case -- and I'm just going to read the relevant portion.

20             6, the telephone number 415-627-7638 was a telephone

21   number used by Anton Postolnikov.

22   Q.  This was not a small event; correct?

23   A.  I don't recall which event this was on that date.

24   Q.  There were a number of guests there; correct?

25   A.  Again, you're asking me correct or not correct.  I don't

1    know what the event was.  I know there was one event at one

2    point that I went to where both Gerald and Anton were at, but

3    it was during the day, I believe, and it was at Gerald's house

4    for one of his kids birthdays or something.  That's the only

5    time I can recall where I was in the same room with Anton and

6    Gerald.

7    Q.  Let me show you what's been marked Defendant's Exhibit 83,

8    tab 20.  Focus your attention on the two items on October 17.

9    A.  Okay.  I think I know what this was now.

10           The only other time I can remember now is --

11           MR. SHAHABIAN:  Objection.

12           THE COURT:  Are you asking for his refreshed

13   recollection?

14           MR. BACH:  Yes.

15   Q.  Can you please gives your refreshed recollection.

16   A.  Anton had thrown his wife a birthday party at a Japanese

17   restaurant where he took over the restaurant.  That's the only

18   other time that I could recall that I may have been in the same

19   place with all of them.  That must have been it, for him to say

20   thanks for --

21           THE COURT:  You're not supposed to read the document.

22   Just tell us what your --

23   A.  It's hard for me to remember times and dates, but there was

24   a birthday party that I was at with my wife for Anton's wife.

25   Q.  And that was at or around October 17th; correct?  I'm

1   sorry.  October 16th; correct?

2   A.  Again, I just can't remember the details, but that would

3   make sense.

4   Q.  And by the way, the 16th was approximately four days before

5   the merger announcement; correct?

6   A.  Correct.

7   Q.  And you also reached out to Mr. Postolnikov on October

8   18th; correct?

9   A.  Again, all of these are -- I could say correct, but I don't

10  know.  I spoke to him quite a bit at that time.  I think I

11  spoke to him every day, but I don't know the dates and the

12  times.  So to answer "correct," I can't say with certainty

13  without having some record in front of me.

14  Q.  You spoke to him almost every day during this time period

15  in October; correct?

16  A.  Yes.

17  Q.  And last night, you had a conversation with the

18  prosecutors; correct?

19  A.  Yes.

20  Q.  And you talked about reaching out to Mr. Postolnikov on

21  October 18th; correct?

22  A.  Very possibly.

23  Q.  Do you remember what you told the prosecutors last night

24  about October 18th?

25  A.  No.

1   Q.  But you did talk to them about it; correct?

2   A.  If someone could refresh my recollection about that

3   conversation, that would be helpful.

4   Q.  During this time period in October, you were also speaking

5   frequently with Patrick Orlando; correct?

6   A.  To some degree, yes.

7   Q.  From time to time during this time period, Mr. Orlando

8   would tell you that he planned to speak to Mr. Postolnikov, as

9   well; correct?

10  A.  Correct.

11  Q.  Then, a few days after the merger announcement, there was

12  another party; correct?

13  A.  Correct.

14  Q.  And you went to that party; correct?

15  A.  Correct.

16  Q.  And Mr. Postolnikov was there; correct?

17  A.  Correct.

18  Q.  Gerald Shvartsman was there; correct?

19  A.  Correct.

20  Q.  Mr. Orlando was there; correct?

21  A.  Correct.

22  Q.  And everyone was talking about DWAC; correct?

23  A.  Correct.  It was a work event.

24  Q.  By the way, Bruce Garelick is not at any of these events on

25  Fisher Island; correct?

1  A.  Correct.

2  Q.  He's not at any of these social events; correct?

3  A.  Correct.

4  Q.  He's not even in Florida; correct?

5  A.  Correct.

6  Q.  Now, on October 21st, the day after the merger

7  announcement --

8          THE WITNESS:  My computer just fell asleep.

9  Q.  October 21st, the day after the merger announcement, you

10 and Gerald Shvartsman text each other; correct?

11 A.  Yes.

12 Q.  To talk about what's happening; correct?

13 A.  Correct.

14         MR. SHAHABIAN:  Objection.  Vague as to what's

15 happened.

16         THE COURT:  The question was already answered and in a

17 vague way, so there's vague testimony.

18 Q.  And Gerald tells you -- Gerald texts you, we love you --

19         MR. SHAHABIAN:  Objection.

20         THE COURT:  Sustained.

21 Q.  Well, let me show you what we'll mark for just the witness,

22 Defendant's Exhibit 502, page 74.  Do you recognize that?

23 A.  Yes.

24 Q.  What is it?

25 A.  It's a text exchange between myself and Patrick Orlando,

1    but I, in that text, take a snapshot of a text exchange between

2    myself and Gerald Shvartsman.

3    Q.  So the top of the page is a screenshot of texts that you

4    exchanged with Gerald on or around October 21?

5    A.  Yes.

6            MR. BACH:  We offer it.

7            MR. SHAHABIAN:  Under the Rule of Completeness, we'd

8    ask that the prior page be offered at the same time in

9    fairness.

10           THE COURT:  Can I see the prior page.  Can somebody

11   show me the prior page, please.

12           MR. SHAHABIAN:  I believe it's on the left now on the

13   screen, your Honor.

14           THE COURT:  Right.  Good.

15           Any objection to the receipt of the prior page under

16   Rule of Completeness?

17           MR. BACH:  Absolutely not.

18           THE COURT:  Then the two pages are received.

19           (Defendant's Exhibit 502 received in evidence)

20           MR. BACH:  Can we publish for the jury the second

21   page.

22   Q.  At the top is a screenshot of texts that you exchanged with

23   Gerald Shvartsman on October 21.

24           Do you see that?

25   A.  Yes.

1  Q.  And Gerald Shvartsman writes to you, we love you.  I hope

2  you have lots of this.

3          Do you see that?

4  A.  Yes.

5  Q.  You told him you had actually invested in the project;

6  correct?

7  A.  No.

8  Q.  Then you write, thanks buddy.  In the next text, he says,

9  let me know your shoe size, I'll send you over something nice.

10          Do you see that?

11  A.  Yes.

12  Q.  And you write, not necessary, buddy.  I'm just glad we all

13  participated.

14          Did you say that?

15  A.  Yes.

16  Q.  What do you mean by, I'm just glad we all participated?

17  A.  I meant I participated by helping solicit and bringing

18  people together, and he participated by investing.

19          MR. BACH:  Let's go to the prior page.

20  Q.  Can you tell us who these texts are between?

21  A.  Patrick Orlando and myself.

22  Q.  And who is the green?

23  A.  Myself.

24  Q.  And you write, did you announce?  Give me something.

25          Do you see that?

1    A.   Yes.

2    Q.   That's during the day on October 20th; correct?  Withdrawn.

3              MR. SHAHABIAN:  Your Honor, I think if we're going to

4    do this line, we need the prior page that actually has the

5    timestamp.

6              THE COURT:  I think that's right.

7              Mr. Bach, under the Rule of Completeness, I think it's

8    appropriate for the prior page, at least with the timestamp for

9    this page to come in.

10             MR. BACH:  So stipulated.

11             So let's look at the prior page.  The prior page is

12   the one that begins on October 8th at 8:07 a.m.  October 18th.

13   Q.   These are texts between you and Mr. Orlando; correct?

14   A.   Correct.

15   Q.   And on October 18th, you're the one in the green text;

16   right?

17   A.   Correct.

18   Q.   And you're confirming that you're on for dinner with him on

19   the 18th; correct?

20   A.   Correct.

21   Q.   Did you have dinner with him on the night of the 18th?

22   A.   I don't recall.

23   Q.   And you write, hey bud, what's the latest?

24             Do you see that?

25   A.   Yeah.

1  Q.  And then on the next page, you said, did you announce?

2  Give me something.

3          Do you see that?

4  A.  Yes.

5  Q.  That's a reference to the merger; correct?

6  A.  Yes.  Well, it's a reference to the text message.  He

7  responded when I said, hey bud, what's the latest?  He sent a

8  screenshot.

9          MR. BACH:  Judge, can we have a sidebar before we

10  leave this?

11          THE COURT:  How much more do you have on your cross

12  examination?

13          MR. BACH:  I think about 15 to 20 minutes.

14          THE COURT:  Actually, it's 3:45, so I think it's a

15  good time for the midafternoon break.

16          Don't talk about the case amongst yourselves and don't

17  do any research on the case.  We'll reconvene at 4 o'clock.

18          I instructed the witness he can step down and step out

19  of the courtroom.  He should be back here in 10 minutes.

20          (Continued on next page)

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Be seated.

3          I should mention that the witness said to me, as he

4     was leaving, that he has a 6:30 flight out of LaGuardia.  He

5     understands that his obligation is to be here through his

6     testimony, but he just wanted us to be aware of that.  I'm

7     putting it on the record because it's a conversation the

8     witness had with me and you should all be aware of it.

9          MS. SHAPIRO:  Your Honor, there was an objection

10    sustained to one of the pages of texts that Mr. Bach tried to

11    introduce and I -- one of my colleagues will correct me if I'm

12    wrong, but I believe it's DX 72.3.  Perhaps we can pull that up

13    on the screen.  On the right side, the blue bubble under

14    Saturday, September 25th at 8:23 a.m., the part that says, I'm

15    going to send you some info on the SPAC opportunity we

16    discussed on WhatsApp.  Also, early next week, I will prepare

17    some info and illustration on the PPLI insurance strategy.

18          We submit, your Honor, that at the minimum, those

19    portions are admissible under 803.3 because they're actually

20    not assertions, but rather, it's a discussion of plans.  As the

21    Advisory Committee notes observe, the rule of *Mutual Life*

22    *Insurance Co. of New York* v. *Hillmon*, an 1892 Supreme Court

23    case allowing evidence of intention doing of the act intended

24    is of course left undisturbed.

25          THE COURT:  I think *Hillmon* was the case I started to

1    mention and I think you cut me off.  I understand the point.

2              MS. SHAPIRO:  We had a sidebar about this.

3              THE COURT:  I know, at an earlier point.  So I

4    understand the *Hillmon* exception.

5              What's the government's argument with respect to those

6    portions of the message?  I frankly was focused on the first

7    part that says, it was great spending the evening last night

8    with you and Olga, which is hearsay under 802, but the other

9    material, it seems to me Ms. Shapiro is right.

