O52Cgar1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                 New York, N.Y.

            v.                            23 Cr. 307 (LJL)

BRUCE GARELICK,

                Defendant.

------------------------------x           Trial

                                          May 2, 2024
                                          9:00 a.m.


Before:

                    HON. LEWIS J. LIMAN,

                                          District Judge
                                            and a Jury


                         APPEARANCES

DAMIAN WILLIAMS
      United States Attorney for the
      Southern District of New York
BY:   ELIZABETH A. HANFT
      MATTHEW R. SHAHABIAN
      DANIEL G. NESSIM
      Assistant United States Attorneys

SHAPIRO ARATO BACH, LLP
      Attorney for Defendant Garelick
BY:   ALEXANDRA  A. E. SHAPIRO
      JONATHAN BACH
      JULIAN S. BROD
      JASON A. DRISCOLL

Also Present:

Special Agent Marc Troiano, FBI
Paralegal Specialist Grant Bianco, USAO
```

O52Cgar1

1          (Trial resumed; jury not present)

2          THE COURT:  Does the government have anything that it

3  needs to raise before we bring in the jury?

4          MS. HANFT:  No, your Honor.  Thank you.

5          THE COURT:  What about the defense?

6          MR. BACH:  Judge, we have one legal issue to raise

7  with respect to the second witness anticipated today.

8          THE COURT:  Just tell me what the nature is of the

9  issue.

10          MR. BACH:  It's an evidentiary issue that goes to the

11  relevance of the witness's testimony and Rule 401 and 403.

12          THE COURT:  The first witness is Mr. Swider?

13          MS. HANFT:  Yes, your Honor.

14          THE COURT:  How long is his direct going to be?

15          MS. HANFT:  Approximately an hour.

16          THE COURT:  We'll address it at a midmorning break.

17          Mr. Nessim, did you want to say something?

18          MR. NESSIM:  One thing to raise, your Honor, on

19  witnesses.  We did have to change the order last night.  We

20  informed defense counsel last night, but in case the Court is

21  interested in the updated order.

22          THE COURT:  I am.

23          MR. NESSIM:  Our current plan is to have Mr. Swider

24  testify, then Jeff Stith, Michael D'Angelo, Christian Isolda,

25  Robert Servinskas, Netanel Suissa and, time permitting, Alex

1   Monje.

2           THE COURT:  Are any of those testifying pursuant to an

3   immunity order?

4           MR. NESSIM:  Mr. Suissa will be testifying pursuant to

5   an immunity order.

6           THE COURT:  I also left you with a question overnight

7   about where we are in the government's case and when the

8   government anticipates that it would finish.

9           MR. NESSIM:  I think we're moving efficiently.

10  Obviously the jury took longer than we expected.  I think we

11  expect that the government should be able to rest either end of

12  the day tomorrow or maybe morning on Monday, depending on how

13  long crosses are and various other issues.  I think we expect

14  to rest by Monday at some point.

15          THE COURT:  It sounds like from that that we're well

16  within what we told the jury about finishing the trial by the

17  end of next week.

18          MR. NESSIM:  We believe so, your Honor.  On that

19  point, with the Court's indulgence, we would just request, to

20  the extent that we could have an hour for lunch today and

21  tomorrow, we've had sort of --

22          THE COURT:  I think I'll be able to accommodate that.

23  Frankly, that may also relieve a little bit of the pressure in

24  terms of the charge conference and give each of you a little

25  bit more time to argue some of the significant issues on the

O52Cgar1

1    charge.  So we'll see how things develop with respect to that.

2                    MR. NESSIM:  Yes, your Honor.  Thank you.

3                    THE COURT:  Mr. Bach.

4                    MR. BACH:  Can we assume that any defense case would

5    not start before next week?

6                    THE COURT:  Until next week?

7                    MR. BACH:  We don't know if there will be a defense

8    case, but if there is, we'll have to coordinate witnesses.

9                    THE COURT:  I don't think that's going to be a

10   problem.

11                   MR. NESSIM:  I don't think so.  I do think there is a

12   high likelihood though that our case does not take, you know,

13   much beyond Monday morning's session.  So I think defense case

14   should be prepared to begin Monday afternoon if necessary.

15                   THE COURT:  And Mr. Bach, if something strange happens

16   and for some reason the government case ends earlier tomorrow,

17   then we might use that time to discuss some legal issues,

18   including I assume that you're going to be making a motion.

19   I'm not prejudging what the motion is.  I just know the lawyers

20   I'm dealing with will make a motion.

21                   MR. BACH:  I can't speak for them, Judge.

22                   THE COURT:  Leaving aside whether the defendant

23   testifies, how long do you think a defense case would be?  Are

24   you anticipating there would be one, again, leaving aside

25   whether the defendant testifies, and how long would it be?

1          MR. BACH:  If there is one, we don't anticipate it

2     would be very long.  I don't think it's going to interfere with

3     the Court's expectations about when the trial will end.

4          THE COURT:  All right.  Let's bring in the jury.

5          Is the witness ready?

6          MS. HANFT:  The witness is in the witness room.

7          MR. BACH:  Judge, I misspoke.  Now that I understand

8     the order of witnesses, it's the third witness on the

9     evidentiary issues, not the second.

10         THE COURT:  Even better.  Let's bring in the jury.

11         (Continued on next page)

1           (Jury present)

2           THE COURT:  Good morning, members of the jury.

3   Welcome back.

4           The government will call their next witness.

5           MS. HANFT:  The government calls Eric Swider.

6           THE COURT:  Let's bring Mr. Swider in.

7    ERIC SWIDER,

8       called as a witness by the Government,

9       having been duly sworn, testified as follows:

10          THE DEPUTY CLERK:  Please state your full name for the

11  record and please spell out your first and last name.

12          THE WITNESS:  Eric Swider, E-R-I-C S-W-I-D-E-R.

13          THE COURT:  Good morning, Mr. Swider.  You may be

14  seated.

15          Counsel, you may inquire.

16          Mr. Swider, please try to keep your voice up, speak

17  into the microphone, wait until the question is done before you

18  answer.

19          Go ahead, Ms. Hanft.

20  DIRECT EXAMINATION

21  BY MS. HANFT:

22  Q.  Good morning, Mr. Swider.

23  A.  Good morning.

24  Q.  Where do you live?

25  A.  I live in Puerto Rico.

1  Q.  What do you do or a living?

2  A.  I'm a private advisor.  I have a private advisory firm.

3  Q.  What kind of advice do you give in your firm?

4  A.  Mostly financial restructuring.

5  Q.  What does restructuring mean?

6  A.  Usually when a client, whether it's a government client or

7  a private client has some sort of financial or economic

8  situation that needs to be worked out, whether it's a debt

9  restructuring, a corporation is having an issue resolving

10  something, that's where I'll usually come in and that's my

11  role.

12  Q.  What's your educational background?

13  A.  I graduated high school, then I spent two years in the navy

14  nuclear power -- their preparatory program.

15  Q.  And have you ever held any professional licenses?

16  A.  Yes, ma'am, I have.

17  Q.  What are they?

18  A.  I once held my Series 7, Series 6, and Series 63 securities

19  license.

20  Q.  And before having your own firm, what did you do, where did

21  you work?

22  A.  Before my own firm, I worked at Horizons Global, and

23  another small private equity shop I worked at for a couple of

24  years.

25  Q.  Approximately how long have you worked in the financial

1    industry?

2    A.   25 years.

3    Q.   Have you ever heard of a company called Digital World

4    Acquisition Corporation?

5    A.   Yes, ma'am, I have.

6    Q.   Is there a shorter term you use to refer to the company?

7    A.   Yes, ma'am.  DWAC.

8    Q.   I'll refer to it as DWAC going forward.

9              How have you heard of DWAC?

10   A.   I served on the board of the company, the board of

11   directors.  Then I served as both the interim CEO and as the

12   full-time CEO.

13   Q.   What is the company called today?

14   A.   Today it's called TMTG.

15   Q.   Why does it have a different name today?

16   A.   Because we completed a company with a company -- DWAC

17   completed a merger with TMTG and therefore the name changed.

18   Q.   And approximately when was that merger completed?

19   A.   That was March of 2024, this year.

20   Q.   Mr. Swider, have you ever come across someone named Bruce

21   Garelick?

22   A.   Yes, ma'am.

23   Q.   How have you come across him?

24   A.   He served on the board of DWAC with me for a short period

25   of time.

1   Q.  I'll ask you more questions about your interactions with

2   the defendant a bit later.  First I'd like to ask you some

3   questions about your background with DWAC and other companies

4   like it.

5            What kind of company was DWAC?

6   A.  DWAC was a SPAC, a Special Purpose Acquisition Company.

7   Q.  And how did you become involved in DWAC?

8   A.  I had known the sponsor of the SPAC, Patrick Orlando, for

9   several years.  He had asked me to serve on the board of a

10  couple of different SPACs that he was starting up.

11  Q.  You referred to a couple of different SPACs that Patrick

12  Orlando was starting up.  Were you involved with any SPACs with

13  Patrick Orlando before DWAC?

14  A.  Yes, I was.

15  Q.  Which ones?

16  A.  I was involved in another one called Benessere Acquisition

17  Corp.

18  Q.  How were you involved with Benessere Acquisition

19  Corporation?

20  A.  I sat on the board of that company, as well.

21  Q.  What does it mean to be on the board of a company?

22  A.  When you sit on a board, you have a duty of care and

23  fiduciary responsibility to the public shareholders or to the

24  shareholders at large.  Your role is to give guidance to and

25  vote on major decisions that management makes and benefit of

1    the shareholders.

2    Q.  In the case of a SPAC, what are those major decisions?

3    A.  The primary major decision that a SPAC board is involved in

4    is selecting a target to do a merger with.

5    Q.  Have you been on any other boards before Benessere or DWAC?

6    A.  Not of public companies, no, ma'am.

7    Q.  Now, you mentioned Patrick Orlando, what was his role in

8    Benessere?

9    A.  He was the sponsor of the SPAC, he was the CEO of the SPAC,

10   and he was on the board of the SPAC, the chairman.

11   Q.  You used the word "sponsor" a few times.  What does

12   "sponsor" mean?

13   A.  The sponsor is the private group that raises the initial

14   capital that finances the SPAC becoming a public company.

15   Q.  When you say "initial capital," what does "capital" mean?

16   A.  The initial money.

17   Q.  What were some of Benessere's potential target companies?

18   A.  There was a media company that we looked at early on.  I

19   don't recall the name of it.  We looked at an automotive

20   specialty glass manufacturer.  There was a hydrogen company.

21   There was also the Trump Media Group.

22   Q.  Turning to DWAC, which you said you originally served on

23   the board of directors on, who were some of DWAC's other

24   directors?

25   A.  Lee Jacobson, Rodrigo Veloso, Bruce Garelick, myself,

1  Patrick, I think that was it.  I might be missing one other

2  one.

3  Q.  Did DWAC ultimately go public?

4  A.  Yes, ma'am.

5  Q.  Describe how that process worked in general terms.

6  A.  So, in general terms, once the sponsor has raised the money

7  to finance the company to go public, the primary step is filing

8  an S1 statement registration with the SEC.  Once that's

9  approved, that allows you to go effectively become public.

10         MS. HANFT:  Mr. Bianco, could we put up Government

11  Exhibit 106, which is in evidence.  If could you highlight the

12  top.

13  Q.  Mr. Swider, do you recognize this?

14  A.  Yes, ma'am, I do.

15  Q.  What is this?

16  A.  This is the amendment No. 1 to the form S1 registration

17  statement that we filed with the SEC for Digital World

18  Acquisition Corp.

19  Q.  And just in general terms, you used the term "S1" a moment

20  ago and read it for us.  What is an S1?

21  A.  The S1 is the original or the initial filing you do with

22  the SEC to go public.

23  Q.  The SEC refers to what?

24  A.  The Securities and Exchange Commission.

25         MS. HANFT:  We could zoom out, Mr. Bianco.  Let's turn

1    to the fourth page of this PDF, which is listed as page 1.

2    Q.  Could you read the first paragraph, Mr. Swider.

3    A.  Digital World Acquisition Corp is a newly organized blank

4    check company formed for the purpose of effecting a merger,

5    capital stock exchange, asset acquisition, stock purchase,

6    reorganization or similar business combination with one or more

7    businesses, which we've referred to as our initial business

8    combination throughout this prospectus.  We have not selected

9    any specific business combination target and we have not, nor

10   has anyone on our behalf, initiated any substantiative

11   discussions, directly or indirectly, with any business

12   combination target.  While we may pursue an initial business

13   combination target in any business or industry, we intend to

14   focus our search on middle market emerging growth

15   technology-focused companies in the Americas, and the Sassoon

16   technology or FinTech and Financial Services sector.

17            MS. HANFT:  Thank you.  If we could turn to page 3,

18   Mr. Bianco.  The No. 3 should be at the bottom of the page, so

19   it will be perhaps page 7.  Thank you.

20   Q.  If you could read this first paragraph, our management

21   team.

22   A.  Our management team is led by Mr. Patrick Orlando, our

23   chairman and CEO, who has served many executive roles in

24   finance over a 25-year career.  Mr. Orlando's experience covers

25   all aspects related to Special Purpose Acquisition

1  Corporations, or SPACs, as he has been involved as executive,

2  sponsor, and director in several SPACs, including Yunhong

3  International, which is traded on the NASDAQ, Benessere Capital

4  Acquisition Corporation, and Maquia Capital Acquisition

5  Corporation.  Over his career, Mr. Orlando has developed an

6  extensive network, and we believe his knowledge and exposure on

7  a global scale will enable us to locate and attract potential

8  targets.

9        MS. HANFT:  Thank you.  Can we turn to the next page,

10  Mr. Bianco.

11  Q.  Can you read the second paragraph, Mr. Swider.

12  A.  Bruce J. Garelick is our director nominee.  Mr. Garelick is

13  a venture capitalist/entrepreneur/c-level executive and

14  disruptive technology investing enthusiast.  Since August 2020,

15  he has served as the chief-strategy-officer at Rocket One

16  Capital.  From May 2019 to August 2020, he served as chief

17  financial officer of Leaf Logix Technologies, Inc., a software

18  company.  From 2012 to May 2019, Mr. Garelick was the founder

19  and managing partner of Garelick Capital Partners LP, a

20  technology hedge fund.  Prior thereto, from January 2005 to

21  2012, Mr. Garelick was a portfolio manager at Adge Capital LP.

22  Mr. Garelick has dedicated his career to investing, molding,

23  and guiding transformative growth technology companies.  He has

24  managed one of the largest technology hedge fund pools of

25  capital in the world for a former Harvard University endowment

1    investment manager to starting his own hedge fund, which grew

2    into one of the top dedicated technology hedge funds in the

3    world.  He has since transitioned his investment focus and

4    managerial skills to the private technology world, where he

5    served as a lead investor and CFO of an industry defining

6    software company to his current venture capital focus on

7    early-stage technology companies at Rocket One Capital.  Mr.

8    Garelick received his MBA from The Wharton School at University

9    of Pennsylvania and his bachelor's degree at Vanderbilt

10   University.  He is a CFA, which is a chartered financial

11   analyst, holder.

12         MS. HANFT:  Thank you, Mr. Swider.  And scrolling

13   down, maybe we can go halfway down this page, and if you could

14   highlight the "Eric Swider" paragraph, Mr. Bianco.

15   Q.  Mr. Swider, please read that paragraph.

16   A.  Eric Swider, our director nominee, has been serving as the

17   Chief Executive Officer of RUBIDEX, a start-up company focusing

18   on data security, since January 2020.  Mr. Swider founded

19   Renatus Advisors and has been serving as the Partner of Renatus

20   LLC since June 2016, where he is responsible for FEMA grant

21   management and government advisory services.  From September

22   2016 to January 2018, Mr. Swider served as the Managing

23   Director of Great Bay Global where he oversaw launch of new

24   business division focused on investing in alternative

25   strategies.  From December 2014 to June 2016, Mr. Swider served

1   as the Managing Director of Horizons Global, where he oversaw

2   expansion of new investment team and was responsible for

3   working on a global basis to expand client base and investment

4   portfolio.  From February 2010 to December 2015, Mr. Swider

5   served as the Managing Director of Oceano Beach Resorts, where

6   he was responsible for growing new property and resort

7   management group.  Since February 2021, Mr. Swider has also

8   served as a director of Benessere Capital Acquisition Corp.

9   Mr. Swider received his education in mechanics engineering and

10  nuclear science studies at US Naval Engineering and Nuclear A

11  Schools, an intensive two-year program, studying nuclear

12  physics, heat transfer and fluid flow, advanced mathematical

13  practices and engineering principles.

14          MS. HANFT:  Thank you, Mr. Swider.

15          You can scroll out.  Thank you, Mr. Bianco.

16  Q.  Mr. Swider, the paragraphs you just read describe both you

17  and Bruce Garelick as director nominees.  What does that mean?

18  A.  A director nominee is someone that has been nominated to be

19  a director and expects to be a director at the time you go

20  public.  It's not necessarily that they are a director yet, but

21  if the company goes public, then they will more than likely

22  become a director.

23  Q.  Mr. Swider, did DWAC have a code of ethics?

24  A.  Yes, ma'am.

25  Q.  Were you informed about the code of ethics as a board

1   member?

2   A.  Yes, ma'am.

3   Q.  I'd like to direct your attention to what's in evidence as

4   Government Exhibit 107E.

5           MS. HANFT:  Mr. Bianco, are we publishing Government

6   Exhibit 107E?

7   Q.  What is this document, Mr. Swider?

8   A.  This is Digital World Acquisition Corp Code of Conduct and

9   Ethics.

10          MS. HANFT:  If we could turn to page 2 of this

11  document, the very bottom, starting with Roman numeral VI.

12  Confidentiality.

13  Q.  Could you read that, sir.

14  A.  Confidentiality.  Employees, officers, and directors must

15  maintain and protect the confidentiality of information

16  entrusted to them by the company, or that otherwise comes into

17  their possession, during the course of their employment or

18  while carrying out their duties and responsibilities, except

19  when disclosure is authorized by the Company or legally

20  mandated.

21          MS. HANFT:  We'll skip the next page, which I believe

22  is blank, and follow along with the next paragraph at the top

23  of this page.

24  Q.  Could you read that, please, Mr. Swider.

25  A.  The obligation to preserve confidential information

1    continues even after employees, officers, and directors leave

2    the Company.  Confidential information encompasses all

3    non-public information (including, for example, "inside

4    information" or information that third-parties have entrusted

5    to the Company) that may be of use to competitors, or may

6    otherwise be harmful to the Company or its key stakeholders, if

7    disclosed.  Financial information is of special sensitivity and

8    should under all circumstances be considered confidential,

9    except where its disclosure is approved by the Company or when

10   the information has been publicly disseminated.

11   Q.  I'd also like to turn your attention to Roman numeral VII.

12   Please read that paragraph.

13   A.  Insider trading.  Insider trading is unethical and illegal.

14   Employees, officers, and directors must not trade in securities

15   of a company while in possession of material non-public

16   information regarding that company.  It is also illegal to

17   "tip" or pass on inside information to any other person who

18   might make an investment decision based on that information or

19   pass that information to third parties.  The Company has an

20   Insider Trading Policy, which sets forth obligations in respect

21   of trading in the Company's securities.

22   Q.  Was this code of ethics adopted?

23   A.  Yes, ma'am.

24   Q.  I'd like to direct your attention to what's in evidence as

25   Government Exhibit 113.

1          MS. HANFT:  Mr. Bianco, please publish exhibit 113.

2     Q.  Could you just read the heading of this document, sir.

3     A.  This is Digital World Acquisition Corp. Unanimous Written

4     Consent to Action of the Board of Directors in Lieu of a

5     Meeting.

6     Q.  What is the date?

7     A.  September 2nd, 2021.

8          MS. HANFT:  Scroll down to page 11, please,

9     Mr. Bianco.

10    Q.  Apologies, Mr. Swider.  Do you see where it says code of

11    ethics?

12    A.  I do, yes, ma'am.

13    Q.  Could you please read the first paragraph.

14    A.  Resolved, that the form, terms, and provisions of the

15    Corporation's Code of Ethics, in substantially the form

16    submitted to the Board, be, and the same hereby are, authorized

17    and approved in all respects.

18    Q.  Mr. Swider, on what exchange was DWAC traded?

19    A.  On the NASDAQ.

20         MS. HANFT:  If we could scroll up to page 3,

21    Mr. Bianco, on this document.  If you could highlight NASDAQ

22    application.

23    Q.  Can you read the first sentence after "resolved" please,

24    Mr. Swider.

25    A.  The Board has determined that it is in the best interests

1    of stockholders that the Corporation should apply for the

2    listing of the Corporation's offered units, including their

3    constituent Securities, on The NASDAQ Global Market ("NASDAQ"),

4    and that any and all prior actions taken by the Authorized

5    Officers in connection therewith are hereby ratified, affirmed,

6    and approved; and each Authorized Officer be --

7    Q.   Stop there.  I'm sorry to interrupt you.

8    A.   Oh, I'm sorry.

9         MS. HANFT:  If we could go to page 9 where it says

10   "Board of Directors."

11   Q.   Could you read the third "resolved" paragraph here.

12   A.   Resolved, that Eric Swider, Justin Shaner, Rodrigo Veloso,

13   Bruce J. Garelick be, and they hereby are, appointed to serve

14   as directors of the Corporation, effective on the Director

15   Effective Time, to fill the vacancies on the Board created by

16   the foregoing increase in the size of the Board.

17   Q.   Thank you.  Mr. Swider, did you have any specific roles on

18   the board of directors of DWAC?

19   A.   Yes, ma'am.  I served on the compensation committee, I

20   served on the audit committee, and I was the chairman of the

21   audit committee, as well.

22   Q.   What is the audit committee?

23   A.   The audit committee's primary responsibility is to review

24   all audited financials before they are published with the SEC,

25   but they also would be involved in any decisions, that might

1  there might be an internal conflict, if there was a conflicted

2  transaction or any wrongdoing within the company that they

3  would audit.

4  Q.  Do you recall approximately when DWAC made its shares

5  available to the public to invest?

6  A.  Yes, ma'am.  It was sometime in early September 2021.

7  Q.  And after DWAC went public, what was your position?

8  A.  I was on the board of directors and I served on those

9  committees.

10  Q.  Did DWAC's board of directors begin to meet after DWAC went

11  public?

12  A.  Yes, ma'am.

13  Q.  I'd like to direct your attention to what's in evidence as

14  Government Exhibit 118.  What is this document, Mr. Swider?

15  A.  These are minutes from one of our board meetings.  I

16  believe it was our first board meeting.

17  Q.  Who was present at this board meeting?

18  A.  Patrick Orlando, serving as the chairman and CEO.  Luis

19  Braganza, serving as the CFO.  Alex Monje, who was serving

20  essentially as legal counsel.  Rodrigo Veloso as a director.

21  Eric Swider as a director, Bruce Garelick as a director, Justin

22  Shaner as a director, and Lee Jacobson as a director.

23  Q.  How did the board meetings typically occur?

24  A.  Usually over Zoom.

25  Q.  And were the meeting minutes usually recorded?

O52Cgar1                    Swider - Direct

1    A.  Yes, ma'am.

2    Q.  And by "recorded," I was referring to notes or writing.

3    A.  Yes, ma'am.

4            MS. HANFT:  If we could zoom out, please, Mr. Bianco.

5    Q.  What was the date of this board meeting, Mr. Swider?

6    A.  September 21st, 2021.

7            MS. HANFT:  If we could look at Roman numeral III

8    under "call to order."

9    Q.  Can you read that line, please.

10   A.  This is the first meeting of the board of directors.  It

11   was called to order at 12:32 p.m.

12           MS. HANFT:  Let's look at Roman numeral V.

13   Q.  Could you read the first paragraph here under "new

14   business."

15   A.  Management introduced potential initial pipeline of

16   targets.  Board members discussed pros and cons of each of the

17   following potential targets:  TMG, HMI, Wag!, Global Oculus,

18   Avnon, Sig Sauer, and Nevo Motors.  Discussion on each target

19   ensued.

20   Q.  Mr. Swider, when it says "potential targets," what does

21   that refer to?

22   A.  Those are potential companies that we would consider

23   merging with.

24   Q.  In the first potential target listed, TMG, what is that?

25   A.  That was Trump Media Group.

1    Q.  Do you recall discussion of Trump Media Group as a

2    potential merger target at this first meeting?

3    A.  I do.

4    Q.  Generally speaking, what do you recall?

5    A.  Generally speaking, I recall that the management was

6    explaining to the board that the company, TMG, had progressed

7    in the last six months.  Because we had looked at them

8    previously and the other SPAC in Benessere, and there was

9    issues with the company, the deal fell apart, I think they lost

10   their licensing agreement, they had some conflicts.  And so,

11   management was telling this board, hey, this target may come

12   back up because we think they fixed some issues and had

13   progressed in their development.

14   Q.  This first paragraph about an initial pipeline of targets

15   and then your discussion of potential targets at the board

16   meeting, how did you view that information?

17   A.  I mean, it was very sensitive.  It was obviously

18   confidential.  It was really the whole foundation of what our

19   job was as a board.

20   Q.  Let's read the next paragraph.

21   A.  Consensus of the board is to follow up/negotiate and

22   execute LOIs with TMG, Global Oculus/Bittrex, and Wag! so that

23   we may conduct deeper due diligence.  HMI and Sig Sauer are

24   seen as stable, but without the high growth potential as the

25   previously mentioned.  Should consider but pursue the high

1   growth group first.

2   Q.  And you just read something that refers to LOIs.  What is

3   an LOI?

4   A.  It's a letter of intent.

5   Q.  What is a letter of intent?

6   A.  The letter of intent basically spells out the terms of

7   which the two parties will potentially move forward in

8   discussions for a potential merger.

9   Q.  And so, this conclusion that the board would follow up,

10  negotiate, and execute LOIs with those companies, how did you

11  view that information?

12  A.  Very sensitive information.

13  Q.  Why?

14  A.  Because that information would be the information that

15  could have the most impact on the company.  Our whole job is to

16  find a target to merge with.  And so, that list would be the

17  most confidential information that we could have.

18  Q.  Did you think that you could use that information to make

19  trades in the stock market?

20  A.  No, ma'am.

21  Q.  Did DWAC and TMG in fact sign a letter of intent?

22  A.  Yes, ma'am.

23  Q.  And I'll direct your attention to what's in evidence as

24  Government Exhibit 120A.

25          MS. HANFT:  Mr. Bianco, please publish that exhibit.

1    Q.  What is this document, Mr. Swider?

2    A.  This is the LOI between Digital World and TMG.

3    Q.  What is the date?

4    A.  September 22nd, 2021.

5    Q.  Please read just the first paragraph of this document.

6    A.  This letter of intent (this "LOI") outlines the general

7    terms and conditions of a potential business combination

8    involving Digital World Acquisition Corp., a Delaware

9    Corporation (the "Investor" or "SPAC"), and Trump Media Group

10   Corp., a Delaware corporation.

11        MS. HANFT:  Thank you.  If we could scroll out and

12   turn to paragraph 5A.

13   Q.  Please read paragraph 5A.

14   A.  The Parties acknowledge and affirm the terms of the

15   Confidentiality Agreement, dated as of September 13, 2021 (the

16   "NDA"), between Investor and the Company.  Each of the Parties

17   acknowledges and agrees that the existence and terms of this

18   LOI and the Proposed Transaction are strictly confidential

19   (provided, that they may be disclosed by the Investor to

20   Significant Investors as contemplated below).  Except as

21   required by applicable law, rule or regulation (including SEC

22   and applicable stock exchange requirements) or any

23   governmental, judicial, regulatory or supervisory authority

24   having jurisdiction over such Party or its Representatives,

25   neither the Investor nor its Representatives, on the one hand,

1    nor the Company nor its Representatives, on the other hand,

2    will make any public announcements relating to the proposed

3    transaction without the prior written consent of the other

4    Party.  The Company acknowledges that U.S. securities laws and

5    other laws prohibit any person who has material, non-public

6    information concerning a public company from purchasing or

7    selling any of its securities, and from communicating such

8    information to any person under circumstances in which it is

9    reasonably foreseeable that such person is likely to purchase

10   or sell such securities.  The Company acknowledges that the

11   confidentiality provisions of the NDA and this LOI shall be

12   deemed to be an agreement to keep the confidential information

13   of the Investor in confidence as contemplated by Regulation FD

14   promulgated by the SEC.

15              THE COURT:  Excuse me for a moment.

16              Mr. Swider, you might try to slow down a teeny bit

17   when you answer questions.  The court reporter is trying to get

18   down everything.

19              THE WITNESS:  I'm sorry.

20              MS. HANFT:  I know you're reading a lot, so there is a

21   water bottle there.

22              THE WITNESS:  Thank you so much.

23   Q.  I'm going to ask you now to read another chunk of text,

24   section 5B.

25   A.  In addition, the Company acknowledges and agrees that some

1   of the confidential information of the Investor (including this

2   LOI) may be considered "material non-public information" for

3   purposes of the federal securities laws and that the Company

4   and its Representatives will abide by all securities laws

5   relating to the handling of and acting upon material non-public

6   information regarding the Investor.  Notwithstanding the

7   foregoing, the Company understands and acknowledges that after

8   each Party executes this LOI, the Investor and its

9   Representatives may, on a confidential basis, share this LOI

10  and certain confidential information about the Company with

11  certain of the Investor's significant existing and potential

12  co-investors (together, the "Significant Investors") in order

13  to gauge their support of the Proposed Transaction, and the

14  Company hereby consents to the foregoing and agrees to

15  cooperate in a timely manner with, and provide reasonable

16  support for, such efforts, including having its Chief Executive

17  Officer and other senior management reasonably available to

18  participate in conversations, presentations, and meetings with

19  significant investors.

20  Q.  Thank you, sir.  Who signed this document?

21      MS. HANFT:  If we could look at page 7, Mr. Bianco.

22  A.  That would be the chairman and CEO of Digital World, which

23  was Patrick Orlando, and the chairman and president of Trump

24  Media Group, which was the president, Donald J. Trump.

25  Q.  What's the date at the top of this document?

1  A.  September 22nd, 2021.

2  Q.  Now you read a sentence in this document that referred to a

3  September 13th nondisclosure agreement between the companies.

4          MS. HANFT:  Let's pull up Government Exhibit 124.

5  Q.  Do you see the document on your screen, Mr. Swider?

6  A.  Yes, ma'am, I do.

7  Q.  What is this document?

8  A.  This is the confidentiality agreement between Digital World

9  and Trump Media Group.

10  Q.  And in sum and substance, rather than make you read

11  significant portions of this document again, in sum and

12  substance, what does this agreement say?

13  A.  This agreement --

14          MR. BACH:  Objection.

15          MS. HANFT:  Withdrawn.  I apologize.

16  Q.  Could you read paragraph 1, sir.

17  A.  Confidential Information.  The term "Confidential

18  Information" shall mean, with respect to the applicable

19  Disclosing Party, all non-public information that can be

20  reasonably regarded as being confidential and/or proprietary in

21  nature (whether written, oral, or electronic communications)

22  regarding the Disclosing Party or its affiliates furnished by

23  or on behalf of the Disclosing Party to the Receiving Party or

24  its Representatives in connection with the Receiving Party's

25  evaluation, negotiation, financing, implementation, or

1   consummation of the Transaction.  Confidential Information will

2   not, however, include information which is or becomes publicly

3   available other than as a result of a disclosure by the

4   Receiving Party or its Representatives in violation of this

5   Agreement, is or becomes available to the Receiving Party or

6   its Representatives from a third party which, to the actual

7   knowledge of the Receiving Party, is not bound by

8   confidentiality obligations to the Disclosing Party with

9   respect to such information, is or has been independently

10  developed by the Receiving Party and/or its Representatives

11  without use of any Confidential Information furnished to it by

12  or on behalf of the Disclosing Party.

13  Q.  I'll stop you right there.  If you could read the next

14  paragraph, paragraph 2, confidentiality of information.  Just

15  read the first two sentences here.

16  A.  The Receiving Party i) will keep the Confidential

17  Information of the Disclosing Party confidential and will not

18  (except as required by applicable law, regulation, Securities

19  and Exchange Commission or stock exchange requirement or legal

20  process (the Legal Requirement), and only after compliance with

