O531GAR1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

            v.                               23 Cr. 307 (LJL)

BRUCE GARELICK,

                  Defendant.

------------------------------x                    Trial

                                             May 3, 2024
                                             9:10 a.m.

Before:

                  HON. LEWIS J. LIMAN,

                                             District Judge
                                               and a Jury


                          APPEARANCES

DAMIAN WILLIAMS
      United States Attorney for the
      Southern District of New York
BY:   ELIZABETH A. HANFT
      MATTHEW R. SHAHABIAN
      DANIEL G. NESSIM
      Assistant United States Attorneys

SHAPIRO ARATO BACH, LLP
      Attorney for Defendant Garelick
BY:   ALEXANDRA  A. E. SHAPIRO
      JONATHAN BACH
      JULIAN S. BROD
      JASON A. DRISCOLL

Also Present:

Special Agent Marc Troiano, FBI
Paralegal Specialist Grant Bianco, USAO

O531GAR1

1          (Trial resumed; jury not present)

2          THE COURT:  Does the government wish to be heard about

3     Ms. Shapiro's letter of this morning?

4          MR. SHAHABIAN:  Yes, your Honor.

5          And I'll make an oral argument, since we obviously

6     haven't had time to put in something written.

7          THE COURT:  Let me just ask you one question before

8     you begin.

9          This is, I take it, coming in through the case agent?

10          MR. SHAHABIAN:  No, your Honor.  This will be through

11     a paralegal employed by our office.

12          THE COURT:  And do you expect to, through this

13     paralegal, to be showing the jury evidence that the jury would

14     not have already seen through other witnesses?

15          MR. SHAHABIAN:  Yes, your Honor.  Most of the evidence

16     in the charts is evidence that the jury hasn't seen yet, such

17     as emails that we haven't even really begun to discuss.

18          THE COURT:  I guess my third question is:  Do you

19     intend to offer the exhibits into evidence or to use them as

20     demonstrative aids for the jury?

21          MR. SHAHABIAN:  Into evidence, your Honor.

22          THE COURT:  Okay.  I'd like to hear your argument, but

23     I have expressed a view on this issue before, as you know.

24          MR. SHAHABIAN:  Yes, your Honor.  And I'm prepared to

25     address that this morning as well.

O531GAR1

1          So to start, what the charts are——and I think the

2     Court has a copy that's been produced in the submissions from

3     the government of our exhibits.  This is the Government

4     Exhibits 960 through 967.  These are timeline charts.  These

5     are no different than the charts that the Second Circuit upheld

6     admitted under 1006 in *Ho* and in other cases like *Ho*, which are

7     not addressed in Ms. Shapiro's letter.  The citation to *Ho*——

8          THE COURT:  I'm aware of *Ho*.

9          MR. SHAHABIAN:  And I'll focus on the Court's ruling

10    in *Phillips*, which I think is probably the most apt authority

11    to distinguish from.

12         THE COURT:  Right.

13         MR. SHAHABIAN:  For this case.  So in *Phillips*, what

14    the Court said is, most of the evidence had already been

15    presented to the jury in a chronological fashion.  It wasn't

16    particularly voluminous.  They had heard it from a lay witness,

17    they'd heard it from an expert witness, and this was a third

18    chance at summation.  That's not the case here.  The charts

19    combine several different forms of voluminous evidence that the

20    jury has not seen yet.  They don't combine them in an

21    argumentative fashion.  It's simply a timeline.  The headings

22    of each of the charts are just literally dates, like

23    September 21 to whatever, 2021.  There's no argument in the

24    headings.  It's purely a chronological timeline of selected

25    exhibits.  The exhibits include emails, the majority of which

O531GAR1

have not yet been admitted into evidence and won't be published

through any other witness because they're, for example, emails

that the defendant sent to co-conspirators or to other

nontestifying witnesses.  No witness has walked through them.

We expect to walk through them with the paralegal summary

witness.  Otherwise the jury is not going to have a chance to

review those voluminous exhibits before summations.

In addition, the charts combine phone records, trading

records, text messages, corporate events, and while the jury

will have seen some of those pieces of evidence, not in a

chronological fashion.

So take, for example, the testimony of Examiner Isolda

from yesterday.  He explained some of the extraction evidence

that is from Mr. Garelick's cellphone and from the iCloud

account.  He didn't walk through it in a chronological fashion.

He explained how Cellebrite works for each of the various

exhibits, text messages, calendar entries, etc., but there was

no attempt to walk through it in a chronological fashion, and

that was just a subset of the text messages in this case,

because many of the texts were not extracted from devices, they

were produced pursuant to subpoenas, and so there was no need

to do that with an extraction witness.  Those text messages

will be presented for the first time, some of them through

Ms. Collins, the paralegal.  Some are, for example, the board

WhatsApp messages, which the jury has seen some of through

O531GAR1

1    Mr. Swider but not all of them, and not in a chronological

2    fashion compared to the other evidence.

3         Similarly, the Court is aware, there are a lot of

4    names and dates in this case.  It's multiple tippees.  It's a

5    lot of evidence for the jury to keep track of.  They've

6    obviously been paying careful attention, but no witness has

7    walked through the chronology of events in any way that allows

8    the jury to see the sequence in a narrative fashion.  The

9    government's permitted to put that on in its case in chief, as

10   the Second Circuit has upheld repeatedly, and hasn't been done

11   in this case and won't be done through any other witness.

12        So I think all of those factors distinguish this case

13   from the Court's decision in *Phillips*, where that had been done

14   repeatedly prior to the summary charts being offered.

15        THE COURT:  I assume if I were to look at some of the

16   exhibits that are cited in the summary slides, they would be

17   voluminous; is that correct?

18        MR. SHAHABIAN:  Yes, your Honor.

19        THE COURT:  Which exhibits do you want me to look at

20   to show that they are voluminous?

21        MR. SHAHABIAN:  And there's a bit of a double level of

22   voluminous.  One of the——two of the key exhibits in the charts

23   are Government Exhibits 930 and 950.  Those in turn are also

24   summary charts of the trading data and the phone call records,

25   which are thousands of pages.  So this is our attempt to be

O531GAR1

1    efficient and walk the jury through this voluminous evidence.

2    The trading data, for example, will be admitted through

3    Mr. Melley, so that's the summary for that voluminous evidence.

4    The phone call records——it's just a spreadsheet of all the

5    phone calls that the government believes is relevant to this

6    case, without other context——will be admitted through Ms. May,

7    who is a cellphone analyst.  So those are examples of

8    voluminous records that we've already started to summarize that

9    are incorporated into these timeline charts.

10             THE COURT:  Okay.  All right.

11             MR. SHAHABIAN:  If I could also turn to the notice

12   point, since Ms. Shapiro raised it in her letter.

13             THE COURT:  You can do so.

14             MR. SHAHABIAN:  The government disclosed its intent to

15   use timeline charts to the defense a week ago when we produced

16   draft charts as 3500 for Ms. Collins, with draft stamps as

17   draft Government Exhibits.  We've continued to update them.

18   Frankly, because the records are voluminous, it took time to go

19   through them and make sure everything was accurate.  As edits

20   were made, we produced those changes as additional 3500 and

21   updated exhibits.  Last night we made the final changes.  The

22   substantive additions were primarily additions relating to

23   Anton Postolnikov, which I'm sure the Court is not surprised

24   was not an initial focus of the government's case when we

25   produced the charts a week ago.  Based on the evidence as it's

1    come out on trial, we've added some limited additional timeline

2    events related to Mr. Postolnikov and produced those last

3    night.

4         THE COURT:  Are you saying the drafts of the summaries

5    were provided to the defense or just that you've kept on

6    updating them internally?

7         MR. SHAHABIAN:  The drafts were provided──the initial

8    drafts were provided a week ago.  And as drafts were updated,

9    we provided those updates.  We provided 3500 that explained

10   how──and I forgot one point that I think is important for the

11   reason we want to admit these for their substantive evidence.

12   One of the things that was disclosed in the 3500 that

13   Ms. Collins was doing in preparing these charts was doing time

14   zone conversions.  So I'm sure the Court is aware there are

15   numerous business records, trading records, phone records,

16   hotel records, all in different time zones, and part of what

17   the charts do is standardize the time zones into the local time

18   of either Eastern time or, at the end of the timeline, when the

19   defendant is in Las Vegas, to Pacific time.  And in particular

20   one of the things she did, as I'm sure the Court may remember

21   from private practice, when emails are produced in discovery,

22   the time zones often shift through the chain because the top

23   email may be produced in Universal Time and the bottom of the

24   chain is produced in local time, and so what Ms. Collins did is

25   compare those emails to other custodial versions of the same

O531GAR1

emails to confirm the time zones of each email that were going to be admitted into evidence. That's very voluminous. It's tedious. It was done painstakingly. And if we're not allowed to admit these charts as substantive evidence, which reflect those time zone conversions, that evidence isn't going to be before the jury. And I want to credit the defense here. I think they've been very reasonable about stipulations to business records and such, and so we've avoided having to waste the jury's time calling custodians to testify about time zones and things like that. But the timing is important substantive evidence, and that's part of the reason we're offering these charts as substantive evidence.

THE COURT: Okay. I understand the arguments. I take it Ms. Collins is probably going to be the last witness, is that——

MR. SHAHABIAN: That's correct, your Honor.

THE COURT: All right. So I need to look a little bit more closely at Ms. Shapiro's letter. I need to think a little bit more closely about your argument and then I'll hear further from the parties and give you a ruling, but not before we bring in the jury.

Anything further from the government before we bring in the jury?

MR. SHAHABIAN: No, your Honor.

THE COURT: What about from you, Ms. Shapiro?

O531GAR1                    Lehan - Direct

1          MS. SHAPIRO:  No, your Honor.  As long as at some

2     point I get to address a number of the things Mr. Shahabian

3     said.

4          THE COURT:  That's what I tried to indicate when I

5     said I need to look at the materials, and then I'll hear more

6     from you.

7          MS. SHAPIRO:  Oh, oh, okay.  I misunderstood that.  I

8     apologize.

9          THE COURT:  Okay.  Who's the next witness?

10          MR. NESSIM:  Daniel Lehan is our next witness.

11          THE COURT:  Okay.  All right.  Let's bring in the

12     jury.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Be seated.

3           Welcome back, members of the jury.  I hope you all had

4    a pleasant evening.

5           Government will call their next witness.

6           MR. NESSIM:  The government calls Daniel Lehan.

7           THE COURT:  Bring Mr. Lehan in.

8           Mr. Lehan, please step forward into the witness box

9    and remain standing once you reach the witness box.  My deputy

10   will administer the oath.

11          THE DEPUTY CLERK:  Please raise your right hand.

12          (Witness sworn)

13          THE DEPUTY CLERK:  Please state your full name and

14   spell out your first and last name for the record.

15          THE WITNESS:  Okay.  My name is Daniel J. Lehan.

16   L-E-H——my first name is D-A-N-I-E-L, my last name is L-E-H-A-N.

17   Dan Lehan.

18          THE COURT:  Okay.  Counsel, you may proceed.

19          Let me direct the witness to try to speak into the

20   microphone, keep your voice up, and, importantly, wait until

21   the question is done before you answer.

22          Go ahead.

23          MR. NESSIM:  Thank you, your Honor.

24    DANIEL J. LEHAN,

25       called as a witness by the Government,

1          having been duly sworn, testified as follows:

2     DIRECT EXAMINATION

3     BY MR. NESSIM:

4     Q.  Good morning, Mr. Lehan.

5     A.  Good morning.

6     Q.  What is your educational background?

7     A.  I went to the University of Vermont, I studied accounting;

8     I went to——after that I worked for a couple years, went to

9     Cornell Business School, and I have an MBA from Cornell

10    Business School.

11    Q.  And where do you work?

12    A.  I work at Adage Capital Management in Boston,

13    Massachusetts.

14    Q.  What is Adage Capital Management?

15    A.  Adage is an investment management firm.  It's a US limited

16    partnership.  We manage about $40 billion for institutional

17    clients.  We have one fund, and we have 30 or so analysts that

18    are fundamental analysts.  That means that they spend their

19    time researching stocks and building investment portfolios.

20    Q.  And what's your title at Adage?

21    A.  I'm the chief compliance officer, I'm the chief operating

22    officer, I'm a partner, and I'm a member of the risk committee,

23    which is essentially the management committee of the firm.

24    Q.  And for approximately how long have you worked at Adage?

25    A.  Since the inception of the firm.  The firm started on

1   July 1, 2001.

2   Q.  And what are your general duties and responsibilities as

3   chief compliance officer?

4   A.  As chief compliance officer, I'm responsible for training,

5   monitoring our daily activities, being a sounding board for

6   folks if they want to discuss issues; I ensure that all

7   the—our regulatory filings are made properly and on time; and

8   I make sure that all of our employees return all of the

9   materials they are required to return.

10  Q.  Are you familiar with the defendant, Bruce Garelick?

11  A.  I am.

12  Q.  How do you know him?

13  A.  Bruce and I worked together at Adage from January 2005

14  until August 2011.

15  Q.  And what was Mr. Garelick's role for those approximately

16  six years at Adage?

17  A.  Bruce was a portfolio manager.  We also used the word

18  analyst, which means that he spent his time analyzing

19  technology stocks.

20  Q.  Over your time at Adage, what type of insider trading

21  policies have you instituted?

22  A.  Well, since—since the inception of our firm, we have a

23  compliance manual.  That compliance manual is distributed to

24  employees annually—sometimes more than annually if we update

25  it throughout the year.  We have annual training.  That

O531GAR1                    Lehan - Direct

1    training is always done towards mid-November of each year.

2    We've done that since the inception of our firm.  That training

3    is mandatory.  Throughout the year we might have other training

4    sessions, but the annual training is focused on the compliance

5    manual.  During that session we'll bring in a expert, typically

6    an attorney, an outside attorney, that will detail MNPI,

7    material nonpublic information, in detail.

8    Q.  And why is it important to maintain policies on insider

9    trading?

10   A.  Several reasons.  First of all, it's required by the——by

11   the SEC.  I'd say much more importantly that our

12   integrity——when I say "our," I mean our firm, Adage Capital,

13   and personally too.  Our integrity, our ethics, our reputation,

14   are critical to our——to our firm, to our livelihood, to our——to

15   our happiness.  It's our most important asset.  It's, I would

16   argue, more important than investment performance.

17          MR. NESSIM:  Mr. Bianco, can you please publish just

18   for the witness and parties what's been marked for

19   identification as Government Exhibit 810.

20   Q.  And Mr. Lehan, I'll have you just look at the first page

21   for a moment and then I'll ask Mr. Bianco to scroll through the

22   first several pages briefly.

23          MR. NESSIM:  And Mr. Bianco, if you can just scroll

24   maybe five pages in.

25   Q.  Do you recognize the materials maintained on this exhibit?

1    A.  I do recognize them, yes.

2    Q.  And just at a very high level, what are they?

3    A.  That's our compliance manual as of 2010.

4            MR. NESSIM:  Your Honor, at this time, also pursuant

5    to Joint Exhibit 1, which is in evidence, which stipulates that

6    Government Exhibit 810 is a business record of Adage Capital

7    Management, LP, the government would offer Government

8    Exhibit 810.

9            MR. BACH:  We stand by the stipulation.  We also

10   preserve our continuing objection.

11           THE COURT:  Okay.  The objection is overruled for

12   reasons previously stated.  And 810 is received.

13           (Government's Exhibit 810 received in evidence)

14           MR. NESSIM:  Mr. Bianco, can you turn back to the

15   first page of this exhibit and then publish it for the jury.

16           And Mr. Bianco, if you can just zoom in just for ease

17   of reading into like the portion of this email that has

18   content.  Thank you.

19   BY MR. NESSIM:

20   Q.  Mr. Lehan, this first page of the exhibit, what is it?

21   A.  That's an email from me to All Users.

22   Q.  And what's the date of the email?

23   A.  November 15, 2010.

24   Q.  And All Users, as you referenced, that email line,

25   allusers@adagecapital.com, what's that?

1   A.   That's our entire employee list.

2   Q.   And approximately how many employees did Adage have in

3   2010?

4   A.   45.

5   Q.   And would Mr. Garelick have been one of the members of the

6   All Users box?

7   A.   Yes.

8   Q.   The subject line here reads Compliance Update.  And can you

9   just tell us the information that you've relayed in this email.

10  A.   Yes.  I'm reminding everyone that we have a mandatory

11  compliance meeting on Friday, November 19th, from 11:30 to 1.

12  There's an attached agenda.  I'm telling everyone that we're

13  going to go over the compliance manual.  And that's the first

14  agenda item.  I'm reminding everyone to review this manual

15  carefully before the meeting, following their review, execute

16  Exhibit C of the manual and return it to Jessica.  Jessica is

17  my administrative assistant.  She still is.

18  Q.   You can stop there.

19  A.   Okay.

20  Q.   So the date of the email is November 15th.

21          MR. NESSIM:  Mr. Bianco, can you please scroll to

22  page 5 of this exhibit.

23  Q.   Is this the table of contents of the compliance manual, or

24  a portion of it?

25  A.   Yes, it is.

O531GAR1                    Lehan - Direct

1    Q.  And just under Code of Ethics, can you read topic C.

2    A.  Topic C is Material Inside Information.

3    Q.  Take a look at some of those provisions.

4           MR. NESSIM:  Mr. Bianco, can you please turn to page 9

5    of this exhibit.  And can we blow up from heading C, the first

6    paragraph under that heading through the bottom of this page.

7    Capital C.  Sorry.

8    Q.  Mr. Lehan, can you please read the first paragraph under

9    the heading Material Inside Information.

10   A.  "All employees are reminded that purchasing or selling

11   securities on the basis of, or while in the possession of,

12   material nonpublic information for their own, for clients, or

13   for the company's account is a crime punishable by imprisonment

14   as well as large fines.  Tipping another person who engages in

15   such activities is also a crime.  The term 'material' is

16   described below."

17          MR. NESSIM:  Mr. Bianco, you can zoom out of that,

18   please.  And let's turn to page 10.

19          And Mr. Bianco, if you could please highlight the

20   first paragraph under 1, "Who is subject to insider trading

21   rules?"

22   BY MR. NESSIM:

23   Q.  Mr. Lehan, if you could please read that paragraph.

24   A.  "All employees and all persons, friends, relatives,

25   business associates, and others who receive nonpublic material

1    inside information from employees concerning an issuer of

2    securities, whether such issuer is a client or not, are subject

3    to these rules.  It does not matter whether the issuer is

4    public or private."

5         MR. NESSIM:  Mr. Bianco, if you can please zoom out of

6    that and please zoom in to the first paragraph under "What is

7    material inside information?"

8    Q.  And if you could please read that paragraph, Mr. Lehan.

9    A.  "Generally speaking, inside information is information

10   about an issuer's business or operations, past, present or

11   prospective, that becomes known to an employee and which is not

12   otherwise available to the public.  Although neither the courts

13   nor the SEC has defined 'material' precisely, the word is

14   similar in meaning to 'important' or 'significant.'"

15        MR. NESSIM:  And you could zoom out of that, please,

16   Mr. Bianco.

17        And let's turn to page 11.  And if you could zoom in

18   to under Section 4, the top few lines down to E.

19   Q.  And Mr. Lehan, this section reads, "Are there certain kinds

20   of information that are particular likely to be material inside

21   information?  Yes.  While the following list is by no means

22   complete, information about the following subjects is

23   particularly sensitive."

24        Can you please read point D.

25   A.  "Corporate acquisitions, tender offers, major joint

1   ventures, or merger proposals."

2   Q.  And point E?

3   A.  "Significant negotiations, new contracts, or changes in

4   business relationships."

5           MR. NESSIM:  Mr. Bianco, if you could please take this

6   down.

7           And let's turn to page 12, please.  And can you zoom

8   in to Section 5.

9   Q.  And Mr. Lehan, can you please read that paragraph.

10  A.  "What is the law regarding the use of material inside

11  information?  Federal law and the policy of the company

12  prohibit any employee from using material inside information,

13  whether obtained in the course of working at the company or

14  otherwise, for his or her private gain, for the company's gain,

15  or for a client's gain, and prohibit any employee from

16  furnishing such information to others for their private gain.

17  This is true whether or not the information is considered

18  confidential.  No trades should be executed for any employee,

19  any client, or for the company if the person executing the

20  trade or the company has material information about the

21  issuer."

22          MR. NESSIM:  Mr. Bianco, can you please turn to

23  page 13.  And can you please zoom in to section 7, "To whom

24  must material inside information be disclosed before an

25  employee can trade?"

O531GAR1                    Lehan - Direct

1    Q.  And can you please read that paragraph, Mr. Lehan.

2    A.  "To whom must material inside information be disclosed

3    before an employee can trade?  To the public.  Public

4    disclosure of material events is usually made by means of an

5    official press release or a filing with the SEC.  An employee's

6    disclosure to a broker or other person will not be effective,

7    and such employee may face civil or criminal liability if such

8    employee or the person to whom the employee makes disclosure

9    trades on the basis of the information.  Company staff should

10   be aware that in most cases they are not authorized to disclose

11   material events about an issuer to the public and that right

12   usually belongs to the issuer alone."

13          MR. NESSIM:  You can take that down, please,

14   Mr. Bianco.

15          And let's turn to page 43 of this exhibit, please.

16   Q.  So at the top here, this reads, "Exhibit C and Compliance

17   Certificate."  What is this?

18   A.  So this is——Exhibit C is part of the compliance manual.

19   It's been part of the compliance manual since——since the

20   inception of our firm.  After the employee has read and

21   understood the manual as required, they execute this,

22   acknowledging that their——that they understand the manual and

23   they're complying with it and they intend to comply with it.

24          MR. NESSIM:  Actually, Mr. Bianco, can you please just

25   zoom in to the first paragraph under Compliance Certificate.

1  Q.  And Mr. Lehan, can you just read that paragraph, please.

2  A.  "The undersigned employee of Adage Capital Management ('the

3  Company') hereby certifies that he or she has read and

4  understood the compliance——the Company's compliance manual and

5  that he or she will conduct himself or herself professionally

6  and complete in accordance with the requirements and standards

7  described therein, and will comply with all applicable federal

8  and state securities and other laws and regulations regulating

9  his or her conduct as an employee of the company."

10              MR. NESSIM:  You can zoom out of that please,

11  Mr. Bianco.

12  Q.  Mr. Lehan, you testified that employees will complete this

13  certification.  How do they do that, at the time, in 2010?

14  A.  At that time the certificate was distributed hard copy to

15  them.  They manually executed it.  They returned it to my

16  administrative assistant.  I collected them.  I have a

17  checklist where I mark receipt, and when I——I just——I checked

18  off all of them until they came in.  If I was missing one, I'd

19  go see somebody until I got it back.

20  Q.  Did all Adage Capital employees return the certificate?

21  A.  Yes.

22  Q.  Every year that you collected it?

23  A.  Yes.

24  Q.  And what happened to those hard-copy certificates?

25  A.  Eventually, I guess a couple years ago——I don't know the

O531GAR1                    Lehan - Cross

1    time frame—they went to a shredder box.  They're just really

2    old.  I think our document retention policy is seven or eight

3    years.  So at that point, hard-copy documents go to the

4    shredder box, unless they just happen to be lying around.

5    Q.  Did Mr. Garelick complete the compliance certificate

6    relevant to this compliance manual we just reviewed portions

7    of?

8    A.  Yes.

9    Q.  And would he have completed compliance certificates for

10   other manuals you distributed relating to compliance?

11   A.  Yes.

12   Q.  Each of these certified his understanding and agreement to

13   comply with those manuals?

14   A.  Yes.

15           MR. NESSIM:  May I have a moment, your Honor.

16           No further questions.

17           THE COURT:  Members of the jury, let me instruct you,

18   I'm going to give you further instructions at the close of the

19   case with respect to the limited purpose to which you can put

20   some of the testimony that you've heard.  Suffice it for now to

21   say that I'm the one who's going to define for you what is

22   material nonpublic information, what the law is with respect to

23   insider trading.  If it differs in any way from what the

24   witness says, you're going to follow my instructions and not

25   what the witness says or what any documents say.  I'm the

1  lawgiver with respect to the legal issues in this case.

2           Mr. Bach, you may proceed.

3           MR. BACH:  Thank you, your Honor.

4  CROSS EXAMINATION

5  BY MR. BACH:

6  Q.  Good morning, Mr. Lehan.  I'm Jonathan Bach.  I'm Bruce

7  Garelick's attorney.

8  A.  Good morning.

9  Q.  You know Bruce Garelick.

10 A.  Yes, I know Bruce.

11 Q.  You were his working colleague at Adage?

12 A.  That's correct.

13 Q.  You remember him?

14 A.  Absolutely.

15 Q.  And you told us that compliance is very important at Adage,

16 correct?

17 A.  That's correct.

18 Q.  Take it very seriously, right?

19 A.  Yes.

20 Q.  And you mentioned ethics and integrity as a hallmark of the

21 firm, correct?

22 A.  Correct.

23 Q.  And when you hire new employees, you consider whether they

24 are ethical and have integrity, correct?

25 A.  That's correct.

O531GAR1                    Reed - Direct

1    Q.  And at the time that Mr. Garelick was hired, Adage had

2    about 15 to 20 employees, correct?

3    A.  About 45.  Oh, when he was hired.  You're right.  That

4    was——2010, it was 45.  15 to 20 is probably right in '05.

5    Q.  And with respect to that 15 to 20 employees, I assume it

6    grew over time as the firm succeeded?

7    A.  Yes.

8    Q.  Any issue——any issue that arose with respect to compliance

9    would be run down to the ground, correct?

10   A.  That's accurate.

11   Q.  And Bruce worked at Adage from approximately January 2005

12   to late 2011?

13   A.  That's accurate.  I believe August 2011.

14   Q.  August.  Thank you.  So that's a period of about six years.

15   A.  Correct.

16   Q.  And I can't do the math in my head.  A little more or

17   little less than six years.

18          Okay.  And throughout that time Bruce Garelick had

19   zero compliance issues that you were aware of, correct?

20          MR. NESSIM:  Objection.

21          THE COURT:  Sustained under *Scarpa*, *Chambers*, and

22   *Dawkins*.

23          MR. BACH:  No further questions.

24          THE COURT:  Anything further?

25          MR. NESSIM:  No, your Honor.

1                THE COURT:  Thank you.

2                Sir, you're excused as a witness.  You may step down.

3                THE WITNESS:  Thank you.

4                (Witness excused)

5                THE COURT:  The government will call its next witness.

6                MR. NESSIM:  The government calls Benjamin Reed.

7                THE COURT:  Okay.  Mr. Reed may come into the

8      courtroom, take the witness stand.

9                Sir, please step forward.  Come into the witness box,

10     and remain standing while my deputy administers the oath.

11               THE DEPUTY CLERK:  Please raise your right hand.

12               (Witness sworn)

13               THE DEPUTY CLERK:  Please state your name for the

14     record and spell your first and last name for the record.

15               THE WITNESS:  Benjamin Reed, B-E-N-J-A-M-I-N, Reed,

16     R-E-E-D.

17               THE COURT:  Mr. Reed, please keep your voice up, speak

18     into the microphone, wait until the question is done before you

19     answer.

20               And counsel, you may inquire.

21               MR. NESSIM:  Thank you, your Honor.

22      BENJAMIN REED,

23          called as a witness by the Government,

24          having been duly sworn, testified as follows:

25

1    DIRECT EXAMINATION

2    BY MR. NESSIM:

3    Q.  Good morning, Mr. Reed.

4    A.  Good morning.

5    Q.  Where do you live?

6    A.  I live in midtown Manhattan.

7    Q.  And how old are you?

8    A.  I'm 37 years old.

9    Q.  And what is your educational background?

10   A.  Graduated high school in Binghamton, New York; and I have a

11   bachelor's in economics from Villanova University.

12   Q.  And what do you currently do for work?

13   A.  I'm the head of wealth management for E.F. Hutton.

14   Q.  What is E.F. Hutton?

15   A.  E.F. Hutton is a broker-dealer investment bank located in

16   midtown Manhattan.

17   Q.  And what are your general job responsibilities as the head

18   of wealth management at E.F. Hutton?

19   A.  I generally handle high-net-worth individuals.  They send

20   in money to manage their portfolio, to invest in stocks, bonds,

21   options, mutual funds, things like that.

22   Q.  And for approximately how long have you worked at E.F.

23   Hutton?

24   A.  Almost four years.

25   Q.  You mentioned E.F. Hutton is located in midtown Manhattan.

1   Where is your specific office located?

2   A.  It's at 590 Madison Avenue, so 57th and Madison.

3   Q.  Mr. Reed, are you familiar with the term SPAC?

4   A.  Yes.

5   Q.  And how, if at all, have you dealt with SPACs as part of

6   your job?

7   A.  E.F. Hutton I think was No. 1 over the last few years in

8   terms of number of SPAC deals.  So we have probably anywhere

9   from 10 to 20 a year that we deal with.

10  Q.  And just very generally, what is a SPAC?

11  A.  A SPAC is a special purpose acquisition corporation.  It's

12  a type of initial public offering, or IPO, where basically

13  investors will raise money for a management team and then the

14  management team will go look for an acquisition target, a

15  company to acquire and bring public.

16  Q.  And approximately how long do SPACs generally have to merge

17  with a private company?

18  A.  It varies, but generally anywhere from a year to maybe

19  three years to look for a acquisition target.

20  Q.  And in your experience how do SPACs generally trade on the

21  market before a merger announcement?

22  A.  They——it varies between SPACs but generally trades roughly

23  around where it went public.  So usually SPACs are brought

24  public at $10 a share.  Generally they'll trade around 9 to

25  maybe $11 a share, very close to where it initially went

1   public.

2   Q.  And in your experience what happens after a merger

3   announcement?

4   A.  It depends on what the announcement is.  If the market

5   likes the announcement, the SPAC can jump up, you know, 10, 20,

6   30 percent.  It can also go up a multiple, if it's a very big

7   deal, you know, like 2 or 3 or 4 or 5 x.  And if it's a deal,

8   an announcement that the market doesn't like, it can drop by,

9   you know, 10 or 50 percent.  Depends on the announcement,

10  really.

11  Q.  Is it ever the case that SPACs do not successfully identify

12  a merger target?

13  A.  Yes.

14  Q.  And what happens in those cases?

15  A.  Basically the SPAC dissolves, and investors get their money

16  back, their 10 percent——their $10 back per share, and also

17  usually receive a little bit of interest for their time, maybe

18  1 or 2 percent.

19  Q.  Are you familiar with DWAC?

20  A.  Yes.

21  Q.  What was DWAC?

22  A.  DWAC was a SPAC that we did a few years ago.

23  Q.  You said "a SPAC that we did."  What role, if any, did E.F.

24  Hutton as an entity have with DWAC?

25  A.  E.F. Hutton was the lead underwriter, meaning we were the

1    investment bank who brought the deal public, the DWAC deal

2    public.

3    Q.   And were you involved in that underwriting process?

4    A.   No.

5    Q.   And why is that?

6    A.   That's what the investment bankers do.  It's a different

7    license.  And so I'm not involved with that.

8    Q.   And what, if any, rules actually govern the relationship

9    between investment bankers at E.F. Hutton and your role in

10   wealth management?

11   A.   Well, there's—there's actual walls that separate the

12   investment bankers from pretty much everyone else, including

13   retail, me.  And that's to make sure information doesn't pass

14   between the two.

15   Q.   And why do those policies exist?

16   A.   That's to prevent insider trading.  So, you know, if I were

17   to hear something that the investment bankers were doing, are

18   doing, I could potentially trade on that, so there's physical

19   walls to keep those groups separate.

20   Q.   And in addition to E.F. Hutton's role as underwriter, what

21   role did you have personally in relation to DWAC?

22   A.   I had a handful of investors, retail investors, clients who

23   invested into DWAC.

24   Q.   And when were those investments first made or when were

25   those clients first referred to you?

1    A.  I had several existing clients that I'd had for various

2    amount of time, maybe up to a few years that I invested, and

3    then I also had five or six referrals, which were referred from

4    the company DWAC itself, I think around August of 2021.

5    Q.  And what was happening with DWAC in around August of 2021?

6    Why was it that you became involved at around that time?

7    A.  Because the company was looking to go public.  The SPAC was

8    going to go public in the coming weeks.

9    Q.  And what was it that you were tasked with in around August

10   in relation to that potential public offering?

11   A.  The company had a few referrals, five or six individuals

12   that wanted to invest in the SPAC IPO, and so they were

13   referred to me to open their retail accounts and to get shares

14   in the IPO.

15   Q.  And what type of investments in DWAC were available to

16   purchase at the time of its IPO?

17   A.  There's only one.  It was a unit.

18   Q.  And what was a DWAC unit?

19   A.  The DWAC unit was in the——in one-unit share.  There was a

20   share of stock, DWAC stock, and a half of a DWAC warrant.

21   Q.  And what is a share of stock?

22   A.  Share of stock is a piece of ownership in a publicly traded

23   company.  So like a share of Apple, if you own a share of

24   Apple, you are a small owner in——of Apple.

25   Q.  What is a warrant?

1   A.  A warrant is a piece of paper that gives you the option to

2   buy more shares with certain parameters.

3   Q.  And how does that play out?

4   A.  It depends on——there's a lot of warrants out there, so it

5   depends.

6   Q.  Let's talk about the DWAC warrant.  Are you familiar with

7   the terms of that warrant specifically?

8   A.  I think so.  I think it——I think it was a five-year

9   warrant, and the strike price, meaning the conversion price,

10  was $11.50.

11  Q.  And so how does a——how would one exercise a DWAC warrant?

12  A.  So if, say, for example, the stock ran up to $20 a share,

13  this would allow you to buy shares down at $11.50, which you

14  could then hypothetical sell for $20.  So it gives you a chance

15  to buy more stock, potentially at a lower price.

16  Q.  Did you become familiar with the Shvartsman brothers at

17  E.F. Hutton?

18  A.  Yes.

19  Q.  And who are they?  How did you meet them?

20  A.  They were two of the referrals from the company for the

21  DWAC IPO.

22          MR. NESSIM:  Mr. Bianco, can you please publish this,

23  just for the witness and parties, what's been marked for

24  identification as Government Exhibit 449.

25          And if you could just scroll through, maybe just one

1   page down.

2          The government offers Government Exhibit 449.  This is

3   referenced in Joint Exhibit 2 as well.

4          MR. BROD:  No objection.

5          THE COURT:  Received.  449 is received.

6          (Government's Exhibit 449 received in evidence)

7          MR. NESSIM:  Mr. Bianco, can you please turn to page 5

8   of Government Exhibit 449 and publish it for the jury.

9          So Mr. Bianco, can you please just zoom in first to

10  the header information and where it says Alex and the first

11  paragraph below that.

12  BY MR. NESSIM:

13  Q.  Mr. Reed, what is——what's this?

14  A.  This is an email from me to Alex——forgive me on the

15  pronunciation——Monje.

16  Q.  And what's the date of this email?

17  A.  August 4, 2021.

18  Q.  And can you just read the body that's on this portion of

19  the blown up screen.

20  A.  "Alex, I tried calling you but got your voicemail.  If we

21  are going to get these accounts opened, this is the day to do

22  it.  That doesn't mean tonight, that means right now.  As a

23  recap——"

24  Q.  And what was it that you were referring to in this email?

25          MR. NESSIM:  And Mr. Bianco, actually, you can zoom

1   out.

