O56Cgar1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                New York, N.Y.

            v.                           23 Cr. 307 (LJL)

BRUCE GARELICK,

            Defendant.

------------------------------x          Trial

                                         May 6, 2024
                                         9:00 a.m.


Before:

                  HON. LEWIS J. LIMAN,

                                         District Judge
                                           and a Jury


                       APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  ELIZABETH A. HANFT
     MATTHEW R. SHAHABIAN
     DANIEL G. NESSIM
     Assistant United States Attorneys

SHAPIRO ARATO BACH, LLP
     Attorney for Defendant Garelick
BY:  ALEXANDRA  A. E. SHAPIRO
     JONATHAN BACH
     JULIAN S. BROD
     JASON A. DRISCOLL

Also Present:

Special Agent Marc Troiano, FBI
Paralegal Specialist Grant Bianco, USAO
```

O56Cgar1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning, everybody.  I'm informed

3     that we have all of the jurors.

4          I have just a few things for the parties and then I'll

5     hear anything the parties have for me before we bring in the

6     jurors.

7          The submissions from both of you over the weekend with

8     respect to the charge were very helpful.  We made some

9     revisions to the charge that we previously had handed out, and

10    I had my law clerk hand to you the current draft of the charge.

11    I would emphasize that it doesn't reflect a final decision with

12    respect to any of the language that is for the charge

13    conference.  The draft that you were handed this morning is

14    what I intend to use during the charge conference.  You each

15    might want to take a look through it.

16         We also handed out to the parties a copy of our

17    proposed verdict sheet and I'd like to discuss that at the

18    charge conference.

19         At the charge conference, also, I would like to hear

20    from the parties with respect to the question of whether a copy

21    of the charge with the table of contents and headings goes back

22    to the jury room.

23         Are there any objections from the defense to the trial

24    indictment that I received from the government?

25         MS. SHAPIRO:  No, your Honor.  Well, I should say,

O56Cgar1

1  except we object to sending it back at all, but if it's going

2  to be sent back, we don't object to the form proposed.

3      THE COURT:  What about to the exhibit list that the

4  government sent?

5      MR. BROD:  Judge, this is not to the exhibit list, but

6  the exhibits they plan to offer --

7      THE COURT:  I think I received from Mr. Nessim, last

8  night, a list of all of the exhibits that had been received

9  into evidence in response to my request at the end of the week

10  that the parties worked together on a list that could go back

11  to the jury room.

12      Was there any objection to that list?

13      MR. BROD:  No, Judge.  I don't have any objections to

14  the exhibits.  There's no objection to the list.

15      MR. NESSIM:  On the point of the list, briefly.  I

16  think it's the parties' intention that the ultimate list that

17  goes back to the jury does not include the admitted identified

18  columns of that list.

19      THE COURT:  Good.

20      I don't need argument right now, but I just need to

21  know the answer.  Is there a response from the government with

22  respect to the defense letter on the scope of cross examination

23  of Mr. Garelick?

24      MS. HANFT:  Your Honor, the government maintains that

25  the topic raised in the letter is perfectly permissible cross,

O56Cgar1

1    but, in any event, we don't actually intend to bring it up.

2    And so, we don't think we need to have argument on it.

3              THE COURT:  Is there anything else from the government

4    before we put the witness on the stand and bring in the jury?

5              MR. SHAHABIAN:  The government intends to offer a

6    number of remaining exhibits since this is our last witness.  I

7    know the defense has objections to some of the exhibits,

8    including ones we don't -- that aren't reflected in the summary

9    charts.  I don't know whether it makes sense to have those

10   objection arguments now or later, but we're prepared to go

11   forward either way.

12             THE COURT:  Do you intend to publish them to the jury

13   during -- the contested exhibits, publish them to the jury

14   during your case?

15             MR. SHAHABIAN:  At least some of them, yes.

16             THE COURT:  Then it may make sense for me to hear you

17   on that.

18             Let me see what the defense has before we make a final

19   decision on that.

20             Anything besides the contested exhibits from the

21   defense?

22             MR. BROD:  No, Judge.

23             THE COURT:  How many disputed exhibits are there,

24   Mr. Shahabian?

25             MR. SHAHABIAN:  I'll defer to Mr. Brod on that.

O56Cgar1

1          THE COURT:  How many exhibits are we talking about?

2     I'm going to want them to be published to me.

3          MR. BROD:  There's four, Judge, one of which doesn't

4     require discussion.  It's our longstanding objection to

5     anything relating to certifications about training on insider

6     trading and so on.

7          THE COURT:  Maybe you could try to speak either a

8     little bit more slowly or a little bit more clearly.

9          MR. BROD:  Apologize, Judge.  I said there's four

10    exhibits at issue, one of which does not require argument.

11    It's just the attestation of Mr. Garelick's CFA license

12    renewal, and we have a longstanding objection to that, but you

13    don't need to hear from the parties on that.

14         THE COURT:  So that the certification will be

15    received.  The defense's objection is preserved.  That has been

16    the subject of my prior rulings.

17         MR. BROD:  For the record, that was GX 853.

18         The next exhibit to which the defense has an objection

19    is GX 477, which is a -- I don't know if that's coming up on

20    the screen.

21         THE COURT:  Give me a second to look at it.

22         Tell me what the objection is.

23         MR. BROD:  Judge, this is a note apparently made by

24    Phil Margolin to himself.  My understanding is that

25    Mr. Margolin was a junior analyst who had started at Rocket One

O56Cgar1

1    a day or two before he made this note.

2            I'm presuming that what the government cares about

3    here is, "bought 2 million warrants because target is Trump

4    Media."  We think that that's hearsay.  We think there's no

5    exception.  To the extent that the Court would find that the

6    hearsay objection is overcome, we think that, without any

7    context for who said it or what was said beyond this note, it

8    should be excluded under Rule 403.

9            THE COURT:  Let me hear from Mr. Shahabian on this.

10           MR. SHAHABIAN:  Yes, your Honor.  As Mr. Brod noted,

11   this is an email from a senior associate at Rocket One Capital.

12   That's the firm where the defendant and his coconspirator,

13   Mr. Shvartsman, are higher up, obviously, in the chain.  The

14   government's position is this statement is admissible as a

15   statement by an agent of a coconspirator, whether that's

16   Mr. Shvartsman -- we're not going to argue the defendant

17   himself necessarily is the person who told this to

18   Mr. Margolin, but it's certainly going to come from somebody

19   involved in this trade to say, "bought 2 million warrants

20   because target is Trump Media."  We think, therefore, it's

21   admissible at both levels of hearsay because it's a statement

22   by a coconspirator at the very least, offered through an agent

23   of Rocket One.

24           THE COURT:  And a coconspirator whose identity is

25   indeterminate?

O56Cgar1

1          MR. SHAHABIAN:  The government's position is it's

2     Michael Shvartsman, given the context that the trade was placed

3     by Michael Shvartsman in consultation with Mr. Garelick.

4          THE COURT:  What foundation are you going to lay with

5     respect to the relationship with who Mr. Margolin is and what

6     his relationship is to Rocket One or Shvartsman?

7          MR. SHAHABIAN:  The foundation is at the signature

8     line of this email, which shows Mr. Margolin identifying

9     himself as a senior associate at Rocket One with a Rocket One

10    Capital email.  In addition, Mr. Margolin is also on the Las

11    Vegas group chat that's been offered into evidence and

12    published previously that he was in Las Vegas with

13    Mr. Shvartsman and Mr. Garelick at the time the government

14    alleges additional tips were made that resulted in insider

15    trades by other coconspirators.

16          THE COURT:  Mr. Brod, any response?

17          MR. BROD:  Judge, I mean, there's two layers of

18    hearsay here.  What we have here appears to be a note to self.

19    So I don't see how at that layer there's any exception,

20    certainly no coconspirator exception, unless Mr. Margolin is

21    conspiring with himself.

22          I'd also note that I believe that the rule is the

23    document itself cannot be used to establish the conspiracy.  In

24    other words, it has to be external evidence.

25          THE COURT:  That certainly is the rule for *Bourjaily*

O56Cgar1

1     for coconspirator statements.  I assume that also applies with

2     respect to the issue of agency.

3                 MR. BROD:  I think that's right, Judge.

4                 Judge, we would also just add, I think I made this

5     point, but this is a note to self.  I cannot understand how

6     it's in any way in furtherance of any conspiracy.

7                 THE COURT:  I'm going to sustain the objection to this

8     exhibit.

9                 Next exhibit.

10                MR. BROD:  The next exhibit is Government Exhibit 540.

11    And so, this is a long, long WhatsApp chain between Michael

12    Shvartsman and a friend of his, Aric Gastwirth, who was also in

13    Las Vegas at the time of the trip to Las Vegas.  Like many of

14    the WhatsApp chains in this case, it goes on for about a year

15    or two.  I've told Mr. Shahabian that we would be fine with the

16    inclusion of certain segments, including the segments that he

17    wants to display in Ms. Collins' charts.  That's the 10/19

18    messages about coming up to the hotel room and also general

19    congratulatory messages exchanged on the 21st and 22nd, I

20    believe.  Beyond that, we don't see the relevance.  We also

21    think that this is hugely prejudicial for reasons that I can go

22    into in a moment.

23                If you look at the second page, Judge --

24                First, Mr. Bianco, if you can scroll through the

25    entire exhibit so the Judge can see how long it is.

1           THE COURT:  You don't have to go through.  Just tell
2    me how many pages it is.
3           MR. BROD:  It's five pages and the messages go well
4    into 2022.
5           At the top of page 2, it's the, I believe, seventh
6    line down.  There's a message from Mr. Gastwirth on the 23rd.
7    It's in reference to a story about the Trump Social network.
8    It says, "Already legal issues."  Michael Shvartsman says,
9    "What else would you expect?"
10          I don't understand the materiality of that statement
11   and I think to the extent there is any relevance to
12   materiality, it's far outweighed by the prejudicial and
13   confusing nature.  There's just no context for this whatsoever.
14   It's people talking about something that's in the news.  We
15   don't think it should come in.
16          I can go onto the next issue.
17          THE COURT:  The next issue with respect to this?
18          MR. BROD:  To this exhibit.
19          THE COURT:  Okay.
20          MR. BROD:  I'm told there's been a rolling production
21   of new versions of exhibits, and Mr. Shahabian tells me they
22   have only a two-page version of this.  What I said about this
23   going into 2022 doesn't apply.
24          The next objection is on page 2.  If you look down at
25   the 1:57 p.m. message from Mr. Gastwirth to Mr. Shvartsman, and

O56Cgar1

1    then the messages immediately above that, it appears they are

2    planning to go out to the Las Vegas nightlife.  Mr. Gastwirth

3    is saying he's going to bring someone.  Further down, there's

4    discussion about, "Is anyone I know going to be there?  Got to

5    be a little careful."  This is all several days after the

6    trading in question in this case.  There's no indication

7    whatsoever that Mr. Garelick is involved.  We just think this

8    is highly prejudicial and unnecessary and shouldn't come in.

9            THE COURT:  What's prejudicial about the "someone"?

10           MR. BROD:  Mr. Shahabian assures me I have an

11   overactive imagination, but I believe, Judge, this is a

12   reference to an overactive indulgence in the Las Vegas

13   nightlife, and that's why Mr. Gastwirth is worried about having

14   people who he knows there.  That's why he puts "someone" in

15   inverted commas.

16           THE COURT:  Is there any other points with respect to

17   this document?

18           MR. BROD:  If you go down to the bottom of the page,

19   there's further, similar references that I don't need to put

20   into the record, I think, just a few lines up from the bottom.

21   We think this is all mostly irrelevant to the issues in this

22   trial.  Clearly, Mr. Gastwirth and Mr. Shvartsman are together

23   in Las Vegas, they see each other, it would appear based on

24   these messages, on the 19th, that's not in dispute.  This is

25   all extraneous, even though there's no indication whatsoever

1    that Mr. Garelick was involved in any of this, would tend to

2    prejudice him by association.

3            THE COURT:  Let me hear from Mr. Shahabian.  Do you

4    need any of that?

5            MR. SHAHABIAN:  So some of it is relevant, and I can

6    explain how, your Honor.  Some of it, for example, the last

7    reference there, the 11:28 p.m. text, we're happy to redact.

8    We don't need that particular statement.

9            The point of the relevance of this is twofold.  So,

10   first, the government is going to offer evidence that Aric

11   Gastwirth received information in Las Vegas on the 20th about

12   the impending merger and made about $1 million buying warrants.

13   I'm sorry.  The 19th he received that information and made

14   about $1 million in warrants that he purchased the next

15   morning.  I take Mr. Brod's point they don't dispute the

16   beginning of this chain that discusses him coming up to

17   Mr. Shvartsman's hotel room.

18           The continuing conversation also is relevant to that

19   fact because, first, there's conversation about them

20   congratulating each other on the 21st, which the government

21   would contend is in reference to the merger announcement news

22   and them making significant amounts of money.  It continues on

23   the 22nd.  They discuss how they're both idiot --

24           THE COURT:  Realize maybe how the defense has control

25   of this exhibit, but maybe the defense can point me to -- pull

O56Cgar1

1   up to the 22nd.

2           MR. SHAHABIAN:  If we go to the text messages starting

3   on the 21st at 9:40 a.m., "Jesus.  Congrats, man."  Michael

4   Shvartsman says, "Thanks, bro."  This is after the morning of

5   the merger announcement.  It continues on the 22nd, "Unreal.  I

6   guess I'm an idiot.  We both are amazing.  Who would have

7   thought."

8           Mr. Brod says no objection to this.

9           So then it continues through the discussion of, "Party

10  in Las Vegas."  For example, at October 21st, Michael

11  Shvartsman says, "Let's get together this weekend.  Want to go

12  off-roading with us on Saturday?"

13          It continues on the next page.  This is the reference

14  to the Trump news.  The government contends this is relevant to

15  showing they were discussing DWAC and Truth Social such that

16  there was a tip.

17          THE COURT:  Is there any problem redacting the already

18  legal issues and "What else would you expect?"

19          MR. SHAHABIAN:  No, there's no objection to redacting

20  that part.  That's fine.

21          The rest of the conversation about going out in

22  Las Vegas, "So we mentioned that we're going off-roading."

23  There's another message on October 23rd, 2021 from

24  Mr. Shvartsman, "Want to go dune buggying tomorrow?"

25          From additional chats, such as the Las Vegas group

O56Cgar1

1    chat, we know that the defendant and Mr. Shvartsman and others,

2    while in Las Vegas, engaged in activities like dune buggying.

3    The defendant has proffered a defense from the opening

4    statements that of course he didn't tip these guys, he barely

5    knows them, he lives in Rhode Island, he doesn't really spend

6    time with them.  The government is allowed to rebut that

7    suggestion by offering evidence that, in fact, the defendant

8    was in Las Vegas having a good time with his coconspirators and

9    other tippees.

10            THE COURT:  Are you going to offer evidence that the

11   defendant was dune buggying?

12            MR. SHAHABIAN:  Yes, your Honor.  We have a picture we

13   admitted into evidence, as well as there's chats between

14   Mr. Garelick and Eric Cornelius, one of the charged other

15   tippee where they call each other dune buggy partners.  Again,

16   this is all relevant evidence showing the relationships between

17   the defendant and his coconspirators, and rebuts the suggestion

18   the defense has offered that the defendant barely knows these

19   guys.

20            MR. BROD:  Judge, I should just say, I didn't mention

21   dune buggying.  We have no objection to the dune buggying.

22            THE COURT:  I think there was a picture admitted into

23   evidence that may have been from the dune buggying.

24            MR. BROD:  So stipulated, Judge.

25            THE COURT:  Mr. Brod, it strikes me that there are

O56Cgar1

portions of this that are relevant, and where the relevant

value outweighs any prejudicial impact.  It also strikes me

there are portions, including the part that says someone in

quotes, the part about it being potentially illegal, but not

referring to the trade, just referring to something undefined

with respect to Truth Social.  The portion that nobody has said

out loud, but that reflects portions of a woman's anatomy that

should be redacted.  Can't the parties work together to redact

the portions that are objectionable in this?  It strikes me

this is not a difficult one.

Mr. Shahabian.

MR. SHAHABIAN:  Yes, your Honor.

MR. BROD:  Judge, those are the portions we objected

to.  I think since Mr. Shahabian isn't planning to offer those

portions through this witness, we can certainly confer.

THE COURT:  You just won't publish any of the

objectionable portions that I've just highlighted.  You and

Mr. Brod can work on redactions and we can then, if there's a

dispute on the redactions, we can resolve them.

MR. BROD:  The last one, Judge, is government 744.  If

we can go to page, I think, 36.  Maybe 37.

So this is, again, a long text message chain between

Mr. Garelick -- it's actually at the bottom of the page.

Mr. Garelick and Eric Cornelius, again, it runs well into 2022.

We don't think it's -- generally speaking, we don't think it's

O56Cgar1

1     appropriate to admit such a long chain. Our most specific

2     objections are to two messages, this one and to the following

3     one from Mr. Garelick on the next page.

4         The objection here is under Rule 403. There's

5     absolutely no context for this. The truth is that

6     Mr. Cornelius had founders shares under many publicly filed

7     documents. It's clear the founder shares can't be unlocked for

8     six months after the merger. This is in April 2022, the

9     mergers still hadn't happened. There's nothing whatsoever

10    that's nonpublic about this. But the jury isn't going to

11    understand that, we understand it. The jury is going to be

12    confused or will take it as Mr. Garelick's propensity to

13    disclose things that he shouldn't. We simply shouldn't have to

14    knock down each of these as they come along, especially one

15    that is so, so immaterial.

16        THE COURT: Your concern is that the jury will think

17    that the still six-plus months away is inside information?

18        MR. BROD: The way the defense looks at it is this is

19    clearly a reference to, as a matter of fact, the founder shares

20    cannot be unlocked for six months after a merger, which, at

21    this point, was still on hold and Mr. Garelick is simply

22    telling him, this is at least six months off when you can

23    unlock your founders shares and trade them. Whatever minimal

24    probative value might be attached to this discussion I think is

25    far outweighed by the 403 concerns, which are confusion and

O56Cgar1

1    prejudice.

2              THE COURT:  Can you show me the text message

3    immediately before the "six months away."  Mr. Shahabian.

4              MR. SHAHABIAN:  The government doesn't intend to offer

5    this to argue that this was an additional tip of MNPI, but it

6    goes to showing the relationship between the defendant and one

7    of the charged tippees, Eric Cornelius, that they discuss DWAC

8    and the merger, as well as showing evidence of the defendant's

9    motive to trade in open market securities because the founder

10   shares were locked up.

11             THE COURT:  I think the latter, if it was only for the

12   latter point, I would exclude the evidence.

13             What's your point, Mr. Brod, with respect to the

14   relationship between the defendant and Mr. Cornelius?

15             MR. BROD:  There's already abundant evidence in the

16   record, which the government will certainly argue to the jury,

17   with regard to the relationship between these two parties.  As

18   I say, we don't have an objection to the balance of the chain,

19   which discusses at length just general business dealings.

20   There's going to be no dispute whatsoever that Mr. Cornelius is

21   a business partner of Michael Shvartsman's and Mr. Garelick is

22   often called upon to assist him in various tasks.  In fact, the

23   defense plans to introduce short message chains that show him

24   working with Mr. Cornelius, just general context of the

25   business relationship at the time in question.  This is much,

1    much later.  This is six months later.  I do think the Rule 403

2    concerns are very serious and substantial here.

3              THE COURT:  I'm going to overrule the objection.  I

4    think the document is relevant to show the relationship.  The

5    relationship between the defendant and the tippees is a central

6    issue at trial.  It's something that the defense opened on the

7    point that Mr. Garelick did not particularly have a

8    relationship with Mr. Shvartsman's contacts.  So it clearly is

9    relevant.  The prejudicial impact, if any, is extremely

10   attenuated.  I'm going to overrule the objection.

11             Let's bring the witness.

12             Mr. Bach.

13             MR. BACH:  Court's indulgence, personal break for

14   30 seconds.

15             THE COURT:  Okay.  I'm going to ask Mr. Brod and

16   Ms. Shapiro a question while you're out about who the other

17   defense witnesses are.  You have 30 seconds.

18             MR. BACH:  I better answer that question.

19             THE COURT:  They don't know?

20             MR. BACH:  Not as well as I do.  This is the one

21   thing, they can talk all about insider trading and *Blaszczak*, I

22   can tell you who our witnesses are.  Our witnesses are Fabien

23   Thayamballi, he's the summary witness.  Then Carl DeJounge and

24   Bill Kremer are character witnesses.  Then, assuming

25   Mr. Garelick elects to take the stand, him.

O56Cgar1

1          THE COURT:  You can step out.  Let's bring the witness

2     in.

3          MS. SHAPIRO:  Just to be clear, we knew the first and

4     last, it was the names of the character witnesses that we

5     forgot.

6          THE COURT:  I think that Mr. Bach could argue

7     *Blaszczak* and *Grossman*, but maybe not as well as Ms. Shapiro or

8     Mr. Brod.

9          MS. SHAPIRO:  We might have to read the cases first,

10    your Honor.

11         THE COURT:  Let's bring in the jury.

12         (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O56Cgar1

1          (Jury present)

2          THE COURT:  Counsel, you may continue in a moment.

3          Welcome back, members of the jury.  I hope you all had

4     a good weekend.

5          Counsel, you may continue.

6          MR. SHAHABIAN:  Thank you, your Honor.

7          Your Honor, before resuming the direct testimony, the

8     government offers the following list of exhibits:  Joint

9     exhibit 5, joint exhibit 6, Government Exhibit 407, Government

10    Exhibit 408, Government Exhibit 417, 441, 443B, 448, 540

11    subject to the redactions the parties will prepare, 726, 729,

12    731, 733, 744, and 853.

13         THE COURT:  Any objections previously made are

14    preserved.

15         Any additional objections?

16         MR. BROD:  No, Judge.

17         THE COURT:  Those are all received.

18         (Joint Trial Exhibits 5, 6received in evidence)

19         (Government's Exhibits 407, 408, 417, 441, 443B, 448,

20    540, 726, 729, 731, 733, 744, 853 received in evidence)

21         MR. SHAHABIAN:  At this time, the government would

22    like to read from the two joint exhibits the stipulations that

23    were just offered into evidence.

24         THE COURT:  You may do so.

25         MR. SHAHABIAN:  The first, members of the jury, joint

1    exhibit 5, is an agreement between the parties about

2    securities, between in or September 21, 2021 and in or about

3    October 2021, the securities of Digital World Acquisition

4    Corporation — DWAC — were securities of a company with a class

5    of securities registered under Section 12 of the Securities

6    Exchange Act of 1934.

7            The second stipulation, joint exhibit 6, is an

8    agreement between the parties about a director.  The parties

9    agree that a director of a public company owes a duty of trust

10   and confidence to the company and its shareholders.

11           You can take that down, Mr. Bianco.  Thank you.

12    KAYLA COLLINS, resumed.

13   DIRECT EXAMINATION CONTINUED

14   BY MR. SHAHABIAN:

15   Q.  Good morning, Ms. Collins.

16   A.  Good morning.

17   Q.  Welcome back.

18   A.  Thank you.

19   Q.  I'd like to pick up where we left off with certain exhibits

20   that you were asked to review prior to your testimony today.

21           MR. SHAHABIAN:  If we could publish, Mr. Bianco,

22   Government Exhibit 416.  If we could turn to page 2.  Highlight

23   just the first paragraph, Mr. Bianco, at the top.

24   Q.  Ms. Collins, do you remember on Friday discussing this

25   email where Patrick Orlando sends an email to Mr. Garelick

1   about, "We really like TMG, but there is absolutely no

2   guarantee we will close that deal or any other, and that we've

3   had no substantive discussions with respect to DWAC"?

4   A.  Yes.

5           MR. SHAHABIAN:  I'd like to now look at Mr. Garelick's

6   reply.  If we could turn to page 1, Mr. Bianco.  If we could

7   highlight the middle email on June 28th.

8   Q.  Who's this email from, Ms. Collins?

9   A.  Bruce G.

10  Q.  What does the defendant say in response to Patrick

11  Orlando's email?

12  A.  Patrick, for clarification purposes, your response

13  regarding the potential target I named in my prior email was my

14  own speculation regarding that potential target.  I did not

15  mean to infer in any way that a definitive target had been

16  engaged/contracted by you or your SPAC.  Best, Bruce.

17          MR. SHAHABIAN:  You can take that down, Mr. Bianco.

18          If we could now publish Government Exhibit 414.  If we

19  could highlight just the bottom email.

20  Q.  What's the date of this email, Ms. Collins?

21  A.  June 27th, 2021.

22  Q.  Who is it from?

23  A.  Bruce G.

24  Q.  What's the first sentence of the email?

25  A.  Patrick and Natalie, please add the following prospective

O56Cgar1                    Collins - Direct

1   investors from Rocket One Capital to the investor packet email

2   distribution list.

3   Q.  Do you see then there's a list of names in bullets, such as

4   Anton Postolnikov, Hartley Wasko, Gary Bayer, Eric Cornelius,

5   Gerald Shvartsman?

6   A.  Yes.

7           MR. SHAHABIAN:  If we could take this down,

8   Mr. Bianco.  If we could go back to Government Exhibit 414.  If

9   you could highlight the reply to this email.

10  Q.  Who's this from, Ms. Collins?

11  A.  Natalie Salume.

12  Q.  What is Ms. Salume's response to Bruce Garelick's email?

13  A.  Hi Bruce.  Of course, they'll have them within the hour.

14  Also, we'll be sending an NDA to those who have not received

15  one.

16          MR. SHAHABIAN:  We can take that down, Mr. Bianco.

17          If we could publish Government Exhibit 865.

18  Q.  Ms. Collins, what is Government Exhibit 865?

19  A.  These are a record of calls between Bruce Garelick and

20  Fidelity.

21  Q.  Were you asked to compare Government Exhibit 865 to the

22  underlying call recordings?

23  A.  Yes.

24  Q.  Were you also asked to compare those to a transcript of

25  those call recordings?

O56Cgar1                    Collins - Direct

1    A.   Yes.

2    Q.   Were those calls Government Exhibits 315 through 318?

3    A.   Yes.

4    Q.   Which of the calls on this chart are government exhibits

5    315 through 318?

6    A.   So the bottom row, the fourth row, dated September 30th,

7    2021, corresponds with Government Exhibit 315.  The third row,

8    dated October 2nd, is Government Exhibit 316.  The second row,

9    dated October 5th, is Government Exhibit 317.  The top row,

10   also dated October 5th, is Government Exhibit 318.

11            MR. SHAHABIAN:  I'd like to play some of these

12   government exhibits.

13            Members of the jury, you may remember we passed out a

14   recordings transcripts binder.  You can take that out.

15            THE COURT:  Members of the jury, as a reminder, the

16   transcripts are only being used as an aid to you, the jurors.

17   The evidence is what you hear on the recordings themselves.  To

18   the extent you hear something different on the recordings than

19   what you see on the transcript, it is what you hear on the

20   recordings is evidence and not what you see on the transcript.

21            MR. SHAHABIAN:  Thank you, your Honor.

22            Members of the jury, you can turn to the tab labeled

23   GX 315T.  It's about halfway through your binders.  The date on

24   the first page of the transcript is September 30th, 2021.

25            Mr. Bianco, if we could publish the first three

1   minutes of this recording.

2            Members of the jury, the transcript is going to start,

3   if you turn the page, the top says page 1.

4            (Audio played)

5            We can stop there, Mr. Bianco.  Thank you.

6            If we could now publish Government Exhibit 316.

7            Members of the jury, you can turn in the next tab of

8   your transcript binder, that's GX 316T, and the first page has

9   a date in the middle of October 2nd, 2021.  When we start

10  playing the recording, the transcript will pick up on page 1,

11  which is the next page after that cover sheet.

12           Mr. Bianco, if we could play this through a minute

13  forty-five.

14           (Audio played)

15           You can stop that, Mr. Bianco.

16           Members of the jury, you can now turn to the next tab,

17  which is GX 317T.  The first page of 317T should say, date,

18  October 5th, 2021.  Participants, Bruce Garelick and Andrew

19  Hall.  When we play the recording, it will start on page 1,

20  which is on the next page.

21           Mr. Bianco, we can play Government Exhibit 317 through

22  a minute thirty.

23           (Audio played)

24           Members of the jury, you can turn to the last tab in

25  this binder.  It's GX 318T.  The date of this recording is also

1    October 5th, 2021, but the participants are now Bruce Garelick

2    and William Mudd.  That's on the first page of GX 318T.  The

3    recording, when we publish it, will pick up on the first page

4    on the next page.  I think you've got it by now.

5              Mr. Bianco, could we publish Government Exhibit 318.

6    You can play this call through the two-minute mark.

7              (Audio played)

8              Members of the jury, you can put your recording

9    transcript binders away.  Thank you.

10             Mr. Bianco, could we publish Government Exhibit 871.

11   Q.  Ms. Collins, were you asked to review portions of

12   Government Exhibit 871?

13   A.  Yes.

14   Q.  What is this?

15   A.  Garelick Capital Partners LP Compliance Manual.

16   Q.  What's the date of this Garelick Capital Partners

17   Compliance Manual?

18   A.  May 1st, 2013.

19             MR. SHAHABIAN:  If we could turn to page 6,

20   Mr. Bianco.  If we could highlight, halfway down, heading C

21   through the first paragraph.

22   Q.  Ms. Collins, could you read paragraph C of the Garelick

23   Capital Partners Compliance Manual.

24   A.  C.  Material inside information.  All employees are

25   reminded that purchasing or selling securities on the basis of,

1    or while in possession of, material nonpublic information for

2    their own, for a client's, or for the company's account is a

3    crime punishable by imprisonment as well as large fines.

4    Tipping another person who engages in such activities is also a

5    crime.  The term "material" is described below.

6             MR. SHAHABIAN:  If we could turn, Mr. Bianco, to page

7    8 of this manual.  If we could highlight paragraph 4.

8    Q.  Could you read, Ms. Collins, just the heading of paragraph

9    4 and the first sentence.

10   A.  4.  Are there certain kinds of information that are

11   particularly likely to be material inside information?  Yes.

12   While the following list is by no means complete, information

13   about the following subjects is particularly sensitive.

14   Q.  If you could read paragraph D, starting "corporate

15   acquisitions."

16   A.  Corporate acquisitions, tender offers, major joint ventures

17   or merger proposals.

18   Q.  And paragraph E.

19   A.  Significant negotiations, new contracts, or changes in

20   significant business relationships.

21            MR. SHAHABIAN:  We can take this down, Mr. Bianco.

22   Q.  Ms. Collins, I'd like to turn now to the summary charts you

23   mentioned on Friday in connection with your work on this case.

24   Are those Government Exhibits 960 through 967?

25   A.  Yes.

1    Q.  Did you create all of those summary charts?

2    A.  No, I created some of those and others I reviewed and

3    edited as necessary.

4    Q.  Did you review all of Government Exhibits 960 through 967?

5    A.  Yes.

6    Q.  What sources of information did you use to either create or

7    review those charts?

8    A.  A number of government exhibits.

9    Q.  Did those include emails?

10   A.  Yes.

11   Q.  Phone records?

12   A.  Yes.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O561GAR2                    Collins - Direct

1    BY MS. SHAPIRO:

2    Q.   Text messages?

3    A.   Yes.

4    Q.   Corporate documents?

5    A.   Yes.

6    Q.   Were you asked to look at items aside from Government

7    Exhibits to compare the accuracy of the information?

8    A.   Yes.

9    Q.   Who gave you the information you used to create or review

10   the charts?

11   A.   The government.

12   Q.   Do the charts in Government Exhibits 960-967 accurately

13   reflect the charts that you created or reviewed in this case?

14   A.   Yes.

15   Q.   And does each chart list the exhibits you consulted to

16   either create or review the chart?

17   A.   Yes.

18   Q.   Does each chart accurately reflect the underlying

19   information drawn from the exhibits cited in the chart?

20   A.   Yes.

21        MS. SHAPIRO:   Government offers Government

22   Exhibits 960-967.

23        THE COURT:   Those are received and the defense

24   objection is preserved.

25        (Government's Exhibits 960-967 received in evidence)

1    MS. SHAPIRO:  Mr. Bianco, if we could publish

2  Government Exhibit 960.

3  BY MR. SHAHABIAN:

4  Q.  Ms. Collins, what is the first page of Government

5  Exhibit 960?

6  A.  This is the beginning of a timeline.  This particular page

7  displays three events that occurred on September 2, 2021.

8  Q.  What three events are depicted?

9  A.  There is a phone call, a message, and an email.

10  Q.  Let's start with the phone call.  Where is that on this

11  page?

12  A.  On the top left.

13  Q.  Who is it between?

14  A.  Bruce Garelick and Michael Shvartsman.

15  Q.  How long was the call?

16  A.  Five minutes, 14 seconds.

17  Q.  And at what time?

18  A.  At 9:03 a.m.

19  Q.  Do you see where it says EST next to 9:03 a.m. in that box?

20  A.  Yes.

21  Q.  What does that mean?

22  A.  Eastern Standard Time.

23  Q.  Did you convert times in this chart from different time

24  zones into either Eastern time or local time, where

25  appropriate?

1    A.  Yes.

2    Q.  And what does telephone icon next to the time indicate on

3    these charts?

4    A.  It's just an icon that I used to represent phone calls

5    where they occurred.

6    Q.  What's the second event on this timeline?

7    A.  The second event on the bottom is a message from Bruce

8    Garelick to Michael Shvartsman, which reads, "I spoke to

9    Patrick Orlando.  Not urgent.  We can catch up later."  At

10   9:18 a.m.

11   Q.  What does it mean that this event is depicted with a green

12   bubble?

13   A.  It symbolizes a message, and the green bubble with the

14   little arrow on the top is just how it appears in the

15   underlying Government Exhibit.

16   Q.  By message, you mean like a text message or WhatsApp

17   message?

18   A.  Yes.

19   Q.  What's the third event depicted on this chart?

20   A.  The third event in the top right is an email at 9:29 a.m.

21   from Bruce Garelick to Patrick Orlando, which reads, "Great to

22   catch up with you this morning."

23   Q.  What does the envelope symbol in the box mean?

24   A.  It's an icon to represent an email.

25   Q.  And do you see how the end of the email body you have here

1    ends with four dots——an ellipsis and a period?

2    A.   Yes.

3    Q.   What does that mean?

4    A.   I used an ellipsis to represent when there was more to a

5    message that's not included in the chart.  So in this case,

6    after "Great to catch up with you this morning," there is

7    additional text in the original email.

8    Q.   Do the three items on this chart represent everything that

9    happened in all of the Government Exhibits on these times and

10   this date?

11   A.   No.

12   Q.   Did you select which events to include and which events not

13   to include?

14   A.   No.

15   Q.   Who asked you to include certain events and not include

16   others?

17   A.   The government.

18   Q.   Do you know why certain events were included and others

19   were not?

20   A.   No.

21   Q.   Now that we've oriented how the timeline works, I'd like to

22   keep going.

23         MS. SHAPIRO:  If we could turn to the next page,

24   Mr. Bianco.

25   Q.   What's depicted on this page, Ms. Collins?

1    A.   This is a continuation of the same timeline, with

2    additional events that occurred on September 2nd.

3    Q.   What's the first event on the left?

4    A.   First event is a phone call between Bruce Garelick and

5    Michael Shvartsman for three minutes, nine seconds, at

6    9:34 a.m.

7    Q.   What's the second event?

8    A.   The second event is an email from Bruce Garelick to Anton

9    Postolnikov at 9:34 a.m., which reads, "The DWAC SPAC is

10   pricing the IPO tonight.  Should start trading tomorrow.

11   Please let me know if you want to discuss.  Note:  It will

12   trade as a unit for likely the first 50 days—unit meaning the

13   combined common share and half warrant.  Thus, you can simply

14   buy through your broker on the open market rather than putting

15   in an order via the IPO underwriter.  Most SPACs trade slightly

16   below the $10 IPO price initially.  So it might make sense to."

17   Q.   And the time of that email, 9:34:11 a.m., is that about the

18   same time as the phone call on the left at 9:34 a.m.?

19   A.   Yes.

20   Q.   And what's the third event depicted on this chart?

21   A.   The third event on the right is another phone call between

22   Bruce Garelick and Michael Shvartsman for two minutes, 48

23   seconds at 2:43 p.m.

24          MS. SHAPIRO:  If we could turn to the next page,

25   Mr. Bianco.

O561GAR2                        Collins - Direct

1   Q.  What's depicted on page 3, Ms. Collins?

2   A.  This is, again, a continuation of the timeline with another

3   event that occurred on September 2nd.

4   Q.  What event is depicted on page 3?

5   A.  Garelick signs Form 3 disclosing 7,500 DWACU granted to

6   him.

7   Q.  Is there a time stamp associated with this event on this

8   slide?

9   A.  No.

10  Q.  Why not?

11  A.  I did not review any material that provided a time for this

12  event so I did not include one in the chart.

13          MS. SHAPIRO:  Mr. Bianco, if we could zoom in on the

14  bottom right where the red boxes are.

15  Q.  Were those red boxes from the underlying exhibit,

16  Ms. Collins, or were those added to this summary chart?

17  A.  Those were added by me.

18  Q.  What does the 7500 box that's in red show?

19  A.  The amount or number of shares.

20  Q.  And what about the box Bruce J. Garelick at the bottom?

21  A.  That is a Docusignature from Bruce J. Garelick on

22  September 2, 2021.

23          MS. SHAPIRO:  We can zoom back out, Mr. Bianco.

24          If we turn to the next page, Mr. Bianco.

25  Q.  What's depicted on this slide, Ms. Collins?

O561GAR2                    Collins - Direct

1    A.   This is still a continuation of the timeline, but these

2    events occurred on September 3rd.

3    Q.   Is that the next day from the dates we were just looking

4    at?

5    A.   Yes.

6    Q.   What's the first event depicted on September 3rd?

7    A.   So the first event in the bottom is an email at 8:30 a.m.

8    in which Ben Reed confirms that Rocket One received 14,500

9    DWACU shares and Bruce Garelick is cc'd.

10   Q.   And what's the second event?

11   A.   The second event at the top, Bruce Garelick buys 610 DWAC

12   units at 12:16 p.m.

13            MS. SHAPIRO:   Mr. Bianco, if we could publish

14   Government Exhibit 961.

15   Q.   Ms. Collins, the end of Government Exhibit 960 said

16   September 3, 2021; is that right?

17   A.   Yes.

18   Q.   And what's the first date on September—on Government

19   Exhibit 961?

20   A.   September 7th to the 8th, 2021.

21   Q.   Do the different Government Exhibit numbers reflect

22   different portions of the chronology in the timelines you

23   prepared?

24   A.   Yes.

25   Q.   Does it include every single day from September 2nd through

1    October 20th, 2021?

2    A.   No.

3    Q.   Who asked you to include certain days and omit other days?

4    A.   The government.

5    Q.   Do you know why certain days were included and others were

6    omitted?

