O571GAR1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

        v.                                   23 Cr. 307 (LJL)

BRUCE GARELICK,

                Defendant.

------------------------------x              Trial

                                             May 7, 2024
                                             9:04 a.m.


Before:

                    HON. LEWIS J. LIMAN,

                                             District Judge
                                              and a Jury


                            APPEARANCES

DAMIAN WILLIAMS
        United States Attorney for the
        Southern District of New York
BY:  ELIZABETH A. HANFT
     MATTHEW R. SHAHABIAN
     DANIEL G. NESSIM
     Assistant United States Attorneys

SHAPIRO ARATO BACH, LLP
        Attorney for Defendant Garelick
BY:  ALEXANDRA  A. E. SHAPIRO
     JONATHAN BACH
     JULIAN S. BROD
     JASON A. DRISCOLL

Also Present:

Special Agent Marc Troiano, FBI
Paralegal Specialist Grant Bianco, USAO

O571GAR1

1          (Trial resumed; jury not present)

2          THE COURT:  We have distributed to the parties a

3     second draft jury charge and we'll post that on the docket.

4          On property for Section 1348, I have deleted the

5     language that Ms. Shapiro found objectionable but added

6     language adapted from *United States v. Grossman* that the fact

7     that a company cannot commercially exploit the information by

8     trading on it does not mean that it had no commercial value to

9     the company.

10          I've rejected the proposed instruction by the defense

11     on character evidence based on *United States v. Pujana-Mena*,

12     949 F.2d 24, 27-28 (2d Cir. 1991), and *United States v. Gupta*,

13     747 F.3d 111, 140 (2d Cir. 2014).

14          I've added the agreed instruction on translations.

15          I'm reserving on the question of adding a charge on

16     willfully causing pending the completion of all of the evidence

17     in this case.  So at the close of the evidence in the case,

18     I'll give you a ruling on willfully causing, and then if there

19     are any exceptions to the new language that has been added or

20     language deleted, as reflected in the second draft jury charge,

21     the parties can make their objections.

22          One thing for the parties to think about and to let me

23     know about is if there are any stipulations as to testimony.

24     If there are not, then I'll delete that language in the charge.

25          We've got the jury.  Is there anything that the

O571GAR1

1    parties have to raise before we bring the jury in?

2              MS. HANFT:  Your Honor, from the government's

3    perspective, just the presence of counsel issue.  We would ask

4    again for at least a proffer from defense counsel relating to

5    the Michael Park compliance issue and where this is going

6    before it obviously comes out in front of the jury.

7              THE COURT:  I think that's a fair request.  Mr. Bach,

8    you elicited or your client referenced the fact that Mr. Park

9    was the internal general counsel.  So far I don't think that

10   there's anything that is objectionable in what was elicited,

11   but it does raise eyebrows in terms of the language that was

12   elicited.  So do you intend to reference Mr. Park's presence?

13             MR. BACH:  Well, Judge, Mr. Park was mentioned in

14   documents submitted by the government in this case.  They

15   had——Mr. Park's name has appeared several times here, not on my

16   doing.  We're not going to be presenting any legal advice that

17   Mr. Park gave to Mr. Garelick.  I think we've made no secret of

18   the fact that there is an important document in this case

19   that's critical to Mr. Garelick's defense that the government

20   briefed pretrial and said that we couldn't admit unless

21   Mr. Garelick testified.

22             THE COURT:  I think actually it was a little bit more

23   subtle than that, that it was hearsay, and that you said you're

24   not going to offer it unless he testified, but I don't think

25   anybody said that if he testifies, it's going to be received in

1 evidence.

2          MR. BACH:  I didn't mean to get caught up in that.

3 I'm just trying to get to the point, which is that we obviously

4 intend to introduce that document.  They have notice that we

5 intend to introduce the document.  I don't believe I need to

6 provide any more notice on that point.  The notice is fulsome.

7 You know, I don't have a big plan here to get into Mike Park

8 and advice.  I would like to know what the standard is that the

9 Court is going to hold me to in this regard.  Certainly their

10 witnesses testified——for instance, Mr. Wachter——that the

11 contract he had with Zoltan Person——Present, with Zoltan

12 Present, was reviewed by the general counsel of DWAC, Alex

13 Monje, and people are talking about lawyers all the time.

14 That's going to happen in passing, because those are part of

15 the historical facts here that people are claiming.  I'm

16 dubious of Mr. Wachter's claim.

17          But what is it that I am allowed and not allowed to

18 do?  What am I actually required to proffer to?  I really——I

19 don't think we've ever had a sense of that.  I'm telling the

20 Court, and I think Ms. Shapiro has told the Court, and the

21 defense was very clear, this is not a reliance on counsel

22 defense in any traditional sense.  We're not intending to say,

23 he got legal advice that he could trade, or he got legal advice

24 that he could talk about warrants with Michael Shvartsman.

25 That's not our defense.  It has never been.  So now we're in

O571GAR1

1  this, to use the Court's phrase, much more subtle terrain about

2  presence of counsel.  Does that mean presence of counsel on an

3  email?  Does that mean presence of counsel in the room?  What

4  is the standard I'm bound to?  Because I don't want to break

5  any rules and I want to provide notice, but I don't understand

6  what the standard is.

7          THE COURT:  Let's start with what the basis is for the

8  introduction of that document.

9          MR. BACH:  Mr. Garelick's state of mind and what he

10  was—his state of mind, what he did.  It tells a story of this

11  case.  It shows that he was acting in good faith, that he

12  restricted himself.  This is part and parcel of our defense.

13          THE COURT:  Can somebody—

14          MR. BACH:  It's also a—excuse me, your Honor.

15          That is, you know, a document that shows what happened

16  and what his state of mind was and how he was processing this.

17  There's been a lot about compliance procedures and what

18  Mr. Garelick historically understood his compliance obligations

19  to be based on his history at various investment firms, and

20  he's acting—and they've suggested that he had the state of

21  mind, which is relevant, and what we're showing is that he

22  acted in conformity with his understanding of what was

23  appropriate under the circumstances and consistent with his

24  compliance history, and that it was consistent with the state

25  of mind of someone who believed they had now come into material

1   nonpublic information but hadn't before and is now introducing

2   the document—and is now telling a compliance officer, true to

3   his training, his professional background and experience, that

4   he can no longer trade.

5           THE COURT:  Can somebody post the document.  Because

6   my recollection of it is that the document comes later in time

7   and contains what appears to be a pure hearsay statement with

8   respect to whether the defendant traded on the basis of

9   material nonpublic information in the past.  But my

10  recollection may be wrong about the document.  Let's indicate

11  what exhibit it is and post it.

12          MS. HANFT:  Defense Exhibit 37, your Honor.

13          THE COURT:  Can somebody post it.

14          MR. BACH:  Yes.  Judge, the later in time, the Court

15  hasn't heard the testimony yet.

16          THE COURT:  I realize, but I'm asking for proffers, so

17  that's the reason why.  You're not going to be blowing in

18  elements of surprise.  We're going to hear it from you in a

19  couple of minutes through your witness.  If you raise it now,

20  it's going to avoid the need for a lengthy sidebar or for me to

21  excuse the jury.

22          MR. BACH:  I understand.  I understand.

23          THE COURT:  So I see 37 up on the screen.  So let me

24  have a proffer.

25          MR. BACH:  So what the chronology of events that will

O571GAR1

be elicited on direct is that on or about September—after
September 23rd or starting on September 23rd and—which was the
last day that he traded, and following, the information he
learned on the board started to show that there was traction in
terms of a potential deal with the Trump group. Remember, he
didn't attend his first board meeting until September 21, and
then there's a drumbeat of events and information, primarily on
the after—you know, it starts at different times, but on
September 23rd, and then onwards, you know, that's when they
start setting up a data room, that's when the parties are
talking about public announcements, that's when this starts to
have traction. And so Mr. Garelick is going to testify, I
anticipate, that he decided that at that point he may become
exposed to material nonpublic information and it would be
prudent not to trade anymore. What happens is that as things
progress, on October 15th or so, then you get what are
unmistakably material events that there are—the parties are on
the verge of a merger agreement. They're trying to extend the
exclusivity period to accommodate—they're progressing
negotiations at that point. It's very clear that this has
moved from his expectation that he—this would get to a point
where he had material nonpublic information to stuff that
clearly constituted material nonpublic information. He then
felt obliged to notify his compliance officer, and he did so.
And there are other documents in the case that the government

O571GAR1

1    has already introduced, where he talks about restricting

2    himself a month earlier, which that's when he restricted

3    himself.  There's a—they've introduced a text dialogue where

4    he says, a month ago, I restricted myself.  That dates back to

5    the September 23 or so time frame.  But this is not when he

6    felt the obligation to restrict himself; this is when he felt

7    the obligation to notify the compliance officer, and, you

8    know—

9            THE COURT:  And what will his testimony be about why

10   he notified the compliance officer that he was in possession of

11   MNPI?

12           MR. BACH:  Well, because that's—he understood his

13   obligations under the securities law in this way.  That was his

14   state of mind, that he understood that one can't trade on MNPI,

15   that he understood that when that happens, one has compliance

16   obligations, that he'd been trained at—I don't know if he's

17   going to get into this detail, but he'd been, you know, trained

18   at Adage and all of his prior employers that what you do at a

19   moment like this, as a good, you know, member of the investment

20   community, is you notify your compliance officer so that—

21           THE COURT:  For what reason?  You go to your

22   compliance officer, oh, by the way, I'm in possession of

23   material nonpublic information?  It's entirely irrelevant, I'm

24   not going to trade on it, but just so you know, I'm in

25   possession of material nonpublic information?

1    MR. BACH:  No, to make a record that you're

2  restricting yourself.  And this is a policy that many hedge

3  funds have, where you have to notify a compliance officer, so

4  there's a clear record.

5    THE COURT:  So the testimony will be he notified the

6  compliance officer that he was in possession of MNPI.

7    MR. BACH:  Yes.

8    THE COURT:  But not that he had never previously

9  traded on the basis of MNPI.

10    MR. BACH:  I'm not sure I understand the distinction.

11    THE COURT:  Well, so I think it's actually a pretty

12  important distinction, as I understand the government's

13  argument.  The exhibit that you posted here says, "I have

14  restricted myself from trading shares in Digital World

15  Acquisition Corp."  His testimony that he previously said that

16  to a compliance officer, if taken for the truth, is a hearsay

17  statement.  It's irrelevant that the hearsay statement comes

18  from a percipient witness.  It still is an out-of-court

19  statement that would be received for the truth.

20    Now is there some other basis on which that statement

21  should be received in evidence other than for the truth that he

22  did not trade on the basis——

23    MR. BACH:  Our defense here is good faith, and his

24  state of mind——and this shows a compliance state of mind.  This

25  shows a good faith pattern of behavior, and that he

1  believed——he's taking steps that he believes are appropriate,

2  compliance steps that he——his state of mind is that he was not

3  restricted until, you know——the government's position is he was

4  restricted even before he made his first trade.  This shows his

5  state of mind is different.  He's admitting to his compliance

6  officer that, I have not been actively trading in securities

7  since September 23rd.  That implies that, you know, he's

8  admitting to his compliance officer that he was actively

9  trading securities before that point.  I mean, this is standard

10  state of mind evidence, and this is——I just want to underscore,

11  this is critical to the defense.  This is——we're entitled to

12  present a defense.  I understand the rules of evidence, but I

13  think——

14        THE COURT:  You're entitled to present a defense

15  consistent with the rules of evidence.

16        Let me hear what else you've got and then I'll hear

17  from the government.

18        MR. BACH:  One moment.  Just a second.

19        Can Ms. Shapiro——I know the Court doesn't like this,

20  but this is very important to us and Ms. Shapiro——

21        THE COURT:  Okay.  I'll hear Ms. Shapiro.

22        MS. SHAPIRO:  Just two points, your Honor.

23        First of all, the government made past compliance and

24  training an issue in this case.  They injected that into this

25  case, over our objection.  We're entitled to put in evidence

1  relating to his state of mind, his understanding of his

2  training and what it required.

3         Secondly, with respect to the hearsay, the so-called

4  hearsay issue, it's inconceivable to me that during the

5  cross-examination of Mr. Garelick that the government is not

6  going to try to suggest——to impeach him on testimony as to his

7  state of mind and when he restricted himself from training, and

8  this clearly could come in as a prior consistent statement.  So

9  that's an additional reason that the notion that this is not

10 admissibility because it's hearsay is ridiculous.  I mean, they

11 have a full opportunity to cross-examine this witness.  Let the

12 jury decide whether he's telling the truth or not.  This

13 is——this is, you know——this is not a situation where, you know,

14 the declarant is unavailable and there's no ability to

15 cross-examine the declarant.  The whole purpose of the hearsay

16 rules is to prevent that type of situation.  We're not here in

17 a situation where the defendant is not testifying.  We're

18 trying to put in something that, you know, somebody might

19 regard as self-serving hearsay.  This was written at the time,

20 and he's here.  They can cross-examine him all they want.

21        THE COURT:  All right.  Ms. Hanft, let me hear from

22 you.

23        MS. HANFT:  Yes, your Honor.  The government can

24 cross-examine Mr. Garelick on his statement, which he can

25 certainly testify to, that at a certain point, he believed he

O571GAR1

1  was in possession of material nonpublic information, and even

2  that he told his compliance officer that.  But this email is

3  very clearly hearsay.  This email specifically references a

4  backward-looking, as we've talked about; he is saying that, I

5  have restricted myself.  And to the extent that Ms. Shapiro's

6  argument is based around cross-examination, to introduce the

7  exhibit on direct would be, you know, improperly bolstering the

8  witness prior to cross-examination.

9       We have a separate issue, Judge, on the content of the

10  email that says, "as discussed."  We haven't even gotten to

11  that.  But presumably, there is going to be some testimony

12  relating to what Mr. Garelick discussed with his compliance

13  officer, and we'd ask Mr. Bach to make a proffer on that too.

14  But I don't want to get ahead of ourselves.  I think this email

15  is very obviously hearsay.  We have the witness here and the

16  witness can testify.

17       THE COURT:  Based on the proffer that I've received,

18  I'm going to exclude the exhibit as hearsay.  It plainly is

19  hearsay.  It's plainly backward looking.  The main purpose,

20  really the only purpose of it, is for the truth of the

21  statements, "I have restricted myself from trading shares in

22  DWAC.  I have also restricted myself from discussing any

23  nonpublic information regarding this company with anyone."

24  It's a self-serving statement made after the trades that would

25  be received by the jury, could be understood by the jury only

O571GAR1

1    with respect to its truth.

2           With respect to the argument from the defense about

3    state of mind, I need to hear the testimony, but my ruling does

4    not preclude the defense from offering evidence that prior to

5    any of Mr. Garelick's trades, he consulted with and informed a

6    compliance officer that he was going to trade and sought

7    permission to do so.  That would go to his state of mind.

8           With respect to Ms. Shapiro's arguments that because

9    the witness is present, the comment doesn't constitute hearsay,

10   that's just inconsistent with the rules.  As I mentioned

11   before, the fact that a percipient witness can authenticate a

12   prior statement or can testify that he previously made a

13   statement out of court does not mean that that statement is not

14   hearsay.  Under 801(d)(1), a prior consistent statement can be

15   received but only as nonhearsay, but only under limited

16   circumstances.

17          Which brings me to my last point, which is that it is

18   within my discretion to permit the offering of a prior

19   consistent statement if it's clear that the cross-examination

20   is going to open the door, so I reject Ms. Hanft's argument to

21   the extent that she would be suggesting that I don't have

22   discretion to permit the defense to anticipate a likely

23   cross-examination, but I also have discretion not to do that,

24   and it seems to me that it's unlikely, but not beyond the realm

25   of possibility, but unlikely, that the government will open the

O571GAR1

1   door.  If the government opens the door on cross-examination,

2   the statement may well be admissible as a prior consistent

3   statement, but I don't need to address that now.

4        MS. SHAPIRO:  Your Honor, two additional points.

5        In her opening, Ms. Hanft said, "He was restricted,

6   but you'll also see that he didn't actually restrict himself."

7   So this is a direct response to that.

8        What's more, there are parts of this that either are

9   clearly not hearsay or are completely undisputed in this case.

10  So for instance, the statement, I have also—sorry— "I have

11  restricted myself from trading shares" is a present-tense

12  statement.  In addition, the paragraph "I currently own" and so

13  forth, "I have not been actively trading securities in this

14  entity since September 23rd," those are undisputed facts in

15  this case, and this document is being introduced for the fact

16  that he said this on October 19th, and that was his state of

17  mind on October 19th.

18       And I also want to just highlight that this is

19  absolutely critical to the defense, and if this document

20  doesn't come in and Mr. Garelick is convicted, this is going to

21  be central to the outcome.

22       THE COURT:  My ruling stands.  The only thing that I

23  would add is that the fact that the statements that are not

24  hearsay, to the extent that there are some, as Ms. Shapiro

25  pointed out, are generally not disputed—in other words, that

O571GAR1

1  he currently sits on the board of DWAC; or that on

2  October 19th, he is not trading the shares of DWAC, which

3  highlights the point that the jury could only receive this for

4  its hearsay purposes.  And so thinking about it from a 403

5  perspective, the hearsay danger of this document far outweighs

6  any relevance of any nonhearsay statements in it.

7       All right.  With respect to the question of "as

8  discussed," do you intend to elicit, Mr. Bach, discussions

9  between Mr. Garelick and Mr. Park?

10      MR. BACH:  Yes.

11      THE COURT:  What are they?

12      MR. BACH:  They're consistent with this letter, that

13  he said these things to Mr. Park, then memorialized it in a

14  writing the following day.

15      THE COURT:  Okay.  My ruling——

16      MR. BACH:  I plan to elicit that he memorialized them

17  in a writing the following day.  I understand I can't introduce

18  the document.

19      THE COURT:  The same ruling applies with respect to

20  his testimony that on October 18th, he said to the compliance

21  officer that he had not traded on the basis of material

22  nonpublic information.  Those might be receivable as prior

23  consistent statements, depending on the cross-examination, but

24  that's my ruling.

25      MR. BACH:  Well, I want to understand it because I

1    don't want to violate it.  I obviously disagree with it, but I

2    do need to understand it.  So can I——what aspects of this

3    chronology can I elicit?

4         THE COURT:  You can elicit that——you haven't told me

5    this, but I'm imagining it.  I'm imagining that one reason why

6    he goes to the compliance officer is to see whether he is

7    prohibited from selling shares of DWAC from October 19th

8    forward, or under what circumstances can he sell or purchase

9    shares going forward.  All of that is perfectly in bounds.

10   What's your proffer as to why he goes to the compliance

11   officer?  Maybe if you give me your proffer, I can tell you

12   what's in bound and what's not.

13        MR. BACH:  The proffer is what we understand the facts

14   to be, okay?  I can't change what I understand the facts to be.

15        THE COURT:  So tell me them.

16        MR. BACH:  The fact is that he went to his compliance

17   officer and he said that he has restricted himself because he's

18   now in possession of MNPI.  And, you know, this is——

19        THE COURT:  So keep on going.  So he goes to a

20   compliance officer and he says, I have restricted myself

21   because I'm now in possession of MNPI.  Does he ask the

22   compliance officer a question?

23        MR. BACH:  He's not seeking legal advice.  This is——

24        THE COURT:  Is he seeking compliance advice?

25        MR. BACH:  No.  He's reporting to his compliance

O571GAR1

1    officer consistent with—he's reporting his plan not to trade

2    until news becomes public.  This is consistent with his

3    understanding of what his obligations are based on all of his

4    compliance training, that that's what professionals do, to make

5    a record, and they send it to the—they go to the compliance

6    officer and they say, I am now in MNPI and I am not going to

7    trade, I do not plan to trade until news becomes public.  And

8    so that's—

9              THE COURT:  Let me hear from Ms. Hanft as to that.  As

10    I understand now, the proffer is, I am now in possession of

11    MNPI and I don't plan to trade because I'm now in possession of

12    MNPI.  Is there anything objectionable about that?

13              MS. HANFT:  No, your Honor.

14              THE COURT:  Okay.  I happen to agree with that.  But

15    what's off bounds is, I have not previously traded on the basis

16    of MNPI.

17              MR. BACH:  We understand the Court's ruling.  We

18    preserve our objection.  And as you know, we reserve the right

19    to revisit it, depending on the contents of the cross.

20              THE COURT:  And I've invited that.

21              MS. SHAPIRO:  Your Honor, just, I don't know if you

22    want us to raise this now or if there will be a break before

23    the cross, but we had two issues we wanted to raise before—

24              THE COURT:  I think there will be a break, at least as

25    I understand Mr. Bach in terms of the length of the remainder

1    of the testimony.  Let me hear from him and then we'll see.

2    How much longer do you have on——

3            MR. BACH:  I anticipate——again, I haven't timed it,

4    but——about an hour, hour and a half.

5            THE COURT:  Ms. Shapiro, maybe you should raise it

6    now.

7            MS. SHAPIRO:  Sure.  There are two issues.

8            One is, the government advised that they may consider

9    cross-examining Mr. Garelick on the fact that Mr. Shvartsman's

10   companies had paid his legal fees in this matter.  This was the

11   subject of another dispute that we didn't have to bring to the

12   Court because they agreed not to do it, but this is completely

13   irrelevant to any issue in this case.  You know, I could have

14   understood if Mr. Shvartsman was a co-defendant or something

15   like that, but he's pled guilty.  It's got nothing to do with

16   what happened at the time.  It's clearly going to confuse and

17   mislead the jury and have them speculating about all kinds of

18   things.  And we're not in the position to, you know, stand up

19   and rebut whatever it is they're trying to imply by pointing

20   out that Mr. Shvartsman pled guilty so there's no, you know——I

21   don't know what it is they'd be trying to imply, but it's just

22   totally irrelevant in this case.  So we would ask that the

23   Court preclude questioning about who's paying his legal fees.

24   That's the first issue.

25           The second issue relates to a document that the

O571GAR1

1    government produced to us the night before last.  I believe

2    it—I believe I have the number right.  It's Government

3    Exhibit 875, which appears to be a relatively lengthy document

4    of notes that were produced by John Donnelly, a former employee

5    of Mr. Garelick's former hedge fund, Garelick Capital Partners.

6    We don't under—we have no idea what they're planning to do

7    with it, but it's clearly hearsay.  These are notes of another

8    guy.  And so we'd like a proffer as to where that's going, and,

9    you know, I think we're probably going to object to the

10   admission of the document.

11              THE COURT:  Let me hear from Ms. Hanft.

12              MS. HANFT:  Thank you, your Honor.

13              As to the question of the fees, I mean, there's

14   certainly no intention for it to be a focus of

15   cross-examination, but whether Mr. Shvartsman and his companies

16   are advance—are covering the legal costs is relevant where

17   personal benefit is an element of the charges here.  It's

18   relevant to their relationship.  They have, you know, stressed

19   as a defense that Mr. Garelick is in an entirely different

20   social circle and kind of contested that he would have any

21   reason to engage in insider trading in the circumstances,

22   including for Rocket One, and so we think that it's relevant

23   that Mr. Shvartsman's company is covering the legal fees.

24              THE COURT:  What about Government Exhibit 875?

25              MS. HANFT:  Your Honor, as to the other exhibit, we,

1  you know——if we introduce it, we intend to introduce it on

2  cross-examination.  We——

3            MS. SHAPIRO:  It's hearsay.

4            THE COURT:  Ms. Shapiro, no comments out of line.  Let

5  me listen to Ms. Hanft.  She's got a right to actually make a

6  presentation——

7            MS. SHAPIRO:  I'm sorry.

8            THE COURT:  ——without being interrupted.

9            MS. SHAPIRO:  Sorry.

10            THE COURT:  If you want to start again, Ms. Hanft.

11            MS. HANFT:  Yes.  Thank you, your Honor.

12            So we intend to inquire about these notes before

13  offering them, and to the extent that they are Mr. Garelick's

14  notes, we think they go to his state of mind.  They directly

15  rebut——they rebut the argument that he, you know, analyzed the

16  purchase of DWAC warrants carefully, he——they are——they show

17  that his process of analysis was different here and that he

18  hasn't produced, in response to the government's request, nor

19  is there any evidence of his notes, you know, a similar manner

20  on the Black-Scholes and the viability of the investments at

21  issue here.

22            THE COURT:  And how far into your cross do you

23  anticipate getting there?

24            MS. HANFT:  I don't know, your Honor.

25            THE COURT:  All right.  I'm going to reserve on

O571GAR1

1  Government Exhibit 875.

2          On the question of attorney's fees, I'm going to grant

3  the defense motion on that.  It is relevant.  On the other

4  hand, the probative value of the payment of attorney's fees to

5  an employee after charges are brought, the probative value is

6  limited, and the prejudicial impact is great.  So I'm going to

7  grant the defense motion on that.

8          Let's bring in the jury.

9          Mr. Bach, let's put Mr. Garelick on the stand.

10         MR. BACH:  Okay.  At some point before we get to the

11 subject we just discussed, it might make sense for me to talk

12 to him and make sure we restrict ourselves in accordance with

13 the Court's ruling.

14         THE COURT:  Okay.  Then we won't bring in the jury

15 right now.  Mr. Garelick presumably has heard the colloquy.

16 Why don't you have a brief conversation with him right now.

17         MR. BACH:  Sure.

18         THE COURT:  Not in front of the jury room, please.

19         MR. BACH:  Oh, okay.

20         (Pause)

21         MS. SHAPIRO:  Your Honor, while we're waiting, can I

22 just bring some authority to the Court's attention regarding

23 the prior consistent statement issue.

