O58Cgar1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

            v.                               23 Cr. 307 (LJL)

BRUCE GARELICK,

                  Defendant.

------------------------------x              Trial

                                             May 8, 2024
                                             9:03 a.m.


Before:

                  HON. LEWIS J. LIMAN,

                                             District Judge
                                              and a Jury


                        APPEARANCES

DAMIAN WILLIAMS
      United States Attorney for the
      Southern District of New York
BY:  ELIZABETH A. HANFT
      MATTHEW R. SHAHABIAN
      DANIEL G. NESSIM
      Assistant United States Attorneys

SHAPIRO ARATO BACH, LLP
      Attorney for Defendant Garelick
BY:  ALEXANDRA  A. E. SHAPIRO
      JONATHAN BACH
      JULIAN S. BROD
      JASON A. DRISCOLL

Also Present:

Special Agent Marc Troiano, FBI
Paralegal Specialist Grant Bianco, USAO

O58Cgar1

1          (Trial resumed; jury not present)

2          THE COURT:  Anything from the government before we

3   bring in the jury?

4          MR. SHAHABIAN:  No, your Honor.

5          THE COURT:  How about from the defense?

6          MR. BACH:  No.  Thank you, your Honor.

7          THE COURT:  How long does the government expect for

8   its summation?

9          MR. SHAHABIAN:  Approximately 90 minutes, your Honor.

10         THE COURT:  And the defense?

11         MR. BACH:  Approximately the same time, probably less.

12         THE COURT:  Let's bring in the jury.

13         MR. SHAHABIAN:  Your Honor, permission to publish the

14   first slide so we're ready to go.

15         MR. BACH:  No objection.

16         (Continued on next page)

17

18

19

20

21

22

23

24

25

1        (Jury present)

2        THE COURT:  Welcome back, members of the jury.  I hope

3   you all had a pleasant evening.  We'll now hear summations.  It

4   is our tradition that the government goes first and then you'll

5   hear from the defense, and then the government will have an

6   opportunity to give a reply summation.

7        The government may proceed with its summation.

8        MR. SHAHABIAN:  Thank you, your Honor.

9        THE COURT:  Mr. Shahabian.

10       MR. SHAHABIAN:  Members of the jury, Bruce Garelick

11  cheated.  In 2021, he knew valuable inside information.  He

12  knew that DWAC, a blank check company, was targeting a merger

13  with President Donald Trump's social media company Trump Media.

14  He knew in June 2021 that DWAC's CEO had already been involved

15  in secret exclusive negotiations with Trump himself.  After he

16  joined the board of directors of DWAC, he knew these secret

17  negotiations were advancing, and fast.  He knew that when a

18  merger between DWAC and Trump Media was announced, it would be

19  an earthquake in the markets.  DWAC's stock price would

20  skyrocket.  This was inside information.  It was confidential.

21  The defendant had a duty to keep that information confidential,

22  secret.  He had a duty as a director to put DWAC's and its

23  shareholders' interests ahead of his own, a duty not to use

24  what he had learned for his personal gain, but that is exactly

25  what he did.

1    After learning about the Trump SPAC, the defendant and

2    his boss agreed on a plan.  They would buy millions of warrants

3    on the open market and sell when the news broke and make a ton

4    of money.  The defendant was their eyes, ears, and mouth on the

5    DWAC board.  He updated his boss on the merger negotiations and

6    he used his board seat to push for the Trump Media merger.

7    When the DWAC merger was announced, the defendant and

8    his boss sold all their open market shares.  They made over

9    $18 million, $18 million.  The people they told in advance made

10   millions more.  The defendant betrayed the trust of DWAC and

11   its shareholders.  He committed insider trading.  He cheated,

12   plain and simple.

13   When the defendant bought his DWAC shares, when he

14   tipped his boss and others and told them to buy DWAC

15   securities, he had an illegal advantage, an advantage that

16   ordinary investors did not have.  When he bought those shares,

17   when he tipped others, he broke the law.  It's time to hold him

18   accountable.

19   Over the past week and a half, you've seen and heard

20   all the evidence in this case as it came in piece by piece.

21   This closing statement is our opportunity to pull all that

22   evidence together and explain how it proves beyond a reasonable

23   doubt that the defendant is guilty as charged.

24   Now, members of the jury, Judge Liman's going to give

25   you detailed instructions on the law.  I'm not going to do

1    that.  I'm going to summarize what I expect Judge Liman is

2    going to tell you.  If there's a difference between what I say

3    and what you hear Judge Liman say, follow his instructions on

4    the law.

5        The defendant is charged with several counts of

6    insider trading, but at the end of the day, the charges boil

7    down to five questions that you need to decide.  First, did the

8    defendant have material nonpublic information?  Second, did he

9    use that information to trade in DWAC securities?  Third, did

10   he tip others?  Fourth, did he violate his duties to DWAC and

11   its shareholders?  Fifth, did he know what he was doing was

12   wrong?  The answer to all of these questions is "yes."  What

13   I'm going to do this morning is walk through how the evidence

14   shows that for each of these questions, we've proven that

15   answer to you beyond a reasonable doubt.

16       Before I do that, I want to talk about one thing.

17   Look, members of the jury, the defendant testified.  At all

18   times, the burden of proof remains on the government.  We have

19   to prove his guilt beyond a reasonable doubt.  The defendant

20   did not have to present evidence, he did not have to testify,

21   it never shifts to him.  But when the defendant chooses to take

22   the stand, when he chooses to give you an explanation, you sat

23   there, you listened to it, and you should scrutinize it

24   carefully, compare it to the evidence you heard in this case.

25   I submit to you that a lot of what the defendant told you the

1    past couple of days was bogus, he lied to you repeatedly.

2           I'm going to talk about what the defendant said on the

3    stand, what I expect the defense will argue today at various

4    points through my summations.  But when you ask yourself, did

5    the defendant know what he was doing was wrong, think about

6    what he tried to tell you on the stand these past couple of

7    days and whether it squares with the evidence.  It doesn't

8    because he lied.

9           So let's start with the first question.  Did the

10   defendant have material nonpublic information?  Let's start

11   with whether it was nonpublic.

12          There isn't going to be a serious dispute about this,

13   I expect, members of the jury.  DWAC's merger negotiations with

14   Trump Media were a secret until the public announcement on

15   October 20th.  The fact that DWAC's CEO, Patrick Orlando, was

16   exploring a merger with Trump Media, even through his previous

17   SPAC, Benessere, that was a secret.  The fact that Patrick

18   Orlando and Mr. Trump had signed a mutually exclusive letter of

19   intent, that was a secret.  Remember, this is the letter of

20   intent that the defendant and the Shvartsman's were shown

21   during that June 2021 meeting to show that this was a serious

22   potential merger that Mr. Orlando had access to the president.

23          Now, I'm going to stop for a minute.  You're not going

24   to get the slides up here on the screen back with you in the

25   jury room.  I'm going to go through them slowly.  If there are

1  any exhibits that seem important to you, you can write down the

2  exhibit numbers.  They'll either be on the exhibits or they'll

3  be in the bottom-right, and I'll try to call out the most

4  important ones as we go along.

5       You heard from Andrew Litinsky.  He was the person

6  negotiating on behalf of Trump Media.  He testified this letter

7  of intent between Benessere and Trump was confidential.  The

8  negotiations between Patrick Orlando and Mr. Trump were

9  confidential.

10      That's also what Hartley Wasko told you.  Remember, he

11 was one of the investors that the defendant brought into DWAC

12 to try to get him to invest in the founder shares.  He said

13 when he sat in on that pitch in the summer, his understanding

14 was that DWAC, this company, had a plan to acquire Truth

15 Social — that's Trump Media — and that he had the opportunity

16 to invest in the founders round.  That was the pitch.  And he

17 understood that that was confidential information.

18      We saw this text chain.  This is when they're trying

19 to find investors in the founders round.  Patrick Orlando tells

20 his team, you can only share the SPAC target media group name —

21 that's Trump Media — if the person is under an NDA, if they

22 signed the confidentiality agreement.  This is very secret

23 information.  This is DWAC's advantage.

24      And the defendant knew it was a secret.  This is

25 Government Exhibit 400.  This is from the summer.  He's telling

1  Eric Hannelius that the DWAC prospectus -- remember, this is

2  one of those publicly filed SEC documents, that's publicly

3  available, but it doesn't say anything about Trump.  It can't

4  yet because it's a secret.  The defendant knew this was a

5  secret.

6         You heard from Michael D'Angelo.  That was the person

7  from Saba Capital, the hedge fund.  He explained their

8  portfolio strategy.  They don't know who the targets of these

9  SPACs are, they're blank check companies, so as a strategy,

10 they just invest in all of them.  It's a safe bet, they get

11 their $10 back, and if one of them hits, they make a lot of

12 money, but they don't know who it's going to be when they

13 invest.  He testified that when Saba invested in DWAC, they had

14 no idea who the potential targets were.  They did not know that

15 Trump Media was one of those targets.

16        Ben Reed.  That was the broker from E.F. Hutton who

17 placed the trades.  He told you the same thing, we do a ton of

18 these SPACs, nobody knows who the targets were.  When I placed

19 the orders, I didn't know.  He said a lot of them don't do

20 anything.  A decent amount don't even find an acquisition

21 target, they just fail.  And so, he was surprised when the news

22 of Trump came out.  The broker didn't know.

23        I don't know if the defense is seriously going to

24 contest that this was nonpublic information.  But remember,

25 they tried to show you this Axios article that the defendant

1  looked at in the summer of 2021.  You can look at it, too.

2  It's Government Exhibit 1202.  It talks about Trump Media,

3  talks about them looking for a SPAC, but what it doesn't say is

4  DWAC, it doesn't say Benessere, it doesn't say Patrick Orlando.

5  The fact that DWAC already was targeting Trump Media, that was

6  the secret.  That's why they invested in DWAC.  So this Axios

7  article is a distraction.  Members of the jury, these

8  negotiations between Patrick Orlando and Trump Media, between

9  DWAC and Trump Media were secret until the announcement on

10  October 20th, 2021.

11         So now that we've talked about it being nonpublic,

12  let's talk about whether the information was material.  You

13  heard a lot about whether it was material in this case.  The

14  defendant told you several times he didn't think any of this

15  was material.  It absolutely was.

16         I expect Judge Liman is going to give you some

17  detailed instructions on what materiality means.  But what it

18  basically means is, was this important?  Was it important to

19  deciding whether to invest in the stock?

20         Here's a portion of what I expect Judge Liman is going

21  to instruct you.  Material information includes any fact,

22  which, viewed objectively, might affect the value of the

23  corporation's stock or other securities.  Might affect, members

24  of the jury.  You know this information might affect the value

25  of DWAC's stock.  You saw the charts.  These SPACs, these blank

1    check companies, they trade at $10 a share.  That's the red

2    line on the bottom because they don't do anything until they

3    announce a merger target.  There's no business, there's no

4    money coming in, they're just looking for an acquisition

5    target.  That's the whole point.

6         Once the news broke, the price skyrocketed from $10 to

7    $52 the next day, to $175 the day after that.  This was huge

8    news.  This was material.  This was important to deciding

9    whether to invest in the stock.  It's why Andrew Litinsky and

10   Peter Melley told you half a billion shares of DWAC traded

11   hands the day after the merger was announced.  This was a

12   gigantic announcement.

13        Now, it wasn't just huge at the end when it was

14   actually announced to the public.  This information that they

15   were negotiating that DWAC was targeting Trump Media was huge

16   news every step of the way.  I'm going to summarize that

17   evidence.  But you sat through this trial, members of the jury.

18   SPACs don't have any value besides the target company.  That's

19   the point.  This SPAC, DWAC, was targeting Trump Media, its top

20   target.  It was about getting Trump from the beginning, and

21   DWAC's management already had an inside track to Trump from

22   their prior SPAC.  That's what got people like the defendant

23   excited about the investment, that's how they structured their

24   investment on the potential that DWAC was going go to land

25   Trump, not that it was a guarantee, but that this could happen

1   and this kind of stock price jump was going to happen.  That's

2   material.  That's important to deciding whether to invest.  You

3   know from this trial nothing was going to make a bigger splash

4   than the Trump Media announcement.  This wasn't two paper

5   companies merging.  This is the former president's social media

6   company launching right after he lost the election.  Of course

7   this is going to be huge.  And you heard the defendant's words

8   from the board meeting on October 20th when they approved the

9   merger.  Unlike any other social media startup he'd seen in his

10  life.  The model is irrelevant.  What matters is it's Trump.

11          Now, the defendant took the stand.  He told you he

12  didn't think any of these negotiations were material until the

13  very end, that it was pie in the sky, that it was aspirational,

14  that there was no reality to it.  It was only a few days before

15  when he heard they were close to a definitive agreement, that's

16  when he realized this might be material.

17          Members of the jury, come on.  You know that the

18  defendant was defendant lying to you when he said that.  You

19  know he was lying because the evidence shows that Trump was

20  important to his investment plan at every step of the way.  It

21  started in that June 18th meeting.  This is where the defendant

22  learned and the Shvartsman's learned that Patrick Orlando had

23  already negotiated an exclusive letter of intent to negotiate

24  with his prior SPAC and Trump Media, exclusive.  Andrew

25  Litinsky told you these were serious merger negotiation

1  discussions.  He testified, at this point, the SPAC Benessere

2  would only be talking to one operating partner, that's Trump

3  Media.  Trump Media at that point would be only talking to one

4  other SPAC, that's Benessere.  The parties are seriously

5  interested, it's not a guarantee, but they're serious.

6        Patrick Orlando didn't say, I know Mr. Trump, I

7  visited Mar-a-Lago, we have a social relationship.  What he

8  told defendant and Rocket One was we already got negotiations

9  underway, I already have a business relationship with him, I've

10  got an inside track.  That was material.  It was important.

11        And the defendant, when he testified, he tried to

12  downplay what he learned in this meeting, the importance of

13  what he heard.  Here's what he said.  He said, well, I didn't

14  see the document at the meeting, I wasn't really sure what he

15  had shown, but I had talked to my boss after, he said

16  Mr. Orlando had shared a photograph of himself with the former

17  president, and he also shared what my boss characterized as

18  some, you know, older prior business contract that Mr. Orlando

19  had with Trump.  You know he was downplaying it because that's

20  not what he was saying at the time he learned this information.

21        This is an important exhibit, Government Exhibit 743.

22  This is June 30th after that meeting on June 18th when the

23  defendant is trying to build the syndicate, to bring investors

24  into DWAC.  And what does he say?  Look at the sentence

25  starting "it involves."  This deal involves founder shares to a

1    soon to IPO SPAC that has an exclusive with the soon to launch

2    Trump Media Group.  The defendant understood how important it

3    was that Mr. Orlando had already negotiated an exclusive

4    contract with Trump Media.

5         Now look, that's not a guarantee the negotiations are

6    going to complete, there's never a guarantee until everything

7    is signed, but it's important.  He explained that, no guarantee

8    the Trump deal happens, but the speculative upside is huge if

9    it does and the downside is protected.  This was material

10   information.  The defendant knew that and he used it to bring

11   other investors into the deal.

12        The defendant and his boss, Michael Shvartsman, this

13   was their plan to bring the syndicate in.  The defendant called

14   it the Trump SPAC.  This is one of his emails to Anton

15   Postolnikov.  Anton, good times last night.  Following up on

16   that Trump Media Group SPAC we mentioned.  The important

17   takeaway from this meeting, the important thing to bring

18   investors in was the potential to get Trump Media.  That's how

19   they pitched it.

20        Government Exhibit 742.  This is the defendant texting

21   Anton Postolnikov.  Hey, Anton.  It's Bruce.  Are you all set

22   on DWAC Trump SPAC?  That's what the defendant thought DWAC

23   was, it was the Trump SPAC.  That was the point, they were

24   trying to get Trump Media.

25        Here are other emails the defendant said to other

1    potential investors in the syndicate.  Eric Hannelius, Hartley

2    Wasko, others.  In every one of these emails, how does he

3    describe the opportunity to invest in DWAC?  It's the Trump

4    SPAC.  That was the plan, it was important, it was material to

5    know that DWAC was targeting Trump Media.

6          Hartley Wasko understood that.  He testified, I

7    participated in one of these calls, the defendant was there,

8    Patrick Orlando was there, and my understanding was that this

9    company, DWAC, had a plan to acquire Truth Social and we had

10   the opportunity to invest in it.  That was the point.  This was

11   important information.

12         This is the calendar invite for that meeting that

13   Hartley Wasko attended.  The defendant was on the invite, he

14   sent it.  Patrick Orlando, the Shvartsman's, Eric Hannelius,

15   Marc Wachter, Hartley Wasko, they're all there.

16         During the meeting, Wachter texts Patrick Orlando, I

17   would also mention that if Trump runs for president again, this

18   will likely be a huge boost to TMG.  This is what they're

19   trying to sell.  This is how they're bringing investors into

20   DWAC.  We might get Trump, and if we do, it's going to be huge.

21   The defendant knew that.

22         The defendant lied to you, members of the jury, when

23   he took the stand and he said — you can go back through the

24   transcript if you need to — five times that there was no

25   reality to the possibility that a deal with Trump was going to

1    happen.  He called it, on the stand, a pie-in-the-sky fantasy,

2    aspirational, he paid it no mind, there was no reality to it.

3    Members of the jury, come on, that was a lie.  This was the

4    point of the investment.  That's why they were bringing a

5    syndicate together.  It wasn't because there was no reality to

6    it, it was because this was important that they might get Trump

7    and they might make a lot of money.

8          Remember, materiality is any information that might

9    affect the value of the stock.  This is that kind of

10   information.  The defendant lied to you when he said there was

11   no reality to it because he had to, because if you believe that

12   this was material information, material nonpublic information,

13   then the defendant knew from the summer before any trades

14   happened that he was in possession of material nonpublic

15   information.  That's why he lied over and over to you.

16         And you can see that in the emails.  Government

17   Exhibit 412.  After the meeting, the defendant emails Patrick

18   Orlando's team and he says in the second paragraph here,

19   Michael — that's Michael Shvartsman — and I the discussed with

20   Patrick Orlando the ROFR on future payment processing needs for

21   the Trump Media Group.  Remember, the defendant explained,

22   Rocket One, they do payment processing, credit cards, things

23   like that.

24         When the defendant testified, he tried to say, oh,

25   they were just asking for an introduction to Mr. Trump, you

know, Patrick Orlando knows him, maybe there's an opportunity there.  That's not what this is, members of the jury.  This is when this merger is complete and when DWAC is running Trump Media.  We want in, we want a right of first refusal — an ROFR — on the payment processing needs, get us in the door.  That's what they're asking for.  This isn't about we'd like to meet Mr. Trump, this is the point of these business negotiations.  DWAC is going to target Trump Media and the defendant and his company wanted an inside track for more business.

Now, you heard a lot about how SPACs aren't supposed to have targets until they go public — some of the SEC rules.  And so, we saw this response from Patrick Orlando.  We really like TMG.  There's no guarantee.  One of many companies.  We've had no substantive discussions with respect to DWAC because we can't yet.  And the defendant understood they weren't supposed to say that DWAC had had any negotiations.  And Andrew Litinsky said, DWAC hadn't done negotiations yet, it was all Benessere before the IPO.  But he understood, after getting this email, that he wasn't supposed to be so clear about the target.  So he said in response, for clarification purposes, your response regarding a potential target I named in my prior email was my own speculation regarding that potential target.  Members of the jury, it wasn't his own speculation, we saw that.  Trump was the discussion in these DWAC pitches.  The defendant

1    understood he had gone a little too far in his email.

2          And we know that because that was the plan.  This is

3    one of the most important text messages in this case.  This is

4    Government Exhibit 742.  This is the Postolnikov text chain.

5    So we saw part of it earlier when the defendant asked Anton

6    Postolnikov, are you in on DWAC?  Are you in on the Trump SPAC?

7    What did you decide to do?

8          A couple of days later, Mr. Postolnikov texts the

9    defendant, let's just hope the merger is with you know who,

10   otherwise won't get much traction.  You know who they're

11   talking about, members of the jury, they're talking about Trump

12   Media.  That's the "you know who."

13         And the defendant explains the plan here.  It's not

14   about Black-Scholes or investing in SPACs or any of the

15   nonsense he tried to tell you on the stand.  It's right here in

16   this text message.  If the merger is not the plan A, we

17   exercise our redemption rights.

18         You heard about redemption rights in this trial.

19   Peter Melley explained them to you.  If you own units or shares

20   in a SPAC and you don't like the target when they announce it,

21   you can get your money back, you can redeem your shares and get

22   the $10 you put in back.  That's what the defendant is saying.

23   The goal was to get Trump Media if they didn't like the target.

24   If it wasn't you know who, if it wasn't Trump, they would

25   redeem their shares.  It was material to them that DWAC was

1   targeting Trump.

2           The defendant testified, he explained these redemption

3   rights were important in their negotiations, that he and his

4   boss negotiated with Patrick Orlando even about the founder

5   shares, which didn't initially have redemption rights, they

6   agreed to pay an extra dollar so that they could get their

7   money back.  He tried to cover himself at the end there.  He

8   said, if you don't like the way that, you know, this goes down

9   the road, you know, post IPO, you get a little more protection.

10  You know what that means, members of the jury.  If it wasn't

11  Trump, they could get their money back.  That's why they were

12  negotiating for the redemption rights.  That's how he pitched

13  to the investors in the syndicate.

14          We looked at this text, Government Exhibit 743.  This

15  is where he says the SPACs already got an exclusive with Trump

16  Media, speculative upside is huge and the downside is

17  protected.  That's the redemption rights.  We're getting in

18  because they're targeting Trump, and if it's not Trump, we're

19  protected, we can redeem.  This was material that Trump was the

20  target.

21          Here's another one, another potential investor,

22  Government Exhibit 723.  June 30th, he texts the defendant and

23  Michael Shvartsman an article about the Trump organization

24  expected to be charged with crimes.  He says, would they even

25  be able to take a company public right now?  And the defendant

1  acknowledges, there's risk, the SPAC, it might not happen.

2  They might not get Trump Media Group for a variety of reasons.

3  However, we have downside protection from the structure of the

4  investment.  The redemption rights, the reason they invested,

5  the goal was to try to get Trump Media, if it wasn't Trump

6  Media, they could redeem.  This was material who the target

7  was.  It was important, it was how they were structuring their

8  investment strategy.  Huge upside if it's Trump, if it's not,

9  you redeem.

10      Here's another version of that.  This is Government

11  Exhibit 465.  This is the email to Eric Hannelius on September

12  9th, 2021.  The defendant says, if they don't announce a target

13  we like/expect.  You know who the target they like/expect is,

14  it's Trump Media.  If it's not Trump Media, we have the right

15  to demand our $10 back, which we will do under this scenario.

16  He's saying the plan right here.  It's not a Black-Scholes

17  model that you never saw any notes of, it's Trump Media or

18  we'll redeem.

19      It's the same reason in Government Exhibit 474.  This

20  is October 16th, shortly before the merger announcement.

21  Remember, Eric Hannelius forwards the defendant an email.  He

22  says, hey, they tell me I have to return some of my money back,

23  what do you think I should do?  Should I take my money back or

24  should I roll it into Patrick Orlando's next SPAC?  The

25  defendant doesn't say, well, SPACs are good investments

1  generally and you should invest in all of them like Saba

2  Capital does.  No, what he says is, get your money back.  Their

3  next SPAC may or may not be interesting to us.  If it is, we

4  can certainly get involved then.  Members of the jury, you know

5  what makes the SPAC interesting to the defendant, the target.

6  If they know who the target is and they like it, then they'll

7  invest, if they don't, there's no reason to put up their money.

8  This is not a portfolio trading strategy like Saba Capital,

9  this is, we want the target, that's the reason we're investing,

10 it's Trump Media.  It's material.  That was the point.

11         It also just wasn't the target, it was their trading

12 strategy.  Remember, you heard a lot about lockup during this

13 trial, that the founder shares had lockup rights.  Here's the

14 defendant explaining it to Justin Friedberg.  There's a catch

15 to those founder shares they were pitched in.  You get in

16 cheap, but you're locked up for at least six months.  And you

17 heard that from a lot of witnesses in this trial, like Hartley

18 Wasko and Marc Wachter and Eric Swider.  They don't have shares

19 because they're still locked up.  If you want to sell on the

20 news of the announcement, a lockup is not helpful.

21         And so, the defendant explained in Government Exhibit

22 745, this is a text message from the defendant to Michael

23 Shvartsman in August of 2021 right before the IPO, recall, we

24 downsized our founders class investment from 400,000 to

25 125,000.  Recall, we are playing the IPO shares warrants as far

1    more of a short-term trader.  This was the strategy.  They

2    didn't want to be locked up, they wanted to be able to sell on

3    the news.  There's no reason to be a short-term trader and a

4    SPAC.  You saw the charts, members of the jury.  They're $10

5    until there's an announcement.  They're not doing anything.

6    The reason he's planning to be a short-term trader is he knows

7    this merger is going to happen fast, and when it does, they can

8    sell and they can make a lot of money.  That was the strategy.

9    It was important, it was material to know that DWAC had an

10   inside track to Trump Media and that was the expected target.

11          You heard the defendant's explanation on the stand.

12   Well, it wasn't about Trump.  Michael Shvartsman was just

13   interested in warrants generally.  That's why I was looking at

14   public SEC filings about volatility and running a Black-Scholes

15   calculation.  He admitted on cross examination there were no

16   notes that you saw in this case of a Black-Scholes investment,

17   of a Black-Scholes calculation, any reason other than Trump

18   Media for these investments.  He lied to you because if he

19   admitted that the reason they bought shares, the reason they

20   invested was Trump Media, then he admitted to knowing he had

21   material nonpublic information in the summer.  The reason they

22   were talking about warrants that summer wasn't because of any

23   Black-Scholes calculation, they wanted to avoid the lockup.

24   They wanted quick securities they could trade and make a lot of

25   money on once the news of Trump Media broke.  That was the

1    strategy.

2           There's one more thing I want to say about this.

3    Again, Judge Liman is going to give you instructions on what

4    materiality means, but it isn't a 100-percent guarantee.  It

5    doesn't mean everyone signed on the dotted line, it's not the

6    night of October 20th.  Material is any information that might

7    affect the stock price, that might affect a reasonable

8    investor's decision to invest in the stock.  You saw that price

9    jump, members of the jury.  Of course it was material to know

10   that DWAC had an inside track to Trump and that that was a

11   potential target for the merger.  That was the point.  The

12   defendant had material nonpublic information.  He had it from

13   the summer.

14          So let's turn to the second question.  Did the

15   defendant use that material nonpublic information to trade in

16   DWAC securities?  Now, there's no dispute he traded.  You saw

17   the charts, he bought DWAC securities.  So the question is:

18   Did he trade using the information he had received?  Again,

19   Judge Liman is going to give you instructions on this.  I

20   expect what he's going to tell you is that to use information

21   in a securities trade means the information in some way

22   informed the investment decision.  It must have been a factor

23   in the decision to trade, it need not have been the only

24   factor.  You know, members of the jury, that the fact that DWAC

25   was targeting Trump Media was a factor in the defendant's

1    trades because it was what he understood was the point of DWAC.

2    The point was to try to get Trump Media.

3            Let's go through what the defendant knew before each

4    of his trades.  We'll take them one at a time.

5            On September 2nd, 2021, the defendant is appointed to

6    the DWAC board.  He has a phone call with Patrick Orlando, the

7    DWAC CEO.  Sends him an email, great to catch up with you.

8    Things are getting started.  The very next day, he's already on

9    the board, he buys 610 DWAC units.

10           Now, members of the jury, think for a minute about all

11   the information we just talked about that the defendant learned

12   in the summer that was nonpublic material information, that

13   Patrick Orlando had been negotiating with Trump, that he

14   already gotten exclusivity with his prior SPAC, that DWAC was a

15   target -- excuse me.  That Trump Media was a target of DWAC.

16   The defendant knew all this at the time he made this trade, he

17   knew it was secret, he knew it was material, he was on the

18   board of directors of the company.  He had a duty not to use

19   material nonpublic information and he traded right here already

20   on September 3rd.  You know why he bought these shares.  He

21   bought them because he wanted to buy in advance of a potential

22   announcement.  He wanted to get in before anybody knew.

23           September 9th, he emails Eric Hannelius.  Look at the

24   second bullet, the announcement — that's the announcement of

25   the target — expected 6 to 10 weeks from now is our expected

1    catalyst to then profitably sell the IPO shares.  6 to 10

2    weeks, members of the jury, from the IPO to the merger

3    announcement.  The defendant knew that because he had been told

4    that, because he had received that as material nonpublic

5    information that these negotiations were going to happen fast,

6    that this was the plan.

7         Ben Reed, the E.F. Hutton broker, told you he had seen

8    a lot of these SPACs.  E.F. Hutton does a ton of them.  He

9    testified that the actual time it took for DWAC to go from IPO

10   to merger announcement, which I know you saw my math was not

11   the best in this trial, but from September 2nd to October 20th,

12   that's about six weeks.  And Ben Reed said, that's very, very

13   fast.  Very, very fast.  The defendant knew that already, on

14   September 9th, that this was going to be a fast merger

15   negotiation.  And he admitted on cross examination that it was

16   unusually fast for DWAC and TMG to announce their merger after

17   the IPO.  He had an advantage already.  What did he do the next

18   day after sending that email to Eric Hannelius?  He bought

19   another 300 units of DWAC.  He bought these shares based on the

20   inside information he knew.

21        The next week, the 16th, Patrick Orlando emails the

22   defendant, we're calling a meeting of the board of directors.

23   Remember, members of the jury, Ben Reed told you a lot of these

24   facts don't do anything, they don't get an acquisition target,

25   nothing happens.  That's not what's going on with DWAC.

1   They're already calling a board of directors meeting.  They're

2   moving forward.  This is secret.  The defendant knows this,

3   other people don't.  He buys 410 shares the next day.  He gets

4   a reminder, board of directors meeting.  The next day, again,

5   he buys another 900 shares.  He's buying because he has

6   material nonpublic information.

7        Now, when he testified, he tried to tell you, well,

8   this is my investment strategy, I buy a little bit at a time,

9   this is how I normally buy.  I'm going to come back to that a

10  bit later.  But you know the reason he was spreading his

11  purchases out wasn't because of an investment strategy to buy

12  at the right time.  Again, these SPACs are $10 until an

13  announcement.  Nothing's happening.  You can buy all at once,

14  you can spread it out, it's going to be about $10.  He spread

15  it out so it doesn't look suspicious, so it doesn't raise any

16  eyebrows.  He buys again on material nonpublic information.