10             MR. SHAHABIAN:  Taking this one sentence at a time,

11   your Honor.  The "it was great spending," that's hearsay.

12   "Thanks for an amazing dinner," that's also hearsay.  The next

13   sentence is both forwards- and backwards-looking at the same

14   time.  "I'm going to send you some info on the SPAC opportunity

15   we discussed on WhatsApp" both references forward intentions

16   and a past historical event, specifically "the SPAC opportunity

17   we discussed on WhatsApp."

18             So the government would object to redacting the

19   backward-looking portion of this text message.  No objection to

20   the "early next week, I'll prepare some info and illustrations

21   on the PPLI insurance."

22             THE COURT:  I think what you said was transcribed as

23   the government would object to the redacting the

24   backwards-looking portion, but I think what you said was

25   actually that you don't object as long as the backward portions

1   are redacted; is that right?

2          MR. SHAHABIAN:  Said or meant to say.

3          THE COURT:  Any problem with that, Ms. Shapiro?

4          MS. SHAPIRO:  Yes, your Honor.  I think we need the

5   words after that so that there's context here.

6          THE COURT:  The "we discussed on WhatsApp"?

7          Just so we're all on the same page, what I've heard

8   from the government is that they don't object to the receipt of

9   the portions of the text message that says, "I'm going to send

10  you some info on the SPAC opportunity," then you would redact

11  the rest of that sentence.  Then, the following sentence would

12  come in, "also, early next week, I will prepare some info and

13  illustrations on the PPLI insurance strategy.  Best, Marc."

14         MS. SHAPIRO:  We'll take that, your Honor.

15         I also just want to say I apologize if I interrupted

16  the Court earlier.  I certainly didn't mean to cause any

17  offense.

18         THE COURT:  And you didn't cause any offense, but I

19  took the opportunity because my words were not necessarily

20  transcribed because the conversation got cut off to indicate

21  that earlier, when there was a colloquy at sidebar about a

22  communication where somebody was expressing a present intent to

23  do something in the future, that I was referring to the *Hillmon*

24  exception, which also refers back to the *Shepherd* case.

25         Is that the issue you wanted to discuss at sidebar?

1      MR. BACH:  Whatever she said.

2      MS. SHAPIRO:  I'll take that.

3      THE COURT:  Sounds like a good rule.

4      We'll start again at 4 o'clock.  I think the witness

5 should be on the stand at 4 o'clock.  I assume that the

6 redirect is going to take us through the rest of the day; is

7 that fair?

8      MS. HANFT:  There is a witness, your Honor, who's here

9 and has been for a while and has a very important commitment

10 tomorrow.  So it is a witness that the government doesn't

11 believe is a lengthy witness.  So, if possible, we would very

12 much like to get that witness on.

13      THE COURT:  The idea would be to take that witness out

14 of order and then have --

15      MS. HANFT:  No, he's next in the order.  It would be

16 after --

17      THE COURT:  We'll sit until 5 o'clock, but we're going

18 to reconvene at 4:00, and Mr. Bach said he's got how much more

19 time?

20      MR. BACH:  If there's someone out of order, I'm happy

21 to finish this line, which I think is going to take about a

22 minute, take the other witness out of order and then return.

23      THE COURT:  The two of you can discuss it.  I'm

24 indifferent.  If I don't hear anything to the contrary, we'll

25 assume that we're going finish up with Mr. Wachter today.

O51Cgar6                    Wachter - Cross

1    You'll discuss it amongst yourselves.  See you back here a

2    couple minutes before 4:00.

3                (Recess)

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  Be seated.

3           What did you all decide about witness order?

4           MS. HANFT:  We're sticking with the order, your Honor.

5           THE COURT:  Okay.  Let's bring the jury in.

6           (Jury present)

7           THE COURT:  Be seated.

8           All right.  Mr. Bach, you may continue.

9           MR. BACH:  Thank you, Judge.

10          We offer Defense Exhibit 72.3.

11          THE COURT:  Okay.  As redacted, is that—

12          MR. BACH:  Yes, Judge.

13          THE COURT:  Okay.  That's received.

14          (Defendant's Exhibit 72.3 received in evidence)

15          MR. BACH:  Thank you.

16          Can we bring back on the screen Government

17  Exhibit 502, pages 199 and 200.

18  BY MR. BACH:

19  Q.   Okay.  Mr. Wachter, these are text messages between you and

20  Mr. Orlando starting on or about October 18th and going through

21  October 21st, correct?

22  A.   Correct.

23  Q.   We were talking about them before, correct?

24  A.   Correct.

25  Q.   Let me focus your attention on the text that you write on

1  October 20th at 6:38 p.m.  Do you see that in green, on the

2  middle of the first page?

3  A.  Yes.

4  Q.  You say, "Hey, Bud, what's the latest?"  Do you see that?

5  A.  Yes.

6  Q.  And that's because you expected to hear from him about some

7  news, correct?

8  A.  No.  I believe it's because I haven't spoken to him in two

9  days, which is not really normal.

10  Q.  You are asking him, what is the latest news you can give

11  me, correct?

12  A.  I don't read it that way.

13  Q.  Okay.  This text that you send to him at 6:38 is before

14  there's been any public announcement of the merger, correct?

15  A.  I believe so.

16  Q.  Okay.  And you anticipated, before there was any public

17  announcement, that he might have the latest news to give to

18  you, correct?

19  A.  I'm sorry, but I don't—I don't view it that way.

20  Q.  Okay.  That text is at 6:38 p.m., correct?

21  A.  Correct.

22          MR. BACH:  And, Judge, I'd like to read into the

23  record a stipulation, Joint Exhibit 2.

24          THE COURT:  Okay.  You may do so.

25          MR. BACH:  It is hereby stipulated and agreed by and

1    between United States of America——oh.  It's already in

2    evidence.

3              Can we publish paragraph 3 of Joint Exhibit 2.

4              Government Exhibit 131 is a true and correct tweet

5    issued by Liz Harrington, a spokeswoman for former president

6    Donald J. Trump at approximately 8:16 p.m. Eastern time on

7    October 20, 2021, containing a press release announcing the

8    merger agreement between Trump Media & Technology Group and

9    Digital World Acquisition Corporation.

10   BY MR. BACH:

11   Q.  The text you sent asking Patrick Orlando "what's the

12   latest" was before 8:16 p.m., correct?

13   A.  Correct.

14   Q.  And after the public announcement, you and Mr. Orlando

15   continued to attempt to interest Mr. Postolnikov in additional

16   SPACs, correct?

17   A.  Correct.

18   Q.  And you and Mr. Orlando planned to talk to Mr. Postolnikov

19   together, correct?

20   A.  Depends on which——I mean, I'm sure there were times that we

21   did.  There were times I was talking to him alone and times

22   with Patrick.  I——you'd have to be more specific.

23              MR. BACH:  Can we——what exhibit number is this?

24              Can we show the witness 75.6, at the bottom of page,

25   MW01922.  Just the witness.

1   Q.  Focusing your attention on the page, you see the page that

2   has in the lower right corner MW01922?

3   A.  Yes.

4   Q.  Focusing your attention on the last five or six lines of

5   that page.

6   A.  Okay.

7   Q.  Do you recognize this?

8   A.  Yes.

9   Q.  What is it?

10  A.  A text exchange between Patrick Orlando and me.

11          MR. BACH:  Okay.  We offer it.

12          MR. SHAHABIAN:  Objection, relevance.

13          THE COURT:  Sustained.

14          MR. BACH:  Can we have a sidebar.

15          THE COURT:  Maybe you can do a little bit more with

16  questions to establish the relevance.

17          MR. BACH:  Sure.

18  BY MR. BACH:

19  Q.  You exchanged texts with Mr. Orlando in November, after the

20  close of the merger agreement, correct?

21  A.  It wasn't the close of a merger agreement.  It was just an

22  announcement that they would be merging.

23  Q.  You are absolutely right.  So after the announcement on

24  October 20th, in early November, you and Mr. Orlando are

25  already attempting to interest Mr. Postolnikov in further

1    investments, correct?

2    A.  Correct.

3    Q.  And you and he considered him to be on the preferred and

4    early list always, correct?

5    A.  Those are Patrick's words, but I would agree with that,

6    yes.

7    Q.  And you and he planned to talk to Mr. Postolnikov about the

8    bigger picture, correct?

9    A.  Correct.

10   Q.  Now you deleted a number of texts from your phone, correct?

11   A.  Correct.

12   Q.  Before you met with the prosecutors in this case, correct?

13   A.  Correct.

14   Q.  And a number of those texts were with Mr. Postolnikov,

15   correct?

16   A.  Correct.

17   Q.  And you don't have a perfect recollection of the texts that

18   you deleted, correct?

19   A.  No.

20   Q.  But on your phone you had chats between you and Mr. Orlando

21   and Mr. Postolnikov, correct?

22   A.  Yes.

23   Q.  And also among these texts were items that Mr. Postolnikov

24   wanted to hide from the insurance cover—the insurance provider

25   in connection with his attempt to get life insurance, correct?

1          MR. SHAHABIAN:  Objection.

2          THE COURT:  Sustained.

3   Q.  Okay.  One of the reasons that you deleted these texts was

4   you wanted to hide certain communications that you had with

5   Mr. Postolnikov concerning his insurance coverage, correct?

6   A.  I wouldn't use the word hide, but I just didn't think it

7   was appropriate to keep that information on my phone.

8   Q.  Well, for instance, you were trying to help him place a

9   life insurance policy, correct?

10  A.  Correct.

11  Q.  And Mr. Postolnikov confided in you about a number of

12  things about his personal life, correct?

13         MR. SHAHABIAN:  Objection.

14         THE COURT:  Overruled, but I'm only going to permit

15  limited examination on this.

16  Q.  Okay.  For instance——and I'll ask you one question——he was

17  taking antiaging medication.

18         MR. SHAHABIAN:  Objection.

19         THE COURT:  Sustained.

20         MR. BACH:  Okay.  Can we just have——I want to make a

21  proffer at the sidebar.

22         THE COURT:  Okay.

23         (Continued on next page)

24

25

1        (At the sidebar)

2            MR. BROD:  So Judge, there's at least two—

3            THE COURT:  Antiaging medication?

4            MR. BROD:  There's at least two bases for this.

5        First, clearly there is an element of insurance fraud

6    here, which goes to the witness's credibility and his motive to

7    cooperate with the government.