21  paragraph 4 below), without receipt of the Disclosing Party's

22  prior written consent, disclose to any person any Confidential

23  Information (except as described herein), and ii) will not use

24  any Confidential Information other than in connection with its

25  evaluation, negotiation, financing, implementation or

1  consummation of the Transaction.

2  Q.  Could you read the next sentence.  Believe it or not, I

3  think that was only one sentence.

4  A.  I think you're right.

5       The Receiving Party further agrees to disclose the

6  Confidential Information only to its Representatives who

7  reasonably need to know the Confidential Information for the

8  purpose of evaluating, negotiating, financing, implementing, or

9  consummating the Transaction, and who are informed of the

10  confidential nature of the Confidential Information and have an

11  obligation of confidentiality to the Receiving Party with

12  respect thereto.

13       MS. HANFT:  Thank you.  We're going to go to section

14  3.

15  Q.  Please read that paragraph.

16  A.  Confidentiality of Transaction.  Without receipt of the

17  prior written consent of the other Party, neither party nor any

18  of their respective Representatives will (except as required by

19  Legal Requirement, and only after compliance with paragraph 4

20  below) disclose to any person (other than its Representatives

21  who reasonably need to know such information for the purpose of

22  evaluating, negotiating, financing, implementing, or

23  consummating the Transaction, and who are informed of the

24  confidential nature of such information and have an obligation

25  of confidentiality to such party with respect thereto) any

1    information regarding a possible Transaction, including (i) the

2    existence of this Agreement, (ii) that any investigations,

3    discussions or negotiations are taking or have taken place

4    concerning a possible Transaction, including the status thereof

5    or the termination of such discussions or negotiations, or

6    (iii) any of the terms, conditions, or other facts with respect

7    to any such possible transaction or its consideration of a

8    possible Transaction (collectively, "Transaction Information).

9    Q.   Thank you.  I want to look at one more portion of this

10   document, paragraph 8.  Please read that paragraph.

11   A.   The Company acknowledges that U.S. securities laws and

12   other laws prohibit any person who has material, non-public

13   information concerning a public company from purchasing or

14   selling any of its securities, and from communicating such

15   information to any person under circumstances in which it is

16   reasonably foreseeable that such person is likely to purchase

17   or sell such securities.  The Company acknowledges that the

18   confidentiality provisions of this Agreement shall be deemed to

19   be an agreement to keep the Confidential Information of DWAC in

20   confidence as contemplated by Regulation FD promulgated by the

21   SEC.  In addition, the Company acknowledges and agrees that

22   some of the Confidential Information of DWAC and Transaction

23   Information may be considered "material non-public information"

24   for purposes of the federal securities laws, and that the

25   Company and its Representatives will abide by all securities

1    laws relating to the handling of and acting upon material

2    non-public information of or regarding DWAC.

3            MS. HANFT:  Thank you.  Mr. Bianco, can we scroll to

4    the last page.

5    Q.  Who signed this document, Mr. Swider?

6    A.  This was signed by Alexander Monje, operating as the chief

7    operating officer of Digital World Acquisition Corp.  Then it

8    was signed by Andy Dean Litinsky and Wes Moss of Trump Media

9    Group.

10           MS. HANFT:  We can take that down, Mr. Bianco.

11   Q.  How did the board of directors generally communicate

12   regarding DWAC matters?

13   A.  It was either through the board meetings on Zoom or we had

14   a chat group.  I think it was in WhatsApp.

15   Q.  I'd like to direct your attention to Government Exhibit

16   511.

17           MS. HANFT:  Which the parties have stipulated is a

18   true and correct copy of text message communications pursuant

19   to joint exhibit 2.

20           The government offers Government Exhibit 511.

21           THE COURT:  Any objection?

22           MR. BACH:  If we're going to see this page by page, we

23   can do it that way.

24           MS. HANFT:  May we be seen at sidebar?

25           THE COURT:  Yes.

1                    (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At the sidebar)

2           THE COURT:  Ms. Hanft.

3           MS. HANFT:  Government Exhibit 511 is a WhatsApp

4    communication with the entire DWAC board of directors.  The

5    government seeks to offer the entire exhibit.  The government

6    marked this as an exhibit a few weeks ago.  If there were

7    specific objections, defense counsel didn't raise them.  Of

8    course, they're always entitled to object to relevance, but

9    Mr. Garelick was on the chat.  And so, the entire conversation

10   is admissible to show his state of mind, show context --

11          THE COURT:  And it's either an admission or an adopted

12   admission.

13          MS. HANFT:  Exactly.

14          THE COURT:  What's the issue?

15          MR. BROD:  Well, Judge, Mr. Garelick makes certain

16   statements.  This is a very long WhatsApp over several months,

17   many, many messages from Patrick Orlando, Alexander Monje,

18   other board of directors and several messages from

19   Mr. Garelick.  It may well be that many of the messages in the

20   most relevant period do come in through Mr. Garelick's state of

21   mind, but we think it's appropriate to go as we have with other

22   very long messages step by step.

23          THE COURT:  What I will do, and if you want to do it,

24   that's okay, give you a couple of minutes, keep the jury in the

25   jury box, you can review the exhibit, and if you've got 403

1    objections to particular parts of it, you'll come back to

2    sidebar, you'll tell me what they are we'll do it that way.

3           MR. BROD:  It's not necessarily 403, but there may be

4    hearsay embedded in some of, for example Patrick Orlando's

5    statements or Alexander Monje's statements.

6           THE COURT:  It's possible there may be hearsay within

7    hearsay.  You'll have to convince me of that because if it's a

8    board chat where the defendant is a participant and is copied

9    on things, it's going to likely be either an admission or an

10   adoptive admission or admissible for some other purpose, but

11   spend a couple minutes now looking through it.

12          MR. BACH:  Was there anything after October 22nd?

13          MS. HANFT:  I don't believe so.

14          MR. BACH:  We'll take a quick look.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  Did we lose Mr. Bach?  Somebody go get

3    him.

4           MS. SHAPIRO:  Mr. Driscoll went to get him.  I

5    apologize, Judge.

6           THE COURT:  Mr. Bach, you'll tell me if there are any

7    objections.

8           MR. BACH:  No objection.

9           THE COURT:  Received.

10          (Government's Exhibit 511 received in evidence)

11          MS. HANFT:  Mr. Bianco, please publish Government

12   Exhibit 511.

13   Q.  Mr. Swider, do you see the document on your screen?

14   A.  Yes, ma'am.

15   Q.  Could you identify the various individuals in this

16   conversation.

17   A.  There was Alex Monje, Rodrigo Veloso, Patrick Orlando,

18   Bruce Garelick, Eric Swider, Luis Braganza, and Justin Shaner.

19   Q.  And you skipped over Robot Cash.  Is that because you're

20   not sure who that individual is?

21   A.  Yes, ma'am.

22   Q.  Generally speaking, what was this text message

23   conversation, how would you describe it?

24   A.  This would be the WhatsApp group that the board management

25   chatted in and kept in communication with.

1              MS. HANFT:  Please turn to page 2, Mr. Bianco.

2    Q.  If you look at the second to last bubble here, Mr. Swider.

3    A.  Yes, ma'am.

4    Q.  What was the title of the group?

5    A.  DWAC officers and directors.

6              MS. HANFT:  Let's turn to the next page.

7    Q.  Please read the message from Patrick Orlando at the top of

8    the page.

9    A.  Just one topic.  We plan on separating the units, DWACU

10   into a share and a warrant, DWAC and DWACW respectively.  This

11   occurs typically with 90 days of the IPO, but in most instances

12   much sooner.  I planned on instructing the separation to

13   commence today unless there are any objections.  DWAC is easier

14   for the public to find and trade.

15   Q.  What does it mean, in broad strokes, Mr. Swider, what does

16   it mean to separate the units?

17   A.  When a stock goes public, they go public with a share and a

18   warrant combined together as a unit.  And so, after you go

19   public, you would split that unit up and then put the shares

20   under one trading symbol and the warrants under a different

21   one.

22             MS. HANFT:  Thank you.  Let's scroll out, please,

23   Mr. Bianco.

24   Q.  At the bottom of this page, what was Bruce Garelick's

25   response?

1    A.  He said, sounds good.  No objection on either.

2    Q.  Could you please read the date of this response from Bruce

3    Garelick.

4    A.  9/21/2021.

5    Q.  And did you have a response to this, as well, sir?

6    A.  I'm sure I did, yes, ma'am.

7            MS. HANFT:  Let's scroll down to the next page.

8            THE WITNESS:  My response was no objections.

9            MS. HANFT:  We could zoom back out, Mr. Bianco, to

10   Eric S.

11           THE WITNESS:  I responded no objections.

12           MS. HANFT:  Let's scroll back out, Mr. Bianco.

13   Q.  Looking at the next message from Patrick Orlando, read that

14   message for us, please, Mr. Swider.

15   A.  Hi everyone.  After our board meeting this morning, we

16   rolled with the marching orders.  Had fruitful advances with

17   some of our top prospects, Atlas, TMG, Global Oculus, and

18   HMI --

19   Q.  Before you go on, sir, what is the date of that message?

20   A.  It is September 21st, 2021.

21   Q.  If you could skip ahead to the third paragraph, starting we

22   will be meeting.

23   A.  We will be meeting with TMG tomorrow to discuss their

24   progress and developments.  From our conversation today, they

25   seem to have made some good progress, but we will know more

O52Cgar1                    Swider - Direct

1    tomorrow.

2            MS. HANFT:  Let's scroll down to the next page,

3    please.

4    Q.  Please read the message on September 22nd from Patrick

5    Orlando at 6:02 a.m.

6    A.  We had several calls, including a second one-hour call with

7    Global Oculus/Bittrex.  Alex and Eric were on.  Eric is

8    experienced in the space, and there are some really promising

9    aspects to the Global Oculus/Bittrex story.  We got under LOI

10   last night, an essential step to defining the opportunity.  We

11   will be asking pertinent questions today and requesting data

12   room access.  We will update you after the Atlas (PCAOB audits

13   in place we believe) call that all are welcome to join at

14   1:20 p.m. at your election and the TMG meeting later today.  We

15   will be adding a few names to the side-by-side and

16   redistributing today.  Thanks everyone.

17           MS. HANFT:  Thank you.  Let's look at the next

18   message.

19   Q.  Before you start reading, Mr. Swider, what's the date and

20   time of this message?

21   A.  September 22nd, 2021, and this was at 3:39.

22   Q.  And this is a message from Patrick Orlando.  Could you read

23   No. 3 here.

24   A.  TMG, we had a great meeting and are have a followup session

25   very soon.  We have gotten great traction on lowering the

1    enterprise value of the target, but are getting pushback on the

2    flexibility to be unilaterally exclusive.  Unilateral

3    exclusivity is more difficult to get nowadays as more SPACs are

4    chasing targets. Mutual exclusivity is very common, and they

5    are pushing hard for that and using the market norm as support

6    for their position.

7    Q.  I'm going to interrupt you for one minute, sir.  Could you

8    describe what is unilateral exclusivity and mutual exclusivity,

9    what do those terms refer to?

10   A.  So mutual exclusivity is when both parties agree to be

11   exclusive in the arrangement.  In this case under the LOI,

12   mutual exclusivity both parties agree they will not talk to

13   other suiters or potential targets.  Unilateral exclusivity

14   means that only one of the parties has that obligation.  In

15   this case, it would have been TMG.

16   Q.  Could you pick up where I interrupted you at "in addition."

17   A.  Yes, ma'am.

18        In addition, they are indicating that if we don't

19   reach an agreement, they are in touch with other SPACs and they

20   may pursue an exclusive deal with another SPAC.  If we were to

21   get an ultimatum in the next meeting to go exclusive for

22   30 days with extension at our election for 45 additional days,

23   how would the board vote about entering into that LOI?

24            (Continued on next page)

25

1    BY MS. HANFT:

2    Q.  Mr. Swider, what did you understand was being asked of the

3    board here?

4    A.  We were being asked that——management was actively

5    negotiating with the various targets, and management was asking

6    the board's permission to enter into, if required or need be, a

7    mutually exclusive LOI with TMG.

8    Q.  And what was the date where that question was asked?

9    A.  That was September 22nd of 2021.

10            MS. HANFT:  Let's turn to page 6 of this document.

11   Q.  What was your response?

12   A.  My response was, "With the resources, expenses on TMG and

13   the potential of the deal, I think you have to go to

14   exclusivity, 430 with option."

15            MS. HANFT:  And turning to the next page, scroll down

16   a little bit, please, Mr. Bianco.

17   Q.  What was Bruce Garelick's response to this question of

18   proceeding with an exclusive letter of intent?

19   A.  He replied, "I am enthusiastically in favor to advance with

20   TMG under the stated terms."

21   Q.  On what date?

22   A.  September 22, 2021.

23            MS. HANFT:  Let's turn to page 11 of this document,

24   please.

25   Q.  On September 29, 2021, Patrick Orlando sent a message to

1   the board.  Could you please read, starting with the second

2   sentence of that message.

3   A.  "We have a few updates and due diligences kicking into high

4   gear.  TMG wants to close on October 14th."

5   Q.  What does "due diligence" refer to?

6   A.  Due diligence is the process where the SPAC does——looks at

7   the company, the potential target; they would look at things

8   like their financial projections, current financials, their

9   business plan, business model, management, all of the things

10  that you would want to understand about the target, before

11  selecting them as an opportunity.

12  Q.  And what is "wants to close on October 14th"?  What you

13  understand that to mean?

14  A.  I would assume that this meant that they wanted to get to

15  the definitive merger agreement by October 14th.

16  Q.  Do you know what due diligence management of DWAC conducted

17  with regard to Trump Media?

18  A.  I don't know the——the detail.  The due diligence is

19  generally conducted by management, and at that time I was a

20  board member.  But I do know that they spent a good bit of time

21  looking at those things I mentioned——their financial

22  projections, the platform development plan, the technology

23  stack, things of this nature.

24  Q.  And how do you know that?

25  A.  Because they held an in-person meeting in their offices of

O521GAR2                      Swider - Direct

1   TMG at some point, and I attended a portion of that meeting,

2   and then when the due diligence was completed, they came back

3   and gave a report to the board on what they had looked at.

4   Q.  And when you say "they" there, you're referring to whom?

5   A.  To management.

6   Q.  Of?

7   A.  Of DWAC.

8           MS. HANFT:  Let's just take a look at the next bubble,

9   please.

10  Q.  Please read that message, Mr. Swider.

11  A.  "We are getting the team data room access."

12  Q.  What's the date of that message?

13  A.  9/29/2021.

14  Q.  What is a data room?

15  A.  Excuse me.

16  Q.  Bless you.

17  A.  Thank you.  Data room is basically a set of file folders on

18  software called The Box, or Box, and that's where management

19  would put all of the due diligence from the target so the board

20  could review it.

21  Q.  And when you say diligence on the target, what target are

22  you referring to in this case?

23  A.  In this case, it would be Trump Media, TMG.

24  Q.  You mentioned a moment ago that there came a time when DWAC

25  management visited TMG headquarters.

1    A.   Mm-hmm.

2    Q.   Where were headquarters?

3    A.   I think at the time they were in Atlanta.

4    Q.   Did you attend that meeting?

5    A.   I attended a portion of it via Zoom.

6         MS. HANFT:  Let's turn to page 12 of this exhibit.

7         And let's look at the September 30, 2021, 11:05 a.m.

8    bubble.

9         I see there are two at 11:05.  Let's look at the

10   second one.

11   Q.   If you could read that, please, Mr. Swider.

12   A.   "Today we are at the TMG headquarters in Atlanta and would

13   like to see if anyone can join by Zoom.  Here is the agenda."

14   Q.   And then if we zoom out, there is an attachment.  You can't

15   see it very clearly, sir, but do you remember what it was,

16   generally speaking?

17   A.   I believe that was the agenda for the meeting, and it may

18   or may not have included the PowerPoint presentation.

19   Q.   Thank you.

20        MS. HANFT:  And let's zoom out again.

21   Q.   Did you participate in the Zoom that day?

22   A.   Yes, ma'am, I did.

23   Q.   What did you see that day?

24   A.   I saw—I wasn't able to stay through the whole course of

25   the meeting, but I saw a PowerPoint presentation that talked

1    about the long-term strategy and rollout of the platform.

2    Q.   What platform, Mr. Swider?

3    A.   The Trump Media Group platform.  And then I also saw an

4    update on the growth of the team and team members they had

5    added to the team.

6    Q.   And then let's look at the bubble at the bottom of this

7    message.

8    A.   Mm-hmm.

9    Q.   What did you send to the chat?

10   A.   I said, "Love the progress and the team.  Impressed.  Had

11   to jump.  Call coming up."

12   Q.   Thank you.

13            MS. HANFT:  And let's keep scroll scrolling down.

14   Q.   What was Rodrigo Veloso's response?

15   A.   "I'm impressed with the progress of TMG.  More updates

16   later."

17   Q.   And what about the response after that?

18   A.   He responded, "Nice job, Patrick."

19   Q.   And what was the date of that message?

20   A.   That was September 30, 2021.

21   Q.   Thank you.

22            MS. HANFT:  Let's zoom out again, Mr. Bianco.

23   Q.   Could you read, Mr. Swider, the message from Patrick

24   Orlando on October 1st of 2021.

25   A.   "Team, let's have a quick update call today.  I am getting

1   written write-ups from our attendees, but universally, I can

2   characterize the all-day sessions today as very organized,

3   impressive, with reps to progress on the vital foundations to a

4   successful and stable media effort."

5   Q.  What did "the all-day sessions" refer to?

6   A.  I believe that referred to the meeting with management at

7   TMG.

8   Q.  Thank you.  Continue, please.

9   A.  "We need all hands on deck for the due diligence effort and

10  would love a list of questions that are pertinent after review

11  of what was covered yesterday.  We saw three fully

12  presentations, and the video in the data room is a much watch.

13  We specifically meet with the key vendors, service providers

14  for TMG and were quite pleased, getting additional information

15  but the text-backs surpassed our expectations.  We went in

16  aggressively, ready to attack weaknesses in the plan but were

17  left only suggesting other service providers that may augment

18  what we observe to be a well-thought-out and very complete

19  portfolio solutions.  Looking forward to questions, any ideas

20  for due diligence.  Lee, Bruce, and the other directors that

21  are near digital media space from different directions, your

22  input would be great to hear.  We have due diligence request

23  lists, but they are information-gathering tools."

24  Q.  Who does "Bruce" refer to in the second to last sentence?

25  A.  That would be Bruce Garelick.

1          MS. HANFT:  Let's turn to page 15, Mr. Bianco.

2     Q.  Can you read the top two bubbles, please, Mr. Swider.

3     A.  "Due diligence list review with TMG on Monday, 4 to 5 p.m.

4     Eastern."

5     Q.  What time was——what date and time was that message sent?

6     A.  That was October 2, 2021.

7     Q.  At what time?

8     A.  Oh, I'm sorry.  8:36 a.m.

9     Q.  And then two days later, there's another message from

10    Patrick Orlando.  What does that say?

11    A.  "TMG due diligence call today moved from 4 to 4:45 p.m.,

12    sending the link here now."  And that was on October 4, 2021,

13    at 7 p.m.

14    Q.  Thank you.

15         MS. HANFT:  Let's zoom back out, please.

16         Mr. Bianco, please turn to page 21 of this

17    conversation.

18    Q.  Can you read the second bubble, please, Mr. Swider,

19    starting, "Good morning, DWAC board."

20    A.  "Good morning, DWAC board.  We are sorry we missed most of

21    you yesterday at the scheduled board meeting.  We would like to

22    have one this afternoon so we can provide some updates.  Please

23    advise if you are available at 2 p.m. for a quick Zoom call.

24    Exclusivity extension.  Since this issue is timely, we are

25    asking for confirmation via this chat ASAP.  We are progressing

1   very well on the definitive agreement and need to provide

2   notice to TMG by October 18th that we intend to extend our

3   mutual exclusivity.  Our unilateral extension keeps us mutual

4   exclusive for an additional 45 days.  While our goal is to

5   execute the definitive agreement before the expiration of the

6   initial 30-day exclusivity period, we want to make sure we are

7   already extended in the event negotiations and merger agreement

8   drafting takes a few extra days.  Call to action.  Please

9   respond in this chat confirming your approval to extend our

10  mutual exclusivity with TMG for an additional 45 days."

11  Q.  What were you being asked in this call to action?

12  A.  We were being asked to approve an extension of the mutual

13  exclusivity between the two companies.

14          MS. HANFT:  And zooming back out, Mr. Bianco.  Can we

15  look at Mr. Swider's response on the next bubble.

16  A.  I said, "Approval on the extension.  I think it's a good

17  idea to be proactive on this."

18          MS. HANFT:  And if we could turn to page 23.

19  Q.  Did Mr. Garelick respond to this request?

20  A.  Mr. Garelick responded, "Approval on the extension, vote in

21  favor, apologies——" Oh.

22  Q.  That's good.  Thank you.

23          And what was the date of his response, "Approval on

24  the extension, vote in favor"?

25  A.  October 15, 2021, and that was at 9:16 a.m.

O521GAR2                         Swider - Direct

1   Q.  Mr. Swider, the information that you received through this

2   chat about the status of the intended merger, how did you view

3   that information?

4   A.  Very sensitive, confidential information.

5   Q.  And did you think you could make trades in the stock market

6   based on that information?

7   A.  Under no circumstance.

8   Q.  Did there come a time when the DWAC board approved the

9   merger with Trump Media?

10  A.  Yes, ma'am.

11  Q.  And did the board have a meeting regarding the merger

12  agreement?

13  A.  Yes, ma'am.

14  Q.  I'd like to direct your attention to what's in evidence as

15  Government Exhibit 127.

16          MS. HANFT:  Mr. Bianco, please publish Government

17  Exhibit 127.

18  Q.  Take a minute to look at this document, Mr. Swider, and

19  then can you please tell me, generally speaking, what this

20  document is.

21  A.  This is a set of notes from a board meeting of DWAC from

22  October 19, 2021.

23  Q.  And who was at that meeting?

24  A.  For DWAC, there was Patrick Orlando, Lee Jacobson, Justin

25  Shaner, Bruce Garelick, Rodrigo Veloso, and Eric Swider.  And

1    on behalf of Benessere Investment Group was Alex Manje, Alex

2    Cano, Alvaro Gomez Mena.

3    Q.  What happened at the meeting?

4    A.  I believe this is the meeting that we approved to go to a

5    definitive agreement.  If you can zoom back out.

6            MS. HANFT:  Zoom back out.  Thank you.

7    Q.  I'm going to ask, under Discussion—well, first, could you

8    read Agenda Item, Mr. Swider.

9    A.  Agenda Item was "TMG overview, definitive agreement

10   discussion."

11   Q.  And then under Discussion, if you could read, starting

12   with, "If we sign."

13   A.  "If we sign this definitive agreement, we are trying to

14   legally lock in TMG to close the deal with us.  If TMG were to

15   back out for anything other than a material breach by the SPAC,

16   they would be penalized and would not be able to execute a

17   go-public deal for at least one year."

18   Q.  And then we could skip ahead to where it says Definitive

19   Agreement.  Could you read the two bullets and subbullets.

20   A.  "Definitive agreement.  There's a commercial agreement.

21   Says it's nearly complete.  Last legal points being cleared by

22   counsel.  Everybody is feeling good on both sides.

23   Relationship with TMG and merger agreement are both in great

24   shape.  Tomorrow at 4 p.m. schedule time to sign definitive

25   agreement, assuming board members agree.  Patrick gives a brief

1  explanation of DWAC's target processing history."

2  Q.  How did you view the information you received at this board

3  meeting, Mr. Swider?

4  A.  Probably some of the most confidential, sensitive

5  information we had discussed so far.

6  Q.  Can you remind us what the date of this board meeting was.

7  A.  This was October 19, 2021.

8          MS. HANFT:  Let's turn to the next page, please,

9  Mr. Bianco.

10          And if we could highlight two paragraphs above

11  Conclusions, where it said, "The board agrees."

12  Q.  Please read that paragraph, Mr. Swider.

13  A.  "The board agrees to move forward with executing the

14  definitive.  There will be a call tomorrow, October 20, 2021,

15  at 1:30 p.m. with the board and TMG to discuss the model and

16  provide extra comfort for the board members.  The resolutions

17  and the form attached as Exhibit A to the minutes were

18  unanimously adopted and approved."

19  Q.  Thank you.  And could you just read Board Member Vote.

20          MS. HANFT:  Why don't we just scroll back out,

21  Mr. Bianco.

22  A.  "Board Member Vote.  Eric Swider seconds the vote.  Patrick

23  Orlando votes in favor.  Lee Jacobson votes in favor.  Justin

24  Shaner votes in favor.  Bruce Garelick votes in favor.  Eric

25  Swider votes in favor.  Rodrigo Veloso votes in favor.

1    Conclusion:  Unanimous decision to vote in favor to sign the

2    definitive agreement.  The resolutions and the form attached as

3    Exhibit A to the minutes were unanimously adopted and

4    approved."

5    Q.  And let's turn now to what's in evidence as Government

6    Exhibit 126.

7            What is this document, Mr. Swider?

8    A.  This is a resolution of the board of directors.

9    Q.  And what is the resolution?

10   A.  This resolution was an approval of the merger transaction.

11           MS. HANFT:  We could take this down, Mr. Bianco.

12   Q.  Mr. Swider, how was news of the merger between DWAC and

13   TMTG announced to the public?

14   A.  That would have been done through a Form 8-K with the SEC,

15   as well as a press release.

16   Q.  And what is a Form 8-K, generally speaking?

17   A.  It's a filing that you publish with the SEC whenever you

18   have a material event with a public company.

19   Q.  Did you see the press release?

20   A.  I did, after it was released.

21   Q.  I'd like to direct your attention to Government

22   Exhibit 129E, which is in evidence.

23           MS. HANFT:  Please publish Government Exhibit 129E.

24   Thank you, Mr. Bianco.

25   Q.  Would you please read the first sentence, Mr. Swider.

1  A.  "Trump Media & Technology Group and Digital World

2  Acquisition Corp. have entered into a definitive merger

3  agreement providing for a business combination that will result

4  in Trump Media & Technology Group becoming a publicly listed

5  company, subject to regulatory and stockholder approval."

6  Q.  What was the date of this document?

7  A.  It was October 20, 2021.

8  Q.  Before this press release, were you aware of any publicly

9  available information regarding the merger of DWAC and TMTG?

10  A.  No, ma'am, there would be none.

11  Q.  Did you learn about the potential merger anywhere other

12  than in connection with your service as a board member of DWAC?

13  A.  No, ma'am.  There would be nowhere else to learn it from.

14  Q.  I'm going to ask you about a new topic now, Mr. Swider.

15          At any point did you trade DWAC securities?

16  A.  Yes, ma'am, I did.

17  Q.  Explain.

18  A.  Right after this announcement, I was in my stock account

19  and went to go add the stock to a tracking portfolio and I

20  accidentally purchased one share of the stock.

21  Q.  When you say a tracking portfolio, what does that refer to?

22  A.  It's just like a sample portfolio where you can put stocks

23  to see how they perform.

24  Q.  And so why were you tracking DWAC stock?

25  A.  I was on the board.  I was just interested to see how the

1  stock performed.

2  Q.  I'm going to direct your attention to Government

3  Exhibit 375.

4       MS. HANFT:  Which is not in evidence, but the parties

5  have stipulated pursuant to Joint Exhibit 3——Joint Exhibit 1 is

6  a business record.

7       THE COURT:  Any objection?

8       MR. BACH:  Yes, for the reasons previously stated.

9       THE COURT:  Okay.  The objection is overruled as

10  previously stated.

11       (Government's Exhibit 375 received in evidence)

12       MS. HANFT:  Actually, Mr. Bianco, if we could put up

13  Joint Exhibit 1, paragraph 9.  We'll just read that.

14       Government Exhibit 375 and all parts and subdivisions

15  thereof is a true and correct business record of Morgan

16  Stanley.

17       And Government Exhibit 375 has been received in

18  evidence, so please publish now Government Exhibit 375.

19  BY MS. HANFT:

20  Q.  Mr. Swider, what is this document?

21  A.  This is the——an excerpt from my 1099 for my stock trades.

22  Q.  And let's take a look at the fourth page of this document.

23       What is reflected in this first row towards the bottom

24  of the page, where it says Digital World Acquisition Co. Class

25  A Common Stock?

1    A.  So that's a reflection of the share of stock that I

2    accidentally purchased and immediately sold.  I purchased it

3    for $13.55; I sold it for $13.72, for a 17-cent profit.

4    Q.  So you made 17 cents?

5    A.  Yes, ma'am, I did.

6    Q.  Why did you sell it right away?

7    A.  I didn't want to end up here.

8              MS. SHAPIRO:  Objection.

9              THE COURT:  Sustained.

10             THE WITNESS:  Oh, I'm sorry.

11   Q.  Mr. Swider, you mentioned that immediately after you

12   purchased the share, you then sold it.

13   A.  Yes, ma'am.

14   Q.  What caused you to sell it immediately?

15   A.  I thought it would be a problem that I purchased it.

16             MR. BACH:  Objection.

17             THE COURT:  Overruled.

18             MR. BACH:  Sidebar.

19             THE COURT:  No.

20   BY MS. HANFT:

21   Q.  I'd like to direct your attention now to Government

22   Exhibit 530.

23             MS. HANFT:  Which is not in evidence so just for the

24   parties and the witness.  But the parties have stipulated this

25   is a text message communication pursuant to Joint Exhibit 2,

1   paragraph 2.  The government offers Government Exhibit 530.

2            MR. BACH:  What is it?

3            MR. BROD:  Could you scroll down.

4            MS. HANFT:  Mr. Bianco, defense counsel is asking if

5   you could scroll to the next page.  Thank you.

6            (Counsel conferring)

7            MR. BACH:  We have no objection.

8            THE COURT:  All right.  530 is received.

9            (Government's Exhibit 530 received in evidence)

10            MS. HANFT:  Thank you.

11            Mr. Bianco, could you publish Government Exhibit 530.

12   BY MS. HANFT:

13   Q.  What is this text message conversation, Mr. Swider?  Who is

14   it between?

15   A.  That would be myself and Patrick Orlando.

16   Q.  And turning to the next page.  Would you read the first six

17   lines of this conversation.

18   A.  "Good morning, good sir.  I know you are slammed.  Can you

19   ask the attorney this morning if we can buy warrants or stock.

20   Would love to know by 9:30.  And we can catch up on the rest

21   later.  Congratulations on the successful start.  I'm sure you

22   are getting hammered today, but you can handle it, brother."

23            And then he responded, "Sorry, Bud, was swamped.

24   Asked the lawyers but didn't hear back in time."

25            And I said, "No worries.  Don't worry about it now."

1    Q.  What was the date of this conversation, Mr. Swider?

2    A.  This was the 21st of October 2021.

3    Q.  What were you asking Patrick Orlando?

4    A.  I was asking him if directors were clear to either buy or

5    sell warrants or the stock.

6    Q.  Why did you think you needed to ask him if you could buy

7    warrants or stock?

8    A.  Well, because there's a lot of rules as a board member

9    around buying or selling securities of the company you're on

10   the board of.  There is obviously the confidential information,

11   there's blackout periods, cleansing of information.  So I

12   wanted to know whether or not those were cleared.  But I had

13   also spoken with Patrick and reported to him the accidental

14   purchase of my share and wanted to know if that was something

15   that we needed to disclose, and so this was a follow-up

16   discussion on that.

17   Q.  Other than this accidental purchase, did you ever trade in

18   DWAC securities?

19   A.  No, ma'am.

20   Q.  Why not?

21   A.  I—I sit on the board and was the CEO.

22            MR. BACH:  Objection.

23            THE COURT:  Overruled.

24   Q.  You just mentioned that you at some point became the CEO of

25   DWAC.  Approximately when was that?

1    A.  That was March of 2023.

2    Q.  And then earlier you told us that you sit on the board of

3    the new merged company.  What is your role as a board member of

4    the merged company?

5    A.  Very similar to my role when it was a SPAC, only now as a

6    board member, we have a much wider purview of decisions that we

7    give guidance on than you do as a SPAC.

8    Q.  Are you currently involved in any disputes regarding DWAC?

9    A.  Yes, ma'am, unfortunately, a lot of them.

10   Q.  Do those disputes have anything to do with Bruce Garelick?

11   A.  None that I'm aware of.

12   Q.  How much money did you make as a result of your work for

13   DWAC?

14   A.  So far, not a dollar.

15            MS. HANFT:  One moment, please, your Honor.

16            No further questions for this witness.

17            THE COURT:  Okay.  Cross-examination.

18   CROSS EXAMINATION

19   BY MR. BACH:

20   Q.  Good afternoon, Mr. Swider.

21   A.  Good afternoon.

22   Q.  You sat on the board of directors of DWAC, correct?

23   A.  Yes, sir, that's correct.