2   Q.  Do you know what accounts you're referencing in this email?

3   A.  Yeah.  This looks like an email I sent regarding these

4   referral accounts and saying, hey, we need to get a move on to

5   get these accounts open.

6           MR. NESSIM:  And Mr. Bianco, can you just zoom in to

7   the "as a recap" section.  And actually, you can go all the way

8   to the bottom.  Thank you.

9   Q.  And who were the referral accounts that are referenced in

10  this portion of your email, or who were the individuals

11  associated with those accounts?

12  A.  Gerald Shvartsman, Raymond Coral, Michael Shvartsman,

13  Stephen Breyer, Anton Postolnikov.

14  Q.  And we don't need to read the whole email, but just

15  generally, what type of information are you seeking in terms of

16  setting up these accounts?

17  A.  So this is "know your customer" information.  KYC is what

18  we call it.  That would include, you know, date of birth,

19  address, Social Security number, financial information and

20  experience, so annual income net worth, their experience

21  trading stocks, bonds, or other types of securities.

22  Q.  And under Michael Shvartsman, it says, "we need the

23  corporate doc for Rocket Holdings, LLC."  What's that a

24  reference to?

25  A.  I believe that's a reference to his entity account, that

O531GAR1                    Reed - Direct

1   they were looking to set up.

2   Q.  And under Anton Postolnikov, toward the bottom, it says,

3   Anton Postolnikov, APLC Investments, LLC."  What relationship,

4   if any, is there between Anton Postolnikov and that entity?

5   A.  That is his entity.  So we set up an account for APLC

6   Investments, LLC, of which Anton was the person with authority

7   on the account to make trades.

8          MR. NESSIM:  Mr. Bianco, can you please zoom out and

9   let's scroll to the bottom of page 3 and top of page 4.  And if

10  you could just——I'm sorry.  Scroll up just a tiny bit, please,

11  Mr. Bianco.  And if you can highlight from the header

12  information to the signature line.  Thank you.

13  BY MR. NESSIM:

14  Q.  Mr. Reed, who is this email from?

15  A.  This is from Bruce G.

16  Q.  And what's the date this email was sent?

17  A.  August 4, 2021.

18  Q.  And who is it sent to?

19  A.  Sent to Alex Monje, myself, and Michael Park.

20  Q.  And just to read the body here, "Hi, Alex/Ben.  Answering

21  your questions regarding Rocket Holdings, LLC and Michael

22  Shvartsman.  There's some additional text there.  Please let me

23  know if you have any questions.  Look forward to finalizing the

24  IPO paperwork with you."  Who is it who sent this email?

25  A.  Bruce Garelick sent this.

O531GAR1                    Reed - Direct

1    Q.  Did you interact with Bruce Garelick?

2    A.  It's been a couple years, so I can't remember exactly, but

3    I think I spoke with him maybe a couple times.

4              MR. NESSIM:  And Mr. Bianco, can you scroll up,

5    please.

6    Q.  And then at the top of this thread, who is that email at

7    the top from?

8    A.  Bruce Garelick.

9    Q.  And generally, what is it that he is responding to in this

10   email?

11   A.  He's responding to my—it looks like my previous email,

12   which went through outstanding items that we need answered or

13   information we need to open the account.

14   Q.  Open which account?

15   A.  This is Michael Shvartsman's Rocket Holdings account.

16             MR. NESSIM:  And then actually, Mr. Bianco, can you

17   just zoom in to Mr. Garelick's signature block.

18   Q.  What's the title provided there?

19   A.  CSO.

20             MR. NESSIM:  Mr. Bianco, you can take that down,

21   please.

22             Pursuant to Joint Exhibit 1, the parties' agreement in

23   Joint Exhibit 1, the government offers Government Exhibits 320,

24   330, and 335.

25             MR. BROD:  Can I just take a look.

1           (Counsel conferring)

2               MR. BROD:  No objection.

3               THE COURT:  320, 330, and 335 are all received.

4               (Government's Exhibits 320, 330, 335 received in

5       evidence).

6    Q.  Did the Shvartsman brothers set up accounts at E.F. Hutton?

7    A.  Yes.

8               MR. NESSIM:  Mr. Bianco, can you please publish

9       Government Exhibit 320.

10              If you can just zoom in to the top portion of this

11      exhibit, please.

12   Q.  Mr. Reed, what is the information contained on this page of

13      Government Exhibit 320?

14   A.  This is our new account form for Rocket One Capital, LLC,

15      with some of that "Know Your Customer" information I mentioned

16      before.

17   Q.  And who is the name and address of the individual under

18      Entity Contact?

19   A.  Michael Shvartsman.

20              MR. NESSIM:  And Mr. Bianco, if you could zoom out for

21      a moment.

22              If you could scroll to the next page, please.

23              Next page, please.  Next page.  If you could zoom in

24      to the signatures there, please, Mr. Bianco.

25

1   BY MR. NESSIM:

2   Q.  Who are the authorized signatories on this account?

3   A.  Michael Shvartsman and Michael G. Park.

4           MR. NESSIM:  Mr. Bianco, please publish Government

5   Exhibit 330.  Mr. Bianco, if you could please zoom in to the

6   name and address section.

7   Q.  What does "new account form" relate to, Mr. Reed?

8   A.  This is a new account form for Gerald Shvartsman.

9           MR. NESSIM:  Mr. Bianco, can you just zoom out for a

10  moment.  At the bottom of this document, Mr. Bianco, can you

11  zoom into the information that's at the very bottom of the

12  page, the RBC correspondence services.

13  Q.  What's RBC Capital Markets?

14  A.  RBC Capital Markets is a clearing firm.  It's our clearing

15  firm.

16          MR. NESSIM:  Mr. Bianco, can you zoom out for a

17  moment, please.  Can you scroll to the next page.  It's

18  actually maybe four pages down.  Sorry.  Six pages down.

19  Q.  Do you see at the top of this page of Government Exhibit

20  330, it says "Benchmark" at the top.  What is Benchmark?

21  A.  The Benchmark is a broker dealer.  At the time, I believe

22  at this time, E.F. Hutton was a division of Benchmark.  So

23  Benchmark was kind of the name on the account statements and

24  that's why it shows here.

25  Q.  Is Benchmark still associated with E.F. Hutton?

A.   E.F. Hutton eventually went and bought Benchmark.  So now

it is just E.F. Hutton.

Q.   And the relationship between E.F. Hutton and RBC Capital

Markets is what?

A.   That still exists.  RBC Capital is still our clearing firm.

E.F. Hutton.  Sorry.

          MR. NESSIM:  Mr. Bianco, you can take these exhibits

down, please.

          Can you please publish just for the jury and the

witness an Excel sheet that's Government Exhibit 824.

          The government offers Government Exhibit 824.

          MR. BROD:  No objection.

          THE COURT:  824 is received.

          (Government's Exhibit 824 received in evidence)

          MR. NESSIM:  Mr. Bianco, can you publish this to the

jury and zoom out slightly so we can see a few of the

remaining -- thank you.

Q.   Mr. Reed, what is Government Exhibit 824?

A.   This is the allocation sheet we send after a deal is

closed.  So it basically gives you the clients and their

account numbers and the number of shares they received in a

deal.  This one is for a Digital World SPAC.

          MR. NESSIM:  Mr. Bianco, can you scroll up slightly on

the sheet.  Thank you.

Q.   Who's listed under "broker name"?

1   A.  Myself, Ben Reed.

2   Q.  Did you create this indication of interest sheet?

3   A.  I believe so, yeah.

4   Q.  Under "customer names," there are a number of individuals

5   and sort of two sections.  What's the import of those two

6   sections of people or entities?

7   A.  So the bottom one, R99 is my existing clients that invested

8   into it.  Then the top group is the referrals that we receive

9   for the deal.

10          MR. NESSIM:  Just to draw your attention to column G,

11   Mr. Bianco, if you could select that column.

12   Q.  What's the information that's included in that column?

13   A.  This is if the order is solicited or unsolicited.

14   Q.  What do those terms mean in reference to this document?

15   A.  "Solicited" means essentially the recommendation to buy or

16   sell comes from the advisor or myself.  "Unsolicited" means the

17   decision to buy or sell comes from the client.

18   Q.  And so, the group from rows 8 to 13 are all unsolicited; is

19   that right?

20   A.  That's correct.

21   Q.  What's included on this chart in columns H and I where it

22   says "dollar" and "indication" and "shares," what does that

23   mean?

24   A.  So "indication of interest," "indication" in column I is

25   the amount of shares that a client is asking for in an IPO.

1  The dollars is that equivalent or thereabouts.

2  Q.  What do you mean by, "that's the amount they're asking for

3  in the IPO"?

4  A.  So, for example, if a client wants to buy 10,000 shares in

5  an IPO, he'll say, I'm indicating, I'm asking for 10,000

6  shares, and that would go in that column.

7  Q.  And then what's the relationship between the information in

8  columns H and I and the information in the "shares retained"

9  column and column M?

10  A.  So H and I is how much they're asking for, and then H and

11  M, "shares retained," is how many they actually received in the

12  IPO.

13  Q.  And why would there be a difference between -- and just to

14  take an example --

15         MR. NESSIM:  Mr. Bianco, could you please highlight

16  row 12, Rocket One Capital LLC.

17  Q.  First of all, who's the individual associated with that

18  entity?

19  A.  Michael Shvartsman.

20  Q.  What was the indication of interest in the IPO associated

21  with that account?

22  A.  20,000 shares.

23  Q.  And what was the shares retained for that account?

24  A.  14,500.

25  Q.  So why would the shares retained be lower than the

1  indication of interest?

2  A.  So, short answer is mainly it's due to supply and demand.

3  If there's more demand than available shares, you can be scaled

4  back on what you ask for.  So you might want 10,000 shares, but

5  you might only get 1,000 or 5,000.

6        MR. NESSIM:  Mr. Bianco, you can take this down,

7  please.

8        Please publish just for the witness and parties what's

9  been marked for identification as Government Exhibit 454.

10  Q.  Actually, before we turn to this exhibit, Mr. Reed, back to

11  that IPO question.  You said, "allocated shares."  What is an

12  IPO and what does it mean to be allocated shares?

13  A.  An IPO is an initial public offering.  So that means when a

14  company starts trading, usually on the NASDAQ or New York Stock

15  Exchange for the first time and it's public, anyone can buy

16  shares of it through E-Trade, Scottrade, whatever you have.  So

17  that's what an IPO means.

18        "Allocation" means, again, there's a limited number of

19  shares you can get in the IPO deal.  And to be allocated means

20  how many you received of those limited amount of shares.

21  Q.  When an investor purchases IPO shares, who are they

22  purchasing those IPO shares from?

23  A.  They're purchasing it from the issuer.  So the company

24  going public issues X amount of shares, and that's what the

25  investors are buying.

O53Cgar2                    Reed - Direct

1  Q.  And the allocation is the portion of those shares that each

2  participant in the IPO receives in that process?

3  A.  That's correct.

4          MR. NESSIM:  Mr. Bianco, could you please publish just

5  for the witness and parties what's been marked as Government

6  Exhibit 454.

7          The government offers Government Exhibit 454.

8          MR. BROD:  No objection.

9          THE COURT:  454 is received.

10         (Government's Exhibit 454 received in evidence)

11         MR. NESSIM:  Mr. Bianco, can you please scroll to page

12  3 of Government Exhibit 454 and publish it for the jury.

13         Mr. Bianco, if you could please zoom in from the email

14  to the header to the sign-off, "Best, Ben."

15  Q.  Mr. Reed, who is this email from?

16  A.  This is from me.

17  Q.  Who did you send it to?

18  A.  Michael Shvartsman, Michael Park, and Bruce Garelick.

19  Q.  What was the date that you sent this email?

20  A.  September 3rd of 2021.

21  Q.  The subject line reads, DWACU allocation.  Can you please

22  read the content of this email.

23  A.  Good morning, gentlemen.  You received 14,500 DWACU shares.

24  Deal was priced at $10 and should begin trading later this

25  morning.  Please don't hesitate to reach out at any point today

1    to discuss.  Best, Ben.

2    Q.  What's the information that you're communicating to

3    Mr. Shvartsman, Mr. Garelick, and Mr. Park?

4    A.  I'm letting them know the deal closed, they received their

5    allocation, they received 14500 of these shares, these unit

6    shares, and that the deal was priced at $10.  I'm giving an

7    indication it will start trading a little later on in the

8    morning.

9    Q.  You say the deal closed.  What deal are you referring to?

10   A.  The Digital DWAC Digital World Acquisition Corp. deal IPO

11   closed.

12           MR. NESSIM:  Mr. Bianco, could you scroll up a moment,

13   please.

14   Q.  That email on September 3rd, who wrote that email?

15           MR. NESSIM:  Mr. Bianco, if you could highlight the

16   very bottom of this page where there's some header information

17   and brief text.

18   A.  I believe that's Michael Shvartsman's email, and he's

19   saying thank you.

20           MR. NESSIM:  Mr. Bianco, could you please scroll to

21   the top of this exhibit.

22   Q.  So after the IPO allocation in early September, what

23   happened next with the Rocket One account at E.F. Hutton?

24   A.  I don't remember specifically.

25   Q.  Well, let me draw your attention to the top email on this

1    page here.  Who's this email from?

2    A.   This is from Michael Shvartsman.

3    Q.   And who's it to?

4    A.   To me and to Bruce Garelick.

5    Q.   What's the date of this email?

6    A.   October 1st, 2021.

7    Q.   What is it that Michael Shvartsman wrote to you?

8    A.   Ben, can you please call me on 786-350-9353.  Thanks.

9              MR. NESSIM:  Mr. Bianco, can you please publish just

10   for the witness and parties what's been marked for

11   identification as Government Exhibit 820.

12             The government offers Government Exhibits 820, 822,

13   823, and 825.

14             MR. BROD:  No objection, Judge.

15             THE COURT:  820, 822, 823, and 825 are all received.

16             (Government's Exhibits 820, 822, 823, 825 received in

17   evidence)

18             MR. NESSIM:  Mr. Bianco, could you please publish

19   Government Exhibit 820.

20   Q.   Mr. Reed, do you recognize this exhibit?

21   A.   Is there more?

22   Q.   Well, let me ask you first to read the two words visible on

23   this exhibit.

24   A.   Rocket One.

25             MR. NESSIM:  Mr. Bianco, if you could please scroll to

1    page 6.

2            THE COURT:  Members of the jury, this is obviously

3    redacted.  I'll give you an instruction at the end of the trial

4    about redactions.

5            Go ahead.

6    Q.  This is page 6 of Government Exhibit 820.  It's the last

7    page of this exhibit.  Do you recognize this portion of the

8    exhibit?

9    A.  This looks like my notes for the account.

10   Q.  Before we get into the specifics of what these notes say --

11           MR. NESSIM:  Actually, Mr. Bianco, if you could zoom

12   out for a moment.

13   Q.  Can you just describe what is your note taking practice on

14   the accounts on which you're the wealth manager.

15   A.  Sure.  What I try and do is just take notes of anything

16   kind of important discussed mainly around when trades are made.

17   So, if we buy or sell something, I'll try and note that on the

18   day it happened.  My notes are shorthand, they're not always

19   accurate, but it's just something I can go back, potentially if

20   there's a dispute, and say, okay, we did speak on this day, did

21   discuss buying or selling this security.

22   Q.  So I'd like to draw your attention to this note on October

23   1st of 2021.

24           MR. NESSIM:  Mr. Bianco, if we could please zoom into

25   it.

1   Q.  This is the same date as that email we just looked at where

2   Michael Shvartsman said please call me.

3           Can you read the first three paragraphs of this note.

4   A.  Called and said DWACU has split, asked me to split his

5   units.  No problem, should take a day or two.  I'll let him

6   know when we're done.

7           Wants me to buy him 2 million DWACW, less than 50

8   cents, don't run it up, over the course of the next few weeks.

9   Said, it's super lightly traded, so it's going to take some

10  time, he understands.  Charge 1 percent or less.  He'll wire in

11  the funds, we need to touch base every morning to confirm more

12  orders.  And also email him in the afternoon if I can.

13          No problem.

14  Q.  First of all, it says, called and said DWACU has split,

15  asked me to split his units.  Do you know what that refers to?

16  A.  Yes.  SPAC IPOs, after a certain amount of time — and it

17  varies between SPACs — you have the option of splitting your

18  unit into its parts.

19  Q.  What's the purpose of splitting units into its parts?

20  A.  You don't need to, it's an option.  Each client has their

21  own kind of reasons for doing it, I would say.

22  Q.  What is splitting it allow someone to do with the share and

23  the warrant that are the new split parts of the unit?

24  A.  So, when they're in a unit, they trade together.  So if you

25  sell one unit, you're selling both of them.  If you split it,

1   you have more flexibility.  So you could potentially sell your

2   shares and keep your warrants or sell your warrants and keep

3   your shares.  Again, you have more flexibility of what you can

4   do.

5   Q.  In the next paragraph, it says wants me to buy him two MM

6   DWACW, less than 50 cents, don't run it up over the course of

7   the next few weeks.  What is that a reference to?

8   A.  That's him saying he wants to buy 2 million of the warrants

9   — this would be in the open market — at a price of less than

10  50 cents per warrant.  "Don't want to run it up" means try our

11  best not to have it go above 50 cents.  "Can do this over the

12  next few weeks," to take your time, no rush, basically.

13  Q.  You said the purchase of the 2 million DWAC warrants would

14  be on the open market.  What do you mean by "the open market"?

15  A.  So this is after the IPO is closed.  So this is no longer

16  buying the IPO because that was a month ago.  This is buying

17  the shares like you would buy Apple stock right now.  You can

18  buy it on the NASDAQ or New York Stock Exchange.

19  Q.  So in addition to buying stocks, you can buy warrants on

20  those stock exchanges?

21  A.  It depends.  If the warrant trades, yes, and this warrant

22  traded.

23  Q.  And then at the end of this paragraph, you wrote, we need

24  to touch base every morning to confirm more orders.  What is

25  that a reference to?

1    A.  If this took more than a day to do, which it looks like

2    that's what we discussed, it would take some time, we would

3    need to confirm the order verbally every morning or every day

4    before we enter the order.

5         MR. NESSIM:  Mr. Bianco, you can take that down,

6    please.

7         Let's turn to page 15 of Government Exhibit 320.

8    Q.  This is an account statement, Rocket One Capital is listed

9    as the recipient.  What's the timeframe of this statement?

10   A.  October 1st of 2021 to October 31st of 2021.

11        MR. NESSIM:  Mr. Bianco, could you please turn to page

12   19.  If you could just highlight the section under "purchases."

13   Q.  I should have asked earlier.  That October 1st note that

14   you made, was that after a phone call or what was the

15   interaction with Mr. Shvartsman?

16   A.  I mean, I don't remember now, but in the notes, it says

17   "called," I think it said "called him."  So it was after a

18   phone call and discussion, yes.

19   Q.  What did you do after that October 1st phone call, based on

20   the statement here?

21   A.  We bought 227,915 of the Digital World warrants at

22   approximately 47 cents.

23   Q.  And then what happened on October 4th of 2021?

24   A.  We purchased about 1.6 million of the Digital World

25   Acquisition warrants.  So bought it around 48 cents or so.

1   Q.  And the next day on October 5th, what happened?

2   A.  We purchased an additional $130,000 some odd warrants of

3   Digital World Acquisition at about 47 cents.

4   Q.  And in total, approximately how many warrants of Digital

5   World Acquisition did you purchase over these three days for

6   Mr. Shvartsman's Rocket One account?

7   A.  That looks like approximately 2 million.

8   Q.  What was the approximate cost of those purchases?

9   A.  Approximately $978,000.

10          MR. NESSIM:  Mr. Bianco, you could take this down,

11  please.

12          Could you please publish just for the parties and the

13  witness what's been marked for identification as Government

14  Exhibit 468.

15          May I have one moment, your Honor?

16          THE COURT:  Yes.

17          (Pause)

18          MR. NESSIM:  Mr. Bianco, can you pull up just for the

19  parties Government Exhibit 476, please.  And 471, please.  And

20  489, please.

21          Your Honor, at this time, the government would offer

22  Government Exhibits 468, 469, 471, 476, and 489.

23          MR. BROD:  No objection.

24          THE COURT:  468, 469, 471, 476, and 489 are all

25  received.

1          (Government's Exhibits 468, 469, 471, 476, 489

2    received in evidence)

3          MR. NESSIM:  Mr. Bianco, could you please go to 468,

4    please.  Please publish that for the jury.  Mr. Bianco, if you

5    could zoom into the top of this page down to the second email

6    on the thread.

7    Q.  Mr. Reed, who sent this email, the second email on the

8    page?

9    A.  I did.

10   Q.  To who?

11   A.  To Michael Shvartsman.

12   Q.  On what day?

13   A.  Tuesday, October 5th, 2021.

14   Q.  And the subject line reads, "update."  What is it that

15   you're updating him about?

16   A.  I'm letting him know that we bought the additional 130,000

17   warrants, the average price for those warrants, and that he now

18   has 2 million of the digital warrants that he wanted.

19         MR. NESSIM:  Mr. Bianco, you could take that down,

20   please.

21         I want to turn to Gerald Shvartsman's account for a

22   moment.

23         Could you please publish Government Exhibit 469,

24   Mr. Bianco.  If you could zoom in, please, Mr. Bianco, to the

25   top two emails in this exhibit.

1   Q.  Mr. Reed, just drawing your attention to the second email

2   on this page, that's on Friday, October 1st, 2021, if you see

3   that.

4          MR. NESSIM:  Mr. Bianco, if you could just highlight

5   that email.

6   Q.  Who is this email from?

7   A.  This is from Gerald Shvartsman.

8   Q.  And what's the date of the email?

9   A.  Friday, October 1st, 2021.

10  Q.  And what did Gerald Shvartsman write to you?

11  A.  He said, Ben, I hope all is quell.  Could you please

12  separate my units into Coman and warrants.

13  Q.  What do you understand that to be a reference to?

14  A.  He's asking to split his Digital World Acquisition units

15  into the underlying common share and the warrant.  So

16  separating them.

17         MR. NESSIM:  Mr. Bianco, if you could zoom out and

18  let's zoom into the top email on this page.

19  Q.  Mr. Reed, who is this email from?

20  A.  Gerald Shvartsman.

21  Q.  And who is it to?

22  A.  It's to me.

23  Q.  What's the date of this email?

24  A.  October 6th, 2021.

25  Q.  And is it that Mr. Shvartsman, Gerald Shvartsman wrote to

1  you on October 6th?

2  A.  Ben, I would like to buy some warrants in DSPAC.  Can you

3  call me tomorrow.

4  Q.  DSPAC, do you know what that's a reference to?

5  A.  I think that's a typo.  I think he meant to say DWAC.

6  Q.  Does DSPAC have a term in the financial world, does it have

7  a meaning in the financial world?

8  A.  Yes, it does.

9  Q.  What does it mean?

10  A.  DSPAC is the term you use when a company makes a SPAC,

11  makes its announcement of the acquisition target and then goes

12  through with that.

13         MR. NESSIM:  Mr. Bianco, can you please publish

14  Government Exhibit 471.  Can you scroll to the next page,

15  please.  I'm sorry.  You can go back up.  Can you please zoom

16  into the second email on this page that's from Ben Reed on

17  October 7th, 2021.

18  Q.  What is this email that you wrote to Mr. Gerald Shvartsman

19  on October 7th of 2021?

20  A.  This email says -- I'm letting him know that he bought

21  275,000 Digital World DWAC warrants at an average price of

22  about 47 cents.  I'm letting him know the amount owed for that

23  purchase and if he wants to buy another $11,000 worth, we can

24  do so tomorrow.

25  Q.  What do you understand he meant by the remaining 11,000

O53Cgar2                     Reed - Direct

1   were?

2   A.  I think he most likely said I want to buy $100,000 worth.

3   That's probably me saying, hey, you want to finish that

4   purchase, we can do it tomorrow.

5           MR. NESSIM:  Mr. Bianco, can you please zoom out.

6   Q.  What was Mr. Gerald Shvartsman's response to you?

7   A.  Yes, please do.

8   Q.  What day did he send that?

9   A.  That's October 7th, 2021.

10          MR. NESSIM:  Mr. Bianco, can you please publish

11  Government Exhibit 476.  Let's zoom into the portion with

12  content, please.

13  Q.  Mr. Reed, who is this email from?

14  A.  Gerald Shvartsman.

15  Q.  Who is it to?

16  A.  It's to me.

17  Q.  What's the date of this email?

18  A.  October 18th, 2021.

19  Q.  What's the subject line?

20  A.  DWAC warrants.

21  Q.  What is it that Gerald Shvartsman wrote to you?

22  A.  He's saying please buy another 100,000 warrants for me.

23          MR. NESSIM:  Mr. Bianco, can you please turn to

24  Government Exhibit 330 on page 17.

25  Q.  Who does this page of the statement relate to?

1  A.  Gerald Shvartsman.

2          MR. NESSIM:  Mr. Bianco, if you could highlight the

3  timeframe under "account statement."

4  Q.  What's the timeframe of the statement?

5  A.  It's October 1st of 2021 to October 31st of 2021.

6          MR. NESSIM:  Mr. Bianco, if you can please turn to

7  page 21.  Just zoom into the "purchases" section.

8  Q.  What does this indicate Mr. Shvartsman purchased over this

9  timeframe?

10  A.  He bought 270,000 Digital World warrants at about 47 cents

11  on October 7th, 2021.  On October 8th, 2021, he bought another

12  25 thousand Digital World warrants at about 45 cents.  And then

13  on the 18th of October 2021, he bought an additional 100,000

14  Digital World warrants at about 44 cents.

15          MR. NESSIM:  Mr. Bianco, you can take this down,

16  please.

17  Q.  In addition to the Shvartsman brothers, did others of the

18  referral accounts you mentioned a few moments ago of DWAC

19  continue to purchase DWAC securities?

20  A.  Yes.

21          MR. NESSIM:  Mr. Bianco, can you please publish

22  Government Exhibit 489.  Can we just zoom into the portion with

23  content, please.

24  Q.  Who is this email from?

25  A.  Anton Postolnikov.

1    Q.   And who is it to?

2    A.   To me.

3    Q.   What's the date of this email?

4    A.   October 12th, 2021.

5    Q.   And what was it that Mr. Postolnikov directed you to do?

6    A.   He asked to put in an order to purchase 500,000 warrants at

7    a price not higher than 45 cents.

8    Q.   And what is it he said on the next line?

9    A.   Let's start slowly buying it up.

10        MR. NESSIM:  Mr. Bianco, can you please publish

11   Government Exhibit 823.

12   Q.   What is this document?

13   A.   This looks like my notes for APLC account.

14   Q.   And what does APLC relate to or who does it relate to?

15   A.   APLC is the entity account that is Anton Postolnikov's

16   accounts.

17        MR. NESSIM:  Mr. Bianco, if you could just highlight

18   the entry on October 12th, 2021, the same date as that email we

19   just looked at.

20   Q.   What did you record in your notes on October 12th, 2021 in

21   relation to the APLC entity account?

22   A.   Confirmed he wants to buy 500K worth of warrants not higher

23   than 45 cents.  Take of the DWACU limit order.  Sounds good.

24   Can do 100K a day for the next few days.

25   Q.   What do you understand "take of the DWACU limit order" to

1   mean?

2   A.  I think he's probably saying -- I'm probably writing take

3   off the DWACU limit order.

4   Q.  What is a limit order?

5   A.  A limit order is an order to not buy or sell over or less

6   than a certain price.  So it's a limit price that you're not

7   willing to sell less than or buy more of above.

8   Q.  Based on these notes and the email we just looked at,

9   Mr. Postolnikov wanted you to buy 500,000 worth of warrants on

10  October 12th?

11  A.  Yes.

12          MR. NESSIM:  Mr. Bianco, you can take this down,

13  please.

14  Q.  So we've looked at a few documents and discussed some of

15  the Shvartsman brothers orders.  How did they actually place

16  their request to order certain warrants or shares with you?

17  A.  In many cases, they would email first what they are looking

18  to do and then I would call them and confirm verbally how they

19  want to place the order.

20  Q.  And where were you located over the course of those calls

21  or emails that you sent and received?

22  A.  In my office in Midtown Manhattan.

23  Q.  And once you received the confirmation that they actually

24  wanted to go forward with the purchase that they indicated,

25  what did you do with that information?

1    A.  I would either enter it on our trading system manually or

2    call it into our traders to put the order in.

3    Q.  When you say "put the order in," what do you mean by that?

4    A.  I mean I would, you know, put in buying one 100,000 shares

5    of DWACU at no greater than 45 cents or whatever the order is.

6    So I put in the specifics of that order in either our trading

7    system to buy it or whatever or give that to the trader to do.

8    Q.  Are you doing that to put the order into the market to

9    actually execute the trade or for some other purpose?

10   A.  Yes, that's correct.

11   Q.  That it's --

12   A.  To execute the trade, yes, to make the purchase in this

13   case of these warrants.

14   Q.  At the time that the Shvartsman brothers and

15   Mr. Postolnikov placed these purchase orders with you, what, if

16   anything, did you understand about their interest in buying

17   securities in DWAC?

18   A.  That they wanted to buy more of it.

19   Q.  Did you think anything about -- that they had any

20   particular information about the company's activities?

21   A.  No.  I think one of them said that they think it's going to

22   be big, but other than that, not really, no.

23   Q.  Would it matter to you if you believed that they had inside

24   information?

25   A.  Yes.

1    Q.  What would you have done if you suspected that?

2    A.  I would have gone to my compliance officer and told them

3    either what was said or why I thought that.

4    Q.  I'd like to turn your attention to October 21st of 2021.

5    Do you remember that day?

6    A.  Not specifically.  I think it's the day that the deal was

7    announced.

8    Q.  Let's talk about the day the deal was announced.

9    A.  Okay.

10   Q.  Can you let us know what you were doing that morning?

11   A.  I was taking an insurance licensing exam.  So I was getting

12   a property and casualty -- taking a property and casualty

13   insurance test.

14   Q.  Where were you taking that test?

15   A.  Somewhere in Midtown Manhattan at a testing center.

16   Q.  And what happened that day as you were leaving your exam?

17   A.  Well, I got out of the exam and then I -- you know, you

18   don't have your phone in the exam, so I got out and checked my

19   phone and I had probably 30 missed calls and voicemails and

20   texts saying where are you.  Obviously there was a lot of

21   commotion that morning.

22   Q.  And what happened, why was there so much commotion?

23   A.  Because they had announced the acquisition target, Digital

24   World had announced their acquisition target.  It was Trump's

25   Truth social media company and Digital World stock was up

1    significantly on the news.

2    Q.  And what were some of those calls that you had received

3    that you needed to look at and respond to?

4    A.  Michael Shvartsman had called I think a few times.  My

5    operations team had called a few times.  Pretty much everyone

6    had called a few times that was at all involved in Digital

7    World.

8    Q.  And you mentioned Michael Shvartsman called.  What was it

9    that he called about?

10   A.  Well, when I got back and answered his call, he was calling

11   about the news that the Trump Social had been announced and the

12   stock was up significantly.

13   Q.  And what did he want to do as a result of that development?

14   A.  He started selling portions of his shares on that day.

15   Q.  What was going on with the share price of Digital World's

16   securities throughout the course of that day?

17   A.  It was up significantly and kept going up.

18   Q.  Was it up significantly in relation to other SPACs that you

19   had been involved in or in a different way?

20   A.  That's a tough question to answer because SPACs all trade

21   differently.

22   Q.  It was a confusing question.  I'll rephrase it.

23        The impact of the announcement on DWAC's share price,

24   does that stand out in your memory for any particular reason?

25   A.  Yes.  I think it was the highest I've ever seen a SPAC go.

1    I've seen SPACs go very high, this one was probably the

2    highest.

3    Q.  Had you heard anything about the Truth Social or Trump

4    Media target before the public announcement?

5    A.  No.

6    Q.  And what did Michael Shvartsman and Gerald Shvartsman and

7    Anton Postolnikov do with their DWAC warrants following the

8    public announcement?

9    A.  They sold them afterwards at various times.

10   Q.  Did they direct their orders to sell those shares-warrants

11   to you?

12   A.  Yes.

13   Q.  How did they communicate those sales requests?

14   A.  Verbally and confirmed by phone call.

15             MR. NESSIM:  One moment, your Honor.

16   Q.  How did you feel as you left the test and you found all

17   those missed calls?

18             MR. BROD:  Objection.

19             THE COURT:  Sustained.

20             MR. NESSIM:  No further questions.

21             THE COURT:  Cross examination.

22   CROSS-EXAMINATION

23   BY MR. BROD:

24   Q.  Good morning, Mr. Reed.

25   A.  Good morning.

1    Q.  My name is Julian Brod.  I'm one of the lawyers for

2    Mr. Garelick.

3            So, you handled a series of trades for Michael

4    Shvartsman during the period October 1st through October 5th;

5    correct?

6    A.  Yes.

7    Q.  And all of those trades involved DWAC securities; correct?

8    A.  It was a couple years ago, so I don't remember, but I think

9    so, yeah.

10   Q.  And all of those trades involved a type of security known

11   as a warrant; correct?

12   A.  I believe that's accurate.

13   Q.  And those trades all stemmed from an instruction that

14   Michael Shvartsman gave you on October 1st to buy 2 million

15   warrants; correct?

16   A.  Yes.

17   Q.  And October 1st was right at the beginning of the period in

18   which investors, members of the general public could buy DWAC

19   warrants in the open market; correct?

20   A.  I don't remember the specific date.  I think so.

21   Q.  I think you testified earlier about the warrants splitting

22   or disaggregating.  Do you remember that testimony?

23   A.  I just don't remember the specific date.

24   Q.  Setting aside a specific date, the date on which the

25   warrants split was the very first date on which a member of the

1    general public could go out into the market and buy DWAC

2    warrants; correct?

3    A.  Yes.

4    Q.  So if an investor had been waiting to buy warrants, that

5    was the first day on which they could go and make that

6    purchase; right?

7    A.  That's correct.

8    Q.  And you spoke with Michael Shvartsman by phone on October

9    1st; correct?

10   A.  Yes.

11   Q.  And we saw your notes regarding that call; right?

12   A.  Yes.

13   Q.  And he told you that he wanted to buy 2 million warrants;

14   right?

15   A.  Yes.

16   Q.  And he didn't want to buy them all at once?

17   A.  Correct.

18   Q.  He wanted you to spread out the purchases?

19   A.  Yes.

20   Q.  And you testified in response to Mr. Nessim's questions

21   that he just didn't want to -- he didn't want to rush the

22   purchases; right?

23   A.  That is correct.

24   Q.  But there's a reason why somebody buying warrants in a

25   thinly traded market would want to spread out their purchases;

1    correct?

2              MR. NESSIM:  Objection.

3              THE COURT:  Overruled.

4    A.  There could be multiple reasons, but yes.

5    Q.  Well, one reason is because if you're looking to buy a

6    large amount of a security that has low trading volume,

7    spreading out your purchases helps ensure that you're not

8    driving the price up as you buy; right?

9    A.  That's correct.

10   Q.  And it's a common trading strategy, to spread out purchases

11   in a thinly traded market; right?

12   A.  Yes.

13   Q.  And DWAC was a thinly traded security at this point, DWAC

14   warrants; correct?

15   A.  I believe so.

16   Q.  And it may not even have been possible, for example, to buy

17   2 million warrants in one day; right?