7    A.   No.

8    Q.   Okay.  So now that we're looking at the second timeline

9    chart that starts September 7th, what's depicted on this slide?

10   A.   So this is the start of a new timeline with an event that

11   occurred on September 8th——7th to 8th, which is APLC

12   Investments, LLC, buys 55,000 DWAC units.

13   Q.   Do you know what APLC Investments, LLC is?

14   A.   No.

15   Q.   Do you know who Anton Postolnikov is?

16   A.   No.

17          MS. SHAPIRO:  If we can turn to the next page,

18   Mr. Bianco.

19   Q.   What's depicted on this slide, Ms. Collins?

20   A.   Again, a continuation of the timeline.  These events

21   occurred on September 8th and 9th.

22   Q.   What is the first event depicted?

23   A.   The first event on the left is an email sent on

24   September 8th from Eric Hannelius to Bruce Garelick.  "Hi,

25   Bruce.  FYI, what are next steps?"

1    Q.  And what's the second event depicted?

2    A.  On the right, on September 9th, another email, this time

3    from Bruce Garelick to Eric Hannelius, which reads, "The stock

4    will likely trade within 30 cents of a $10 handle until they

5    announce the target.  That announcement, expected 6-10 weeks

6    from now, is our expected catalyst to then profitably sell the

7    IPO shares.  If they don't announce a target we like/expect, we

8    have the right to demand our $10 back, which we will do under

9    this scenario.  We plan to buy another 255 of this stock in the

10   open market over the next four weeks."

11   Q.  These two events, Ms. Collins, is that from that very long

12   and messy email chain we reviewed last Friday?

13   A.  Yes.

14   Q.  That's Government Exhibit 465?

15   A.  Yes.

16          MR. SHAHABIAN:  If we could turn to the next page,

17   Mr. Bianco.

18   Q.  What's depicted on this slide, Ms. Collins?

19   A.  This is a continuation of the timeline.  These events

20   occurred from September 10th through the 13th.

21   Q.  What's the first event depicted?

22   A.  The first event on the 10th at 12:11 p.m., Bruce Garelick

23   buys 300 DWAC units.

24   Q.  And what's the second event?

25   A.  The second event on the bottom right is a calendar entry,

O561GAR2                    Collins - Direct

 1   Bruce Garelick and Eric Hannelius in Miami from the 11th at

 2   8 p.m. to the 13th at 7:59 p.m.

 3            MR. SHAHABIAN:  If we could turn to the next page,

 4   Mr. Bianco.

 5            If we could turn to the next page, Mr. Bianco.

 6   Q.   What's depicted here, Ms. Collins?

 7   A.   This is, again, a continuation of the timeline.  This event

 8   occurred on September 13th.

 9   Q.   What event is depicted on September 13th?

10   A.   Hannelius account buys 500 DWAC units.

11            MS. SHAPIRO:  You can take this down, Mr. Bianco.

12   Q.   So the last date was September 13th, Ms. Collins?

13   A.   Yes.

14            MR. SHAHABIAN:  If we could now turn to Government

15   Exhibit 962, Mr. Bianco.

16   Q.   What's depicted on the first page of Government

17   Exhibit 962?

18   A.   This is another timeline with events that occurred from

19   September 16th through the 19th, 2021.

20   Q.   So we're picking up three days after the end of the last

21   chart?

22   A.   Yes.

23   Q.   What's the first event depicted?

24   A.   The first event in the top left is an email from the 16th

25   from Patrick Orlando to Bruce Garelick.  "We are calling a

O561GAR2                    Collins - Direct

1    meeting of the board of directors for next Tuesday,

2    September 21st, at 12:30 p.m."

3    Q.  What's the next event depicted?

4    A.  The next event at the bottom on the 17th, Bruce Garelick

5    buys 410 DWAC units.

6    Q.  And what's the last event?

7    A.  The last event on the top right, an email from the 19th,

8    Patrick Orlando reminds Bruce Garelick about board of directors

9    meeting.

10              MR. SHAHABIAN:  If we turn to the next page,

11   Mr. Bianco.

12   Q.  What's depicted on the next page, on September 20th?

13   A.  So this is a continuation of the timeline with two events

14   from the 20th, the first on the top left, at 3:41 p.m., Bruce

15   Garelick buys 900 DWAC units.

16   Q.  And what's the next event?

17   A.  The bottom right, an email at 5:41 p.m., from Bruce

18   Garelick to Patrick Orlando.  "I can attend the BOD meeting

19   tomorrow."

20   Q.  What time was that email sent?

21   A.  5:41 p.m.

22              MR. SHAHABIAN:  If we go to the next page, Mr. Bianco.

23   Q.  What's the first event depicted on this slide, Ms. Collins?

24   A.  On the left, at 5:52 p.m., this is a message from Bruce

25   Garelick to Michael Shvartsman.  "FYI——" oop.  Sorry.

1    Q.  How soon after the Patrick—the email Mr. Garelick sent to

2    Mr. Orlando is this text message?

3    A.  About ten minutes.

4    Q.  And what's the body of the text message?

5    A.  "FYI, I have a DWAC BOD meeting tomorrow at 12:30.  I

6    recommend starting to buy more DWACU stock.  Recall we only own

7    $145,000 with the $400,000 target position size.  Your RBC/E.F.

8    Hutton account was funded with $400,000.  You can buy more by

9    calling Ben Reed, E.F. Hutton, 607-761-0331."

10   Q.  What's the next event depicted on this slide?

11   A.  The next event is an email at 10:16 p.m. in which Patrick

12   Orlando sends a presentation to the board of directors.

13   Q.  What are the two pages behind the email on this chart?

14   A.  Those are two pages from the attachment to that email.

15        MR. SHAHABIAN:  And Mr. Bianco, if we could zoom in on

16   the top of the first page.

17   Q.  What's the target name in the attachment to this email?

18   A.  Trump Media Group, TMG.

19   Q.  And the target code name?

20   A.  Project USA 47.

21        MR. SHAHABIAN:  We can zoom back out, Mr. Bianco.

22   Q.  And what's the date on this chart, Ms. Collins?

23   A.  September 20th.

24        MR. SHAHABIAN:  If we could turn to the next page,

25   Mr. Bianco, on September 21st.

O561GAR2                    Collins - Direct

1    Q.   What event is depicted on this slide?

2    A.   Bruce Garelick buys 1,800 DWAC units.

3          MR. SHAHABIAN:  Mr. Bianco, if we could publish

4    Government Exhibit 963.

5    Q.   What's depicted on this chart, Ms. Collins?

6    A.   This is another timeline.  This page displays events that

7    occurred on September 21, 2021.

8    Q.   The first event, Bruce Garelick buys 1800 DWAC units, is

9    that the same event as the last slide we just looked at on

10   Government Exhibit 962?

11   A.   Yes.

12   Q.   It's just a duplication.

13   A.   Yes, exactly.

14   Q.   Are the two events what follows in the chronology?

15   A.   Yes, correct.

16   Q.   So let's pick up after Bruce Garelick buys 1800 units.

17   What's the next event depicted?

18   A.   The next event, at the bottom, at 12:30 p.m., is the board

19   of directors meeting.

20   Q.   And how soon is the board of directors meeting after the

21   defendant purchased 1800 DWAC units?

22   A.   About four minutes.

23   Q.   What's the third event on this slide?

24   A.   On the top right, this is a message from Patrick Orlando to

25   DWAC Officers/Directors Group at 9:36 p.m.  "Hi, everyone.

1    After a the board meeting this morning, we rolled with the

2    marching orders, had fruitful advances with some of our top

3    prospects——Atlas, TMG, Global Oculus, and HMI."

4              MR. SHAHABIAN:  If we could turn to the next page,

5    Mr. Bianco.

6    Q.  What's depicted on this slide, Ms. Collins?

7    A.  These are events from September 22nd.

8    Q.  Is that the next day after the board meeting?

9    A.  Yes.

10   Q.  What's depicted on the left side of this chart?

11   A.  On the left side there are two messages.  So the first one

12   at 3:39 p.m., from Patrick Orlando to DWAC Officers/Directors

13   Group.  "TMG.  We had a great meeting and I have a follow-up

14   session very soon.  Mutual exclusivity is very common, and they

15   are pushing hard for that."

16             The next message from Bruce Garelick to DWAC

17   Officers/Directors Group at 3:51 p.m., I am enthusiastically in

18   favor to advance with TMG under the stated terms."

19   Q.  What does the box underneath the defendant's message to

20   enthusiastically advance with TMG, "Board of directors approves

21   with a thumbs up," what does that mean?

22   A.  That indicates that other members of the group also

23   responded expressing support to advance with TMG.

24   Q.  What's depicted on the right side of this chart?

25   A.  DWAC and TMG sign letter of intent.

1          MS. SHAPIRO:  If we could turn to the next page,

2     Mr. Bianco.

3     Q.  What's depicted on this chart, Ms. Collins?

4     A.  It's a continuation of the timeline with events from

5     September 23rd, so the next day.

6     Q.  This is the day after the chart we just looked at with the

7     signing of the letter of intent?

8     A.  Yes.

9     Q.  I want to go out of order for a second.  What does the box

10    at the bottom of September 23rd show?

11    A.  Bruce Garelick buys 1,300 DWAC units at 12:04 p.m.

12    Q.  That's on September 23rd?

13    A.  Yes.

14    Q.  Okay.  Let's go back in order.  What's the first event

15    depicted on September 23rd?

16    A.  The first event in the top left is a phone call between

17    Bruce Garelick and Michael Shvartsman for approximately one

18    hour, 12 minutes, begins at 8:49 a.m.

19    Q.  What's the second call?

20    A.  The second call in the top middle is a conference call

21    between Bruce Garelick, Michael Shvartsman, and Eric Hannelius

22    for approximately six minutes and 36 seconds at 10:31 a.m.

23    Q.  And now going in the chronological order, what's the third

24    event depicted on this chart?

25    A.  Third event at the bottom is, Bruce Garelick buys 1,300

1    DWAC units at 12:04 p.m.

2    Q.  And what's the fourth event?

3    A.  The fourth event in the top right is another phone call

4    between Bruce Garelick and Michael Shvartsman for 21 minutes,

5    16 seconds, at 5:16 p.m.

6         MS. SHAPIRO:  Mr. Bianco, if we could now publish

7    Government Exhibit 964.  Or, I'm sorry.  I skipped 963.  If we

8    could publish Exhibit 96——no, I'm confusing myself.  We just

9    did 963.  We're going to go to 964.  Thank you, Mr. Bianco.

10   Q.  What's depicted on the first page of Government

11   Exhibit 964, Ms. Collins?

12   A.  This is another timeline with events that occurred on

13   September 29th.

14   Q.  That's six days after the end of the last chart we just

15   looked at?

16   A.  Yes.

17   Q.  What's the first event depicted?

18   A.  The first event in the top left at 7:37 a.m. is a message

19   from Patrick Orlando to DWAC Officers/Directors Group.  "We

20   have a few updates and due diligence is kicking into high gear.

21   TMG wants to close on October 14th."

22   Q.  What's the second event?

23   A.  The second event at the bottom, at 11:05 a.m., Bruce

24   Garelick granted access to TMG data room.

25   Q.  What's the third event?

O561GAR2                    Collins - Direct

1    A.  On the top right, at—or from 12:20 p.m. to 1:17 p.m., two

2    phone calls between Bruce Garelick and Michael Shvartsman for a

3    total of eight minutes, 15 seconds.

4            MS. SHAPIRO:  If we could turn to the next page,

5    Mr. Bianco.

6    Q.  What's depicted on this slide, Ms. Collins?

7    A.  A continuation of the timeline with events from

8    September 30th.

9    Q.  Have we gone forward one day?

10   A.  Yes.

11   Q.  What's the first event depicted?

12   A.  The first event on the left at the top, there are some

13   meeting minutes titled DWAC TMG Day in Atlanta Meeting Minutes.

14   There is a message at 11:05 a.m. from Patrick Orlando to DWAC

15   Officers/Directors group.  "Today, we are at the TMG

16   headquarters in Atlanta and would like to see if anyone can

17   join by Zoom.  Here is the agenda."  And to the right

18   thereafter is the image that followed.

19   Q.  When you say "image that followed," do you mean the image

20   that Patrick Orlando sent to the DWAC Officers/Directors Group

21   WhatsApp?

22   A.  Yes.

23   Q.  What does it appear to be?

24   A.  Appears to be the event agenda.

25   Q.  And what's the next event depicted on this chart?

1   A.  The next event to the right at 5:23 p.m., phone call

2   between Bruce Garelick and Michael Shvartsman for six minutes,

3   40 seconds.

4   Q.  And I just want to focus on the time stamp for this call.

5   When does this call between Bruce Garelick and Michael

6   Shvartsman end?

7   A.  At 5:30 p.m.

8          MR. SHAHABIAN:  If we could turn to the next page,

9   Mr. Bianco.

10  Q.  Before we get into the content, what is the time stamp on

11  the first text message between Bruce Garelick and Michael

12  Shvartsman on this page?

13  A.  5:40 p.m.

14  Q.  How soon after that phone call is this text message?

15  A.  Ten minutes.

16  Q.  What's depicted on this slide?

17  A.  These are additional events from September 30th.

18  Q.  What's on the left of the slide?

19  A.  The left are three text messages from Bruce Garelick to

20  Michael Shvartsman at 5:40 p.m.  "Mike, Note:  DWACW (warrants)

21  started trading today.  Traded just below 50 cents on volume of

22  116K."

23          The second message at 5:41 p.m., "That means there was

24  only approximately $60,000 of volume today.  Volume should pick

25  up as DWACU holders disaggregate 30 minutes."

1          And the last message at 5:44 p.m.  "Ben Reed at R.F.

2     [sic] Hutton, 617-761-0331 [sic], is your contact to trade.

3     Recall you have $255,000 cash in that account, plus $145,000

4     worth of DWACU."

5     Q.  What's the next event depicted on this slide?

6     A.  The next event on the right, Bruce Garelick calls Fidelity,

7     at 5:47 p.m.

8     Q.  How soon is that call after the text message from Bruce

9     Garelick to Michael Shvartsman telling him that Ben Reed is his

10    contact to trade?

11    A.  It's about three minutes later.

12    Q.  Are those—is that call one of the calls we listened to

13    earlier today?

14    A.  Yes.

15    Q.  Is this the full call or just an excerpt of the call?

16    A.  This is just an excerpt of that call.

17          MR. SHAHABIAN:  Could we publish that excerpt,

18    Mr. Bianco.

19          (Audio played)

20    Q.  What's the last event depicted on this slide, Ms. Collins?

21    A.  The last event at the bottom right is another text message

22    from Bruce Garelick to Michael Shvartsman at 6:06 p.m., which

23    reads, "Call you back in little bit.  On the line with Fidelity

24    getting them to disaggregate my DWACU."

25          MS. SHAPIRO:  Turn to the next page, Mr. Bianco.

1  Q.  What's depicted on this slide, Ms. Collins?

2  A.  This is again a continuation of the timeline, this time

3  with events from October 1st.

4  Q.  Is that the next day?

5  A.  Yes.

6  Q.  What's the first event on this slide?

7  A.  On the left at 6:49 a.m. is a WhatsApp message from Patrick

8  Orlando to DWAC Officers/Directors Group.  "We saw three fully

9  presentations and the video in the data room is a must watch.

10  We specifically meet with the key vendors/service providers for

11  TMG and were quite pleased.  What we observed to be a

12  well-thought-out and very complete portfolio of solutions."

13  Q.  What's the next event depicted on this timeline?

14  A.  The next event on the right at the top is an email from

15  Michael Shvartsman to Ben Reed and Bruce G at 9:37 a.m., which

16  reads, "Ben, can you please call me on 786-350-9353.  Thanks,

17  Michael."

18  Q.  What's depicted below the email from Michael Shvartsman to

19  Ben Reed on October 1st?

20  A.  Rocket One Capital buys 227,915 DWAC warrants.

21  Q.  Is there a time stamp associated with that purchase on

22  October 1st?

23  A.  No, there's not.

24  Q.  What's below that entry?

25  A.  It's an excerpt from notes, which reads, "Wants me to buy

1    him 2 million DWACW less than 50 cents, don't run it up, over

2    the course of the next few weeks."

3              MS. SHAPIRO:  If we could turn to the next page,

4    Mr. Bianco.

5    Q.  What's depicted on this slide, Ms. Collins?

6    A.  These are additional events from October 1st.

7    Q.  It's the same day as the "wants me to buy him 2 million

8    warrants" in the initial purchase?

9    A.  Yes.

10   Q.  What's the first event depicted here?

11   A.  The first event is a message at 10:53 a.m. from Bruce

12   Garelick to Michael Shvartsman, and it's an image.

13   Q.  What's the image?

14   A.  The image appears to be a screenshot or a picture depicting

15   the price of DWAC warrants.

16   Q.  What's the next event depicted?

17   A.  The next event in the middle at——or from 12:08 p.m. to

18   12:11 p.m., two phone calls between Bruce Garelick and Michael

19   Shvartsman for a total of three minutes.

20   Q.  And what's the next event?

21   A.  On the right at 2:05 p.m., from Bruce Garelick to the DWAC

22   Officers/Directors Group, "Hey, guys, nice work this week.

23   Apologies I've been out of the loop past couple days.  Got

24   buried with my day job.  Will catch back up this weekend."

25             MR. SHAHABIAN:  You can turn to the next page,

1    Mr. Bianco.

2    Q.  What's depicted on this slide, Ms. Collins?

3    A.  This is an event that occurred on October 2nd, and it's

4    another call between Bruce Garelick and Fidelity.

5    Q.  This is the next day after the 2 million warrant slides we

6    were just looking at?

7    A.  Yes.

8    Q.  Is this one of the Fidelity calls we were just listening to

9    today?

10   A.  Yes.

11   Q.  Is this the full call or just an excerpt?

12   A.  Just an excerpt again.

13            MR. SHAHABIAN:  If we could play this, Mr. Bianco.

14            I think there's no audio here, so we can just keep

15   going.

16            If we can go to the last page.

17   Q.  What's depicted here?

18   A.  This——this is a continuation of the timeline with an event

19   from October 4th to the 5th.

20   Q.  What's depicted?

21   A.  Rocket One Capital buys over 1.7 million DWAC warrants.

22   Q.  It says over 1.7 million warrants.  If you——I hate to ask

23   you to do math on the fly.  Does it look like a little under

24   1.7 million warrants?

25   A.  Yes, it does.

O561GAR2                    Collins - Direct

1    Q.  Or wait.  Actually, I can't do math.  That is over

2    1.7 million warrants.  I apologize.

3    A.  Oh.  Yes, over 1.7.

4            MS. SHAPIRO:  You can take this down, Mr. Bianco.

5            If we could publish Government Exhibit 965.

6    Q.  What's the date on this timeline, Ms. Collins?

7    A.  October 1-2, 2021.

8    Q.  Have we gone back a few days in time from the last slide we

9    were just looking at?

10   A.  Yes.

11   Q.  Do you know why you were asked to go back a few days for

12   Government Exhibit 965?

13   A.  No.

14   Q.  What events are depicted on Government Exhibit 965, the

15   first page?

16   A.  On the first page in the top left, on October 1st, is a

17   WhatsApp message from Patrick Orlando to DWAC

18   Officers/Directors Group.  "Bruce says if you have any

19   media-related DD questions from previous deals, happy to see

20   them.  Generally we are in good shape, but I am beating up all

21   aspect to make sure we are rock solid."

22   Q.  What's the second event?

23   A.  In the bottom right, on the 2nd, another message from

24   Patrick Orlando to DWAC Officers/Directors Group.  "DD list

25   review with TMG on Monday, 4 to 5 p.m. Eastern."

1          MS. SHAPIRO:  If we go to the next page, Mr. Bianco.

2    Q.   What's depicted on this slide, Ms. Collins?

3    A.   This is a continuation of the timeline with events from

4    October 3rd.

5    Q.   Is that the next day from the text message we were just

6    looking at?

7    A.   Yes.

8    Q.   What's the first event depicted?

9    A.   The first event on the left is an email at 6:03 a.m. from

10   Eric Hannelius to Bruce Garelick.  "Hi, Bruce, want to follow

11   your lead here.  I've been buying some DWACUs since seeing you

12   in Miami via my brokerage account.  Should I keep buying?

13   What's your thoughts?  Again, want to follow your lead here.

14   Any updates on timing and next steps from Patrick Orlando?"

15   Q.   What's the second event depicted?

16   A.   On the right at 9:44 a.m., this is another email from Bruce

17   Garelick to Eric Hannelius.  "Hi, Eric, free to discuss this

18   today, or tomorrow morning?"

19          MS. SHAPIRO:  If we could go to the next slide,

20   Mr. Bianco.

21   Q.   Is this the next day, Ms. Collins?

22   A.   Yes.

23   Q.   What's depicted on this slide?

24   A.   These are events from October 4th.

25   Q.   What's the first event depicted?

1    A.   The first event in the top left, phone call between Bruce

2    Garelick and Eric Hannelius for 28 minutes, 38 seconds at

3    11 a.m.

4    Q.   What's the next event?

5    A.   The next event at 12 p.m., two phone calls between Bruce

6    Garelick and Michael Shvartsman for total of two minutes, 50

7    seconds.

8    Q.   And what's the next event at the bottom of the slide?

9    A.   At 12:13 p.m., Bruce Garelick accesses TMG data room.

10   Q.   What's the next event?

11   A.   Next event, at the top again, at 12:47 p.m., two phone

12   calls between Bruce Garelick and Michael Shvartsman for a total

13   of nine minutes, 43 seconds.

14   Q.   And the event that follows?

15   A.   At 3:11 p.m., two phone calls between Michael Shvartsman

16   and Eric Hannelius for a total of five minutes, 53 seconds.

17   Q.   I just want to stop here on some of these two phone calls.

18   Where you grouped multiple phone calls into a single event,

19   were some of those calls very short duration, 30 seconds or

20   less?

21   A.   Yes.

22   Q.   Did you include those in the total times and number of

23   calls?

24   A.   Yes, I did.

25   Q.   Do you know if those calls went to voicemail or were picked

O561GAR2                      Collins - Direct

1   up?

2   A.   No.  I didn't review the contents of any of the calls.

3   Q.   Were you asked to include even those short calls in your

4   charts?

5   A.   Yes.

6   Q.   What's the last event depicted on this slide?

7   A.   On the bottom right at 7:03 p.m., a WhatsApp message from

8   Patrick Orlando to DWAC Officers/Directors Group.  "TMG due

9   diligence call moved from 4 p.m. to 4:45 to 5 p.m."

10           MR. SHAHABIAN:  If we turn to the next page,

11   Mr. Bianco.

12   Q.   Is this the next day, Ms. Collins, October 5th?

13   A.   Yes.

14   Q.   What's the first event depicted?

15   A.   The first event in the bottom left at 1:11 p.m., two phone

16   calls between Bruce Garelick and Michael Shvartsman for a total

17   of 15 minutes, five seconds.

18   Q.   What's the second event?

19   A.   The second event at the top, 3:53 p.m., is a WhatsApp

20   message from Bruce Garelick to DWAC Officers/Directors Group.

21   "D&O AIG policy good by me.  Was there a TMG DD call yesterday?

22   WhatsApp, Facebook was down."

23   Q.   What's the third event?

24           MR. BACH:  Excuse me.  Judge, can I—

25           THE COURT:  Excuse me?

O561GAR2                    Collins - Direct

1          MR. BACH:  I'm just coughing.  I need to—

2          MR. SHAHABIAN:  Happy to take a break, your Honor.

3          THE COURT:  How long do you need, Mr. Bach?

4          MR. BACH:  Hopefully only 30 seconds, but I'm—

5          THE COURT:  We'll just take a break for 30 seconds.

6          (Pause)

7          THE COURT:  Mr. Brod, do you want to check to see if

8    we need a longer break?

9          Okay.  All right.  We've got Mr. Bach back.

10          MR. BACH:  Apologies.

11          THE COURT:  Counsel, you may proceed.

12          MS. SHAPIRO:  Mr. Bianco, if we could return to

13   Government Exhibit 965.  I think we were on page 4.

14          The next page.  Thank you.

15   BY MS. SHAPIRO:

16   Q.  Ms. Collins, frankly, I forget where we were on this slide,

17   so maybe if you could start at the first event on the left.

18   A.  At 1:11 p.m., two phone calls between Bruce Garelick and

19   Michael Shvartsman for a total of 15 minutes, five seconds.

20   Q.  What's the second event?

21   A.  At the top, 3:53 p.m. from Bruce Garelick to DWAC

22   Officers/Directors Group, a WhatsApp message, which reads, "D&O

23   AIG policy good by me.  Was there a TMG DD call yesterday?

24   WhatsApp, Facebook was down."

25   Q.  And what's the third event?

1  A.  The third event in the bottom right at 4:27 p.m. is an

2  email from Ben Reed to Michael Shvartsman.  "Michael, bought

3  the remaining 130,354 DWACW warrants today at an average price

4  of about .4726.  You now have the desired 2 million DWACW

5  warrants."

6          MS. SHAPIRO:  If we could turn to the next page,

7  Mr. Bianco.

8  Q.  What's depicted on this slide, Ms. Collins?

9  A.  There are two additional events from October 5th.

10 Q.  What's the first event?

11 A.  At the bottom, at 6:07 p.m., a phone call between Bruce

12 Garelick and Michael Shvartsman for three minutes, 47 seconds.

13 Q.  And what's the next event?

14 A.  At the top, at 6:37 p.m., a phone call between Michael

15 Shvartsman and Eric Hannelius for eight minutes, 12 seconds.

16         MR. SHAHABIAN:  If we could turn to the next page,

17 Mr. Bianco.

18 Q.  Is this the next day, October 6th, Ms. Collins?

19 A.  Yes.

20 Q.  What's depicted on this slide?

21 A.  So there are four events.  The first, at the top left, APLC

22 Investments, LLC buys 510 DWAC units.

23 Q.  Is that connected to the chronology below?

24 A.  No.  There wasn't a time for this exhibit——or for this

25 piece of information, only a date, so it's just there without a

1    time.

2    Q.  October 6th is the date you saw.

3    A.  Yes.

4    Q.  What's the first event with a time stamp?

5    A.  At the bottom at 10:04 a.m., Hannelius account buys 1,000

6    DWAC warrants.

7    Q.  What's the next event?

8    A.  In the top right, at 7:19 p.m., two phone calls between

9    Michael Shvartsman and Gerald Shvartsman, for a total of four

10   minutes, 40 seconds.

11   Q.  And what's the end of the two phone calls between Michael

12   and Gerald Shvartsman?

13   A.  7:39 p.m.

14   Q.  What's the next event depicted?

15   A.  It's an email at 7:40 p.m. from Gerald Shvartsman to Ben

16   Reed, which reads, "Ben, I'd like to buy some warrants in D

17   SPAC.  Can you call me tomorrow."

18   Q.  How soon after the phone call with Michael Shvartsman did

19   Gerald Shvartsman send that email to Ben Reed?

20   A.  About a minute.

21        MS. SHAPIRO:  If we could turn to the next page,

22   Mr. Bianco.

23        All right.  Next page, Mr. Bianco.  Thank you.

24   Q.  Is this the next day, Ms. Collins, October 7, 2021?

25   A.  Yes.

O561GAR2                    Collins - Direct

1  Q.  What's depicted on this slide?

2  A.  The first event in the top left at 8:36 a.m. is a phone

3  call between Gerald Shvartsman and Ben Reed for two minutes, 22

4  seconds.

5  Q.  What's the next event depicted?

6  A.  At the bottom, at 10:07 a.m., Hannelius account buys 300

7  DWAC warrants.

8  Q.  And what's the third event depicted?

9  A.  On the top right, Gerald Shvartsman buys 275,000 DWAC

10  warrants.

11  Q.  Is there a time associated with that event?

12  A.  No, just a date, October 7th.

13          MR. SHAHABIAN:  If we could turn to the next page,

14  Mr. Bianco.

15  Q.  What's depicted on this slide, Ms. Collins?

16  A.  These are additional events from October 7th.

17  Q.  What's the first event depicted?

18  A.  In the top left, at 3:30 p.m., is a phone call between

19  Bruce Garelick and Michael Shvartsman for three minutes, 38

20  seconds.

21  Q.  What's the next event?

22  A.  At the bottom left, 3:46 p.m., Bruce Garelick accesses TMG

23  data room.

24  Q.  And the event that follows?

25  A.  The top middle, at 6:09 p.m., phone call between Bruce

1   Garelick and Michael Shvartsman for two minutes, 30 seconds.

2   Q.  And what's the last event on this slide?

3   A.  At 7 p.m., it's an email from Bruce Garelick to Alex Cano,

4   with the DWAC board of directors cc'd.  "All, I remain

5   enthusiastic in support of TMG as the prime target for us.  My

6   feedback on the data room plus due diligence materials

7   follows."

8   Q.  What's the date on the top of this slide, Ms. Collins, just

9   to orient us?

10  A.  October 7th.

11          MR. SHAHABIAN:  If we go to the next slide,

12  Mr. Bianco.

13  Q.  What's the date on the top of this slide?

14  A.  October 11th.

15  Q.  What do the two lines in the timeline mean here, the

16  vertical lines?

17  A.  Just represents that there was a break in the timeline

18  since a number of days had passed.

19  Q.  And what event is depicted from October 11, 2021?

20  A.  APLC Investments, LLC buys 20,800 DWAC units.

21          MR. SHAHABIAN:  And if we turn to the next page,

22  Mr. Bianco.

23  Q.  Is this the next day, October 12, Ms. Collins?

24  A.  Yes.

25  Q.  What's depicted on this slide?

1   A.  We have a few events.  In the top middle is APLC

2   Investments, LLC places order for 500,000 warrants.  100,000

3   warrants purchased October 12, 2021.

4   Q.  What's the next event depicted?

5   A.  In the bottom left at 1:20 p.m. is an email from Anton

6   Postolnikov to Ben Reed.  "Ben, can you put an order to

7   purchase 500K warrants at the price not higher than 45 cents

8   per warrant.  Let's slowly start buying it up."

9   Q.  And what's on the right next to that email?

10  A.  It's an excerpt from notes dated October 12th, "Confirmed

11  he wants to buy 500K worth of warrants, not higher than 45

12  cents.  Take off the DWACU limit order.  Sounds good.  Can do

13  100K a day for the next few days."

14          MR. SHAHABIAN:  What's the next slide, Mr. Bianco?

15  Q.  I should have directed the question to you, Ms. Collins.

16  What's depicted on the next slide?

17  A.  These are events that occurred from October 18th to the

18  20th.

19  Q.  What events are depicted?

20  A.  APLC Investments, LLC, 349,517 DWAC warrants purchased.

21          MS. SHAPIRO:  You can take this down, Mr. Bianco.

22  Thank you.

23          If we could publish Government Exhibit 966.

24  Q.  What's the date for Government Exhibit 966, the first page,

25  Ms. Collins?

1    A.    October 15th.

2    Q.    What's depicted on this slide?

3    A.    On the left at 8:57 a.m. is a WhatsApp message from Alex

4    Monje to the DWAC Officers/Directors Group.  "Good morning,

5    DWAC board.  Exclusivity extension.  Since this issue is

6    timely, we are asking for confirmation via this chat ASAP.  We

7    are progressing very well on the definitive agreement and need

8    to provide notice to TMG by October 18th that we intend to

9    extend our mutual exclusivity.  Our unilateral extension keeps

10   us mutually exclusive for an additional 45 days.  While our

11   goal is to execute the definitive agreement before the

12   expiration of the initial 30-day exclusivity period, we want to

13   make sure we are already extended in the event negotiations and

14   merger agreement drafting takes a few extra days.  Call to

15   action.  Please respond in this chat confirming your approval

16   to extend our mutual exclusivity with TMG for an additional 45

17   days."

18   Q.    What's the next event depicted?

19   A.    At 9:16 a.m., a WhatsApp message from Bruce Garelick to the

20   DWAC Officers/Directors Group.  "Approval on the extension.

21   Vote in favor."

22          MR. SHAHABIAN:  If we go to the next slide,

23   Mr. Bianco.

24   Q.    What's depicted on this slide, Ms. Collins?

25   A.    These are events that occurred in October 15th through the

1    16th.

2    Q.  What's the first event depicted?

3    A.  The first event on the 15th is a phone call between Bruce

4    Garelick and Michael Shvartsman for eight minutes, 43 seconds.

5    Q.  And what's the second event?

6    A.  The second event on the 16th is a phone call between

7    Michael Shvartsman and Gerald Shvartsman for one minute, 16

8    seconds.

9           MR. SHAHABIAN:  And if we go to the next page,

10   Mr. Bianco.

11   Q.  What date is on this slide, Ms. Collins?

12   A.  October 17th.

13   Q.  So we've gone to the next day?

14   A.  Yes.

15   Q.  What's depicted on this slide?

16   A.  Well, on the left there are messages, beginning at around

17   1:38 p.m., from Alex Monje to the DWAC Officers/Directors

18   Group.  "Gentlemen, I hope you are all having a great weekend.

19   Please see attached the negotiated definitive agreement with

20   TMTG.  There are a few minor points we are fine-tuning, but all

21   major commercial terms have been agreed upon and we are in a

22   position to execute tomorrow morning.  I will send out a Zoom

23   link in the next few minutes for a board meeting tomorrow at

24   10 a.m. Eastern Standard Time, where we will hold a formal vote

25   on the merger agreement."  There is an attachment,

1    TMTGDefinitive-101721.pdf.

2    Q.  What's the next event depicted?

3    A.  Next event is a WhatsApp message from Patrick Orlando to

4    the DWAC Officers/Directors Group at 1:40 p.m.  "To be clear,

5    no deal has been made yet, and these negotiations are highly

6    confidential."

7            MR. SHAHABIAN:  Could we turn to the next page,

8    Mr. Bianco.

9    Q.  What's depicted on this slide, Ms. Collins?

10   A.  This is another event from the 17th.

11   Q.  What event is depicted on this slide?

12   A.  At 6:12 p.m. a phone call between Bruce Garelick and

13   Michael Shvartsman for 30 minutes, 59 seconds.

14           MR. SHAHABIAN:  If we turn to the next slide,

15   Mr. Bianco.

16   Q.  What's depicted here, Ms. Collins?

17   A.  There are two events from October 18th.

18   Q.  Is that the next day?

19   A.  Yes.

20   Q.  What's the first event?

21   A.  The first event at 8:44 a.m. is a phone call between

22   Michael Shvartsman and Gerald Shvartsman for 43 seconds.

23   Q.  What's the next event?

24   A.  Next event at 9:54 a.m. is a message from Bruce Garelick to

25   Michael Shvartsman.  "FYI, I have a SPAC BOD Zoom meeting at

O561GAR2                    Collins - Direct

1    10 a.m.  Should free up at 11 a.m."

2              MR. SHAHABIAN:  If we turn to the next page,

3    Mr. Bianco.

4    Q.  What's depicted on this slide, Ms. Collins?

5    A.  These are additional events from October 18th.

6    Q.  What's the first event?

7    A.  The first event at 3:26 p.m. is an email from Gerald

8    Shvartsman to Ben Reed, Subject:  DWACW.  "Please buy another

9    100,000 warrants for me."

10   Q.  What's the next event depicted?

11   A.  Next event is Gerald Shvartsman buys 100,000 DWAC warrants.

12   Q.  Is there a time associated with that purchase?

13   A.  No.

14   Q.  And what's the last event depicted on this slide?

15   A.  The next event at 6:37 p.m. are conference calls between

16   Bruce Garelick, Michael Shvartsman, and Eric Hannelius for an

17   approximate total of 27 minutes, 25 seconds.

18             MR. SHAHABIAN:  If we turn to the next page,

19   Mr. Bianco.

20   Q.  What's on this slide, Ms. Collins?

21   A.  These are events from October 19th.

22   Q.  Is that the next day?

23   A.  Yes.

24   Q.  What's the first event depicted?

25   A.  The first event on the left are a number of messages

O561GAR2                    Collins - Direct

1  starting at 12:03 p.m. from Adrian Lopez to Ramse Moll.  "Ready

2  to make some money?  Supposedly.  DWACW.  They're going to

3  announce something big in the next two weeks.  Supposedly

4  Trump.  Social media."

5  Q.  When you say a number of messages, did you combine several

6  text messages into one text bubble for the purpose of this

7  chart?

8  A.  Yes.

9  Q.  What's the next event depicted on this slide?

10 A.  Messages on the right at 12:05 p.m., or starting at

11 12:05 p.m., messages from Adrian Lopez to Gerald Shvartsman,

12 "Loaded 100K, ticker DWACW."

13 Q.  What's below that?

14 A.  Starting at 12:11 p.m., messages from Gerald Shvartsman to

15 Adrian Lopez.  "I'm in for 500K, my brother, 2 million, and my

16 buddy, 10 million."

17         MR. SHAHABIAN:  Go to the next page, Mr. Bianco.

18 Q.  What's depicted on this slide, Ms. Collins?

19 A.  They're additional messages from October 19th.

20 Q.  What's the first message?

21 A.  The first is a number of messages beginning at 1:17 p.m.

22 from Adrian Lopez to Poppa.  "This is speculative.  Stock

23 DWACW.  Apparently they're going to announce in two weeks a

24 merger with Trump Media.  That's what Gerald told me.  I'll

25 explain later."

O561GAR2                    Collins - Direct

1    Q.  What's the next event?

2    A.  At 1:20 p.m., a message from Poppa to Adrian Lopez.  "If

3    it's with Trump Media, it will be really good because it would

4    explode big."

5    Q.  And what's the next event?

6    A.  A message at 1:20 p.m. from Adrian Lopez to Poppa.  "That's

7    what he says."

8            MR. SHAHABIAN:  Thank you, Mr. Bianco, for advancing

9    us to the next slide.

10   Q.  What's depicted on this slide, Ms. Collins?

11   A.  There are additional events from the 19th.

12   Q.  What's the first event depicted?

13   A.  First event at 2:38 p.m., a phone call between Gerald

14   Shvartsman and Netanel Suissa for two minutes, 11 seconds.

15   Q.  And what's the next event depicted?

16   A.  Beginning at 2:50 p.m., Suissa buys 1,301 DWAC.

17   Q.  And how soon after the phone call with Gerald Shvartsman

18   does Suissa buy 1301 DWAC?

19   A.  About ten minutes.

20           MS. SHAPIRO:  If we could turn to the next slide,

21   Mr. Bianco.

22   Q.  What's depicted on this page, Ms. Collins?

23   A.  There are more events from October 19th.

24   Q.  What events are depicted on this slide?

25   A.  Our check-ins to the Wynn Las Vegas for three different

1    individuals.

2    Q.   Which three people?

3    A.   The first, Eric Hannelius, approximately 1 p.m. Pacific

4    time, or 4 p.m. Eastern; Bruce Garelick, also around the same

5    time; and Michael Shvartsman, at approximately 4:15 p.m.