24         A witness's prior consistent statements can be

25 admitted for the nonhearsay purpose of rehabilitation under

O571GAR1                    Garelick - Direct

1    Rule 801(d)(1)(B).  That rule was amended in 2014 to expand the

2    basis for admitting such statements such that when opposing

3    counsel makes a general attack on a witness's candor and

4    veracity, the witness's prior consistent statements may be

5    admitted for rehabilitation.  *United States v. Purcell*, 967

6    F.3d 159, 196-97 (2d Cir. 2020).

7            THE COURT:  I'm aware of that.  I should also state

8    that I don't think that there was anything that was done in the

9    opening that opened the door to the receipt of this document as

10   a prior consistent statement.

11           Okay.  Let's put the witness on the stand and bring in

12   the jury.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Be seated.

3          Welcome back, members of the jury.  I hope you all had

4     a pleasant evening.

5          We'll continue with the direct examination of

6     Mr. Garelick.

7          Mr. Garelick, you're reminded you're still under oath.

8          Counsel, you may inquire.

9          MR. BACH:  Thank you, Judge.

10     BRUCE J. GARELICK, resumed.

11    DIRECT EXAMINATION CONTINUED

12    BY MR. BACH:

13    Q.  Mr. Garelick, when we left off yesterday, I had been asking

14    you some questions about the TMG data room.  Do you remember

15    that?

16    A.  Yes, sir.

17    Q.  And you told us that you had visited the TMG data room for

18    the second time on October 7.  Do you remember being asked

19    those questions and essentially giving that answer?

20    A.  Yes, I do recall, sir.

21    Q.  Yeah.  What, if anything, prompted you to go back to the

22    data room on October 7?

23    A.  I think two things.  I had, you know, been given a couple

24    reminders from Patrick Orlando and I think one of his—his key

25    lieutenants to get into the data room and, you know, provide

O571GAR1                    Garelick - Direct

1    some feedback.  And I certainly wanted to do that as I was, you

2    know, starting to free myself up from some other work

3    obligations.

4              MR. BACH:  Let me——could we put before the witness

5    Defense Exhibit 1129.

6    Q.  Do you recognize this, Mr. Garelick?

7    A.  Yes, sir, I do.

8    Q.  And just in generic terms, what is it?

9    A.  In generic terms, this is a——an email from one of

10   Mr. Orlando's officers here providing me with a reminder on

11   the——providing me with yet another reminder.

12             MR. BACH:  We offer this.

13             MS. HANFT:  No objection.

14             THE COURT:  Received.

15             (Defendant's Exhibit 1129 received in evidence)

16             MR. BACH:  Can we publish it for the jury.

17   Q.  Okay.  This is from——do you see at the top it's from Alex

18   Cano?

19   A.  Yes, sir.

20   Q.  And do you understand him to be associated with DWAC?

21   A.  Yes.

22   Q.  And do you see the subject where it says DWAC TMG Data

23   Room?

24   A.  Yes, I do.

25   Q.  And do you see the date sent, October 6th?

1    A.  Yes, sir.

2    Q.  Is that the day before you visited the data room for the

3    second time on October 7th?

4    A.  Yes, I believe it was.

5    Q.  And can you please read aloud the content of this email

6    message to the jury.

7    A.  Sure.  Mr. Cano writes, "Please receive this as a reminder

8    to review the documents in the data room.  We are uploading the

9    new files daily.  Any issues and/or questions, please let us

10   know.  Best, Alex."

11   Q.  And the following day, you went to the data room, correct?

12   A.  Yes, sir.

13            MR. BACH:  Can we show Defense Exhibit 470——Government

14   Exhibit 470 again.

15   Q.  Do you recall being asked questions and giving responses

16   about this document yesterday?

17   A.  Yes, I do.

18   Q.  Is this the due diligence that you report——due diligence

19   report that you wrote the following day on October 7th after

20   visiting the data room?

21   A.  In fact it is, yes.

22   Q.  Okay.  And this was presented to the other board members,

23   correct?

24   A.  That is correct.

25            MR. BACH:  Okay.  We can take that down.

1   Q.  All right.  Mr. Garelick, I want to ask you some questions

2   about stock that you buy for yourself.

3   A.  Sure.

4   Q.  Have you ever purchased securities in the public market?

5   A.  Yes, I have.

6   Q.  Can you give the jury a general sense of your personal

7   stock-buying practices.

8   A.  Sure.  You know, in my personal investment account, my—in

9   this case my IRA, which is my investment account, you know, I'm

10  fairly conservative.  I tend to invest in stocks.  My expertise

11  is in the technology sector, so I also mostly would invest in

12  tech stocks.  You know, I have two sort of practices to, you

13  know, create some risk aversion, if you will.  One is what I

14  call diversification, right?  So I don't want any—any one

15  stock to really, you know, meaningfully drive my overall

16  portfolio.  I know from experience, I've been humbled before,

17  I'm going to be wrong in my stock selections.  If I'm good,

18  I'll be right more than 50 percent of the time and therefore be

19  able to make some money.  But if I have, you know, extremely

20  large positions, you know, that would be invalidated.  So to do

21  that I limit myself to a 10 percent position max, meaning any

22  one stock I want to limit to not be more than, you know,

23  10 percent of the value of the portfolio.  Again, 'cause I'm

24  going to be right and/or wrong sometimes.

25          The other thing I do is, you know, I'm not clever

1  enough to buy stocks right at the bottom, sell them at the top,

2  and I——stocks are volatile, and so I'll tend to——when building

3  a position in a stock, I'll tend to do so, you know, over a

4  series of kind of small purchase trading increments, and that

5  way over, you know——over a period of time, I can get kind of an

6  average price and smooth out some of the natural ups and downs

7  of the——of the market.

8  Q.  Okay.  And in other words, when you buy a stock, you buy it

9  all on one day?

10  A.  No, sir.

11  Q.  Do you spread it out in increments over time?

12  A.  Correct.

13  Q.  Did you purchase——did there come a time when you purchased

14  any DWAC stock in the open market?

15  A.  Yes, there was a time.

16  Q.  And what was your stock investment approach in connection

17  with buying DWAC stock?

18  A.  Very much as I just, you know, kind of laid out as my——my

19  practice, right?  I bought over a series of sort of small

20  trading increments and, you know, I kept the position size at

21  a, you know, at a level that was within my——the normal

22  constraint I like to put on myself to not, you know, go over

23  10 percent.

24  Q.  Okay.  What account did you use?

25  A.  I used my——my IRA, my retirement account.

O571GAR1                    Garelick - Direct

1    Q.  Okay.  And is that the same account that you used during

2    this period, for all of the stock that you bought on the public

3    market?

4    A.  Yes, it was.

5    Q.  Okay.  Approximately what was the total amount of money

6    that you invested in buying DWAC stock?

7    A.  I think roughly speaking, it was about a $50,000 position.

8    Q.  When did you first buy DWAC stock?

9    A.  September 3, 2021.

10   Q.  Okay.  What prompted you to buy DWAC stock on that date?

11   A.  That was the first date in which I could.  That was the

12   date of the IPO, the initial public offering.

13   Q.  And you say it was the first date that you could.  Could

14   any member of the public buy stock in DWAC before

15   September 3rd?

16   A.  No, sir.  September 3rd was the first day you could

17   publicly——you could buy DWAC, you know, in the stock market.

18   Q.  By September 3rd had you attended any board meetings?

19   A.  No, sir.

20   Q.  At that point did you believe you possessed any material

21   nonpublic information?

22   A.  No, sir.

23   Q.  When did you——was the last time that you purchased any DWAC

24   stock?

25   A.  The last time?

1    Q.   Yes.

2    A.   The last trade I made was on September 23, 2021.

3    Q.   Okay.  And when you——after that last trade on

4    September 23rd, did you have money in your IRA account that

5    would have permitted you to buy more DWAC stock?

6    A.   Yes, I did.

7    Q.   Why did you not purchase any additional DWAC stock after

8    September 23rd?

9    A.   Yeah, I think in the afternoon of the 23rd, I could see

10   that, you know, there was a start of a drumbeat, activity on

11   the board that I thought could potentially lead somewhere, and

12   the prudent thing was at that point, you know, to not trade

13   anymore.  I never really got a 10 percent position, maybe it

14   was 7 or 8 percent, but the prudent thing was to stop on that

15   day, you know, as things——and in the weeks that

16   followed——really started to pick up.

17   Q.   And why was that prudent?

18   A.   That was prudent because, you know, in my training, you

19   know, there's material nonpublic information, you know, which

20   I've been trained on, and there's a fairly clear definition of

21   that, but, you know, to be conservative as you're starting to

22   approach something that could lead to material nonpublic

23   information, you know, the prudent and right thing to do is,

24   you know, to just——to no longer trade, to restrict one's self.

25         MR. BACH:  Can we pull up Government Exhibit 930.

O571GAR1                    Garelick – Direct

1   Q.  Mr. Garelick, this is the chart that Mr. Melley presented

2   earlier at this trial.  Do you recognize it?

3   A.  Yes, sir, I do.

4   Q.  Do you agree with this chart?

5   A.  Yes, that appears to be accurate.  The chart appears to be

6   accurate.

7   Q.  Okay.  This is a fair and accurate statement of your

8   trading activity in DWAC?

9   A.  I believe it is, yes.

10          MR. BACH:  Okay.  And can we show Government

11  Exhibit 303.

12          This is already in evidence.

13  Q.  Do you see at the top it says Fidelity Premium Services?

14  A.  Yes, sir.

15  Q.  And on the right it says, Investment Report September 1,

16  2021 through September 30, 2021?

17  A.  Yes, I see that.

18  Q.  What is this we're looking at?  What is this whole

19  document?

20  A.  So this is a, you know, a typical monthly brokerage

21  statement.  In this case it's from Fidelity, you know,

22  who——where I had my IRA retirement account, and so this is my

23  monthly statement for September of 2021.

24  Q.  Does this statement capture all of your trading activity in

25  September with respect to DWAC?

O571GAR1                    Garelick - Direct

1    A.  Yes, it does.

2              MR. BACH:  Okay.  Can we go to page 11.

3              And can we highlight——

4    Q.  So this, what's described on this page, generally?

5    A.  Sure.  This page here is sort of the trading activity page

6    for the month of September 2021, and it shows all of my buys as

7    well as sells of stocks.

8              MR. BACH:  Ms. McFerrin, is it possible to highlight

9    just the Digital World Acquisition Corp. entries on this page?

10   Q.  Okay.  Do you see that highlight in yellow?  Are those all

11   the trades that relate to Digital World Acquisition Corp.?

12   A.  Yes, they are.  The dates that——those are settlement dates,

13   not the trade dates, but yes, those do appear to be all the

14   trades.

15   Q.  And do you see at the top, all the way up to the left, it

16   says Settlement Date?  Do you see that?

17   A.  Yes, sir.

18   Q.  Is that the day that you actually bought the stock?

19   A.  No.  That is not.

20   Q.  What's the difference between the trading date and

21   settlement date?

22   A.  A settlement date is typically three to five days after you

23   would have put the trade in on the stock and got——you get the

24   confirmation, you know, on the actual day you trade it, but the

25   settlement date is, you know, when the broker goes to their

1   clearinghouses and, you know, custodians and such and, you

2   know, then all the records are complete, but again, it's

3   typically about three to five days later.

4   Q.  Okay.  But you agree with the trading dates as represented

5   in Mr. Melley's——in the government's chart, correct?

6   A.  Correct.  Prior exhibit, I think it's a Government Exhibit

7   from Mr. Melley, showed what appeared to be accurate, yes.

8   Q.  And apart from that, the difference between trading date

9   and settlement date, does all the information here in your

10  trading account correspond with the entries on the government's

11  chart?

12  A.  Yes.

13          MR. BACH:  And can we just go to the next page.

14  Q.  Does this show the settlement of your final September

15  trades?

16  A.  Yes, sir, it does, I believe.

17  Q.  Okay.  And those are also reflected on the government's

18  chart, correct?

19  A.  Correct.

20  Q.  Okay.  Now did you do anything to hide any of the trades

21  that you made in DWAC?

22  A.  No, sir.

23  Q.  Did you use a different name to place the trades other than

24  your own name?

25  A.  No, absolutely not.

O571GAR1                    Garelick - Direct

1    Q.  Did you trade in an account in which you usually don't

2    trade?

3    A.  I'm sorry.  Could you repeat that.

4    Q.  Sure.  Did you trade in an account other than the one in

5    which you usually trade?

6    A.  No, I did not.

7    Q.  At the time that you placed these trades, had DWAC publicly

8    announced that you were on its board of directors?

9    A.  Yes.

10           MR. BACH:  Okay.  Could we go to the top of page 8 of

11   this exhibit.

12   Q.  Okay.  Referring your attention to the upper left corner,

13   do you see where it says Total Cash Management Activity?

14   A.  Yes, sir.

15   Q.  And do you see where it says Ending Balance?

16   A.  Yes, sir.

17   Q.  And then it has a large number that's approximately

18   $250,000.  Do you see that?

19   A.  Yes, I do.

20   Q.  What is represented by Total Cash Management Activity

21   Ending Balance 249,966.43?

22   A.  So that shows the cash balance or, you know, in Fidelity's

23   case, they might call it money markets, but it's cash, right?

24   It would sweep into that.  That's the cash available to trade

25   if I——if I so chose.

O571GAR1                    Garelick - Direct

1    Q.  Okay.  That is money that you can use to make more trades

2    in this account?

3    A.  Correct.

4          MR. BACH:  Okay.  And can we show——go to page 7.  And

5    can we blow up that kind of pie chart to the right.

6    Q.  Do you see it says 62 percent stocks, and then in the light

7    gray it says 38 percent core account, 249,966.  Do you see

8    that?

9    A.  Yes, sir.

10   Q.  What does this graph depict?

11   A.  So this depicts exactly what I think we were just

12   discussing, which is the account——38 percent of the value of

13   this IRA account, which I think was approximately 650,000,

14   250,000, roughly speaking, was sitting in cash, the balance was

15   invested in stocks.

16   Q.  Could you have used the cash in this account to buy more

17   DWAC after September 23rd?

18   A.  Sure.  In theory.  If the cash is there, I could have,

19   yeah.

20   Q.  Why didn't you?

21   A.  I didn't buy any more DWAC because I saw things, you know,

22   again, on the afternoon of the 23rd and going into early

23   October, things were picking up.  There wasn't a deal, but

24   things were picking up, and, you know, the prudent thing to do

25   was no longer to trade.  And then, you know, eventually you get

O571GAR1                    Garelick - Direct

1    to the point of an actual definitive agreement, right?  So I

2    wanted to stop on the 23rd, and there was no reason at that

3    point why I would, you know, buy any more of it.

4              MR. BACH:  Okay.  Can we go to page 3, please.

5    Q.  See where it says Top Holdings?

6    A.  Yes, I do.

7    Q.  And then if you go over a little bit to the right from Top

8    Holdings, it says Percent of Portfolio.  Do you see that?

9    A.  Yes.

10   Q.  And am I correct that the bottom three entries, where it

11   says 8, 6, and 4, are those stocks?

12   A.  That is correct, yes.

13   Q.  Are any of those above 10 percent?

14   A.  No, sir.

15   Q.  Okay.  By the way, do your stocks maintain the same percent

16   level in your portfolio from month to month?

17   A.  No.  There was some—there was some variability.  There was

18   certainly months that I had a lot more stock investments than I

19   did in this month.

20   Q.  But do they ever get above 10 percent in any one stock?

21   A.  Not that I recall, no.  I think I kept a pretty tight lid

22   on, you know, again, what I called sort of a safety

23   diversification constraint.

24             MR. BACH:  Okay.  Can we go back to page 11, please,

25   Ms. McFerrin.

1       You told us a moment ago that this is the page that

2   depicts your stock investment activity, correct?

3   A.  Yes, sir.

4       MR. BACH:  Can you, Ms. McFerrin, highlight all of the

5   TripAdvisor entries.

6   Q.  Do you see that there's more than one TripAdvisor entry on

7   this page?

8   A.  Yes, sir.

9   Q.  Can you explain that to the jury.

10  A.  Sure.  It's the similar style that I purchase securities

11  in, where, you know, I buy over a series of small trading

12  increments, you know, to end up with a roughly average price

13  over the, you know, the cumulative purchase period time.

14  Q.  Do you buy it all in one day?

15  A.  No, sir.

16      MR. BACH:  Ms. McFerrin, can we focus on Sumo Logic,

17  Inc. Com.  Can we blow those up.

18  Q.  Did you buy all the Sumo Logic, Inc. Com stock in your IRA

19  on the same day?

20  A.  No, sir.  Similar trading practice, illustration, with

21  similar logic.

22  Q.  Okay.  And did you follow the same pattern in purchasing

23  DWAC stock?

24  A.  Yes, I did.

25      MR. BACH:  Okay.  Let's pull up Government Exhibit 930

1    again.

2    Q.  Okay.  This chart shows that you——let's focus on the first

3    entry on September 3rd.  Do you see that?

4    A.  Yes, sir.

5    Q.  Okay.  And again, just very quickly, why did you start

6    trading on that particular date?

7    A.  That was the first day I could.  That was the IPO date.

8    Q.  Okay.  And when was the next time that you bought DWAC

9    stock?

10   A.  September 10th.

11   Q.  Okay.  At that time had you attended a single board

12   meeting?

13   A.  No, sir.

14   Q.  At that point did you believe you had any material

15   nonpublic information?

16   A.  No, sir.

17              (Continued on next page)

18

19

20

21

22

23

24

25

1  BY MR. BACH:

2  Q.  When was your next trade?

3  A.  September 17, 2021.

4  Q.  At that time, had you participated in a single board

5  meeting?

6  A.  No, sir.

7  Q.  At that point, did you believe that you had any material

8  nonpublic information?

9  A.  No, sir.

10  Q.  That's on September 17th.  Please keep that date in mind

11  for a second while I show you Government Exhibit 124.

12          See at the top that this is a confidentiality

13  agreement, dated September 13th, between Digital World

14  Acquisition Corp and Trump Media Group Corp.  Do you see that?

15  A.  Yes.

16  Q.  Did anyone ever send you this document?

17  A.  No, sir, this was not provided to me.

18  Q.  Had anyone told you an agreement like this had been made or

19  signed?

20  A.  No.

21  Q.  To your knowledge, had this been circulated to any of

22  DWAC's directors at this time, other than Mr. Orlando?

23  A.  To my knowledge, it wasn't.  It was not circulated to me,

24  nor was it circulated to the board via the communication

25  channels that Digital World Acquisition Corp. had with its

1  board members.

2  Q.  When you placed your trade on September 17, did you know

3  that this September 13 document existed?

4  A.  No, I did not.  I had no idea.

5        MR. BACH:  Let's go back to Government Exhibit 930,

6  please.

7  Q.  After September 17th, when was your next trade?

8  A.  That would be September 20th, 2021.

9  Q.  At that point, had you attended any board meetings?

10  A.  No, sir.

11  Q.  At that point, did you believe you had any material

12  nonpublic information?

13  A.  I -- no, I did not.

14  Q.  When, again, was your first board meeting?

15  A.  It was September 21st, 2021.

16  Q.  Did you trade on September 21st?

17  A.  I did trade on September 21st, yes.

18  Q.  Was that before or after your first board meeting?

19  A.  That was before my first board meeting.

20  Q.  What is a board packet?

21  A.  A board packet is, you know, would be materials that the

22  company in this case, Digital World Acquisition, would send to

23  its board of directors so it could be the basis for discussion

24  at a board meeting, an upcoming board meeting.

25  Q.  Did you receive a board packet in anticipation of the

O57Cgar2                    Garelick - Direct

1    September 21 board meeting?

2    A.  Yes, I did.

3    Q.  Did you place your trade on the 21st before or after you

4    received that board packet?

5    A.  After.

6    Q.  And when you received the board packet, did you consider

7    yourself to be in possession of material nonpublic information?

8    A.  No, I did not.

9    Q.  And why not?

10   A.  There's nothing really in the board packet that I would

11   deem material nonpublic information whatsoever.

12          MR. BACH:  Can we show Government Exhibit 458, please.

13   Q.  Before we show it, when you just made a statement that --

14   can you explain why -- what about this content led you to

15   believe that it was not material nonpublic information?

16   A.  The packet -- can I talk about the packet, even though it

17   hasn't been put in evidence yet?

18   Q.  Sure.

19   A.  The packet shows a handful of prospects with very little

20   information.  It looks like it was kind of pulled from public

21   sources.  There isn't much there.  It's a prospect pamphlet, if

22   you will.  It's thin.  There's not a lot to it.

23   Q.  Did it reflect any decisions that had been made?

24   A.  No, sir.

25          MR. BACH:  Let's pull up Government Exhibit 458.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O57Cgar2                    Garelick - Direct

1    Q.  So this is to DWAC origination from Patrick Orlando.  It

2    says sent on September 21st UTC.

3            When did you receive this document?

4    A.  I received this September 20th -- I'm going to talk about

5    the time zone I was in when I received it, not UTC, because I

6    don't live in the UTC time zone.  My recollection is September

7    20th at approximately 10:00 p.m. the evening -- east coast

8    time.

9    Q.  I will represent to you that there's a stipulation between

10   the parties when you see UTC there, the time is four hours

11   before.

12   A.  Okay.

13   Q.  Can we agree that was roughly 10:16 p.m.?

14   A.  Correct.  So doing some math there, four hours minus the

15   UTC time takes you back to 10:00 p.m. the prior day, which

16   would be September 20th.

17   Q.  What is this document here?  What are you receiving that

18   night of September 20th?

19   A.  So this shows --

20   Q.  It's the board packet you were just discussing?

21   A.  Correct.  Correct.

22           MR. BACH:  Can we go to the page for Trump Media

23   Group.

24   Q.  Was this part of the board packet?

25   A.  Yes, it was.

1    Q.  Can you walk us through this page?

2          By the way, is this the only part of the board packet

3    that talks about Trump Media Group?

4    A.  I believe this is the only page, yeah.  The rest of the

5    board packet discussed other prospects.

6    Q.  Can you walk us through this document and describe what you

7    see.

8    A.  Sure.  So, at the top, it says target name, Trump Media

9    Group.  It has a code name, project U.S.A.  It establishes the

10   fact this is a startup business, it doesn't have much in

11   revenue.  It establishes the fact that, unfortunately, it

12   doesn't have audited financials, which is something you would

13   need before you could close a deal like this.  There's no

14   information about the cash that would be needed, it says not

15   applicable.  It says not applicable for the status of their

16   pre-IPO financing.  I'm assuming that means pre potential SPAC

17   merger, so they don't know much about the financing the

18   company's had up until then.  They do establish this is in the

19   media entertainment industry.  They give a market size, which

20   looks to be probably based on something around Twitter, which

21   is a public company.  The geography solicited is not

22   applicable.  It says brief description.  To create a

23   conservative media powerhouse to rival the liberal media and

24   fight back against big tech companies of Silicon Valley.

25   Q.  Just stopping right there.  Was that type of information

1  available on the public domain?

2  A.  Yes.  At this point, there's a number of media stories

3  talking about what Trump and the Trump Media Group were trying

4  to build here.

5  Q.  Similarly, if we look below, there are descriptions of a

6  subscription-based service to provide live daily video

7  podcasts, live conference calls with President Trump, nightly

8  news, morning news.  Do you see on the second page, TMG

9  Technologies, the disruptor of the liberal media and technology

10 landscape.  This is the development and growth of formidable

11 conservative platforms.  Do you see that?

12 A.  I do, yes.

13 Q.  Was that kind of thing being discussed about Trump in the

14 public domain at this point in time?

15 A.  Yes.  There's obviously some political fodder and those

16 statements, but yes, that was in the public domain and number

17 of media stories.

18 Q.  What's an EV?

19 A.  EV is enterprise value.

20 Q.  Was this in the public domain?

21 A.  Yes.  There was -- I believe it was a media outlet called

22 Zero Hedge that had published months prior an estimated

23 enterprise value for this business of $15 billion.  There

24 wasn't much basis for that, but that's what that media outlet

25 had thrown out there.

O57Cgar2                    Garelick - Direct

1    Q.  Before you saw these pages of the packet, you had spent

2    approximately 20 years as an investment analyst; correct?

3    A.  Yes.

4    Q.  Why didn't you consider this information material?

5    A.  I mean, I'm an analyst at heart and I've spent my career as

6    an analyst that loves to analyze investment opportunities.

7    This is paper thin.  There's nothing here of real substance to

8    kind of dig in and analyze.

9                MR. BACH:  We can take that down.

10   Q.  By the way, that's a communication that was distributed to

11   all the board members.  Did you have any individual phone calls

12   with Patrick Orlando in the month of September?  Let's start

13   with that.  Did he ever speak to you one-on-one outside of a

14   board meeting?

15   A.  The month of September, the only one-on-one phone call I

16   recall having with Patrick was before the IPO, maybe September

17   2nd, which I think related to some of the logistics with the

18   IPO and such.  I don't think I had any other conversations with

19   him during September, one-on-one, that is, outside of the board

20   meetings.

21   Q.  September 2nd, that was the day before the IPO on September

22   3rd; correct?

23   A.  Yes, sir.

24   Q.  So when you say logistics, what kind of things did

25   Mr. Orlando call you to talk about?

A.  On September 2nd of 2021, that was the date, you know, I

officially became a board member.  So, to the best of my

recollection, you know, maybe there was some conversation about

that.  It was now, you know, confirmed that the IPO was going

to be happening the next day, so I think there was a little bit

of brief conversation about that.  That was really about it as

far as I can recall.

Q.  Did you talk to him on September 10th, September 17th,

September 20th, September 21st, did you ever have any

conversation with Mr. Orlando outside of any board meeting?

A.  No, sir.

Q.  What about in October, at any time before the news of the

merger with Trump Media Group was announced, did you ever speak

to Mr. Orlando outside the presence of the board one-on-one?

A.  No, I can't recall a single conversation I had with him in

that time period either.

Q.  Now, on September 21, did you attend the DWAC board

meeting?

A.  Yes, I did.

Q.  And what was discussed?

A.  The prospects that were outlined in the packet, perhaps

another prospect or two were discussed.  This was the first

board meeting, so the board was trying to figure out what

prospects were interesting, what was worthy of doing more work

and potentially looking to actually start to have some serious

O57Cgar2                    Garelick - Direct

1    conversations with those prospects.