17  Tells Patrick Orlando, I can attend the board meeting tomorrow.

18  That night, he gets an email from Patrick Orlando.  This is the

19  board packet.  This is what they're going to discuss at the

20  board meeting.  Six potential targets, one of them, Trump Media

21  Group.

22       Now, you heard the defendant testify and ask questions

23  about this, that all of the information in this memo was from

24  publicly available information.  That's not the point, members

25  of the jury.  It's not the information about Trump Media that's

 1    material nonpublic information, it's that DWAC was targeting

 2    Trump Media.  They had a target list and Trump Media was one of

 3    them, and nobody knew that, and if you knew that, you could buy

 4    the shares at the $10 price before anybody else knew.  That's

 5    the material nonpublic information.

 6         What did the defendant do the next day?

 7         Sorry.  Before we get to that.  You heard Eric Swider

 8    explain that to you.  The initial pipeline of targets and the

 9    discussion the board had about that pipeline, this board

10    packet, it was very sensitive.  It was obviously confidential.

11    It was really the whole foundation of what our job was as a

12    board.  This was the point of DWAC, find targets, pick one.

13    This is their material nonpublic information until the

14    announcement.

15         What does the defendant do the next day after getting

16    this board packet?  He buys 1800 DWAC shares for $18,000.  This

17    is purchasing DWAC securities using the material nonpublic

18    information he's being given.  And when did that purchase

19    happen?  About half an hour to five minutes before the board

20    meeting.  What happens during the board meeting?  The consensus

21    of the board is to follow up and negotiate and execute LOIs

22    with TMG, Global Oculus, Bitrix and WAG so that we may conduct

23    deeper due diligence.

24         This is the board narrowing the field of potential

25    targets.  We should pursue the high growth group first, one of

1    those was Trump Media.  Again, this is material nonpublic

2    information.  The board is focusing its search on its key

3    targets.  Who are we going to try to negotiate with.  And

4    remember, the defendant knows they already have an inside track

5    with Trump because Patrick Orlando had already negotiated an

6    LOI once with them.  This is material nonpublic information and

7    the defendant votes, let's pursue these LOIs.  He's not just

8    learning this information, he's creating it.

9         What did Eric Swider say about this?  The conclusion

10   of the board will follow up and negotiate and execute LOIs with

11   these companies was very sensitive information.  That

12   information would be the information that could have the most

13   impact on the company.  Our whole job is to find a target to

14   merge with, and so that list would be the most confidential

15   information that we could have.  The defendant tried to

16   downplay this.  Well, it was just a vote to try to negotiate

17   these LOIs, who knows if they're going to happen, we'll send

18   them out.  Members of the jury, come on.  This was the point of

19   DWAC, find a target, negotiate with it, get to a merger.  This

20   was material nonpublic information.

21        What did the defendant do?  He traded, but he learned

22   more before he traded.  The next day, there's additional

23   information he gets.  Patrick Orlando texts the WhatsApp chat.

24   This is a portion of that chat.  He says, TMG, we had a great

25   meeting, going to have a followup session very soon.  Mutual

1   exclusivity is very common and they are pushing hard for that.

2   And all the board members, including the defendant, vote to

3   advance on mutual exclusivity with TMG.

4        This is on September 22nd.  This is the day after they

5   say, let's negotiate LOIs.  Again, they're narrowing the field

6   to Trump Media.  And this is just an excerpt of what Patrick

7   Orlando says.  I want to go to the full chat because this is an

8   important message, this is important material nonpublic

9   information that the defendant received before he traded.

10       Here's the full message on the right.  That's from

11  Government Exhibit 511, if you want to take a look at it.

12  Patrick Orlando tells the board, including the defendant, TMG,

13  we had a great meeting.  We're about to have a followup session

14  very soon.  We've gotten great traction on lowering the

15  enterprise value of the target, meaning they're getting the

16  price down.  We're getting a better deal for DWAC shareholders

17  if this merger happens, but we're getting pushback on the

18  flexibility to be unilaterally exclusive.  Unilateral

19  exclusivity is more difficult to get nowadays as more SPACs are

20  chasing targets.

21       Andrew Litinsky explained this to you.  Unilateral

22  exclusivity means one side is locked up, but the other side can

23  go out.  Here, what Patrick Orlando is saying is, look, Trump

24  Media won't agree to let us keep looking for other targets,

25  they want mutual exclusivity.  Patrick Orlando says it's very

common, they are pushing hard for that, they're using the

market norm.  This they're telling us if we don't reach an

agreement on mutual exclusivity, they are in touch with other

SPACs and they may go somewhere else, we may lose this.  So if

we were to go into our next meeting, would the board vote to

approve us entering into a mutually exclusive LOI.  The just

going to be the two of us negotiating.  We won't negotiate with

anyone else, Trump Media can't negotiate with anyone else.

That's the point of this question.  We want board approval

before we go into our next meeting, can we do this, can we get

mutual exclusivity.  What does the defendant say?  I'm

enthusiastically in favor to advance with TMG under those

terms.  Enthusiastic, because that's the point, they're trying

to get Trump Media, and this is a big step towards doing that.

This is huge.  These weren't emails back and forth between

lawyers and someone DocuSigns a contract.  Andrew Litinsky told

you, we met at Mar-a-Lago, the former president signed the

mutually exclusive LOI that day, the 22nd, and so did Patrick

Orlando, we took pictures, people brought their wives.  This is

a huge event in the merger negotiations.

          Now, we're not saying that the defendant saw these

pictures, that he was at Mar-a-Lago, but members of the jury,

you know this was huge because it was obvious to all of the

sophisticated businessmen in this deal, that this is a big step

towards a potential merger.  We're agreeing to only talk to

1  each other to try to get to a merger agreement.

2          This is Andrew Litinsky.

3  "Q.  Was the signing of the exclusive letter of intent between

4  DWAC and Trump Media Group an important event in the merger

5  negotiations?

6  "A.  I would agree with that.

7  "Q.  Why?

8  "A.  I think any time two companies -- I guess I can speak for

9  ours, that's Trump Media.  Any time you're entering into an

10  exclusive LOI, it's a serious step on the way to a merger

11  potentially, it's not a guarantee, but it could be to a merger,

12  which would be the ultimate goal for a SPAC.  And for a

13  operating company like ours, you know, it's a serious thing.

14  This was a big step in the merger negotiations.

15          MR. SHAHABIAN:  What does the defendant do after

16  learning this information, learning that Patrick Orlando was

17  seeking approval for mutual exclusivity that Trump Media was

18  pushing for that or they would walk away and look for another

19  SPAC?  He buys 1300 DWAC units for $13,000 the very next day.

20  This is purchasing securities using the material nonpublic

21  information he had received.  This, members of the jury, this

22  is huge.  This is insider trading.  The defendant testified he

23  had no serious explanation for this, none at all.

24          You saw some summary charts that the defendant was

25  really busy that day, that he sent emails and attended some

1  phone calls, but he had time to buy 1300 DWAC units the day

2  after approving moving forward with mutual exclusivity.  He was

3  busy, but he wasn't too busy to commit insider trading.

4         The defendant received material nonpublic information.

5  He got it as early as the summer when he learned that DWAC was

6  targeting Trump Media.  He got appointed to the board, he kept

7  learning information about the negotiations, and then he traded

8  in the securities of the company he was on the board for after

9  learning that information.  This is using material nonpublic

10 information to purchase securities.  The defendant used the

11 information he had received to trade.

12        So that takes us to the third question.  Did the

13 defendant tip others?  Now, I'm going to talk about the

14 charges, the actual five counts you're being asked to vote on

15 at the end of my remarks.  This third question, did he tip

16 others, it doesn't relate to all of the counts, it only relates

17 to some of them.  The fact that the defendant himself bought

18 securities for himself, that's enough to convict on some of the

19 counts, and we'll talk about that at the end.  Part of the

20 evidence is and part of the counts are that he didn't just

21 trade for himself, he tipped others.  He told them to trade on

22 the basis of material nonpublic information.  In particular,

23 you're going to be asked to determine if the defendant tipped

24 two people:  Michael Shvartsman and Eric Hannelius.

25        Now, you heard a lot of names about people who traded

1430

1    in this trial, and I'm going to talk about them because it's

2    evidence that you should consider in determining what the

3    defendant did, how we proved to you that he traded on material

4    nonpublic information, and that he tipped that information to

5    others.  But the question you're being asked to decide is

6    whether he tipped Michael Shvartsman and Eric Hannelius, and

7    those other tippees, that other information, I'm going to go

8    through that for that basis, to help you see that's what he

9    did, that he tipped these two men.

10           Let's start with Michael Shvartsman.  It's defendant's

11   boss at Rocket One Capital.  He's the person he built the

12   syndicate for to bring people into the DWAC deal.  We're

13   jumping all the way to September 20th.  We're focusing on the

14   trades here.  The defendant texts Michael Shvartsman, I have a

15   board meeting tomorrow at 12:30.  I recommend starting to buy

16   more DWACU stock.  Recall, we only own $145,000 worth of a

17   $400,000 target position.  You can buy more by calling Ben

18   Reed, your broker, at E.F. Hutton.  This is September 20th.

19           Again, members of the jury, you heard about everything

20   they learned in the summer, that DWAC had an inside track to

21   Trump Media, that Patrick Orlando had already executed an

22   exclusive LOI with his last SPAC, that DWAC was targeting Trump

23   Media.  And this is him telling Michael Shvartsman, start

24   buying DWAC stock after he's on the board, after he's got a

25   board meeting scheduled.  This is tipping him.  This is telling

1    him to trade on inside information.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. SHAHABIAN:  Now I want to keep going after the

2     defendant's trade on the 23rd.  Remember, he said none of this

3     was material until the very end, until right before the merger

4     announcement——that's when I realized there might be something

5     here.  Until then it was all "pie in the sky" aspirational.

6     That's not what he was being told at the time, members of the

7     jury.  He was lying to you.

8          Government Exhibit 511, September 23rd.  This is the

9     board WhatsApp.  Alex Monje, third sentence:  "TMG expressed

10    interest in announcing next week."  Announcing what, members of

11    the jury?  A merger.  These negotiations are moving fast.  They

12    want to get to an announcement.  The defendant knew that on

13    September 23rd.

14         September 29th.  The defendant gets a text message

15    from Patrick Orlando.  This is, again, to the board WhatsApp.

16    "TMG wants to close on October 14th."  What does "wants to

17    close" mean?  Close the merger.  Announce the deal.  This is

18    fast.  They are moving.  The defendant knew this, on

19    September 29th.  This is material.

20         And he's talking to his boss, Michael Shvartsman.  You

21    saw the chronology.  There are phone calls.  We don't have the

22    content of those phone calls, we don't know exactly what was

23    said, but they're in touch.  They work together.  Two calls

24    that day, September 29th.

25         The next day, Patrick Orlando tells the board, "We're

1   at TMG headquarters.  We're doing our due diligence.  This is

2   the agenda for the day."  Later that day, phone call between

3   the defendant and Michael Shvartsman.  Right after that phone

4   call, ten minutes later, the defendant texts Michael

5   Shvartsman.  "Note:  DWAC warrants started trading today.  That

6   means they traded just below 50 cents on a volume of 116,000.

7   That means there were only 60,000 of volume today.  Volume

8   should pick up as holders disaggregate."  And he reminds him,

9   "Ben Reed is your contact to trade."  It's time to start buying

10  DWAC warrants.

11       Now, members of the jury, warrants are a little

12  different than the founders shares they invested in, from the

13  IPO shares that have the redemption rights.  Warrants are

14  risky.  The defendant admitted on cross-examination that if

15  DWAC did not find a merger target, if, like a lot of these

16  SPACs, nothing happened and you didn't exercise your warrants,

17  they would expire.  They'd be worthless.  There's no redemption

18  rights in the warrants.

19       What does Michael Shvartsman do, the very next day,

20  after receiving this text message?  He calls Ben Reed.  He

21  emails him.  He cc's the defendant.  The defendant knows what

22  he's doing.  And he says, "I want to buy 2 million warrants in

23  DWAC.  Don't run up the price.  Spread it out over the next few

24  weeks.  Not in a rush."  He's got the defendant on the board.

25  Knows, I've got a few weeks.  Start buying warrants.  And that

1    day, the Rocket One Capital account purchases $100,000 worth of

2    warrants.  The warrants are cheap.  They're 50 cents, about, a

3    little less than that, but we're going to look at those price

4    charts.  When they hit, they hit big.

5        October 1st.  Again, they're talking about the warrant

6    plan.  The defendant texts Michael Shvartsman a picture of the

7    current price of DWAC warrants, 46 cents.  They exchange some

8    phone calls.  Keep buying warrants.

9        And on October 4th through 5th, Rocket One buys the

10   rest of the 2 million-warrant plan, over 1.7 million warrants.

11   This is another almost $900,000 worth of DWAC warrants.  The

12   defendant——or, excuse me——Michael Shvartsman has to confirm

13   each of these trades with Ben Reed before he buys.  This is

14   purchases based on the material nonpublic information they

15   have.

16       And when the announcement happens on October 20th, the

17   warrants jump from about 50 cents to $14.49, to $79.22.  And

18   the defendant and Michael Shvartsman sell their securities; the

19   defendant for $50,000, Michael Shvartsman for about 18 million

20   profit.  And the defendant texts Ms. O'Shea:  "Big day today.

21   We made 20 million."  The plan worked.  This was their plan.

22   Get in on DWAC, get in before they announce it's Trump; when

23   the merger happens, we're going to make a lot of money.  The

24   defendant tipped Michael Shvartsman.  He told them to start

25   buying securities based on this material nonpublic information.

1    Now when the defendant testified, he gave you some

2    explanations about why they were buying warrants.  First he

3    said—and also why he traded, not just the warrants.  But for

4    the warrants, he said, well, it wasn't really about Trump

5    Media, it was even before the first meeting, Michael Shvartsman

6    was interested in warrants.  I looked at the public filings, I

7    ran a Black-Scholes calculation, and I thought, you know, this

8    is a good investment, generally, not because it's Trump.

9    That's bogus, members of the jury.  That's not a trading

10   strategy.  Saba Capital explained to you what a trading

11   strategy is.  If you don't know who the merger target is, like

12   Saba, you just invest in all of them.  You have a diversified

13   portfolio.  And if one of them succeeds, you don't know which

14   one, then you've got exposure to them, then you'll make money.

15   That's not what the defendant and Michael Shvartsman did.  He

16   admitted on the stand, he had only invested in one SPAC; Rocket

17   One had only invested in one SPAC—DWAC.  And that was because

18   they knew the target was Trump Media, not because of a

19   Black-Scholes analysis.  The defendant said, well, he'd been

20   hearing a lot about SPACs, you know, he added to his portfolio

21   conservatively.  Again, he was minimizing.  He was lying to

22   you, because the reason he wanted to hide his trades was to

23   avoid anyone knowing a board of director member had bought DWAC

24   shares.  The only reason to buy this SPAC, one particular SPAC,

25   that the general public knows nothing about other than Patrick

1  Orlando is on the board and the other management, they don't

2  know who they're targeting, they don't know what the plans are,

3  it doesn't make any money.  The only reason the defendant and

4  Rocket One invested was because it was Trump.  He tipped

5  Michael Shvartsman from the board.  He told him, start buying

6  DWAC, start buying warrants, start executing our plan.

7          The defendant also tipped Eric Hannelius.  That was

8  Michael Shvartsman's business partner.  You heard about him

9  during the trial.  On September 9th——again, this is after the

10 defendant is on the board——he tells Eric Hannelius, "the

11 announcement expected 6-10 weeks from now."  That's going to be

12 how we make money on our shares.

13         The defendant and Eric Hannelius meet up in Miami.

14 They're both there that week.  And at the end of that meeting,

15 on September 13th, the defendant——excuse me——Eric Hannelius

16 buys 500 DWAC units.

17         We know that's because of what the defendant told him

18 during their stay in Miami because of the emails that follow.

19 This is from October 3rd, from Eric Hannelius to Bruce

20 Garelick.  "Hi, Bruce.  Want to follow your lead here.  I have

21 been buying some DWACU since seeing you in Miami via my

22 brokerage account."  This is him telling him, we met in Miami,

23 we talked about DWAC, and then I bought open-market shares.

24 They had material nonpublic information.  They knew an

25 announcement was coming.  They knew it was targeting Trump

1    Media.  He said, "Should I keep buying?  What's your thoughts?

2    Again, want to follow your lead here.  Any updates on timing

3    and next steps from Patrick Orlando?"

4        The defendant testified, members of the jury, and he

5    tried to explain this.  He said, well, I knew right away this

6    crossed a line.  I couldn't tell him anything.  I was on the

7    board.  And that's what I told him.  He lied, members of the

8    jury.  This email doesn't say, I can't tell you that, we

9    can't—we can't talk about this.  He says, "Hi, Eric, Free to

10   discuss this today or tomorrow morning."  They have several

11   phone calls.  The first one between the defendant and Eric

12   Hannelius is 30 minutes.  It doesn't take 30 minutes to say, I

13   can't tell you anything.  This was improper.  You didn't see an

14   email after the fact from the defendant, Just following up to

15   confirm, I can't tell you anything.  I'm glad we spoke about

16   it.  Nothing from Eric Hannelius, Sorry I mentioned this to

17   you, my bad, I won't ask you again.

18       This was a tip.  This was talking about DWAC, talking

19   about the plan.  This is October 4th.  We saw there were

20   several phone calls involving the defendant, Eric Hannelius,

21   and Michael Shvartsman.  The merger negotiations are ongoing.

22   The defendant is accessing the data room that Trump Media had

23   set up.

24       October 5th.  The defendant and Michael Shvartsman

25   speak, and their plan is complete this day.  Michael Shvartsman

1  gets an email from Ben Reed.  They purchased the 2 million

2  warrants.  That day, the defendant and Michael Shvartsman talk.

3  After that, Michael Shvartsman and Eric Hannelius talk after

4  that.  And then the very next day, Eric Hannelius buys a

5  thousand DWAC warrants.  This is a purchase of shares based on

6  the discussions of Trump Media.  It's not the only person.

7  Anton Postolnikov buys 510 units that day.  We'll come back to

8  Mr. Postolnikov.

9       That evening, Michael Shvartsman calls Gerald

10  Shvartsman, his brother.  Less than a minute after that call,

11  members of the jury, Gerald Shvartsman emails the broker, Ben

12  Reed, "I'd like to buy some warrants in DWAC——D SPAC.  Can you

13  call me tomorrow."  Right after the phone call with Michael

14  Shvartsman.  This is the tipping chain.  The defendant is

15  telling Eric Hannelius, he's telling Michael Shvartsman,

16  Michael Shvartsman, now that his plan is over, he's got his

17  2 million warrants, he tells his brother, this merger is

18  coming, it's time to start buying warrants.

19       The next day, Gerald Shvartsman buys 275,000 DWAC

20  warrants.  He spends $130,000 on warrants.  Eric Hannelius

21  keeps buying DWAC warrants.  The negotiations are ongoing.  The

22  defendant is in touch with Michael Shvartsman.  He tells the

23  directors, "I remain enthusiastic in support of TMG as the

24  prime target for us."

25       And then we jump to October 12th, when Anton

1  Postolnikov purchases 500,000 warrants.

2          Now I want to spend a little bit of time on Anton

3  Postolnikov, not because you have to find the defendant tipped

4  him as part of your jury deliberations but because I expect the

5  defense is going to bring up Anton Postolnikov and who tipped

6  him a lot.  And you heard that during some of the

7  cross-examination of Marc Wachter who, with Anton Postolnikov

8  on the 16th, on the 17th, on the 18th, on the 19th, who had

9  dinner with him, who was in Miami.  None of that matters,

10  members of the jury.  Because even though Anton Postolnikov

11  bought shares at the end of October, that was all based on this

12  trade, on October 12, 2021.  Unlike the defendant, who

13  purchased his shares on each day, each day he traded, he logged

14  into his account and bought shares, that's not what Anton

15  Postolnikov did.  On October 12th, he told Ben Reed, I want

16  500,000 worth of warrants.  Start buying today.  He got a

17  hundred thousand on October 12th, but the other purchase is at

18  the end.  16th, 17th, 18th, that's from this 500,000 standing

19  order.  This happens after the defendant traded, after Michael

20  Shvartsman had already purchased 2 million warrants, after Eric

21  Hannelius had started buying units and warrants, and after

22  Michael Shvartsman had told his brother, it's time to start

23  buying warrants.  That's when Anton Postolnikov puts in a

24  standing order for 500,000 warrants.

25          The idea that there was another tipper who told Anton

1     Postolnikov that wasn't the defendant, that it came from Marc

2     Wachter on the 16th or the 17th, he traveled backwards in time

3     and told Anton Postolnikov start buying, it's ridiculous,

4     members of the jury.  The purchases for the 500,000 warrants

5     continued, but the order was placed on the 12th.

6              And again, I'm doing this because I expect you're

7     going to hear a lot about Marc Wachter.  He wasn't on the

8     board.  He didn't have access to the information that the

9     defendant had.  He didn't trade.  If you were expecting to

10    commit insider trading, you would expect to buy some for

11    yourself, like the defendant did.  He never traded in DWAC

12    securities.  He didn't just not trade; you saw, members of the

13    jury, he was pissed.  He lost money because he transferred his

14    founders interest, that hundred thousand dollars' worth of

15    founders shares, to Zoltan Present, right before the merger

16    announcement.  And to do that, he had to push Patrick Orlando.

17    You saw the texts, you saw the emails.  Hey, I got to get this

18    transfer done, I'm trying to get this deal done so Mr. Present

19    can close on his house.  And he's pissed that Patrick Orlando

20    didn't tell him, oh, maybe we should wait a week, let's slow

21    this down a bit.  His shares went from a hundred thousand to

22    2 million.  Now he didn't have them yet, and he admitted, I

23    don't know when I'm going to get them, just like Hartley Wasko

24    is not sure when he's going to get his founders shares.  But he

25    didn't buy securities.  He didn't make money on this supposed

1   tip he made.  This is a ludicrous theory.

2          And he had immunity.  You're going to get an

3   instruction on this, members of the jury.  You should

4   scrutinize the testimony of immunized witnesses carefully.

5   They're testifying on the understanding that what they say

6   can't be used against them in a future prosecution.  You heard

7   Netanel Suissa say, yes, I traded after I got the tip.  He had

8   immunity.  You heard Adrian Lopez Torres say, yes, I traded

9   after I got the tip.  He had immunity.  And you heard Marc

10  Wachter.  We shouldn't say you should believe him because you

11  like him or you think he's always a trustworthy guy, but he

12  admitted to potential securities fraud and soliciting

13  investors, he admitted to potential mortgage fraud in this

14  transfer to Zoltan Present to close the deal, he admitted to

15  potential insurance fraud in the Postolnikov life insurance

16  deal.  But he said, I didn't tip anybody.  I didn't have that

17  information, and I'm pissed 'cause I lost money.  And you can

18  believe him because that's consistent with the emails and the

19  text messages, and all the other evidence in this case.  So the

20  idea that there was another tipper for Michael Shvartsman and

21  Eric Hannelius to trade, that it was Marc Wachter at the very

22  end, it just doesn't add up.  And that's all I'll say about

23  that.

24         The truth is, the defendant was the tipper.  He was

25  the babysitter on the board.  Here's Government Exhibit 742

1    again.  This is the text chain between Anton Postolnikov and

2    the defendant, in June of 2021.  Anton Postolnikov says,

3    "Mike," that's Mike Shvartsman, "told me you are going to be on

4    the board."  The defendant says, "Hopefully.  Awaiting

5    approval.  Probably more of a front row babysitting job, but

6    well worth it for an unconventional investment like this."

7    What is the babysitting job, members of the jury?  It's to make

8    sure their plan works, that DWAC lands the Trump Media merger,

9    that he can tell everybody else what's going on.  That's the

10   babysitting.  That's the tipping.

11          Now after these trades, the defendant continues to get

12   updates on the merger.  This is October 15th.  This is when

13   Alex Monje says, "We're progressing very well on the definitive

14   agreement.  We need to extend the exclusivity you already voted

15   on in September 22nd."  This is when the defendant said, for

16   the very first time, he realized he might have material

17   nonpublic information.  Before this, it was pie in the sky,

18   could have fallen apart at any time, just didn't think about

19   it.  That was bogus, members of the jury.  This is just the

20   continuing negotiations that have been going in earnest as soon

21   as DWAC IPO'd.  The defendant votes to approve the extension.

22          The 17th.  He gets the draft definitive merger

23   agreement.  Now again, this pie in the sky, things could have

24   fallen apart, that could happen at any time——and Patrick

25   Orlando says it on the 17th.  That's the second text message.

1  "To be clear, no deal has been made yet.  It's not final until

2  everybody signs.  Everyone knows president Trump can be fickle,

3  but this is important.  These negotiations are highly

4  confidential."

5      That evening, the defendant and Michael Shvartsman

6  talk for 30 minutes.  The next morning, Michael and Gerald

7  Shvartsman talk for 43 seconds.  Now that's not a very long

8  phone call, but it doesn't take very long to say, hey, merger's

9  happening, get ready.

10      The defendant texts Michael Shvartsman, "I have a

11  board Zoom meeting.  I should free up."  And then that day,

12  Gerald Shvartsman says, "I want to buy another hundred thousand

13  warrants."  That day.  Because he knew from Michael Shvartsman,

14  who knew from the defendant, the merger was happening.

15      And you know that Gerald Shvartsman was getting

16  specific information about the merger because of how detailed

17  the information was he provided to his employees.  Adrian Lopez

18  Torres:  They're going to announce in two weeks a merger with

19  Trump Media, that's what Gerald told me.  This is that highly

20  confidential information Patrick Orlando said about in the

21  board WhatsApp.  He tells Netanel Suissa, who said the same

22  thing when he testified.  Mr. Suissa bought shares that day, on

23  October 19th.

24      That same day, the defendant, Eric Hannelius, and

25  Michael Shvartsman fly to Las Vegas.  They all check in at the

1    Wynn.  This was the Las Vegas group chat we spent a lot of time

2    on.  There's Eric Hannelius on the left, Michael Shvartsman to

3    his right, and the defendant all the way to the right.  They're

4    all in this group chat together, Los Vegas.

5            That day, the 19th, Michael Shvartsman says, "Come to

6    my room, 5506."  The defendant says, "All right.  I'm on my

7    way.  They're letting me up."  That's at 4:30, 4:45.  The

8    defendant then dials into the board meeting at 6:00, where he

9    votes on the merger agreement, where he says, "The potential is

10   enormous.  This is unlike any other kind of media internet

11   startup I've ever seen in my life."  The board meeting ends at

12   6:50.  This merger agreement is happening.  Less than 30

13   minutes later, the defendant texts the board—sorry, not the

14   board, the Los Vegas group chat—"What are our meet-up plans

15   tonight?"  Phil Margolin and Michael Shvartsman say, "The

16   suite," Mr. Shvartsman's room, "7:45."  At the same time,

17   Michael Shvartsman is telling Aric Gastwirth, "Come to my

18   suite."  He says, "I'll be there around 8."  Everyone's getting

19   there at about the same time.  This is the night after the

20   defendant votes to approve the merger agreement.

21           And what happens that night, while they're in Vegas?

22   Well, about an hour later, Eric Hannelius logs into his E*Trade

23   account, and then about an hour after that, he buys 10,000 DWAC

24   warrants.  And the very next morning, Aric Gastwirth buys

25   150,000 DWAC warrants.  You know what happened here, members of

1    the jury.  They're in Vegas, they get the news that the merger

2    announcement is coming, and when it's announced the next day,

3    they all sell and they make millions.  Eric Hannelius, 168,000;

4    Gerald Shvartsman, 4.6 million; Anton Postolnikov,

5    14.5 million; Aric Gastwirth, 1.4 million; Adrian Lopez Torres,

6    400,000; Netanel Suissa, 16,000.

7          Now, again, members of the jury, you're only being

8    asked to determine if the defendant tipped Michael Shvartsman

9    and Eric Hannelius.  But you know that this tipping chain

10   proves that that's exactly what the defendant did.  They all

11   knew the merger was coming, and they all made a ton of money on

12   it.

13         The defendant tipped Michael Shvartsman and Eric

14   Hannelius.

15         So that brings us to our fourth question.  Did he

16   violate his duties, his duties of trust and confidence to DWAC,

17   to its shareholders, even to Benessere?  Because he had signed

18   a nondisclosure agreement with Benessere.  Did he violate his

19   duties?  He did.

20         Now I don't think there's going to be a dispute here.

21   The defendant had a duty, right?  He admitted on the stand that

22   he understood that as a board member, he had a fiduciary duty.

23   He had to put shareholders' interests ahead of his own as a

24   member of the DWAC board.  And the parties have stipulated that

25   if you're the member——if you're a director of a public company

1    like DWAC, you have a duty of trust and confidence to the

2    company and its shareholders.

3            Eric Swider told you he understood what that duty

4    meant.  It meant he couldn't disclose the information.  He

5    couldn't trade on it.  This is part of his explanation of when

6    he panicked, when he accidentally bought one share of DWAC

7    after the public announcement.  Remember he said he wanted to

8    look up the price, he was curious, and to do that he

9    accidentally bought a share.  And he sold it immediately,

10   because he realized that as a board of directors member, it

11   could be a problem that he's purchasing DWAC securities.  He

12   didn't know if he still had nonpublic information yet.  So what

13   did he do?  He talked to Patrick Orlando.  We talked about that

14   with Mr. Swider.  And he explained to you why.  He said, well,

15   I know there's a lot of rules as a board member around buying

16   and selling securities of the company you're on the board of.

17   It's confidential.  He wanted to know if he was cleared.  And

18   so he wanted to talk to Patrick Orlando to see if this was

19   something that we needed to disclose.  The defendant's

20   co-director understood, couldn't trade, couldn't tip, talked to

21   Patrick Orlando as soon as he accidentally did it.

22           Trump Media, the other side, Andrew Litinsky, they

23   understood that too.  Andrew Litinsky said, I did not share

24   news of the potential merger or merger negotiations with anyone

25   who wasn't authorized.  It was confidential.  It would be

1  against the rules to do so.  He also said he never traded in

2  the securities of DWAC or Benessere because it would have been

3  against the rules.  He knew he couldn't do that.

4          The defendant violated these duties when he traded,

5  when he tipped based on material nonpublic information he was

6  in possession of.

7          The people who testified at this trial, who said they

8  knew nonpublic information and they knew it came from DWAC, did

9  not trade in DWAC securities.  Eric Swider.  I should correct

10  that.  He accidentally purchased a share and then he sold it.

11  Andrew Litinsky, never traded.  Eric, or Marc Wachter, never

12  traded.  Hartley Wasko, never traded.  That's because they all

13  understood they had duties of confidentiality.

14          This is one of those nondisclosure agreements.  This

15  is the other source of the duty that the defendant had, because

16  it wasn't just as a director; he had promised in the summer to

17  keep the information that he received confidential.  He signed

18  this nondisclosure agreement.  You can look at it.  It's

19  Government Exhibit 209.  And it says any possible target

20  transaction is confidential information.  Possible target

21  transaction.  The possible merger with Trump Media, that's

22  confidential.  The defendant promised he will keep the

23  information confidential.  He promised he won't use it except

24  to decide whether to invest in DWAC, the founders round shares.