8        Second, the government elicited on direct, because

9    they knew this was coming in on cross, that he deleted text

10   messages—these messages with Anton, possibly also a group text

11   with Orlando.  The messages with—he tells the

12   government—backtrack.

13       What they elicited was very, very minimal.  There were

14   things that he didn't think were appropriate.  The truth is

15   that they know from interviewing him multiple times that it

16   goes to specific medical issues that could have interfered with

17   the $75 million life insurance policy, with annual premiums of

18   several hundred thousand dollars.  And he didn't want those on

19   his phone because if it was found out by the insurance company,

20   the policy might not have gone through.

21           MR. SHAHABIAN:  The objection is on 403 grounds.  I

22   don't have an objection to them exploring motive to conceal,

23   but going into, like, antiaging pills and that just seems like

24   undue—

25           THE COURT:  That's absolutely the reason I sustained

1    the objection.

2            Mr. Brod, everything that you mentioned seems to me to

3    be fair game.  The particular medical conditions, you know, is

4    not sort of the first line of examination.

5            MR. BROD:  But we can inquire that there were medical

6    issues they were texting about.

7            MR. BACH:  Speaking in general terms.

8            THE COURT:  Speak in general terms.  Mr. Brod laid out

9    a perfectly good line of examination, and I'm sure, Mr. Bach,

10   you can pick up on that.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2      BY MR. BACH:

3      Q.  Mr. Wachter, you were trying to help Anton Postolnikov

4      place a life insurance policy, correct?

5      A.  Correct.

6      Q.  And you know from your experience in life insurance that

7      one of the issues for life insurance providers is the health

8      and medical care of the person applying for life insurance,

9      correct?

10     A.  Correct.

11     Q.  And there were issues that you became aware of concerning

12     Mr. Postolnikov's health and medical regime, correct?

13     A.  No.  I wouldn't call it an issue.  I would just say there

14     were questions that he was asking me, personal questions, and I

15     didn't want to keep a record of it, but—

16     Q.  Well, you understood that those issues could impact him

17     getting life insurance, correct?

18     A.  I didn't believe that they would, but it's possible.

19     Q.  Whatever questions he raised, you thought that it was

20     important to delete them, correct?

21     A.  Correct.

22     Q.  And part of the reason is that you and Mr. Postolnikov were

23     seeking a $75 million life insurance policy, correct?

24     A.  No.  I believe it was a $50 million policy.

25     Q.  Okay.  And in seeking that policy, you wanted to be sure

1  that certain information that could jeopardize his getting that

2  policy was removed from your phone, correct?

3  A.  Correct.

4  Q.  Now the prosecutors in this case interviewed you a year

5  ago, on May 30, 2023, approximately a year ago, correct?

6  A.  Correct.

7  Q.  And you told them that there came a point when you and

8  Mr. Postolnikov stopped working on the life insurance deal,

9  correct?

10  A.  Correct.

11  Q.  And you told them that you stopped working on it after the

12  FBI had approached you, correct?

13  A.  Yes.

14  Q.  And that was because you were concerned that the life

15  insurance would appear to be a payback related to DWAC,

16  correct?

17  A.  I believe that's what I had stated then, but he was going

18  through a divorce, which is I believe the primary reason he

19  canceled the policy, or decided not to pursue it at that time.

20  Q.  So when you told the FBI and federal prosecutors that the

21  reason you and Mr. Postolnikov stopped pursuing the policy was

22  because you were concerned it would look like a payback related

23  to DWAC, were you telling them the truth or not?

24  A.  I believed that it could have looked like that with what

25  was going on, but I don't believe that that was the primary

1    reason that Mr. Postolnikov stopped pursuing the policy.  I

2    believe it was because he was going through a divorce.

3    Q.  Okay.  But you did—you told the prosecutors that the

4    reason was because you were concerned about how it would look,

5    correct?

6    A.  If I told them that, then that was the case.

7    Q.  And the reason you were concerned was because you were

8    going to get a lot of money if this insurance policy was

9    placed, correct?

10   A.  Correct.

11   Q.  A $50 million insurance policy, correct?

12   A.  Correct.

13   Q.  And your funds were tight during this period of time,

14   correct?

15   A.  Correct.

16   Q.  And Mr. Postolnikov had made more than any other human

17   being on earth in the DWAC deal, correct?

18            MR. SHAHABIAN:  Objection.

19            THE COURT:  Sustained.

20   Q.  You understood, sir, that Mr. Postolnikov had not only

21   invested in the founders round for $4.5 million but had gone on

22   to invest a total of $10 million in DWAC, correct?

23   A.  Correct.

24   Q.  Okay.  And you were concerned that this life insurance deal

25   would look like he was paying you back, correct?

1    A.   Correct.

2              MR. BACH:  Thank you.  No further questions.

3              THE COURT:  Redirect examination.

4              MR. SHAHABIAN:  Yes, your Honor.

5    REDIRECT EXAMINATION

6    BY MR. SHAHABIAN:

7    Q.   Mr. Wachter, do you remember being asked questions on

8    cross-examination about receiving founders shares from Patrick

9    Orlando in compensation for your work assisting him with DWAC?

10   A.   Yes.

11   Q.   Have you received those shares yet?

12   A.   No.

13   Q.   Do you still anticipate receiving shares as compensation

14   for your work with DWAC?

15   A.   Yes.

16   Q.   To your understanding have those founders shares been

17   issued yet?

18   A.   They have not.

19   Q.   Are they still locked up, to your understanding?

20   A.   Yes.

21   Q.   Do you anticipate receiving those founders shares after the

22   lockup period expires?

23   A.   Yes.

24   Q.   I'd now like to talk to you a little bit about the Zoltan

25   Present transaction you discussed on cross-examination.  Do you

1   remember being asked questions about that?

2   A.  Yes.

3   Q.  And the purpose for the transaction from your perspective

4   and DWAC's perspective?

5   A.  Yes.

6   Q.  Do you recall testifying about something about

7   oversubscription in DWAC?

8   A.  Yes.

9   Q.  What did you mean by that?

10  A.  It meant that Patrick had raised more money for it than he

11  could allocate to everyone, or was willing to allocate to

12  everyone, and he was planning on returning a portion of

13  everyone's money back or using that overage to give people a

14  discount on his future SPACs.

15  Q.  Was that something that you and Patrick Orlando discussed

16  before you suggested this transfer arrangement with Zoltan

17  Present?

18          MR. BACH:  Objection.  Leading.

19          THE COURT:  Overruled.

20  A.  I believe so.

21          MR. SHAHABIAN:  If we could bring up for the witness

22  and counsel Government Exhibit 502 at pages 63 to 64.

23          If we could go to the next pages, 64 to 65,

24  Mr. Bianco.  It's not in evidence yet.

25          If we could show them side by side, Mr. Bianco.

1    Actually, sorry for the technical instructions.  Maybe the

2    better way to do this is show it in one line and split the

3    difference between 64 and 65.

4              Apologies, your Honor.

5              If we could just blow up the text message on

6    September 21st, starting at 8:40 p.m. and continuing down to

7    the before 8:10 time stamp on the 27th.  Perfect.

8    BY MR. SHAHABIAN:

9    Q.  Do you see this exchange, Mr. Wachter?

10   A.  Yes.

11   Q.  Who is this between?

12   A.  Patrick Orlando and myself.

13             MR. SHAHABIAN:  Government offers this portion of

14   Government Exhibit 502 at pages 64 to 65.

15             MR. BACH:  No objection.

16             THE COURT:  Received.

17             (Government's Exhibit 502, pages 64-65 received in

18   evidence)

19             MR. SHAHABIAN:  Publish.

20   BY MR. SHAHABIAN:

21   Q.  Could you read the first text message, Mr. Wachter.

22   A.  "If Zoltan wants his cash back—" Oh, no, this is from

23   Patrick.

24   Q.  And what does Patrick say?

25   A.  "If Zoltan wants his cash back, let me know.  I need to

1   return some overfunding."

2   Q.  And what did you respond?

3   A.  "I don't think that's the case at all."

4   Q.  Why did you say that?

5   A.  Because I don't believe Zoltan wanted to sell his shares.

6   Q.  And what did Mr. Orlando respond to you?

7   A.  "Ok, man, someone has to want cash back.  We got too much."

8   Q.  Did this text exchange lead to your agreement with

9   Mr. Present to transfer some of your shares to him?

10  A.  Yes.

11  Q.  How?

12  A.  Well, I realized Patrick wanted to get some money back, and

13  then it didn't really hit me till I learned he needed cash for

14  the closing of his house to get his mortgage, and at that

15  moment I had this idea that I would be willing to sell my

16  interest to him and get him the same position that he

17  had—he—beforehand, free up money for Patrick, which he

18  needed—I mean, return money for Patrick, free up shares, and I

19  would ultimately get some cash in my pocket.

20          MR. SHAHABIAN:  If we could take this down and move to

21  Government Exhibit 472.

22          If we could blow up the body of the email, Mr. Bianco.

23  Q.  Mr. Wachter, do you remember being asked questions about

24  this on cross-examination?

25  A.  Yes.

Q.  And do you remember specifically being asked questions
about announcing some DWAC news very soon?

A.  Yes.

Q.  You said that you didn't remember what this was but that
you didn't know what Mr. Orlando's news was; is that accurate?

A.  Correct.

Q.  Do you believe that you were referring to news about the
status of the merger between Trump Media and DWAC?

A.  No.

Q.  Why not?

A.  Because I didn't know that there was a merger——or an
announcement that was going to be taking place between them.

Q.  What was the rest of the topic of conversation in this
email?

A.  About accommodating the return of his investment and that I
would do a side deal with him to get him those shares back.

Q.  Would you have transferred a hundred thousand dollars of
your DWAC membership interest at this point if you knew that
the Trump Media-DWAC negotiations were progressing towards a
merger?

A.  No.

Q.  Why not?

A.  Because as I stated earlier, what——whether it was fantasy
or not, I believed I had those shares to transfer and I
believed that they were of, you know, a certain value, and——and

1    after the announcement, the value of that went up, I think I

2    said 20, 30 plus times, so a hundred-thousand-dollar investment

3    on paper I think was worth close to $3 million the next day, so

4    of course I wouldn't have made that transfer if I knew that.