24   Q.  And you understood that if you learn confidential

25   information in your capacity as a board member, you could not

1    disclose it to anyone else, correct?

2    A.  That is correct, yeah.

3    Q.  And you understood in fact, sir, that you had a duty not to

4    disclose it to anybody else.

5    A.  Yes, sir, that is correct.

6    Q.  And you will agree with me that directors like yourself and

7    Mr. Garelick, and everyone else who sat on that board, cannot

8    share confidential information with anyone else.

9    A.  That is correct, yup.

10   Q.  DWAC does have an obligation to make certain information

11   public, correct?

12   A.  Yes, DWAC has an obligation to make certain information

13   public, yes.

14   Q.  For instance, it has to make filings with the Securities

15   and Exchange Commission, correct?

16   A.  That is correct, yes, sir.

17   Q.  And that is in the public domain, correct?

18   A.  Yes, sir, that is correct.

19   Q.  You can look it up on the internet, correct?

20   A.  Yes, sir, that is correct.

21   Q.  And the reason that that information is in the public

22   domain is so that investors who are considering investing in

23   DWAC can consult it in connection with their investment

24   decision.

25   A.  That is correct, yeah.

1    Q.  So you're familiar, for example, with something called a

2    prospectus.

3    A.  Yes, sir.

4    Q.  And you're familiar with something called an S-1.

5    A.  Yes, sir, correct.

6    Q.  And those are the names in the industry for the type of

7    public informational filings that companies make to the entire

8    public world, correct?

9    A.  An S-1 would be, yes, sir, is one of many.

10   Q.  Okay.  And let me——the public filings——let me just ask you

11   generally, you're familiar with DWAC's public filings?

12   A.  Yes, sir.

13   Q.  And you just were shown a few of them on direct, correct?

14   A.  Yes, sir.

15   Q.  The DWAC public filings discussed such things as the types

16   of securities that would be offered to the public, correct?

17   A.  Yes, sir.

18   Q.  For instance, they discussed warrants?

19   A.  Yes, sir.

20   Q.  They discussed different types of securities and additional

21   warrants that could be available?

22   A.  Yes, sir.

23   Q.  They discussed how it might be disaggregated at some point

24   in time?

25   A.  I'm sure it did, yes, sir.

1   Q.  Okay.  And all of the information that was in these

2   filings, that's public information, right?

3   A.  Once it's filed, it is.

4   Q.  Once it's filed and out there and you can look it up on the

5   internet, you agree it's public.

6   A.  Yes, sir, yeah.

7           MR. BACH:  Okay.  And just can we take a look at

8   Government Exhibit 116.  I don't know if that's in evidence.

9           Yeah, it's already in evidence.  Could we pull it up,

10  please.

11  Q.  Do you recognize this, Mr. Swider, as a prospectus of DWAC?

12          MR. BACH:  Is there something you can do to help show

13  Mr. Swider the date of this document?

14  A.  This document is titled Prospectus, yes.

15  Q.  Okay.  Do we have the date?

16  A.  I don't see a date.

17  Q.  We had a date a moment ago.  I apologize.

18          MR. BACH:  Page 2.  Turn to page 2, please.

19  Q.  Do you see that date on the bottom?

20  A.  Yes, sir.

21  Q.  September 2, 2021.

22  A.  Yeah, yes, sir.

23  Q.  Was that the date of this prospectus?

24  A.  I would assume, yes, sir, that is.

25          MR. BACH:  Okay.  And Ms. McFerrin, could you just do

O521GAR2                    Swider - Cross

1    a find and search for—well, let's take a look at—let's just

2    take a look at this page.

3    Q.  Do you see there's some blue highlights on it?

4    A.  Yes, sir.

5    Q.  And there's the discussion of, for instance, the public

6    offering price?

7    A.  Mm-hmm.

8         THE COURT:  You have to, sir, answer out loud.  Mm-hmm

9    doesn't count.

10        THE WITNESS:  I apologize.

11   A.  Yes, sir, I do see that.

12   Q.  And that's public information, correct?

13   A.  Once this is filed, it would be public, yes, sir.

14   Q.  Correct.

15        MR. BACH:  And, Ms. McFerrin, can you go to page 12.

16   Q.  Do you see, sir, there's a bold on page 12 towards the top,

17   there's something in bold about warrants and there's

18   information about warrants here?

19   A.  Yes, sir.

20   Q.  And then there's additional information about their

21   exercisability?

22   A.  Yes, sir.

23   Q.  And it's no secret that warrants are going to be part of

24   the public offering at some point after this document has been

25   publicly filed, correct?

1  A.  That is correct.

2          MR. BACH:  And if you can go to just the top of the

3  document.  And Ms. McFerrin, can you do those search and finds

4  for the word "warrant."  I just want to find "warrant"

5  everywhere it appears in this document.

6          Apologies for technical difficulties.

7          Okay.  Ms. McFerrin, have you done a find and search

8  for the word "warrant"?

9          Okay.  Can you please just scroll through the document

10  so that we can get a sense of how much discussion of warrants

11  there is here.

12          Just show another page or so.  I think people——

13          Okay.  You can stop.  You can stop there.

14  BY MR. BACH:

15  Q.  And this is September 2nd, correct?  There were earlier

16  prospectuses filed by DWAC going back to July, correct?

17  A.  I'd have to go back and refresh my memory.  I don't

18  remember what the first date of the——of a filing was.

19  Q.  Okay.  You don't remember the dates, but you would agree

20  with me that there were earlier versions of the prospectus that

21  were filed.  I'm just trying to——

22  A.  No, I get it.  Yes, sir, I understand.  Are you asking

23  earlier versions than the one that's on the screen?

24  Q.  Yes.  This is September 2nd, but DWAC was around before

25  September 2nd, and there were earlier prospectuses that were

1    filed, correct?

2    A.   There were earlier S-1s that were filed.  I don't know

3    whether or not a prospectus was attached to them.

4    Q.   Okay.  So for instance, there was an S-1 publicly filed on

5    May 26th, correct?

6    A.   I would need to see the EDGAR filing in order to confirm

7    that.

8              MR. BACH:  Okay.  Can we show the defendant [sic],

9    please, Defense Exhibit 195.  Just the witness.

10             Let's pull up the first page.  Oh, wait.

11   Q.   Do you recognize—do you have the first page in front of

12   you, Mr. Swider?  Great.

13             Mr. Swider, do you recognize this?

14   A.   Yes, sir.  This appears to be the cover page of the

15   May 25th filing of the Form S-1.

16             MR. BACH:  Okay.  We offer it.

17             THE COURT:  Any objection?

18             MS. HANFT:  No objection, your Honor.

19             THE COURT:  Received.

20             (Defendant's Exhibit 195 received in evidence)

21             MR. BACH:  Okay.  And can we take a look at page 13,

22   for example.

23   Q.   And do you see that there's a discussion of warrants here,

24   exercise price, exercise period?

25   A.   I do, yes, sir.

1  Q.  Okay.  And there's discussions of various other

2  nomenclature and mechanics and logistics associated with the

3  public's purchase of securities on the market, correct?

4  A.  Yes, sir.

5  Q.  So if you were a member of the public and you were

6  wondering, you know, what the structure, what the mechanics,

7  what some of the logistics might be, you could find some public

8  information about that, as early as May 2021, correct?

9  A.  Yes, sir.

10          MR. BACH:  Take that down.

11          Now can we pull up Government Exhibit 106.

12  Q.  Showing you Government Exhibit 106.  This is an amendment

13  to Form S-1 dated July 8, 2021, correct?

14  A.  Yes, sir, that's correct.

15  Q.  And Ms. Hanft just showed you this document and asked you

16  some questions about this a moment ago.  Do you remember that,

17  sir?

18  A.  I do.

19  Q.  Okay.  And I think she drew your attention to language on

20  page 1.

21          MR. BACH:  Can we go to page 1.

22          Can I ask Ms. Hanft if I'm getting the page right.

23          (Counsel conferring)

24          MR. BACH:  The fourth page.  Thank you.

25  Q.  Do you see the first paragraph that begins, "Digital World

1    Acquisition Corp. is a newly organized blank check company"?

2    A.   I do, yes, sir.

3    Q.   Do you remember Ms. Hanft asked you some questions about

4    this paragraph?

5    A.   I do.

6         MR. BACH:  Highlight where it says, "We have not

7    selected any specific business combination target and we have

8    not, nor has anyone on our behalf, initiated any substantive

9    discussions directly or indirectly, with any business

10   combination target."

11   Q.   Do you see that?

12   A.   I do.

13   Q.   Was that a true statement at the time that this S-1 was

14   filed?

15   A.   I can only speak for myself, but from my perspective, yes.

16   Q.   And it goes on to say, "While we may pursue an initial

17   business combination target in any business or industry, we

18   intend to focus our search on middle-market emerging growth

19   technology-focused companies in the Americas in the SAAS and

20   technology or fintech and financial services."

21        To your knowledge, sir, as of the July 8, 2021, date

22   on which this was filed, was that a true statement?

23   A.   To the best of my knowledge, yes, sir.

24   Q.   And the first board meeting—this is in July.  The first

25   board meeting, I think you testified to a moment ago, was not

1   until September 21st, correct?

2   A.  Yes, sir, yeah, because it was after we went public in

3   September.

4   Q.  And you became a member of the board on September 2nd,

5   correct?

6   A.  I believe that was the effective date, but I'd have to

7   verify, but that sounds right.

8   Q.  And you were not on the board on July 8th when this was

9   filed, correct?

10  A.  I think I may have been the director nominee, but I don't

11  recall.

12  Q.  Okay.  Nominee means someone who's nominated to become,

13  down the road, a member of the board, correct?

14  A.  Yes, sir, that's correct, yeah.

15  Q.  You are not a member of the board on this date, correct?

16  A.  That is correct, yeah.

17  Q.  Mr. Garelick is not a member of the board on this date,

18  correct?

19  A.  Honestly, I wouldn't know.  I just know I wasn't a member

20  of the board.

21  Q.  Now at the time that this July 8th DWAC S-1, amended S-1

22  was filed, on or about July 8th, you sat on the board of

23  Benessere, correct?

24  A.  On July 8th.  I believe I was still on the board then,

25  correct.

1    Q.  Okay.  And that was another SPAC that Mr. Orlando was

2    running, correct?

3    A.  That is correct, yeah.

4    Q.  And that's a different SPAC, correct?

5    A.  That is correct.

6    Q.  Okay.  You never had anything to do with Mr. Garelick in

7    connection with the board of Benessere, correct?

8    A.  Not that I recall.

9    Q.  He never attended a Benessere board meeting, to your

10   knowledge?

11   A.  Not that I recall.

12   Q.  I mean, can you think of anything that he did that was done

13   for the board of Benessere, at any point in time?

14   A.  I don't think so.

15   Q.  He was on the board of DWAC, correct?

16   A.  Yes, sir, he was.

17   Q.  And you had met Mr. Orlando before you were on the board of

18   DWAC.

19   A.  Yes, sir.

20   Q.  And before you were on the board of Benessere, right?

21   A.  Yes, sir, that is correct.

22   Q.  And you'd met him a few years before.

23   A.  Yes, sir, that is correct.

24   Q.  And at that point in time you met him not in connection

25   with any SPAC-related activity but in connection with real

1    estate opportunities, correct?

2    A.   That is correct, yes, sir.

3    Q.   And you explored some real estate opportunities with him,

4    correct?

5    A.   No, sir, no.  I was——that would not be a correct statement.

6    Q.   Okay.  All right.  Did you do any business with him at any

7    point in time before you joined the Benessere board?

8    A.   Yes, sir.

9    Q.   What types of business did you do with Mr. Orlando?

10   A.   Mr. Orlando retained my services to help give some advisory

11   services for his sugar commodity trading business.

12   Q.   And you say sugar commodity trading business.  So he's

13   trading sugar, right?

14   A.   Mm-hmm, yes, sir.

15   Q.   And he's trading commodities, correct?

16   A.   I believe that's a correct statement, yeah.

17   Q.   And that's not the same thing as being the chairman of a

18   public company, correct?

19   A.   That——that would be a correct statement.

20   Q.   Okay.  And when you met him in 2015 or 2016, he had no

21   experience in SPACs, correct?

22   A.   I——I don't know.

23   Q.   And when you joined the board of Benessere——when did you

24   join the board of Benessere?

25   A.   I would need to go back and refresh my memory.

O521GAR2                    Swider - Cross

1   Q.  If you just——I don't need an exact date, sir.  Just

2   approximately.

3   A.  Very candidly, I don't remember when we went public.  It's

4   been a hectic three years.

5   Q.  Fair enough.

6   A.  Yeah.

7   Q.  But at the time you joined Benessere, it's fair to say that

8   you understood that Mr. Orlando had never successfully combined

9   a SPAC with an operating target, at any point in his career.

10  A.  Yeah, I had no reason to believe he had, yeah.

11  Q.  So this was something that he was attempting to do for the

12  very first time, correct?

13  A.  I wouldn't say that.  I couldn't attest to that.

14  Q.  Okay.  It's a bad question, so I'm going to withdraw it.

15          THE COURT:  You asked it so I don't think you can

16  withdraw it.  You can ask a new question.

17          MR. BACH:  Okay.

18  Q.  So when you were on the board of Benessere, there came a

19  point in time——did there come a point in time when you learned

20  that Benessere may consider a potential combination with a

21  company known as TMG, or Trump Media Group?

22  A.  Yes, sir.

23  Q.  Okay.  And approximately when did you learn that Benessere

24  may be pursuing that target?

25  A.  I really don't recall.

1    Q.  Okay.  And there came a time—well, let me focus your

2    attention on June of 2021.

3    A.  Mm-hmm.

4    Q.  You were on the Benessere board in June 2021, correct?

5    A.  I believe that is correct.

6    Q.  And you're not on the DWAC board yet; that doesn't happen

7    until September, correct?

8    A.  That is correct, yeah.

9    Q.  And in June, had you been nominated to be on the DWAC board

10   yet in June?

11   A.  I don't recall.  I need to see the original filing.

12   Q.  Okay.  And in June you communicated with Mr. Orlando about

13   a concern you had that you didn't have very much information

14   about TMG, correct?

15   A.  I know that I had expressed concerns to Mr. Orlando.  I

16   don't know if it coincides with the date you're speaking about,

17   but I'll—yeah, I just—I don't know the dates of those

18   communications.

19   Q.  But there came a time that you communicated with

20   Mr. Orlando that he was not giving you information that you

21   wanted to have about TMG?

22   A.  That's correct, yeah.

23   Q.  You felt that there was a lack of information about TMG,

24   correct?

25   A.  Yes, sir, yeah, that is correct.

1   Q.  For instance, you told him that you hadn't——as a member of

2   Benessere's board, you had never even seen Trump Media

3   Group's——a business plan for Trump Media Group, correct?

4   A.  At some point I did convey that concern, yes.

5   Q.  And a business plan you know from your background in

6   business is a plan that a business has to go forward into the

7   world, correct?

8   A.  Of course, yeah.

9   Q.  And as a responsible director, you were saying to

10  Mr. Orlando, if we're thinking about Trump Media Group,

11  wouldn't it be a good idea to see if it has a business plan,

12  correct?

13  A.  Yes, sir.

14  Q.  And you didn't have that information——I'm going to——we'll

15  get to the time frame in a second.  Okay.

16          And you were concerned and you expressed to

17  Mr. Orlando that without more information, without a business

18  plan, it could be challenging to move forward and support that

19  type of opportunity, correct?

20  A.  I think more specifically the concern was that the board

21  didn't have the business plan.  I don't know whether or not

22  management had the business plan, but yes, it would be

23  difficult for the board to vote to approve a transaction

24  without seeing the full document set.

25  Q.  So as a board member, you're saying, Mr. Orlando, give me

1   more information, show me a business plan if there is one, I

2   need to understand TMG, correct?

3   A.   That is correct, yes, sir.

4   Q.   Okay.  And you complained to him that you hadn't seen one

5   page, not even a single page of documents relating to TMG,

6   correct?

7   A.   I mean, I don't have the communication in front of me, but

8   that—that—that could be true.

9            MR. BACH:  Okay.  Well, let me put the—do we have—

10           MS. HANFT:  Objection, your Honor.

11           THE COURT:  Basis?

12           MS. HANFT:  There is no failure of recollection, so—

13           THE COURT:  Overruled.  I think the answer is fairly

14   read to indicate a failure of recollection.

15  BY MR. BACH:

16  Q.   Well, do you recall the date on which you were expressing

17  these types of concerns to Mr. Orlando?

18  A.   No, sir, I don't, no.

19           MR. BACH:  Let me show just the witness 3511-09, which

20  is a three-page document.

21  Q.   And if you want to scroll through it, we'll work with you

22  to help you see all the pages.

23  A.   Yeah, no, this—I now recall this, yeah.

24  Q.   Okay.  And so I have one simple question for you then.  The

25  questions I was just asking you were questions that you were

1    asking on or around June 24, 2021, correct?

2    A.   Correct.

3            THE COURT:  Does that bring back a recollection?

4            THE WITNESS:  Yes, sir, it does, yeah.

5            MR. BACH:  And you can take that down.

6    Q.   And at that time you were saying to Mr. Orlando, or you

7    demanded of Mr. Orlando that the board have some alternative

8    targets to discuss if this TMG thing just happens to go

9    nowhere, correct?

10   A.   I may.  I don't recollect.  Was that just on the screen?

11           THE COURT:  And again, when you're shown a document

12   like you were shown moments ago, it's not being shown to you

13   for you to recite what it says.  It's being shown to you to see

14   whether it sparks a recollection.

15           THE WITNESS:  Yes, sir.

16           THE COURT:  Testify to the best of your recollection.

17           Go ahead, Mr. Bach.

18           MR. BACH:  Okay.

19   BY MR. BACH:

20   Q.   Do you recall in and around that time frame suggesting to

21   Mr. Orlando that if TMG is not something that the board or

22   Benessere goes forward with, that the company ought to be

23   considering other potential targets?

24   A.   I just don't recollect.

25           MR. BACH:  Okay.  Can we put that 35——I want to show

O521GAR2                    Swider - Cross

1    just the witness that document again.  It's 3511-09.  I want to

2    highlight, if you look at the——

3    Q.  I'm going to highlight just a sentence for you to take a

4    look at.

5            Yeah.  It's on Bates page 829.  The bottom of

6    paragraph 3.  Do you see that final sentence in the bottom of

7    paragraph 3?

8            THE COURT:  It may be helpful to make it a little bit

9    larger for the witness.

10           MR. BACH:  Yeah, make it larger and highlight it,

11   please.

12   A.  Yes, sir, I see that, yeah.

13   Q.  So this is really a yes or no question.  Seeing that

14   sentence, does that refresh your recollection that during this

15   period of time you were asking Mr. Orlando if there would be

16   some other potential targets for——

17   A.  No, sir, no.

18   Q.  Okay.  And around that point in time did you ask to

19   understand what other paths might be pursued?

20           THE COURT:  You can take down the document.

21           MR. BACH:  Yeah, take down the document.

22   Q.  Did you discuss with Mr. Orlando, say, it would be a good

23   idea for the board to know what other paths would be pursued if

24   TMG is not an option?

25           MS. HANFT:  Objection, your Honor.

1          THE COURT:  Basis?

2          MS. HANFT:  Relevance.

3          THE COURT:  What's the relevance, Mr. Bach?

4          MR. BACH:  What's relevant?

5          THE COURT:  Yeah.

6          MR. BACH:  That——can I make a proffer at the sidebar.

7          THE COURT:  You can come up to sidebar.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MR. BACH:  This is going to show that at the point——at

3    this point in time, in June, there's a lack of information

4    about TMG and the continued paths, and there's no way to

5    understand that than a different alternative from——from TMG

6    being considered, some kind of contingency if this doesn't

7    arise, and I just want to show that that's the nature of his

8    dialogue with Mr. Orlando at that point.

9          THE COURT:  In connection with the service on the

10   Benessere board and Benessere looking for other paths?

11         MR. BACH:  Well, this is a time period on June 24th

12   and it's a question of what type of information is available

13   about Trump Media Group at that time.

14         THE COURT:  Ms. Hanft?

15         MS. HANFT:  I think there's been some of that

16   information offered.  I think at a certain point we're veering

17   off into totally irrelevant side topics and I think that this

18   is a discussion of Benessere in June, which is not relevant to

19   Mr. Swider's service on the board of DWAC, which was the scope

20   of his direct.

21         THE COURT:  I'm going to sustain the objection.

22         (Continued on next page)

23

24

25

1          (In open court)

2    BY MR. BACH:

3    Q.  Now you were asked some questions on direct a few minutes

4    ago about LOIs.  Do you remember that?

5    A.  Yes, sir.

6    Q.  Okay.  And you were shown by Ms. Hanft——

7          MR. BACH:  Can we pull up Government Exhibit 120A.

8    A.  Are you asking me?

9    Q.  No, I'm asking my staff.

10   A.  Oh.

11   Q.  So you were just asked some questions about this document a

12   moment ago by Ms. Hanft.  Do you remember that, sir?

13   A.  I do, yes, sir.

14   Q.  And this is the letter of intent dated September 22, 2021,

15   between DWAC and Trump Media Group, correct?

16   A.  Yes, sir, that is correct.

17   Q.  Okay.  And she had you read portions of this document,

18   correct?

19   A.  Yes, sir, that is correct.

20   Q.  Okay.  And you were on DWAC's board on September 22, 2021,

21   correct?

22   A.  Yes, sir, that is correct.

23   Q.  Okay.  But this LOI, a copy of this LOI was not sent to you

24   at that time, correct?

25   A.  I believe that is correct, yes, sir.

1   Q.  And you did not read this LOI at the time, correct?

2   A.  I——I really don't recall.  I don't recall.

3   Q.  In fact, this LOI, as far as you know, was not sent to any

4   individual member of the board of directors at this time.

5   A.  I can't say that it was or wasn't.

6   Q.  Do you recall when you first saw this document?

7   A.  I certainly don't.

8   Q.  Okay.  And you weren't involved in any of the negotiations

9   for this LOI, correct?

10  A.  In direct negotiations, no, that is correct, yeah.

11  Q.  In other words, when you say direct negotiations, I assume,

12  sir, you're referring to the negotiations at the table with the

13  Trump organization.

14  A.  Yes, sir, correct, yeah.

15  Q.  That was being handled by——you say management——by

16  Mr. Orlando?

17  A.  By management.  I don't know exactly what members, but yes,

18  sir, yeah.

19  Q.  And you were also——

20          MR. BACH:  Can we pull up Government Exhibit 124, an

21  NDA dated September 13, 2021.

22          Can we pull up Government Exhibit 124.

23  Q.  Mr. Swider, this is also a document that Ms. Hanft was just

24  asking you some questions about——

25  A.  Mm-hmm.

1   Q.  ——an NDA on September 13, 2021; is that correct?

2   A.  Yes, sir.

3   Q.  And you were——again, sir, you were on the board at that

4   time, right?

5   A.  Yes, sir, I was.

6   Q.  And you don't recall receiving this document at the time,

7   correct?

8   A.  I don't recall that we, as board members, received it.

9   Q.  And that's any board member, any individual board member,

10  correct, to your knowledge?

11  A.  I mean, I can't——I can only speak for myself.

12  Q.  And do you recall when you first saw this document?

13  A.  I don't.

14  Q.  Okay.  Now let's move forward to October.  In October,

15  there came a time when you learned that there was a draft

16  merger agreement between Trump Media Group and DWAC, correct?

17  A.  Yes, sir, that's correct.

18  Q.  And that was on or about October 17th, correct?

19  A.  That sounds about right.

20  Q.  Give or take?

21  A.  Yeah, give or take, yeah.

22  Q.  That is a document that you recall seeing at the time,

23  correct?

24  A.  I believe the board——I believe we saw it at the time.  I——I

25  really don't recall, though.   (Continued on next page)

1          THE COURT:  Mr. Bach, maybe about two more minutes of

2     questions and we'll take our midmorning break.

3          MR. BACH:  Okay.  If you want to take it now, we can.

4          THE COURT:  Members of the jury, we'll take our

5     midmorning break now for 15 minutes or so.  Don't talk about

6     the case amongst yourselves or with anybody else.  Don't do any

7     research on the case.  Have a good break.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  Mr. Swider, you may step down.

3              (Witness not present)

4              Be seated.

5              Mr. Bach, how much longer do you expect?

6              MR. BACH:  Very little, but subject to consultation

7    with my colleagues here.

8              THE COURT:  How long do we expect the testimony of the

9    next witness to go?

10             MS. HANFT:  10 minutes, your Honor.

11             THE COURT:  I need a quick break.  So how long is it

12   going to take me to entertain your argument with respect to the

13   third witness?

14             MR. BACH:  I can make the argument in two and a half

15   minutes, in under two and a half minutes.

16             THE COURT:  You'll make that in about five minutes.

17             MR. NESSIM:  Your Honor, we also have something to

18   raise when you come back.

19             (Recess)

20             THE COURT:  I do have a request of the defense.  I

21   have reviewed the defense's proposed edits to my charge.  It

22   would be helpful if you can do it, to get me a copy of that in

23   word form rather than in PDF.  You can just email it to

24   chambers and copy the government on it.  I don't know if you

25   need to scrape any meta on it.

1          MS. SHAPIRO:  We'll do it at the next break, your

2     Honor.

3          THE COURT:  Mr. Nessim.

4          MR. NESSIM:  We have an issue related to some of the

5     defense exhibits that have been offered.  During the cross

6     examination of Mr. Swider, the defense offered defense exhibit

7     195, which was a prospectus of DWAC.  That is an exhibit that

8     has not been previously produced to the government.  It's also

9     the third time that the defense has attempted to offer an

10    exhibit on cross examination, not for impeachment purposes,

11    that has not been produced to the government.  We raised this

12    issue with them yesterday and it happened again today.  It's

13    fine if they want to keep stuff for impeachment, but they don't

14    want to reveal it to us until cross examination, we understand

15    that.  If they don't have the opportunity to impeach, they need

16    to walk away from that exhibit.  Any exhibit that they're

17    trying to substantively offer must be produced to us in

18    advance.

19         And it's particularly absurd that we're dealing with

20    this issue when exhibits that we've produced more than two

21    weeks ago, they want to go page by page for seriatim 403

22    objections.  The purpose of this exchange is to avoid issues

23    like this.  We can't be caught dealing with exhibits that we're

24    seeing for the first time for non-impeachment purposes.  They

25    have produced a number of exhibits, we credit them for that, we

haven't received an exhibit list, but we have received a number

of exhibits.  This is the third time that they've attempted to

do this not for impeachment purposes, it's improper, and it's

contrary to the Court's mutual disclosure rules.

THE COURT:  Mr. Nessim, you'll make an objection at

the right time with respect to the next exhibit.

MR. BACH:  I just want to respond, because I totally

understand his point.  The last document was the prospectus.

It do not occur to me until the midst of the direct to use that

document.  That's what happens in a trial, you hear the direct

and the defense decides they want to introduce.  So I asked

Mr. Brod to find it on Edgar.  It's a public document, it's a

prospectus, we added the newest defense exhibit number.  We

didn't mean to sandbag the government.  This is a public

document.  We asked some very basic questions about it, it's

not controversial.  Yesterday, they brought an instance to my

attention where they had introduced a document.  It was the

text chain between Mr. Lopez and his father, that was their

document, and we introduced some portion of that had apparently

been cut off from a revised version of their exhibit.  We're

not trying to sandbag them.  There are 300, 400 exhibits in

this case.  That was an exhibit that they produced to us.

We're not trying to hide the ball here.  We have produced every

exhibit that we are aware of that we plan to use in our direct

case, and we're --

1          THE COURT:  Let me give a warning to both sides.  I do

2     have an order in this case that required the disclosure of

3     exhibits.  It gave the defense quite a bit of latitude in terms

4     of timing, in that it required the production of defense

5     exhibits only very shortly before trial.  There are

6     circumstances in which either party can be permitted to use a

7     document that was not produced pursuant to that order, but they

8     have to have some justification, and convincing justification

9     for the reason why they're using the document without it having

10    been included among the exhibits that the parties are intending

11    to use.  So, scrub your exhibits and make sure that you've

12    given them everything that you intend to use.

13          What's your issue, Mr. Bach?

14          MR. BACH:  Judge, they intend to call today a

15    representative of an entity called Saba Capital Management

16    named Michael D'Angelo.  We have an objection under Rules 401

17    and 403.  We anticipate the purpose of this witness's testimony

18    goes to materiality.  Saba was an investor in DWAC, and they

19    are anticipated to testify that if they had known that the

20    intended target was Trump Media Group, they would not have

21    participated in the investment opportunity.

22          We understand materiality to concern the mix of

23    information a reasonable investor would consider important in

24    making a decision with respect to the security, the value of

25    the security, whether it's a good investment or bad investment.

1    We think the government may be confusing the question of an

2    investment decision with a business decision.  Saba, looking at

3    the 3500 material, it seems what the Saba representative is

4    going to say is that they were concerned that investing in

5    Trump Media Group would hurt their corporate goodwill, it would

6    hurt their business reputation.  It had nothing to do with how

7    they necessarily valued the stock or its price value or analyze

8    the investment per se.  They made money on it and would have

9    made even more if they hadn't sold.

10         So, materiality is not a question of business

11   reputation.  Those are separate concerns.  Materiality goes to

12   the mix of analyzing the value of the particular investment in

13   question and not -- some companies may say if we had known that

14   this was not a clean energy company, we wouldn't have invested

15   in it, or questions like that, because we have a lot of

16   customers that care about those things.  That's not analyzing

17   the mix of information about the value of the investment,

18   that's making --

19         THE COURT:  What do you have for the proposition that

20   it is the value as opposed to information that would be

21   material to or important to a reasonable investor in deciding

22   whether to make the investment decision?

23         MR. BACH:  When you have a SPAC, you generally don't

24   have that information.  That's not one of the things that you

25   typically evaluate in these situations.  Here, there's an

1    additional 403 concern because what the issue is, it's what the

2    world associates with Trump, his stigma, his issues.  They were

3    concerned if they invested heavily in the Trump-related thing,

4    it would damage the business reputation and goodwill, and

5    that's going to confuse the issues and it's prejudicial because

6    it's going to bring in the type of considerations that your

7    Honor said were not going to be a part of this trial, and it

8    shouldn't be a part of this trial.  It goes to the, oh, the

9    stigma associated with Trump, we didn't want to take on, even

10   though it might have made money, even though it might have been

11   a good investment, even though it might be very profitable, all

12   else being equal, we didn't want to take on the stigma

13   associated with Trump.  That's not a standard materiality

14   concern for analyzing the price of a security or the value of a

15   security, it has to do with goodwill.  It's prejudicial because

16   it's going to raise the very Trump-related issues in this case

17   that we all want to avoid.

18            THE COURT:  Ms. Hanft, you want to respond?

19            MS. HANFT:  Yes, your Honor.

20            Primarily, in fact, this witness from Saba Capital

21   will go to the issue of whether the information was nonpublic.

22   The fact that a giant hedge fund was not aware of the potential

23   target tends to prove that the information was nonpublic.

24            Second, this witness will testify about the investment

25   strategy for SPACs of Saba Capital, and that goes to the good

1    faith defense being put forward by defendant here.  If Mr. Bach

2    was to cross this witness as to the reason behind Saba pulling

3    out when Saba learned of the target, I think that's perfectly

4    appropriate.

5              THE COURT:  How much is the witness going to do on

6    direct about wanting to stay away from a business prospective

7    with any association with the former president?

8              MS. HANFT:  I anticipate one question that I will ask

9    about whether Saba would have invested had they known who the

10   proposed target was, and I anticipate a negative answer.

11             THE COURT:  The objection is overruled.

12             Let's bring the witness in, put him on the stand, and

13   then we can call the jury.

14             MS. SHAPIRO:  Your Honor, I'm sorry.  I have another

15   issue that I think is very important respecting the witness

16   currently on the stand.  It will take a few seconds.

17             THE COURT:  For future reference, you can do this, but

18   remember my rule that we don't play seriatim, either defense

19   lawyers or government lawyers — it's one lawyer.  I'll hear

20   from you.  The next time, your team works out what your

21   objection is and then I hear from the lawyer.  It's not fair to