18   A.  I think you could, but not at a certain price.  So with the

19   price --

20   Q.  Please explain.

21   A.  If you're not wanting to pay over a certain price, that

22   might be difficult to do, but if you're willing to pay any

23   price, you could potentially get 2 million warrants.

24   Q.  In other words, trades don't happen automatically, they

25   require a willing buyer and a willing seller.  If you want to

1    buy a large amount of a thinly traded security at one time, you

2    have to go out and find that buyer; right?

3    A.   Roughly, yeah.

4              MR. BROD:  Can we pull up Government Exhibit 820.

5    Hold on.  Can you take that down.  Thank you, Mr. Bianco.  And

6    Mr. Bianco, if you could scroll to the very last page, please.

7    Q.   You see at the bottom of your notes of the 10/1 call,

8    you've added a note there and it's highlighted.  Do you see

9    that?

10   A.   Yes.

11   Q.   And you highlighted that; right?

12   A.   I think so.

13   Q.   Can you read that note, please.

14   A.   Also, it's half a warrant, so it would be worth half the

15   difference.  Tell high tomorrow.

16   Q.   Do you know what this note was about?

17   A.   I think this was me saying there's a half warrant in the

18   unit, so I wasn't thinking of that when we had our previous

19   discussion and I should tell him that tomorrow.  I think that's

20   a typo.

21   Q.   So when you had your discussion with Mr. Shvartsman on

22   10/1, you weren't sure whether he had full information; right?

23   A.   I'm not sure.  I think this turned out to be wrong, so I'm

24   not sure.

25   Q.   That's correct, it turned out to be wrong.

1          MR. BROD:  If we go up one page, Mr. Bianco.

2    Q.  You paused the purchases of warrants because you weren't

3    sure whether Mr. Shvartsman had the correct information when

4    you spoke with him on 10/1; correct?

5    A.  I'm not sure of that.

6    Q.  Well, you called him on October 4th; correct?

7    A.  Yes.

8    Q.  And you confirmed that you were going to continue the

9    purchases; correct?

10   A.  Correct.

11   Q.  And between your call on 10/1 and 10/4, you had found the

12   correct information about the terms of the warrants; right?

13   A.  Correct.

14   Q.  And that was public information; right?

15   A.  Yes.

16   Q.  You didn't go over the wall to your investment banking

17   colleagues and say, tell me about the warrants.  You went to

18   publicly available information to find out about the terms of

19   the warrants; right?

20   A.  Correct.

21   Q.  You went to documents filed with the SEC; correct?

22   A.  I think I was just thinking about it wrong and then looked

23   at it and was like, oh, yeah, that's incorrect.

24   Q.  And when you spoke with Mr. Shvartsman on 10/4, he told you

25   to continue with the previously discussed plan and keep buying

1   up to get to 2 million warrants; correct?

2   A.   That's correct.

3   Q.   In other words, continue as instructed on October 1st;

4   right?

5   A.   Correct.

6           MR. BROD:  Mr. Bianco, if you could move to the next

7   note, 10/5.

8   Q.   And you spoke with Mr. Shvartsman again on 10/5; correct?

9   A.   Correct.

10  Q.   And you confirmed that you would buy the remainder of the

11  2 million warrants that he requested; right?

12  A.   If possible, yes.

13  Q.   And it was possible, you completed the purchase of the

14  2 million warrants on that day; correct?

15  A.   I think that's right, yes.

16          MR. BROD:  Ms. McFerrin, could we see Government

17  Exhibit 468, please.

18  Q.   Just focusing on the second email, you were shown this by

19  Mr. Nessim, you see, you say bought remaining 130,354 DWAC

20  warrants today at an average price of about -- I'll leave the

21  number out.  You now have the desired 2 million DWACW warrants.

22          Do you see that?

23  A.   Yes.

24  Q.   And that's a reference to the warrants he had told you he

25  wanted on October 1st; correct?

O53Cgar2                    Reed - Cross

1    A.  Correct.

2              MR. BROD:  We can take this down.

3    Q.  After this purchase, Mr. Shvartsman made no further

4    purchases of DWAC securities; that's correct?

5    A.  I can't remember, but I think that's right.

6    Q.  His instruction, his primary instruction was given to you

7    on October 1st, you carried it out and then he was done; right?

8    A.  I believe that's right.  If I saw the statement, I'd know

9    for sure, but I believe that's right.

10   Q.  Let me just ask you about your note taking practices.

11             You testified that it's your general business practice

12   to keep a note, a contemporaneous note of your calls with

13   clients?

14   A.  I try to, yes.

15   Q.  And those notes are not verbatim, but you try to include

16   all of the important details; correct?

17   A.  Correct.

18   Q.  And that's so that you have a record of what the client

19   asked you to do should there ever be a dispute; right?

20   A.  That's correct.

21             MR. BROD:  Mr. Bianco, if I could impose on you again

22   to pull up government 820 and go to the last page.

23   Q.  So you see here, Mr. Reed, we see the instruction to buy

24   2 million warrants, we see that he wants to buy at less than

25   50 cents, the instruction not to run it up, but we don't see

O53Cgar2                    Reed - Cross

1   any instruction about how many warrants he wants purchased on

2   10/1 itself.

3            Do you see that, sir?

4   A.  I see that he wants to buy 2 million of the warrants.

5   Q.  But over time; correct?

6   A.  I believe it's 2 million warrants.  If you can get them for

7   less than 50 cents, fine.  I don't see specifically that day,

8   if that's what you're asking.

9   Q.  For example, he doesn't say buy me 200,000 today, 200,000

10  on Friday?

11  A.  Correct.

12  Q.  And had he begin you such a specific instruction, you would

13  have certainly included it in your notes; correct?

14  A.  I think so, yeah.

15  Q.  And we don't need to bring them up just this moment, but

16  some of the other notes you were shown with Mr. Postolnikov and

17  Mr. Gerald Shvartsman, they include specific daily orders

18  requesting particular numbers of warrants; correct?

19  A.  I believe they did, yeah.

20           MR. BROD:  I don't know who is in control, but whoever

21  is in control, could we please go to the next page before.

22  Just focusing on the bottom, 10/4, 10/5.

23  Q.  Just looking at the note on October 4th, again, there's no

24  specific instruction as to how many warrants Mr. Shvartsman

25  wants you to go out into the market and buy on 10/4; correct?

1    A.  Correct, just the general idea to get to 2 million.

2    Q.  Correct, he wants you to get to 2 million, but he's not

3    specific about how you should do that; right?

4    A.  Correct.

5    Q.  And same question with regard to 10/5, he says confirmed --

6    or you write that you confirmed that we'll buy the remainder

7    today if possible and then send out the wire form; correct?

8    A.  Correct.

9    Q.  On 10/5, you had already got pretty close to the 2 million

10   cap that he wanted; right?

11   A.  I believe so, yeah.

12   Q.  Because he had made a very large purchase on 10/4; right?

13   A.  I think that was the day of the 1.6, yes.

14   Q.  And again, had Mr. Shvartsman given you specific

15   instructions on either day as to how many warrants he wanted

16   purchased that day, you would have included it in your notes;

17   correct?

18   A.  I probably would have, yes.

19   Q.  By the way, these were all open market trades; right?

20   A.  That's correct.

21   Q.  And you understood that Mr. Shvartsman had purchased

22   founders shares in DWAC; correct?

23   A.  No.

24           MR. BROD:  Well, let me show you 3508-004, just for

25   the witness please.  Page 4.

1            I'll come back to this point.  You can take it down.

2    Q.  You testified on direct, I believe, that you understood

3    that these were referral accounts from DWAC; correct?

4    A.  That's correct.

5    Q.  In other words, they were friends and family of the

6    company, in so many words; correct?

7    A.  Friends and family, yeah, know them somehow, correct.

8    Q.  That's not uncommon when a SPAC is going public, that there

9    are people who in some way associate with the company who want

10   to buy into the IPO; correct?

11   A.  Correct.

12   Q.  And you set up accounts for the purpose of these investors

13   buying the IPO; right?

14   A.  That's correct.

15   Q.  As September and October went on, these accounts were also

16   used to make open market purchases; right?

17   A.  That's correct.

18   Q.  Because, just to be clear for the jury, those are two very

19   different things.  Buying into the IPO is one thing and making

20   open market purchases is something else; correct?

21   A.  That's right.

22   Q.  And also, buying in the founders round way back before the

23   IPO, again, that is a totally different type of transaction;

24   correct?

25   A.  That's correct.

O53Cgar2                    Reed - Cross

1    Q.  These three types of transaction are subject to different

2    regulatory regimes; correct?

3    A.  Yes.

4    Q.  And so, you knew that these were referral accounts and you

5    knew that Mr. Michael Shvartsman was buying in the open market;

6    correct?

7    A.  That's correct.

8    Q.  And in general, you did not see a problem with Michael

9    Shvartsman buying warrants in the open market?

10   A.  Correct.

11   Q.  And you didn't take any notes or advise anyone that you saw

12   a problem with that; correct?

13   A.  That's correct.

14   Q.  I'm going to change topics a little bit.

15        Your job is at least in part to advise clients on

16   their investments; correct?

17   A.  Correct.

18   Q.  You made a distinction, when you were answering

19   Mr. Nessim's questions, between unsolicited and solicited

20   trades; correct?

21   A.  Correct.

22   Q.  And I think you said that the solicited trades were the

23   ones you provided advice on, recommendations?

24   A.  No, not quite.

25   Q.  Please explain.

1   A.   Solicited means the idea of the purchase or sale originates

2   with the advisor, meaning me.  So I'm basically saying you

3   should buy or sell.  Unsolicited means it originates with the

4   client.  So they're saying, I want to do this.  I can advise

5   them on either one to try and act in their best interest.

6   Q.   That's what I was going to ask you, you do in fact advise

7   both unsolicited clients who bring you unsolicited trades and

8   the clients who are bringing you solicited trades, you advise

9   both of them about the purchase; right?

10  A.   Not on every purchase.  So, for example, an unsolicited, I

11  might if they ask for advice.  If they're just saying, hey, I

12  want to buy X, Y, Z, I mean not necessarily I'll advise them on

13  it if they're, you know, if they seem like they know what

14  they're doing.

15  Q.   Correct.  And we've seen your notes of the trades we're

16  discussing here, and you're going through the pros and cons of

17  particular strategies with Mr. Shvartsman and Mr. Postolnikov

18  and Mr. Gerald Shvartsman; correct?

19  A.   Yeah.

20  Q.   You were providing advice on what they should do?

21  A.   Trying to help them with, hey, what are the risks, rewards.

22  Q.   Absolutely.  It's just part of your job.  When you do that,

23  you obviously have to familiarize yourself with the terms of

24  the particular securities; correct?

25  A.   Yes.

1   Q.  And to do that, you don't go over the wall into the

2   investment banking side, you look at the public documents;

3   right?

4   A.  Correct.

5   Q.  And that would include the prospectus?

6   A.  Correct.

7   Q.  And that's a document that you have available to you not

8   only because you can go on the SEC's website and find it, but

9   it would be circulated at the time of the IPO; correct?

10  A.  Correct.

11  Q.  In fact, you would send it out to clients?

12  A.  That's correct.

13  Q.  And you did that in this case; right?

14  A.  That's correct.

15          MR. BROD:  Ms. McFerrin, could we pull up Government

16  Exhibit 116.  If you would scroll down to the second page,

17  please go back up to the first page.

18  Q.  Do you recognize this as the September 2nd prospectus for

19  the Digital World Acquisition Corp. IPO?

20  A.  I don't recognize it on the date, but this looks like it,

21  yeah.

22  Q.  This is something you would have looked at before you

23  started advising your clients on whether they should purchase

24  different types of DWAC security; right?

25  A.  Correct.

1    Q.  And just so we remind the jury of what this is --

2              MR. BROD:  Ms. McFerrin, could you scroll through

3    five, six pages.  If you could go back to the start,

4    Ms. McFerrin, and scroll through, say, 10 pages.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O531GAR3                    Reed - Cross

1    BY MR. BROD:

2    Q.  Okay.  That's enough.

3         And just in general terms, the prospectus lists

4    information about the company that's going public, right?

5    A.  Correct.

6    Q.  It talks about the different types of security, correct?

7    A.  Yes.

8    Q.  It describes, for example——taking a warrant as an example,

9    it might describe how that warrant works, right?

10   A.  Correct.

11   Q.  It might describe——because you testified on direct, for

12   example, that there are lots of different types of warrants,

13   they're not all the same, right?

14   A.  Correct.

15   Q.  Okay.  And for example, one of the things that varies would

16   be when the warrant expires, right?

17   A.  That's correct.

18   Q.  Okay.  And when it can be exercised, correct?

19   A.  That's correct.

20   Q.  And what the strike price is, correct?

21   A.  Yes.

22   Q.  And this is all information that is in the prospectus and

23   is available to the general public, right?

24   A.  That's correct.

25         MR. BROD:  And can we bring up just for the witness

1    DX 14, please.

2    Q.  Do you recognize this email, Mr. Reed?

3    A.  This looks like an email from me to the referrals for the

4    Digital World SPAC.

5            MR. BROD:  Okay.  Defense offers DX 14.

6            MR. NESSIM:  No objection.

7            THE COURT:  Received.  DX 14 is received.

8            (Defendant's Exhibit 14 received in evidence)

9    Q.  Mr. Reed, do you see you're sending them the S-1A, the

10   amended S-1, in relation to the IPO that was going to happen in

11   a matter of days, correct?

12   A.  I don't see the attachment on here, but usually there is,

13   so yes.

14           MR. BROD:  Ms. McFerrin, can you just highlight the

15   attachment line.

16   A.  Oh, wait.  I see it at the top, yes.

17           MR. BROD:  Okay.  And if you just scroll very quickly

18   through this email.

19           Okay.  And if you go back up to the top.

20   Q.  And do you see that Mr. Shvartsman, Mr. Michael Shvartsman,

21   is copied here?

22   A.  Yes.

23   Q.  And Bruce at Rocket One Capital is copied here?

24   A.  Yes.

25   Q.  And some others.  So these are all people who you were

1    sending the S-1A associated with the IPO that was to happen on

2    September 3rd, correct?

3    A.  Yes.

4    Q.  You're sending them information.

5         I'll take you to—that was September 1st.  Going to

6    move to September 2nd, okay?

7         MR. BROD:  And you can take this down.

8    Q.  And on September 2nd, you had a call with Mr. Michael

9    Shvartsman about the upcoming IPO, correct?

10   A.  It's possible.  I don't remember though.

11        MR. BROD:  Okay.  Well, can we pull up GX 824, which

12   is in evidence.

13   Q.  While the exhibit is coming up, I'll ask you, September 2nd

14   would have been the day before the IPO commenced, correct?

15   A.  That sounds about right, yeah.

16   Q.  And it's also the day before it becomes possible to buy

17   DWAC units on the open market, right?

18   A.  Correct.

19   Q.  Okay.  And I understand that you don't remember the

20   specific date on which the units split, but it was roughly a

21   month, a month later, correct?

22   A.  I think so, yes.

23   Q.  Okay.  And in that period between September 3rd and the

24   dates on which the units split, the only security that it was

25   possible to purchase in the open market, the only DWAC

1   security, was a unit, correct?

2   A.   That's correct.

3            MR. BROD:  And Ms. McFerrin, now that we have the

4   exhibit, can we go to first to box A12.  Can you just highlight

5   that.

6   Q.   And so this line that we're showing you has your notes for

7   your calls with Rocket One Capital, right?

8   A.   It shows I emailed them on 9/3/21.

9   Q.   Okay.  Well, let me ask you a second question.  When you

10  refer to Rocket One Capital here, that is for all intents and

11  purposes Mr. Shvartsman, Mr. Michael Shvartsman, correct?

12  A.   That's correct.

13  Q.   And that's because he traded through an entity, Rocket One

14  Capital, right?

15  A.   That's correct.

16  Q.   And his brother didn't and so he's listed as Gerald

17  Shvartsman, correct?

18  A.   That's correct.

19           MR. BROD:  Okay.  And Ms. McFerrin, if we now go to

20  box AJ12.  If you go over to the right.  If you bring up box

21  AJ12.

22  Q.   Okay.  Well, we're going to have to read it.  If you look

23  in the top line of the Excel spreadsheet there, do you see your

24  note, Mr. Reed?

25           MR. BROD:  Thank you, Ms. McFerrin.

1    A.   Yes.

2    Q.   Okay.  And your note says that Mr. Shvartsman called back

3    to confirm the 200,000.  Do you see that?

4    A.   Yes.

5    Q.   And that's a reference to the amount that he wanted to put

6    into the IPO, the indication of interest, correct?

7    A.   Correct.

8    Q.   And it wasn't the full amount that he had wired into his

9    account with E.F. Hutton, was it?

10   A.   Correct.

11   Q.   He had wired in 400,000, correct?

12   A.   I don't remember the specific amount.

13   Q.   Okay.  Well, your next note says, "Split the baby in case

14   it drops in the open market and he wants to buy the unit then."

15   Do you see that?

16   A.   Yes.

17   Q.   And Mr. Bruce Garelick was also on this call, correct?

18   A.   Yes.

19   Q.   And you spoke with him and talked about other deals that

20   you might have been involved in, right?

21   A.   Correct.

22   Q.   And he expressed that he appreciated all the work you were

23   doing on this, right?

24   A.   Yes.

25   Q.   And you said that he and Mr. Shvartsman seemed to be

1   extremely knowledgeable, right?

2   A.  Correct.

3   Q.  And you make a note, "Michael Shvartsman said let's lower

4   the indication to 200,000 in case it drops later and we have

5   cash ready."  Do you see that?

6   A.  Correct.

7   Q.  Okay.  And that's a reference to having cash ready to make

8   open-market trades, correct?

9   A.  Correct.

10  Q.  He wanted to leave money in his account so that you could

11  later buy for him on the open market, right?

12  A.  Correct.

13  Q.  And you make a note here also about the commission, the

14  commission associated with unsolicited trades, correct?

15  A.  Correct.

16          MR. BROD:  And we can take this down.

17  Q.  And you also interacted with an investor called Anton

18  Postolnikov.

19  A.  Correct.

20  Q.  And did you have an understanding of how much he had

21  invested in the founders round?

22  A.  I think I found out later on he had founders shares.  I

23  don't think I knew how much.

24  Q.  You understood that he was a very substantial investor in

25  the founders round.

1          MR. NESSIM:  Objection.

2          THE COURT:  Are you asking at the time of the IPO or

3     are you asking for later acquired information?

4          MR. BROD:  At the time of the IPO.  And I'm asking

5     whether he has an understanding.

6          THE COURT:  Okay.  So you're limited to at the time of

7     the IPO, not later acquired information.

8     A.  No.

9     Q.  You understood that he invested a substantial amount in the

10    IPO itself, correct?

11    A.  He invested a larger——I think he was the largest amount

12    invested of the referrals.

13    Q.  Yes.  And that's reflected in the document we just saw, the

14    Excel spreadsheet, right?

15    A.  Correct.

16    Q.  Millions of dollars, right?

17    A.  I think so, yes.

18    Q.  Okay.  And in October——well, withdrawn.

19         MR. BROD:  Ms. McFerrin, could we put up DX 23, just

20    for the witness, please.

21         Can you just scroll through to the second page.

22    Q.  Mr. Reed, do you recognize this email chain?

23    A.  This looks like an email from Anton to me, and there's a

24    couple with Patrick as well included.  Patrick Orlando.

25         MR. BROD:  Okay.  Defense offers DX 23.

O531GAR3

1          MR. NESSIM:  Objection.

2          THE COURT:  How much more do you have?

3          MR. BROD:  Not much, Judge.  Five minutes.

4          THE COURT:  All right.  It's now 11:12.  Why don't we

5   take our midmorning break.  During the break, please don't talk

6   about the case amongst yourselves or with anybody else, and

7   don't do any research.  We'll reconvene at about 11:30.  Have a

8   good break.

9          THE DEPUTY CLERK:  All rise.

10          (Continued on next page)

O531GAR3

1          (Jury not present)

2          THE COURT:  Okay.  The witness can step down, and the

3     parties can be seated.

4          Can somebody either hand up to me the document or post

5     it, and then I'll hear the objection.  But I need a moment to

6     review the document.

7          Okay.  What's the objection, Mr. Nessim?

8          MR. NESSIM:  Your Honor, it's irrelevant, it's

9     confusing.  This is a reference to private placement warrants,

10    which is something that has not come up in trial and won't be

11    explained, that are in the ownership of Patrick Orlando.  It's

12    hearsay.

13         THE COURT:  Let me see the entire document because I

14    just have whatever people are putting up at the moment.

15         MR. NESSIM:  I only have one copy.  So let me just——

16         THE COURT:  Okay.  Give me one moment to look at the

17    document.

18         Okay.  So what's the relevance, the nonhearsay

19    relevance to this document?

20         MR. BROD:  Yes, Judge.  I'm offering the

21    judge——offering the document, Judge, not for the truth of any

22    statements in it but for the forward-looking statements and

23    instructions and plans showing that Mr. Orlando was helping

24    Mr. Postolnikov to move these placement warrants——and

25    Mr. Nessim is quite correct, they're placement warrants, which

1    I can certainly bring out, and have the witness explain——these

2    placement warrants in his account at E.F. Hutton, and it's

3    simply for the fact that Mr. Orlando, who is the CEO and the

4    chairman of DWAC, is essentially providing, you know,

5    logistical, ministerial help to Mr. Postolnikov, and it just

6    goes to the nature of their relationship.  That was the only

7    point I'm trying to make with these documents.

8              THE COURT:  Okay.  I'm going to exclude it on 403

9    grounds.

10             Okay.  How much more with this witness?  Five minutes

11   more with this witness, you think?

12             MR. BROD:  No more than that, Judge.

13             THE COURT:  And who's the next witness after this?

14             MR. NESSIM:  Peter Melley.

15             THE COURT:  And who is Mr. Melley and how long do we

16   expect that to go?

17             MR. NESSIM:  He's a somewhat lengthy witness.  He

18   works——he's a——he works for FINRA.  He's going to be explaining

19   some of the summary charts on trading, some of the securities

20   concepts.

21             THE COURT:  All right.  So Ms. Shapiro, do you want to

22   be heard now with respect to your response on the summary

23   charts or I'll break at 12:50 and you can be heard for five

24   minutes then?

25             MS. SHAPIRO:  I'm sorry, your Honor.  I apologize.  I

1    didn't hear what they said about the witness.

2              THE COURT:  With respect to the summary charts.

3    Mr. Melley is the next witness.

4              MS. SHAPIRO:  Oh.

5              THE COURT:  I will hear from you either now or at

6    12:50 with respect to your response to Mr. Shahabian with

7    respect to the summary charts, your letter of this morning.

8    Which would you——

9              MR. SHAHABIAN:  Your Honor, they're different summary

10   charts.

11             MS. SHAPIRO:  I would like to clarify that, if you

12   don't mind.

13             MR. SHAHABIAN:  Sure.

14             MS. SHAPIRO:  We are not objecting to any of the

15   charts, as I understand it, that Mr. Melley created.

16             THE COURT:  No, I understand that.  I mean the summary

17   charts that were the subject of your letter this morning.  Do

18   you wish to——

19             MS. SHAPIRO:  I don't want to be heard now.  I don't

20   want to be heard now.

21             THE COURT:  All right.  I'll hear you at 12:50 then.

22             Okay.  We'll see you back here in a couple minutes.

23             ALL COUNSEL:  Thank you.

24             THE DEPUTY CLERK:  All rise.

25             (Recess)

O531GAR3                    Reed - Cross

1           (Jury not present)

2           THE COURT:  Let's bring the witness back in and then

3    bring the jury in.

4           (Jury present)

5           THE COURT:  Be seated.

6           You may continue.

7           MR. BROD:  Thank you, Judge.

8    BY MR. BROD:

9    Q.  Mr. Reed, both parties have asked you some questions about

10   an individual named Anton Postolnikov.  Do you remember those

11   questions?

12   A.  Yes.

13   Q.  And I think just to find our place, you testified that

14   Mr. Postolnikov was the——was amongst the individuals who were

15   referred by DWAC; he was the largest investor in the IPO,

16   correct?

17   A.  That's correct.

18   Q.  And he continued buying DWAC securities in October 2021,

19   correct?

20   A.  Correct.

21   Q.  And on or around October 12th, he started buying warrants,

22   correct?

23   A.  Correct.

24   Q.  He told you to buy a hundred thousand warrants, correct?

25           MR. NESSIM:  Objection.

O531GAR3                          Reed - Cross

1          THE COURT:  Basis?

2          MR. NESSIM:  Misstates testimony and——

3          THE COURT:  Overruled.  You can ask the question and

4    see what the answer is.  What did he tell you?

5    A.  This was a couple years ago, but I think the email was

6    500K, but also he did say a hundred K in that as well.

7    Q.  And that's exactly my point.  He wanted you to buy a total

8    of 500,000——we're just focusing on October 12th——but on that

9    date he wanted you to buy a hundred thousand, correct?

10   A.  That sounds right.

11         MR. BROD:  Ms. McFerrin, can we just call up GX 823.

12   Q.  And take a look at this document.  These are your notes,

13   sir?

14   A.  I'm not a hundred percent sure, but it looks like the

15   notes.

16         MR. BROD:  Government Exhibit 823.

17         Okay.  This is what I wanted.

18   Q.  Do you see your notes?

19   A.  Yes.

20   Q.  And there's confirmation that Mr. Postolnikov wants to buy

21   a total of 500,000 warrants——500,000 worth of warrants?

22   A.  Correct.

23   Q.  He doesn't want to pay more than 45 cents at this point?

24   A.  Correct.

25   Q.  Okay.  And there was discussion of buying a hundred

O531GAR3                        Reed - Cross

1    thousand a day for the next few days, correct?

2    A.  Correct.

3    Q.  And you recorded that because that was an important detail,

4    right?

5    A.  I think so, yes.

6            MR. BROD:  And can we call up for the witness and

7    everyone Government Exhibit 822.  Go to the last page.

8    Q.  And just focusing on the note, it says 10/118/21.

9    A.  Okay.

10   Q.  And I take it that's a typo; that's 10/18/21?

11   A.  I think so.

12   Q.  And again, these are your notes of your calls with

13   Mr. Postolnikov?

14   A.  Correct.

15   Q.  And he confirmed that he wants to buy another hundred

16   thousand DWAC warrants, correct?

17   A.  Correct.

18   Q.  If we move to the next note up on the page, is this another

19   confirmation to buy another hundred thousand warrants?  Do you

20   see that?

21   A.  Correct.

22   Q.  And on this day you weren't actually able to buy the full

23   100,000 warrants for him; is that right?

24   A.  I don't remember.

25   Q.  Okay.  But from time to time it's not possible to fill the

1  entirety of a client's order because there just isn't

2  sufficient liquidity in the market, correct?

3  A.  That's correct.

4  Q.  And so from the IPO on September 3rd through October 19th,

5  Mr. Postolnikov had built up a position of over 400,000 DWAC

6  shares, correct?

7  A.  I don't remember the specific amount.

8          MR. BROD:  Okay.  Well, can we show just the witness

9  Defense Exhibit 38.

10  Q.  And if you could just read this over and then I'll ask you

11  a question.

12  A.  Okay.

13  Q.  Okay.  And does this refresh your recollection that as of

14  October 20th, Mr. Postolnikov had bought 433,300 DWAC shares?

15  A.  Yes.

16  Q.  And he had bought 492,167 DWAC warrants?

17  A.  Correct.

18          MR. BROD:  We can take this down.

19  Q.  So we've just been testifying about his purchases on the

20  18th and the—sorry—on the 12th and the 18th and the 19th.

21  And so more than half of those warrants had been purchased in

22  the week leading up to 10/19, correct?  Not the week, ten days.

23  Ten days leading up to 10/19, correct?

24  A.  I think that's right.

25  Q.  And he called you on 10/20.

1    A.  I don't remember specifically if he did on that day.

2              MR. BROD:  Can we put back up GX 822, please.

3    Q.  And looking at the second to last page, bottom of the page.

4    A.  Yes.

5    Q.  Okay.  And so on 10/20 he called you again, and you took a

6    note, and he told you that he wants to buy another 175,000

7    warrants, correct?

8    A.  Correct.

9    Q.  And he raised the price at which he was willing to—the

10   price he was willing to pay to buy those warrants to 52 cents,

11   correct?

12   A.  Correct.

13   Q.  He raised it from 45 cents to 52 cents, right?

14   A.  I think that's right, yes.

15   Q.  Okay.  And we've spoken about specific orders for

16   particular dates and also goals for how much an investor wants

17   to purchase, correct?

18   A.  Correct.

19   Q.  And he also told you that he now wanted to get to not

20   500,000, he wanted to get to 1 million DWAC warrants.  Do you

21   see that?

22   A.  Yes.

23   Q.  You were asked by Mr. Nessim about whether it ever crossed

24   your mind that there was something not quite right, potential

25   for insider trading in some of these investments.  Do you

1    remember that question?

2    A.  I think so.

3    Q.  And you testified that at one point one of the individuals

4    we're talking about told you that he thought it was going to be

5    a big win.  Do you remember that testimony?

6    A.  Yes.

7    Q.  And you said at that point you had a fleeting suspicion,

8    correct?

9    A.  No.

10   Q.  Well, what crossed your mind, sir, when one of these

11   investors told you that he thought it was going to be a big

12   win?

13   A.  I thought he thought this was going to be, you know, big

14   for him.  I didn't really think that it was.  I think—I

15   thought it was unlikely.  I thought he was kind of "drinking

16   the Kool-Aid" is kind of a term used.  You know, he believes in

17   it, which is fine.

18              MR. BROD:  Can we look at the last page of this

19   document, Ms. McFerrin.  The 10/1 note.

20   Q.  Okay.  And again, these are your notes of your calls with

21   Mr. Postolnikov, correct?

22   A.  Yes.

23   Q.  And if you focus on the bottom of this particular note, you

24   write, "He thinks it's going to be a big, big win, so he is

25   okay paying the extra 10 cents to buy the unit on the open

1    market."  Do you see that, sir?

2    A.  Yes.

3    Q.  So it was Mr. Postolnikov and not one of the other

4    investors who told you that he thought it was going to be a big

5    win, right?

6    A.  Correct.

7              MR. BROD:  No further questions at this point.

8              THE COURT:  Any redirect?

9              MR. NESSIM:  Briefly, your Honor.

10   REDIRECT EXAMINATION

11   BY MR. NESSIM:

12   Q.  Mr. Reed, I'll just pick up where we just left off.

13             When you said you thought it was unlikely that this

14   would be a big win, what was the——what did you think about

15   that?

16   A.  Just SPACs in general, a lot of them don't do anything, so,

17   you know, decent amount don't find an acquisition target, and

18   so I just figured it was unlikely that you'd have an

19   acquisition come, really.  Not unlikely, but I certainly didn't

20   expect, you know, the news of the Trump and the reaction of the

21   stock.

22   Q.  And between the IPO——which you testified was around

23   September 3rd, the IPO was; is that right?

24   A.  Correct.

25   Q.  ——and the announcement, which was around October 20th,

1    October 21st, that's approximately a little more than a month

2    and a half?

3    A.   Correct.

4    Q.   How does that time frame——is that a fast or slow time frame

5    between IPO and merger announcement for a SPAC?

6    A.   In my experience, that's very, very fast.

7    Q.   Very, very fast?

8    A.   Yes.

9    Q.   You were asked some questions on cross-examination before

10   the break about whether you believed there was anything

11   improper about Michael Shvartsman and Gerald Shvartsman's

12   warrant purchases.  Do you remember those questions?

13   A.   I actually don't.

14   Q.   Well, let me ask you this:  Do you think, at the time that

15   you bought warrants for Michael Shvartsman's Rocket One

16   account, and Gerald Shvartsman's account, did you believe there

17   was potentially anything improper about what was happening

18   there?

19   A.   No.

20   Q.   At the time that you did that what, if anything, did you

21   know about whether Michael Shvartsman, Gerald Shvartsman, and

22   Bruce Garelick had been informed that Trump Media was a

23   possible merger target in June of 2021?

24              MR. BROD:  Objection.  Leading.

25              THE COURT:  Overruled.  You can answer the question.

1    A.  I wasn't aware of any—that they knew of any acquisition

2    target.

3    Q.  And what, if anything, did you know about whether Michael

4    Shvartsman, Bruce Garelick, and Gerald Shvartsman had signed

5    nondisclosure agreements with DWAC?

6    A.  I was not aware of that.

7    Q.  And what, if anything, did you know about the fact that

8    Bruce Garelick was on the board of DWAC?

9    A.  I did not know that.

10   Q.  And what, if anything, did you know about the fact that on

11   or about September 22nd, DWAC and Trump Media signed a letter,

12   a mutually exclusive letter of intent?

13   A.  You said September 22nd?

14   Q.  Of 2021, that's right.

15   A.  Okay.  I did not know that.

16   Q.  And what, if anything, did you know about the fact that on

17   October 1st of 2021 or September 30th of 2021, Mr. Garelick

18   recommended to Mr. Shvartsman that he should buy warrants?

19   A.  I don't—I didn't know that.

20   Q.  If you were aware of any of those items I mentioned, what,

21   if anything, would you have done before placing those warrant

22   orders?

23   A.  I think all but the last—all but the last one, I would

24   have talked to my compliance officer.  I think the last one was

25   just that Bruce suggested Michael buy warrants, and if that was

1    it by itself, I don't think that's anything noteworthy, really,

2    but if I'd known he was a director, then, yeah, that would be

3    noteworthy.

4    Q.  And why would you have consulted your compliance officer?

5    A.  For the potential that they would be trading on inside

6    information, nonpublic information.

7    Q.  And would you have put through the order, orders for

8    warrants until you heard back from your compliance officer?

9    A.  No.  I would have waited for compliance.

10             MR. NESSIM:  One moment, your Honor.

11             No further questions.

12             MR. BROD:  No further questions, Judge.

13             THE COURT:  Okay.  Sir, you're excused as a witness.

14   And you may step down.

15             (Witness excused)

16             THE COURT:  Government will call its next witness.

17             MR. NESSIM:  The government calls Peter Melley.

18             THE COURT:  Okay.  Let's bring Mr. Melley into the

19   courtroom.

20             Mr. Melley, please step forward into the witness box.

21   You'll remain standing while my deputy administers the oath.

22             THE DEPUTY CLERK:  Please raise your right hand.

23             (Witness sworn)

24             THE DEPUTY CLERK:  Please state your full name for the

25   record and spell out your first and last name for the record.

1        THE WITNESS:  Peter Joseph Melley.  P-E-T-E-R, Melley

2    is M-E-L-L-E-Y.

3        THE COURT:  Mr. Melley, please keep your voice up,

4    speak into the microphone, wait until counsel is done answering

5    the question before you answer.

6        You may proceed.

7        MR. NESSIM:  Thank you, your Honor.

8    PETER J. MELLEY,

9        called as a witness by the Government,

10       having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. NESSIM:

13   Q.  Good morning, barely, Mr. Melley.

14   A.  Good morning.

15   Q.  Where do you work?

16   A.  I am the director of FINRA's Criminal Prosecution

17   Assistance Group based in Washington, DC.

18   Q.  And what is your general educational and work background?

19   A.  I have a undergraduate degree in history from Loyola

20   Maryland; I have my JD from University of Baltimore Law School;

21   I'm licensed in the state of Maryland; and for the past 28

22   years, I have a number of experiences conducting and

23   participating in securities training classes and presentations.

24   Q.  And you mentioned that you work for FINRA, and I guess how

25   long have you worked for FINRA?