6    Pacific time or 7 p.m. Eastern.

7    Q.   Why did you include Pacific time on this slide?

8    A.   Because Las Vegas uses Pacific time and that's where these

9    events took place.

10   Q.   Do you see the room and numbers for each of these boxes?

11   A.   Yes.

12   Q.   What are those depicting?

13   A.   The hotel room numbers assigned at check-in to each

14   individual.

15   Q.   What was Mr. Hannelius's room number?

16   A.   65519.

17   Q.   Mr. Shvartsman's?

18   A.   65506.

19   Q.   And Mr. Garelick's?

20   A.   3745.

21          MR. SHAHABIAN:   If we turn to the next slide,

22   Mr. Bianco.

23   Q.   What's depicted here, Ms. Collins?

24   A.   There are additional events from the 19th.

25   Q.   What's the first event depicted?

O561GAR2                     Collins - Direct

1   A.  There are messages beginning at 2:40 p.m. Pacific time,

2   7:20 Eastern from Michael Shvartsman to the Los Vegas chat.

3   "5506.  Call me when here.  We'll have to grab you."

4   Q.  You said 2:40 p.m., Ms. Collins, Pacific time?

5   A.  Sorry.  4:20 Pacific and 7:20 Eastern.

6   Q.  And what's the number 5506?  Is that the number——

7   A.  The room number?

8            MR. SHAHABIAN:  If we go back a slide, Mr. Bianco.

9   Q.  Is it missing the 6?

10  A.  Yes.

11           MR. SHAHABIAN:  If we go to the next page, Mr. Bianco.

12  Q.  What does Los Vegas represent on this slide?

13  A.  Los Vegas is a WhatsApp group chat.

14  Q.  What's the next event depicted on this slide?

15  A.  The next event are messages beginning at 4:36 p.m. Pacific

16  time or 7:36 Eastern time, from Bruce Garelick to the Los Vegas

17  chat.  "Ok.  Three minutes away.  I'm at the Encore elevator

18  entrance.  They are letting me up."

19  Q.  What's the next event?

20  A.  The next event at 4:45 Pacific time or 7:45 Eastern time,

21  from Michael Shvartsman to the Los Vegas chat.  "Ok."

22  Q.  If we turn to the next slide, what's depicted on this

23  slide, Ms. Collins?

24  A.  So this is information related to the Los Vegas WhatsApp

25  chat.  At the top are the people, or——the people who are

O561GAR2                    Collins - Direct

1   involved in the group, and at the bottom are two images from

2   that group chat.

3   Q.  And who are the people listed as members of the Los Vegas

4   group chat?

5   A.  Bruce G; Shvartsman, Michael; Hoyt, Ryan; Phil Margolin;

6   Hannelius, Eric; and Beyer, Alan.

7               MR. SHAHABIAN:  If we go back a slide for a second,

8   Mr. Bianco.

9               Sorry.  If we could go backwards instead of forwards.

10              (Audio played)

11              MS. SHAPIRO:  Stop that for a second.  Thank you.

12              Can you go back a slide to the one before the Los

13  Vegas chat.

14              Just one more.  Thank you.

15  BY MR. SHAHABIAN:

16  Q.  What's the time stamp of the last text message on this

17  slide, Ms. Collins?

18  A.  4:45 p.m. Pacific time.

19              MR. SHAHABIAN:  If we can now go two slides.  Thank

20  you, Mr. Bianco.

21  Q.  What's depicted on this slide, Ms. Collins?

22  A.  This is another event from the 19th, the board of directors

23  meeting, which began at 6 p.m. Pacific time.

24  Q.  What else is depicted on Government——on this slide?

25  A.  In the bottom right, board of directors approves merger

1  agreement.

2  Q.  And what's on the bottom left?

3  A.  This is an excerpt from the recording from the board of

4  directors meeting.

5           (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O56Cgar3                    Collins – Direct

1   BY MR. SHAHABIAN:

2   Q.  Is that the recording we listened to last Friday?

3   A.  Yes.

4           MR. SHAHABIAN:  If we could play the recording,

5   Mr. Bianco.

6           (Audio played)

7   Q.  What's the timestamp for the end of the board of directors

8   meeting on October 19th, Ms. Collins?

9   A.  6:50 p.m. Pacific Time.

10          MR. SHAHABIAN:  Go to the next page, Mr. Bianco.

11  Q.  What's the timestamp for the first message on this page?

12  A.  7:16 p.m. Pacific Time.

13  Q.  How soon after the end of the board meeting is this text

14  message?

15  A.  About 25 minutes.

16  Q.  Who's it from?

17  A.  Bruce Garelick.

18  Q.  Who's it to?

19  A.  The Las Vegas chat.

20  Q.  What's the chat?

21  A.  "Meet-up plans."

22  Q.  What are the next events depicted on this slide on the

23  left?

24  A.  Next up, 7:18 p.m. Pacific Time is a message from Phil

25  Margolin to the Los Vegas chat.  7:30 at the suite.

1  Q.  What's the next message?

2  A.  At 7:26 p.m. Pacific Time, from Michael Shvartsman to the

3  Los Vegas chat.  7:45.

4  Q.  What's on the right side of this slide?

5  A.  On the right side are messages between Michael Shvartsman

6  and Aric G.

7  Q.  Is that part of the group chat or is that a separate

8  message exchange between these two people?

9  A.  It's a separate exchange.

10  Q.  What's the first message?

11  A.  The first message at 4:46 p.m. Pacific Time from Michael

12  Shvartsman to Aric G.  5506 Tower Suites Encore.

13  Q.  What's the next message?

14  A.  At 7:09 p.m. Pacific Time from Aric G. to Michael

15  Shvartsman.  Prob be there closer to 8:00.

16  Q.  And the third message.

17  A.  At 7:50 p.m. from Aric G. to Michael Shvartsman.  Here.

18  Coming up.

19        MR. SHAHABIAN:  If we turn to the next slide,

20  Mr. Bianco.

21  Q.  What's depicted on this page, Ms. Collins?

22  A.  These are events that occurred on October 20th.

23  Q.  What's the first event depicted?

24  A.  Eric Cornelius logs into E-Trade account.

25  Q.  What date and time did Eric Cornelius log into his E-Trade

1    account.

2    A.   The 19th at 9:14 p.m. in Pacific Time, or the 20th at 12:14

3    a.m. Eastern Time.

4    Q.   So the night of the 19th in Las Vegas?

5    A.   Yes.

6    Q.   What's the next event depicted?

7    A.   The next event is Eric Cornelius places an order for 10,000

8    DWAC warrants.

9    Q.   When did that take place?

10   A.   On the 19th at 10:04 p.m. Pacific Time, or the 20th at 1:04

11   a.m. Eastern Time.

12   Q.   What's the next event depicted?

13   A.   The next event is Aric Gastwirth buys 150,000 DWAC

14   warrants.

15   Q.   When did that take place?

16   A.   On the 20th at 6:39 a.m. Pacific Time, or the 20th at 9:39

17   a.m. Eastern Time.

18   Q.   Is there any significance to you using dollar bill symbols

19   for these purchases as compared to other purchases we

20   discussed?

21   A.   No, it's just a different way to display the information.

22            MR. SHAHABIAN:   If we turn to the next slide,

23   Mr. Bianco.

24   Q.   What's depicted on this page, Ms. Collins?

25   A.   These are additional events from October 20th.

1  Q.  What's depicted here?

2  A.  On the left appears to be a Tweet from October 20th.  On

3  the right is a document.

4  Q.  What's the timestamp of the Tweet?

5  A.  8:16 p.m.

6  Q.  And what's the document on the right?

7  A.  The header is TMTG, Trump Media & Technology Group.

8  Q.  Does this look like a press release?

9  A.  Yes.

10            MR. SHAHABIAN:  We can take this down, Mr. Bianco.

11            If we could publish Government Exhibit 967.

12  Q.  Ms. Collins, is the first page of 967 a duplication of the

13  last page of 966?

14  A.  Yes.

15            MR. SHAHABIAN:  If we could turn to the next page,

16  Mr. Bianco.

17  Q.  What's depicted on page 2 of Government Exhibit 967?

18  A.  These are events from October 21st to the 22nd.

19  Q.  What events are depicted?

20  A.  In the top-left on the 21st, Bruce Garelick sells DWAC

21  securities for approximately $49,700 profit.

22  Q.  What's the other event depicted?

23  A.  The other event on the top-right, from the 21st to the

24  22nd, Michael Shvartsman sells Rocket One Capital DWAC warrants

25  for approximately $18.3 million profit.

1   Q.  What's the message below those events depicted on this

2   slide?

3   A.  At the bottom, on the 21st, at 7:14 p.m., is a message from

4   Bruce Garelick to Diedre O'Shea, big day today.  My Trump

5   aspect traded up 400 percent today.  We made $20 million on it.

6   The New York Times called me for comment, which I said no

7   comment.  Not publicity I need.  Haha.

8           MR. SHAHABIAN:  If we go to the next page, Mr. Bianco.

9   Q.  What's depicted on this slide, Ms. Collins?

10  A.  Additional events from October 21st to 22nd.

11  Q.  What's the first event?

12  A.  First event on the left is a message on the 21st from

13  Justin Friedberg to Bruce Garelick.

14  Q.  What's the messenger?

15  A.  You didn't even tell me about that stock.  So mad now.

16  Q.  What's the timestamp on this message?

17  A.  October 21st at 2:50 p.m.

18  Q.  What's the timestamp on the next message?

19  A.  October 22nd at 6:55 p.m.

20  Q.  Were there additional messages between these two that you

21  omitted from this chart?

22  A.  Yes.

23  Q.  Who asked you to omit those messages?

24  A.  The government.

25  Q.  Do you know why they were omitted?

1    A.   No.

2    Q.   What's the second message?

3    A.   Second message is from Bruce Garelick to Justin Friedberg.

4    It's Michael's business, man.  I keep a tight lid on what he

5    does unless he tells me to share it.  In this case, he did tell

6    me to socialize it to his normal network of investor peeps.

7    Perhaps I should have proactively thought of you.

8              MR. SHAHABIAN:  If we go to the next slide,

9    Mr. Bianco.

10   Q.   What's depicted on this slide, Ms. Collins?

11   A.   These are additional messages between Justin Friedberg and

12   Bruce Garelick on October 22nd.

13   Q.   What's the first message?

14   A.   At 6:57 p.m., from Justin Friedberg to Bruce Garelick.  You

15   make out like a bandit.

16   Q.   What's the second message?

17   A.   There's multiple messages beginning at 7:01 p.m. from Bruce

18   Garelick to Justin Friedberg.  I did okay, but unfortunately

19   had to restrict myself a month ago due to my involvement on the

20   board of directors of the SPAC, so was very limited in what I

21   could buy.  Wish I wasn't on the BOD.  Severely restricted what

22   I could do.

23             MR. SHAHABIAN:  If we turn to the next page,

24   Mr. Bianco.

25   Q.   What's on this slide, Ms. Collins?

1   A.   More messages between the same individuals on October 22nd.

2   Q.   What's the first message?

3   A.   There are multiple messages beginning at 7:03 p.m. from

4   Justin Friedberg to Bruce Garelick.  Oh, so Rocket is very

5   involved, I assume.  That's standard to restrict board members

6   like that.

7   Q.   What's the next set of messages?

8   A.   Beginning at 7:03 p.m. from Bruce Garelick to Justin

9   Friedberg.  Yup, took one for the team.

10       MR. SHAHABIAN:  If we go to the next page, Mr. Bianco.

11  Q.   What's depicted on this slide, Ms. Collins?

12  A.   These are a number of events that took place over several

13  days.

14  Q.   Starting from the top-left, what's the first event

15  depicted?

16  A.   From October 21st to 22nd, Hannelius account sells DWAC

17  securities for approximately $168,000 profit.

18  Q.   If we go left to right, what's the next event at the top in

19  the middle?

20  A.   Also the 21st to the 22nd.  Gerald Shvartsman sells DWAC

21  warrants for approximately $4.6 million profit.

22  Q.   And in the top-right?

23  A.   November 2nd to November 11th.  APLC Investments LLC sells

24  DWAC securities for approximately $14.5 million profit.

25  Q.   The bottom-left.

1   A.   On October 21st, Aric Gastwirth sells DWAC warrants for

2   approximately $1.4 million profit.

3   Q.   Middle.

4   A.   Also October 21st, Adrian Torres sells DWAC warrants for

5   approximately $404,000 profit.

6   Q.   And the bottom-right.

7   A.   Also on the 21st.  Netanel Suissa sells DWAC shares for

8   approximately $16,000 profit.

9            MR. SHAHABIAN:  If I could have a moment, your Honor.

10           THE COURT:  Yes.

11           MR. SHAHABIAN:  Nothing further, your Honor.

12           THE COURT:  Members of the jury, it's about 11:15, so

13  it's a good time for our midmorning break.  We'll take it for

14  about 15 minutes.  Don't discuss the case amongst yourselves in

15  the jury room and don't do any research.  Have a good break.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

O56Cgar3                    Collins - Direct

1    (Jury not present)

2    THE COURT:  Witness may step down.  See you all back

3 here in about 10 minutes.

4    (Recess)

5    Any reason, from the government's perspective, we

6 shouldn't bring in the jury?

7    MR. SHAHABIAN:  Your Honor, the government has some

8 objections to some of the exhibits that the defense intends to

9 offer with their first witness.

10    THE COURT:  With their first witness?

11    MR. SHAHABIAN:  Yes, your Honor.

12    THE COURT:  Mr. Bach, how long do you expect the cross

13 examination to go here?

14    MR. BACH:  15 minutes.

15    THE COURT:  We'll address those after the witness is

16 done and the government rests its case.  I'll entertain

17 motions, I realize the motions are going to be short, but we're

18 going to have to excuse the jury for that anyway.

19    MR. SHAHABIAN:  Yes, your Honor.

20    THE COURT:  Mr. Bach, anything before we bring in the

21 jury?

22    MR. BACH:  No, your Honor.

23    THE COURT:  Let's bring in the jury.

24    (Continued on next page)

25

1    (Jury present)

2    THE COURT:  Mr. Bach, you may examine.

3    MR. BACH:  Thank you, Judge.

4  CROSS-EXAMINATION

5  BY MR. BACH:

6  Q.  Good morning, Ms. Collins.

7  A.  Good morning.

8  Q.  I'm Jonathan Bach.  I'm the lawyer for Bruce Garelick.

9    Ms. Collins, you work with the prosecution team in

10  this case; correct?

11  A.  I did.

12  Q.  And you're a paralegal at the office; correct?

13  A.  Yes.

14  Q.  And you're here, as I'm sure you do often, you help them

15  out with their work; correct?

16  A.  Yes.

17  Q.  You put a lot of time into that and did a careful job;

18  correct?

19  A.  Yes.

20  Q.  They asked you to make charts for them with certain

21  materials?

22  A.  Yes, that was part of what I did for this case.

23  Q.  Part of what you did.  The other part is they made charts

24  and asked you to review those charts?

25  A.  Yes, I also reviewed a number of other government exhibits.

1    Q.  Those other government exhibits are not in the charts?

2    A.  I believe there were certain emails or other exhibits that

3    we discussed on Friday that were not present in the charts.

4    Q.  And when they asked you to prepare or view these materials,

5    you checked for the accuracy of the timestamps; correct?

6    A.  Yes.

7    Q.  And you helped convert time zones that had different

8    metrics to make sure they were all on uniform time zones;

9    correct?

10   A.  Yes.

11   Q.  So you could get things in chronological order; right?

12   A.  Correct.

13   Q.  Just to be clear, you didn't conduct the investigation in

14   this case or interview the witnesses?

15   A.  No.

16   Q.  So if I ask you questions about what witnesses said, you

17   wouldn't be able to answer; correct?

18   A.  That's correct.

19   Q.  I may ask you questions about your chart and the documents

20   you reviewed, not to put you on the spot, but just to get

21   clarity about what you saw or didn't see, what you reviewed or

22   didn't review.  Is that okay?

23   A.  Yes.

24   Q.  Great.  It was the prosecution team who told you which

25   materials to include in these charts?

1  A.  Yes, that's correct.

2  Q.  And they told you which materials to check; is that

3  correct?

4  A.  Yes.

5  Q.  And is it fair to say that you included about 50 or 55

6  documents in some form or other in that chart?

7  A.  That sounds about right.

8  Q.  There are other documents and pieces of evidence that were

9  not included in the chart, we just went over that; correct?

10  A.  Yes.

11  Q.  In other words, there are hundreds of documents and

12  exhibits in this case; right?

13  A.  I don't know the full scope.  I only know what I reviewed.

14  Q.  Someone else giving you this project might have asked you

15  to include a different set of materials; correct?

16  A.  It's possible, yes.

17  Q.  For instance, if I got to pick the materials, these charts

18  might look a little bit different; correct?

19  A.  Sure.

20  Q.  And you did look closely at the materials they picked;

21  correct?

22  A.  Yes.

23  Q.  In those documents that you looked at and reviewed

24  carefully in the course of your work, did you see any in which

25  Mr. Garelick tells someone about an upcoming merger between a

1    company called DWAC and a company called TMG?

2    A.   Yes.

3    Q.   Which document was that?

4    A.   I don't remember.

5    Q.   Can you identify one today?

6    A.   I believe there were emails and text messages in which

7    Mr. Garelick spoke about the upcoming potential deal between

8    DWAC and TMG.

9            MR. BACH:   Let me rephrase the question.

10   Q.   Any in which he discussed an upcoming merger with anyone

11   outside of the board of directors of DWAC?

12   A.   I don't believe so, but I'm not entirely sure.

13   Q.   In any document that you reviewed and included in this

14   chart, did you see Mr. Garelick reveal any confidential board

15   of director information to anyone else, other than his fellow

16   board members?

17           MR. SHAHABIAN:   Objection.

18           THE COURT:   Sustained.

19   Q.   Much of the chart that you made precedes September 21,

20   2021; correct?

21   A.   Yes.

22   Q.   The chart, I think, begins on September 2nd; is that right?

23   A.   Yes.

24   Q.   So about 19 days before; correct?

25   A.   Correct.

              MR. BACH:  Can we pull up Government Exhibit 963 at

page 1?

Q.  This is your chart; right?

A.  Yes, it's one of the charts.

Q.  This is the page, September 21, 2021?

A.  Yes.

Q.  And you had the picture at the bottom, the board of

directors meeting?

A.  Correct.

Q.  You also talked a moment ago about Government Exhibits 960,

961, and 962; correct?

A.  Yes.

Q.  All of those exhibits depict events or communications

before Mr. Garelick has even attended a single board meeting;

correct?

A.  That's my understanding.

Q.  F?

              MR. BACH:  We can take that down.

Q.  The chart you made includes reference to a number of phone

calls; right?

A.  Yes, correct.

Q.  And you agree with me that you don't know what was said on

those calls?

A.  That's correct.

              MR. BACH:  Just to explore this a bit, can we pull up

1    Government Exhibit 963, go to the last page, September 23.

2    Q.  So, for instance, here, on September 23rd, at the top of

3    this slide, you capture on your chart a variety of phone calls;

4    correct?

5    A.  Yes.

6    Q.  You told me a moment ago you don't know what was said on

7    these calls.

8            This chart doesn't undertake to describe any of the

9    business activity that was taking place at Rocket One on

10   September 23rd; correct?

11   A.  This page does not show that, no.

12   Q.  So this page doesn't undertake to show any of the business

13   activity that Mr. Garelick and Mr. Shvartsman and Mr. Hannelius

14   might have been working on that day; correct?

15   A.  Yes, it's just the calls.

16   Q.  That's true of the other pages of this chart, that there's

17   no context provided in terms of the workday or business

18   activity that these individuals were engaged in at the time;

19   correct?

20   A.  I believe some of the slides have emails, at least from

21   Rocket One accounts, and notes about calls with representatives

22   from that company.

23   Q.  So there might be a few scattered references to some -- I

24   don't want to belabor the point.  In general, the purpose of

25   this chart is not to provide full context of the day-to-day

1   activity of these individuals; correct?

2           MR. SHAHABIAN:  Objection.

3           THE COURT:  Sustained.

4   Q.  This chart does not show the full context of day-to-day

5   activity of these individuals; correct?

6   A.  No, just what's depicted on the chart.

7   Q.  Now, your chart includes a number of documents in which

8   Mr. Garelick is texting or emailing people who are not on the

9   board of directors; correct?

10  A.  Yes.

11          MR. BACH:  Let's pull one of those up.  Can we pull up

12  Government Exhibit 960 at page 1.

13          MR. DRISCOLL:  Say that one more time.

14          MR. BACH:  I'm sorry.  Government Exhibit 960 at page

15  1, September 2.

16  Q.  Ms. Collins, just asking you to look, for instance, at the

17  image here right in the middle.  Do you see that, from

18  Mr. Garelick to Mr. Postolnikov?

19  A.  Yes.

20  Q.  Do you know whether this is public information that is

21  available to the public or whether this is private,

22  confidential information?

23          MR. SHAHABIAN:  Objection.

24          THE COURT:  Overruled.

25  A.  I do not know.

O56Cgar3                    Collins - Cross

1    MR. BACH:  Let's take a look at Government Exhibit 967

2    at page 2.

3         I'm sorry.  Can we pull that down.  I'm trying to get

4    to -- I'm sorry.  Pull up Government Exhibit 964 at page 3,

5    September 30th continued.

6    Q.  Do you have that in front of you, Ms. Collins?

7    A.  Yes.

8    Q.  Focusing your attention on the text on the left-hand side

9    here, again, you don't know whether this is public information

10   available to the public or whether this is private,

11   confidential information; correct?

12   A.  I do not know.

13   Q.  To the right, do you see where it says disaggregate in that

14   portion of the transcript?

15   A.  Yes.

16   Q.  Do you know whether it was publicly announced to the public

17   that disaggregation could begin that day?

18   A.  I do not know.

19        MR. BACH:  We can take that down.

20        I want to pull up Government Exhibit 218, which is

21   already in evidence.

22   Q.  Do you recall being asked questions about this document on

23   direct examination?

24   A.  Yes.

25   Q.  This is a DocuSign document.  Do you see that in the upper

O56Cgar3                    Collins - Cross

1   right?

2   A.  Yes.

3   Q.  Is it fair to say this is a record of a document that was

4   DocuSigned by Mr. Garelick?

5   A.  Yes.

6   Q.  And this is a record relating to his signature of the NDA

7   with DWAC; correct?

8   A.  Yes.

9   Q.  You can see that up in the subject line.  Do you see that?

10  A.  Yes.

11          MR. BACH:  Can we blow up his signature in the middle

12  of the page.

13  Q.  This is a DocuSign signature.  Do you see that?

14  A.  Yes.

15  Q.  And a DocuSign signature is one that you sign

16  electronically on a device, a phone or a computer or something

17  like that?

18  A.  Correct.

19  Q.  You don't necessarily print out the document after you sign

20  it; correct?

21  A.  Yes.

22  Q.  Do you see, going slightly over to the right, where it

23  says, "viewed"?

24  A.  Yes.

25  Q.  That represents the date on which Mr. Garelick opened or

O56Cgar3                    Collins - Cross

1    viewed the document; correct?

2    A.   Yes.

3    Q.   And the date there is June 20; correct?

4    A.   Correct.

5    Q.   And the time is at 9:07:58.  Do you see that?

6    A.   Yes.

7    Q.   That means 9:00 p.m. or 9:07 p.m. and 58 seconds; correct?

8    A.   Correct.

9    Q.   And that's when he would have first viewed or opened the

10   document; correct?

11   A.   Correct.

12   Q.   By the way, that's two seconds before 9:08, the clock turns

13   9:08; correct?

14   A.   Yes.

15   Q.   Take a look at the line below where it says, "signed."

16   Mr. Garelick viewed this document and then signed it 19 seconds

17   later; correct?

18   A.   Yes.

19        MR. BACH:  Now, if we take that down.

20        I'd like to pull up Government Exhibit 966.  Can we go

21   to the page that has at the top Los Vegas.  I think it's about

22   four pages from the end.

23   Q.   This is a page from the chart that you prepared; correct?

24   A.   Correct.

25   Q.   It's got some photographs and a group WhatsApp chat

1    identification?

2    A.  Yes, the members of that chat.

3           MR. BACH:  Can we take a look at the page before this.

4    Q.  What's the date on that page?

5    A.  October 19th.

6           MR. BACH:  Let's go back to the photos.  Let's go to

7    the next page.

8    Q.  What's the date on that page?

9    A.  Also October 19th.

10          MR. BACH:  Now let's go back to the photos.

11   Q.  Are these slides meant to be chronological order?

12   A.  Generally, yes.

13   Q.  But this slide is not in chronological order; correct?

14   A.  This slide is just depicting the members of the chat that

15   were mentioned in the previous slide as well as images from

16   that chat.

17   Q.  But these photos were not taken on October 19th; correct?

18   A.  I don't know exactly when those photos were taken.

19   Q.  Do you know if these photos were taken before or after news

20   of the merger had been made public and announced to the world?

21   A.  I don't know that.

22   Q.  Are you familiar with metadata?

23   A.  Yes, generally.

24   Q.  Are you familiar with metadata extraction?

25   A.  To some extent.

O56Cgar3                    Collins - Cross

1   Q.  If I showed you -- do you know who Christian Isolda is?

2   A.  No.

3           MR. BACH:  Will the government stipulate that he's an

4   FBI agent who did the extraction in this case and testified

5   here in court?

6           THE WITNESS:  I don't know.

7           MR. BACH:  I'm not asking --

8           THE COURT:  Mr. Shahabian.

9           MR. SHAHABIAN:  That's correct.  Except he's not an

10  agent, is the one clarification I was told to make.  He's a

11  forensic examiner.

12          THE COURT:  He's the FBI employee who did the

13  extraction in this case; correct?

14          MR. BACH:  Yes, your Honor.  And the gentleman who we

15  met in court when he testified.

16  Q.  If I showed you an extraction report with metadata, is that

17  something you'd recognize?

18  A.  I'm not sure that I would.

19          MR. BACH:  Let me give it a try.  Let me see if I can

20  talk to the prosecution.

21          I will represent to you that the photo on the right

22  has a date of October 24th and the photo on the left has a date

23  of October 22nd, and Mr. Shahabian has just advised me that the

24  government will so stipulate.

25          THE COURT:  That stipulation is accepted.

O56Cgar3                    Collins - Cross

1    Q.  Who instructed you to put those photos between two pages on

2    October 19th?

3    A.  I don't believe I created this, I just reviewed it.

4              MR. BACH:  One moment, please.

5              Thank you very much, Ms. Collins.  I appreciate you.

6              THE COURT:  Mr. Shahabian, anything further?

7              MR. SHAHABIAN:  No redirect.

8              THE COURT:  You may step down.

9              (Witness excused)

10             What's next on the government case?

11             MS. HANFT:  The government rests.

12             THE COURT:  Members of the jury, I'm going to give you

13   another break.  There's some legal matters I need to discuss

14   with the parties.

15             Let me remind you that the case has not yet been

16   submitted to you.  It won't be submitted until all of the

17   evidence is in and until I give you your instructions and tell

18   you that it's time to deliberate.

19             So, number one, keep an open mind, but number two,

20   please make sure not to discuss the case amongst yourselves and

21   also not to do any research on the case.

22             We'll see you back here in about 15 minutes or so.

23             (Continued on next page)

24

25

1    (Jury not present)

2           THE COURT:  I'm prepared to rule that the documents

3    that were submitted as coconspirator statements and that were

4    conditionally admitted will now be received.  I think that

5    there's a sufficient foundation under Bourjaily for the receipt

6    of those documents.

7           Is there a motion from the defense?

8           MS. SHAPIRO:  Yes, your Honor.

9           We move for a judgment of acquittal under Rule 29(a)

10   as to each of Counts One through Five, and I'm using the

11   numbers in the trial indictment, which has been renumbered,

12   obviously.  The government has failed to prove each essential

13   element of the offenses beyond a reasonable doubt.

14           Among other things, as to Count Two, which pertains to

15   Mr. Garelick's personal trades, as well as Count Five to the

16   extent it applies to those same trades, there's no evidence

17   showing that Mr. Garelick traded while in knowing possession of

18   material nonpublic information and no evidence that he acted

19   willfully or with a specific intent to break the law or defraud

20   DWAC or its shareholders.

21           As to Counts One, Three, and Four, and Count Five, to

22   the extent it covers other people's trades, there's no evidence

23   that Mr. Garelick tipped anyone else or shared material

24   nonpublic information that he learned from DWAC with anyone

25   else intending for them to trade.

1    In addition, to the extent the government's theory is

2   premised upon the NDA, we submit that the proof doesn't support

3   the notion that the NDA created the requisite duty of trust and

4   confidence largely for the reasons we debated already in

5   connection with the charge.

6    I think our view of the law is laid out in most detail

7   in a letter we submitted to the Court at docket 132 at pages 7

8   to 8.  I'm not going to repeat all of that here, but I think

9   the Court is aware of our legal position.

10    In addition, with regard to the NDA, there's a lack of

11   evidence that Mr. Garelick believed the NDA created any such

12   duty and the alleged tippees at issue in the substantive counts

13   were all, I believe, members of the founders syndicate and

14   would have signed similar NDAs.

15    So, for all of those reasons, among others, we

16   respectfully submit that Mr. Garelick is entitled to a judgment

17   of acquittal.

18    THE COURT:  Give me one moment.

19    Does the government wish to be heard?

20    MR. NESSIM:  Yes, your Honor, just briefly.

21    The government obviously opposes the motion.  There is

22   ample evidence upon which a reasonable juror can return a

23   verdict of guilt on each of the charged counts.  There's

24   substantial evidence that the defendant obtained material

25   nonpublic information to which a duty of confidence and trust

1    was attached both in the summer 2021 interaction subject to the

2    nondisclosure agreement and expectation of confidentiality, as

3    well as his time on the board.  It's obvious the defendant

4    traded while he was in possession of that information.

5          There's also more than substantial evidence that the

6    defendant tipped others, including Michael Shvartsman and Eric

7    Cornelius.  I would point the Court in particular to the

8    defendant's communications with Michael Shvartsman encouraging

9    him to purchase DWAC units at relevant times after the DWAC

10   board meeting -- first DWAC board meetings, and also Eric

11   Cornelius' email of early October.

12         In addition, there's more than substantial evidence of

13   the defendant's willfulness and his state of mind, his

14   sophisticated knowledge of insider trading, policies and

15   regulations, his failure to file form 4s, for example, goes to

16   his willfulness and many other items in the record which

17   establish more than enough evidence upon which a reasonable

18   juror could return a verdict of guilty.

19         THE COURT:  I'm going to deny the Rule 29 motion.

20         Just one observation, I think the parties have both

21   used the language "known possession," but just so there's no

22   ambiguity, I've also considered the evidence under the standard

23   set by the Eleventh Circuit in *SEC v. Adler* and the jury

24   instructions actually given in the *Royer* case, which would

25   require there to be evidence that the information was used at

1  least in part.  I conclude that there is sufficient evidence to

2  support a jury verdict on all of the counts, even under that

3  standard.

4       I'd note that an inference, among other things, an

5  inference can be drawn from the possession of material

6  nonpublic information that the information was used as least in

7  part.

8       There is an objection to some of the exhibits with

9  respect to the next witness.  What are they, Mr. Shahabian?

10      (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O561GAR4

1    MR. SHAHABIAN:  Yes, your Honor.  There are four

2  defense exhibits that the defense informed the government last

3  night that they intend to offer with their summary chart

4  witness that we object to hearsay.  They appear to be offered

5  for their truth.  Those are Defense Exhibits 801, 1108, 1111,

6  and 1112.

7    THE COURT:  Sorry.  Give that to me again?

8    MR. SHAHABIAN:  801, 1108, 1111, and 1112.

9    THE COURT:  Would somebody post them for me.  Let's

10  start with 801 and then go through the remainder.

11    MR. SHAHABIAN:  So if we could highlight the top

12  email, Mr. Bianco.  I'm sorry.  Or whoever is—oh, okay.

13    So this is an email from Bruce Garelick.  The

14  statements, "However, I am slammed right now.  It's going to

15  take me a few weeks before I'll be able to review" are hearsay

16  statements offered for the truth.

17    THE COURT:  Let me hear from the defense on 801.

18    MR. BROD:  Just a moment.

19    Judge, I don't believe we are—well, Judge, this is

20  coming in—could we just see the whole email, please.

21    So, Judge, the defense will be offering in connection

22  with the summary witness a number of exhibits that underlie

23  charts, which provide fuller context to Mr. Garelick's business

24  days in the relevant period.  The charts which were presented

25  by the government are of course highly selective, and while we

O561GAR4

1  respect the Court's ruling admitting them into evidence, we do

2  think the defense is entitled to present the full context.

3  None of these exhibits, I believe——certainly not this one——is

4  being presented for the truth.  This one is in fact I believe

5  cited in the chart only so that we have the phone number of

6  Kofi Obeng because of a phone call between Mr. Garelick and

7  Mr. Obeng on November 23rd, and it's just noted on the chart as

8  something that happened.  I understand that Mr. ——

9          THE COURT:  I'm not sure I understand what you're

10  saying, Mr. Brod.  Are you saying that this exhibit is being

11  offered only to establish the telephone number of Kofi Obeng?

12          MR. BROD:  That's correct.

13          THE COURT:  And is that all that's in the chart?

14          MR. BROD:  The phone number——the chart reflects a call

15  between Mr. Obeng and Mr. Garelick.  We cite to Mr. Garelick's

16  phone records and we also cite to this exhibit, but solely to

17  establish the phone number.  I understand Mr. Shahabian's

18  concern is probably, "However, I'm slammed right now," and we

19  can certainly redact that statement.  We don't have to show it

20  to the jury, and I wasn't planning to show this email to the

21  jury.  And to the extent that the government would stipulate to

22  the phone number, we can not offer this exhibit.

23          MR. SHAHABIAN:  We'll stipulate to the phone number.

24          THE COURT:  All right.  So that takes care of it.  801

25  is not going to be received and the phone number is stipulated.

O561GAR4

1  MR. BROD:  Judge, the summary chart the defense will

2  offer will cite to particular exhibits in, frankly, small

3  bites, just to indicate which exhibits underlie them.  We

4  don't——unless you give us an hour's adjournment, we don't plan

5  to redo them at this stage, but——

6  THE COURT:  I'm not going to give you that

7  adjournment, but I will allow you, before anything goes into

8  the jury room, to redact the reference to an exhibit number

9  that's not in evidence.

10  Okay.  Next one is 1108.

11  MR. SHAHABIAN:  For this exhibit, your Honor, the

12  government's objection is to the first sentence, "Zach, great

13  to catch up with you and the team today."  That's a hearsay

14  statement offered to prove the truth of the fact that a call or

15  meeting took place; the difference between the backward-looking

16  and forward-looking issue we've had throughout the trial.

17  THE COURT:  Mr. Brod?

18  MR. BROD:  Judge, this one is included in the chart.

19  I think it is offered just for general context and——if I could

20  have a moment, Judge.

21  Judge, can we offer this subject to connection during

22  Mr. Garelick's testimony?  And I would just add, Judge——

23  THE COURT:  Can I see what the chart looks like that

24  references this?

25  MR. BROD:  This is 852.  And Judge, this is

1    not—because this is an issue, huge issue in the case, we're

2    not offering it to prove anything substantial, just that he has

3    various calls and business meetings as reflected in the phone

4    records and—

5                THE COURT:  Where is it referenced to?

6                MR. BROD:  This is on the right-hand column near the

7    bottom, I believe.  I believe.

8                I'm sorry.  This is the wrong chart.  If we go forward

9    to—yes, 857.  And it's the second to last entry.  It's the 714

10   entry.

11               THE COURT:  I'll hear from the government, but the

12   problem is that the "subject to connection" doesn't cure the

13   hearsay problem.  If your chart had referenced that there's a

14   meeting, that's your client's testimony, but unless your client

15   is confronted on cross-examination and the statement comes in

16   to rehabilitate his testimony, I don't see how your solution of

17   "subject to connection" provides a basis for 1108 to come in.

18               MR. BROD:  Just one last point, Judge, is that, you

19   know, we think—if this is hearsay, Judge, we think this is

20   right at the edge.

21               THE COURT:  I can't hear you.

22               MR. BROD:  If this is hearsay—if this is hearsay,

23   Judge, we think it's right at the edge of hearsay because this

24   is primarily an assertion, "It was great to talk to you."  This

25   is not the sort of statement that, you know, we have to be

O561GAR4

worried about the credibility of a declarant. So to the extent

that it's hearsay, we think it's right at the edge there and,

you know, certainly could—but we—I think we think there's an

assertion perhaps embedded, but the thrust of this is, it was

great talking with you, not—

THE COURT: I'm going to exclude 1108, but that said,

I'm not going to require you to redo the charts right now.

Just don't highlight this to the jury during the presentation

of the summary witness, and then you'll prepare a new page for

this slide.

MR. BROD: Understood, Judge.

THE COURT: All right. 1111 is the next one.

MR. SHAHABIAN: Your Honor, while the chart is up, we

can—1112 is our last one, and it's actually the next slide on

this chart. Same objection, same issue. "Steve, great

speaking with you today."

THE COURT: Do you want to bring up 1112.

And I guess the question is, Mr. Brod, any different

argument?

MR. BROD: No, Judge.

THE COURT: Okay. Then I'm going to exclude 1112,

but, again, not require you to redo the chart, as long as you

don't highlight it for the jury during the testimony of the

summary witness.

All right. Last one is 1111.

1    MS. SHAPIRO:  Your Honor, could we just redact the

2  content of the emails and just keep the subject line and the

3  fact that the email was sent at the particular time and, in the

4  case of that previous email, the fact that the prospectus is

5  attached, or whatever—

6    THE COURT:  Yes, that I have no problem with.  That's

7  fine.

8    MS. SHAPIRO:  Okay.

9    THE COURT:  And so the exhibits will come in with the

10  content redacted except, you know, the to, from, date, subject

11  matter, and the attachment.

12    MS. SHAPIRO:  Okay.  Thank you, your Honor.

13    THE COURT:  Okay.  1112.  I'm sorry.  1111 is the last

14  one.

15    MR. SHAHABIAN:  And in particular, it's the third

16  email in this chain, starting on September 29th.  "Josh, I'm

17  going to be slammed today until late afternoon."  Again, this

18  is offered for the truth of the fact that the defendant is

19  busy, and we would object to this portion of the exhibit.

20    MR. BROD:  And Judge, I'm happy to redact everything

21  from this third email down.  I, frankly, wasn't even focused on

22  this one.

23    MS. SHAPIRO:  Just the part, "I'm going to be

24  slammed."

25    MR. BROD:  Yes, if we could just redact the part "I'm

1  going to be slammed until late in the afternoon."  I understand

2  that's the government's concern.