2    Q.  Was there any discussion of something called an LOI?

3    A.  September 21st -- yeah, there was several companies that

4    there was discussions of LOIs if I recall correctly.

5    Q.  About having LOIs or seeking LOIs?

6    A.  Seeking LOIs, there may have been one that they disclosed

7    there had been an LOI for the first time.  I can't recall

8    exactly.  There was loose conversation about LOIs, yeah.

9    Q.  At or around this time, were you ever sent any copy of any

10   LOI that DWAC was seeking?

11   A.  No, I was not.

12   Q.  At or around the time, were you ever sent a copy of any LOI

13   that DWAC executed with Trump Media Group?

14   A.  No, they never provided me or, as far as I know, the board

15   with the LOIs.

16          MR. BACH:  Can we pull up Government Exhibit 930

17   again.

18   Q.  After attending the board meeting on September 21, did you

19   buy anymore DWAC shares?

20   A.  Yes, I made one more purchase after that first board

21   meeting.

22   Q.  According to the chart and what you just told us, that was

23   on September 23rd; correct?

24   A.  Correct.

25   Q.  And why not make anymore trades after that date?

O57Cgar2                    Garelick - Direct

1    A.  So I think in the afternoon of September 23rd, there

2    started to be, you know, a little bit of a pickup in activity,

3    a drumbeat.  There was a bunch of WhatsApp messages I saw in

4    the afternoon that looked like there was some nice activity,

5    some nice pickup in the conversations that were going on with

6    TMG.  Again, at that point, the prudent thing to do was, you

7    know, there still wasn't anything tangible that I could see,

8    but the prudent thing to do was, hey, this might be going

9    somewhere, I'm not going to trade anymore.

10                MR. BACH:  One moment, please.

11                Can we show the witness Defendant's Exhibit 853.  It's

12   in evidence.  Publish this for the jury, please.

13   Q.  Do you see at the top, this says, DWAC Officers/Directors

14   WhatsApp September 23rd, 2021.  Do you see that?

15   A.  Yes, I do.

16   Q.  Is that the day you placed your final purchase of DWAC

17   stock?

18   A.  Yes, it was.

19   Q.  Do you recognize this as the WhatsApp chain of text

20   communications that were being maintained by the board of

21   directors of DWAC?

22   A.  Yes, I do.

23   Q.  Can you see in the right-hand corner, lower-bottom of each

24   message, there's a timestamp?

25   A.  Yes, sir.

1  Q.  Can you see that there's a short text at the top that has

2  the timestamp 10:49 a.m.?

3  A.  Yes, I do.

4  Q.  And then there are four texts that all occur after 2:00

5  p.m.  Do you see that?

6  A.  Yes, I do.

7  Q.  One at 2:16, one at 2:23, one at 2:25, and one at 2:27.  Do

8  you see that?

9  A.  Yes.

10  Q.  Now, you told us you traded on this date, that was your

11  final purchase; correct?

12  A.  That's correct.

13  Q.  And did you make that final purchase before the text at

14  2 o'clock?

15  A.  Yes, it was before 2 o'clock.

16  Q.  And did you make it after the first one?

17  A.  Yes, I believe it was after the 10:49 a.m. one.

18  Q.  Can you explain to the jury what happened on September 23rd

19  in terms of your trading.

20  A.  Sure.  This morning of September 23rd, I know I had a lot

21  of business matters and meetings.  I know midday I purchased

22  several different stocks, including DWAC.  As you get into the

23  afternoon here, you know, my WhatsApp number on the app starts

24  to pop up here and I was like, okay, I take a look in the

25  afternoon and I could see, you know, starting at 2:16,

1   there's -- it sounds like there's some traction here.  They're

2   talking about announcements.  I think that had to do more with

3   TMG announcing their platform.  Even past the 2:27, there is an

4   increasing drumbeat of activity that sounds like this could

5   actually be leading, potentially leading to something.

6   Q.   What happened after September 23rd?

7   A.   After September 23rd, there was further confirmations in

8   terms of, you know, a site visit to TMG's headquarters, there

9   was talk of due diligence, we discussed the data room that

10  opened up in early October for further detailed due diligence.

11  The activity really started to pick up as you get into late

12  September and then early October.

13  Q.   Did you place any trades once that activity began to occur?

14  A.   No, I did not.

15  Q.   What were you doing all day on September 23rd?

16  A.   I know on the 23rd it was a very busy day.  I think

17  yesterday I testified about it was related to Emcompay.  We

18  hired an investment bank.  And so, we were really starting to

19  get into -- well, one, we were trying to lock down a

20  presentation we would use for prospective investors.  Again,

21  this is for a private payment processing business that we were

22  seeking financing and investors for.  And so, I know that

23  morning, you know, there was the presentation I was working on

24  the investment bank with, I needed feedback from my two

25  founders of that business, I needed to set up -- I needed to

O57Cgar2                    Garelick - Direct

1    prepare for the calls I was then going to have with the

2    investment banks and all the subsequent prospective investor

3    calls, again, for this payment processing business that Michael

4    founded, you know, in the days and weeks that followed.

5            MR. BACH:  Can we show Defendant's Exhibit 852.  It's

6    already in evidence.

7    Q.  Is this a fair and accurate representation of what your day

8    looked like on September 23rd?

9    A.  Yeah, this was a bit of a crazy day.  This is fair and

10   accurate.

11   Q.  When you traded, was that around noon or midday?

12   A.  Yes, sir, I believe it was around noon.

13   Q.  Can you briefly, do you see the references to Emcompay and

14   calls with others during this day?  I know you just described

15   it for the jury, but can you point out a couple things here and

16   make clear what was going on?

17   A.  Sure.  Let's see here.  Starting in the morning a little

18   past 8 o'clock, I knew I was going to need quite a bit of

19   collaboration as we were trying to finish this presentation for

20   Emcompay, again, you know, related to the investment bank and

21   financing we were doing.  And so, I created a group chat to

22   start to get some feedback.  I sent out, you know, at that time

23   the draft of the presentation and proposed getting the two

24   founders of the business, Mr. Shvartsman and Hannelius, on the

25   phone to discuss and get their feedback and start to edit this

1   and lock it down.  Michael was very responsive, it looks like,

2   and called me right away to discuss it.  So I immediately got

3   his feedback.  Then I was scheduled to speak to Mr. Hannelius

4   later at 10:30 to get his feedback, for which Michael looks

5   like he then joined that call to kind of put in his two cents

6   to his founding partner, Mr. Hannelius.

7               Then, as the morning progresses --

8               MR. BACH:  You don't have to go all the way through,

9   but thank you.

10              THE WITNESS:  Sure.

11              MR. BACH:  Let's take that down.

12  Q.  Let's focus just on 2021 more generally now.

13              You told us you were working remotely from Providence

14  while Mr. Shvartsman was based in Florida; correct?

15  A.  That is correct, yes.

16  Q.  When you were in Providence, did you have a way of letting

17  Mr. Shvartsman know when you may or may not be available if he

18  needed you?

19  A.  Yes, you know, our professional business understanding was

20  if I, you know, during kind of normal business hours, if I was

21  going to be unavailable, I'd let him know.

22  Q.  When you say normal business hours, what are you talking

23  about?

24  A.  I mean, there's times when I didn't have normal business

25  hours, but the understanding, the courtesy was if you're

O57Cgar2                    Garelick - Direct

1    sometime between 8:00 a.m. and 5:00, 5:30, that would be kind

2    of a normal window when he would expect me to be available.

3    He's a reasonable man, but if I wasn't going to be available

4    for any block of time in there, I'd let him know.

5                MR. BACH:  Can we show the witness Defendant's

6    Exhibit 60.

7    Q.  Do you recognize this?

8    A.  Yes, I do.

9    Q.  In very general terms, what is this?

10   A.  This looks like a WhatsApp exchange I had with

11   Mr. Shvartsman.

12               MR. BACH:  We offer it.

13               THE COURT:  Any objection?

14               MS. HANFT:  No, your Honor.

15               THE COURT:  Defendant's Exhibit 60 is received.

16               (Defendant's Exhibit 60 received in evidence)

17   Q.  Do you see at the top here, this is a WhatsApp

18   communication between you and Mr. Shvartsman on December 13,

19   2021?

20   A.  Yes, sir.

21               MR. BACH:  Can we go to the next page.

22   Q.  You write, reminder, I'll be on a cross-country flight

23   today, taking off soon.  Hope Mickey Mouse wasn't too

24   torturous.  Is this an example of what you were just describing

25   to us?

O57Cgar2                    Garelick - Direct

1  A.  Yes, it is.  Making a little Disney World joke there.  He

2  has young kids.

3  Q.  Why are you telling Mr. Shvartsman that you were going to

4  be on a cross-country flight?

5  A.  Because I would be unavailable and he like me to not only

6  tell him, but often remind him of things.  I wanted to remind

7  him that he wouldn't be able to get me for a period of time

8  here during the business day.

9        MR. BACH:  Let me show the witness Defendant's

10  Exhibit 81.

11  Q.  Do you recognize this?

12  A.  Yes, I do.

13  Q.  In very general terms, what is it?

14  A.  This looks like another WhatsApp exchange I had with

15  Mr. Shvartsman.

16        MR. BACH:  Can we show the Court and counsel the next

17  page.

18        We offer this.

19        MS. HANFT:  Objection.

20        THE COURT:  Basis?

21        MS. HANFT:  403.

22        THE COURT:  Overruled.

23        (Defendant's Exhibit 81 received in evidence)

24        MR. BACH:  Can we show this to the jury.

25  Q.  Do you see at the top here, this is a WhatsApp text

O57Cgar2                    Garelick - Direct

1    communication between you and Mr. Shvartsman on October 13th?

2    A.  Yes, sir.

3         MR. BACH:  Can we go to the next page.

4    Q.  See, you write, Mike, heads up, tonight from 4:45 -- let me

5    start over.

6         You write, Mike, heads up, tonight from 5:45 p.m. to

7    7:00 p.m., I have a kid's school obligation.  Free after 7:00.

8    He writes, no worries.  Do you see that?

9    A.  Yes, sir.

10   Q.  Can you explain this exchange.

11   A.  Sure.  I think in this case, it starts to push the

12   boundaries of what I described as a normal courtesy during

13   normal business day hours.  My guess here is that, you know,

14   once again, I'm giving him the same courtesy, but I'm extending

15   those same hours a little because I think around that time we

16   had a lot going on and I knew there was some things he was

17   probably going to want to collaborate on, so I'm giving the

18   same courtesy heads up.

19   Q.  Let me show you Government Exhibit 746.  This is an

20   extraction report of some WhatsApp communications between you

21   and Mr. Shvartsman.  Do you see that?

22   A.  Yes, I do.

23   Q.  And the date of it, you see where it says all timestamps in

24   the top, in the center there?

25   A.  Yes.

1  Q.  The date of it is 9:20:21 p.m.  Do you see that?

2  A.  Yes, sir.

3  Q.  You see it says 5:52 p.m. UTC minus four?

4  A.  Yup.

5  Q.  And going just to the right, see where it says, "body"?

6  A.  Yes.

7  Q.  That's a body of a text communication you had with

8  Mr. Shvartsman at or around that time?

9  A.  Yes, it was.

10  Q.  And you write, FYI, I have a DWAC board of directors

11  meeting tomorrow at 12:30.  Do you see that?

12  A.  Yes, I do.

13  Q.  Why did you so advise Mr. Shvartsman?

14  A.  Again, if I'm going to be unavailable during business

15  hours, I want to let him know I'm going to be unavailable.

16  Q.  At the time that you sent this, had you received the board

17  packet describing what the contents of that board of directors

18  meeting would be?

19  A.  No, that came later, later that evening.

20  Q.  Do you see the time here is 5:52?

21  A.  Yes, sir.

22  Q.  And before we were talking about some time -- I'm not sure

23  I'm translating the times right, but before we were talking

24  about something you received later in the evening around 9:00

25  or 10:00 p.m., correct?

1  A.  I believe it was 10:00 p.m. that evening, yes.

2  Q.  As of this date, you've not attended the September 21 board

3  meeting; correct?

4  A.  Correct.

5  Q.  And you haven't received the packet in anticipation of the

6  meeting; correct?

7  A.  Yes.

8  Q.  Then you write below --

9        MS. HANFT:  Objection, your Honor, to the leading.

10  It's been a whole line.

11       THE COURT:  Overruled.  He's just directing the

12  witness to the portions that he's asking about.

13       Go ahead, Mr. Bach.

14       MR. BACH:  Thank you.

15  Q.  You write, I recommend starting to buy more DWACU stock.

16  Recall, we only own 145K worth of 400K target position size.

17  Your RBC E.F. Hutton account was funded with 400K.  You can buy

18  more by calling Ben Reed.  Do you see that?

19  A.  Yes.

20  Q.  Can you explain why you were telling -- what are you

21  communicating to Mr. Shvartsman here?

22  A.  Sure.  As I think I mentioned, he tells me to remind him of

23  what his plans and intentions are.  I knew what his intentions

24  were.  I also knew I was about to come into a period where I

25  started having board meetings.  And so, this isn't, you know, a

1   reminder I was going to give him later.  I use the word

2   "recommend," but I'm reminding him of what he instructed me to

3   remind him of what his intended plans were.

4   Q.  Were these plans that were made on September 20th or are

5   these plans that were made earlier in time?

6   A.  As I understood from Mr. Shvartsman, these were his plans

7   well before the IPO.

8   Q.  Do you see where it says, your RBC E.F. Hutton account was

9   funded with $400,000?  When was that funded with $400,000?

10  A.  That was funded before the IPO.

11  Q.  Are you conveying any confidential nonpublic information in

12  this WhatsApp exchange?

13  A.  No, not at all.

14  Q.  And why were you providing Mr. Reed's phone number?

15  A.  Again, this is a little more administrative.  I'm aware

16  that he's spoken to Ben Reed and he knows who Ben Reed is, but

17  my boss is the kind of fella that would say, you know, who, and

18  what, and where, and what's his phone number again.  He

19  wouldn't necessarily retain it in his contacts.  So, you know,

20  I'm being a good little, I don't know, administrative assistant

21  in this case.

22  Q.  By the way, do you see it says DWACU?

23  A.  Yes, sir.

24  Q.  What does the "U" refer to?

25  A.  That, I think we talked about this in the days prior.

1  That's the unit.  At this point, it was the unit that went

2  public, that had its IPO.  At this point, that was the only

3  security that was trading.

4  Q.  And the U is different from warrants or other forms of

5  securities; correct?

6  A.  Correct.  The unit is sort of the package that contains one

7  common stock and a half warrant.

8          MR. BACH:  We can take that down.

9  Q.  Are there other occasions when you advised Mr. Shvartsman

10  that you would be unavailable because of a DWAC board meeting?

11  A.  I think so.  I think there might have been one other

12  instance of that, yes.

13          MR. BACH:  Can we show the witness Defendant's

14  Exhibit 92.

15  Q.  Do you recognize this?

16  A.  Yes, I do.

17  Q.  In very general terms, what is it?

18  A.  So this is a WhatsApp exchange that I had with my boss,

19  Michael Shvartsman in October.

20          MR. BACH:  We offer it.

21          MS. HANFT:  Objection, your Honor.  Could we have a

22  sidebar on this one?

23          THE COURT:  Yeah, let's have a sidebar.

24          (Continued on next page)

25

1    (At the sidebar)

2    THE COURT:  Is the objection to more than the first

3    line?

4    MS. HANFT:  No, just the first line.

5    THE COURT:  Can you redact the first line?

6    MR. BACH:  The first line is to provide context that

7    he has let this employee off for the day, he expects a call

8    from Michael Shvartsman to discuss it.  And so, he's letting

9    him know that he's not going to be available for the board of

10   directors meeting.  I think without that it just -- they're

11   going to argue that this is gratuitous mention of a board

12   meeting.  It's to explain -- it's for the context of the

13   communication.

14   THE COURT:  How does the first message provide

15   context?

16   MR. BACH:  Because he has called Michael Shvartsman,

17   he told him he's let this guy off for the day.  That's Michael

18   Shvartsman's prerogative, certainly not Bruce Garelick's

19   prerogative.  He expects -- he's called Mike Shvartsman, he's

20   expecting a call back, he's dealing with this.  And so, he's

21   letting him know that I'm going to be unavailable at 10:00, but

22   I'll be available at 11:00 if you want to discuss this.

23   THE COURT:  I'm going to sustain the objection with

24   respect to the first line on 403 grounds, but the rest of it

25   I'll receive.

O57Cgar2                    Garelick - Direct

1          MR. BACH:  Can he describe what was happening that day

2     without the exhibit?

3          THE COURT:  What is he going to say in testimony?

4          MR. BACH:  I anticipate he'll explain why he was

5     letting him know about his unavailability.

6          THE COURT:  What would he say?

7          MR. BACH:  He'll say, I was dealing with a situation

8     with Josh, I let an employee go for the day, I know he might

9     have had questions about that, so I was letting him know I was

10    going to be unavailable.

11         THE COURT:  Who is Josh?

12         MR. BACH:  Josh is an assistant analyst who works at

13    Rocket One.  It's not a family member or a friend or -- this is

14    not personal, emotional --

15         MS. HANFT:  I mean, your Honor, I think the relevance

16    is minimal.  He elicited multiple times when he was

17    unavailable.

18         THE COURT:  You can elicit the testimony, but not that

19    first line.

20         MR. BACH:  I can't introduce this portion of it?

21         THE COURT:  You can elicit testimony in terms of why

22    were you letting him know you were not available, you were not

23    going to be available.

24         MS. HANFT:  Nothing about the best friend being

25    killed?

Garelick - Direct

1          THE COURT:  Nothing about the best friend being

2     killed.

3               MR. BACH:  Can I talk to him?

4               THE COURT:  Yes, you can confer briefly.

5               MR. BACH:  Where should I talk to him?

6               THE COURT:  You can approach.

7               MS. SHAPIRO:  We heard your Honor say the first line.

8               THE COURT:  Sorry.  Meant the first message.

9               MS. SHAPIRO:  What about, "I told him to take the day

10    off"?  Can we leave that in for the context?

11              THE COURT:  You can include, "I told him to take the

12    day off."

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1   (In open court)

2   THE COURT:  DX 92 is received in redacted form.  Go

3   ahead.

4   (Defendant's Exhibit 92 received in evidence)

5   MR. BACH:  Thank you.

6   Can we publish it for the jury, please, in redacted

7   form.

8   BY MR. BACH:

9   Q.  First page here, Mr. Garelick, another WhatsApp message

10  between you and Mr. Shvartsman.  This one is on October 18,

11  2021.  Do you see that?

12  A.  Yes, sir.

13  MR. BACH:  Can we go to the next page.

14  Q.  Do you see at the top, there's a message from you to

15  Mr. Shvartsman at 9:40 a.m. saying, I told him to take the day

16  off?

17  A.  Yes.

18  Q.  And then you're telling him you have a aspect BOD meeting

19  at 10:00 and should be free at 11:00.  Do you see that?

20  A.  Yes, sir.

21  Q.  Just very, very briefly, what were the circumstances here

22  that led you to advise Mr. Shvartsman that you would have a

23  board meeting at 10:00?

24  A.  It's during, you know, my normal business hours, so I

25  wanted him to know I wouldn't be available.  The issue above,

1    take the day off, that's a separate issue I'm covering with

2    him.

3    Q.   Does that relate to another employee at Rocket One?

4    A.   It does, yes.

5    Q.   Who, generally, had permission to tell employees to take a

6    day off, was that you or Mr. Shvartsman?

7    A.   That was Mr. Shvartsman.

8    Q.   And once you told him that, were you expecting a phone call

9    back from him?

10   A.   I was, yes.  Yes.  There's an individual, without going

11   into details, it's been redacted, an employee who had something

12   difficult happen.  Yeah.

13   Q.   Is there any other reason that you were letting him know

14   that you might be unavailable at 10:00 a.m.?

15   A.   No.

16            MR. BACH:  Can we take that down.

17   Q.   Was there, in fact, a board meeting on October 18th?

18   A.   No.  I believe, if memory serves, they intended to have

19   one, but for one reason or another, maybe there wasn't a quorum

20   of the directors, it actually didn't happen officially.

21   Q.   Apart from the documents that we've just seen, did you ever

22   tell Mr. Shvartsman about any scheduling of any board of

23   directors meeting?

24   A.   I'm sorry.  Repeat the question.

25   Q.   Apart from the documents I've just shown you, did you ever

1    tell Mr. Shvartsman about the scheduling of any board of

2    directors meeting?

3    A.   Not that I can recall because I think the other ones were

4    outside of the normal business hours.

5    Q.   And that would be at night?

6    A.   Correct.

7    Q.   You told us a moment ago that you would occasionally remind

8    Mr. Shvartsman about his plans.  Focusing your attention on

9    September 30th, did you send him another reminder?

10   A.   I did, yes.

11   Q.   And what prompted that reminder on September 30?

12   A.   Sure.  Is there a document you're going to show first or

13   you want me to just --

14   Q.   Tell the jury what you remember.

15   A.   Yeah.  Mr. Shvartsman, from very early on, you know, going

16   back to the founders class, even though before was very focused

17   on warrants as an appealing portion of the DWAC securities

18   options.  The warrants don't trade right away with the IPO.

19   That comes later in what I think we've covered in the case,

20   it's called a disaggregation where it splits.  And so,

21   Mr. Shvartsman told me very early on, he said, when the

22   warrants start to trade, when that's public information, he

23   goes, please let me know when that happens.

24   Q.   September 30th, how did that date relate to when the

25   warrants became freely trading?

1  A.  That was the date that the warrants first started to trade

2  on their own in the public markets.

3        MR. BACH:  Let's take a look at Government Exhibit

4  747, which is already in evidence.

5  Q.  Do you see this is an extraction of some WhatsApp

6  communications on September 30th?

7  A.  Yes, I do.

8  Q.  If you go to the right where it says content, you write at

9  the top, Mike, note, DWAC warrants started trading today,

10  traded just below 50 cents for volume of 116K.  Do you see

11  that?

12  A.  Yes, I do.

13  Q.  Was that confidential information?

14  A.  No, that was not.

15  Q.  Who knew that?

16  A.  Anybody that was paying attention to the stock market would

17  know that.

18  Q.  Any member of the public could know that information?

19  A.  Yes, sir.

20        MR. BACH:  Let's go down to the body of the next text.

21  Q.  You write, that means there was only approximately 60K of

22  volume today.  Volume should pick up as DWACU holders

23  disaggregate their units.  Do you see that?

24  A.  Yes, sir.

25  Q.  Does that message convey any confidential inside

1    information?

2    A.  No, it does not.

3    Q.  Does that convey any information you learned from the board

4    of directors?

5    A.  No, it does not.

6          MR. BACH:  Can we go to the next text message.

7    Q.  Ben Reed at R.F. Hutton.  Is that a typo?

8    A.  That's a typo.  It should say E.F. Hutton, yes.

9    Q.  Is your contact to trade.  Recall, you have 25K cash in

10   that account, plus 45K worth of DWACU.  Do you see that?

11   A.  Yes, sir.

12   Q.  And does this contain any material nonpublic information?

13   A.  No, sir.

14   Q.  Why are you reminding Mr. Shvartsman of this?

15   A.  Again, this is an administrative ask that he has.  He's a

16   very, very smart man, but he's not particularly organized.  So

17   he asked me to administratively remind him of what his plans

18   are and who the relevant contact is in this case, you know, for

19   him to trade.  I'm sure he'd remember Ben Reed, but again, I

20   doubt he would have all the contact information.  So he asked

21   me to remind him of these type of things.

22          MR. BACH:  Let's take that down.

23   Q.  Let's go back to what's happening on the DWAC board.  When

24   we left off a moment ago, we were talking about September 23rd

25   and some events that followed after that.  Do you remember

1  that?

2  A.  Yes, sir.

3  Q.  Do you remember we were discussing the data room with TMG,

4  October 4th, October 7th?  Do you remember that, you were asked

5  some questions and you gave some answers about that?

6  A.  Yes, I recall.

7  Q.  Moving forward a little bit in time to around October 15,

8  what types of information were you starting to learn from your

9  participation on the board of directors?

10  A.  By October 15th was the question?

11  Q.  Yes.

12  A.  So, by that point, the board had worked through a good deal

13  of due diligence.  I believe there was a communication from

14  Digital World Acquisition to the directors saying, hey, we're

15  getting close to getting a deal done, and something to the

16  effect of, to be safe, we want to extend an exclusivity period

17  just in case it stretches on for another month or so.  But, you

18  know, things were -- "we're getting close to a deal" at that

19  point was what was being communicated.

20  Q.  When you say a deal, are you talking about a merger between

21  DWAC and TMG?

22  A.  Yes.  There still wasn't a draft of a definitive agreement,

23  but that is correct, yes.

24          MR. BACH:  Let's show Mr. Garelick Government Exhibit

25  511.  Can we blow up the large text in the middle of the page.

1  Q.  Do you see this is a text from Alex Monje?

2  A.  Yes, I do.

3  Q.  Is he associated with DWAC?

4  A.  He is.  I understood him to be the head legal counsel, the

5  general counsel at DWAC.

6  Q.  Do you see in the bottom-right corner, this is at 8:57

7  a.m.?

8  A.  Yes, I do.

9  Q.  Mr. Monje writes, good morning, DWAC board.  He goes on to

10  describe, do you see in all caps, an exclusivity extension?  Do

11  you see that?

12  A.  Yes, I do.

13  Q.  He talks about, since this issue is timely, we are asking

14  for confirmation via this chat ASAP.  We are progressing very

15  well on the definitive agreement and need to provide notice to

16  TMG by October 18 that we intend to extend our mutual

17  exclusivity.  Do you see that?