25  That was the point of this.  You're going to meet with us in

1    the summer.  We're going to pitch you on the opportunity to get

2    in at the founders share, but you have to promise to keep this

3    information confidential, to only use it to decide whether to

4    invest in the founders round shares.  And you don't need to

5    read all the technical-legal language in the nondisclosure

6    agreement to understand that.  Hartley Wasko testified, he

7    understood that.  That's how these business discussions work.

8    You're getting a pitch.  They're telling you their secret

9    information.  To do that, you have to agree to keep it

10   confidential.  You can't turn around and use it against them.

11   That's the point of these nondisclosure agreements.  They

12   create duties of trust and confidence.  The defendant signed

13   one with DWAC; he signed one with Benessere too, because

14   remember, that exclusive letter of intent, that was with

15   Benessere.  That's the one they were shown during the summer

16   meeting.

17          And the defendant knew that this information that he

18   had received in the summer that was under this duty of trust

19   and confidentiality, that the only reason he was getting this

20   information is because of the nondisclosure agreement.  This is

21   an email he sent, Government Exhibit 418, to the DWAC team.  It

22   says, This is our syndicate.  These are all the people we want

23   to bring in under the tent.  We want them pitched on DWAC.  We

24   want them invested on DWAC.  And what does he say under the

25   spreadsheet?  "Note:  Some of these investors that we're

1  bringing in may still need to sign an NDA with you."  He knew

2  from the summer that when he was getting this material

3  nonpublic information, it was under this duty of

4  confidentiality.  All the potential investors had to sign these

5  NDAs.  That's how they got the information.  That was the basis

6  on which they were being brought into the tent.

7          But those weren't the only duties the defendant owed.

8  On September 2nd, he became a director of DWAC.  He was on the

9  board.  He owed duties of confidentiality as a board member.

10  He owed duties not to tip, not to engage in insider trading, as

11  a board member.  And all of his trades happened after he became

12  a board member and was subject to these duties.  He had these

13  duties and he violated them.  He violated them when he traded

14  based on material nonpublic information, when he tipped others

15  and told them to trade based on material nonpublic information,

16  while he was a director, after he had signed these NDAs.

17          So that takes us to the last question:  Did he know

18  what he was doing was wrong?

19          Again, he admitted he knew he had a fiduciary duty to

20  the company; he knew he had to put DWAC's interests and

21  shareholders' interests ahead of his own; he knew he shouldn't

22  be trading or tipping.

23          This is Government Exhibit 967.  After the merger

24  announcement.  Justin Friedberg, the employee he didn't really

25  like, asks him, "You make out like a bandit?"  And he says,

1   "I'm on the board.  I was very limited.  I was severely

2   restricted."  He understood he should not be doing this.  He

3   didn't tell Justin Friedberg, but, you know, I bought some

4   securities on the side 'cause I thought it was okay.  Because

5   he knew he wasn't supposed to.  He knew he was restricted.  He

6   knew it was wrong.

7           And he hid what he had done from DWAC and from its

8   shareholders.  This is one——this is the Form 3 that Peter

9   Melley described in his testimony.  When you're a director of a

10  public company and you own stock in the company that you're a

11  director of, you have to tell the public.  And he did that with

12  the initial founders shares that he got——or, excuse me——the

13  initial shares he got as a member of the board.  He signed the

14  Form 3 on September 2nd, disclosing he had 7500 shares coming

15  to him as a director.  But he never filed any of the other

16  required SEC forms disclosing that he had been purchasing on

17  the open market after September 2nd.  Never filed a Form 4,

18  never filed a Form 5.  This is the only document he ever signed

19  where he disclosed the purchases he had made.

20          And this is repeated in every public filing of DWAC

21  after the defendant gets on the board, including through its

22  10-K, which, if you look at Government Exhibit 130, this is for

23  the fiscal year ended December 31, 2021.  This is for, in 2022,

24  after he's sold everything, made all his money.  What does it

25  say?  Same 7500 shares.  He never disclosed that he had made

1    any of these securities transactions.  And you can see in the

2    bottom right——I'm not saying you have to do this,

3    but——Government Exhibits 107, 109, 110, 111, 112, 113, 116,

4    those are all SEC filings of DWAC, and they say the same thing.

5    Bruce Garelick, 7500 shares.  Never disclosed his transactions.

6         This wasn't a mistake.  This wasn't a "I didn't know I

7    needed to do that."  He testified, members of the jury.  He

8    never said, "I didn't know I had to file a Form 4 or 5.  Nobody

9    told me I had to do that."  And there's a reason he didn't say

10   that, because he knew that would be a blatant lie, that would

11   be a step too far, because he had to admit he knows what an

12   insider sale is.  He's a hedge fund portfolio manager.  He had

13   his own hedge fund.  He analyzed public stocks and he admitted,

14   you know that insider sales are publicly reported.  It's part

15   of what people like hedge fund managers use to make

16   investments.  Do the directors believe in the company?  Are

17   they buying or are they selling?  He knew what he had to do and

18   he didn't do it, because he wanted to hide the fact that he was

19   engaging in insider trading.  He wanted to hide that he knew

20   what he had done was wrong.

21        And he knew that not just from this.  You heard from

22   Ben Reed, the broker from E.F. Hutton, on the redirect

23   examination.  He said, if I knew that somebody of a director of

24   the company was placing trades, I wouldn't have placed the

25   trade.  I would have called my compliance officer.  This is a

1    huge deal, and the defendant knew it, and he failed to file the

2    forms so no one would know what he was doing.

3          He knew that because he'd been trained on this

4    throughout his career.  He'd been in the industry for decades.

5    He was a CFA.  You heard that to take that rigorous

6    examination, you have to know that you can't trade on the basis

7    of material nonpublic information, you can't tip others.  He

8    knew that when he worked at Adage Capital and signed those

9    compliance manuals.  And he knew this wasn't just a formality.

10   Daniel Lehan, his former co-worker, testified, "Our integrity,

11   our ethics, our reputation, this is critical, this is our most

12   important asset."  This isn't Netanel Suissa, who opened up his

13   Robinhood account and couldn't find the DWAC warrants.  This is

14   a sophisticated hedge fund professional.  He knew he should not

15   be doing this.  He used the Adage manual.  The same language is

16   in his hedge fund's compliance manual.  But what he said was, I

17   kept a tight lid on what Michael does.  It's his business.  I

18   only brought in the people Michael told me to.  He knew what he

19   was doing was wrong.

20          Now I expect you're going to hear the defendant's, I

21   only bought 50,000, I bought it over a slow period of time

22   because that's my portfolio strategy, that's how I do all my

23   purchases.  You saw the evidence, members of the jury.  But the

24   most important reason you know the defendant knew what he was

25   doing was wrong was because he took the stand and he lied to

you about what he did and why he was doing it.  You can take

that into consideration when you determine whether he knew what

he was doing was wrong, and you should, because he did.  He

didn't buy only 50,000 because it was a conservative portfolio

investment; he only bought 50,000 because he didn't want to get

caught.  It's one thing for Michael Shvartsman, who isn't on

the board, to be buying millions in warrants.  That's why Ben

Reed didn't think twice about it.  He placed the orders.  But

when the director of a public company, if he bought 2 million

warrants, that would raise some flags.  So the defendant hid

his trading.  You know, it's not fair that all these rich

people are making millions of dollars while he had to take one

for the team and sit on the board of directors and make sure

the plan worked, decided he wanted to make a little money for

himself, $50,000.  But he didn't want to get caught, so he

bought it slowly, he bought it in his retirement account, he

did it over a period of time so that no one would notice.  And

then when he took the stand and tried to explain it away, he

lied to you.  This wasn't a conservative strategy.  This was

masking his trades.  The defendant got greedy.  He wanted a

taste of the action.  He knew what he was doing was wrong.  He

just thought no one would notice.  That's why he lied when he

didn't file any Form 4s or Form 5s like he was supposed to.

That's why he lied on his CFA attestation when he said, after

the FBI approached him, that he wasn't under investigation.

1   And it's why he lied to you, because he knew this was wrong.

2   He knew he shouldn't be doing this.

3          The defendant committed insider trading.  We have

4   proven that to you beyond a reasonable doubt.  And you're going

5   to get detailed instructions on the charges from Judge Liman

6   today.  But I want to explain to you briefly what those charges

7   are so you're not surprised when you hear them from Judge

8   Liman.

9          So the defendant's charged in five counts.

10          Count One charges him with conspiracy to commit

11   securities fraud.  A conspiracy, you'll hear, is an agreement

12   between two or more people to commit a crime——in this case,

13   insider trading.  We have proven that the defendant entered

14   into a conspiracy to commit insider trading when he agreed with

15   Michael Shvartsman, when he agreed with Eric Hannelius, to

16   commit insider trading.  That's Count One.

17          Count Two, Title 15 securities fraud.  This is what's

18   called a substantive count of insider trading.  What this

19   means, members of the jury, is that the defendant committed

20   insider trading when he purchased his own shares.  That's what

21   Count Two is.  And we've proven that to you beyond a reasonable

22   doubt.

23          Count Three is one of the tipping counts.  This is

24   that the defendant committed insider trading when he tipped

25   Michael Shvartsman, who purchased the 2 million warrants.

O581GAR2                    Summation - Mr. Shahabian

We've proven that to you beyond a reasonable doubt.  That's

Count Three.

        Count Four is the second tipping count, that the

defendant committed insider trading when he tipped Eric

Hannelius, who purchased DWAC securities on the open market.

We've proven that to you beyond a reasonable doubt.

        Count Five is another kind of insider trading that

Judge Liman will explain to you, but basically it's the full

scheme, that the defendant was given property, valuable

confidential information of DWAC——the fact that Trump Media was

a potential target——and that he misappropriated that property,

that he used it for himself and for others by committing all

the insider trading we talked about.  So that you can find, if

you apply it to his trades alone, that is sufficient to convict

on Count Five.  It also applies to the tipping counts.  It's

sort of a combination of Counts Two through Four but explained

in the context of different elements.  So you should listen to

Judge Liman about that, but the key is, he got this

confidential information and he converted it, he embezzled it,

he lied to DWAC by using it for himself.  That's Count Five.

        Members of the jury, the defendant was a director of a

public company.  He had a position of trust.  DWAC trusted him,

DWAC's shareholders trusted him to act in their interests, to

put his duty of loyalty to them above any loyalties he might

have to Michael Shvartsman, above himself.  He had a duty not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    to use the information he learned for his profit or for his

2    company's profits.  He promised them, promised them that he

3    would follow those duties.  And then he lied to them.  He broke

4    those promises.  He broke his promises to DWAC.  He broke his

5    promises to shareholders.  He thought he could get away with

6    it.  He thought he'd get away with it this week when he lied to

7    you about what he had done and why he did it.  It is time to

8    hold him accountable for these egregious breaches of trust and

9    confidence that shareholders placed in the director of a

10   publicly traded company.  He saw dollar signs.  They made

11   millions.  He thought he would get away with it, but not

12   anymore.  It is time to find him accountable, because the

13   defendant is guilty.

14           Thank you.

15           THE COURT:  Thank you, counsel.

16           Members of the jury, it's now 10:47.  We'll take about

17   a 10-minute break and we'll reconvene no later than 11:00.

18   Please don't discuss the case amongst yourselves or with

19   anybody else.

20           THE DEPUTY CLERK:  All rise.

21           (Jury not present)

22           THE COURT:  All right.  So counsel, no more than five

23   minutes so Mr. Bach can get started promptly at 11:00.  See you

24   in a couple minutes.

25           (Recess)

O581GAR2

1          (Jury not present)

2          THE COURT:  Mr. Bach, should we bring in the jury?

3          MR. BACH:  Sure.

4          THE COURT:  Bring the jury.

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Jury present)

2      THE COURT:  Members of the jury, we will now hear the

3  defense summation.

4      Mr. Bach.

5      MR. BACH:  Thank you, Judge.

6      They have charged Bruce Garelick with five extremely

7  serious crimes.  They claim he engaged in them knowing every

8  step of the way that what he was doing was wrong, that he acted

9  with a criminal state of mind and with a deliberate intent to

10  disobey the law.  That's what they're telling you, that's what

11  they must prove, and they tell you that they've proved this

12  beyond any reasonable doubt.  Ladies and gentlemen of the jury,

13  I submit to you that this is a case in which you should have

14  profound doubt, profound doubt, because Bruce Garelick did not

15  commit any crime, he did not commit any crime at all.

16      Let's start by talking about the witnesses.  When I

17  spoke with you at the very beginning of this trial, I told you

18  that Bruce did not tip anybody, that he did not share any

19  confidential information that he learned on the board, I told

20  you that he purchased a small amount of DWAC stock for himself,

21  but stopped as soon as he thought he might be exposed to

22  material nonpublic information.  That's what I told you on day

23  one.  Not one witness has come into this courtroom and told you

24  otherwise.  Sure, the government presented witnesses, but none

25  really knew Bruce and none had really anything to say about him

1    at all.

2            Andy Litinsky, he's the gentleman who was on The

3    Apprentice, the first witness you saw, lovely guy.  He never

4    met Bruce Garelick, never heard his name until he became

5    involved in this case.

6            Adrian Lopez Torres.  Do you remember him?  He told us

7    he had one phone call with Bruce once.  When he came in, he

8    couldn't even recognize him in the courtroom.

9            Marc Wachter said, yes, I was on a Skype call, he was

10   on Skype during the meeting on June 18th, but I don't recall

11   having any other interaction or dealing with him at any time.

12           The only person, the only government witness who

13   seemed to know Bruce or to have any substantial interaction

14   with him at all was Hartley Wasko.  He's the investor who at

15   times invests with Michael Shvartsman.  He had nothing but good

16   things to say about Bruce Garelick.  He said that Bruce was

17   smart and analytical in thinking about potential investments.

18           They are trying to prove to you that someone who has

19   never been in trouble before, someone who has never taken any

20   shortcuts, but who has instead worked hard throughout his

21   career suddenly decided in the middle of 2021 to throw it all

22   away and break the law for a total of less than $50,000 when he

23   had $250,000 of cash sitting in his trading account and

24   $650,000 total in value in that account.

25           Instead of bringing in witnesses, people, human beings

1   with real knowledge of Bruce and with real knowledge of what he

2   was doing and working on and thinking about in 2021, what

3   evidence are you being asked to rely upon?  You're given phone

4   logs and lists of phone numbers and times of phone calls

5   without a single piece of evidence of what was said on a single

6   call.  Those are mixed in with a variety of emails and text

7   messages and documents, but there are no witnesses who were

8   there in real time putting these into context.

9           Instead, you have these very good lawyers at the

10  government's table giving you their read, their interpretation,

11  their lawyer spin on these documents and telling you that's,

12  that's the evidence from which you're supposed to read between

13  the lines and determine that someone has committed these

14  extremely serious crimes.

15          They've taken the times of phone calls and documents,

16  and they mixed them together in this chronological chart, and

17  they want you to read between the lines and draw inferences and

18  adopt certain readings and interpretations.  And you're

19  supposed to infer from their presentation that it was during

20  these calls that Bruce Garelick was passing tips, whispering in

21  people's ears, oh, this is happening on the board.

22          But the evidence, ladies and gentlemen, doesn't come

23  close to proving that.  The most this suggests is that a phone

24  call took place at which of course it's possible that any topic

25  could have been discussed, including a tip, but it doesn't

1    prove that a tip took place.  Is this the new standard?  Is

2    this how we convict people of crimes in this country, with

3    charts and phone logs without witnesses to place documents in

4    context who were there in real time to invite you to make

5    guesses and mental leaps?

6         The Judge, as Mr. Shahabian said, will instruct you on

7    the law, and you should listen to him carefully.  I anticipate

8    that one of the things that he will tell you is that an

9    inference is not a suspicion or a guess, it is not enough to

10   put a chart together to create the idea of suspicious

11   circumstances.  What has to happen is proof that something

12   actually occurred, actual evidence and proof beyond a

13   reasonable doubt.  That's a rigorous standard.  It requires

14   room for no hesitation, no hesitation, no reasonable doubt.

15        MR. NESSIM:  Objection.

16        THE COURT:  Overruled.

17        MR. BACH:  Now, we presented a witness in this case.

18   We presented someone who experienced these events in real time,

19   who was fully and thoroughly familiar with them, who was able

20   to address the documents and explain the conduct and walk you

21   through the chronology here.  That witness's name was Bruce

22   Garelick.  He explained to you, over several hours, how he

23   experienced these events as they unfolded and how he viewed

24   things at the time.  The government had a full opportunity to

25   confront him.  He was subject to cross examination.  If he

1  wasn't telling the truth, they had the opportunity to expose

2  any lie.  You saw his demeanor, you will be the judges of that,

3  you will make those decisions.  I submit to you he answered the

4  questions posed by both sides respectfully, and he explained

5  what happened from his perspective in a coherent and compelling

6  way.

7           But, just as importantly, what he told you was

8  corroborated by the evidence.  It's backed up by the evidence.

9  He is not carrying his own water here.  He is telling you what

10 happened.  The evidence that you saw at this trial

11 independently corroborates what he told you happened and what

12 he told you occurred.  I'm going to go over some of that now.

13          Mr. Shahabian put it very well in his very eloquent

14 summation a moment ago.  He said, the question is:  Does it

15 square with the evidence?  Does it compare to the evidence

16 submitted at trial?

17          So I want to talk about four major aspects of

18 Mr. Garelick's testimony.  Let me go over what they are.  We'll

19 go over them one by one.

20          The first is Bruce told you that he helped form a

21 syndicate, but he was not sure what would happen with TMTG.  He

22 helped put the syndicate together, but he had doubts about

23 where this would actually go.

24          Secondly, he testified that he assisted others with

25 investment logistics, but that assistance was based on public

1    information, information available from public sources.

2              Third, he told you that he believed it was okay to buy

3    DWAC securities in the open market as long as the person buying

4    those securities was not in possession of material nonpublic

5    information.

6              Fourth, he told you that he purchased DWAC stock, but

7    stopped as soon as he believed he might be exposed to material

8    nonpublic information.

9              I want to spend some time on each of those points.  So

10   let's start with point 1.  He helped form a syndicate, but was

11   not sure what would happen with Trump Media Technology Group.

12   You heard his account, on June 18, he was asked to remotely

13   Skype into a call.  Patrick Orlando was on the call.  Patrick

14   Orlando was making a big sales pitch.  Trump was featured as

15   part of that pitch.  Mr. Garelick, at the request of Michael

16   Shvartsman, agreed to help put together a group of investors —

17   or a syndicate — to invest in this opportunity.  Mr. Garelick

18   told you that he called it the Trump SPAC in his emails and

19   communications because Trump was the name that Mr. Orlando

20   touted and the one name that stood out, and it was the obvious

21   nickname for the project.

22             At the same time, Mr. Garelick testified that he was

23   personally not sure what to make of all this, that he was

24   skeptical whether there was any there-there at this point, and

25   whether anyone could really count on it.  He understood he had

1  an obligation to keep this information confidential.  He signed

2  an NDA and he kept the information confidential, but he did not

3  consider the information material.  He's an experienced

4  research analyst and it was not whatever Michael Shvartsman

5  thought about this opportunity, whatever Gerald Shvartsman or

6  others thought about this opportunity, from his background,

7  from his analytic point of view.  It was not at all clear to

8  him based on Patrick Orlando's pitch that this added up, at

9  least not on June 18th, at least not at this early point in

10  time.  From his point of view, he was hearing a sales pitch,

11  but there wasn't really anything to go on at this stage.

12        In fact, he chose, based on what he heard, not to

13  invest in the founders round.  You heard all this talk about

14  this is an earthquake, everyone knows an earthquake is about to

15  happen and people are going to make a lot of money and

16  Mr. Garelick had all this greed.  He looked at this and said,

17  there's not enough here for me.  He did not invest in that

18  founders round.

19        Now, that was his testimony.  The evidence in this

20  case supports it independently and backs it up and corroborates

21  it.  Mr. Garelick had the same exact reaction that Mr. Hartley

22  Wasko did.  Mr. Wasko is another sophisticated investment

23  professional.  He was similarly skeptical.  Look at what he

24  said.

25  "Q.  And you thought it was a sales pitch and that the deal

1    could easily not happen?

2    "A.  Correct.

3    "Q.  In fact, you described him --

4              MR. BACH:  That's Patrick Orlando.

5    "Q.  -- as cocky and confident?

6    "A.  Correct.

7    "Q.  But you were skeptical; correct?

8    "A.  Correct."

9              MR. BACH:  That's how people who spent their careers

10   in finance at Adage, when someone like Patrick Orlando shows up

11   who has never successfully combined a SPAC with a target

12   company, who has no real track record in the business, and

13   comes in and starts saying, I'm friends with President Trump —

14   from an analytic investment perspective, you don't know, you're

15   going to reserve judgment and you're going to think hard about

16   this.

17             So Mark Wasko had the same reaction.  But, take a look

18   at what was being said to the world in DWAC's public filings,

19   filings with the United States Securities and Exchange

20   Commission that describe the status of DWAC at this point in

21   time.  They want to tell you, the government wants to tell you,

22   the prosecution wants to tell you, oh, everyone knew this was

23   Trump, this was just because Patrick Orlando said, you know, I

24   know Trump, I've been to Mar-a-Lago, I've seen the golf course,

25   I've done Bene and I've approached him.  They want to tell you

1  that that means that DWAC was on a rollercoaster ride to

2  success.

3         Look at what DWAC is telling the SEC and the entire

4  investing public.  At this point, this is in July, this is

5  after the June 18th meeting.  This is what they say.  We have

6  not selected any specific business combination target and we

7  have not, nor has anyone on our behalf, engaged in any

8  substantive discussions, directly or indirectly, with any

9  business combination target.  No one from DWAC had yet set foot

10 to talk about DWAC in the Trump camp.  This is ground zero.

11 This is not material.  This, at this point, is a wish that some

12 guy has a personal connection and some prior dealings, and now

13 we're going to shift to a new company and a new entity, and

14 we're going to hope that that gets some traction.  This is what

15 they're reporting officially to the public and the United

16 States Securities and Exchange Commission, and it's exactly

17 what Patrick Orlando is saying to Mr. Garelick.

18        If we look at Government Exhibit 416, we have had no

19 substantive discussions.  You've heard, there's no dispute

20 about this, you've heard that --

21        Can we take that down, Ms. McFerrin.

22        One of the things Michael Shvartsman does here is he

23 says, you know what, I'm going to pay a little bit more than

24 you're asking me, Mr. Orlando, I'm going to pay 20 percent more

25 for my founders shares, $5 instead of $4.  I'm going to ask you

1    give that more expensive option to everyone in the syndicate

2    that I've formed.  Why?  Because if I thought this was clearly

3    a Trump thing and was going to go there, why would I pay the

4    extra dollar?  Because they all knew at this point, this point,

5    this is ground zero, that the hope is that whatever DWAC will

6    prove to be in the future may be able to do a little better

7    then Bene.  Remember, Bene had utterly failed to get anywhere

8    with Trump, despite all these LOIs and all these documents,

9    Bene went nowhere with Trump.  The idea that DWAC is going to

10   get another foot in the door is complete speculation at this

11   point.  That's why there's a negotiation for a $5 option, a

12   more expensive option, because everyone understood that there

13   was a good chance this was not going there at all.

14            Now, take a look at the exhibit Mr. Shahabian just

15   showed you.  Can we pull up Government Exhibit 742, the bottom

16   of page 5.  There you go.  This is Mr. Postolnikov writing, I

17   just hope the merger is with you know who, otherwise won't get

18   much traction.  That's obviously a reference to Trump.  And how

19   does Mr. Garelick respond?  He doesn't say, of course, of

20   course it's going to work, of course we're on board to get to

21   Trump.  No.  He says, if the merger is not the plan A, we'd

22   exercise our redemption rights.  So that is the $5 purchase

23   opportunity that they bought.  The idea that Patrick Orlando

24   can promise something because he has a Bene LOI that has never

25   had any traction and a letter of intent, we went over the

1  language in some of those letters of intent on the first day of

2  testimony in this case, and I highlighted some of the terms for

3  you.  It's no commitment, no commitment.  You might recall this

4  from day one of the trial, an LOI is just a placeholder that's

5  subject to and conditioned upon the negotiation and execution

6  of a definitive agreement.  That's the real play here.  That's

7  the real play here.  It's not the LOI, it's, is there going to

8  be a merger agreement.  That's the real play.

9          With respect to these LOIs, Mr. Litinsky — he was not

10  my witness, he was the government's witness — he explained to

11  you that Trump didn't take these LOIs all that seriously, he

12  ignored the exclusivity.  He was talking to other parties down

13  to the last day in October 20th, someone from Gettr called him,

14  and that very day Mr. Litinsky had to go meet with Donald Trump

15  to see if this was going to go forward at all.  It went down to

16  the last minute when Mr. Litinsky walked out of the room.  You

17  can read his testimony, and didn't know if Trump was going to

18  sign with DWAC or not.

19          So Mr. Garelick, as an investment professional, that

20  summer in June at the time that he's forming this syndicate and

21  going forward — remember, he hasn't joined the board yet,

22  that's not until September — is not looking at this yet as

23  something that you could bet your house on.  He's not looking

24  at this as having traction yet.  This is a good idea.  If it

25  works out, great.  We all have a lot of good ideas.  But that's

1   how he sees it, and that's corroborated by this other evidence,

2   including how Mr. Wasko sees it, including how it's reported in

3   very important documents filed with the SEC.

4          Let's go to the second aspect of Mr. Garelick's

5   testimony that I want to discuss with you, that he assisted

6   others with investment logistics based on public information.

7          And by the way, there's one thing to tip people.

8   Tipping is when you tell someone something they're not supposed

9   to know and it's based on confidential information, but when

10  you tell someone something that's in the newspaper or that

11  you've seen on TV, that's not a tip.  That's already in the

12  public domain.  That's public information.  In this case, sure,

13  you saw a lot of emails and texts where Mr. Garelick says to

14  some of the people in the syndicate, the IPO starts tomorrow or

15  warrants are trading at this amount, this is $10 is the average

16  price.  Any investment professional anywhere in the United

17  States knew exactly the same thing and had access to the same

18  information.  That's not a tip, that's sharing public

19  information.

20         So what corroborates?  What's the evidence that backs

21  up and supports Mr. Garelick's testimony in this regard?  Well,

22  first of all, most, most of the assistance, not all of it, but

23  most of the assistance he provided was before he had any

24  confidential DWAC information at all.  Remember, he didn't go

25  to a board meeting until September 21.  And no one was

1    whispering in his ear about anything that was going on at DWAC

2    before then.

3            SPACs were new in 2021, they were booming, and there's

4    lots of ways to invest in SPACs.  You heard founders shares,

5    class A, class B, units, warrants, shares.  There were lots of

6    ways and not everyone has done a SPAC before, this is new.  So

7    Mr. Garelick is translating the public information that's

8    available in the filings, the public filings that DWAC has made

9    to say, here's the different warrant classes, here's this,

10   here's that.

11           If you take a look at some of those public filings,

12   you'll see that they're very complex documents.

13           Can we pull one up.

14           This is the prospectus.  These are in evidence.  These

15   are pages of the prospectus where the details and nuances of

16   some of the warrants are being spelled out.  Someone has to

17   read this and break it down.  A lot of people are busy.  If

18   Michael Shvartsman is busy and he doesn't want to read this and

19   figure it all out, he'll call up Mr. Garelick.  The point is,

20   this is not confidential information misappropriated from a

21   company, this is public information gleaned from a public

22   document.

23           Let's take a look at some of the information that you

24   see Mr. Garelick conveyed.  These are some texts that he sends

25   to -- this is just one example.  You can look at all the

1    evidence when you get back in the room.  Mike, note, DWACW

2    warrants started trading today.  Everyone knows that, it's

3    public, the markets are open, warrants are trading.  That's

4    like saying the Yankees are playing today.  Traded just below

5    50 cents.  That's like saying the score is 2 to 1.  That's

6    public.  That kind of ticker information, that's information

7    that's known to everybody.  He gives him Ben Reed's phone

8    number at R.F. Hutton.  This is not a tip.  This is on

9    September 30th.  It's not like Bruce Garelick learned something

10   on September 30th and he said, aha, I now have an important

11   piece of information that I learned from the board, so now I'm

12   going to write these texts.  Michael Shvartsman, no.

13           What prompted this was not any secret information that

14   Bruce Garelick learned, it's the warrants are freely trading,

15   this is the day this is happening, so I'm letting you know

16   this, not because I received confidential information on the

17   board, but because this is what's happening in public in the

18   public domain.  Any broker, any financial professional in the

19   United States could have given the same information to Michael

20   Shvartsman.  You don't have to be on the board of DWAC to do

21   this.

22           Now, the government has presented lots of documents in

23   this case, and they've sprinkled throughout that chronological

24   chart that I talked about that puts them together with the

25   phone calls.  Take a look at those documents.  You're not going

1    to see a single one, not a single one that shows Bruce Garelick

2    disclosing any confidential DWAC board information to anybody

3    else.  Those communications concern public information and

4    they're about the logistics and mechanics of the trading.

5    That's what they're about.  They're not about information that

6    makes this a good or bad deal.

7           Let's talk about the third aspect, that he believed it

8    was okay to buy DWAC securities in the open market as long as

9    people were not in possession of material nonpublic

10   information.  That was his state of mind.  That's what he

11   thought at the time.  Again, he did not regard this, you heard

12   him, in these early stages before it there was further traction

13   between these two companies, before they started talking to

14   each other, DWAC and TMG, before they start talking to each

15   other, he did not believe there was a material relationship

16   here.  That was his state of mind and that's what was reflected

17   in that July SEC public filing.  Those two companies weren't

18   even talking to each other yet.  He thought that, at that

19   point, this was tenuous and it was okay.  That was his state of

20   mind.

21          The evidence in this case corroborates about that.

22   There are many emails and texts about trading in the open

23   market.  No one's hiding the idea that he, that Michael

24   Shvartsman, you know, they're going to trade for warrants or do

25   these other things in the open market.  They spoke openly with

1  Ben Reed at E.F. Hutton about it.  They said, let's set up

2  Michael's account.

3          This is a note that Ben Reed wrote to himself about

4  Michael's account.  Split the baby in case it drops in the open

5  market and he wants to buy the unit then.  You heard a lot

6  about whether Ben Reed knew at the time that Bruce Garelick was

7  a director.  Well, Bruce Garelick assumed, assumed that someone

8  in Ben Reed's position would of course know that he was on the

9  board of directors because Bruce, as Ben Reed explains, it's

10  part of his job before he starts working with customers, to

11  familiarize himself with the public filings and documents.