5    Q.  Were you upset that you had agreed to this transfer after

6    learning about the DWAC-Trump Media news?

7    A.  Yes.

8    Q.  Why were you upset?

9    A.  Because I had——I am very close with Patrick, I had dinner

10   with him just a few nights before that, and I would have

11   thought, as a good friend, he'd just tell me to slow down and

12   not, you know——we could——you can do this in a couple of weeks.

13   Q.  Did he say anything like that to you?

14   A.  No, not a word.

15            MR. SHAHABIAN:  No further questions.

16            THE COURT:  Anything further, Mr. Bach?

17            MR. BACH:  Yes.  Can we pull up 502-065.

18            The exhibit that was shown by the government.

19   RECROSS EXAMINATION

20   BY MR. BACH:

21   Q.  Okay.  So Mr. Orlando was oversubscribed, correct?

22   A.  Correct.

23   Q.  Meaning he had too many people who had signed subscription

24   agreements and not enough founders shares to give them,

25   correct?

1   A.  Correct.

2   Q.  And Mr. ── and Zoltan had founders shares that he could

3   give back, correct?

4   A.  Correct.

5   Q.  And he needed──in September, when you wrote, "I don't think

6   that's the case at all," that's before he needed money for a

7   mortgage, correct?

8   A.  Correct.

9   Q.  And then at some point he needs money to show a bank for

10  his mortgage and so he wants liquidity, correct?

11  A.  Correct.

12  Q.  And because Mr. Orlando was oversubscribed, he could return

13  his shares and get some money back, correct?

14  A.  Correct.

15  Q.  And then he could show the bank he had money and get a

16  mortgage, correct?

17  A.  Correct.

18  Q.  Okay.  He could have done that with Mr. Orlando without

19  you, correct?

20  A.  Correct, but then he would have been out of the shares.

21  Q.  All right.  So in other words, if he wanted money for the

22  mortgage, he could have returned his shares to Mr. Orlando,

23  Mr. Orlando would have said, thank you, I'm oversubscribed,

24  here's your hundred thousand dollars back, correct?

25  A.  Correct.

1    Q.  Okay.  He didn't need to involve you, correct?

2            MR. SHAHABIAN:  Objection.

3            THE COURT:  Sustained.

4    Q.  Okay.  Sir, you've never given him a single share in your

5    life, correct?

6            MR. SHAHABIAN:  Objection.

7            THE COURT:  Sustained.

8    Q.  You have never transferred any shares to Zoltan Present,

9    correct?

10            MR. SHAHABIAN:  Objection.

11            THE COURT:  Sustained.

12    Q.  Have you ever transferred any shares to Zoltan Present?

13    A.  No, not yet.

14            THE COURT:  Anything further from the government?

15            MR. SHAHABIAN:  No, your Honor.

16            THE COURT:  All right.  Sir, you're excused as a

17    witness.

18            THE WITNESS:  Thank you.

19            (Witness excused)

20            THE COURT:  Government can call its next witness.

21            MS. HANFT:  Your Honor, may we approach.

22            (Continued on next page)

23

24

25

O511GAR7

1          (At the sidebar)

2          THE COURT:  The last witness is very interested in

3     catching his flight.

4          MS. HANFT:  So I think despite what I said, what would

5     be least disruptive to this next witness is actually for him to

6     fly home and then come back on Friday, so there's no sense in

7     starting him now if we're not going to finish him because he

8     has a very important personal commitment tomorrow.  So I think,

9     your Honor, we would request that we break for the day.

10         THE COURT:  Is there another witness you can put on

11    today?

12         MR. BACH:  Can't we finish him today?  He's going to

13    be 15 minutes on direct and 10 minutes on cross.

14         MS. HANFT:  The jury has to leave, and I'm not sure

15    we'll finish him, and I really don't want to—then he's going

16    to have to stay tomorrow.  If we could stay a little later than

17    5, I think that's fine, but if you're not going to ask the jury

18    to do that, then—

19         MR. BACH:  We can ask the jury.

20         THE COURT:  If they could stay till 5:15, do you think

21    that would do it?

22         MS. HANFT:  I think that's possible.

23         MS. SHAPIRO:  Your Honor, can I—

24         THE COURT:  Hold on for a second.  Why don't I have

25    Mr. Fishman—

O511GAR7

1      MS. SHAPIRO:  I have something I want to put on the

2   record.

3      THE COURT:  Let me just have Mr. Fishman check with

4   the jurors if they can stay a little later.

5      MS. SHAPIRO:  I just want to put on the record, I know

6   your Honor ruled on the *in limine* motions regarding

7   co-conspirator hearsay related to this witness, Mr. Lopez.  And

8   we just want to put on record that we have a continuing

9   objection both to the hearsay and actually to his testimony at

10  all because we don't think the government has laid an adequate

11  foundation to establish that he or Mr. Gerald Shvartsman are a

12  co-conspirator with Mr. Garelick.  So we think it would be

13  prejudicial to introduce his testimony and any hearsay of

14  Gerald Shvartsman during his examination because of the reasons

15  I just stated.

16     THE COURT:  As you indicated, I've ruled on this.

17  Let's call the witness.

18     MS. HANFT:  But your Honor, he needs to invoke.

19     MR. SHAHABIAN:  You need to excuse the jury.

20     MS. HANFT:  He needs to invoke.

21     THE COURT:  Oh, okay.

22     (In open court)

23     THE COURT:  Members of the jury, with apologies——and

24  there's going to be a thanks.  Apologies is there is one legal

25  matter I need to discuss with the lawyers very quickly so I'm

1    going to ask you to go back to the jury room, but thanks for

2    your agreement to stay a little later.

3              THE DEPUTY CLERK:  All rise.

4              (Jury not present)

5              THE COURT:  Okay.  Let's bring the witness in.

6              MS. HANFT:  The government calls Adrian Lopez Torres.

7              THE COURT:  Sir, please step forward into the witness

8    box, remain standing, and my deputy will administer the oath.

9              THE DEPUTY CLERK:  Please raise your right hand.

10             (Witness sworn)

11             THE DEPUTY CLERK:  Please state your full name for the

12   record and please spell out your first and last name.

13             THE WITNESS:  Adrian Lopez Torres.  Adrian,

14   A-D-R-I-A-N, Lopez, L-O-P-E-Z, Torres, T-O-R-R-E-S.

15             THE COURT:  You may be seated.

16             Counsel, you may inquire.

17    ADRIAN LOPEZ TORRES,

18        called as a witness by the Government,

19        having been duly sworn, testified as follows:

20   DIRECT EXAMINATION

21   BY MS. HANFT:

22   Q.  Mr. Lopez Torres, are you testifying here—you can be

23   seated, sir.

24             Are you testifying here today pursuant to an immunity

25   order?

1    A.  Yes.

2    Q.  Is that because you believe that the answers you would give

3    today might tend to incriminate you?

4    A.  Yes.

5    Q.  If you were asked any questions without the immunity order,

6    would you invoke your Fifth Amendment right?

7    A.  Yes.

8            MS. HANFT:  Your Honor, I ask that the order become

9    effective and be marked as a Court Exhibit .

10           THE COURT:  Any objection?  Mr. Bach, any objection?

11           MR. BACH:  No objection.

12           THE COURT:  All right.  I declare that the order is

13   effective.  The witness will be testifying pursuant to the

14   immunity order, which will be marked as Court Exhibit No. 2.

15           MS. HANFT:  Thank you, your Honor.

16           THE COURT:  Let's bring in the jury.

17           (Continued on next page)

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Be seated.

3           Witness should remain standing.

4           Ms. Hanft, why don't you announce the witness.  My

5   deputy will administer the oath.

6           MS. HANFT:  The government calls Adrian Lopez Torres.

7           THE DEPUTY CLERK:  Please stand and raise your right

8   hand.

9           (Witness sworn)

10          THE DEPUTY CLERK:  Thank you.  Please state your full

11  name for the record.

12          THE WITNESS:  Adrian Lopez Torres.

13          THE COURT:  You may be seated.

14          Counsel, you may inquire.

15   ADRIAN LOPEZ TORRES,

16        called as a witness by the Government,

17        having been duly sworn, testified as follows:

18  DIRECT EXAMINATION

19  BY MS. HANFT:

20  Q.  Good evening, Mr. Lopez Torres.

21  A.  Good evening.

22  Q.  Where do you live?

23  A.  West Palm Beach.

24  Q.  And what do you for a living?

25  A.  IT.

1   Q.  What does IT stand for?

2   A.  Information technology.

3   Q.  Do you currently have a job?

4   A.  I was.  I stopped working a week ago.

5   Q.  And where were you working until a week ago?

6   A.  Source Furniture.

7   Q.  How long did you work at Source Furniture?

8   A.  Around 12 years.

9   Q.  What kind of store is Source Furniture?

10  A.  It's a manufacturer of furniture.

11  Q.  And who is the owner of Source Furniture?

12  A.  Gerald Shvartsman.

13  Q.  And what did you do for Source Furniture?

14  A.  IT.

15  Q.  Now you mentioned your boss was Gerald Shvartsman.  How

16  would you describe your relationship with Gerald Shvartsman?

17  A.  Good relationship.

18  Q.  Did you know any of his family members?

19  A.  Throughout the years, I met his mother, his father, and his

20  brother.

21  Q.  What was his brother's name?

22  A.  Michael Shvartsman.

23  Q.  Did there ever come a time when you bought something called

24  warrants in the stock market?

25  A.  Yes.

1    Q.   What kind of warrants?

2    A.   DWAC W.

3    Q.   Why did you buy those warrants?

4    A.   I received a call from Gerald and that he said that he

5    purchased warrants, and I purchased a warrant.

6    Q.   Did you sell them?

7    A.   Yes, I did.

8    Q.   About how much money did you make?

9    A.   Approximately 350.  That's an estimate.

10   Q.   I'd like to back up for a few minutes and talk about how

11   you got to that point.

12        During your time working at Source Furniture did you

13   speak to Gerald Shvartsman about investments?

14   A.   If I remember correctly, once he approached me, get my

15   opinion about Tesla, and I shared my opinion.  I'd been

16   following the company for many years, and——yeah.  Not sure if

17   he ever purchased Tesla or——or traded the stocks.