22   the Court.  Go ahead.

23             MS. SHAPIRO:  I'm sorry, your Honor.

24             This witness said, and the Court properly sustained an

25   objection, but the answer was already out that he didn't want

1  to end up here.  I'm sure the Court recalls that moment.

2           THE COURT:  I do recall that.

3           MS. SHAPIRO:  We would ask the Court strike the

4  answer, outside the presence of the jury, from the transcript.

5           Second, at the conclusion of the testimony, we would

6  ask the Court to give a limiting instruction advising the jury

7  that the witness's opinions about whether he could trade as

8  board member are not the law, and that the Court will instruct

9  the jury on the law at the conclusion of the evidence as to

10  what the law of insider trading and the obligations of

11  directors in that regard are.

12           THE COURT:  I will grant the application to strike the

13  testimony.  I want to think about the form of the curative

14  instruction.  I'll hear from the government with respect to

15  that.  It may not be immediately at the end of this witness's

16  testimony.  I want to think about whether a curative

17  instruction is appropriate.  So I'll take that second request

18  under advisement.  I will strike the bit of the testimony from

19  the transcript where the witness said, "I didn't trade because

20  I didn't want to be here."

21           Let's bring the witness in.

22           Ms. Shapiro, I apologize to you.  I thought you were

23  making a further point to the points Mr. Bach made, not an

24  entirely separate point.

25           (Continued on next page)

1            (Jury present)

2            Mr. Bach, you may continue.

3    BY MR. BACH:

4    Q.  Mr. Swider, just a few more questions.  Before the break, I

5    was asking you whether, as a board member, you had seen a copy

6    of the draft merger agreement for the merger with TMG.  Do you

7    remember I was asking you those questions?

8    A.  Yes.

9            MR. BACH:  Can we pull up Government Exhibit 511 and

10   go to page 25.

11   Q.  Do you have that on your screen, Mr. Swider?

12   A.  I do.

13   Q.  Do you recall being asked some questions about this

14   WhatsApp board of directors text chain by Ms. Hanft?

15   A.  Yes, sir.

16   Q.  Focusing your attention on the third bubble, do you see, it

17   says, TMTG definitive, October 17?

18   A.  Yes, sir.

19   Q.  That's a WhatsApp message attaching the draft definitive

20   merger agreement on October 17th; correct?

21   A.  I believe so, yes, sir.

22   Q.  So as a board member, that's a document that you were sent

23   a copy of; correct?

24   A.  Yes, sir.

25            MR. BACH:  We can take that down.

1  Q.  Now, at the beginning of your testimony on direct when you

2  were describing your professional background, you referred to

3  having various securities licenses.

4  A.  Yes, sir.

5  Q.  Can you tell the jury just a little bit about those

6  licenses and why you have them or had them.

7  A.  Why I had them, yeah.  So the Series 7 is a general

8  brokerage license that allows you to sell securities to the

9  members of the public.  The Series 6 allows you to sell

10  insurance-related products, such as annuities.  The 63 was the

11  state equivalent of South Carolina's insurance license.

12  Q.  To obtain those licenses, you had to meet certain

13  requirements; correct?

14  A.  Yes, sir.

15  Q.  You had to fill out forms attesting that you had met those

16  requirements; correct?  You had to apply for the license?

17  A.  It was a securities exam we had to take.

18  Q.  You had to study, you had to take an exam, there was a

19  whole procedure?

20  A.  Yes, sir.

21  Q.  Are you familiar with an individual named Marc Wachter?

22  A.  I am.

23  Q.  How are you familiar with him, sir?

24  A.  I met Marc Wachter in Miami probably 18 months ago through

25  Patrick Orlando.  Patrick Orlando had showed me a business that

1    Marc Wachter needed help with.  Once I found out who Marc

2    Wachter was, I declined to do the business.

3    Q.  What was the business that Mr. Orlando --

4              MS. HANFT:  Objection.  Relevance.

5              THE COURT:  Sustained.  608(b) grounds.

6    Q.  You serve on the board of DWAC; correct?

7    A.  Yes, sir.

8    Q.  You serve on the board of Trump Media Group; correct?

9    A.  I do.

10   Q.  Did there come a time that Mr. Orlando approached the board

11   of Trump Media Group to obtain some money for Mr. Wachter?

12   A.  I don't think he approached the board.

13   Q.  Did he approach you?

14   A.  No.

15             MS. HANFT:  Objection, your Honor.

16   Q.  Did there come a time when you became aware of an invoice

17   from an entity called Entoro Securities?

18             MS. HANFT:  Objection.

19             THE COURT:  Sustained.

20   Q.  Did there come a time when you learned that an application

21   had been made on Mr. Wachter's behalf to receive funds --

22             MS. HANFT:  Objection.

23             THE COURT:  Sustained.

24             MR. BACH:  Can we have a sidebar?

25             (At the sidebar)

1                    THE COURT:  Okay.

2                    MR. BACH:  This goes to the relationship between

3         Mr. Orlando and Mr. Wachter.  There were questions during

4         Mr. Wachter's testimony posed by both the government and the

5         defense about compensation arrangements between Mr. Wachter and

6         Mr. Orlando.  Mr. Wachter testified in certain ways.  We're

7         entitled to impeach what Mr. Wachter said and we're entitled to

8         show that, because we have this alternative tipping theory as

9         we referred to it, what the relationship of trust is and what

10        the relationship in general is between Mr. Wachter and

11        Mr. Orlando.  We believe it's relevant to our defense.  We're

12        only going to ask a few questions about it.  We think it's

13        significant that this idea of compensating Mr. Wachter for

14        services that he's providing on behalf of this now combined

15        entity — it's still DWAC, it's still DWAC in part — is at the

16        heart of this case, it's at the heart of our defense.  We

17        should be able to elicit testimony about it.  The topics have

18        already been discussed, so there's no -- it's not extraneous,

19        it's not introducing new subject matter to the case and I'm not

20        going to be spending a lot of time on it, but I do think it is

21        pertinent and relevant to issues that have arisen.

22                    MS. HANFT:  We have a 608(b) objection, your Honor.

23        This is not impeachment, this is different specific instances

24        of conduct.  There's also a hearsay objection and a relevance

25        objection.

1          THE COURT:  I'm going to sustain the objections.  You

2     could impeach Mr. Wachter and you did impeach Mr. Wachter and

3     were permitted to do so extensively during his testimony.  It's

4     excludable under 608(b) to the extent that it's being offered

5     to show specific instances of conduct of Mr. Wachter or of

6     Mr. Orlando.

7          With respect to the relevance, it's of extremely

8     attenuated relevance, and any relevance is outweighed by the

9     risk that the jury would be tremendously confused by this

10     testimony.  I did permit the question, a single question, and I

11     think that is sufficient.

12          MR. BACH:  Can I make a further proffer?

13          If the Court is going to deny, I want to make a

14     further proffer on the record of what I believe I would have

15     elicited.  Mr. Orlando created an invoice from an entity called

16     Entoro Securities and submitted it to Trump Media Group saying

17     that the combined entity owed a commission to Mr. Wachter, and

18     the reason for the commission was that Mr. Wachter had raised

19     additional monies from Mr. Postolnikov, that Mr. Postolnikov

20     made a bridge loan of $8 million to Trump Media Group, arranged

21     by Marc Wachter and Mr. Orlando, and that what Mr. Orlando was

22     approaching TMG was to get a permission from Marc Wachter after

23     the fact.

24          Mr. Swider advised the government of this in its 3500

25     material.  That's how I know about it.  He thought that what

1    Mr. Swider shared with the government was that this was the way

2    that Orlando was trying to get the commission to what he called

3    "the Russian" through this -- he seems to understood it as a

4    fairly circuitous way to get Marc Wachter some money.

5              So that's what this evidence will show.  We think it's

6    not simply for impeachment.  We think it shows the scheme.

7    Just as they were able to put on witnesses like Mr. Lopez

8    Torres and now they'll be allowed to put on Mr. Suissa over

9    objection.  We're really at the tail end of a tipping chain in

10   a set of events.  We're entitled to present a complete defense

11   to show a full picture of the conduct here, it's not just for

12   impeachment, but it really shows the nature of this

13   relationship.  It doesn't confuse the jury, it presents our

14   defense, and we think that denying us the opportunity to show

15   the jury the full picture prejudices defense.

16             THE COURT:  Correct me if I'm wrong, but my

17   recollection is Mr. Wachter talked about the fact that he

18   helped bring in Mr. Postolnikov to the investment; is that

19   correct?

20             MR. BACH:  To the founders round.

21             THE COURT:  To the founders round, correct.

22             Anything further from the government?

23             MS. HANFT:  One moment, your Honor.

24             MR. SHAHABIAN:  With the Court's permission, I can

25   jump in.  Your Honor, with the Court's indulgence, since I was

1    the attorney for the Wachter examination, if I could jump in

2    with Ms. Hanft.

3            For the record, that's not correct that Mr. Wachter

4    did not introduce Mr. Postolnikov to the DWAC investment.  He

5    testified he met him after that introduction was made.  What he

6    testified to, however, is that he and Patrick Orlando worked to

7    bring Mr. Postolnikov in on other SPACs separate from DWAC.

8            In addition, to respond to Mr. Bach's proffer, these

9    are all going to be offered for the truth.  It's all hearsay

10   through Mr. Swider.  They could have cross examined Mr. Wachter

11   on that, they declined to do so.

12           And to the 403 point, the proffer is about the pipe

13   financing for DWAC after the IPO that Mr. Postolnikov was

14   involved in.  It has nothing to do with the initial investment,

15   the trading.  It's a total waste of time and confusion.

16           MR. BACH:  It's to show the strength of these

17   relationships, what value was attached to Mr. Postolnikov by

18   both Mr. Orlando and Mr. Wachter.

19           THE COURT:  If you wanted to establish the strength of

20   the relationship, why couldn't you have gone through the pipe

21   investment with Mr. Wachter?  Isn't that the way you would have

22   done it through nonhearsay?

23           MR. BACH:  I don't know the nature of his knowledge.

24   I could see if this is a hearsay basis or not.  I'm working on

25   the basis of the 3500 material.  If it's hearsay, obviously

1    it's inadmissible.  If I can lay a foundation it's not hearsay,

2    I don't know if I can.

3              THE COURT:  I will permit you to try to lay a

4    nonhearsay basis for his knowledge of what Mr. Wachter did with

5    Mr. Postolnikov with respect to the pipe investment, limited

6    testimony.

7              MR. SHAHABIAN:  Your, before I respond to that, before

8    we do that and start suggesting things to the jury that might

9    ultimately be sustained, can we get a proffer on what this

10   possible nonhearsay basis could be?

11             THE COURT:  You're going to ask three questions to see

12   if there is a -- three questions, Mr. Bach, for there to be a

13   nonhearsay --

14             MR. BACH:  All I have is 3500 material.  I don't have

15   access to any other information.

16             (Continued on next page)

1          (In open court)

2          THE COURT:  New question.

3    Q.  Did you ever discuss with Mr. Wachter any role he had in

4    connection with a bridge loan made to Trump Media Group?

5          MS. HANFT:  Objection.

6          THE COURT:  Sustained.

7    Q.  Did you ever have any discussion with Marc Wachter?

8          MS. HANFT:  Objection.

9          THE COURT:  Sustained on 802 grounds.

10          MR. BACH:  I'm trying to --

11          THE COURT:  I know what you're trying to do, but you

12    have to do it in a way that doesn't call for hearsay.

13    Q.  Do you have personal knowledge of any transaction brought

14    to Trump Media Group involving Marc Wachter?

15    A.  It has been indicated to me --

16          THE COURT:  No, that's not personal knowledge.

17          Were you involved with any transactions between Trump

18    Media Group and Marc Wachter personally?

19          THE WITNESS:  No, sir, not at all.

20          THE COURT:  Okay.  New topic.

21          MR. BACH:  Nothing further, your Honor.  Thank you.

22          THE COURT:  Redirect examination.

23    REDIRECT EXAMINATION

24    BY MS. HANFT:

25    Q.  Mr. Swider, did you receive updates as a DWAC board member?

1    A.  Yes, ma'am.

2    Q.  And you received those updates in a few different ways, I

3    believe you testified to on direct; is that right?

4    A.  Yes, ma'am.

5    Q.  And one of the ways was in the WhatsApp conversation we

6    were looking at, Government Exhibit 511; is that right?

7    A.  Yes, ma'am, that's correct.

8    Q.  Were those updates important to you as a board member?

9    A.  Yes, ma'am.

10   Q.  Why were those updates important to you?

11   A.  That was the format that management gave us a lot of very

12   important information.

13   Q.  Did you think that the updates that Patrick Orlando and

14   Alex Monje provided to the board on that chat were

15   confidential?

16   A.  Yes, ma'am.

17   Q.  And why?

18   A.  Anything that the board receives from management regarding

19   our duties and responsibilities is confidential.

20   Q.  If information regarding the proposed merger had gotten out

21   to the public, were there any potential issues there?

22   A.  Yes, absolutely.

23   Q.  What were the potential issues?

24   A.  Well, considering the target that we were looking at, just

25   the name itself could impact the market in serious ways.

O52Cgar3                    Swider – Redirect

1              MS. HANFT:  No further questions, your Honor.

2              THE COURT:  Anything further, Mr. Bach?

3              MR. BACH:  Nothing further.  Thank you.

4              THE COURT:  Sir, you're excused as a witness.  You may

5     step down.

6              THE WITNESS:  Thank you, sir.

7              (Witness excused)

8              THE COURT:  The government may call its next witness.

9              MS. HANFT:  The government calls Jeffrey Stith.

10             MS. SHAPIRO:  Your Honor, may we have a brief sidebar?

11             THE COURT:  Does it pertain to this witness?

12             MS. SHAPIRO:  Yes.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          MS. SHAPIRO:  The next witness is Jeff Stith, who is

3  from the CFA.  As your Honor will recall, we moved in limine to

4  preclude evidence on this topic.  So I just wanted to note for

5  the record that we object to the testimony and all the exhibits

6  the government plans to introduce.  We want to have a standing

7  objection.  I just wanted to put that on the record.  I

8  understand your Honor has ruled.

9          THE COURT:  You can take up my ruling on it, but if

10  there are specific objections that you've got with respect to

11  particular questions or particular exhibits that you've not

12  made previously, you should just make them.

13          MS. SHAPIRO:  I understand, your Honor.  This relates

14  to the compliance topic, not the other topic.  I just want to

15  put on the record we object to the entire testimony at the

16  beginning so there wasn't any question about that.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Sir, please step up into the witness box,

3   remain standing, my deputy will administer the oath to you.

4          THE WITNESS:  Thank you, Judge.

5    JEFFREY STITH,

6        called as a witness by the Government,

7        having been duly sworn, testified as follows:

8          THE DEPUTY CLERK:  Can you please state your full name

9   for the record and please spell out your first and last name.

10         THE WITNESS:  My name is Jeffrey Stith.  It's

11  J-E-F-F-R-E-Y, last name is S-T-I-T-H.

12  DIRECT EXAMINATION

13  BY MS. HANFT:

14  Q.  Good morning, Mr. Stith.

15  A.  Good morning.

16  Q.  Where do you live?

17  A.  I live in Charlottesville, Virginia.

18  Q.  Where do you currently work?

19  A.  I work as an attorney at CFA Institute, also in

20  Charlottesville.

21  Q.  What is the CFA institute?

22  A.  Well, CFA Institute is a global membership organization for

23  investment professionals.  Our mission is to promote the

24  highest standards of professional ethics in the profession

25  around the world.

1    Q.  What does CFA stand for?

2    A.  It stands for Chartered Financial Analyst.

3    Q.  How long have you worked at the CFA Institute?

4    A.  I've been with the CFA Institute, it will be 16 years in

5    August.

6    Q.  What is your title there?

7    A.  I'm head of the professional conduct enforcement program.

8    Q.  And what are your duties as head of the professional

9    conduct enforcement program?

10   A.  We have a staff of currently 13 people.  Our mission is to

11   promote and enforce our code of ethics and standards of

12   professional conduct around the world.  So we conduct

13   investigations, and if we find violations, we bring

14   disciplinary actions.

15   Q.  What did you do before you worked at the CFA Institute?

16   A.  Before CFA Institute, I was at FINRA, which is the

17   Financial Industry Regulatory Authority for 17 years.  The

18   first 10, I was an attorney of the enforcement department, and

19   the final 7 I was chief litigation counsel for the market

20   regulation department.

21   Q.  How does someone become a CFA carter holder?

22   A.  We're best known for the CFA exam.  It's an extremely

23   rigorous program.  It requires that a candidate pass a series

24   of three very difficult exams, they're typically day-long

25   exams.  When people sign up, they're told to commit at least

1   300 hours to prepare for each stage.  So it's a very rigorous

2   program.  It makes the CFA designation if you can achieve it.

3   Obviously, very prestigious.

4   Q.  Generally speaking, who are the people who seek this

5   certification?

6   A.  I would say typically people that either are or want to be

7   portfolio managers, maybe manage money for hedge funds, deal

8   with high net worth clients, people that manage pension funds

9   and institutional money.  I would say that's typically the

10  aspiration of CFA candidates.  It's obviously a huge boost in

11  your career if you can obtain the Chartered Financial Analyst

12  designation.  It's very valued by employers around the world.

13  Q.  Those rigorous exams that you just referred to, do they

14  have a section on ethics?

15  A.  Absolutely.  The organization is -- we really put extreme

16  emphasis on ethics.  We want people that were in the program,

17  especially those that achieve the CFA charter to be exemplary.

18  So we hold them to the very highest standards of professional

19  ethics and competence.

20  Q.  Do you personally know the defendant, Bruce Garelick?

21  A.  I do not, no.

22  Q.  Was Bruce Garelick ever a CFA charter holder?

23  A.  Yes, he was.  He received his CFA charter in September of

24  2000.

25  Q.  And how do you know that?

1    A.  I looked it up using our records and I had my staff confirm

2    it, as well.

3    Q.  You said he received the charter in 2000.  Is he currently

4    a CFA charter holder?

5    A.  No, he's not a charter holder or member in good standing.

6    His membership lapsed in February of this year.

7    Q.  I'm going to direct your attention, sir, to Government

8    Exhibit 860.

9            MS. HANFT:  The parties have stipulated that this

10   exhibit is a business record.

11           The government offers Government Exhibit 860.

12           MS. SHAPIRO:  Subject to our previous discussion, your

13   Honor.

14           THE COURT:  It's received.

15           (Government's Exhibit 860 received in evidence)

16           MS. HANFT:  Mr. Bianco, could you publish Government

17   Exhibit 860.

18   Q.  What is this document, Mr. Stith?

19   A.  This is our standards of practice handbook.  It contains

20   our code of ethics and our standards.  It also has some

21   guidance for each of the standards and some Q&A.  We provide

22   this, it's available physically and it's been on our website

23   for many years so that candidates and members can refer to it,

24   both in studying for the exam and, more importantly, in their

25   day-to-day practice if they encounter an ethical issue.  They

1   can turn to it and, with confidence, see what is expected of

2   them according to our standards.

3   Q.   The date on this document is 2014.  It says 11th edition.

4   When would this have been in effect?

5   A.   This was in effect from I believe July of 2014 through the

6   beginning of this year.  We did, just this year, update with

7   the 12th edition.

8   Q.   What are the standards of practice generally?

9   A.   I'd say they're sort of the -- they're really

10  principle-based rules.  It's really our statement on behalf of

11  the organization and the other charter holders around the world

12  as to what is expected of them ethical.  It's really meant to

13  be a set of rules and a guide, as well, as to what is required

14  to be a truly ethical person in the investment profession.

15          MS. HANFT:  Let's turn to page 8, Mr. Bianco.

16  Q.   Could you read towards the bottom of page 8, Mr. Stith, can

17  you read material nonpublic information?

18  A.   Yes, it's a standard II.A.  It states:  Material nonpublic

19  information.  Members and candidates who possess material

20  nonpublic information that could affect the value of an

21  investment must not act or cause others to act on the

22  information.

23          THE COURT:  Members of the jury, it may be appropriate

24  now for me to give you a bit of a limiting instruction.  I'll

25  have more to say when I give you your final instructions about

O52Cgar3                         Stith - Direct

1    the relevance of this testimony and how you're to use it.

2              Suffice it to say, this witness is not testifying with

3    respect to the obligations of the federal securities law, or

4    with respect to what constitutes material nonpublic

5    information, or what's necessary for you to find in order to

6    return a verdict in this case.  You'll take your instructions

7    from me.

8              It's also important for me to highlight that there are

9    no charges in this case about violations of ethical rules or

10   violations of the compliance standard.  That is not the charge

11   in this case.

12             Go ahead, Ms. Hanft.

13             MS. HANFT:  Thank you, your Honor.

14             Mr. Bianco, could we please turn to page 59 of this

15   document.

16   Q.  Could you read standard II.A at the top, Mr. Stith.

17   A.  This is, again, standard II.A material nonpublic

18   information.  Members and candidates who possess material

19   nonpublic information that could affect the value of an

20   investment must not act or cause others to act on the

21   information.

22   Q.  Let's look at the following page, there's a section

23   entitled "What is Material Information?"  I'm going to ask you

24   to read that section.

25   A.  What is material information?  According to our standards.

1    Information is material if its disclosure would probably have

2    an impact on the price of a security or if reasonable investors

3    would want to know the information before making an investment

4    decision.  In other words, information is material if it would

5    significantly alter the total mix of information currently

6    available about a security in such a way that the price of the

7    security would be affected.

8            The specificity of the information, the extent of its

9    difference from public information, its nature, and its

10   reliability are key factors in determining whether a particular

11   piece of information fits the definition of material.  For

12   example, material information may include, but is not limited

13   to, information on the following: earnings; mergers,

14   acquisitions, tender offers, or joint ventures; changes in

15   assets or asset quality.  And it goes on from there.

16           MS. HANFT:  Thank you.  Let's zoom back out,

17   Mr. Bianco.

18   Q.  Mr. Stith, if you can read the final paragraph on this

19   page.

20   A.  In addition to the substance and specificity of the

21   information, the source or relative reliability of the

22   information also determines materiality.  The less reliable a

23   source, the less likely the information provided would be

24   considered material.

25   Q.  Let's turn to page 61.  How does the standard define what

1    constitutes nonpublic information?  If you could read the first

2    two sentences here.

3    A.   Information is "nonpublic" until it has been disseminated

4    or is available to the marketplace in general as opposed to a

5    select group of investors.  "Disseminated" can be defined as

6    "made known."

7              MS. HANFT:  Let's zoom out, please.

8              We could take this exhibit down, Mr. Bianco.

9    Q.   Mr. Stith, are CFA charter holders required to know these

10   standards of practice?

11   A.   Absolutely.  I mean, it's repeated throughout their

12   learning process, to prepare for the CFA exam levels, the three

13   levels.  Each year as a prerequisite of remaining a member,

14   they have to complete and submit what we call a professional

15   conduct statement.  In this document, they are asked to

16   self-disclose if they, for example, received a client

17   complaint, maybe been interviewed by a regulator, anything that

18   might suggest there's a violation.  Then, at the bottom of the

19   document, they're required to agree to the membership terms

20   each year, and that includes reaffirming that they understand

21   and are following our code and standards and bylaws and such.

22              (Continued on next page)

23

24

25

O521GAR4                    Stith - Direct

1    BY MS. HANFT:

2    Q.  So by submitting a professional conduct statement, do I

3    have it right that they are attesting they will comply with the

4    standards?

5    A.  That's correct.

6    Q.  Did Mr. Garelick ever submit professional conduct

7    statements?

8    A.  He did.  As I said, it's a requirement every year that

9    individuals go through this process.  It's a self-disclosure

10   and reaffirmation.  And if you do not, your membership will

11   lapse and you lose the opportunity to be a member and you lose

12   the—importantly, you lose the right to use the CFA

13   designation.  You can no longer put CFA after your name.  For

14   example, you can no longer hold yourself out as a chartered

15   financial analyst to clients, your employer, things of that

16   nature.

17   Q.  And did he submit such professional conduct statements, for

18   example, in the year 2019?

19   A.  Yes, he did.

20   Q.  What about 2020?

21   A.  Yes.

22   Q.  2021?

23   A.  Yes.

24   Q.  2022?

25   A.  Yes.

1          MS. HANFT:  The government offers Government Exhibits

2    850, 851, and 852, which the parties have stipulated are

3    business records.

4          THE COURT:  I assume same objection, Ms. Shapiro?

5          MS. SHAPIRO:  Yes.

6          THE COURT:  Those are received.

7          (Government's Exhibits 850, 851, and 852 received in

8    evidence)

9          MS. HANFT:  Mr. Bianco, please publish Government

10   Exhibit 851.

11   BY MS. HANFT:

12   Q.  Mr. Stith, what is this document?

13   A.  This is——this shows the——the annual professional conduct

14   statement and membership agreement.  This is an example.

15   Q.  And who filled out this professional conduct statement?

16   A.  In this case, it was Bruce Garelick.

17   Q.  And what is the date on which this was completed?

18   A.  In this case, it was 27 August 2020.

19   Q.  And was this document signed, completed and signed by

20   Mr. Garelick?

21   A.  Yes, it was.

22   Q.  How was it signed?

23   A.  It's signed electronically.  We used to actually send out

24   pages people would have to physically return, but in 2009 we

25   went to an electronic form and signature.

1    Q.  And could you read, at the top there, starting with the

2    first "I certify."

3    A.  Yes.  It says, "I certify that my answers below are

4    accurate, truthful, and complete.  I also agree to notify CFA

5    Institute promptly of any changes that would require a

6    different response to any of the following questions."

7           MS. HANFT:  And if we could scroll down to the third

8    page of this document, where it says Membership Agreement.

9    Q.  What is the date on which the membership agreement was

10   completed by Mr. Garelick?

11   A.  Again, this is 27 August 2020, and the—there are really

12   two parts to the same document.  This is the membership

13   agreement I referred to earlier.

14   Q.  Could you read No. 1 here.

15   A.  Sure.  It says, "I have read, understand, and agree to

16   comply with the CFA Institute Code of Ethics and Standards of

17   Professional Conduct, Bylaws, and Rules of Procedure," that's

18   the governing documents, "and other rules and regulations

19   established by CFA Institute as amended from time to time."

20   Q.  And so that agreement, is that to comply with the Standards

21   of Professional Conduct we just looked at?

22   A.  That's correct.

23           MS. HANFT:  And let's look at item No. 3, please,

24   Mr. Bianco.  If you could highlight item No. 3.

25   A.  Yeah, item 3 says, "I hereby acknowledge that all of the

O521GAR4                    Stith - Cross

1    information I have provided to CFA Institute is true, correct,

2    complete in all respects."

3               MS. HANFT:  One moment, please.

4               No further questions, your Honor.

5               THE COURT:  Cross-examination, Ms. Shapiro.

6    CROSS EXAMINATION

7    BY MS. SHAPIRO:

8    Q.  Good morning, Mr. Stith.

9    A.  Good morning.

10   Q.  Mr. Garelick has been a chartered financial analyst since

11   2000, correct?

12   A.  That's correct.

13   Q.  And in order to become a chartered financial analyst, he

14   had to take three rigorous exams, right?

15   A.  Yes, he did.

16   Q.  And I believe you called them very difficult on direct,

17   correct?

18   A.  Yeah, they're—they're very difficult.  Like I said, it

19   requires a tremendous amount of study, and the pass rate is

20   notoriously low.  During my time I've seen it as low as like

21   27 percent.

22               And I should add, too, that there's a minimum

23   requirement of four years of relevant work experience in

24   investments to attain the CFA charter.

25   Q.  And I think you also testified on direct that it typically

1   takes about 300 hours to prepare for each of the three stages;

2   is that correct?

3   A.   That's correct.  It's often said to be one of the most

4   difficult credentials of any profession.

5   Q.   And it's the gold standard, in fact, in this industry,

6   correct?

7   A.   That's correct.

8   Q.   And Mr. Garelick started the program in or around 1996; is

9   that right?

10  A.   I believe so.  I think he passed the Level 1 exam in 1997.

11  Q.   And he passed actually all three exams without having to

12  retake any of them; isn't that correct?

13  A.   I believe that's true.  '97, '98, and 2000.

14  Q.   And is it fair to say that that is pretty rare for someone

15  to do that, given the low pass rate?

16  A.   Yeah, it is.  I would agree.

17  Q.   And now on direct examination you were shown three examples

18  of certifications that Mr. Garelick had to sign each year to

19  maintain his CFA status.  Do you remember that?

20  A.   Yes, I do.

21  Q.   And although you were shown those three examples, it's fair

22  to say that actually he signed similar certifications each year

23  that he's—since he's had the status; is that correct?

24  A.   Yes.  He would have had to or else his membership would

25  have been lapsed.

1    Q.  And that membership agreement and his attestation included

2    an attestation that he was complying with insider trading rules

3    and regulations, correct?

4    A.  Not specifically, but that is one of our standards, yes.

5    Q.  Well, he was attesting compliance with your standards,

6    correct?

7    A.  Yes, that's right, more generally.

8    Q.  There's a standard prohibiting insider trading, correct?

9    A.  That's correct, yes.

10   Q.  If a CFA was found to have engaged in insider trading, he

11   would lose his CFA charter, correct?

12   A.  Yeah, assuming, you know——we would always investigate

13   independently, and we have our own disciplinary process, where

14   our other charter holders will judge the violations and

15   determine an appropriate sanction, which could well be a

16   revocation.

17   Q.  And the CFA is a very prestigious——it's a very prestigious

18   designation, correct?

19   A.  Yeah, I certainly think so, and——I'm biased.  But no,

20   it's——it's highly regarded in the profession, as I said before.

21   Q.  And I think you testified on direct that it actually can be

22   a huge boost to a person's career, correct?

23   A.  Yes.

24   Q.  And it's highly valued by employers and prospective

25   employers, correct?

O521GAR4                    D'Angelo - Direct

1    A.  Yes, definitely.

2    Q.  And it's highly valued by clients and prospective clients

3    of investment professionals, correct?

4    A.  Yes, certainly.

5    Q.  And so if Mr. Garelick was found to have engaged in insider

6    trading, he would never be able to work in the industry again,

7    correct?

8    A.  Not necessarily, but, I mean, it would certainly be a——

9            MS. HANFT:  Objection.

10           THE COURT:  Overruled.

11   A.  ——a setback.  I mean, obviously to lose such a prestigious

12   credential, you know, would affect one's employment and

13   prospects, I would think.

14   Q.  And it would be——once you lose the CFA, you wouldn't have

15   access to all the benefits that you described in your

16   testimony, right?

17           MS. HANFT:  Objection.

18           THE COURT:  Overruled.

19           MS. SHAPIRO:  Just if I could have one moment, your

20   Honor.

21           No further questions.

22           THE COURT:  Anything further, Ms. Hanft?

23           MS. HANFT:  No, your Honor.  Thank you.

24           THE COURT:  Okay.  Sir, you're excused as a witness.

25           THE WITNESS:  Thank you, your Honor.

1       (Witness excused)

2           THE COURT:  The government will call its next witness.

3           MS. HANFT:  The government calls Michael D'Angelo.

4           THE COURT:  Okay.  Bring Mr. D'Angelo in.

5           Mr. D'Angelo, please step forward into the witness

6    box, remain standing, and my deputy will administer the oath.

7           THE DEPUTY CLERK:  Please raise your right hand.

8           (Witness sworn)

9           THE DEPUTY CLERK:  Thank you.

10          Can you please state your full name for the record and

11   please spell out your first and last name.

12          THE WITNESS:  Michael D'Angelo.  D apostrophe

13   A-N-G-E-L-O.

14          THE COURT:  I take it Michael is spelled the ordinary