1   A.  Approximately 28 years.

2   Q.  And you mentioned that you were the director of the

3   Criminal Prosecution Assistance Group.  For approximately how

4   long have you served in that group?

5   A.  The past 11 years.

6   Q.  What is FINRA?

7   A.  FINRA is a self-regulator of the securities industry.  It's

8   given its authority by the SEC to create rules to govern the

9   conduct of its members, who are brokerage firms like Fidelity

10  and E*Trade and TD Ameritrade.  In addition, it conducts

11  surveillance of various public markets, like the NASDAQ stock

12  market, and it's also charged with licensing brokers to handle

13  customer accounts.

14  Q.  You mentioned it's self-regulating.  Is FINRA a government

15  agency?

16  A.  It is not.  It is a membership organization, so it is

17  funded by brokerage firms who have funded FINRA to then in turn

18  regulate their activities.

19  Q.  What are brokerage firms?

20  A.  Brokerage firms are financial institutions that purchase

21  and sell securities for their own accounts as well as their

22  customers.  Again, a number of the most popular would be

23  Fidelity, Charles Schwab, TD Ameritrade, E*Trade, Robinhood,

24  RBC Capital Markets.

25  Q.  And what is the CPAG group at FINRA?  The Criminal

1    Prosecution Assistance Group, what's that group's role at

2    FINRA?

3    A.   That is a unit separate from FINRA's regulatory function of

4    the securities industry.  CPAG's sole focus is to provide

5    assistance to law enforcement in their investigations and

6    prosecutions involving securities fraud.  It is a group of

7    approximately five attorneys who analyze trading records, often

8    create exhibits based on their analysis, and, if necessary,

9    provide testimony to that analysis.

10   Q.   In the course of your work with CPAG, approximately how

11   many cases have you worked on or assisted with?

12   A.   I'd say over a thousand.

13   Q.   And have you testified at trials before?

14   A.   I have; approximately 45 or so, with I think around 40 at

15   the federal level.

16   Q.   And approximately how many of those were insider trading

17   cases?

18   A.   I would say at least 10.

19   Q.   So I'd like to turn to some questions about some general

20   background on the securities market.

21        Are you generally familiar with how the securities

22   market and securities transactions work?

23   A.   I am.

24   Q.   So just some basic concepts.  What is a security?

25   A.   A security is a financial instrument that has a cash value

1    to it and that it can be traded.  When we think of securities,

2    we may think mostly in terms of stock, which is one example,

3    you know, stock trading of Amazon or Tesla or Microsoft, you

4    can trade it in a public market.

5    Q.  So just to follow up on that, what is stock?

6    A.  So stock is one type of security.  It signifies ownership

7    in a corporation like those companies I just mentioned, and

8    it's usually measured in shares, which are issued by those

9    public companies, and then they can be traded by shareholders

10   or investors.  And again, they will be traded in some of the

11   most common trading platforms, like the New York Stock Exchange

12   or NASDAQ, where buyers and sellers come together to buy and

13   sell and trade those stocks.

14   Q.  And what is——what's a public company as opposed to a

15   private company?

16   A.  So a public company is a corporation that issues shares to

17   shareholders, investors who can then trade those shares in a

18   public market like the NASDAQ stock market.  Those shares are

19   registered with the SEC, and with that comes a lot of

20   responsibility for the company.  They have to provide periodic

21   filings to the SEC.  The point of that is to kind of be

22   transparent, providing information to investors regarding the

23   management, financials, what the operations of the business

24   are, and that way it gives information to investors so they can

25   make an informed decision to invest.  And depending on where a

1  company trades, for instance, like on the NASDAQ stock market,

2  there may be additional requirements to be listed on that

3  exchange, and you have other hoops you have to go through.

4  Q.  And how do those features of a public company differ from a

5  private company?

6  A.  So for a, you know, public company, again, you may have

7  thousands and thousands of shareholders, depending on the size.

8  For a private company, it's often owned by a small group of

9  individuals or entities.  There may be shares that those

10 entities or individuals own, but because it's private, they

11 cannot trade them in a public market like NASDAQ or the New

12 York Stock Exchange, and as a result, there's also fewer

13 disclosure obligations so there's often not as much information

14 publicly available to, in general, investors.

15 Q.  And another term you just mentioned.  What is a public

16 market?

17 A.  A public market is a trading platform where buyers and

18 sellers come together, again, NYSE or NASDAQ would be the most

19 common, NASDAQ being an all-electronic network, where brokerage

20 firms are connected via computer system, and again, either on

21 behalf of their client-customers or their own accounts, they

22 will buy and sell various securities on a daily basis.

23 Q.  I'm sorry.  You mentioned NYSE.  What does that stand for?

24 A.  The New York Stock Exchange, which is just another trading

25 platform similar to NASDAQ.

1    Q.  And what sort of—what are the types of individuals or

2    entities who buy the securities at public companies?

3    A.  The most common could be any of us here in this room, where

4    we would be considered a retail investor, where you can open an

5    online brokerage account, again, through Fidelity or E*Trade or

6    Charles Schwab, and you can put in an order to buy shares of

7    any publicly traded company.  Another group would be considered

8    more institutional investors.  Those would be businesses where

9    their—the whole point of their operation is to trade in these

10   securities markets.  Those could be hedge funds, mutual funds,

11   could also be the brokerage firms themselves.

12   Q.  What is a stock price?

13   A.  Stock price is the negotiated price between a buyer and a

14   seller, sort of agreed-upon price by those two parties.  Also,

15   you may look at—a stock price could be the opening price of

16   trading during the course of a trading day, which regular hours

17   start at 9:30, closing price of the day would be 4 p.m., which

18   is the end of regular trading for the market day.

19   Q.  And how are stock prices for publicly traded stocks

20   generally reported?

21   A.  So NASDAQ, NYSE, other trading platforms will report that

22   to a variety of outlets.  Back in the day you would primarily

23   have to just go to the newspaper and see what the closing price

24   was.  Nowadays you can go to Yahoo Finance, other internet

25   sites, the stock exchanges themselves, or something like

O531GAR3                    Melley - Direct

1    Bloomberg, which is a financial news data and software company

2    that investors have public access to and can see closing prices

3    and information on companies like the volume of trading, the

4    number of shares, and so forth.

5                    (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O53Cgar4                    Melley - Direct

1    BY MR. NESSIM:

2    Q.  You mentioned Bloomberg.  Is Bloomberg a service that is

3    relied upon by professionals in the securities industry?

4    A.  Yes, it is.

5    Q.  Putting aside what the cause might be, can the price of

6    securities fluctuate from day-to-day?

7    A.  Yes, it can.  Other times, depending on the circumstances,

8    maybe it doesn't fluctuate much at all.

9    Q.  What are some of the ways that public companies report

10   information about themselves to the public?

11   A.  One way would be kind of directly to the marketplace

12   through press releases.  Another way, because they are required

13   as public companies to register their shares with the SEC, they

14   have to provide these periodic reports to the SEC's online

15   database, which is called EDGAR.  That would include an annual

16   financial filing, called a 10K, or a quarterly filing, which is

17   a 10Q, or anything material regarding the company that happens

18   over the course of the year.  In addition, individuals who are

19   officers and directors of these companies also have their own

20   disclosure requirements based on their security holdings.

21   Again, the whole point is to be transparent to the market so

22   investors can make an informed decision.

23   Q.  What is the SEC?

24   A.  The U.S. Securities and Exchange Commission.  They have the

25   civil authority to enforce the federal security laws.

1    Q.  You mentioned stock a few moments ago.  Let's talk about

2    some other types of securities.  In the context of a securities

3    market, what is a warrant?

4    A.  A warrant is another type of security.  It's different that

5    it kind of derives its value from something else, namely stock.

6    So if you own a warrant, basically it's giving you the right to

7    at some point in time go out and buy usually stock at a

8    predetermined price.  You want to think of it kind of like a

9    coupon where it gives you added value.  You're buying the

10   warrant, but depending on how the market works, maybe you're

11   going to exercise that warrant and buy shares of stock for that

12   company at a price that can be separate from the market.

13   Warrants, usually you have a number of years before you have to

14   exercise it as opposed to a stock option, which is another kind

15   of derivative where usually you only have days, weeks, or

16   months.  When you exercise the warrant, the company itself will

17   issue those shares to you so there are now more shares in the

18   marketplace for that company.

19   Q.  So you said warrants can be exercised.

20   A.  Correct.

21   Q.  So what happens when you exercise a warrant?

22   A.  When you exercise a warrant, you can then go into the

23   market.  Basically, you're going to be issued shares that you

24   can then purchase or sell into the market.

25            Another thing you can do with warrants is you can just

1   trade them as warrants.  There are also a market for warrants

2   itself where, if you own them, maybe you sell them to somebody

3   else, they're looking to buy that warrant from you, maybe they

4   exercise it down the road.

5   Q.  You mentioned there are time restrictions on exercising a

6   warrant.  Are there also other limitations on whether a person

7   can actually exchange a warrant for a share of stock?

8   A.  Yes.  One is depending on the warrant, it may tell you how

9   many shares you can kind of get for that warrant.  There's

10  obviously the time restriction.  There's also going to be the

11  price at which you can exercise it, so you may not always want

12  to exercise it.  There is a bit of a risk that if the price

13  doesn't go in the direction you want, you may not be able to

14  exercise it to your own financial benefit.

15  Q.  What is a unit?

16  A.  A unit is another type of security.  That's one that you

17  see in what's called an initial public offering where a company

18  is first looking to go from a private to a public company and

19  trade in a public market.  A unit is a combination usually of

20  warrants or stocks.  Or if you own it, it kind of gives you a

21  little more bang for the buck where, at some point in time,

22  that unit will split into both stock and warrants, and then you

23  can kind of trade or sell both of them separately with the

24  expectation of a financial gain.

25  Q.  Why are units generally an offering as part of an initial

1  public offering or IPO?

2  A.   Units are considered -- again, they do that combination to

3  attract new investors.  It enhances the value of investing in

4  the company because, again, you're offering two different

5  securities often for the price of one for that initial offering

6  with the expectation that, once it starts trading in the

7  market, both the warrant and stock will continue to trend

8  upward and then you can kind of make a profit down the road

9  when you sell those individual shares and warrants.

10  Q.   So an IPO, the initial public offering, what is the process

11  of an IPO, generally speaking?

12  A.   So, the tradition idea of an IPO is where a private company

13  is looking to raise funds to expand their existing business,

14  maybe enhance their brand, and also get access to public

15  markets.

16       So they'll go through this kind of long, expensive

17  process, because it involves a lot of paperwork with the SEC, a

18  lot of disclosures need to be made.  The company will have to

19  hire at least one brokerage firm who's considered the

20  underwriter where they're helping determine, okay, what price

21  are we go to offer to investors and how many shares are we

22  going to offer to investors right off the bat before we trade

23  in the public market, which is called the secondary market.

24       So it can often take years from the beginning of the

25  idea to when actually a private company makes its way to a

1  public market.  Again, once you're trading on the public

2  market, you again have all those additional hoops.  Maybe on

3  NASDAQ, you have certain listing requirements.  So it can be a

4  lengthy process.  You have to market your company to investors

5  and try to find ways to make a pitch to kind of attract them to

6  make an investment with your company.  So it can take a while

7  and be fairly costly.

8  Q.  What is an additional way for a company to go public?

9  A.  Another way to go public would be through the SPAC IPO

10  process.  A SPAC, which is a Special Purpose Acquisition Corp.,

11  it basically is just how it sounds.  The point or purpose of

12  the company is to acquire another company.  So with a SPAC IPO

13  process, the company is created not to raise money to expand an

14  existing business, but because it's created with no assets, no

15  real operations.  It's like a shell company or they call it a

16  blank check company.  It's created only for the purpose of at

17  some point acquiring another private company and rolling that

18  business into its shell.

19       Usually, there's kind of a timeframe, usually of a

20  couple of years, that those -- that that SPAC will have to go

21  find a company and roll that existing business into it.  It's

22  not as time consuming or as expensive as the traditional

23  process because once the private company is merged or acquired

24  by the public SPAC, there's less paperwork involved because

25  there's already the public shell company has already done some

1   of that initial paperwork.

2   Q.   How are SPAC initial public offerings generally priced?

3   A.   Generally, the IPO prices for SPACs have historically been

4   around $10 for a unit and $10 a share.  That's kind of where

5   the initial trading will be.  Again, for those initial

6   investors, the expectation is once there's going to be news of

7   a potential acquisition or business combination, that price

8   will increase and then they will be able to profit from their

9   initial investment.

10  Q.   How does a SPAC initial public offering pricing structure

11  differ, if it does, from a typical conventional IPO pricing?

12  A.   Again, for a traditional offering, the underwriter will

13  have to work with the company to determine what's our pricing

14  methodology.  We have to attract investors, what's going to be

15  kind of the right price, you know, there's market uncertainty

16  in terms of how the public investors will kind of respond to

17  this private company that's looking to go public for us.

18          A SPAC process, it's kind of more closely held where

19  you just have the original founders, who are called sponsors,

20  who put in a certain amount of money.  They're deciding, that

21  small group, of what that price is going to be for attracting

22  those initial investors.

23          So the sponsors, they get what are called founders

24  shares, they're putting in the original 20 to 25 percent of the

25  company and the IPO will be the remaining 75 to 80 percent.

1    They will kind of negotiate that amongst themselves and it will

2    be kind of a more closely held faster process because, again,

3    you're dealing with market certainty of a smaller group.

4    Q.  And on the pricing point for SPACs, you said they're

5    initially offered generally around $10 a unit or share.  What

6    tends to happen to those trading prices once they go public?

7    A.  So, once they go public, they may often in the beginning

8    stay around that same amount, but again, the expectation is

9    depending on what company or type of company they target and

10   the prospects for that, demand will increase and there'll be

11   greater interest if it looks like there is going to be a

12   business combination or acquisition at some point within that

13   window, again, usually of about two years.  Once there is news

14   of that, that will kind of stir up that demand and drive that

15   price up, again, to the benefit of those initial shareholders.

16   Q.  And you mentioned founders shares.  When someone purchases

17   a founder share, who are they purchasing that share from, who's

18   on the other side of that transaction?

19   A.  So the founder shares are, again, the sponsors or the

20   original management team.  They are kind of deciding how many

21   shares are going to be divvied among the management team or

22   among the sponsors.  That's kind of like the seed money that is

23   the beginning of capital for the eventual company, the public

24   SPAC.  So that is kind of decided among themselves, and it's

25   usually at a much cheaper price than even what the initial

public price is in an IPO to those other initial investors.

And even, obviously, much smaller than what's going to

hopefully be traded at down the road on the secondary mark.

Q.  For example, on the secondary market, when someone buys a

share on the secondary market, who are they buying those shares

from, who's on the other side of those transactions?

A.  It's going to be if you have shares and you're looking to

sell them, it's going to be another retail investor or

institutional investor that holds those shares.  It's just the

market dictating what the price is.  For those founders shares,

that pricing structure is dictated by the sponsors themselves.

They've decided what price is going to be the price that

they're all comfortable with and how many shares will be

divided up among those sponsors, that management team.

Q.  Is that because the company is the party selling the shares

to the sponsors?

A.  Correct, they are the company.

Q.  What about IPO shares, when you purchase an IPO share, who

are you buying that share from or who or what?

A.  So who for the IPO shares, similar to a traditional IPO,

you're still going to bring in what's called an underwriter,

which is going to be a financial firm that's going to work with

that management team to kind of go out and try to get those

initial IPO investors.  So that management sponsor team will

work with the underwriter to kind of dictate what the pricing

1    is going to be.  So those shares are really coming from the

2    company is basically the entity that's on the other side of

3    those IPO shares.  Those initial investors are buying directly

4    from the company, not as we talked about the secondary market

5    where you're just buying from somebody else who has an account

6    at another firm.

7    Q.  Once a SPAC is publicly listed, how, if at all, is the

8    information available to investors different from a

9    conventional operating company?

10   A.  The SPAC, they will have a similar listing requirement or a

11   similar -- if it's publicly traded, similar requirements to the

12   SEC in terms of their filings.  There may not be as much

13   publicly available information because, again, there's no

14   assets, there's no business operations.  So it's really until

15   it's able to acquire that other private company and merge it

16   into its own business where it becomes a full fledged operating

17   public company.

18   Q.  Are there circumstance under which SPACs fail to

19   successfully merge with a private company?

20   A.  Yes.  Absolutely.  It happens, actually, quite often.

21   Usually there's a window of a couple of years that you have

22   from kind of start to, if you don't get to that two-year window

23   without acquiring or combining with another private entity, if

24   that happens, then the funds or the capital that have been

25   raised have to be returned to those initial investors.

1   Q.  Mr. Melley, let's turn to your involvement in this case.

2   How did you become involved in this case?

3   A.  I was contacted by the government earlier this year, in

4   February 2024.

5   Q.  Prior to that, were you involved at all in the

6   investigation that led to the charges in this case?

7   A.  I was not involved in the investigation at all, no.

8   Q.  And when you were contacted by the government, what sort of

9   documents did you review as part of your preparation to testify

10  in this trial?

11  A.  I reviewed SEC filings for selected individuals, as well as

12  for Digital World Acquisition Corp itself, primarily its

13  original registration statement.  In addition, I reviewed

14  Bloomberg price and volume information and some background on

15  Digital World Acquisition Corp.  Also trading records from a

16  variety of firms for selected individuals.  That would include

17  account statements and trade blotters.

18  Q.  Mr. Melley, did you create charts and timelines that

19  summarize the records in the case, some of the records you just

20  described?

21  A.  I did.

22  Q.  So let me just --

23          MR. NESSIM:  Your Honor, may I approach the witness

24  briefly and hand him a thumb drive?

25          THE COURT:  Yes.

1   Q.  Mr. Melley, if you can take a look at that.  Do you

2   recognize that drive?

3   A.  Yes.

4   Q.  And just generally speaking, does that contain the records

5   and data that you reviewed and that supported the summary

6   charts that you prepared?

7   A.  It does.

8   Q.  Are those voluminous records?

9   A.  Yes.  Thousands of pages of account statements, lines of

10  trading information.

11          MR. NESSIM:  We're going to offer some exhibits, but

12  I'll give counsel a moment --

13          THE COURT:  Give counsel a minute to infer.

14          MR. NESSIM:  Mr. Bianco, could you please, just for

15  the witness and parties, pull up an Excel sheet that's marked

16  as Government Exhibit 900.

17          THE COURT:  Are we marking the thumb drive with an

18  exhibit number?

19          MR. NESSIM:  Yes.  We can mark the thumb drive as

20  Government Exhibit 1100.

21          THE COURT:  Okay.

22          MR. NESSIM:  Mr. Bianco, you can take this down.

23          Pursuant to joint exhibit 1, which lays out a number

24  of business records, the government would offer the following

25  business records of Fidelity, Government Exhibits 301, 302,

1    303, 304, 305; of TD Ameritrade, Government Exhibits 335, 355,

2    356, and 360; of Robinhood, 340, 341, 342, 343, 344, 345, and

3    346; and of E-Trade, 350 through 352.

4              THE COURT:  Any objection?

5              MS. SHAPIRO:  Your Honor, the ones about Robinhood and

6    TD Ameritrade are subject to the Court's prior ruling, so

7    that's all.

8              THE COURT:  Those are admitted.  They're all admitted

9    as business records and they're relevant.  All of the exhibits

10   stated by Mr. Nessim are received.

11             (Government's Exhibits 301, 302, 303, 304, 305, 335,

12   355, 356, 360, 340, 341, 342, 343, 344, 345, 346, 350, 351, 352

13   received in evidence)

14             MR. NESSIM:  The government would also offer

15   Government Exhibits 900, 905, 910, and 915.

16             MR. BACH:  We have objections, but only to exhibit

17   900.

18             THE COURT:  I'm sorry?

19             MR. BACH:  We have an objection only to exhibit 900.

20             THE COURT:  Are you going to display 900 to the jury

21   or use it right now?

22             MR. NESSIM:  Your Honor, can we just approach briefly?

23             THE COURT:  What's the basis of the objection?

24             MR. BACH:  It's not an accurate summary.

25             THE COURT:  Let's go to the sidebar.

1             (At the sidebar)

2             THE COURT:  Mr. Bach.

3             MR. BACH:  My colleague, Mr. Driscoll, will explain

4     the inaccuracy.

5             MR. DRISCOLL:  Yes, Judge.  Exhibit 900 purports to be

6     Bloomberg data from basically the volume trading activity in

7     DWACU, DWAC units, and it's missing a row of data from October

8     18th, 2021.  Accordingly, most of the data in row B of the

9     chart inaccurately captures the trading volume.

10            MR. NESSIM:  Row B?

11            MR. DRISCOLL:  Column B.

12            THE COURT:  Is column B specific for a date?  I'm

13    trying to understand the objection.  Is it just that the

14    summary is missing a date or is it something more pronounced?

15            MR. DRISCOLL:  This is Bloomberg data that I believe —

16    the government can correct me if I'm wrong — that the witness

17    pulled from the Bloomberg terminal, but it's missing a row of

18    data.  So column B purports to be the trading volume in DWACU

19    affiliated with certain dates from September throughout

20    October.  But because it's missing a date, most of that trading

21    volume is off by one day.  So it just inaccurately depicts the

22    trading volume.

23            THE COURT:  You're saying the summary of the total

24    trading volume over the period of time is off because it's

25    missing one day?

1          MR. DRISCOLL:  Correct.  As well as the particular

2    volumes attributed to particular days during that period.

3          THE COURT:  Can you explain it to me?

4          MR. NESSIM:  I'm learning about this objection now.

5    It's a chart that has the DWAC unit prices and volume from

6    Bloomberg terminal.  It sounds like it may be it's possible

7    that there might be a day or row missing, which, if I

8    understand the objection correctly, I think it's in reverse

9    chronological order.  And so, to the extent the volume reported

10   for some reason -- if what he's saying is that the volume has

11   jumped a row on the dates preceding October 18th.

12         However, I don't think that this is actually an issue.

13   I think it can be resolved now.  To the extent there is this

14   inaccuracy, we're not going to show it right now, we're not

15   going to ask for opinions on DWACU volume.  And the volume on

16   DWACU at the earlier trading period is of very limited

17   relevance to this witness's testimony and the summary charts,

18   which --

19         Are the summary charts inaccurate, would you argue?

20         THE COURT:  The objection Mr. Bach made was that it

21   was an inaccurate summary.  Now you're saying that this is not

22   a summary, this is the underlying data.

23         MR. DRISCOLL:  Correct, but this is an exhibit that I

24   believe the witness prepared.  Again, I don't know if that's

25   accurate.  The government can correct me.

O53Cgar4                    Melley - Direct

1              MR. NESSIM:  I can ask him to lay a foundation.  I

2    would expect him to say he downloaded this data from Bloomberg

3    terminal for pricing and volume.  I wasn't aware of this one

4    line issue.

5              But do you think the summary chart that deals with

6    DWAC unit pricing volume is inaccurate?

7              MR. DRISCOLL:  No, the objection is to exhibit 900.

8              MR. NESSIM:  Your Honor, I would propose that the

9    exhibits be received with the caveat that we will ensure that

10   the ultimate exhibit that the jury receives is accurate as to

11   the price and volume on these days, and it won't be an issue in

12   this witness's testimony and this exhibit won't be seen by the

13   jury.

14             THE COURT:  I will receive it subject to a motion to

15   strike if the issue is not worked out in terms of what actually

16   goes to the jury.

17             (Continued on next page)

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  All those exhibits are received subject to

3     the caveat mentioned at sidebar.

4          (Government's Exhibits 900, 905, 910, 915 received in

5     evidence)

6          MR. NESSIM:  Thank you, your Honor.

7     Q.  Mr. Melley, you mentioned that you reviewed brokerage

8     records.  What are some of the brokerages that you reviewed in

9     the course of preparing to testify today?

10    A.  Documents connected to Fidelity, RBC Capital Markets,

11    TD Ameritrade, Robinhood, and E-Trade.

12    Q.  Let's look at some of the types of documents you reviewed

13    as an example.

14         MR. NESSIM:  Mr. Bianco, could you publish Government

15    Exhibit 301.  If you could zoom into "account information."

16    Thank you.

17    Q.  What type of account does this account information relate

18    to?

19    A.  This is with regard to a rollover IRA account for

20    Mr. Garelick at Fidelity as part of the kind of new account

21    information.

22         MR. NESSIM:  Mr. Bianco, if you could please turn to

23    Government Exhibit 303 at page 7.

24    Q.  Mr. Melley, what does this page of Government Exhibit 303

25    show?

1    A.   This is an example of a monthly account statement from

2    Fidelity, again, for Mr. Garelick.  For this particular

3    instance is September 2021.  It just kind of shows the value of

4    the account as well as various holdings in the account.

5            MR. NESSIM:  Mr. Bianco, can you just highlight at the

6    top-right corner where the timeframe of this investment report

7    is indicated.  Thank you.

8            You can take that down.

9            Sorry.  If you can pull back up 303 at page 7.

10   Q.   What is the account value listed for this account statement

11   period?

12   A.   Again, for September 2021, the total account value is

13   approximately $651,000.

14           MR. NESSIM:  Mr. Bianco, could you please turn to page

15   11 of this exhibit.  Mr. Bianco, if you could just zoom into

16   some of the transactions from September 1st through September

17   9th.

18   Q.   Mr. Melley, what type of information is contained on this

19   page of Government Exhibit 303?

20   A.   So this is showing on a settlement date basis.  So there

21   are two important dates.  Obviously trade date, which is the

22   date somebody puts in an order, it's filled, and it's reported

23   to the market.  Settlement date usually is within a couple of

24   days later once the trade settles with the other party on the

25   other side.  So this provides a settlement date, the name of

1    the security that is purchased or sold, as well as the CUSIP

2    number or symbol.  Every security has a unique identifying

3    symbol, name, or CUSIP number.  Then it just kind of indicates

4    how many shares or warrants are being involved in the trade, at

5    what price, and whether there is a cost or proceed amount.  And

6    at the end there is a running balance for the account.

7    Q.  Just for an example, on September 8th here, what's

8    indicated as being -- what transactions are associated with

9    that settlement date?

10   A.  There were three separate purchases of Digital World

11   Acquisition Corp units, totaling 610 for the day, all purchased

12   at around $10 a unit.

13   Q.  Just on that settlement date or settlement process that you

14   referenced, can you explain that a little more, what the

15   settlement means?

16   A.  Again, you have trade days when you kind of put the order

17   in, it's matched with the other side, and it's reported to the

18   market.  However, now you have the process to actually settle

19   the actual transaction.  All firms are linked electronically,

20   but there's still a delay to make sure that the shares go from

21   one account to the other, and then going back are the cost or

22   proceeds from the other side to the side that is engaging in

23   the transaction.  So, basically, you have a couple of days to

24   completely settle and clear the transaction to make sure it's

25   completely official, and that's what settlement date is.

1  Q.  What's the entity that's involved in that clearing and

2  settle process?

3  A.  DTC or depository trust company.  They're basically the

4  bookkeeper of the securities industry where they're linked to

5  all brokerage firms and all transactions.  So they make sure,

6  within a couple of days, every party that has the expectation

7  of receiving shares does so, and then every contra party that's

8  expecting money in return for those shares receives those

9  proceeds.

10 Q.  Is that all a part of the securities transaction?

11 A.  Exactly.  And that's what, again, what makes it settle on

12 that settlement date.

13        MR. NESSIM:  Mr. Bianco, can you take this exhibit

14 down and can you please publish an Excel sheet that's marked as

15 Government Exhibit 305 and is in evidence.

16 Q.  Mr. Melley, what is Government Exhibit 305?

17 A.  This is a trade blotter, which is a trade report that lists

18 all transactions.  It can be for a particular account or series

19 of accounts or it could be even sorted just based on everybody

20 who traded at that firm in a particular security.  In this

21 instance, we're looking at a trade blotter at Fidelity for

22 Mr. Garelick's activity.  As you can see at the bottom, it's

23 indicated by the account numbers.  Going from left to right, it

24 gives you a window into the transactions, including trade date

25 in this instance.

1  Q.  In addition to trade date, does this blotter also include

2  the times that particular orders were placed?

3  A.  Yes.  That would show up in a couple of different fields.

4  Order entered date, order entered time, cap, trade statement,

5  which, again, is showing those -- not only the date, but the

6  time of day that those orders are put in and then filled and

7  reported as completed transactions.

8          MR. NESSIM:  Mr. Bianco, you can take this down,

9  please.

10  Q.  Mr. Melley, you testified that you prepared some summary

11  charts in this case.  Did those summary charts include price

12  and volume data of certain securities?

13  A.  Yes.

14  Q.  Which securities did you consider in determining the -- in

15  assessing the price and volume of --

16  A.  Three securities connected to Digital World Acquisition

17  Corp, the units, which went under DWACU, common stock, which,

18  at the time was DWAC, and then also the warrants, DWACW.

19  Q.  Where did you obtain the price and volume data from?

20  A.  From Bloomberg.

21  Q.  What is Bloomberg, again?

22  A.  Bloomberg is a financial news data and software company

23  that, among its -- it is considered a source for the securities

24  industry that's relied on, provides company information, price,

25  volume, backgrounds on companies, SEC filings, kind of gives

1  you a -- it's like a one-stop shopping for company information.

2  Q.  Mr. Melley, you should have a binder before you.  Do you

3  see that?

4  A.  Yes.

5  Q.  Can you take a moment to look at that.

6  A.  Okay.

7  Q.  Do you recognize it?

8  A.  I do.

9  Q.  Is that versions of the summary charts that you prepared in

10  this case?

11  A.  They are.

12  Q.  Did you discuss those summary charts with the prosecutors,

13  including myself, before your testimony today?

14  A.  Yes.

15  Q.  And did prosecutors give you direction on what kind of

16  summary charts to create?

17  A.  Yes, they did.  Charts

18  Q.  Did you review those charts for accuracy in advance of your

19  testimony today?

20  A.  Yes.

21  Q.  Are they fair and accurate to the best of your knowledge?

22  A.  Yes.

23  Q.  And are the exhibits that the summary charts are based on

24  listed on the summary chart exhibits themselves?

25  A.  Yes, they are.

1          MR. NESSIM:  Your Honor, at this time, the government

2    would offer Government Exhibits 920, 930, 940, and 941.

3          THE COURT:  Any objection?

4          MR. BACH:  No objection.

5          THE COURT:  Those are received.

6          (Government's Exhibits 920, 930, 940, 941 received in

7    evidence)

8    Q.  Mr. Melley, you mentioned that you looked at some DWAC

9    securities?

10   A.  Correct.

11   Q.  When was DWAC publicly traded?

12   A.  The units began trading publicly on September 3rd, 2021,

13   and the common stock and warrants began at the end of that

14   month on September 30th.

15   Q.  And why were the units traded earlier than the common stock

16   and warrants where it publicly traded?

17   A.  Again, the units were the security that was offered in the

18   initial public offering.  So the units will be the first

19   security traded and then the understanding is at some point

20   that those units will then also kind of split into the

21   combination of warrants and common stock, which can then be

22   traded in those respective markets.

23   Q.  What did a DWAC unit consist of at the time that it was

24   offered?

25   A.  Each unit consisted of one share of DWAC stock as well as

1    half of a warrant.

2    Q.  During the time that it was publicly traded, on what

3    exchange was the DWAC unit traded?

4    A.  NASDAQ.

5    Q.  And what about DWAC warrants?

6    A.  NASDAQ -- all three securities were traded on NASDAQ's

7    global market, which is the middle of three tiers of the NASDAQ

8    system.

9    Q.  Where is the NASDAQ headquartered?

10   A.  In Manhattan, I believe Times Square area.

11   Q.  Are DWAC shares currently available to trade?

12   A.  They're currently trading not as DWAC, but as after the

13   business combination was completed earlier this year.  I

14   believe as of March 26th, 2024, it's trading under the symbol

15   DJT and the new name, which is Trump Media & Technology Group.

16            MR. NESSIM:  Mr. Bianco, can you please just publish

17   an Excel sheet that's Government Exhibit 905.  Mr. Bianco, if

18   you could just -- okay.

19   Q.  Mr. Melley, what is Government Exhibit 905?

20   A.  This is a Bloomberg generated spreadsheet of market volume

21   as well as pricing information for, at the time, DWAC common

22   stock, but as you could see in that top box, indicates under

23   the current symbol DJT, and it's trading in the common stock

24   between September 30th of 2021 through November 1st of that

25   year.

1   Q.  What is the sort of data that's included in this Bloomberg

2   chart?

3   A.  It provides on a daily basis the market volume.  So again,

4   that's all the shares that are exchanged among buyers and

5   sellers, as well as prices throughout the day, the last or

6   closing price, the open price, the high and low prices and then

7   it kind of gives for most of those days what the change is in

8   both dollars and percentages.

9           MR. NESSIM:  Mr. Bianco can you select rows 15 and 16,

10  please.

11  Q.  Mr. Melley, if you could, what was the volume of DWAC

12  shares on October 20th of 2021?

13  A.  Almost 500 million shares were traded on the 21st.

14  Q.  And what about on the 21st.

15          THE COURT:  I think he answered the question on the

16  21st.  Why don't you start the line of examination again so

17  it's clear what days you're each referring to.

18          MR. NESSIM:  Yes, your Honor.

19  Q.  Mr. Melley, I would draw your attention to cell B16 on

20  October 20th, what was the volume in DWAC shares on October

21  20th of 2021?

22  A.  Approximately 700,000 shares were traded that day.

23  Q.  What was the volume in DWAC shares on the next day on

24  October 21st in the cell right above that?

25  A.  Almost 500 million.

1   Q.  And what was that changes in volume?

2   A.  I mean, it's a tremendous change of, you know, almost close

3   to, you know, the complete amount of 500 million or 496 million

4   shares just in course of one day.

5   Q.  And what was the -- and turning your attention --

6           MR. NESSIM:  Mr. Bianco, if you could just highlight

7   the cells I15 and I16.

8   Q.  What was the high price of DWAC shares on October 20th of

9   2021?

10  A.  It was $10 .04.

11  Q.  What was the high price on October 21st of 2021?

12  A.  It got to 52 during the course of the 21st.

13  Q.  What was the high price on the 22nd?

14  A.  175.

15  Q.  And is this just an example of some of the Bloomberg data

16  that you used to build the summary charts in this case?

17  A.  Yes, and it's very similar for both the warrants and the

18  units of trading.

19          MR. NESSIM:  Mr. Bianco, can you please publish

20  Government Exhibit 920.

21  Q.  Mr. Melley, what is page 1 of Government Exhibit 920

22  depict?

23  A.  This depicts the market volume and daily closing prices for

24  the DWAC units trading between the first day it was able to

25  publicly trade on September 3rd through the end of October

1    2021.

2    Q.  How do you read this chart, what on the chart shows the

3    price and what shows the volume?

4    A.  So the volume is indicated by the blue bars, and then the

5    left side vertical axis showing that share volume, which,

6    again, is the number of shares purchased and sold on a daily

7    basis.  Then the red line is the price trending line.

8          As you could see, for most of the period of September

9    through the first few weeks of October, it is at $10 a share.

10   Each of those black dots indicates the closing price of about

11   $10 for each day.  And then you can see the spike starting on

12   the 21st and 22nd.  And then there are text boxes indicating

13   the high prices for both of those days.