3          THE COURT:  You will redact "I'm going to be slammed

4  until late afternoon, this is still not good," is that——

5          MR. BROD:  Although, Judge——and it's been a refrain in

6  this case, but under the *Hillmon* case, this may be a

7  forward-looking statement that we're entitled to offer for its

8  truth.

9          THE COURT:  I think that might be a good argument.  So

10  Mr. Shahabian?

11          MR. SHAHABIAN:  I think there's both embedded, but I

12  do take it that that's a good——

13          THE COURT:  1111 is received.

14          (Defendant's Exhibit 1111 received in evidence)

15          THE COURT:  Anything else from the government before

16  we bring the jury in?

17          MR. SHAHABIAN:  Your Honor, I just want to put on the

18  record, because there were issues raised with respect to the

19  notice provided for our summary charts, and in the event this

20  comes up later, we're not asking for any relief now, but the

21  government would just note for the record that we received the

22  defense's summary charts——it's DX 852-860——for the very first

23  time yesterday at about 11 p.m., as well as 26.2 reflecting

24  revisions and edits to those summary charts, so I'm just

25  putting that on record to the extent any issues of timing and

1    notice come up later.

2           THE COURT:  I mean, I didn't specifically address the

3    issues of timing and notice with respect to the government's

4    summary charts, but I did conclude that the issues of timing

5    did not create any prejudice, so I might just put that on the

6    record.

7           Okay.  Let's bring in the——

8           MR. BACH:  One second.

9           Judge, we have a couple of witnesses that have

10   arrived.  I just want to let them know that——

11          THE COURT:  Okay.  Is this a real 30-second break?

12          MR. BACH:  Yes, yes.

13          (Pause)

14          THE COURT:  Okay.  Let's bring in the jury.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1    (Jury present)

2    THE COURT:  Be seated.

3    All right.  What's next on the defense case?

4    MR. BROD:  Judge, the defense calls Fabien

5    Thayamballi.

6    THE COURT:  Okay.  The witness may take the stand.

7    Sir, please step up into the witness box, remain

8    standing.  My courtroom deputy will administer the oath.

9    THE DEPUTY CLERK:  Please raise your right hand.

10    (Witness sworn)

11    THE DEPUTY CLERK:  Please state your full name for the

12    record and please spell out your first and last name.

13    THE WITNESS:  My name is Fabien Thayamballi, and

14    that's spelled F-A-B-I-E-N, T-H-A-Y-A-M-B-A-L-L-I.

15    THE COURT:  Okay.  Mr. Thayamballi, please keep your

16    voice up, speak into the microphone, wait until the question is

17    complete before you answer.

18    Counsel, you may proceed.

19    FABIEN THAYAMBALLI,

20    called as a witness by the Defendant,

21    having been duly sworn, testified as follows:

22    DIRECT EXAMINATION

23    BY MR. BROD:

24    Q.  Good afternoon, Mr. Thayamballi.

25    A.  Good afternoon.

1   Q.  Where are you employed?

2   A.  I'm employed at Shapiro Arato Bach, LLP.

3   Q.  And what do you do at Shapiro Arato Bach?

4   A.  I'm a partner.

5   Q.  Are you a part of the legal team—

6   A.  No, I'm not.

7   Q.  —in connection with this case?  And if you'd just allow me

8   to finish my question, it's easier for the court reporter.

9           THE COURT:  Remember the instruction wait until he's

10  done with the question, even if you suspect how the question is

11  going to end.

12          THE WITNESS:  Certainly.

13  A.  No, I am not part of the legal team on this case.

14  Q.  Okay.  Did you review certain charts and summaries in

15  connection with your testimony today?

16  A.  Yes, I did.

17  Q.  Were those charts and summaries that you created?

18  A.  No.

19  Q.  Who created them?

20  A.  I imagine the legal team on this case did.

21  Q.  And what did you do in connection with those charts and

22  summaries in preparation for your testimony today?

23  A.  I reviewed the charts and summaries and compared the

24  information that they contained with the underlying records,

25  phone records, often text messages, other communications of

1  that sort, and I verified that the summaries and charts were

2  accurate.

3  Q.  And were some of those underlying records and evidence

4  voluminous documents?

5  A.  Yes.

6  Q.  And were the charts and summaries that you reviewed in fact

7  fair and accurate summaries of the underlying records?

8  A.  Yes, they were.

9          MR. BROD:  The defense would at this time offer

10  Defense Exhibits 850-860, Judge.

11          THE COURT:  Any objection?

12          MR. SHAHABIAN:  No, your Honor.

13          THE COURT:  Those are received subject to the limited

14  redactions we discussed during the break.

15          (Defendant's Exhibits 850-860 received in evidence)

16          MR. BROD:  Ms. McFerrin, could we call up Defense

17  Exhibit 851.

18  BY MR. BROD:

19  Q.  Mr. Thayamballi, do you remember this chart?

20  A.  Yes, I do.

21          MR. BROD:  And Ms. McFerrin, could we just scroll

22  through the remaining pages.

23  Q.  Okay.  What is this chart, Mr. Thayamballi?  What's

24  depicted here?

25  A.  This is a chart that lists the phone calls between Patrick

1  Orlando and Marc Wachter in October of 2021.

2  Q.  And if we just go—we're at the top of the chart,

3  October 1st.  Just read the first entry and explain what we see

4  there for the jury.

5  A.  Sure.  So I'll go, you know, from left to right.

6      In the first entry, there is a call on October 1,

7  2021, at 3:43 p.m. Eastern time, from Patrick Orlando to Marc

8  Wachter, and that call lasted 15 minutes and three seconds.

9  Q.  And if we look at the right-hand column, some of the

10  entries are less than a minute—indeed, less than 30 seconds.

11  Do you know whether there was a—whether those calls connected?

12  A.  No, I don't know that.

13  Q.  Were you asked to include all calls regardless of duration

14  in this chart?

15  A.  Yes, this chart has—has all calls, even if they were only

16  a couple of seconds.

17      MR. BROD:  And we can take that one down.

18      And can we put up Defense Exhibit 850, please.

19  Q.  What does this chart depict, Mr. Thayamballi?

20  A.  This is a chart of the calls between Patrick Orlando and

21  Anton Postolnikov in October 2021.

22  Q.  And does this depict all of the calls between those two

23  individuals that you saw in the records in October 2021?

24  A.  Yes, it does.

25  Q.  And what were the dates of those calls?

1   A.  The dates were October 15th, October 21st, and

2   October 28th, 2021.

3   Q.  And just focusing on the October 15th call, who called who?

4   A.  On October 15th, Patrick Orlando called Anton Postolnikov.

5   Q.  How long did that call last?

6   A.  Four minutes and two seconds.

7           MR. BROD:  We can take that down.

8           Can we put up Defense Exhibit 852.

9   Q.  What's depicted in this chart, Mr. Thayamballi?

10  A.  This is a chart of phone calls, messages, communications,

11  and other events that took place on September 23, 2021, that

12  relate to Bruce Garelick.

13  Q.  Okay.  I just want to focus you on the entry at 8:47.  Do

14  you see the right-hand side of the entry there in bold, it says

15  DX 87?

16  A.  Yes, I see that.

17  Q.  And is that an example of one of the exhibits that you

18  reviewed in preparation for your testimony today?

19  A.  Yes, it is.

20          MR. BROD:  Okay.  And could we put up DX 87.

21          And just before we do that, Ms. McFerrin, in fact,

22  could we go to Government Exhibit 96.3, page 3.

23          Before we do that, I would at this point move in

24  certain defense exhibits.

25          THE COURT:  Why don't you list them.

1    MR. BROD:  Judge, the defense would offer Defense 87,

2    88, 90, 803, 804, 805, 812, 900, 901, 902, 903, 905, 906, 908,

3    909, 921, 922, 1100, 1101, 1108, subject to the discussion

4    earlier, 1109, 1110, 1111, and 1112, subject to the earlier

5    discussion.

6    THE COURT:  Any objections?

7    MR. SHAHABIAN:  May I just have a moment, your Honor.

8    Subject to the government's prior objections, no

9    additional objections, your Honor.

10   THE COURT:  Okay.  So those are received subject to

11   the redactions that I ordered previously.

12   (Defendant's Exhibits 87, 88, 90, 803, 804, 805, 812,

13   900, 901, 902, 903, 905, 906, 908, 909, 921, 922, 1100, 1101,

14   1108, 1109, 1110, 1111, 1112 received in evidence)

15   MR. BROD:  Can we now put up Government Exhibit 963,

16   slide three.

17   BY MR. BROD:

18   Q.  And Mr. Thayamballi, you weren't in the courtroom earlier,

19   but what is this?

20   A.  This is Government Exhibit 963.  It looks like a slide

21   prepared by the government.

22   Q.  And what date is this in reference to?

23   A.  It refers to September 23, 2021.

24   Q.  And does it depict certain calls between Bruce Garelick,

25   Michael Shvartsman, and calls between Mr. Garelick, Michael

1    Shvartsman, and Eric Hannelius?

2    A.  Yes, it does.

3    Q.  And the time of the first call between Mr. Garelick and

4    Mr. Shvartsman, that's 8:49 a.m.?

5    A.  Yes.

6    Q.  Okay.  And how long did that call last?

7    A.  One hour, 12 minutes.

8    Q.  And what is the time of the call between Mr. Garelick,

9    Mr. Shvartsman, and Mr. Hannelius?

10   A.  It starts at 10:31 a.m.

11   Q.  How long does that call last?

12   A.  Six minutes, 36 seconds.

13   Q.  And the final call depicted on the far right, what time did

14   that call start?

15   A.  It started at 5:16 p.m.

16   Q.  And how long did it last?

17   A.  21 minutes, 16 seconds.

18          MR. BROD:  Can we now put up Defense Exhibit 87,

19   please.

20          And can we go to the second page.

21   Q.  Mr. Thayamballi, is this one of the documents you reviewed

22   in checking this chart?

23   A.  Yes, it is.

24   Q.  And I'm going to ask you to read——just starting from the

25   third message from Bruce G, can you read that message.

1    A.  Yes.  So Bruce G writes, "Mike, Eric, please take a look at

2    the Encope presentations I emailed you from Canaccord.  Free to

3    discuss at 10:30 a.m. today?"

4    Q.  And what time was that message sent?

5    A.  It was sent at 8:48 a.m. on September 23, 2021.

6    Q.  And simple question, Mr. Thayamballi:  Do you have any idea

7    what Encope is?

8    A.  No, I don't.

9    Q.  Do you have any idea what Canaccord is?

10   A.  No.

11   Q.  Can you read the next message.

12   A.  In the next message, Eric Hannelius writes at 9:34 a.m. on

13   September 23, 2021, "10:30 a.m. EST today works for me, guys."

14   Q.  And can you read the fuller message?

15   A.  So then at 10:02 a.m. on September 23, 2021, Bruce G

16   responds, "Eric, I'll call you at 10:30 a.m. EST.  Michael has

17   already provided his feedback to me."

18   Q.  And the message after that?

19   A.  Eric Hannelius responds at 10:10 a.m., "Sounds good."

20   Q.  And the final message, please.

21   A.  And Michael Shvartsman responds at 10:20 a.m., "Conference

22   me in."

23   Q.  Can we now go back to Defense Exhibit 852.

24            And I'm just going to focus your attention on the

25   entry at 10:31.  What occurs at 10:31?

1  A.  Well, at 10:31, first, Bruce Garelick calls Eric Hannelius

2  for seven minutes.

3  Q.  And do you see there's an entry following that?

4  A.  Right.  And so then it looks like partway through the call

5  Bruce Garelick loops Michael Shvartsman into that call.

6  Q.  I focus your attention on the entry at 4:30.  What is shown

7  there?

8  A.  At 4:30 there is a calendar entry in Bruce Garelick's

9  calendar, and the title of the entry is Emcompay Presentation

10  Discussion.

11  Q.  And we're not going to do this entry by entry, but can we

12  take a look at DX 903, please.

13          Okay.  And is this one of the records that you

14  reviewed when you were checking these charts?

15  A.  Yes, it is.

16  Q.  Okay.  And can you just read the subject line, please.

17  A.  The subject line is Emcompay Presentation Discussion.

18  Q.  And what is the start date and time?

19  A.  The start date and time is September 23, 2021, at 4:30 p.m.

20          MR. BROD:  We can take that down.  And can we go back

21  to Defense Exhibit 852.

22  Q.  And can you just read the entry at 5:16.

23  A.  The entry at 5:16 says, Bruce Garelick returns call to

24  Michael Shvartsman for 21 minutes.

25          MR. BROD:  We can take that down.

1    Can we put up Defense Exhibit 856.

2    Q.  Is this one of the charts that you reviewed in preparation

3    for your testimony today?

4    A.  Yes, it is.

5    MR. BROD:  I may have skipped one, Ms. McFerrin.

6    Could we go back to Defense 854.

7    Q.  Same question, Mr. Thayamballi.  Is this a chart that you

8    reviewed in preparing for your testimony today?

9    A.  Yes, I reviewed this one too.

10   MR. BROD:  Okay.  And can we take a look at Government

11   Exhibit 964, slide 1, please.

12   Q.  And Mr. Thayamballi, again, you weren't in the courtroom

13   during the presentation of the government's charts, but what

14   are we looking at here?

15   A.  This is a slide that shows a timeline of communications on

16   September 29, 2021.

17   MR. BROD:  Okay.  Can we go back to the defense

18   exhibit, please, 854.

19   Q.  Okay.  And do you see an entry in yellow-highlighted color?

20   A.  Yes, I do.

21   Q.  Okay.  And can you read that entry, please.

22   A.  Yes.  It's a calendar entry, a Zoom calendar entry that's

23   titled "EEC and Rocket One re Akerna," with the attendees,

24   Bruce Garelick, Michael Shvartsman, Andy Sterner and Adam

25   Ginsberg, and the time is 12:30-1 p.m.

O561GAR4                      Thayamballi - Direct

1    Q.  And what time is the call between Mr. Garelick and

2    Mr. Shvartsman that follows?

3    A.  The call between Mr. Garelick and Mr. Shvartsman starts at

4    1:09 p.m.

5    Q.  How long does that call last?

6    A.  Seven minutes and 43 seconds.

7    Q.  And do you have an understanding of why the calendar entry

8    was highlighted in yellow here?

9    A.  Well, it doesn't look like it appeared on the previous

10   slide.

11   Q.  Thank you.  And we can now go to 856.

12        Was this one of the charts that you reviewed before

13   coming to testify today?

14   A.  Yes.

15        MR. BROD:  Okay.  And can we go to Government

16   Exhibit 964, slide 2.

17   Q.  Okay.  And taking a look at the box on the far right there,

18   what does it show?

19   A.  The box on the far right shows a phone call between Bruce

20   Garelick and Michael Shvartsman for six minutes and 40 seconds

21   starting at 5:23 p.m.

22   Q.  And going to the message on the far left, could you just

23   read that message.

24   A.  Yes.  It's a message from Patrick Orlando to the DWAC

25   Officers/Directors Group, and the message says, "Today we are

1    at the TMG headquarters in Atlanta and would like to see if

2    anyone can join by Zoom.  Here is the agenda."

3    Q.  And what time was that message sent?

4    A.  11:05 a.m.

5         MR. BROD:  Can we go back to Defense 856, please.

6    Q.  And here you see several entries that are——there's a yellow

7    glow behind them.  And do you have an understanding of why that

8    yellow highlighting is there?

9    A.  Yes.  These entries did not appear on the government's

10   slide.

11   Q.  And I'm going to just ask you to read the message at the

12   top in the middle of the page from Rod Matheson.  Can you read

13   that.

14   A.  Yes.  So at 4:43 p.m., Rod Matheson writes, "Hi, Michael

15   and Bruce.  I've spoken to a few of my contacts, and it seems

16   like there may be some interest in providing financing for your

17   buy now, pay later project.  Accord is not able to provide a

18   line because their bank syndicate includes some US banks, but

19   there may be some other lenders who could provide some

20   financing.  Let me know if you'd like to have a quick call to

21   discuss.  Thanks, Rod."

22   Q.  What time was that message sent?

23   A.  It was sent at 4:43 p.m.

24   Q.  Can you read the next message in this timeline, please.

25   A.  Yes.  So at 5:17 p.m., Bruce G responds.  "Hey, Rod,

1  appreciate that.  Yes, let's talk.  Free at 5:30 p.m. EST

2  today?"

3  Q.  And what time was that message sent?

4  A.  That was sent at 5:17 p.m.

5  Q.  And the next entry on the timeline, not the message but the

6  next entry, what appears in the timeline?  What is that?

7  A.  The next entry is the 5:23 p.m. call between Bruce Garelick

8  and Michael Shvartsman.

9  Q.  Based on your review of the documents in this case, is that

10  the same call that was depicted in the government's chart?

11  A.  Yes, it is.

12  Q.  And just taking a look at the very last message on the

13  page, can you read that one, please.

14  A.  Yes.  So at 5:47 p.m., Rod Matheson writes, "Unfortunately,

15  I have an AGM to attend this evening so that won't work for me.

16  I'm available tomorrow from 2:30 p.m. until 4 Eastern.  Let me

17  know if there is a time slot in there that could work for you."

18  Q.  And Mr. Thayamballi, do you have any idea what Mr. Garelick

19  and Mr. Shvartsman talked about for six minutes and 40 seconds

20  at 5:23 p.m.?

21  A.  No, I don't.

22          MR. BROD:  We can take this down.

23          Can we pull up DX 855.

24  Q.  Is this one of the charts that you reviewed and checked

25  before coming to testify today?

1   A.  It just disappeared from my screen.

2   Q.  Okay.

3   A.  It says "Display going to sleep."

4          THE COURT:  Can the jurors see it?

5          Okay.  The jurors can see it.  Can the witness see it?

6          THE WITNESS:  Yes, I can.  Thank you.

7          THE COURT:  Why don't you proceed, Mr. Brod.

8          MR. BROD:  Thank you.

9   Q.  Was this one of the charts you reviewed in preparation for

10  your testimony today?

11  A.  Yes, it was.

12  Q.  And can we take a look at—stepping back, what is depicted

13  in this chart?

14  A.  This is a timeline of communications and calendar entries

15  on October 1, 2021.

16         MR. BROD:  And can we take a look at Government

17  Exhibit 964.  Slide 5, please.

18  Q.  What's depicted in this chart, Mr. Thayamballi?

19  A.  This also depicts communications on October 1, 2021.  I

20  think they are the same ones.

21         MR. BROD:  Okay.  Can we go back to the defense

22  exhibit, please.

23  Q.  And below the line, you see two entries that are

24  highlighted.  Can you read the first one, please.

25  A.  Yes.  The first one is a calendar entry that says, "Quona

1  Capital/Rocket One intro at 10 a.m."

2  Q.  And the second one, please?

3  A.  Second one is a calendar entry that's titled "I heart Jane

4  called at 1 p.m."

5  Q.  And there's a call between Mr. Garelick and Mr. Shvartsman

6  for two minutes.  Withdrawn.

7       Do you see a call between Mr. Garelick and

8  Mr. Shvartsman in the middle of the page?

9  A.  I do.

10  Q.  How long did that call last?

11  A.  That was a call for two minutes and 46 seconds.

12  Q.  Do you have any idea what was discussed in that call?

13  A.  No, I don't.

14  Q.  Just focusing your attention on the message on the

15  right-hand side of the screen, can you read that, please.

16  A.  Yes.  It's a message from Bruce Garelick to the DWAC

17  Officer/Directors Group, and the message says, "Hey, guys, nice

18  work this week.  Apologies I've been out of the loop past

19  couple days.  Got buried with my day job.  Will catch back up

20  this weekend."

21       MR. BROD:  You can take it down.

22       Can we go to Defense Exhibit 857, please.

23  Q.  Mr. Thayamballi, was this one of the charts that you

24  reviewed in preparation for your testimony?

25  A.  Yes, it is.

1    MR. BROD:  And can we take a look at Government

2  Exhibit 965, slide 3, please.

3  Q.  And what's depicted on this slide, Mr. Thayamballi?

4  A.  This is a timeline of communications and other events that

5  took place on October 4, 2021.

6    MR. BROD:  Let me go back to Defense 857, please.

7  Q.  And just focusing your attention on the first——on the

8  second entry.  Can you just read that, please, the entry at

9  10:25.

10  A.  Yes.  So at 10:25 there was an email from Eric Hannelius to

11  Bruce Garelick and he wrote, "Welcome, Bruce.  There has not——"

12    MR. BROD:  Can we open up Defense Exhibit 1109,

13  please.

14  Q.  And focusing your attention on the second email on the

15  page, can you read that email, please.

16  A.  Yes.  So Bruce Garelick writes, "Eric, thanks for digging

17  up this Paylitix C subscription agreement confirming that there

18  has not been any subsequent conversion into equity since your

19  November 2019 safe investment."

20    MR. BROD:  If we could go now to the top email.

21  Q.  Can you read that email, please.

22  A.  Yes.  So Eric Hannelius responds, "Welcome, Bruce.  There

23  has not.  From Peter the CEO via text on Friday, we haven't

24  done a 409A in a while.  Probably Q1.  Also, conversion will

25  probably happen in April.  The rest should be in your note."

1          MR. BROD:  And we can take that down.

2          If we go back to Defense Exhibit 857.

3    Q.  Focusing your attention on entries at 12:01 and 12:47.  Can

4    you read those entries, please.

5    A.  Yes.  So at 12:01 Michael Shvartsman calls Bruce Garelick

6    twice, two calls for a total of two minutes and 50 seconds.

7    And then at 12:47 p.m., Michael Shvartsman calls Bruce Garelick

8    again for one minute and 13 seconds.

9    Q.  Can you read the entry at 1 p.m., please.

10   A.  At 1 p.m. there's a calendar entry entitled Rocket

11   One/Akerna.  The invitees were Michael Shvartsman, Eric

12   Hannelius, and Bruce Garelick, along with a team from Entourage

13   Effect Capital Partners.

14   Q.  Can you read the entry at 1:45.

15   A.  The entry at 1:45 says, Michael Shvartsman calls Bruce

16   Garelick for eight minutes and 30 seconds.

17   Q.  Can you read the entry at 2:30, please.

18   A.  At 2:30 there's a calendar entry that's entitled Rocket One

19   Capital call with Steve McCune, co-Adjute (ph) investor and BOD

20   member.  Attendees were Steve McCune, Michael Shvartsman, Bruce

21   Garelick, and Josh Taylor."

22   Q.  And Mr. Thayamballi, do you have any sense at all of what

23   was discussed on any of these calls between Mr. Garelick and

24   Mr. Shvartsman or Mr. Garelick and Mr. Hannelius?

25   A.  No, I don't.

O561GAR4                    Thayamballi - Direct

1          MR. BROD:  We can take the slide down, and can we go

2     to Defense Exhibit 858.

3     Q.  Mr. Thayamballi, is this one of the charts that you

4     reviewed in preparation for your testimony today?

5     A.  Yes.

6     Q.  And broadly speaking, what is depicted on this chart?

7     A.  Shows calendar entries and calls involving Bruce Garelick

8     on October 5, 2021.

9          MR. BROD:  And we can take that one down.

10         Can we go to Defense Exhibit 859, please.

11    Q.  Mr. Thayamballi, is this a chart that you've reviewed and

12    checked before your testimony today?

13    A.  Yes, it is.

14    Q.  Okay.  And can we—and what does it show?

15    A.  It shows text messages and calls involving Bruce Garelick

16    on October 7, 2021.

17         MR. BROD:  And can we now go to Defense Exhibit 90,

18    please.

19         And can you go to the second page, Ms. McFerrin.

20    Q.  And Mr. Thayamballi, can you read the first message,

21    please.

22    A.  Yes.  So at 1:33 p.m. on October 7th, 2021, Eric Hannelius

23    writes, "Is the Monroe call now, Bruce?"

24    Q.  Can you read the second message, please.

25    A.  At 1:37 p.m. he sends a second message that says, "Never

1    mind.  I see the time is 3:30 p.m. EST."

2    Q.  Can you read the third message, please.

3    A.  Bruce Garelick responds at 1:40 p.m.  "Yes, 3:30 p.m. EST

4    Monroe and 4:30 p.m. EST Roystone."

5    Q.  Do you have any idea what Monroe and Roystone are?

6    A.  No, I have no idea.

7         MR. BROD:  You can take this down.  Can we go now to

8    Exhibit 965, page 8, please, Ms. McFerrin.

9    Q.  I just want to focus your attention on the entry on the far

10   right.  Can you read that, Mr. Thayamballi.

11   A.  Yes, it's an email from Bruce Garelick to Alex Cano,

12   copying the DWAC board of directors at 7 p.m. Eastern time.

13   The message says, "All, I remain enthusiastic in support of TMG

14   as the prime target for us.  My feedback on the data room and

15   due diligence materials follows."

16   Q.  And Mr. Thayamballi, what is the date of this slide?

17   A.  October 7, 2021.

18        MR. BROD:  Can we now go to Defense Exhibit 860,

19   please.

20   Q.  Mr. Thayamballi, is this one of the documents that you

21   reviewed in preparing for your testimony about these charts?

22   A.  Yes, it is.

23   Q.  Okay.  And just focusing on the top of the email and the

24   first couple of sentences, is this the same email that's

25   depicted in the government's chart?

1    A.  Yes, it is.

2    Q.  Okay.  Can you read from the beginning of the email.

3    A.  "All, I remain enthusiastic in support of TMG as the prime

4    target for us.  My feedback on the data room and due diligence

5    materials follows."

6    Q.  Can I bother you to just stop.  Is that what we saw in the

7    government's chart?

8    A.  Yes, it is.

9    Q.  Okay.  Can you continue.

10   A.  Then there's a heading that says Positives and a series of

11   bullet points.  "I am impressed with the tech team/tech

12   infrastructure/tech architecture TMG is putting in place

13   contracts with vendors, employees, etc.  Business model at the

14   high level seems well thought out current cost modeling and

15   they are clearly not—" the exhibit just disappeared.

16           Okay.  Thank you.

17   Q.  Sometimes you worry about putting the jury to sleep, but

18   sometimes it's the technology that goes to sleep.

19   A.  Sometimes it's the computer.

20   Q.  If you continue through the end of that Positives section,

21   if you don't mind.

22   A.  Sure.  So the bullet I was reading says, "Current cost

23   modeling and they are clearly not cutting corners on

24   foundational infrastructure investments.  DWAC DD requests list

25   detailed and thorough."

1   Q.  Mr. Thayamballi, can you read the bullet points listed on

2   the Negatives.

3   A.  Sure.  "No revenue modeling/forecasts, nothing in the data

4   room to show what TMG's financial model might look like beyond

5   the 2021 startup phase, i.e., what is the potential in 2022 to

6   2023 and how will the business model monetization levers

7   work/scale over time.  Nothing in the data room to capture

8   "what if" governance and business continuation situations if

9   Trump runs for president again, gets thrown in jail,

10  Apple/Google app stores ban TMG offerings, etc."

11  Q.  And again, what was the date of this email?

12  A.  October 7, 2021.

13  Q.  Who was it directed to?

14  A.  It was an email from Bruce Garelick to Alex Cano copying

15  the DWAC board of directors and Alvaro Gomez Mena.

16          MR. BROD:  No further questions, Mr. Thayamballi.

17          THE COURT:  Cross-examination?

18          MR. SHAHABIAN:  Thank you, your Honor.

19  CROSS EXAMINATION

20  BY MR. SHAHABIAN:

21  Q.  Good afternoon, Mr. Thayamballi.

22  A.  Good afternoon.

23  Q.  Did I pronounce your name correctly?

24  A.  You did.  That was very good.

25  Q.  I'm Matt Shahabian.  I'm one of the prosecutors on this

1    case.  We've never met before, right?

2    A.  Right.

3    Q.  You testified you were asked to review certain charts

4    prepared by the legal team in this case; is that right?

5    A.  That's right.

6    Q.  Those are the charts you just testified about on direct

7    examination?

8    A.  Yes.

9    Q.  You're a lawyer, right, Mr. Thayamballi?

10   A.  Yes.

11   Q.  You're a criminal defense lawyer?

12   A.  That's part of what I do, yes.

13   Q.  You know this is an insider trading case?

14   A.  Yes, I do know that.

15   Q.  You know that one of the things that's important in an

16   insider trading case is when the defendant actually trades

17   securities?

18           MR. BROD:  Objection, Judge.  This is beyond the

19   scope.

20           THE COURT:  No.  Overruled.  I assume that you're

21   going to get to a point.

22           MR. SHAHABIAN:  Yes, your Honor.

23   Q.  You're aware that one of the things relevant in an insider

24   trading case is when the defendant actually trades securities,

25   right?

1  A.  I imagine that would be relevant, yes.

2  Q.  None of the charts you just testified about included any of

3  Bruce Garelick's trading in DWAC securities, did they?

4  A.  I don't think any of the charts did.  I seem to remember

5  seeing something on my screen that referred to trades.

6  Q.  That was one of the government exhibits, right?

7  A.  It may have been.

8  Q.  Did you review any of the government's charts prior to your

9  testimony today?

10  A.  Yes, I did see government charts.

11  Q.  Before taking the stand today.

12  A.  Yes.

13  Q.  So you knew prior to your testimony today that there were

14  government charts that included trades by the defendant, right?

15  A.  I don't know if I knew that specific fact.

16  Q.  And you knew that the charts you were going to testify

17  about did not include any of the defendant's trades in your

18  chronology, right?

19  A.  Yes.

20  Q.  Why not?

21        MR. BROD:  Object to the form, as well as anything

22  else.

23        THE COURT:  Sustained.

24  Q.  Mr. Thayamballi, you didn't include the defendant's trades

25  in DWAC securities because he is a client of your firm, right?

O561GAR4                    Thayamballi - Cross

1              MR. BROD:  Objection.

2              THE COURT:  Overruled.

3    A.  I did not prepare the charts.

4    Q.  Okay.  But you testified you work at Shapiro Arato Bach,

5    correct?

6    A.  Yes.

7    Q.  You're a partner there?

8    A.  Yes.

9    Q.  That means you're a lawyer at the firm.

10   A.  Yes.

11   Q.  That's the same firm that represents the defendant,

12   correct?

13   A.  Yes.

14   Q.  Your partners include Ms. Shapiro and Mr. Bach, right?

15   A.  Yes.

16   Q.  How many partners are there at Shapiro Arato Bach?

17   A.  Five.

18   Q.  And you know that as a lawyer, you have a duty of loyalty

19   to your firm's clients, right, Mr. Thayamballi?

20   A.  Right.

21   Q.  That means you can't take steps that would negatively

22   impact your firm's clients, right?

23   A.  I think that's a very broad way of putting it.

24   Q.  Okay.  Well, you have a duty—you and your firm have a duty

25   to zealously represent your clients, right?

1  A.  Well, I think that the client's attorneys have a duty to

2  zealously represent the client, yes.

3  Q.  And in this case, the defendant's attorneys are your law

4  firm partners, right?

5  A.  Yes.

6  Q.  You can't take actions that would undermine their

7  representation of their client; isn't that right?

8  A.  I can't——what do you mean by I cannot?

9  Q.  Well, Mr. Thayamballi, you know that as a lawyer, you have

10 a duty not to take steps that would negatively undermine your

11 firm's representation of one of its clients; yes or no?

12 A.  Yes, it would not be good to undermine a client.

13 Q.  It would violate your duty as a lawyer, right?

14 A.  Yes.

15 Q.  Okay.  And your charts did not address any of the

16 defendant's trading in DWAC securities; fair to say?

17        MR. BROD:  Objection again.  The witness did not

18 create the chart so——

19        THE COURT:  No speaking objections, but the objection

20 is sustained, on the grounds of asked and answered.

21 Q.  Let's look at some of the charts, Mr. Thayamballi.

22        MR. SHAHABIAN:  If we could publish, Mr. Bianco,

23 Defense Exhibit 852.

24        THE COURT:  Before we do questions on that, how long

25 do you expect on cross-examination?

O561GAR4

1     MR. SHAHABIAN:  Maybe another 15 to 20 minutes, your

2  Honor.

3     THE COURT:  Okay.  Then it's 12:55.  We'll take our

4  lunch break now.

5     Members of the jury, don't discuss the case amongst

6  yourselves, don't do any research, don't discuss the case with

7  anybody else.  Please be back here in the jury room five

8  minutes of 2 so we can get started promptly at 2.

9     THE DEPUTY CLERK:  All rise.

10     (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O561GAR4

1          (Jury not present)

2          THE COURT:  Counsel may be seated.  The witness may

3    step down.

4          Mr. Bach, how long are the character witnesses?

5          MR. BACH:  Well, the direct examinations will be very

6    short.

7          THE COURT:  Okay.  And I'm prepared to have a colloquy

8    with Mr. Garelick if he chooses not to testify.  I'm also

9    prepared to have a short colloquy with him if he chooses to

10   testify, just to ensure that he understands that the decision

11   is his.  Any objection, Mr. Bach, to me having that colloquy?

12         MR. BACH:  No, your Honor.

13         THE COURT:  Why don't I wait until actually he's at

14   the point of making that decision.

15         Anything else from the government before we break for

16   lunch?

17         MS. HANFT:  Your Honor, just a reminder that the

18   witness is on cross-examination right now so he can't speak

19   with the defense team.

20         THE COURT:  Okay.  I assume the defense will not talk

21   to their partner about this case while he's on

22   cross-examination.  Mr. Bach?

23         MR. BACH:  That is correct.  We rarely talk to him

24   anyway.

25         THE COURT:  Anything from the defense besides that?

O561GAR4

1          MR. BACH:  Nothing further at this time.

2          THE COURT:  Okay.  See you back here a couple minutes

3    before 2.  Make sure the witness is actually on the stand at

4    2:00.

5          THE DEPUTY CLERK:  All rise.

6          (Luncheon recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O56Cgar5                        Thayamballi - Cross

1                          AFTERNOON SESSION

2                             2:11 p.m.

3              THE COURT:  Any reason, from the government's

4     perspective, why we can't bring in the jury?

5              MR. SHAHABIAN:  No, your Honor.

6              THE COURT:  Mr. Bach.

7              MR. BACH:  No, your Honor.

8              THE COURT:  Let's bring in the jury.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (Jury present)

2               THE COURT:  Mr. Shahabian, you may continue.

3               MR. SHAHABIAN:  Thank you.

4   BY MR. SHAHABIAN:

5   Q.  Good afternoon, Mr. Thayamballi.

6   A.  Good afternoon.

7   Q.  I want to start with one of the charts you discussed on

8   direct examination.

9               MR. SHAHABIAN:  Mr. Bianco, could we please publish

10  what's evidence as defense exhibit 852.

11  Q.  Mr. Thayamballi, this is one of the charts you discussed on

12  your direct; right?

13  A.  Yes, it is.

14  Q.  It's a chart that shows a timeline for September 23rd,

15  2021; correct?

16  A.  Correct.

17  Q.  This chart does not contain any entries for trading and

18  securities in DWAC on September 23rd, 2021, does it?

19  A.  No, it doesn't.

20  Q.  Were you aware that the defendant purchased 1300 DWAC

21  shares on September 23rd, 2021?

22  A.  No.

23              MR. SHAHABIAN:  If we could publish, Mr. Bianco,

24  Government Exhibit 963 at page 3.

25  Q.  Do you see this, Mr. Thayamballi?

O56Cgar5                    Thayamballi - Cross

1    A.  I do see this.

2    Q.  You see at the bottom of Government Exhibit 963, it shows

3    Mr. Garelick purchased 1300 DWAC units at 12:04 p.m. on

4    September 23rd, 2021?

5    A.  I see that.

6    Q.  So remember, 12:04 p.m.

7           MR. SHAHABIAN:  If we go back to defense exhibit 852.

8    Q.  If this was on the chart, it would be above the "group chat

9    IPO plans" at the bottom-left of this chart; fair to say?

10   A.  Yes.

11   Q.  When you were reviewing this chart, were you aware that the

12   defendant attended a board meeting two days prior for DWAC on

13   September 21st, 2021?

14   A.  No.

15   Q.  Were you aware that the day before this timeline, DWAC and

16   TMG entered into a mutually exclusive letter of intent?

17   A.  No.

18          MR. SHAHABIAN:  We can take this down, Mr. Bianco.

19          I'd like to turn to another chart.  If we can publish

20   defense exhibit 856.

21   Q.  Do you remember discussing defense exhibit 856 on direct

22   examination, Mr. Thayamballi?

23   A.  Yes, I do.

24   Q.  And do you remember Mr. Brod asked you about the phone call

25   in the top-right of your chart where the defendant and Michael

1   Shvartsman spoke for 6 minutes and 40 seconds?

2   A.  Yes.

3   Q.  Correct me if I'm wrong, I believe on direct examination

4   you testified you did not know what they spoke about during

5   that call?

6   A.  That's correct.

7   Q.  Do you see any text messages between the defendant and

8   Michael Shvartsman depicted on your chart, defense exhibit 856?

9   A.  I'm sorry.  Text messages between whom?

10  Q.  Bruce Garelick and Michael Shvartsman.

11  A.  Between the two of them, no.  Although, it seems like the

12  Rod Matheson message at the top is to Michael and Bruce.

13  Q.  So the date of this is September 30th, 2021?

14  A.  Yes.

15  Q.  The call reflected on your chart, that's at 5:23 p.m.?

16  A.  Yes.

17        MR. SHAHABIAN:  If we could publish, Mr. Bianco,

18  Government Exhibit 964, and turn to page 3.

19  Q.  Do you see, Mr. Thayamballi, the title for Government

20  Exhibit 964 at page 3 is September 30th, 2021?

21  A.  Yes.

22  Q.  That's the same date as your chart, Defendant's

23  Exhibit 856; right?

24  A.  Yes.

25  Q.  If you look at the left, do you see the text messages

1   between Bruce Garelick and Michael Shvartsman, starting at 5:40

2   p.m.?

3   A.  I see those, yes.

4   Q.  That's about 10 minutes after the phone call we were just

5   looking at on Defendant's Exhibit 856?

6   A.  I don't remember the time exactly, but that sounds about

7   right.

8   Q.  Roughly.

9        And you see that the first text message from the

10  defendant to Michael Shvartsman is, Mike, note, DWACW warrants

11  started trading today, traded just below 50 cents on volume of

12  116,000.  That text message is not in Defendant's Exhibit 856;

13  correct?

14  A.  Correct.

15  Q.  If you look at the next message, it's from the defendant to

16  Michael Shvartsman at 5:41 p.m.  That means there was only

17  60,000 of volume today.  Volume should pick up as DWACU holders

18  disaggregate their units.  That text message was not in

19  Defendant's Exhibit 856, was it?

20  A.  Right.

21  Q.  And then the next message below that from the defendant to

22  Michael Shvartsman.  Been Reed at E.F. Hutton, and then a phone

23  number.  Is your contact to trade.  Recall, you have $255,000

24  cash in that account plus $145,000 worth of DWACU.  That text

25  message at 5:44 p.m. is not in Defendant's Exhibit 856;

O56Cgar5                    Thayamballi - Cross

1  correct?