18  A.  Yes, I do.

19  Q.  Would you consider this to be material nonpublic

20  information?

21  A.  This is cross the line.  This is -- it either is or it's

22  very close to material nonpublic information, yeah.  To be

23  safe, I'd say yes.

24  Q.  Couple of days later, did things progress further?

25  A.  Yes.

1   Q.  What happened?

2   A.  A couple days later, so that would be -- I think it was

3   October 17, 2021, the board was presented with a draft

4   definitive merger agreement.  You know, draft meaning not the

5   final, but a working document that was, you know, they aspired

6   to finalize to then have a definitive merger agreement.

7              MR. BACH:  Can we go to page 25 of the same exhibit

8   and blow up the bottom text.

9   Q.  Do you see this is October 17th, 1:38 p.m. from Alex Monje?

10  A.  Yes, I do.

11  Q.  And it says "attachments."  Do you see that?

12  A.  Yes.

13  Q.  It says TMTG definitive?

14  A.  Yup.

15  Q.  I asked you before if you ever -- anyone ever send you the

16  LOI.  Did anyone ever send you that LOI between Trump Media

17  Group and DWAC?

18  A.  No, the LOI was not provided to me or the board, but this

19  draft of the definitive certainly was here on October 17th.

20  Q.  This was sent to you; correct?

21  A.  That is correct.  And I believe the other board members, as

22  well.

23  Q.  And it was sent as an attachment to the entire board

24  through this WhatsApp chain; correct?

25  A.  That is correct, yes.

1    Q.  Now, did you consider this to be significant?

2    A.  Absolutely, without a doubt.

3    Q.  Did you consider this to be material nonpublic information?

4    A.  Yes, very much so.

5    Q.  Are you familiar with an individual named Mike Park?

6    A.  Yes, I am.

7    Q.  Who is Mike Park?

8    A.  Mike Park is the general counsel of Rocket One Capital,

9    Michael's firm.  He's also the chief compliance officer.

10   Q.  After receiving these messages, did you have a conversation

11   with Mr. Park?

12   A.  Yes, I did.

13   Q.  Did you report to him whether you were in possession of

14   material nonpublic information?

15   A.  Yes, I did.

16   Q.  Did you report that you were in possession of material

17   nonpublic information?

18   A.  Repeat the question.  I'm sorry.

19   Q.  Did you report to him that you were in fact in possession

20   of material nonpublic information?

21   A.  Yes, I did.

22   Q.  Did you report to him that you would not make any trades

23   until news was announced to the public?

24   A.  Yes.  I considered myself very much restricted at this

25   point, yes.

1    Q.  Why did you have that conversation with Mr. Park and report

2    that to him?

3    A.  Sure.  From, you know, all my training going back to my

4    hedge fund and investment years we covered in the case, that is

5    my fiduciary duty.  When you're in possession of material

6    nonpublic information — this goes into the CFA training, as

7    well — you go to your compliance officer, you tell him you

8    think you have it, you don't necessarily have to tell him the

9    nature of it, and that you're restricted.  And the compliance

10   officer's duty then is to make sure that everything is

11   safeguarded around that material nonpublic information so that

12   it's treated appropriately and it's carefully guarded and the

13   appropriate protections are put on myself and anyone else that

14   he deemed appropriate.

15   Q.  After making that report to Mike Park, when in your mind

16   did you understand that you would be free to buy or sell DWAC

17   stock again?

18   A.  When that material news is disseminated to the public, the

19   news is out, that's when, from all my training, it would then

20   be reasonable again, fair game.

21   Q.  Let me switch topics now and show you Government Exhibit

22   474.  Do you see that this is an email exchange between you and

23   Eric Hannelius on or about October 16th?

24   A.  Yes, I do.

25              MR. BACH:  Can we go to the bottom of this document.

1    This is not what I thought the bottom of the document

2    was.  Can we go one page below.

3    Q.  This is on the second page.  Do you see that?

4    A.  Yes, I do.

5         MR. BACH:  Bear with me for one moment.

6    Q.  Can you see at the bottom of page 1, there's an email from

7    Natalie Salume to -- and it says on the bottom, dear valued

8    stakeholder?

9    A.  Yes.

10   Q.  Who is Natalie Salume?

11   A.  She is Patrick Orlando's executive assistant.

12   Q.  This particular correspondence is to Eric Hannelius.  Do

13   you see that?

14   A.  Yes, sir, I do.

15   Q.  Her salutation begins, dear valued stakeholder.  And then

16   she provides information on the second page, talking about DWAC

17   successfully went public as a SPAC, including over-allotment

18   approximately six weeks ago.  Do you see that?

19   A.  Yes, I do.

20   Q.  Is this board of director information?

21   A.  No, it's not.

22   Q.  What type of information is Ms. Salume here distributing to

23   investors or stakeholders?

24   A.  Sure.  So she's communicating -- I think this relates just

25   to the founders class, if I'm not mistaken, and she's

1    communicating with all the founders class investors and saying,

2    essentially, hey, we were oversubscribed, we took in more money

3    than we needed.  Therefore, everyone, on what's called a pro

4    rata basis, I would assume, is going to be returned -- it says

5    10 percent of capital invested.  Or they had the option to roll

6    that money into some future SPAC that Mr. Orlando might be

7    rolling out.

8                (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O571GAR3                    Garelick - Direct

1   BY MR. BACH:

2   Q.   Okay.  Let me see if I can break that down——

3   A.   Sure.

4   Q.   ——a little bit.  You used the term "oversubscribed,"

5   correct?

6   A.   Yes.

7   Q.   When people buy founders shares, they sign subscription

8   agreements.

9   A.   That's correct, yup.

10  Q.   And so when you're oversubscribed, you've signed up more

11  people for subscriptions than you can actually provide,

12  correct?

13  A.   That's my understanding, yes.

14  Q.   So what is——DWAC is now trying to compensate for that

15  oversubscription?

16  A.   Correct.  They're trying to either return the money to

17  those founders class investors, and I think all of them, or

18  saying, hey, you have the option to just keep this money on

19  hold with us and, you know, it could be used for a future SPAC

20  opportunity.

21  Q.   Okay.  So people can return 10 percent or figure out some

22  option that is being made available to all founders shares

23  investors, correct?

24  A.   Correct.

25  Q.   Okay.  And when you respond to Mr. Hannelius here, does

1   this have anything to do with confidential information that you

2   learned on the board of directors?

3   A.  No, absolutely not.

4   Q.  Does this have anything to do with buying any stock on the

5   open market?

6   A.  No, it does not.

7           MR. BACH:  Take that down.

8           Oh, can we pull that back up.

9   Q.  Mr. Garelick, I'm reminded by my more able colleagues that

10  I should ask you to explain what you've written here at the top

11  of the page.

12  A.  Oh, sure, yeah.  So in this case, Mr. Hannelius is asking

13  me, you know, a totally fair administrative question, right?

14  And I respond to him and I——would you like me to read my

15  response or——

16  Q.  Explain it.

17  A.  Oh, sure.  So I'm telling him basically, like, have them

18  return the money to you, like, why——if you want to invest in a

19  future SPAC that Mr. Orlando rolls out, you can certainly make

20  that decision at the time.  There's no reason, you know, to——to

21  commit to some future possibility now, you know, elect option

22  1.  I recommend you elect option 1 and just get your money

23  back.

24          MR. BACH:  Can we scroll down a little bit on this

25  page.

1  Q.  Do you see how Mr. Hannelius writes, "Thoughts on what to

2  do here?  I just have founders shares."  Do you see that?

3  A.  Yes.

4  Q.  Were you keeping close tabs on what type of investment or

5  shares Mr. Hannelius had or didn't have?

6  A.  No, I wasn't.

7        MR. BACH:  Take that down.

8  Q.  Now let's talk about Las Vegas.  Did there come a time when

9  you went to Las Vegas in 2021?

10  A.  Yes, there did come a time.

11  Q.  Okay.  And when did you go to Las Vegas?

12  A.  I think I flew out—this was for an industry conference,

13  the 18th or the 19th of October, if memory serves, of 2021.

14  Q.  Okay.  And what was the purpose of the trip?

15  A.  Yeah.  It was a big industry conference, and so, you know,

16  the plan was our company was going to be meeting with business

17  partners, customers, prospective investors, technology

18  partnership companies.  It was, you know—it was a busy week at

19  an industry conference out in Las Vegas.

20  Q.  And were you the only person from Rocket One who went to

21  the conference?

22  A.  No, I was not.  There were several, or many.

23  Q.  Okay.  So roughly how many or who came from Rocket One?

24  A.  Roughly speaking, seven, maybe eight individuals, I want to

25  say.

1   Q.  And do you remember who was there?

2   A.  Sure.  Michael Shvartsman and Eric Hannelius were certainly

3   there; several of the salespeople were there; one analyst was

4   there; I think that's about it, yeah.

5   Q.  And did you talk with, interact with, the other Rocket One

6   people who were there on this business trip?

7   A.  Sure.  I mean, we shared a number of business meetings

8   while we were there.

9   Q.  Okay.  What about dinners?  Did you have dinners with them

10   on October 19th or 20th?

11   A.  I—we—we stayed through the weekend.  Michael and Eric

12   were kind to put us all up for the weekend and do, you know,

13   some team building.  So we certainly did then.  I can't recall

14   doing dinners with them during the week.  I know my analyst and

15   I had dinner on the 21st of October, with an attorney that was

16   in the industry.  I know the investment bank we were working

17   with on the 19th or the 20th had a, you know, kind of a

18   cocktail event-mixer for all of their clients, and, you know,

19   that was the investment bank we were working on the financing

20   deal with.

21   Q.  When you say Michael and Eric were kind enough to put

22   everyone up for the weekend, was that after October 20th?

23   A.  Yes, it was.

24   Q.  It was after the public announcement, correct?

25   A.  That's correct, yes.

1   Q.  Of the merger agreement, correct?

2   A.  Yup.

3   Q.  Now what was your job on this trip?  What were you supposed

4   to be doing?

5   A.  Yeah.  My main focus on the trip was, you know, meeting

6   with investors, right, things that involved strategic finance,

7   so meeting with some of the prospective investors.  I also

8   would get involved in, you know, some of the——the negotiations

9   if we had like business partnerships.  I sat in on some of the

10  meetings with customers more as an observer, you know, than a

11  participant.  And I was also, you know, pretty active while I

12  was out there with this investment bank we were working with.

13  You know, that——that deal or that financing was starting to get

14  some nice traction, so there was a lot of collaboration with

15  the investment bank.

16  Q.  At any point while you were in Las Vegas did you attend a

17  DWAC board meeting?

18  A.  Yes, I did.

19  Q.  How did you participate in that board meeting?

20  A.  Via Zoom.

21  Q.  Do you remember what day or time that meeting was?

22  A.  I believe there was two.  I think there was one on the 19th

23  of October and I think there was one on the 20th of October.

24  Q.  Okay.  Starting with the 19th, what time was that?

25  A.  That was in the evening.  I think that was 9 p.m. East

1  Coast time.

2  Q.  Okay.  And where did you participate?

3  A.  From my hotel room.

4  Q.  And was anyone else present?

5  A.  No.

6  Q.  Did you tell anyone anything that was said at that meeting?

7  A.  No, absolutely not.

8  Q.  Did you tell anyone that meeting took place?

9  A.  I didn't tell anyone that meeting took place, no.  That was

10 after business hours so I wouldn't have even told my boss I was

11 going to be unavailable.  No, I did not.

12 Q.  What about on the 20th, where did you participate in a

13 board meeting?

14 A.  From my hotel room.

15 Q.  Anyone else present?

16 A.  No.

17 Q.  Did you advise anyone of that meeting?

18 A.  No, I did not.

19 Q.  Did you share anything you learned in any board meeting on

20 October 19th or October 20th with a soul outside of the board?

21 A.  No, absolutely not.

22 Q.  Okay.  Do you know of an individual named Aric Gastwirth?

23 A.  I know of him because of this case, yes.

24 Q.  Okay.  Have you ever met a Mr. Aric Gastwirth?

25 A.  No, I have not.

O571GAR3                    Garelick - Direct

1   Q.  Have you ever spoken to a Mr. Aric Gastwirth?

2   A.  No, I have not.

3   Q.  Would you recognize a Mr. Aric Gastwirth if you were in the

4   same room with him?

5   A.  I would not, no.  I don't know him.

6           MR. BACH:  Okay.  Can we pull up Government

7   Exhibit 930 again.

8   Q.  Now after the news——well, let's back up a second.

9           You told us before that it was your understanding you

10  could not be involved in any DWAC securities transactions until

11  after news was made public, correct?

12  A.  You mean in terms of being able to sell?

13  Q.  Yes.

14  A.  Or trade at all, once——absolutely, yeah.

15  Q.  Okay.  And did there come a time that you sold the position

16  in DWAC stock that you had purchased?

17  A.  Yes.

18  Q.  And was that before or after the news was publicly

19  announced?

20  A.  That was after the news was publicly announced.

21  Q.  Okay.  And are those the two——you see the two Ss after

22  October 21?  Do you see that?

23  A.  Yes, I do.

24  Q.  Okay.  And those Ss are for sell?

25  A.  That's correct.

1  Q.  And are these entries in this chart fair and accurate?

2  A.  Yes, they are, to the best of my knowledge.

3  Q.  And you see the total on the bottom where it says

4  49,701.37?

5  A.  Yes, sir.

6  Q.  Is that an accurate statement of the total amount of money

7  that you made?

8  A.  Yes, I believe that is accurate.

9  Q.  Okay.  And after you sold the stock, what did you do with

10  the money?

11  A.  Nothing.  It was in my retirement account.  It sat there.

12  Q.  Okay.  Would there have been a penalty if you had withdrawn

13  it?

14  A.  Yes, if you pull money out from a retirement account before

15  you retire, there's——there's some stiff penalties, yes.

16  Q.  Okay.

17  A.  As well as IRS taxes and such to pay.

18  Q.  Okay.  Let me show you Government Exhibit 751.

19          And do you see that this is an extraction report of a

20  text from you to a Miss O'Shea on October 21?

21  A.  Yes, I see that.

22  Q.  And is this before or after the news was public?

23  A.  This is after.

24  Q.  Okay.  And you write, "I'm still in meetings but will come

25  up for air in a couple of hours and call.  Big day today.  My

1    Trump SPAC traded up 400 percent today.  We made 20 million on

2    it.  The New York Times called me for comment, which I said no

3    comment, no publicity I need.  Ha ha."  Do you see that?

4    A.  Yes.

5    Q.  Can you walk us through it.  What do you mean when you say

6    "we made 20 million on it"?

7    A.  Well, "we" is Rocket One Capital, which is—which is

8    Michael Shvartsman.

9    Q.  Okay.  Was any of that money for you?

10   A.  No, it was not.

11   Q.  Okay.  All right.  And can you explain the rest of the text

12   to us.

13   A.  Sure.  I mean, The New York Times—and I certainly didn't

14   want to be associated with the former president, so it alludes

15   to that.

16          MR. BACH:  Can we show Government Exhibit 749A and

17   749B.

18   Q.  Okay.  These are photographs that the government introduced

19   into evidence.  Let's take each one at a time.

20          Let's take the one on the left with the palm trees.

21   What's depicted in this photograph?

22   A.  Sure.  This is me with several of the sales folks of the

23   company, an analyst.  I think this is maybe that Friday night

24   in Vegas as we were starting to relax and—after a long

25   business week and, you know, have a little bit of fun.

O571GAR3                    Garelick – Direct

1    Q.  When you say Friday night, was that before or after—before

2    or after October 20th?

3    A.  It was after October 20th.

4    Q.  Okay.  So this is after the news is public, correct?

5    A.  That's correct.  I think this was probably the 22nd of

6    October.

7    Q.  And who are the individuals in this photo?

8    A.  Sure.  That's Ryan, Allen, and Phil and myself on the far

9    right there.

10   Q.  Do you know their last names?

11   A.  Yes.

12   Q.  Can you just tell the jury who they are.

13   A.  Sure, Ryan Hoyt, Allen Beyer, and Phil Margolin.

14   Q.  Who are those guys?

15   A.  They're all employees of Michael's company.

16   Q.  Okay.  And before this, did you socialize with them in this

17   way at any time before October 22nd or so?

18   A.  No.  I think this is the first time I, you know, I had a

19   little bit of fun with them.

20   Q.  Okay.

21   A.  Yeah.

22   Q.  All right.  And let's look at the second photo.

23        This is a different time of day, correct?

24   A.  Yes.

25   Q.  Is this the same day or a different day?

O571GAR3                    Garelick - Direct

1    A.  This is a different day.  I think this is either the

2    Saturday or Sunday that followed, so the 23rd or maybe the 24th

3    of October.

4    Q.  We stipulated with the government this is the 24th.

5    A.  The 24th, okay.

6    Q.  So is this before or after the public announcement?

7    A.  This is after the public announcement.

8    Q.  The public announcement was on the 20th, correct?

9    A.  Correct.

10   Q.  And tell the jury, please, what does this photograph

11   capture here?

12   A.  So this photograph captures Mr. Hannelius and

13   Mr. Shvartsman, you know, the two founders of this business,

14   they want to do a little team building, so they, you know, put

15   up the employees, including myself, for the weekend in Las

16   Vegas and they took us dune buggy racing, dune buggy driving

17   over the weekend here, so this is us in our—our dune buggy

18   mode.

19   Q.  And just—could we put names to faces.  Who's all the way

20   on the left there in the black T-shirt?

21   A.  Sure.  That's Eric Hannelius in the far left; that's

22   Michael Shvartsman to his right; that's Ryan Hoyt there in the

23   middle; then Phil Margolin; and then myself on the far right.

24   Q.  And had you ever gone dune buggy riding with any of these

25   guys at any point between June 18th when you first met

O571GAR3                    Garelick - Direct

1   Mr. Orlando and October 20th when the news of the merger was

2   publicly announced?

3   A.   No.   In fact, this I think might have been the first time I

4   ever went dune buggy racing at all.

5   Q.   Had you ever had this kind of social experience with these

6   gentlemen as a group during the time period I just referred to?

7   A.   No, I had not.   This was——this was a new thing.

8            MR. BACH:   All right.   We can take that down.

9   Q.   Do you know someone named Justin Friedberg?

10  A.   Yes, I do.

11  Q.   And who is Mr. Friedberg?

12  A.   He's another employee of Mr. Shvartsman's company.

13  Q.   And how would you describe your relationship with him?

14  A.   I mean, he's a work colleague, so I interact with him from

15  time to time.   I wouldn't call him a friend by any means.

16  Q.   Okay.   After the news of the merger became public did you

17  have any communications with him?

18  A.   Yes, I did.

19  Q.   And what did you and he——what type of communications were

20  those; talking, by phone, or what?

21  A.   He——after the news had come out, you know, about DWAC and

22  TMG merging on the October 20th, he had texted me and what he I

23  think in the text described as FOMO, or he was upset when he

24  saw the news and the stock went up that, you know, he wasn't

25  involved.

1    MR. BACH:  Okay.  And let me——let's take a look at

2  Government Exhibit 750.

3         Is this just a piece of it?  Can we go to the top.

4         Is this the top of it?  Hold on just a second.

5         Could we go to the very first page of the document.

6  Q.  Okay.  Okay.  Do you see that this is an extraction

7  report——

8         MR. BACH:  Keep going down a little bit.

9  Q.  Do you see the participants are Justin Friedberg and Bruce

10  Garelick?

11  A.  Yes.

12  Q.  Okay.  And if we can go down.  And these are text messages,

13  right?

14  A.  Yes.

15  Q.  And if we can go down to the first text here.

16  Mr. Friedberg writes, "You didn't even tell me about that

17  stock.  So mad now."  Do you see that?

18  A.  Yes, I see that.

19  Q.  And that's on October 21, correct?

20  A.  Correct.

21  Q.  And the news is public, on the internet, all over the

22  place, correct?

23  A.  Yes.

24         MR. BACH:  Okay.  And if we go to the next text here.

25  The next text on the next page.  Could we blow up the top one.

1  Q.  Justin writes to you——this is at 12:43——"How did you guys

2  get those founders shares?  That one hurts.  Next time please

3  let me know."  Do you see that?

4  A.  Yes, sir.

5  Q.  Okay.  So what type of securities, DWAC securities, do you

6  understand Mr. Friedberg to be referring to here in this text?

7  A.  Yes, I——he's referring to the founders shares, and perhaps

8  somebody's told him that there were, you know——that founders

9  shares investments were made and people made money 'cause

10  he's——he's referencing that and, you know, he's——he's upset

11  that he wasn't involved.

12         MR. BACH:  Could we pull up Defense Exhibit 952.

13  Q.  Referring your attention to Defense Exhibit 952, what was

14  the time period in which you were organize——helping Michael

15  organize people to buy founders shares?

16  A.  Yeah, so that was, you know, the second half of June 2021

17  into the first week or so of July 2021.

18  Q.  That's the other investors syndicate here on this chart?

19  A.  Correct.

20  Q.  Okay.  And did the syndicate——what type of securities did

21  the syndicate purchase?

22  A.  Founders shares.  Some of them also put in indications of

23  interest for the IPO, but the purpose of this was primarily for

24  founders shares.

25  Q.  Okay.  And when Mr. Shvartsman gave you a list of, you

O571GAR3                    Garelick - Direct

1    know, friends and family and contacts to reach out for this

2    investor group, was Justin Friedberg one of the names that he

3    gave you?

4    A.   He was not——and I think this is the source of

5    Mr. Friedberg's being upset with that.  He was not one of the

6    names that Mr. Shvartsman flagged for me to reach out to for

7    building this founders share syndicate.

8    Q.   Okay.

9              MR. BACH:  Can we go to page 4.

10             THE WITNESS:  Could we take a brief five-minute

11   restroom break.

12             THE COURT:  How much more do you have, Mr. Bach?

13             MR. BACH:  About ten minutes, but if the witness needs

14   a break——

15             THE COURT:  Can you wait ten minutes?

16             THE WITNESS:  Sure.  No problem.

17             MR. BACH:  All right.  Can we take a look at page 4.

18   And go down to the bottom text.

19   BY MR. BACH:

20   Q.   Mr. Friedberg writes, "So how does that founders share

21   stuff work?  I gotta do more of this shit with you, man."  Do

22   you see that?

23   A.   I see that, yes.

24   Q.   And just in general, what was your experience in

25   interacting with Mr. Friedberg, generally?

O571GAR3                     Garelick - Direct

1   A.  He's——how to put this politely.  He's——he could be

2   difficult.  This is major FOMO here.

3   Q.  Okay.

4   A.  He means well, but—— it could be difficult to interact with

5   him.

6   Q.  Okay.  And what type of——what round of investments is he

7   referring to here?

8   A.  I'm sorry?  Say it again?

9   Q.  What round of investments is he referring to in this

10  message?

11  A.  He's referring to the founders share.  This is the pre-IPO

12  founders share stock.

13          MR. BACH:  And can you go to page 5, please.  Blow up

14  at the top.

15  Q.  You write, "Founders shares are discounted shares in the

16  SPAC sponsor before the SPAC IPO.  $5 versus normal 10.  The

17  catch is you get locked up for six months."  Do you see that?

18  A.  Yes.

19          MR. BACH:  Then let's go down to the next text.

20  Q.  And you write, "Apologies if we failed to mention this to

21  you."  Do you see that?

22  A.  Yes, I do.  I think at this point I'm just trying to end

23  this conversation with him.

24  Q.  Okay.  And then in the next text he writes, "When did you

25  guys do it?"  Do you see that?

1    A.  Yes.

2    Q.  And then let's go to the next page and look at the next

3    text.

4           He writes, "It's fine.  Shit happens.  Don't let it

5    happen again."  Do you see that?

6    A.  I do, yes.

7    Q.  Okay.  Did you want to continue this text exchange?

8    A.  No, I very much did not want to continue this text

9    exchange.

10   Q.  Okay.  Let's go to the next text he sends you.

11          "This, why don't we talk about the SPA 401(k) idea

12   next week.  Obviously different to a degree, but still, the

13   opportunity is limitless."  Do you see that?

14   A.  Yes.

15   Q.  Okay.  Then let's take a look at the text──the next text

16   here.

17          You write back to Mr. Friedberg at 6:55, "It's

18   Michael's business, man.  I keep a tight lid on what he does

19   unless he tells me to share it.  In this case he did tell me to

20   socialize it to his normal network of investor peeps.  Perhaps

21   I should have proactively thought of you."  Do you see that?

22   A.  Yes.

23   Q.  And can we──when we're talking about the "normal network of

24   investor peeps," what is that a reference to?

25   A.  Yeah.  So this is──I mean, first of all, I'm trying to land

1    this plane in terms of this conversation with Mr. Friedberg.

2    Michael has wealthy friends, and he will, you know, in some

3    instances——in terms of DWAC founder shares, he said, hey,

4    here's people I think might be interested in this to build a

5    syndicate.  And Justin wasn't one of the people that he had

6    mentioned.

7    Q.  Okay.  And there's more texts here.  But let's go to

8    page 8.

9             Let's go down to the bottom text on page 8.

10            This is now at 6:57 p.m.  Do you see that?

11   A.  Yes.

12   Q.  And Mr. Friedberg writes, "You make out like a bandit?"  Do

13   you see that?

14   A.  Yes.

15   Q.  Did you want to continue this text conversation with

16   Mr. Friedberg?

17   A.  No, I didn't, and unfortunately, he's just not letting go.

18   Q.  Okay.  And can we go to the next text that you send back.

19   He had just asked you, "Did you make out like a bandit?"  What

20   did you write back?

21   A.  I said, "I did ok but unfortunately had to restrict myself

22   a month ago due to my involvement on the board of directors of

23   the SPAC, so was very limited in what I could buy."

24   Q.  Okay.  Now when you talk about that you're limited in what

25   you could buy, are you still talking about founders shares?

1    A.  No.  In this case I'm referring to my own involvement,

2    which was in, you know, the regular stock that had gone public

3    and was trading.