12          This is Ben Reed's testimony.

13  "Q.  And to do that, you don't go over the wall into the

14  investment banking side, you look at the public documents?

15  "A.  Correct.

16  "Q.  And that would include the prospectus?

17  "A.  Correct."

18          MR. BACH:  These are the things that Ben Reed looks

19  at.  Then let's look at what's in the prospectus that Ben Reed

20  typically looks at.  It says right there in the prospectus,

21  public information, public to the world.

22          Now, of course, people, you know, you've heard about

23  NDAs and LOIs and prospectuses.  These are documents -- let's

24  be real.  A lot of these are like rental car agreements.  No

25  one reads them line for line and goes, sits down, and so Is

them.  Sometimes you get on your phone, you get a new app and

there's a contract, people just accept and say agree.  I'm not

saying anyone does this.  What I'm saying is when Bruce

Garelick was involved in these phone calls with Ben Reed, he

didn't think, oh, this guy's never going to know I'm a

director.  This is public information to a professional like

Ben Reed, who makes -- is his responsibility to review these

public documents.  And it's quite public that Bruce Garelick is

a director.  No one is trying to sneak one past the goalie

here.  What you have is a state of mind that it's okay to trade

at this point.  At this point, it's okay.

          Take a look at what Bruce Garelick said to Justin

Friedberg, his fellow employee.  As Mr. Shahabian put it, this

is the employee that Bruce Garelick didn't get along with so

well or didn't like so much.  But nevertheless, Bruce Garelick

has no qualms saying to him that he traded in the open market.

I was very limited in what I could buy.  He's not hiding this.

Justin Friedberg is not someone he would share a confidence

with.  In real time, as he experienced it, Bruce Garelick

thought this was okay.  As soon as he thought it wasn't okay,

he restricted himself.  He restricted himself.  I'm going to

talk more about that as we go on.

          Patrick Orlando -- in fact, no one at DWAC ever said

to Bruce Garelick or Michael Shvartsman or anybody, it's not

okay to trade in the open market.  DWAC had no guidance.  When

 1    Mr. Melley -- he was the gentleman from FINRA who knew a lot

 2    about boards of directors and he knew a lot about public

 3    companies and he introduced you to some terms.  I asked him if

 4    a lot of public companies have guidance and training for their

 5    directors and officers so that these types of situations can be

 6    avoided, and he said yes.  He said there were such things as

 7    blackout periods, which is when a compliance officer or a

 8    lawyer or someone in a position of that type of authority would

 9    send out what's called a blackout notice, and say, blackout,

10    you cannot trade, and when it was okay to trade, they would

11    lift the blackout notice.  No one was doing that at DWAC.

12    Bruce had never been on a -- yeah, he was good at picking

13    stocks, he was an investment professional at a hedge fund.  He

14    had never been on a board of directors before.  And there was

15    no guidance for the directors in this regard.

16            When he did communicate -- let's take a look at what

17    happens when he raises some of these questions with Patrick

18    Orlando.  Here on July 13th, Bruce Garelick writes to Patrick

19    Orlando, how soon after the IPO will the warrants freely trade?

20    Patrick Orlando writes back in all caps, public warrants are

21    freely trading.  No one says to Bruce, what on earth are you

22    talking about?  You're sitting on confidential material

23    nonpublic information, you can't trade, we'll give you guidance

24    with the blackout period.  No, Bruce's state of mind at this

25    point in time, his good faith belief is that this is okay.

1    Let's take a look at the forth aspect of

2    Mr. Garelick's testimony.  He purchased a small amount of DWAC

3    stock, but stopped as soon as he believed he might be exposed

4    to material nonpublic information.

5    Now, you just heard an argument that this was a

6    carefully calculated plan to buy $50,000 worth of stock where

7    he spread it out to avoid detection so that it wouldn't -- it

8    was cold and calculated, the steps a criminal takes to hide his

9    tracks, you spread it out so no one will know and you slip

10   under the radar.  Why would someone engage in that kind of cold

11   and calculated plan to make $49,000 or why would they throw

12   away their career when they already have plenty of money.  What

13   Mr. Shahabian is ignoring is that when you looked -- when I

14   showed you the other stock purchase appearance in

15   Mr. Garelick's accounts, I showed you Sumo Logic, I showed you

16   one other company.  He spread them out in the same way.  That's

17   how he invests, he spreads them out because he understands the

18   price of stock can go up one day, go down the next, and if you

19   spread them out, he gets the benefit of an average price.

20   That's what he always does.  It's in the records.  What, was he

21   trying to hide the trades in those two other companies?  Were

22   they part of another dastardly plan?  Who was he conspiring

23   against there?  No, this is how he always trades.  This is

24   innocent behavior.  He's trading DWAC shares the same way he

25   always trades, in small increments for a small amount.

1    And he stopped.  It's undisputed that he stopped on

2    September 23rd.  Mr. Garelick explained that, at that point,

3    you know, I did not know whether there was a reality to this, I

4    followed as best I could.  Even on the September 21st board

5    meeting, when I saw the Trump page in the board packet, there

6    was nothing here that I hadn't seen before in an Axios article

7    from five months back.  I didn't know whether there was any

8    traction on September 21st, but on September 23rd, there's a

9    drumbeat of text messages that afternoon about public

10   announcements and other things, and I stopped because at that

11   point, I knew my obligations, and now we're reaching a terrain

12   where this could start to have traction.  And that's what he

13   testified to.  What other explanation have they given you about

14   why he stopped?  He didn't run out of money.  He had $250,000

15   in cash sitting in that account that he could have used to buy

16   more DWAC stock.

17        Can we show the money in his account.

18        Do you see, ending balance, $250,000.  You just saw,

19   Mr. Shahabian showed you in his summation — can we pull up

20   Government Exhibit 511 — this text on the afternoon of

21   September 23rd.  Team, I just want to clarify that there is no

22   announcement yet scheduled.  TMG expressed an interest in

23   announcing next week, but it has not been confirmed.  So there

24   is active discussion about a public announcement.  This is now

25   getting very real.  If you look at the time of this, this is at

1    2:23 in the afternoon on September 23rd.  You'll see that there

2    are WhatsApp texts piling up on that afternoon.  People look at

3    their WhatsApps at different times of the day, but when you

4    start to see a number like 5 or 6 piling up, that's when you

5    might look at your WhatsApp.  At this point on September 23rd

6    and the days that followed, things started to progress.  The

7    companies started talking in an active way moving towards a

8    data room, due diligence, and Mr. Garelick said no more, that's

9    it.

10            They quibble and say, well, you know, on September

11   22nd, maybe he had information on that day, but this September

12   23rd, you know, then he crossed the line.  That's silly.

13   That's silly.  All of his trades, except one, come well before

14   September 23rd.  Is he going to just violate the law in

15   flagrant disregard to invest another $1,500 or whatever he did

16   on September 23rd?  Is he going to say, you know, I'm so

17   greedy, I'm going to place just one more little small trade on

18   September 23rd even though I know I crossed this line?  No.

19   He's a busy man, he's actively involved, he's following this as

20   best he can, and on September 23 he comes to understand it's no

21   longer appropriate for me.  This is it, I'm on the board, I

22   have fiduciary responsibilities, I'm an investment

23   professional, and he stops trading.  And they want to say

24   things were heating up before then, it was material before

25   then, but did just wasn't from his point of view.

1        Can we pull up the board packet he got.

2            This is where things stood in Bruce Garelick's mind.

3    This is how he saw them in his head just two days before

4    September 23rd at the time of the board meeting on September

5    21, that they have nothing, no information, no traction with

6    Trump Media Group.  What they've done is created a mirage

7    because they've lifted the text from a public information

8    source published five months before and pasted it in.

9    Mr. Garelick got that Axios article back in June and now it's

10   September, he's like this is more or less the same information

11   that I saw months ago.  No progress is being made.  They say,

12   oh, well, if you look at around September 22nd or 23rd, there

13   was an LOI.  Yes, but that LOI was never sent to Mr. Garelick,

14   he didn't study its terms, he was not given -- no one thought

15   it was important enough at the time to send to members of the

16   board.  This is not a merger agreement.  This is an LOI that

17   says, "no commitment."  It's around this time that these things

18   are heating up that he stops trading and doesn't place another

19   trade.

20           His state of mind, when they cross examined him, one

21   of the lines of cross examination was, you're a smart guy,

22   you're a brilliant mind, you've read all the evidence in this

23   case, you've consulted with your lawyers, you've studied this,

24   you're able to craft your testimony accordingly.  But take a

25   look at GX 750.

1    Can we pull it up.

2    This is not something that Bruce Garelick made up for

3    purposes of this trial, this is not an argument that he

4    recently concocted to defend himself, this is not something a

5    lawyer whispered into his ear.  This is what he said on October

6    22nd, 2021.  "I had to restrict myself a month ago."  A month

7    ago, October 22, back around September 22nd or 23rd, "due to my

8    involvement on the board of directors of the SPAC."  That was

9    his state of mind at the time.  It is corroborated, it is

10   squared with the evidence, it is backed by the evidence.  It is

11   a contemporaneous document.  It is a window to what he was

12   thinking at the time.  It is not a lawyer's interpretation or

13   spin after the fact.

14   Mr. Shahabian, in his closing, talked a lot about the

15   end, you know, how Mr. Garelick said, well, it wasn't really

16   material until the end of October.  That's a red herring.

17   That's a red herring.  Mr. Garelick understood that it was

18   inappropriate and prudent for him not to buy anymore shares

19   when things started to heat up on or around September 23rd, and

20   he stopped, and he restricted himself.  Why did he do that?

21   Because he follows the law, because the follows the rules.

22   That's what he does.  He's a skilled investment professional.

23   Just talked to you about Mr. Garelick's testimony and

24   how it squares with the evidence and how it's backed up by the

25   evidence, but I want to talk about other evidence because there

1    is very compelling evidence in this case well beyond

2    Mr. Garelick's testimony to show that he was not involved in

3    any criminal scheme or conspiracy, that there were other

4    extraordinarily innocent explanations from what occurred.

5    Don't get me wrong, I'm going to come to what I think was

6    insider trading, pretty much indisputable insider trading at a

7    certain point in this case, but for much of this there are

8    explanations that don't depend on the existence of any crime.

9          What I really want to focus on here and kind of have

10   as a guide for you are the charts.

11         By the way, before I get to that.  I obviously don't

12   have any burden of proof, I don't have to prove anything beyond

13   a reasonable doubt, I don't have FBI agents to help me, I can't

14   convene a grand jury to do my investigation, I don't have a

15   burden of proof.  But nevertheless, the evidence in this case

16   that has come out and has been presented here supports a very

17   different scenario of what occurred, and that is another reason

18   that you should have profound doubt about the accusations that

19   have been made.

20         So I want to just talk, and I'm going to talk with

21   repeated reference to the charts of the trading activity that

22   Mr. Melley made.

23         Can we pull up Government Exhibit 930 just so everyone

24   sees what I'm talking about.

25         These charts, and Mr. Melley made these charts for

1  Mr. Garelick and various other individuals.  I think these are

2  some of the most interesting pieces of evidence in the case and

3  that they're very helpful.  I'm going to talk about them.  When

4  you go back in the jury room, you are authorized to request any

5  exhibit in this case that you want to see for whatever reason.

6  I just think 930 is a helpful guide because it kind of takes

7  the whole case and shows you key dates and key conduct.  I'm

8  going to use that to orient part of my discussion here to show

9  you what I think the evidence shows in this case.  It doesn't

10  show Mr. Garelick whispering tips and committing crimes and

11  throwing his career away for $49,000.  That's not what it

12  shows.  Let me show you what it shows or at least makes a very

13  compelling case for.

14       Let's take a look at Michael Shvartsman's trades.

15  This is, of all the people in this case, Mr. Shvartsman is the

16  one who has the most access to Bruce, right?  He's Bruce's

17  boss, he works with him every day.  If there's one individual

18  that Bruce is close to in the case, I mean, he worked remotely,

19  but he interacted with, is Mr. Shvartsman.

20       So let's take a look.  What are the days on which

21  Mr. Shvartsman buys warrants?  There are three days.  There's

22  Friday, October 1st; and then there's a weekend, that's the 2nd

23  and 3rd, so the markets are closed, you don't see that; then

24  there's October 4th and 5th.  He buys those warrants and then

25  he's done.  He's done.  Okay.  There's no more trading

1  activity, no more buying activity before the public

2  announcement by Mr. Shvartsman.

3        Now, you know from the evidence in this case, and it's

4  undisputed, although these trades and transactions took place

5  not only on Friday, October 1st, but on Monday and Tuesday the

6  following week.  They all flow from an order that was placed on

7  October 1st.  They all flow from a standing order, get me --

8  buy me 2 million warrants.  So they happen to unfold on

9  different days, but we're really talking about an October 1

10  event.

11        Can we show what Ben Reed at E.F. Hutton wrote to

12  himself.

13        This is on October 1st.  See at the top, October 1st,

14  Ben Reed writes, wants me to buy him 2 million DWAC warrants,

15  50 cents, don't run it up, over the course of the next few

16  weeks.  So this is a standing order on October 1st.

17        Can we take a look at Ben Reed's testimony in this

18  case.  He was asked:

19  "Q.  And those trades all stemmed from an instruction that

20  Michael Shvartsman gave you on October 1st to buy 2 million

21  warrants; correct?

22  "A.  Yes."

23        MR. BACH:  Now, why October 1st?  What is so special

24  about October 1st?  Is it because Bruce Garelick learned some

25  tidbit of juicy confidential information on the DWAC board and

1   tipped Michael Shvartsman and whispered it in his ear?  No.

2   October 1st is opening day.  It's virtually -- I think

3   September 30th is the official opening day, but October 1st is

4   really one of the first days.  If you're someone interested in

5   pursuing a warrant investment strategy, that's the first day --

6   one of the first days you can do it.  Michael Shvartsman — I'm

7   going to go over this in a minute — had been waiting a long

8   time to buy warrants.  That was his longstanding plan.  It was

9   a preconceived plan.  It was not something that, on October 1,

10  on the spur of the moment with a tip from Bruce Garelick he

11  suddenly decided to pursue.

12          I want to show you a couple of exhibits that

13  Mr. Shahabian just showed you in his closing.

14          Can we pull up Government Exhibit 962.  This might not

15  be the right exhibit.  Go back a page.

16          If you look at this green text, they said this was

17  Bruce Garelick conveying tipping information to Michael

18  Shvartsman.  I have a DWAC board meeting tomorrow at 12:30, I

19  recommend starting to buy more DWACU stock.

20          First of all, these aren't even warrants, this is

21  units.  This board meeting hasn't even occurred yet.  Bruce

22  Garelick hasn't even gotten the board packet yet.  He doesn't

23  know anything of any content related to the board meeting.  He

24  doesn't have that information.  So there's nothing to tip

25  Mr. Shvartsman about.  This is all public information.

1          Can we pull up Government Exhibit 964.

2          This is on September 30th, the day before October 1st.

3     Bruce Garelick writes to Michael Shvartsman, note, DWAC

4     warrants started trading today.  That's public information.

5     Again, that's like saying the New York Yankees are playing

6     today.  That's what all this is.  You've asked me to remind

7     you, you wanted to trade warrants, that's been your goal and

8     desire since an early stage?  Guess what?  It's public

9     information, it's going to start, it's not a tip, there's no

10    confidential information being conveyed here.

11         Now, what I've been telling you is that Mr. Shvartsman

12    was interested in warrants independently of any type or

13    confidential information from Bruce, no such thing happened.

14         (Continued on next page)

1     MR. BACH:  And the evidence in this case makes that

2  overwhelmingly clear.  Let's take a look at some texts.

3     Okay.  These are texts between two very close friends,

4  Patrick Orlando and Marc Wachter.  And the date of them is

5  June 17th.  That's one day before the June 18th meeting which

6  marks Bruce Garelick's first involvement in anything having to

7  do with DWAC.  So before Bruce Garelick is around to tip

8  anybody or has even, you know, stepped a toe in the water of

9  this whole mess, Patrick Orlando and Marc Wachter are talking

10  to Michael Shvartsman about warrants, and warrants share

11  packages, from time one.  If June 18 is time one, this is from

12  minus time one.  And what does Patrick Orlando tell his friend

13  Marc Wachter?  By the way, I can sell warrants and warrant

14  share package cheaper to Mike.  Marc Wachter writes back:  I'm

15  setting up a meeting for tomorrow.  That warrant plan was

16  preconceived from an early stage.  It had nothing to do with

17  any information that Bruce Garelick learned at any time or

18  conveyed to Michael Shvartsman at any time.

19     This comes up on June 14th.  There's a chain.  This is

20  between Bruce and Michael.  This is four days.  Michael's been

21  talking to Marc Wachter at this time about this potential SPAC

22  investment and about warrants.  Bruce doesn't know about DWAC

23  yet.  He doesn't know what this relates to.  And he's asked,

24  "SPAC warrant arbitrage?"  "No simple answer.  Best we

25  scrutinize the SPAC founders share legal documents to

1  determine.  Best that we look at the public information to

2  figure it out."  The public information, the legal documents,

3  that's where the warrant logistics are spelled out.  He doesn't

4  even know this relates to DWAC yet, but the important point

5  here is that on June 14th, four days before the June 18th

6  meeting, Michael is all ready.  He's like a—he's like a bull

7  at a rodeo ready to go out the gate.  He wants to do warrants.

8  Warrants, warrants, warrants, from day one.  Please.  I want to

9  do warrants.  Okay?  For reasons having nothing to do with

10 Bruce Garelick.

11         It's corroborated by what the witness Hartley Wasko

12 testified to at trial.  This is Mr. Wasko.  Again, this is the

13 government's witness, not my witness.

14         "And what, if anything, did you learn about investing

15 in DWAC warrants specifically?"

16         "Well, we knew that with DWAC, there were warrants

17 that were trading separately, and I know that Michael purchased

18 some or invested in some, and, you know, floated the idea that

19 it was a smart and a good way to add onto the position."

20         Okay?  This is Michael's play.  This is what he wants

21 to do.

22         And at some point he asks Bruce about warrants.  And

23 Bruce is a modeling nerd.  There's no dispute about that at

24 this trial.  I think both sides will stipulate that

25 Mr. Garelick is a modeling nerd.  I don't know if that's a good

1   or a bad thing.  But he says, What do you think about warrants?

2   And Bruce, who's been to business school and spent his years in

3   investment, says, Warrants are like options.  What you do is a

4   Black-Scholes analysis.  You look at the terms of the warrant

5   and decide the value, and there's a standard calculator for

6   doing that.  And I will punch the numbers.  I'll go up on the

7   internet and punch the numbers in the calculator.  And that's

8   public information.  That is not—that is not based on any

9   confidential information that anyone gets from DWAC.  And the

10  government makes a big point, well, you know, how do we know

11  that really happened?  Mr. Garelick can't show any, you know,

12  notes he took of the calculation he performed.  Well, you know,

13  that's not surprising.  That calculation is the calculator on

14  the internet.  You punch the numbers in, you see what the

15  result is, and that's what it is.

16          But let's go back to Government Exhibit 930 and look

17  at Michael's trades, because I think this is something that's

18  very important.

19          Government Exhibit 930 is that there is no reason on

20  earth for Bruce Garelick to be tipping Michael Shvartsman at

21  all.  Michael Shvartsman makes basically one trade here, on

22  October 1st.  That's it.  It carries out over a few days.  That

23  trade is prompted by opening day of warrant trading.  And he

24  doesn't trade again.  That was his investment.  Why would he be

25  talking to Bruce Garelick on the phone?  You know, you saw that

1   chart that has all those little phone calls, Michael

2   Shvartsman, Bruce Garelick.  They weren't talking about

3   Emcompay, they weren't talking about——they were talking about

4   DWAC.  Why?  He's done.  He's not making another investment.

5   He's not thinking about it.  That was his plan, that he

6   preconceived from day one:  I'm going to buy a chunk of

7   warrants here.  There's no reason for them to be discussing

8   DWAC confidential inside information because Michael Shvartsman

9   is not investing again.  The whole theory that Bruce is tipping

10  Michael makes no sense, because Michael is not participating.

11  He's done.  And all this is just, first time I can trade

12  warrants, I'm going to do it.  Now I'm going to sit on the

13  sideline.  Michael Shvartsman is a one-shot Johnny.

14  October 1st.  And when you're a one-shot Johnny, you don't need

15  to be tipped on other days.

16         So he's done with warrants on October 5th.  And you

17  don't need to have any crime or any conspiracy or any attempt

18  to disobey the law to understand that.  The evidence explains

19  that very well.  And the evidence——now let's take a look at

20  Gerald Shvartsman's trades.  Let's go to that chart.

21         Gerald starts to trade in warrants just when his older

22  brother's trades tail off, okay?  On October 7th and 8th, he's

23  following in his brother's footsteps.  Why is he following?

24  Well, you heard from Mr. Melley that there's issues of

25  liquidity in the market.  There are only so——for every warrant,

1   you need to have a buyer and a seller, and Michael Shvartsman

2   was buying a lot of warrants.  He was buying 2 million

3   warrants, and when Michael Shvartsman was doing that, you know,

4   there's only so many warrants to be had; you know, monopolizing

5   the availability or much of it in the market.  And you know how

6   brothers are.  He's not telling Gerald to do this until he's

7   done, till he's taken advantage of the liquidity.  And once

8   he's done with that, he's like, okay, Gerald, now you go ahead

9   and buy your warrants too.  I'm doing it.  I think it's a good

10  idea.  You go ahead and do it.  This is not based on

11  confidential inside information.  This is based on an idea that

12  warrants are a smart buy here, okay?

13         And you can see, on the evening of October 5th,

14  when—let's talk about Eric Hannelius.  October 5th, when

15  Michael is done with his warrants, he has a call with Eric

16  Hannelius.  This is on October 5th.  That's October 5th.

17  Michael's done.  He calls Eric Hannelius.  Now let's take a

18  look at the Mr. Melley charts for Eric Hannelius.

19         You can see that on October 6th and October 7th, Eric

20  Hannelius switches to a warrant strategy, after talking to

21  Michael, and picks up where his business partner, you know, has

22  left off.  That's the explanation for what happens on those

23  days.

24         And while we're on this chart, let's just talk about

25  the September 13th trade in units that Mr. Hannelius made.

1   That's not based on any tip by Bruce Garelick.  Bruce Garelick

2   is not on the board.  He's not attended a single board meeting

3   on September 13th.  He doesn't have any information to tip.

4   The first board meeting is not until September 21.  And

5   Mr. Hannelius is a founders round investor.  He met with

6   Patrick Orlando, just like Mr. Garelick did.  There's not one

7   tidbit of information that Bruce Garelick knows that Eric

8   Hannelius doesn't know on September 13th.  Okay?  There just

9   isn't.

10          And the only thing that Mr. Garelick knows is how to

11  read the public statements to talk about some of the logistic

12  and mechanical features of how you place these trades.  How do

13  you buy units, how do you buy warrants, that's public

14  information.  But he's not on the board.  He doesn't have

15  confidential information to tip.  So I think the bottom line

16  is, when you look at what's happening at this stage in time, in

17  early October, these trades are—the evidence—there's

18  compelling evidence to suggest that these trades are not the

19  result of a crime or a conspiracy or any kind of

20  dastardly—it's—they're based on Michael Shvartsman's interest

21  in warrants and his desire, as soon as he's done, to let his

22  friend Eric Hannelius and his brother, you know, invest in the

23  same way.  Okay?  But the bottom line is this is not based on

24  any tip by Bruce.

25          Okay?  Now let's talk about the rest of October,

1   because I think here's where the rubber meets the road.

2           And for those of you interested in beyond a reasonable

3   doubt, in seeing a real crime, now we're getting there, okay?

4   But it doesn't involve Bruce Garelick.  Let's go back to Gerald

5   Shvartsman's chart.

6           Look at this.  I've just told you about his warrant

7   trading on October 7th and October 8th.  Out of the blue, on

8   October 18th, he places a trade.  Ten days later.  Separate

9   from his earlier trade.  A trade like this that's made out of

10  the blue cannot be explained as part of a preconceived plan or

11  strategy that dates back.  It has to be prompted by something,

12  by a tip.  This is evidence of willful, knowing, deliberate

13  insider trading.  You'll remember there's evidence in this case

14  that on October 18th, the day of this trade, Gerald speaks to

15  two of his employees—you met them, Adrian Lopez Torres and

16  Netanel Suissa—and tells them, I got news.  There's going to

17  be a merger, in two weeks.  DWAC.  And those two gentlemen took

18  the tip from Gerald and went ahead and bought shares on their

19  own.  And I submit to you what Gerald gave them was a tip and

20  that he had a source of information.  And the question is, who

21  was the source?  I'm going to talk about that.  I'm going to

22  talk about that.  But I'm going to tell you right at the outset

23  that there's strong, solid, irrefutable proof that the source

24  was not Bruce Garelick.  How do we know that?  We know that

25  because Gerald is not simply tipping about DWAC; he's also

1    tipping about Bene.  His source knows about Bene too.  His

2    source is not just a DWAC board of——can't be someone who only

3    knows DWAC's board; his source is someone with knowledge at a

4    more fundamental level about more than one SPAC that Patrick

5    Orlando is operating at that time.  How do we know that?

6              Can we show Mr. Lopez's testimony.

7              Do you remember Adrian Lopez took the stand at the end

8    of a courtroom day and I had to question him fairly quickly so

9    we could all get out by 5:30?  But we showed you documents, and

10   on two days after Gerald told him to go buy DWAC, he said,

11   "Told me to go buy Bene."

12             "The ticker symbol that Gerald shares with you on

13   October 21st is Bene, correct?"

14             "Yes."

15             And can we show the texts.  The texts.

16             These are texts that Mr. Lopez shares with his father.

17   You see the transcript of Mr. Lopez's testimony on the left of

18   the screen.  Next potential investment.  That's the Bene

19   warrants, correct?  This is what Gerald told me now.  And look

20   at those texts.  *Proxima potencial*.  My bad Spanish.  This is

21   what Gerald is telling me now.  And you'll see that if you look

22   closely at the texts between Adrian and his father.  I don't

23   have them here.  He's telling his father, same story, same

24   story as with DWAC.  So Bruce Garelick doesn't have——couldn't

25   tip on Bene any better than I could tip on Bene, or anyone

1  else.  He had nothing to do with Bene.  This source is not

2  Bruce Garelick.  What explains what Gerald does out of the blue

3  on October 18th is not Bruce Garelick.

4        Now I told you in my opening——and by the way, you

5  didn't hear a word about this in the government's closing

6  argument.  You didn't hear any explanation for how this Bene

7  tip came about.  He just said, Marc Wachter is not a tipper.

8  That's what he said to you.  But how does he explain this?

9        Now I told you in my opening statement that there were

10  other people in this case that you're going to hear about and

11  that I was going to tell you more about at the end of this

12  trial, people who were close friends and buddies, people who

13  were very tight with each other, people who shared secrets, and

14  confidences, people who trusted each other in unusual ways.

15  And there are a number of those people with those relationships

16  here.  Okay?  And I'm going to talk about some of these

17  relationships.

18        Let's start with the relationship between Marc Wachter

19  and Patrick Orlando.  We know that Marc Wachter is desperate

20  for money.  He's tight on funds.  You met him.  You saw him.

21  And that he's hoping that Patrick Orlando is going to find a

22  way, a work-around to pay him off the books.  And they have a

23  friendship or a relationship of trust in which they engage in

24  certain illegitimate things.  Marc Wachter, with Mr. Orlando's

25  knowledge, is promoting securities without a license.  They're

1    finding a way to——if he can pay him for this or make him

2    get——get him a payment on the side, they're going to work it

3    out.  Marc Wachter and Patrick Orlando, no one knows more

4    inside information about DWAC than Patrick Orlando.  He is

5    DWAC.  He's the guy.  And no one knows more about Patrick

6    Orlando than Marc Wachter.  Let's see how often they talk.

7         And by the way, the government didn't show you these

8    phone records.  They showed you a lot of phone records.  But

9    here's the pattern of communication between Patrick Orlando and

10   Marc Wachter in October.

11        Okay?  So can we go back to that social circle that I

12   showed a moment ago.  Who else is in this circle?  Well, Marc

13   Wachter and Gerald Shvartsman are very close friends.  They've

14   known each other over ten years.  Could we show the testimony.

15        This is Marc Wachter:

16        "Q.  How do you know Gerald Shvartsman?"

17        "Gerald's been a good friend of mine for at least ten

18   plus years.  He's also an insurance client of mine.  And just a

19   very close friend."

20        Let's go back to the social circle.

21        Michael and Gerald are as close as you can get.

22   They're brothers.  And Michael and Gerald are close with

23   someone named Anton Postolnikov.  That's someone who Michael

24   recommended for his founders syndicate.  And there was——you

25   heard Mr. Wachter explain to you that when he met

1    Mr. Postolnikov, he and Patrick Orlando began courting him and

2    they were interested in making him, you know, their new best

3    friend.  Why?  Not hard to know why.  Mr. Postolnikov is

4    loaded.  Marc Wachter told you he had over a hundred million

5    dollars.  He was by far the largest investor in DWAC.  He'd

6    bought, by far, more founders round shares than anybody.  This

7    is someone who Patrick Orlando wanted to be very happy.  As

8    Marc Wachter explained, Patrick Orlando——can we show the

9    quote——said that Anton Postolnikov should be on our preferred

10   and early list always.  Mr. Wachter told us, "Those are

11   Patrick's words, but I would agree with that."

12            Okay?  And we know, because Mr. Wachter admitted it,

13   that before he was interviewed by the government in this case,

14   he went on his phone and he deleted a bunch of text

15   conversations, including a group chat with Mr. Orlando and

16   Mr. Postolnikov.  Okay?  And the information, the evidence in

17   this case——again, I have no burden of proof.  I'm not trying to

18   prove anything beyond a reasonable doubt, but I'm trying to

19   show you what the evidence suggests and what should not be

20   brushed off.  I think the government in summation wanted you to

21   just brush this off and not pay attention to it.  But you have

22   to pay attention to it, because it's very real.

23            On October 11th, nine days before the merger is about

24   to be announced, Marc Wachter has inside information.  He knows

25   that Patrick Orlando is about to announce news.  He says that

1    in an email to his friend Zoltan Present.  This is on

2    October 11th.  "Patrick will be announcing some DWAC news very

3    soon."

4           Now Mr. Wachter said, oh, that's not about a merger.

5    That's not about that.  Look at the context.  Okay.  What else

6    could this news possibly be about?  A SPAC is an empty shell

7    company.  It has no operation.  All it does is seek a merger.

8    It's not like DWAC is about to announce a new product line.

9    Doesn't have any product.  That's not the news.  It's not like

10   DWAC is about to announce a new advertising campaign.  Doesn't

11   operate a business.  This is news.  Very soon.  October 11th.

12   And the merger, okay?

13          And what's interesting about October 11th is that's

14   the day when Anton Postolnikov places his standing order.