18   Q.   Do you regularly invest in the stock market?

19   A.   I myself?

20        THE COURT:  Do you regularly invest in the stock

21   market?

22        THE WITNESS:  Not——not regularly.  I usually am

23   long-term investor.

24   Q.   Did there come a time when Gerald Shvartsman approached you

25   about a potential investment specifically?

1    A.  Yes.

2    Q.  What did he say?

3    A.  So one——one time I was at——at the factory floor, and

4    basically he said that if I was interested in hearing more

5    about a——an investment opportunity.

6    Q.  Did he say anything else about the investment opportunity?

7    A.  If I remember correctly, he mentioned the word Trump Media.

8    Q.  Do you recall approximately when that was?

9    A.  June, July 2021.

10   Q.  And I'm going to show you what's been marked for

11   identification as Government Exhibit 700.

12           MS. HANFT:  If we could show it just to the witness

13   and the parties.

14           And pursuant to Joint Exhibit 3, which has been

15   offered, I'll now read paragraphs 1 and 2.

16           Government Exhibits 700-703 and all parts and

17   subdivisions thereof are true and correct copies of text

18   message conversations obtained from a cellular device belonging

19   to and used by Adrian Lopez Torres.

20           Government Exhibits 702A and 704——I'm sorry.  I

21   just——Mr. Bianco, could we take down Government Exhibit 700 and

22   instead put up Joint Exhibit 3.

23           Government Exhibits 702A and 704 are true and correct

24   copies of photographs recovered from the ALT phone.  Government

25   Exhibit 702A corresponds to the photograph exchanged during the

O511GAR7                    Lopez Torres - Direct

1    course of the text conversation obtained in Government

2    Exhibit 702; Government Exhibit 704 is the photograph exchanged

3    in the text message conversation reflected in Government

4    Exhibit 703 at row 8 of that exchange.

5              And the government offers Government Exhibits 700

6    through 703, and 702A and 704.

7              THE COURT:  Any objection?

8              Mr. Bach, any objection?

9              MS. SHAPIRO:  Could we see them on the screen?

10             MS. HANFT:  We'll start with Government Exhibit 700.

11   Could you bring it back up for the parties, Mr. Bianco, and the

12   witness.

13             MR. BACH:  No objection.

14             THE COURT:  All right.  Received.

15             (Government's Exhibits 700-703, 702A, 704 received in

16   evidence)

17             MS. HANFT:  Could you publish Government Exhibit 700.

18   BY MS. HANFT:

19   Q.  And Mr. Lopez Torres, do you see the conversation on your

20   screen?

21   A.  Yes, I do.

22   Q.  Who is it a conversation between?

23   A.  Between Gerald Shvartsman and myself.

24   Q.  And so starting at row 2, can you read the message that you

25   sent to Gerald Shvartsman on June 22, 2021.

1   A.  "Send me the information later.  I would like to review

2   it."

3   Q.  And what was his response at row 3?

4   A.  "K."  Okay.

5   Q.  And let's go down to row 4, please.

6   A.  "Need NDA."

7   Q.  Mr. Lopez Torres, what is an NDA?

8   A.  A nondisclosure agreement.

9   Q.  Do you recall signing a nondisclosure agreement around this

10  time?

11  A.  Based on my understanding, no, I did not.

12          MS. HANFT:  We can take this down.

13  Q.  Did you then participate in a phone call regarding the

14  investment that Gerald Shvartsman told you about?

15  A.  Eventually, yes.

16          MS. HANFT:  Okay.  Government Exhibit 438, Mr. Bianco,

17  can we pull that up for the parties and the witness.

18          MR. BACH:  No objection.

19          MS. HANFT:  Government offers Government Exhibit 438.

20          THE COURT:  Received.

21          (Government's Exhibit 438 received in evidence)

22          MS. HANFT:  The parties have stipulated is a true and

23  correct copy of an email communication pursuant to Joint

24  Exhibit 2.

25  BY MS. HANFT:

1  Q.  Now starting at the top of the document, Mr. Lopez Torres,

2  could you read the title.

3  A.  "Gerald Bruce Contact Info."

4  Q.  And what's the date and time of this email?

5  A.  Friday, July 2, 2021.

6  Q.  And who's the email from?

7  A.  Gerald Shvartsman.

8  Q.  And who is it to?

9  A.  It's going to Bruce G, Eli 88008, Adrian Lopez.

10 Q.  And taking that, the most recent one first, who is Adrian

11 Lopez?

12 A.  That's correct.

13 Q.  Who is Adrian Lopez?

14 A.  Oh, myself.

15 Q.  And who is Eli 88008?

16 A.  I do not know.

17 Q.  Do you know who bruce@rocketonecapital is?

18 A.  At the time, no.

19 Q.  Did you then speak with the person you believed to be Bruce

20 at Rocket One Capital?

21 A.  Yes.

22 Q.  Going to the second page, there's another email from Gerald

23 Shvartsman.  What was——or we could skip that.

24         MS. HANFT:  All the way down to the——oop.  Mr. Bianco,

25 if you could scroll up.  Thank you.  And stop right there.

1   Q.  At 3:49, what was your response?

2   A.  "Yes, I'm in."

3   Q.  Okay.  And let's keep scrolling down to 3:53.  What did

4   Gerald Shvartsman say to you and Larry Markovitz, copying Bruce

5   G and Eli Goldberg?

6   A.  "Bruce, please send out the invite to all."

7   Q.  And we'll take a look at the next email response.

8           What was Bruce G's response?

9   A.  "Hey, Adrian and Eli, nice to meet you both.  I'm free now

10  if you guys want to hop on a call to walk through this.

11  710015950."

12  Q.  And keep scrolling down, please.

13          What was Bruce G's response?

14  A.  "Will do.  You'll see a calendar invite email with the

15  Google Meet connection link for 4:15 p.m."

16  Q.  And Gerald Shvartsman's email below that?

17  A.  "Bruce, make a Zoom invite for 5:30 today, please."

18  Q.  And what was your response?

19  A.  "Can't do this time but I can after office hours, 5 p.m.

20  Eastern."

21          MS. HANFT:  Okay.  And if we could go to the bottom of

22  this document, the final email from Bruce G.  I'm sorry.  The

23  final email of that page, not the document.

24  Q.  And what does Bruce G say at 4:05 p.m.?

25  A.  "No problem.  Call is now at 5:30 p.m."

1   Q.  And could you read what it says below that.

2   A.  "SPAC investment discussion——" I'm sorry "——Friday, July 2,

3   5:30-6 p.m., Google Meet."

4   Q.  What is this text, sir?

5   A.  This is a Google Meet information.

6   Q.  For what?

7   A.  For a SPAC investment discussion.

8          MS. HANFT:  And if you could scroll all the way back

9   to the top, Mr. Bianco.  Thank you.

10  Q.  Gerald Shvartsman's initial email in this chain at

11  3:33 p.m., could you read again what it says in the body of

12  this email.

13  A.  "Adrian and Eli, let me know if you're interested in

14  hearing the Trump SPAC opportunity."

15  Q.  So how did you——how did the call that you spoke about a

16  moment ago happen?

17  A.  Yeah.  So I joined——I joined the call late.  I was

18  multitasking.  When I joined the call, I——I remember Gerald

19  mentioning, Adrian, is that you?  And I said yes.

20         During the call, a discussion was made that an

21  investment opportunity, there was a——a minimum of investment

22  and——and there was a——a lockup period that you won't be able to

23  access your funds.

24  Q.  So just to back up a moment, who was on the call when you

25  joined?

1   A.  It's my understanding was Gerald and Bruce.

2   Q.  And did Gerald ever tell you who Bruce G was or Bruce

3   Garelick was?

4   A.  I don't think we ever went into details who Bruce was, no.

5   Q.  Did he tell you anything about him?

6   A.  I think either verbally or I read it somewhere in an email

7   or something; he was a stockbroker.

8   Q.  And to the best of your recollection what was being offered

9   on the call?

10  A.  I have bad memory specific about the call, but as I said,

11  it was, you invest a minimum and you will be locked for a

12  period of time, so——

13  Q.  And you——we referred to the word SPAC before.  You just

14  read Trump SPAC opportunity.  Did you know what a SPAC was?

15  A.  Yes, at the time I was very familiar with the SPAC.  It was

16  basically two——two companies merge together to go public.

17  Q.  And you also mentioned something about being locked up.

18  What does that mean?

19  A.  So it's my understanding that if you invested at least the

20  minimum, you wouldn't be able to access the funds for a period

21  of time.

22          MS. HANFT:  Mr. Bianco, can we scroll down to the

23  fourth page of this exhibit.

24  Q.  Did you respond to Mr. Garelick after this call?

25  A.  Yes, I did.  I did send an email thanking Bruce in this

1    case for putting the call together, yes.

2    Q.  Sir, could you just repeat what you just said.

3    A.  Yes, I did reply back here, "Bruce, thank you for putting

4    this call together.  I really appreciate it."

5    Q.  And did you end up making the investment described on the

6    call?

7    A.  No, I did not.

8    Q.  Why not?

9    A.  At the time I really didn't understand what was being

10   proposed, and I also didn't like the idea of having my—my

11   funds locked up, so, yeah, I didn't—didn't make sense to me.

12   Q.  Did there come a time when this opportunity or something

13   related to it came up again in conversation with Gerald

14   Shvartsman?

15   A.  Yeah.  So some time later, I received a call from Gerald,

16   and I think he asked me something about IT related, and he

17   mentioned to me from—if I invested into the deal, and my

18   answer to him was no, I did not.  He mentioned to me that

19   he—he was expecting news in two weeks, that he purchased a lot

20   of warrants.

21   Q.  What kind of warrants did he say he purchased?

22   A.  DWAC W.

23              (Continued on next page)

24

25

1    BY MS. HANFT:

2    Q.  Where were you when he told you he was expecting news in

3    two weeks?

4    A.  I was at a conference.

5    Q.  Did he say what the news was?

6    A.  I don't think during the call he was specific of the news.

7    It was my understanding that the result, either a decision to

8    merge.

9    Q.  Did he tell you to do anything on that call?

10   A.  He didn't tell me exactly what to do.  He basically says

11   you buy a bunch -- I bought a bunch of warrants, I'm expecting

12   the news in two weeks.  He was excited about it, so I went

13   ahead and purchased the warrants.