15   way?

16          THE WITNESS:  Yes.

17          THE COURT:  Okay.  Sir, keep your voice up, speak into

18   the microphone, pause before you answer a question so that the

19   questioner can finish asking the question.

20          Ms. Hanft, you may proceed.

21    MICHAEL D'ANGELO,

22       called as a witness by the Government,

23       having been duly sworn, testified as follows:

24   DIRECT EXAMINATION

25   BY MS. HANFT:

1   Q.  Good morning, Mr. D'Angelo.

2   A.  Good morning.

3   Q.  Where do you live?

4   A.  I live in Connecticut.

5   Q.  Where do you currently work?

6   A.  I work at Saba Capital Management.

7   Q.  What is Saba Capital Management?

8   A.  Saba Capital Management is a registered investment advisor,

9   better known as a hedge fund.

10  Q.  What does that mean?

11  A.  Hedge fund, we manage private pools of capital for

12  investors.

13  Q.  When you say capital, what does that refer to?

14  A.  Their money.

15  Q.  And how much money does Saba Capital manage?

16  A.  Around 4.6 billion.

17  Q.  What is your job at Saba Capital?

18  A.  I am the general counsel and chief operating officer.

19  Q.  How long have you worked there?

20  A.  Since 2015.

21  Q.  And what is your educational background?

22  A.  I have an undergraduate degree in finance from Pace

23  University and a juris doctorate from Hofstra University.

24  Q.  What are your duties and responsibilities at Saba Capital

25  Management?

1  A.  I manage the legal and compliance function and certain

2  operating responsibilities as well.

3  Q.  Where did you work before Saba?

4  A.  I worked at another hedge fund manager called Prolog

5  Capital.

6  Q.  Mr. D'Angelo, does Saba invest in something called SPACs?

7  A.  It does.

8  Q.  And what are SPACs, generally speaking?

9  A.  SPACs are——SPACs are companies that raise capital through

10  initial public offerings, and then there's a defined

11  term——period, generally 18 to 24 months, where the SPAC's

12  sponsor team goes out and looks for a private company to merge

13  with or effectively take public, and during that initial period

14  they take the IPO proceeds and place them into a savings

15  account, which is a trust account.

16  Q.  You stated in response to my question that Saba invests in

17  SPACs.  Which ones?

18  A.  We have——at one point we had over 500 SPACs.  We look to

19  own the market.

20  Q.  So what is the strategy behind Saba's investment in SPACs?

21  A.  Saba's strategy can best be defined as a trading strategy,

22  where we go out and either buy the SPAC at its IPO or we buy it

23  in the market during that first two-year period, with the goal

24  of either selling it back into the market at a higher price

25  than we bought it for in the first two years or hold it to earn

1   that interest that that trust account pays in the first two

2   years, but in both cases to be out of, or sold, have sold the

3   SPAC at the merger.

4   Q.  And when you say at the merger, you mean at the time of the

5   consummation of the merger?

6   A.  Yes, exactly.

7   Q.  How does Saba decide which SPACs to invest in?

8   A.  We are generally indifferent as to the SPAC or the pedigree

9   of the sponsor team.  We're really just looking to trade, trade

10  the name, so we—it's why we have a diverse portfolio of SPACs.

11  Q.  Did Saba ever purchase DWAC securities?

12  A.  Yes.

13  Q.  Approximately when?

14  A.  At its IPO.

15  Q.  Do you recall approximately when that was?

16  A.  I don't.

17  Q.  And why did Saba purchase DWAC securities?

18  A.  Same reason we purchased all the other SPACs, to have the

19  opportunity to sell it at a higher price or to earn the

20  interest.

21  Q.  When Saba purchased those DWAC securities in the IPO, did

22  Saba know what company DWAC would merge with?

23  A.  It did not.

24  Q.  Did Saba know any potential targets of the company?

25  A.  It did not.

1    Q.  At some point did you become aware of DWAC's merger target?

2    A.  Yes.

3    Q.  When?

4    A.  When the company——when the SPAC itself put out a press

5    release.

6    Q.  What happened?

7    A.  At Saba?  At Saba, we had a number of conversations that

8    night amongst my partners, and then in the morning before the

9    market opened, and ultimately the decision was made by the firm

10   to sell out all the unrestricted shares of DWAC at the——at or

11   before the opening, the market opened the next day.

12   Q.  So when news——just to be clear, when news of the intended

13   merger was announced publicly, did Saba make a decision?

14   A.  We had——yes, the decision was to immediately sell the SPAC

15   at the next available opportunity.

16   Q.  And did Saba in fact do that?

17   A.  Yes.

18   Q.  Why?

19   A.  We believed it was in the best interest of our investors

20   not to own a SPAC associated with Donald Trump.

21   Q.  Prior to the public announcement did you ever learn that

22   Trump Media Group was a potential target of DWAC?

23   A.  We did not.

24   Q.  And if Saba had known that Trump Media Group was an

25   intended merger target of DWAC, would Saba have invested in

1    DWAC?

2    A.  I don't believe so.

3            MS. HANFT:  No further questions.

4            THE COURT:  Cross-examination.

5    CROSS EXAMINATION

6    BY MS. SHAPIRO:

7    Q.  Good morning, Mr. D'Angelo.

8    A.  Good morning.

9    Q.  So I think you testified on direct that Saba focuses on

10   SPACs, right?

11   A.  One of the strategies we focus on.

12   Q.  And at one point I think you said you had roughly 500

13   different SPAC investments in your portfolio; is that correct?

14   A.  That's correct.

15   Q.  And Saba is one of the big——at that time was one of the

16   biggest SPAC investors; is that right?

17   A.  At one time we were the biggest SPAC investor.

18   Q.  The biggest.  Excuse me.  And your strategy, as I

19   understand it——and correct me if I'm wrong——is to either buy at

20   the IPO or——sorry.  Withdrawn.

21           Tell us again the two strategies that you have.

22   A.  Sure.  We're looking to either buy the shares at its IPO or

23   subsequent to the IPO, in the market, you know, off an

24   exchange, with the idea——with the hope or the goal of either

25   selling it back into the market for a higher price or, if we

1   can't do that, to hold it to the merger point, where we can

2   effectively redeem back into the company and get the trust

3   value, so you can redeem and get effectively the interest paid.

4   Q.  And in either case I think you said you would sell at the

5   merger, typically?

6   A.  No later than the merger.

7   Q.  No later than the merger.  And Saba, at the time it was

8   pursuing this investment strategy, was indifferent, I think you

9   said, to the SPAC or the management team; is that right?

10  A.  Generally, yes.

11  Q.  And in fact, you analyzed the SPACs and made determinations

12  about which ones to invest in using a quantitative analysis; is

13  that correct?

14  A.  I wouldn't say that.  I would say we are looking to buy it,

15  you know, the IPO at $10, so we're happy to buy it at 10, and

16  if it trades at 11 or 12, we're happy to sell it.  If it trades

17  to 8, we can't sell it——we don't want to sell it at 8 and print

18  a loss.  We're happy to hold it and get $10.20 back because

19  you're getting your principal back plus your interest, so we

20  have that two-year window to do that.

21  Q.  But it's essentially, I'll call it——tell me if this

22  is——it's essentially kind of a number-crunching formula; is

23  that fair?

24  A.  I wouldn't——I don't think so.  I think we're just looking

25  to buy the market.  That's why we own so many names, because

1   when you have a portfolio, some of them are going to go to 15,

2   some of them are going to go to 5, and so our team is

3   monitoring day to day what——what's trading above trust value

4   and versus what's trading below trust value, and if it's

5   trading above trust value, the decision is going to be made

6   either to hold it longer or to sell it.

7   Q.  And Saba didn't use analysts to research whatever public

8   information it could find about any particular SPAC's possible

9   target, correct?

10  A.  We have analysts and we have trading assistants.  They're

11  just monitoring Bloomberg, but we're not doing, you know, deep

12  fundamental analysis on a SPAC.

13  Q.  Well, do you recall meeting with the government to prepare

14  for your testimony on or about April 18th?

15  A.  I don't remember if it was the 18th, but I do recall

16  meeting with the government.

17  Q.  A couple weeks ago——

18  A.  Yeah.

19  Q.  ——roughly?  And do you recall telling the government at

20  that time that Saba did not have analysts trying to figure out

21  the targets that the SPACs may merge with?

22  A.  Right.  Just to clarify, it's not that we're looking before

23  we own it, before it IPO's.  Our team is monitoring what's

24  going on in the market day to day, what's on Bloomberg, what's

25  publicly available to see what's driving the price, but we're

1    not looking to do an analysis and try to figure out who they're

2    going to merge with, what their sector is, what their plans are

3    generally.  As a trading strategy, it's effectively an

4    arbitrage strategy.

5    Q.  An arbitrage strategy.

6    A.  Yeah, better way to say it.

7    Q.  Okay.  And Saba was one of the largest investors in DWAC at

8    the time you invested; is that correct?

9    A.  Yes.

10   Q.  And in fact, Saba invested about $25 million; is that

11   correct?

12   A.  Sounds about right.

13   Q.  And at $10 a unit, right?

14   A.  Sounds about right.

15   Q.  And that was a large position relative to other investors

16   in DWAC at that time, correct?

17   A.  I believe we were one of the biggest owners on a percentage

18   basis.

19   Q.  Okay.  And you heard about the announcement about DWAC

20   merging with Trump Media on or about October 20, 2021, right,

21   in the evening?

22   A.  If that's the day the company put out the press release,

23   then yes.

24   Q.  And it was in the evening, right?

25   A.  Yes.

1  Q.  After the market closed?

2  A.  Yes.

3  Q.  And as soon as you heard that, you alerted the Saba

4  portfolio manager about the news, correct?

5  A.  Correct.

6  Q.  And the news was a concern to you, right?

7  A.  Correct.

8  Q.  And the reason was that you were concerned that Saba

9  investors may not like being invested with Trump's company,

10  correct?

11  A.  Correct.

12  Q.  And in fact, Saba actually contacted PR, public relations

13  firms for assistance in connection with this issue, correct?

14  A.  I think at that point in time we were getting inbound from

15  the press and so we have a team, an outside firm that helps us

16  respond to those requests.  So they were engaged.

17  Q.  And——but you spoke with public relations firms in

18  connection with those inquiries; is that right?

19  A.  I don't recall if it was me or one of my partners that

20  night.

21  Q.  But somebody——

22  A.  Somebody did, yes.

23  Q.  And at that time the chief investment officer and the

24  portfolio manager decided that they would sell anything the

25  company held in DWAC; is that right?

1    A.  The next morning the decision was made, before the market

2    opened, to sell all of our unrestricted shares.

3    Q.  And so Saba did that, right?

4    A.  Yes.

5    Q.  And it sold those shares at around 12.50; is that correct?

6    A.  Sounds about right.

7    Q.  ──a share?  And the stock actually went up much higher than

8    that later in the day; isn't that correct?

9    A.  Yes.

10   Q.  And but basically Saba liquidated the position to avoid

11   being associated with a Trump company; is that correct?

12   A.  I think it's──it's a couple scenarios, a couple factors.  I

13   think that's certainly one of them.  We thought that was in the

14   best interest of our investors.  We thought that that's what

15   they would want.  We know we have a lot of investors that are

16   focused on ESG and other, you know, endowments and etc., so we

17   believed that was in their best interest.  Obviously being

18   pulled into a political debate is not something that we're here

19   to do.  It's a distraction.  But also, I think from a portfolio

20   management perspective, buying at 10 and selling at around

21   12.50 is already on the better end of what we typically see,

22   and so I think at the time the team felt like, you know, maybe

23   it will go a little bit higher, but this is already on the good

24   side of the bell curve for us.

25   Q.  And in fact, Saba made around $5 million from that, those

1   trades, correct?

2   A.  I'd have to look, but we made—there was a profit.  I don't

3   remember how much.

4   Q.  Just to go back, I just want to make sure this is just

5   clear.  You don't have to do the math, but I believe you

6   testified earlier that Saba had invested $25 million, correct?

7   A.  Mm-hmm.

8           THE COURT:  You have to answer that out loud.

9   A.  Yes, yes.  Sorry.

10  Q.  And the price went up from $10 a share, which is what the

11  purchase price was, to around 12.50, correct?

12  A.  Yes, 20 percent.

13  Q.  And so when you made the decision to sell, that was a

14  business decision, correct?

15  A.  When the portfolio managers made the decision to sell, it

16  was a—a combination of a business decision and a decision that

17  we thought was in the best interest of our investors, so a

18  combination.

19  Q.  And that was—were you—you were concerned about

20  reputational harm and concerns of the investors if Saba stayed

21  in the SPAC, correct?

22  A.  Right.  The concern from our investors' point of view is

23  that they did not want to have exposure to this, this SPAC.

24  Q.  And when you say "exposure to this SPAC," you're talking

25  about the political controversy around former president Trump,

O521GAR4                    Servinskas - Direct

1    correct?

2    A.   Yes.

3           MS. SHAPIRO:  No further questions.

4           THE COURT:  Anything further, Ms. Hanft?

5           MS. HANFT:  Just very briefly, your Honor.

6    REDIRECT EXAMINATION

7    BY MS. HANFT:

8    Q.   On cross-examination just now, Mr. D'Angelo, you were asked

9    about——I believe one of your responses was that Saba didn't

10   want its investors to have exposure to the SPAC.  Does exposure

11   also refer to exposure to risk in the market?

12          MS. SHAPIRO:  Object.  Leading.

13          THE COURT:  Sustained.

14   Q.   When you said exposure, what did you mean?

15   A.   They didn't want to have an indirect ownership or

16   association with the Trump organization.  It was not about

17   market risk or the name going, you know——the stock price going

18   up or down.  We believed it was——they didn't want to have

19   indirect expo——they didn't want to have an association with

20   this investment.

21          MS. HANFT:  Thank you.  No further questions.

22          MS. SHAPIRO:  Nothing further, your Honor.

23          THE COURT:  Okay.  You're excused as a witness.  Thank

24   you.

25          THE WITNESS:  Thank you.

1          (Witness excused)

2          THE COURT:  Government will call its next witness.

3          MR. NESSIM:  Your Honor, could we have just one minute

4    to just confirm one evidentiary issue.

5          THE COURT:  Okay.

6          MR. NESSIM:  Your Honor, the government calls Robert

7    Servinskas.

8          THE COURT:  Okay.  Let's bring the witness in, please.

9          Sir, please come in, step up to the witness box.  When

10   you get to the witness box, remain standing and my deputy will

11   administer the oath.

12         THE DEPUTY CLERK:  Please raise your right hand.

13         (Witness sworn)

14         THE DEPUTY CLERK:  Thank you.  Could you please state

15   your full name for the record and please spell out your first

16   and last name.

17         THE WITNESS:  Robert Mark Servinskas.  First name

18   Robert, R-O-B-E-R-T, last name, S-E-R-V-I-N-S-K-A-S.

19         THE COURT:  Okay.  Sir, you may be seated.

20         THE WITNESS:  Thank you.

21         THE COURT:  Counsel, you may inquire.

22         The witness is directed to keep his voice up, try to

23   speak into the microphone, and wait until the question is done

24   before you answer.

25         Go ahead, counsel.

1          MR. NESSIM:  Thank you, your Honor.

2     ROBERT M. SERVINSKAS,

3          called as a witness by the Government,

4          having been duly sworn, testified as follows:

5     DIRECT EXAMINATION

6     BY MR. NESSIM:

7     Q.  Good afternoon, Mr. Servinskas.

8     A.  Good afternoon.

9     Q.  Where do you work?

10    A.  The Depository Trust & Clearing Corporation.

11    Q.  And does that also go by the DTCC, for short?

12    A.  Yes, it does.

13    Q.  Okay.  And for approximately how long have you worked at

14    the DTCC?

15    A.  For 29 years.

16    Q.  And what is your——what's your job at the DTCC?  What do you

17    do?

18    A.  I'm the director of data center operations and strategy.

19    Q.  And just at a high level, what does that involve?

20    A.  So presently we own and operate four data centers where we

21    hold data, post-trade data.

22    Q.  And just generally, what do you do in relation to those

23    data centers?

24    A.  So we do all aspects of maintenance, upkeep, systems

25    changes, system upgrades, to ensure that, you know, our data is

1   current, our systems are current.

2   Q.  Are you familiar with an entity called the NSCC, or the

3   National Securities Clearing Corporation?

4   A.  I am.

5   Q.  What is that entity and what's its relationship to the

6   DTCC?

7   A.  It's a wholly owned subsidiary of DTCC.

8   Q.  And are you familiar with the DTC, or the Depository &

9   Trust Company?

10  A.  Yes, Depository Trust Company is also a wholly owned

11  subsidiary.

12  Q.  And what is——okay.  Sorry.  And what is the role, if any,

13  that the NSCC and the DTC play in securities transactions on

14  national exchanges in the United States?

15  A.  So both are a part of post-trade clearance and settlement.

16  NSCC is a clearinghouse, so they work with the exchanges on

17  clearing trade data.  DTCC is a depository, so we hold

18  certificates and we track ownership of securities.

19  Q.  And just generally, what role do those entities play in

20  completing the securities transactions?

21  A.  So they ensure that buyers end up with their securities and

22  sellers, you know, end up with their——their money.

23  Q.  From just a data perspective——and I want to position you in

24  around 2021——where did the DTCC store its data?

25  A.  So in 2021, DTCC had two data centers in New York——one in

O521GAR4                    Servinskas - Direct

1    lower Manhattan at 55 Water Street, and one at the Brooklyn

2    Army Terminal.

3    Q.  And 55 Water Street is lower Manhattan.  Where is the

4    Brooklyn Army Terminal?

5    A.  It's at 140 58th Street in Brooklyn, New York.

6    Q.  And what was the process that DTCC employed with the data

7    it received during that time frame in terms of how it was

8    stored?

9    A.  So DTCC, we leveraged two z15 IBM mainframes along with EMC

10   PowerMax technology.  Data is written in a synchronous fashion

11   between both locations, so the 55 Water Street and the Brooklyn

12   location.

13   Q.  And you said——sorry.  Did you say a synchronous or

14   synchronous?

15   A.  Synchronous, so the data is actually written at the same

16   time.  There's a confirmation that passes between the two

17   systems and writes at the same time.

18   Q.  And why does——why did the DTCC at that time record

19   synchronous copies of the data in both Brooklyn and Manhattan?

20   A.  It's for redundancy and resiliency for disaster recovery.

21   If there's any issue at one of the buildings, be it a fire or

22   anything that might harm the systems, bring them down, we would

23   always have a second copy of the data.

24   Q.  And can you just break down a little more granularly what

25   happens, and not the specifics of the types of technology used

1  or the equipment but just, as data is entering the DTCC, what's

2  actually happening within the computer system?

3  A.   Sure.   So DTCC——well, NSCC and DTCC are very close

4  partners.   We go through a process called clearance and net

5  settlement, so we net-settle transactions for brokers.   So all

6  the transactions that occur through a day are net-settled

7  through a day and then we clear through the Federal Reserve at

8  the end of the day.

9  Q.   And of the transactions that brokers take place——that

10 brokers engage in on the national exchanges, what's the

11 approximate proportion of those transactions that are cleared

12 and settled by the DTCC?

13 A.   Virtually all transactions are cleared and settled by the

14 DTCC.

15 Q.   In addition to the data being recorded at the Manhattan

16 mainframe location in 2021, were there also DTCC employees who

17 worked at that location?

18 A.   Yes.

19 Q.   And what was their role in relation to that data

20 collection?

21 A.   I have a team of people that worked in the location at the

22 time, and we have monitoring consoles and different things that

23 we track the data flows, just ensuring that everything's

24 occurring properly.

25 Q.   And the process that you described about the data

1    recording, is that true of all settlement and clearance

2    transactions that went through the DTCC systems in 2021?

3    A.  Yes, it is.

4    Q.  Did the government send the DTCC certain trades to review?

5    A.  Yes.

6    Q.  And did the DTCC go through its systems and identify

7    clearance orders that the DTCC had received from brokerages?

8    A.  Yes, we did.

9    Q.  And were you able to confirm that the data related to those

10   trades was reflected in the DTCC's servers?

11   A.  We did confirm the trades.

12   Q.  And that those had been synchronously recorded in realtime

13   as those trades came into the DTCC; is that right?

14   A.  That's correct.

15   Q.  And they were recorded at the Manhattan facility.

16   A.  Yes.

17            MR. NESSIM:  At this time, your Honor, the government

18   would offer, pursuant to a business records stipulation, a

19   trade blotter of Fidelity that's marked as Government

20   Exhibit 305.

21            And Mr. Bianco, if you could just publish for the

22   parties the Excel sheet that we cued up a moment ago.

23            And this is Joint Exhibit 1 is the business records

24   stipulation that references this exhibit.

25            THE COURT:  Any objection?

1              MS. SHAPIRO:  No, your Honor.

2              THE COURT:  305 is received.

3              (Government's Exhibit 305 received in evidence)

4              MR. NESSIM:  Could we publish this for the jury,

5    please, Mr. Bianco.

6              Could you just scroll over to—so we could see column

7    A as well.

8    BY MR. NESSIM:

9    Q.   Okay.  Mr. Servinskas, do you see in column A it says

10   Symbol?

11   A.   Yes.

12   Q.   Could you just read what the symbol is indicated in row 306

13   on the screen.

14   A.   DWACU.

15   Q.   And then Trade Date, just as an example, 306, what's the

16   trade date listed there?

17   A.   September 3, 2021.

18   Q.   And of the DWACU trades included on Government Exhibit 305

19   that were trades sent through—

20             MR. NESSIM:  Actually, Mr. Bianco, if you could just

21   scroll to the right slightly before I ask that question.

22             Can you keep going.  Keep going.  Keep going.

23   Q.   Do you see Account Short Name, AS, that row there?

24             MR. NESSIM:  If you could just highlight that column,

25   Mr. Bianco.  AS.  Or not highlight it.  I'm sorry.  Just sort

1    of select it.  Either way.  Sorry.

2    Q.  Can you read what's listed as the Account Short Name?

3    A.  Yes.  GARELICK, Garelick.

4    Q.  And for the DWACU purchase order transactions listed on

5    Government Exhibit 305, was the DTCC able to look for that data

6    in its systems?

7    A.  Yes.

8    Q.  And what did the DTCC find?

9    A.  We verified the data.  We verified that they were on our

10   systems and synchronously written between 55 Water Street and

11   the Brooklyn address.

12   Q.  And that was in realtime as those trades were being settled

13   and cleared by the DTCC.

14   A.  That's correct.

15              MR. NESSIM:  One moment, your Honor?

16              THE COURT:  Okay.

17              MR. NESSIM:  No further questions.

18              MS. SHAPIRO:  No questions, your Honor.

19              THE COURT:  Okay.  Sir, you're excused as a witness.

20              THE WITNESS:  Thank you.

21              (Witness excused)

22              THE COURT:  Is there another witness?

23              MR. SHAHABIAN:  Yes, your Honor.  The government calls

24   Christian Isolda.

25              THE COURT:  Okay.  Let's bring the witness in.

O521GAR4                    Isolda - Direct

1            Members of the jury, we'll take our lunch break at

2      about ten of 1, and then you'll be back at 2:00.

3            MR. SHAHABIAN:  I'm sorry, your Honor?

4            THE COURT:  We'll take our lunch break at 12:50.

5            MR. SHAHABIAN:  Yes, your Honor.

6            THE COURT:  Sir, please step forward into the witness

7      box.  Remain standing as my deputy administers the oath.

8            THE DEPUTY CLERK:  Please raise your right hand.

9            (Witness sworn)

10           THE DEPUTY CLERK:  Thank you.  Could you please state

11     your full name for the record and please spell out your first

12     and last name.

13           THE WITNESS:  Sure.  My name is Christian Isolda.

14     C-H-R-I-S-T-I-A-N, I-S-O-L-D-A.

15           THE COURT:  All right.  Mr. Isolda, please keep your

16     voice up, speak into the microphone, and wait until the

17     question is done before you answer.

18           Counsel, you may inquire.

19           MR. SHAHABIAN:  Thank you, your Honor.

20      CHRISTIAN ISOLDA,

21         called as a witness by the Government,

22         having been duly sworn, testified as follows:

23     DIRECT EXAMINATION

24     BY MR. SHAHABIAN:

25     Q.  Good afternoon, Mr. Isolda.

1    A.   Good afternoon.

2    Q.   Where do you work?

3    A.   I work at the FBI.

4    Q.   What do you do at the FBI?

5    A.   My role is a digital forensic examiner.

6    Q.   What's a digital forensic examiner?

7    A.   It's a role in which we deal with the preservation of

8    digital evidence, the extraction of the data from digital

9    devices, as well as the analysis of the data that was

10   extracted.

11   Q.   What is digital evidence?

12   A.   Digital evidence can vary.  It's all different types of

13   digital devices.  Anything that stores data in an electronic

14   device.  You can think of cellphones, computers, laptops, even

15   cars have such devices.

16   Q.   What do you mean by extracts digital evidence?

17   A.   Extracting digital evidence in short is essentially pulling

18   the data from the device, making copies of that data.

19   Q.   Do you work at a particular unit with the FBI?

20   A.   I do.

21   Q.   What unit is that?

22   A.   It's a unit called CART.

23   Q.   Does CART stand for something?

24   A.   It does.

25   Q.   What does CART stand for?

1    A.   CART is the Computer Analysis Response Team for the FBI.

2    Q.   What does the Computer Analysis Response Team do?

3    A.   We are the main team that handles the digital evidence,

4    exactly what I just said, the extraction and analysis of it.

5    Q.   How long have you been a digital forensic examiner with the

6    FBI?

7    A.   I've been a full-time digital forensic examiner for just

8    under five years.

9    Q.   Did you receive any training before you began that role?

10   A.   I have.

11   Q.   What kind of training?

12   A.   So the FBI puts together a training curriculum, which is

13   equivalent to six or seven two-week classes, taken at Quantico.

14   I also have training from third-party vendors outside FBI.

15   Q.   Approximately how many devices have you performed digital

16   extractions or analysis on?

17   A.   I've performed extractions on over 2,000 devices in my

18   tenure.

19   Q.   Do you use any tools to help do your job?

20   A.   I do.

21   Q.   What kinds of tools?

22   A.   We predominantly use software-based tools or forensic tools

23   to extract and analyze data.

24   Q.   Have you heard of a tool called Cellebrite?

25   A.   I have.

1  Q.  What is Cellebrite?

2  A.  Cellebrite is a forensic tool.  As I just mentioned, in

3  most cases we use Cellebrite for mobile devices, so cellphones,

4  iPads, stuff of that nature.

5  Q.  What does Cellebrite do?

6  A.  Cellebrite can extract data from mobile devices and it also

7  is able to parse the data that's been extracted, essentially

8  making it so it's human reviewable, human readable once it's

9  been extracted.

10  Q.  I want to turn your attention to this case.

11          Did you have any particular role in an investigation

12  into DWAC?

13  A.  I did.

14  Q.  What was your role?

15  A.  For this case, I was given a few cellphones to extract and

16  analyze.

17  Q.  Did you do that?

18  A.  I did.

19  Q.  What tools did you use to perform those extractions?

20  A.  For this case, I used a tool called GrayKey to extract data

21  from the phone; I also used a forensic tool, Cellebrite that we

22  just mentioned, to parse and analyze the data.

23  Q.  In connection with your testimony today were you asked to

24  review some of the extractions that you performed in this case?

25  A.  I was.

Q.  Were you also asked to review digital evidence collected

that you didn't personally extract?

A.  I was.

Q.  Did you review those exhibits?

A.  I did.

Q.  What kinds of evidence were you asked to review?

A.  I was asked to review a few cellphones and the reports of

the cellphones, as well as an Apple iCloud return.

Q.  What is an Apple iCloud return?

A.  An Apple iCloud return is the return of all the data

associated to an iCloud account, which is essentially a account

that Apple has that stores all data from cellphones or any

device that's linked to that iCloud account.

Q.  What kinds of data can be obtained from an Apple iCloud

account?

A.  It ranges, so it's whatever the phone or the user chooses

to back up.  Some common pieces of data can include text

messages, it can include notes that were saved to the phone,

any calendar events, anything that the phone or the user

decides to back up.

Q.  And I asked you about iCloud accounts, but I also want to

ask you about devices.  What kinds of data can be extracted

from physical devices like cellphones?

A.  Similar.  Similar types of data.  Chat applications, you

can think of WhatsApp, Telegram, emails, pictures, videos;

 1   anything that's saved on the phone will get extracted and we

 2   can view it in a parsing tool.

 3           MR. SHAHABIAN:  Mr. Bianco, could we publish Joint

 4   Exhibit 3, which is a stipulation between the parties about

 5   device and account extractions.

 6           And if we could show paragraph 4, which I think it's

 7   split between the two pages.  Thank you.

 8           "Government Exhibits 721-731, 736, 737 are true and

 9   correct copies of text message conversations obtained from an

10   Apple iCloud backup stored in Bruce Garelick's Apple iCloud

11   account ('the Garelick iCloud')."

12           If we go to paragraph 5, Mr. Bianco.

13           "Government Exhibits 723A and 730A are true and

14   correct photographs stored in the Garelick iCloud and

15   corresponding to photographs exchanged over the text message

16   exchanges marked in Government Exhibits 723 and 730,

17   respectively."

18           Paragraph 6, 7 and 8, we can blow all those up.

19           "Government Exhibits 732, 733, and 738 are true and

20   correct calendar entries stored on the Garelick iCloud."

21           "Government Exhibit 734 is a true and correct user

22   account report associated with the Garelick iCloud."

23           "Government Exhibit 735 includes true and correct

24   contact information stored on the Garelick iCloud."

25           Now I'm going to shift to the phone.

1          Paragraph 9 and 10.

2          "Government Exhibits 741-753 are true and correct

3    copies of text message conversations obtained from a cellular

4    device belonging to and used by Bruce Garelick ('the Garelick

5    iPhone')."

6          "Government Exhibits 749A, 749B, and 754 are true and

7    correct photographs stored in the Garelick iPhone."  Government

8    Exhibits 749A and 749B correspond to photographs exchanged over

9    the text message conversation marked as Government Exhibit 749,

10   and Government Exhibit 754 corresponds to a photograph

11   exchanged over the text message conversation marked as

12   Government Exhibit 753."

13         At this time the government offers, to the extent they

14   haven't already been offered into evidence, Government

15   Exhibits 721-731, 736 and 737, 723A, 730A, 732, 733, 738, 734,

16   735, 741-753, and all corresponding subparts.

17         THE COURT:  Any objections?

18         MR. SHAHABIAN:  Pursuant to the stipulation.

19         MR. BROD:  Judge, we do object to this manner of

20   submitting the exhibits.  We had no notice that all of these

21   exhibits were going to come in through this witness all at one

22   go, and so——

23         MR. SHAHABIAN:  If I could be seen at sidebar, your

24   Honor, I think——

25         THE COURT:  Well, we're going to take our lunch break

1    in three minutes.  Is there something that you can do for the

2    three minutes and then I'll hear both counsel, or do you—

3            MR. SHAHABIAN:  It might be a good time to do a little

4    three minutes extra for lunch.  This is the next topic.

5            THE COURT:  All right.  We'll take our lunch break

6    now, members of the jury.  Don't discuss the case amongst

7    yourselves or with anybody else.  Don't do any research into

8    the case.

9            Enjoy your lunch.  Please get back here a couple

10   minutes before 2 so we can get started promptly at 2.  Have a

11   good lunch.

12           THE DEPUTY CLERK:  All rise.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O521GAR4

1      (Jury not present)

2      THE COURT:  You may be seated.

3      Is there any reason why I shouldn't make the two of

4 you meet and confer, Mr. Brod, for you to spend the time

5 looking over the exhibits during lunch and then having you come

6 back here at ten of 2, just the lawyers to this witness being

7 required, and then you can tell me if you've got any objections

8 to specific exhibits?

9      MR. BROD:  Judge, the reason you shouldn't make me do

10 that is because that was already my plan.

11      THE COURT:  Because what?

12      MR. BROD:  That was already my plan was to look over

13 the exhibits in the next few minutes.

14      THE COURT:  Okay.  So I'm sensitive to the request for

15 a full hour for a lunch break.  It is now 12:50.  The

16 government and Mr. Brod should be back here——just

17 Mr. Shahabian——at 1:50 to address any issues with respect to

18 the exhibits.  The rest of you can wander in five minutes

19 later.

20      Anything else?

21      MR. SHAHABIAN:  And just to clarify the record,

22 because it was put on the record that notice was not provided,

23 this was disclosed in the 3500 material that Mr. Isolda had

24 reviewed the entire 700 series, which are the device extraction

25 exhibits.  I just want that on the record.

O521GAR4

1          And in terms of speaking objections in front of the

2   jury, the government would just ask that unless the Court asks

3   for grounds, we refrain from speaking objections.

4          THE COURT:  I don't think that was that bad an

5   infraction.

6          MR. SHAHABIAN:  I don't think so, your Honor.

7          THE COURT:  But you both will stay away from speaking

8   objections.