14   Q.  Are you aware of what happened between October 20th and

15   October 21st that triggered that change and price in volume?

16   A.  After the close of market trading on the 20th of October,

17   there was an announcement later that evening that DWAC was

18   going to combine -- there was an intent to combine with Trump

19   Media & Technology Group.

20         MR. NESSIM:  Mr. Bianco, could you please just publish

21   for the witness and the parties what's been marked as

22   Government Exhibit 131.

23         The government offers Government Exhibit 131.

24         MR. BACH:  No objection.

25         THE COURT:  Received.  131 is received.

1          (Government's Exhibit 131 received in evidence)

2          MR. NESSIM:  Let's just publish this for the jury.

3          Mr. Bianco, if you could just zoom in just to the Liz

4     Harrington and these texts separated by sirens.

5     Q.  Mr. Melley, can you please just read this announcement?

6     A.  President Donald J. Trump announces Trump Media &

7     Technology Group.

8          MR. NESSIM:  Mr. Bianco, if could you zoom out and

9     let's look at the press release that's attached to this Tweet.

10    Q.  Mr. Melley, if you could just read the first sentence of

11    this press release, including the location and date.

12    A.  So this is from Palm Beach, Florida, October 20th of 2021.

13    Trump Media & Technology Group and Digital World Acquisition

14    Corp. with the NASDAQ symbol DWAC have entered into a

15    definitive merger agreement providing for a business

16    combination that will result in Trump Media & Technology Group

17    becoming a publicly listed company subject to regulatory and

18    stockholder approval.

19         MR. NESSIM:  Mr. Bianco, if you could zoom out and

20    zoom into the time and date of this Tweet.  It's at the bottom

21    of the Tweet.

22    Q.  What's the time and date that this Tweet was sent?

23    A.  8:16 p.m. on the evening of October 20th, 2021.

24    Q.  And when is that in relation to market hours?

25    A.  So regular market hours close at 4:00 p.m. Eastern Time.

O53Cgar4                    Melley - Direct

1    So this was much later that evening.  And so, this news would

2    primarily be absorbed the following day when the market opens

3    at 9:30 a.m.

4              MR. NESSIM:  Mr. Bianco, let's please go back to

5    Government Exhibit 920.

6    Q.  This is the page that shows the price and volume of units

7    over this timeframe; is that right?

8    A.  Correct.

9              MR. NESSIM:  Mr. Bianco, let's turn to page 2.

10   Q.  What does page 2 of Government Exhibit 920 show?

11   A.  This is a chart, similar format to the unit one we just

12   looked at, with closing price and market volume.  In this

13   instance, the focus is only on DWAC common stock, again,

14   showing the tremendous bump in both price and volume on the

15   21st and 22nd after the news of the evening of the 20th.

16   Q.  What's the general trend in closing price for DWAC common

17   stock for the period before the merger announcement?

18   A.  It was flat throughout those weeks of October until the

19   announcement, trading at $10 and not fluctuating much from

20   that.

21   Q.  And then what was the high price on October 21st, the first

22   day after the announcement?

23   A.  52.

24   Q.  And what about the next day?

25   A.  175 was the high on the 22nd.

1              MR. NESSIM:  Mr. Bianco, let's go to page 3, please.

2     Q.  What does this page show?

3     A.  This is a similar format chart.  In this instance, the

4     focus is on DWAC warrants, again, showing how the trading --

5     the price was flat until at announcement occurred on the

6     evening of the 20th and then the spike in price and volume on

7     the 21st and 22nd.

8     Q.  What was the approximate price of DWAC warrants on the

9     market from around September 30th to October 20th?

10    A.  I don't believe that DWAC warrants traded for more than

11    50 cents in any given transaction during that time period

12    before the news of the evening of the 20th.  As you can see,

13    the next day, it reached a high price of approximately $14.50.

14    Q.  What was the approximate volume in warrant sales on October

15    21st?

16    A.  There were basically about 95 million shares traded -- or

17    95 million warrants traded on the 21st.

18             MR. NESSIM:  Mr. Bianco, could you please publish

19    Government Exhibit 930.

20    Q.  What does page 1 of Government Exhibit 930 show?

21    A.  This is a table listing the transactions in DWAC securities

22    for Mr. Garelick's Fidelity account between September 3rd and

23    October 21st.  Going from left to right, it indicates the trade

24    date, whether it was a buy or a sell, the type of security,

25    whether it was a unit, common stock, or warrant involved, the

1    amount, and also the quantity of the security itself.  And then

2    a kind of, at the bottom, just calculating the total profit of

3    just under $50,000 made from the sale of those common stock and

4    warrants.

5    Q.  So what are the days indicated here that Mr. Garelick's

6    Fidelity account purchased DWAC units?

7    A.  September 3rd, September 10th, September 17th, September

8    20th, the 21st, and also September 23rd.

9    Q.  And what are the days indicated here that Mr. Garelick sold

10   DWAC securities?

11   A.  October 21st.

12   Q.  And what kind of securities did he sell?

13   A.  So he had originally purchased the units and then they had

14   split and were posted in his Fidelity account on October 6th.

15   And then a couple weeks later, he sold those warrants and

16   shares.  Again, each unit composed one share of stock as well

17   as half a unit.  So he sold 5,320 shares, which was equal to

18   the number of units, and then he sold 2,660 warrants of DWAC.

19   Q.  So those sales on October 21st of 2021, that was the first

20   trading day following the announcement; right?

21   A.  Correct.

22        THE COURT:  Is now a convenient time for us to take

23   our lunch break?

24        MR. NESSIM:  Yes, your Honor.

25        THE COURT:  Members of the jury, it is 10 of 1:00.

1    We'll take a lunch break until 2 o'clock.  Try to get back into

2    the jury room a little bit before 2:00 so we can start promptly

3    at 2:00.

4              Don't talk amongst yourselves or with anybody else

5    about the case and don't do any research on the case.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  The witness can step down.  The parties

3     can be seated.

4          Mr. Nessim, how much more do you have with this

5     witness?

6          MR. NESSIM:  I think it's probably around 30 to 40

7     minutes, your Honor.

8          THE COURT:  What do we have left in the government

9     case after that?

10          MR. NESSIM:  After this will be Sue Maj, who is a

11     short witness testifying to phone record summary charge, and

12     then Kayla Collins.

13          THE COURT:  How long does the defense expect the cross

14     examination of this witness to be?

15          MR. BACH:  15 minutes, 10 minutes.

16          THE COURT:  Ms. Shapiro, let me hear from you with

17     respect to the summary charts for Ms. Collins.

18          MS. SHAPIRO:  Sure, your Honor.

19          So these charts are really just a third closing

20     argument for the government.  They select out bits and pieces

21     of the evidence and weave them together to present the

22     government's narrative, they omit other pieces.  Of course,

23     that's their right in argument, that's the purpose of closing

24     argument, and we get to do the same thing in our closing

25     argument.  That is, we have to get in the bits and pieces of

1    evidence that we believe support our narrative of the case, but

2    it's not evidence, your Honor.

3              I'd just like to respond to a few of the specific

4    points that Mr. Shahabian raised.

5              For instance, he said that Rule 1006 was properly

6    invoked with respect to these charts because the government

7    needed to combine phone records, trading records, text

8    messages, and corporate events into a narrative.  I would

9    respectfully submit that is describing exactly what a summation

10   is.

11             With respect to the texts and the emails, they are not

12   voluminous.  But, more importantly, if you actually look at the

13   charts, they don't summarize them.  They select out particular

14   texts and particular emails and line them up with other pieces

15   of evidence, like particular phone calls and so forth and

16   trades into the government's narrative that they're going to

17   present to the jury in closing argument.

18             With respect to the testimony of examiner Isolda,

19   Mr. Shahabian mentioned that he had explained some of the

20   extraction evidence, but that he didn't walk through it in a

21   chronological fashion.  Now, the government chose to present

22   his testimony in the manner in which they decided to do that,

23   and that was their choice.  Presumably they could have

24   presented other messages and read them to the jury in

25   chronological order during his testimony had they wanted to do

1    so.

2            In addition, Mr. Shahabian said that there's a double

3    level of voluminous because there are summary charts of trading

4    records and summary charts of telephone records and this

5    timeline, and these timelines are needed to summarize those.

6    Now we, as the Court is aware, have not objected to any of

7    Mr. Melley's charts, we don't anticipating objecting to any of

8    the telephone record charts.  We think those are proper summary

9    charts under the rule.  However, it is not appropriate under

10   Rule 1006 to summarize charts of evidence in another chart.  If

11   you look at the language of the rule, that clearly is outside

12   the language of the rule.  The rule is designed to allow

13   summary charts that summarize voluminous pieces of evidence

14   that are otherwise admissible that cannot be conveniently

15   examined in court.  There's no reason the jury can't look at

16   these other summary charts.

17           With respect to the time zone issue, the defense has

18   stipulated that in joint exhibit 3, that during a particular

19   relevant period of time in 2021, UTC time was four hours ahead

20   of the time on the east coast in the United States.  That was

21   the stipulation they requested, we agreed to it.

22           Finally, I know the Court is well aware of this, but

23   just so it's clear, we're of course aware of *Ho* and the other

24   Second Circuit case law, but obviously, No. 1, those are Second

25   Circuit cases holding that in a particular situation, a

1    district court did not abuse its discretion, they do not stand

2    for the proposition that these particular charts comply with

3    the rule.  And, more importantly, I think the recent amendment,

4    which obviously hasn't taken effect yet, but is clearly

5    designed to deal with the problem that is present by exactly

6    these types of charts, which clearly, the advisory committee

7    never intended would be what this rule was used for.

8         Finally, I would just remind the Court that, as is

9    obvious, this is an extremely short trial.  It's not anything

10   even remotely close to something like the *Casamento* case, but

11   certainly other white collar cases that last even four to six

12   weeks and have a lot more documents in evidence, this is a very

13   limited scope of evidence and records that we're talking about.

14        So that's what I have to say.  I don't know if the

15   Court has any questions.

16        THE COURT:  I have one question just to better

17   understand your argument.  By our calculation, I think there's

18   something like 58 exhibits that are referenced in the charts.

19   Do you dispute that 58 would be a voluminous number of

20   writings?  In other words, are you challenging that it is

21   voluminous or is it something else?

22        MS. SHAPIRO:  Well, I think we are, but the main

23   argument is a Rule 403 argument, and an argument that to the

24   extent the charts are purporting to summarize other charts,

25   that that's not an appropriate invocation of the rule.  But I

1    think if you actually look at them, it's one thing if you have

2    a telephone chart like the other ones that are going to come in

3    later, but we're not talking about a chart that summarizes any

4    emails or texts.  We're talking about a chart that takes a

5    chronology and puts different pieces of evidence together to

6    make the government's argument.  That's the purpose of the

7    chart.  It's not a neutral document.  It omits lots of other

8    things that the defense could argue are relevant.  And I

9    recognize that they're going to stand up, as they always do,

10   and say, well, the defense can put in an argumentative chart,

11   too.  They won't say it that way, but that will be the

12   argument.  But that's not what this rule is for and that's the

13   precise reason that the advisory committee has promulgated an

14   amendment to change that.

15            THE COURT:  I've got one question for Mr. Shahabian

16   and then I'll give you some indication of at least a portion of

17   my thinking.

18            For Mr. Shahabian, as to Ms. Shapiro's last point,

19   assuming that the charts address writings that are voluminous,

20   can you explain to me how the charts are intended to prove the

21   content of those voluminous writings as opposed to telling a

22   narrative, focusing, obviously, on the language of the rule.

23            MR. SHAHABIAN:  Yes, your Honor.  I think to one of

24   the points Ms. Shapiro raised is my response to this.  The

25   charts purposefully did not characterize or attempt to restate

1    the underlying words because we did not want them to be

2    presented as argumentative.

3              But, for example, some of the emails -- and I can pull

4    one up for the Court if the Court needs an example.  It's an

5    email chain with like 10 back and forth, the formatting is

6    wonky because of the way it's produced in discovery.  Rather

7    than have the jury wade through each email, and we intend to do

8    some of them with the summary witness first so they can see the

9    underlying documents and understand what these charts are based

10   on, but that's the kind of volume that we're talking about in

11   terms of efficiently presenting the underlying evidence that is

12   relevant and presenting it, not arguing from it.  The summary

13   witness won't be drawing inferences.  It's simply setting

14   forward a chronology of factual evidence we'll argue at

15   closing.

16             THE COURT:  I'm reserving on the question of whether

17   the charts will be admissible under Rule 1006.  I think you

18   both can assume that, regardless of whether I permit them to be

19   offered into evidence under Rule 1006 — and I'll give you a

20   ruling right after lunch — that I would permit them to be used

21   as illustrative and as a demonstrative aid.  And so, the

22   defense should be prepared for a cross examination on that.

23   But I understand the issues now.

24             MS. SHAPIRO:  Your Honor, can I make one last point?

25   Just to be clear, the objection, we assume the Court would

1    allow it as a demonstrative, just so that's clear.

2            One last point in response to what Mr. Shahabian said,

3    they obviously, if there's a long email chain and they want to

4    highlight a particular portion of it, they can create a

5    demonstrative and use that in their summation.  There's no

6    reason they can't do that.

7            THE COURT:  I understand the issues.

8            Let me raise a couple of other things -- Mr. Bach --

9    Mr. Bach, maybe you can let me speak and go to some other

10   things.

11           I raised earlier, a couple of days ago, the question

12   of stipulations, including whether the parties are going to

13   stipulate as to the securities being registered under Section

14   12.  This really just goes to the question of how I charge the

15   jury.  I'm not pushing the parties, I just want to know where

16   they stand with respect to stipulations.

17           MS. SHAPIRO:  Your Honor, we've signed a stipulation

18   to that and the other one the Court asked us about.

19           THE COURT:  Good.  Maybe after lunch, you can give me

20   a copy of it.

21           Has the issue with respect to if, as, and when

22   subpoenas have been resolved?

23           MS. SHAPIRO:  Yes, your Honor.  I was going to submit

24   a short letter about that later.  The parties have met and

25   conferred over the past several days and the government has

1    substantially narrowed the subpoena and we were going to

2    withdraw the motion.

3             THE COURT:  Excellent.  Great.

4             It's not, I think, too early for me to ask the

5    question of how long each side anticipates for closing

6    arguments?

7             MR. SHAHABIAN:  At a maximum, and I'm hoping for

8    significantly less, two hours.

9             THE COURT:  Mr. Bach.

10            MR. BACH:  Judge, I want to keep mine short, but I'd

11   like to reserve three hours.

12            THE COURT:  Three hours?

13            MR. BACH:  Yes.

14            THE COURT:  Let me think about those estimates.

15            The last thing that I have, and I really am going to

16   let you go for lunch, is on the assumption that we're going to

17   finish up with the government's case, I would anticipate

18   engaging in a colloquy, Mr. Bach, with your client just to make

19   sure, going into the weekend, he is aware that the question

20   whether he testifies is going to be up to him, and he can and

21   should take advice with respect to that, but ultimately, the

22   decision will be one that he makes.  And then, if he elects

23   next week not to testify, I'll have a further colloquy.

24            Any objection to me having that kind of a colloquy?

25            MR. BACH:  No.

O53Cgar4                    Melley – Direct

1              THE COURT:  All right.  Have a good lunch, everybody.

2              MR. NESSIM:  When should we be back, your Honor?

3              THE COURT:  2:05.

4              (Luncheon recess)

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O531GAR5

AFTERNOON SESSION

2:14 p.m.

(Jury not present)

THE COURT:  Okay.  Before we call in the jury, the Court is prepared to rule.

The defense moves to exclude eight summary charts, Government Exhibits 960 through 967, under Federal Rules of Evidence 1006 and 403.  Dkt. No. 139.  The motion is denied.

Under Rule 1006, a proponent of evidence "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."  Fed. R. Evid. 1006.  In *United States v. Ho*, 984 F.3d 191, 209-10 (2d Cir. 2020), the Second Circuit reiterated that it has long approved the use of charts in complex trials and has allowed the jury to have the charts in the jury room during its deliberations, so long as the court properly instructs the jury that it is not to consider the charts as evidence.  *See also United States v. Casamento*, 887 F.2d 1141, 1151 (2d Cir. 1989).

This case is controlled by *Ho*.  There, the district court admitted summary charts that provided timelines of certain text messages, emails, and other documents admitted into evidence.  The defendant argued that the district court erred because the charts were "created for the purpose of generating a narrative supporting the prosecution's theory of

O531GAR5

the case." 984 F.3d at 209. He also contended the charts were improper because the jury could have easily examined the underlying materials, which consisted of 133 documents across 769 pages. Although the Court recognized that "summary charts are sometimes used to synthesize even larger volumes of documentary evidence," the circuit affirmed the district court and held that "it was clearly not an abuse of discretion for the district court to conclude that hundreds of pages of evidence merited the use of summary charts in a complex fraud trial." *Id.* at 210.

Here, the Court concludes that the challenged charts are admissible under Rule 1006 "to prove the content of voluminous writings . . . that cannot conveniently be examined in court." I have examined the charts. The charts summarize 58 different exhibits, many of which are lengthy and difficult to parse without being summarized. *See, e.g.*, Gov. Exs. 351, 352, 360. Others, though not quite as voluminous, are communication chains that contain a significant amount of irrelevant material. *See, e.g.*, Gov. Exs. 349, 749. The summary charts summarize the evidence as a group. The summary charts viewed together also summarize underlying records that are themselves voluminous when viewed in isolation—-the way that summaries do so, by pointing out the information from those records that is relevant to the proponent's case in chief. They are not excludable because they are organized in

O531GAR5

1    the form of a timeline or in a manner that the government

2    believes would be effective in presenting its case.

3         The Court's decision is not inconsistent with *United

4    States v. Maxwell*.  In *Maxwell*, the government sought to have a

5    federal agent provide a verbal narrative connecting various

6    pieces of evidence in the case.  But the government explicitly

7    disclaimed any reliance on Federal Rule of Evidence 1006.  And

8    Judge Nathan determined that the underlying exhibits did not

9    consist of the kind of "complicated, extensive set of

10   records{ }. . . [that] require the type of 1006 summary."  ECF

11   No. 757 in 20 Cr. 330, at 1984:10-11, 17-18.

12        It also is not appropriate to judge the case under a

13   new rule that has not yet gone into effect.  The parties are

14   entitled to a trial based on the law as it exists today.

15        In the end, the defense objection turns upon Rule 403,

16   and based upon Rule 403, the Court concludes that the probative

17   value of the charts far outweighs any prejudicial impact and

18   the waste of time that would occur if the government were

19   forced to go through the underlying records item by item.

20   Although the defense points out that this case is not as long

21   as some others in which summary evidence was admitted, were the

22   defense suggestion to be adopted and the government required to

23   go through the records item by item, the case would take much

24   longer, unnecessarily wasting the jury's time.

25        Okay.  Let's put the witness back on the stand.  Bring

1    in the jury.

2            MS. SHAPIRO:  Your Honor, can I just quickly put

3    something on the record.  It's about something else.

4            THE COURT:  Yes.

5            MS. SHAPIRO:  During Mr. Melley's direct, we made an

6    objection referring to your Honor's earlier ruling with regard

7    to the trading records of the downstream tippees, and the

8    purpose of the objection was to just reiterate and preserve the

9    relevance objection and not the hearsay, not a hearsay

10   objection.

11           THE COURT:  Okay.

12           MS. SHAPIRO:  We just wanted the record to be clear.

13           THE COURT:  Thank you.  Thank you.

14           That is the reason, Ms. Shapiro, in certain instances

15   I've conditionally admitted exhibits and others I have admitted

16   them.  And you've got your relevance objection.

17           (Continued on next page)

18

19

20

21

22

23

24

25

1        (Jury present)

2        THE COURT:  Be seated.

3        The witness is reminded he's still under oath.

4        Counsel, you may continue to inquire.

5        MR. NESSIM:  Thank you, your Honor.

6        Mr. Bianco, let's pick up where we started.  Can you

7   please publish Government Exhibit——where we ended.  Excuse me.

8   Can you please publish Government Exhibit 930.

9   BY MR. NESSIM:

10  Q.  Mr. Melley, before the break you testified that this page

11  of Government Exhibit 930 relates to DWAC security transactions

12  conducted in Bruce Garelick's Fidelity account; is that right?

13  A.  Correct.

14  Q.  And what's the approximate profits that Mr. Garelick

15  received as a result of these transactions?

16  A.  $49,700.

17        MR. NESSIM:  Mr. Bianco, can you please turn to page 2

18  of Government Exhibit 930.

19  Q.  What account does page 2 of Government Exhibit 930 relate

20  to?

21  A.  An account in the name of Rocket One Capital, Michael

22  Shvartsman, RBC Capital Markets, and it covers the purchase and

23  sale of 2 million DWAC warrants between October 1st and

24  October 22nd, 2021.

25  Q.  Okay.  And you mentioned it covers warrants.  Were there

1    additional DWAC securities in Michael Shvartsman's RBC

2    Capital——or Rocket One's RBC Capital Markets account that are

3    not included on this chart?

4    A.  Yes.  There were also DWAC units that were purchased in the

5    IPO.

6    Q.  And now why did you not include the IPO units in the chart?

7    A.  I was instructed by the government just to capture trading

8    starting on October 1st in the warrant activity.

9    Q.  So just the open-market trading?

10   A.  Correct.

11   Q.  What was the time frame in which Michael Shvartsman's

12   Rocket One account——or the Rocket One account purchased

13   2 million DWAC warrants?

14   A.  It was over a three-day period——October 1st, October 4th,

15   and October 5th.

16   Q.  And what was the time frame in which Rocket One sold DWAC

17   warrants?

18   A.  All 2 million warrants were sold on the 21st and 22nd of

19   October.

20   Q.  And what was the profit to Rocket One from that sale of

21   DWAC warrants on October 21st and October 22nd?

22   A.  Approximately $18.2 million.

23        MR. NESSIM:  Mr. Bianco, let's turn to the next page,

24   please.

25   Q.  Which account does page 3 of Government Exhibit 930 relate

1    to?

2    A.   An RBC Capital Markets account involving Gerald Shvartsman,

3    and in this instance covering the purchase and sale of 400,000

4    warrants in October of 2021.

5    Q.   And what was the—and similar to Michael, to the Rocket One

6    account, were there any securities in this account that you did

7    not include on the chart?

8    A.   Correct.   There were also IPO units that were purchased in

9    this account, that are not reflected on this chart.

10   Q.   Okay.   And what was the time frame in which Gerald

11   Shvartsman's account purchased 400,000 DWAC warrants?

12   A.   Those warrants were purchased on October 7th, October 8th,

13   and October 18th; and subsequently all 400,000 were sold on the

14   21st and 22nd of October.

15   Q.   And approximately how much money did Gerald Shvartsman make

16   in profits from the sale of DWAC warrants?

17   A.   $4.6 million.

18        MR. NESSIM:   Mr. Bianco, please turn to page 4 of

19   Government Exhibit 930.

20   Q.   Mr. Melley, which account does page 4 of Government

21   Exhibit 930 relate to?

22   A.   This reflects an E*Trade account in the name of Eric and

23   Karla Hannelius, covering the trading in various DWAC

24   securities between September and October of 2021.

25   Q.   So what was the time frame in which this account purchased

1   DWAC securities?

2   A.   September 13th for a purchase of DWAC units.  Subsequently

3   in October, there were purchases of 11,300 DWAC warrants, which

4   were then——the warrants and common stock were all sold on the

5   21st and 22nd of October.

6   Q.   And just turning your attention to the purchases, there are

7   500 DWAC units purchased September 13th and then 1300 DWAC

8   warrants purchased over October 6th and October 7th; is that

9   right?

10  A.   Correct.  And again, each unit consists of one share and

11  half of a warrant.  So those 500 shares that are sold on the

12  21st reflect back to the 500 DWAC units.

13  Q.   What is the date and quantity of the last purchase order

14  depicted on this chart?

15  A.   On October——

16          MR. NESSIM:  Mr. Bianco, if you could highlight

17  October 20th.

18  A.   The last purchase, right?

19  Q.   Yes.

20  A.   10,000 DWAC units were purchased on October 20th in the

21  amount of $5,200.

22  Q.   I think you said DWAC units.

23  A.   I'm sorry.  DWAC warrants.  My apologies.

24  Q.   Those were purchased on October 20th.

25  A.   Correct.

Q.  And then when, what were the days that Mr. Hannelius's

account sold his positions?

A.  The following day, the 21st, as well as the 22nd.

Q.  And what was the approximate profit that this account

realized as a result of these transactions?

A.  $168,000.

       MR. NESSIM:  Mr. Bianco, please turn to page 5.

Q.  Which account transactions are reflected on page 5 of

Government Exhibit 930?

A.  An account in the name of APLC Investments, LLC, covering

DWAC activity between September 7th and November 11th, 2021.

Q.  And were there any DWAC securities reflected in the

underlying RBC records that are not included on this page of

Government Exhibit 930?

A.  Yes.  There were DWAC units similar to the others that we

just discussed from the IPO that are not reflected in this

chart, and as a result, the activity that was sold that

reflects those units were also removed from this chart.

Q.  And how did you determine which sold securities should be

removed corresponding with the IPO securities that were also

removed?

A.  So with regard to the IPO securities that were removed, I

then did a first in, first out analysis, so the first shares

and warrants that were sold that would have been attributed to

those units, I removed from this analysis.  So that's what's

1    left, with the resulting profit total of approximately

2    $14.4 million.  If you include those units, it would be a much

3    higher number.

4    Q.  And so this chart reflects just the open-market purchases

5    and sales; is that correct?

6    A.  Correct.

7    Q.  And what's the time frame in which the APLC Investments

8    account purchased DWAC securities?

9    A.  First purchase of the units occurred on September 7th.  And

10   there were subsequent purchases on the 8th, October 6th, and

11   October 11th; there were subsequent warrant purchases on

12   October 12th, 18th, 19th, and then the final purchase on

13   October 20th.

14        MR. NESSIM:  Mr. Bianco, please turn to page 6.

15   Q.  Mr. Melley, which account data is reflected on this page of

16   Government Exhibit 930?

17   A.  This is a TD Ameritrade account in the name of Run It Up

18   Inc., to the attention of Aric Gastwirth.  It involves the

19   purchase and sale of a hundred thousand, 150,000 warrants.  All

20   those warrants were purchased on October 20th and subsequently

21   sold the following day on the 21st.

22   Q.  And what was the approximate profits that the Run It Up

23   Inc./Aric Gastwirth account was able to realize from these two

24   days of purchases and sales?

25   A.  $1.4 million.

O531GAR5                      Melley - Direct

1        MR. NESSIM:  Mr. Bianco, please turn to page 7.

2   Q.   What account does page 7 of Government Exhibit 930 relate

3   to?

4   A.   An account in the name of Unique Realty to the attention of

5   Adrian Torres regarding the October 20th purchase of 100,000

6   DWAC warrants and the following day selling that entire

7   position, generating a profit of approximately $404,000.

8   Q.   And there's an asterisk on the first date entry of

9   October 20th.  What does that relate to?

10  A.   That indicates that while the transaction was completed on

11  the 20th, that Mr. Torres started putting limit orders in at

12  certain prices to buy those DWAC warrants on the 19th, but

13  because of the prices he was putting in did not meet the market

14  price, and they weren't filled until the following morning when

15  the price reached 49, 50, and 51 cents, so again, he started

16  putting orders in on the 19th, but it wasn't until the 20th

17  that the purchases were completed.

18       MR. NESSIM:  And Mr. Bianco, please turn to the last

19  page of Government Exhibit 930.

20       One moment, your Honor.  Can I have one moment?

21       THE COURT:  Yes.

22  BY MR. NESSIM:

23  Q.   What does this page of Government Exhibit 930 relate to?

24  A.   An account in the name of Netanel Suissa talking about or

25  covering purchases in DWAC common stock on the 19th and 21st of

1    October and the subsequent sale of DWAC common stock on the

2    21st, generating profit of approximately $16,000.

3    Q.  And what's the number 1 next to total at the bot——the final

4    row?

5    A.  There was——so there was a sale of 2,102 DWAC shares on the

6    21st of October, but Mr. Suissa had purchased 2103, so as of

7    the end of the 21st, there's still one share of DWAC remaining

8    in that position.

9              MR. NESSIM:  Mr. Bianco, you can take this down,

10   please.

11             And let's publish for the jury what's in evidence as

12   Government Exhibit 940.

13   Q.  So Mr. Melley, what does Government Exhibit 940 show?

14   A.  This depicts the closing price on a daily basis in DWAC

15   units between September 3rd and October 22nd, 2021.  And then

16   there is a text box on 9/3 to indicate that Mr. Garelick made

17   that initial purchase in the open market of 610 DWAC units.

18             MR. NESSIM:  Mr. Bianco, can you turn to page 2,

19   please.

20   Q.  Mr. Melley, what event is represented on page 2 of this

21   exhibit?

22   A.  The September 10th purchase by Mr. Garelick of 300 more

23   DWAC units.

24             MR. NESSIM:  Let's turn to page 3, please, Mr. Bianco.

25   Q.  What's this?

1  A.  On September 17th, Mr. Garelick purchases an additional 410

2  units of DWAC.

3        MR. NESSIM:  Let's turn to page 4, please.

4  Q.  What's this event?

5  A.  On September 20th, he then goes on to buy 900 more units.

6        MR. NESSIM:  And let's turn to page 5, please.

7  Q.  What happened on September 21st?

8  A.  Mr. Garelick purchases 1800 units of DWAC.

9        MR. NESSIM:  And page 6, please, Mr. Bianco.

10  Q.  What happened on September 23rd?

11  A.  He makes his final DWAC unit purchase, this time of 1300

12  units.

13        MR. NESSIM:  Let's turn to page 7, please.

14  Q.  And what event is depicted on page 7 of this exhibit?

15  A.  So again, keeping in mind that those units then will split

16  into common stock shares as well as warrants, Mr. Garelick sold

17  that position of all those shares and all those warrants,

18  generating over 49,000 in profit from those sales, on

19  October 21st.

20        MR. NESSIM:  Mr. Bianco, please publish Government

21  Exhibit 941.

22  Q.  Mr. Melley, what information does Government Exhibit 941

23  show?

24  A.  This focuses on the daily closing price and market volume

25  of DWAC warrants and comparing Michael Shvartsman's warrant

1    trading on the selected days that he was active.  So for

2    instance, this indicates that on October 1st, he purchased

3    227,915 warrants, which, by the orange shading of that volume

4    box, indicates that he was responsible for 95 percent or almost

5    all of the volume of activity on the warrant trading that day

6    on the 1st.

7    Q.  That means that 95 percent of all warrants purchased on

8    October 1st in DWAC were purchased by Rocket One?

9    A.  Correct.

10   Q.  And what was the approximate price of warrants during this

11   time frame?

12   A.  The warrants were trading at no more than 50 cents a

13   warrant.

14        MR. NESSIM:  Mr. Bianco, please turn to page 2.

15   Q.  What event is reflected on page 2 of Government

16   Exhibit 941?

17   A.  This shows that on the following day, October 4th,

18   Mr. Shvartsman purchased 1,641,731 warrants.  Also, as

19   indicated by the orange shade of the box, this represented

20   64 percent of all the warrant trading on the 4th of October.

21   Q.  Of all the warrant trading where?

22   A.  All the warrant trading on NASDAQ in DWAC warrants.

23        MR. NESSIM:  Mr. Bianco, please turn to page 3.

24   Q.  What does this page show?

25   A.  That for the third trading day in a row, Mr. Shvartsman is

1    purchasing DWAC warrants on the 5th in the amount of 130,354,

2    representing 38 percent of the warrant market that day, of

3    market trading, and this completes the 2 million warrant

4    purchases over this three-day period.

5              MR. NESSIM:  Mr. Bianco, let's turn to the next page,

6    please.

7    Q.  What event is depicted on page 4?

8    A.  This is to indicate, in the top right-hand corner in the

9    yellow box, that after the close of regular market trading that

10   evening, there was the media announcement that Trump Media &

11   Technology and DWAC had announced a planned merger.

12             MR. NESSIM:  Let's turn to the next page, please,

13   Mr. Bianco.

14   Q.  What event is depicted on this page of Government

15   Exhibit 941?

16   A.  So this chart now carries it out a few days later into

17   October 22nd to reflect the trading on the 21st where

18   Mr. Shvartsman sold approximately 1.8 million warrants.  That's

19   the same day on the 21st that the DWAC warrant price increased

20   over $10, or 2000 percent, due in part to the news that

21   occurred the evening before.

22   Q.  And turning your attention to the price and volume

23   information from September 30th to October 20th.  How would you

24   compare the detail that we're able to see on this page of

25   Government Exhibit 941 to the earlier pages?

1    A.  So they're earlier pages because it was just covering

2    through the 20th.  The scale is different to just reflect what

3    that volume and pricing is going to be.  It's really apples and

4    oranges.  So when you have to include these two days, you have

5    to kind of change the scale to kind of reflect the impact of

6    the warrant price increasing to almost $11 on the 21st and

7    almost $30 on the 22nd and then also the tremendous spike in

8    volume on the 21st and 22nd, after the news announcement the

9    evening of the 20th.

10   Q.  What does this indicate about the market interest and

11   warrants before October 20th and after October 20th?

12   A.  That there was tremendous demand and interest in DWAC and

13   the planned merger with Trump Media & Technology, and the

14   market responded by driving the price up in warrant trading.

15   You see it in the volume and you obviously see it in the

16   closing prices, on the 21st and 22nd.

17          MR. NESSIM:  And Mr. Bianco, can you please turn to

18   page 6 of this exhibit.

19   Q.  What's this event?

20   A.  This just kind of completes the story through the 22nd,

21   where Mr. Shvartsman sells his remaining 207,250 warrants, so

22   that's the remaining of the 2 million total that he had

23   purchased earlier in the month, and as you can see, DWAC

24   continues to climb, the price increasing almost another $18

25   from the prior date close on the 21st.

1    Q.  Is that more than double increase in price between

2    October 21st and October 22nd?

3    A.  Correct.  Yeah, I mean, it goes——it closes at about $11 on

4    the 21st and $29 on the 22nd.

5            MR. NESSIM:  Mr. Bianco, can you just turn to the

6    final page of this exhibit, please.

7    Q.  And this just reads, Michael Shvartsman sells 2 million

8    warrants for $18.2 million.

9    A.  Correct.

10           MR. NESSIM:  Mr. Bianco, you can take this down.

11   Thank you.

12   Q.  Mr. Melley, earlier you testified that in the course of

13   preparing to testify today, you reviewed publicly filed

14   documents with the Securities and Exchange Commission; is that

15   right?

16   A.  Yes.

17   Q.  What sort of documents did you look at?

18   A.  So those documents included some initial registration

19   statement for DWAC, as well as individual disclosures by

20   Mr. Garelick, one in particular disclosing his position of DWAC

21   shares, which is commonly called a Form 3.

22           MR. NESSIM:  Mr. Bianco, please publish what's in

23   evidence as Government Exhibit 112.

24   Q.  Mr. Melley, what type of document is this?

25   A.  So this is——I was referring to the registration statement

1    earlier.  I think I characterized it as an S-1.  An S-1 is the

2    initial statement that a public company needs to file before it

3    can actually become public.  And it basically lays out kind of

4    a window into the operations of the company, the management

5    structure, what the business——the intentions are, and also the

6    plan for the proceeds generated from an IPO.  So that has to be

7    laid out and filed with the SEC to make investors aware of what

8    they potentially could be investing in down the road.