2  A.  Correct.

3          MR. SHAHABIAN:  We can take this down, Mr. Bianco.

4          If we can publish Defendant's Exhibit 857.  Sorry.

5  Defendant's Exhibit 858.  Apologies, Mr. Bianco.  857 was

6  right.

7  Q.  Do you see Defendant's Exhibit 857, Mr. Thayamballi?

8  A.  Yes, I do.

9  Q.  This is a chart from October 4th, 2021; is that right?

10  A.  Yes.

11  Q.  And it depicts a series of events that involve the

12  defendant on October 4th, 2021; right?

13  A.  Right.

14  Q.  First timestamp is 9:08 a.m., right?

15  A.  Yes.

16  Q.  Last timestamp is 7:17 p.m., right?

17  A.  Right.

18  Q.  You did not include in this chart that the defendant also

19  accessed the TMG data room on this day; fair to say?

20          MR. BROD:  Objection.

21          THE COURT:  Overruled.

22  A.  I didn't prepare the chart.

23  Q.  This chart does not include that the defendant accessed the

24  TMG data room on October 4th, 2021; fair to say?

25  A.  That's right.

O56Cgar5                    Thayamballi - Cross

1   Q.  If we look at Government Exhibit 965 at page 3, do you see

2   here that on October 4th, 2021, at 12:13 p.m., the defendant

3   accessed the TMG data room?

4   A.  That's what this slide says, yes.

5   Q.  And this event is not depicted on your chart that we just

6   looked at; right?

7   A.  Right.

8           MR. SHAHABIAN:  If we could publish Defendant's

9   Exhibit 860.

10  Q.  You testified about Defendant's Exhibit 860 on direct

11  examination; correct?

12  A.  Correct.

13  Q.  This was an email that you read for the jury; right?

14  A.  Right.

15  Q.  The second sentence starts, "my feedback on the data room,

16  plus due diligence materials follows," correct?

17  A.  Correct.

18  Q.  And then there's a list of positives and negatives that you

19  discussed; right?

20  A.  Yes.

21  Q.  It included, for example, the negatives, no revenue

22  modeling forecasts; correct?

23  A.  Correct.

24  Q.  Are you aware the defendant subsequently said at a board

25  meeting that the model was irrelevant for Trump Media?

1  A.  No.

2  Q.  If I could direct your attention --

3          MR. SHAHABIAN:  Members of the jury, if I could direct

4  your attention to the recording transcript binder, you could

5  turn to the tab labeled Government Exhibit 125-AT, which is the

6  second tab.  The first page of 125-AT says, recorded

7  conversation, October 19th, 2021.  You can feel free to the

8  first page and follow along as we publish Government Exhibit

9  125-A.

10          Go ahead, Mr. Bianco.

11          (Audio played)

12          If I could have a moment, your Honor.

13          THE COURT:  Yes.

14          MR. SHAHABIAN:  No further questions.

15          THE COURT:  Any redirect?

16  REDIRECT EXAMINATION

17  BY MR. BROD:

18  Q.  Mr. Thayamballi, do you remember being asked some questions

19  about items that were included or not included in your chart?

20  Do you remember being asked that by Mr. Shahabian?

21  A.  Yes.

22  Q.  For example, you were asked about whether you included in

23  the October 4th chart the fact that Mr. Garelick accessed the

24  TMG data room on that day?

25  A.  I was asked that, yes.

O56Cgar5                    Thayamballi - Redirect

1   Q.  And do you recall during my examination of you that I

2   showed you certain government slides?

3   A.  Yes.

4           MR. BROD:  Can we bring up Government Exhibit 965,

5   page 3.

6   Q.  Was this one of the slides that I showed you during my

7   examination?

8   A.  Yes.

9   Q.  Did I show you several other government slides?

10  A.  Yes.

11          MR. BROD:  No further questions.

12          THE COURT:  Anything further, Mr. Shahabian?

13          MR. SHAHABIAN:  No, your Honor.

14          THE COURT:  Sir, you're excused as a witness.  You may

15  step down.

16          (Witness excused)

17          Defense will call their next witness.

18          MR. BACH:  Thank you.  We call Carl DeJounge.

19          THE COURT:  Mr. DeJounge can be brought into the

20  courtroom.

21          Mr. DeJounge, please step forward into the witness

22  box, remain standing, and my courtroom deputy will administer

23  the oath.

24   CARL DeJOUNGE,

25       called as a witness by the Defendant,

1    having been duly sworn, testified as follows:

2            THE DEPUTY CLERK:  Please state your full name for the

3    record, and please spell out your first and last name.

4            THE WITNESS:  Carl DeJounge, C-A-R-L D-e-J-O-U-N-G-E.

5            THE COURT:  Mr. DeJounge, please make sure that you

6    speak into the microphone, keep your voice loud just like

7    you've been doing.  Wait until the question is done until you

8    answer.

9            Counsel, you may inquire.

10           MR. BACH:  Thank you, Judge.

11   DIRECT EXAMINATION

12   BY MR. BACH:

13   Q.  Good afternoon, Mr. DeJounge.

14           Could you please introduce yourself to the jury and

15   tell them your educational background.

16   A.  I was born and raised in Sweden, moved to Westport,

17   Connecticut right before high school in August of 1984.  Went

18   to Staples High School.  From there, I went to Lafayette

19   College between 1988 and 1992.  After graduating from -- well,

20   I graduated from college with a bachelor of arts in

21   international affairs, a minor in French.  That fall of 1992, I

22   took a job in New York and I've been in financial services in

23   New York ever since for various employers, mostly as a research

24   analyst.  I currently live and reside up in Manchester,

25   Vermont, and have been in Vermont full-time since early days of

1   COVID.  Before that, most of the prior decades with my family

2   was spent in Connecticut.

3   Q.  Do you know someone named Bruce Garelick?

4   A.  Yes.  Bruce and I became close friends during freshman year

5   in high school, so almost 40 years ago.  As I mentioned, I just

6   moved from Sweden, started at Staples High School in Westport

7   in that fall of 1984.  We became good friends.  We had a common

8   interest in tennis and skiing, among other things.  I've been a

9   close friend of his ever since.

10  Q.  Just very generally speaking, what kind of interactions

11  have you had with Mr. Garelick over the years?

12  A.  Many close interactions.  So, as I mentioned, we became

13  close friends in high school.  So that was between '84 and '88.

14  We graduated -- I went to Lafayette College in Easton,

15  Pennsylvania.  Bruce went to Vanderbilt in Nashville.  It just

16  so happened I went abroad with a Vanderbilt program in France,

17  spring semester of junior year in college where I became very

18  good friends with Michael Lamont, who was also a good friend of

19  Bruce's from Vanderbilt.  So we had common connections through

20  college.  We would see each other during college.  Upon

21  graduating in 1992, I was in New York, Bruce was initially down

22  in the Baltimore area before he moved up to the Boston area,

23  but we would see each other quite frequently.  When I was

24  married in September of 1995, Bruce was the best man at my

25  wedding.

1   We would, over the years, often get together on ski

2   trips.  We went skiing in places like out in Wyoming and

3   Colorado and Utah.  And by the way, Bruce was usually the

4   organizer of those trips.  Very organized and liked to research

5   all the in's and out's of those trips.  So we would see each

6   other there.  We had a common practice of seeing each other in

7   New York over the years.  When he would come in for a

8   conference, for example, we would grab dinner and keep in touch

9   that way.  More recently, just here in the past year or so, I

10   would visit him when I attended a conference down in Florida,

11   we saw each other in Florida a little bit here in the past

12   year.

13   Q.  Based on your experiences and interactions with

14   Mr. Garelick, do you have an opinion as to his character for

15   honesty and truthfulness?

16   A.  I have a strong opinion.  As I've noted here, I've known

17   him for almost 40 years and I've had countless interactions

18   over those years, myself and groups of friends.  I've also held

19   Bruce in the highest regard for honesty and integrity.  I would

20   not have chosen him to be the best man at my wedding otherwise.

21   So I have nothing but the most positive views on his integrity

22   and honesty and truthfulness.

23   Q.  Among your common friends, do you know his reputation for

24   truthfulness and honesty?

25   A.  Yes.  We have several common friends from both high school

1  and college as I mentioned.  I have never heard anything

2  negative from any of them.  So all my recollection there is

3  that he's always been viewed as an upstanding, good, honest

4  person that is a good friend.  I've never heard anything

5  otherwise than that.

6          MR. BACH:  Thank you, Mr. DeJounge.  No further

7  questions.

8          THE COURT:  Cross examination.

9  CROSS-EXAMINATION

10  BY MR. NESSIM:

11  Q.  Good afternoon, Mr. DeJounge.

12  A.  Good afternoon.

13  Q.  I just want to ask you a few questions about your

14  relationship with Mr. Garelick.

15          You are a high school friend of Mr. Garelick's?

16  A.  Correct, yes.

17  Q.  Most of your interactions with him are from the '80s and

18  '90s when you were in high school and college?

19  A.  Those were the most frequent interactions, that's correct.

20  As I noted, we stayed in touch over the years.

21  Q.  Since you graduated high school, you have not lived in the

22  same city as Mr. Garelick; is that right?

23  A.  That's correct.

24  Q.  And you have not worked with Mr. Garelick?

25  A.  That's correct.

O56Cgar5                    DeJounge - Cross

1   Q.  You have not seen him every day since you were in high

2   school in the 1980s?

3   A.  Not every day, that's correct.

4   Q.  What you know about him is in the context of your

5   friendship; right?

6   A.  That's correct.

7   Q.  Before you testified today, you didn't review any of the

8   evidence that's been admitted during this trial; right?

9   A.  I did not.

10  Q.  So you did not review the nondisclosure agreement that

11  Mr. Garelick signed?

12  A.  I have not.

13  Q.  And you did not know that that nondisclosure agreement

14  forbade Mr. Garelick from using inside information improperly?

15          MR. BACH:  Objection.

16          THE COURT:  Overruled.

17  Q.  You're not aware of that NDA forbidding Mr. Garelick's

18  improper use of --

19  A.  That's correct, I'm not aware of any NDA.

20  Q.  And you're not aware of whether or not Mr. Garelick

21  obtained inside information as a board member of DWAC; right?

22  A.  Correct, I do not know.

23  Q.  And you're not aware of the fact that Mr. Garelick

24  purchased shares of DWAC while he was sitting on the board of

25  directors?

1   A.  I do not.

2   Q.  And you're not aware of the fact that Mr. Garelick

3   recommended that his boss purchase DWAC shares while he sat on

4   the board of DWAC; right?

5   A.  Not aware.

6   Q.  If you were shown evidence establishing those things, would

7   it change your opinion as to Mr. Garelick's character?

8   A.  It would -- it would depend on the quantum of evidence.

9   From my perspective, it would be completely out of character

10  for him to have done something untruthful.  So I -- without

11  having any evidence in front of me, I don't -- I don't see how

12  I could reach that conclusion.  But I feel like I'm speaking

13  hypotheticals here.

14  Q.  You mentioned you're in the financial profession; right?

15  A.  That's right.

16  Q.  Are you aware of the term "insider sales"?

17  A.  Yes, I am familiar with that term.

18  Q.  Insider sales is when a director or a executive of a

19  company purchases --

20          MR. BACH:  Judge, this is beyond the scope.  We

21  object.

22          THE COURT:  Very well.  Maybe.  Let's see what the

23  rest of the question is and then I'll rule on the objection.

24          MR. NESSIM:  May I have one moment, your Honor?

25          THE COURT:  Yes.

1  Q.  Sorry, Mr. DeJounge.

2       You would agree with me that someone who commits

3  insider trading is not being truthful; right?

4  A.  If it's material -- if you're trading on material nonpublic

5  information and it's factually proven, then I would agree with

6  that, yeah.

7       MR. NESSIM:  One moment, your Honor.

8       No further questions.

9       THE COURT:  Anything, Mr. Bach?

10      MR. BACH:  Nothing further.

11      THE COURT:  Sir, you're excused as a witness.

12      (Witness excused)

13      Defense will call the next witness.

14      MR. BACH:  We call Bruce Garelick.

15      THE COURT:  Let me see the parties at sidebar.

16      (Continued on next page)

17

18

19

20

21

22

23

24

25

1    (At the sidebar)

2    THE COURT:  I just wanted to know, first from the

3  government's perspective, whether any further colloquy with

4  Mr. Garelick is necessary.  I would not think so, but I'm more

5  interested in the government's views.

6    MS. HANFT:  Not from the government's view.

7    THE COURT:  How about from the defense?

8    MR. BACH:  No.

9    MS. HANFT:  Your Honor, if we could have a break at

10  some point this afternoon --

11    THE COURT:  You'll have one.

12    MS. HANFT:  Thank you.

13    (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1     (In open court)

2          THE COURT:  Mr. Garelick, please step forward into the

3     witness box, remain standing, and my deputy will administer the

4     oath.

5      BRUCE GARELICK,

6          called as a witness by the Defendant,

7          having been duly sworn, testified as follows:

8          THE DEPUTY CLERK:  Please state your full name for the

9     record, and please spell your full name for the record.

10         THE WITNESS:  My name is Bruce Garelick.  First name

11    is B-R-U-C-E, last name is Garelick, G-A-R-E-L-I-C-K.

12         THE COURT:  Mr. Garelick, keep your voice up, speak

13    into the microphone, wait until the question is done before you

14    answer.

15         Mr. Bach, you may inquire.

16         MR. BACH:  Thank you.

17    DIRECT EXAMINATION

18    BY MR. BACH:

19    Q.  Mr. Garelick, did you ever share with anyone else any

20    confidential information that you learned as a member of DWAC's

21    board?

22    A.  No, I absolutely did not.

23    Q.  Did you ever tip anyone about anything you learned as a

24    member of DWAC's board?

25    A.  No, I did not.

O56Cgar5                    Garelick - Direct

1    Q.  Did you ever buy or sell stock for yourself at a time when

2    you believed you were in possession of material nonpublic

3    information?

4    A.  No, I did not.

5    Q.  How did you plead in response to the charges in this case?

6    A.  I pled not guilty.

7    Q.  Mr. Garelick, can you please introduce yourself to the

8    jury.  Start by telling them about your educational background.

9    A.  Sure.  I'm Bruce Garelick.  Nice to meet you all.  I got my

10   high school diploma in the New York suburbs.  I went to public

11   school.  That was 1988.  I then found my way down south to

12   Vanderbilt University in Tennessee where I got a bachelor of

13   arts in political science.  I graduated in 1992.  I worked for

14   a few years out of undergraduate in the insurance industry.  I

15   then, in 1995, started to pursue my master's in business

16   administration degree at the Warden School at the University of

17   Pennsylvania.  I graduated with an MBA from Warden in 1997.

18   Q.  Mr. Garelick, after business school, what did you do?

19   A.  Yes, that's really where my investment and financial

20   analysis career began.  I moved to Boston, Massachusetts where

21   I had taken a job with a mutual fund company there.  I spent

22   the next six, seven years working for two different mutual fund

23   companies as an equity analyst, so as a stock analyst, focused

24   on the technology sector.  I also managed some pieces of

25   portfolios that were dedicated to the technology equity or

1   stock sector.  From there I found my way into the hedge fund

2   industry, still in Boston, Massachusetts.  I worked for Adage

3   Capital in Boston, which is a large hedge fund there, for

4   approximately six years.  I was, again, a technology equity

5   research analyst as well as a sector -- a technology sector

6   portfolio manager.  After Adage, I started my own hedge fund,

7   similarly focused in the technology equity sector.

8   Q.  What was your own hedge fund called?

9   A.  We called it GCP, but the full name was Garelick Capital

10  Partners because we couldn't come up with a more creative name

11  than that.

12  Q.  Along the way, Mr. Garelick, did you obtain any

13  professional certifications?

14  A.  I did.  I believe it was 2001 that I finished the charter

15  financial analyst designation, also known as the CFA.

16  Q.  For how many years did you hold that certification?

17  A.  Many, many years until just recently, actually.  So 20-plus

18  years.

19  Q.  And why until just recently?

20  A.  Well, unfortunately, with this case, the CFA, to their

21  credit, will notice if there's a case like this that's pending

22  or if you've been accused of any kind of securities-related

23  issues.  They reached out to me and they basically put my

24  status on hold pending the outcome of this case.

25  Q.  During your career in finance, were you aware there were

1  rules and laws governing the securities industry?

2  A.  Yes, absolutely.  I was well aware of the rules in

3  particular around material nonpublic information.

4  Q.  The term "insider trading," what do you understand that to

5  mean?

6  A.  Insider trading is if you trade on information that's

7  material — meaning by itself — it's going to have a meaningful

8  impact on the stock and it's nonpublic, and you, in the

9  process, breach what's called a fiduciary duty, you would have

10  broken the law.  Similarly, if you tipped someone of material

11  nonpublic information, that would be against the law.

12  Q.  Before this case, at any point during your career in the

13  securities industry, had you ever had any run-in with the law?

14          MS. HANFT:  Objection.

15          THE COURT:  Sustained.

16          THE WITNESS:  Oh, sustained.

17  A.  No, sir, I --

18          THE COURT:  I sustained the objection.  When I sustain

19  the objection, you don't answer.  When I overrule, you answer.

20          THE WITNESS:  Apologies.

21  Q.  Had any investor at any company at which you worked ever

22  filed a complaint against you?

23          MS. HANFT:  Objection.

24          THE COURT:  Sustained.

25  Q.  After you worked at GCP or Garelick Capital Partners, what

1  did you do next?

2  A.  I was sort of ready.  This was -- what year are we up to

3  now?  We're early 2019.  I spent a lot of time in the

4  technology investment world and I was ready to try my hand in

5  the -- also in the technology sector, something a little more

6  entrepreneurial, so I went to work for a private software

7  company right here in New York City.

8  Q.  Are you familiar with someone named Michael Shvartsman?

9  A.  Yes, I am.

10  Q.  How did you come to know Mr. Shvartsman?

11  A.  Sure.  So, while I was working for this software company in

12  New York, one of their key, probably most important products

13  was a Point of Sale software system.  You see Point of Sale in

14  any retail establishment.  And as has been well sort of born

15  out over the last several decades, Point of Sale software and

16  payment processing kind of nicely go hand in hand, almost like

17  a nice ice cream sandwich, Witness, Toast, and Square, which

18  are public companies.

19        So, one of the things I was doing at this software

20  company, it was a young company, it was doing well, but in

21  early stage.  I wanted to increase the monetization of the

22  platform, meaning more ways that the company could scale and

23  make money.  And so, the idea was that if we could find a good

24  payment processing partnership, that could be -- it could be

25  value added to the consumer because it would make for an easier

1  checkout experience, but it also could be good for the business

2  model because there would be to some degree a revenue share

3  there.  And so, I started to research various payment

4  processors that could be appropriate to pair with my software

5  company's Point of Sale software in a nicely integrated

6  offering.  Did a lot of research, stumbled across Michael, and

7  he had one of the big payment processing companies out there.

8  His offerings looked to me to be the most robust from my

9  research.  That's how I got to know him, I struck a partnership

10  deal with him while I was working for the software company.

11  Q.  Did there come a time when you went to work for him?

12  A.  Yes.  So my software company ended up getting sold to

13  another entity, another private company.  At that point,

14  Mr. Shvartsman broached the idea that he could use someone like

15  myself to come work for him.  Several months later, August

16  2020, I did go to work for him.

17  Q.  What did you understand Michael Shvartsman's business to

18  be?

19  A.  Sure.  He essentially has a family office that invests.

20  He's a very successful, wealthy entrepreneur.  And so, he has a

21  family office, Rocket One Capital, as you've heard in this

22  case, that invests.  He and his partner also founded some

23  pretty innovative companies that they own and operate, this

24  payment processing company I mentioned a little while ago being

25  a good example of that.  So it was -- it's investments as well

1  as technology-related operating companies.

2  Q.  What was your role and responsibility in working for

3  Mr. Shvartsman?

4  A.  Sure.  So he brought me on as a seasoned financial analyst,

5  a finance executive to help him -- I think it's severalfold.

6  One, to really help diligence investments as well as

7  acquisitions for his private operating companies.  Also to do

8  some of what I was doing at the software company, which was

9  more to think of financial ways to optimize the business

10  models -- the business model he had in these private operating

11  companies, like the payment processing business.

12  Q.  When you began working for Michael Shvartsman, where was he

13  based?

14  A.  He was and remains based in south Florida.  Specifically,

15  his office is in Aventura, Florida.  I think it's the first

16  town just north of Miami.

17  Q.  When you began working for Mr. Shvartsman, where were you

18  based?

19  A.  I was in lovely Providence, Rhode Island.

20  Q.  Throughout the entire year of 2021, where did you live?

21  A.  Providence, Rhode Island.

22  Q.  How did you work from Providence, Rhode Island for someone

23  based in Florida?

24  A.  Yeah, so, in 2021, I think we were unfortunately pretty far

25  into COVID, so applications like Zoom, collaboration,

1    technology offerings like Zoom were pretty established.  It

2    wasn't particularly difficult.  We would talk on the phone

3    frequently, we would do Zoom calls.  I collaborated with him

4    remotely.  Occasionally I'd come down to the Florida office to

5    visit, but I was a remote worker during that time.

6    Q.  How often would you speak to Mr. Shvartsman remotely by

7    phone?

8    A.  Fairly frequently.  I'd say some weeks every single day,

9    often multiple times a day.  Sometimes I wouldn't talk to him

10   for a few days.  It was an active remote collaboration, working

11   relationship we had.

12   Q.  How would you describe your relationship with

13   Mr. Shvartsman?

14   A.  Professional, business courteous.

15   Q.  Did you have a social relationship with him?

16   A.  No, I really didn't have a social relationship with him.

17   Q.  Are you and he part of the same social circle?

18   A.  I would not say that, no.

19   Q.  Focusing on the summer of 2021, what kind of things were

20   you working on with Michael at Rocket One?

21   A.  Yeah, that was -- actually, that was a very busy time.  The

22   payment processing company I had mentioned, he and his sort of

23   founding business partner had really successfully built this to

24   scale privately without bringing in outside investors.  It was

25   at a point now where they did want to bring in some outside

1    financing and potentially take some money off the table, so to

2    speak, as successful founders.  And so, we engaged with an

3    investment bank.  This was something that I led to then engage

4    with some large institutional investors for potential

5    investments or financing.  So that was one.

6         Two, there were financing endeavors related to some

7    new product initiatives that we were rolling out.  I think buy

8    now, pay later might have been mentioned earlier in the case.

9    There was also some acquisitions that we were working on for

10   the operating business.  There was a bunch of sort of one-off

11   investment opportunities.  There was something called an SBIC,

12   which is a small business investment company.  Type of thing we

13   were working on with the federal government, actually, through

14   their Small Business Administration division.  There was a lot

15   going on at that time.

16   Q.  Was there anyone else involved, at a high level, besides

17   yourself and Mr. Shvartsman?

18   A.  Yes.  A gentleman by the name of Eric Cornelius I think has

19   come up in the case.  He's a good friend of Mr. Shvartsman.  He

20   is his founding business partner in some of the notable

21   businesses that they have.  He's also a fairly frequent

22   co-investor with Michael, tend to mirror a lot of what Michael

23   does.

24   Q.  You mentioned a number of projects.  What was the magnitude

25   of some of these projects?

O56Cgar5                    Garelick - Direct

A.  Some of those were quite large.  I mean, the endeavor with

the investment bank was -- it actually resulted in extremely

large investors and term sheets, 50, 100, $200 million that

were kind of personal, I'll say, to some degree, game changers

for Mr. Shvartsman and Mr. Hannelius.  So that one was probably

top of my most important.  The other ones I mentioned too, I

mentioned them because they're etched in my head as some pretty

meaningful endeavors we were working on at the time.

Q.  Can you give us a sense of your normal working day, how

hard did you work, what was it like?

A.  There's some variability I think to my typical workweek,

you get involved in deals.  Generally, if it was a quiet time,

it was never that quiet, I might get some weeks where I do a

normal, like 40, 45-hour workweek.  There were other weeks

where I would just pound through the weekend and sometimes put

in an 80-hour workweek if the deal that we were working on

necessitated it.

Q.  Before we move on, I want to see if we can identify some

key dates so we can establish a basic chronology for the jury.

A.  Sure.

Q.  Did there come a time that you met someone named Patrick

Orlando?

A.  Yes, sir.

Q.  When was that?

A.  That was June 18, 2021.

1  Q.  Did there come a time that you helped put together a group

2  or syndicate of investors?

3  A.  Yes, sir.

4  Q.  When was that?

5  A.  That was, roughly speaking, in the threeish weeks that

6  followed that initial introductory meeting.

7  Q.  Did there come a time that you officially became a member

8  of DWAC's board of directors?

9  A.  Yes, sir.

10  Q.  When was that?

11  A.  That was September 2nd, 2021.

12  Q.  Did there come a time that you attended your very first

13  board of directors meeting?

14  A.  Yes, sir.

15  Q.  When was that?

16  A.  That was September 21st, 2021.

17          MR. BACH:  Can we show the witness DX 952, but don't

18  publish.

19  Q.  Do you recognize this, Mr. Garelick?

20  A.  Yes, I do.

21  Q.  What is it?

22  A.  This looks like a fair, accurate timeline assessment of the

23  material we just covered.

24          MR. BACH:  We offer it.

25          MS. HANFT:  No objection.

O56Cgar5                          Garelick - Direct

1          THE COURT:  It's received.

2          (Defendant's Exhibit 952 received in evidence)

3          MR. BACH:  Publish it to the jury, please.

4   Q.  Focusing your attention on June 18, did there come a time

5   that you met someone named Patrick Orlando?

6   A.  I'm sorry.  Can you repeat the question.

7   Q.  Sure.  Focusing your attention on June 18, did there come a

8   time that day when you met someone named Patrick Orlando?

9   A.  Yes.

10          MR. BACH:  We can take down the chart.

11  Q.  What happened?

12  A.  So, I was working from my home office in Providence, Rhode

13  Island on June 18th, 2021.  I got a phone call from my boss,

14  Michael, and he asked me if I could Skype into what was an

15  unscheduled meeting with a SPAC opportunity that he just had

16  come into his offices in Florida.

17  Q.  Did you join the meeting from the beginning?

18  A.  No, I joined -- the meeting was already underway, so I

19  joined it after it already started.

20  Q.  When you joined the meeting, who was present at the

21  meeting?

22  A.  My recollection is that my boss, Michael Shvartsman was

23  there.  Patrick Orlando, who I learned that day was the CEO of

24  Digital World Acquisition Corp, a SPAC.  His executive

25  assistant, Natalie Salume.  Somebody by the name of Marc

1    Wachter, who I believe came up in this case.  Michael's

2    brother, Gerald Shvartsman, also joined that meeting.

3    Q.  Where were they while this meeting was taking place?

4    A.  They were in-person in the Florida offices.  So they were

5    all in a meeting room and I was remote Skyped in.

6    Q.  What is your recollection of what was said at that meeting,

7    if you could walk us through it?

8    A.  I came into this a little cold turkey, but my recollection

9    was that Mr. Orlando had a SPAC.  He was in a founders round

10   stage, meaning he hadn't IPO'd yet.  He was trying to raise

11   founders shares class capital so he could get to an IPO.

12   That's really a prerequisite before an IPO.  So he covered the

13   basic term structures of the securities involved here, founders

14   class, first IPO share class, then you get into warrants and

15   such.  He also touched on his background.  He also discussed

16   some kind of prospective or aspirational targets that he wanted

17   to pursue after he went public.

18   Q.  At any time, did you hear any reference to President Trump

19   or an entity known as Trump Media Group?

20   A.  Yes, I did.

21   Q.  What did you hear?

22   A.  So I heard a couple things.  I heard Mr. Orlando sort of

23   tout that he knew the former president and spent some personal

24   time with him.  I heard him say that he was aware that the

25   Trump Media Group was looking for a SPAC partner, that that was

1  an interesting possibility for him when the time was right to

2  pursue amongst other prospective candidates he wanted to

3  pursue.

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. BACH:

2   Q.  And you mentioned a gentleman named Marc Wachter.  Do you

3   know who he was, or did you know who he was?

4   A.  I did not, no.  That was the first time I came across him.

5   Q.  So had you ever met him before?

6   A.  No, sir, I had not.

7   Q.  Did you ever meet him again since?

8   A.  I think he was on a subsequent Zoom shortly after that

9   June 18th meeting with some of the, you know, what we call like

10  the syndicate investors that were being put together.  Other

11  than that, I really don't know Mr. Wachter.

12  Q.  Through your Skype connection to the meeting, were you able

13  to see any documents presented at the meeting?

14  A.  No, I wasn't.  I was Skyped into my boss's computer so I

15  was really just looking at him during the meeting and I could,

16  you know, I could hear the——the background of the other

17  participants.

18  Q.  Do you recall any documents being presented at the meeting?

19  A.  No, sir, I don't.

20  Q.  After the meeting did anyone tell you about any documents

21  presented at the meeting?

22  A.  Yes.

23  Q.  Who told you?

24  A.  My boss Michael, you know, shared with me that he had seen

25  a couple——a couple documents.

O561GAR6                    Garelick - Direct

1  Q.  Can you tell the jury what he told you with respect to the

2  couple of documents.

3  A.  Sure.  He said that, you know——this is after the meeting.

4  He followed up and he said that, you know, Mr. Orlando had

5  shared a photograph of himself with the former president Trump,

6  you know, establishing he actually did know him, and he also

7  shared what my boss characterized as some, you know, older

8  prior business contract that Mr. Orlando had with Mr. Trump.

9  Q.  At the time of this meeting did you have any prior

10  experience with SPACs?

11  A.  No.  This was——I had a lot of experience, but in the SPAC,

12  you know, as far as SPACs go, this was my first rodeo.  I had

13  never had any real involvement with SPAC investment.

14  Q.  Did you know what a SPAC was?

15  A.  I did know what a SPAC was, yes.

16  Q.  And later the same day, did Michael Shvartsman send you any

17  additional materials?

18  A.  He did.  So after that meeting, I don't know, hour or two

19  later, he sent me a link to a——a media story——I think it was

20  Axios was the writer of it——in the public domain that just

21  discussed, you know, the Trump Media Group was out there

22  looking for, you know, for a SPAC partner.  And that was

23  certainly, you know, interesting and noteworthy.

24          MR. BACH:  Can we show Defense Exhibit 78 to the

25  witness, please.

1    Q.  Do you recognize this, Mr. Garelick?

2    A.  Yes, I do.

3    Q.  In broad terms, what is it?

4    A.  So this is the article I just alluded to, you know, after

5    my initial introductory meeting to DWAC and Patrick Orlando.

6    The time stamp here is 4:57 p.m., so this is—

7    Q.  Just wait till we get permission to introduce the exhibit.

8    A.  Oh, sorry.

9              MR. BACH:  We offer this.

10             THE COURT:  Any objection?

11             MS. HANFT:  Objection, your Honor.

12             THE COURT:  What rule?

13             MS. HANFT:  Hearsay, at least in part.

14             THE COURT:  I take it this is just for state of mind,

15   the fact that he was sent this?

16             MR. BACH:  Yes.

17             THE COURT:  Overruled.

18             (Defendant's Exhibit 78 received in evidence)

19             MR. BACH:  Okay.  Can we publish the first page to the

20   jury, please.

21   BY MR. BACH:

22   Q.  Do you see at the top it says Short Message Report?  Do you

23   see that?

24   A.  Yes, sir.

25   Q.  And it says, Conversations 1 Participant 2.

1   A.  Yes, sir.

2   Q.  And you see further down, it says WhatsApp, Bruce G,

3   Shvartsman, Michael?

4   A.  Yes, I do.

5   Q.  What kind of communication is this?

6   A.  This looks like a WhatsApp text.

7   Q.  And between whom?

8   A.  Yes, WhatsApp text between myself and my boss Michael

9   Shvartsman.

10          MR. BACH:  Can we turn to the next page.

11          And could we blow up after it says https.

12  Q.  Can you just slowly read that link to the jury.

13  A.  Sure.  After the https part or—

14  Q.  Yes.

15  A.  Okay.  Yeah, so it's—it's

16  www.axios.com/trump-spac-media-group—

17  Q.  You don't have to read the rest.

18  A.  Okay.

19  Q.  And what is Axios?

20  A.  Axios is, you know, I think of Axios, Guardian, they're

21  free online news services, you know, with reporters that try to

22  find and publish interesting stories.

23  Q.  Okay.  Available to the public?

24  A.  Yes, this is all—this is publicly available, for free.

25          MR. BACH:  Can we take that down.

1  Q.  Are you familiar with a document called an NDA?

2  A.  Yes, sir.

3  Q.  Did you sign an NDA with DWAC?

4  A.  Yes, I did.

5  Q.  And when did you sign it?

6  A.  June 20, 2021.

7  Q.  Was that before or after you Skyped into the June 18

8  meeting with Mr. Orlando?

9  A.  That was after.  That was a couple days later.

10  Q.  Did you review it before you signed it?

11  A.  I gave it a quick cursory glance.

12  Q.  And why did you give it a quick cursory glance?

13  A.  In my experience, I mean, I think I've seen and signed

14  maybe a hundred NDAs, roughly speaking, and they're always kind

15  of the same.  They're just a boilerplate-type document, or I

16  shouldn't say they're always the same, but generally they are.

17  And, you know, the purpose of it is, the company doesn't want,

18  you know, information they share shared with their competitors,

19  right?  It's a competitor sensitivity type of thing.  So I saw

20  it as a formality and, you know, I——I gave it a quick glance

21  and assumed it was, you know, the same type of NDA I'd seen

22  many, many times before.

23  Q.  And when you say a competitor, who in your mind would be a

24  competitor in this instance?

25  A.  Well, in this situation, you know, it would be other——other

1   SPACs, you know, who were also looking for targets, and, you

2   know, this is the time period when this was the heyday of

3   SPACs, I guess, so there was a lot of SPACs out there, and

4   certainly DWAC wouldn't want their SPAC competitors to, you

5   know, know what they're up to.

6   Q.  Okay.  After the meeting on June 18, did Michael Shvartsman

7   ask you to take any additional steps with respect to DWAC?

8   A.  He did, yes.  He, you know, wanted, rightly so, further

9   analysis of what were already public filings, you know, with

10  the SEC, about the securities structures involved here, you

11  know, it's a little more complicated than a common stock when

12  you get into units and warrants and all this type of stuff, and

13  so he——he certainly wanted to understand that.  He also, you

14  know, early on was very focused on warrants and so he, you

15  know, he wanted some analysis generally about warrants, how

16  warrants are valued, that type of stuff.  He also wanted to put

17  together an investment syndicate, and that came up in that

18  original June 18th meeting with Mr. Orlando, who was, you know,

19  very receptive to that idea.

20  Q.  And just, an investment syndicate, can we break down that

21  word and just explain.

22  A.  Yeah, it's kind of a big——a big word.  All it really means

23  is, it's a group of investors, you know, that would come into

24  an investment opportunity together, and in a case like this,

25  where, you know, Mr. Orlando is looking to fill out his

1    founders class, you know, that's helpful because it's—you can

2    bring in a lot more investors that way, and Mr. Shvartsman's,

3    you know, very smart and connected to—with friends and family

4    that also have a lot of money that he thought would be

5    interested in this kind of opportunity.

6             MR. BACH:  Can we pull up Defense Exhibit 952 already

7    in evidence again.

8    Q.  And Mr. Garelick, can you give us a sense of the time frame

9    in which—well, first let me ask, did you assist Mr. Shvartsman

10   in moving forward with the idea of a group of investors for a

11   syndicate?

12   A.  Yes, I did.

13   Q.  And when, approximately, did you do that?

14   A.  That was, you know, roughly in the few weeks that followed

15   that initial June 18th meeting; call it three-ish weeks or so.

16   Q.  And were you a member of the board of directors of any

17   public company at that time?

18   A.  No, sir.

19   Q.  When did the idea—

20            MR. BACH:  We can take this down.

21   Q.  When did the idea of forming this syndicate for DWAC first

22   come up?

23   A.  Yeah.  It came up in the initial June 18th meeting.  My

24   boss Michael posed it as an idea, and Mr. Orlando was very

25   receptive and I think excited about that idea.

1     Q.   Okay.  And what did you do?  What happened next?

2     A.   The next step was my boss, you know, gave me a list of his

3     friends and family that he thought would be interested and

4     I——and their contact information, and instructed me to do, you

5     know, the initial reachout, just the introductory, here's the

6     basic, you know, investment opportunity, and after that I

7     would, if the parties were interested, then, you know, make the

8     introduction to DWAC and to Patrick Orlando to kind of take it

9     from there.

10    Q.   Okay.  And when Michael Shvartsman gave you a list of

11    contacts and names, did you reach out to those contacts and

12    names?

13    A.   Yes, sir, I did.

14    Q.   Who were some of those names?

15    A.   So Anton Postolnikov was one, Eric Hannelius was another,

16    Ray Corral, Steve Breyer, Igor——Igor's last name is escaping

17    me.  A gentleman by the name of Yuval.  His brother,

18    although——Gerald, although he was in the first meeting.

19    There's a——there's a few others that I'm——that I'm not

20    recalling.

21    Q.   Okay.  And did you arrange for any of the people that you

22    communicated with to meet with Mr. Orlando?

23    A.   Yes, I did.

24    Q.   And did you participate——did they meet with Mr. Orlando?

25    A.   Yes, they did.

1   Q.  And did you participate in any call or meeting that any

2   other investors had with Mr. Orlando?

3   A.  Yeah, I think there were several—I don't know—two, three

4   occasions off the top of my head, roughly speaking, where I

5   made the introduction, and I joined a Zoom call where

6   Mr. Orlando then, you know, connected with these prospective

7   syndicate investors.

8   Q.  And during these meetings or Zoom calls, what would

9   Mr. Orlando say to these potential investors who were

10  considering joining this group?

11  A.  Yeah, I mean, he—he provided the same basic pitch we heard

12  and, you know, that I heard in that initial June 18th meeting.

13  He talked about the different, you know, share structures and

14  terms, founders class, IPO shares, he talked about his

15  background, and he talked about, you know, some aspirational

16  prospects.

17  Q.  And did he mention Trump?

18  A.  He did.  He once again mentioned, you know, that he knew

19  the former president, and when the time was right, you

20  know—this was an aspirational prospect—that he wanted to

21  connect with and see what, you know, what could happen after

22  the IPO.

23  Q.  Okay.  And when you communicated with people about joining

24  this investor group, did you ever refer—did you yourself ever

25  refer to Trump or to the Trump SPAC?