4    Q.  And you referred to a month ago.  Do you see that?

5    A.  Yes.

6    Q.  And this is on October 22nd, correct?

7    A.  Correct.

8    Q.  What day did you place your last trade?

9    A.  September 23, 2021.

10        MR. BACH:  Okay.  And can we pull up Defense

11   Exhibit 8, the opening chart again.  952?

12   Q.  So what you're referring to is not this other investor

13   syndicate period but the period of September when you placed

14   your trades, correct?

15   A.  Of my own involvement, yes.

16   Q.  Okay.  Did you hide from Mr. Friedberg the fact that you

17   had bought shares in the open market?

18   A.  No, I did not.

19        MR. BACH:  Could we go back to the text we were just

20   looking at.  Blow up——I think we were on page 9, where he

21   says——blow up the top one.

22   Q.  Why didn't you hide from Mr. Friedberg the fact that you

23   had bought shares in the open market?

24   A.  Why would I?  I didn't think I had any reason to hide that

25   from anyone that asked me specifically what I was, you

O571GAR3                      Garelick - Direct

1   know——what my involvement was.

2   Q.  Okay.  And he writes back, "Very cool, Mr. Board of

3   Directors."  You see that?

4   A.  Yes, I do.

5   Q.  Did you want to continue this conversation?

6   A.  No, I very much did not.

7   Q.  Okay.  And then let's go to the next text he sends you.  He

8   writes, "How was the suite and meetings?  Solid?"  Do you see

9   that?

10  A.  Yes.

11  Q.  What did you understand him to be referring to?

12  A.  He did——so he, again, is a salesperson for

13  this——Mr. Shvartsman's company that, you know, was at the

14  industry conference in Las Vegas and he did not attend it, so

15  he's basically asking how it went.

16  Q.  Did he get to attend that event in——

17  A.  No, he was not there.  He was not in Las Vegas.

18  Q.  Did he get to do the dune buggy ride?

19  A.  He missed out on the dune buggy ride as well.

20  Q.  Then let's show your next text in response to him.

21          You write, "Wish I wasn't on the board of directors.

22  Severely restricted what I could do."  What did you mean by

23  that?

24  A.  I meant, you know, he's asking me if I made out like a

25  bandit and all this stuff, and again, I'm trying to end the

O571GAR3                    Garelick - Direct

1    conversation, just to say, hey, I was on the board of

2    directors, you know, I had fiduciary responsibilities, I had

3    restrictions in what I could do.

4         MR. BACH:  Let's go to page 11, please.

5    Q.  And he writes at the top, "That's standard to restrict

6    board members like that."  Do you see that?

7    A.  Yup.

8    Q.  Let's go to your next text.  You write, "Yup."

9    A.  I write, "Yup."

10   Q.  And then you send him another text.  Can we see that?  You

11   wrote, "Took one for the team."  Do you see that?

12   A.  Yes.

13   Q.  What did you mean when you said to Mr. Friedberg, "Took one

14   for the team"?

15   A.  Again, I'm trying to make conversation, but the point of

16   that is, I'm on the board of directors of a public company.  I

17   have a fiduciary responsibility, right, and so I have

18   limitations on myself, and that's what that means.

19        MR. BACH:  Okay.  We can take that down.

20   Q.  Mr. Garelick, while you served as a member of DWAC's board

21   of directors, did you share inside information with any

22   individual who was not on that board?

23   A.  No, I did not.

24   Q.  Did you ever buy DWAC stock for your own account for your

25   own benefit while you believed you were in possession of

1    material nonpublic information?

2    A.  No, I did not.

3    Q.  Did you commit securities fraud?

4    A.  No, I did not.

5    Q.  Did you agree or conspire with anyone else to commit

6    securities fraud?

7    A.  No, absolutely not.

8              MR. BACH:  Thank you, sir.  No more questions.

9              THE COURT:  Okay.  Members of the jury, it's 11:30, or

10   a couple minutes after that.  Thank you for your patience in

11   terms of going a little bit later than usual before taking a

12   break.  We will now take a 15-minute break.  During the break

13   please don't talk about the case amongst yourselves or with

14   anybody else and don't do any research on the case.  Enjoy your

15   break, and see you back here in 15 minutes.

16             THE DEPUTY CLERK:  All rise.

17             (Jury not present)

18             THE COURT:  See you all back here in about ten

19   minutes.

20             (Recess)

21             (Jury not present)

22             THE COURT:  Anything from the government before we

23   bring the jury in?

24             MS. HANFT:  No, your Honor.

25             THE COURT:  What about from the defense?

1    MR. BACH:  No, your Honor.

2    THE COURT:  All right.  Let's bring in the jury.

3    (Jury present)

4    THE COURT:  Be seated.

5    All right.  Cross-examination.

6    MS. HANFT:  Thank you, your Honor.

7    CROSS EXAMINATION

8    BY MS. HANFT:

9    Q.  Good afternoon, Mr. Garelick.  I think we've hit the

10   afternoon.  Maybe not quite yet.  Good morning.

11   A.  Hi, Ms. Hanft.  Nice to meet you.

12   Q.  Mr. Garelick, I just want to make sure I have your

13   testimony straight.  We can agree that as a board member of

14   DWAC, you knew you had a fiduciary duty to the company; isn't

15   that right?

16   A.  Yes.

17   Q.  And it's a big deal to be on the board of a public company?

18   A.  Yes.

19   Q.  And in fact, you testified this was the first time you were

20   on the board of a public company?

21   A.  That's correct.

22   Q.  And it's your testimony, sir, that by September 23rd, you

23   thought you were in possession of material nonpublic

24   information.

25   A.  Not exactly.  That was where things—that afternoon things

1  started to pick up and, you know, the materiality did evolve

2  from there.

3  Q.  Right.  The materiality evolved from there.  You said

4  something along the lines of, "At least as a prudential matter,

5  sure, yes, Mr. Bach, I think by that time I was—I'll say I was

6  in possession of material nonpublic information"; isn't that

7  right?

8          MR. BACH:  Objection.  Misstates the testimony.

9          THE COURT:  Overruled.

10 A.  I don't recall that, and if I said that, that would not be

11 my perception, no.

12 Q.  Let's use your terms then, sir.

13         Steady drumbeat.  Did you say there was a steady

14 drumbeat starting on September 23rd of important information?

15 A.  I think what I said was there was a start of a drumbeat

16 that began that afternoon, yes.

17 Q.  Right.  Specifically the afternoon of September 23rd.

18 A.  Yes, that was the start of what I think I classified as a

19 drumbeat, yes.

20 Q.  And your purchases were before the afternoon, right?

21 A.  Yes, I—

22 Q.  But it's the afternoon—I'm just going to ask you to answer

23 my questions, sir.

24 A.  Sure.

25 Q.  It's in the afternoon when that drumbeat began.

O571GAR3                    Garelick - Cross

1    A.  That, yes, the start of that drumbeat caught my attention

2    that afternoon.

3            MS. HANFT:  Mr. Bianco, could we put up Government

4    Exhibit 511, please.

5    Q.  Mr. Garelick, you remember Government Exhibit 511——is that

6    right——the board WhatsApp chat we've seen a lot of during this

7    trial?

8    A.  Yes, I——I believe so.

9    Q.  You participated in this chat; isn't that right?

10   A.  I believe I did, yes.

11   Q.  You responded when questions were asked?

12   A.  Yes.

13   Q.  On September 22nd——

14           MS. HANFT:  Could we go to page 6, please, Mr. Bianco.

15           Could we go back one page, please.

16   Q.  Mr. Garelick, on September 22nd, did you get a message that

17   DWAC was asking board members how they voted about entering

18   into an exclusive letter of intent?

19   A.  Yes, I did.

20   Q.  And sir, is September 22nd before or after September 23rd?

21   A.  It would be one day before.

22   Q.  And again, your purchases, your last purchase that you

23   spoke about this morning, that was September 23rd; isn't that

24   right?

25   A.  That's correct.

O571GAR3                      Garelick - Cross

1    Q.  Could you read the last line of this No. 3, sir.

2    A.  Sure.  It says, "If we were to get an ultimatum in the next

3    meeting to go exclusive for 30 days, with extension at our

4    election for 45 additional days, how would the board vote about

5    entering into that LOI?"

6          MS. HANFT:  And Mr. Bianco, could you advance, please,

7    to the next message.

8    Q.  Rodrigo Veloso, he votes.  Could you read the last line,

9    sir.

10   A.  Sure.  Mr. — let's see.  Mr. Veloso says—the last

11   paragraph there, you said?

12         Sure.  He says, "If we can do the TMG agreement with

13   only 30 days initially, I think we'll have to do it.  If it's

14   not good, we can pivot.  My vote is to advance with TMG if

15   possible."

16   Q.  Let's go to the next message.

17         How does Eric Swider vote, sir?

18   A.  He says, "With the resources and expenses on TMG and the

19   potential of the deal, I think you have to go exclusivity for

20   30 with option."

21   Q.  Keep going, please.

22         How does Justin Shaner vote?

23   A.  Mr. Shaner says—let's see here—"My vote is to advance

24   with TMG under these conditions of 30 days with option to

25   extend 45 additional days."

1  Q.  Thank you.  That's Justin Shaner.  How do you vote,

2  Mr. Garelick?

3  A.  I think I vote in favor of this aspiration.  Let's see.

4  Q.  What were your words on September 22nd?

5  A.  Yes.  I say, "I'm enthusiastically in favor to advance with

6  TMG under the stated terms."

7  Q.  So you voted in favor of entering into a mutually exclusive

8  letter of intent with Trump Media.

9  A.  To try to do so, yes.  There was, you know, some

10  competitive issues that were addressed earlier in the text

11  exchange, competing with other SPACs as well.

12         MS. HANFT:  Thank you.  We can take that down.

13  Q.  Mr. Garelick, yesterday and today, you've used the word

14  "aspirational"; isn't that right?

15  A.  I believe so, yes.

16  Q.  And in business everything is to some extent aspirational

17  until a deal is fully done; isn't that right?

18  A.  Yeah.  I mean, I think there's varying degrees of that, but

19  I understand your question, yes.

20  Q.  And so I'm going to take you back so we can start where you

21  started yesterday to the summer of 2021, when you were helping

22  Mr. Shvartsman reach out to potential investors for DWAC,

23  right?  You were trying to form a syndicate?

24  A.  Correct.

25  Q.  When you reached out to those investors about the SPAC, you

1  called this the Trump SPAC; isn't that right?

2  A.  Yes, I did.

3  Q.  You created a WhatsApp group called the Trump Media Group

4  SPAC?

5  A.  I believe I did, yes.

6        MS. HANFT:  Let's take a look at Government

7  Exhibit 743.  And if we could turn to page 2, Mr. Bianco.

8  Q.  In fact, Mr. Garelick, on June 30th, you explained to

9  potential investors that the SPAC had an exclusive with the

10  soon-to-launch Trump Media Group; isn't that right?

11  A.  That is correct in this instance, yes.

12        (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    MS. HANFT:  Let's turn to page 5 of this document.

2  Let's go to Government Exhibit 742, page 5 of that document.  I

3  apologize.

4  Q.  Let's look at this last bubble here.  What did you say,

5  Mr. Garelick, to Anton Postolnikov when you were speaking to

6  him about the potential investment?

7  A.  Let's see here.  I think that's not something I wrote.  I

8  think that's something Mr. Postolnikov wrote.

9  Q.  What did he write, sir?

10 A.  He said, let's just hope the merger is with you know who,

11 otherwise won't get much traction.

12 Q.  Who is "you know who," Mr. Garelick?

13 A.  I think he's probably referring to, you know, to Trump, to

14 Trump Media Group.

15 Q.  Right.

16 A.  I can't say for sure, but I could surmise that.

17     MS. HANFT:  Let's turn to page 1 of this document.

18 One page beyond.

19 Q.  What did you first ask Mr. Postolnikov?

20 A.  I asked him -- let's see here.  June 28th, 2021.  I said,

21 hey Anton, it's Bruce.  Are you all set on DWAC (Trump SPAC)?

22 What did you decide to do?

23 Q.  On June 28th, DWAC was the Trump SPAC; isn't that right,

24 sir?

25 A.  That was the nickname we were using, yes.  It wasn't the

1    Trump SPAC, but we used that nickname and I used that nickname.

2    Q.  Did you use the name Trump SPAC in multiple conversations

3    with potential investors?

4    A.  I did use that nickname with multiple of the prospective

5    syndicate founders class investors, yes.

6    Q.  You didn't call it the aspirational possibility SPAC, did

7    you?

8    A.  I think there's some communications where I kind of spell

9    that out in sum and substance, as well.  I called it the Trump

10   SPAC, I named it the Trump SPAC in that early period, yes.

11            MS. HANFT:  Let's look at Government Exhibit 406.

12   Q.  We looked at this with your attorney yesterday; isn't that

13   right?

14   A.  Yes, I recall.

15   Q.  And you testified that you got together with Anton

16   Postolnikov that night, and then you emailed him because you

17   had spoken about the Trump SPAC; isn't that right?

18   A.  We had spoken about the SPAC opportunity the night before

19   when I first met him.  Yes --

20            MS. HANFT:  Sir, I'm going to ask that you answer my

21   question.  You had your chance to testify this morning.

22            MR. BACH:  I object to the colloquy.

23            THE COURT:  The objection is overruled.

24            THE WITNESS:  Ms. Hanft, if you ask me simple yes/no

25   questions, I'm happy to answer them yes/no.  Otherwise, I'll

1   provide a brief elaboration if that's okay.

2              THE COURT:  No, you'll follow my instructions.  My

3   instructions will be to answer the questions if you can.  If

4   there's an objection to you volunteering, then I very well may

5   sustain the objection, but we'll take it as it goes.  The two

6   of you don't work out the terms of it, I do.

7              MS. HANFT:  Thank you, your Honor.

8              THE WITNESS:  Understood, your Honor.  Thank you.

9   Q.  What's the subject line of this email?

10  A.  It says, Anton, followup on Trump SPAC opportunity.

11  Q.  Those are your words; right, sir?

12  A.  Yes, they are.

13             MS. HANFT:  I'm going to ask we turn to Government

14  Exhibit 747.

15  Q.  Just skipping ahead in time, Mr. Garelick, and then we can

16  go back.  We talked about this document this morning; isn't

17  that right?

18  A.  Yes, I recall that we did.

19  Q.  This is September 30th; right?

20  A.  That's correct.

21  Q.  And this is after DWAC and Trump Media had entered into a

22  letter of intent; right?

23  A.  The record will show that is the case, yes, at this point.

24  Q.  Right.  And after the messages we just looked at earlier

25  today in which you voted to advance with Trump Media Group;

O57Cgar4                    Garelick - Cross

1   isn't that right?

2   A.   That's correct.

3   Q.   And this was also after executives from DWAC had visited

4   Trump Media headquarters; isn't that right?

5   A.   I believe that's correct.  I think on the 30th of

6   September, they did visit the headquarters, yes.

7   Q.   And you wrote to Michael Shvartsman, DWAC warrants started

8   trading today, traded just below 50 cents on volume of --

9        MS. HANFT:  Can we zoom back out, Mr. Bianco.  Let's

10  look at the second message, please.

11  Q.   Can you read that, sir.

12  A.   Sure.  That means there was only, roughly speaking, $60,000

13  of volume today.  Volume should pick up as the DWACU, the unit

14  holders disaggregate their units.

15       MS. HANFT:  We can scroll out, Mr. Bianco.

16  Q.   And so, Mr. Garelick, you were telling Mr. Shvartsman that

17  he should begin purchasing DWAC warrants?

18  A.   I would not agree with that characterization, no.

19  Q.   Mr. Garelick, on September 30th early in the day, had DWAC

20  executives visited TMG?

21  A.   Yes.

22  Q.   And then a few hours later, you texted your boss to let him

23  know that the warrants were trading; isn't that right?

24  A.   That is correct.

25  Q.   Mr. Garelick, you're a sophisticated investor; right?

1   A.  More or less, I think, yes.

2   Q.  You graduated from some very prestigious schools; isn't

3   that the case?

4   A.  Sure.

5   Q.  You went to Vanderbilt University for college?

6   A.  Yes, I did.

7   Q.  You went to Wharton Business School?

8   A.  That's correct.

9   Q.  You received a master's degree in business there?

10  A.  Yes, ma'am, that's correct.

11  Q.  You have your CFA certification?

12  A.  Yes.  It's on hold currently, but I had a CFA --

13  Q.  You had it for many years; right?

14  A.  Yes.

15  Q.  You worked at Adage Capital?

16  A.  That's correct.

17  Q.  Adage Capital, that's a renowned hedge fund; isn't that

18  right?

19  A.  I think that's a fair characterization, yes.

20  Q.  Manages billions of dollars?

21  A.  Yes.

22          MS. HANFT:  We could take the exhibit down,

23  Mr. Bianco.

24  Q.  At Adage, you were a portfolio manager; isn't that right?

25  A.  That's correct.

O57Cgar4                    Garelick - Cross

1   Q.  You worked there for about seven years?

2   A.  Roughly speaking, I think that's correct, yeah.

3   Q.  After Adage, you went out and started your very own hedge

4   fund; isn't that right?

5   A.  Yes, I did.

6   Q.  Garelick Capital Partners?

7   A.  Yes, ma'am.

8   Q.  That was another technology hedge fund?

9   A.  That's correct.

10  Q.  You were the managing partner?

11  A.  Yes, I was.

12  Q.  You were the boss?

13  A.  Yes.

14  Q.  You had that fund for seven years?

15  A.  Roughly speaking, I think it was about seven years, maybe a

16  little less.

17  Q.  You're not an administrative assistant, are you, sir?

18  A.  I would not classify myself as an administrative assistant

19  in my primary job responsibilities, no.

20  Q.  Is it fair to say you know a lot about the financial

21  industry?

22  A.  A fair amount, not everything, but a decent amount.

23  Q.  You know a lot about the industry in 2021?

24  A.  To some degree, yes.

25  Q.  Now, we can agree, right, that you signed an NDA with DWAC

1  in the summer of 2021?

2  A.  That's correct.

3  Q.  And you signed an NDA with Benessere, as well, another of

4  Patrick Orlando's SPACs?

5  A.  Yes.  I believe it was all one big document that he covered

6  several of his entities, yes.

7  Q.  And you said you saw many NDAs over the course of your

8  career; right?

9  A.  Yes.

10  Q.  And an NDA is signed so that information doesn't leak;

11  isn't that right?

12  A.  Yes.  It's a competitive sensitivity generally.  A company

13  doesn't want one's competitors to get that information and know

14  what their plans are.

15  Q.  And you were ultimately put on DWAC's board of directors.

16  We just talked about that?

17  A.  Yes, that's correct.

18  Q.  You became an insider of DWAC; isn't that right?

19  A.  Yes.

20      MS. HANFT:  Let's look at Government Exhibit 114-A.

21  Q.  This is a document that had to be filed because you were a

22  director of DWAC; isn't that right?

23  A.  I think that's correct, yes.

24  Q.  And it was filed in September of 2021?

25  A.  Yes.

1  Q.  By September 3rd, I believe your testimony was -- or

2  September 2nd, you were director of DWAC?

3  A.  That's correct.  That was the official date, I believe,

4  yup.

5  Q.  Again, just to make sure we have your testimony straight,

6  on September 3rd, you bought units of DWAC; isn't that right?

7  A.  That is correct, yes.

8  Q.  And you bought those units on the open market?

9  A.  Yes, ma'am, I did.

10  Q.  You didn't buy them as a part of DWAC's IPO?

11  A.  No, I did not.

12  Q.  And you bought those shares after you had spoken to Patrick

13  Orlando more than once; isn't that right?

14  A.  So you're asking me on September 3rd when I bought stock,

15  had I spoken to Mr. Orlando previously?

16  Q.  Yes.

17  A.  That's correct, yes.

18  Q.  You had been in a meeting months before?

19  A.  I had been in a founders class meeting via a Skype

20  connection.

21  Q.  And on that Skype connection, you learned that Patrick

22  Orlando had close connections with Trump Media; isn't that

23  right?

24  A.  That he had close connections with Trump himself, yes.

25  Q.  And you recalled, I believe yesterday, something about a

O57Cgar4                    Garelick - Cross

1    contract with Trump Media being shown at that meeting; isn't

2    that right?

3    A.  I was told that after the meeting, yes.

4    Q.  By Michael Shvartsman?

5    A.  That's correct.

6    Q.  And on September 2nd, you spoke to Patrick Orlando; isn't

7    that right?

8    A.  I believe that's correct, yes.

9    Q.  Then you texted your boss, Michael Shvartsman?

10   A.  I'll take your word for that, sure.

11   Q.  You don't have to take my word, sir.

12          MS. HANFT:  Let's look at Government Exhibit 728,

13   page 2.  If we could look at the green bubble at the bottom,

14   please.

15   Q.  What did you say, sir?

16   A.  I said, on September 2nd, 2021, 9:18 in the morning, I

17   spoke to Patrick Orlando.  Not urgent, we can catch up later.

18   Q.  Now, September 3rd, a day after this, was the first

19   purchase of DWAC units that we spoke about today; isn't that

20   right?

21   A.  That's correct.  It was the IPO, as well.

22   Q.  On September 10th, you also purchased DWAC units again;

23   right?

24   A.  Yes.

25          MS. HANFT:  Let's put up Government Exhibit 930,

O57Cgar4                    Garelick - Cross

1   Mr. Bianco.

2   Q.  These are the purchases you said you agree with; right?

3   These were your DWAC purchases and sales?

4   A.  Yes, ma'am, I believe this is accurate and correct.

5   Q.  The September 10th is the second row.  How many DWAC units

6   did you buy that day?

7   A.  300.

8   Q.  A few days after that, you were in Miami, weren't you,

9   Mr. Garelick?

10  A.  I think so.  I think I had one trip down to Miami in there

11  somewhere, yes.  The exact dates I can't remember, but that

12  sounds roughly accurate.

13  Q.  When you're in Miami, you meet up with Eric Hannelius?

14  A.  I think he was in Miami at that time period, yes.

15  Q.  Eric Hannelius, he's your buddy; right?

16  A.  No, I wouldn't characterize the relationship that way so

17  much.

18  Q.  Is he your dune buggy partner?

19  A.  When we were in Vegas and we did our little team building,

20  yes, we did refer to -- because the two of us shared a dune

21  buggy, everyone had to pair up.  So that is accurate, yes, we

22  became dune buggy buddies at that point.

23  Q.  You paired up with Eric Hannelius?

24  A.  That is correct, yes.

25          MS. HANFT:  Let's look at Government Exhibit 744, turn

1  to page 15.  Can we zoom in on the bottom bubble, the blue.

2  Q.  Can you read that, sir.

3  A.  Sure.  I said -- let's see.  From Eric to me.  So Eric is

4  saying thanks, my dune buggy partner.  Yes, as I established,

5  from this Vegas trip, we became dune buggy partners or dune

6  buggy buddies.

7  Q.  And so, in September, you saw Eric Hannelius in Miami?

8  A.  Yup.

9  Q.  And you know, sir, that on September 13th, Eric Hannelius

10  bought DWAC units?

11  A.  I was not aware of that at the time, no.

12  Q.  Are you aware of that today?

13  A.  From the case, I am aware of that now, yes.

14  Q.  I'm going to fast forward a few days and talk about

15  September 16th.

16       So September 16th, by then, you're on the DWAC board,

17  the board, you testified, hasn't met yet, but you are

18  officially a director of DWAC.  Can we agree on that?

19  A.  Yes, ma'am, that's correct.

20  Q.  And you got an email from Patrick Orlando that day, didn't

21  you?

22  A.  I believe I did, yes.

23  Q.  And he said there would be a DWAC board meeting?

24  A.  Yes, he was, I think, signaling an upcoming board meeting,

25  correct.

O57Cgar4                    Garelick - Cross

1       MS. HANFT:  Can we put up Government Exhibit 455,

2  Mr. Bianco.

3  Q.  You got this email on September 16th from Patrick Orlando

4  telling you, we will be forwarding -- I'm looking now at the

5  second to last line, the last line with content.  We will be

6  forwarding information about the agenda for your review prior

7  to the meeting as well as the Zoom link.

8  A.  Yes, I see that.  That's accurate.

9  Q.  On Tuesday, September 21st -- I'm sorry.

10      MS. HANFT:  We could scroll out.

11      Could we put up Government Exhibit 456.

12 Q.  You received Patrick Orlando's email and you told him you

13 could attend the board meeting the next day; is that correct?

14 A.  That's correct, yes.

15 Q.  And that is September 20th?

16 A.  Correct.

17 Q.  Let's talk more about what you do on September 20th.

18      You reach out to Michael Shvartsman; isn't that right?

19 A.  Probably.  I speak to him often.  I can't remember the

20 exact time and date, but --

21 Q.  You told him you had a board meeting the next day?

22 A.  I think this is one of the board meetings I did tell him

23 during business hours, yes.

24      MS. HANFT:  Could we put up Government Exhibit 746.

25 If we could zoom in on the message in the front.

1   Q.  You said, FYI, I have a DWAC board of directors meeting

2   tomorrow at 12:30.  Then you told Michael Shvartsman, I

3   recommend starting to buy more DWACU stock; isn't that right,

4   sir?

5   A.  That is correct, yes.

6   Q.  And you said, "I recommend" because you were telling him to

7   buy stock?

8   A.  I was reminding him, but I used the word "recommend."  So I

9   understand your point there.

10  Q.  You got something called a target analysis memorandum that

11  night; isn't that right?

12  A.  Later that night, the board sent a board packet, which is

13  what I think you're referring to.

14  Q.  Right.  You called it a board packet.  That's fine.  I'll

15  use that terminology.

16          You described it as information that was thin about

17  TMG, I believe.

18          MS. HANFT:  Could we pull up Government Exhibit 457.

19  Q.  This is the email with attachment conveying that the board

20  packet we were talking about; isn't that right?