15          Can we show Government Exhibit 965.

16          Mr. Shahabian showed you this on his closing.  He

17   said, you know, you don't have to think about Anton Postolnikov

18   because all of his activity stems from a standing order that he

19   placed on October 12th.  That was the day that he said he

20   wanted to buy 500,000 worth of warrants.  Well, fine.  It's a

21   standing order.  But it's placed the day after Marc Wachter,

22   who's pursuing Anton Postolnikov like his new best friend, is

23   telling people, like Zoltan Present, that Patrick is about to

24   announce some big news.  Do you think if there was money to be

25   made, Marc Wachter told only Zoltan Present that there was

1    going to be big news?  You think he kept his mouth shut when he

2    was talking to Anton Postolnikov?

3              Could we show chart 930, the Melley chart.

4              And you can see on October 11th is when Anton switches

5    to a warrant strategy.  You see how it goes from U to W?

6              How else do you know that Marc Wachter had inside

7    information and knew the merger was coming because he lied

8    through his teeth about that on the witness stand?  I'm going

9    to demonstrate that now.  You might recall that I showed him a

10   series of texts from October 20th, the day the public

11   announcement of the merger was made.  Here's what he texted to

12   one of his close, good friends, Patrick Orlando.  This is

13   before any news is public.  The news does not become public

14   until around 8 p.m. or after.  You see that bottom text?  He

15   says, "Hey, bud, what's the latest?"  I pressed—I pressed

16   Mr. Wachter about that.  And Mr. Wachter had a great

17   explanation.  He said:  That's because I haven't spoken to him

18   in two days, which is really not normal.  This is just me—this

19   is a typical what's up.  I haven't spoken to him in two days,

20   and we're so close, we're such buddies, that not to have spoken

21   to him in two days is just not normal for us, so I'm texting

22   him, "Hey, bud, what's up?"  Well, guess what?  The phone

23   records make very clear that Marc Wachter and Patrick Orlando

24   had not gone two days without talking to each other.  They

25   spoke to each other that very morning, for 16 minutes and 29

1   seconds, at 8:48.  And do you think that phone call was

2   pleasantries at 8:48 in the morning, before anyone had had

3   coffee, or do you think this is Marc Wachter saying:  Where we

4   at?  What's up?  Is it going forward?  What's happening?  Is

5   the merger gonna happen?  Where are we?  I don't have proof,

6   but there's compelling evidence.

7           And there's very compelling evidence that Marc Wachter

8   and Patrick Orlando and Anton Postolnikov and Gerald Shvartsman

9   and Michael Shvartsman saw each other often and regularly

10  throughout this key period and at key times that line up with

11  Mr. Melley's charts about trading.  And I want to go over them

12  with you.

13          Can we pull up our chart.

14          This——I apologize——is an extraordinarily confusing,

15  overwhelming chart, but we were trying to fit in all of the

16  contacts between these people leading up to late October.  And

17  you'll see this is all from testimony in the case, mainly from

18  Marc Wachter and some exhibits.  But on September 15th, Anton

19  and Marc Wachter meet at Postolnikov's residence on Fisher

20  Island.  24th, they're meeting again.  On the 11th, Marc

21  Wachter and Patrick are talking.  That's the day——that's

22  earlier in the day.  They have a seven-minute call.  Then it's

23  later that day that Marc Wachter emails Zoltan Present that

24  Patrick will be announcing some DWAC news very soon.

25          October 15th, Gerald Shvartsman and Anton Postolnikov

 1   have a one-minute call.  October 15th, Patrick Orlando and

 2   Anton have a four-minute call.

 3          Multiple calls on the 16th.  Okay?

 4          And then on October 16th, there's a party, at a

 5   restaurant, attended by Marc Wachter, Anton Postolnikov, Gerald

 6   Shvartsman, and Michael Shvartsman.  Okay?

 7          Now I just want you to understand these dates in

 8   context.  October 15th, when Patrick Orlando and Anton

 9   Postolnikov have a four-minute call, that's a Friday.  And

10   October 16th, when they go to the party, that's a Saturday.

11   The first day anyone can trade is October 18th.  That's the

12   Monday.  That's when that funky Gerald Shvartsman trade takes

13   place on October 18.  That's when Gerald Shvartsman contacts

14   Adrian Lopez and Netanel Suissa and says, guys, there's going

15   to be a merger.  You should think about investing in DWAC,

16   okay?  And how do we know they're all there?  Well, first of

17   all, Marc Wachter testified to some of the guests as best he

18   can recall and he—but we'll show you texts.  This party took

19   place.

20          Can we show Defense Exhibit 93.

21          Is that Defense Exhibit 93?

22          Okay.  So this is a text communication.  I don't know

23   if you've seen it before, but it's between Michael and Gerald.

24   It doesn't say Gerald, but there's a stipulation as to the

25   phone numbers in this case.  And this is October 16th, the day

1    of the sushi dinner, and Michael is saying, "Gerald, dinner

2    tonight, Bulga (ph) birthday" ──that's Anton's wife──and Gerald

3    is saying, "I know about the dinner."

4              And could we show Defense Exhibit 83A.

5              This is Gerald writing to Anton the following day,

6    sending a thank-you note.  "Great party.  Thanks for the

7    invite."  "Thanks for coming, Gerald."

8              Let's take a look at the Gerald Shvartsman chart.

9    When the markets open on October 18, he buys.

10             Let's take a look at the Adrian Lopez chart.  Adrian

11   Lopez Torres.  He buys after the tip on the 20th.

12             Let's take a look at the Netanel Suissa.  Starts

13   buying on the 19th.

14             Patrick Orlando was the captain of a very leaky ship.

15   I submit to you that as the biggest deal of his life

16   approached, toward the end of October, he was so excited, he

17   couldn't keep it from his best friend.  Again, you met Marc

18   Wachter.  Do you think he's the type of person who would keep

19   his mouth shut if there was money to be made?  Eric Swider told

20   you that he met Marc Wachter only once and thought he was

21   toxic.

22             Could we pull that up.

23             The question is asked of Mr. Swider:

24             "Are you familiar with an individual by the name of

25   Marc Wachter?"

1           "I am."

2           "How are you familiar with him, sir?"

3           "I met Marc Wachter in Miami probably 18 months ago

4     through Patrick Orlando.  Patrick Orlando had showed me a

5     business that Marc Wachter needed help with."

6           And this is what Mr. Swider says:  "Once I found out

7     who Marc Wachter was, I declined to do the business."

8           Marc Wachter is the guy who deletes texts and defrauds

9     insurance companies, and you heard it.

10          Mr. Shahabian just said, Marc Wachter is not the

11    tipper because he wasn't on the DWAC board of directors.  That

12    was his argument.  Well, Marc Wachter didn't have to be on the

13    board of directors because he had unlimited access to Patrick

14    Orlando——much more access than Mr. Garelick ever had, who

15    didn't speak to Patrick Orlando once outside a board meeting

16    between September 2nd and all the way through the time when the

17    news was publicly announced.  And Mr. Shahabian just told you,

18    oh, you know Marc Wachter wasn't the tipper because he gave up

19    his shares; remember, he conveyed them to his friend Zoltan

20    Present, and he would never have done that if he had inside

21    information and had known that a merger was around the corner.

22    Well, I think it was pretty clear at trial that that was utter

23    nonsense because Mr. Wachter never had any shares.  They were

24    never issued to him.  That was all in his head, that he had no

25    shares to give up.  But look at Marc Wachter's own testimony:

1    "Q.  If someone went to your house in 2021, knocked on

2    your door, and said, show me something from DWAC that says you

3    own DWAC founders shares, you would have nothing to show them,

4    correct?"

5            "A.  Correct."

6            "Now you testified on direct that you gave up your

7    founders shares before the merger announcement, correct?"

8            "A.  Correct."

9            "Sir, that's all make-believe, isn't it?"

10           "A.  Yes."

11           They're asking you to take the word of Marc Wachter,

12   while they're calling Bruce Garelick a liar.  Proof beyond a

13   reasonable doubt is doubt on which you don't hesitate.  I

14   submit to you, you would hesitate in an important decision in

15   your life if you were relying on Mark Wachter's word.  I submit

16   to you if he wanted to sell you insurance, you would hesitate.

17           Now let's take a look——we just talked about

18   October 18th.  By the way, none of this is involving any

19   tipping by Bruce Garelick.  Remember, his boss was in and out,

20   in one shot, on October 1st, because that's when warrant

21   trading opened, and he was done, okay?  None of this is tipping

22   by Bruce Garelick.

23           If you look at October——let's look at October 20th.

24           I'm sorry.  Let's look back at these Melley charts.

25           And this is Mr. Hannelius.  And you can see that

Mr. Hannelius——we just talked——we talked earlier about how he

followed in the footsteps of Michael Shvartsman on October 6th

and 7th by buying warrants as soon as the liquidity opened up

after Mr. Shvartsman's trades.  But now you get one again kind

of out of the blue on October 20th.  Again, I'm submitting to

you, when you see these out of the blue and they're not in any

logical or coherent pattern, they're not part of a preconceived

plan, yes, you can be suspicious.  And yes, I have no burden of

proof.  I don't know what happened.  I'm just telling you,

there is compelling evidence.

          So you see this for Mr. Hannelius.

          And can we show on October 20th.  That's just while

the market is open, the last day before the merger is

announced.

          Can we look at Aric Gastwirth's chart.

          This is Aric Gastwirth.  You can see also a lot of

buying activity on October 20th, okay?  And what do we know?

We know that Aric Gastwirth is a good friend of Michael

Shvartsman, that they——that Eric Hannelius is a close business

partner of Michael Shvartsman, that Michael Shvartsman was at

that dinner party on October 16th with Marc Wachter and Gerald

and Anton, and now, but, you know, Mr. Hannelius and

Mr. Gastwirth don't live in Florida, they live in different

states, but now they see him in Las Vegas.  I don't know, you

know, what——I wasn't there.  I don't have——I didn't conduct a

1   grand jury investigation.  But these are two close friends of

2   Michael Shvartsman.  If anyone told them something, it wasn't

3   Bruce Garelick.  He told you he doesn't know Aric Gastwirth.

4   Yes, yes, this is killer evidence.  Bruce Garelick and Eric

5   Hannelius were dune buggy partners.  But that was two days

6   later, after the news was publicly announced.  That was not at

7   the time this occurred.  There is no evidence, none, zero, that

8   Bruce Garelick tipped either Aric Gastwirth or Eric Hannelius.

9   That is pure speculation.  Ladies and gentlemen, everyone in

10  this courtroom wants you to use your common sense and draw

11  reasonable and rational inferences, but when that common sense

12  crosses a line to speculation, you know, this might have

13  happened, that's when your antennae need to go up in the jury

14  room and you need to say, proof beyond a reasonable doubt is

15  not about speculation; it's about evidence and rational

16  inferences drawn from solid evidence.  It's not, I guess this

17  could have been Bruce Garelick.  They presented no proof of

18  that whatsoever.

19         Bruce Garelick gave you credible testimony,

20  corroborated by other evidence, explaining his state of mind

21  that he did buy stock, but he did it at a time when he thought

22  it was okay and he stopped, and that's corroborated by

23  contemporaneous documents.  He explained to you what he did.

24  He told you he didn't tip anybody.  And you've heard his

25  testimony.  And now I've shown you that there's compelling

1   evidence that explains exactly what happened here without

2   having to think that someone with his career and his——what he's

3   worked hard to achieve, that everything he's done, that all of

4   this was because of him, and some criminal scheme that he was

5   behind?

6           Before I sit down, I want to address some of the legal

7   concepts that Judge Liman will talk to you about, and he will

8   tell you what the law is.  He will——he is the master of the

9   law.  You will listen to him, not me.  But like Mr. Shahabian,

10  both of us have a crystal ball into what we think he will tell

11  you.

12          All of the charges in this case, you will learn,

13  require you to consider Bruce Garelick's state of mind.  The

14  issue in this case is, did he at any point in time have the

15  mind of a criminal?  Did he do something that he knew at the

16  time was wrong?  Right?  That's what makes someone a criminal,

17  when they cross a line and transgress.  They know that that

18  line divides right from wrong and they cross that line

19  knowingly and intentionally, knowing that they're disobeying

20  the law.  That is the essence of any crime.  And the judge is

21  going to instruct you on some terms and concepts that bear that

22  out.

23          The first term or concept that I want to share with

24  you is the word "knowingly."  That means that the government

25  must prove beyond a reasonable doubt that Bruce Garelick knew

1    that he was actually in possession of material nonpublic

2    information at the time that he traded or encouraged others,

3    that he knew——that his state of mind was such that, I know that

4    this is material nonpublic information.  Okay.  He told you, I

5    achieved that state of mind on or about September 23rd and I

6    stopped trading, and I never tipped anybody and I never did

7    anything wrong.  I never encouraged anyone to break the law.

8    That's knowingly.

9         The second thing the judge is going to talk to you

10   about is a concept called intent to defraud.  That means if you

11   are considering Bruce Garelick, in order to convict, you must

12   find that he knew he was involved in a fraud and acted

13   intentionally to make it succeed, that that was his state of

14   mind as he was doing this, as he was telling Michael

15   Shvartsman, by the way, warrants, it's public now, warrants are

16   freely trading in the market, you know, you can trade warrants

17   now, call Ben Reed, you've got to find that he was doing that

18   with an intent to defraud, and he was involved——he believed he

19   was involved in a fraud and trying to make it succeed.  That's

20   what you have to find.  That's a heavy, heavy thing to have to

21   find.

22        And the judge is going to tell you about the word

23   "willfully."  "Willfully."  And that's a word that's applied in

24   connection with four of the five counts in this case.  And what

25   "willfully" means is that someone has to act purposely, with

1    the intent to disobey or disregard the law.  Okay?  You have to

2    have the mind of a criminal to be convicted of any of these

3    crimes, okay?  It's just—it's not a question of, did someone

4    exercise bad judgment?  It's not a question of, did someone do

5    something they shouldn't have done?  Did someone make a

6    mistake?  Would someone else have seen material nonpublic

7    information two days earlier?  Would someone have seen material

8    nonpublic information two days later?  One can sit here in

9    retrospect and look back at this, these events, you know, in

10   the calm of retrospection and say, you know what, it might have

11   been prudent for him to stop trading on the 16th, or the 13th

12   or the 14th.  That's not the issue.  The issue is not whether

13   what he did was a bad judgment call or what he did was a

14   mistake or something like that.  That's not the issue.  The

15   only issue here is whether he did it with the intent and

16   purpose of disobeying the law, knowing that it was wrong and

17   yet went ahead and stepped forward and crossed that line.

18   You're not going to find anything that comes close to that

19   here.

20           I told you, when I first spoke to you at the outset of

21   this case, the essential question that what was in Bruce

22   Garelick's mind, did he have the mind of a criminal or did he

23   act in good faith.  The judge will instruct you that good faith

24   is a complete defense, a complete defense, to all of the crimes

25   that are charged.  I urge you to listen very carefully to that

1    part of this instruction.

2            The judge will tell you that as long as he held an

3    honest belief, even if it turned out to be wrong, as long as he

4    held an honest belief at the time and did not have an intent to

5    defraud anybody or to break the law, you must acquit him.

6            Now you heard from Bruce Garelick.  You heard from him

7    when I talked to him and asked him questions.  You heard from

8    him when the prosecutors talked to him and asked him questions.

9    Why would he act with a deliberate intent to commit fraud and

10   break the law, for $49,000?  Give up everything he had ever

11   gained?  Why would he risk his whole career and suddenly start

12   acting that way, and thinking that way?  There is no evidence

13   that he tipped anybody.  There's no evidence that this was a

14   get-rich scheme for him to make tons of money for himself.  He

15   had a good faith belief at the time that he was not in

16   possession of material nonpublic information, and he stopped

17   trading when he sensed that that was going to change.

18           Now he did fail to file forms.  That's true.  He

19   didn't file Form 3, Form 4, Form 5.  That was a mistake.  He

20   had never been on a board of directors before.  He received no

21   training.  And the stock trades he was making were in small

22   amounts, for little—relatively little dollar amounts that, you

23   know, it wasn't top of mind.  When you go back to the jury

24   room, you can convict him, convict him of failing to fill out

25   that paperwork, because he did.  But while you're convicting

1   him of that, please acquit him of insider trading, because he

2   didn't do that.  And the judge will instruct you that a

3   director's failure to file forms does not constitute insider

4   trading, nor does such a failure by itself, without more proof

5   of any element of the crimes charged here.

6          Now I——this is my last chance to speak to you.  I

7   don't get to speak to you again.  The prosecution has a

8   rebuttal.  That's fair.  That's part of the process, because

9   they have the burden of proof, beyond a reasonable doubt.  And

10  that's a heavy burden, and it's taken very seriously by every

11  court that——that standard is applied in every court in this

12  country, to protect citizens who are accused of crimes.  They

13  can only be convicted if the government meets that very heavy

14  standard.  They get to go again, and I urge you, when you're

15  back in the jury room and talking to each other, say, what

16  would——if there's an argument that he makes that I don't get to

17  come up here and tell you, please think, what would the defense

18  say in response to this?  Is there another way to look at this?

19  I think you've seen this.  You've been a very attentive jury.

20  I ask you to do that.

21          Jury duty is an interesting thing.  People get pulled

22  out of their ordinary lives, and it's one of the duties of

23  citizenship, and it's different.  It's different from other

24  duties.  You know, when we vote, you go into a ballot booth all

25  by yourself.  You're not allowed to see what anyone else is

1    doing, right?  That is an individual, solitary experience with

2    voting.  That's not like being on jury duty.  Jury duty is——we

3    kind of form a community of people who haven't met each other

4    before, and we share our thoughts and our way of thinking, and

5    we talk to each other.  And it's a collective effort.  And each

6    of you should speak to your own views and listen carefully to

7    those of others.  And we do this in courtrooms like this with

8    nice oak panels and beautiful rugs because this is a solemn——a

9    solemn calling.  We're rarely called upon to judge an

10   individual and decide his fate.  I know you will do that.

11          You've been a very attentive jury.  You've been taking

12   notes.  I speak for all of the lawyers here that we thank you

13   for your service and your time, and I urge you to return the

14   only reasonable verdict you can return here, which is not

15   guilty, on all five counts.

16          Thank you very much.

17          THE COURT:  Thank you, Mr. Bach.

18          Members of the jury, it's now 10 of 1, so it's a

19   convenient time for us to take our lunch break.  We'll

20   reconvene at 2:00.  So I'm going to ask you to be in the jury

21   room five minutes of 2 so we can get started promptly at 2.  As

22   Mr. Bach just informed us, at that point we will hear a

23   rebuttal summation, and then you'll receive my charge.

24          A reminder that the case has not yet been submitted to

25   you, so that means that until you hear the rebuttal summation

1    and until my charge, number one, you shouldn't talk about the

2    case amongst yourselves or with anybody else, you shouldn't do

3    any research about the case at any time, and you should keep an

4    open mind until you step into that jury room and start

5    deliberating with one another.

6            So have a good lunch.  We'll see you back here in a

7    little bit.

8            THE DEPUTY CLERK:  All rise.

9            (Jury not present)

10           THE COURT:  Be seated.

11           Just a few things.  First of all, I want to

12   congratulate the lawyers on both sides for delivering

13   summations that, while in each instance they were a little bit

14   over their estimates, made sure that we got done by 1:00, which

15   helps in terms of the schedule.

16           When I deliver my charge, as previously discussed,

17   we'll have copies of the charge that I intend to have in the

18   hands of the jurors so that they'll be able to follow along.

19   And you all were provided copies of that last night by email.

20           We need an agreed-upon exhibit list to give to the

21   jurors.  I don't think I received anything from the parties

22   last night.  So maybe if there are lawyers or paralegals who

23   are not working on the rebuttal summation, that they can just

24   make sure that that's finalized, that would be helpful.

25           We intend to give a copy of the trial indictment to

O581GAR4

1   the jurors.  I think there was no objection to the verdict

2   sheet, so we'll give them one copy of the verdict sheet.

3          And then just so you know, my practice, after I

4   deliver the charge and after they go back to deliberate, you're

5   all free to leave the courtroom, but you need to give my deputy

6   contact information, and make sure that you're always within

7   ten minutes of the courtroom so that if we get a note, you can

8   come back here and that we don't delay the jury.  If, you know,

9   a lawyer is more than ten minutes late, I'm going to reserve

10  the right to get started.  So just make sure that my deputy has

11  that information.

12         Anything from the government before lunch?

13         MR. SHAHABIAN:  No, your Honor.

14         THE COURT:  Mr. Bach?

15         MR. BACH:  No, thank you, Judge.

16         THE COURT:  Okay.  See you back here.

17         THE DEPUTY CLERK:  All rise.

18         (Luncheon recess)

19

20

21

22

23

24

25

O58Cgar5

1        AFTERNOON SESSION

2                2:01 p.m.

3        (Jury not present)

4        THE COURT:  I understand the jury is here.

5        Mr. Nessim, are you ready for me to bring the jury in?

6        MR. NESSIM:  Yes, your Honor.

7        THE COURT:  Mr. Bach.

8        MR. BACH:  Yes.

9        THE COURT:  Let's bring the jury in.

10       MS. HANFT:  Your Honor, can I put one thing on the

11   record first?

12       THE COURT:  Yes.  Mr. Fishman will hold off bringing

13   in the jury while you do it.

14       MS. HANFT:  Our paralegal informed us that as he was

15   getting into the elevator, he encountered a juror.  He did not

16   immediately realize it was a juror and said like a casual hey,

17   and then let the juror go ahead when he realized and said sorry

18   and walked away.  I just wanted to put that on the record.

19       THE COURT:  The defense request me to do anything with

20   respect to that?

21       MR. BACH:  No.

22       THE COURT:  All right.  Let's bring in the jury.

23       (Jury present)

24       Welcome back, members of the jury.  We'll now hear the

25   government's rebuttal summation.

1          Mr. Nessim.

2          MR. NESSIM:  Thank you, your Honor.

3          Good afternoon, everyone.  What you had heard before

4    the lunch break was an experienced and skilled defense attorney

5    working hard to do his best for his client.  Mr. Bach is a very

6    good attorney, but he is not a magician.  You heard him say

7    that there is no evidence establishing that Bruce Garelick

8    tipped Michael Shvartsman, Eric Hannelius, and others.  You

9    heard him say there's no evidence that he was involved in this

10   criminal scheme, in these five counts that you're being asked

11   to consider in this trial.  That's not true.  He is not a

12   magician, the evidence exists, and he can't make it disappear.

13   He can't make the nondisclosure agreements that you saw

14   disappear.  He can't make email after email and text message

15   after text message disappear, the one where he says, I

16   recommend you buy DWAC units; the ones where he says, this is

17   anticipated to be announced in 6 to 10 weeks; the one where he

18   says, I took one for the team; the one where he says, we made

19   $20 million — he can't make those disappear.

20         He can't make the fact that Garelick was a director of

21   DWAC disappear.  He can't make the fact that he owed fiduciary

22   duties to that company and to its shareholders, he can't make

23   that disappear.  He can't make Garelick's own trades disappear,

24   that page full of trading that Garelick placed in DWAC

25   securities at the time that he had material nonpublic

1   information.  He can't make Garelick admitting that he's on the

2   board just to babysit disappear.  He can't make all of his

3   urgings to Michael Shvartsman to buy warrants, to buy DWAC

4   units, he can't make that disappear.  He can't make any of that

5   evidence disappear.  And because he can't make it disappear,

6   he's tried to explain it away to you.  He has tried to explain

7   why each piece of evidence points to some other conclusion than

8   that their client is guilty, but he is not a magician.

9            I'm going to briefly address some of those specific

10  arguments that he made before lunch.  I'm not going to address

11  every argument because I don't want to repeat Mr. Shahabian's

12  entire closing argument.  I know that you'll apply your common

13  sense and your memory to all of the evidence that came in in

14  this case.  You've been sitting here and paying attention

15  throughout this trial, and you heard and seen all the evidence.

16  Mr. Bach's arguments don't hold up against all that you've

17  seen.

18           And before I get there, I want to remind you again,

19  the defense has no burden in this case, the government does.

20  We embrace that burden.  We have met that burden here.  But

21  when the defense does put forward arguments, when the defendant

22  testifies, you can and should scrutinize that evidence, you

23  should scrutinize those arguments carefully, especially

24  arguments and evidence as unsound as the ones you heard from

25  the defense during this trial.

1    I want to turn first to an issue about the alternative

2    tippers.  Mr. Bach spent some time on this in his closing.  I

3    want to deal with it first because it's really not the core of

4    this case, it's not the core of what you're being asked to

5    consider.  It's being presented to you to distract you from

6    what matters.

7    There is substantial evidence that Mr. Garelick tipped

8    Michael Shvartsman, Eric Hannelius, others.  Gerald Shvartsman

9    received those tips, Aric Gastwirth received those tips, Adrian

10   Lopez Torres received those tips, Anton Postolnikov traded on

11   insider information.  There's substantial evidence of all of

12   that.  Most of that is irrelevant -- it's relevant — excuse

13   me — you should consider it for the charged counts, but you're

14   not required to in order to return a verdict of guilty on each

15   of the five counts that you're being asked to consider.

16   The questions of alternative tippers, those apply to

17   trades in October, late October, well after Mr. Garelick placed

18   his own purchases of DWAC securities on the basis of inside

19   information, well after Michael Shvartsman placed his trades,

20   well after this conspiracy was formed, well after this scheme

21   was reached, well after the defendant tipped Eric Hannelius.

22   Even if you decide for some reason that some of those later

23   tipping conduct may not have been committed by the defendant,

24   we submit to you that's the wrong conclusion, but it does not

25   require a verdict of not guilty on any of the five counts.

1    So, let's talk about some of that alternative tipper

2    testimony.  I want to deal with it briefly because it really is

3    a distraction from the core issues here.

4    So, first of all, their justifications for certain

5    trades shift as the timeline continues, and this is an

6    indication to you that this is just a distraction, it's a way

7    to confuse you from issues that matter.

8    So, for example, Gerald Shvartsman's earlier trades,

9    the one he placed October 7th, October 8th, that was his kind

10   brother, Michael Shvartsman, clueing him in on this great

11   investment strategy that he's had for a long time, that's

12   totally fine.  But his October 18th trade in DWAC, that's based

13   on the terrible tip he received from Anton Postolnikov, from

14   Marc Wachter, from Patrick Orlando, this whole alternative

15   tipping chain.

16   There are inconsistent justifications for the same

17   person's investment in DWAC, and they're inconsistent because

18   they don't make sense.  Gerald Shvartsman purchased his DWAC

19   securities because he knew that DWAC was working to merge with

20   Trump, and he purchased more as it got closer to the merger

21   because he knew that that merger was about to be announced and

22   the shares were going to go way up.  That's why, not because he

23   received some illicit tip at the end of that period, it's

24   because that was the plan from the beginning.

25   They talked about Marc Wachter.  Mr. Wachter testified

1    here, you all saw him, you were able to assess his demeanor,

2    his answers.  No one is asking you to like Mr. Wachter, no one

3    is asking you to share a meal with him.  The question is, was

4    he the tipper?  The answer's obviously not.  What came across

5    very clearly from Mr. Wachter is that he's someone who likes

6    money, he wants money, he doesn't have as much as he wishes he

7    has.  If he had any idea that the merger was about to be

8    announced was just days away from being announced and he had

9    the potential to have millions of dollars worth of founders

10   shares, as much as that was a contingent thing that depended on

11   other things happening for him to access the founders shares,

12   would he have ever signed away his rights to that for $100,000?

13   He gave up millions for $100,000.  That's one indication to you

14   that he had no idea that this merger was about to be announced.

15          The alternative approach theory falls apart.  They say

16   he talked to Orlando all the time.  That's true.  He testified

17   they're close friends, they talked all the time, but he voted

18   with his feet.  He took action, he sold his interests because

19   he didn't understand what was about to happen, he didn't

20   understand the potential of what it was.  He could not have

21   been part of this tipping chain.

22          And Anton Postolnikov, they point to him like this

23   ghost who's lurking on the fringes of this case.  He also had

24   access to inside information.  That was thanks to Mr. Garelick

25   and his tips to Michael Shvartsman, and that is how he got it.

1    Look at Mr. Garelick's text with Mr. Postolnikov and look at

2    Mr. Wachter's communications with Mr. Postolnikov.  Wachter,

3    Postolnikov talked about life insurance.  Wachter is lusting

4    after this guy's money, he wants to sell life insurance, sure,

5    but the defendant's texts with Mr. Postolnikov, they're about

6    DWAC.  It's about what is this position, I'm on the board to

7    babysit, this is a great deal, if it's not who you like/expect,

8    then we'll redeem.  It's all about DWAC.

9            So what is the more reasonable conclusion?  Some

10   alternative tipper chain that's hard to understand or that it

11   came from the defendant?  It's that it came from the defendant.

12   But again, even if you disregard the alternative tipper chain

13   or those later trades, they cast very limited light on the core

14   of the five charged counts, so it's really a distraction.

15           So let's turn to some of the other arguments that

16   defense counsel raised.  They asserted that Mr. Garelick didn't

17   believe the information he had was material.  I'm going to get

18   into this in a little bit about how Mr. Garelick lied on the

19   stand, but let's just talk about from the earliest meetings,

20   his earliest meetings with Mr. Orlando when he gets the

21   information about this deal.  The idea that he didn't think

22   that Mr. Orlando's back was in negotiations with Trump was

23   material is preposterous, it's ridiculous.

24           I just want to pull up one example of this.

25   Mr. Bianco, could you please publish Government Exhibit 743 and

1    turn to page 2.  If you could zoom into the last text there.

2    Thank you.

3         So this is on June 30th of 2021.  This is just after

4    the two meetings that Mr. Garelick had with Patrick Orlando

5    that were subject to nondisclosure agreement.  Here he is

6    trying to pitch the founders shares idea to another potential

7    investor.  He's saying Michael and I wanted to share with you

8    an interesting investment opportunity.  And then he says, just,

9    this is a sweetheart deal with protected downside and some

10   crazy speculative upside.  It involves founders shares of a

11   soon to IPO SPAC that has an exclusive with the soon to launch

12   Trump Media Group, TMG.

13        This message shows you that Mr. Garelick knew this was

14   material on June 30th.  How do you know that he knew it was

15   material?  Because it's the information that he is giving to

16   potential investors to tell them they should make this

17   investment.  It's the important issue that affects their

18   investment decision, so he's telling them, this is what it is,

19   it's exclusive with Trump, invest.  He knew it was material

20   from the outset.  So the idea that he didn't know, that is

21   ridiculous.