14   Q.  How did you purchase the warrants?

15   A.  I purchased through my phone.

16        MS. HANFT:  I'm going to direct your attention to

17   Government Exhibit 703, which is now in evidence and the

18   parties have stipulated is a text message conversation.

19        Let's publish Government Exhibit 703.

20   Q.  Who is this a conversation between?

21   A.  Between Adrian Lopez and Gerald Shvartsman.

22        MR. BACH:  Subject to the Court's ruling, we restate

23   our position for the record.

24        THE COURT:  It's conditionally received.

25        (Government's Exhibit 703 received in evidence)

1          MS. HANFT:  The government offers Government Exhibit

2     703.

3          THE COURT:  Conditionally received.

4          MS. HANFT:  Mr. Bianco, can you publish Government

5     Exhibit 703.

6  Q.  Mr. Lopez Torres, who is this a conversation between?

7  A.  This is between Adrian Lopez and Gerald Shvartsman?

8  Q.  What was going on in this conversation?

9  A.  This is a conversation after the call that I had with

10    Gerald, basically texting that I loaded 100,000.

11 Q.  What was the date of that when you told him that?

12 A.  October 19, 2021.

13 Q.  When you said loaded 100,000, what did you mean?

14 A.  I placed an order for 100,000 warrants.

15         MS. HANFT:  If we could go to the next row, row 2.

16 Q.  Could you read that, sir.

17 A.  I text him ticker DWACW.

18 Q.  What did you mean by ticker DWACW?

19 A.  If that was the ticker of the warrants that he purchased.

20 Q.  What did he respond?

21 A.  October 19, 2021.

22 Q.  Row 4.

23 A.  I'm in for 500,000, October 19, 2021.

24 Q.  Let's read the next one, too.

25 A.  My brother, 2M.

1   Q.  What did you understand that to mean?

2   A.  500,000 warrants or dollars.

3   Q.  What is I'm in for 500,000?

4   A.  That he's purchased 500,000.

5   Q.  And my brother?

6   A.  2M.

7   Q.  What did you understand that to mean?

8   A.  2 million warrants or $2 million.

9   Q.  Now turning to row 8.

10          MS. HANFT:  I'm sorry.  We skipped something.  Could

11  you go up, Mr. Bianco, just where we were at row 6.

12  A.  And my buddy, 10M.

13  Q.  Did you know who that referred to?

14  A.  The buddy, no.

15          MS. HANFT:  Let's turn to row 8.  If we could

16  highlight that text.

17  Q.  What did you say to Gerald Shvartsman?

18  A.  October 19, 2021.

19  Q.  What did you say to him?

20  A.  DWAC warrant, correct.

21          MS. HANFT:  And then there's an attachment that the

22  government would offer, that I read in the stipulation, and

23  that's Government Exhibit 704.

24          Any objection?  It's the attachment in that

25  conversation.

1      MR. BACH:  No, no objection.

2      MS. HANFT:  Government offers Government Exhibit 704.

3   Maybe we can pull it up side by side, Mr. Bianco.

4      THE COURT:  Received.

5      (Government's Exhibit 704 received in evidence)

6   Q.  Is that the attachment you sent to Gerald Shvartsman?

7   A.  Yes.

8   Q.  Why did you send it?

9   A.  Just to confirm it was the right ticker.

10  Q.  And what was his response?

11     MS. HANFT:  If we could toggle back to Government

12  Exhibit 703.  Row 9.

13  A.  October 19, 2021, correct.

14     MS. HANFT:  We can take that down.

15  Q.  Mr. Lopez Torres, do you recall learning at some point that

16  your investment had gone up?

17  A.  Yes.

18  Q.  Describe what happened.

19  A.  So one day I wake up in the morning, I look at my phone, I

20  looked and saw the warrants went up.

21  Q.  Which warrants?

22  A.  The one that I purchased.

23  Q.  And what did you do?

24  A.  I sold them.

25  Q.  Approximately how much money did you make?

1   A.  An estimated 350, plus or minus.

2   Q.  When you say 350, plus or minus, 350 what?

3   A.  $350,000.

4           MS. HANFT:  Let's turn back to Government Exhibit 703,

5   row 12.

6   Q.  Please read the date, Mr. Lopez Torres.

7   A.  October 21, 2021.

8   Q.  And what did you write to Gerald Shvartsman on the 21st?

9   A.  Thank you.

10          MS. HANFT:  Scrolling down to the next row.

11  Q.  Could you read that message, please?

12  A.  Amount sold out.

13  Q.  What did you mean by that?

14  A.  That I sold all my warrants.

15          MS. HANFT:  One row down, please, Mr. Bianco.

16  A.  Thank you again.

17  Q.  Why were you thanking him?

18  A.  For sharing information with me.

19  Q.  Please read rows 15 and 16 of this exhibit.

20  A.  I'm happy for you.  I will be waiting for my commission.

21  Q.  Who are those messages from?

22  A.  From Gerald Shvartsman to Adrian Lopez.

23  Q.  I'm going to direct your attention to Government Exhibit

24  335.

25          MS. HANFT:  Just to the witness and the parties.

1        This is pursuant to joint exhibit 3.  The parties have

2    stipulated that Government Exhibit 335 is a business record.

3    The government offers Government Exhibit 335.

4            MR. BACH:  Same basis subject to the previous

5    discussion.

6            THE COURT:  335 is received.

7            (Government's Exhibit 335 received in evidence)

8            MS. HANFT:  Please publish Government Exhibit 335,

9    Mr. Bianco.

10   Q.  What is this document, Mr. Lopez Torres?

11   A.  This is a statement.

12   Q.  What kind of statement?

13   A.  Brokerage statement.

14   Q.  Whose?

15   A.  Mine.

16   Q.  And what is Unique Reality Investments Incorporated?

17   A.  My company.

18           MS. HANFT:  Mr. Bianco, could you highlight for the

19   jury, beginning row 2 of page 5 through the fourth row of page

20   6.

21   Q.  Did these, generally speaking, Mr. Lopez Torres, reflect

22   your purchases of DWAC warrants that you were describing?

23   A.  That's correct, yes.

24           MS. HANFT:  If you could please highlight the fifth

25   and sixth row on page 6, Mr. Bianco.

1    Q.  Do these reflect the sale of those warrants after you

2    learned the merger was announced?

3    A.  That's correct, yes, that day.

4    Q.  Did you tell anyone else the information Gerald Shvartsman

5    shared with you?

6    A.  Yes, I did.

7    Q.  Who did you tell?

8    A.  My dad.

9    Q.  Why did you tell your dad?

10   A.  We share common investments and I share with him.

11           MS. HANFT:  I'm going to ask Mr. Bianco to pull up for

12   the parties Government Exhibit 701 and 701A pursuant to the

13   stipulation.  The parties have stipulated to the authenticity

14   to these exhibits.  The government would offer Government

15   Exhibits 701 and 701A.

16           MR. BACH:  No objection.

17           THE COURT:  Received.

18           (Government's Exhibits 701, 701A received in evidence)

19           MS. HANFT:  Mr. Bianco, if you could pull up for the

20   witness Government Exhibit 701T.

21   Q.  Mr. Lopez Torres, do you see Government Exhibit 701T?

22   A.  Yes, I do.

23   Q.  What is this?

24   A.  A text message translation.

25   Q.  And have you reviewed it?

1    A.   Yes.

2    Q.   Is the translation accurate?

3    A.   Best my understanding, correct.

4              MS. HANFT:   Government offers Government Exhibit 701T.

5              THE COURT:   That's just the translation?

6              MS. HANFT:   Yes, your Honor.

7              THE COURT:   So this is as an aid to the jury or are

8    you offering it in evidence?

9              MS. HANFT:   We'll offer it in evidence, your Honor.

10             THE COURT:   Any objection?

11             MR. DRISCOLL:   Just a clarifying question, 701 is a

12   pretty long exhibit.  Is it the whole exhibit coming in?  Can

13   we just admit the full 701?

14             MS. HANFT:   No.  We're not offering the full exhibit

15   right now.

16             MR. DRISCOLL:   Subject to completeness, Judge, I think

17   the full exhibit should come in.

18             MR. BACH:   In the interest of time, we'll go forward

19   with this now.

20             THE COURT:   701T is received and then I'll entertain

21   later whether more comes in under the Rule of Completeness.

22             Thank you, Mr. Bach.

23             (Government's Exhibit 701T received in evidence)

24   Q.   Do you recognize this conversation, sir?

25   A.   Yes, I do.

1   Q.  Who is it a conversation between?

2   A.  Between me and my dad.

3   Q.  What's the date of the conversation?

4   A.  October 19, 2021.

5   Q.  And could you please read the first four lines of the

6   messages here.

7   A.  This is speculative.  SPAC DWACW.  Apparently they're going

8   to announce in two weeks a merge with Trump Media.

9   Q.  Where did you get this information you were sending to your

10  father?

11  A.  From Gerald.

12  Q.  Gerald who?

13  A.  Shvartsman.

14  Q.  Why did you tell it to your father?

15  A.  I felt like it was an investment opportunity.

16          MS. HANFT:  Could we turn to the next row, 7 and 8.

17  Q.  Could you read what you wrote to your father.

18  A.  That's what Gerald told me.  I will explain later.

19          MS. HANFT:  Thank you.  If we could scroll back out.

20  Q.  Do you know if your -- sorry.  What was your father's

21  response?

22  A.  If it's with Trump Media, it would be really good because

23  it could explode big.

24  Q.  And your response?

25  A.  That's what he says.

1    Q.  Do you know what your father did after he received this

2    information?

3    A.  I think he eventually purchased the warrants.

4    Q.  Did he sell those warrants after the merger was announced?

5    A.  That's correct, yes.

6    Q.  Did you ever learn how much your father made?

7    A.  My understanding was a rough estimate of $1.4 million,

8    $1.5 million.

9              MS. HANFT:  The government is going to offer

10   Government Exhibit 370, which the parties have stipulated as a

11   business record.  We don't need to put it up right now.

12             THE COURT:  Any objection to it, Mr. Bach?

13             MR. BACH:  Can you put that on my screen so I can see

14   what it is.

15             No objection.

16             THE COURT:  Received.

17             (Government's Exhibit 370 received in evidence)

18             MR. BACH:  We just object to the relevance.

19             MS. HANFT:  It's the standing objection, we

20   understand.