9          Thank you.  We'll see you all back here after lunch.

10          THE DEPUTY CLERK:  All rise.

11          (Luncheon recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O52Cgar5                    Isolda - Direct

1                        AFTERNOON SESSION

2                            1:55 p.m.

3            (Jury not present)

4            THE COURT:  Mr. Brod, were you able to work out

5       everything?

6            MR. BROD:  We were able to work out a great deal of

7       what we needed to work out.  Since most of these exhibits don't

8       need to come in through this witness, there's an agreement

9       between Mr. Shahabian and myself that he will use certain ones

10      and I'll get back to him this afternoon on the others.

11           MR. SHAHABIAN:  That's correct.

12           THE COURT:  Any issues, Mr. Shahabian, for me to

13      address?

14           MR. SHAHABIAN:  No, your Honor.  I'll withdraw the

15      list of exhibits I offered before lunch and give a revised list

16      that we're offering now at this stage that Mr. Brod and I have

17      agreed upon.

18           THE COURT:  I'm going to step off the bench and I'll

19      be back in a couple minutes.

20           Mr. Bach.

21           MR. BACH:  Judge, we received an email from the

22      government at lunch, a very kind email telling us not to spend

23      time preparing the cross examination for Mr. Monje, who was the

24      general legal advisor of DWAC, unless anticipated to testify

25      this afternoon, so we stopped our prep.  We're waiting to hear

1    more about -- they told us they're very unlikely to call him,

2    we're waiting for that decision.  Your Honor might want to stay

3    here.  I don't know what's happening.

4           We've just been advised in real time that they're now

5    not planning to call Mr. Monje.

6           We would like to make a record on a couple of matters

7    related to that whenever it's convenient for the Court, but as

8    soon as possible.

9           THE COURT:  Since we've got all of the lawyers back

10   here now, you can go ahead and make that record.

11          MR. BACH:  We received additional 3500 material from

12   the government at some point in the wee hours last night.  We

13   reviewed it on the way to court this morning.  It's based on

14   conversations they had with Mr. Monje yesterday after

15   Mr. Wachter's testimony.  They appear to have been exploring

16   issues.  Up until lunch, it was our understanding they planned

17   to call him this afternoon.  At lunch, we were suddenly given

18   this notice.

19          Let me just tell the Court some of the highlights of

20   the 3500 material.  Mr. Monje told them, among other things,

21   that Mr. Wachter came to the office a lot to see Mr. Orlando,

22   that he came to the office during the relevant period, that he

23   didn't know whether any news about the merger announcement was

24   shared or not, but he said that given the relationship between

25   Orlando and Wachter, he advised the government that that was

1    certainly something that could happen, based on the nature of

2    that relationship.  He told the government that Mr. Wachter was

3    always short on cash, and the government showed him some of the

4    legal documents relating to the purported transactions between

5    Mr. Wachter and Zoltan Present.  You may recall that

6    Mr. Wachter testified that Mr. Monje had drafted one of those

7    agreements.  The government asked mister -- it appears the

8    government asked Mr. Monje if that was the case.  He did not

9    remember who drafted it.  He said it could have been here.

10   There are notes here that we don't fully understand about other

11   matters relating to those documents and agreements.  It appears

12   that there were questions about provisions of that agreement

13   and whether they violated or did not violate what was allowed

14   with respect to the restrictions on founders shares.  There

15   were questions about the relationship with Postolnikov.

16   Mr. Monje didn't have, it appears, much to do with

17   Mr. Postolnikov.

18            In any event, I recite this for the Court because the

19   Court has followed this, it's followed the case, it followed

20   our proffer.  The government has made a sudden decision not to

21   call him.  It's their witness, that's their prerogative.

22   Obviously, we feel compelled as defense counsel to at least

23   inquire whether there is a Brady-based reason for that decision

24   that has arisen that has not been disclosed.  This is a rather

25   surprising turn of events for us.  We spent a lot of time

1    preparing for this witness.  We were told they would be a long

2    witness.  I don't have any basis to suggest anything at all

3    inappropriate.  We feel obliged as defense counsel to make this

4    inquiry to see if there is something we don't know for if the

5    government has it believes should be disclosed to us.

6            THE COURT:  I haven't heard anything that gives rise

7    to a basis for me concluding that there's been a Brady

8    violation.  There is no request for relief.  If the government

9    feels compelled, I'll let the government go on the record to

10   say whatever the government wants, but I'm not asking the

11   government to do so because there's no request for relief right

12   now.  What you have told me, Mr. Bach, does tend to confirm me

13   in my belief that I made the right decision in permitting you

14   to engage in the cross examination that you did yesterday,

15   which was extensive, with the witness.

16           Again, I'm not asking the government to say anything.

17   If the government feels like they need to put something on the

18   record, they could do so if they want.

19           MS. HANFT:  Yes, your Honor.  We'll put on the record

20   the familiar refrain, that we're aware of our Brady and Giglio

21   obligations and we've complied with them.  The decision to not

22   call Mr. Monje is not related to anything of the sort.

23           THE COURT:  Where does that leave us for this

24   afternoon?  Where does that leave us with respect to witnesses

25   generally.  I've got the witness list in front of me.  Maybe

1    you can tell me who's left in the government's case.

2              MR. NESSIM:  Yes, your Honor.  For this afternoon, we

3    have Mr. Isolda, who just began his direct testimony.  Then we

4    would turn to Netanel Suissa.  I think, given this, there's a

5    chance, with the Court's permission, that we may end slightly

6    before 5:00 given this change.  However, I think it puts us

7    ahead of our anticipated schedule because we were expecting

8    Mr. Monje to run into tomorrow morning.  Additional witnesses

9    that remain are Benjamin Reed, Peter Melley, Susanna Maj,

10   Daniel Lehan, and Kayla Collins.

11             THE COURT:  Okay.  I take it, from what you said, the

12   witnesses other than Mr. Suissa are not available later this

13   afternoon?

14             MR. NESSIM:  That's correct, your Honor.  I expect the

15   witnesses today will get us to 4:00 and change.

16             THE COURT:  I'm not ordering you to call somebody who

17   you haven't previously designated for today.  Number one, we

18   might be able to use some of the time to discuss some of the

19   issues with respect to the charge.  Number two, since they

20   weren't on the list for the defense to prepare for cross

21   examination, I can understand putting them off for tomorrow,

22   particularly since we're on time.

23             MR. NESSIM:  Thank you, your Honor.

24             THE COURT:  Is there anything else before we bring the

25   witness to the stand and then bring in the jury from the

1   government?

2            MR. SHAHABIAN:  No, your Honor.

3            THE COURT:  Mr. Bach.

4            MR. BACH:  No.  Thank you, your Honor.

5            THE COURT:  Let's get the witness.  Once the witness

6   takes the stand, we'll bring in the jury.

7            (Witness present)

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (Jury present)

2            THE COURT:  The witness may retake the stand.  Counsel

3    may continue examination.  I hope you all had a good lunch.

4            MR. SHAHABIAN:  Thank you, your Honor.

5            Your Honor, at this time, the government is going to

6    withdraw the list of exhibits I rattled off before lunch and

7    offer a revised list of exhibits.

8            At this time, pursuant to the stipulation, the

9    government offers Government Exhibits 742, 743, 745, 746, 749,

10   and 749A and B, 750, 751, 723, 732, 734.

11           THE COURT:  Any objection to any of those?

12           MR. BROD:  No objection.

13           THE COURT:  They're all received.

14           (Government's Exhibits 742, 743, 745, 746, 749, 749A,

15   749B, 750, 751, 723, 732, 734 received in evidence)

16           MR. SHAHABIAN:  Mr. Bianco, we could go back to joint

17   exhibit 3, the phone stipulation and turn to page 2,

18   paragraph 9.

19   BY MR. SHAHABIAN:

20   Q.  Mr. Isolda, were you asked to review Government Exhibits in

21   the 700 series as they were given to you?

22   A.  Yes.

23   Q.  Do you see here in this joint stipulation, the parties

24   agree that certain of exhibits were obtained from a cellular

25   device belonging to and used by Bruce Garelick?

1    A.  I do.

2    Q.  Did you extract an iPhone belonging to and used by Bruce

3    Garelick?

4    A.  I do.

5    Q.  Did you compare the exhibits that you were shown to the

6    extraction that you performed in this case?

7    A.  I did.

8    Q.  And did those look like the same, like the exhibits were

9    from the extraction you performed?

10   A.  Yes, they were.

11   Q.  Were the exhibits the entirety of the phone you extracted?

12   A.  No.

13   Q.  Did you have any role in selecting which of the portions of

14   the extraction were marked as government exhibits?

15   A.  No.

16   Q.  Did you review them?

17   A.  I did.

18          MR. SHAHABIAN:  I'd like to turn to some of them.  If

19   we can start by publishing Government Exhibit 742.

20   Q.  Mr. Isolda, what are we looking at on the cover page of

21   Government Exhibit 742?

22   A.  So this is a Cellbrite report.  In the report shows a

23   WhatsApp conversation that was taken from a Cellbrite report.

24   Q.  What's a Cellbrite report?

25   A.  So as mentioned, Cellbrite is a product that we use to

1   parse and analyze data taken from mobile devices.  So this

2   report shows content and data that was parsed and taken from a

3   mobile device or a cellphone.

4   Q.  And is this particular exhibit from the cellphone that the

5   parties stipulated is the Garelick iPhone?

6   A.  It is.

7   Q.  You said this is a chat from that phone.  How do you know

8   that?

9   A.  It says "WhatsApp" on the top, as well as in the source

10  section, it quotes "WhatsApp."

11  Q.  What is WhatsApp?

12  A.  WhatsApp is a common chat application that's used to

13  message other people, create group chats, send files such as

14  photos, videos, or any file type of that matter.

15  Q.  Does this Cellbrite report display who the participants

16  were in this chat?

17  A.  It does.

18  Q.  Where are the participants?

19  A.  The participants are located towards the bottom of the

20  page.

21          MR. SHAHABIAN:  If, Mr. Bianco, we could blow up the

22  portion labeled "participants" and then the two phone numbers

23  below that.

24  Q.  Is this the portion of the page you were referring to,

25  Mr. Isolda?

1    A.   It is.

2    Q.   What's displayed here in the Cellbrite report?

3    A.   So these are the participants of the WhatsApp conversation

4    listed as Bruce G, and Postolnikov, Anton.

5    Q.   What is the owner in parentheses next to Bruce G mean?

6    A.   The owner in parentheses means this was the owner of the

7    device.  So this is the side of the conversation that the user

8    was sending messages from.

9    Q.   What is the number above Bruce G's name mean?

10   A.   So that's the WhatsApp ID correlated to that WhatsApp

11   account.

12   Q.   What's a WhatsApp account?

13   A.   A WhatsApp account is the account a user would use to

14   access what's happening and send messages back and forth.

15   Q.   What's the number above the name Postolnikov, Anton?

16   A.   That is also a WhatsApp ID.

17           MR. SHAHABIAN:  We can go back to the full screen,

18   Mr. Bianco.

19   Q.   I just want to look at a little more of the text on this

20   page, Mr. Isolda, so we can understand what a Cellbrite report

21   looks like.  Do you see details of group photos, what's

22   displayed there?

23   A.   That's a photograph.

24   Q.   Is that part of the chat?

25   A.   Yes.

1    Q.  And you see "start time" and "last activity"?

2    A.  I do.

3    Q.  What does that mean?

4    A.  So "start time" indicates when the conversation was

5    started, so the inception of that conversation.  "Last

6    activity" is the last activity that was recorded in this

7    conversation.  So that could be a message being sent, a picture

8    being sent.

9    Q.  Do you see "UTC minus 4" next to the timestamp?

10   A.  I do.

11   Q.  What does that mean?

12   A.  That is the time zone offset that the message or the

13   activity was recorded at.

14   Q.  What's a time zone offset?

15   A.  That essentially offsets the universal time zone to pair it

16   to a location that the device is in.

17   Q.  Such as Eastern Time?

18   A.  Correct.

19        MR. SHAHABIAN:  We can unminimize this, Mr. Bianco.

20   Q.  If we turn to the next page of this exhibit, what are we

21   looking at on this page, Mr. Isolda?

22   A.  This page shows the chat messages from the conversation

23   that we were just looking at, and it's the back and forth

24   messages going and coming.

25   Q.  What do the green bubbles represent?

1    A.  The green bubbles represent outgoing messages.  So that is

2    messages that the device was sending or the user on the device

3    was sending.  Blue messages on the left indicate incoming

4    messages, messages that were received.

5    Q.  And so, just to be clear, who sent in this chat, the green

6    messages in this exhibit?

7    A.  So the green messages on the right is from Bruce G, and it

8    was to Postolnikov, Anton.

9    Q.  Let's start with that message.

10          MR. SHAHABIAN:  If we could blow that up, Mr. Bianco.

11   Q.  How do you know this green bubble was sent by Bruce G?

12   A.  In the "from" section, it has "Bruce G" listed.

13   Q.  How do you know this was sent to Anton Postolnikov?

14   A.  It has a "to" section that has Postolnikov, Anton.

15   Q.  What was the date of this message?

16   A.  This message was June 28th of 2021.

17   Q.  How do you know that?

18   A.  In the bottom-right corner, you can see when the message

19   was sent.

20   Q.  Do you see the notation "delivered" in the middle of the

21   scene?

22   A.  I do.

23   Q.  What does that mean?

24   A.  That is when the message was delivered to the user's device

25   that it was being sent to.

1  Q.  Do you see the box that says "read" next to it?

2  A.  I do.

3  Q.  What's the date for "read"?

4  A.  The date for "read" is December 10th, 2021.

5  Q.  Do you have any understanding why the date would be

6  December 10th when it's delivered June 28th?

7  A.  That could be that the message was read on December 10th of

8  2021.  It could also be from settings being changed within

9  WhatsApp on the device.

10         MR. SHAHABIAN:  I'd like to look at the body of the

11  message that Bruce G sent to Anton Postolnikov, if we could

12  keep that up, Mr. Bianco, on June 28th, 2021.

13  Q.  What's the body of this message?

14  A.  The body of this message is the third row of text, and

15  below that, as well.

16  Q.  Could you read the message that was sent from Bruce G to

17  Postolnikov, Anton.

18  A.  Sure.  It says, "Hey Anton, it's Bruce.  Are you all set on

19  DWAC?  Trump's back.  What did you decide to do?"

20         MR. SHAHABIAN:  If we could take that down,

21  Mr. Bianco.

22         If we go to the next message and we blow that up.

23  Q.  What is this message, Mr. Isolda?

24  A.  This is a system message that gets put into every WhatsApp

25  conversation at the start.  It gets put there by WhatsApp just

1  to say that the messages are end-to-end encrypted.

2  Q.  What does it mean that the messages are end-to-end

3  encrypted?

4  A.  That the message is sent and the encrypted data is sent

5  encrypted so it can't be intercepted and read through the air.

6          MR. SHAHABIAN:  We can take this down.

7  Q.  Is there a response in the chat?

8  A.  There is.

9  Q.  Where is the response?

10 A.  The response is in the bottom-left of this page.

11 Q.  Who sent the response?

12 A.  The response was from Postolnikov, Anton.

13 Q.  And who is it sent to?

14 A.  This was sent to Bruce G.  It's from the same conversation.

15 Q.  How do you know this was sent to Bruce G if it doesn't say

16 that in this bubble?

17 A.  Cellbrite, in conversations such as this one, groups

18 messages in the conversation it belongs to.  It shows all the

19 messages that were sent in this one chat thread.

20 Q.  And what does Postolnikov, Anton say in response to the

21 question, "Are you all set on DWAC?  Trump's back.  What did

22 you decide to do?"

23 A.  The response is, "Hi Bruce."

24          MR. SHAHABIAN:  If we go to the next message,

25 Mr. Bianco.

1    Q.  Is there a second message after, "Hi Bruce"?

2    A.  There is.

3    Q.  What does it say?

4    A.  It says, "Let me dial you in a few hours."

5            MR. SHAHABIAN:  We can take that down, Mr. Bianco.

6    Q.  Does the owner of the phone respond to Mr. Postolnikov

7    saying, "Let me dial you in a few hours"?

8    A.  They do.

9    Q.  Where is that response?

10   A.  That's on the right side in the green bubble.

11   Q.  What's the response?

12   A.  The response is:  "Sounds good.  I'll free up at 5:30 p.m."

13           MR. SHAHABIAN:  You can take that down, Mr. Bianco.

14   Q.  So now that we've oriented how the Cellbrite report works,

15   I'd like to read through this chat.  If you could read the

16   portions in green, Bruce G, and I'll read the portions in blue

17   in response.

18   A.  Sure.

19   Q.  We could start with the next message on June 28th, 2021.

20   "Q.  Hi Bruce.  Quick call.

21   "A.  Are you free tomorrow morning?

22   "Q.  Yes.  Sure.  Call you in the morning.

23           MR. SHAHABIAN:  If we could stop there for a second.

24   Q.  Do you see the date of that last message?

25   A.  Yes.

1    Q.   What's the date?

2    A.   That date is June 28th of 2021.

3              MR. SHAHABIAN:  Let's go to the next message,

4    Mr. Bianco.

5    Q.   What's the date of this message, Mr. Isolda?

6    A.   This is June 30th of 2021.

7    Q.   Two days later?

8    A.   Correct.

9    Q.   Let's continue the conversation on June 30th, 2021.  Again,

10   you could read the green bubbles and I'll read the blue

11   bubbles?

12   A.   Sure.

13   "A.   Anton Patrick Orlando's other SPAC tickers are ZGYH, BENE,

14   and MAQC.  The latter two are fairly new and have not yet

15   announced targets.  ZGHY recently announced a target.  The

16   stock has marginally traded up on that announcement.

17   "Q.   Yeah.  Not much on ZGYH.

18             MR. BROD:  Objection.

19             THE COURT:  What's the objection?

20             MR. BROD:  I may have misheard it.  Withdrawn.

21             THE COURT:  You can continue.

22             MR. SHAHABIAN:  To continue the conversation on June

23   30th, Mr. Isolda, we published this document.  If you can read

24   the green portions, I think you just read the green bubble,

25   I'll read the blue bubbles for Mr. Postolnikov.

"Q.  Yeah, not much on ZGYH.  Not much.  1850 shares traded per

day volume.  Let's just hope the merger is with you know who,

otherwise won't get much traction.

"A.  If the merger is not the plan A, we'd exercise our

redemption rights.

"Q.  Are you guys going with redeemable option, as well?

"A.  Yes, 50 percent $5 founders redeemable and 50 percent $10

IPO.

"Q.  Nice.  Mike told me you are going to be on the board.

"A.  Hopefully.  Awaiting approval.  Probably more a front row

seat babysitting job, but well worth it for an unconventional

investment like this.

Q.  What's the date on that last message, Mr. Isolda?

A.  The date on this last message is June 30th of 2021.

          MR. SHAHABIAN:  If we go to the next message,

Mr. Bianco.

Q.  What's the date of this next message, Mr. Isolda?

A.  This is July 20th of 2021.

Q.  So we've gone forward in time about 20 days?

A.  Correct, approximately.

Q.  Again, for clarity, I'll read the blue messages from

Postolnikov, Anton, if you could read the green messages from

Bruce G.

"Q.  Hi Bruce.  How is it going?  Do you know when Patrick's

SPAC goes public?  Public.

1   "A.  Last I heard, they are just waiting on the final SEC

2   sign-off, should be soon.

3   "Q.  All right.  How did you guys invest?

4   "A.  We invested 400K in the founder class, finalizing the IPO

5   paperwork for another 400K.

6   "Q.  You went small.

7   "A.  Not as big as you, man.  Haha.  Did you invest in the IPO

8   shares?  $10?

9   "Q.  Yes.  We went for 4.5 in founder shares and .5 in

10  warrants.  5 will be in the pre-IPO.

11          MR. SHAHABIAN:  We can take this down, Mr. Bianco.

12          We could go to Government Exhibit 743 and publish

13  that.

14  Q.  Do you see what's on Government Exhibit 743, Mr. Isolda?

15  A.  I do.

16  Q.  What is this?

17  A.  This is also a WhatsApp conversation.

18  Q.  Who are the participants in this WhatsApp conversation?

19  A.  In this WhatsApp chat, the participants are Bruce G;

20  Kouperman Sasha Alexander; Pruzansky, Jon; and Shvartsman,

21  Michael.

22  Q.  What kind of a conversation is this, Mr. Isolda?

23  A.  This is a group chat.

24  Q.  What's a group chat?

25  A.  A group chat is considered to be multiple people.  So more

1    than two, it's not just one-on-one, it's multiple participants.

2    Q.  Can participants in a group chat give a name to the group

3    chat?

4    A.  Yes, you can name the group chat.

5          MR. SHAHABIAN:  We can go back to the full screen,

6    Mr. Bianco.

7    Q.  Did this group chat have a name?

8    A.  It did.

9    Q.  Where do you see that?

10   A.  You see that on the top portion of this page.  The name is

11   Trump Media Group SPAC.

12         MR. SHAHABIAN:  You can take this down, Mr. Bianco.

13         If we can blow up the first message on this page,

14   Mr. Bianco.

15   Q.  What's this message, Mr. Isolda?

16   A.  So this is a system message from WhatsApp when a group chat

17   gets created and given a name.

18   Q.  Could you read the body of the system message in this chat.

19   A.  Sure.  It says, Bruce G, 17818015950, so the WhatsApp ID,

20   created the group: Trump Media Group SPAC.

21   Q.  What's the date that this group chat was created by

22   Bruce G?

23   A.  This was on June 30th of 2021.

24         MR. SHAHABIAN:  If we go to page 2 of this chat.

25   Q.  What does the green bubble on this page represent,

1   Mr. Isolda?

2   A.   This represents an outgoing message to the group chat sent

3   by Bruce G.

4   Q.   How do you know this was sent to the entire group chat?

5   A.   In the green bubble, you can see the "to" line and who the

6   message is being sent to, which is also the same as the

7   participants listed in the group chat above.

8           MR. SHAHABIAN:   If we could blow up just the green

9   bubble, Mr. Bianco.

10  Q.   Where does this green bubble display that it was sent by

11  Bruce G?

12  A.   In the "from" line on the top.

13  Q.   Where does it show it was sent to?

14  A.   In the three "to" lines listed.

15  Q.   Who was it sent by?

16  A.   It was sent by Bruce G.

17  Q.   Where is the body of the message in this chat?

18  A.   The body is starting from the fifth line down.

19  Q.   Could you read the body of the message that Bruce G sent to

20  the group chat?

21  A.   The body says, Sasha/John, Michael and I wanted to share

22  with you an interesting investment opportunity, no ax to grind.

23  Just think this is a sweetheart deal with protected downside

24  and some crazy speculative upside.  Plus, it will be fairly

25  liquid.   It involves founder shares of assumed IPO SPAC that

1   has an exclusive with the soon to launch Trump Media Group,

2   TMG.  No guarantee the Trump deal happens, but the speculative

3   upside is huge if it does and downside is protected.  Let me

4   know if you want to discuss.  We will need to know today if you

5   want in.

6           MR. SHAHABIAN:  You can take this down, Mr. Bianco.

7           You can publish Government Exhibit 745.

8   Q.  What is Government Exhibit 745, Mr. Isolda?

9   A.  So this is a singular message taken from a WhatsApp

10  conversation.

11  Q.  Why does this look different from the green and blue text

12  bubbles we were looking at on the other exhibits?

13  A.  This looks different because it's one message taken from a

14  conversation rather than the entire portions of the

15  conversation going back and forth.

16  Q.  This is one message taken from a longer conversation?

17  A.  Yes.

18  Q.  And to be clear, did you have any role in deciding which

19  messages would be taken out of particular conversations?

20  A.  I did not.

21  Q.  What kind of message is displayed in Government Exhibit

22  745?

23  A.  This is a WhatsApp message.

24  Q.  How do you know that?

25  A.  The source on the left shows "WhatsApp."

1    Q.  Who's the message from?

2    A.  The message is from Bruce G.

3    Q.  And who's it to?

4    A.  To Shvartsman, Michael.

5    Q.  What's the date of the message?

6    A.  The date is August 30th of 2021.

7    Q.  Where's the body of the message?

8    A.  The body is listed under the content field.  It says,

9    "body:" and the body is listed after.

10   Q.  You see it says, "direction, outgoing"?

11   A.  Yes.

12   Q.  What does that mean?

13   A.  That means that it was an outgoing message.  So it was

14   "sent" message by the user.

15   Q.  Who's the user on this exhibit?

16   A.  Bruce G was the user.

17   Q.  What's the body of the message that Bruce G sent to

18   Shvartsman, Michael on August 30th, 2021?

19   A.  Mike, our paperwork for the DWAC IPO is now complete.  Do

20   we still want to invest 400K in the $10 IPO shares?  Recall, we

21   downsized our founders class investment from 400K to 125K.

22   Also recall, we are playing the IPO/warrants as far more of a

23   short-term trader.

24            MR. SHAHABIAN:  We can take that down, Mr. Bianco.

25            If we could turn to publishing Government Exhibit 746.

1    Q.  What is Government Exhibit 746, Mr. Isolda?

2    A.  This is similar to the last exhibit.  It's a singular

3    message taken from a WhatsApp conversation.

4    Q.  Who are the participants in this WhatsApp conversation?

5    A.  The participants are Bruce G and Shvartsman, Michael.

6    Q.  Are those the same participants as the last message we just

7    looked at?

8    A.  Correct.

9    Q.  What's the date of this particular message?

10   A.  This message is September 20th of 2021.

11   Q.  Who sent the message?

12   A.  The message was sent by Bruce G.

13   Q.  Who did he send it to?

14   A.  Shvartsman, Michael.

15   Q.  Could you read the body of the message that Bruce G sent to

16   Shvartsman, Michael on September 20th, 2021.

17   A.  FYI, I have a DWAC BOD meeting tomorrow at 12:30.  I

18   recommend starting to buy more DWAC used stock.  Recall, we

19   only own 145K worth of 400K target position size.  Your

20   RBC/E.F. Hutton account was funded with 400K.  You can buy more

21   by calling Ben Reed, E.F. Hutton 607-761-0331.

22            MR. SHAHABIAN:  You can take this down, Mr. Bianco.

23            If we could turn to Government Exhibit 750.

24   Q.  Do you recognize Government Exhibit 750, Mr. Isolda?

25   A.  I do.

1    Q.   What is this?

2    A.   This is a chat conversation taken from a Cellbrite report

3    of a native messaging chat thread.

4    Q.   What is a native messaging chat thread?

5    A.   So when Cellbrite says it's a native messaging.  You can

6    think of native messages on an iPhone such as iMessage or text

7    messages.  For an Android, it would be texting back and forth.

8            MR. SHAHABIAN:  Mr. Bianco, could we just blow up the

9    "native messages" portion at the top.

10   Q.   What's the difference between a native message, like

11   iMessage, and a WhatsApp?

12   A.   WhatsApp is a third-party application that you have to

13   install whereas iMessage or text messages is built into the

14   phone.

15   Q.   Who are the participants in this native message chat?

16   A.   The participants are Justin Friedberg and Bruce Garelick.

17   Q.   What does the (owner designation) mean next to Bruce

18   Garelick?

19   A.   The parenthesis owner, that's the owner of the device that

20   this conversation was taken from.

21   Q.   Why did the owner for the WhatsApp chats say "Bruce G" and

22   this one says "Bruce Garelick"?

23   A.   The WhatsApp user name could be set as "Bruce G."  The

24   WhatsApp could have been changed based on what the user set

25   that username as.

1    Q.   What's the number above "Bruce Garelick" mean?

2    A.   The number above "Bruce Garelick" is the phone number

3    that's associated with that text message.

4             MR. SHAHABIAN:  We can go back to the full screen,

5    Mr. Bianco.  If you go to the first message in this chat chain.

6    Q.   What does the blue bubble on this exhibit mean?

7    A.   So that's an incoming message.

8    Q.   What is an incoming message?

9    A.   So the owner of the device.  So Bruce Garelick in this

10   instance is receiving a message from Justin Friedberg.

11   Q.   What's the date of this message?

12   A.   This message is October 21st, 2021.

13   Q.   What's the body of the message that Justin Friedberg sent

14   to Bruce Garelick on October 21st, 2021?

15   A.   It says:  "You didn't even tell me about that stock.  So

16   mad now."

17            MR. SHAHABIAN:  We can go to the next page,

18   Mr. Bianco.

19   Q.   What's the difference between the blue and green bubbles on

20   Government Exhibit 750?

21   A.   So, similar to how WhatsApp was shown in the last couple

22   reports, the blue is incoming messages, so messages being

23   received, and the green is outgoing messages, so messages that

24   the owner of the device was sending.

25   Q.   What's the date of the first blue message on the top of the

1    screen?

2    A.  The date is October 22nd of 2021.

3    Q.  Who's it sent by?

4    A.  It was sent by Justin Friedberg.

5    Q.  Who's it sent to?

6    A.  Bruce Garelick.

7    Q.  Similar to the prior chat thread, I'll read the blue text

8    messages sent from Justin Friedberg, if you could read the

9    green messages sent by Bruce Garelick.

10   A.  Sure.

11   "Q.  How did you guys get those founder shares?  That one

12   hurts.  Next time, let me know, please.

13   "A.  We talked about it, didn't we?

14        MR. SHAHABIAN:  You can keep going, Mr. Bianco.

15   "Q.  Nope.  You forgot about me.

16   "A.  Never forget about you.

17   "Q.  It was privately you guys went in?  When do you guys leave

18   Vegas?

19   "A.  I leave Sunday.  Michelle is staying through part of next

20   week for the Money 2020 conference.

21   "Q.  Nice.  So how does that founder share stuff work?  I got

22   to do more of this shit with you, man.  Major fomo.

23   "A.  Founder shares are discounted shares in the SPAC sponsor

24   before the SPAC IPO.  $5 versus normal $10.  The catch is you

25   get locked up for six months.  Apologies if we failed to

1  mention this to you.

2  "Q.  When did you guys do it?  It's fine.  Shit happens.  Don't

3  let it happen again.  This is why we talk about the SPV 401K

4  idea next week.  Obviously different to agree, but still the

5  opportunity is limitless.

6  "A.  It's Michael's business, man.  I keep a tight lid on what

7  he does, unless he tells me to share it.  In this case, he did

8  tell me to socialize it to his normal network of investor

9  peeps.  Perhaps I should have proactively thought of you.

10  "Q.  It's all good, brother.  Lol.  Let's just talk about the

11  401K SPV stuff next week.  Locked up for six months?  This

12  thing will pump again for sure.  It's effing Trump.

13  "A.  Let's just talk about the 401K SPV stuff next week.

14          MR. SHAHABIAN:  If we stop there for a second,

15  Mr. Bianco.

16  Q.  What does the "liked" designation mean in a chat like this

17  mean?

18  A.  This is how Cellbrite shows if you "thumbs up" a message in

19  native messages, so if you "thumbs up" an iMessage, this is how

20  Cellbrite shows that to you.

21          MR. SHAHABIAN:  We can keep going with the thread.

22  Again, I'll read the blue from Justin Friedberg if you could

23  read the green from Bruce Garelick.

24  "Q.  The next president of the United States again.  You make

25  out like a bandit.

 1   "A.  I did okay, but unfortunately had to restrict myself a

 2   month ago due to my involvement on the board of directors of

 3   the SPAC.  So it's very limited in what I could buy.

 4   "Q.  Very cool, Mr. Board of directors.  How is the suite and

 5   meetings.  Solid.

 6   "A.  Wish I wasn't on the BOD.  Severely restricted what I

 7   could do.

 8   "Q.  Oh, so Rocket is very involved, I assume.  That's standard

 9   to restrict board members like that?

10   "A.  Yup.  Took one for the team.

11   "Q.  Lol.  It will be okay, Bruce.

12   "A.  Haha.  All good, man.  No complaints.

13   Q.  What's the date of the last message in this text exchange?

14   A.  The last text message is on October 22nd, 2021.

15           MR. SHAHABIAN:  If we could go to Government Exhibit

16   751.

17   Q.  What is Government Exhibit 751, Mr. Isolda?

18   A.  This is a singular text message taken from a native message

19   chat thread.

20   Q.  How do you know this is from a native message chat thread?

21   A.  It someplace that under the source column.

22   Q.  Who is the message from?

23   A.  The message is from Bruce Garelick.

24   Q.  Who's it to?

25   A.  It's to Deirdre Oshea.

1    Q.  What's the date of this singular message?

2    A.  The date of this message is October 21st, 2021.

3    Q.  Is that day before the end of the text chat we were just

4    looking at in Government Exhibit 750?

5    A.  I believe so.

6            MR. SHAHABIAN:  Mr. Bianco, if we could blow up the

7    body of this message.

8    Q.  Who sent this message, Mr. Isolda?

9    A.  This was sent by Bruce Garelick.

10   Q.  Who's it to?

11   A.  This was to Deirdre Oshea.

12   Q.  Could you read the body of the message that Bruce Garelick

13   sent to Deirdre Oshea on October 21st, 2021.

14   A.  Hey baby.  I'm still in meetings.  But will come up for air

15   in a couple hours and call.  Big day today — my Trump SPAC

16   traded up 400 percent today.  We made $20 million on it.  The

17   New York Times called me for comment... which I said no

18   comment.  Not publicity I need.  Haha.

19           MR. SHAHABIAN:  We can take this down, Mr. Bianco.

20   Q.  So the exhibits we just went through, Mr. Isolda, were all

21   from the Garelick iPhone?

22   A.  Correct.

23   Q.  I'd like to turn to the iCloud account you mentioned

24   previously.

25   A.  Sure.

1          MR. SHAHABIAN:  If we can go back to the stipulation,

2     which is joint exhibit 3.  I'll read paragraph 4.

3          Government Exhibits 721 and other numbers are true and

4     correct copies of text message conversations obtained from an

5     Apple iCloud backup stored in Bruce Garelick's Apple iCloud

6     account, the Garelick iCloud.

7     Q.  Did you review text messages and other data from the

8     Garelick iCloud account that were marked as Government

9     Exhibits?

10    A.  I did.