9    Q.  And what's the purpose of the requirements of S-1 filing?

10   A.  Just to provide transparency to the marketplace and

11   potential investors so that investors can make an informed

12   decision of whether they want to invest in a company like this

13   or not.

14           MR. NESSIM:  Mr. Bianco, can you please turn to

15   page 12 of this exhibit.  Can you zoom in to the paragraph that

16   begins, "Bruce J. Garelick."

17   Q.  Do you see here it says, "Bruce J. Garelick is our director

18   nominee"?

19   A.  Yes.

20   Q.  So based on the S-1 documents that you reviewed, what, if

21   any, role did you learn Mr. Garelick held within DWAC?

22   A.  That Mr. Garelick was a member of the board of directors

23   for the company.

24           MR. NESSIM:  And Mr. Bianco, can you please turn to

25   page 78 of Government Exhibit 112.  And if you could please

1    zoom in to the second paragraph—no, sorry, the—above that.

2    The second paragraph on the page, the one that begins on

3    January 20, 2021.  If you could highlight the second sentence,

4    "As of July 2nd."  The one that begins, "As of July 2nd."

5    BY MR. NESSIM:

6    Q.  Mr. Melley, can you please read this sentence.

7    A.  "As of July 2, 2021, our sponsor transferred 10,000 founder

8    shares to our chief financial officer and 7500 founders shares

9    to each of our independent director and director nominees."

10   Q.  And what is the second part of that sentence about 7,500

11   founder shares to the independent director and director

12   nominees?  What does that mean?

13   A.  That for each individual that becomes a director or is a

14   director nominee as of that point in time, they are going to

15   receive, as part of their compensation, 7500 founders shares.

16        MR. NESSIM:  Mr. Bianco, you can take that down,

17   please.

18   Q.  Mr. Melley, you said that you learned that Mr. Garelick was

19   a director of DWAC?

20   A.  Correct.

21   Q.  What does it mean to be a director?

22   A.  So the board of directors are in charge of governing the

23   company and making all material, major decisions, whether it's

24   what can you acquire, a merger with another company, change the

25   name, engage in stock splits, things of that nature, and the

1    members of the board, they have a fiduciary duty to

2    shareholders, meaning that they have to put shareholders'

3    interests above all other interests, including the director's

4    own, any self-interest that they may have, any conflict of

5    interest, so that fiduciary duty, which is basically a duty of,

6    like, loyalty and good faith and to take care, means that one

7    needs to be transparent in their own dealings, with their own

8    role at the company, and also to put the shareholder interests

9    above all others.

10            MR. NESSIM:  And I'd like to publish, Mr. Bianco,

11   Government Exhibit 136.

12   Q.  Mr. Melley, have you reviewed this document?

13   A.  Yes.

14   Q.  What is it?

15   A.  This is a filing made with the SEC's EDGAR system, as I

16   mentioned earlier, that receives all the filings that a company

17   is required to submit, and this entails a letter dated

18   September 2, 2021, to shareholders regarding the initial public

19   offering of Digital World Acquisition Corp.  And it's a letter

20   to those investors from the members of the board of directors.

21           MR. NESSIM:  And Mr. Bianco, could you just zoom in to

22   the first paragraph, please, that begins, "This letter."

23   Q.  Mr. Melley, what does this initial sentence say and who are

24   the parties that are identified by it?

25   A.  So this, again, basically is a letter regarding the IPO in

1   accordance with the underwriting agreement, and again, as I

2   mentioned earlier, when one is engaging in an IPO, the company

3   will enlist the help of a brokerage firm who is considered the

4   underwriter.  In this instance that underwriter is E.F. Hutton,

5   so they're listed here as the representative as well.  And

6   they're handling, again, all the specifics of how many shares

7   and what price those shares are going to be for the stock, the

8   warrants, the units, what the structure of the IPO offering

9   will be.

10          MR. NESSIM:  Mr. Bianco, you can return to the

11  document, please.  And let's look at the second paragraph on

12  the page, of the letter.

13  BY MR. NESSIM:

14  Q.  Can you please read this paragraph.

15  A.  "In order to induce the company and underwriters to engage

16  into the underwriting agreement, I proceed with the public

17  offering and for other good and valuable consideration, the

18  receipt and sufficiency of which are hereby acknowledged. ARC

19  Global Investment, Inc., the sponsor, and the undersigned

20  individuals, each of whom is a member of the company's board of

21  directors and/or management team, or an advisor of the company,

22  as an insider, hereby agrees with the company as follows:"

23          MR. NESSIM:  Mr. Bianco, if you could highlight the

24  first numbered paragraph.  That's right after this, please.

25  Q.  And Mr. Melley, there's a good amount of legalese in this.

1    I'll try to skip over it.

2              MR. NESSIM:  Mr. Bianco, can you just highlight the

3    portion of the sentence that is after (ii).

4              That's great.  Thank you.

5    Q.  Mr. Melley, what does this provision of the letter say?

6    A.  This is basically, again, telling those investors that the

7    sponsors, the board of directors, have waived their right to

8    redeem any shares of common stock in connection with the

9    stockholder approval if there is a combination of the business

10   with a merger or acquisition at some point.  So again, if at

11   some point there is going to be that merger or acquisition with

12   a private company that they're intending to engage with, the

13   board of directors and the sponsors have agreed that they're

14   not going to redeem any of their shares, meaning they're not

15   going to cash out.  They're going to stay with the company as

16   investors.  They're not going to look to cash out for their own

17   profit.

18   Q.  And what are the redemption rights applicable to DWAC; do

19   you know that?

20   A.  So for investors in DWAC, usually the time frame is usually

21   within a couple of years to complete that business combination,

22   and if for whatever reason that combination is not completed

23   during agreed-upon time frame, those shareholders have a right

24   to redeem their initial investment and get their money back.

25   So when they initially invest, that money is put in a trust

 1    account and it's held for purposes of the acquisition at some

 2    point.  If that acquisition doesn't come to fruition, that

 3    money has to be returned to the investors.  So that's one way

 4    they can get it back.  Also, you can redeem it even if the

 5    business combination comes to fruition but you, the

 6    shareholder, you're not comfortable with the acquiring target,

 7    you can still look to cash out at that point yourself.

 8    Q.  So in this paragraph, the insiders agreed not to——agree to

 9    waive those redemption rights.

10    A.  Correct.

11         MR. NESSIM:  Mr. Bianco, if you could please zoom out,

12    and let's turn to the next page and zoom in to numbered

13    paragraph——or I'm sorry.  The next page.  I think it's the

14    third page down.  It's numbered paragraph 3.

15         Yep, perfect.

16    Q.  Can you please read, Mr. Melley, the first portion of this

17    paragraph.

18    A.  "During the period commencing on the effective date of the

19    underwriting agreement and ending 180 days after such date, the

20    sponsor and each insider shall not, without the prior written

21    consent of the representative——which, again, is E.F.

22    Hutton——sell, offer to sell, contract, or agree to sell,

23    hypothecate, pledge, grant, any objection to purchase or

24    otherwise dispose of or agree to dispose of directly or

25    indirectly or establish or increase a put-equivalent position,

O531GAR5                    Melley - Direct

1    or liquidate or decrease a call-equivalent position."

2    Q.  I think actually I can cut you off there.

3    A.  But basically what it's saying is that, again, each of

4    these insiders and sponsors are not going to cash out their

5    position, based on the business combination and the——under this

6    agreement that they have with the underwriter.

7    Q.  And if they do, it requires the prior written consent of

8    E.F. Hutton?

9    A.  Yes, exactly.

10        MR. NESSIM:  Mr. Bianco, you can take this down,

11   please.

12   Q.  Are you aware of any SEC regulations that apply to

13   directors of public companies?

14   A.  Yes, there are a number of regulations that kind of go to

15   governing their conduct because of their position and how they

16   can trade, as well as disclosures regarding their securities

17   ownership.

18   Q.  So let's talk about regulations that limit how they can

19   trade.  What regulation——

20        MR. BACH:  Can we approach.

21        THE COURT:  Yes.

22        (Continued on next page)

23

24

25

1          (At the sidebar)

2          MR. BACH:  I don't know exactly where they're going,

3    but I presume they're going to certain noncriminal and perhaps

4    certain non-SEC enforceable rules and regulations that govern

5    director trading behavior.  I think it's not relevant and it's

6    prejudicial under 403, and it's unnecessary.  And the question

7    here is whether Mr. Garelick engaged in insider trading.  And

8    this discussion only confuses the jury, to hear about this

9    other body of rules that's not about trading on material

10   nonpublic information.

11         THE COURT:  I mean, there hasn't been an objection to

12   date.  Where are you going now with this?

13         MR. NESSIM:  So I expect that Mr. Melley will talk

14   about the short-swing regulations, which prohibits directors

15   from profiting from the purchase and sale of securities within

16   a six-month period and requires them to pay those proceeds back

17   to the company.  That goes to willfulness and intent here.

18         And the second issue is the evidence will show that

19   Mr. Garelick filed a Form 3 relating to the shares he received

20   as part of the initial public offering because his

21   compensation—or in recognition of his service as a board

22   member.  He did not file any of the requisite forms for any of

23   the subsequent purchase or sale—

24         THE COURT:  A Form 4 or 5?

25         MR. NESSIM:  Right.

 1          THE COURT:  So those two issues may be somewhat

 2    separate.

 3          MR. BACH:  Right.

 4          THE COURT:  On the short-swing profit, can you explain

 5    to me how that is relevant with respect to consciousness of

 6    guilt.  The short-swing profit is quite a complicated body of

 7    law.  It's not clear to me that that goes to consciousness of

 8    wrongdoing.

 9          MR. NESSIM:  Yes, your Honor.  It shows consciousness

10    of wrongdoing because it shows——it shows the steps that

11    Mr. Garelick took knowing his obligations to the company, its

12    shareholders, and this regulation, he wanted to maintain these

13    profits, he wanted to capture those profits, so he didn't

14    disclose them.  He set up an account outside of the

15    underwriting, bookmaking entity that he knew was set up for

16    this purpose, and he did all this because he wanted to maintain

17    these profits for himself, he wanted to profit from insider

18    information, and it's up to the jury to decide whether he did

19    that with the requisite——

20          MR. BACH:  Another reason it would confuse the issues,

21    apart from being very complicated, is that they haven't laid a

22    foundation that he knew about the short-swing profit rules.

23    Yes, he was in the investment industry and had——he was never on

24    a board before.  He was not trained on what director

25    obligations were.  They haven't put in any evidence to suggest

O531GAR5                    Melley - Direct

 1    that he had that knowledge.  This is way out of bounds.

 2              THE COURT:  So I'm going to permit testimony with

 3    respect to failure to file a Form 4 and 5.  I'm not going to

 4    allow testimony as to the short-swing profit.

 5              MR. NESSIM:  Your Honor, just to note, I'm not asking

 6    questions that I intend to elicit this, but I might want to

 7    lead the witness slightly just to avoid—

 8              MR. BACH:  It will be fine with us if he were to

 9    confer with the witness.

10              THE COURT:  All right.  I'll direct you just to—in

11    front of the jury, I will direct you to confer with the witness

12    with respect to the instruction, just so the jury is not

13    confused.

14              MR. BACH:  Thank you.

15              MR. NESSIM:  Your Honor, sorry.  I think I can just

16    trust the witness.  I don't think we need to confer.

17              THE COURT:  Okay.

18              MR. BACH:  Well, we saw what happened during jury

19    selection.

20              (Continued on next page)

21

22

23

24

25

1          (In open court)

2          THE COURT:  You may proceed.

3          MR. NESSIM:  Thank you.

4    BY MR. NESSIM:

5    Q.  So Mr. Melley, I want to turn your attention only to

6    regulations focused towards director disclosure of securities

7    transactions and not others that might apply to director

8    transactions and securities and shares them with their

9    insiders, okay?

10   A.  Sure.

11   Q.  What SEC rules exist dealing with director disclosure of

12   positions in the shares of companies on whose boards they sit?

13   A.  So those directors have a responsibility——those officers,

14   as insiders, have a responsibility to disclose their securities

15   ownership to the market public.  And again, with that spirit of

16   transparency, so there's what's called a Form 3, which one has

17   to file within a couple of days of their initial ownership of

18   any security connected with the company that they're on the

19   board of, for instance, so that has to be filed and made

20   available to the general public.

21          And then any subsequent change in ownership, they

22   accumulate a larger position or they sell shares, things of

23   that nature, that is called a Form 4, and that must be filed

24   within a few days of that actual change in ownership.

25          And if they fail to do the Form 4, there's another

1    opportunity, what's called a Form 5, which is kind of an annual

2    filing.  So if you don't make the change in the Form 4, you

3    have up to 45 days after the end of the fiscal year for the

4    company to file a Form 5, which is kind of your annual state

5    of, this is what I own in the company that I'm a member of the

6    board.  And again, this is all so that investors can get a

7    sense of what interests financially do these board members have

8    within this own company that they're governing.

9             THE COURT:  Let me direct the witness just to make

10   sure that you're answering just the questions that are asked.

11            THE WITNESS:  Yes, your Honor.

12            MR. NESSIM:  Mr. Bianco, will you please publish

13   what's in evidence as Government Exhibit 114A.

14   Q.  So this is a two-page exhibit.  Just directing your

15   attention to the top of this exhibit.  What type of form is

16   this?

17   A.  This is the Form 3 that I mentioned, the initial statement

18   of beneficial ownership of securities.  In this case it

19   involves Mr. Garelick.

20            MR. NESSIM:  Mr. Bianco, if you could just highlight

21   box 1 where that name is referenced.  Or—thank you.  You can

22   take that down, please.

23            And Mr. Bianco, if you could just highlight with the

24   yellow highlight function the information in box 2.  Box No. 2.

25   Thank you.

O531GAR5                    Melley - Direct

1    BY MR. NESSIM:

2    Q.  Mr. Melley, what date was this form filed?

3    A.  This was filed on September 2, 2021.

4    Q.  And turning your attention to box 3, what issuer does this

5    relate to?

6    A.  Digital World Acquisition Corp.

7    Q.  And what's the relationship of the reporting persons to the

8    issuer in box 4?

9    A.  Mr. Garelick is a director of DWAC.

10            MR. NESSIM:  Mr. Bianco, if you would turn to page 2,

11   please.

12   Q.  What is the information, the disclosure information here

13   about ownership on this form?

14   A.  It lists that Mr. Garelick is in possession of 7500 shares

15   of DWAC stock.

16            MR. NESSIM:  And Mr. Bianco, if you would please zoom

17   in to the Docusign function, or the signature line and date.

18            (Continued on next page)

19

20

21

22

23

24

25

1    BY MR. NESSIM:

2    Q.  Who signed this form?

3    A.  It is signed here by Mr. Garelick on September 2nd, 2021.

4            MR. NESSIM:  Mr. Bianco, you can take this down,

5    please.  You can take the exhibit down.  Thank you.

6    Q.  Mr. Melley, you testified about form 4s and form 5s, which

7    are ways to disclose additional changes in securities

8    positions?

9    A.  Correct.

10   Q.  Were you able to review the SEC filing system and determine

11   whether Mr. Garelick filed any form 4s or form 5s related to

12   DWAC securities?

13   A.  Yes.  I did a review of the SEC EDGAR filing system, and

14   putting in Mr. Garelick's name, and even looking just based on

15   the company as a whole.  This is the one filing that I saw that

16   involved Mr. Garelick, the one filed on September 2nd, 2021.

17   There were no subsequent form 4 or form 5 filings by

18   Mr. Garelick.

19           MR. NESSIM:  Mr. Bianco, if would you publish

20   Government Exhibit 930?

21   Q.  So there were no filings for any of the six purchases of

22   DWAC units depicted on Government Exhibit 930?

23   A.  Correct, there were none.

24   Q.  And none for the two days of sales of DWAC securities, also

25   on Government Exhibit 930?

1   A.  Correct.

2           MR. NESSIM:  One moment, your Honor.

3           THE COURT:  Okay.

4           (Pause)

5           MR. NESSIM:  No further questions.

6           THE COURT:  Cross examination.

7           MR. NESSIM:  Mr. Bianco, if you would take that

8   exhibit down, please.  Thank you.

9   CROSS-EXAMINATION

10  BY MR. BACH:

11  Q.  Good afternoon, Mr. Melley.

12  A.  Good afternoon, sir.

13  Q.  You reviewed the trading records for trades of DWAC

14  securities; correct?

15  A.  Correct.  For certain accounts as well as marketwide as a

16  whole, yes.

17  Q.  I take it based on your experience, that's something you've

18  been asked to do on more than one occasion?

19  A.  Correct, sir.

20  Q.  And that is more or less an objective undertaking; right?

21  It's a matter of finding the records and just taking the

22  numbers and plotting them on charts?

23  A.  Yes.

24  Q.  Someone else even less experienced than you asked to do the

25  same thing would essentially generate the same results?

1                   MR. NESSIM:  Objection.

2                   THE COURT:  Overruled.

3    A.  Again, part of my roll is to analyze the trading data and

4    put into a variety of formats depending on what I'm directed to

5    do.

6    Q.  Understood.  But the numbers of the trades --

7    A.  Are the numbers.

8    Q.  Are the numbers?

9    A.  Correct.

10   Q.  And they're obtainable from trading blotters and trading

11   records and they're placed into charts?

12   A.  Correct.

13   Q.  Let's look at the chart you prepared summarizing

14   Mr. Garelick's trading activity.

15                  MR. BACH:  I believe that's GX 930.  Can we pull it

16   up.  I'm presuming it's published to the jury.

17                  JUROR:  Yes.

18   Q.  This is a one-page chart that you prepared that is a

19   capsule summary of Mr. Garelick's trades and the totals that

20   they generated; correct?

21   A.  For the DWAC units and subsequent sales are the commented

22   warrants, correct.

23   Q.  So the trades that he placed in the open market?

24   A.  Correct.

25   Q.  And to make this chart, you reviewed his trading account in

1   Fidelity; correct?

2   A.   Yes, sir.

3   Q.   All of the trades reflected on this chart were made by

4   Mr. Garelick in the same Fidelity trading account; correct?

5   A.   Correct.

6   Q.   And that's an account he keeps in his own name; correct?

7   A.   Correct.  I think it's considered the rollover IRA account.

8   Q.   And that's an account you saw in which he buys and sells

9   other stocks; correct?

10  A.   Yes.

11  Q.   And you just mentioned that it's an IRA rollover account.

12  Can you tell the jury what an IRA rollover account is.

13  A.   This is an account in an individual's name where,

14  basically, some people may use it as more of a retirement

15  situation.  In an IRA, you're kind of putting in money in this

16  account.  For Mr. Garelick, it was pretty consistent in terms

17  of the value from month to month.  I think that was the one we

18  looked at earlier.  I think it was over 600,000 on a monthly

19  basis.

20  Q.   So an IRA account is generally known as a retirement

21  account?

22  A.   Correct, sir.

23  Q.   It's an account that many investors have; correct?

24  A.   Yes.

25  Q.   Forgive me if I oversimplify, but the IRA account is tax

1   free until one reaches the age of retirement, more or less?

2   A.  Correct.

3   Q.  So in other words, if I make a little bit of money on

4   trades, if I want to get the benefit of that IRA account, I

5   can't taking money out and spending it; right?

6   A.  Correct.

7   Q.  To get the tax benefit, I have to leave the money in the

8   account; correct?

9   A.  Correct.

10  Q.  There are penalties that would apply, in addition to the

11  taxes I would have to pay, if I took it out prematurely;

12  correct?

13  A.  Correct, if you took it out early, yes.

14  Q.  Here, I think you pointed out that the total is $49,701.

15  If Mr. Garelick were to decide he wanted to spend that money on

16  whatever, that amount would be lowered by the penalties and

17  taxes he would have to pay; correct?

18          MR. NESSIM:  Objection.

19          THE COURT:  Overruled.

20  A.  Correct, sir.

21          MR. BACH:  Can we take down that total, please.  I

22  just want to look at the chart.  Great.

23  Q.  So focusing now on the date range of these trades, all of

24  them are all of the buys.  The buys are the ones with the B

25  next to them in the second column?

O53Cgar6                    Melley - Cross

1    A.   Yes.

2    Q.   All of the buys are in the month of September; right?

3    A.   Correct.

4    Q.   And the very first buy is on September 3rd; correct?

5    A.   Right.  That was the first day of open market trading in

6    the units.

7    Q.   Correct.  So if someone wanted to buy and they wanted to

8    buy on September 1st, that wasn't possible; right?

9    A.   Right.

10   Q.   September 3rd is like opening day of the baseball season,

11   that's the opening day of public trading in this stock;

12   correct?

13   A.   Correct.

14   Q.   And he made no trades after September 23rd; correct?

15   A.   That's his final purchase.

16   Q.   You are absolutely right.  Let's talk about buys and sells.

17          He did not buy any DWAC shares on the open market

18   after September 23rd; correct?

19   A.   Correct.  By that time, he had 5,320 units.

20   Q.   I understand.

21          MR. BACH:  Just, if the Court could remind the

22   witness.

23          THE COURT:  Just answer the questions that are being

24   asked.

25   Q.   So September 23rd is the last day as reflected on this

1   chart when Mr. Garelick buys DWAC warrants.  Not warrants.

2   Units?

3   A.  Correct.

4   Q.  And Mr. Melley, you don't know why he stopped on that day;

5   correct?

6   A.  I don't.

7   Q.  In other words, you're not testifying today as to

8   Mr. Garelick's state of mind or reasoning?

9   A.  Exactly.  I don't know why.

10  Q.  You mentioned a moment ago that in making this chart, you

11  looked at Mr. Garelick's trading account, his Fidelity account;

12  correct?

13  A.  Right.  That's where this comes from.

14  Q.  You answered a question on direct saying that the total

15  balance in that account was about $650,000; correct?

16  A.  I think on average, for most of the months in 2021, yes.

17  Somewhere in the 600 range.

18  Q.  In September 2021, that $650,000 balance consisted of some

19  securities on the one hand and some cash on the other hand;

20  correct?

21  A.  I believe so, correct.

22  Q.  Of that $650,000, only about two-thirds were invested in

23  securities; correct?

24  A.  I didn't do an analysis of the other securities, so I can't

25  remember in terms of what the breakdown is, but it sounds about

O53Cgar6               Melley - Cross

1    right.

2    Q.  Do you remember he had about $250,000 worth of cash sitting

3    in that account?

4    A.  I don't.

5    Q.  If he had cash in that account, he could have used it, it

6    would be available to make additional purchases of DWAC

7    securities; correct?

8              MR. NESSIM:  Objection.

9              THE COURT:  Overruled.

10   A.  He could have used that cash for however he wanted.

11   Q.  And again, you don't know why he decided not to use any of

12   that cash after September 23rd to buy any additional DWAC

13   securities; correct?

14   A.  I don't.

15             MR. BACH:  We can take that chart down for a moment.

16   Q.  Let's just go back to the world of SPACs and SPAC

17   terminology for a minute, if you will.

18             Some people who invest in SPACs have something called

19   redemption rights; correct?

20   A.  Yes.

21   Q.  I think you testified a little bit about that before, but a

22   redemption, redemption is a fancy way of saying there are

23   circumstances which you could get your money back?

24   A.  Right, get cash out.

25   Q.  So if I invest and something happens, there are

O53Cgar6                    Melley - Cross

1    circumstances in which I could redeem my investment and get the

2    money back in my pocket; correct?

3    A.   Correct.

4    Q.   And sometimes, in certain circumstances, I can get the

5    money back, plus interest?

6    A.   Correct.  And again, it always depends on who you are as an

7    investor.

8    Q.   Yes.  So that, it applies to some investors, including some

9    IPO investors; correct?

10   A.   Correct, ordinary IPO investors.

11   Q.   And it applies to some open market or secondary market

12   investors; correct?

13   A.   Correct, but it may not apply to other investors.  I'm just

14   trying to make that distinguish --

15            THE COURT:  Just try and answer the questions.  The

16   lawyer for the government will also have an opportunity to ask

17   you redirect questions.

18            Go ahead, Mr. Bach.

19            MR. BACH:  Thank you.

20   Q.   And this ability of certain, but not all, investors to

21   redeem the money they spent is also known as a form of downside

22   protection; correct?

23   A.   Sure.

24   Q.   In other words, down the road, if there's an eventuality

25   that the investor doesn't like, they're protected, they can get

1  their money back?

2  A.  Right.  It's almost like a money back guarantee.

3  Q.  And that is one of the attractive features of SPACs; right?

4  A.  Correct.

5  Q.  It's not unique to DWAC, this is an attractive feature

6  that's inherent to all SPACs; correct?

7  A.  Yes.

8  Q.  And even if the SPAC -- there are circumstances where even

9  if the SPAC fails to combine with an operating target, the

10  investors can get their money back?

11  A.  Correct, they can.

12  Q.  Some investors find SPACs attractive for that reason;

13  correct?

14  A.  Yes, they may.

15  Q.  And 2021 was a boom year for SPACs; correct?

16  A.  I believe it was.

17  Q.  SPAC IPOs reached record breaking numbers in 2021; correct?

18  A.  I don't know the numbers.  I just know there were many that

19  year.

20  Q.  Well, total SPAC IPO proceeds were roughly $160 billion in

21  2021; correct?

22  A.  I can't say "correct" because I don't know, as I told you.

23       THE COURT:  The jury is advised, as I told you at the

24  very beginning, questions are not evidence, it's only the

25  answers.

1                    Go ahead, Mr. Bach.

2     Q.  And SPACs were less common before 2021; correct?

3     A.  I believe they were, correct.  Or definitely like a number

4     of years ago.  I don't know if it was before '21 or '20.

5     Q.  I'm going to ask you questions that I don't know the answer

6     to, but before 2021 -- let me start over.

7                    You've testified in about 45 cases; correct?

8     A.  Yes.

9     Q.  And before 2021 am I correct, I'm just guessing, that you

10    had never testified in any case about a SPAC?

11    A.  Correct.

12    Q.  Have you since testified in cases other than this about a

13    SPAC?

14    A.  No, this is the first one.

15    Q.  Just a little bit more on SPACs.

16                    In the IPO, when the public can start to buy the units

17    of the SPAC securities, the typical price hovers about $10;

18    correct?

19    A.  Yes.

20    Q.  And it typically stays in that $10 area until a later point

21    in time; correct?

22    A.  Yes.

23    Q.  And typically until the target is announced, correct, if a

24    target is announced?

25    A.  Yes.

O53Cgar6                    Melley - Cross

1   Q.  And that's essentially what happened with this stock, DWAC,

2   it opened at or near $10 and it stayed pretty much at that

3   price until the announcement; correct?

4   A.  Correct.

5   Q.  Now, you know from your work at FINRA -- let me back up.

6           From your work at FINRA, you're familiar with the

7   concept of public companies?

8   A.  Yes.

9   Q.  You talked on direct about public companies and private

10  companies; correct?

11  A.  Yes.

12  Q.  And public companies have certain obligations to the public

13  that private companies don't have?

14  A.  Correct.

15  Q.  Many public companies employ procedures and controls to

16  attend to those obligations; correct?

17  A.  Yes, they do.

18  Q.  There are procedures and controls to help manage the public

19  company to make sure it stays in conformity with the rules?

20  A.  Yes.

21  Q.  And to assist the directors and the officers in determining

22  when they can trade and when they cannot trade; correct?

23  A.  They should, yes.

24  Q.  For instance, you're familiar with something called a

25  blackout period?

1    A.  Correct.

2    Q.  And a blackout period is — again, I'm going to

3    oversimplify — when someone in charge of compliance at a

4    company, be it a lawyer or a compliance officer, sends out a

5    notice saying, this is a blackout period, no one should trade

6    in the company's securities; correct?

7    A.  Yes, that's customary.

8    Q.  It's also customary, when appropriate, for there to be a

9    notice sent lifting the blackout period if there's a time, for

10   instance, after a public announcement when it's okay to trade;

11   correct?

12   A.  Sure.

13   Q.  And those notices about blackout periods or lifting the

14   blackout period are sent to provide guidance?

15   A.  Yes.

16   Q.  Let's go back to the chart, Government Exhibit 930, but

17   this time I want to focus you on a different page, and that is

18   the page pertaining to Michael Shvartsman's trades.

19          Let's again look just at the buys, the trades that

20   have the B next to them in the second column.

21          Do you see those, sir?

22   A.  Yes.

23   Q.  The first day that warrants were freely trading in DWAC was

24   on October 1st; is that correct?

25   A.  I believe it was on September 30th.

1   Q.  The day before, September 30th?

2   A.  Right.

3   Q.  In other words, if it was opening day of the baseball

4   season, for warrant trading freely trading, that would be

5   September 30th for this security?

6   A.  Correct.

7   Q.  And that October 1st, according to this chart, is the first

8   day that Mr. Shvartsman places his warrant trades, his buys;

9   correct?

10  A.  Yup.

11  Q.  And the last day was October 5; correct?

12  A.  Right, two days later.

13  Q.  He made no buys after that date; correct?

14  A.  Correct.

15  Q.  And again, you're not here testifying as to anyone's state

16  of mind, you don't know why he did or didn't stop on that day?

17  A.  I have no idea.

18  Q.  Now, there is a concept in securities known as a float;

19  correct?

20  A.  Yes.

21  Q.  And forgive me if I get this wrong, but a float is

22  basically how many shares are floating out there to be bought

23  or sold?

24  A.  Yeah, float refers to how many shares are publicly

25  available at a given time.

1    Q.  Another word for that is "volume"?

2    A.  Correct.

3    Q.  I think you testified on direct, not necessarily in these

4    words, but that there was not much float for warrants during

5    the period in which Mr. Shvartsman --

6    A.  Well, I just want to clarify.  "Float" and "volume" are not

7    the same thing.  So volume is the number of shares that are

8    traded.  Float refers to how many shares are held by public

9    investors.  So you could have a million shares held by

10   investors, but on any given day, there's only 100,000 shares of

11   volume.  I wouldn't say you're talking about the float is very

12   little.  I don't know what the float was for the warrants,

13   meaning how many warrants were out there.  I just know that the

14   volume, he had the majority that first day of trading on the

15   1st.

16   Q.  If he wanted to buy warrants on October 1st, 4th, or 5th,

17   it was not a robust market for those warrants on those days;

18   correct?

19   A.  I mean, on the first day, he had the majority of it.

20   There's not as much warrant trading as there is on the second

21   day of the 4th, yes.

22   Q.  To buy a warrant, for every warrant you buy, there has to

23   be a seller who's willing to sell a warrant?

24   A.  Correct.

25   Q.  And so, the ability to buy a warrant depends on there being

1    enough sellers out there to satisfy the number of warrants you

2    want to buy; correct?

3    A.  Correct.

4    Q.  So in a situation like this where there's not a robust

5    market, the underwriter or the company administering the trades

6    might reach out to warrant holders and see if they're

7    interested in making a sale; correct?

8    A.  Well, the underwriter at this point doesn't necessarily

9    have -- this is all the secondary market, not the initial.  I

10   mean, again, you were asking me about a state of mind.  I don't

11   know when he was looking to put in "buy" orders, who else was

12   out there, or who his firm, RBC Capital Markets, contacted.  It

13   wouldn't necessarily be the underwriter.

14   Q.  RBC Capital Markets -- E.F. Hutton is handling a number of

15   trades in this security; correct?

16   A.  E.F. Hutton was the underwriter for the IPO.  All this

17   activity is in the secondary market.  I mentioned RBC Capital

18   because that's where Mr. Shvartsman's account was.

19   Q.  Would E.F. Hutton be in a position to contact, for

20   instance, institutional investors that it had dealt with and

21   see if warrants were available for sale?

22         MR. NESSIM:  Objection.

23         THE COURT:  I'll permit it, give you a little bit of

24   leeway to link it up.  Overruled.  We'll see how far it goes.

25   A.  I have no idea what E.F. Hutton's role would have been in

O53Cgar6                        Melley - Cross

1   this.

2   Q.  RBC, which you just mentioned a second ago, they were the

3   clearing house for E.F. Hutton; correct?

4   A.  I don't know if they were.  I just know that his account

5   was at the clearing firm of RBC Capital Markets.  I'm not sure

6   who E.F. Hutton's clearing firm was.

7   Q.  Let's move on to a different topic.

8         Before we leave this chart in front of you, you see,

9   again, just for transition purposes, the last buy we see for

10  Michael Shvartsman is on October 5; right?

11  A.  Yes.

12  Q.  Now, you know from your work in this case that there is

13  another gentleman named Gerald Shvartsman who's Michael's

14  brother; correct?

15  A.  Yes.

16  Q.  And Gerald's purchases of warrants pick up almost a day or

17  two after Michael's stop; right?

18  A.  Correct.

19  Q.  Let's take a look at the page for Gerald, which I think is

20  page 3.  So we were just looking at how Michael's purchases

21  ended on October 5.  Here you see Gerald buys warrants on

22  October 7th and October 8th.  Those are the first two times

23  that he buys warrants.

24        Do you see that?

25  A.  Yes.

O53Cgar6                    Melley - Cross

1    Q.  But then there's a jump of about 10 days; correct?

2    A.  I mean, it's 10 days on the calendar.  It would be a

3    handful of trading days.

4    Q.  The jump is the trading days between October 8th and

5    October 18th; correct?

6    A.  Correct.

7    Q.  You don't know what prompted Gerald to trade on October

8    18th, do you?

9    A.  No, sir.

10   Q.  You have not investigated who the tipper was in this case?

11           MR. NESSIM:  Objection.

12           MR. BACH:  I'll withdraw the question.

13   Q.  Take a look at the chart, page 5 of this exhibit.  See at

14   the top it says APLC Investments LLC?

15   A.  Yes.

16   Q.  You understand that's the investment vehicle for an

17   individual named Anton Postolnikov?

18   A.  I believe so.

19   Q.  What does he do on October 18th?

20   A.  He purchases 100,000 warrants of DWAC.

21   Q.  And that's after a period of -- well, that's the same

22   amount that Gerald purchases on the same day; correct?

23   A.  I believe so.  We may have to go back to verify that, but I

24   think that's about right.

25   Q.  Let's go back to the Gerald chart.

O53Cgar6                         Melley - Cross

1    A.   Yup.

2    Q.   Now, let's go back to the APLC chart.

3          Now, this page of this exhibit is something you were

4    asked to put together only recently; correct?

5    A.   Correct.

6    Q.   In the past couple of days; correct?

7    A.   Yes.

8    Q.   The other pages of this chart you began to prepare a couple

9    weeks ago; correct?

10   A.   Correct.

11   Q.   This page, what's the total at the bottom of the right

12   column?

13   A.   That there were approximately $14.4 million in profits

14   generated from the sale of the DWAC warrants and common stock

15   in the APLC account.

16   Q.   Just taking a look at some of the activity here, there's a

17   time when Mr. Postolnikov switches from buying units to buying

18   warrants.

19          Do you see that?

20   A.   Right, he's buying the units back in September and early

21   October, and then switches to warrants in the middle of

22   October.

23   Q.   He switches to warrants on October 11th; correct?

24   A.   Yes.

25   Q.   And all of his buys after that point are purchases of

1    warrants; correct?

2    A.   Correct.

3    Q.   On the 20th, that's his most heavy purchase activity;

4    correct?

5    A.   In terms of the warrant activity?

6    Q.   Yes.

7    A.   Yes, in terms of the number of warrants, 175,000.

8            MR. BACH:  You can take that down.

9    Q.   You talked about options and warrants and different forms

10   of securities on direct.  Are you familiar with something

11   called a Black-Scholes model?