O561GAR6                    Garelick - Direct

1   A.  Yes, I did.

2   Q.  And why did you refer to DWAC as the Trump SPAC?

3   A.  You know, I mean, that was the one name that Mr. Orlando

4   floated and, you know, depending on your vantage point, it's a

5   name that, you know, garners attention, right?  In some circles

6   positive, in some negative.  It wasn't about politics, but that

7   was the one name that just, everyone immediately, you know——it

8   was top of mind when you said it.  It was the attention

9   grabber.

10  Q.  Okay.  And at the time of these meetings did you believe

11  that a deal with Trump was going to happen?

12  A.  No, absolutely not.  I mean, I thought it was a, you know,

13  a possibility, but there was, you know, no——it wasn't——there

14  was no reality to it——

15  Q.  Okay.  Did you——

16  A.  ——at that point.

17  Q.  Did you know whether a deal with Trump was going to happen?

18  A.  No, sir.  I had no basis to assume a deal, you know, would

19  happen at that point.  It was early on.  There was just no

20  reality to it.  The former president, you know, is I think——I

21  knew——I knew at that point he's notoriously fickle and hard to

22  negotiate with, and there was a hell of a lot of SPACs out

23  there looking for targets, and there was a number of media

24  stories about the fact that, you know, the Trump Media Group

25  was looking for a SPAC partner, so I saw it as like a nice

1  pie-in-the-sky possibility, and it definitely resonated that

2  Mr. Orlando knew the former president, but there was just no

3  reality to it at that point.

4  Q.  Okay.  Showing you what's already in evidence, Government

5  Exhibit 400.  Do you see at the top that this is an email

6  string between you and Eric Hannelius dated June 21?

7  A.  Yeah.

8  Q.  And do you see at the bottom of the screen?

9  A.  Yup.

10  Q.  Mr. Hannelius writes, "Hi, Bruce, Can you send me any info

11  on the option we discussed and then circle right back."  Do you

12  see that?

13  A.  Yup.

14      MR. BACH:  Can we go up to the top.

15  Q.  You write, "Hi, Eric, I've attached the SPAC prospectus.

16  However, it doesn't say anything about Trump.  Can't yet."  Do

17  you see that?

18  A.  Yes, sir.

19  Q.  What did you mean by that?

20  A.  Yeah.  So I think in this email exchange Mr. Hannelius

21  is—he's heard about this, right, and I think the Trump name

22  also caught his attention and so his email says regarding

23  Trump.  He's trying to I think better understand what's going

24  on, and here what I'm trying to, you know, lay out for

25  him—let's see.  June 21, 2021, is—it doesn't say anything

1  about Trump because it can't.  Again, it's not a reality.

2  It's——they have to go through an IPO, they have to approach

3  targets, they have to negotiate with targets, and so this

4  is——there's just no reality to it, and I'm trying to point that

5  out to them, 'cause he's, I think, trying to understand exactly

6  what——what the situation is here at this point.

7  Q.  And did you have an understanding at this time of when a

8  SPAC could actually begin to approach a target?

9  A.  Yes, I did.

10  Q.  When would that be?

11  A.  You have to wait until after the IPO to actually, you know,

12  have a target and to have a conversation, you know, a

13  negotiation, a formal approach to a target.  I understand you

14  can have aspirations and you can have connections before an IPO

15  but you can't have any——the formal process of reaching out to

16  targets and, you know, the reality of those conversations than

17  actually, you know, developing or not, that all has to happen

18  post IPO.

19  Q.  Okay.  Let me show you what's in evidence as Government

20  Exhibit 423.  This is——at the top, you can see this is an email

21  from you to Mr. Hannelius dated June 30, 2021.  Do you see

22  that?

23  A.  Yes, sir.

24  Q.  Okay.  And in the first email——first sentence, you write,

25  "I am pleased to introduce you to the team at Digital World

1   Acquisition Corp. SPAC.  They will guide you through the

2   investor subscription process."  Can you explain that to the

3   jury.

4   A.   Sure.  So with the, you know, the prospective syndicate

5   investors that, you know, we were putting together here, in

6   many cases they'd already had the introductory call to Orlando

7   and DWAC.  This email is more the formal handoff.  We

8   weren't——we, Rocket One, were not going to handle the paperwork

9   for investors.  They had to then, you know, engage with DWAC

10  and Orlando and his team directly.  So this is me making the

11  sort of formal introduction and also making sure Mr. Hannelius

12  had Orlando's key colleagues that were going to be handling the

13  paperwork and, you know, having all the documents signed if in

14  fact Mr. Hannelius, you know, chose to go forward with the

15  different investment options that were presented to him.

16  Q.   You mentioned Mr. Orlando's colleagues.  Can you look at

17  the cc line in this email.

18  A.   Sure.

19  Q.   Who's in that cc line?

20  A.   Yeah.  So you've got Mr. Orlando; and then you have Alex

21  Monje, who my understanding was the general counsel of DWAC;

22  then you have Horacio Cruz, who I think he was like a chief

23  operating officer for Digital World Acquisition Corp.; and

24  Natalie Salume, who was mentioned earlier, was the executive

25  assistant for Mr. Orlando.

1    Q.  Okay.  And then looking at the second paragraph, you write,

2    "I have you down for 75K of the founders share class B stock,

3    75K of the IPO stock class A."  Do you see that?

4    A.  Yes, sir.

5    Q.  And then you write, "Note:  You have the option of the $4

6    class B stock we discussed or, alternatively, a $5 class B

7    stock with a 45-day notice redemption notice."  The notice——the

8    word "notice" is a typo one of those times, correct?

9    A.  That's correct, yeah.  I have one too many notices in

10   there.  That's a typo.

11   Q.  Can you explain to the jury what the difference is between

12   the $4 item being discussed here and the $5 item being

13   discussed here?

14   A.  Sure.  So my boss Michael, you know, came up with this idea

15   that there, you know——to have a separate founders share class

16   and, you know, pose it to Mr. Orlando, and he agreed, and

17   essentially what it does is for paying an extra dollar, so for

18   paying a premium, you get the added investor right of being

19   able to get your money back, you know, if you don't like the

20   way that, you know, this goes down the road, you know, post

21   IPO.  It gave you a little bit more protection, but, you know,

22   you had to pay an extra dollar for it.

23   Q.  What do you mean if you don't like the way this goes down

24   the road?

25   A.  Yeah.  So with the founders share class, you know, you're

 1   very locked up, right?  You're paying a much lower price than

 2   the $10 IPO shares, but this is the $4 option, right, but you

 3   know, you're locked up and you might not like the way this

 4   goes, right?  Like they might eventually name a target that you

 5   think is terrible.  You can't sell or get your money back.

 6   You're locked up for a period of time after.  The point of the

 7   $5 was, you know, given the uncertainty of what would happen

 8   here, it provided——it gave the option to say, hey, after they

 9   named a target, I don't like it, I'd like to get my money back,

10   which is similar to, you know, how the——our understanding was

11   similar to how the IPO $10 shares stock would work.

12   Q.  If you paid the extra dollar and you didn't like the target

13   that the SPAC ultimately combined with, you could get your

14   money back; is that fair?

15   A.  Correct.

16   Q.  Okay.  And could you get the same thing if you paid $4?

17   A.  No, sir.

18   Q.  And did you assist Mr. Shvartsman in negotiating for that?

19   A.  I did.  I have to give him credit.  It was his idea.  It

20   was a good idea.  And I did.  It wasn't——it wasn't really a

21   difficult negotiation.  Mr. Orlando was happy to accommodate

22   that.

23   Q.  And why did you and Michael Shvartsman negotiate to have

24   this $5 option with an opportunity to get the money back?

25   A.  Yeah, I think just the inherent uncertainty of what you

1  were actually investing in here, right?  It's a blank check

2  company.  You know, you're not analyzing any operating company

3  at this point.  It's just a blank check company.  And so it was

4  protection for the inherent risk of really not knowing exactly

5  what you're signing up for here.

6  Q.  I'm going to show you what's in evidence as Government

7  Exhibit 406.  Do you see that this is an email from you to S.

8  Anton Postolnikov dated June 24, 2021?

9  A.  Yes, sir.

10  Q.  And is this in the time frame in which you're trying to

11  form a syndicate?

12  A.  Yes, this is.  This is within that first week, actually,

13  after the initial meeting.

14  Q.  And who is Mr. Postolnikov?

15  A.  He's some——he's a very wealthy, you know, Florida-based

16  investor.  He's a good friend of, you know, Michael and

17  Michael's brother.  And so he was one of the individuals that,

18  you know, my boss circled as a prospective member of the

19  syndicate and instructed me to, you know, reach out to him.

20  Q.  Had you ever met Mr. Postolnikov?

21  A.  No.  This was actually the first time I ever met him.  We

22  went out to dinner with my boss and, you know, we talked about

23  this opportunity, you know, the night before and hence the, you

24  know, the initial greeting here, "Good times last night."

25  Q.  Apart from those good times, did you ever meet or be in the

1    same room as Mr. Anton Postolnikov again?

2    A.  You know, to the best of my recollection, I think this is

3    the only time, so the night before the June 23, 2021, that I

4    actually met him in person.

5    Q.  Okay.  Looking at the first sentence here, you write, "Good

6    times last night.  Following up on that Trump Media Group SPAC

7    we mentioned.  The deal is going to finalize this week."  Do

8    you see that?

9    A.  Yes, sir.

10   Q.  What deal were you referring to?

11   A.  The founders share class, not the IPO, right?  So at this

12   point, you know, we're working on the syndicate.  There's a

13   certain amount of capital that Mr. Orlando was hoping to raise

14   for the founders class, again, so he could go on to his IPO.

15   And so we were, you know, trying to figure out with these

16   prospective syndicate members, who was in, who was out, and so

17   that we could, you know, come back to, and, you know,

18   Mr. Orlando could kind of finalize the founders class.

19   Q.  This was the syndicate deal.

20   A.  Correct.

21   Q.  And when you reached out to Mr. Postolnikov and

22   Mr. Hannelius or any of these other names that you mentioned,

23   when you reached out to them about joining this group or

24   syndicate, did you provide any more information to them than

25   Mr. Orlando had provided to you?

1    A.  No.  I simply relayed, you know, a summary of——of what we

2    understood, from June 18th, the opportunity to be.

3    Q.  Did you invest in the syndicate?

4    A.  I did not, no.

5    Q.  Did you participate in a syndicate?

6    A.  I did not, no.

7    Q.  Why not?

8    A.  My investment, you know, practices and style and comfort

9    for many decades, you know, rooted in my mutual fund and hedge

10   fund years is, you know, to invest in the public markets, not

11   so much in, you know, kind of private situations like this.

12   And honestly, it was intriguing, but it wasn't like a——a

13   private founders class situation that I was, you know, jumping

14   up and down to, you know, get out of my normal comfort range of

15   being more of a public markets investor.

16   Q.  Did there come a time when you joined DWAC's board of

17   directors?

18   A.  Yes, sir.

19        MR. BACH:  Can we pull up again Defense Exhibit 952.

20   Q.  How did that come about?

21   A.  So after this, you know, my boss's investment and, you

22   know, the syndicate of his friends and family came together, he

23   asked DWAC, he asked Mr. Orlando if, you know, we, Rocket One

24   Capital, you know, could get a board seat, you know, and that

25   he would name someone who could hopefully add value.  And they

1    agreed, and, you know, there was a process where they had to

2    think about it, review me and such, and on September 2, 2021,

3    that became official and I became a member of the board of

4    directors.

5    Q.  Before that became official on September 2nd, did you have

6    to fill out any paperwork at earlier periods of time?

7    A.  Yes, sir.

8    Q.  Okay.  And let's just shift gears back to June for a

9    minute.  I apologize for going out of order here.

10   A.  Sure.

11   Q.  But shifting time back to June 18th or so, after that

12   initial meeting, were there any discussions with Mr. Patrick

13   Orlando about the possibility of Michael's companies doing

14   business with Trump Media Group?

15   A.  Yes, there was one instance of that.

16   Q.  Okay.  Can you tell the jury about that.

17   A.  Sure.  So I think as I've mentioned, you know, one of

18   Michael's most notable business is a really successful payment

19   processing company, and he, you know—at this point we knew

20   that Mr. Orlando at least actually knew the former president,

21   you know, and my boss wanted an introduction into Trump Media

22   Group so that he could—so that he/we, Rocket One Capital,

23   could pitch the Trump Media Group on my boss's payment

24   processing business offerings and capabilities.

25   Q.  Okay.  And what became of that?

1    A.  Well, so I reached out to Patrick——I think I initially

2    reached out to his colleague Horacio and maybe Patrick was on

3    copy——and, you know, was asking for an introduction for, you

4    know, commercial business purposes, and, you know, Mr. Orlando,

5    you know, gave me a fairly snappy response to that, that, you

6    know, that isn't something——that's not an introduction he could

7    do, and he also, you know, took the opportunity to set the

8    record straight that, you know, he didn't have any substantive

9    conversations with the Trump Media Group, they weren't a target

10   at that point, and if they were going to be, you know, it

11   certainly couldn't happen until after the IPO and perhaps he

12   would, you know——there then would be a formal process where he

13   would approach them.

14   Q.  Let me show you Government Exhibit 416.

15            THE COURT:  Actually, before you do that, when is a

16   convenient time, Mr. Bach, to take a break?

17            MR. BACH:  Whatever the pleasure of the Court.

18            THE COURT:  Okay.  Members of the jury, it's now 3:31.

19   Let's take a 15-minute break.  So you'll be back here at 3:46.

20   Have a good break.  Don't talk about the case amongst

21   yourselves or anybody else, and don't do any research on the

22   case.

23            THE DEPUTY CLERK:  All rise.

24            (Jury not present)

25            THE COURT:  Be seated.  The witness can step down.

1    Mr. Bach, what's your estimate of how long you've got

2    with the witness on direct?

3    MR. BACH:  I don't have a precise estimate, but, I

4    mean, it's roughly three hours, maybe less, maybe more.

5    THE COURT:  So in other words, you think it will take

6    us through the rest of the afternoon.

7    MR. BACH:  It may well.

8    THE COURT:  Okay.  Anything, Ms. Hanft, to discuss

9    before we take break?

10    MS. HANFT:  No, your Honor.  Thank you.

11    THE COURT:  Mr. Bach?

12    MR. BACH:  No.

13    THE COURT:  Okay.  See you back here in about ten

14    minutes.

15    THE DEPUTY CLERK:  All rise.

16    (Recess)

17    THE COURT:  Let's bring in the jury.

18    (Continued on next page)

19

20

21

22

23

24

25

1        (Jury present)

2        THE COURT:  Be seated.

3        Okay.  Counsel, you may inquire.

4        MR. BACH:  Thank you.

5        Ms. McFerrin, can you please pull up Defense

6   Exhibit 952.

7   BY MR. BACH:

8   Q.  Mr. Garelick, before the break I was taking you back to the

9   June time period and asking you about any business

10  possibilities that——for Michael's companies being discussed

11  with Mr. Orlando.  Do you remember that?

12  A.  Yes.

13       MR. BACH:  Okay.  Can we call up, please, Government

14  Exhibit 416, which is already in evidence.

15  Q.  And let me focus your attention to bottom of this page.  Do

16  you see where it says, "Hi, Horacio"?

17  A.  Yes, sir.

18  Q.  And are you the author of this "Hi, Horacio"

19  correspondence?

20  A.  Yes, I am.

21  Q.  Okay.  And without reading it word for word, can you just

22  tell the jury what you're requesting here.

23  A.  Yeah.  So right before the break, this is what I——I think I

24  was discussing where I'm reaching out to one of Mr. Orlando's,

25  you know, key lieutenants here, Horacio, and I'm, you know,

1    sort of formalizing this request to, you know, can we get an

2    introduction to the Trump Media Group so we can discuss, you

3    know, payment processing offer——needs that they might have that

4    Michael's company could provide.

5    Q.  Okay.  And did Mr. Orlando respond?

6    A.  He does respond to this thread, yes.

7    Q.  Okay.  Can we go up to the top paragraph.

8            Is this Mr. Orlando's response?

9    A.  Yes, it is.

10   Q.  Can you please read that for the jury.

11   A.  Sure.  Mr. Orlando states, "For clarity, we really like TMG

12   but there is absolutely no guarantee that we will close that

13   deal or any other.  TMG is just one of many companies in our

14   pipeline of deals, but we've had no substantive discussions

15   with TMG with respect to DWAC as we can't until after the IPO.

16   We are a SPAC and cannot guarantee we will combine with anyone

17   because no deal can be made until after IPO."

18   Q.  Was that consistent with your understanding at the time?

19   A.  Yes, it was, and perhaps he doesn't understand I'm asking

20   about an introduction for a commercial venture, but he's

21   certainly, you know——I understand what he's saying, and that's

22   consistent with my understanding.

23   Q.  Did you write back to Mr. Orlando after this?

24   A.  Yes, I did respond to this email.

25           MR. BACH:  Can we move up.

1  Q.  Do you see where you say, "Patrick, for clarification

2  purposes"?

3  A.  Yes, sir.

4  Q.  Is that your response?

5  A.  Yes, that is my response.

6  Q.  Can you please read it for the jury.

7  A.  Sure.  "Patrick, for clarification purposes, your response

8  regarding a potential target I named in my prior email was my

9  own speculation regarding that potential target.  I did not

10 mean to infer in any way that a definitive target had been

11 engaged, contracted by you or your SPAC.  Best, Bruce."

12 Q.  Is that consistent with your understanding at the time?

13 A.  Yes.  I wanted to make sure he understood that I

14 understood, you know, what was being discussed here and what

15 was not being discussed.

16      MR. BACH:  Okay.  Can we take that down, please.

17 Q.  Okay.  Apart from helping Michael Shvartsman put together

18 the group of investors in the syndicate, did you assist him in

19 any way with his own investment in DWAC?

20 A.  Yes, I did.  In a couple ways.

21 Q.  Okay.  What were those couple ways?  How did you assist

22 him?

23 A.  Administratively, I, you know—the paperwork was handled by

24 his general counsel inside Rocket One Capital, but I created

25 that handoff.  He gave me a sense, you know, early on what his

1  sort of plans were, you know, for the investment.  Third, he,

2  you know, very early on was very interested in warrants and,

3  you know, he had some kind of——some more academic sort of

4  valuation, you know, type questions about options that, you

5  know, fed into a Black-Scholes calculator.

6  Q.  When did the topic of warrants——you just mentioned

7  warrants.  When did the topic of warrants——when did

8  Mr. Shvartsman first raise the topic of warrants with you?

9  A.  Yeah, very early.  Actually, I believe it was even——he

10 alluded to warrants in a real general sense even before that

11 initial meeting on June 18th.

12 Q.  Okay.  Let me show you——

13        MR. BACH:  Can we show the witness Defense Exhibit 77.

14 Q.  Do you recognize this?

15 A.  Yes, sir, I do.

16 Q.  Okay.  Can you just in general terms tell us what it is.

17 A.  Sure.  This is on June 14th.  My boss Michael had asked me

18 kind of a generic question.

19 Q.  Don't get into detail until we publish it for the jury.

20 A.  Oh, this is a——sorry.  This is a text——this is a text——yes,

21 this looks like a text from my boss to me on June 14, 2021.

22        MR. BACH:  We offer it.

23        MS. HANFT:  No objection.

24        THE COURT:  Received.

25        (Defendant's Exhibit 77 received in evidence)

1    MR. BACH:  Okay.  So let's start——let's show the jury

2    the first page.

3    Q.  And is this another WhatsApp conversation——or I take that

4    back.  Is this some form of text communication between you and

5    Mr. Shvartsman?

6    A.  Yes, it is.  It's either Apple text or WhatsApp text, and

7    this is what I just looked at, yes.

8    Q.  And the date is June 14?

9    A.  Correct, 2021, June 14th.

10   Q.  Okay.  And how many days before the June 18 meeting is

11   that?

12   A.  Four.

13   Q.  Good.  All right.  Should have known that.

14            MR. BACH:  Go to the next page, please.

15   Q.  Do you see at the top, 5:36 p.m., you write, "SPAC warrant

16   arbitrage.  No simple answer.  Best we scrutinize the SPAC

17   founders share at legal docs to determine."  Do you see that?

18   A.  Yes, sir.

19   Q.  What is that a reference to?

20   A.  So my best recollection is, I think he had called me

21   earlier and he just asked me a very general question if I knew

22   anything, you know, in terms of how SPACs work with warrants

23   and if there was a way to arbitrage out warrants.  And that's a

24   industry term.  What that means is, you know, a way where you'd

25   sell one security, buy another.  This isn't specific to any

1    SPAC.  He's just sort of testing my knowledge or asking me a

2    question, really, if I know anything about this, and it's not

3    an area I had much experience, but, you know, if I had

4    something to actually analyze, perhaps I could add some value

5    here, and so that's why I kind of just come back to him with

6    the simple answer.

7    Q.   Had you heard of the SPAC called DWAC at this time?

8    A.   I had not, no, not at this time.

9    Q.   Okay.  After the June 18 meeting four days later, did

10   Michael speak to you again about the topic of warrants?

11              MR. BACH:  You can take this down.

12   A.   Just so I make sure I heard that correctly, did you say

13   four days later?

14   Q.   After the June 18 meeting with Mr. Orlando, did

15   Mr. Shvartsman raise the topic of warrants with you again?

16   A.   Yes, he did.

17   Q.   Okay.  What happened?

18   A.   He was just sort of intrigued with I think in general SPAC

19   warrants, but I think at this point now he's starting to think

20   about DWAC after the June 18th meeting and he's trying to, you

21   know, figure out, like, what's the right framework to think

22   about and value, you know, warrants, almost in an academic way,

23   to then see, where is the relative attractiveness or the

24   relative value of the different, you know, options on the table

25   here with──with DWAC, like founders class, IPO shares, and

O56Cgar7                    Garelick - Direct

1    units and warrants.  And I assisted him in that regard.

2    Q.  You just mentioned something called Black-Scholes.  What is

3    that?

4    A.  Yes.  I do know what a Black-Scholes model is.  I've had a

5    lot of experience with it.  So a Black-Scholes calculator or

6    model——you can hear it referred to either way——it——it's readily

7    available on the internet.  It's a way to value options or

8    warrants.  So options being call options, put options, warrants

9    essentially being very similar to call options.  And

10   it's——there's a lot of pretty sophisticated math behind it that

11   I think a couple of clever professors came up with several

12   decades ago.  But the inputs into the calculator are actually

13   pretty simple.  There's only four or five inputs.  And then

14   that way you can value, you know, what the sort of intrinsic

15   value of a warrant is without having any view on what the stock

16   is going to do or, you know, what the fundamental opinion is

17   of——of the business.

18              (Continued on next page)

19

20

21

22

23

24

25

1    BY MR. BACH:

2    Q.  Did you perform a Black-Scholes analysis?

3    A.  I did, yes.

4    Q.  With respect to DWAC lines?

5    A.  Yes, I did.

6    Q.  What did it show?

7    A.  It showed that the warrants for DWAC, given the inputs that

8    were all available in the public filings, that they were worth

9    somewhere between $4 and $5 in my estimation.

10   Q.  Did that mean it was a good value or a bad value?

11   A.  Well, it would mean it's a good value if the warrants, when

12   they traded, traded below that semblance of fair value, $4 to

13   $5.  The warrants, when they eventually traded in the public

14   market, if they traded above that $4 to $5 range, then it would

15   be a bad value.

16   Q.  Did you rely on any nonpublic information to perform the

17   Black-Scholes analysis?

18   A.  No, sir, I did not.

19   Q.  Did you do a Google search for anything before you came to

20   court today?

21   A.  Yes.  There is one thing I Google searched.

22   Q.  What did you Google search?

23   A.  I typed in Black-Scholes model to refresh my memory

24   exactly, the whips that it went to and how I assembled this.

25           MR. BACH:  Can we show the witness Defendant's

1    Exhibit 950.

2    Q.  Do you recognize this?

3    A.  Sure.

4    Q.  What is this?

5    A.  This is -- you've typed a search term into a Google search

6    bar and results have spun out of that search.

7             MR. BACH:  We offer it.

8             MS. HANFT:  No objection.

9             THE COURT:  Received.

10            (Defendant's Exhibit 950 received in evidence)

11   Q.  Mr. Garelick, is this the Google search that you performed

12   before coming to court today?

13   A.  Yes, sir.

14   Q.  Can you tell the jury what you punched into Google at the

15   top there?

16   A.  Black-Scholes, and those are the two very bright

17   individuals that invented this.  Black and Scholes, their names

18   escape me.  And the third word is calculator.

19   Q.  After you did this Google search, did you open any of these

20   websites?

21   A.  Yeah, I believe it's the first one I clicked on.

22            MR. BACH:  Can we show just the witness Defendant's

23   Exhibit 951.

24   Q.  Without saying what it is, I'm just asking if you recognize

25   this.

1   A.  Yes, I do recognize this.

2   Q.  What is it?

3   A.  This is a Black-Scholes calculator.

4              MR. BACH:  We offer it.

5              MS. HANFT:  As a demonstrative, your Honor?

6              THE COURT:  As a demonstrative, Mr. Bach?

7              MR. BACH:  We'll offer it in evidence.  Let's offer it

8   in evidence.

9              MS. HANFT:  Objection.

10             THE COURT:  Sustained.

11             MR. BACH:  We'll offer it as a demonstrative.

12             THE COURT:  Any objection?

13             MS. HANFT:  No objection.

14             THE COURT:  Members of the jury, I'm going to permit

15  the witness to use this exhibit as a demonstrative to assist

16  the witness in answering questions from Mr. Bach, but the

17  exhibit is not in evidence itself.  It won't be with you in the

18  jury room.  It's just being offered to assist you in

19  understanding the testimony.

20             MR. BACH:  Can we publish this for the jury, please.

21  Q.  Mr. Garelick, what is this?

22  A.  So this is a Black-Scholes calculator that requires five

23  key inputs here to then spit out a value.

24  Q.  Did you see where it has those zeros in the white squares?

25  A.  Yes, sir.

1  Q.  Is that where you put the input?

2  A.  Yes, sir.

3  Q.  Where do you get the information for the input?

4  A.  So all of the inputs, with the exception of the last one,

5  the annualized volatility, you have to make an estimate of

6  that.  Four of the five inputs, the top four there, those are

7  all going to be essentially available -- they are available in

8  publicly filed SEC documents and/or what the risk free interest

9  rate was at that time based on government bond strength.

10 Q.  When you refer to publicly filed documents, who filed those

11 documents?

12 A.  So, Digital World Acquisition Corp, even going back well

13 before my first meeting with them, there's a couple key initial

14 filings that they would have done.  So you have a prospectus,

15 then you have an S1, which is the initial draft of the IPO

16 documents.  They can amend that several times as they get more

17 and more information.  So those would be the sources for the

18 inputs into this Black-Scholes calculator.

19 Q.  Is this similar or identical to the Black-Scholes

20 calculator that you used back in 2021?

21 A.  Yes.  I can't say I recall it was this exact website, but

22 these are a dime a dozen on the internet.  They're easy to

23 find.

24      MR. BACH:  We can take that down.

25 Q.  At the time that you helped Michael Shvartsman analyze

1   warrants, did you have an understanding about whether there was

2   something that he could trade in the open market?

3   A.  Yes, I did.

4   Q.  What was that understanding?

5   A.  My understanding was there was no restriction that he would

6   be able to trade on the open market so long as he was not in

7   the possession of any material nonpublic information.

8   Q.  Did Patrick Orlando ever tell you that people who

9   participated in the founders round could not trade in the open

10  market?

11  A.  No, he never said that.

12  Q.  Did anyone affiliated with DWAC ever tell you that people

13  who participated in the founders round could not trade in the

14  open market?

15  A.  No, sir.

16  Q.  Let me show you what's in evidence as Government Exhibit

17  444.  Do you see that this is an email chain among you,

18  Mr. Orlando, then at the top, you're forwarding it to

19  Mr. Shvartsman.  Do you see that?

20  A.  Yes, sir.

21  Q.  Focusing on the bottom, some of the typed in here is all in

22  capital letters and some is in lowercase.  Can you explain

23  that.

24  A.  Sure, the all caps portion would be Mr. Orlando's answers

25  to my questions, which are not all caps.

1  Q.  Focusing on the lowercase, you're the author of the

2  lowercase; correct?

3  A.  Correct.

4          MR. BACH:  Can you blow up that first lowercase

5  sentence there.

6  Q.  Can you read to the jury what you write in lowercase

7  letters there.

8  A.  Sure.  The first question, if I'm looking at this

9  correctly, how soon after the IPO will the warrants freely

10  trade.

11  Q.  And can you read Mr. Orlando's response in all caps.

12  A.  Sure.  Mr. Orlando responds in all caps, public warrants

13  are freely trading.  And it says, however, the warrants I get

14  are locked up until 30 days after the business combination,

15  which is a separate type of warrant.

16          MR. BACH:  Can we take that down.

17          Let me show you Defendant's Exhibit 80.  Don't publish

18  yet.  Can we show the witness Defendant's Exhibit 80.  Can you

19  show the witness the next page so he can see what this is.

20  Q.  Do you recognize this?

21  A.  Yes, sir, I do.

22  Q.  What is this?

23  A.  So -- you want me to answer that generically.

24  Q.  Generically.

25  A.  This is a text exchange with one of the prospective members

1    of the syndicate of Michael's friends and family.

2              MR. BACH:  We offer it.

3              MS. HANFT:  No objection.

4              THE COURT:  Received.

5              (Defendant's Exhibit 80 received in evidence)

6              MR. BACH:  Publish this for the jury, please.

7    Q.  If you look at the first page, do you see that this is a

8    text conversation or a WhatsApp conversation among a number of

9    different participants, including yourself, Mr. Orlando, Anton

10   Postolnikov and others?  Do you see that?

11   A.  Yes, sir, I do.

12             MR. BACH:  Can we go to the next page.  Can we blow up

13   the entry at 4:59 p.m.

14   Q.  It says Bruce G.  That's you, Mr. Garelick, I presume?

15   A.  Yes.

16   Q.  You write, Patrick, few followup questions and

17   confirmations for you.  Do you see that?

18   A.  Yes, sir.

19   Q.  Can you read your first question aloud to the jury.

20   A.  Sure.  No. 1 question I ask here to Patrick is, can the $10

21   units be traded immediately after the IPO?

22   Q.  What do you say after that?

23   A.  Parentheses, I say, I realize not smart to do so, just want

24   to know if possible.

25   Q.  What's your second question?  Can you read that one aloud.

1    A.  No. 2, I say, or do we need to wait for the units to split

2    up into their respective components before trading them.

3              MR. BACH:  Go back into the main document,

4    Ms. McFerrin.  Go to the next page.

5    Q.  Do you see all the way at the bottom that Mr. Orlando joins

6    this chain?

7    A.  Yes.

8              MR. BACH:  Can we blow up that.

9    Q.  Can you read to the jury what Mr. Orlando says.

10   A.  Sure.  He responds, and this is still I think on the same

11   date here, June 24th, 7:32 p.m.  Mr. Orlando says, sorry guys,

12   I've been in meetings, I'll respond in a sec.  Then he says,

13   IPO units are free-trading.  Founders shares are locked up

14   until six months after biz combo.

15             MR. BACH:  Let's take that down.

16   Q.  Do you know someone named Ben Reed?

17   A.  Yes, sir, I do.

18   Q.  Who is Ben Reed?

19   A.  Ben Reed, he was here a few days ago.  He is a broker at

20   E.F. Hutton.  E.F. Hutton also happened to be the investment

21   bank, the underwriter of DWAC'S IPO.  And Mr. Reed was

22   introduced to us, meaning Rocket One Capital, my boss and such,

23   as the individual who could help us if we were interested in

24   the IPO units and/or to trade after the IPO.

25   Q.  Shortly before the IPO, shortly before open market trading

1    began, did you and Mr. Shvartsman have any conversations with

2    Ben Reed?

3    A.   Yes, I do recall we did.

4    Q.   What did you discuss?

5    A.   So the IPO was September 3rd, 2021.  I believe it was the

6    day prior, so that would be the 2nd.  We spoke to Mr. Reed, my

7    boss was on the phone.  Wanted to confirm that my boss's new

8    brokerage account at E.F. Hutton had been set up and funded.

9    Two, to confirm -- I guess Mr. Reed actually confirmed that the

10   authorized traders for the account were the signatories on all

11   the paperwork, which was not me, that would be my boss and his

12   internal general counsel, a gentleman by the name of Mike Park.

13   Three, Mr. Reed confirmed what the total value of the account

14   was and what the allocation was from the IPO, the difference

15   being -- he confirmed the cash that was in the account that was

16   then available to trade in the open market.

17   Q.   Did he tell you who to contact for trades in the open

18   market?

19   A.   He said that my boss should contact him directly, yes.

20   Q.   Did he tell you when the IPO would begin trading -- when

21   the open market trading would begin?

22   A.   Yeah, he mentioned that the IPO was the next day.  That was

23   known.  That was in the public domain.  He reiterated that.

24   Q.   The day of this conversation was the day before open

25   trading began?

1   A.   That's correct.  Yeah, it was September 2nd, 2021.

2          MR. BACH:  Can we pull up Government Exhibit 453.

3   Q.   Do you see this is an email on September 2nd from you to

4   Anton, Anton Postolnikov?  Do you see that?

5   A.   Yes, I do.

6   Q.   Is this the same day you spoke to Mr. Reed with

7   Mr. Shvartsman?

8   A.   Yes, it was.

9   Q.   Was this before or after you spoke to Mr. Reed?

10  A.   This was after.

11  Q.   And you write Anton, hope you are well.  The DWAC SPAC is

12  pricing the IPO tonight.  Should start trading tomorrow.

13  Please let me know if you want to discuss.  Note, it will trade

14  as a unit for likely the first 50 days.  Unit meaning the

15  combined common share and half warrant.  Thus, you could simply

16  buy through your broker on the open market rather than putting

17  in an order via the IPO underwriter.  Most SPACs trade slightly

18  below the $10 IPO price initially, so it might make sense to.

19  Do you see that?

20  A.   Yes, I do.

21  Q.   Is any of the information that you're communicating in this

22  email nonpublic information?

23  A.   No, sir.  And I think I'm just following up here with some

24  questions that Mr. Postolnikov had, but this is all in the

25  public domain.

1    MR. BACH:  Let's take that down.

2  Q.  Before you joined the DWAC board of directors, had you ever

3  previously served on the board of directors of any public

4  company?

5  A.  No, sir, I had not.

6  Q.  What was your understanding of why you were being asked to

7  assume that role on DWAC?

8  A.  I think that DWAC certainly looked at my background, my

9  qualifications, credentials, and they saw a pretty seasoned

10  financial analyst that could add value.  It was a request of my

11  boss, who helped put together a syndicate, so I think that was

12  another element of it.  They could have easily denied it, but I

13  think they thought, despite my lack of experience on public

14  boards, that I did have some good financial analysis experience

15  that could potentially be helpful to them.

16  Q.  You told us there was a board meeting.  The first board

17  meeting was on September 21; correct?

18  A.  That is correct.

19  Q.  Who were some of the other members of the board?

20  A.  There was six total board members, including Mr. Orlando,

21  myself being No. 2.  There was Justin Shaner, Eric Swider,

22  Rodrigo Veloso, and Lee Jacobson.

23  Q.  Did you know any of these individuals before you joined the

24  board?

25  A.  No.  Again, I met Mr. Orlando previously, but I didn't know

1  any of the other board members.

2  Q.  Do you know if any of the other board members had a prior

3  relationship with Mr. Orlando?

4  A.  I did not know that, no, at the time.

5       MR. BACH:  Could we pull up the opening chart, please.

6  Q.  At any point over the summer or in September or October of

7  2021, did anyone at DWAC provide you with any training

8  regarding your service on the DWAC board of directors?

9  A.  No, they did not.

10 Q.  Referring to the same time period, did you receive any

11 training as a board member with regard to compliance matters?

12 A.  No, I did not.

13 Q.  Referring again to the summer of 2021 and September and

14 October 2021, did you receive any training as a board member

15 with regard to steps you had to take to be sure to comply with

16 the law?

17 A.  No, I did not.

18 Q.  In the summer of 2021 and in the fall months of September

19 and October 2021, did you receive any training as a board

20 member with respect to when you could or could not trade?

21 A.  No, I did not.

22 Q.  At any point from June through October 2021, did you

23 receive any instructions from anyone at DWAC on these matters?

24 A.  No, I did not.

25       MR. BACH:  Let's take down this chart.

1  Q.  Putting aside any training you did or did not receive from

2  DWAC, did you have an understanding when you joined DWAC's

3  board about things you could do and things you could not do?

4  A.  Yes, I did.

5  Q.  What was that understanding?

6  A.  I, from many years of experience and training, knew

7  material nonpublic information is sacred and I couldn't trade

8  if I was in possession of it, I couldn't tip anyone as to its

9  specificity.  It was sacred and needed to be guarded carefully.

10  Q.  Did you have an understanding of the particular forms that

11  you would have to fill out as a director if you did trade?

12  A.  No, I did not.

13  Q.  Now, while you're on the board --

14        MR. BACH:  Could we pull up that chart again, the

15  opening chart.

16  Q.  While you were on the board, did you ever tell anyone

17  anything that you learned at a DWAC board meeting?

18  A.  No, I did not.

19  Q.  Did you ever reveal any confidential board information to

20  anyone else?

21  A.  No, I did not.

22        MR. BACH:  Take that down.

23  Q.  While you were on the board, did you communicate with

24  Michael Shvartsman and other members of the syndicate about

25  their DWAC investments?

1    A.   Yes.

2    Q.   Did you draw lines about what you could discuss with them

3    and what you could not discuss with them?

4    A.   Yes, absolutely.

5    Q.   Can you describe for the jury the lines that you drew.

6    A.   Sure.  Again, any material nonpublic information is sacred,

7    not to be shared.  In addition to that, anything I learned on

8    the board that was confidential to the board, I wasn't going to

9    share with anybody, it wasn't their business.  The

10   conversations I had while I was on the board were some residual

11   conversations about the logistics of the different share

12   structures all in the publicly available documents.

13   Q.   Can you be a little bit more concrete.  What type of

14   information was available in the publicly available documents?

15   A.   So there was, again, the concept of units and warrants and

16   units being a basket.  That isn't something I hadn't spent a

17   lot of time on, and certainly the syndicate members hadn't.

18   What is a unit, how many warrants are in each warrant, first

19   the common stock, when do warrants typically start to trade

20   after an IPO, what do the public documents say about a lockup

21   in a founders share class.  Things of that sort.

22   Q.   When you say public documents, what public documents are

23   you talking about?

24   A.   So, an S1 being a very notable one, an S1 is the SEC's

25   abbreviation for the IPO documents that are filed.  There's

1  also prospectuses that are filed in cases like this. They're

2  lengthy documents that spell out these securities terms.

3  Q.  Did those documents, when you say securities terms, did

4  those documents spell out the terms and conditions of the

5  warrants, for example?

6  A.  Yes.

7  Q.  Can those documents be accessed by any member of the

8  public?