21  A.  That's correct.

22  Q.  And you received this on September 20th at 10:16 p.m.?

23  A.  That is correct.

24  Q.  Please receive the information on the companies we will be

25  reviewing at tomorrow's board of directors meeting.  Attached

1  is also a side-by-side analysis performed on six selected

2  companies.

3         So when you received this email, you understood,

4  didn't you, that the six selected companies were potential

5  targets for DWAC to merge with, didn't you?

6  A.  Sure.  These were six potentials, yes.

7         MS. HANFT:  Let's look at Government Exhibit 458.

8  457.

9         Apologies, Mr. Bianco.  If you could put up 458 again

10 and please go to page 17.

11 Q.  What is this document, Mr. Garelick?

12 A.  This is, I think, the document we reviewed earlier today.

13 This is a part of that board packet that was sent out that

14 night.  This particular page here is the section on the Trump

15 Media Group.

16 Q.  Can we agree, sir, you knew at this point that Trump Media

17 Group was a potential target of DWAC?

18 A.  Yes, I think that's fair.

19 Q.  There's information at the top, Project USA 47.  From your

20 time in business, have you had occasion to learn that, for

21 potential deals, there are often code names?

22 A.  Yeah, I've seen that before.

23 Q.  And there are code names because you don't want the

24 potential deal to leak out; isn't that right?

25 A.  Sure.

O57Cgar4                    Garelick - Cross

1   Q.  And Project USA 47 was the code name for the potential

2   merger with Trump Media; isn't that right?

3   A.  That's correct.

4           MS. HANFT:  Let's go to Government Exhibit 930.

5   Q.  The next morning, you bought DWAC units again; isn't that

6   right?

7   A.  That is correct, yes.

8   Q.  Now, later that day you have what you describe as the first

9   DWAC board meeting?

10  A.  Correct.

11  Q.  It's the first in-person board meeting; isn't that right?

12  A.  Later on the 21st of September, yes.

13  Q.  You're in that meeting?

14  A.  Yes, I was.

15  Q.  Patrick Orlando was there?

16  A.  Yes, ma'am.

17  Q.  Luis Braganza was there?

18  A.  I believe he was, yeah.

19  Q.  Alex Monje is there?

20  A.  Yup.

21  Q.  Rodrigo Veloso was there?

22  A.  I think he was, as well, yes.

23  Q.  Eric Swider is there?

24  A.  Yes.

25  Q.  Justin Shaner is there?

O57Cgar4                    Garelick - Cross

1    A.  Yes.

2    Q.  Lee Jacobson is there?

3    A.  Yes.

4    Q.  At that meeting, you talked about DWAC's potential pipeline

5    of targets, right, you talked about these companies?

6    A.  Yes.

7         MS. HANFT:  Can we put up Government Exhibit 118,

8    Mr. Bianco.  If we could highlight "under new business."

9    Q.  At this meeting, the board discussed six potential targets.

10   We can agree on that?

11   A.  Let's see.  Manage potential pipeline of targets, one, two,

12   three, four, five, six.  That looks correct, yup.

13   Q.  And the board's consensus was to execute LOIs with some of

14   those targets; right?

15   A.  To try to, yes.

16   Q.  It was decided that DWAC would execute a letter of intent

17   with TMG, with Trump Media?

18   A.  I'm sorry.  It was decided?

19   Q.  At that board meeting, it was decided that DWAC would

20   pursue a letter of intent with Trump Media?

21   A.  I think that's accurate from this board meeting.

22   Q.  Do you see on the page, it says, consensus of the board is

23   to follow up/negotiate and execute LOIs with TMG, Global

24   Oculus, Bitrix, and WAG?

25   A.  Yes, I do.

1  Q.  In fact, TMG was viewed as in the high growth group; right?

2  A.  That's accurate, yes.  High growth group potential, but

3  yes.

4  Q.  You thought it was a promising target, didn't you?

5  A.  I did.

6  Q.  And after that meeting, you received an update from

7  management that they were moving ahead talking to some of the

8  targets discussed at the meeting?

9  A.  Correct.

10  Q.  That included Trump Media?

11  A.  Yes, I believe it did.

12       MS. HANFT:  Let's put up Government Exhibit 511 again.

13  If we could advance to page 4.

14  Q.  So we looked at this again earlier, but this is a message

15  from Patrick Orlando.  Am I right that after the board meeting,

16  DWAC was rolling with the marching orders from the board

17  meeting; right?

18  A.  That's correct, yes.

19       MS. HANFT:  If we could scroll out.  We looked at the

20  next message, turn the page, please.  Let's go to the bottom

21  bubble.

22  Q.  We looked at this just this morning.  TMG, there was then

23  the ultimatum, right, the question of how you would vote to go

24  exclusive for 30 days with an extension at your election for 45

25  additional days to enter into the LOI.  Right, you received

1  this message?

2  A.  Yes, I think we covered this.  I did.

3  Q.  Earlier today, you were talking about in October, isn't

4  that right, when there was a question of whether to extend the

5  exclusivity period?

6  A.  That's correct.

7  Q.  I believe your testimony is at that point, you knew you had

8  material information?

9  A.  I think what -- if I can elaborate there.  I think what

10  you're referring to is on October 15th, 2021, I think it was

11  Mr. Maj, Alex Maj said they were getting close to a definitive

12  agreement and they thought they might have that in the days

13  ahead, but just to be sure and safe, they wanted to extend an

14  exclusivity period.

15  Q.  Sir, I believe it was your testimony that at that point,

16  you believed you were in possession of material nonpublic

17  information?

18  A.  If not then, it was very close.  I mean, for sure on

19  October 17th when a draft is disseminated.  But yeah, to be

20  fair, like, that's pretty material on the 15th.

21  Q.  And going mutually exclusive with a company is a step along

22  the way to a merger; isn't that right?

23  A.  Sure.  You get an LOI, then you get an LOI with

24  exclusivity, that's fair.

25  Q.  And so, this is September 22nd.  We already established --

MS. HANFT:  Again, if we can put up Government Exhibit 930.

Q.  -- the next day on the 23rd, you bought more DWAC units; isn't that right?

A.  That's correct.

Q.  By the way, that day, you talked to Michael Shvartsman on the phone, didn't you?

A.  Yes, I believe I did.

Q.  You talked to him a number of times.

A.  Yes.  I think we covered what September 23rd looked like business calendar wise and some of the projects I had going on with him.

Q.  You spoke about those projects.  It was a busy, busy day you said; right?

A.  I believe I did, yes.

Q.  You had enough time that day, though, to buy more DWAC units; isn't that right?

A.  Sure.  I eat lunch every day.  I grab my lunch and that's when I often look at my stocks.

MS. HANFT:  Let's go back to Government Exhibit 511.

Q.  On September 29th, so moving forward in time, you were told that due diligence was kicking into high gear; isn't that right?

A.  I think that's accurate, yes.

MS. HANFT:  If we could look at Government Exhibit

1   511, page 11, the second bubble on the page.

2   Q.  You received a message from Patrick Orlando.  We have a few

3   updates and due diligence is kicking into high gear.  TMG wants

4   to close on October 14th.

5   A.  Yup.

6   Q.  And you were also given access to the data room that day?

7   A.  I think the data room access began on that day, if not,

8   within a day or so of that date of September 29th, yes.

9   Q.  And you had some more phone calls with Michael Shvartsman

10  that day?

11  A.  I believe I did, yes.

12          MS. HANFT:  If we could advance by a page.

13  Q.  Now, the next day, DWAC goes to TMG headquarters; right?

14  A.  If you could just blow that up for me there, otherwise I

15  need new reading glasses.

16  Q.  Today, we are at the TMG headquarters in Atlanta and would

17  like to see if anyone can join by Zoom.  Here is the agenda.

18  A.  Correct.  Yup.

19  Q.  There's a presentation that day?

20  A.  Yup, I believe there was.

21  Q.  This is September 30th; right?

22  A.  Correct.

23  Q.  And then you talked to Michael Shvartsman again that

24  evening?

25  A.  I think I did, yes.

1   Q.  And then that's when you send him some messages; right?

2   A.  Perhaps.

3            MS. HANFT:  We looked at those messages before.  Let's

4   put Government Exhibit 747 up again.  We looked at the first

5   two messages, but if we could turn to the third.

6   Q.  You told him Ben Reed was his contact to trade?

7   A.  That's correct.

8   Q.  You said that was just an administrative task; isn't that

9   right?

10  A.  Correct.  He specifically asked me to flag for him when the

11  warrants started to trade.

12  Q.  Did we see where he asked you to tell him when the warrants

13  started to trade?

14  A.  No, he verbally asked me that very early on in the process.

15  Q.  And he needed you to be the one to let him know when the

16  publicly available information about warrants trading came out?

17  A.  Supposedly, yes, he did.  He asked me to do that.

18  Q.  That day, you called Fidelity to segregate your own units;

19  right?

20  A.  That's correct.

21  Q.  That day, you said you were very busy, as well.  We looked

22  at your calendar, chock full of events; isn't that right?

23  A.  Yes.

24  Q.  But you spoke to Fidelity a number of times; isn't that

25  right?

1    A.  Yeah.  I mean, that day, I might have spoken to him once,

2    but as we saw in the case, there was several followups with

3    them in subsequent days, yes.

4    Q.  It was a busy time, your company was considering a number

5    of deals, but you made the time to call Fidelity to desegregate

6    your units?

7    A.  Sure, yes.

8    Q.  And on October 3rd, now a few days later, you got a

9    question from Eric Hannelius; isn't that right?

10   A.  Yes.

11          MS. HANFT:  Let's look at Government Exhibit 465.  If

12   we could turn to the second page, please, Mr. Bianco.

13   Q.  You got an email from Eric Hannelius asking you -- well,

14   first I'll read the top.

15          Hi Bruce, want to follow your lead here.  See my

16   agreement attached.  I just did 75K in founders class shares.

17   I've been buying some DWACU since seeing you in Miami via my

18   brokerage account.  Should I keep buying?  What's your

19   thoughts?  Again, want to follow your lead here.  Any updating

20   on timing and next steps from Patrick Orlando?

21          And so, Eric Hannelius is asking you about timing and

22   next steps from Patrick Orlando because you had spoken about

23   DWAC in Miami; isn't that right?

24   A.  Perhaps, but if we had, it was just about logistical things

25   with the structures.  There's no way I would have crossed this

1  line in terms of what he's asking me in this email.

2  Q.  Just logistics?

3  A.  Yeah, just term structures, founders class and such, yeah.

4  Q.  Eric Hannelius needed you to discuss, the cofounder with

5  Michael Shvartsman of Rocket One, he needed your assistance in

6  talking about logistics?

7  A.  Well, when you say logistics, I don't know if he'd ever

8  invested in a SPAC, so he's trying to continually understand

9  his founders share class and units and warrants.  This question

10  on the 3rd that he asked me, I mean, this clearly crosses a

11  line.

12  Q.  So the question you thought clearly crossed the line

13  because he was asking for timing and status updates, next

14  steps; isn't that right?

15  A.  Everything about this email is entirely inappropriate that

16  he's asking me.

17        MS. HANFT:  If we could scroll out and zoom up.

18  Q.  You asked him for a call; right?

19  A.  Yup.

20  Q.  And you spoke with him the next day?

21  A.  That's correct.

22  Q.  The next day you spoke with him for 28 minutes.  Sir, it

23  took you 28 minutes to tell him that the email he had sent was

24  inappropriate?

25  A.  Yes.  Well, yes and no, Ms. Hanft.  If you recall, it was

1  covered earlier, on that day we had a major call coming up at

2  1:00 with the potential acquisition we wanted to do or a

3  business partnership that both he and Michael were on or were

4  going to be on.  There was quite a bit of collaboration we had

5  to do before the call.  There was a number of things I know we

6  discussed that day.

7  Q.  A lot of business deals going on at this time; right?

8  A.  Yeah, there was -- it was a busy time.

9  Q.  DWAC was a business deal for Rocket One; isn't that right?

10 A.  DWAC was an investment for Rocket One, it wasn't so much a

11 business deal.

12 Q.  But you spoke for 28 minutes that day and you spoke about

13 other business deals, but you didn't speak about DWAC, except

14 to tell Mr. Hannelius that you weren't going to tell him any

15 information because you were on the board of DWAC?

16 A.  Yeah, which is a very short and simple message to him, yes.

17 Q.  That's your sworn testimony, Mr. Garelick?

18 A.  Yes.

19        MS. HANFT:  Let's go to Government Exhibit 511, back

20 to this document.  We're going to turn to October 15th.  We

21 looked at this earlier, but if we could blow up, on page 21,

22 under "exclusivity extension."

23 Q.  There's a call to action.  Please respond in this chat

24 confirming your approval to extend our mutual exclusivity with

25 TMG for an additional 45 days.

1  A.  Yes, I see that.

2  Q.  And DWAC in fact extended the mutual exclusivity with TMG;

3  is that right?

4  A.  That is my understanding, yes.  After October 15th, they

5  did do just that.

6  Q.  And you knew that?

7  A.  Yes.  I mean, I don't think we were provided with a

8  contract that it extended, but I had the sense that that was

9  what was going on here.  I also got the sense that DWAC was

10  getting closer to a deal, a possible deal.

11  Q.  And you voted in favor of this extension; isn't that right?

12  A.  Yes, I did.

13  Q.  After that, you spoke to Michael Shvartsman?

14  A.  Yes, I believe I did.

15  Q.  Also on October 15th, you got a copy of the definitive

16  merger agreement?

17  A.  No, that's not correct, actually.  I think it was October

18  17th that I did.

19  Q.  October 17th, though, you got that copy; isn't that right?

20  A.  Yes.  So on the 17th, I get a draft of the definitive

21  merger agreement.

22  Q.  Let's talk about October 19th or, as your attorney said,

23  let's talk about Vegas.

24       On October 19th, you went on a trip; isn't that right,

25  sir?

O57Cgar4                    Garelick - Cross

1    A.   That's correct.

2    Q.   You went to Vegas?

3    A.   Yes, ma'am.

4    Q.   And you met up with the Rocket One folks?

5    A.   Yes, I did.

6    Q.   You met up with Michael Shvartsman?

7    A.   Yes, he was there.

8    Q.   Eric Hannelius?

9    A.   Yes.

10   Q.   And there were others there from Rocket One; isn't that

11   right?

12   A.   That is correct.

13   Q.   And we've established that you went dune buggying while you

14   were there?

15   A.   Yes, I think we've established that.

16   Q.   And it was in Las Vegas where you attended another DWAC

17   board meeting; isn't that right?

18   A.   Yes, at least one, maybe two.

19   Q.   Right.  The meeting that you attended or those meetings

20   were a big deal; isn't that right?

21   A.   Yes, I'd agree with that.

22   Q.   The merger agreement was approved?

23   A.   The merger agreement was approved, yes, on the -- it was

24   the 19th or the 20th, yes.

25   Q.   That was a huge deal; right?

1   A.  Very big deal, yes.

2   Q.  You thought the potential was enormous?

3   A.  I did think there was some substantial potential here,

4   yeah.

5   Q.  You didn't think it was substantial potential, you thought

6   it was unlike anything you'd ever seen before?

7   A.  For a startup internet company, that is accurate, yes.

8   Q.  You called it something special?

9   A.  Yes, I did.

10  Q.  That night, you met up with some of the other guys from the

11  trip; isn't that right?

12  A.  I believe I did briefly, yes.

13  Q.  You met up with Michael Shvartsman?

14  A.  Yup.

15  Q.  You met up with Phil Margolin?

16  A.  Yes.

17  Q.  We talked about Phil Margolin this morning.  Can you just

18  remind the jury who Phil Margolin was?

19  A.  He's an analyst that was working for Rocket One Capital and

20  he sort of became more of a salesperson.

21  Q.  Do you remember when he started working at Rocket One?

22  A.  Not exactly, but it was sometime shortly before I think we

23  all went out to Las Vegas for that industry conference.

24  Q.  Not long before then?

25  A.  I think that's accurate, yes.

1    Q.  And was he junior to you?

2    A.  Yes.

3    Q.  You were the chief strategy officer, chief investment

4    officer; isn't that right?

5    A.  Correct.

6    Q.  After that, sir, Eric Hannelius bought 10,000 DWAC

7    warrants; isn't that right?

8            MR. BACH:  Objection.  Lacks foundation.

9    Q.  Sir, do you know if Eric Hannelius bought 10,000 DWAC

10   warrants?

11           MR. BACH:  Objection.  That still doesn't establish

12   any foundation.

13           THE COURT:  Let me see the parties at sidebar.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1    (At the sidebar)

2    THE COURT:  Refresh me, Ms. Hanft.  Is there a factors

3  wall foundation for that question?

4    MS. HANFT:  Your Honor, he said he is aware, from

5  sitting through trial, that all of these participants -- so I'm

6  simply asking if he's become aware of that.

7    THE COURT:  There were those purchases?

8    MS. HANFT:  Yes.

9    MR. BACH:  She's implying he was aware at the time

10  Mr. Hannelius made the purchase.  If her was, have you learned

11  in this case.  She needs to make clear.  There's no reason why

12  she can't make that clear, otherwise it's confusing and

13  prejudicial and creates the wrong impression.

14    THE COURT:  The objection is overruled.

15    (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1    (In open court)

2    Q.  After that night you met up with the other Rocket One

3    people in Vegas and after the DWAC board meeting, did Eric

4    Hannelius purchase 10,000 DWAC warrants?

5        MR. BACH:  Objection.

6        THE COURT:  Overruled.

7    A.  So I've learned subsequent to the fact in this case that,

8    in fact, he did.

9    Q.  Mr. Garelick, you have described yourself as a modeling

10   nerd; isn't that right?

11   A.  I have described myself as that before, yes.

12   Q.  You consider investments very carefully?

13   A.  Generally speaking.

14   Q.  You said you're a public markets guy; right?

15   A.  Primarily, yes.

16   Q.  I believe yesterday when you were asked about founders

17   shares, you said that's not really my thing, I prefer investing

18   in the public markets?

19   A.  Generally speaking, yes.

20   Q.  And you know a lot about the public markets?

21   A.  I think so, yeah, not everything, but a good amount, yes.

22   Q.  And you've come to learn a great deal about SPACs; isn't

23   that right?

24   A.  I certainly learned a lot about SPACs in this process.  It

25   wasn't a prior experience I had.

O57Cgar4                    Garelick - Cross

1    Q.  Well, when we were talking about the summer of 2021, I

2    believe you testified that you knew enough about SPACs to know

3    that they could not select their merger targets before they

4    IPO'd; isn't that right?

5    A.  That's correct.

6    Q.  And many, many SPACs don't successfully complete a merger;

7    isn't that right, Mr. Garelick?

8    A.  Yeah, there's many that never do, that's correct.

9    Q.  And even when they do, it takes a very long time?

10   A.  It can, yes.

11   Q.  It's very unusual for a SPAC to complete a merger in a few

12   weeks; isn't that right?

13   A.  When you say a few weeks, what's the start and finish

14   vantage point you're referring to?  I'm sorry.

15   Q.  Is it unusual for a SPAC to complete a merger in two

16   months?

17   A.  From the start of an IPO?

18   Q.  Yes.

19   A.  That, I think, would be on the faster side of things, yes,

20   very much so on the faster side of things.

21   Q.  It takes usually much longer than it took for DWAC and TMG

22   to announce their merger; right?

23   A.  Not in all cases, but typically, yes.

24   Q.  It was unusually fast, can we agree on that?

25   A.  Sure.

1   Q.  And the warrants that you talked about, mostly yesterday,

2   that you and Michael Shvartsman decided to buy for Rocket One,

3   it's risky to buy those warrants; right?

4            MR. BACH:  Objection to the form of the question.

5            THE COURT:  Sustained to the form.

6   Q.  Is it risky to purchase warrants in a SPAC?

7   A.  It depends.  It depends on what the variables are of the

8   warrants, the strike price, the current stock price, the

9   duration that you can exercise them within.

10  Q.  The warrants at issue here, those couldn't be redeemed if

11  the merger didn't happen; isn't that right?

12  A.  If the merger didn't happen, that's correct.  That would

13  assume that you would hold the warrants for -- say it was a

14  two-year period they had to find a target and they didn't find

15  a target and you didn't trade the warrants and you didn't

16  exercise them in that two-year window, then they would just

17  expire and be worthless, yes.

18           MS. HANFT:  Let's look Defendant's Exhibit 195, if we

19  could go to page 37.  If we could highlight, Mr. Bianco,

20  starting with, "there will be no redemption rights."  It's

21  three lines up from the bottom of the first paragraph.  I'm

22  sorry.  The first paragraph of the second chunk of text here.

23  Just those three lines.

24  Q.  This says, there will be no redemption rights or

25  liquidating distributions with respect to our warrants or

 1    rights, which will expire worthless if we fail to complete our

 2    initial business combination within the 18-month time period.

 3              So you couldn't get your money back if the merger

 4    didn't complete; isn't that right?

 5    A.  That's correct, yes.

 6    Q.  Unlike purchasing the shares?

 7    A.  That's correct.

 8    Q.  And this strategy that Michael Shvartsman asked you about

 9    that you two discussed about purchasing warrants, you didn't

10    apply it to other SPACs besides DWAC; isn't that right?

11    A.  That's correct, but there was no prior experience really

12    with SPACs as far as I knew Mr. Shvartsman had and that I had.

13    This warrant analysis was kind of -- it was new and it was very

14    much focused on DWAC.

15              THE COURT:  Mr. Garelick, let me ask you just to

16    respond to the question that you're asked.

17              THE WITNESS:  Sorry.  Sure.

18    Q.  This was the only one, this was the only SPAC; isn't that

19    right?

20    A.  Please just rephrase the question to make it clear.  The

21    only --

22    Q.  The only SPAC that Rocket One invested in?

23    A.  As far as I know, yes.

24    Q.  The only SPAC that Bruce Garelick invested in?

25    A.  Yes, I believe that is -- that is accurate.

1  Q.  This one was special?

2  A.  Sure.  Yes.

3  Q.  You described it as special at a board meeting, didn't you?

4  A.  I did.  I think I was -- yes, I did.

5  Q.  And you do research on potential investments, Mr. Garelick?

6  A.  Yes.

7  Q.  You study the market?

8  A.  Yes.

9  Q.  You take careful notes typically; isn't that right?

10  A.  In some cases, in most cases.

11  Q.  Sir, where are the notes about the warrant strategy for

12  DWAC?

13  A.  Well, I don't think there were notes.  It was a fairly

14  simple exercise.  It wasn't something elaborate.  It was, let's

15  look at a Black-Scholes model, what does it say for what value

16  is of warrants based on publicly available inputs.  There

17  really wasn't much more to it than that.

18  Q.  Before your testimony today, Mr. Garelick, you received a

19  subpoena from the government, didn't you?

20  A.  Yes.

21  Q.  And it went into effect if you took the stand?

22  A.  I believe that's correct, yes.

23  Q.  And if you took the stand, it required you to produce

24  certain materials?

25  A.  Correct, that's my understanding of it.

1  Q.  And you looked for those materials or you had your

2  attorneys look for them?

3  A.  Yeah, my attorneys -- I just gave my attorneys access to

4  whatever relevant systems they needed to respond to that

5  subpoena.

6  Q.  The subpoena asked for documents that reflected your

7  decision to purchase DWAC securities and to recommend that

8  Michael Shvartsman purchase DWAC securities around this time

9  period; isn't that right?

10  A.  I wouldn't agree with the general characterization there

11  entirely, no.

12  Q.  Did it ask for documents reflecting your decision to

13  purchase DWAC securities in September of 2021?

14  A.  I believe it did, yes.

15           MR. BACH:  Can we have a sidebar, Judge?

16           THE COURT:  Okay.

17           (Continued on next page)

18

19

20

21

22

23

24

25

1    (At the sidebar)

2         MS. SHAPIRO:  Judge, this is incredibly misleading

3    because the subpoena was narrowed to the point where the

4    timeframe at issue covered only a timeframe as to which the

5    government already had Mr. Garelick's devices and email

6    accounts.  We asked him to provide the phone to us and give us

7    access to the email accounts to see, to the extent it covered

8    anything later, whether there was anything responsive as to

9    that timeframe the government already had in its possession

10   whatever existed.

11        And so, I mean, he doesn't know -- he knew the

12   subpoena was out, but we made judgments about how to respond to

13   it.  And they have everything from his phone, they seized his

14   phone as of like June 2022.  It was narrowed to the earlier

15   period.  So this is kind of a misleading type of question.

16        THE COURT:  Was the subpoena narrowed in a way that

17   excluded the time period during which you had the phone?

18        MS. HANFT:  It still called for this time period, but

19   I said to Ms. Shapiro, if we already have it, you don't need to

20   produce it.

21        MS. SHAPIRO:  But that's my point, is that --

22        THE COURT:  Ms. Hanft actually said something very

23   different from what you just said.  She said that if the

24   government already had a document, you did not need to

25   reproduce it, but she doesn't know what documents you have

1    during that time period.

2              MS. SHAPIRO:  I understand, without going into

3    privileged materials, we discussed all of that with

4    Mr. Garelick and satisfied ourselves that if any documents

5    existed, they were already in materials the government had

6    obtained personally to various search warrants.

7              MS. HANFT:  So why can't I say --

8              THE COURT:  Ms. Hanft can ask the questions about

9    whether there were subpoenas for documents during this time

10   period and did you produce any documents showing an analysis,

11   and that's because there were no documents showing an analysis.

12   I assume that's where you're going Ms. Hanft?

13             MS. HANFT:  Yes.

14             MS. SHAPIRO:  I guess the point is, if they existed,

15   the government would have had -- I mean, I'm not sure exactly

16   what she's got in mind, but I also want to make sure we're not

17   revealing privileged communications, as well.

18             THE COURT:  So far, she hasn't asked for anything that

19   goes for privileged communications.  The objection's overruled.