22        Mr. Bianco, you can take that down, please.

23        It's so obvious how meaningful this information is to

24   the defendant.  Trump SPAC, Trump SPAC, Trump SPAC, referencing

25   it again and again.  You heard him at the board, his thoughts

of how explosive this possible deal could be.  He was thinking

that way throughout.  It was material to him throughout.  He

knew that.  Mr. Bach was saying something like, you know, it

was uncertain it if this merger would happen or it was

uncertain if the business would actually combine.  That may be

true, but uncertainty doesn't make something immaterial, the

chance of the hit is what makes it immaterial.  The average

investor would want to know that they have the chance to strike

gold.  It is part of their calculus in determining how to make

their investments.  And there are also all those messages about

how they'll exercise their redemption rights if it's not plan

A, if it's not who we examine.  It's the purpose of a deal.

It's material from the beginning.

        Now I want to turn to another way that you know

Mr. Garelick committed these crimes and that he did it

knowingly, willfully, and with intent to defraud, and that's

his testimony here before you.

        He lied.  He got up on that witness stand, he swore an

oath to tell the truth, and he lied through his teeth.  He lied

because he had to and he lied because the truth is devastating.

He lied about when he learned about the DWAC opportunity.  He

said that it was surprise invitation, his first meeting with

Patrick Orlando.

        He claimed it was a surprise meeting, but that is not

true.  On June 14th, the defendant, Michael Shvartsman and

1    Gerald Shvartsman received the NDAs relating to DWAC and

2    Benessere in advance of that June 18th meeting.  That's

3    Government Exhibits 217 for Michael Shvartsman and 218 for the

4    defendant.  The same day, June 14th — and this is in Government

5    Exhibit 721 — they start talking about SPACs, how to make money

6    off of SPACs.  The defendant testified, this is just generally

7    about SPACs.  Four days before this meeting, the same day I got

8    the NDA, the same day my boss got and actually signed the NDA,

9    this is just general conversation.  And why did he have to lie

10   about that?  Because he wanted to seem like he wasn't prepared

11   for this conversation, like he didn't understand that he was

12   receiving confidential information, but that's not true.

13          And he lied about when he believed he came into

14   possession of material nonpublic information.  On his

15   testimony, he entirely dodged the board meeting that happened

16   on September 21st.  He entirely avoided mention of the

17   September 22nd letter of intent that he voted on on September

18   22nd.  He had to lie and he had to claim that the first time he

19   had some idea that he might have material nonpublic information

20   was after his last trade on September 23rd.  It's obvious why

21   he lied that way, because he had to find a way to justify his

22   own purchases in DWAC.  He said the drumbeat began to start on

23   September 23rd.  Members of the jury, the drumbeat began to

24   start on September 23rd?  The drumbeat started in June.  By

25   September 23rd, it's the Macy's Thanksgiving Day Parade,

1  marching bands are coming down Central Park West.  I mean, that

2  was the first idea he had nonpublic information?  He had voted

3  on a mutually exclusive letter of intent, the same information

4  that he thought was material in that June text message to

5  Mr. Cooperman.  It's laughable.

6         He also told you that his text message to Michael

7  Shvartsman, when he said, I recommend you buy DWAC units, that

8  in that text message he didn't mean "recommend," what he

9  actually meant was "remind," as if he's some kind of Outlook

10  calendar pushing Michael Shvartsman's reminders to him.  It's

11  ridiculous.  Here's Michael Shvartsman's chief investment

12  officer.  The plan was for him to be Michael Shvartsman's seat

13  on the board, his eyes and his ears and his mouth.  He is

14  recommending he buys DWAC units because by this point events

15  are happening quickly.  He knew that.  It's time to start

16  buying because this merger announcement is coming and we need

17  to hit it rich.

18         And you saw his mannerisms here on the witness stand.

19  He testified very differently on direct examination than he did

20  on cross examination.  His lies were not ready to be tested on

21  cross examination.  And what do all these lies tell you?  That

22  he's guilty, that he knew what he was doing was wrong, that he

23  acted intentionally.

24         I mentioned that his role was to report back.  This is

25  so obvious.  There are so many messages where he refers to his

 1    role on the board.  They're in messages beforehand to

 2    Mr. Postolnikov about a front-row babysitting job, he is there

 3    to watch out for the investment, he is there to make sure they

 4    can take advantage of this opportunity, to trade on the

 5    material nonpublic information.

 6            And then after the fact, big day today, we made

 7    $20 million on it.  And then he tells the colleague at Rocket

 8    One that he took one for the team.  All good, man.  No

 9    complaints.  This was the plan from the beginning.  This plan

10    shows you, it's another important piece of the evidence as to

11    how you know he tipped Michael Shvartsman because this was the

12    point of him being on the board, so that he could do this.

13            And you see some of these messages in terms of the

14    nature of his relationship in reporting communications back to

15    Michael Shvartsman.  He has that phone call with Patrick

16    Orlando on September 2nd.  That's in Government Exhibit 950 and

17    950a.  Those are some of the phone records from that period of

18    time.  And he talks to Patrick Orlando.  It's the first day

19    that he is a board member of Patrick Orlando's SPAC company.

20    He has fiduciary duties to that company, and Orlando knows he's

21    a board member.  They talk and he texts Michael that day.  "I

22    spoke to Patrick Orlando, we can catch up later."  He's feeding

23    information.

24            And then it's interesting, the reminder text.  There's

25    that message about, "I recommend you buy DWAC units," but he

1    sends it on September 20th, which is the day before the first

2    board meeting.  This is a tip, this is his suggestion to buy on

3    the basis of material nonpublic information that they know is

4    the Trump merger announcement.  He sends that message, "I

5    recommend you buy DWAC units."  And I think Mr. Bach pointed

6    out that point about DWAC units.

7              Mr. Bianco, can you please turn to Government Exhibit

8    511 and turn to page 3.  Zoom into the top message, please.

9              So the next day on September 21st, Patrick Orlando

10   tells the board that they're now talking about separating the

11   units, disaggregating the units.  So up until this point, as

12   you learned during this trial, investors could only buy units

13   in DWAC.  Once they're separated, you could buy warrants and

14   shares separately.

15             Mr. Bianco, you can take that down.

16             So what happened after his "I recommend you buy DWAC

17   units" message, he told Michael Shvartsman to hold off because

18   the warrants were going to be available to trade soon.  And so,

19   Michael Shvartsman didn't buy DWAC units, he didn't buy any

20   securities in DWAC until the warrants were available because

21   the warrants were cheaper, because the warrants had more

22   upside.

23             MR. BACH:  Objection.

24             THE COURT:  Let me see the parties at sidebar.

25             (At the sidebar)

1          What's the basis for the objection?

2          MR. BACH:  There is no evidentiary basis for a

3     statement that was made.  Mr. Nessim just said that

4     Mr. Garelick instructed Mr. Shvartsman to hold off from buying

5     units.  There's no evidence of that in any way, shape, or form.

6          THE COURT:  I'm going to give the jury an instruction

7     that just says, members of the jury, your recollection of the

8     evidence governs.  I think that that's --

9          MR. NESSIM:  If I could just be heard.  There are

10    plenty of documents in evidence about phone calls between

11    Michael Shvartsman and Bruce Garelick after that text message

12    and it's argument based on that evidence.  I can make an

13    additional statement to clarify this, that it's the phone

14    records we're pointing to as the source.

15         THE COURT:  Mr. Bach.

16         MR. BACH:  I just think they should limit their

17    arguments to the evidence and not posit facts that are not in

18    evidence.  I think that's a basic fundamental requirement of

19    closing argument, particularly for prosecutors, and they should

20    stick to it.

21         MR. NESSIM:  Your Honor, this is permissible argument

22    on the basis of the evidence.  We don't have recordings of

23    these calls, so we can't say exactly on which call it was said,

24    but it's permissible to argue that this information was relayed

25    based on the circumstances in evidence, which is that he

1    recommended he buy DWAC units, he didn't buy those units, they

2    spoke after he received this message, he changed his advice.

3          THE COURT:  I think you can say we don't know what he

4    said in that conversation, but the fact that he didn't buy DWAC

5    units doesn't preclude the notion that he gave them advice to

6    buy the warrants.  I think that is permissible argument.

7          MR. NESSIM:  If I can --

8          THE COURT:  You can clean it up.

9          MR. BACH:  Thank you.

10         (In open court)

11         MR. NESSIM:  Members of the jury, Mr. Garelick learned

12   that the warrants were going to be split off, and there are

13   plenty of records of phone calls between Michael Shvartsman and

14   Bruce Garelick after that information was relayed to

15   Mr. Garelick.  Mr. Shvartsman did not buy DWAC units.  I would

16   argue to you that you can conclude from that that Mr. Garelick

17   told him to hold off until the warrants were publicly traded.

18   And then his September 30th message of saying units are now

19   publicly available, I would submit to you that that is just a

20   continuation of that advice, that now the warrants are

21   available, it's time to buy, and that's what Michael Shvartsman

22   did.

23         Mr. Bach also argued that that no one hid open market

24   trades in this case, as if Ben Reed blessed this insider

25   trading.  Ben Reed did not know the full story.  If

1    Mr. Garelick was so prudent, if he truly believed that he had

2    no access to material nonpublic information, if you could

3    credit his testimony, which you cannot, wouldn't he have gone

4    out of his way to make sure he was doing things properly?

5    There's nothing here of any sort of disclosure to Ben Reed.  I

6    think Mr. Bach argued he assumed Ben Reed knew.  There's no

7    evidence of that and there is no indication that Mr. Garelick

8    took the prudent steps to ensure that he was acting

9    consistently with his obligations as a director and

10   consistently with the law because he didn't care because the

11   crime was the point.

12           There also has been some argument that these purchases

13   are part of an investment strategy, some kind of strategy that

14   Michael Shvartsman and Bruce Garelick came up with months

15   earlier, months before they learned the material nonpublic

16   information.

17           This is a ridiculous argument.  The evidence is clear

18   that Garelick, Rocket One, they invested in DWAC because the

19   target was Trump.  It wasn't because of any sort of

20   Black-Scholes calculation, it wasn't because of any sort of

21   sense on general warrant upside, it was because they had inside

22   information.

23           And what was that material information, by the way?

24   It's not about, oh, is this report on the Trump Media Group

25   consistent with what's reported in the Axios article?  The

1    inside information is this SPAC, DWAC, is talking to Trump

2    Media.  The inside information is this SPAC, DWAC, has a board

3    meeting.  The inside information is this SPAC, DWAC has a

4    letter of intent.  The nature of Trump Media is not the point.

5    The point is what's material nonpublic information here is what

6    DWAC's doing, and that's what the defendant knew and that's

7    what Michael Shvartsman knew thanks to his help, and that's

8    what they traded off.

9            This is clear through so many messages.  It's not

10   about some general calculation, it's not some analyst workup.

11   It's, we have downside protection.  It's, we're doing this

12   because we think the merger is with who we will expect, it's if

13   it's not plan A, we'll exercise our redemption rights.  And he

14   knew the announcement was going to be soon because of his

15   material nonpublic information.  You know, he told Michael

16   Shvartsman, we're playing this as more of a short-term trader.

17   He told Eric Hannelius that the announcement is going to be 6

18   to 10 weeks from now.  That's all based on inside information.

19   All of his assumptions, all of his beliefs, all of his

20   conviction in this investment is based on what he knew as a

21   result of his privileged position in the board and as to one

22   who signed a nondisclosure agreement and received confidential

23   information from DWAC.

24           And Mr. Garelick admitted on the stand that he did not

25   invest in other SPACs, and neither did Rocket One.  So if this

1   is some sort of, our thesis is that SPAC warrants are

2   undervalued and you can make a lot of money on it, you would

3   have expected them to make that investment on many other SPACs.

4   They don't need to be like Saba, like a hedge fund, but you

5   would expect them to at least replicate that on several other

6   examples, but they don't because it's not about the theory,

7   it's about the material nonpublic information.

8          There's also substantial evidence in the record that

9   Mr. Garelick tipped Eric Hannelius.  And this is something

10  Mr. Bach attacked a bit because it's one of the substantive

11  counts that you're going to be asked to consider.

12         Mr. Bianco, can you please publish Government Exhibit

13  465, page 3.  Actually, page 2 into page 3.  If you could

14  highlight from the header down into the third bullet.

15         So this is that email on September 9th from

16  Mr. Garelick to Eric Hannelius.  The second bullet here, it

17  reads that announcement expected 6 to 10 weeks from now is our

18  expected catalyst to then profitably sell the IPO shares.  That

19  information about timing is material nonpublic information.

20         Mr. Bianco, if you could just scroll down from this

21  frame a little.  A little more.  Great.

22         At the end of this email, Mr. Garelick writes, hope

23  that context helps, look forward to seeing you in Miami next

24  week.

25         Mr. Bianco, you can take that down.

1    And again, this is after that September 2nd phone call

2    with Patrick Orlando that Mr. Garelick had as a board member

3    with fiduciary duties.

4    Mr. Bianco, can you please publish Government Exhibit

5    465 and turn to the top page.  I'm sorry.  The second page.

6    Zoom into "Important."

7    This is the October 3rd email from Eric Hannelius that

8    you heard a lot about in summations and also in the defendant's

9    testimony.  Mr. Hannelius wrote, hi, Bruce, want to follow your

10   lead here.  See my agreement attached.  I just did 75K in

11   founders shares.  I've been buying some DWACU since seeing you

12   in Miami via my brokerage account.  Should I keep buying?

13   What's your thoughts?  Again, want to follow your lead here.

14   Any updating on timing and next steps from Patrick Orlando?

15   So first of all, what does this email say?  It says

16   Mr. Hannelius has been buying DWAC units since his

17   conversations with Mr. Garelick.  It's based on the information

18   that he relayed that led him to purchase these DWAC units.

19   And then he asks, any updating on timing and next

20   steps from Patrick Orlando?  Now, I submit to you why would

21   Mr. Hannelius ask that?  Is it out of the blue?  He is just

22   intuiting that Mr. Garelick may have updates on timing and next

23   steps from Patrick Orlando?  No.  The obvious conclusion is

24   that Garelick had already shared updates and timing from

25   Patrick Orlando to Hannelius.  He's asking for more.  They met

1   in Miami in September and he started buying, and he's saying

2   what's the new update because Garelick had already shared those

3   updates, he already shared the material nonpublic information.

4           Mr. Bianco, you can take that down please.

5           There's this argument that Mr. Garelick restricted

6   himself, that he took steps to limit himself.  On his own

7   trades, he was greedy, but he was smart.  He knew that if he

8   did much more, his chances of getting caught would increase

9   significantly.  The point of the whole plan, the point of him

10  being on the board was so that his boss and his company could

11  get rich.  He didn't restrict himself, he took one for the

12  team.  He did not act prudently.  He did not stop at the first

13  sense of some drumbeat of material nonpublic information.  He

14  is a sophisticated professional.  He spent years in the

15  financial industry.  He received training after training on

16  what insider trading and material nonpublic information means.

17  Adage Capital, CFA, his own hedge fund.  He testified, and you

18  can go back to his testimony on page 1241, he said, the

19  definition of material nonpublic information is fairly clear.

20  And he said that you should be conservative as you're

21  approaching material nonpublic information.  That may be true

22  statements of his training and what he knows, but that is not a

23  representation of what he did.  He testified that he knew what

24  it means to have fiduciary duty to the company and to the

25  shareholders.  That's on page 1283 of his testimony.  Again, he

1    knows these things, but he ignored them, he disregarded them,

2    he acted in direct violation of what he knew because the point

3    was to break the law, the point was to commit insider trading.

4    He knew better, but he still did it.

5          And he said on his testimony that he also has

6    fiduciary duties to Rocket One.  He testified about his duties

7    to Rocket One.  We've all talked about this, how his role on

8    the board was to serve as a babysitter to look out for Rocket

9    One's interests.  But even with that role, he couldn't resist a

10   little bit of trading himself, couldn't resist trying to make a

11   little extra money in his retirement account.  And it's not a

12   little extra money, it's almost $50,000.  He doubled his

13   investment in the round of a month.  That is significant.

14         And the forms are also such important evidence of his

15   willfulness, his intent to defraud.  He testified he knows

16   about insider sales, he knows that these are publicly reported,

17   he knows that people look to those forms to get transparency of

18   the market, of insiders.  It's about making sure that the

19   public has access to this kind of sensitive information.

20   There's been no real explanation as to why he didn't file these

21   forms.

22         And I just want to be clear, because defense counsel

23   said you should go back to the jury room and convict him on

24   failing to file the Form 4s.  No one is asking you to do that.

25   That's not one of the counts.  The counts are insider trading.

1  But the Form 4s, the failure to file them, it shows you so

2  clearly how at the time that the defendant was committing these

3  crimes, he knew exactly what he was doing, he knew it was

4  wrong, he knew it was against the law, he knew he didn't want

5  to get caught, and filing the Form 4s would basically be

6  advertising his crime to the world.

7          Now, we've talked about his personal sales.  I just

8  want to turn to one of them in particular, September 23rd.

9  This was the purchase that Mr. Garelick made after he had voted

10  on a mutually exclusive letter of intent with Trump Media.

11  This is devastating to their case and that's why he had to

12  construct this lie about the drumbeat during his testimony

13  because that trade, it's irrefutable, it's irrefutable

14  throughout, but this is the most obvious example of the

15  defendant's trading in material nonpublic information in

16  violation of his duties.  There is no defense to it.  This is

17  not a trick question.  This is as clear as day.  He was on the

18  board, he had material nonpublic information.  He knew his

19  obligations, he ignored them, he traded.  And that's really all

20  you need to know about what he did.

21          Members of the jury, the defendant was a director.  He

22  had a fiduciary duty, a duty of trust and confidence, a duty he

23  owed to DWAC and a duty he owed to the shareholders, retail

24  investors, institutional investors, the shareholders that the

25  defendant betrayed, people who don't have access to the same

O58Cgar5

1    information, the same power.  He cheated.  He used his inside

2    information for himself.  He didn't care about his duties, he

3    didn't care about anyone other than himself and his boss and

4    the other people in the small group that he tipped.  Mr. Bach

5    asked, why would he do this?  The point is that he did it.  He

6    committed these crimes.  He is responsible for his actions.  He

7    made these choices knowing full well what he was doing.

8         Now, I'm about to sit down, but before I do, I just

9    want to say that you heard a lot in the defense summation about

10   reasonable doubt.  The defense wants you to believe that it's

11   an impossible standard.  Now, Judge Liman will instruct you

12   about what that term means in a few minutes.  The standard is

13   not beyond any doubt.  As you listen to Judge Liman's

14   instructions, please keep this in mind:  There is nothing

15   mystical or magical about the term "beyond a reasonable doubt."

16   It is the very same burden of proof that is applied in criminal

17   cases every single day in every single courtroom in this

18   country, and every day, juries reach verdicts.  Every criminal

19   defendant is entitled to a trial, absolutely, but not every

20   case is a close case, and this one isn't close at all.  The

21   defendant is guilty.

22        THE COURT:  Thank you, counsel.

23        Members of the jury, you've heard argument from

24   counsel that information Mr. Garelick had at certain periods of

25   time was or was not material nonpublic information.  It's not

1    up to the lawyers to decide what is material nonpublic

2    information, that will be a decision that you will make, and

3    you'll make it on instructions that I'll give you in a moment.

4    I'll also give you the other instructions that govern this case

5    with respect to state of mind.

6          For now, we're going to take a 10-minute break.  My

7    instructions will take probably about an hour and a half, so

8    it's a good time for you to stretch your legs.  Don't talk

9    about the case, keep an open mind until it's time for you to

10   deliberate, and don't talk amongst yourselves about the case.

11         (Jury not present)

12         Be seated.

13         Mr. Bach, I think counsel pretty much cleaned up what

14   he said, but was there anything you wanted to raise with me?

15         MR. BACH:  No.  Thank you, Judge.

16         THE COURT:  It's now 2:44, let's be back here at

17   5 minutes of 3:00.

18         MR. BACH:  Thank you.

19         (Recess)

20         THE COURT:  I'm prepared to bring in the jury.

21   Anything from the government before I do so?

22         MR. NESSIM:  No, your Honor.

23         THE COURT:  Anything from the defense?

24         MR. BACH:  Nothing.  Thank you, Judge.

25         THE COURT:  When we bring in the jurors, we'll hand

O58Cgar5

1    out the charge to them and I'll deliver the charge.

2              I want to thank the parties for the exhibit list.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Jury present)

2    THE COURT:  Be seated.

3    Mr. Fishman, would you please hand the members of the

4  jury a copy of my charge.

5    Members of the jury, we've handed you copies of my

6  written charge.  You'll have that in the jury room with you.

7  It's now being provided to you for your assistance as I read

8  the charge, but focus on the words that I speak.  Don't look

9  ahead.  Focus on the words that I say, and you can read with me

10 on the charge.  And I'm going to start on page 1.

11    I.  Introductory Instructions.

12    You have now heard all of the evidence in the case as

13 well as the final arguments of the parties.

14    My duty at this point is to instruct you as to the

15 law.  It is your duty to accept these instructions of law and

16 apply them to the facts as you determine them, just as it has

17 been my duty to preside over the trial and decide what

18 testimony and evidence is relevant under the law for your

19 consideration.

20    On these legal matters, you must take the law as I

21 give it to you.  If an attorney has stated a legal principle

22 different from any that I state to you in my instructions, it

23 is my instructions that you must follow.

24    You should not single out any instruction as alone

25 stating the law, but you should consider my instructions as a

1  whole when you retire to deliberate in the jury room.  And you

2  should know that you're going to be able to take a copy of

3  these instructions into the jury room.

4        Your final role is to pass upon and decide the fact

5  issues that are in the case.  You, the members of the jury, are

6  the sole and exclusive judges of the facts.  You pass upon the

7  weight of the evidence; you determine the credibility of the

8  witnesses; you resolve such conflicts as there may be in the

9  testimony; and you draw whatever reasonable inferences you

10  decide to draw from the facts as you have determined them.  I

11  will later discuss with you how to pass upon the

12  credibility—-or believability—-of the witnesses.

13        In determining the facts, you must rely upon your own

14  recollection of the evidence.  The evidence before you consists

15  of the answers given by witnesses—-the testimony they gave, as

16  you recall it—-and the exhibits that were received in evidence.

17  The evidence does not include questions.  Only the answers are

18  evidence.  But you may not consider any answer that I directed

19  you to disregard.

20        You may also consider the stipulations of the parties

21  as evidence.

22        Since you are the sole and exclusive judges of the

23  facts, I do not mean to indicate any opinion as to the facts or

24  what your verdict should be.  The rulings I have made during

25  the trial are not any indication of my views of what your

1  decision should be as to whether or not the guilt of the

2  defendant has been proven beyond a reasonable doubt.

3        I also ask you to draw no inference from the fact that

4  upon occasion I asked questions of certain witnesses.  These

5  questions were only intended for clarification or to expedite

6  matters and certainly were not intended to suggest any opinions

7  on my part as to the verdict you should render or whether any

8  of the witnesses may have been more credible than any other

9  witness.  You are expressly to understand that the Court has no

10  opinion as to the verdict you should render in this case.

11        As to the facts, you are the exclusive judges.  You

12  are to perform the duty of finding the facts without bias or

13  prejudice as to any party.

14        As I said, in determining the facts, you must rely

15  upon your own recollection of the evidence.  What the lawyers

16  have said in their opening statements, in their closing

17  arguments, in their objections, or in their questions is not

18  evidence.  If your recollection of the facts differs from the

19  statements made in opening or closing, you should rely on your

20  recollection.  If a statement was made during an opening or

21  summation and you find that there is no evidence to support the

22  statement, you should disregard the statement.

23        A question put to a witness is not evidence.  It is

24  only the answer that is evidence.  Nor is anything I may have

25  said during the trial or may say during these instructions with

1   respect to a fact to be taken in substitution for your own

2   independent recollection.  What I say is not evidence.

3       Relatedly, do not conclude from any of my questions or

4   any of my rulings on objections or anything else I have done

5   during this trial that I have any view as to the credibility of

6   the witnesses or how you should decide the case.

7       In addition, remember that it is the duty of a party

8   to object when the other side offers testimony or other

9   evidence that the party believes is not properly admissible.

10  Therefore, you should draw no inference from the fact that

11  there was an objection to any evidence.  An objection is not

12  evidence.  Nor should you draw any inference from the fact that

13  I sustained or overruled an objection.  Simply because I have

14  permitted certain evidence to be introduced does not mean that

15  I have decided on its importance or significance.  That is for

16  you to decide.

17      The personalities and the conduct of counsel are not

18  in any way at issue.  If, from their conduct at this trial, you

19  formed opinions of any kind about any of the lawyers in the

20  case, favorable or unfavorable, whether you approved or

21  disapproved of their behavior, those opinions should not enter

22  into your deliberations.  The only issue is whether the

23  government has proven each of the elements of the charged

24  offenses beyond a reasonable doubt.

25      The fact that the prosecution is brought in the name

1   of the United States of America entitles the government to no

2   greater consideration than that accorded to any other party to

3   a litigation.  By the same token, it is entitled to no less

4   consideration.  All parties, whether the government or

5   individuals, stand as equals at the bar of justice.

6          Now, I will instruct you on the presumption of

7   innocence and the government's burden of proof in this case.

8   The defendant has pleaded not guilty.  By doing so, he denies

9   the charges in the indictment.  Thus, the government has the

10  burden of proving the charges against the defendant beyond a

11  reasonable doubt.  The defendant is presumed innocent.  A

12  defendant does not have to prove his innocence.  This

13  presumption of innocence was in the defendant's favor at the

14  start of the trial, continued in his favor throughout the

15  entire trial, is in his favor even as I instruct you now, and

16  continues in his favor during the course of your deliberations

17  in the jury room.

18         The government has the burden of proof in this case.

19  The presumption of innocence is removed as to the defendant if,

20  and only if, you, as members of the jury, are satisfied that

21  the government has sustained its burden of proving the guilt of

22  the defendant beyond a reasonable doubt.

23         The question that naturally arises is, "What is a

24  reasonable doubt?"  A reasonable doubt is a doubt based on your

25  reason, your judgment, your experience, and your common sense.

1  It is a doubt that a reasonable person has after carefully

2  weighing all the evidence.  It is a doubt founded in reason and

3  arising out of the evidence in the case—-or the lack of

4  evidence.

5      Proof beyond a reasonable doubt does not mean proof

6  beyond all possible doubt.  It is practically impossible for a

7  person to be completely and absolutely convinced of any

8  disputed fact that, by its nature, cannot be proven with

9  mathematical certainty.  The government's burden is to

10  establish guilt beyond a reasonable doubt, not all possible

11  doubt.

12      If, after a fair and impartial consideration of all

13  the evidence, you can candidly and honestly say that you do

14  have an abiding belief of the defendant's guilt, such a belief

15  as a prudent person would not hesitate to act upon in important

16  matters in the personal affairs of his or her own life, then

17  you have no reasonable doubt, and under such circumstances it

18  is your duty to convict.  On the other hand, if, after a fair

19  and impartial consideration of all the evidence, you can

20  candidly and honestly say that you are not satisfied with the

21  guilt of the defendant, that you do not have an abiding belief

22  of the defendant's guilt—-in other words, if you have such a

23  doubt as would reasonably cause a prudent person to hesitate in

24  acting in matters of importance in his or her own affairs—-then

25  you have a reasonable doubt, and in that circumstance it is

1    your duty to acquit.

2          The government is not required to prove the essential

3    elements of either offense by any particular number of

4    witnesses.  The testimony of a single witness may be sufficient

5    to convince you beyond a reasonable doubt of the existence of

6    the essential elements of the offense you are considering if

7    you believe that the witness has truthfully and accurately

8    related what they have told you.

9          There are two types of evidence that you may properly

10   use in deciding whether the defendant is guilty or not guilty

11   of the crimes with which he is charged.

12         One type of evidence is called direct evidence.

13   Direct evidence of a fact in issue is presented when a witness

14   testifies to that fact based on what he or she personally saw,

15   heard, or otherwise observed through the five senses.  The

16   second type of evidence is circumstantial evidence.

17   Circumstantial evidence is evidence that tends to prove a

18   disputed fact indirectly by proof of other facts.

19         There is a simple example of circumstantial evidence

20   that is often used in this courthouse.  Assume that when you

21   came into the courthouse this morning, the sun was shining, and

22   it was a nice day outside.  Also assume that the courtroom

23   shades were drawn, and you could not look outside.  Assume

24   further that as you were sitting here, someone walked in with

25   an umbrella that was dripping wet, and then, a few moments

1   later, somebody else walked in with a raincoat that was also

2   dripping wet.

3          Now because you could not look outside the courtroom

4   and you could not see whether it was raining, you would have no

5   direct evidence of that fact.  But on the combination of facts

6   that I've asked you to assume, it would be reasonable and

7   logical for you to conclude that it was raining.

8          That is all there is to circumstantial evidence.  You

9   infer on the basis of your reason, experience, and common sense

10  from one established fact the existence or the nonexistence of

11  some other fact.

12         The matter of drawing inferences from facts in

13  evidence is not a matter of guesswork or speculation.  An

14  inference is a logical, factual conclusion that you might

15  reasonably draw from other facts that have been proven.

16         Many material facts, such as a person's state of mind,

17  are not easily proven by direct evidence.  Usually, such facts

18  are established by circumstantial evidence and the reasonable

19  inferences you draw.  Circumstantial evidence may be given as

20  much weight as direct evidence.  The law makes no distinction

21  between direct and circumstantial evidence.  The law simply

22  requires that before convicting a defendant, you must be

23  satisfied of the defendant's guilt beyond a reasonable doubt,

24  based on all of the evidence in the case.

25         During the trial you may have heard the parties use

1    the term "inference," and in their arguments they asked you to

2    infer, on the basis of your reason, experience, and common

3    sense, from one or more established facts the existence of some

4    other fact.

5         An inference is not a suspicion or a guess.  It is a

6    reasoned, logical decision to conclude that a disputed fact

7    exists on the basis of another fact that you know exists.

8         There are times when different inferences may be drawn

9    from facts, whether proven by direct or circumstantial

10   evidence.  The government asks you to draw one set of

11   inferences, while the defense asks you to draw another.  It is

12   for you, and you alone, to decide what inferences you will

13   draw.

14        The process of drawing inferences from facts in

15   evidence is not a matter of guesswork or speculation.  An

16   inference is a deduction or conclusion that you, the jury, are

17   permitted, but not required, to draw from the facts that have

18   been established by either direct or circumstantial evidence.

19   In drawing inferences, you should exercise your common sense.

20        So, while you are considering the evidence presented

21   to you, you are permitted to draw, from the facts that you find

22   to be proven, such reasonable inferences as would be justified

23   in light of your experience.

24        Some of the recordings and text messages presented

25   were in English and some were only in Spanish.  With respect to

1    recordings that were in English, the transcripts were only

2    aids—-the recordings themselves are the evidence.  But with

3    respect to messages that were in Spanish, the English

4    translations provided in writing or through testimony are the

5    evidence.  You may not rely on your own interpretation of the

6    Spanish, even if you understand Spanish.  The English

7    translation is the evidence of what was written in Spanish.