21             THE COURT:  This is received.

22             MS. HANFT:  Thank you, your Honor.

23             We can take this down.

24   Q.  Mr. Lopez Torres, are you testifying here today

25   voluntarily?

1    A.   No.

2    Q.   Are you testifying because of an immunity order?

3    A.   That's correct.

4    Q.   Does that mean you've been ordered to testify?

5    A.   That is correct.

6    Q.   You have a lawyer to help you understand the lawyer?

7    A.   Yes, I do.

8    Q.   Under the order, what do you have to do?

9    A.   Say the truth.

10   Q.   And if you do that, what protection do you get?

11   A.   None of my words used in court will be used against me.

12   Q.   And do you get protection from prosecution in general or

13   just from the use of your words today?

14   A.   Just from the use of my words today.

15   Q.   What happens if you don't tell the truth?

16            MR. BACH:  Objection.

17            THE COURT:  Overruled.

18   A.   Basically, I can go -- I can get arrested.

19   Q.   Does the order protect you from prosecution if you lie

20   today?

21   A.   No.

22   Q.   Do you know where Gerald Shvartsman got the information he

23   shared with you?

24   A.   I do not.

25   Q.   And sir, have you returned the money you made as a result

O51Cgar8                    Lopez Torres - Direct

1    of the trades you described today?

2    A.  No.

3    Q.  And just one final topic.  Did you tell anyone, aside from

4    your father, the information Gerald Shvartsman told you about

5    the upcoming Trump Media merger?

6    A.  Yes.

7    Q.  Who did you tell?

8    A.  A friend.

9    Q.  What was the friend's name?

10   A.  Rameses.

11          MS. HANFT:  I'm going to offer Government Exhibit 702

12   and 702A, which is the conversation.

13          MR. BACH:  Objection.

14          THE COURT:  Those are conditionally received.

15          (Government's Exhibits 702, 702A received in evidence)

16          MS. HANFT:  If we could also pull up, before we

17   publish to the jury, Government Exhibit 702T.

18   Q.  Sir, do you recognize 702T?

19   A.  Yes.

20   Q.  What is it?

21   A.  It is a text message between Adrian and Rameses.

22   Q.  Have you reviewed this translation?

23   A.  Yes.

24   Q.  Is the translation accurate?

25   A.  Based on my understanding, yes.

1        MS. HANFT:  The government offers 702T.

2        THE COURT:  That's also conditionally received.

3        (Government's Exhibit 702T received in evidence)

4        MS. HANFT:  Mr. Bianco, could you please publish both

5    exhibits to the jury.

6    Q.  Mr. Lopez Torres, could you please read the first four

7    lines of 702T.  What did you write to your friend, Rameses?

8    A.  Supposedly DWAC.  They're going to announce something big

9    in the next two weeks.

10   Q.  You said DWAC, but what does it say in line 3?

11   A.  DWACW.

12   Q.  And where did you get that information that you were

13   telling Rameses?

14   A.  From Gerald.

15   Q.  Why did you tell him the information?

16   A.  We shared information, potential opportunities, and yeah, I

17   share with him.

18   Q.  Did you expect he would do anything with the information?

19   A.  Buy them.

20        MS. HANFT:  If we could keep going to line 5, what was

21   Ramse's response?

22   A.  It's already on the market.

23   Q.  What was your response?

24   A.  Yes.

25   Q.  If you could just read through the rest of the exhibit --

1          THE COURT:  Ms. Hanft, how much more do you have?  We

2      told the jury 5:15 based on estimates we had received.

3          MS. HANFT:  This is the end, your Honor.  We're just

4      finishing this exhibit.

5      A.  They are going to do a SPAC.

6          MS. HANFT:  Mr. Bianco, if you can scroll out.

7      Q.  If you could read through the end of the exhibit.

8      A.  I just got the news.  A friend put in $200,000.  Let me

9      stop and I will put in.  I was driving.  Ha ha ha.  Attachment.

10         MS. HANFT:  And then could we pull back up Government

11     Exhibit 702A.

12     Q.  Is that the attachment that he sent to you?

13     A.  That's correct.

14     Q.  And what did you respond?

15     A.  Yes.

16     Q.  Please read row 17.

17     A.  Supposedly Trump.  Social media.  It will come out through

18     there.

19     Q.  And so, what information were you conveying to your friend

20     Rameses?

21     A.  That there was a potential merge and it could be announced

22     in the next two weeks.

23         MS. HANFT:  One moment, your Honor.

24         Nothing further, your Honor.

25         THE COURT:  How much cross do you have, Mr. Bach?

1          MR. BACH:  Short.

2     CROSS-EXAMINATION

3     BY MR. BACH:

4     Q.  Good afternoon, Mr. Lopez Torres.

5     A.  Good afternoon.

6     Q.  I'm Jonathan Bach and I represent Bruce Garelick.

7     A.  Who's Bruce?  Over here?

8     Q.  Do you recognize Mr. Garelick?

9     A.  No.

10    Q.  You've never met him in person right?

11    A.  No, not that I'm aware of.

12    Q.  You had one video call with him sometime in July 2021;

13    correct?

14    A.  A conference call, yes.

15    Q.  And you don't remember what he said in that call; right?

16    A.  Very vague.  It was an investment opportunity.  There was a

17    minimal amount to invest and there's going to be a lock period.

18    That's mostly of what I remember.

19    Q.  Whatever he said, it wasn't enough to sway you to make the

20    investment at that time; correct?

21    A.  Correct.  At the time, I didn't really understand what was

22    being proposed, so --

23    Q.  You didn't trade on any information that he provided;

24    correct?

25    A.  Based on my understanding, no.

1   Q.  And that was in July, and did you understand at that time

2   he was trying to help organize a group of investors for Michael

3   Shvartsman to invest in DWAC?

4   A.  I don't recall mentioning a group of investors, just here's

5   an investment opportunity and --

6   Q.  And you turned that down at the time; correct?

7   A.  Oh, yes.  I did not move forward.

8   Q.  So now let's talk about Gerald Shvartsman.

9           He was your main source of contact on this; correct?

10  A.  That is correct.

11  Q.  He was your employer; correct?

12  A.  That is correct.

13  Q.  He was the one that you knew and had the relationship with;

14  right?

15  A.  That is correct.

16  Q.  And when October rolled around, that was about six

17  months -- no.  Maybe four months after you had that one brief

18  conversation with Mr. Garelick; right?

19  A.  That's correct.

20  Q.  And Mr. Garelick had nothing to do with that conversation

21  in October; right?

22  A.  The one I had with Gerald?

23  Q.  Yes.

24  A.  That's correct.

25  Q.  And you had nothing to do with Mr. Garelick in October;

1   correct?

2   A.   Based on my knowledge, no.

3   Q.   And Mr. Gerald Shvartsman gave you a stock tip; correct?

4   A.   He give me a ticker, yes.

5   Q.   And he gave you a tip to invest in the stock market;

6   correct?

7   A.   He shared information with me.

8   Q.   Yes.  And you have no idea where he got that information;

9   correct?

10  A.   That is correct.

11  Q.   You don't know who he was talking to or socializing with in

12  October, for example; correct?

13  A.   Based on my understanding at the time, correct.

14  Q.   And you placed your order after you received his

15  information; correct?

16  A.   That is correct, yes.

17  Q.   And did you understand this to be inside information when

18  you did this?

19  A.   No, sir.

20  Q.   Did you have any sense that this was lawful or unlawful at

21  the time?

22          MS. HANFT:  Objection.

23          THE COURT:  Overruled.

24  A.   No, sir.

25  Q.   And you went ahead and you placed an order; correct?

1   A.  I placed a buy order, correct.

2           MR. BACH:  Could we pull up Government Exhibit 703,

3   which I think you were just shown.  Could we go to where it --

4   Q.  You write in line 1, loaded 100K.

5           Do you see that, sir?

6   A.  Yes, I do.

7   Q.  That means you had invested $100,000; correct?

8   A.  That I placed an order for the $100,000.

9   Q.  And then Gerald, your employer, responds; correct?

10  A.  No, this is me.  The ticker?

11  Q.  I apologize, I'm going as fast as I can.

12  A.  No worries.  Line 2 is Adrian to Gerald.

13  Q.  You see in line 4, Gerald writes to you, I'm in for 500K?

14          Do you see that?

15  A.  Line 4, that is correct.

16  Q.  Line 5, my brother, $2 million; correct?

17  A.  That is correct.

18  Q.  And then in the next line, line 6, he says my buddy

19  $10 million.

20          Do you see that?

21  A.  That is correct.

22  Q.  And I think you testified in response to Ms. Hanft's

23  questions that you don't know who that friend or buddy is;

24  correct?

25  A.  That is correct, sir.

1   Q.  Did Gerald ever mention to you the name Anton Postolnikov?

2   A.  I'm sorry?

3   Q.  Did Gerald ever mention to you the name Anton Postolnikov?

4   A.  No, sir.

5           MR. BACH:  Let's take that down.

6   Q.  And now, let's talk about a few days later on October 21st.

7           October 21st, you're at work at Source Furniture;

8   correct?

9   A.  That's correct.

10  Q.  That's Gerald's furniture store; correct?

11  A.  Yes.

12  Q.  And he shares with you another ticker symbol; correct?

13  A.  That is correct.

14  Q.  And the ticker symbol that Gerald shares with you on

15  October 21st is Bene; correct?

16  A.  Yes.

17  Q.  And Gerald told you that he had recently added to his own

18  position in Bene W?

19  A.  That is correct.

20  Q.  You assumed some kind of news would be coming out at some

21  point with respect to Bene; correct?

22  A.  No, sir, not at the time.

23  Q.  I'm not asking if news came out, I'm asking if you assumed

24  at or around that time that news would be coming out at some

25  point?

1    A.  No.  No, sir.

2    Q.  Let me show you what I'll mark for identification as

3    Defendant's Exhibit 3512-026.  Take a look at this document,

4    Mr. Lopez, and I want you to focus on the second paragraph,

5    which says Bene at the top.

6           THE COURT:  You want to highlight for him what you

7    want him to focus on.

8           MR. BACH:  Sure.  Could you highlight the second

9    paragraph and, in particular, where it begins, "I assumed."