11    Q.  Did you perform the analysis of that iCloud account?

12    A.  I did not.

13    Q.  Did you compare the Government Exhibits to the analysis

14    that was performed on the Garelick iCloud account?

15    A.  I did.

16    Q.  And did you confirm that these are from the Garelick iCloud

17    account?

18    A.  I did.

19         MR. SHAHABIAN:  I'd like to turn to some of the iCloud

20    exhibits.  If we could publish Government Exhibit 723.

21    Q.  What is Government Exhibit 723, Mr. Isolda?

22    A.  This is a Cellbrite report that was taken from the iCloud

23    backup, or the iCloud return, that includes a chat from the

24    native messages.

25    Q.  How do you know this is from the iCloud account?

1   A.   At the top of the page, it says Apple iCloud backup.

2   Q.   How do you know this is a native message from the backup?

3   A.   In the content section, you can see that it's considered a

4   chat in the native message.

5   Q.   How many chats are in Government Exhibit 723?

6   A.   This exhibit has one chat.

7   Q.   How do you know that?

8   A.   It says "include in report" with the number 1.

9   Q.   Was that the only chat that was available on this iCloud

10  account?

11  A.   It was not.

12  Q.   How many were available?

13  A.   349.

14  Q.   Did you participate in the selection of this chat from the

15  iCloud account?

16  A.   I did not.

17          MR. SHAHABIAN:  Mr. Bianco, if we could go to the

18  bottom of the same page.

19  Q.   Who are the participants in this chat, Mr. Isolda?

20  A.   The participants are Michael Shvartsman, the number

21  847-560-1793, and BJG@GarelickCapital.com.

22  Q.   What does it mean when there's a participant that has a

23  number listed, but no name?

24  A.   That means that the contact for that number doesn't have an

25  associated name and there's most likely not a contact saved for

1    that number.

2    Q.  So like an unsaved phone number?

3    A.  Correct.

4    Q.  What about below that where there's an email address,

5    BJG@GarelickCapital.com, but no name?

6    A.  So in iMessage, the Apple text messaging protocol, you can

7    send messages with an email account linked.

8    Q.  Can you tell from the Cellbrite report who the owner of

9    this chat exchange is, what iCloud account it's from?

10   A.  The account listed is BJG@GarelickCapital.com.

11   Q.  Does it tell you if the iCloud data that's displayed came

12   from another device?

13   A.  It does.

14   Q.  Where does it say that?

15   A.  In the source file, it shows which device this came from in

16   the iCloud account.

17   Q.  What does it say for this particular Government Exhibit?

18   A.  It shows the name of the device, which is BG iPhone 11.  In

19   the parenthesis next to that, that's the actual model of the

20   phone, which is an iPhone 11 Pro Max.

21   Q.  What does that mean in the context of data from an iCloud

22   account?

23   A.  This shows that this message thread was taken from a device

24   backup in the iCloud account with the name and model listed

25   above.

1    Q.  So like an iPhone that's being backed up to the iCloud?

2    A.  Correct.

3              MR. SHAHABIAN:  If we turn to the body of this chat

4    exchange.

5    Q.  What does the blue bubble on the screen represent?

6    A.  This is a message being received.

7    Q.  Who's it sent from?

8    A.  It's sent from the phone number that ends in 1793.

9    Q.  Who's it sent to?

10   A.  It was sent to BJG@GarelickCapital.com and Michael

11   Shvartsman.

12   Q.  What's the date of this message?

13   A.  The date of this message is June 23rd, 2021.

14   Q.  Where's the body of the message?

15   A.  The body of the message starts four lines down.

16   Q.  Could you read — and I know this is a longer message, the

17   body of the message that 793 phone number sent to BJG and

18   Michael Shvartsman.

19   A.  Sure.  Thoughts on TMG.  DT hyped up his from-the-desk of

20   Donald Trump social media platform and it tanked.  Was an

21   embarrassment.  A president cannot use his public political

22   position for his own personal financial gains.  Considered, he

23   may run for president, but never win.  If DeSantis wins on

24   another ticket, he will destroy him.  This will allow DT do

25   whatever he wants and be the best case scenario for this social

1    media platform.  Next thing to consider.  Is there even a

2    social media platform?  Do they have tech plans?  If they do,

3    what are they and can it be successful out of the gate in terms

4    of adoption by other key political figures/social media

5    figures.  If it's just an app with forever Trumpers, this can

6    easily be a bust.  Many Americans, even staunt, conservative

7    political figures may not create accounts for obvious risks to

8    reputation/not share.  Republican party is going to want to get

9    in bed again with DT unless it's absolutely necessary.

10   Thinking for themselves/party progression.  More thoughts.

11   Michael, do you think we can actually help with tech

12   development when Trump decision-makers go for it/ability to

13   reuse components of job leo.  Can you trust this?  Let's make

14   it happen at all costs type dude.  Forget his name to do this

15   the right way.  And would you ever be associated with this as a

16   founder in case it goes up in literal flames?

17            MR. SHAHABIAN:  We can go back to the full screen,

18   Mr. Bianco.

19            If we turn to page 4 of this exhibit and blow up the

20   blue bubble.

21   Q.  What's the date of this message, Mr. Isolda?

22   A.  This is June 30th, 2021.

23   Q.  Is that a week after the last message we just looked at?

24   A.  Yes.

25   Q.  Who's the message from?

1  A.  It's from the same sender as the last message, phone number

2  ending in 1793.

3  Q.  Who's it to?

4  A.  It's to BJG@GarelickCapital and Michael Shvartsman.

5  Q.  What's the body of the message?

6  A.  Fresh off the Wall Street Journal.

7  Q.  Do you see below that there's some attachments and some

8  text?

9  A.  Yes.

10  Q.  What does that mean?

11  A.  That means that this message was sent with an attachment.

12  Q.  What's an attachment?

13  A.  An attachment can be a piece of media, a file, you can

14  think of like a picture or a video being sent via text

15  messages.

16  Q.  What kind of attachment is sent with this "fresh off the

17  Wall Street Journal" text?

18  A.  This was a picture.

19  Q.  How can you tell it's a picture?

20  A.  The file extension .JPG signifies a picture.

21      MR. SHAHABIAN:  I'm going to read into the record —

22  you don't have to bring it up, Mr. Bianco — a portion of the

23  stipulation, joint exhibit 3, this is paragraph 5.

24      Government Exhibit 723A and 730A are true and correct

25  photographs stored in the Garelick iCloud and corresponding to

1   photographs exchanged over the text message exchange marked as

2   Government Exhibits 723 and 730 respectively.

3              Now that we looked at 723, I want to go to 723A.  If

4   we can publish that, Mr. Bianco, side by side.

5   Q.  Is Government Exhibit 723A the attachment that was sent in

6   this text chain, Mr. Isolda?

7   A.  Yes.

8   Q.  And what does 723A appear to say?

9   A.  It says:  Breaking news.  The Trump Organization and its

10  CFO are expected to be charged with tax-related crimes by

11  Manhattan DA Thursday, say people familiar with the matter.

12  Q.  Is this the image that was sent to the text chain on June

13  30th, 2021?

14  A.  Yes, this is the attached image.

15             MR. SHAHABIAN:  We can take the image down,

16  Mr. Bianco.

17  Q.  If we go back to the text chain and we go to the next

18  message, what is the next message in the text chain,

19  Mr. Isolda?

20  A.  It is a message from the number ending in 1793, but saying

21  would something like impact their ability to take a co public

22  right now.

23             MR. SHAHABIAN:  If we go to the next message,

24  Mr. Bianco.

25  Q.  What does the green bubble in this exhibit represent,

1    Mr. Isolda?

2    A.   This is a message being sent from that device.

3    Q.   Who's the sender?

4    A.   BJG@GarelickCapital.com.

5    Q.   What is the response from BJG?

6    A.   Yes, there's certainly risk.  The SPAC does not get the

7    Trump Media Group for a variety of reasons.  However, we have

8    downside protection from the structure of the investment.

9             MR. SHAHABIAN:  We can take this down, Mr. Bianco.

10            Let's publish Government Exhibit 732 from the Garelick

11   iCloud account.

12   Q.   What is this, Mr. Isolda?

13   A.   This is a Cellbrite report from the iCloud return report.

14   Q.   What kind of data is in Government Exhibit 732?

15   A.   These are excerpts from the calendar application that was

16   backed up to the iCloud.

17   Q.   What are calendar entries in an iCloud?

18   A.   So those are the entries that a user would put into their

19   calendar for a date and time or a topic of what the meeting or

20   the calendar entry is about.

21   Q.   I'm not going to have you go through the whole calendar log

22   here, but just to show how this works, could we go to page 4,

23   line 7.  What does "start time" and "end time" mean in line 7,

24   Mr. Isolda?

25   A.   That's the date and time that the calendar entry was listed

1    as in the calendar application.

2    Q.  What's the start time and end time of this calendar entry?

3    A.  The start time is September 21st, 2021, at 12:30 p.m. and

4    the end time is September 21st of 2021 at 1:30 p.m.

5              MR. SHAHABIAN:  If we go to the next bubble,

6    Mr. Bianco.

7    Q.  What's the subject of this calendar entry on September

8    21st?

9    A.  The subject is DWAC board of directors meeting.

10             MR. SHAHABIAN:  We can go back to the full screen,

11   Mr. Bianco.

12   Q.  You don't have to read them all, Mr. Isolda, but all the

13   "mail to" and "names" under "attendees," what does that mean?

14   A.  Those are the attendees or potential attendees of the

15   calendar event that's posted here.

16   Q.  So, for example, "mail to," the fourth line,

17   Bruce@RocketOneCapital.com — Bruce@RocketOneCapital.com, would

18   that be an invitee to this calendar entry?

19   A.  Correct.

20   Q.  And do you see under "details," there's text listed in the

21   calendar entry?

22   A.  I do.

23   Q.  What does that text mean?

24   A.  So this is the body of that calendar meeting or the

25   calendar event.

1    Q.  And you see where it says "join Zoom meeting" below?

2    A.  I do.

3    Q.  What does that mean?

4    A.  "Join Zoom meeting," Zoom is a common application used for

5    online meetings and there seems to be a link below to join the

6    Zoom meeting.

7           MR. SHAHABIAN:  We can take this down, Mr. Bianco.

8           If we go to Government Exhibit 734.

9    Q.  What is Government Exhibit 734, Mr. Isolda?

10   A.  This is an excerpt of the user accounts that were saved in

11   the iCloud return.

12   Q.  What are user accounts?

13   A.  User accounts are user names or email addresses that are

14   used to log into certain services or applications on the phone.

15   Q.  These are all user accounts associated with the iCloud

16   account?

17   A.  Correct.

18          MR. SHAHABIAN:  We can take this down, Mr. Bianco.

19          If we could publish Government Exhibit 735,

20   Mr. Bianco.

21   Q.  What is Government Exhibit 735, Mr. Isolda?

22   A.  This is also an excerpt from the iCloud return that

23   contains contacts from the iCloud.

24   Q.  What are contacts?

25   A.  Contacts are pretty much contact information or information

1    about a user that you want saved about someone.

2    Q.  How many contacts are in Government Exhibit 735?

3    A.  19.

4    Q.  How many are available in the iCloud account?

5    A.  9,443.

6    Q.  Did you have any role in selecting the 19 in this exhibit?

7    A.  I did not.

8             MR. SHAHABIAN:  If I could have a moment, your Honor.

9             THE COURT:  You can.

10            (Pause)

11            MR. SHAHABIAN:  One more exhibit.  Sorry for the false

12   alarm, Mr. Isolda.

13            Actually going to go back to the phone, one exhibit I

14   forgot, Government Exhibit 749.  If we could publish that.

15   Q.  What is Government Exhibit 749?

16   A.  So these are messages from a WhatsApp conversation from the

17   Garelick iPhone.

18   Q.  How do you know this is from a WhatsApp conversation?

19   A.  There are WhatsApp IDs listed.  There's also WhatsApp in

20   the source information.

21            MR. SHAHABIAN:  If we can blow up the participants,

22   Mr. Bianco.

23   Q.  Who are the participants in this WhatsApp chain?

24   A.  So the participants are Bruce G; Shvartsman, Michael;

25   Beyer, Allen; Hoyt, Ryan; Phil Margolin; Hannelius, Eric.

1   Q.  What kind of message exchange is this, Mr. Isolda?

2   A.  This would be considered a group chat.

3   Q.  What does the "owner" designation next to Bruce G's name

4   mean?

5   A.  That's just the account that was logged into the device

6   that was being extracted.

7   Q.  What does "admin" next to Shvartsman, Michael's name mean?

8   A.  That usually signifies the admin of the group chat.

9            MR. SHAHABIAN:  If we go to the second message of this

10  group chat.

11  Q.  What is this, Mr. Isolda?

12  A.  This is a system message from WhatsApp that gets posted

13  when a group chat gets created saying that a user created the

14  group with a name associated to that group.

15  Q.  Which user created this group?

16  A.  Shvartsman Michael.

17  Q.  What's the date that this group was created?

18  A.  October 19th, 2021.

19  Q.  What's the name of this group chat?

20  A.  Los Vegas.

21           MR. SHAHABIAN:  We can take that down, Mr. Bianco.

22           I want to publish the two attachments, I'm not going

23  to have you read through the whole group chat, but I'd like to

24  publish the two attachments to this group chat, Government

25  Exhibits 749A and 749B.

1    Q.  Could you just remind the jury, what does it mean for there

2    to be attachments to a group chat in a Cellbrite report?

3    A.  Those could be files such as pictures, videos that were

4    sent in the chat, back and forth.

5    Q.  The group chat in Government Exhibit 749?

6    A.  Correct.

7         MR. SHAHABIAN:  With the Court's indulgence, if I

8    could have one more moment.

9         THE COURT:  Okay.

10        (Pause)

11        MR. SHAHABIAN:  No further questions.

12        THE COURT:  We'll go to cross examination.

13        Members of the jury, let's take a five-minute stretch

14   break while counsel sets up for cross examination.

15        Mr. Bach, are you doing the cross examination?

16        MR. BROD:  I am, your Honor.

17   CROSS-EXAMINATION

18   BY MR. BROD:

19   Q.  Good afternoon, Mr. Isolda.

20   A.  Good afternoon, sir.

21   Q.  Your role in this case was to extract digital data and make

22   it available to your colleagues at the government table for

23   review; correct?

24   A.  Correct.

25   Q.  And you extracted text messages; correct?

1    A.   Correct.

2    Q.   You extracted WhatsApp messages; correct?

3    A.   Correct.

4    Q.   And WhatsApp is just a very common messaging service;

5    correct?

6    A.   Correct.

7    Q.   And you also extracted data from the cloud; correct?

8    A.   In this case, I personally did not extract the data in this

9    case.

10   Q.   But in connection with your testimony today, you've

11   reviewed data taken from the iCloud in preparation for your

12   testimony today; correct?

13   A.   Correct.

14   Q.   And you testified about some of that data a few moments

15   ago; right?

16   A.   I did.

17   Q.   And if someone has deleted a message, sometimes it is

18   possible to recover it when you extract a phone; correct?

19   A.   Correct.

20   Q.   But not always; correct?

21   A.   Not always.

22   Q.   Sometimes if somebody deletes a message, you can't recover

23   it when you extract the phone; right?

24   A.   That's possible, yes.

25   Q.   And sometimes if somebody has deleted a message, it's not

1    possible to recover it from the iCloud; correct?

2    A.   That could also be possible, yes.

3              MR. BROD:  No further questions.

4              THE COURT:  Any redirect?

5              MR. BACH:  Just one minute.

6              THE COURT:  Okay.

7              (Pause)

8              MR. BROD:  One more question.

9    Q.   Mr. Isolda, among the phones that you examined in this

10   case, in connection with this case, was a phone of an

11   individual named Marc Wachter; correct?

12   A.   Could you restate that question.  Sorry.

13   Q.   Amongst the phones that you examined in connection with

14   this case was the phone of an individual named Marc Wachter?

15   A.   I'm not sure, sir.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

O521GAR6

1    BY MR. BROD:

2    Q.  Mr. Isolda, were you asked to attempt to recover deleted

3    messages on his phone?

4           MR. SHAHABIAN:  Objection.

5           THE COURT:  Sustained.

6           MR. BROD:  No further questions.

7           THE COURT:  Anything further from the government?

8           MR. SHAHABIAN:  No, your Honor.

9           THE COURT:  Okay.  You're excused as a witness.

10          Let me see the parties at sidebar.

11          (Witness excused)

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  Am I correct that the next witness is

3   testifying pursuant to an immunity order?

4          MR. SHAHABIAN:  That's correct, your Honor.

5          THE COURT:  Okay.  Then I'm going to give the jury

6   their break right now and then we'll take care of the immunity

7   order while the jury is out.

8          MR. SHAHABIAN:  Yes, your Honor.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O521GAR6

1          (In open court)

2          THE COURT:  Members of the jury, we're going to take

3     our midafternoon break a little bit early, so we're going to

4     take it now for about 15 minutes or so.  Don't talk amongst

5     yourselves or with anybody else about the case.  Don't do any

6     research.  Enjoy the break.

7          THE DEPUTY CLERK:  All rise.

8          (Jury not present)

9          THE COURT:  Be seated.

10          So we're going to give the jury a 15-minute break.  Do

11     you want me to have the next witness take the Fifth now or do

12     you want to do it after I give you all a short comfort break?

13     What's your preference?

14          MR. SHAHABIAN:  I could use a short comfort break,

15     your Honor.

16          THE COURT:  Okay.  All right.  So before I let you go

17     for the comfort break, are there any legal issues we need to

18     discuss with respect to the next witness, from the government?

19          MR. SHAHABIAN:  No, your Honor.

20          THE COURT:  What about from the defense?

21          MS. SHAPIRO:  I just want to put on the record, for

22     the same reasons we did with Mr. Torres Lopez, that the defense

23     objects, for the reasons that have been previously litigated,

24     about the co-conspirator issue.

25          THE COURT:  Okay.  All right.  See you back here at

O521GAR6                    Suissa

1    3:15.  Maybe the witness can be on the stand when I come back

2    in at 3:15.

3              THE DEPUTY CLERK:  All rise.

4              (Recess)

5              (Jury not present)

6              THE COURT:  For the record, would the government

7    identify their next witness, and then Mr. Fishman will put the

8    witness under oath and we'll proceed with the invocation.

9              MR. SHAHABIAN:  Government calls Netanel Suissa.

10             THE COURT:  All right.  Mr. Suissa, would you please

11   stand.  My deputy will administer the oath.

12             THE DEPUTY CLERK:  Please raise your right hand.

13             (Witness sworn)

14             THE DEPUTY CLERK:  Thank you.  Could you please state

15   your full name for the record and spell out your first and last

16   name.

17             THE WITNESS:  Netanel Suissa.  N-E-T-A-N-E-L,

18   S-U-I-S-S-A.

19             THE COURT:  Okay.  Counsel, you may inquire.

20             MR. SHAHABIAN:  Thank you, your Honor.

21    NETANEL SUISSA,

22        called as a witness by the Government,

23        having been duly sworn, testified as follows:

24   DIRECT EXAMINATION

25   BY MR. SHAHABIAN:

1    Q.  Good afternoon, Mr. Suissa.

2    A.  Good afternoon.

3    Q.  Are you testifying here today pursuant to an immunity

4    order?

5    A.  Yes.

6    Q.  Is that because you believe that the answers you would give

7    during today's proceeding might tend to incriminate you?

8    A.  Yes.

9    Q.  If you were asked any questions without the immunity order,

10   would you invoke your Fifth Amendment rights?

11   A.  Yes.

12           MR. SHAHABIAN:  Your Honor, I ask that the order

13   become effective and that it be marked as Court Exhibit 3.  I

14   have a copy I can hand up to the Court if the Court needs a

15   copy.

16           THE COURT:  I declare that the immunity order is

17   effective and that the witness is permitted to testify pursuant

18   to the order, and the order will be marked as Court

19   Exhibit No. 3.

20           We will bring the jury in in a moment.  The witness

21   will be resworn and then counsel may begin the examination.

22           Anything else before we bring in the jury?

23           MR. SHAHABIAN:  No, your Honor.

24           THE COURT:  Okay.  Let's bring in the jury.

25           MR. SHAHABIAN:  Your Honor, Mr. Brod pointed out

O521GAR6

1    during the break that I forgot to offer Government Exhibit 735.

2    I may do that before beginning the examination with Mr. Suissa.

3    I appreciate the courtesy.

4                THE COURT:  That's fine.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Jury present)

2        THE COURT:  Be seated.

3        Government will call their next witness.

4        MR. SHAHABIAN:  Yes, your Honor.  Before the

5   government calls its next witness, the government offers an

6   exhibit forgotten in the previous witness.  The government

7   offers Exhibit 735 into evidence.

8        THE COURT:  Any objection, Mr. Brod?

9        MR. BROD:  No, Judge.

10        THE COURT:  735 is received.

11        (Government's Exhibit 735 received in evidence).

12        THE COURT:  Call your next witness.

13        MR. SHAHABIAN:  Yes, your Honor.  The government calls

14   Netanel Suissa.

15        THE COURT:  Okay.  Mr. Suissa, please stand.  My

16   deputy will administer the oath.

17        THE DEPUTY CLERK:  Please raise your right hand.

18        (Witness sworn).

19        THE DEPUTY CLERK:  Thank you.  Please state your full

20   name for the record.

21        THE WITNESS:  Netanel Suissa.

22        THE COURT:  Do you want to spell it for the record.

23        THE WITNESS:  N-E-T-A-N-E-L, S-U-I-S-S-A.

24        THE COURT:  Counsel, you may inquire.

25        Mr. Suissa, let me direct you to keep your voice up,

1   stay as close to the microphone as you can, and wait until the

2   question is finished before you answer.

3           Go ahead, counsel.

4           MR. SHAHABIAN:  Thank you, your Honor.

5    NETANEL SUISSA,

6        called as a witness by the Government,

7        having been duly sworn, testified as follows:

8   DIRECT EXAMINATION

9   BY MR. SHAHABIAN:

10  Q.  Good afternoon, Mr. Suissa.

11  A.  Good afternoon.

12  Q.  Where do you live?

13  A.  New York.

14  Q.  What do you do for a living?

15  A.  I'm currently in between jobs.

16  Q.  Where did you live in 2021?

17  A.  South Florida.

18  Q.  Where did you work when you lived in South Florida?

19  A.  Source Furniture.

20  Q.  How long did you work at Source Furniture?

21  A.  Four years.

22  Q.  Are you testifying here today voluntarily?

23  A.  No.

24  Q.  Are you testifying under a compulsion order?

25  A.  Yes.

O521GAR6                     Suissa - Direct

1    Q.  Have you been ordered to testify?

2    A.  Yes.

3    Q.  Have you consulted a lawyer to help you understand the

4    compulsion order?

5    A.  Yes.

6    Q.  Under that order what do you have to do?

7    A.  To tell the truth.

8    Q.  If you do that, what protection do you get, if any, from

9    the compulsion order?

10   A.  Protection from prosecution.

11   Q.  Does that protection cover prosecution in general or is it

12   protection from the use of your words today?

13   A.  It's from the use of my words today.

14   Q.  Does the order protect you if you do not tell the truth

15   today?

16   A.  No.

17   Q.  Could you be prosecuted for lying if you did not tell the

18   truth today?

19   A.  Yes.

20   Q.  I want to turn back to your employment at Source Furniture

21   in South Florida.  Who did you work for?

22   A.  Are you asking who the owner was?

23   Q.  Who was the owner of Source Furniture?

24   A.  Gerald Shvartsman.

25   Q.  What was your relationship with Gerald Shvartsman?

SOUTHERN DISTRICT REPORTERS, P.C.

1    A.  Employee-boss relationship.

2    Q.  What was your job at Source Furniture?

3    A.  Sales representative.

4    Q.  How often did you interact with Gerald Shvartsman as a

5    sales representative?

6    A.  We would speak on the phone and sometimes I would see him

7    in person.

8    Q.  Did you ever talk to Gerald Shvartsman about stock

9    investing?

10   A.  Yes.

11   Q.  Do you frequently invest in the stock market?

12   A.  I would say, yes.

13   Q.  Did you ever talk about a stock called Digital World

14   Acquisition Corporation, or DWAC, with Gerald Shvartsman?

15   A.  Yes.

16   Q.  Could you tell us how DWAC arose between you and Gerald

17   Shvartsman.

18   A.  I received a phone call one day when I was at work and he'd

19   mentioned to me that I should——I should buy this stock, and I

20   said, okay, what stock is this, and he told me to look——look up

21   a stock symbol on Google, so I looked it up.  It was DWACW.  So

22   that's what he told me.  And then I asked what it——what this

23   was, and he said that this company's going to be merging with

24   some Trump company and that he's putting in $500,000 and his

25   brother is putting in a million dollars and——and I should think

1  about investing, and if I lose, if I lose money, don't come

2  crying to him.

3  Q.  Do you remember when this conversation was?

4  A.  This was October 19, 2021.

5  Q.  Why do you remember the day, October 19, 2021?

6  A.  That was my birthday.

7  Q.  When is your birthday?

8  A.  October 19th.

9  Q.  So just to go over what Mr. Shvartsman said to you, what

10  was the acronym, the five letters you mentioned that he told

11  you to look up?

12  A.  It was DWACW.

13  Q.  What did he say about the Trump company during the call?

14  A.  He said that in the next few weeks it would merge with some

15  type of Trump company, so that's what I——I thought it was like,

16  oh, Donald Trump, it could be——it could be good, you know, I

17  started to think about it.

18  Q.  And you said——he said he put in 500,000?

19  A.  Yes, that's what he told me.

20  Q.  What did you understand that to mean?

21  A.  Dollars.

22  Q.  In terms of saying "put in," what did you understand "put

23  in" $500,000 to mean?

24  A.  Bought $500,000 worth of stock.

25  Q.  And you said he said his brother put in a million.  What

1   did you understand that to mean?

2   A.  A million dollars' worth of stock.

3   Q.  Did you know Gerald Shvartsman's brother?

4   A.  I knew him but not personally.

5   Q.  Do you know what he did?

6   A.  For work?

7   Q.  Yes.

8   A.  I——I know that he was in some payment-processing business

9   or something like that.

10  Q.  Do you know his name?

11  A.  Michael Shvartsman.

12  Q.  During this conversation did Gerald Shvartsman tell you

13  what kind of stock to buy in DWAC?

14  A.  So the ticker was a warrant.

15  Q.  Did you know what a warrant was at the time you looked up

16  the ticker?

17  A.  I did not.

18  Q.  What did you do after you——or what did you see when you

19  looked up the ticker DWACW?

20  A.  Just some Yahoo Finance links and just——I don't

21  know——random links on Google connecting the stock.

22  Q.  Did you see anything about Trump Media when you looked up

23  DWACW on Google?

24  A.  I did not.

25  Q.  What did you do after Gerald Shvartsman told you you should

1    think about buying DWACW?

2    A.   I discussed this with my friends.

3    Q.   Which friends?

4    A.   Joshua Hawley and Jacob Adi.

5    Q.   What did you discuss?

6    A.   I spoke to Jacob and kind of——I told him what Gerald had

7    told me, and we were kind of thinking about, you know, A,

8    should we invest in this, should we buy this, you know, if it's

9    true, you know, it could probably, you know, go up, we could

10   probably make money, so that's what we discussed.

11   Q.   Did Gerald Shvartsman tell you how he knew that this merger

12   was going to happen?

13   A.   No.

14   Q.   Did you know where he got the information from?

15   A.   I did not.

16   Q.   Did you know anything about DWAC before Gerald Shvartsman

17   called you on your birthday?

18   A.   I did not.

19   Q.   Did you buy DWAC stock?

20   A.   Yes.

21   Q.   How soon after you spoke to Gerald Shvartsman did you buy

22   DWAC stock?

23   A.   I think it was the same day after I spoke to my friends and

24   we came to a conclusion like, hey, let's buy this together.

25   Q.   How did you buy DWAC stock?

1   A.   I bought it on my Robinhood account.

2   Q.   What's Robinhood?

3   A.   Robinhood is a trading platform for stocks.

4   Q.   Is it like an app on your phone?

5   A.   It is an app on my phone, yes.

6   Q.   Did you buy DWACW, DWAC warrants?

7   A.   No.

8   Q.   Why not?

9   A.   When I originally looked up DWACW on Robinhood, it was not

10  there, but all I saw was DWAC.

11  Q.   Did you buy the DWAC shares you saw on Robinhood?

12  A.   Yes.

13  Q.   How many shares did you buy?

14  A.   I bought 1300 shares.

15  Q.   How much money did you put in?

16  A.   $13,000.

17  Q.   Did your friends tell you if they bought DWAC stock?

18  A.   Yes.

19  Q.   Did they tell you how much money they put in?

20  A.   They did.  I don't remember the exact number.  It was

21  probably more than me.  I think it was more than what I put in.

22  Q.   After you purchased DWAC stock did you learn anything in

23  the news about DWAC merging with Trump Media?

24  A.   Yes.

25  Q.   What did you learn?

1    A.  That DWAC would be merging with Trump Media.

2    Q.  How did you learn that?

3    A.  I came across a——an Instagram post.

4    Q.  How soon after you purchased your DWAC shares did you see

5    that Instagram post?

6    A.  I think it was——had to be the next day or so.

7    Q.  What did you do after you saw that news?

8    A.  I took a screenshot and I sent it to my friends.

9    Q.  Did you talk to Gerald Shvartsman about DWAC after the news

10   became public?

11   A.  I spoke to him the day——yes, yes.

12   Q.  How did you talk to him?

13   A.  Through text message.

14   Q.  What did you discuss by text message?

15   A.  I asked him if he was going to——if he was allowed to sell

16   or something like that.

17   Q.  Why did you ask him if he was allowed to sell?

18   A.  Because we spoke——months before the DWAC stock, he——we'd

19   briefly talk about, you know, buying this or Dogecoin or just

20   random things, and one day Airbnb had its IPO and I saw that

21   and he was next to me, so I said, oh, I——Airbnb IPO'd today,

22   and he mentioned to me that he——he had it at——or he bought it

23   at $65 or something like that.  But when I looked at the stock

24   of Airbnb, it was——it was at like a hundred and something

25   dollars.  So I was like, oh, how did you——how do you get this

1    at $65 or something like that, and that's kind of why I asked

2    him.

3    Q.  How did that relate to asking him if he could sell DWAC

4    on——after the news was announced?

5    A.  I——I mean, I thought he must have been like some early

6    investor, maybe for like rich people that get offers to buy

7    things earlier.

8    Q.  Did you know one way or another if he was an early investor

9    in DWAC?

10   A.  I——I don't know.  I just know what he told me.

11   Q.  Did you eventually sell your DWAC shares?

12   A.  Yes.

13   Q.  How much money——or how quickly did you sell your DWAC

14   shares after the news was announced?

15   A.  I sold it the day of.

16   Q.  The day of?

17   A.  The day of the——the day it started trading, after the news

18   came out.

19   Q.  How much money did you make after you sold your DWAC stock?

20   A.  I don't remember exactly the number.  Anywhere between

21   13,000 to $20,000.

22   Q.  Has anyone made you repay what you made trading in DWAC

23   stock?

24   A.  No.

25   Q.  Did you ever learn the source or how Gerald Shvartsman knew

1    that this merger was going to happen?

2           MR. BROD:  Objection.

3           THE COURT:  Overruled as to that question.  You can

4    just answer the question yes or no.  Did anybody tell you.

5    A.  Can you repeat the question, please.

6    Q.  Did you ever learn how Gerald Shvartsman knew the merger

7    was going to happen?

8    A.  No.

9    Q.  Do you know who Bruce Garelick is?

10   A.  I do not.

11          MR. SHAHABIAN:  If I could have a moment, your Honor.

12          No further questions.

13          THE COURT:  Cross-examination.

14   CROSS EXAMINATION

15   BY MR. BROD:

16   Q.  Good afternoon, Mr. Suissa.

17   A.  Good afternoon.

18   Q.  My name is Julian Brod.  I'm one of the attorneys for

19   Mr. Garelick.

20          You just testified you've never met Mr. Garelick,

21   correct?

22   A.  I have never met him.

23   Q.  You've never spoken with him, correct?

24   A.  I have never spoken to him.

25   Q.  You've never communicated with him in any way, correct?

1    A.  I have not.

2    Q.  Okay.  I want to take you back to the start of 2020.  That

3    was when you joined Source Furniture as a salesman, correct?

4    A.  Yes.

5    Q.  And that was right before the pandemic began, correct?

6    A.  Yes.

7    Q.  And the pandemic began in March, and you were working

8    remotely at that time, correct?

9    A.  Correct.

10   Q.  And you would speak with your employer Mr. Gerald

11   Shvartsman from time to time on the phone, correct?

12   A.  Yes.

13   Q.  Okay.  And then in May of 2020, pandemic restrictions in

14   Florida began to lift somewhat, correct?

15   A.  Yes.

16   Q.  And at that point you began to go into the show—into the

17   store more often, correct?

18   A.  Correct.

19   Q.  And you were living relatively close to Source Furniture's

20   location in Miami at that time, correct?

21   A.  Yes.

22   Q.  And so you began to develop a little bit of a relationship

23   with Mr. Gerald Shvartsman, you got to know him, correct?

24   A.  Yes.

25   Q.  Okay.  And taking you forward to the middle of October

O521GAR6

1    2021, you received a phone call, as you testified a few minutes

2    ago, from Mr. Gerald Shvartsman on or around October 19th,

3    telling you about this DWAC stock, correct?

4    A.  Yes.

5    Q.  And as you testified a moment ago, he did not tell you the

6    source of any information he had about that stock, correct?

7    A.  He did not.

8    Q.  And you didn't ask him, correct?

9    A.  I did not.

10   Q.  And you invested about $13,000 in total, correct?

11   A.  Correct.

12   Q.  And that was about half of your portfolio at the time; is

13   that right?

14   A.  I believe so.

15   Q.  And you made, I think you testified, somewhere between 13

16   and $20,000, correct?

17   A.  Correct.

18   Q.  You told some of your friends and they bought the stock as

19   well, correct?

20   A.  Yes.

21              MR. BROD:  No further questions.

22              THE COURT:  Anything further?

23              MR. SHAHABIAN:  No, your Honor.

24              THE COURT:  Okay.  You're excused as a witness, sir.

25              THE WITNESS:  Thank you.

O521GAR6