12   A.   No, I'm not.

13   Q.   Are you familiar with a Black-Scholes model for calculating

14   the value of warrants?

15           MR. NESSIM:  Objection.

16           THE COURT:  Overruled.

17           MR. NESSIM:  Foundation, your Honor.

18           THE COURT:  Just seeing whether he knows about it.  He

19   said Black-Scholes model and then there's a question to probe

20   the answer.

21   A.   I have no idea.

22   Q.   That's something you've never heard of before?

23   A.   Nope.

24   Q.   Have you heard of a Black-Scholes calculator?

25   A.   Sorry, can't help you.

1           MR. BACH:  I have no further questions.

2           Thank you very much, Mr. Melley.

3           THE COURT:  How much do you have on redirect?

4           MR. NESSIM:  No redirect, your Honor.

5           THE COURT:  You're excused.

6           THE WITNESS:  Thank you, your Honor.

7           (Witness excused)

8           THE COURT:  Members of the jury, we'll take our

9     midafternoon break now.  It will be about 15 minutes.  You know

10    the instructions.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Be seated.  I guess unless the government

3    paralegal knows how to do options pricing, we're not going to

4    have options pricing in this case.  Fair enough, Mr. Bach?

5          MR. BACH:  Well, it's available on the internet.

6          THE COURT:  The paralegals, how long do you expect the

7    testimony to go?

8          MR. NESSIM:  We first have an analyst who will be, we

9    think, 15 minutes or so, Ms. Maj.

10         MR. SHAHABIAN:  I think the paralegal might end up

11   being longer and go into Monday morning because, in addition to

12   the summary charts, we have exhibits that we didn't think were

13   voluminous and needed charts that we wanted to be able to

14   publish through her.  So I'm estimating, I'd say a couple

15   hours, to be safe.

16         THE COURT:  We'll see how it goes.

17         Anything else before we break for midafternoon break,

18   Mr. Bach?

19         MR. BACH:  Nothing from us.

20         MS. HANFT:  Does your Honor still anticipate having

21   the charge conference at the end of the day today?

22         THE COURT:  I think based upon what I've just heard,

23   maybe it doesn't make sense to do that.  Maybe it makes sense

24   to go into Monday.  We'll see what testimony we've got, we'll

25   see whether there's a defense case, and if there's no defense

1    case, then we'll do the charge conference at the end of the day

2    on Monday and then go to do summations on Tuesday.  I'll hear

3    from the parties what their preference is.

4            From the defense, what's your preference?

5            MS. SHAPIRO:  Your Honor, the proposal sounds fine,

6    your Honor, assuming there's no defense case.  I guess if there

7    is, it will change.

8            MR. NESSIM:  The government has no objection.  If

9    there is a defense case, we do expect to finish on Monday

10   morning.  So we wouldn't want to push an additional day for a

11   defense case.

12           THE COURT:  I think what I would want is some

13   indication over the weekend, end of the day on Saturday,

14   whether you expect to put on a defense case, including putting

15   on your client, just so I know that in terms of planning.

16   Things can change, I realize that, but you can give me some

17   education.

18           MS. SHAPIRO:  Could we notify the Court whether we

19   have a defense case at the end of the day Saturday and get a

20   little more time for the notice as to whether Mr. Garelick is

21   going to testify?

22           THE COURT:  When do you want to let me know that?

23           MS. SHAPIRO:  At the end of the weekend.

24           THE COURT:  Maybe by 4 o'clock on Sunday so I can plan

25   my calendar.

1              MS. SHAPIRO:  That's fine, your Honor.

2              THE COURT:  See you back here in a little bit.

3              (Recess)

4          Before we bring the next witness in, on the charge, in

5     anticipating the charge conference, there are two related

6     questions on Title 18 securities fraud that are on my mind in

7     that it's worth me mentioning to the extent the parties can

8     give me guidance or tell me that I'm thinking the wrong way.

9              One point is that to the extent that the Second

10    Circuit's vacated opinion in Blaszczak is persuasive authority,

11    but not binding authority.  In my role as a district court

12    judge, is it a prudent exercise of my authority to give a

13    charge similar to the one that the government has proposed on

14    the notion that if I'm wrong, either I can correct it after a

15    verdict or the Second Circuit could correct it in the event

16    that the jury acquits on Title 15 securities fraud.  Is that

17    the prudent thing for me to do?  I would just appreciate

18    thoughts on that question.

19             The second one is more of a legal question.  As I

20    understand some of the government's argument and some of the

21    way Judge Sullivan has put it, it's that this shouldn't be a

22    separate Title 15 gloss on Title 18 and on 1341 and 1343.  I'd

23    like to sort of throw out a hypothetical and have the parties

24    think about it in terms of 1341 and 1343, assume two things.

25             First of all, assume that a defendant obtains property

1    from the victim through a false pretense, obtains bailment

2    through a false pretense, makes lies and gets property that's

3    temporarily in that persons possession or is intended to be

4    temporarily in that person's possession through a lie and then

5    misuses the property.  I think in that instance, probably

6    everybody would agree that there's a scheme to defraud.

7              Then, if you change the hypothetical a little bit and

8    assume that the person obtains property temporarily, bailment,

9    not through false representation, but violates the term of the

10   bailment after obtaining the property, let's assume it's

11   physical property, in that instance where there's been no lie

12   or misrepresentation to obtain the property initially but

13   simply a violation of the terms of the bailment, is there a

14   1341 or 1343 type fraud?  And if there's not in that instance,

15   how does something like this differ where, according to some of

16   the proof Mr. Garelick obtained information, was entitled to

17   that information for limited purposes, and then misused the

18   information that he had.

19             Those are just thoughts.  You can address them after

20   we let the jury go or you can address them in writing or on

21   Monday, but they're things on my mind, so I want to make sure

22   you've got the benefit with some of what I'm struggling with.

23             Ms. Shapiro, did you want to say something?

24             MS. SHAPIRO:  No, I wanted to think about those

25   questions.  I had two other quick questions for the Court.  One

1    was, does your Honor intend to circulate a revised proposed

2    draft charge over the weekend that we can consider before the

3    charge conference?

4              THE COURT:  I don't think so.  I mean, I've got the

5    benefit of your comments and I've got the benefits of the

6    government's comments.  I think I'm going to work through it

7    with you all at the charge conference.  There's certain things,

8    for example, Title 18 fraud, on the definition of property on

9    the question of whether an NDA itself creates a duty of trust

10   in confidence.  On personal relationship, those seem to me to

11   be the key legal questions.  I'm going to want to get the

12   benefit of your thinking and of the government's thinking,

13   circulating something that says, well, here's what I'm thinking

14   today, A, wouldn't necessarily reflect what I'm thinking

15   because what I'm thinking is a mulling over of your respective

16   views, and B, wouldn't provide much help.

17             MS. SHAPIRO:  I understand, your Honor.  I just wanted

18   to understand the process that you were contemplating.

19             The second thing is totally unrelated.  We would just

20   ask, and I didn't want -- I wanted you to let the jury go as

21   soon as you were ready to do so.  When your Honor excuses the

22   jury this afternoon, particularly that it's given the weekend,

23   we would ask your Honor to do the customary caution, that they

24   keep an open mind and remember the presumption of innocence.

25             THE COURT:  I'll do that.  I'll do a little bit of the

1    presumption of innocence, but I'll also do the bit about

2    keeping an open mind and the case comes in and bits and pieces,

3    and they shouldn't form a view and they shouldn't start to

4    deliberate.  I'll do that.

5        MR. NESSIM:  Your Honor, I don't know if the jury

6    should be instructed on the presumption of innocence before

7    they're released for the weekend.  I think just "keep an open

8    mind" is a typical instruction.  I don't have prior experience

9    of that being an instruction when a jury is sent home for a

10   night or the weekend.  But on the Court's questions, we do want

11   to think about the issues raised.

12        As to the Court's first question, I will say our

13   preliminary answer is that the Court should instruct the jury

14   as the -- because it's correct, not because it would be

15   prudent.  To that end, we do think the government's brief in

16   *Chow* is helpful in considering this issue.

17        THE COURT:  I read the government's brief in *Chow* is

18   an easy case for the Second Circuit because the defendant was

19   convicted of Title 15 fraud, there was an argument made by the

20   government in the alternative that any error was harmless

21   because of the conviction on Title 15, and the Second Circuit

22   says the defendant has not identified anything that would cause

23   a reversal of this case.  So I don't think *Chow* gets you there.

24        MR. NESSIM:  I wasn't sure if the Court has a copy of

25   that.  I was going to offer it if not, but understood.

O53Cgar6                    Melley - Cross

1              THE COURT:  It's available on Westlaw.

2              Let's bring in the witness and bring in the jury.  You

3      can put the witness on the stand.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Government will call its next witness.

3           MR. NESSIM:  Government calls Susanna Maj.

4    SUSANNA MAJ,

5         called as a witness by the Government,

6         having been duly sworn, testified as follows:

7           THE DEPUTY CLERK:  Please state your full name for the

8    record and please spell out your first and last name.

9           THE WITNESS:  Susanna Maj, S-U-S-A-N-N-A, last name

10   M-A-J.

11          THE COURT:  Ms. Maj, let me advise you to keep your

12   voice up, speak into the microphone just as you've been doing,

13   and wait until the question is complete before you answer it.

14          Counsel, you may inquire.

15   DIRECT EXAMINATION

16   BY MR. NESSIM:

17   Q.  Good afternoon, Ms. Maj.

18   A.  Good afternoon.

19   Q.  Where do you work?

20   A.  I currently work at the U.S. Attorney's Office Southern

21   District of New York.

22   Q.  For approximately how long have you worked for the

23   U.S. Attorney's Office?

24   A.  Around a year.

25   Q.  What is your current title?

O53Cgar6                    Maj - Direct

1   A.  I'm currently an investigative analyst.

2   Q.  What are some of your duties and responsibilities as an

3   investigative analyst?

4   A.  Broadly speaking, I analyze all technical and digital data

5   that our office obtains.  This could be anything from social

6   media to call detail records.

7   Q.  What are call detail records?

8   A.  A call detail record is a data record provided from a

9   cellular phone provider, like AT&T, Verizon, or T-Mobile.  It

10  also shows the details of phone communications such as calls or

11  texts.

12  Q.  You mentioned phone calls and text messages.  What sort of

13  communications are not generally reflected on call detail

14  records?

15  A.  On a call detail record, messages and calls such as data

16  calls and messages are not reflected because those are from

17  application-to-application.  For example, Facebook Messenger,

18  iMessage, or FaceTime, those won't be reflected in call detail

19  as those are data and not over the network.

20  Q.  Were you asked to prepare summary charts to testify to in

21  this case?

22  A.  Yes.

23  Q.  What sort of summary charts?

24  A.  I was asked to analyze the communication between target

25  numbers.

O53Cgar6                    Maj - Direct

1    Q.  And beyond those summary charts, have you had any other

2    involvement in this investigation?

3    A.  No.

4         MR. NESSIM:  At this time, the government would offer,

5    pursuant to joint exhibit 1 and the parties' agreement, a

6    number of business records, including Government Exhibits 600,

7    601, 610, 611, 620, 620A, 621, 630, 631, 640, 641, 650, and

8    660.

9         THE COURT:  Any objection?

10        MR. BACH:  No objection.

11        THE COURT:  Those are all received.

12        (Government's Exhibits 600, 601, 610, 611, 620, 620A,

13   621, 630, 631, 640, 641, 650, 660 received in evidence)

14        MR. NESSIM:  So let's just take a look at some of

15   those.  Mr. Bianco, would you please publish Government Exhibit

16   621.  If you could zoom into the top third or so of this

17   exhibit.

18   Q.  What's the heading of this exhibit?

19   A.  Wireless subscriber information.

20   Q.  What company produced this record?

21   A.  AT&T.

22   Q.  Who's the name of the individual that this information

23   relates to?

24   A.  Bruce Garelick.

25        MR. NESSIM:  Mr. Bianco, can you zoom out for a moment

1  and zoom into user information, please, that section.

2  Q.  Do you see where it says MSISDN?

3  A.  Yes.

4  Q.  Do you know what that means or what it refers to?

5  A.  An MSISDN is a mobile station international subscriber

6  directory number, which, in short, is a phone number.

7  Q.  And what's the known number associated with Mr. Garelick's

8  account at AT&T?

9  A.  781-801-5950.

10       MR. NESSIM:  Mr. Bianco, would you please publish

11  Government Exhibit 620.

12  Q.  Ms. Maj, just generally, what information is contained on

13  Government Exhibit 620?

14  A.  This is a call detail record, which, as I previously

15  described, is basically detailing a phone's communications,

16  such as, in this case, calls.

17       MR. NESSIM:  Mr. Bianco, can you highlight toward the

18  top of this.  Actually, can you just blow up at the top of this

19  exhibit where it says "run date," "run time."  Do you see that

20  on the top left corner, please.

21  Q.  Ms. Maj, what phone number does this exhibit relate to?

22  A.  This relates to 781-801-5950.

23       MR. NESSIM:  Mr. Bianco, you can zoom out, please.

24  Q.  Just generally, what type of data is contained in this

25  chart, if you could just go column by column.

1          MR. NESSIM:  Mr. Bianco, just for clarity, can you

2     zoom into the top headings that are in bold and then just rows

3     1 and 2.

4     A.   The records that are provided include a connection date and

5     time, which you'll see it says UTC in parentheses.  This is

6     basically AT&T giving records in universal time as all phone

7     providers do.  In order for us on the east coast to actually

8     see the time of the phone call, we do need to transcribe this

9     time, which is around behind four to five hours.  But these

10    records are universal time.

11         The seizure time is how long it took to connect the

12    call.

13         The ET is basically the elapsed time of the call.

14         Originating number is the phone number that started

15    the call.

16         Terminating number is the phone number that received

17    the call.

18         And then to the right, we have an IMEI, which is an

19    international mobile equipment identity.  It's basically a very

20    unique number assigned to someone's device.

21         And then there's an IMSI, which is international

22    mobile subscriber information, which is also a number assigned

23    from a device to a network or account.

24         Then all the way on the far right, there's CT, which

25    basically describes what kind of call it was, whether it was

1    originating or terminating.

2           All the way to the far right is a feature basically

3    describing more details of the call, such as you'll see VM,

4    which means it went to voicemail, or you'll see WiFi, which is

5    basically AT&T letting us know that that call went over an AT&T

6    hotspot.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MR. NESSIM:

Q.  And just looking at the second row here, the second

numbered row, where it says ET 0:00.  What does that indicate?

A.  Indicates that either the phone wasn't picked up or it went

straight to voicemail.

Q.  And on the first row, where it says 4:16, what does that

indicate?

A.  Indicates that the call was four minutes and 16 seconds.

          MR. NESSIM:  Mr. Bianco, you can take this down,

please.

Q.  And are these subscriber records and call detail records

that you reviewed very lengthy?

A.  Yes.

Q.  Do you create summary charts summarizing portions of those

records?

A.  Yes.

Q.  And who directed you to make those charts?

A.  The prosecutors.

Q.  In addition to summary charts summarizing the records, did

you also create a summary chart identifying certain phone

numbers?

A.  Yes.

Q.  And were those based on exhibits that you reviewed that the

prosecutors gave you?

A.  Yes.

1   Q.  You should have I believe before you a binder.  Do you see

2   that?

3   A.  Yes.

4   Q.  Just looking at the paper exhibits there, have you seen

5   that binder before?

6   A.  Yes.

7   Q.  How do you know?

8   A.  I reviewed and signed it with the date.

9   Q.  And what does it contain?

10  A.  It contains the summary charts that I created.

11  Q.  And, in one case, that you reviewed?

12  A.  Sorry?

13  Q.  That you created or reviewed?

14  A.  Yes.

15  Q.  And do they fairly and accurately summarize the underlying

16  exhibits on which they're based?

17  A.  Yes.

18  Q.  And does each chart identify the exhibits, the underlying

19  exhibits that you used to create those charts?

20  A.  Yes.  On the bottom.

21          MR. NESSIM:  So at this time the government would

22  offer some of those exhibits in the binder.  Government

23  Exhibits 950, 950A-950G, and 951.

24          THE COURT:  Any objection?

25          MR. BACH:  No objection.

1              THE COURT:  Received.

2              (Government's Exhibits 950, 950A-950G, and 951

3     received in evidence)

4              MR. NESSIM:  Mr. Bianco, please publish Government

5     Exhibit 951.

6              And if you could just zoom in to the portion with

7     information.  Thank you.

8     BY MR. NESSIM:

9     Q.  Ms. Maj, what does Exhibit 951 show?

10    A.  951 is a key showing the phone numbers all the way to the

11    right and what individual is associated with that phone number

12    based on sources that I reviewed.

13    Q.  And who selected which individuals you should focus on?

14    A.  The prosecutors.

15             MR. NESSIM:  Mr. Bianco, please publish Government

16    Exhibit 950.

17    Q.  What is Government Exhibit 950?

18    A.  A summary chart I created that shows communications between

19    the targets we just saw in the key between the dates of

20    August 30, 2021, and October 26, 2021.

21    Q.  Ms. Maj, when you say target number, is that just another

22    way of saying the numbers that you were asked—phone numbers

23    you were asked to consider?

24    A.  Sorry, yes, the phone numbers.

25    Q.  Just turning your attention to Government Exhibit 950,

1   what——

2          MR. NESSIM:  And Mr. Bianco, actually, if you could

3   just zoom in to the top five or so rows, that would be great.

4   Thank you.

5   Q.  What's the type of data that's recorded on Government

6   Exhibit 950?

7   A.  On 950, there are calls and texts which I noted all the way

8   to the right, which are voice calls and text calls.

9          MR. NESSIM:  And sorry, Mr. Bianco, if you could just

10  highlight on the right where it says Type.

11  Q.  So that's where you note the type of communications?

12  A.  Correct.

13  Q.  And just going from left to right in that first row, what

14  are the entries that are reflected in Government Exhibit 950?

15  A.  Starting at the far left, I included a date and time, in

16  parentheses you will see EST, which is short for Eastern

17  Standard Time, and like I was saying before, this is——and this

18  time period also depends on daylight savings, but here it was

19  behind four hours than Universal.

20         Right after that, there is a user call-in, which as we

21  saw in the key before is how we attributed a phone number to a

22  user.

23         The initiating number is the number that started the

24  call or the text.

25         The receiving number is the number that received or

1    the call or text.

2            The user on that right is basically associated with

3    the receiving number, as we saw on the key before.

4            The duration you'll see on the far right is how long

5    the call was.

6    Q.   And the type you already mentioned.

7    A.   The type, sorry, it's a voice or a text.

8    Q.   Okay.  And if you could just give an example on the next

9    row, the second row, of how this chart can be read, just using

10   the example of that communication.

11   A.   Using the top row, we see that there was a call on

12   August 30, 2021, at around 9 a.m., and we see that the phone

13   number ending in 9353 called the phone number ending in 5950,

14   and that phone number——that phone call, sorry, lasted around 24

15   minutes.

16   Q.   And the phone number ending in 9353, that's a phone number

17   that's associated with Michael Shvartsman?

18   A.   Correct.

19   Q.   And the phone number ending in 5950 is a phone number

20   associated with Bruce Garelick.

21   A.   Correct.

22           MR. NESSIM:  Mr. Bianco, if you could just zoom out

23   for a moment.

24   Q.   The colors on this chart, what do the colors indicate?

25   A.   The colors indicate any time two specific people had a

1  communication.  So going back to the top row, Michael

2  Shvartsman and Bruce Garelick, any time they had a

3  conversation, would be purple.  And so on.

4  Q.  And Ms. Maj, in creating this chart, did you review phone

5  records of multiple individuals?

6  A.  Yes.

7  Q.  Were there times when you looked at phone records that had

8  the same call or text message reflected on multiple records?

9  A.  Yes.

10  Q.  And what was a circumstance where that might happen?

11  A.  If, for example, we received phone——phone records from

12  Michael Shvartsman and Bruce Garelick and we would like to see

13  both of those, that communication, once you combine two call

14  detail records, it's going to be the same overlapping because

15  both networks will capture that call.

16          So in this case, to create this, I did have some

17  duplicates.  In order to get rid of those duplicates, I would

18  filter them manually by myself, through date, time, and

19  direction, and see what time.  If it was at the same time or

20  the same duration, I would filter that out and delete the one

21  that's the duplicate.

22  Q.  And for calls, did you try to delete the duplicates to the

23  best of your ability?

24  A.  Yes.

25  Q.  And what about the text messages?  What happens if there

1   are text messages on multiple call detail records?

2   A.   When there's text messages, we leave text messages because

3   you don't know how fast someone could type so it could be the

4   same exact text being sent through or a quick typer.

5   Q.   And also on this exhibit, if you see in the time——just

6   pointing your attention to the red call in the middle of this

7   page, on August 30th, between the phone number associated with

8   Bruce Garelick and the phone number associated with Alex Monje,

9   the time there says 1534.  What kind of clock are the times on

10  this chart reflected in?

11  A.   That's a 24-hour or military time, which basically

12  translates to 3 p.m.

13          MR. NESSIM:  Mr. Bianco, you can zoom out, and let's

14  just scroll through just to get a sense of how many pages this

15  exhibit is.

16  Q.   And Ms. Maj, just, again, how do you choose which number

17  pairs to include on these charts?

18  A.   I was asked by the prosecutors.

19  Q.   And when the users are identified on this and other

20  exhibits like it, do you have any personal knowledge of who was

21  actually handling a given phone at a given time?

22  A.   No.

23  Q.   And the user just reflects the person associated with a

24  particular phone number.

25  A.   Correct.

1    Q.  And this chart you said in the Type column captures voice

2    messages and text messages.  What type of communications would

3    not be captured by this chart?

4    A.  Sorry.  So it captures voice calls and text messages.  And

5    here, you would not be seeing data which, as I described

6    before, is basically anything going from application to

7    application, such as iMessage or WhatsApp.

8              MR. NESSIM:  Mr. Bianco, please publish Government

9    Exhibit 950A.

10   Q.  Ms. Maj, what is Government Exhibit 950A?

11   A.  Government Exhibit 950A is also a communication analysis

12   from the morning of September 2, 2021.  This exhibit accurately

13   reflects 950, and it's just a small portion of that exhibit.

14   Q.  So these calls are also in 950; this is just sort of a

15   sub-exhibit with some of that data?

16   A.  Correct.

17   Q.  There are a number of sub-exhibits that we've moved into

18   evidence.  I won't have you look at all of them right now.  I

19   do just want to pull up Government Exhibit 950E, please, which

20   is the last of these sub-exhibits.

21             MR. NESSIM:  I'm sorry.  It's 950G that I'm looking

22   for is the last of the series, Mr. Bianco.

23             If you could turn to page 2 of this exhibit.

24   Q.  So the sub-charts you made you said are reflections of

25   what's included in the larger Government Exhibit 950?

O531GAR7                     Collins - Direct

1    A.  Correct.

2    Q.  Are there differences between 950G and the rest of those

3    exhibits?

4    A.  Yes.  950G has two additional phone numbers added.  Those

5    phone numbers were attributed to Netanel Suissa and Adrian

6    Lopez Torres.  And this specific date and time will not be

7    reflected in—and those—I'm sorry—those specific calls will

8    not be reflected in 950.

9              MR. NESSIM:  One moment, your Honor.

10             No further questions.

11             THE COURT:  Cross-examination.

12             MR. BACH:  One moment, please.

13             Very briefly.

14             THE COURT:  Okay.  Go ahead.

15   CROSS EXAMINATION

16   BY MR. BACH:

17   Q.  Did you prepare any charts showing calls to or from

18   Mr. Anton Postolnikov?

19   A.  I don't recall that name.

20             MR. BACH:  No further questions.

21             THE COURT:  Anything further?

22             MR. NESSIM:  No, your Honor.  Thank you.

23             THE COURT:  Okay.  You're excused as a witness.  Have

24   a good weekend.

25             THE WITNESS:  Thank you.

1        (Witness excused)

2        THE COURT:  What's next from the government?

3        MR. SHAHABIAN:  Government calls Kayla Collins.

4        THE COURT:  Okay.  Let's bring Ms. Collins in.

5        Ms. Collins, please step forward into the witness box,

6    remain standing, my deputy will administer the oath.

7        THE DEPUTY CLERK:  Please raise your right hand.

8        (Witness sworn)

9        THE DEPUTY CLERK:  Please state your full name for the

10   record and please spell out your first and last name.

11       THE WITNESS:  Kayla Collins.  K-A-Y-L-A,

12   C-O-L-L-I-N-S.

13       THE COURT:  All right.  Ms. Collins, please keep your

14   voice up, speak into the microphone, just as you've been doing,

15   make sure that you wait until the question is done before you

16   answer.

17       Counsel, you may inquire.

18       MR. SHAHABIAN:  Thank you, your Honor.

19       And before I begin asking Ms. Collins questions, I

20   have, unfortunately, a long list of exhibits I'd like to offer

21   at this time.

22       THE COURT:  Okay.

23       MR. SHAHABIAN:  Government offers Government

24   Exhibits 215-218, 315-318, 400-406, 411-412, 414-416, 418-420,

25   422-432, 435, 437, 442-443, 444-447, 451-453, 455-459, 463,

1    465, 470, 474, 479, 485, 516, 721-722, 727-728, 730 and 730A,

2    737, 738, 747, 748, 840-844, 865, 870, and 871.

3              THE COURT:  Any objection to any of those?

4              MR. BACH:  No objection except to 870 and 871,

5    pursuant to our continuing objection.

6              THE COURT:  Okay.  That objection is overruled as

7    previously discussed and the exhibits are all received.

8              (Government's Exhibits 215-218, 315-318, 400-406,

9    411-412, 414-416, 418-420, 422-432, 435, 437, 442-443, 444-447,

10   451-453, 455-459, 463, 465, 470, 474, 479, 485, 516, 721-722,

11   727-728, 730 and 730A, 737, 738, 747, 748, 840-844, 865, 870,

12   and 871 received in evidence)

13    KAYLA COLLINS,

14        called as a witness by the Government,

15        having been duly sworn, testified as follows:

16   DIRECT EXAMINATION

17   BY MR. SHAHABIAN:

18   Q.  Good afternoon, Ms. Collins.

19   A.  Good afternoon.

20   Q.  Where do you work?

21   A.  I work at the U.S. Attorney's Office for the Southern

22   District of New York.

23   Q.  What is your title at the U.S. Attorney's Office?

24   A.  Paralegal specialist.

25   Q.  What are your duties and responsibilities as a paralegal

1    specialist?

2    A.  I primarily support the National Security and International

3    Narcotics Unit, by assisting with investigations and trials,

4    organizing and maintaining evidence, and general administrative

5    tasks.

6    Q.  Does your work on this case have anything to do with your

7    work for the National Security and International Narcotics

8    Unit?

9    A.  No.

10   Q.  Did you have any prior involvement in this case prior to

11   your preparing to testify today?

12   A.  No.

13   Q.  What were you asked to do in this case?

14   A.  I was asked to review a number of Government Exhibits, and,

15   for certain of those exhibits, pull information and display

16   them in a chart that places things in chronological order.

17   Q.  I'd like—before I turn to the chronological order, I'd

18   like to start with some of the records you reviewed.

19            In connection with your work on this case, were you

20   asked to review emails, recordings, transcripts, and other

21   business records?

22   A.  Yes.

23   Q.  Okay.  I'd like to show you some of the documents you

24   reviewed to walk through them with the jury.

25            MR. SHAHABIAN:  If we could publish what's now in

1    evidence as Government Exhibit——we'll start with

2    emails——Government Exhibit 400.

3    Q.  What does Government Exhibit 400 appear to be, Ms. Collins?

4    A.  This is an email chain.

5          MR. SHAHABIAN:  Let's blow up the header information,

6    Mr. Bianco.

7    Q.  Who is the email from?

8    A.  Eric Hannelius.

9    Q.  Who is it to?

10   A.  Bruce G.

11   Q.  Is there anyone cc'd on the email?

12   A.  Michael Shvartsman.

13   Q.  And what's the date of this top email in the chain?

14   A.  June 21, 2021.

15         MR. SHAHABIAN:  We can zoom out, Mr. Bianco.  Oh,

16   before we zoom out:

17   Q.  What's the subject of this email?

18   A.  Re Trump.

19         MR. SHAHABIAN:  Now we can zoom out, Mr. Bianco.

20         And Mr. Bianco, if you could zoom in on the bottom

21   email in the chain that starts, "On Monday, January 21st."

22   Q.  Who is the email at the bottom part of the chain from,

23   Ms. Collins?

24   A.  Eric Hannelius.

25   Q.  What's the date of this email?

1  A.  June 21, 2021.

2  Q.  Could you read the body of the email, starting, "Hi,

3  Bruce."

4  A.  "Hi, Bruce.  Can you send me any info on the opportunity

5  discussed.  I'll then circle right back.  Thanks.  Very Best

6  Regards, Eric Hannelius."

7          MR. SHAHABIAN:  You can zoom back out, Mr. Bianco.

8          And if we could magnify the second email in the chain.

9  Q.  Who is this email from, Ms. Collins?

10  A.  Bruce G.

11  Q.  And as we're reading an email chain like this, does the

12  earliest email appear at the top of the exhibit or the bottom?

13          MR. SHAHABIAN:  We could zoom back.

14  A.  At the bottom.

15  Q.  Okay.  So we started at the bottom, from the first email,

16  we're now going to the middle, the response.

17          MR. SHAHABIAN:  So we can zoom back in, Mr. Bianco.

18  Q.  What is Bruce G's response to the email?

19  A.  "Hi, Eric.  I've attached the SPAC prospectus.  However, it

20  doesn't say anything about Trump.  Can't get.  I am setting up

21  a call with Patrick Orlando (CEO) for tomorrow afternoon.

22  Calendar invite to follow soon.  BG."

23          MR. SHAHABIAN:  We can take this down, Mr. Bianco.

24          If we could publish Government Exhibit 404.

25  Q.  What is Government Exhibit 404, Ms. Collins?

1    A.   Another email.

2    Q.   Who is it from?

3    A.   Bruce G.

4    Q.   Who is it to?

5    A.   Eric Hannelius.

6    Q.   What's the date?

7    A.   June 24, 2021.

8    Q.   What's the subject of this email?

9    A.   Eric, Trump Media Group SPAC.

10   Q.   Could you read the body of the email that Bruce G sends to

11   Eric Hannelius.

12   A.   "Eric.  We are finalizing our investment in this SPAC.

13   Founders shares and IPO shares.  Michael (Rocket One) is

14   inclined to invest $800,000, split evenly between the $4

15   founders shares and the $10 IPO shares.  Please let me know if

16   you want to invest and sizing.  Feel free to call me if you

17   want to discuss further.  Thanks, Bruce."

18        MR. SHAHABIAN:  We can take this down, Mr. Bianco.

19        Please go to Government Exhibit 406.

20   Q.   What is Government Exhibit 406, Ms. Collins?

21   A.   Another email.

22   Q.   Who is this email from?

23   A.   Bruce G.

24   Q.   Who is it to?

25   A.   Anton Postolnikov.

O531GAR7                    Collins - Direct

1    Q.  What's the date of this email?

2    A.  June 24, 2021.

3    Q.  What's the subject of this email?

4    A.  Anton, Follow-Up on Trump SPAC Investment Opportunity.

5    Q.  If we could start with the first sentence.

6    A.  "Anton.  Good times last night.  Following up on that Trump

7    Media Group SPAC we mentioned.  The deal is going to finalize

8    this week."

9    Q.  And if you could read the remainder of the email.

10   A.  "Please let us know if you are interested in investing and,

11   if so, investment amount between the $4 founders share class

12   shares and the $10 SPAC IPO shares.  If helpful, we can discuss

13   it again today with you and/or set up a call for you to speak

14   to the CEO of the SPAC, Patrick Orlando.  Best, Bruce."

15            MR. SHAHABIAN:  You can take this down, Mr. Bianco.

16            If we could publish Government Exhibit 411.

17   Q.  What is Government Exhibit 411, Ms. Collins?

18   A.  Another email chain.

19   Q.  I'm not going to have you read this whole email chain, but

20   if we could start with the header.

21            MR. SHAHABIAN:  If we could blow that up, Mr. Bianco.

22   Q.  Who is it from?

23   A.  Bruce G.

24   Q.  And who are the other recipients of this email?

25   A.  It's to Horacio Cruz, and cc'd is Patrick Orlando, Patrick

1  Orlando, Michael Shvartsman, Natalie Salume.

2  Q.  And what is the subject?

3  A.  Horacio, Rocket One Capital, Follow-Up on BOD and Payment

4  Processing ROFR.

5          MR. SHAHABIAN:  We can zoom back out.

6          So if we could turn to page 3, Mr. Bianco, and start

7  with the first email in this chain.  Sorry, at the very bottom.

8  Q.  Who is this email from, Ms. Collins?

9  A.  Bruce G.

10  Q.  Could you read the body of the email.

11  A.  "Hi, Patrick.  Great to meet you last week.  We very much

12  appreciate the magnitude of what you are building and plan to

13  move forward with an investment.  We are also putting together

14  an investment syndicate of like-minded friends to join us.  Do

15  you have a free 30-minute window this week to do a call with us

16  and our syndicate investor prospects?  We want to give them a

17  chance to meet you and ask a few questions.  Thanks, Bruce."

18          MR. SHAHABIAN:  You can take this down, Mr. Bianco.

19          Go back to page 1.  And if we could blow up the first

20  email, the top email, Mr. Bianco, starting from—great.

21  Q.  And Ms. Collins, could you read starting from, "Hi,

22  Horacio," through the end of this email.

23  A.  "Hi, Horacio, Nice to meet you.  Patrick also mentioned to

24  us earlier some prerequisite board of directors (BOD)

25  paperwork.  I understand there are some tight time constraints

 1   to that process, so please send that paperwork list to my

 2   attention and I will get cracking on it.

 3          "On a separate note, Michael and I discussed with

 4   Patrick a ROFR on future payment processing needs for the Trump

 5   Media Group.  Through Rocket One Capital Holding Companies, we

 6   are a leading payment processor for many industries and have

 7   the ability to customize offerings to unique use cases.

 8   Patrick asked us for a specific written description of what we

 9   were referring to by payment processing.  That description

10   follows.

11          "Right of first refusal on future TMG payment

12   processing needs.  Payment processing is defined to include

13   credit and debit card payment processing for future consumer

14   business organization, paid subscription offerings, or paid

15   discrete product purchase of the Trump Media Group.  Thanks,

16   Bruce."

17          MR. SHAHABIAN:  You can take this down, Mr. Bianco.

18          If we go to Government Exhibit 412.

19   Q.  And looking at Government Exhibit 412, Ms. Collins, do you

20   see the first two emails on this?

21   A.  Yes.

22   Q.  Does the top email appear to be a response to the email we

23   just looked at?

24   A.  Yes.

25   Q.  Who is the top email from?

1    A.   Patrick Orlando.

2    Q.   Who is it to?

3    A.   Bruce G.

4    Q.   Let's start with paragraph 1 of this email.  Could you read

5    paragraph 1.

6    A.   "Bruce.  1.  For clarity, we really like TMG, but there is

7    absolutely no guarantee that we will close that deal or any

8    other.  TMG is just one of many companies in our pipeline of

9    deals, but we have had no substantive discussions with TMG with

10   respect to DWAC as we can't until after the IPO.  We are a SPAC

11   and cannot guarantee we will combine with anyone because no

12   deal can be made until after IPO."