9  A.  Yes.

10 Q.  You mentioned Mr. Hannelius a moment ago. Where did he

11 live in 2021?

12 A.  He lived in the Los Angeles, California general area.

13 Q.  You told us you lived in Providence. How would you

14 describe the nature of your relationship with him in 2021?

15 A.  I did know Mr. Hannelius somewhat well at that point. He

16 is a cofounder in many of my boss, Michael Shvartsman's

17 businesses. He's also a frequent co-investor with Michael.

18 He's not my boss, but I know him as kind of my boss's

19 right-hand man, so to speak.

20 Q.  Up through the time of the merger on October 20th, did you

21 have a social relationship with Mr. Hannelius?

22 A.  No, I wouldn't characterize it that way at all.

23 Q.  Let me show you Defendant's Exhibit 34.

24        MR. BACH:  I will represent to the Court and the

25 government that this is a part of what's already in evidence as

1    Government Exhibit 465.

2              THE COURT:  Any objection to DX 34?

3              MS. HANFT:  No objection, your Honor.

4              THE COURT:  DX 34 is received.

5              (Defendant's Exhibit 34 received in evidence)

6              MR. BACH:  Can we publish this to the jury.

7    Q.  Do you see that this is an email exchange between you and

8    Eric Hannelius, I guess it begins at the bottom, it says

9    September 8th, it continues on the top, it says September 9th.

10   Do you see that?

11   A.  Yes, sir.

12   Q.  At the bottom, Eric writes, hi Bruce, FYI, what are next

13   steps.  Do you see that?

14   A.  Yes.

15             MR. BACH:  At the very top, could we blow up where it

16   says, hey Eric, and that first sentence.

17   Q.  You write, hey Eric, two different variables to consider

18   here, one for the $10 IPO stock and two for the $5 founders

19   class stock, assuming you invested in both.

20             Did you know what he had invested in?

21   A.  I did not know definitively what he invested in.  I think

22   early on I had a sense of what his plans were, but I didn't

23   actually know what he truly did end up investing in at this

24   point.

25   Q.  Let's go further down.  Do you see, there's a number one,

1    $10 IPO stock?  Do you see that?

2    A.  Yes, sir.

3    Q.  And it says at the first bullet point, the stock will

4    likely trade within 30 cents of $10 handle until they announce

5    a target.  Do you see that?

6    A.  Yes, I do.

7    Q.  Is anything you write here nonpublic information?

8    A.  No, not at all.  This is just conveying to him what SPACs

9    typically do, again, pre the announcement of a target, then

10   they'll trade differently.

11   Q.  Do you see the second bullet point, it says, that

12   announcement, expected six to ten weeks from now, is our

13   expected catalyst to then profitably sell the IPO shares.  Do

14   you see that?

15   A.  Yes.

16   Q.  Is that based on anything you learned at a board of

17   directors meeting?

18   A.  No, sir.  That's just a loose guesstimate.

19   Q.  Did you know on September 9th whether any target would be

20   announced in six to ten weeks?

21   A.  No, I hadn't had a single board meeting and there was no

22   information of any substance provided to me or the board as far

23   as I knew.

24   Q.  Had you received any information from the board about any

25   expected timeframe?

1  A.  No, sir.

2  Q.  Had you met with the board at all at this point?

3  A.  No, the first board meeting is still weeks away.

4  Q.  Then, in the next bullet, you write, if they don't announce

5  a target we like expect, we have the right to demand our $10

6  back, which we will do under this scenario.  What did you mean

7  by this?

8  A.  So, when I refer to "we" in a lot of these emails, I'm

9  referring to Michael at Rocket One Capital.  This is why you're

10  asking me this, I don't think he knows much about SPACs.  And

11  so, basically I'm saying you'd have the right, if you don't

12  like the target with the $10 IPO stock, to redeem and get your

13  money back, i.e., protected downside.

14  Q.  Why were you discussing the possibility that he might not

15  like a target?

16  A.  Because it's just a wild ask, you know, what's going to

17  happen.  It could be something good, it could be something bad,

18  but what's interesting here is you have some protected downside

19  if the outcome isn't to your liking.

20  Q.  Let's go down to the fifth bullet point.  It says, ROC.

21  What's that a reference to?

22  A.  That's Rocket One Capital.

23  Q.  Invested 145K in the $10 IPO shares.  We plan to buy

24  another $255 — I assume that's thousand — of this stock in the

25  open market over the next four weeks.  Do you see that?

1   A.  Yes, I do.

2   Q.  What does that refer to?

3   A.  So this is me conveying what I understand my boss's plans

4   to be.  I know Eric is asking me essentially what's Michael

5   going to do when the two of them are very close.  So I'm

6   conveying what I understood Michael's plans to be at that

7   point.

8   Q.  When you used the word "we,' we plan," what does that refer

9   to?

10  A.  That refers to Rocket One Capital, which refers to Michael

11  and Michael's money.

12  Q.  Were you personally a beneficiary of this investment in any

13  way?

14  A.  No, I was not.

15  Q.  At the time you sent this email, had you attended a single

16  board meeting?

17  A.  No, sir, I had not yet, no.

18  Q.  At this point, did you consider yourself to be in

19  possession of material nonpublic inside information?

20  A.  No, I did not.

21  Q.  Let's go toward the end of this email.  Do you see in the

22  middle here, it says, hope that context helps.  Look forward to

23  seeing you in Miami next week.  Do you see that?

24  A.  Yes, sir.

25  Q.  Did you see Mr. Hannelius in Miami the week after September

1    9th?

2    A.  I believe I did, yes.

3    Q.  Did you discuss DWAC with him?

4    A.  If I did, it just would have been this basic logistical

5    type of stuff that's in the publicly available documents.

6    Q.  The type of material you've described here?

7    A.  Correct.

8    Q.  Now let me show you Government Exhibit 465, which is in

9    evidence.  I want to show you here at that time date on this is

10   October -- this is emails between you and Mr. Hannelius, dated

11   October 3rd, 2021; correct?

12   A.  Yes.

13          MR. BACH:  Can we go to the bottom of this document.

14   Q.  Do you see in the middle, Mr. Hannelius writes, hi Bruce,

15   want to follow your lead here.  See my agreement attached.  I

16   just did 75K in founders class shares.  I've been buying some

17   DWACU since seeing you in Miami via my brokerage account.

18   Should I keep buying?  What's your thoughts.  Again, want to

19   follow your lead here.  Any updates on timing and next steps

20   from Mr. Orlando?  Very best regards.

21          Did you respond?

22   A.  Yes, I do believe I respond to him here.

23   Q.  Taking a look at the rest, you arranged to have a phone

24   call with Mr. Hannelius?

25   A.  Correct.

O56Cgar7                    Garelick - Direct

1    Q.  And at the top, you say, I'll call you at 8:00 a.m. PST

2    tomorrow.  Do you see that?

3    A.  Yes.

4    Q.  And that's at 11:00 a.m. Eastern Time; correct?

5    A.  Correct.

6    Q.  Did you have a call with Mr. Hannelius at 11:00 a.m.

7    Eastern Time the following day, October 4th, 2021?

8    A.  Yes, I did.

9    Q.  Did you discuss DWAC?

10   A.  Yes, I did.

11   Q.  And what about DWAC did you discuss with Mr. Hannelius?

12   A.  Well, this email crosses a line, and I made it very clear

13   to Mr. Hannelius that this was entirely inappropriate, I'm on

14   the board of directors, he's asking me questions that are

15   inappropriate and I can't have this conversation with him.

16   This is very different than earlier on when he's asking me

17   about terms of the securities and the public filings.  He

18   apologized.  I don't think he was trying to probe me for

19   something inappropriate, but I certainly took it that way and I

20   think it reads that way.  So I shut this conversation down and

21   he didn't email me again on it.

22   Q.  Did you, apart from that discussion of DWAC with

23   Mr. Hannelius on October 4th, did you discuss anything else

24   with him that day?

25   A.  Yes, on October 4th, that was a fairly busy day for us.  I

1  know that a little bit later that day we were going to have a

2  call with a technology company, software company that we were

3  either thinking of acquiring or partnering with.  There was a

4  lot of analysis and modeling and thoughts and strategy going

5  into it, how we assess that company and perhaps how we want to

6  negotiate with them.

7  Q.  Let me show you Defendant's Exhibit 857, which is already

8  in evidence.  Do you see at the top, this says October 4th,

9  2021?

10  A.  Yes.

11  Q.  Is that the day you had the 11:00 a.m. call with

12  Mr. Hannelius?

13  A.  Yes.

14  Q.  Do you see that in the third line here, it says phone call

15  between Bruce Garelick and Eric Hannelius?

16  A.  Yup.

17  Q.  Could you just look at the two entries preceding that.  Can

18  you give us a sense of -- well, first of all, were you

19  corresponding with Mr. Hannelius in anticipation of the

20  11 o'clock call?

21  A.  I was, yes.

22  Q.  What were you corresponding with him about?

23  A.  A separate matter.  It was trying to figure out a private

24  investment that Mr. Hannelius had made.  I think this is

25  probably related to some of the track record accounting work we

1  were doing for the Small Business Administration at work, and

2  he had made an investment in something called Paylitix.  I was

3  trying to understand what that investment was and what the

4  proper accounting was for it.

5  Q.  Do you see, looking at the 11 o'clock call with

6  Mr. Hannelius, do you see it lasts 28 minutes and 38 seconds?

7  A.  Yes, sir.

8  Q.  But at 11:05, five minutes in, you get an email from Josh

9  Taylor.  Do you see that?

10  A.  Yes.

11  Q.  Who is Josh Taylor?

12  A.  So Josh Taylor was a young analyst working for me at the

13  time.  He was tasked with really putting together a model for

14  this company called Akerna.  We had a call that day at

15  1 o'clock, and this was what I was alluding to a minute ago in

16  terms of potential acquisition or potential commercial

17  partnership.  So we were kind of feverishly getting ready for

18  that call.

19  Q.  This is at the 11:05 entry.  Hey, Bruce.  Here's the latest

20  version of the Akerna model.  I've attempted to implement as

21  many of the changes you require, but there is still some

22  uncertainty with the data.  Do you see that?

23  A.  Yes, sir.

24  Q.  Just looking further down the page, do you see at

25  13 o'clock or 1 o'clock, there's a calendar entry for a Rocket

1    One Akerna call where the invitees include you, Eric Hannelius,

2    and Michael Shvartsman along with others?

3    A.   Yes.

4    Q.   While you were on the phone with Mr. Hannelius at

5    11 o'clock, did what Mr. Taylor sent you, the version of the

6    model, did that relate to what you were discussing with

7    Mr. Hannelius?

8    A.   Yes, it did.  So there was a lot of discussion that morning

9    to get ready for this call with Mr. Hannelius, with

10   Mr. Shvartsman, you know, Mr. Taylor is assisting in a

11   component of that.

12   Q.   There are also calls with Mr. Shvartsman during this day.

13   Do you see those?

14   A.   Yes.

15   Q.   And there is, in addition to the 13:00 or 1 o'clock call

16   with Akerna, do you see there is a 14:30 or 2:30 call with a

17   Steve McKeon?  Do you see that?

18   A.   Yes.

19   Q.   Then there is email correspondence later that day; correct?

20   A.   Yup.

21   Q.   On a day like this, what would you tend to be discussing on

22   the phone with Mr. Hannelius and Mr. Shvartsman?

23   A.   I mean, this was a really busy day.  I mentioned this

24   Akerna call at 1:00, but there's a lot more going on in the

25   afternoon.  This is late in the afternoon.  This is following

1  up with the investment bank that was doing this big financing

2  for Michael and Eric's payment processing company I alluded to

3  earlier.  The Steve McKeon call was related to a British tech

4  company, private tech company that we were diligencing for

5  potential investment.

6  Q.  Was the Akerna, was that an important transaction for

7  Rocket One?

8  A.  At the time we were -- yeah, we were thinking it very well

9  could be, but it just -- the devil's in the details in terms of

10  what type of form that could potentially take.  It was very

11  formative and we were still just trying to understand their

12  business.  Hence this model being built by Mr. Taylor and such.

13  Q.  Are you familiar with something called a data room?

14  A.  Yes, sir.

15  Q.  What is a data room?

16  A.  So a data room is, you know, that term, when it's used in

17  financial investment circles, would refer to -- we call it a

18  virtual data room or a VDR.  It's a place where the company's

19  seeking investment or, in the case of DWAC, seeking a merger,

20  an operating partner, would post a bunch of important

21  materials, financial formation, the technology stack

22  information so that it could be reviewed and analyzed as part

23  of due diligence.

24  Q.  Did Trump Media Group have a data room?

25  A.  Yes, they did.

Q.  Was it available for board members at DWAC to visit

virtually?

A.  Yes, there became a point where they opened a data room for

the board of directors at DWAC to review TMG.

Q.  And continuing to talk about October 4th, did you visit the

TMG data room on October 4th?

A.  I believe yes.  I think that was the first day I got into

the data room on October 4th, 2021.

Q.  What prompted you to visit it on that day, on October 4th?

A.  If I recall correctly, they had -- DWAC had opened the TMG,

Trump Media Group data room for the respective DWAC board

members the week prior.  I think the 4th is a Monday, I could

be off a day or two, and I think they opened it the prior

Friday or maybe it was the prior Thursday.  They wanted the

board members to get in there and take a look and provide their

feedback.  And so, I do remember getting like a reminder email

from Mr. Orlando on the Friday before.  So I'm going to say

October 4th -- October 1st, roughly.  I had a lot going on at

this point, so I wasn't able to get into it.  I know they were

waiting for my feedback and I was eager to give it.  And so,

October 4th, after some urging from Mr. Orlando, I got in the

data room and started to assess and analyze what was there.

        MR. BACH:  Let's take a look at Government Exhibit 511

at page 14.  Can we blow up the bottom bubble here.

Q.  Do you see this is in the government's WhatsApp chain for

1    the board, do you see the date October 1st, 2021, in the

2    bottom-right?

3    A.  Yes, sir.  My recollection was a little bit better than I

4    thought it was going to be.  Yes, that's correct.

5    Q.  Is that the Friday before Monday, October 4?

6    A.  I couldn't say that definitively without looking at a

7    calendar, but my recollection is it was a Friday-Monday

8    spillover there.  So I think October 1, 2021 was a Friday.

9    Q.  Do you see at the top, this is from Patrick Orlando?

10   A.  Yes, sir.

11   Q.  And he calls out your name, Bruce.  Do you see that?

12   A.  Yup.

13   Q.  Do you have any media-related DD questions.  What does that

14   stand for?

15   A.  Due diligence.

16   Q.  Where would you conduct due diligence?

17   A.  In this case, it would have been to go into the data room

18   and analyze and assess the materials that were provided within

19   that data room.

20   Q.  Then he writes, Bruce, do you have any media-related DD

21   questions from previous deals happening.  See if there's

22   anything I'm overlooking.  Generally, we are in good shape, but

23   I'm beating up all aspects to make sure we are rock solid.  Do

24   you see that?

25   A.  Yes, sir.

1  Q.  Now, did you go into the data room that day?

2  A.  I --

3  Q.  October 4th, that --

4  A.  Sorry.  Rephrase the question.

5          MR. BACH:  Let's bring up the chart again, 857.

6  Q.  On October 4th, did you visit the Trump Media Group data

7  room?

8  A.  My recollection that was the first day I got into the data

9  room and started to analyze it, yes.

10 Q.  Did you discuss anything you saw in the Trump Media data

11 room with Michael Shvartsman?

12 A.  Absolutely not, no.

13 Q.  Did you discuss anything you saw in the Trump Media Group

14 data room with Eric Hannelius?

15 A.  No, absolutely not.

16 Q.  And by the way, we've been talking about October 4th.  Is

17 that the only day that you and Mr. Shvartsman and Mr. Hannelius

18 would be working together on business transactions and deals in

19 this way?

20 A.  This, no.  I mean, this was a busy period.  So really, all

21 through the fall 2021, there was a lot we were working on.  So

22 some days weren't quite this busy, but there was a lot of days

23 that was exactly like this.

24 Q.  Let's move slowly ahead in time to October 7th.  Did you

25 have business calls with Mr. Shvartsman and Eric Hannelius on

1  that day?

2  A.  Yes, I did.

3  Q.  What kinds of things were you discussing?

4  A.  So, by October 7th, it was a good thing.  The investment

5  bank that we had retained to seek financing capital for the

6  private payment processing company that Mr. Hannelius and

7  Mr. Shvartsman founded was starting to get some traction with

8  potential investors.  We were starting to do calls with those

9  prospective investors and followups with them.  I believe,

10  shortly after, started to get some nice term sheets from them.

11          So October 7th, I think we had two calls scheduled

12  that day with two of the bigger potential investors for that

13  payment process financing endeavor.

14          MR. BACH:  Ms. McFerrin, can you pull up Defendant's

15  Exhibit 859.

16  Q.  Do you see this document already in evidence, Defendant's

17  Exhibit 859?  Do you see the top says, October 7, 2021?

18  A.  Yes, sir.

19  Q.  And do you see that there are communications with

20  Mr. Shvartsman and Mr. Hannelius on those days?

21  A.  Yes, I do.

22  Q.  Do you see the word "Monroe"?

23  A.  Yes, I do.

24  Q.  What's Monroe and what's going on with Monroe on October

25  7th?

1    A.  Monroe is the very large institutional investor, financier,

2    credit provider, meaning debt provider.  We had a call

3    scheduled with them that day to discuss potential financing for

4    Michael and Eric's private payment processing business.

5    Q.  What is Royston?  You see Royston there?

6    A.  I sure do.  So Royston is another large institutional

7    investor that was interested.  This was either the first or

8    second call with these institutional investors.

9    Q.  And you see how in the middle text here, you write,

10   3:30 p.m., Monroe; 4:30 p.m., Royston?  Do you see that?

11   A.  Yes, sir.

12   Q.  Do you recall whether either of those calls took place?

13   A.  The Royston one I believe did happen.  I think the Monroe

14   one got rescheduled at the last minute on their ask, on

15   Monroe's ask to I want to say the next day.

16   Q.  But it was scheduled for 3:30.  Do you see that?

17   A.  Yes, sir.

18   Q.  At 15:30 or 3:30, Mr. Shvartsman calls you.  Do you see

19   that?

20   A.  Yes.

21   Q.  And do you have any recollection of why he would call you

22   at 3:30?

23   A.  Yeah.  I mean, a vivid memory of exactly what we talked

24   about at that moment, no, but I have a pretty good sense.  That

25   is, there was nothing more important to Mr. Hannelius and

1   Mr. Shvartsman than this specific endeavor because it would

2   have been a personal -- it was going to be a personal game

3   changer for them in terms of their business.  So there was a

4   ton of followup and collaboration.  They were very interested.

5   We had at least this one call with I believe Royston, so we

6   were likely discussing that call and trying to figure out next

7   steps.

8   Q.  There's a short call again at 6:09.  Do you have any

9   memory -- I know -- vaguely, what types of things would you be

10  discussing with him on a day like this?

11  A.  That one, again, the exact specifics I can't recall, but it

12  had to have related maybe not even to the Royston one again,

13  but there was a lot of big prospective investor calls coming up

14  for this business.  And so, each one of those, we had to

15  carefully think through what were their interests, was there a

16  good fit, was there not, and what were the potential financial

17  terms that we should or shouldn't try to negotiate.

18  Q.  Did you visit the Trump Media Group data room on this day,

19  on October 7th?

20  A.  I did.  I think this was the second time I went in there

21  and I think I -- at this point, I think after visiting it a

22  second time, I kind of finished my assessment, my financial

23  analysis and other analysis of what was in there from a due

24  diligence perspective.

25  Q.  Did you tell Mr. Shvartsman about anything you learned

1    during your analysis and assessment of the materials in the

2    data room?

3    A.  No, I did not.

4    Q.  Did you discuss what you saw in the data room with any

5    other party?

6    A.  I did, yes.

7    Q.  Who did you discuss it with?

8    A.  I discussed it with the DWAC board and Mr. Orlando.

9    Q.  What did you tell them?

10   A.  I gave them my assessment of what I saw in that data room,

11   positives, negatives.

12         MR. BACH:  Can we pull up Government Exhibit 470,

13   please.

14   Q.  What is this document?

15   A.  So this is on Thursday, October 7th, 2021.  You want me to

16   generically answer that question first?

17   Q.  Sure.

18   A.  This is an email to the DWAC board and the DWAC officers,

19   providing my assessment of the data room and my read on some

20   due diligence findings.

21   Q.  And you tell them at the top you remain enthusiastic in

22   support of TMG as the prime target for us.  Do you see that?

23   A.  Yes, I do.

24   Q.  Is that consistent with your understanding at the time?

25   A.  Yes, at that time I was enthusiastic about it.

1  Q.  And then you say, my feedback on the data room, plus due

2  diligence materials follows.  Do you see that?

3  A.  Yes, sir.

4  Q.  Why were you sharing this information with the board?

5  A.  Well, that was my job, and Patrick Orlando specifically, he

6  reminded me and asked me to do this, and I was happy to do so,

7  I just had to free myself up a little from the days prior.  So

8  I'm finally coming back to him to fill what my obligation was

9  and Mr. Orlando's direct request to provide some real feedback

10  of what I had seen in the data room.

11  Q.  You don't have to read this word for word, but what was

12  your sense of the positives of this possible transaction?

13  A.  I think that I was pleasantly surprised that they were a

14  little further along on some of the tech infrastructure

15  investments than I would have expected.  They did have

16  contracts in place with key vendors.  You see -- as an

17  investor, you'll see companies at different stages and you'll

18  see companies maybe that are early stage, but you could tell

19  they're not well thought out, they haven't really gone through

20  the motions to put something together.  These positives, they

21  say, hey, there are some things here that are well thought out.

22  I mentioned the business model, the cost sides, the

23  infrastructure.  And the last positive I mention there is I did

24  like the due diligence requests lists that DWAC had put

25  together.  I thought it was detailed and thorough.

1  Q.  Can you summarize what negatives were you trying to convey

2  here?

3  A.  So I think any good analyst investor, it's very rare that

4  you think everything's just sunny and perfect, and in this case

5  there really were some negatives to be thorough and thoughtful

6  I wanted to also highlight.

7         So the first negative was there was really no --

8  normally you'd see a forecast, especially for an early stage

9  company because if they don't have anything much today in terms

10  of revenues, then it's about what's on the come.  There wasn't

11  really any thoughtful modeling forecast here.  There was some

12  initial 2021 startup fees financials, but again, that's not

13  really that relevant for a startup like this.  So that was

14  disappointing to me.  I also couldn't even see the business

15  model levers or monetization levers, as I put it, which is a

16  nerdy way of saying what switches will they pull to try to make

17  money at some point with this business model.

18         Do you want me to go onto the second group of

19  negatives?

20  Q.  Sure.

21  A.  So the second group of negatives gets into the very nature

22  of Donald Trump and Donald Trump being Donald Trump.  At this

23  point, gosh, you're -- what is it?  Nine, nine and a half

24  months removed from the Capital riots?  And he's still a fairly

25  controversial figure --

1    MS. HANFT:  Objection.

2    MR. BACH:  He doesn't have to discuss this.  We're

3    happy to discuss it or not discuss it, whatever the Court

4    prefers.

5    THE COURT:  I'm going to overrule the objection, but

6    it's up to you in terms of how much to go into.  I think it's

7    fair to examine the witness on the positives and the negatives.

8    Q.  So what was this negative?

9    A.  Sure.  Just to be clear, I wasn't about to go off on a

10   political tangent.  This was not about politics whatsoever.

11   And so, what I was about to allude to was I think when

12   you assess risk here and you think of this business model,

13   there was nothing in the data room to say, well, if Trump runs

14   for president again, would he have to maybe recuse himself from

15   this business.  What if he gets thrown in jail?  What if Apple

16   and Google have, in my opinion, a ridiculous amount of control

17   over the app's ecosystem that most people would use on their

18   phones.  One of the levers they have is they can ban an app.

19   So say everything's ready to roll out, but Apple and Google say

20   we don't want Truth Social or Trump Media operating on our

21   platform.  That would in some ways be almost a dead on arrival

22   situation for them.  So those are negatives I felt compelled to

23   flag.

24   Q.  Were you sharing your honest assessment with the board

25   here?

1  A.  Absolutely, yeah.  And I certainly wanted answers to these

2  negatives, too.  I mean, it wasn't they were deal killers, but

3  the board and Mr. Orlando and his lieutenant's like, we needed

4  to very figure out these two negatives to get over the hump.

5  The potential was intriguing for sure, but these negatives had

6  to be thoughtfully answered and addressed.

7          MR. BACH:  Judge, we're about to change topics, so

8  this might be a convenient time.

9          THE COURT:  Members of the jury, it is just about

10  5 o'clock, so we're going to break for the day.

11          Please don't talk amongst yourselves or with anybody

12  else about the case.  Don't do any research on the case.  A

13  reminder that we'll have breakfast available for you at 8:30.

14  Please try to be in the jury room at 8:45 so we can get started

15  promptly at 9:00 a.m.

16          Have a good evening, everybody.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  The witness can step down.

3          The parties may be seated.

4          Mr. Bach, how much longer do you have?

5          MR. BACH:  I think about an hour and a half.  It's

6     hard to know the pace, but I have about a little less than what

7     I've already covered.

8          THE COURT:  Any sense, Ms. Hanft, as to how long your

9     cross is going to be?

10         MS. HANFT:  Difficult to say, but I would think at

11    least two hours, your Honor.

12         THE COURT:  I would like to do some bit of a charge

13    conference this afternoon, try to get through the charge if we

14    can.  We can take a five-minute comfort break right now.  Then

15    I think we'll see how we do tomorrow.  It may be that I let the

16    jury go early and then we do summations and the charge all on

17    Wednesday.

18         Does the government have a preference?

19         MS. HANFT:  Yes, your Honor, that works for the

20    government.  In fact, we would request that we be given until

21    the next day to do summations.

22         THE COURT:  Mr. Bach.

23         MR. BACH:  Total agreement.

24         THE COURT:  It's rare.  And it's pretty rare for the

25    judge to go against the adversaries when they're in agreement,

1   so that's what I'll do.  I think it still would benefit both of

2   you to have a sense from me as to what my charge is going to be

3   and also to be able to spend the rest of the time tomorrow

4   afternoon preparing your closing statements.  So why don't we

5   take five minutes now and then we'll reconvene.

6              MR. BACH:  Judge, can some of us be excused?

7              THE COURT:  I should have said that.  I only need one

8   lawyer from each side, as many of you who want to are welcome

9   to stay, but anybody who is not necessary can be excused.

10             MS. SHAPIRO:  Your Honor, just one moment.

11             Your Honor, would it be all right for Mr. Garelick to

12  be excused from the charge conference, as well?

13             THE COURT:  Any objection from the government as to

14  that?

15             MS. SHAPIRO:  He's still on direct, obviously.

16             MS. HANFT:  No, your Honor, as long as the record

17  reflects he's choosing to absent himself because he obviously

18  has the right to be present at the charge conference.

19             THE COURT:  Why don't I have that colloquy with

20  Mr. Garelick himself.

21             Mr. Garelick, I want to make sure you understand that

22  we're about to do the charge conference on the charge that's

23  going to be given to the jury.

24             Do you understand that?

25             THE DEFENDANT:  Yes, sir, I do.

O56Cgar7                    Garelick - Direct

1          THE COURT:  And you've got a right to be present for

2    that as well as a right to be present for all the critical

3    stages of your trial.

4          Do you understand that?

5          THE DEFENDANT:  Yes, your Honor, I do.

6          THE COURT:  And do you waive that right to be present

7    for the charge conference?

8          THE DEFENDANT:  In this instance, yes, I do.

9          THE COURT:  Then you may be excused and we'll start up

10   again at 5:10.

11         (Recess)

12         (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O561GAR8

1          (Jury not present)

2          THE COURT:  As I mentioned, I distributed a redline of

3     our charge this morning.  We'll put that on the docket just so

4     there's a record of it, what we're working through.

5          And what I propose to do is start with the defense on

6     each instance and see the first exception that the defense has,

7     and then I'll see if the government has anything before that,

8     and we'll just work through it.  There will be instances where

9     I may ask for some argument, but I've also had the benefit of

10    very good briefing from both of you.

11         So Ms. Shapiro, what is the first exception you've

12    got?

13         MS. SHAPIRO:  Sure, your Honor.  And I just want to

14    note for the record, obviously, there's been extensive briefing

15    and so forth, that we are preserving all our prior requests to

16    charge and objections, including the various——I don't know if I

17    need to go through the docket numbers, but I'm happy to do that

18    just to put it on the record or——

19         THE COURT:  I don't feel like you need to do that, but

20    I'm not the appellate court, so if you want to mention the

21    docket numbers——

22         MS. SHAPIRO:  I'll do that quickly before I turn to

23    the first issue.

24         I think it's docket 109, 118, 132, 137, 138, 140, and

25    then we've also had some colloquies during the course of the

1    trial.

2            So the first question I had just actually isn't

3    related to the substance of the charge, but I just wanted to

4    reraise the issue of whether the Court plans to include the

5    table of contents and the headings in the copy that's sent back

6    to the jury, and we would prefer that the Court not do that for

7    the reasons I stated earlier.

8            THE COURT:  Okay.  All right.  Let me take that under

9    advisement.  I'm glad that you raised that, because I wanted to

10   make sure I got your position down on that.  Do you know if

11   there's any authority one way or the other on that issue?

12           MS. SHAPIRO:  I don't know of any authority.  We just

13   had this experience.  It was a different type of case, and it

14   also—although it also involved securities fraud and some

15   different fraud counts, and the intent element was described in

16   different ways in the table of contents for the different

17   counts, and there was a press reporting on various jurors'

18   statements to the press about their deliberations and the

19   verdicts they had reached, and several of the jurors seemed to

20   have had some sort of a misunderstanding as to the level of

21   criminal intent required for different counts based on the way

22   the headings were described.  So it's really just more of a

23   pragmatic request.  I will say that obviously there is

24   authority for the proposition that the appellate court is

25   supposed to look at the charge as read to the jury in the

O561GAR8

transcript and not the typed version and so that would be the

authority I would rely on.  It just seems appropriate, in light

of that, if one is providing a typed copy of the charge, to

provide exactly, the exact instructions that were delivered to

the jury by the Court.

THE COURT:  Two questions for you.  One is, can you

give me the case where the problem arose; and the second——

MS. SHAPIRO:  Yes.  It was *United States v. Trevor

Milton*.  I don't have the docket number off the top of my head.

It's currently pending on appeal.

THE COURT:  It's easy enough for me——

MS. SHAPIRO:  Sorry.  It's 21 Cr. 478 (ER).  And

there's a post-trial motion that describes these facts I was

just getting into.

THE COURT:  Are there any headings that you believe

are misleading?

MS. SHAPIRO:  Not specifically, your Honor.  It was

more just a general cautionary concern.

THE COURT:  All right.  What's the first thing that

you have for the charge itself?

MS. SHAPIRO:  Okay.  So on page 12, we had objected,

in the particular context of this case, because it's an insider

trading case, to the standard instruction on variance in dates

and amounts, and I didn't actually see any response from the

government indicating they disagreed with that objection.

1          THE COURT:  I believe that I did, but let me see,

2     first, does the government have anything before Item No. V on

3     page 12?

4          MR. SHAHABIAN:  No, your Honor.

5          THE COURT:  Does the government want to respond with

6     respect to variance in dates and amounts.

7          MR. SHAHABIAN:  Yes, your Honor.  With the Court's

8     indulgence, can we ping-pong between counsel on issues?

9          THE COURT:  If that's the way you want to handle it, I

10    don't have a problem with it.

11         MR. NESSIM:  I thought we had addressed this earlier

12    last week, but—one moment.

13         So the defense cites *Nersesian* as their case in

14    support of striking the variance language.  That case basically

15    says that because the charging language charges like "on or

16    about" or an approximate time frame, it's appropriate to give a

17    variance instruction.  Two of the five counts charged have that

18    language of, you know, "in or about" or from a time frame, so

19    under the theory of *Nersesian*, it's certainly plainly

20    applicable to those counts.  As to the substantive counts,

21    Counts Two, Three, and Four, those are charged over a range of

22    time themselves, even though the charging language does say on

23    the following dates, you know, securities fraud took place, but

24    they do charge a range of dates, which is nearly

25    indistinguishable from the idea of the range of *Nersesian* and

O561GAR8

1    the supporting the variance instruction.

2         In addition, their arguments are sort of like that

3    they would suffer some prejudice from the variance charge being

4    included as to those substantive counts because the jury would

5    be confused as to, at the time the trades took place, if the

6    defendant was in possession of material nonpublic information

7    or if he was subject to a duty.  There's no real possibility of

8    prejudice here.  The dates charged in the substantive counts

9    are a narrow time frame, a time frame over a period of time,

10   but the jury will have to make separate findings as part of the

11   elements, of the substantive elements, that those have been

12   met.  So really, it's appropriate under any basis.  It's

13   certainly appropriate under the case they cite as to Counts One

14   and Five, and as to the substantive counts, there's no risk of

15   prejudice.

16        THE COURT:  I'm going to overrule the exception for

17   substantially the reasons stated by the government.  The

18   defense's concern is addressed by the substantive instructions

19   with respect to the fact that the information needs to be

20   material nonpublic information at the time in which it is used.

21   And confidential.  So the exception is overruled.

22        What's the next thing that the defense has?

23        MS. SHAPIRO:  It's on page 13.

24        THE COURT:  Okay.

25        MS. SHAPIRO:  So in the redline, in the top runover

O561GAR8

paragraph, the Court added some language, and obviously we
don't disagree with the proposition that, you know, a person
could be guilty of the substantive crime or the conspiracy or
neither or both, but we object to the particular wording here.
Among other things, it says, "if the defendant both
participates in a conspiracy and commits the crime that was the
object, the defendant may be guilty of both.  Conversely," etc.
And, you know, "participates in a conspiracy" is sort of
shorthand, but it leaves out, you know, the fact that he has to
have knowingly joined the conspiracy, etc., and, you know, we
just don't think that sentence and the next one are necessary.
If the Court feels that it absolutely has——and the other thing
we're a little bit concerned about is, it seems to be sort of
inviting the jury to potentially split its verdict as opposed
to simply conveying the basic proposition that these are
separate crimes, you have to follow the instruction as to each
crime and consider each count separately.  So, yeah, so for
those reasons we object to, I guess, the first two additional
sentences.  Obviously we don't object to the idea that each
count needs to be considered separately.

THE COURT:  Let me ask you, Ms. Shapiro——I understand
your point.  But I also do think that it is important to convey
to the jury the substance that a defendant may be guilty of
both or neither or one or the other and that therefore, the
jury must consider each count separately.  So if I revised the

O561GAR8

1  charge so that it read, "A defendant may be guilty of both

2  conspiracy and the substantive crime, defendant may be found

3  guilty of neither, or of one but not the other, you therefore

4  must consider each count separately," which eliminates the

5  problem that you've identified of a shorthand with respect to

6  what the elements are of conspiracy.

7  　　　　MS. SHAPIRO:  That's fine.  I was going to propose

8  something like that.  That's fine.

9  　　　　THE COURT:  Okay.  That's what I'm going to do.  I

10  don't need to hear from the government on that because that is

11  what I'm going to do.

12  　　　　All right.  What's the next thing that—

13  　　　　MS. SHAPIRO:  Just further down the page, in the

14  penultimate paragraph, where it says, "in violation of the

15  duties of trust and confidence," and I understand the Court

16  added Benessere because that was charged in the indictment, but

17  when it says the duties, it's sort of implying that there were

18  such duties, so I wanted to propose that the Court change it

19  back to a duty, you know, that the defendant may have owed, or

20  something like that.

21  　　　　MR. SHAHABIAN:  I hear Ms. Shapiro's point.  If we

22  just eliminate the article and say "in violation of duties," I

23  don't know if that would—

24  　　　　THE COURT:  I think the way in which to handle it

25  would be to say "violation of a duty of trust and confidence

O561GAR8

 1     that the defendant owed DWAC and Benessere."  I don't want to

 2     use the language "may have owed DWAC and Benessere" because the

 3     defendant is guilty only if he in fact owed a duty and not if

 4     he may have owed the duty.  I take it, Ms. Shapiro, that

 5     that's——

 6             MS. SHAPIRO:  Yes, obviously, I wasn't trying to

 7     suggest that.  Yeah, that's fine.

 8             THE COURT:  All right.  Is there anything else that

 9     the defense has on VIII?  And then I'm going ask if the

10     government has anything on VIII up to No. 1, first element, on

11     page 14.

12             MS. SHAPIRO:  Sorry.  I may have misunderstood.  We do

13     have a number of comments regarding VIII, or objections.

14             THE COURT:  Prior to subsection——

15             MS. SHAPIRO:  Oh, sorry.  No, none before we get to

16     the first element.

17             THE COURT:  Okay.  So anything from the government on

18     VIII before the first element language?

19             MR. SHAHABIAN:  No, your Honor.

20             THE COURT:  Okay.  All right.  Let me hear from you,

21     Ms. Shapiro, with respect to the first element of Title 15

22     securities fraud.

23             MS. SHAPIRO:  Okay.  If the Court could just bear with

24     me a moment.

25             So this sort of relates to something that's on the

1    next page as well, but on page 15, with regard to the paragraph

2    before (a) Count Two and, relatedly, some of the language on

3    page 16 regarding the duty of trust and confidence and the

4    guidance to the jury as to how to find whether there was such a

5    relationship, you know, I think we made this clear in at least

6    one of our letters, but I think our position is that both that

7    the——it's up to the jury to determine whether such a

8    relationship existed with the——and obviously we stipulated to

9    it with respect to Mr. Garelick's status as a director, but so

10   this is really more focused on the confidentiality agreement,

11   but we think it's important to convey to the jury that they

12   have to determine, with respect to the confidentiality

13   agreement-based theory, that Mr. Garelick owed a duty of not

14   just of confidence but a duty of trust and confidence, and it's

15   up to them to determine whether that NDA created such a duty.

16   And so first of all, with respect to the language on page 16,

17   which is more detailed about this, we object to everything from

18   "to determine" under fifth, that paragraph, and the next

19   paragraph, and would request that instead, the Court charge the

20   jury along the lines of what we proposed in docket 132-2 at

21   pages 15-16.  And then so obviously if the Court rejects that,

22   then I don't, you know——it's really the same objection, because

23   I think the way the language on——right above Count Two on

24   page 15 is describing it doesn't fully capture this idea that

25   the confidentiality agreement alone isn't enough and that the

1   jury has to determine, based on all the facts and

2   circumstances, whether the NDA created——the particular NDAs

3   that are in evidence created a duty of trust and

4   confidentiality.

5        THE COURT:  Somebody want to be heard from the

6   government on this briefly?  Mr. Shahabian?