20             (Continued on next page)

21

22

23

24

25

O57Cgar4                    Garelick - Cross

| 1 | (In open court) |

Q.  Mr. Garelick, we were talking about the subpoena the

government served on you that went into effect if you took the

stand?

A.  Yes, ma'am.

Q.  And you said that you looked for materials responsive to

the subpoena?

A.  I did not.  No, I handed the project over to my attorneys.

Q.  And you had your attorneys look for those materials; right?

A.  Correct.

Q.  The subpoena asked for documents reflecting your decision

to purchase DWAC securities in September of 2021, didn't it?

A.  I believe that's correct, yes.

Q.  And it also asked for all documents reflecting your

decision to advise Michael Shvartsman and Rocket One to

purchase DWAC securities in September and October 2021; isn't

that right?

            MR. BACH:  One moment, Judge.  One moment.

            No objection.

            THE COURT:  You can answer the question.

Q.  You can answer, Mr. Garelick, didn't the subpoena ask for

all documents reflecting your decision to advise Michael

Shvartsman and Rocket One to purchase DWAC securities in

September and October 2021?

A.  I think that sounds accurate, Ms. Hanft.  I turned it over

O57Cgar4                    Garelick - Cross

1    to my attorneys and didn't really scrutinize the document, but

2    I think that sounds like it's probably correct.

3    Q.   And you didn't produce anything in response to it, did you?

4    A.   Again, I handed the project over to my attorneys.

5    Q.   Have you seen any notes reflecting your analysis of DWAC?

6    A.   Have I seen any analysis of my -- I'm not sure of that.

7    You're analyzing a SPAC, you're not analyzing Cisco or Google

8    where there's a ton of information.  There really wasn't a lot

9    to analyze here.  This was all about --

10            THE COURT:  Mr. Garelick, would you just answer the

11   question.

12            I'm going to strike the answer and you can ask the

13   question again.

14   Q.   You didn't produce any notes, sir, reflecting your analysis

15   of DWAC; isn't that right?

16   A.   My attorneys may have if there was notes to that effect,

17   but I don't believe I did, no.

18   Q.   And your attorneys didn't produce any notes reflecting a

19   Black-Scholes analysis?

20   A.   I don't think so, but I can't say with certainty, but I'm

21   going to say most likely not.

22   Q.   Mr. Garelick, we've spent a great deal of this trial

23   talking about Michael Shvartsman; right?

24   A.   Yes.

25   Q.   Michael Shvartsman is your boss?

1    A.   That is correct.

2    Q.   And you know his brother, Gerald Shvartsman?

3    A.   I do know him, yes.

4    Q.   You've socialized with them?

5    A.   Not really.  I mean, we talked about our Vegas trip, but I

6    wouldn't call them, like, social friends, no.

7    Q.   You have socialized with them?

8    A.   Yes.

9    Q.   And you went to Vegas with a group of them?

10   A.   Yes.

11   Q.   That was in October 2021?

12   A.   Yes, ma'am, that's correct.

13   Q.   Anton Postolnikov wasn't in Vegas in October 2021, was he?

14   A.   He was not, no.

15   Q.   Where do you live now, sir?

16   A.   Now I live in Florida, in Fort Lauderdale.

17   Q.   Where do you work now?

18   A.   I still work for Michael.

19   Q.   You still work for Michael Shvartsman at Rocket One, don't

20   you?

21   A.   That's correct.

22   Q.   And Michael Shvartsman, fair to say he's a very wealthy

23   man?

24   A.   Yes.

25   Q.   And he's friends with other very wealthy people?

O57Cgar4                    Garelick - Cross

1    A.  Yes, fair to say.

2    Q.  Powerful connections?

3    A.  Yes.  He's friends with wealthy people.

4    Q.  Rocket One is how you earn your salary; isn't that right?

5    A.  That's correct.

6    Q.  And you went to Rocket One after you shuttered your own

7    hedge fund?

8    A.  That's not correct.

9    Q.  You went there, I believe you testified there was --

10   somewhere you went in the middle, but it was after Garelick

11   Capital Partners closed that you went to Rocket One.  Can we

12   agree on that?

13   A.  Sure.

14   Q.  It wasn't before?

15   A.  That's correct.

16   Q.  And you advised Michael Shvartsman on transactions?

17   A.  Yes.

18   Q.  When his investments do well, it's a good thing for you,

19   too; right?

20   A.  To some degree, I guess.

21   Q.  When Rocket makes money, it's good for you?

22   A.  It's my fiduciary responsibility to help him to the best of

23   my ability.  So when he does well, then, you know, I suppose if

24   I've helped, then I've done well.

25   Q.  You made a lot of money as a result of your DWAC trades;

1    isn't that right?

2    A.  I would not characterize it that way, no.

3    Q.  $50,000 isn't a lot of money?

4    A.  No, it's not a lot of money in my retirement account, but

5    it wasn't trivial either.

6    Q.  And you and Rocket, you made millions and millions of

7    dollars in DWAC trades?

8             MR. BACH:  Objection to form.

9             THE COURT:  Sustained.

10   Q.  You and Rocket One made millions of dollars when Rocket One

11   purchased DWAC; isn't that right?

12            MR. BACH:  Same objection.

13            THE COURT:  Sustained.

14   Q.  Did you ever say "we made $20 million," Mr. Garelick?

15   A.  I did say those words, yes.

16            MS. HANFT:  Can we look at Government Exhibit 751,

17   Mr. Bianco.

18   Q.  In this message that you sent on October 21st,

19   Mr. Garelick, you said, "we made $20 million on it," isn't that

20   right?

21   A.  That's correct.

22   Q.  And you said that to Dierdre O'Shea?

23   A.  That's correct.

24            MS. HANFT:  We can take this down, Mr. Bianco.

25            THE COURT:  It's just about 1 o'clock.  Is that a good

1    time for a break, Ms. Hanft?

2              MS. HANFT:  Yes.  That's fine, your Honor.

3              THE COURT:  Members of the jury, we'll take our lunch

4    break now for an hour.  I'd like to reconvene as close to

5    2 o'clock as possible, so please try to be back in the jury

6    room a couple minutes before 2 o'clock.

7              Don't talk about the case amongst yourselves or with

8    anybody else.  Don't do any research on the case.  Enjoy your

9    lunch.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  The witness may step down.

3          Let me see the parties at sidebar.

4          (At the sidebar)

5          Several questions.  First of all, I assume there's no

6     objection to me instructing the defense not to talk to the

7     defendant about the case --

8          MR. BACH:  I will proactively volunteer that of course

9     we're not going to talk to him.  I was going to try to preempt

10    their suggestion, but of course we're not going to talk to him.

11         THE COURT:  Number two is I don't know if the

12    government has thought about a rebuttal case or the issue with

13    respect to the documents that were contained in the subpoena or

14    not or produced pursuant to a subpoena or not, but maybe if

15    that's an issue, the parties could work out a stipulation with

16    respect to what's in the subpoena returns rather than having to

17    call a witness back.  So you should all think about that.

18         And then the third question is, how long is the cross

19    examination is going to be?

20         MS. HANFT:  I think I have at least a half hour more,

21    your Honor, probably not much more than that.

22         THE COURT:  Anything else before we break for lunch?

23         MS. HANFT:  No.  Thank you, your Honor.

24         MR. BACH:  No, thank you.

25         THE COURT:  Have a good lunch.

O571GAR5

AFTERNOON SESSION

2:02 p.m.

1    (Jury not present)

2    THE COURT:  Anything from the government before we

3    bring in the witness and the jury?  I do have the government's

4    letter with respect to the rebuttal case, which I don't think I

5    need to address right now.  Anything else?

6    MR. NESSIM:  The only thing is we understand the

7    defense——that the defense intends to offer three exhibits at

8    the close of Mr. Garelick's testimony, and then I understand

9    they intend to rest after that.  I'm not sure how soon that

10   will be, but assuming it's before a break, the government

11   objects to two of the three exhibits that the defense intends

12   to offer.

13   THE COURT:  All right.  Let's address that at sidebar

14   or during a break after the examination of Mr. Garelick is

15   done.

16   MR. NESSIM:  Yes, your Honor.

17   THE COURT:  Anything from the defense?

18   MR. BROD:  Just to be clear, Judge, these are not

19   exhibits we need to use with the jury.  We're offering them in

20   so that we can use them in summation, so at the Court's

21   convenience.  We don't need to display them at the close of the

22   testimony.

23   THE COURT:  Do we have Mr. Garelick?

1    MS. SHAPIRO:  He's right here.

2    THE COURT:  Oh, there he is.  Mr. Garelick should take

3  the stand, and let's bring the jury.

4    (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Jury present)

2        THE COURT:  Be seated.

3        Ms. Hanft, you may continue.

4        The witness is reminded that he's still under oath.

5    BY MS. HANFT:

6    Q.  Good afternoon, Mr. Garelick.

7    A.  Good afternoon.

8    Q.  You know what the SEC is, right?

9    A.  Yes.

10   Q.  You know what SEC filings are?

11   A.  Yes, generally speaking.

12   Q.  We looked yesterday at an S-1 and you told us what that

13   was?

14   A.  Yes.

15   Q.  You know what a prospectus is, don't you?

16   A.  Yes.

17   Q.  You've invested in public companies for years; isn't that

18   right?

19   A.  That is correct, Ms. Hanft.

20   Q.  And you're familiar with the term "insider sale."

21   A.  Yes.

22   Q.  An insider sale, you know that insider sales are reported

23   publicly, don't you?

24   A.  I do know that, yes.

25   Q.  And it's——a member of the public, it's easy for them to

O571GAR5                    Garelick - Cross

1   look and see whether an insider of a company has sold shares in

2   the company; isn't that right?

3   A.  Correct, yes.

4   Q.  And when you sold your DWAC shares here, you didn't file

5   any SEC forms, did you, sir?

6   A.  No, I did not.

7   Q.  And when you made your purchases here, you didn't file any

8   SEC forms.

9   A.  No, I did not.

10          MS. HANFT:  If we could put up Government Exhibit 465,

11  Mr. Bianco.

12          And let's go to the second page.

13  Q.  This is an email.  It starts at the bottom of the second

14  page.  We looked at this email yesterday.  And it goes on to

15  the next page.  And I'm going draw your attention to two

16  bullets that you talked about a little bit with your attorney

17  yesterday.

18          First, the second bullet on this page.  "That

19  announcement, expected 6-10 weeks from now, is our expected

20  catalyst to then profitably sell the IPO shares."  And that

21  announcement refers, doesn't it, Mr. Garelick, to the

22  announcement of the merger target, correct?

23  A.  Potentially, yes.  I mean, there's a number of scenarios

24  that are mathematically bullet-pointed in this, this response

25  here, yes.

O571GAR5                          Garelick - Cross

1    Q.  But you, sir, wrote that it was expected in 6-10 weeks,

2    didn't you?

3    A.  I did write that, yes.

4              MS. HANFT:  And if we could look at the next bullet.

5    Q.  You wrote, "If they don't announce a target we

6    like/expect"; isn't that right?

7    A.  Yes.

8    Q.  And Mr. Garelick, you, before you testified, you reviewed

9    the government's evidence in this case; isn't that right?

10   A.  To some degree.

11   Q.  You've had most of the government's evidence for months;

12   isn't that right?

13   A.  Yeah.  I don't know if personally I have, but I understand

14   your question.

15   Q.  It's been provided to your attorneys for months and you

16   know that, sir?

17   A.  Yes, that's correct.

18   Q.  And you've had a chance to look at the text messages here?

19   A.  Some of them, yes.

20   Q.  You've had a chance to look at emails?

21   A.  Some of them, yes.

22   Q.  Your own emails?

23   A.  Some of them.

24   Q.  Other people's emails?

25   A.  Yes.

O571GAR5                    Garelick - Cross

1    Q.  The phone records?

2    A.  To some degree, yes.

3    Q.  The trading records?

4    A.  Yes.

5    Q.  DWAC's board documents?

6    A.  Yes.

7    Q.  You've known for weeks what exhibits the government would

8    use at trial, haven't you?

9              MR. BACH:  Objection.

10             THE COURT:  Overruled.

11   A.  To some extent, but certainly not to any level of

12   precision, no.

13   Q.  You've been here the whole trial, correct?

14   A.  Yes, I have.

15   Q.  You've listened carefully to all the witnesses in the

16   trial?

17   A.  Yes, I think most of them I've listened fairly carefully.

18   Q.  And the government gave you reports of the witnesses' prior

19   interviews, didn't they?

20   A.  I am not certain of that.

21   Q.  The government provided those reports to your attorneys and

22   you know that, don't you, sir?

23   A.  I know that the government's provided a number of required

24   disclosures to my attorneys, so if that's part of the

25   disclosure, then the answer would be yes.

O571GAR5                    Garelick - Cross

1    Q.  You've had a lot of time to think about the evidence in

2    this case, haven't you?

3    A.  Yes, but, I mean, I know what I did and so it, frankly,

4    doesn't require a lot of thought, you know, some of the

5    timeline——sorry.

6              THE COURT:  Follow the Court's direction to just

7    answer the questions.

8              THE WITNESS:  Sorry, your Honor.

9    A.  Yes.

10             MS. HANFT:  Mr. Bianco, could we put up Defense

11   Exhibit 78.  And we could scroll to the second page so that the

12   witness can see it as well.

13   Q.  This is an exhibit you looked at yesterday with your

14   attorney, Mr. Garelick; is that right?  Do you recognize this?

15   A.  Yes, Ms. Hanft, that's correct.

16   Q.  And this was a link that Michael Shvartsman sent you in

17   June of 2021; is that right?

18   A.  Yes, it looks like June 18, 2021, he sent this to me,

19   correct.

20   Q.  And I would like to show you what's been marked for

21   identification only——just to the witness and the

22   parties——Government Exhibit 1202.

23             MS. HANFT:  And if you could scroll down so the

24   witness can see the whole document, Mr. Bianco.

25   Q.  Do you recognize this, Mr. Garelick?

O571GAR5                    Garelick - Cross

1    A.  Yes, I do.

2    Q.  Is this the article that you——that Michael Shvartsman sent

3    you?

4    A.  I'm fairly certain it is, yes.

5          MS. HANFT:  The government offers Government

6    Exhibit 1202.

7          MR. BACH:  No objection.

8          THE COURT:  Received.

9          (Government's Exhibit 1202 received in evidence)

10   Q.  You can take a minute to look at it, sir.  But once you've

11   had a chance, my question to you is:  There's nothing about

12   DWAC in this article, is there?

13   A.  No, there is not.

14   Q.  And in fact, this article says that the Trump Media Group

15   Truth Social plan is dead in the water, doesn't it?

16   A.  Let me take a close look here.

17          It says this particular proposal——"while this

18   particular proposal seems dead in the water," do you want me to

19   read the whole——

20   Q.  No, that's okay.  Thank you.  That's the part I was asking

21   about.  Thank you, Mr. Garelick.

22   A.  Sure.

23   Q.  Mr. Garelick, you filled out annual CFA attestations every

24   year for a very long time, didn't you, sir?

25   A.  That is correct, yes, ma'am.

1   Q.  And you filled one out in 2019?

2   A.  I'm pretty certain I did, yes.

3   Q.  In 2020?

4   A.  Yes.

5   Q.  In 2021?

6   A.  I believe so, yes.

7   Q.  In 2022?

8   A.  I may have.

9   Q.  Let's look at Government Exhibit 853.

10          You see the date on the top of this document,

11  23 July 2022?

12  A.  Yes.

13  Q.  You lied on this attestation, sir, didn't you?

14  A.  I would not agree with that characterization.  I'll take a

15  look at it here.

16  Q.  You said, Mr. Garelick, that you hadn't been the subject of

17  any investigation, didn't you?

18  A.  I said no to question No. 1, yes.

19  Q.  Let's look at question No. 2.  "In the last two years have

20  you been the subject of any investigation, internal or

21  external, in which your professional conduct or activities were

22  questioned or at issue?"  You answered no, Mr. Garelick, didn't

23  you?

24  A.  It looks that way, yes.

25  Q.  Mr. Garelick, FBI agents approached you in June of 2022,

O571GAR5                    Garelick - Redirect

1    one month before this; isn't that right, sir?

2    A.   That's correct.

3    Q.   And you were told you were the subject of an investigation

4    around that time?

5    A.   That is not correct, no.

6    Q.   Your attorney was told you were the subject of an

7    investigation; isn't that right?

8    A.   I don't recall being told I was the subject of an

9    investigation.  I think it was an inquiry of some sort at that

10   point.

11   Q.   You were served with a subpoena, sir; isn't that right?

12   A.   I was, yes.

13   Q.   And you answered in July 2022 that you had not been the

14   subject of any investigation; isn't that right?

15   A.   That was my understanding at the time, that I hadn't been.

16   I thought this was a—a cooperative inquiry that I was helping

17   with.

18             MS. HANFT:  No further questions.

19             THE COURT:  Redirect examination.

20             MR. BACH:  One moment.

21             Okay.  Very briefly.

22   REDIRECT EXAMINATION

23   BY MR. BACH:

24   Q.   Mr. Garelick, you were just shown Government Exhibit 1202.

25             MR. BACH:  Can we pull that up.

1   Q.  You were just shown a copy of this article.  Do you see

2   this?

3   A.  Yes, sir.

4   Q.  This is the Axios article that Mr. Shvartsman sent you on

5   June 18th, the same day that you first met with Mr. Orlando?

6   A.  That's correct.

7           MR. BACH:  Can we move that to the left, Ms. McFerrin,

8   and pull up Government Exhibit 458 next to it.  Side by side.

9           That's 485.  I want 458.

10  Q.  On the right, is this the board packet you received in

11  anticipation of the board meeting, the very first board meeting

12  you attended on September 21?

13  A.  That is correct, sir.

14          MR. BACH:  Can we turn to the page for Trump Media

15  Group.  Can we make that larger, Ms. McFerrin, please.  Or

16  Mr. Bianco.

17  Q.  Okay.  Now with that in front of you—

18          MR. BACH:  Can we just go to the next page of this

19  Axios article.

20  Q.  Okay.  First of all, do you see—you talked about this

21  board packet a bit earlier today and whether you believed it

22  contained material nonpublic information.  Do you remember

23  that?

24  A.  I do recall that, yes.

25  Q.  Okay.  And this Axios article, this is a published article

1  in the public domain, correct?

2  A.  That is correct.

3  Q.  Okay.  So do you see in the Axios article where it says,

4  about three paragraphs down, "Conservative media powerhouse

5  that will rival the liberal media and fight back against big

6  tech companies of Silicon Valley"?

7  A.  Yes, I see that.

8  Q.  Now look at the brief description in this confidential

9  board packet.  Is that the same information that has been

10  published to the entire world in the Axios article?

11          MS. HANFT:  Objection.

12          THE COURT:  Sustained as to form.

13  Q.  Is that the same information in the Axios article, same

14  language?

15  A.  Verbatim to the level of almost plagiarism.

16  Q.  Okay.  Well, just answer my question, Mr. Garelick.

17  A.  Yes.

18          MR. BACH:  Can we move to—can we pull those both back

19  up again.

20  Q.  Do you see the second bullet point?

21  A.  Yes, sir.

22  Q.  It says a base case valuation of 15 billion.  Do you see

23  that?

24  A.  Yes.

25  Q.  Okay.  And this is, again, in a published article in the

1   Axios publication?

2   A.  Yes.

3          MR. BACH:  Can we go to the next page of the Trump

4   Media description in the board packet.

5   Q.  What is the estimated value indicated here?

6   A.  It has squiggly line 15 billion so I read that to mean

7   approximately 15 billion.

8   Q.  Okay.  And is that the same figure that has been published

9   in the Axios article?

10  A.  Yes.

11  Q.  Okay.  Do you see in this Axios article, first bullet

12  point, it was to be comprised of three divisions?  Do you see

13  that?

14  A.  The first—yes, I see that.

15         MR. BACH:  Could we go back to page 1 of the board

16  packet.

17  Q.  Do you see where it says Revenue Description?

18  A.  Yes.

19  Q.  And it says, "A combination of three entities."  Do you see

20  that?

21  A.  Yes, sir.

22         MR. BACH:  Okay.  I have no further questions.  Thank

23  you.

24         THE COURT:  Recross?

25         MS. HANFT:  Just very briefly, your Honor.

O571GAR5

RECROSS EXAMINATION

BY MS. HANFT:

Q.   Mr. Garelick, at the time you got that memo, it wasn't public that DWAC was considering TMG, was it?

A.   No, it was not.

          MS. HANFT:  No further questions, your Honor.

          THE COURT:  Okay.  Sir, you're excused as a witness. You may step down.

          (Witness excused)

          THE COURT:  Does the defense have any additional witnesses?

          MR. BACH:  No, just some exhibits which we'll take up——

          THE COURT:  Okay.  Members of the jury, with apologies, I'm going to ask you to go back to the jury room. There are some legal matters I have to discuss with the parties.  I think it would be more convenient to have you go back to the jury room.  So don't discuss the case amongst yourselves or with anybody else.  Don't do any research.  See you back here in a little bit.

          THE DEPUTY CLERK:  All rise.

          (Continued on next page)

1     (Jury not present)

2     THE COURT:  Be seated.

3     All right.  What are the three exhibits that are at

4  issue?

5     MR. BROD:  Well, I actually haven't had another chance

6  to confer with the government, so——

7     THE COURT:  Okay.  Maybe you can work them out.

8     MR. BROD:  Judge, we told them about this this

9  morning, so I imagine——

10     (Counsel conferring)

11     THE COURT:  Were you able to work it out?

12     MR. BROD:  We were not entirely able to work it out,

13  Judge.

14     Ms. McFerrin, can we have 93, please, for——and can we

15  scroll.

16     So Judge, you'll see this is a 10/16 message chain.

17     Can we go to the second page, please.

18     And just in broad strokes——I'll let the government

19  make their objection and then I'll respond.

20     THE COURT:  Okay.

21     MR. NESSIM:  So we object to the portions of this

22  document that are offered for the truth of the matter asserted.

23  Specifically, so just to summarize, this appears to be a

24  document where I think Michael Shvartsman, maybe his wife,

25  Gerald Shvartsman——I'm not actually sure Gerald Shvartsman is a

O571GAR5

1  participant——Igor, who I assume is the same Igor who invested

2  in founder shares, are talking about meeting up at some sort of

3  haunted circus outside of a mall, and towards the end of the

4  message, they talk about:  All done, I purchased tickets,

5  general admission tickets for three today.  That's on page 2 of

6  the chat.  So we don't object to the portions of this exhibit

7  that are, you know, talking about plans in the future, sort of

8  state of mind.  We do object to the portions that are intended

9  to draw the truth of the matter asserted, which is that they

10  actually did meet up.

11          THE COURT:  So as I understand the objection, you have

12  no problem——I don't see how you would have a problem——with the

13  note from Igor saying, "I'm buying tickets now for 1 p.m.," or

14  Sarah saying, "Ok, perfect, I will buy tickets now too," or

15  others saying, "I'll buy for us," to any of those.  The only

16  problem is the, "Ok, done for 1 p.m." and "All done, general

17  admission for three for today, 1 p.m."?

18          MR. NESSIM:  That's right.

19          THE COURT:  Technically those two messages are

20  hearsay, and I would think, frankly, from the defense

21  perspective, you've got all of the other statements so——

22          MR. BROD:  If I could just have the ones as to which

23  the government objects again.

24          THE COURT:  The only ones that are hearsay are, "Ok,

25  done for 1 p.m.," and, "All done, general admission for three

O571GAR5

1    today for 1 p.m."

2           MR. BROD:  That's fine, Judge.

3           THE COURT:  Okay.  So DX 93 will be admitted except

4    for the two messages that I just mentioned.

5           MR. BROD:  Okay.  Take that one down.

6           And the next one, can we have 83A, please.

7           THE COURT:  Okay.  Let me hear from the government

8    with respect to 83A.

9           MR. NESSIM:  So this is a two-message exchange between

10   Gerald Shvartsman and Anton Postolnikov, and it's being offered

11   for the truth that they attended a party the night before.

12          THE COURT:  I don't think that this is hearsay.  I

13   mean, people can draw an inference that they were at a party

14   the night before, but it says, "Great party.  Thanks for the

15   invite."  "Thanks for coming, Gerald."

16          So 83A will be received.

17          MR. BROD:  Thank you, Judge.

18          THE COURT:  Is that it?

19          MR. BROD:  That's it.

20          THE COURT:  Okay.  All right.  So do you want to offer

21   those in front of the jury or do you want to just offer them

22   now and have my rulings?  What's the——

23          MR. BROD:  Judge, I think we'll offer them in front of

24   the jury, we can put them on the screen, and then the defense

25   will rest.

O571GAR5

1    THE COURT:  Okay.  All right.  Let's discuss then—

2    MR. BROD:  Well, let me confer, Judge.

3    We'll rest in front of the jury, Judge.  We'll offer

4  them, and if they're received, we can use them in summation.

5    THE COURT:  So I'm ruling that 93 is received except

6  for the two messages that I've indicated are hearsay.  83A is

7  received.  You don't need to reoffer them in front of the jury.

8  And then when the jury comes back in, I gather the defense will

9  rest.

10    MR. BROD:  And, Judge, there's a third exhibit to

11  which the government didn't have an objection.  And I've lost

12  my sticky note that I—72.6.  We had a third exhibit that the

13  government has no objection to, and that exhibit is 72.6.

14    THE COURT:  172.6?

15    MR. BROD:  My colleagues have had various ideas here,

16  but I think the final concept, Judge, is we'll move them in in

17  front of the jury and then rest without publishing them.

18    THE COURT:  Okay.  172.6 is the final exhibit?

19    MR. BROD:  72.6 is the final exhibit.

20    THE COURT:  72.6.

21    MR. BROD:  Yes, your Honor.

22    THE COURT:  So 72.6 will be received.

23    All right.  Then I have a letter from the government

24  with respect to an exhibit that they want to put in on

25  rebuttal.  I'll hear from the defense with respect to that.