8            Some of the exhibits admitted into evidence include

9    redactions of certain information.  "Redacted" means that part

10   of the document was taken out.  There is nothing unusual or

11   improper about such redactions.  You are to concern yourself

12   only with the part of the item that has been admitted into

13   evidence.  You should not consider any possible reason why the

14   other part of it has been deleted.

15           In this case you have heard evidence in the form of

16   stipulations of fact.  A stipulation of fact is an agreement

17   between the parties that a certain fact or set of facts are

18   true, and you must regard such agreed facts as true.  It is for

19   you to determine the effect or weight to give those agreed-upon

20   facts.

21           If certain testimony or evidence was received for a

22   limited purpose, you must follow the limiting instructions I

23   have given and use the evidence only for the purpose I

24   indicated.

25           You, as jurors, must decide this case based solely on

1    the evidence presented here within the four walls of this

2    courtroom.  As I told you at the beginning of this case, you

3    must not conduct any independent research about this case, the

4    matters in this case, and the parties involved in the case.  In

5    other words, you should not consult dictionaries or reference

6    materials, search the internet, websites, blogs, social media

7    platforms, or use any other electronic tools to obtain

8    information about this case or to help you decide the case.

9    You must not visit any location mentioned in this case for the

10   purpose of investigating it.  Please do not try to find out

11   information from any source outside the confines of this

12   courtroom.

13        You must not talk to anyone about this case or use

14   these tools to communicate electronically with anyone about the

15   case.  This includes your family and friends.  You may not

16   communicate with anyone about the case on your cellphone,

17   through email, instant messaging, text messaging, through any

18   blog or website, through any internet chat room, or by way of

19   any other social networking platforms, including Facebook,

20   Twitter (or "X") Instagram, Threads, LinkedIn, Snapchat, and

21   YouTube.

22        If you become aware that any other juror is violating

23   or has violated this instruction, you should immediately bring

24   it to my attention through my courtroom deputy, Mr. Fishman,

25   but please do not make it known to any other jurors.

1     Your verdict must be based solely upon the evidence

2  developed at trial or the lack of evidence.

3     It would be improper for you to consider, in reaching

4  your decision as to whether the government sustained its burden

5  of proof, any personal feelings you may have about the

6  defendant's race, religion, national origin, sex, or age.  As I

7  have explained to you, all persons are entitled to the

8  presumption of innocence, and the government has the burden of

9  proof.

10    It would be equally improper for you to allow any

11 feelings you might have about the nature of the crimes charged

12 to interfere with your decision-making process.

13    To repeat, your verdict must be based solely upon the

14 evidence or the lack of evidence in the case.

15    I also caution you that, under your oath as jurors,

16 you cannot allow to enter into your deliberations any

17 consideration of the punishment that may be imposed upon the

18 defendant if he is convicted.  The duty of imposing a sentence

19 in the event of conviction rests exclusively with the Court,

20 and the issue of punishment may not affect your deliberations

21 as to whether the government has proven the defendant's guilt

22 beyond a reasonable doubt.

23    Under your oath as jurors, you are not to be swayed by

24 sympathy.  You are to be guided solely by the evidence in this

25 case, and the crucial question that you must ask yourselves as

1    you sift through the evidence is:  Has the government proven

2    the guilt of the defendant beyond a reasonable doubt?

3         It is for you alone to decide whether the government

4    has proven that the defendant is guilty of the crimes charged

5    solely on the basis of the evidence and subject to the law as I

6    charge you.  It must be clear to you that once you let fear or

7    prejudice, or bias or sympathy interfere with your thinking,

8    there is a risk that you will not arrive at a true and just

9    verdict.

10        If you have a reasonable doubt as to the defendant's

11   guilt, you should not hesitate for any reason to return a

12   verdict of not guilty.  But, on the other hand, if you should

13   find that the government has met its burden of proving the

14   defendant's guilt beyond a reasonable doubt, you should not

15   hesitate because of sympathy or any other reason to return a

16   verdict of guilty.

17        The defendant, Bruce Garelick, has been formally

18   charged in an indictment.  An indictment is not evidence.  As I

19   instructed you at the outset of this case, the indictment is a

20   charge or accusation.  It merely describes the charges made

21   against a defendant.  An indictment is a formal method of

22   bringing a case into court for trial and determination by a

23   jury.  It creates no presumption that a crime was committed,

24   and no inference of any kind may be drawn from an indictment.

25   You may not consider an indictment as any evidence of the

1    defendant's guilt.  The fact that the defendant is the subject

2    of this indictment and is on trial here may not be used against

3    him in any way whatsoever.

4         Before you begin your deliberations, you will be

5    provided with a copy of the indictment.  I will not read the

6    entire indictment to you at this time.  Rather, I will first

7    summarize the offenses charged in the indictment and then

8    explain in detail the elements of each of the offenses.

9         The indictment contains five counts.  Each count

10   charges a separate offense or crime.  You must, therefore,

11   consider each count separately and you must return a separate

12   verdict on each count.

13        Count One charges the defendant with conspiring to

14   commit securities fraud through insider trading in the

15   securities of Digital World Acquisition Corporation, or DWAC.

16        Counts Two through Four charge the defendant with

17   securities fraud under Title 15 of the United States Code, and

18   Count Five charges the defendant with securities fraud under

19   Title 18 of the United States Code.  Specifically, the

20   indictment alleges that the defendant committed securities

21   fraud by misappropriating inside information from DWAC and

22   Benessere Capital Acquisition Corporation and using that

23   information to purchase DWAC securities himself and to tip

24   Michael Shvartsman and Eric Hannelius so they could use that

25   information to purchase DWAC securities.

1    The theory of the defense in this case is that when he

2    purchased DWAC securities between September 3 and September 23,

3    2021, Mr. Garelick believed in good faith that he was not in

4    possession of material nonpublic information and that he was

5    therefore permitted by law to trade DWAC securities.  Thus,

6    under the defense's theory, the defendant did not knowingly,

7    willfully, and intentionally engage in securities fraud when he

8    personally traded in DWAC securities.

9    In addition, Mr. Garelick maintains that he did not

10   disclose any information about DWAC that he knew to be material

11   and nonpublic to any other people.  Thus, under the defense's

12   theory, Mr. Garelick did not agree with anyone else to commit

13   securities fraud, nor did he aid or abet any securities fraud

14   by anyone else.

15   You will note that the indictment alleges that certain

16   acts occurred on or about various dates or involved specific

17   amounts of securities or money.  It does not matter if the

18   evidence you heard at trial indicates that a particular act

19   occurred on a different date or involved a different amount of

20   securities or money.  The law requires only a substantial

21   similarity between the dates alleged in the indictment and the

22   dates established by the evidence, or the amounts of securities

23   or money alleged in the indictment and the amounts established

24   by the evidence.

25   You must return a separate verdict of guilty or not

1  guilty for each count charged.  Whether you find the defendant

2  guilty or not guilty as to one offense should not affect your

3  verdict as to any other offense.  You must analyze and evaluate

4  the evidence separately as to each count.

5       As I have told you, Count One of the indictment

6  charges the defendant with the crime of conspiracy.  Counts Two

7  through Five charge him with what we call substantive crimes.

8       The crime of conspiracy is different from a

9  substantive crime.  A conspiracy charge, generally speaking,

10  alleges that two or more persons agreed together to accomplish

11  some unlawful objective.  The focus of a conspiracy count,

12  therefore, is on whether there was an unlawful agreement.  A

13  substantive count, on the other hand, charges a defendant with

14  the actual commission of an offense.  A substantive offense

15  therefore can be committed by a single person.  It need not

16  involve any agreement with anyone else.

17       A conspiracy to commit a crime is an entirely separate

18  and different offense from a substantive crime, the commission

19  of which may be an objective of a conspiracy.  Since the

20  essence of the crime of conspiracy is an agreement or an

21  understanding to commit a crime, it does not matter if the

22  crime that was the objective of the conspiracy was ever

23  actually committed.  In other words, for a conspiracy charge,

24  there is no need to prove that the crime or crimes that were

25  the objective or objectives of the conspiracy actually were

1    committed.  By contrast, conviction on a substantive count

2    requires proof that the crime charged actually was committed,

3    but does not require proof of an agreement.  A defendant may be

4    guilty of both conspiracy and the substantive crime, one but

5    not the other, or neither.  You therefore must consider each

6    count separately.

7            Now for clarity, I'm going to instruct you first with

8    respect to the counts that charge substantive crimes, Counts

9    Two through Five.  Then I will instruct you on the conspiracy

10   count, Count One.

11           II.  Counts Two through Four—-Title 15 Securities

12   Fraud.

13           Let us turn first to Counts Two through Four.  Counts

14   Two through Four charge the defendant with securities fraud

15   under Title 15 of the United States Code.  Counts Two through

16   Four also charge the crimes of aiding and abetting the

17   commission of insider trading.  Later, I will instruct you on

18   those crimes.

19           Count Two concerns the defendant's own trades.  Count

20   Two charges the defendant with engaging in insider trading by

21   using material nonpublic information to purchase DWAC

22   securities himself, in violation of a duty of trust and

23   confidence that the defendant owed DWAC and Benessere.

24           Counts Three and Four charge the defendant with

25   engaging in insider trading by tipping others with material

1    nonpublic information that the defendant misappropriated from

2    DWAC and Benessere, in anticipation of a personal benefit and

3    with the expectation that those individuals would use that

4    information to trade in securities; Count Three charges the

5    defendant with engaging in this form of insider trading in

6    connection with Michael Shvartsman's purchase of DWAC warrants;

7    and Count Four charges the defendant with engaging in this form

8    of insider trading in connection with Eric Hannelius's purchase

9    of DWAC units and warrants.

10           In order to find the defendant guilty on a count of

11   Title 15 securities fraud, you must find that the government

12   has proven each of the following elements for that count beyond

13   a reasonable doubt:

14           First, that in connection with the purchase or sale of

15   a security, the defendant employed a device, scheme, or

16   artifice to defraud, or engaged in an act, practice, or course

17   of business that operated, or would operate, as a fraud or

18   deceit;

19           Second, that when he engaged in this scheme, the

20   defendant acted knowingly, willfully, and with an intent to

21   defraud; and

22           Third, that in furtherance of the scheme, the

23   defendant knowingly used, or caused to be used, any means or

24   instrument of transportation or communication in interstate

25   commerce, or the use of the mails, or the use of any facility

1    of any national securities exchange.

2            A few words about the first element: the employment of

3    a scheme, device, or artifice to defraud.  A device or artifice

4    to defraud is a plan to accomplish a fraudulent objective.  The

5    specific device, scheme, or artifice to defraud, or act,

6    practice, or course of business that the government alleges the

7    defendant employed in connection with Counts Two through Four

8    is known as insider trading.

9            For these charges, an insider is a person who

10   possesses material nonpublic information about a publicly

11   traded company by virtue of a relationship that involves a duty

12   of trust and confidence.  When a person possesses such

13   information and that person also has a duty of trust and

14   confidence to the source of the information, the law forbids

15   him from (1) buying or selling the securities in question on

16   the basis of that information, or (2) disclosing that

17   information to another person in anticipation of a personal

18   benefit and with an expectation that the recipient will either

19   trade in such securities on the basis of that information or

20   cause others to do so.

21           The indictment alleges that the defendant owed a duty

22   of trust and confidence to DWAC and Benessere pursuant to the

23   confidentiality agreements he signed with them and to DWAC and

24   its shareholders in his capacity as a director of DWAC, and

25   that he misappropriated and misused material nonpublic

1    information that was protected by the confidentiality

2    agreements or that he received in his capacity as a director at

3    DWAC by using it to place trades for himself and to tip others,

4    with the anticipation of receiving a personal benefit and an

5    expectation that those others would use the information to

6    trade.

7            Count Two involves the defendant's alleged use of

8    material nonpublic information himself, for his own trades.  In

9    order to find that the government has established the first

10   element of Count Two, you must find that the government has

11   proven beyond a reasonable doubt:

12           First, that the defendant had a relationship of trust

13   and confidence with DWAC or Benessere;

14           Second, that the defendant obtained information from

15   DWAC or Benessere by virtue of his relationship of trust and

16   confidence with that entity, that the entity expected him to

17   keep confidential;

18           Third, that the information was material;

19           Fourth, that the information was nonpublic; and

20           Fifth, that the defendant violated his duty of trust

21   and confidence to DWAC or Benessere by using the material

22   nonpublic information to trade in DWAC securities.

23           To determine whether the government has proven the

24   existence of a relationship of trust and confidence, you must

25   look to all of the facts and circumstances and ask whether both

1  the defendant and DWAC or Benessere recognized that their

2  relationship involved trust and confidence.  A person will be

3  deemed an "insider" if the government establishes that he had

4  assumed a relationship affording him access to material

5  confidential information intended to be available only for a

6  corporate purpose and not for his personal benefit.  Thus, it

7  is the confidential nature of the relationship that determines

8  whether a person is an insider, and not merely the title he

9  holds.  Here, the parties have stipulated that the defendant

10  was a director of DWAC and that, as a director of DWAC, the

11  defendant owed a duty of trust and confidence to DWAC and its

12  shareholders.

13          I further instruct you, as a matter of law, that an

14  express agreement to keep certain information confidential

15  gives rise to a duty of trust and confidence between the

16  parties to that agreement with respect to the information

17  protected by that agreement.  Breaching such an agreement,

18  however, does not constitute a device, scheme, or artifice to

19  defraud if the defendant fully discloses—-to whomever the duty

20  is owed—-his intent to personally use or disclose the

21  confidential information.

22          Information is material if a reasonable investor would

23  consider it important in deciding whether to buy, sell, or hold

24  securities.  Put differently, information is material if a

25  reasonable investor would have viewed the information as having

1    significantly altered the total mix of information then

2    available.  Material information includes any fact which,

3    viewed objectively, might affect the value of the corporation's

4    stock or other securities.  Materiality of the information is

5    judged as of the time the information was misappropriated.

6    With respect to speculative information or events, like the

7    possibility of a merger, materiality will depend at any given

8    time upon a balancing of both the indicated probability that

9    the event will occur and the anticipated magnitude of the event

10   in light of the totality of the company activity.

11           Information is nonpublic if, at the time it is used,

12   it is not available to the public through such sources as press

13   releases, trade publications, analysts' reports, newspapers,

14   magazines, television, radio, websites, rumors, word of mouth,

15   or other similar sources.  In evaluating what information a

16   company has treated as confidential, you may consider written

17   company policies, contracts, trainings at the company, measures

18   the company has taken to guard the information's secrecy, how

19   insiders at the company treated the information, the extent to

20   which the information is known outside the company's place of

21   business, the ways in which other employees may access and use

22   the information, and any other relevant facts and

23   circumstances.

24           However, the fact that information has not appeared in

25   a newspaper or other widely available public medium does not

O581GAR6                    Charge

alone determine whether the information is nonpublic.

Sometimes a corporation is willing to make information public

other than by disseminating it in a newspaper or other

publication.  Information is not necessarily nonpublic simply

because there has been no formal announcement or because only a

few people have been made aware of it.

On the other hand, the confirmation by an insider of

unconfirmed facts or rumors, even if reported in a

newspaper—-may itself be inside information.  A tip from a

corporate insider that is more reliable or specific than public

rumors is nonpublic information despite the existence of such

rumors in the media or investment community.  Whether

information is nonpublic is an issue of fact for you to decide.

In considering whether the defendant used the

information to trade securities, the government must prove that

the defendant was aware of the material nonpublic information

when making the purchase or sale of DWAC securities and the

information in some way informed the investment decision.  You

need determine only that the information was a factor in the

decision to trade—-it need not have been the only factor.

Counts Three and Four involve the defendant's alleged

tipping of material nonpublic information to others.  In order

to find that the government has proven the first element of

Counts Three and Four, you must find that the government has

proven beyond a reasonable doubt as to whichever count you are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

considering:

First, that the defendant had a relationship of trust and confidence with DWAC or Benessere;

Second, that the defendant obtained information from DWAC or Benessere by virtue of his relationship of trust and confidence with that entity, that the entity expected him to keep confidential;

Third, that the information was material;

Fourth, that the information was nonpublic;

Fifth, that the defendant violated his duty of trust and confidence to DWAC or Benessere by disclosing this information to the tippee each count asks you to consider—that is, Michael Shvartsman or Eric Hannelius;

Sixth, that the defendant expected that the tippee you are considering would use this information to trade DWAC securities or to cause others to trade DWAC securities and that the tippee did, in fact, use that information to trade DWAC securities; and

Seventh, that the defendant, in providing this information to the tippee in question, anticipated receiving a personal benefit in return.

I have already defined the concepts of a relationship of trust and confidence, material information, nonpublic information, and duty to you in my instructions for Count Two, and those definitions apply here as well.

As to the sixth requirement, you must determine
whether the government has proven beyond a reasonable doubt
that the defendant expected that the tippee in question would
use or cause others to use the information to trade DWAC
securities.  Direct proof that the defendant expected that the
tippee in question would use the information to trade, or cause
others to trade DWAC securities is not required.  The
defendant's knowledge may be established by circumstantial
evidence.  Further, it is not necessary for the government to
prove that the defendant knew to a certainty that the tippee
would use the information to trade or to cause others to trade
the securities of DWAC.  It is sufficient for the government to
prove that the defendant expected that the tippee would use the
information to his advantage by trading in DWAC securities (or
causing others to do so).

The government must also prove that the tippee did in
fact trade DWAC securities on the basis of the inside
information provided by the defendant.  In this context, you
may conclude that a trade was made "on the basis of inside
information" if the tippee was aware of the information when
making the purchase or sale and the information in some way
informed the tippee's investment decision.

Finally, you must determine whether the defendant
anticipated receiving a personal benefit in return for
providing material nonpublic information to the tippee.  The

1    benefit does not need to be financial or tangible in nature.

2    It could include, for example, a *quid pro quo* exchange of

3    information, maintaining a useful networking contact, or

4    improving the defendant's reputation in a way that would

5    translate into obtaining future financial or business benefits.

6    In addition, a defendant receives a personal benefit when he

7    discloses inside information with an intention to benefit the

8    recipient, such as when he discloses inside information as a

9    gift to a relative or friend.  In such circumstances, the tip

10   and trade resemble trading by the insider himself followed by a

11   gift of the profits to the recipient.

12          However, I must caution you that an insider's

13   disclosure of material nonpublic information, standing alone,

14   does not establish this benefit factor.  Even where a person

15   has a duty of trust and confidence, meaning that he was

16   required to keep information confidential, his breach of the

17   duty is not fraudulent unless he discloses the information with

18   the expectation that the tippee would use the information to

19   purchase or sell the securities of DWAC or cause others to do

20   so and with the intention that he receive a personal benefit in

21   return.  While you need not be unanimous as to what particular

22   benefit the defendant received or expected to receive as a

23   result of his disclosures to the tippee or tippees, you must

24   all agree that the defendant received or expected to receive a

25   benefit of some kind and that his reason was personal rather

1  than one authorized by DWAC or Benessere.

2          The government must establish each of these factors

3  beyond a reasonable doubt for you to determine that the

4  government has sustained its burden of proof as to the first

5  element on Counts Two through Four.  If, however, the

6  government has not established that factor beyond a reasonable

7  doubt, then you must find that the government did not satisfy

8  its burden of proof and you must return a verdict of not guilty

9  as to the count you are considering.

10         The second element of the substantive securities fraud

11 charges in Counts Two through Four relates to the defendant's

12 state of mind.  If you find that the government has met its

13 burden of proving that the defendant engaged in the charged

14 insider trading scheme—-that is, the factor I just

15 explained—-the government must then prove beyond a reasonable

16 doubt that the defendant engaged in the scheme knowingly,

17 willfully, and with an intent to defraud.

18         To act "knowingly" means to act voluntarily and

19 deliberately, rather than by mistake, accident, ignorance, or

20 carelessness.  The defendant must have known that he was in

21 possession of information that was material, nonpublic, and

22 subject to a duty of trust and confidence.

23         To act "willfully" means to act knowingly and

24 purposely, with an intent to do something the law forbids; that

25 is to say, with a bad purpose either to disobey or to disregard

1  the law.  It is not necessary that the defendant knew that he

2  was violating a particular law.  It is enough if he was aware

3  that what he was doing was, in general, unlawful.

4      "Intent to defraud" in the context of the securities

5  laws means to act knowingly and with intent to deceive.  In

6  order to find that the defendant acted with intent to defraud,

7  you must find that he knew of the fraudulent nature of the

8  scheme and acted with the intent that it succeed.

9      Whether the defendant acted knowingly, willfully, and

10 with intent to defraud is a question of fact for you to

11 determine, like any other fact question.  Direct proof is not

12 required.  Knowledge and criminal intent may, like any other

13 fact, be established by circumstantial evidence.

14     Because an essential element of the crime charged is

15 intent to defraud, good faith on the part of the defendant is a

16 complete defense to a charge of insider trading.  That is, the

17 law is not violated if the defendant held an honest belief that

18 his actions were proper and not in furtherance of any unlawful

19 scheme.  A person who acts on such a belief or opinion honestly

20 held that turns out to be wrong also lacks an intent to

21 defraud.  However misleading or deceptive a plan may be, it is

22 not fraudulent if it was devised or carried out in good faith.

23 The defendant does not bear the burden of proving his good

24 faith; it remains at all times the government's burden of

25 proof, beyond a reasonable doubt, that the defendant acted

1    knowingly, willfully, and with intent to defraud.

2            With respect to Counts Two through Four of the

3    indictment, the third and final element that the government

4    must prove beyond a reasonable doubt is that the defendant used

5    or caused to be used some instrumentality of interstate

6    commerce, such as an interstate telephone call or email, use of

7    the mails, or use of a facility of a national securities

8    exchange, such as a securities trade made on the New York Stock

9    Exchange or NASDAQ, in furtherance of the insider trading

10   scheme.

11           The defendant himself does not have to have made the

12   interstate call, sent the mailing, or made the trade on the

13   stock exchange; anyone can do it as long as it furthers the

14   insider trading scheme.  If the defendant knew or could

15   reasonably foresee that the insider trading scheme would result

16   in the use of some instrumentality of interstate commerce,

17   including the use of the telephone, the internet, or the mail,

18   that is sufficient to show that the defendant caused such use.

19           As to each of Counts Two through Four, if you find

20   that the government has proven each element of Title 15

21   securities fraud beyond a reasonable doubt, then you must find

22   the defendant guilty of that count.  On the other hand, if you

23   find that the government has failed to prove any element of any

24   count beyond a reasonable doubt, then you must find the

25   defendant not guilty of that count.

1    III.   Count Five—-Title 18 Securities Fraud.

2         Count Five charges the defendant with securities fraud

3    under Title 18 of the United States Code.  Count Five also

4    charges the crime of aiding and abetting the commission of

5    securities fraud.  Later, I will instruct you on that crime.

6         In Count Five, the defendant is charged with

7    participating from at least in or about June 2021 through in or

8    about November 2021 in a scheme to defraud DWAC or Benessere by

9    converting to his own use material nonpublic information that

10   was the property of DWAC or Benessere to use, in whole or in

11   part, to execute transactions in DWAC securities.  It is not

12   necessary for the government to prove that the scheme lasted

13   throughout the entire period alleged, but only that it existed

14   for some period within that time frame.

15        In order to find the defendant guilty on Count Five,

16   you must find that the government has proven each of the

17   following elements for that count beyond a reasonable doubt:

18        First, that the defendant executed a scheme or

19   artifice to defraud or to obtain money or property by

20   materially false and fraudulent pretenses, representations, or

21   promises;

22        Second, that the defendant participated in the scheme

23   or artifice to defraud knowingly and with an intent to defraud;

24        Third, that the scheme to defraud or to obtain money

25   or property through fraudulent means was in connection with the

1    purchase or sale of securities.

2         With respect to the first element, a "scheme" is

3    merely a plan to accomplish an object.  A "scheme to defraud"

4    exists where an individual engages in any plan, device, or

5    course of action to accomplish a fraudulent objective.  "Fraud"

6    is a general term that embraces all efforts and means that

7    individuals devise to deprive another of money or property by

8    deception.  It includes fraudulently embezzling or fraudulently

9    converting for one's own use property entrusted to one's care

10   by, and belonging to, another.  The undisclosed

11   misappropriation of property, in breach of a fiduciary or

12   similar duty of trust and confidence, constitutes fraud.

13        The scheme to defraud must have money or property as

14   its object.  I instruct you that confidential business

15   information can be considered "property" for purposes of Count

16   Five if it had commercial value to DWAC or Benessere.  The fact

17   that a company cannot commercially exploit information by

18   trading on it does not mean the information has no commercial

19   value to the company.  In determining whether information is

20   confidential business information of a company, you may

21   consider the time and resources the company expended in

22   generating and maintaining the confidentiality of the

23   information, including any policies and measures the business

24   has taken to guard the information's secrecy.

25        The second element that the government must prove with

respect to Count Five is that the defendant participated in the

scheme knowingly and with an intent to defraud.  I have

previously instructed you regarding the meaning of "knowingly"

and with "intent to defraud" for purposes of Title 15

securities fraud.  You should apply those same instructions

here.  Again, since an essential element of the crime charged

is intent to defraud, it follows that good faith on the part of

the defendant is a complete defense.

        The final element that the government must prove with

respect to Count Five is that the scheme to defraud was

connected to the purchase or sale of securities of a company

with a class of securities registered under Section 12 of the

Securities Exchange Act of 1934.  A scheme to defraud is "in

connection with" a security if you find the alleged conduct

"touched upon" a securities transaction.

        The parties have stipulated that DWAC's securities

were those of a company with a class of securities registered

under Section 12 of the Securities Exchange Act of 1934.

        In addition to charging the defendant with substantive

counts of Title 15 securities fraud and Title 18 securities

fraud, all of the substantive counts I have instructed you on

today also charge the defendant with what is called aiding and

abetting.  Aiding and abetting is a theory of liability that

permits a defendant to be convicted of a specific crime if the

defendant, while not himself committing the crime, assisted

1    another person or persons in committing the crime.

2            If the government proves beyond a reasonable doubt

3    that the defendant committed a given substantive count, then

4    you need not consider aiding and abetting with respect to that

5    count.  If, however, you find that the government has not

6    proven beyond a reasonable doubt that the defendant engaged in

7    securities fraud for purposes of a particular substantive

8    count, then you should consider whether the government has

9    proven beyond a reasonable doubt that the defendant aided and

10   abetted someone else in the commission of securities fraud as

11   alleged in that count.

12           Under the federal aiding and abetting statute, whoever

13   "aids, abets, counsels, commands, induces or procures" the

14   commission of an offense is punishable as a principal.  That

15   means a person who aids and abets another to commit a

16   substantive crime is just as guilty of that crime as if he had

17   personally committed it.  A person aids or abets a crime if he

18   knowingly does some act for the purpose of aiding or

19   encouraging the commission of that crime, with the intention of

20   causing the crime charged to be committed.  To "counsel" means

21   to give advice or recommend.  To "induce" means to lead or move

22   by persuasion or influence as to some action or state of mind.

23   To "procure" means to bring about by unscrupulous or indirect

24   means.  To "cause" means to bring something about, to effect

25   something.

1        The first requirement is that another person has

2    committed the crime at issue.  Obviously, no one can be

3    convicted of aiding and abetting the criminal acts of another

4    if no crime was committed by the other person.  But if you do

5    find that a crime was committed by another person, then you

6    must consider whether the defendant aided or abetted the

7    commission of the crime.

8        I emphasize, however, that to aid or abet another to

9    commit a crime, it is necessary that the defendant willfully

10   and knowingly associated himself in some way with the crime,

11   and that he willfully and knowingly sought by some act to help

12   make the crime succeed.  In the aiding and abetting context,

13   participation in a crime is willful if action is taken

14   voluntarily and intentionally.

15       An aider and abettor must have some interest in the

16   criminal venture and must take some action to assist or

17   encourage the commission of the crime.  The mere presence of a

18   person where a crime is being committed, even coupled with

19   knowledge by that person that a crime is being committed, or

20   the mere acquiescence by a person in the criminal conduct of

21   others, even with guilty knowledge, is not sufficient to

22   establish aiding and abetting.

23       To determine whether the defendant aided and abetted

24   the commission of the crime with which he is charged, ask

25   yourself these questions:

SOUTHERN DISTRICT REPORTERS, P.C.

O581GAR6                    Charge

1          Did someone other than the defendant commit the crime

2     at issue?

3          Did the defendant participate in the crime charged as

4     something he wished to bring about?

5          Did he associate himself with the criminal venture

6     knowingly and willfully?

7          Did he seek by his actions to make the criminal

8     venture succeed?

9          If he did, then the defendant is an aider and abettor,

10     and therefore guilty of the offense.  If, on the other hand,

11     your answer to any one of these questions is "no," then the

12     defendant is not an aider and abettor, and is not guilty as an

13     aider and abettor.

14          IV.  Count One--Conspiracy to Commit Securities Fraud.

15          Now let us turn back to Count One, the conspiracy

16     charge.  Count One charges the defendant with conspiring to

17     commit Title 15 securities fraud and Title 18 securities fraud.

18          To meet its burden of proof with respect to Count One,

19     the government must prove each of the following three elements

20     beyond a reasonable doubt:

21          First, the existence of the conspiracy charged in the

22     indictment--in other words, that there was in fact an agreement

23     or understanding to commit at least one of the object crimes

24     charged in the indictment;

25          Second, that the defendant intentionally joined and

1   participated in the conspiracy during the applicable time

2   period; and

3           Third, that at least one of the co-conspirators

4   knowingly committed an overt act in furtherance of the

5   conspiracy.

6           The first element is the existence of a conspiracy.  A

7   conspiracy is an agreement, or an understanding, by two or more

8   persons to accomplish one or more unlawful objectives by

9   working together.  To prove that a conspiracy existed, the

10  government must prove beyond a reasonable doubt that the

11  defendant and one or more co-conspirators explicitly or

12  implicitly agreed to commit at least one of the two alleged

13  unlawful objects.

14          For the government to establish this element, you need

15  not find that the alleged members of the conspiracy met

16  together and entered into any express or formal agreement.