10   Q.  Do you see that sentence?

11   A.  That's correct, yes.

12   Q.  Do you recognize this document?

13   A.  No, I do not.

14   Q.  Do you see at the very top of the document, there's someone

15   named Michael M.?

16   A.  That's correct.

17   Q.  That's your lawyer, isn't it?

18   A.  That is correct.

19          MS. HANFT:  Your Honor, objection to how this is

20   proceeding.

21          THE COURT:  Well, not to that question, but I think it

22   can be used to refresh recollection.

23          MR. BACH:  Okay.

24   Q.  Sir --

25          THE COURT:  Or to impeach.

1              MR. BACH:  I want to do this in a -- okay.

2   Q.  You wrote emails to a lawyer who forwarded them to the

3   U.S. Attorney's Office; correct?

4   A.  That is correct.

5   Q.  If you look at the top of this document, you'll see someone

6   who says, please see my client's email about --

7              MS. HANFT:  Objection.

8              THE COURT:  Overruled.

9   A.  Yes, I do.

10  Q.  These are two emails that you wrote; correct?

11  A.  Two emails?

12             THE COURT:  Material below, can you show --

13  A.  I see two highlighted lines, correct.

14  Q.  And these are emails that you wrote, sir; correct?

15  A.  That is correct.

16  Q.  And you wrote, I assumed some kind of news will come out at

17  some point without any specific timeframe; correct?

18  A.  At the time of writing the email, that's correct.  The date

19  that I purchased the Benny W., I did not expect any news that

20  date.

21  Q.  At a later date, a potential merger was announced for Bene;

22  correct?

23  A.  That same day?

24  Q.  At a later date.

25  A.  At a later date, yes.

1    Q.  On October 22nd, you texted your dad; correct?

2    A.  Probably.  I don't know.  I don't remember.

3    Q.  Let me show you Government Exhibit 701 at page 147.

4           MR. BACH:  This is the one we asked to have subject to

5    completeness.

6           Can the government show page 147.

7           We offer pages 147 through 149 at this point.

8           THE COURT:  Any objection, Ms. Hanft?

9           MS. HANFT:  No objection, your Honor.

10          THE COURT:  Received.

11          (Government's Exhibit 147 received in evidence)

12   Q.  If you look at line 23, you have to forgive me, my Spanish

13   is terrible.

14   A.  Of course.

15          MR. BACH:  Could we publish this to the jury.

16   Q.  Line 23, you text to your father, proxima potencial.

17          Do you see that?

18   A.  Yes.

19   Q.  What does that mean?

20   A.  Next potential investment.

21   Q.  This is on October 22nd; correct?

22   A.  Yes.

23   Q.  Two days after the DWAC merger has been announced; correct?

24   A.  That is correct.

25   Q.  And do you see, as you go down the page, it says Bene W.?

1   A.  That's correct.

2   Q.  And that's Bene warrants; correct?

3   A.  That's correct.

4   Q.  If you go down to the next line, line 424, you write, quien

5   esta papa.

6           Do you see that?

7   A.  Yes.

8   Q.  And then you write -- again, forgive my Spanish.

9   A.  No worries.

10  Q.  La misma historia pero aun no se a anunciado.

11          What does that mean?

12  A.  Same story.  No news has come out yet.

13  Q.  When you say same story, you mean same story as DWAC;

14  correct?

15  A.  That is correct.

16  Q.  The next line, line 426, you write, tengo que leer de ellos

17  pero es la misma cosa.

18          Do you see that?

19  A.  That's correct.

20  Q.  What does that mean?

21  A.  Basically that I need to read more about the company, but

22  it seems to me that is the same thing as DWACW, yes.

23          MR. BACH:  Keep going.  The next line, can we see line

24  429.  Can we see line 429.  It.

25          MS. HANFT:  It's not in evidence.

1   Q.  Here it is, 429.  It says, eso en dijo Gerald ahora.

2           Do you see that?

3   A.  Yes.

4   Q.  What does that mean?

5   A.  This is what Gerald told me now.

6   Q.  This is information about Bene; correct?

7   A.  Correct, a different company.

8   Q.  A different company from DWAC; correct?

9   A.  Correct.

10  Q.  And Gerald is giving it to you; correct?

11  A.  That is correct.

12  Q.  Mr. Garelick never spoke to you about Bene; correct?

13  A.  Correct.

14  Q.  To your knowledge, he's not on the board of Bene; correct?

15  A.  Bruce?

16  Q.  Yeah.

17  A.  No.

18  Q.  You don't know where -- any reason why he would be the

19  source of any information about Bene, do you?

20  A.  No, no source with Gerald.

21          THE COURT:  Are we done Mr. Bach?

22          MR. BACH:  Yes, one moment.

23          THE COURT:  Okay.

24          MR. BACH:  We'll stop here, Judge.

25          THE COURT:  Anything further from the government?

1          MS. HANFT:  No, your Honor.  Thank you.

2          THE COURT:  You're excused as a witness.

3          (Witness excused)

4          Members of the jury, you're excused for the day.

5   Thank you very much for your kind attention.  As a reminder,

6   we'll have breakfast for you available for you tomorrow

7   morning.  Try to get here by 8:45 so we can start promptly at

8   9 o'clock.  Don't talk about the case to anybody else and don't

9   do any research on the case.

10          All rise.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         (Jury not present)

2         THE COURT:  The witness is excused and the parties can

3    be seated.  I have a 5:30 and I'm sure you're all anxious to

4    get back to your offices and prepare for tomorrow.  Just tell

5    me if there are other items I need to address from the

6    government before we start with testimony tomorrow, and then

7    I'm going to want to know who the government's witnesses are

8    tomorrow.  Mr. Bach, I'm going to have the same question for

9    you.

10        Any topics we need to discuss?

11        MR. BACH:  Not at the moment for us.

12        MS. HANFT:  Not from the government right now.

13        THE COURT:  Witnesses for tomorrow.

14        MS. HANFT:  Give me one moment, your Honor.

15        Eric Swider, Michael D'Angelo, Ben Reed, Alex Monje,

16   Jeff Stith, Netanel Suissa, and Christian Isolda.

17        THE COURT:  I'm going to want to hear from the

18   government in the morning about where we are in the case once

19   you get a sense of how we're doing in terms of timing and when

20   you expect the government will complete its case, but we can

21   discuss that in the morning, you can figure it out overnight.

22        MS. HANFT:  Understood, your Honor.  Thank you.

23        THE COURT:  Have a good evening, everybody.  See you

24   in the morning.

25        (Adjourned to May 2, 2024 at 9:00 a.m.)

1     INDEX OF EXAMINATION

2  Examination of:                              Page

3   ANDREW DEAN LITINSKY

4  Direct By Mr. Bach . . . . . . . . . . . . . . 184

5  Redirect By Mr. Shahabian . . . . . . . . . 192

6  Recross By Mr. Bach . . . . . . . . . . . . 199

7   HARTLEY WASKO

8  Direct By Mr. Nessim . . . . . . . . . . . . 205

9  Cross By Mr. Bach . . . . . . . . . . . . . 234

10   MARC WACHTER

11  Direct By Mr. Shahabian . . . . . . . . . . 255

12   MARC WACHTER

13  Direct By Mr. Shahabian . . . . . . . . . . 257

14  Cross By Mr. Bach . . . . . . . . . . . . . 301

15  Redirect By Mr. Shahabian . . . . . . . . . 395

16  Recross By Mr. Bach . . . . . . . . . . . . 400

17   ADRIAN LOPEZ TORRES

18  Direct By Ms. Hanft . . . . . . . . . . . . 405

19   ADRIAN LOPEZ TORRES

20  Direct By Ms. Hanft . . . . . . . . . . . . 407

21  Cross By Mr. Bach . . . . . . . . . . . . . 432

22

23

24

25

```
 1                    GOVERNMENT EXHIBITS

 2   Exhibit No.                                  Received

 3   1   . . . . . . . . . . . . . . . . . . 209

 4   3   . . . . . . . . . . . . . . . . . . 212

 5   409 . . . . . . . . . . . . . . . . . . 218

 6   410 . . . . . . . . . . . . . . . . . . 220

 7   433 . . . . . . . . . . . . . . . . . . 224

 8   484 . . . . . . . . . . . . . . . . . . 226

 9   502 . . . . . . . . . . . . . . . . . . 283

10   472 . . . . . . . . . . . . . . . . . . 286

11   502 . . . . . . . . . . . . . . . . . . 290

12   475 . . . . . . . . . . . . . . . . . . 292

13   830 . . . . . . . . . . . . . . . . . . 293

14   700-703, 702A, 704 . . . . . . . . . . . 411

15   703 . . . . . . . . . . . . . . . . . . 418

16   335 . . . . . . . . . . . . . . . . . . 423

17   701, 701A . . . . . . . . . . . . . . . 424

18   370 . . . . . . . . . . . . . . . . . . 427

19   702, 702A . . . . . . . . . . . . . . . 429

20   147 . . . . . . . . . . . . . . . . . . 439

21   2   . . . . . . . . . . . . . . . . . . 207

22   438 . . . . . . . . . . . . . . . . . . 412

23   502, pages 64-65 . . . . . . . . . . . . 397

24   504 . . . . . . . . . . . . . . . . . . 268

25   701T . . . . . . . . . . . . . . . . . 425
```

1          GOVERNMENT EXHIBITS CONTINUED

2    Exhibit                                    Received

3     702T  . . . . . . . . . . . . . . . . . 430

4     704  . . . . . . . . . . . . . . . . . . 421

5     732, row 1,  . . . . . . . . . . . . . . 280

6                  DEFENDANT EXHIBITS

7    Exhibit No.                                Received

8     502  . . . . . . . . . . . . . . . . . . 375

9     72.2  . . . . . . . . . . . . . . . . . 361

10    72.3  . . . . . . . . . . . . . . . . . 364

11    72.3  . . . . . . . . . . . . . . . . . 384

12    73  . . . . . . . . . . . . . . . . . . 366

13    73.3  . . . . . . . . . . . . . . . . . 344

14    75.2  . . . . . . . . . . . . . . . . . 346

15    75.4  . . . . . . . . . . . . . . . . . 349

16    75.9  . . . . . . . . . . . . . . . . . 334

17                  JOINT EXHIBITS

18    Exhibit No.                               Received

19    2                                         217

20    3  . . . . . . . . . . . . . . . . . . . 275

21

22

23

24

25