```
 1          (Witness excused)

 2          THE COURT:  Let me see the parties at sidebar.

 3          (At the sidebar)

 4          THE COURT:  Does that complete the witnesses for the

 5   day?

 6          MR. SHAHABIAN:  It does, your Honor.

 7          THE COURT:  Okay.  I propose to let the jury go till

 8   tomorrow morning and then we can discuss legal matters.

 9          (In open court)

10          THE COURT:  Members of the jury, the parties have been

11   very efficient in their presentation of evidence and so what

12   that means is that I'm going to be able to let you go a little

13   bit early this afternoon.  We'll reconvene tomorrow at 9:00.

14   We'll have breakfast for you available at 8:30.  Please make

15   sure that you're in the jury room by 8:45.  Don't talk about

16   the case with anybody during the break.  Don't do any research

17   about the case during the break.  See you all tomorrow morning.

18          THE DEPUTY CLERK:  All rise.

19          (Jury not present)

20          THE COURT:  Be seated.

21          A couple of logistical matters.  I'm going to need

22   probably over the weekend, and I'm going to want you to

23   maintain, an agreed-upon exhibit list with some form of a

24   description that, when the jury retires to deliberate, we can

25   send back with them.  So I'm going to direct the parties to
```

1  meet and confer with respect to that and to send me on Sunday

2  night by email whatever you've got as your current exhibit

3  list.

4  　　　　The other logistical matter has to do with the

5  indictment.  Has the government or the parties given any

6  thought to whether there's a redacted indictment that would go

7  back to the jury and how one would redact the indictment?

8  　　　　MR. NESSIM:  We haven't discussed it with defense

9  counsel, but we would be prepared to, for example, prepare a

10  trial indictment that just includes the counts and individuals

11  relevant to this case.

12  　　　　THE COURT:  So I'm not going to make the defense

13  commit right now to that.  What I am going to do is to direct

14  you all to meet and confer with respect to that and to let me

15  know also by Sunday night whether there are any disputes with

16  respect to the form of a trial indictment that could go back to

17  the jury.

18  　　　　And then the third thing that I would like to

19  accomplish this afternoon is that I have the defense's

20  objections to the charge that I distributed.  I haven't

21  received anything from the government.  I don't propose right

22  now to do a full-scale charge conference, going through

23  everything, but it would be very useful for me to have,

24  particularly from the government, any objections to what I

25  distributed and objections to what the defense has requested.

1    I have on the bench with me the redline form of the charge that

2    I received from the defense, and what I propose to do is to

3    have the government go through that with me page by page to

4    indicate what they have on the charge and then, since we are

5    moving quickly, I think that will give me time to consider the

6    charge more and to have a focused charge conference early next

7    week.

8          Is there anything else from the government that we

9    should do right now?  And I also can give you all a

10   couple-minute break if you want that.  Mr. Nessim?

11         MR. NESSIM:  Just a couple questions, your Honor.  On

12   the Sunday night deadlines, just end of day Sunday?  Is there a

13   particular time that you would——

14         THE COURT:  Yeah, why don't we say 8 p.m.

15         MR. NESSIM:  And is the Court anticipating receiving

16   our objections orally now or do you want something——

17         THE COURT:  If you want to put something on paper,

18   that's always helpful, but I really am anticipating that orally

19   we would go through now what the government has.  I think I

20   gave you all a heads up.  And that would be useful.  Is there

21   anything else from the government that we should do right now?

22         MR. NESSIM:  No, your Honor.

23         THE COURT:  From the defense?

24         It sounds like the government does have one more

25   thing.

1          MR. NESSIM:  One more thing.  In the defense opening,

2     they referenced sort of Mr. Garelick's general trading strategy

3     and how his stock positions as to——I think it was not to commit

4     more than 10 percent of the portfolio on a particular stock and

5     some other explanations like that.  We just want to put before

6     the Court that barring, you know, Mr. Garelick taking the

7     stand, which might be subject to different considerations, that

8     we're not conceding now sort of——prior good act testimony or

9     other innocent act testimony, evidence, argument, is improper,

10    so they can't put forward specific instances of conduct of

11    Mr. Garelick in terms of his other investments or other times

12    he might have behaved ethically or honestly as proof that he

13    did not commit the charged offenses, and——

14          THE COURT:  Go ahead.

15          MR. NESSIM:  That's from the Scarpa case of the Second

16    Circuit.  I can pull up that cite for the Court.  If helpful,

17    we can also put a short letter in, if that would be helpful.  I

18    don't know exactly what the defense is intending here.  I just

19    raise it now because tomorrow we are calling as a witness——the

20    Scarpa cite——my colleague has helped me——it's 897 F.2d at 70.

21          THE COURT:  Okay.

22          MR. NESSIM:  63 is the full case cite.

23          So I just raise that now because tomorrow we are

24    calling Daniel Lehan, who was the——is the current compliance

25    officer at Adage Capital that employed Mr. Garelick I think for

1  approximately six years, and I don't know what they're

2  intending to do on cross, but to the extent they're intending

3  to inquire on specific instances of conduct, obviously we would

4  object, but just wanted to front that issue for the Court now.

5  THE COURT: Okay. All right. I'll let the defense

6  respond to that, but also indicate to me whether there are

7  other issues we should take up this afternoon.

8  MR. BACH: Apart from that, there are no other issues,

9  but I think your Honor said some of us could go take a

10  raincheck.

11  THE COURT: Are you asking for a 10-minute break or

12  are you asking to be excused for the afternoon?

13  MR. BACH: To be excused from the afternoon.

14  THE COURT: You may be excused for the afternoon.

15  MR. BACH: Thank you. I'll stay for a few more

16  minutes.

17  THE COURT: Okay. Ms. Shapiro, do you want to

18  respond.

19  MS. SHAPIRO: Just briefly, your Honor. Just to say

20  that it's common in insider trading cases, and indeed the

21  government often makes these arguments, that evidence about

22  trading patterns is relevant to whether or not to infer that

23  someone was engaged in insider trading, and so I just wanted to

24  say that's common.

25  THE COURT: It sounds to me like what you are arguing

|     |                                                                    |
| --- | ------------------------------------------------------------------ |
| 1   | is that it's not going to be prior good acts but you intend to     |
| 2   | elicit information about trading patterns?                         |
| 3   | MS. SHAPIRO:  Correct, your Honor.                                 |
| 4   | THE COURT:  And is it fair to assume that that would               |
| 5   | come from Mr. Lehan?                                               |
| 6   | MS. SHAPIRO:  No.  It's Mr. Melley.                                |
| 7   | THE COURT:  Who is——                                              |
| 8   | MS. SHAPIRO:  He's the government's——the FINRA witness           |
| 9   | who's going to present various charts about trading, among         |
| 10  | other things.                                                      |
| 11  | THE COURT:  Okay.  And I take it it's fair to assume               |
| 12  | that what you're going to do is point out from the trading         |
| 13  | records patterns.                                                  |
| 14  | MS. SHAPIRO:  Just to be clear, to the extent we                   |
| 15  | present evidence about this, whether it's from that witness or     |
| 16  | in our own case, that's the subject matter of the testimony.       |
| 17  | It's not going to be prior good acts.                              |
| 18  | THE COURT:  I'm asking which witness just so I can                 |
| 19  | anticipate when the issue is going to come up.                     |
| 20  | MS. SHAPIRO:  We don't know, your Honor.  We have to               |
| 21  | hear Melley's testimony.                                           |
| 22  | THE COURT:  Okay.  Do you have cases that you want me              |
| 23  | to look at?                                                        |
| 24  | MS. SHAPIRO:  Well, I think it's——I'm not sure exactly           |
| 25  | we understand the nature of the government's objection except      |

1  to the extent I thought I heard them say we couldn't put in

2  prior good acts, and so I'm simply advising the Court that

3  that's not our intention.  If they have a case that says

4  trading pattern is irrelevant, I'd like to see it, because I've

5  been in many insider trading cases where that's the

6  government's argument, this is unusual, this person has never,

7  you know, for instance, bought options, you know, and things

8  like that, and so that's what this is.  I don't think they've

9  cited a case indicating that that's irrelevant, and nor do I

10  believe they could find one, if they were.

11       THE COURT:  No.  Maybe I misunderstood your argument,

12  but I thought what you were saying is that it was common for

13  the defense to put on——

14       MS. SHAPIRO:  No, no, your Honor.  I'm simply saying

15  that an individual's trading pattern is relevant to a

16  circumstantial——

17       THE COURT:  Got it.  I understand.

18       MS. SHAPIRO:  That's all I'm saying.

19       THE COURT:  I understand your point now.

20       Does the government have anything further on this?  I

21  think I now understand the issue.  And I guess my question is,

22  why would it be improper for the defense to put on, you know,

23  hypothetically, you know, it was Mr. Garelick's practice to buy

24  some stock in every company that he was a director of?  I know

25  that that's not going to be the case here, based upon what I've

1  heard in terms of Mr. Garelick's board memberships, but

2  hypothetically, if that was the case, I would think, you know,

3  that testimony would be relevant, and I don't know now exactly

4  what they're going to say, but if this is consistent with his

5  general trading strategy, it seems to me it's probably

6  permissible.

7       MR. NESSIM:  Your Honor, I think we would appreciate

8  the opportunity to just think about this a little bit further.

9  If we could put in a letter tonight if we have more to add on

10  this issue.

11       THE COURT:  Okay.  The issue did come up in the

12  Phillips case a little bit, which is not something that the

13  defense has mentioned, but I did in that case permit some

14  testimony with respect to trading strategy, and again, I think,

15  unless you convince me otherwise, that that's an appropriate

16  area for the defense to inquire into.

17       All right.  Mr. Bach, you can leave, if you want.

18  You're not being directed to leave.

19       MR. BACH:  You're misinterpreting my body language.

20       MR. BROD:  Judge, I'll make a supplemental application

21  also for a writ of excusal.

22       THE COURT:  Okay.  That's granted.

23       MR. BACH:  Thank you very much.

24       THE COURT:  Does the government want a little bit of a

25  break?  I don't need it, but if you want five minutes, I'll

1   give it to you.

2           MR. NESSIM:  If we could have just five minutes or

3   less to get organized, that would be helpful.

4           THE COURT:  Okay.  All right.  4:05 I'll be back on

5   the bench.

6           THE DEPUTY CLERK:  All rise.

7           (Recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O52Cgar7

1          (Jury not present)

2          THE COURT:  Let me hear from the government.  I've got

3     in front of me the black line that was submitted by Ms. Shapiro

4     and we'll just go page by page, starting from the beginning

5     with the first page as to which you've got comments.

6          MR. NESSIM:  Yes, your Honor.  Hopefully, if it's okay

7     with the Court, we'll probably all be chiming in at different

8     points on different issues.

9          THE COURT:  However you want to handle it.

10          MR. NESSIM:  Our first issue with the red line is on

11     page 11 on the bottom, but page 14 of the docket numbers.

12          THE COURT:  Okay.  I'm there.  This is variance and

13     dates?

14          MR. NESSIM:  Right.  We believe that should not be

15     struck.  We can argue on that.

16          THE COURT:  Okay.

17          MR. SHAHABIAN:  The next objection would be on the

18     conspiracy and substantive crimes instruction on the next page.

19     The third paragraph begins, "A conspiracy to commit a crime is

20     an entirely separate and different offense."  In the

21     government's proposed charge, we had included the final

22     sentence, "that a defendant of course could be guilty of both

23     conspiracy and the substantive offense," to make clear to the

24     jury that it's not an either-or discussion.  We think that

25     language is standard and appropriate, and would object to

1    omitting it.

2              THE COURT:  What's next?

3              MS. SHAPIRO:  Your Honor, can I ask a quick question.

4    Are you going to expect us to respond today?

5              THE COURT:  No, I'm not.

6              MS. SHAPIRO:  Okay.  Thank you.

7              THE COURT:  I just want to understand where there are

8    objections.

9              MR. SHAHABIAN:  The next objection would be page 13,

10   Counts Two through Four, Title 15 Securities Fraud, through

11   page 14.  The Court's proposed instruction uses a

12   misappropriation theory of insider trading.  The government's

13   initial instructions flip the difference between the insider

14   misappropriation and classical theories as charged in the

15   indictment.  I don't have language to propose today, but I

16   think the government would propose some language that is closer

17   to the misappropriation and classical theories since we think

18   both are applicable given the defendant's obtaining of

19   information pre-board-of-directors seat and

20   post-board-of-directors seat.

21             THE COURT:  How quickly can you get me that proposed

22   language?

23             MR. SHAHABIAN:  Tonight, your Honor.

24             THE COURT:  That would be very good.

25             One question that I have for the government, reviewing

O52Cgar7

1    the indictment, is with respect to misappropriation, whether

2    it's the government's theory that the misappropriation is from

3    DWAC or whether it's the government's theory that the

4    misappropriation is from DWAC and Bene, or whether it's

5    something different.  It was not clear to me from the

6    indictment.  You can either answer it now or answer it in the

7    proposed language that you're going to give me.

8            MR. SHAHABIAN:  We'll answer it tonight.  I think the

9    government's preliminary view is that it's both given that the

10   defendant signed confidentiality agreements to both companies.

11           MR. NESSIM:  Our next issue is on page 15 of the

12   defense's red line.  The "close personal duty" language, which

13   I think it was in their initial objections to our proposed

14   requests to charge.

15           MS. SHAPIRO:  Are you looking at page 15 of the red

16   line?

17           THE COURT:  Work off of the red line, please.

18           MR. NESSIM:  I'm sorry.  One moment.

19           I'm sorry.  It's not the close personal relationship

20   issue, it's whether the NDA imposes a duty of confidentiality

21   as a matter of law issue, which we oppose their addition.

22           On the question about whether it could be instituted

23   unilaterally, this is what they cite in their letter to

24   Chessman again.  The defense is saying there's only duty of

25   confidentiality if the agreement is signed before the

O52Cgar7

1    information is obtained.  The question of whether information

2    is confidential is a fact intensive one.  It doesn't turn on

3    the simple technicality of whether an NDA is executed at the

4    time the information is shared and Chessman does not stand for

5    that point.

6         In addition, the Second Circuit in Chow has said an

7    NDA is a per se, as a legal matter, imposes a duty of

8    confidentiality.  We think that binding circuit law and the

9    defense's arguments otherwise are not a persuasive reason to

10   disregard that.

11        THE COURT:  I take it, Mr. Shahabian, and I'm

12   directing myself to you because it pertains to the prior point

13   that you made when you said that the government's theory is a

14   mix of misappropriation and classical, that might defect some

15   of your requests with respect to Count Two on page 15,

16   including within a relationship of trust and confidence.

17        MR. SHAHABIAN:  That's correct, your Honor.

18        THE COURT:  What's next?

19        MR. NESSIM:  The next issue is on page 17 of the red

20   line where they struck the possibility of a merger.  I think

21   the argument in their letter is that a SPAC is always looking

22   for a merger target.  And so, the possibility of a merge is

23   sort of per se, immaterial with regard to a SPAC.

24        MS. SHAPIRO:  That's not --

25        MR. NESSIM:  If I mischaracterize it --

1    MS. SHAPIRO:  It's fine.  I don't mean to interrupt.

2  I'm not saying anything.

3    MR. NESSIM:  As I read their argument, that's what

4  they're saying, it's a softer version of that.  That's how I

5  read it.

6    Many SPACs don't successfully identify a merger

7  target.  They don't even announce a merger during the lifetime

8  of the SPAC.  Many SPACs will wind down --

9    THE COURT:  I take it you think it's important that

10  the like possibility for "merger" stay in it?

11    MR. NESSIM:  That's correct.

12    I also think given, just the SPAC situation, it should

13  also include additional things related to a merger beyond the

14  possibility of a merger.  So, for example, the timing of the

15  merger, the merger target, other considerations that go into

16  the merger sort of bucket --

17    THE COURT:  So you'll give me proposed language

18  tonight?

19    MR. NESSIM:  Yes.

20    THE COURT:  I will make the observation to

21  Ms. Shapiro, but I'm not asking for a response right now, that

22  the language "like the possibility of a merger" is intent and I

23  think can only reasonably be read to indicate that the

24  possibility of a merger is speculative of information or events

25  and not to indicate that the Court believes that the

O52Cgar7

possibility of a merger is itself material information.  I'll

entertain argument when we do the charge conference.

Okay.  What's next?

MR. SHAHABIAN:  Just to follow up on Mr. Nessim's

point, and we appreciate the Court's indulgence.  We may also

propose the language from our requests to charge here that the

Court omit it from basic v. Levinson about merger discussions

can become material at an earlier stage because it is one of

the most important events in a corporation's --

THE COURT:  Let me give you a thought with respect tot

that, that you might be prepared to address.  One of the

reasons I struck that language is because it arises outside of

a SPAC context.  It's not at all clear to me that what arises

outside of the SPAC context is appropriate in a SPAC context

where, as I understand the way SPACs work, unless there is a

merger that takes place within the specified time period, the

money gets returned and the managers don't get the increase in

value of their equity.

So, it strikes me that the possibility of a merger,

which might be something that is material for a company that

doesn't always engage in mergers for a SPAC, which is always

going to be looking for the possibility of a merger, that can't

be material.  The possibility that the SPAC might do a merger

is not going to be material information for a SPAC.

MR. SHAHABIAN:  I take the Court's point.  That

1    certainly is not the government's contention that the idea that

2    a SPAC is looking for a merger is material information because,

3    of course, that's the point of the SPAC.

4         I do believe this does cut both ways, and the

5    government may want to think about this and propose some

6    language because, unlike an operating corporation, there's

7    really no other basis to project the value of a SPAC other than

8    the merger target.  In some ways, this is the only important

9    information.  Unlike an operating company that's generating

10   revenue and has financial projections and all other things that

11   go into the stock price.  Really, as we'll see tomorrow from

12   the testimony of Mr. Melley, these trade flat until there's a

13   merger announcement.  And so, I hear the Court's point, but I

14   think it actually cuts both ways and the government may want to

15   propose language.

16        THE COURT:  Think about it.  But the language from

17   basic, which seems to indicate that the possibility that the

18   company is going to engage in a merger is itself material, is

19   not appropriate in the context of this case.

20        MR. SHAHABIAN:  I hear the Court's concern and we'll

21   propose language that takes that into account tonight.

22        THE COURT:  What's next?

23        I take it no objection to me adding the word

24   "trainings," which actually comes out of Mahaffy.

25        MR. SHAHABIAN:  No objection.

O52Cgar7

1     So the next objection is on page 18 of the red line,

2     the second full paragraph beginning, "however."  The government

3     raised this objection in its objections to the defendant's

4     proposed requests to charge, as well, I believe.  The

5     instruction says, second sentence, "Sometimes a corporation is

6     willing to make information available to securities analysts,

7     prospective investors, or members of the press who ask for it,

8     even though it never may have appeared in any newspaper

9     publication or other publication, such information would be

10    public."  The government's position is that's incorrect,

11    particularly on the facts of this case where information was

12    being made available to prospective investors under NDAs.  This

13    would confuse the jury on whether providing information to

14    prospective investors under an NDA renders the information

15    public.

16            THE COURT:  I understand the point.

17            MR. NESSIM:  Our next issue is on page 19.  The change

18    that the Court said, "while in knowing possession of material

19    nonpublic information," I believe the Court should follow the

20    Second Circuit on this point and retain that language.

21            THE COURT:  Let me tell both of you one of the things

22    that I'm considering, and it may be the kind of thing neither

23    of you like.  I'm saying it because it might help me for you to

24    know in advance the thought that I've got, which is that if you

25    actually look at Royer, and you look at Whitman, and you look

1    at the case from which they originate teacher, all of those

2    cases, the actual charge that was given was not one that

3    referred to knowing possession alone being sufficient.  They

4    all had some form of the notion of the information in some way

5    informed the investment decision.  So I think there's a fair

6    amount of force to the government's argument that the Royer

7    case establishes the law of the circuit, and the law of the

8    circuit is known possession is sufficient.

9           It could be argued that, just as Royer said, the

10   earlier discussion of the issue in Teicher was dicta,

11   notwithstanding the fact that Royer treats what it's saying as

12   law and not dicta.  In the facts of Royer, it actually might be

13   dicta.  So think about it, because the charge in Royer was not

14   of known possession.

15          MR. NESSIM:  Thank you, your Honor.

16          The next one is on page 20.  There are a few other

17   pages where this comes up.  It's the defense's request to

18   strike the reference to the use of circumstantial evidence in

19   assessing state of mind.  We believe the language should

20   remain.

21          First of all, it's a correct statement of the law.  It

22   does not assume guilt.  It is helpful to the jury in assessing

23   state of mind.  It's extremely common in charges.  No case law

24   supports the view that it's prejudicial or misleading or should

25   be struck.  The case they cite, Dove, is not on point.  So we

1  think the limited language of reminding the jury about the use

2  of circumstantial evidence in assessing someone's state of mind

3  is helpful and should remain.

4  THE COURT:  I realize that it appears later on, but

5  sometimes, the adage that, "actions speak louder than words,"

6  does the government have an objection to me deleting that

7  language or a response to the defense argument, other than that

8  it is frequently given and may, in fact, be out of Sand.  The

9  adage, "actions speak louder than words" is applicable here in

10  a case where there actually are some number of words.

11  MR. NESSIM:  Our view on that, first of all, it's

12  extremely common and we think it's fine and appropriate to keep

13  and should be kept.  If the Court is considering striking it or

14  modifying in some way, I think the idea it communicates is an

15  important one, even if it's not that exact phrasing, which you

16  can judge someone's mind based on the steps they take or how

17  they behave.  I understand their point on the latter being a

18  relative consideration, but we do believe it should remain.

19  THE COURT:  What's next?

20  MR. NESSIM:  The knowingly in possession point appears

21  again on page 20.

22  On page 21, I think that's the close personal

23  relationship objection issue, which we oppose.

24  THE COURT:  I take it that you're relying upon

25  Martoma?

O52Cgar7

1          MR. NESSIM:  And Chow, other cases that have

2     considered that same issue.

3          We don't understand why the defense struck on page 21,

4     meaning that he was required to keep the information

5     confidential.  We think that language should remain.

6          On page 22, while we agree that the defendant must

7     know that the information was material, nonpublic, and subject

8     to duty of trust and confidence, we think the element requiring

9     the consideration of his mens rea covers this point.  I'm

10    sorry.  And repeating the particular considerations is not

11    necessary.

12         THE COURT:  I take it you don't disagree with the

13    legal proposition, I think it comes directly out of the Second

14    Circuit, that in order to be guilty of Title 15 securities

15    fraud, the defendant must have known that he was in possession

16    of information that was material, that he must have known that

17    the information was nonpublic, and he must have known that it

18    was subject to a duty of trust and confidence.

19         MR. NESSIM:  We don't dispute, we agree with the legal

20    proposition.  We don't think the addition there is necessary to

21    have a legally correct charge.  That's an element of confusion.

22         Page 23 has the circumstantial point again.

23         Our next objection is on page 25, the first element of

24    Title 18 Securities Fraud.

25         THE COURT:  I take it your point is that I should

|   |   |
|---|---|
| 1 | follow Judge Sullivan's opinion in Blaszczak, even if it's |
| 2 | vacated? |
| 3 | MR. NESSIM:  We think it's precedented and correct and |
| 4 | should be followed. |
| 5 | I'll also point to the Court, in Chow, this |
| 6 | instruction was challenged and it was an issue on appeal, which |
| 7 | was defended in the government's brief, which we can submit to |
| 8 | chambers and opposing counsel if it would be helpful. |
| 9 | The circuit, in its opinion affirming of Chow, said |
| 10 | they considered all remaining issues and none have any merit. |
| 11 | But it's exactly this point, which is that there's no case law |
| 12 | supporting the instruction they want.  The elements of 1348 |
| 13 | have been given by the circuit in Mahaffy.  They sort of quote |
| 14 | I think an EDNY lower court decision, as I remember it.  That's |
| 15 | 693 F.3d 125.  The elements there are fraudulent intent, scheme |
| 16 | or artifice to defraud a nexus to security. |
| 17 | There are many prudential reasons to read Section 1348 |
| 18 | differently from 10(b), and I think many of those are in Judge |
| 19 | Sullivan's opinion.  Just to hit on some of them.  Obviously, |
| 20 | it's modeled on the fraud statutes.  There's no reason why |
| 21 | Section 1348 would have different elements when it's part of |
| 22 | the package of fraud statutes, which base generally criminalize |
| 23 | scheme or artifices to defraud in connection with certainly |
| 24 | jurisdictional elements when executed with an intent to |
| 25 | defraud. |

1          Again, the Chow point and the cite on the

2     consideration and rejection is 993 F.3d 144.  And also, I think

3     this is part of the government's argument in Chow, as well.  In

4     Carpenter, the Supreme Court affirmed the conviction on the

5     wire fraud theory without an importation of 10(b)'s fraud

6     definitions.

7          THE COURT:  I understand the point.

8          MR. SHAHABIAN:  The next issue related to element 1 of

9     the 1348 instruction is the property instruction.  The

10    government doesn't have an objection to I believe the defense

11    proposed striking the clause, "Information that could be used

12    by others for a profit."  We're fine striking that.

13         We do think the definition of "property" as submitted

14    by the defense is not legally correct because it ignores the

15    Second Circuit's decision in United States v. Grossman, 843

16    F.2d 78.  In that decision, they rejected the idea that

17    confidential information under Carpenter has to be exactly like

18    it was in Carpenter, that is the stock in trade.  In that case,

19    it was the confidential information of a law firm that the

20    defendant had misappropriated and the circuit held that because

21    maintaining the confidential of the information had commercial

22    value, to protect the law firm's reputation, that that was

23    sufficient for it to have property.  The government is going to

24    look at this instruction again in light of the defendant's

25    objections and likely submit some proposed language this

O52Cgar7

1    evening, but that's our position on that property objection.

2           THE COURT:  It sounds like you don't disagree with the

3    general proposition that in order for the confidential business

4    information to constitute property, it must have commercial

5    value in the hands of the party from whom it's misappropriated.

6           MR. SHAHABIAN:  I want to be careful with this.  I

7    believe in Chastain the issue was litigated, and Judge Furman

8    gave an instruction that the information doesn't have to have

9    economic value to the victim in order to constitute property,

10   and we believe that's legally correct.  That's why the

11   government wants to think about this and propose some language.

12   We do agree that directing the jury to the value of the user's

13   information is not perhaps legally correct and that's why we

14   don't have an objection to striking it.

15          THE COURT:  You're going to look carefully at the

16   Cleveland case, also?

17          MR. SHAHABIAN:  Yes, your Honor.

18          THE COURT:  I look forward to the language I get from

19   you.

20          MR. NESSIM:  On page 31, we object to the defense

21   striking the language concerning conspiracy.

22          THE COURT:  Tell me why the last paragraph, "A

23   conspiracy is often referred to as a partnership in crime," and

24   then it goes on, which the defense points out is really drawn

25   from Pinkerton, is actually appropriately placed in the section

1    that talks about what a conspiracy is.  I know it's actually

2    standard, but one of the things about charge conferences is

3    that whatever was standard in the past gets reconsidered.

4            MR. NESSIM:  We think it's necessary because the

5    consideration of what a conspiracy is is whether there's been

6    an agreement to commit these criminal acts.  The jury should

7    understand that acts in furtherance of the conspiracy committed

8    by conspirators are attributable to that conspiracy.  In

9    assessing whether, in fact, that agreement was formed.  And so,

10   the fact that the law does attribute the act of conspirators to

11   the conspiracy and to the participants in that conspiracy, it's

12   important to assess the question of whether it exists.

13           THE COURT:  I'll think about it.

14           MR. NESSIM:  A minor point on page 33.  I think

15   "unlawful purposes" is redundant in the context of conspiracy.

16           THE COURT:  Any objection to me striking the language

17   about how conspiracies end?  I don't think withdrawal is an

18   issue here.

19           MR. NESSIM:  As long as they're not arguing

20   withdrawal.

21           MS. SHAPIRO:  That won't be an issue, your Honor.

22           MR. NESSIM:  On page 34, we oppose the striking of an

23   overt act is not an act that is in itself criminal or

24   constitutes an object of the conspiracy.

25           THE COURT:  Okay.

O52Cgar7

1    MR. NESSIM:  On page 35, we oppose the additional

2    language on venue.

3        THE COURT:  Why?  It does look like that is the

4    language with respect to conspiracy out of the Kurtang Yuk

5    case, and that language also has been accepted with respect to

6    securities fraud in I believe Royer.

7        MR. NESSIM:  Your Honor, we addressed this in our

8    letter objections to their proposals in our letter filed at

9    docket 120.

10        THE COURT:  I'll look at that.

11        Anything else?

12        MR. NESSIM:  That's it, your Honor.

13        THE COURT:  On the charge with respect to immunized

14    witnesses, I'm going to take some of what Ms. Shapiro gave us.

15    I may not take it all.  It indicates that it's adapted from

16    Sand.  And so, I may tweak it a little bit.  You'll have an

17    opportunity, both of you, to comment with respect to it.

18        MR. NESSIM:  One comment on the immunity and character

19    evidence.

20        On the immunity evidence, we would point the Court to

21    Judge Rakoff's instruction on this in Gupta, it appears at page

22    3366 of the charge in that case.

23        THE COURT:  Do you have a docket number?

24        MR. NESSIM:  We can send a copy of the charge.  It's a

25    shorter instruction on immunity.  We think it's appropriately

O52Cgar7

1    balanced and we think it's a good articulation of the

2    considerations.

3              On the opinion reputation evidence proposals that they

4    sent, which are mostly from Sand, we think that this should be

5    one charge.  Oh, you know what, I'm sorry.  I misspoke.  The

6    Gupta language is character.

7              MS. SHAPIRO:  It's character.

8              MR. NESSIM:  Oh, it's just character that you're

9    seeking?

10             MS. SHAPIRO:  No.  We put two in because there are two

11   different issues.

12             THE COURT:  Hold on.  If the two of you are going to

13   have a private conversation, have the private conversation.  If

14   not, then you'll have it on the record.

15             MR. NESSIM:  I misspoke.  On immunity, there is some

16   additional language we want to incorporate into their proposal

17   that adds balance.  So I misspoke on Gupta.  We'll submit that

18   proposed language in our letter tonight.

19             The Gupta point is Judge Rakoff's instruction on

20   character testimony, which we would ask the Court to consider

21   in considering the character witness testimony instruction.  We

22   can submit that to the Court tonight as part of our letter.

23             We think that, ultimately, the character and

24   reputation instruction should not be separate instructions.

25   They're very similar.  We believe that the impact of them can

O52Cgar7

 1    be accomplished by combining them into something that's

 2    consolidated.

 3              THE COURT:  This is very helpful.

 4              Ms. Shapiro, you can speak now, but you're not

 5    required to.  I'm going to give you a full audience at a charge

 6    conference after I hear the rest of the government's case

 7    tomorrow.

 8              MS. SHAPIRO:  I appreciate that, your Honor.  I'm not

 9    going to say anything substantive.  I believe there was one

10    issue as to which Mr. Nessim mentioned that he didn't know why

11    we some language, so I just wanted to highlight.  This is on

12    page 21, I think it's footnote 9.  It explains, it refers the

13    Court to the objections letter we filed.  So I just wanted to

14    highlight that there was a reason and it's discussed there.

15              Is the Court intending to hold the final charge

16    conference tomorrow afternoon?

17              THE COURT:  We'll see sort of where we are with

18    respect to the government's case.

19              Does the government now expect that it's going to

20    finish its case tomorrow?

21              MR. NESSIM:  I think that is a reasonable possibility,

22    but we're not guaranteed on that.

23              THE COURT:  If they are finishing, Ms. Shapiro, how

24    long do you expect you're going to want to make your arguments

25    on your motion?

O52Cgar7

1          MS. SHAPIRO:  Not very long, your Honor.

2          THE COURT:  Then I think you should both be prepared

3   that we would do a charge conference and we'll see how far we

4   get.  I mean, it strikes me that there are several well defined

5   legal issues where I would benefit from hearing from both of

6   you on the securities counts.  Then I'll hear from you with

7   respect to the other issues where Ms. Shapiro argue that

8   language is not balanced or where there should be additional

9   language.  I'm not prejudging that for either of you, but those

10  are less matters of law and more matters of how does the charge

11  fit the evidence in this case and how do I do a charge that is

12  not unbalanced.

13         Ms. Shapiro.

14         MS. SHAPIRO:  We do intend, as we've indicated, to

15  submit a theory of the defense charge.  Does the Court need

16  that tomorrow or could we do that on Monday?  It just might be

17  a little premature until there's a decision, for instance,

18  whether Mr. Garelick is going to testify.  It obviously will be

19  short, but I just want to know --

20         THE COURT:  I'm not going to make you do it until the

21  government closes or until the earlier of the end of the day

22  tomorrow or the government closing, because if the government

23  still has a little bit that they need to do on Monday, it's

24  only going to be a little bit, but it would be useful for me to

25  have the theory of the defense over the weekend.

O52Cgar7

1        MS. SHAPIRO:  That's fine, your Honor.

2        THE COURT:  So I would say Saturday afternoon.

3        I will see you all at 9 o'clock tomorrow morning.

4        (Adjourned to May 3, 2016 at 9:00 a.m.)

5                        * * *

1          INDEX OF EXAMINATION

2     Examination of:                              Page

3      ERIC SWIDER

4     Direct By Ms. Hanft . . . . . . . . . . . . . 6

5     Cross By Mr. Bach . . . . . . . . . . . . . 503

6     Redirect By Ms. Hanft . . . . . . . . . . . 543

7      JEFFREY STITH

8     Direct By Ms. Hanft . . . . . . . . . . . . 547

9     Cross By Ms. Shapiro . . . . . . . . . . . 558

10      MICHAEL D'ANGELO

11    Direct By Ms. Hanft . . . . . . . . . . . 562

12    Cross By Ms. Shapiro . . . . . . . . . . . 567

13    Redirect By Ms. Hanft . . . . . . . . . . . 574

14      ROBERT M. SERVINSKAS

15    Direct By Mr. Nessim . . . . . . . . . . . 576

16      CHRISTIAN ISOLDA

17    Direct By Mr. Shahabian . . . . . . . . . . 583

18    Cross By Mr. Brod . . . . . . . . . . . . . 634

19      NETANEL SUISSA

20    Direct By Mr. Shahabian . . . . . . . . . . 640

21      NETANEL SUISSA

22    Direct By Mr. Shahabian . . . . . . . . . . 644

23    Cross By Mr. Brod . . . . . . . . . . . . . 653

24              GOVERNMENT EXHIBITS

25    Exhibit No.                              Received

1    511   . . . . . . . . . . . . . . . . . . . .35

2    860   . . . . . . . . . . . . . . . . . . 550

3    850, 851, and 852   . . . . . . . . . . . . 556

4    742, 743, 745, 746, 749, 749A, 749B,  . . . . 599

5            750, 751, 723, 732, 734

6    305   . . . . . . . . . . . . . . . . . . 581

7    375   . . . . . . . . . . . . . . . . . . 499

8    530   . . . . . . . . . . . . . . . . . . 501

9    735   . . . . . . . . . . . . . . . . . . 643

10                   DEFENDANT EXHIBITS

11   Exhibit No.                              Received

12    195   . . . . . . . . . . . . . . . . . . 509

13

14

15

16

17

18

19

20

21

22

23

24

25