13            MR. SHAHABIAN:  We can take that down.

14            Let's go to Government Exhibit 418.

15   Q.   Who is this email from, Ms. Collins?

16   A.   Bruce G.

17   Q.   Who is it to?

18   A.   Patrick Orlando, Alex Monje, Horacio Cruz, and Natalie

19   Salume.

20   Q.   Who is cc'd?

21   A.   Michael Shvartsman; Mike Park; Taylor, Joshua.

22   Q.   And what's the subject?

23   A.   Rocket One Capital Syndicate Investor Accounting and

24   Logistics.

25            MR. SHAHABIAN:  We could zoom back out, Mr. Bianco.

O531GAR7                    Collins - Direct

1          And if we could start with the first half of the email

2     from Patrick and team through the spreadsheet.

3     Q.   Could you read just the first sentence through "Excel file

4     attached," Ms. Collins.

5     A.   "Patrick and Team.  Based on verbal commitments, our final

6     investment syndicate looks like this.  Screenshot below and

7     Excel file attached."

8     Q.   Could you just read the names under the investor column.

9     A.   Rocket One Capital; Anton Postolnikov, Paxum, Hartley

10    Wasko, The Eleven Fund, Gary Beyer, Eric Hannelius, Gerald

11    Shvartsman, Ojus Ajmera, Ryan Nolte, Fred Lee, Falchion

12    Capital.

13         MR. SHAHABIAN:  Could we scroll down below the Excel

14    spreadsheet and just highlight the—instead of all of that,

15    Mr. Bianco, let's just do the paragraph "I will email" through

16    "sign an NDA with you."  And could you highlight the last

17    sentence.

18    Q.   Could you read the highlighted sentence, Ms. Collins.

19    A.   "Note:  Some of these investors, Fred Lee, etc., may still

20    need to sign an NDA with you."

21         MR. SHAHABIAN:  You can take that down.

22         If we could publish Government Exhibit 431.

23    Q.   Who is this email from?

24    A.   Bruce G.

25    Q.   Who is it to?

1   A.   Anton Postolnikov.

2   Q.   And who's cc'd on it?

3   A.   Patrick Orlando, Alex Monje, Horacio Cruz, Natalie Salume,

4   Michael Shvartsman.

5   Q.   And what's the subject?

6   A.   Anton DWAC SPAC Investment Paperwork and Logistics.

7   Q.   Could you just read the first paragraph of this email.

8   A.   "Anton, I'm pleased to introduce you to the team at Digital

9   World Acquisition Corp. SPAC.  I realize you have already been

10  in touch with them directly.  Just want to make sure you have

11  the contact info for the entire team.  Alex will guide you

12  through the investor subscription process."

13  Q.   And if we could read the next sentence also.

14  A.   "I have you down for $4.5 million of the founders class

15  share, class B at $5 with added liquidity cause and

16  $4.5 million of the IPO stock, class A."

17          MR. SHAHABIAN:  You can take this down.

18          If we could publish Government Exhibit 432.

19  Q.   How many emails are on this exhibit?

20  A.   Two.

21  Q.   And could you read the first email at the bottom from Alex

22  Monje.

23  A.   "Hi, Bruce.  Attached is the subscription agreement at $5.

24  Please let me know who will be signing and their title and I

25  will send via Docusign for execution.  Best regards, Alexander

1   J. Monje."

2           MR. SHAHABIAN:  You can zoom out, Mr. Bianco.  And go

3   to the response from Bruce Garelick on June 30th.

4   Q.  Could you read the body of the response.

5   A.  "Hi, Alex.  The signatory for Rocket Holdings, LLC will be

6   Michael Shvartsman, copied.  Please send the $5 share founders

7   class subscription paperwork via Docusign to his attention.

8   Thanks, Bruce."

9           MR. SHAHABIAN:  Okay.  You can take that down,

10  Mr. Bianco.

11          So I want to shift from June emails to July.  If we

12  could publish Government Exhibit 442.

13          If we could blow up the header, Mr. Bianco.

14  Q.  Who's on this email chain, Ms. Collins?

15  A.  It's from Bruce G, cc'd is Michael Shvartsman and to Gerald

16  Shvartsman.

17  Q.  What's the date?

18  A.  July 8, 2021.

19  Q.  What's the subject?

20  A.  Re Trump Deal.

21          MR. SHAHABIAN:  Could we go to the first email,

22  Mr. Bianco.

23  Q.  You see the email on July 8, 2021, from Gerald Shvartsman?

24  A.  Yes.

25  Q.  What does Gerald Shvartsman say?

A. "So what's the story on the Trump deal? Are we in or out?

Where's the docs?"

         MR. SHAHABIAN: If we go to the response, Mr. Bianco.

Q. What is Bruce's response on July 8th?

A. "Hey, Gerald, we are in. Please email them directly to get

your docs. Alex Monje's email below."

         MR. SHAHABIAN: If we could turn to Government

Exhibit 444.

         I'm not going to ask you to read this whole email

chain, Ms. Collins.

         If we could blow up the top email, Mr. Bianco.

Q. Who is this email from, Ms. Collins?

A. Bruce G.

Q. Who is it to?

A. Michael Shvartsman.

Q. What's the date?

A. July 13, 2021.

Q. What's the subject?

A. "Forward: Patrick DWAC Purchase Additional Warrants."

         MR. SHAHABIAN: And Mr. Bianco, could we highlight the

first bullet that started "Buy more warrants."

Q. Could you read that bullet, Ms. Collins.

A. "Buy more warrants. Not feasible for us to buy additional

warrants from the SPAC sponsor. FYI. Reasons laid out in

correspondence with them in the email below. Lock up with

1   standalone purchase warrants for discretely trading free

2   warrants, etc."

3           MR. SHAHABIAN:  If we could publish Government

4   Exhibit 453.

5   Q.  Now jumping to September.  Who is this email from?

6   A.  Bruce G.

7   Q.  Who is it to?

8   A.  Anton Postolnikov.

9   Q.  What's the date?

10  A.  September 2, 2021.

11  Q.  What's the subject?

12  A.  Anton DWAC IPO Closing Tonight.

13  Q.  Could you read the body of the message from Bruce G to

14  Anton Postolnikov.

15  A.  "Anton, Hope you are well.  The DWAC SPAC is pricing the

16  IPO tonight.  Should start trading tomorrow.  Please let me

17  know if you want to discuss.  Note:  It will trade as a unit

18  for likely the first 50 days.  Unit meaning the combined common

19  share and half warrant.  Thus, you can simply buy through your

20  broker on the open market rather than putting in an order via

21  the IPO underwriter.  Most SPACs trade slightly below the $10

22  IPO price initially, so might make sense to."

23          MR. SHAHABIAN:  You can take this down, Mr. Bianco.

24          Publish Government Exhibit 465.

25  Q.  What is Government Exhibit 465, Ms. Collins?

1    A.   Another email chain.

2    Q.   Have you reviewed this particular email chain in some

3    detail?

4    A.   Yes.

5    Q.   Is it a messily displayed email chain?

6    A.   Yes, I would say that.

7    Q.   We'll go through this one a little slower.

8            What's the date on the top?

9    A.   October 3, 2021.

10   Q.   Who is it from?

11   A.   Eric Hannelius.

12   Q.   Who is it to?

13   A.   Bruce G.

14           MR. SHAHABIAN:  I want to go to page 4 of this

15   exhibit.  And Mr. Bianco, if you could blow up the paragraph

16   starting on Wednesday, September 8th.

17   Q.   Is this an email in the chain from Eric Hannelius to Bruce

18   Garelick on September 8, 2021?

19   A.   Yes.

20   Q.   What's the email?

21   A.   "Hi, Bruce, FYI, what are next steps?"

22           MR. SHAHABIAN:  Could you zoom out, Mr. Bianco.

23           And if we could go to the—to page 2.  And highlight

24   the top or the bottom of the screen starting on September 9th.

25   Q.   Is this the response to that email in this Government

O531GAR7                    Collins - Direct

1   Exhibit?

2   A.  Yes.

3   Q.  What does Bruce Garelick respond on September 29th?  And

4   we'll start with the beginning that's displayed here on the

5   screen.

6   A.  On September 9th.

7   Q.  On September 9th.  Yeah.

8   A.  "Hey, Eric.  Two different variables to consider here.  (1)

9   for the $10 IPO stock and (2) for the $5 founders class stock.

10  Assuming you invested in both.  One $10 IPO stock."

11          MR. SHAHABIAN:  If we could scroll down, Mr. Bianco.

12          And if we could highlight the first three bullets at

13  the top of the screen.

14          Let's take it one bullet at a time, since this is a

15  lot of text.  If we could start with the first bullet,

16  Mr. Bianco.

17          If you'd highlight it.

18          Great.  Thank you.

19  BY MR. SHAHABIAN:

20  Q.  Ms. Collins, could you read the first bullet.

21  A.  "The stock will likely trade within 30 cents of a $10

22  handle until they announce a target."

23          MR. SHAHABIAN:  If we could scroll down to the next

24  bullet, Mr. Bianco.

25  Q.  What does the second bullet say, Ms. Collins?

1  A.  "That announcement (expected 6-10 weeks from now) is our

2  expected catalyst to then profitably sell the IPO shares."

3  Q.  And the third bullet?

4  A.  "If they don't announce a target we like/expect, we have

5  the right to demand our $10 back--which we will do under this

6  scenario."

7         MR. SHAHABIAN:  If we could go down, skip the fourth

8  bullet and go to the fifth bullet, starting "ROC invested."

9  Q.  Could you read this bullet, Ms. Collins.

10  A.  "ROC invested $145,000 in the $10 IPO shares.  We plan to

11  buy another $255 of this stock in the open market over the next

12  four weeks."

13         MR. SHAHABIAN:  You can take this down.

14         If we go to the bottom bullet, Mr. Bianco.

15  Q.  What's the next bullet say, Ms. Collins?

16  A.  "If they announce a sexy target after the disaggregation of

17  the shares into DWAC and DWACW, we will then sell all of the

18  DWAC at a nice profit and retain the warrants.  Alternatively,

19  if the shares disaggregate before they announce a target, we

20  will likely sell all of DWAC common at approximately $10 and

21  put the proceeds into more DWACW, warrants."

22         MR. SHAHABIAN:  If we go to the next page.

23  Q.  If you could read——

24         MR. SHAHABIAN:  Oh, you could leave the whole part up

25  there, Mr. Bianco.  Thank you.

1  Q.  What does this part say, Ms. Collins?

2  A.  "2.  The founders class.  $5 cost basis.  We are locked up

3  here for approximately six months after they announce the

4  target with the caveat below.

5       "We do have the option within a short window to demand

6  our money back if we don't like the target they name.

7  Otherwise, we become 'investors' for at least six months."

8       MR. SHAHABIAN:  If we scroll down just to the last

9  part of this email.

10 Q.  And if you could read this, Ms. Collins.

11 A.  "Hope that context helps.  Look forward to seeing you in

12 Miami next week."

13      MR. SHAHABIAN:  If we go to Government Exhibit 474.

14      If we could highlight just the top email, Mr. Bianco.

15 Q.  Who is this email from, Ms. Collins?

16 A.  Bruce G.

17 Q.  Who is it to?

18 A.  Eric Hannelius.

19 Q.  Who is cc'd?

20 A.  Michael Shvartsman.

21 Q.  And what is the subject?

22 A.  Re Investor Update, DWAC Return of Capital.

23      MR. SHAHABIAN:  If we could minimize this, Mr. Bianco.

24 And go to page 2.

25      And if we could highlight the first two paragraphs.

1  Q.  Could you read this, Ms. Collins.

2  A.  "Digital World Acquisition Corp. (DWAC) successfully went

3  public as a $287,500,000 SPAC, including overallotment,

4  approximately six weeks ago.  While a $287,500,000 is a

5  substantially sized SPAC, DWAC had been originally registered

6  as a $345 million SPAC, including the overallotment.  As a

7  result of the somewhat tight current IPO market, the need arose

8  to reduce the size of the DWAC offering by 16.7 percent.

9  Therefore, to maximize our investors' exposure, we will be

10  reducing the amount of capital invested of each investor by

11  10 percent.  We are providing two options for the reduction of

12  invested capital.  Investors must make their election by

13  replying to this email by Friday, October 22, 2021, or the

14  first option below will be elected by default."

15          MR. SHAHABIAN:  We can zoom back out, Mr. Bianco.

16  Q.  What's option 1 listed in this email, Ms. Collins?

17  A.  "Option 1.  Return of capital.  We will return 10 percent

18  of capital invested by wire to the investor.  We will require

19  the investors to provide their wiring instructions."

20          MR. SHAHABIAN:  Zoom out, Mr. Bianco.

21  Q.  And what's option 2?

22  A.  "Option 2.  Investment rollover.  We will permit investors

23  to roll their overages into Big Four sponsor.  The sponsor of

24  Big Four Acquisition Corp., which is our next

25  technology-focused SPAC.  Investors will receive a reduced

O531GAR7                    Collins - Direct

1    price of $4.25.  For clarity, due to market conditions, Big

2    Four sponsor will be offering investments at $6 after its S-1,

3    the registration statement, is filed."

4              MR. SHAHABIAN:  You can take this down, Mr. Bianco.

5              If we go to the first page of this exhibit.

6    Q.  What does, in the middle—do you see the middle email,

7    Ms. Collins?

8    A.  Yes.

9    Q.  What does Eric Hannelius ask the other participants on this

10   chain, Bruce G and Michael Shvartsman?

11   A.  "Hi, guys.  Thoughts on what to do here?  I just have

12   founders shares."

13             MR. SHAHABIAN:  You can zoom out.

14             And if you highlight the response from Bruce Garelick

15   on October 16, 2021, what's the response?

16   A.  "Hi, Eric.  I recommend electing to have them return

17   10 percent of the capital you invested.  Their next SPAC may or

18   may not be interesting to us.  If it is, we could certainly get

19   involved then.  No need to commit capital to it now.  Best,

20   Bruce."

21             MR. SHAHABIAN:  You can take this down.

22   Q.  So I'm going to shift now from emails to another group of

23   exhibits.

24             Were you asked to review some business records from

25   Docusign?

1    A.  Yes.

2            MR. SHAHABIAN:  If we could publish Government

3    Exhibit 202.

4            And if we could highlight, Mr. Bianco——and this is

5    going to be a little particular——all the way from the header

6    that says Docusign Envelope ID through Michael Shvartsman.

7    Perfect.

8    BY MR. SHAHABIAN:

9    Q.  Ms. Collins, do you see the top of this document, it says

10   it's a confidentiality agreement between Digital World

11   Acquisition Corp. and Michael Shvartsman?

12   A.  Yes.

13   Q.  Do you see there's a header at the top that says Docusign

14   Envelope ID, and it's a long string of characters ending in

15   E848?

16   A.  Yes.

17           MR. SHAHABIAN:  I'd now like to publish Government

18   Exhibit 217.  And if we could highlight just the top part of

19   the Docusign document.

20   Q.  Do you see, Ms. Collins, at the top of this Docusign

21   document, where it says Envelope ID, a long string of

22   characters ending E848?

23   A.  Yes.

24   Q.  Is that the same string of——appear to be the same string of

25   characters as the confidentiality agreement we just looked at?

1   A.  The last four are certainly the same.

2   Q.  Fair enough.  If we scroll down, if you could read the

3   subject of this Envelope ID as well.

4   A.  "Please Docusign.  DWAC, ARC, Bene, Confidentiality

5   Agreement."

6           MR. SHAHABIAN:  You can zoom back out, Mr. Bianco.

7   And if you could highlight or—excuse me, not highlight,

8   magnify under Signer Events from Michael Shvartsman.  Great.

9   Q.  Do you see the name listed under the Signer Events heading,

10  Ms. Collins?

11  A.  Yes.

12  Q.  What's the name listed?

13  A.  Michael Shvartsman.

14  Q.  And do you see that time stamp column on the right?

15  A.  Yes.

16  Q.  What's the date reflected under Sent?

17  A.  June 14, 2021.

18  Q.  What about Viewed?

19  A.  June 14, 2021.

20  Q.  And Signed?

21  A.  June 14, 2021.

22          MR. SHAHABIAN:  You can take this down.

23          Could we publish Government Exhibit 209.

24          And same thing, Mr. Bianco, if you could just

25  highlight from the top of the Docusign Envelope ID through

1    Bruce Garelick.

2    Q.  Do you see, Ms. Collins, this is also dated June 14, 2021,

3    in the confidentiality agreement paragraph between Digital

4    World Acquisition Corp. and Bruce Garelick?

5    A.  Yes.

6    Q.  And do you see the last four characters in the Envelope ID

7    are E1E6?

8    A.  Yes.

9              MR. SHAHABIAN:  If we could publish Government

10   Exhibit 218.

11             And if we could blow up the top portion.

12   Q.  Do you see the same four characters we just looked at, E1E6

13   at the end of the Envelope ID?

14   A.  Yes.

15   Q.  Do you see the subject?

16   A.  Yes.

17   Q.  What's the subject?

18   A.  "Please Docusign.  Bene, DWAC, ARC confidentiality

19   agreement."

20             MR. SHAHABIAN:  If we could zoom back out, Mr. Bianco.

21             And if we could open the Signer Events.  Great.

22   Q.  What's the name under Signer Events, Ms. Collins?

23   A.  Bruce Garelick.

24   Q.  And if we go to the time stamp column, what's the date

25   sent?

O531GAR7                    Collins - Direct

1    A.   June 14, 2021.

2    Q.   The date resent?

3    A.   June 18, 2021.

4    Q.   What's the date signed?

5    A.   June 20, 2021.

6         MR. SHAHABIAN:  You can take this down.

7    Q.   Ms. Collins, were you also asked to review certain

8    recordings and transcripts of recordings from a Fidelity

9    account and of a board meeting?

10   A.   Yes.

11        MR. SHAHABIAN:  Your Honor, during the break we passed

12   out some transcript binders to the jury.  I don't know if the

13   Court wants to give an instruction, but this is the appropriate

14   time.

15        THE COURT:  I take it you're about to play a

16   recording?

17        MR. SHAHABIAN:  Yes, your Honor.

18        THE COURT:  Okay.  So members of the jury, you have

19   transcript binders in front of you.  In them, you have

20   transcripts.  The transcripts are really just an aid to you.

21   They're not evidence.  The evidence will be what you hear

22   through the audio.  If there's a difference between what you

23   hear in the audio and what you see in the transcript, it's the

24   audio that controls.  And the transcripts are just an aid to

25   you; they're not evidence itself.

O531GAR7                    Collins - Direct

1          MR. SHAHABIAN:  I'd like to start with the Fidelity

2    recordings.  If we could turn to——

3          THE COURT:  And maybe, Mr. Shahabian, we'll do one

4    recording and then we'll break for the weekend.  Does that make

5    sense?

6          MS. SHAPIRO:  Yes, your Honor.  In that case, I'll do

7    a different recording.

8          THE COURT:  Okay.

9          MR. SHAHABIAN:  I'll use the board recording.

10          If we could publish Government Exhibit 125A.  And

11    members of the jury, there are tabs in your binder.  Feel free

12    to turn to the one labeled 125AT, which is the second tab in

13    your binders.  And the date on the transcript, first page is

14    October 19, 2021.

15    BY MR. SHAHABIAN:

16    Q.  And Ms. Collins, while we're getting that cued up, is

17    Government Exhibit 125A an excerpt of the longer recording that

18    is Government Exhibit 125?

19    A.  Yes.

20          MR. SHAHABIAN:  And whenever you're ready,

21    Mr. Bianco——I don't mean to rush you——you can publish

22    Government Exhibit 125A.

23          And members of the jury, you can follow the transcript

24    of this excerpt starting on page 2.

25          Apologies for the technical difficulties, your Honor.

1          THE COURT:  We'll give it another minute or so.

2          (Audio played)

3          THE COURT:  Is this a convenient time to break for the

4     weekend?

5          MR. SHAHABIAN:  Yes, your Honor.

6          THE COURT:  Okay.  Members of the jury, we're going to

7     break for the weekend.  Let me tell you where we are, and then

8     I'm going to give you a few instructions.

9          We've been proceeding with the government's case, and

10    I'm pleased to tell you that we're making a good deal of

11    progress with the government's case and that the trial is very

12    much on schedule.

13         After the government presents its case, the government

14    will rest, and then the defendant will have an opportunity to

15    present a defense, if the defendant chooses to do so.  I remind

16    you that the defendant is under no obligation to present a

17    defense.  The burden remains at all times on the government to

18    prove the elements of each case beyond a reasonable doubt.

19         I'm going to instruct you, since we're breaking for

20    the weekend, that you should not form any opinion until all of

21    the evidence is in.  As I told you at the beginning of this

22    week, a case can be presented only step by step, witness by

23    witness, until all of the evidence is before you.  All of the

24    evidence is not before you yet.  Keep an open mind until the

25    evidence is all in and I give you your instructions and you

1    start your deliberations at the end of the case.

2            Finally, let me instruct you again not to discuss the

3    case with anyone or to permit anyone to discuss it with you.

4    Don't post anything on the internet on the case; don't talk

5    about the case with anyone; do not even discuss the case with

6    your fellow jurors.  And do not do any research on the case.

7            We'll reconvene at 9:00 on Monday morning.  Breakfast

8    will be available for you at 8:30.  Please be in the jury room

9    at 8:45.  And have a good weekend, everybody.

10            THE DEPUTY CLERK:  All rise.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Counsel may be seated and the witness may

2     step down.

3          I have, Mr. Shahabian, joint exhibit 5, a stipulation

4     in front of me.  I assume at some point before you close the

5     case, you'll read the stipulation into the record or offer it

6     into evidence.

7          MR. SHAHABIAN:  That's correct, your Honor.  There's

8     also a joint exhibit 6 that I could hand up.

9          THE COURT:  You may.

10          That's very helpful.

11          A reminder, earlier in the trial, there were two

12     government exhibits that were marked and maybe received, but I

13     think marked with -- they were large exhibits, they were marked

14     in their entirety, but only portions of the exhibits were

15     received.  The portions that were going to be received were

16     going to be remarked A and B.  And so, I just want to make sure

17     that that gets taken care of, and there's an agreement before

18     the government closes its case and before we get ready to send

19     the list of exhibits to the jurors during their deliberations.

20          Also, a reminder, you're going to send me, over the

21     weekend, a proposed trial indictment and your agreed list of

22     exhibits that have been received so far.

23          Then I'm going to have a brief colloquy with

24     Mr. Garelick.

25          Is there anything else from the government before we

O53Cgar8

1   break for the weekend?

2            MR. SHAHABIAN:  Your Honor, I was prepared to offer a

3   few thoughts for the Court to consider on the charge issues the

4   Court raised at the break.  It won't take long.

5            THE COURT:  Why don't I raise the questions with

6   Mr. Garelick and then I'll hear from you on that.

7            Anything else from the defense before we break for the

8   weekend?

9            MR. BACH:  No, your Honor.  Thank you.

10           THE COURT:  Let me, if you don't mind, Mr. Bach and

11  Mr. Brod and Ms. Shapiro, let me have a brief colloquy with

12  Mr. Garelick.

13           MR. BACH:  Certainly, your Honor.

14           THE COURT:  Mr. Garelick, before we break for the

15  weekend, I want to make sure that you know that when it comes

16  time for the defense to present its case, you've got an

17  absolute right to testify.

18           Do you understand that?

19           THE DEFENDANT:  Yes, your Honor.  I understand my

20  rights.

21           THE COURT:  And you should consult with your attorneys

22  about whether to testify.

23           Do you understand that?

24           THE DEFENDANT:  Yes, I do.

25           THE COURT:  But even if they advise you not to

O53Cgar8

1   testify, you have the absolute right to testify if you choose

2   to do so.

3          Do you understand that?

4          THE DEFENDANT:  I do understand that, your Honor, yes.

5          THE COURT:  You also have the absolute right to choose

6   not to testify, and if you choose not to testify, no inference

7   will be drawn against you.

8          Do you understand that?

9          THE DEFENDANT:  I do, yes.

10         THE COURT:  At the end of the day, the important point

11  is that the decision of whether to testify or not to testify is

12  yours and yours alone.

13         Do you understand that?

14         THE DEFENDANT:  I understand, your Honor.  Thank you.

15         THE COURT:  I may have further colloquy with you

16  during the defense case.

17         Thank you, sir.

18         Mr. Shahabian.

19         MR. SHAHABIAN:  Yes, your Honor.

20         The Court raised two considerations at the break.  I

21  know the Court is still musing these issues and the government

22  is, as well, but in the event it's helpful as we go into the

23  weekend.

24         On the issue of whether the Court should still follow

25  the Blaszczak opinion, notwithstanding the vacatur, the

1    government's position is it is correct, it is persuasive

2    authority and the Court should follow it.  It's not

3    something -- I think we originally took the position that it

4    was binding, I think defense counsel correctly pointed out it

5    was vacated and it is not binding.  So, for the record, we

6    don't think the Court should follow it because it's binding

7    authority.  And I don't know that the prudential considerations

8    that the Court raised are ones that should really guide what

9    the correct view of the law is here.  I think our position is

10   that it is the correct view of the law.

11       That leads me to the second point the Court raised,

12   which is how to think about the obtaining of the property in

13   the context of a 1348 charge, especially in relation to 1341

14   and 1343.  I think the issue with the example the Court offered

15   about bailment and not having intent to defraud at the time one

16   obtains the properties, that actually misconceives the nature

17   of the property at issue.

18       In a confidential information case that's charged

19   under the Title 18 fraud statutes, the property is not the

20   information at the point of receipt, the property interest is

21   actually the ongoing duty to maintain confidentiality.  It's

22   not a property that's received at any given point in time.  I

23   think the authorities for that are the *Carpenter* case, the

24   *Grossman* case.

25       I think also, and I haven't looked at this for a long

1    time, but this certainly came up in the *Mittendorf* case before

2    Judge Oetken, which was a different issue because it was not a

3    securities fraud case, it was the obtaining of confidential

4    information from the PCOB, but it was charged as a wire fraud.

5         The theory of fraud, the scheme to defraud in those

6    kinds of cases is not this bailment, real-property-type theory,

7    it's an embezzlement theory, that the defendant has made a

8    promise to hold the intangible continuing right in trust and

9    that the breach and intent basically, if they can be proven,

10   occur at the same time, that when defendant converts the

11   property that's been entrusted to him in breach of the

12   confidentiality agreement, that is a fraud that obtains the

13   property of the confidentiality because it deprives the owner

14   of the property the right to control who learns the information

15   and when.

16        So it's not when you're entrusted with the property,

17   the information, it's when you breach the confidentiality

18   because that's actually the property interest that's being

19   fraudulently obtained.  The fraud, of course, is the violation

20   of the promise to keep it confidential.

21        So, in these embezzlement-type cases involving

22   tangible interests, the act of fraud and the intent merge

23   basically at the same time.

24        THE COURT:  Let me ask you two followup questions,

25   Mr. Shahabian.  I'm asking this in the context of an arm's

| | |
|---|---|
| 1 | length nondisclosure agreement, not in a fiduciary -- otherwise |
| 2 | in a fiduciary circumstance. |
| 3 | MR. SHAHABIAN:  Yes, your Honor. |
| 4 | THE COURT:  You might quarrel with the hypothetical, |
| 5 | but live with the hypothetical for a moment. |
| 6 | You mentioned embezzlement.  If the property that is |
| 7 | embezzled is cash that is being held by the bailee, in that |
| 8 | circumstance, would you say that there was a 1341 or 1343 |
| 9 | violation by the embezzlement of the cash that is obtained |
| 10 | without there being any deception and without there being an |
| 11 | ongoing duty to disclose, simply a duty to hold the money for |
| 12 | the purposes and return it when the purposes are over? |
| 13 | MR. SHAHABIAN:  I think that's more of a |
| 14 | straightforward embezzlement case, but I think that is a scheme |
| 15 | to defraud and is frequently charged in this district when the |
| 16 | other elements of 1341 and 43 are satisfied.  If you are |
| 17 | entrusted with cash and embezzle it in violation of your |
| 18 | promise to keep it in trust, that is a scheme to defraud, and |
| 19 | if you satisfy the other elements of 1341 — use of the mails, |
| 20 | use of the wires — I think that can and does, is charged in |
| 21 | this district as a species of fraud under Title 18.  I don't |
| 22 | think this is persuasive authority, but I've certainly |
| 23 | prosecuted such cases in this district. |
| 24 | THE COURT:  Do you have anything other than |
| 25 | Shahabian J. to cite? |

O53Cgar8

1          MR. SHAHABIAN:  I think, your Honor, going back to

2    Carpenter, that's the starting point to describe it as a theory

3    of embezzlement.  I think over the weekend we want to think

4    about it and marshal authorities.  I did want to respond to the

5    hypothetical.

6          THE COURT:  You understand that at least one of the

7    thoughts with respect to Carpenter is that the relationship

8    that existed at the Wall Street Journal might be argued to be

9    something more than just an arm's length nondisclosure

10   relationship?

11         MR. SHAHABIAN:  I do understand that.  I think that

12   goes, though, to not the property point, it goes to the duty

13   point.  I think there are certainly -- embezzlement does not

14   require the sort of fiduciary level of responsibility that is

15   necessarily under Title 15, for example, for an insider before

16   the misappropriation theory arose.  That's why I'm pushing back

17   on the idea.

18         THE COURT:  I'm glad you're pushing back.  That helps

19   me think about it.  When there's an ongoing relationship of

20   trust and confidence — again, don't challenge me on the

21   hypothetical — that an arm's length nondisclosure is just a

22   contract, you might say that in that circumstance, that you

23   might have a duty to disclose that you have embezzled the

24   property, and that silence in the face of a duty to disclose

25   constitutes a misrepresentation, whereas if there is no ongoing

1    relationship, there simply is a contract, and depending on what

2    the terms of the contract say, it might be a straight out

3    embezzlement, not a fraud.  One way of thinking about it.

4         MR. SHAHABIAN:  I think that's one way of thinking

5    about it, but I think, again, the intangible interest is the

6    right to control who learns the information and when.  That's

7    what the confidentiality agreement is ensuring and it's not

8    something that necessarily changes because it's done under the

9    terms of a confidentiality agreement versus employment or some

10   other relationship.

11        I do think this is something the government wants to

12   give thought to the Court's concerns and will submit something

13   in writing over the weekend.

14        THE COURT:  Ms. Shapiro, you don't have to respond --

15        MS. SHAPIRO:  I'm not going to shoot from the hip, but

16   we will submit a letter over the weekend.

17        THE COURT:  I will make the observation that one of

18   the pleasures of this case is that, unlike in a lot of other

19   cases, I have at the government table and at the defense table

20   the lawyers who have handled every significant insider trading

21   case it seems in the Southern District of New York, if not in

22   the country.  So I think both sides are equally matched and

23   it's helpful for the Court.

24        MR. SHAHABIAN:  With the Court's indulgence, if I can

25   come back to one more colloquy we had yesterday.

O53Cgar8

1          THE COURT:  After that nice compliment, you might blow

2      it.

3          MR. SHAHABIAN:  On the commercial value point that we

4      discussed yesterday, to the extent the Court is still

5      considering it in the instruction, I don't think it's accurate

6      to instruct the jury that they have to find that this

7      particular victim treated it with commercial value.  The

8      example I'd give the Court is imagine if I obtained the formula

9      for Coca-Cola.  Everyone would agree that's a trade secret

10     under *Ruckelshaus*, it's a property interest, it's an intangible

11     property right.

12         If I personally, for my own reasons, decided soda was

13     bad and I never wanted Coke to be marketed again, such that to

14     me it had no commercial value, but someone defrauded me into

15     giving up the formula for Coke, we wouldn't say that that

16     intangible right lost its characteristics of property because

17     the particular victim did not ascribe commercial value to it.

18         In *Cleveland*, the issue was distinguishing between

19     regulatory value such that the interest had no property rights

20     to begin with and something with commercial value such that we

21     would consider it property for purposes of the wire fraud and

22     mail fraud statutes.

23         But I don't think that that leads to giving the jury

24     an instruction that they need to find, as a factual matter,

25     that the particular victim in a particular case ascribed

1  commercial value to the information.  And for that reason,

2  that's why we objected to that.

3          THE COURT:  I will think about it.  I do think in this

4  case, if it came to me on Rule 29, there would be little

5  question that the jury could find that the information at

6  question had commercial value to the SPAC in a circumstance

7  where, really, the only thing that is of value to a SPAC is the

8  process of a target and where the evidence has established that

9  there was competition among SPACs for targets, a limited number

10 of targets, and this one was a particularly valuable target,

11 and where the evidence also established that there was a

12 prospect that the SPAC could have lost the target.  That would

13 be Rule 29 and I need to look at the materials that Ms. Shapiro

14 sent me and whatever else the government sends me.

15          Okay.  Have a good weekend, everybody.

16          (Adjourned to May 6, 2024, at 9:00 a.m.)

17                              *  *  *

18

19

20

21

22

23

24

25

1                           INDEX OF EXAMINATION

2    Examination of:                          Page

3     DANIEL J. LEHAN

4    Direct By Mr. Nessim . . . . . . . . . . . . 697

5    Cross By Mr. Bach  . . . . . . . . . . . . . 708

6     BENJAMIN REED

7    Direct By Mr. Nessim . . . . . . . . . . . . 711

8    Cross By Mr. Brod  . . . . . . . . . . . . . 745

9    Redirect By Mr. Nessim . . . . . . . . . . . 777

10    PETER J. MELLEY

11   Direct By Mr. Nessim . . . . . . . . . . . . 781

12   Cross By Mr. Bach  . . . . . . . . . . . . . 859

13    SUSANNA MAJ

14   Direct By Mr. Nessim . . . . . . . . . . . . 886

15   Cross By Mr. Bach  . . . . . . . . . . . . . 900

16    KAYLA COLLINS

17   Direct By Mr. Shahabian  . . . . . . . . . . 902

18

19

20

21

22

23

24

25

```
 1                          GOVERNMENT EXHIBITS

 2     Exhibit No.                                      Received

 3     320, 330, 335  . . . . . . . . . . . . . . . 721

 4     824  . . . . . . . . . . . . . . . . . . . . 723

 5     820, 822, 823, 825  . . . . . . . . . . . . . 729

 6     468, 469, 471, 476, 489  . . . . . . . . . 735

 7     301, 302, 303, 304, 305,  . . . . . . . . . 799

 8              335, 355, 356  360, 340-346,

 9              350, 351, 352

10     900, 905, 910, 915  . . . . . . . . . . . . . 803

11     920, 930, 940, 941  . . . . . . . . . . . . . 809

12     131  . . . . . . . . . . . . . . . . . . . . 814

13     600, 601, 610, 611, 620,  . . . . . . . . . 888

14              620A, 621, 630, 631, 640, 641,

15              650, 660

16     950, 950A-950G, and 951  . . . . . . . . . . 894

17     215-218, 315-318, 400-406,  . . . . . . . . 902

18              411-412, 414-416, 418-420,

19              422-432, 435, 437, 442-443,

20              444-447, 451-453, 455-459,

21              463, 465, 470, 474, 479, 485,

22              516, 721-722, 727-728, 730,

23              730A, 737, 738, 747, 748,

24              840-844, 865, 870, 871

25     449  . . . . . . . . . . . . . . . . . . . . 717
```

1    454  . . . . . . . . . . . . . . . . . . 727

2    810  . . . . . . . . . . . . . . . . . . 700

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    DEFENDANT EXHIBITS

2     Exhibit No.                          Received

3      14    . . . . . . . . . . . . . . . . . 761

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25