7        MR. SHAHABIAN:  I'm not sure I totally understand the

8   objection because as I read the Court's proposed charge, it is

9   instructing the jury that they have to——that the agreement

10  gives rise to a duty of trust and confidence, not just

11  confidence, and that's consistent with *Chow* and with the other

12  authorities the government cited in its submission over the

13  weekend.

14       THE COURT:  I'm going to overrule the objection

15  because I think *Chow* governs on this, and I did not find the

16  distinction of *Chow* that it involved tipping rather than the

17  defendant's own trades to be persuasive.

18       MS. SHAPIRO:  Your Honor, just——I respect the Court's

19  ruling.  I understand it.  I just want the record to be clear

20  that we're making our argument——it isn't just based on the

21  distinction of *Chow* that we made in that footnote that I think

22  your Honor is referring to but to a broader argument that's

23  based on the Supreme Court cases that we cited, and so I just

24  want to make that clear for the record.

25       THE COURT:  I understand that argument, and I think

O561GAR8

1    that argument would have to be taken up with a higher court.  I

2    well understand that argument.

3           All right.  Is there anything else on 1(a), Count Two,

4    from the defense?

5           MS. SHAPIRO:  Just one second, your Honor.

6           Can I just have one second to confer with

7    Mr. Driscoll.

8           We have something with regard to Counts Three and Four

9    but not Count Two.

10          THE COURT:  Okay.  What does the government have with

11   respect to Count Two or anything before Counts Three and Four

12   on page 18?

13          MR. SHAHABIAN:  The government has no additional

14   objections on pages—up through the Count Two instruction we're

15   discussing.

16          THE COURT:  And it just should be clear for the record

17   that with respect to the question of knowing possession, I

18   ultimately was persuaded that the language that was used by the

19   district court judge in the charge in *Royer* accurately

20   described the element of the offense and so I elected to use

21   the language of the charge which was affirmed by the circuit in

22   *Royer*, rather than the language that the Second Circuit used in

23   *Royer* that knowing possession was sufficient.

24          All right.  On Three or Four, what does the defense

25   have?

1    MS. SHAPIRO:  So on page 19, in the paragraph that

2  starts, "As to the sixth requirement," second sentence about

3  direct proof not being required and the defendant's knowledge

4  may be established by circumstantial evidence, obviously we

5  made this type of objection earlier in our briefing and just

6  reiterating it and noting that on page 6 in the general

7  instruction on direct and circumstantial evidence, that the

8  Court specifically, towards the end of that instruction, calls

9  the jury's attention to the fact that this is particularly

10  relevant with regard to a person's state of mind.  We don't

11  think——we think it's redundant and it's not necessary to repeat

12  it here, and I believe it's——I'll come to it later, it's

13  repeated again later——and that it's wrong to just keep

14  repeating this instruction whenever we're talking about state

15  of mind, which is at the heart of the defense in this case.  To

16  keep telling the jury and reminding them something the Court

17  has told them before that is obviously correct as a matter of

18  law, but it's sort of tilting the scales a bit to keep

19  reminding them in the particular context of the key disputed

20  elements in this case.

21    THE COURT:  That objection is obviously preserved.  I

22  took the defense's objections seriously, but number one, the

23  language is accurate, and number two, I think it's helpful to

24  the jury, doesn't render the instruction to be unbalanced.  I

25  did later on strike language that is traditionally used but I

thought was unbalanced with respect to actions speaking louder

than words and conspiracies usually being secret.  Maybe that

was in an excess of caution, but I believe that it was not

necessary in this case.

All right.  What else does the defense have on Counts

Three and Four?  And then I'll turn to the government on Counts

Three and Four.

MS. SHAPIRO:  Yeah.  So on page 20, I'm sorry to keep

repeating myself.  Your Honor I know has thought about all of

these things that we've raised before, but I gotta do my job

here, so——

THE COURT:  I'm not begrudging you from doing your

job.

MS. SHAPIRO:  The paragraph that starts "Finally"

omits the language that we had proposed about a close personal

relationship.  We understand that——we understand what *Martoma*

says, but we're preserving that objection and requesting that

the Court go back to our prior proposal for language on that.

And then in a similar vein, the paragraph that starts

"However," the second sentence says "even where a person has a

duty of trust and confidence," meaning that he was required to

keep the information confidential, consistent with, you know,

the objection we made earlier about how confidentiality

agreements are treated and whether they're sufficient to create

the requisite duty, we would object to the suggestion here that

1    all that's required is a duty to keep information confidential.

2             THE COURT:  So I rejected the first point based upon

3    *Martoma*.  I rejected the second point, number one, based upon

4    *Chow*, but also because I think it is important that the jury

5    understand that the duty of trust and confidence is a duty that

6    requires that information be kept confidential.  So that was my

7    thinking with respect to that.

8             All right.  Is there anything else that the government

9    has before we get to No. 2 Title 15 Securities Fraud: Second

10   Element?

11            MR. SHAHABIAN:  No, your Honor.

12            THE COURT:  Okay.  Title 15 Securities Fraud: Second

13   Element.  Ms. Shapiro?

14            MS. SHAPIRO:  Your Honor, I know what you're going to

15   say, but I'll just note for the record that the bottom of 21

16   and 22 is the second reference I was just speaking about

17   earlier with regard to circumstantial evidence.

18            THE COURT:  And I did strike some of the language that

19   I thought was, number one, not applicable to the case and,

20   number two, was potentially unbalanced, with specifically the

21   language, "It would be a rare case where it could be shown that

22   a person wrote or stated that as of a given time in the past,

23   he committed an act with fraudulent intent."

24            MS. SHAPIRO:  Thank you, Judge.

25            THE COURT:  All right.  Is there anything that the

O561GAR8

1   government has in Title 15 Securities Fraud: Second Element?

2           MR. SHAHABIAN:  The government would note that we

3   object to the striking but understand we've been overruled on

4   that.

5           THE COURT:  Okay.  I have ruled on that.

6           All right.  Title 15 Securities Fraud: Third Element.

7   Anything from the defense?

8           MS. SHAPIRO:  No, your Honor.

9           THE COURT:  From the government?

10          MR. BACH:  No, your Honor.

11          THE COURT:  Okay.  Title 18 Securities Fraud.  Why

12  don't, Ms. Shapiro, you cover this as a whole, pointing out for

13  me any exceptions and all of the exceptions that you've got,

14  then I'll hear from the government.

15          MS. SHAPIRO:  Okay.  So I think we've briefed this

16  extensively, but I guess we have two objections.

17          The first one is that, you know, as we indicated in

18  all the briefing, we believe that the law requires, in an

19  insider trading case, the first element essentially to be the

20  same as the element in the Title 15 counts, and so we proposed

21  language that would basically just remind the jury that it had

22  already instructed them of what they need to find for this

23  first element.  We stand by that objection and that request for

24  all the reasons that we briefed as to why we think the

25  *Blaszczak I* decision was wrong, etc.  I'm happy to answer any

O561GAR8

1    questions the Court has, but I think we've belabored that

2    issue, and I'm sure Court understands our position on it.  But

3    again, I'm happy to answer any questions.

4         The second one is, in light of the Court's apparent

5    decision to overrule that objection and sort of go with the

6    government's theory of the first element, we stand by the

7    arguments we've made with respect to commercial value, and so

8    to that extent, we disagree with and would ask the Court to

9    strike the part of, like, sort of in the redline, in the middle

10   where it says——we're happy——it says, "if it had commercial

11   value or could be used for commercial advantage," we would

12   object to the "or could be used for commercial advantage."  I'm

13   not sure what that means, but I think it's inconsistent with

14   our position, which is that to be property for purposes of

15   these Title 18 property fraud statutes, the information has to

16   be something that has commercial value in the hands of the

17   owner of the information such that, for instance, they could

18   sell it to someone.  That's——I think, you know, we briefed that

19   ad nauseam, but that's the——

20        THE COURT:  But actually, I do want to engage with you

21   on this one because in your last statement you repeated

22   something that is in your letters also, which is the example

23   that the property could be sold, and as I read, for example,

24   *U.S. v. Kelly*, which talks about labor being of commercial

25   value, the labor, the work of the employees is not something

1  that could have been sold in that instance.  You can't sell the

2  personal contracts with a worker.  So I don't think that it is

3  legally accurate to say that the only thing that is property is

4  confidential business information that could be sold because

5  other forms of property can still be property even if you can't

6  alienate them.  At least that's how I read *Kelly*.  So maybe

7  help me with, when you say commercial, your notion of

8  commercial value, what are the metes and bounds of that?

9          MS. SHAPIRO:  So just, I just want to make sure I

10  understand what your Honor is referring to.  So you're

11  referring to, in the Bridgegate case, *Kelly*, where the court

12  talks about the difference between a hypothetical situation

13  where, for instance, the public official, you know, for

14  instance, might——well, I guess she can't remember exactly the——

15          THE COURT:  In *Kelly*, what the Supreme Court says——and

16  I'm not going to be quoting it literally——is that if the object

17  of the fraud was to deprive the——

18          MS. SHAPIRO:  Got it.

19          THE COURT:  ——Transit Authority of the labor of the

20  employees, then there's no dispute that that would constitute a

21  scheme to defraud a property, that the labor of the employees

22  constituted property.  So what I'm reading into that is that,

23  for that reason, among others, it can't simply be that what

24  you've got can be sold to a willing buyer.

25          MS. SHAPIRO:  I see what you're saying, your Honor.

O561GAR8

1    Well, I think it's a little——that's a little different because

2    the way I've always read that part of it is that what the court

3    was saying was in that situation, the Transit Authority would

4    be losing money because it's paying these workers, you know,

5    for their labor but it's not getting what it's paying for in

6    exchange, and that when we're talking about confidential

7    business information, you know, we're thinking about things

8    that the court was addressing in *Carpenter* and the historical

9    common law types of property——situations where information

10   could be property, like, you know, news matter, literary

11   property, trade secrets, those types of things.  So I guess I

12   hadn't thought about it the way your Honor is saying, but I

13   think that the *Kelly* example was to say, you know, that the

14   Transit Authority would lose money in that context whereas when

15   they were——whereas when the object of the fraud was just, you

16   know, to create chaos to help the governor's political agenda,

17   their object was, even if there was some incidental loss of

18   money by the Transit Authority because it wasn't getting

19   everything it was paying its laborers for or whatever, that

20   that was not the object of the fraud.  That's how I interpreted

21   that case.

22        THE COURT:  So under your hypothesis, would the

23   information that was at issue in *O'Hagan* and in *Grossman*

24   constitute property, the notion of, here's a merger target?

25        MS. SHAPIRO:  So I have a two-layered answer to that,

O561GAR8

1    your Honor.  I think in *O'Hagan*, my first answer is that it

2    doesn't matter because it's clearly——there are clearly other

3    statutes that get at that conduct, whether it's 10(b) or in a

4    tender offer context, also Rule 1483, and so at least in terms

5    of a policy concern, there's not really an issue.  We're not

6    saying, like, that conduct isn't criminal and can't be charged.

7    I think *O'Hagan* doesn't directly address how this plays out in

8    the mail and wire fraud context.  There were——I forgot whether

9    they were mail or wire fraud or both——other counts that got

10   sent back to the Eighth Circuit as well.  But the Supreme Court

11   in its discussion of those counts doesn't analyze this issue at

12   all and just sort of says, well, we rejected all these other

13   arguments so the whole thing goes back.

14          With regard to *Grossman*, I have two answers.  One is

15   that it could be distinguished on its facts, and indeed that's

16   what we've argued in the other case, because at least part of

17   what the court said there was that the information had

18   commercial value to the——well, it didn't say it quite like

19   this, but essentially part of what the law firm is being paid

20   for is to keep the information confidential.  But to the

21   extent——

22          THE COURT:  You agree with that theory.

23          MS. SHAPIRO:  To the extent that, you know, there's

24   certainly language in *Grossman* that goes against my argument,

25   I'll concede that.  However, I would point out two things.

1  One, the case was decided in 1988, and since then we've had a

2  number of Supreme Court cases which, you know, we discussed in

3  our papers and the Court is extremely familiar with, which I

4  would respectfully submit read the term "property" far more

5  narrowly than that, and therefore we would submit that to the

6  extent you read *Grossman* as rejecting this argument, you know,

7  it's been superseded by subsequent Supreme Court case law.

8  　　　　THE COURT:  Okay.  Let me hear from the——is there

9  anything else, actually, on Title 18 Securities Fraud, up to

10  the first element, from the defense?

11  　　　　MS. SHAPIRO:  No, your Honor.

12  　　　　THE COURT:  Okay.  Let me hear from the government

13  with respect to the language that I added about commercial

14  value "or could be used for commercial advantage."  I know that

15  the government has an objection to that also because they

16  believe it's restrictive, too restrictive, but I would not mind

17  hearing from the government with respect to Ms. Shapiro's

18  arguments.

19  　　　　MR. SHAHABIAN:  Yes, your Honor.

20  　　　　And before we turn to that, this is a minor objection

21  on the previous page, page 23, where the Court added "that was

22  the property of DWAC and Benessere."  The government requests

23  that it be "or Benessere," so that the jury doesn't have to

24  find it the property of both.

25  　　　　THE COURT:  I'll make that change.

1    MR. SHAHABIAN:  With respect to Ms. Shapiro's

2  objections, I know that the Court has the government's briefing

3  on this.  I think the government's main authority is the

4  *Grossman* case in particular.  To the point that Ms. Shapiro

5  raised about information being property when it can be sold or

6  stock in trade like in *Carpenter*, that's expressly what

7  *Grossman* rejected in the context of a mail fraud conviction and

8  said—this is at page 86 of the decision, 843 F.2d 78—"The

9  fact that Kramer Levin could not commercially exploit the

10  information by trading on it does not mean the confidentiality

11  of the information had no commercial value to the firm."  And I

12  think that's accurate.  Law firms can't sell the information

13  that their clients entrust to them, but that doesn't mean the

14  lack of alienability in the victim—there, the law firm—means

15  that it is no longer property.  And I think that the Supreme

16  Court cases that follow *Grossman* don't address this issue.

17  *Grossman* was responding to an argument that *Carpenter* was

18  essentially limited to its facts, the kind of information that

19  the *Wall Street Journal* does sell, news that gets publicly

20  disseminated, and the Second Circuit has said, that's not

21  right, that's not the definition of confidential business

22  information or value for purposes of the mail and wire fraud

23  statutes.  The subsequent cases from the Supreme Court are

24  drawing a distinction that's just not at issue here, which is,

25  when does an intangible interest have characteristics that make

1   it private property versus regulatory interests that don't fall

2   under the common law definitions of property.  Of course that

3   was the issue in *Kelly*.  It was also the issue in *Cleveland* and

4   *Pasquantino*, and I don't think any of those decisions actually

5   touch on the square holding of *Grossman*, and so for that

6   reason—and the government had raised its prior objections to

7   commercial value but heard the Court's sort of reasoning that

8   that's not really at issue in a case like this, and so we're

9   fine with the proposed language.

10            THE COURT:  I'm going to give a little bit more

11   thought to commercial advantage.  I should state for the record

12   that I ultimately came to the conclusion that the Title 18

13   securities fraud differs from Title 15 securities fraud based

14   on the language of Title 18 and also based on Judge Sullivan's

15   opinion.  If I were to apply the notion of "scheme to defraud"

16   from 1341 and 1343 on to 1348, it's pretty clear to me from the

17   Second Circuit law that embezzlement constitutes a deprivation

18   of property.  That would be so if it's physical property or, by

19   extension, if it's intangible property.  The courts have held

20   that a bailee's conversion of intangible property to his or her

21   own benefit and contrary to the terms of the bailment

22   constitutes an embezzlement, and then that would constitute the

23   scheme to defraud, and I think there's no issue that it would

24   be in connection with a security of an issuer with a class of

25   securities registered under Section 12.  So that's an

O561GAR8

1    abbreviated statement of my reasoning.

2              All right.  Is there anything on IX, Section 2 or

3    Section 3 from the defense?

4              MS. SHAPIRO:  No.  The only——those were our only

5    objections.

6              THE COURT:  Okay.  Anything from the government prior

7    to X?

8              MR. SHAHABIAN:  No, your Honor.

9              THE COURT:  Okay.  Anything on X from the defense?

10             MS. SHAPIRO:  No, your Honor.

11             THE COURT:  Anything from the government on X?

12             MR. SHAHABIAN:  No, your Honor.

13             THE COURT:  Okay.  XI, there had been an objection by

14   the defense that willfully causing is not applicable.  Do you

15   still have that objection, Ms. Shapiro?

16             MS. SHAPIRO:  Yes, your Honor.  I don't think there's

17   any evidence that——

18             THE COURT:  I was going to ask the government their

19   view with respect to that rather than hearing you in the first

20   instance, and then I'll permit you to respond, but is there any

21   evidence to support a willfully causing instruction in this

22   instance?

23             MR. SHAHABIAN:  I believe so, your Honor, particularly

24   given the defense's contention it's a two-layered defense,

25   right?

1  The first is the information that was learned, and I'm

2  not limiting their defenses, but for purposes of this argument,

3  the information learned in the summer for purposes of the NDA

4  was not material or at least good faith not material, and that

5  the subsequent information that the defendant learned as a

6  board member is not information he transmitted to anybody else.

7  With respect to the——even if the jury were to agree on the

8  second theory, that the defendant did not tip Michael

9  Shvartsman, for example, with board information in the fall of

10  2021, the willfully causing theory would still apply on the

11  first theory; that is, because the defendant and Mr. Shvartsman

12  had learned what the government contends is material nonpublic

13  information that Trump Media was a potential merger target for

14  DWAC that summer, when the defendant told Mr. Shvartsman to

15  start purchasing open market securities in DWAC, even absent

16  additional information that was tipped to Mr. Shvartsman, that

17  could be the basis for willfully causing a violation of the

18  securities fraud statutes on that theory.  So for that reason,

19  the government thinks the instruction is appropriate.

20  MS. SHAPIRO:  Your Honor, I'm not sure I understand

21  that, because I believe it's the government's position that

22  Mr. Shvartsman is guilty of securities fraud, and indeed he has

23  pled guilty to that, although obviously that plea didn't come

24  into evidence, and so those are the only trades that

25  Mr. Shvartsman made, and I don't think the government is

O561GAR8

1    arguing that Mr. Shvartsman wasn't part of the charged

2    conspiracy.  So I don't see how they can argue in the

3    alternative that Mr. Shvartsman was, you know, an innocent

4    trader for those trades.  It doesn't really make any sense.

5    Either the theory is that they were in a conspiracy, or the

6    theory——I just don't understand that.  I understand that

7    they're alleging that Mr. Garelick aided and abetted

8    Mr. Shvartsman, but I just don't understand what the 2(b)

9    theory is.

10            THE COURT:  Give me one second.

11            I guess the question, as I understand it, for the

12   government is, if Mr. Garelick is aware that Mr. Shvartsman is

13   in possession of material nonpublic information from a prior

14   disclosure and if at a somewhat later time he directs or

15   encourages Mr. Shvartsman to sell, wouldn't that constitute the

16   substantive crime rather than the willfully causing?  I think

17   that's, as I understand it, Ms. Shapiro's point.  Am I wrong,

18   Ms. Shapiro?

19            MS. SHAPIRO:  Hold on, your Honor.

20            Yes, your Honor, that's correct.

21            MR. SHAHABIAN:  Let me add one additional then sort of

22   tweak to this theory in the alternative, which is why we

23   requested the willful causing.  I think the Court raised a good

24   point about Mr. Shvartsman and the defendant having the same

25   level of information.  But of course the government's theory is

1   that, for example, Mr. Garelick attended the board meeting on

2   September 21, 2021, where he learned about the plans to

3   negotiate with Trump Media followed by the execution of the

4   mutual exclusivity.  It was after that information was

5   transmitted to him that he then told Mr. Shvartsman to begin

6   trading.  So even absent a tip of that information to

7   Mr. Shvartsman, the addition of that quantum of MNPI in the

8   possession of the defendant is the basis for a willfully

9   causing theory, even if the jury were to think, for example,

10  that the summer information were not MNPI.  And I realize I'm

11  now changing what I had originally offered as the basis for the

12  willfully causing instruction, but I think the Court's

13  questioning has clarified my thinking on why we requested it,

14  and it's that when the defendant learns material nonpublic

15  information as a board member, even if he doesn't disclose that

16  information by causing others to trade, he is still willfully

17  causing the violation that can lead to liability.

18          THE COURT:  Well, so I'm now focusing on the second

19  element on willfully causing, which reads, "Did the defendant

20  intentionally cause another person to commit the action or

21  actions that constituted the crime?"  On the government's

22  hypothesis, if Mr. Garelick caused Mr. Shvartsman to purchase

23  without Mr. Shvartsman having knowledge of MNPI, then how is

24  Mr. Shvartsman committing the act or actions that constituted

25  the crime?  And aren't you in effect saying that the tipper is

O561GAR8

1    always going to be liable for the tippee's trades and then you

2    don't need to show any knowledge on the part of the tippee?

3    MR. SHAHABIAN:  I think, your Honor, that the first

4    element of the willfully causing theory addresses that, because

5    the defendant has to have the mental state necessary for the

6    elements of the offense; that is, knowing that he is in

7    possession of MNPI, that he's breaching that duty by causing

8    securities trades to be executed and that instead of doing them

9    himself, he's telling somebody else to do it.  And so I think

10   that's the rationale for the willfully causing theory.

11   THE COURT:  All right.  I'm going to think about this

12   one.

13   Ms. Shapiro, do you have more?

14   MS. SHAPIRO:  I mean, I don't think this makes any

15   sense because the theory of willfully causing—sorry—is

16   that—I think I'm reading from Sand, but my colleague will

17   correct me if I'm wrong.  But, "It's appropriate where the

18   government contends the defendant did not actually commit the

19   crime charged or was the cause in fact of an innocent

20   intermediary's commission of the crime."  And I think on the

21   tipping theory, it's the—it can't—I don't understand the

22   government to be arguing that Mr. Garelick didn't commit a

23   crime under these circumstances.  So I just don't think this

24   makes any sense.  It's also inconsistent with the government's

25   theory of conspiracy, of there being a conspiracy between

O561GAR8

1    Mr. Garelick and Mr. Shvartsman.  So this just seems like it's

2    going to confuse the jury and it just doesn't seem like it's

3    applicable to the evidence in this case.

4         THE COURT:  I want to think about this, but on your

5    second point about it being inconsistent with the government's

6    theory of conspiracy, what's wrong with the government arguing

7    that, you know, even if you find that Mr. Shvartsman was not a

8    member of the conspiracy, you know, there is enough evidence

9    here to find liability on a willfully causing theory?  I mean,

10   you can argue two different theories to the jury, can't you?

11        MS. SHAPIRO:  Well, can I have just one moment.

12        THE COURT:  Yes.

13        MS. SHAPIRO:  Well, I really think this instruction is

14   inappropriate to begin with, but if the Court is going to give

15   it, we would ask that the Court give the Sand language, which

16   we submitted in the redline document 118, which I can't

17   remember what that is, but it's one of—it's our objections to

18   the government's proposed language, which would include

19   language that says, "Under such a theory of liability, the

20   government does not contend that the defendant actually

21   committed the crime charged in the indictment; instead, it

22   contends the defendant willfully caused another person to

23   physically commit the crime."  Again, I just don't think this

24   applies at all, but if the Court is going to overrule that

25   objection and instruct the jury, it should use the Sand

language, which is based on *United States v. Concepcion,* a

Second Circuit case from 1992, which is cited on page 36 of our

docket 118.

THE COURT:  I'm going to take this one under

advisement.

MR. SHAHABIAN:  And your Honor, while the Court is

considering, my colleague offered a citation that the Court may

want to consult.  This was *United States v. Riley*.  It's case

No. 13 Cr. 339, from Judge Patterson, and at Docket 51,

transcript pages 62-76, Judge Patterson denied a motion to

dismiss a willfully causing theory on the grounds that there

was—in an insider trading case, that the government's theory

that causing another person to trade is sufficient to establish

willfully causing criminal liability.

THE COURT:  Okay.  All right.  Let me look at that.

All right.  Is there anything else, Ms. Shapiro, on

willfully causing?

MS. SHAPIRO:  No, your Honor.  I think you understand

our position.

THE COURT:  Okay.  On conspiracy to commit securities

fraud, why don't you give me everything that you've got.

(Continued on next page)

O56Cgar9

1          MS. SHAPIRO:  On this one, I just wanted to reiterate

2     an objection we hadn't previously made to the last two

3     paragraphs, the paragraph beginning on the bottom of page 29,

4     you may through the end of the part right before heading No. 2.

5     I see the Court made some edits, which your Honor referred to

6     earlier, and we appreciate those.  We would still object to

7     this.

8          In particular, in that first paragraph, it says, you

9     may also infer its existence from the circumstances of this

10    case and the conduct of the parties involved.  It seems to me

11    that that one would sort of suggest a view on the actual

12    evidence presented about the circumstances of the case and the

13    conduct.  And so, we're concerned about it for that reason

14    alone.  We do appreciate the Court striking the last sentence

15    of that paragraph.

16          THE COURT:  Let me think about that.

17          I take it that that particular concern that the Court

18    could be construed as putting its thumb on the scale in

19    suggesting that the circumstances of the case support the

20    existence of a conspiracy would be addressed by language that

21    says, you may also infer its existence from circumstantial

22    evidence and the conduct of the parties involved.

23          MS. SHAPIRO:  Yes, your Honor.  That would solve that

24    problem, I think.

25          THE COURT:  I know it doesn't solve your other

1    objection.  I'm going to make that change.

2         MS. SHAPIRO:  Thank you, your Honor.

3         The objection to the last paragraph is one that you

4    heard.  That was the Pinkerton issue and I take it you rejected

5    our position.

6         THE COURT:  I did.  What's next, Ms. Shapiro.

7         MS. SHAPIRO:  This is a reiteration on page 32, for

8    the second element, I take it the Court rejected this

9    suggestion, but we think that the first paragraph on page 32,

10   the second to last line, we would ask the Court to say, of the

11   unlawful purposes or objectives of the conspiracy, just for

12   clarity.

13        THE COURT:  I considered that and I overruled it.

14        MS. SHAPIRO:  The only other thing we had on

15   conspiracy, the Court overruled the objection, but I'll state

16   it for the record.  On page 33, in the overt acts, we proposed

17   taking out some language we thought was redundant.  I thought

18   the last sentence of that paragraph right before "venue" is

19   redundant of a couple sentences up.  The Court has already made

20   clear that an apparently innocent act is sufficient to

21   establish an overt act.

22        THE COURT:  Hold on for a second.

23        I guess for the government, my question is whether on

24   that last sentence before you get to venue, it's sufficient for

25   me to say, you are therefore instructed that the overt act does

O56Cgar9

1    not have to be an act that in and of itself is criminal, and

2    strike the language what constitutes the objective of a

3    conspiracy.

4             MR. NESSIM:  We have no objection to that.

5             THE COURT:  I'm going to strike that language.

6             Is there anything else the government has on the

7    conspiracy charge?

8             MR. NESSIM:  No, your Honor.

9             THE COURT:  Venue.  Ms. Shapiro, I think I adopted

10   your language?

11            MS. SHAPIRO:  Yes.

12            THE COURT:  Anything else on venue?

13            MS. SHAPIRO:  No.  We appreciate that.

14            THE COURT:  Anything from the government on venue?

15            MR. SHAHABIAN:  We object to the adoption, but we've

16   been overruled.

17            THE COURT:  I should say there are cases out there

18   where courts have not given this venue instruction and where

19   courts have been affirmed in not giving this venue instruction,

20   but it seems to me that the language that Ms. Shapiro provided

21   is the best statement of the current law in the circuit, and

22   that's the reason why I've adopted it.

23            Ms. Shapiro, anything else on the remainder of the

24   charge?

25            MS. SHAPIRO:  Just a couple of minor things.

1    On page 38, I don't think we've had any expert

2  testimony.

3    THE COURT:  I was going to ask that question.  There

4  was a person who gave what seemed to me to be expert testimony,

5  but there was no objection that it was expert testimony.

6  Nobody asked for the expert to be qualified.  I'm thinking of

7  the FINRA person where some of that could have been construed

8  to be expert testimony.  I'm prepared not to give that charge.

9    MR. NESSIM:  No objection.

10    THE COURT:  I'm going to strike that then.

11    MS. SHAPIRO:  Anyway, he didn't know what a

12  Black-Scholes model was.

13    THE COURT:  I probably shouldn't comment on the fact

14  that your client did not know the first name of a Nobel

15  laureate, but he's on the stand and I realize he's on the stand

16  as a defendant in a criminal case, it's okay to forget the

17  first name of a Nobel laureate.

18    MS. SHAPIRO:  I think the next thing we had was page

19  39, the character and reputation.  We would just request,

20  again, that the Court add that sentence that says, the jury can

21  acquit based entirely on --

22    THE COURT:  I'm sorry.  Say it again.

23    MS. SHAPIRO:  In the language we had proposed, there

24  was an additional sentence to the effect that I believe is in

25  the *Sand* instruction, that the jury can acquit based on the

1 character evidence alone.

2          THE COURT:  Let me look at that.

3          MR. NESSIM:  Obviously we would object to that if the

4 Court is inclined to include it.  We have an earlier change.

5          THE COURT:  Let me see if there's anything else

6 Ms. Shapiro has through the rest.  I'm not going to ignore the

7 government.

8          MS. SHAPIRO:  Page 42, this particular investigative

9 techniques, I don't think that's an issue in this case.  I may

10 be missing something.  I see the Court crossed out "if

11 applicable," but I'm not sure what that's supposed to refer to.

12 We're not arguing, I don't know, whatever people usually argue

13 in drug cases and stuff like that.

14          THE COURT:  Anything else?

15          MS. SHAPIRO:  No.  The last thing was that I realized

16 when I was reading off those docket numbers at the beginning of

17 my remarks, I neglected to mention the last couple of letters

18 we wrote, 141 and 142.  So I just wanted to put on the record

19 that we stand by the arguments in those submissions, as well.

20          THE COURT:  Let me hear from the government with

21 respect to all of the instructions at the back of this,

22 including with respect to whether I can strike the particular

23 investigative techniques not required.

24          MR. NESSIM:  Our first objection of the fact part of

25 the charge is the instruction in XVII, which is an instruction

O56Cgar9

1    on the compliance manual and SEC forms.

2            MS. SHAPIRO:  What page is that?

3            MR. NESSIM:  It's on the top of page 39.  Excuse me.

4            We believe the Court should add language -- we're not

5    attached to the particular language, but something along the

6    lines of, however, you may consider this evidence as probative

7    or something of the defendant's intent or lack of good faith.

8            THE COURT:  Let me look at that.  I think there's some

9    force to the proposition that I should tell the jury how the

10   compliance policies are relevant.

11           MS. SHAPIRO:  There's something -- on the compliance

12   policies, it says, the existence or nonexistence of such

13   policies and practices may be relevant to the defendant's state

14   of mind.  That's on page 38.  So that's already in there.

15           MR. NESSIM:  It's similar to the form 3, form 4

16   instruction.

17           MS. SHAPIRO:  What I was pointing to was on page 38, I

18   think it's four lines from the top of the paragraph.

19           THE COURT:  It says the existence or nonexistence of

20   such policies or practices may be relevant to the defendant's

21   state of mind.  Why is that not sufficient?

22           MR. NESSIM:  Your Honor, it is sufficient as to

23   compliance manuals, but we're asking for something similar as

24   to the form 3, form 4.

25           THE COURT:  Got it.

1     Ms. Shapiro, any objection to that?

2     MS. SHAPIRO:  So where --

3     THE COURT:  On the form 4 and form 5, the suggestion

4  is that I add language to the effect of the directors failure

5  to file such forms may be considered by you with respect to the

6  defendant's state of mind.

7     MS. SHAPIRO:  I would just -- I don't object to that

8  in concept.  I would suggest that if the Court's going to do

9  that, maybe put it in between the two sentences that are there

10  now and the third sentence could say "however" or something

11  like that.  Just put it in the middle the way the other one

12  reads.

13     THE COURT:  I probably will do something like that.

14  I'll make sure the concept is there.

15     What else does the government have?

16     MR. NESSIM:  We believe this may be our mistake in not

17  proposing something.  There's a small quantity of Spanish

18  language translations that have been admitted.  We can propose

19  something tonight, just a short proposal on translations in

20  evidence.

21     THE COURT:  Please do that.

22     MR. NESSIM:  The next is I guess a response to

23  particular investigative techniques not required.  We think

24  this is required.  The defense has argued already things about

25  can the government recover deleted messages, messages that were

O56Cgar9

1    deleted, ways in which you can recover deleted messages or

2    might not be able to.  I expect they will use some of that

3    argument in their closing, sort of attacking the testimony of

4    Mr. Wachter in particular.  So I think it's already at issue

5    and it's appropriate to be given here.

6            THE COURT:  That is, in fact, the reason why I struck

7    the "if applicable."

8            Anything else from the government?

9            MR. NESSIM:  No, your Honor.

10          THE COURT:  Anything else, Ms. Shapiro, from you?

11          MS. SHAPIRO:  No.  I just -- I didn't get a chance to

12    look at the language of this instruction.  Is it the *Sand*

13    instruction or has it been modified?

14          THE COURT:  I think it is the *Sand* instruction.  I

15    gather it's been modified a small amount.

16          MS. SHAPIRO:  I think we proposed, and this is on page

17    61 of docket 118, which was our objections to the government's

18    proposed charge, a modified version that I think tracks *Sand* a

19    little more clearly.

20          THE COURT:  Let me look at that.

21          Anything else, Ms. Shapiro?

22          MS. SHAPIRO:  No, your Honor.

23          THE COURT:  Let me just raise one question with the

24    parties in terms of beginning, Ms. Shapiro, about you

25    preserving your objections.  I will revise the instructions

O56Cgar9

1    based upon our conference today.  There'll be some new

2    language.  All of the objections that have been made at this

3    conference or have been made to date are preserved.

4          Is it sufficient, Ms. Shapiro, if I file on the docket

5    something that contains the revisions from what has been

6    circulated this morning?  If you've got any objections to that

7    revised language, you'll note it for the record or you'll tell

8    me why you've got an objection and that way we can do this in a

9    time efficient way.

10          MS. SHAPIRO:  I think that's fine, your Honor.  That

11    would be done I guess some time tomorrow so that the lawyers

12    giving the closings also know exactly what's going to be in the

13    charge.

14          THE COURT:  Exactly right.  It shouldn't take very

15    much time at all.  We'll do it right after the close of all of

16    the evidence tomorrow.  I will then send the parties the charge

17    that is going to be used tomorrow afternoon.  The parties will

18    have that, as required, before they give their closing

19    statements.

20          MS. SHAPIRO:  That sounds good.  Thank you, your

21    Honor.

22          THE COURT:  Anything else, Ms. Shapiro?

23          MS. SHAPIRO:  No.

24          THE COURT:  Mr. Shahabian?

25          MR. SHAHABIAN:  Not on the charge.  There's one thing

O56Cgar9

1 I wanted to flag for the Court that we'll likely want to

2 address in the morning.  I know Mr. Bach is not here and

3 Ms. Hanft has also excused herself.

4         During the defendant's testimony today, he referred to

5 Michael Park as Rocket One's internal counsel.  This raises for

6 the government the issue that we briefed before the final

7 pretrial conference about the potential raising of a presence

8 of counsel defense with respect to the defendant emailing

9 Michael park on October 19th, 2021, that he was restricting

10 himself from trading.  Given the introduction of testimony now

11 that Michael Park is internal counsel, is a lawyer, I think

12 we'll want to discuss in the morning where this is going.

13         MS. SHAPIRO:  I think I can -- I've been very involved

14 in preparing Mr. Garelick.  I'm pretty familiar with his

15 testimony, his prospective testimony.

16         I think the government has full knowledge of -- I

17 mean, there's nothing besides that document the government has

18 seen that's going to come out that's going to be like a

19 surprise to them.  I don't think there's any issue here.

20         THE COURT:  That's very helpful to know, but let me

21 look back at the transcript to see how Mr. Park was referred to

22 and see whether there are doors that have been opened or an

23 issue that has been raised by the way in which he was referred

24 to.  It may be the fact that it was just one mention and I

25 assume something that is not going to be referred to in any of

1  the arguments is sufficient to address any issue, but I do want

2  to take a look at the transcript and hear from counsel.

3          MS. SHAPIRO:  That's fine.

4          THE COURT:  That's something going forward.  It sounds

5  like you're sensitive to and to be careful with respect to the

6  testimony.

7          MS. SHAPIRO:  I just want to note, we'll bring this up

8  tomorrow at some point before the cross, but we may have a

9  couple of issues to raise just orally regarding the cross based

10  on some productions that we've gotten during the course of the

11  trial day.

12          THE COURT:  As you know, it's always helpful to get it

13  in the form of a letter from you, but I realize --

14          MS. SHAPIRO:  One of them I think is a question and

15  maybe the government will have to give a proffer before we

16  understand where they're going with the document.

17          THE COURT:  All right.  Have a good afternoon,

18  everybody.

19          (Adjourned to May 7, 2024 at 9:00 a.m.)

20                              *  *  *

21

22

23

24

25

1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3     KAYLA COLLINS

4    Direct By Mr. Shahabian . . . . . . . . . . 961

5    Cross By Mr. Bach . . . . . . . . . . . . .1020

6     FABIEN THAYAMBALLI

7    Direct By Mr. Brod . . . . . . . . . . . . .1045

8    Cross By Mr. Shahabian . . . . . . . . . . .1065

9    Redirect By Mr. Brod . . . . . . . . . . . .1080

10    CARL DeJOUNGE

11   Direct By Mr. Bach . . . . . . . . . . . . .1082

12   Cross By Mr. Nessim . . . . . . . . . . . .1085

13    BRUCE GARELICK

14   Direct By Mr. Bach . . . . . . . . . . . . .1090

15                       GOVERNMENT EXHIBITS

16   Exhibit No.                              Received

17    407, 408, 417, 441, 443B, 448, . . . . . . 960

18            540, 726, 729, 731, 733, 744,

19            853

20    960-967  . . . . . . . . . . . . . . . . . 969

21

22

23

24

25

DEFENDANT EXHIBITS

Exhibit No.                                          Received

850-860   . . . . . . . . . . . . . . . . . .1047

87, 88, 90, 803, 804, 805,  . . . . . . . .1050

          812, 900, 901, 902, 903, 905,

          906, 908, 909, 921, 922, 1100,

          1101, 1108, 1109, 1110, 1111,

          1112

1111   . . . . . . . . . . . . . . . . . . .1043

34   . . . . . . . . . . . . . . . . . . . .1147

77   . . . . . . . . . . . . . . . . . . . .1128

78   . . . . . . . . . . . . . . . . . . . .1106

80   . . . . . . . . . . . . . . . . . . . .1138

950   . . . . . . . . . . . . . . . . . . . .1133

952   . . . . . . . . . . . . . . . . . . . .1101

JOINT EXHIBITS

Exhibit No.                                          Received

5, 6                                                 960