1       Is there anything else that the government expects to

2  do on rebuttal?

3       MR. NESSIM:  So, your Honor, we are actively exploring

4  whether we intend to put forward a rebuttal case beyond the

5  letter that we put forward to the Court.  If we do put forward

6  a rebuttal case, it will be very short.  We will ask that we

7  have the afternoon to determine if we will call a short

8  rebuttal witness, and if we do, that would be very brief in the

9  morning tomorrow.  In the alternative, if we could have a few

10  hours to consider.  I just don't want to have the jury waiting

11  in the event that we don't.  But I think that if we do call a

12  rebuttal witness, it would be very short, and it would go to

13  the question of some of the testimony about how SPACs were

14  trading at the time and the analysis of some of the economics

15  here, so I think it would be a short witness, just to testify

16  to that, to the extent we call someone.

17       THE COURT:  Can you come to a conclusion on that in an

18  hour?  It may be the most I'm going to give you, so——

19       Mr. Bach, let me hear from you.

20       MR. BACH:  Judge, first of all, we don't——it would be

21  helpful if they told us who it is because once we learn, we

22  might be asking for an adjournment to study the issue.  If it's

23  a issue of economic analysis, we might well need to consult

24  someone beyond ourselves.  The government has known for months

25  that this is a case about SPACs.  They had Mr. Melley.  They've

1    had ample time to present the relevant issues here.  We think

2    this is unnecessary.  If they have a rebuttal case that's ready

3    to go now, that's pertinent, we can have it.  But we object to

4    it.

5         THE COURT:  It's 2:30, so I will give the government

6    until 3:30 to tell me if they've got a rebuttal case.  If

7    anybody wants to leave right now from either side, they can,

8    but I am going to hear from the parties with respect to the

9    exhibit that the government wrote about.

10        Give me one moment.

11        And I'm going to have my deputy inform the jury that

12   we're going to reconvene in an hour or so.  So—

13        MR. NESSIM:  Your Honor, maybe if you could just give

14   us ten minutes, five minutes to make very quick decisions, we

15   might be able to streamline this.

16        THE COURT:  Okay.  All right.  I'll do that.  And what

17   I'll do is I also won't require argument right now with respect

18   to that exhibit so that you can focus on this issue.

19        It's now 2:30.  I'll come back out in ten minutes.

20        MR. NESSIM:  Thank you, your Honor.

21        THE DEPUTY CLERK:  All rise.

22        (Recess)

23        THE COURT:  All right.  Let me hear from the

24   government.

25        MR. NESSIM:  So, your Honor, we discussed it during

1  the break and we decided we're not going to call a witness in

2  our rebuttal case.  We also raised with defense counsel the

3  prospect of a stipulation on the point that came up on

4  cross-examination concerning the defendant's notes.  We're

5  concerned about a burden-shifting argument if we make arguments

6  that the jury hasn't seen notes of that sort.  The defense has

7  informed us that they don't intend to make such arguments and

8  we should not expect them with regard to that issue.  So I

9  don't think we're going to enter into a stipulation regarding

10  that point.  They won't agree to a stipulation, so we're not

11  going to pursue one.

12          So I think all that remains is our letter and

13  Government Exhibit 477.

14          THE COURT:  All right.  So let me hear from the

15  defense on that.

16          MR. BROD:  So, Judge, Exhibit 477 is the exhibit that

17  the government tried to get in a couple days ago as a

18  co-conspirator statement.  It's a note to self by Phil

19  Margolin, the junior analyst who we saw photographs of earlier.

20  It appears to have been made on October 15th.  There's no

21  indication on the face of the note itself as to who made the

22  statements that are contained in the note.  The government

23  suggests, based upon an attorney proffer, that the statements

24  were made by Michael Shvartsman, not by Mr. Garelick, but of

25  course that's the only foundation there is for this.  The only

1  basis on which they are offering it at this time is as

2  statements against penal interest, first by Mr. Margolin to get

3  past the first level of hearsay, and second by Mr. Shvartsman.

4  And just before coming on to the hearsay exception issue, I

5  would note this is a witness who the government believes has

6  exposure, which is why we understand he would take the Fifth.

7  Clearly they could have immunized him and called him to testify

8  to this issue, but for whatever reason have chosen not to do

9  so.

10         As to the——

11         THE COURT:  That particular argument is neither here

12  nor there.  I understand the atmospherics about it, but it

13  really doesn't go to the legal issues.

14         MR. BROD:  I'll try and avoid atmospheric arguments,

15  Judge.

16         But in any event, the legal issue is I think a pretty

17  simple one.  This is a note to self.  I do not think it is

18  against Mr. Margolin's penal interest.  I think on the face of

19  the government's letter, it cannot be a statement against his

20  penal interest.  They suggest that it's against his penal

21  interest because subsequently, I think some days later, he

22  caused someone else to trade.  We understand from the 3500

23  material he may have asked a friend to trade on his behalf some

24  days later.  At the time that he made this note, there's no

25  reason to believe whatsoever that it was against his penal

1 interest.  There's no reason to believe that simply the

2 disclosure that the company he worked for had bought 2 million

3 DWAC warrants exposed him in any way to legal jeopardy.

4 As the exception is, as Weinstein's Evidence says, a

5 narrow exception meant to admit evidence that has clear indicia

6 of trustworthiness because it's something that someone wouldn't

7 ordinarily say to another person because it would expose them

8 to legal jeopardy, this particular statement has none of those

9 indicia of reliability.  It's a note to self.  At the time it

10 was made it did not expose Mr. Margolin to legal jeopardy.

11 And—

12 THE COURT:  Maybe, Mr. Brod, you can refresh me when

13 the last trade was of Michael Shvartsman that got it up to

14 2 million warrants.

15 MR. BROD:  October 5th.

16 THE COURT:  October?

17 MR. BROD:  5th.

18 THE COURT:  5th.  Okay.

19 MR. BROD:  So as for Mr. Margolin, we don't believe

20 that we get past that level of hearsay.

21 I'd also note that the Second Circuit has been clear

22 that the exception only applies where the declarant—and here,

23 the first level of that is Mr. Margolin—has personal knowledge

24 of the matter that is the subject of the statement.  And that's

25 *United States v. Lang.*  This was a reversal of a criminal

1    conviction.   589 F.2d 92, 97-98 (2d Cir. 1978).

2         Moving to the second level, we don't think that this

3    is even necessarily against, assuming—taking a step back.

4    Assuming that this was a statement by Michael

5    Shvartsman—that's what the 3500 says—we don't think that this

6    is necessarily even against his penal interest, in the sense

7    that the people he's speaking to, these junior employees at

8    Rocket One, there's no reason why they, and particularly

9    someone like Phil Margolin, who we understand had just joined

10   the company a day or two before, would have known any of the

11   surrounding context which might have exposed Mr. Shvartsman to

12   criminal liability.   There's no reason to think that they knew

13   that he had executed an NDA, and received confidential

14   information and then traded upon it.   It's simply a statement

15   that he bought 2 million warrants which was the target of a

16   SPAC with Trump.   So we don't think there's any basis to admit

17   it.

18        And just in case I wasn't clear, we just think there's

19   no foundation here and no context, because on the face of it,

20   there's no reason on the face of the note to suggest that the

21   note reflects a statement by Mr. Michael Shvartsman, and to the

22   extent that the Court would have reached this, we think that

23   the use of this attorney proffer to lay a foundation for this

24   would raise confrontation clause issues, and the admission of

25   the note without any context would raise 403 issues.

O571GAR5

1       THE COURT:  All right.  Let me hear from the

2   government.

3       MR. NESSIM:  So, your Honor, the government does

4   believe this piece of evidence is admissible under the

5   exception.  I'll start first with Philipp Margolin's statement.

6   The inclusion of "bought 2 million warrants because target is

7   Trump Media" is a statement against interests as to

8   Mr. Margolin at the time it was made.  In a prosecution for

9   insider trading for Mr. Margolin's trades, for example, this

10  statement would be proof that he had access to material

11  nonpublic information.  This is five days before the merger

12  target was announced.  This is material nonpublic information

13  at the time it is given and the time it is recorded, and it

14  would be against Mr. Margolin's penal interest for the

15  statement to be produced as to his own purchases and as also—

16      THE COURT:  What's the evidence in the record with

17  respect to his purchases?

18      MR. NESSIM:  That is, based on what we understand, the

19  reason for his invocation, your Honor.  But even if it's not

20  his own purchases, which we think is a sufficient basis to

21  conclude that there's a statement against interest here as to

22  Mr. Margolin, it's also a statement against interest as to the

23  consummation of the sale of these warrants, which has not yet

24  occurred, that's in the future, that Rocket One will sell these

25  warrants, which they obtained on the basis of material—which

O571GAR5

1    they purchased on the basis of material nonpublic information.

2    It's also a statement against interest for his involvement in

3    that conduct as an employee of Rocket One.  Mr. Garelick

4    testified that Mr. Margolin was an employee of Rocket One, that

5    he started shortly before the trip to Las Vegas, which was

6    later this week, and so it's a statement against interest as to

7    Mr. Margolin.

8            As to Mr. Shvartsman, who we understand to be the

9    speaker of this statement, it's obviously a statement against

10   interest against him.  It's an admission that he traded on

11   these warrants, on the basis of material nonpublic information.

12   Defense counsel states that there's, you know, no basis on the

13   exhibit itself to conclude that Michael Shvartsman is that

14   declarant.  You know, we wanted the Court to have the facts as

15   we understand it, and the parties have the facts as we

16   understand it.  However, for the statement against interest

17   exception, the question of who exactly Rocket One made the

18   statement, that the reason we purchased these warrants is

19   because the target is Trump Media, it doesn't turn on who the

20   speaker was.  For any person to make that statement to Philipp

21   Margolin, that's a statement against interest.  It's an

22   admission of their involvement in this scheme to engage in

23   insider trading in the DWAC warrants.  And so while we do

24   believe the statement was made by Michael Shvartsman, it

25   doesn't change the analysis as to whether that layer of hearsay

1  is a statement against interests against the speaker.

2  And I just—my colleague just pointed out a portion

3  from *Lang*.  I think as I understand it, Mr. Margolin does have

4  personal knowledge of the statements he recorded.  It's the

5  statement that he was—that was delivered to him, in his

6  presence, and it was part of his note to self.  *Lang* requires

7  that the incriminating statement sufficiently tender to the

8  subject, the declarant, to criminal liability so that a

9  reasonable man in his position would not have made the

10  statement unless he believed it to be true.  For both—for both

11  speakers here, for Mr. Margolin and Mr. Shvartsman, or really

12  any co-conspirator in that scheme to trade in the DWAC

13  warrants, the admission that the acquisition was based on

14  material nonpublic information is a statement against interest.

15  THE COURT:  Anything further from you, Mr. Brod?

16  MR. BROD:  Just two points, Judge.

17  I just want to focus at each level of the hearsay

18  here.  At the first level, we heard Mr. Nessim say that—two

19  things: one, that Mr. Margolin was involved in the sale of

20  these securities.  I have not seen—I trust that's a good faith

21  proffer, but we haven't—certainly I haven't seen it, or don't

22  recall it in the 3500.  But—

23  MR. NESSIM:  It's been produced in 3500.

24  MR. BROD:  Okay.  Then I take that back.

25  There's no reason, however, to believe that on this

O571GAR5

day, on the second day, first or second day that he was
employed, that he had any reason to believe that in the future
he would be involved in the sale of this security.  And so at
the time he makes this statement——to himself, I should add,
it's a note to self, which already takes it far, far outside
the heartland, if not entirely out of the ballpark of the
statement against penal interest exception——there's no reason
to believe that at this time he had any consciousness
whatsoever that he was exposing himself to penal interest.  So
this is a narrow, narrow exception.  It is not an open door.
It is intended to allow the admission of evidence that is
necessarily reliable because somebody would not have made the
statement——I would not tell Mr. Bach that I committed some
terrible crime unless I had actually done it.  This is far, far
outside the exception at that level.

As to Mr. Nessim's second point, which is that even if
Mr. Shvartsman was not the speaker, I think this just indicates
how fundamentally unreliable this is, because if they are not
relying on the proffer that this was Mr. Shvartsman, we know
nothing whatsoever about this statement.  We don't know the
context in which the underlying declarant made it, what that
underlying declarant knew.  They say that anybody who knew that
they had bought warrants because the target was Trump must have
been exposing themselves to criminal liability.  I think just
saying that shows how weak the argument is.

O571GAR5

1     THE COURT:  Let me ask one question of the government.

2     With respect to Mr. Michael Shvartsman's unavailability as a

3     trial witness, besides the fact that he pled guilty and the

4     government's assertion that he's unavailable as a trial

5     witness, what other basis is there to conclude that he's

6     unavailable?

7     MR. NESSIM:  Your Honor, we—we've been in touch with

8     defense counsel for Mr. Shvartsman.  We've not specifically

9     asked him to testify at trial on this point, but his counsel

10    has made clear that he could not testify at trial absent some

11    attending to exposure that he would have as a result of his

12    testimony.  So while we haven't specifically said would he come

13    and testify and would he plead the Fifth, counsel has indicated

14    as much to us.

15    THE COURT:  All right.  I'm going to grant the motion

16    to exclude this exhibit.

17    With respect to Michael Shvartsman—well, there are

18    two levels of hearsay in this, as the defense has pointed out,

19    and with respect to the first level of hearsay, regarding

20    Philipp Margolin, I think the defense makes a persuasive case

21    that the government has not established that at the time that

22    this statement was made, Mr. Margolin was in a position to

23    appreciate that the statement was against his penal interest.

24    In addition, as a statement of Mr. Margolin's alone,

25    the evidence would have only extremely marginal value and would

1  have a prejudicial impact.  It would be relevant that Michael

2  Shvartsman had indicated that he bought the warrants because

3  Trump Media was the target.  That would tend to undermine the

4  testimony of the defendant that the warrants were purchased

5  because they were a good economic investment, and that there

6  was analysis done with respect to Black-Scholes and the like.

7  But with respect to Philipp Margolin's understanding as to why

8  the trades were done, that, in the absence of there being

9  evidence of the defendant being in touch with Philipp Margolin

10  about these trades, again, is of very attenuated relevance and

11  great prejudicial impact.

12       With respect to the question of whether this is a

13  statement against penal interest of Michael Shvartsman, the

14  Second Circuit has instructed that a showing of unavailability

15  is not to be made based upon assumption but actually has to be

16  made based upon an assertion either by the declarant or the

17  declarant's attorney.  So I'm dubious that a sufficient showing

18  has been made with respect to the second level of hearsay.

19       But in any event, it would be excludable based on the

20  first level of hearsay.  So that's my ruling.

21       Let's bring the jury in.

22       (Continued on the next page)

23

24

25

O57Cgar6

1    (Jury present)

2    THE COURT:  What's next on the defense case?

3    MR. BROD:  Your Honor, the defense offers Defendant's

4    Exhibits 93, 83A, and 72.6.

5    THE COURT:  Those are all received subject to the

6    Court's ruling.  Those are received.

7    (Defendant's Exhibits 93, 83A, 72.6 received in

8    evidence)

9    MR. BROD:  Judge, the defense rests.

10    THE COURT:  Anything further from the government?

11    MS. HANFT:  No, your Honor.

12    THE COURT:  I take it the government rests?

13    MS. HANFT:  Yes, the government rests.

14    THE COURT:  Members of the jury, that concludes the

15    presentation of the evidence in this case, it doesn't conclude

16    your work.  My expectation is I'm going to let you go for the

17    afternoon.  Tomorrow we'll have a full day because we'll have

18    summations by counsel.  Then my expectation is that you'll have

19    the charge from the Court.

20    The case has not yet been submitted to you, so I would

21    ask you again to keep an open mind until you retire into the

22    jury room to deliberate.  Please don't talk about the case with

23    anybody else, including among yourselves.  Don't do any

24    research on the case.  Again, breakfast will be available for

25    you at 8:30.  Please try to get here at 8:45 so we can start

O57Cgar6

1   promptly at 9 o'clock.

2           Have a good afternoon, everybody.

3           (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Jury not present)

2    THE COURT:  I mentioned a Second Circuit ruling

3 earlier, I didn't provide the citation.  This is on

4 unavailability.  It's *United States v. Al Jaber,* 436 F. App'x 9

5 (2d Cir. 2011).  It stands for the proposition that it's

6 insufficient for counsel to assume that a witness would have

7 invoked the Fifth Amendment privilege if called, and that it's

8 the witness or the witness's representative who must assert it.

9 Again, that's not the sole basis for my ruling.

10    I'm also prepared to rule with respect to willfully

11 causing, and I am not going to give the willfully causing

12 charge.

13    Section 2(b) punishes as a principal one who causes

14 the doing of an act, which, if done by him directly, would

15 render him guilty of an offense against the United States.  18

16 U.S.C. 2(b).  "The person who actually performed the act need

17 not have had any criminal purpose or intent if the defendant

18 willfully caused an act that, had he performed it directly,

19 would be an offense against the United States."  *US v.*

20 *Concepcion*, 983 F.2d 369, 384 (2d Cir. 1992).  It is irrelevant

21 that the person who committed the act lacked the requisite

22 criminal intent or was not legally capable of personally

23 committing the act forbidden by federal law.  *Sand's* Federal

24 Jury Instructions, comments to Instr. 11-3.  The examples given

25 by *Concepcion* include the defendant who causes another party to

1  import heroin into the United States or to fail to file

2  currency transaction reports.  *Concepcion*, 983 F.2d at 384.

3          In this case, the principal violation and the alleged

4  violation that is willfully caused completely overlap.  There

5  is no evidence to support a separate charge of willful

6  causation.  The criminal act by Michael Shvartsman is a trade

7  in DWAC securities made using material nonpublic information

8  knowing that it was obtained from one who breached a duty of

9  trust and confidence.  *See SEC v. Obus*, 693 F.3d 276, 285

10  (2d Cir. 2012).  The wrong inheres in the fact that the trade

11  is made with knowledge that the information comes from a breach

12  of duty.  A person who makes a trade based on confidential

13  information is not liable based on that fact alone.  It is not

14  simply making a trade that would not have been made had the

15  party on the other side known the confidential information.

16  *See Dirks v. SEC*, 463 U.S. 646 (1983).  The act of selling

17  stock without knowledge of MNPI that the trader knows comes

18  from a breach of duty is not an offense against the United

19  States.  It follows that a person who causes another to sell

20  stock, when the seller of the stock is without knowledge of

21  MNPI, which the seller knows is from a breach of duty, cannot

22  be liable as a causer of a violation.  There might conceivably

23  be a case for willfully causing a violation if the defendant —

24  with criminal intent — caused a third party who lacked criminal

25  intent or capacity to trade on MNPI if the third party had the

1    requisite knowledge, even if the defendant were not the tipper

2    himself. But, in this case, where the theory of the Government

3    is that the defendant and not some other person is the tipper,

4    there is no basis upon which the jury could find the defendant

5    guilty on a willfully causing theory without finding him liable

6    on a principal theory.

7            That's my ruling on that.

8            With respect to the question of section headings, let

9    me tell you what I intend to do and I'll entertain any

10   objections.

11           I do think that it would be helpful for the jury to

12   have some section headings, some index when they go into the

13   jury room, but I do take Ms. Shapiro's point that what they

14   have in the jury room should be identical to what is read.  I

15   also understand that Ms. Shapiro has not objected to any of the

16   headings as being inaccurate or prejudicial.

17           I don't think, for the jury to discharge its duties,

18   it needs all of the section headings.  So what I intend to do

19   is give a charge that has a section heading for introductory

20   instructions that has a section heading for Counts Two through

21   Four, Title 15 securities fraud, that has a section heading for

22   Count Five, Title 18 securities fraud, that has another

23   heading, Counts Two through Five, aiding and abetting, that has

24   a section heading, Count One, conspiracy to commit securities

25   fraud, another heading that says venue, a heading after venue

1    that has additional instructions under which the language,

2    beginning with credibility of witnesses and continuing into

3    particular investigative techniques not required would be

4    placed, and then a final heading that says instructions

5    regarding deliberations.

6            And to Ms. Shapiro's point, I intend, when delivering

7    the charge, to deliver it with those section headings.  So if

8    the parties have an objection to that, they should let me know.

9            Ms. Shapiro, I'll turn to you on that and with respect

10   to any of the additional language either included or omitted.

11           MS. SHAPIRO:  Your Honor, I think I'm fine with -- the

12   only question I wanted to raise with the Court is with respect

13   to the idea of including a separate heading for aiding and

14   abetting, which seems to call that out and highlight that as an

15   additional theory.  It seems unnecessary and inappropriate.

16           THE COURT:  I'm fine with deleting that section

17   heading.  I don't think the jury particularly needs a section

18   heading for that to do their job.

19           MS. SHAPIRO:  Right.  Other than that, we have no

20   issue with the proposal.

21           While preserving all our prior objections, without

22   rearguing them, I had I think just one further objection to the

23   proposed edited charge, but I don't want to forget to renew our

24   Rule 29 motion.  So we're doing that, as well.

25           THE COURT:  You want to say anything more about that?

1      MS. SHAPIRO:  No, your Honor.

2      THE COURT:  The motion is denied.

3      MS. SHAPIRO:  Okay.  So on page 24, with respect to

4  the Title 18 securities fraud first element, we object to the

5  proposed changes to the second paragraph.  Since the Court has

6  already rejected our original objection, which was not to do

7  this at all, if the Court's going to give this instruction, we

8  believe that it shouldn't say, the fact that a company cannot

9  commercially exploit the information by trading on it does not

10  mean the information has no commercial value to the company,

11  which is kind of a one-sided statement.  We prefer not to have

12  that at all.  Instead, to end the previous sentence that's not

13  red line where it says, for purposes of Count Five, if it had

14  commercial value, we would just end that with, to DWAC, period,

15  and pick up with, in determining whether, for sort of all of

16  the same reasons we've been arguing about earlier.  If the

17  Court rejects that proposal, I have another proposal to modify

18  the sentence that the Court inserted.

19      THE COURT:  I am rejecting that, except perhaps with

20  respect to adding "had commercial value to DWAC."

21      Any objection to me adding "to DWAC"?

22      MR. NESSIM:  Just for consistency, your Honor, if it

23  could be "to DWAC or Benessere."

24      THE COURT:  I think that point is well taken.

25      MS. SHAPIRO:  So if the Court's going to keep the rest

O57Cgar6

1    of this as written, we would ask that the second sentence

2    that's been added be modified so it reads:  "The fact that a

3    company cannot commercially exploit the information by trading

4    on it does not mean the information has no commercial value to

5    the company, as long as there's some way the company could have

6    commercially exploited the information."  I think that's a fair

7    statement, even under the Court's view of the law, and it's

8    more balanced because this is singling out the whole issue of

9    trading.

10           THE COURT:  What is the government's position?

11           MS. HANFT:  Could we have one moment, your Honor.

12           MR. NESSIM:  Your Honor, we think the proposal from

13   defense counsel is confusing and the statement as written is

14   accurate and helpful to the jury.

15           THE COURT:  The statement that I'm giving is directly

16   out of *Grossman*, so I'm going to overrule the objection.

17           Anything else, Ms. Shapiro?

18           MS. SHAPIRO:  No, your Honor, other than just

19   preserving all the objections we already made.

20           THE COURT:  Anything from the government?

21           MR. NESSIM:  No.

22           THE COURT:  For summations tomorrow, I really would

23   like to get everything done so I charge the jury by the end of

24   the day.

25           Does the government have a revised estimate for the

1    length of its summation?

2           MR. SHAHABIAN:  I think in an abundance of caution,

3    I'll stick with my original 2-hour estimate, but hopefully

4    less.

5           THE COURT:  Mr. Bach, do you think you can do it in

6    two or two and a half hours?

7           MR. BACH:  I hear a strong nudge there, so I would

8    certainly like to do it within that time, but they get a

9    rebuttal and I just think if I need a little more time, I

10   should be able to have it.  I haven't written it yet.  I don't

11   want to go past two hours.

12          THE COURT:  I think you probably have written some

13   portions of it.

14          MR. BACH:  I thought about it very seriously.

15          THE COURT:  I just would not want there to be a record

16   that indicates that the first time you thought about your

17   summation was when you came down after all of the evidence was

18   complete.  I don't think that that's accurate; correct?

19          MR. BACH:  Thank you for protecting me, Judge.

20          THE COURT:  I'm not going to impose time limits, but

21   you've got my strong nudgings with respect to time.

22          I am going to ask you when I come on the bench how

23   much time the government anticipates because it ties into when

24   I give the jury breaks.  My anticipation is what we'll do is

25   we'll have the government do its summation, have a very short

O57Cgar6

1   break for the jury, have the defense do their summation, and

2   then take a lunch break, and then the rebuttal summation and

3   then the charge.

4           Anything else from the government?

5           MS. HANFT:  No, your Honor.  Thank you.

6           THE COURT:  From the defense?

7           MR. BACH:  Nothing further.  Thank you, Judge.

8           THE COURT:  Have a good afternoon, everybody.

9           (Adjourned to May 8, 2024 at 9:00 a.m.)

10                          *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

 BRUCE J. GARELICK

Direct By Mr. Bach . . . . . . . . . . . . .1235

Cross By Ms. Hanft . . . . . . . . . . . .1308

Redirect By Mr. Bach . . . . . . . . . . .1367

Recross By Ms. Hanft . . . . . . . . . . .1371

                GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 1202    . . . . . . . . . . . . . . . . . .1365

                DEFENDANT EXHIBITS

Exhibit No.                                    Received

 93, 83A, 72.6  . . . . . . . . . . . . . .1388

 1129    . . . . . . . . . . . . . . . . .1236

 60      . . . . . . . . . . . . . . . . . .1264

 81      . . . . . . . . . . . . . . . . . .1265

 92      . . . . . . . . . . . . . . . . . .1274