17  Similarly, you need not find that the alleged conspirators

18  stated, in words or writing, what the scheme was, its object or

19  purpose, or every precise detail of the scheme or the means by

20  which its object or purpose was to be accomplished.  What the

21  government must prove is that there was a mutual understanding,

22  either spoken or unspoken, between two or more people to

23  cooperate with each other to accomplish one or more of the

24  unlawful objectives alleged, namely (1) to commit Title 15

25  securities fraud or (2) to commit Title 18 securities fraud.  I

1   have already instructed on the elements of these alleged

2   crimes.  You need not find that the conspirators agreed to

3   accomplish both of these objects.  An agreement to accomplish

4   one of these objects is sufficient.  However, you must be

5   unanimous as to at least one of the two alleged objectives of

6   the conspiracy.  In other words, you all have to be in

7   agreement as to at least one specific object of the conspiracy

8   before you can find the conspiracy charged in the indictment

9   existed.  If the government fails to prove beyond a reasonable

10  doubt that at least one of the unlawful objectives alleged in

11  Count One was in fact an objective of the conspiracy, or if you

12  cannot unanimously agree as to which of the unlawful objects

13  alleged in the indictment has been proven beyond a reasonable

14  doubt, then you must find the defendant not guilty as to the

15  conspiracy charge.  Moreover, if you conclude that "an

16  agreement" existed but that its purpose, even if unlawful, was

17  not one of the specific unlawful objectives alleged in the

18  indictment, you must also find the defendant not guilty as to

19  Count One.

20          You may, of course, find that the existence of an

21  agreement to commit securities fraud has been established by

22  direct proof.  However, you may also infer its existence from

23  circumstantial evidence and the conduct of the parties

24  involved.  Accordingly, in determining whether there has been

25  an unlawful agreement, you may judge the facts and conduct of

1   the alleged members of the conspiracy that are done to carry

2   out an apparent criminal purpose.

3            A conspiracy is often referred to as a partnership in

4   crime.  Thus, as in other types of partnerships, when people

5   enter into a conspiracy to accomplish an unlawful end, each and

6   every member becomes an agent for the other conspirators in

7   carrying out the conspiracy.  Accordingly, the reasonably

8   foreseeable acts, declarations, statements, and omissions of

9   any member of the conspiracy and in furtherance of the common

10  purpose of the conspiracy, are deemed under the law to be the

11  acts of all members, and all of the members are responsible for

12  such acts, declarations, statements, and omissions.

13           If you find that the government has proven beyond a

14  reasonable doubt the first element of Count One—-that a

15  conspiracy to commit securities fraud existed—-then you must

16  consider the second element of Count One.  The second element

17  the government must prove beyond a reasonable doubt to

18  establish the offense of conspiracy is that the defendant

19  became a member of the conspiracy knowingly, willfully, and

20  with intent to further its unlawful purpose or objective.

21           I already defined "knowingly" and "willfully" in

22  charging you on Counts Two through Four.  You will apply those

23  same definitions here.

24           In deciding whether the defendant was, in fact, a

25  member of the conspiracy, you should consider whether the

defendant knowingly joined the conspiracy.  Did he participate

in it with knowledge of its unlawful purpose and with the

specific intention of furthering its objective?

It is important for you to note that the defendant's

participation in the conspiracy must be established by

independent evidence of his own acts or statements, as well as

those of the other alleged co-conspirators, and the reasonable

inferences that may be drawn from them.  A defendant's

knowledge is a matter of inference from the facts proven.  In

that connection, I instruct you that to become a member of the

conspiracy, a defendant need not have known the identities of

each and every other member, nor need he have been apprised of

all of their activities.

Moreover, the defendant need not have been fully

informed as to all of the details, or the scope of the

conspiracy to justify an inference of knowledge on his part.

Furthermore, the defendant need not have joined in all of the

conspiracy's unlawful objectives.

The extent of a defendant's participation has no

bearing on the issue of a defendant's guilt.  A conspirator's

liability is not measured by the extent or duration of his

participation.  Indeed, each member may perform separate and

distinct acts and may perform them at different times.  Some

conspirators play major roles, while others play minor roles in

the scheme.  An equal role is not what the law requires.  In

1  fact, even a single act may be sufficient to draw a defendant

2  within the ambit of the conspiracy.

3          I want to caution you, however, that a defendant's

4  mere presence at the scene of the alleged crime does not by

5  itself make him a member of the conspiracy.  Similarly, mere

6  association with one or more members of the conspiracy does not

7  automatically make a defendant a member, even if he knows that

8  the conspiracy exists.  A person may know or be friendly with a

9  criminal without being a criminal himself.

10         Mere similarity of conduct or the fact that they may

11  have assembled and discussed common aims and interests does not

12  necessarily establish membership in the conspiracy.

13         I also want to caution you that mere knowledge or

14  acquiescence without participation in the unlawful plan is not

15  sufficient.  Moreover, the fact that the acts of a defendant or

16  any other person without knowledge merely happened to further

17  the purpose or objectives of the conspiracy does not make that

18  person a member.  More is required under the law.  What is

19  necessary for a person to be a member of the conspiracy is that

20  the person must have participated with knowledge of the purpose

21  or objectives of the conspiracy and with the intention of

22  aiding in the accomplishment of that unlawful end.

23         (Continued on next page)

24

25

1          THE COURT:  The government is not required to prove

2    that the members of the alleged conspiracy were successful in

3    achieving the object or objects of the conspiracy.

4          The third element that the government must prove

5    beyond a reasonable doubt to establish the offense of

6    conspiracy charged in Count One is that one of the members of

7    the conspiracy knowingly committed at least one overt act in

8    order to further the object of the conspiracy.  The purpose of

9    the overt act requirement is clear.  There must have been

10   something more than mere agreement; some overt step or action

11   must have been taken by at least one of the conspirators in

12   furtherance of the conspiracy.

13         For this element, you need not find that the defendant

14   in this case committed the overt act.  It is sufficient for the

15   government to show that one of the conspirators knowingly

16   committed an overt act in furtherance of the conspiracy, since

17   such an act becomes, in the eyes of the law, the act of all of

18   the members of the conspiracy.  Furthermore, you should bear in

19   mind that the overt act, standing alone, may be an innocent,

20   lawful act.  An apparently innocent act may shed its harmless

21   character if it is a step in carrying out, promoting, aiding,

22   or assisting the conspiratorial scheme.  You are therefore

23   instructed that the overt act does not have to be an act that,

24   in and of itself, is criminal.

25         V.   Venue.

1      With respect to any given count you are considering,

2   the government, in addition to proving the essential elements

3   of that charge, must also prove that at least one act in

4   furtherance of that charge occurred in the Southern District of

5   New York.  This requirement is called venue.  You must

6   determine the satisfaction of the venue requirement separately

7   for each count.

8      The Southern District of New York is the judicial

9   district that includes Manhattan, as well as several other

10  counties not relevant here.

11     The government does not have to prove that a completed

12  crime was committed within the Southern District of New York,

13  or that the defendant was ever in the Southern District of New

14  York.  It is sufficient to satisfy the venue requirement if any

15  act in furtherance of the crime charged occurred in this

16  district.  The act itself may not be a criminal act.  It could

17  include, for example, processing or executing a securities

18  trade within this district, and the act need not have been

19  taken by the defendant, so long as the act was part of the

20  crime that you find the defendant committed.  Venue is proper

21  if, one, the defendant intentionally knowingly caused such an

22  act in furtherance of the charged offense to occur in this

23  district, or two, it was reasonably foreseeable that such an

24  act would occur in this district.

25     Unlike the elements of the offenses which must be

1    proven beyond a reasonable doubt, the government is only

2    required to prove venue by a preponderance of the evidence.  A

3    preponderance of the evidence means that it is more probable

4    than not that some act in furtherance of the crime you are

5    considering occurred in this district.  If you find that the

6    government has failed to prove this venue requirement with

7    respect to a particular charge, then you must acquit the

8    defendant of that charge.

9         Members of the jury, I have some additional

10   instructions I'm going to give you.  We're right now going to

11   take a 30-second stretch break before I give you those

12   additional instructions.  Everybody can take the stretch break.

13        For those who are following on the written charge, I'm

14   on page 31.

15        VI.  Additional Instructions.

16        I'm now going to briefly discuss evaluating the

17   credibility of witnesses.

18        You have had the opportunity to observe the witnesses.

19   It is now your job to decide how believable or credible each

20   witness was in his or her testimony.  You are the sole judges

21   of the credibility of each witness and of the importance of his

22   or her testimony.  How do you judge the credibility of

23   witnesses?  There's no magic formula.

24        You should carefully scrutinize all of the testimony

25   of each witness, the circumstances under which each witness

1    testified, the impression the witness made when testifying, the

2    relationship of the witness to the controversy and the parties,

3    the witness's bias or impartiality, the reasonablenesses of the

4    witness's statement, the strength or weakness of the witness's

5    recollection viewed in light of all the other testimony and

6    evidence, and any other matter in evidence that may help you to

7    decide the truth and importance of each witness's testimony.

8            In other words, what you must try to do in deciding

9    the credibility is to size a witness up in light of his or her

10   demeanor, the explanations given, and all of the other evidence

11   in the case.  You should use your common sense, your good

12   judgment, and your everyday experiences in life to make

13   credibility determinations.

14           In passing upon the credibility of a witness, you may

15   also take into account any inconsistencies or contradictions as

16   to material matters in his or her testimony.

17           If you find that any witness has willfully testified

18   falsely as to any material fact, you have the right to reject

19   the testimony of that witness in its entirety.  On the other

20   hand, even if you find that a witness has testified falsely

21   about one matter, you may reject as false that portion of his

22   or her testimony and accept as true any other portion of the

23   testimony which commends itself to your belief or which you may

24   find corroborated by other evidence in this case.  A witness

25   may be inaccurate, contradictory, or even untruthful in some

1   aspects, and yet be truthful and entirely credible in other

2   aspects of his or her testimony.

3       The ultimate question for you to decide in passing

4   upon credibility is: did the witness tell the truth before you?

5   It is for you to say whether his or her testimony at trial is

6   truthful in whole or in part.

7       In deciding whether to believe a witness, you should

8   specifically note any evidence of hostility or affection that

9   the witness may have towards one of the parties.  Likewise, you

10  should consider evidence of any other interest or motive that

11  the witness may have in cooperating with a particular party.

12  You should also take into account any evidence of any benefit

13  that a witness may receive from the outcome of the case.

14      It is your duty to consider whether the witness has

15  permitted any such bias or interest to color his or her

16  testimony.  In short, if you find that a witness is biased, you

17  should view his or her testimony with caution, weigh it with

18  care, and subject it to close and searching scrutiny.

19      Of course the mere fact that a witness is interested

20  in the outcome of the case does not mean he or she has not told

21  the truth.  It is for you to decide from your observations and

22  applying your common sense and experience and all the other

23  considerations mentioned whether the possible interest of any

24  witness has intentionally or otherwise colored or distorted his

25  or her testimony.  You are not required to disbelieve an

1  interested witness; you may accept as much of his or her

2  testimony as you deem reliable and reject as much as you deem

3  unworthy of acceptance.

4       You have heard evidence during the trial that

5  witnesses had discussed the facts of the case and their

6  testimony with the lawyers before the witness appeared in

7  court.  Although you may consider that fact when you are

8  evaluating a witness's credibility, I should tell you that

9  there is nothing either unusual or improper about a witness

10  meeting with lawyers before testifying, so that the witness can

11  be made aware of the subjects that he or she will be questioned

12  about, focus on those subjects, and have the opportunity to

13  review relevant exhibits before being questioned about them.

14  In fact, it would be unusual for a lawyer to call a witness

15  without such consultation.  Again, the weight you give to the

16  fact or nature of the witness's preparation for his or her

17  testimony and what inferences you draw from such preparation

18  are matters completely within your discretion.

19       You've heard the testimony of a law enforcement

20  official.  The fact that a witness may be employed as a law

21  enforcement official does not mean that his or her testimony is

22  necessarily deserving of more or less consideration or greater

23  or lesser weight than that of an ordinary witness.  In this

24  context, the defendant is allowed to try to attack the

25  credibility of such a witness on the ground that his or her

1  testimony may be colored by a personal or professional interest

2  in the outcome of the case.  It is your decision, after

3  reviewing all the evidence, whether to accept the testimony of

4  the law enforcement witness and to give that testimony whatever

5  weight, if any, you find that it deserves.

6        The fact that one party called more witnesses and

7  introduced more evidence than the other does not mean that you

8  should necessarily find the facts in favor of the side offering

9  the most witnesses.  By the same token, you do not have to

10  accept the testimony of any witness who has not been

11  contradicted or impeached if you find the witness not to be

12  credible.  You also have to decide which witnesses to believe

13  and which facts are true.  To do this, you must look at all the

14  evidence, drawing upon your own common sense and personal

15  experience.  I've just discussed the criteria for evaluating

16  credibility; keep in mind that the burden of proof is always on

17  the government and the defendant is not required to call any

18  witnesses or offer any evidence since he is presumed to be

19  innocent.

20        A defendant in a criminal case never has any duty to

21  testify or come forward with any evidence.  This is because, as

22  I have told you, it is the government's burden to prove the

23  defendant guilty beyond a reasonable doubt, and that burden

24  remains on the government at all times.  In this case, the

25  defendant did testify, and he was subject to cross-examination

1  like any other witness.  You should examine and evaluate his

2  testimony just as you would the testimony of any witness.

3          Evidence has been introduced in this case regarding

4  internal compliance policies.  These policies are not a

5  substitute for the law.  Companies adopt compliance policies

6  for any number of reasons, and they impose different

7  requirements on their employees than the law imposes.  My

8  instructions on the law apply to this case and not anything in

9  the compliance policies.  The existence or nonexistence of such

10  policies and practices may be relevant to the defendant's state

11  of mind.  But the defendant is not charged with violating

12  compliance policies.  Even if you were to find that the

13  defendant or an alleged coconspirator violated a compliance

14  policy, that does not necessarily mean that there was a

15  violation of law.

16          Similarly, the defendant is not charged with failing

17  to file required SEC forms.  A failure to file SEC forms, such

18  as Form 4 and Form 5, may be relevant to the defendant's state

19  of mind.  However, a director's failure to file such a form

20  does not constitute insider trading, nor does such a failure

21  alone prove any element of securities fraud.

22          You heard the names of several people during the

23  course of the trial who did not appear here to testify, and one

24  or more of the attorneys may have referred to their absence.  I

25  instruct you that each party had an equal opportunity or lack

1  of opportunity to call any of these witnesses.  However, the

2  government bears the burden of proof; the defendant does not.

3  Therefore, you should not draw any inferences or reach any

4  conclusions as to what these persons would have testified to

5  had they been called.  Their absence should not affect your

6  judgment in any way.

7        You've heard testimony from a witness regarding his

8  opinion of the defendant's character and reputation.  This

9  testimony is not to be taken by you as the witness's opinion as

10  to whether the defendant is guilty or not guilty of the charges

11  in this case.  That question is for you alone to determine.

12  You should, however, consider this character and reputation

13  evidence together with all the other evidence in this case in

14  determining whether the defendant is guilty or not guilty of

15  the charged offenses.

16        If, after considering all of the evidence, including

17  testimony about the defendant's character and reputation, you

18  find that the government has not established defendant's guilt

19  as to a particular count beyond a reasonable doubt, you must

20  acquit the defendant as to that count.

21        On the other hand, if after considering all the

22  evidence, including that of a defendant's character and

23  reputation, you find that the government has established each

24  element of a count beyond a reasonable doubt, you should not

25  acquit the defendant on that count merely because you believe

1  he has a good character or reputation.

2          You have also heard the testimony of witnesses who

3  testified under grants of immunity from this Court.  What that

4  means is that the testimony of the witnesses may not be used

5  against them in any criminal case, except a prosecution for

6  perjury, giving a false statement, or otherwise failing to

7  comply with the immunity order of this Court.

8          You are instructed that the government is entitled to

9  call, as a witness, a person who has been granted immunity by

10  order of this Court and that you may convict the defendant on

11  the basis of such a witness's testimony alone, if you find the

12  testimony proves the defendant guilty beyond a reasonable

13  doubt.

14          However, the testimony of a witness who has been

15  granted immunity should be examined by you with great care.

16  You should scrutinize it closely to determine whether or not it

17  is colored in such a way as to place guilt upon the defendant

18  in order to further the witness's own interests.  If, after a

19  careful examination of the witness's testimony and demeanor

20  upon the witness stand, you are satisfied that the witness told

21  the truth, you should give it such weight as you believe it

22  deserves.

23          It is no concern of yours why a witness received

24  court-ordered immunity.  Your sole concern is whether the

25  witness has given truthful testimony in this trial.  That is a

1    determination entirely for you, the jury.

2           You may not draw any inference, favorable or

3    unfavorable, toward the government or the defendant from the

4    fact that any person was not named as a defendant in this case,

5    and you may not speculate as to the reasons why other people

6    are not on trial before you now.  Those matters are wholly

7    outside your concern and have no bearing on your function as

8    jurors in deciding the case before you.

9           You've heard testimony about evidence obtained after

10   lawful searches of defendant's phone and electronic accounts,

11   such as iCloud and Google accounts, pursuant to a search

12   warrant signed by a judge.  This evidence was properly admitted

13   in this case and may be properly considered by you.  Whether

14   you approve or disapprove of how this evidence was obtained

15   should not enter into your deliberations because I now instruct

16   you that the government's use of this evidence is entirely

17   lawful.

18          You must, therefore, regardless of your personal

19   opinions, give this evidence full consideration along with all

20   the other evidence in the case in determining whether the

21   government has proven the defendant's guilt beyond a reasonable

22   doubt.

23          There's evidence before you in the form of charts is

24   and summaries.  These exhibits purport to summarize the

25   underlying evidence that was used to prepare them, and were

1  shown to you to make the other evidence more meaningful and to

2  aid you in considering the evidence.  They are no better than

3  the documents upon which they are based, and are not themselves

4  independent evidence.  Therefore, you are to give no greater

5  weight to these charts and summaries than you would give to the

6  evidence on which they are based.

7        It is for you to decide whether the charts and

8  summaries correctly present the information contained in the

9  exhibits on which they were based.  You are entitled to

10  consider the charts and summaries if you find that they are of

11  assistance to you in analyzing and understanding the evidence.

12        You have heard reference to the fact that certain

13  investigative techniques were not used by law enforcement

14  authorities.  There is no legal requirement that the government

15  prove its case through any particular means.  Although you are

16  to carefully consider the evidence adduced by the government,

17  you are not to speculate as to why they used the techniques

18  they did or why they did not use other techniques.  The

19  government is not on trial, and law enforcement techniques are

20  not your concern.  Your concern is to determine whether, on the

21  evidence or lack of evidence, a defendant's guilt has been

22  proven beyond a reasonable doubt.

23        Your function now is to weigh the evidence in this

24  case and to determine if the government has sustained its

25  burden of proof with respect to each count of the indictment.

1        You must base your verdict solely on the evidence, and

2    these instructions as to the law, and you are obliged under

3    your oath as jurors to follow the law as I've instructed you,

4    whether you agree or disagree with the particular law in

5    question.

6        The verdict must represent the considered judgment of

7    each juror.  In order to return a verdict, it is necessary that

8    each juror agree to it.  Your verdict must be unanimous.

9        Let me also remind you that you took an oath to decide

10   this case impartially, fairly, without prejudice or sympathy,

11   and without fear, solely based on the evidence in the case and

12   the applicable law.

13       You have been chosen to try issues of fact and to

14   reach a verdict on the basis of the evidence or lack of

15   evidence.  Both sides are entitled to a fair trial.  You are to

16   make a fair and impartial decision so that you come to a just

17   verdict.

18       VII.  Instructions Regarding Deliberations.

19       You are about to go into the jury room and begin your

20   deliberations.  A list of exhibits that were received into

21   evidence will be provided to you in the jury room.  If you want

22   any of the testimony read back to you, you may also request

23   that.  If you want to see an exhibit or if you want testimony

24   read back to you, please try to be as specific as you possibly

25   can so that we can identify the correct exhibit and because, in

1    the case of testimony, the court reporter will have to look

2    through the transcript, and the parties will have to agree on

3    what portions of testimony may be called for in response to

4    your request, and if they disagree, I must resolve those

5    disagreements.  If you have any questions regarding my

6    instructions to you, you should also send me a note.

7           Your requests for exhibits or testimony — in fact any

8    communications with the Court — should be made to me in

9    writing, signed by your foreperson, and given to one of the

10   marshals or the court security officer.  In any event, do not

11   tell me or anyone else how the jury stands on any issue until

12   after a unanimous verdict is reached.

13          If any of you took notes during the course of the

14   trial, you should not show your notes to, or discuss your notes

15   with, any other jurors during your deliberations.  Any notes

16   you have taken are to be used solely to assist you.  The fact

17   that a particular juror has taken notes entitles that juror's

18   views to no greater weight than those of any other juror.

19   Finally, your notes are not to substitute for your recollection

20   of the evidence in the case.  If, during your deliberations,

21   you have any doubt as to any of the testimony, you may — as I

22   just told you — request that the official trial transcript that

23   has been made of these proceedings be read back to you.

24          You will now retire to decide the case.  Your function

25   is to weigh the evidence in this case and to determine whether

1    the government has proven the guilt of the defendant with

2    respect to each count charged in the indictment.

3           It is your duty as jurors to consult with one another

4    and to deliberate with a view to reaching an agreement.  Each

5    of you must decide the case for himself or herself, but you

6    should do so only after a consideration of the case with your

7    fellow jurors, and you should not hesitate to change an opinion

8    when convinced that it is erroneous.  Discuss and weigh your

9    respective opinions dispassionately, without regard to

10   sympathy, without regard to prejudice or favor for either

11   party, and follow my instructions on the law.

12          When you are deliberating, all twelve jurors must be

13   present in the jury room.  A jury of fewer than twelve jurors

14   is just an assemblage of persons; it is not a jury.  If a juror

15   is absent, you must stop deliberations.

16          Again, your verdict must be unanimous, but you are not

17   bound to surrender your honest convictions concerning the

18   effect or weight of the evidence for the mere purpose of

19   returning a verdict or solely because of the opinion of other

20   jurors.  Each of you must make your own decision about the

21   proper outcome of this case based on your consideration of the

22   evidence and your discussions with your fellow jurors.  No

23   juror should surrender his or her conscientious beliefs for the

24   purpose of returning a unanimous verdict.

25          Remember at all times that you are not partisans.  You

1   are judges — judges of the facts.  Your sole interest is to

2   seek the truth from the evidence in the case.

3            If you are divided, do not report how the vote stands.

4   If you reach a verdict, do not report what it is until you are

5   asked in open court.

6            I have prepared a verdict form for you to use in

7   guiding your deliberations and recording your decision.  Please

8   use that form to report your verdict.

9            The first thing you should do when you retire to

10  deliberate is to take a vote to select one of you to sit as

11  your foreperson, and then send out a note indicating whom you

12  have chosen.

13           The foreperson doesn't have any more power or

14  authority than any other juror, and his or her vote or opinion

15  doesn't count for any more than any other juror's vote or

16  opinion.  The foreperson is merely your spokesperson to the

17  Court.  He or she will send out any notes, and when the jury

18  has reached a verdict, he or she will notify the marshal or

19  court security officer that the jury has reached a verdict, and

20  you will come into open court and give the verdict.

21           After you have reached a verdict, your foreperson will

22  fill in and date the form that has been given to you.  All

23  jurors must sign the form reflecting each juror's agreement

24  with the verdict.  The foreperson should then advise the

25  marshal or court security officer outside your door that you

1    are ready to return to the courtroom.

2            I will stress that each of you must be in agreement

3    with the verdict which is announced in court.  Once your

4    verdict is announced by your foreperson in open court and

5    officially recorded, it cannot ordinarily be revoked.

6            In a moment, the first twelve jurors will begin

7    deliberation in the case.  The final two who are alternates

8    won't deliberate at this time.  Nevertheless, the alternate

9    jurors are not quite excused.  While the jury conducts its

10   deliberations, you do not have to be in court, but you should

11   give Mr. Fishman phone numbers where you can be reached because

12   it is possible that one or both of you could be needed to

13   deliberate if a juror is unable to continue.  Mr. Fishman will

14   then call you when deliberations are completed so that you will

15   know that you are completely finished.

16           Between now and then, you must continue to observe all

17   the restrictions I've instructed you on throughout the trial.

18   That is, you must not discuss the case with anyone, including

19   your fellow alternate jurors, the other jurors, other people

20   involved in the trial, members of your family, friends,

21   coworkers, or anyone else.  And until a verdict is reached, as

22   I've already instructed, you may not communicate with anyone

23   about the case in any way.  If anyone approaches you and tries

24   to talk to you about the case, please report that to me,

25   through Mr. Fishman, immediately.

1       Do not listen to or watch or read any news reports

2  concerning this trial if there were to be any; do not do any

3  research on the internet or otherwise.  The reason for this of

4  course is that should you be asked to participate in reaching a

5  verdict in this case, the only information you will be allowed

6  to consider is what you've learned in this courtroom during the

7  trial.  Please accept my heartfelt gratitude for your service.

8       I'm sorry that you will likely miss the experience of

9  deliberating with the jury, but the law provides for a jury of

10  twelve persons in this case.

11       Let me see the parties at sidebar briefly.

12       (At the sidebar)

13       I'm about to excuse the alternates and then swear the

14  jury.

15       All of the exceptions that have been made to date are

16  preserved.  Any exceptions by the defense to whatever end?

17       MS. SHAPIRO:  No additional ones.  Thank you.

18       MS. HANFT:  No, your Honor.  Nothing from the

19  government.

20       (In open court)

21       THE COURT:  I'm going to ask the last two jurors,

22  jurors No. 13 and 14 before the rest of the jury retires to the

23  jury room, if you have any clothing or objects there, to please

24  go pick them up and to withdraw without discussing the case.

25  you may also say goodbyes to your fellow jurors.  You may do so

1    in a moment.

2              Do we have the court security officer?

3              Mr. Fishman, would you please swear the court security

4    officer.

5              (Marshal sworn)

6              Members of the jury, in conclusion, I am sure that if

7    you listen to the views of your fellow jurors and if you apply

8    your own common sense, you will reach a fair verdict here.

9              You are now invited to retire to the jury room to

10   begin to deliberate.

11             (At 4:30 p.m., the jury retired to deliberate)

12             Just a couple of things.  First of all, I'd like to

13   congratulate both sides on a case very well tried.  Please make

14   sure that Mr. Fishman has contact information for all of you.

15   You're also invited to look at what Mr. Fishman sends into the

16   jury room in terms of the exhibit list, the verdict form, and

17   the trial indictment.

18             It's my practice, unless there is an objection, should

19   the jury return a verdict of not guilty on all of the counts,

20   for me to meet with the jurors and just ask them about their

21   experience.  It's also my practice that if the jury returns a

22   verdict of guilty on any count, not to meet with the jurors.

23   If anybody has an objection to me meeting with the jurors in

24   the context in which I said I would, you should let me know.

25             Finally, before I ask whether you have anything for

1  me, I know that you are all experienced trial lawyers.  It

2  sometimes is the case that participants in a trial ask to meet

3  with the judge for comments and advice on their performance.

4  I'm happy to do so.  I'm also fine if nobody wants my advice.

5  I won't do it if anybody objects.  So you'll let me know.

6          Anything from the government?

7          MR. NESSIM:  No, your Honor.  Thank you.

8          THE COURT:  Mr. Bach.

9          MR. BACH:  No.  Thank you, Judge.

10          THE COURT:  Try to stay around here because I expect

11  that we'll get a note soon of who the foreperson is.

12          (Recess)

13          We've got a foreperson.  Court Exhibit 1 was received

14  at 4:40 today.

15          It reads as follows:  "Magdalena Majcher-Tascio is the

16  foreperson."  The note was from 4:39 p.m.  I think that's juror

17  No. 2, is my recollection.

18          Parties can inspect the note if they want.

19          MR. NESSIM:  Your Honor, just in terms of the schedule

20  for us for the day tomorrow morning, how long will the jury

21  deliberate?

22          THE COURT:  They'll stay as long as they want to.  I

23  don't think they've given us an indication yet as to how long

24  they want to.  We'll let you know when they would like to leave

25  as soon as we know it.  My expectation is that they'll want to

O58Cgar7          Charge

1    start at 9 o'clock, but if they let us know they want to start

2    earlier than 9:00 or a little bit later than 9:00, we'll

3    accommodate them.

4         MR. NESSIM:  If they want to leave at some point today

5    and when they come back tomorrow, is it the Court's practice to

6    convene the parties and the jurors when they're dismissed and

7    when they come in in the morning?

8         THE COURT:  No, not unless there's a request that I do

9    that.  The jury just leaves when they are ready to leave unless

10   there's an occasion for me to meet with you.  I don't think

11   there's a reason for me to do so.

12        MR. NESSIM:  No request from the government on that.

13        THE COURT:  From you, Mr. Bach?

14        MR. BACH:  No.  We'll give our phone numbers and I'm

15   sure we'll be in the building.

16        THE COURT:  I'll see you when we get the next note.

17        (Continued on next page)

18

19

20

21

22

23

24

25

O581GAR8

```
 1          (Jury not present, 5:37 p.m.)

 2          THE COURT:  All right.  The jury has left for the

 3    evening to return at 9 a.m., but they did send a note.  It's

 4    marked as Court Exhibit No. 2.  Time stamp from the jury is

 5    5:20, received at 5:30.  It asks for the following:  Government

 6    Exhibit 750, requesting cross-examination of Bruce Garelick

 7    testimony, GX 465, GX 965, GX 751, and then it looks like

 8    Government Exhibit 122.

 9          So the parties are free to examine it.  And I guess

10    I'll hear from the parties, in terms of the cross-examination,

11    whether it's sufficient for the parties to agree on the

12    portions of the transcript to go back to the jury or whether we

13    need to have the jury come back in and just have the court

14    reporter read the entire transcript.  It's my preference for

15    the transcript to go back to them.  But does the government

16    have a view?  Mr. Bach, do you have a view?

17          MR. NESSIM:  The government's fine with the transcript

18    going back to the jury, with the parties' agreement on the

19    section.

20          THE COURT:  Mr. Bach?

21          MR. BACH:  Fine with us.

22          THE COURT:  Okay.  So it means that you all are not

23    quite done for the evening.  Why don't you figure out what

24    should go back to the jury before you leave tonight and then

25    make sure that my deputy knows what it is so that when the jury
```

O581GAR8

1    comes in at 9:00, they can be given it.  But I think this is

2    the last time you will see me tonight, unless anybody needs me

3    for anything.  From the government?

4               MR. NESSIM:  For the exhibits that are going back, I

5    assume those should be paper copies unless they're very

6    voluminous.

7               THE COURT:  Yeah.  I don't know what these exhibits

8    are.  Are any of them extremely voluminous?

9               MR. NESSIM:  I don't——122 may be an S-1.  I'm not

10   sure.  But otherwise I don't think that they're——

11              THE COURT:  I think paper copies should go back to

12   them.

13              MR. NESSIM:  Okay.

14              THE COURT:  Mr. Bach, anything?

15              MR. BACH:  No, that's fine.  Thank you.  Nothing

16   further.

17              THE COURT:  Okay.  The note is here for your

18   inspection.  Thank you.

19              THE DEPUTY CLERK:  All rise.

20              (Adjourned to May 9, 2024, at 9:00 a.m.)

21

22

23

24

25