**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

- v. -

Case No.: 23-CR-307 (LJL)

BRUCE GARELICK,

Defendant.

## SENTENCING MEMORANDUM

## ON BEHALF OF DEFENDANT BRUCE GARELICK

Jonathan P. Bach
Alexandra A.E. Shapiro
Julian S. Brod
Jason A. Driscoll
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Floor
New York, NY 10036
(212) 257-4880
jbach@shapiroarato.com

*Counsel for Bruce Garelick*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ..............................................................................................1

BACKGROUND ................................................................................................3

A.    Personal History and Characteristics ................................................ 3

B.    Professional History................................................................... 8

C.    The Offense.......................................................................... 9

    1.    The Alleged Tips To Michael Shvartsman And Eric Hannelius ......................... 10

    2.    The Alleged Tips In The Week Preceding The Announcement ........................... 14

    3.    Bruce's Trades.................................................................... 17

THE SENTENCING GUIDELINES YIELD AN IRRATIONAL RESULT................................18

A.    The Loss Amount.................................................................... 18

B.    Bruce Did Not Obstruct Justice ..................................................... 20

A SIGNIFICANT DOWNWARD VARIANCE IS WARRANTED.....................................22

A.    Bruce's Actions Concerning A Single Stock During A Short Period Of Time Were An Aberration In An Otherwise Law Abiding Life ................................. 22

B.    Bruce's Own Trades Were In Small Amounts And Ceased Before Bruce Could Truly Exploit The Inside Information.......................................... 24

C.    Bruce Took No Steps To Conceal His Actions ...................................... 25

D.    Bruce Was An Employee Placed In A Difficult Situation With No Guidance ........................................................................ 27

E.    The Need To Avoid Sentencing Disparities ......................................... 28

F.    Deterrence Does Not Require A Long Sentence..................................... 35

G.    The Collateral Effects Of Bruce's Conviction And Punishment ..................... 36

H.    Forfeiture............................................................................ 38

I.      The Probation Officer's Recommendation ........................................................................ 38

CONCLUSION............................................................................................................................39

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                    **Page(s)**

*Pepper v. United States,*
    562 U.S. 476 (2011) ............................................................................................ 22

*Peugh v. United States,*
    569 U.S. 530 (2013) ............................................................................................ 22

*SEC v. Dobkin,*
    21 Civ. 9285 (N.D. Cal.) .................................................................................... 29

*SEC v. Holzer,*
    22 Civ. 8342 (S.D.N.Y.) .................................................................................... 29

*SEC v. Iberger,*
    22 Civ. 10565 (D. Mass) .................................................................................... 29

*SEC v. Moraes,*
    22 Civ. 8343 (S.D.N.Y.) .................................................................................... 29

*SEC v. Van de Grift,*
    23 Civ. 1491 (S.D.N.Y) ..................................................................................... 29

*United States v. Adelson,*
    441 F. Supp. 2d 506 (S.D.N.Y. 2006) ............................................................... 35

*United States v. Blaszczak,*
    17 Cr. 357 (S.D.N.Y.) ........................................................................................ 33

*United States v. Buyer,*
    22 Cr. 397 (S.D.N.Y.) ........................................................................................ 33

*United States v. Canova,*
    412 F.3d 331 (2d Cir. 2005) ............................................................................... 21

*United States v. Chow,*
    993 F.3d 125 (2d Cir. 2021) ............................................................................... 30

*United States v. Chow,*
    17 Cr. 667 (S.D.N.Y.) ................................................................................... 30, 31

*United States v. Dunnigan,*
    507 U.S. 87 (1993) ............................................................................................. 21

*United States v. Glassner,*
    22 Cr. 451 (S.D.N.Y.) ........................................................................................ 31

*United States v. Gupta*,
  747 F.3d 111 (2d Cir. 2014) ...................................................................................... 18, 19, 32

*United States v. Gupta*,
  904 F. Supp. 2d 349 (S.D.N.Y. 2012) ........................................................................ 18, 35

*United States v. Gupta*,
  12 Cr. 4448 (S.D.N.Y). ...................................................................................................... 32

*United States v. Johnson*,
  16 Cr. 457, 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) ......................................... 18

*United States v. Kosinski*,
  976 F.3d 135 (2d Cir. 2020) ............................................................................................ 31

*United States v. Kosinski*,
  16 Cr. 148 (D. Conn.) ........................................................................................................ 31

*United States v. Parris*,
  573 F. Supp. 2d 744 (E.D.N.Y. 2008) ......................................................................... 18

*United States v. Pinto-Thomasz*,
  18 Cr. 579 (S.D.N.Y.) ....................................................................................................... 34

*United States v. Rosario*,
  988 F.3d 630 (2d Cir. 2021) ............................................................................................ 21

*United States v. Stewart*,
  907 F.3d 677 (2d Cir. 2018) ............................................................................................ 33

*United States v. Stewart*,
  15 Cr. 287 (S.D.N.Y.) ................................................................................................. 22, 33

*United States v. Whitman*,
  115 F. Supp. 3d 439 (S.D.N.Y. 2015) .......................................................................... 34

*United States v. Whitman*,
  |12 Cr. 125 (S.D.N.Y) ................................................................................................ 22, 34

**Statute**

18 U.S.C. § 3553 .................................................................................................................... 22

## INTRODUCTION

Bruce Garelick's convictions result from a two-month period when he served, at his employer's request, on the board of a newly formed SPAC known as Digital World Acquisition Corp. The essence of the wrong was that information about a potential and potentially extremely lucrative SPAC target had been prematurely revealed to a privileged group of insiders, well before other market participants learned the information. Early SPACs are not supposed to have identified targets, so if you know the target, you know the most important business information about the SPAC. But Bruce Garelick was not the one who revealed that critical information. Patrick Orlando shared it with a group of potential investors while falsely representing to the SEC that he had had no substantive dealings with the target company at all. Indeed, Orlando and his finder Marc Wachter first brought this idea to Michael and Gerald Shvartsman before Bruce was even involved. According to the government's case, the key tip—that Trump Media & Technology Group was in the crosshairs of the SPAC and had previously signed an exclusive LOI with its sister SPAC—came from Orlando, not from Bruce.

The government's evidence also demonstrated Bruce's role was secondary to and followed the improper revelation of this inside information. He was asked by his employer to help coordinate an investment syndicate and to sit on DWAC's board. He was asked to take these steps after Orlando had already disclosed who the primary target would likely be. Unlike others, Bruce did not initially seek to monetize this information. He did not participate in or invest as part of the syndicate that his employer asked him to help coordinate. He carried on his responsibilities not for his own profit, but to satisfy the wishes of his employer. None of the major steps were taken on his initiative, and none were his idea. He had worked remotely for a new employer for less than a year, during a difficult pandemic, and was going along with what he was asked to do.

Bruce did eventually invest a relatively small amount of his own retirement funds in DWAC, mostly before he attended his first board meeting. But the yield from that investment, less than $50,000, pales in comparison to the illicit profits others made on inside information concerning DWAC, including several individuals who were never prosecuted at all, even though they made far more money than Bruce. Bruce's personal investment was also made well before news of the merger announcement. He did not invest a penny during the late stages of the merger negotiations, when other inside investors reaped millions.

Apart from what might be said about this limited period of Bruce's life, he is in every other respect an exemplary human being. He has never previously had any brush with the law over several decades in a highly regulated industry. As part of its trial preparation, the government scoured his employment and investment history, interviewing numerous former colleagues and reviewing thousands of records. It found no infraction or misdeed, and nothing to present under Rule 404(b). Everything suggests that what the jury found was a departure from an otherwise law-abiding life. Bruce presents no conceivable risk of recidivism.

The Probation Department has recommended a term of incarceration of 36 months. For the reasons that follow, we respectfully submit that a three-year prison sentence exceeds what is sufficient and necessary to achieve the ends of justice in this case. Bruce's involvement was at the behest of his employer, Michael Shvartsman, who, with his brother, made more than *450 times* the amount Bruce made. At the very least, his sentence should be less than theirs.

## BACKGROUND

As numerous friends and family members attest in letters submitted to the Court, viewed apart from the crimes of which he was convicted, Bruce has led an admirable and law-abiding life, based on hard work, integrity, and kindness to others.

### A.     Personal History and Characteristics

Bruce was born in Minneapolis on December 28, 1969.  His father, Max, worked in the clothing business, starting his career at Filene's, and later holding senior roles at Dayton-Hudson Corp., Saks Fifth Avenue, and Perry Ellis International.  His mother, Lynn, was primarily a homemaker.  Bruce's brother, Jeffrey, was born three years after him.  The family moved several times in Bruce's early years, following Max as he moved between jobs in Minnesota, Colorado, and Michigan.  In the mid-1970s, the family settled permanently in Westport, Connecticut.  His parents later divorced, but remained friendly until his father's premature death, aged 65, in 2004.

Bruce married in 2000 and with his wife Ashley raised two children, Liv and Drew, in the Boston suburbs.  Bruce and Ashley separated in 2017.  Their divorce was finalized earlier this year.  In 2020, Bruce began a new relationship with Deirdre O'Shea, then a Ph.D. candidate in neuropsychology at Brown University, now an assistant professor of neuropsychology at the University of Miami.  Bruce and Deirdre are expecting their first child, a daughter, in January.

Those who know Bruce best describe him as a person of high integrity, gregarious, relentlessly positive, hardworking, and kind.  Peter Cahill, who has known Bruce since elementary school, writes:

> Bruce is my best friend.  Our friendship began in elementary school.  My family moved to Westport, CT. in 1979.  I was the new kid and did not know a soul.  From the first day of school, Bruce included me in various games and activities and helped me make friends.  Bruce has a knack for bringing people together.  It is a trait I have always admired in him, and I believe it to be one of the main reasons our friendship has endured for more than forty years.

…

I could ramble on and extol virtue after virtue about Bruce. I would rather share with you one fact that I believe speaks volumes about who Bruce Garelick is as a man, father, and friend. I trust Bruce absolutely, and when it came time to decide who would be a successor trustee for various trusts my wife and I had set up for our children, we had only Bruce in mind. My wife and I could think of no one better suited to effectively shoulder the responsibility of guiding and overseeing our children into adulthood.

(Exhibit D).

Carl de Jounge, another life-long friend, who travelled from Vermont to testify as a

character witness at trial, writes:

I have been a close friend of Bruce Garelick since we first met during the fall semester of 1984 at Staples H.S. in Westport, CT. … As close friends in high school, Bruce became the person I could always trust and rely on for sound judgment. He was someone that I admired and was a positive role model, pushing me to excel in my academics. I would not have known or applied to Lafayette College without his encouragement and I greatly appreciate this.

…

However, it's Bruce's personal character and caring personality that resonates most for me. I have always known Bruce to do the right thing, and as I testified at Bruce's trial, he is someone I, and everyone in our circle, regards as honest and straightforward. When it came time for me to pick a best man at my wedding in September 1995, I chose Bruce because he embodies all the qualities a best friend should have. He offers sound judgment, acts with strong personal integrity and character, and is a caring friend.

(Exhibit E).

Another high-school friend, Michael Rabin, writes:

From our days in high school, Bruce has consistently demonstrated unwavering integrity, compassion and determination. He has always been a person of high moral values. He has genuine care and empathy for others. He has a remarkable ability to connect with people on a deep level and make them feel valued and heard.

4

(Exhibit F).  Rabin concludes, "of all the people I grew up with … Bruce Garelick is truly the last person I would have ever guessed would be charged with a crime."  (*Id.*).

Bruce's family see the same qualities.  Bruce's mother, Lynn, writes:

> Bruce has always been a good and honest person.  As a child, young man, and then adult, he was never someone you expected to be in any kind of trouble.  This case has been a shock, because what Bruce has been accused of is so completely out of character.

(Exhibit B).

Bruce's divorce, which was finalized earlier this year, was not easy, and placed a great strain on him.  Bruce's son Drew, describes how Bruce has modeled maturity and positivity even amid the inevitable stress of a divorce:

> My father has always been a role model, showing me the value of perseverance in difficult times, showing me the importance of a caring disposition and of empathy, and showing me the importance of accountability.  I have witnessed my father in a variety of life situations and I can state with confidence that he is a person of integrity and strong moral principles.
>
> My parents separated several years ago, and recently were divorced.  This was hard on us.  Our parents handled the situation differently and did not always see eye to eye.  I was living with my mother but I would visit with my father as often as I could to keep our relationship strong.  If you want to know why my father is an incredible man, it is because of how he handled this difficult family situation with maturity, focused on his own actions, and on our relationship.  He took the higher road.  He never mentioned my mother in a negative connotation, never spoke poorly of her behind her back. I admire him so much for this.

(Exhibit I).

Bruce's mother Lynn similarly writes about how Bruce handled the divorce "with grace, fairness and kindness."  (Exhibit B).  In an interview with probation, Bruce's ex-wife, Ashley, described him as a "great guy" who remained active in caring for the children and was "honest, ethical, and humble."  (PSR, ¶ 73).

Bruce has always been there to help others, whether they are close family or new friends.

Bruce's brother, Jeff, writes:

> Throughout my life, Bruce has always been an older brother in the truest and best sense. His support and love for me has been unwavering, even in the face of other people's opinions. He is a truly good person, and I want you to know that.
>
> Bruce was there for me at a crucial time in my teenage years, at a time when I was drinking and using substances and hit rock bottom. One day our mother confronted me. I ran off into the woods near where we lived in Westport, but Bruce followed me. We sat together on the ground and talked. He eventually persuaded me to come home and speak openly to our parents about my problems. I did, and shortly afterwards I began rehab, and my journey to sobriety has been successful since 1989.
>
> Bruce was also there for me in 1994, when I came out to him as gay. The United States was then a much more conservative place. I looked up to Bruce and was close to him, but I was unsure how he would react if I opened up to him. He was one of the first in our family I spoke to, and I was able to speak to him about my struggles. He was immediately accepting, never hesitated, and I am hugely grateful for that.
>
> In both of these areas I never felt judgement from Bruce. Rather he was a source of great counsel as I navigated both of these major life happenings. He was always sympathetic to the challenges I was facing and never minimized my feelings when the going was rough.

(Exhibit C).

David Waintraub, who met Bruce when both were living in New York in 2020, describes

Bruce as "infectiously kind" and relates how Bruce helped him through his own divorce:

> I met Bruce in the summer of 2019 when we were both living in New York. Both of us were going through divorces and we became fast friends. We were both big sports fans and passionate about our Yankees and Knicks. At that time I was not only going through a divorce but also struggling in my relationship with my highly religious family. Bruce is older than me, and he was a great friend to lean on and sounding board as I worked through these issues. He was the family that I chose.

(Exhibit G).

Bruce's fiancée, Deirdre O'Shea, who attended the trial, describes him as "kind, gentle, and respectful … a man of integrity, compassion, and unwavering support, not only to me but to his family and friends as well." (Exhibit A). She writes about how it was Bruce's kindness and positivity that stood out for her when they first met:

> Bruce and I met in 2020 in Providence, Rhode Island, where I was completing my PhD in neuropsychology. During the uncertainty and difficulties of that time, Bruce was a constant source of encouragement and positivity for me, all the more important because my family was in Ireland and had never seemed further away.

(*Id.*).

Bruce's daughter Liv, who also attended part of the trial, writes about the "determination and sunny outlook" of her "loving, proud, and supportive father." (Exhibit H). She describes their shared love of music and tradition of attending concerts together. (*Id.*). She describes how he encouraged her to "take the path less traveled" as a ballet dancer and how he has been there "for me from throughout my journey – from my first performances to my recent move to join a company in Florida." (*Id.*). She concludes, "My dad is a good man. He is a loving, proud, and supportive father to me and my brother. We love him so much." (*Id.*).

Drew Garelick similarly writes about his warm memories of annual snowboarding trips with his father and how Bruce helped guide him on the path to college and in his choice of a political science major. (Exhibit I). Drew concludes:

> My high school's motto is *agape latte.* This is a Greek phrase and it means unconditional love, or spreading love and expecting nothing in return. My father is the first person to show me the true meaning of this motto. I intend to share what I have learned from him with the people that I care for, and be as strong as he is.

(*Id.*).

**B.**    <u>**Professional History**</u>

During nearly 30 years in finance, Bruce has never, prior to this case, had any problems with regulators, or even with compliance departments at institutions where he worked. The government investigated Bruce extensively before trial and did so again prior to Bruce's testimony. No "other act" evidence was offered, except for an utterly unfounded tax allegation that the government raised pretrial and then promptly rescinded after defense counsel explained how Bruce had been completely compliant. (Doc. Nos. 108, 119). Shortly before Bruce testified, the government discovered a SAR relating to a single transaction at Bruce's hedge fund and subpoenaed Barclays, the broker, for further information. The defense moved to preclude, explaining that there was nothing to the SAR (Doc. No. 143), and the government immediately disclaimed any intent to cross-examine on the topic (Tr. 944-45).

In his professional life, as elsewhere, Bruce has been a model good citizen and a person of high integrity.

Bruce graduated from Vanderbilt University in 1992 and after working for several years entered the Wharton School, where he obtained his MBA in 1997. While still at Wharton, Bruce began studying to be a Chartered Financial Analyst ("CFA"). The CFA is the "gold standard" in the investment industry and entails three arduous exams. (Tr. 558-59). Bruce passed each exam at the first attempt, a "pretty rare" achievement given the rigor of the exams. (Tr. 559).

Bruce's career in finance began in Boston at Loomis Sayles & Co. Peter Cahill, who worked at Loomis at the same time, writes that he and Bruce were both "students of the markets" and shared a "passion" for "analyzing complex financial information." (Exhibit D). After several years Bruce moved to State Street Research. From State Street he was recruited to run

the billion-dollar technology portfolio at Adage Capital Management, where he remained for six years.

In 2011, Bruce opened his own hedge fund, Garelick Capital Partners.  The firm focused on technology stocks.  It started small, with three employees, and grew to about 10 employees, taking investments from major endowments and foundations.  However, by 2018 the firm was going through challenges, as were many others in the market.  Faced with the likely loss of major investors and the need to lay off employees, Bruce decided to close the firm.

The following year, recently separated from his wife, Bruce moved to New York to take a role as Chief Financial Officer for Leaf Logix Technologies, which offered point of sale technology for the legal cannabis industry.  Leaf Logix was sold in 2020 and in August that year Bruce joined Rocket One Capital as Chief Investment Officer.  Hired in the middle of the pandemic, Bruce worked remotely from New England before moving to the Miami area in March 2022.  (Tr. 1096).

Bruce's role at Rocket One was to serve as a financial analyst and help Michael Shvartsman diligence new investments and merger targets, as well as providing general support. (*Id*.).  Although he was working remotely, Bruce was in constant day-to-day contact with Shvartsman concerning various Rocket One projects.  (Tr. 1097-99).  One of those projects was Rocket One's initial investment in founders shares in DWAC and the assembly of a syndicate of other investors to do the same.  (Tr. 1109-10).

## C.    The Offense

In 2021, Bruce was beginning a new chapter of his life.  Over the last several years he had separated from his wife, shut his hedge fund, and moved his residence.  Having worked for decades within rigidly structured financial institutions, Bruce was now working remotely for a

freewheeling enterprise answerable to a single independent-minded boss who moved in a Miami social and business world unfamiliar to Bruce.

Bruce wore many different hats at Rocket One.  One of his jobs was to serve as an investment advisor to Michael Shvartsman, crunching numbers and providing financial advice. But Bruce also provided basic logistical support and carried out practical tasks, effectively acting, at times, as Shvartsman's assistant in handling day-to-day matters.  In the summer of 2021, Bruce was asked to help coordinate meetings for potential investors in the syndicate Michael wanted to form.  He was also asked to serve as a director of DWAC.

Bruce did not seek a role on DWAC's board.  He had never previously served on a corporate board and received no training or guidance with on his obligations.  He did not, as the government claims, join the board as a "mole."  (Doc. No. 219, at 1).  He joined the board to take care of Shvartsman's investment, a "front row babysitting job," to make sure Orlando didn't do anything crazy.  (GX742).  But he was thrown into a situation rife with conflicts.  And, as the probation officer notes, this assignment placed Bruce in an "awkward position."  (PSR, at 41).

None of this absolves Bruce, or justifies conduct which the jury found to have occurred, but the situation he found himself in may help explain why someone with a history of integrity experienced a critical lapse of judgment.  His actions cannot be ascribed simply to greed— arguably a greedy person would have made a far larger investment.  The better inference is that he was trying to serve and please his employer, after having been placed in a difficult position, and did not handle the situation well.

### 1.    The Alleged Tips To Michael Shvartsman And Eric Hannelius

The alleged tipping by Bruce is unusual because the government acknowledges that the primary tippee (Michael Shvartsman) had already obtained "highly confidential, highly valuable

information" concerning the possible DWAC-TMTG merger directly from Orlando prior to learning "supplement[al]" information from Bruce.  (Doc. No. 221, at 2).  As the government puts it, "Shvartsman, armed with the inside information he had already learned from Orlando, supplemented by the tips passed on from Garelick, then made several well-timed, massive purchases of publicly trading DWAC securities[.]"  (*Id.*).  Orlando was the primary tipper.  He let it be known that the SPAC had a particular target, and he disclosed the target.  Indeed, his surrogate, Marc Wachter, had already told Shvartsman about the target before Orlando even met with Shvartsman.  (Tr. 350-51).  According to the government's theory, the identity of any pre-IPO SPAC target is critical inside information, because SPACs are not supposed to have defined targets before their IPO.

On June 18, 2021, Bruce, at home in Rhode Island, was remotely patched into a meeting occurring at Rocket One's offices in Miami.  Attending the meeting in person were Marc Wachter, Patrick Orlando, Michael Shvartsman, and Gerald Shvartsman.  Ignoring that SPACs are not meant to have undisclosed targets prior to going public, Orlando, in the government's account, "told the Shvartsmans that … DWAC might be the company to profit from [his] relationship [with President Trump] and could potentially merge with Trump's company."  (Doc. No. 221, at 2).

That Orlando was planning to use DWAC to merge with TMTG was no secret.  Indeed, Orlando and his confederates were using Trump's name as enticement for investors in the founders' round—both after and before potential investors signed NDA's.  Documents produced in discovery show, and the SEC has alleged, that "*TMTG*'s outside counsel was copied on some emails from an existing DWAC investor to prospective investors" that "referred to 'one major standout [target company] which makes this SPAC opportunity even greater'" and dangled a

post-NDA "'call with Patrick's team, and [TMTG's outside counsel] on the possible SPAC acquisition to understand the uniqueness of this possible opportunity.'" (Complaint, *SEC v. Orlando*, 24 Civ. 2097, Doc. No. 1, ¶ 77). Others were even more brazen. As Wachter admitted, "it certainly was helpful that [Orlando] had a relationship with Mr. Trump" and he [Wachter] would "talk about that when [he] got together with wealthy individuals to urge them to meet with Patrick Orlando." (Tr. 337).

Wachter followed that playbook here. He spoke with Michael Shvartsman several times ahead of the June 18 meeting in which Bruce was asked to join the group. Wachter talked about Trump and TMTG, and even want so far as to discuss with Shvartsman the possibility of purchasing warrants. (Tr. 350-51). In this context, it is no surprise that Bruce and others referred to DWAC as far back as June 2021 as the "Trump SPAC." If the merger with TMTG was not foreordained, it was at least the reason the Shvartsmans and their associates in the syndicate invested.

Michael Shvartsman assigned Bruce responsibilities following the June 18 meeting. Bruce was tasked with coordinating a syndicate of Michael Shvartsman's friends and associates to invest in the DWAC founder's round. (Tr. 1109-11). These chains of communication would later create conflicts when Bruce sat on the DWAC board. And they reveal that the members of the syndicate were thinking of DWAC as a vehicle for a merger with TMTG—based entirely on what they had already been told *by Orlando,* well before Bruce sat on the board. (*E.g.*, GX400 (June 21, 2021 emails between Bruce and Hannelius regarding DWAC and Trump)).

These were not Bruce's only responsibilities on the DWAC deal. Bruce was also tasked with analyzing the potential value of DWAC warrants, negotiating a redeemable $5 Class B stock option for Michael Shvartsman and his syndicate, and even approaching Orlando to secure

a right of first refusal "on future payment processing needs for the Trump Media Group." (Tr. 1109, 1117-19, 1122-26, 1127-32; GX416). And as the IPO approached, Bruce was tasked with coordinating between Michael Shvartsman and Ben Reed to set up Rocket One's trading account. Bruce was also tasked with responding to questions from members of the Rocket One syndicate. (*E.g.*, GX453).

Although the government characterizes Bruce as a "mole" on the DWAC board, Bruce's dual status as a DWAC board member and as the coordinator of a key investor syndicate who remained employed by a key investor was no secret. In SEC filings following Bruce's nomination, DWAC had disclosed Bruce as a nominee director, and his affiliation with Rocket One. (*See, e.g.*, GX106, 107). Filings following September 2, 2021, the date Bruce took his seat on the board, made the same disclosure. (*See, e.g.*, GX116).

In the late evening on September 8, 2021, Eric Hannelius, who was Michael Shvartsman's closest business partner, emailed Bruce asking about "next steps" in relation to DWAC. (DX34). Early the following morning, Bruce responded with a detailed email explaining the different classes of DWAC securities, stating that a target announcement "expected 6-10 weeks from now" was "our expected catalyst to then profitably sell the IPO shares," and stating that Rocket One "plan[ned] to buy another $255 [thousand] of [the IPO stock] in the open market over the next four weeks." (*Id.*). This email exchange and a subsequent meeting between Bruce and Hannelius in Miami both occurred *before* Bruce attended his first DWAC board meeting, on September 21, 2021. (Tr. 1100). Although the government suggested that Bruce later tipped Hannelius over the phone, there is no evidence that he did so, and Bruce denied doing so on the stand. (Tr. 1151-52).

13

Bruce's alleged tips to Michael Shvartsman were also in the form of written communications related to Bruce's existing responsibilities as Shvartsman's investment advisor. On September 20, Bruce sent Michael a message notifying him that he had a DWAC board meeting at 12:30 the following day. (GX746). In the same message, he "recommend[ed]" that Michael "start[] to buy more DWACU stock." (*Id.*). He reminded Michael that "we only own $145k worth of $400k target position size" and that the EF Hutton trading account "was funded with $400k[.]" (*Id.*). On September 30, 2021, Bruce sent Michael a series of messages notifying him that DWAC warrants had begun trading and reminding him that he had $255,000 in cash in the trading account with EF Hutton. (GX747).

No witness came into the courtroom and accused Bruce of tipping, and it is not clear what the jury found. The jury may have found, as the government urged it to do, that Bruce's September 9, 2021 email to Hannelius together with his September 20 and September 30 messages to Michael were tips and convicted on that basis. Alternatively, the jury may have found that Bruce tipped Michael Shvartsman through general reassurances or even by failing to dispel Michael's impression that DWAC was progressing towards a merger with TMTG as planned. There was no evidence that Bruce tipped Michael in more specific and express terms.

### 2.    The Alleged Tips In The Week Preceding The Announcement

At trial, the government also put on evidence of blatant insider trading in the week before the announcement of the DWAC-TMTG merger agreement. This insider trading involved Gerald Shvartsman, his two employees, Adrian Lopez Torres and Netanel Suissa, Anton Postolnikov, Eric Hannelius, and Michael's Las Vegas-based friend, Aric Gastwirth. The trading occurred immediately before and during a trip by Bruce, Michael Shvartsman, and other Rocket One employees to Las Vegas for an industry conference. Bruce was not charged in connection with

14

Gerald Shvartsman's employees' trades, and the government did not proceed to trial on the counts related to Gerald Shvartsman and Aric Gastwirth. The government never charged Anton Postolnikov, nor did it charge any of the defendants in this case in connection with Postolnikov's trades, which netted profits of approximately $14 million.

There was no evidence that Bruce was the source of any tips associated with this trading. The government suggested that Bruce may have been in Michael Shvartsman's hotel suite at the same time as Gastwirth in the hours following the October 20, 2021 board meeting. But there was no actual evidence that Bruce was there, let alone that he tipped Gastwirth, or Hannelius, who also traded that night. Bruce testified unequivocally that he had never met Gastwirth, had never spoken to him, and would not recognize him if he saw him. (Tr. 1291-92).

There is, moreover, strong evidence that the egregious insider trading in the immediate run up to the October 20 announcement had nothing to do with Bruce. Postolnikov, Wachter, Orlando and both Shvartsman brothers were in frequent communication with each other in the weeks leading up to the announcement. All of them knew the announcement was coming.

On October 11, Wachter told a friend, Zoltan Present, who had invested in the founders' round, and was serving as a back channel for Orlando's illegal $100,000 payment to Wachter for his services as an unlicensed broker, that "Patrick will be announcing some DWAC news very soon." (GX472). On October 15, Postolnikov and Orlando had a four-minute call. (GX660). The next day, October 16, a Saturday, Wachter and both Shvartsman brothers attended a birthday party that Postolnikov threw for his wife. (Tr. 371-72). When markets opened the following, Monday, October 18, Gerald Shvartsman instructed Ben Reed at EF Hutton to buy him more DWAC warrants. (Tr. 738; GX476). He also tipped Lopez Torres and Suissa. (Tr. 417-21, 646-47). That Monday, October 18, and over the following days, Postolnikov instructed Reed to

purchase ever large amounts of DWAC warrants, at steadily increasing price points.  (Tr. 772-75; GX822, 823).  There is no question that he was trading ahead of and preparing for the expected announcement.

Wachter's testimony that he had no idea the agreement was in progress or about to be announced was a flat out lie.  (*E.g.*, Tr. 295, 399).  Wachter was as close to Orlando as anyone outside Orlando's immediate family.  They saw each other often and throughout October 2021 they spoke on the phone several times a week, often several times a day.  (DX851).  When Wachter told Present that that "Patrick will be announcing some DWAC news very soon" (GX472), he was referring to the merger agreement.  Wachter also lied when he testified that his message to Orlando at 6:38 pm on October 20, 2021—"Hey, Bud, what's the latest" (GX502)— had nothing to do with the announcement that everyone was waiting for.  Asked whether he sent the message "because you expected to hear from him about some news," Wachter responded, "No.  I believe it's because I haven't spoken to him in two days, which is not really normal."  (Tr. 385).  In fact, Wachter and Orlando had spoken that morning for 16 minutes.  (DX851).

There is also other, more subtle, evidence that the tips that led to the insider trading in the days leading up to October 20 flowed from a source other than Bruce.  At around the same time as he tipped Lopez Torres to buy DWAC warrants, Gerald tipped Lopez Torres to buy stock in a second Orlando affiliated SPAC that also was expecting to announce news soon.  That SPAC was Beneserre Capital Acquisition Corp., known as BENE.  Lopez Torres passed the tip onto his father, telling him that it had come from Gerald and was the "same story" as DWAC.  (Tr. 439-41).  Bruce had nothing whatsoever to do with BENE.

The Court will recall that during the trial, the government attempted to block the defense from putting on an "alternative tipper" defense, describing "the idea that Mr. Wachter is the

source of a tip in October" as "frankly ludicrous." (Tr. 30). The government used the same

word—"ludicrous"—to describe the "alternative tipper" theory in its summation. (Tr. 1439-41).

It appears the government is no longer so sure. In response to the initial draft of the PSR, the

defense submitted a number of objections and proposed revisions. The government contested

many of them, especially the more substantive ones. One that the government *did not* contest

read as follows:

> The evidence showed that others, including Orlando himself,
> Postolnikov, and Marc Wachter, a close friend of Orlando, Postolnikov,
> and Gerald Shvartsman, were all in possession of material non-public
> information, and were in contact with Michael Shvartsman and Gerald
> Shvartsman during October 2021. The defense contends that these other
> people, not Mr. Garelick, were the source of the tips that led to the insider
> trading in the days shortly before the announcement regarding the merger
> agreement.

(PSR, at 36).

We understand that the government's investigation is ongoing and we are hopeful that the

truth about what occurred in the weeks leading up to the announcement of the merger agreement

will eventually emerge.

### 3. <u>Bruce's Trades</u>

Between September 3 and September 23, the day the DWAC-TMTG letter of intent was

signed, Bruce purchased $53,455 in DWAC IPO stock. (Tr. 1238-41). Bruce made these

purchases in the same account where he does all of his personal trading—his retirement account

at Fidelity. (*Id.*). On September 23, following the execution of a letter of intent, when it became

clear that DWAC and TMTG were heading towards a merger agreement, Bruce stopped buying

DWAC securities. (Tr. 1241). At that time, he had approximately $250,000 in cash in his

retirement account that he could have used to make further purchases of DWAC securities had he

chosen to do so. (Tr. 1245). He made a total of $49,701. (GX930).

## THE SENTENCING GUIDELINES YIELD AN IRRATIONAL RESULT

### A.    The Loss Amount

The loss enhancement under §2B1.1(b)(1) renders the Guidelines calculation in Bruce's case wholly irrational and divorced from actual culpability.  The Guidelines calculation should play no role in Bruce's sentencing.

As a number of courts have recognized, the fraud guidelines sometimes "war[] with common sense" and can "lead to bizarre results."  *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) (Rakoff, J.); *see also, e.g.*, *United States v. Johnson*, 16 Cr. 457, 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) (Garaufis, J.) ("loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime."); *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (Block, J.) (fraud guidelines are a "black stain on common sense").

In some cases, loss amount may be a decent proxy for culpability.  A person who defrauds another person out of $10 million is likely to be more culpable, all other things being equal, than a person who defrauds someone out of $50,000.  Similarly, a person who illegally purchases a large amount of securities may be more culpable than a person who illegally purchases a small amount.  But, as Judge Rakoff has observed, the culpability of a convicted tipper in an insider trading case is poorly measured by "the resultant but unpredictable monetary gains made by others," especially when the tipper "did not in any direct sense receive one penny" from the tippees' trades.  *Gupta*, 904 F. Supp. 2d at 350.

Consider the first of Rajat Gupta's two tips as an example.  Immediately following the Goldman Sachs board's approval of Warren Buffet's $5 billion investment, Gupta called Raj Rajaratnam.  *United States v. Gupta*, 747 F.3d 111, 117 (2d Cir. 2014).  The time was 3:54 pm, and the call lasted approximately 30 seconds.  *Id.*  Rajaratnam then orally relayed purchase

instructions to two traders. *Id.* As a result of Gupta's haste, Rajaratnam was able to buy more than $33 million in Goldman stock before the market closed at 4:00 pm and to realize a profit of $1 million on the surge that followed the announcement. *Id.* at 117-18. But what if Rajaratnam had not been able to execute the trades in time, or had been able to purchase only $2 million in Goldman stock? Would Gupta have been any less culpable? No rational sentencing scheme would view those two cases differently.

This case well fits the paradigm of a tipper who had no knowledge of how much his tippee would trade or how much his tippee would make. There is no evidence Bruce knew how much Michael Shvartsman was going to invest in DWAC warrants. To the contrary, in his September 30 messages to Michael regarding the opening of the DWAC warrant market, Bruce reminds Michael that he has $255,000 in cash available to trade in the EF Hutton account. (GX747). Bruce was not on Michael's calls with Ben Reed regarding his warrant trades. That Bruce subsequently found out how much Michael had made from his DWAC warrants does not suggest Bruce knew the scope of Michael's trading plans at the time he allegedly tipped him. Nor could Bruce have foreseen how extraordinarily the market for warrants would rise or the magnitude of Michael's profits.

The loss amounts associated with Gerald Shvartsman and Aric Gastwirth are even more attenuated from any rational consideration of Bruce's culpability. The government did not seek a verdict on the charges relating to these trades. There is no evidence Bruce knew anything about Gerald's trades, let alone the volume of his trading. And we submit that the best view of the evidence is that Bruce never met Gastwirth, never tipped him, and knew nothing about his trading.

Bruce also did not receive any direct economic benefit for his role in this alleged tipping scheme. For someone with his credentials, he was not a highly compensated employee. His salary in 2021 and 2022 was $200,000 and in 2022 received a bonus of $50,000. This was the lowest bonus Bruce had received since he graduated from business school in 1997 and in no way correlated with Rocket One's profits from its DWAC investment.

Finally, because the sentencing chart curves upwards, the loss adjustments required by the fraud guidelines compound the effect of *other* adjustments, such as obstruction of justice or abuse of trust, in ways that are divorced from actual culpability. For example, the two-level obstruction adjustment, if applied to a Level 9 offender, increases the bottom and top of the guidelines range by 4 months. Add to the chart the 20 levels that the loss enhancement adds for Bruce and the two-level obstruction enhancement now increases the bottom of the range by 21 months and the top of the range by 27 months. But surely perjury is perjury, and the tariff for perjury should not be subject to a multiplier based on the loss amount. The effect for a director of a public company is even more severe. For a Level 7 offender, the four-level director adjustment increases the bottom and top of the range by eight months. For a Level 27 offender, the adjustment increases the bottom of the range by 38 months and the top of the range by 48 months.

For all of these reasons, we submit that the Guidelines calculation yields a wholly irrational result and should play no role in Bruce's sentence.

B.    **Bruce Did Not Obstruct Justice**

The Court should not apply the two-level obstruction enhancement proposed by the PSR and should not penalize Bruce for giving the jury his version of events.

"Any sentence enhancement for perjured trial testimony implicates a defendant's constitutional right to testify in his or her own defense," *United States v. Rosario*, 988 F.3d 630, 633 (2d Cir. 2021), and courts should not "enhance sentences as a matter of course whenever the accused takes the stand and is found guilty," *United States v. Dunnigan*, 507 U.S. 87, 96-97 (1993).  Instead, district courts must "make findings to support all the elements of a perjury violation in the specific case … namely, that the defendant (1) willfully and (2) materially (3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." *Rosario*, 988 F.3d at 633 (cleaned up).  Willfulness, in this context, refers to the "specific purpose of obstructing justice."  *United States v. Canova*, 412 F.3d 331, 357 (2d Cir. 2005).   "[N]ot every accused who testifies at trial and is convicted will incur an enhanced sentence under § 3C1.1 for committing perjury."  *Dunnigan*, 507 U.S. at 95.  As the Supreme Court has noted, in addition to "inaccurate testimony due to confusion, mistake, or faulty memory," an accused may testify truthfully to matters that may be "insufficient to excuse criminal liability or prove lack of intent."  *Id*.

Here, nothing in the jury's verdict required it to reject Bruce's testimony.  The matters disputed at trial largely concerned Bruce's intent in sending certain communications or in making certain trades.  The question was not "What did Bruce do?" or "What did Bruce know?" but "What did Bruce understand about his obligations?"  On such a murky question, the jury may have rejected Bruce's defense without also concluding that he willfully and intentionally perjured himself.

What is more, the policy embodied in § 3C1.1 is contrary to the truth-seeking function of criminal trials.  As Judge Rakoff has observed, courts should "encourage people to take the stand" because "it is … useful and helpful in many white collar cases to hear testimony from

both sides." *United States v. Stewart*, 15 Cr. 287 (S.D.N.Y.), Doc. No. 367, at 4 ("I never give

the two point adjustment for alleged perjury at trial.").  Moreover, the enhancement is "an

impediment to innocent people taking the stand and clearing their name" because it requires

counsel to advise their client that "if the Judge does not believe the testimony … they will face a

higher guideline range and, therefore presumptively a higher sentence."  *United States v.

Whitman*, 12 Cr. 125 (S.D.N.Y), Sent. Tr., Jan. 24, 2013, at 6-7 (Rakoff, J.); *see also id.* at 3 ("I

want to hear from counsel on the obstruction issue … But … I will let you know in advance that

whichever way I come out … it will make zero difference to my sentence").

> Juries benefit from hearing a defendant's testimony, regardless of whether they ultimately

convict or acquit.  We would submit that it does not make sense, as a policy matter, to penalize a

defendant such as Bruce who has taken the stand and given the jury his version of events.

## A SIGNIFICANT DOWNWARD VARIANCE IS WARRANTED

> Courts "may not presume that a within-Guidelines sentence is appropriate" but rather

"must make an individualized assessment of the appropriate sentence based on the facts

presented."  *Peugh v. United States*, 569 U.S. 530, 552 (2013) (cleaned up).  Indeed, "a district

court may freely depart from the range recommended by the Guidelines based not only on an

individualized determination that the Guidelines yield an excessive sentence in a particular case,

but also based on *policy* disagreement with the Guidelines themselves."  *Id.*  In imposing

sentence, courts must consider the factors enumerated in, 18 U.S.C. § 3553(a), and we address

those factors, as relevant, below.

## A.    Bruce's Actions Concerning A Single Stock During A Short Period Of Time Were An Aberration In An Otherwise Law Abiding Life

> It is a signal part of our "tradition" that "the punishment should fit the offender and not

merely the crime."  *Pepper v. United States*, 562 U.S. 476, 487-88 (2011).

There are people in the finance industry as elsewhere who sail close to the wind, who seek an edge; people whose involvement in a criminal case may not come as a surprise. Bruce is not one of those people. His involvement in this case is shocking to the people who have known him his whole life because it is so completely out of character. As life-long friend Michael Rabin writes, "of all the people I grew up with … Bruce Garelick is truly the last person I would have ever guessed would be charged with a crime." (Exhibit F).

Bruce has lived a good and law-abiding life. Until the events of this case, which were instigated by his employer, he had never had any brush with the law. He is regarded by his friends, family, and colleagues, and someone who acts with integrity, someone who can be trusted. That is why Peter Cahill made Bruce a replacement trustee for trusts established for his children. (Exhibit D). That is why Carl de Jounge, who still works in the finance industry, travelled from Vermont to testify as a character witness at Bruce's trial, testifying both to his own opinion, and to Bruce's reputation in their circle. (Tr. 1082-88).

It is notable that the government's investigation of Bruce turned up no prior bad acts. Bruce worked in finance for 30 years. He ran his own hedge fund for seven years. He was involved in thousands if not millions of transactions. He worked at highly regulated institutions and with highly regulated counterparties, many with reporting obligations should wrongdoing be detected. If Bruce was someone who bent the rules, he would have been found out before. The government's investigation, which redoubled before Bruce's testimony, turned up nothing of significance.

Bruce's conduct in this case was an aberration. We use that word not in the specialized sense used by the Sentencing Guidelines, but in the more colloquial sense: it was untypical of

23

how Bruce has lived his life, lasted a short period of time, and has not been repeated.  Bruce's sentence should reflect this.

**B.    Bruce's Own Trades Were In Small Amounts And Ceased Before Bruce Could Truly Exploit The Inside Information**

While the Shvartsman profits do not correlate to Bruce's culpability, Bruce's own modest profits are a factor that should be considered at sentencing.

Bruce's trades involved small amounts, little different from other trades he placed in his retirement account.  In total, Bruce spent $53,455 on DWAC units between September 3 and September 23, 2021.  His trading ceased a month in advance of the merger announcement.  All but one of his trades occurred before he had attended a DWAC board meeting, and that September 21 board meeting was a general discussion of several different possible targets.  Several of his trades occurred before he had received any information at all in his capacity as a DWAC board member.  As soon as Bruce learned that DWAC had executed a letter of intent and moved to the due diligence stage, he stopped trading.   He did so despite having hundreds of thousands of dollars in his trading account he could have used to make further purchases.  He never purchased DWAC warrants, thus forswearing the most profitable means of exploiting his inside information.  In total he made $49,701.

The profit Bruce made in this case is a tiny amount in the context of most insider trading schemes.  And it is dwarfed by the millions and tens of millions made by others involved in this case—including those who have never been charged.

As significant as the fact that Bruce made only modest profits is the *reason* why he made only modest profits.  Not only were Bruce's trades small, but he stopped trading at the moment the inside information hardened into a sure thing, the moment it became indisputably material.  Bruce pushed the limits, and the jury determined that he pushed too far.  But he did not ignore

the limits, or act as if they didn't exist.  He did not exploit the illegal opportunity to its fullest.

He pulled back from the brink.  This is a stark contrast with many other insider trading

defendants, who, at the moment of greatest opportunity, go all in.  Bruce did not do so, and his

sentence should reflect this.

**C.**    **Bruce Took No Steps To Conceal His Actions**

Bruce also took no steps to conceal either his trading or his alleged tipping.  He did not

use a nominee account.  He did not delete text messages.  He did not use a burner phone.  He

used none of the elaborate and not so elaborate methods often seen in insider trading cases.  *See,*

*e.g.*, "SEC Announces Settlement with Cooperator in Grand Central Post-It Notes Insider

Trading Case," S.E.C. 15-143, 2015 WL 4187109, July 13, 2015.  Lack of concealment does not

make Bruce innocent.  It does not make him non-culpable.  But it does speak to a relative lack of

willfulness and thus a relatively lower degree of culpability.

Begin with Bruce's own trading.  He traded in his own rollover retirement account using

his own name.  He spoke with Fidelity on recorded lines.  He traded after being publicly

disclosed in SEC filings as a member of DWAC's board.  And he traded even though he surely

knew that any merger agreement between DWAC and TMTG would garner widespread publicity

*and* regulatory scrutiny above and beyond that typically seen in such transactions.

Bruce's alleged tips—his communications with Michael Shvartsman and Hannelius—

were transmitted *in writing* using regular channels.  He didn't create a dummy email account.

He didn't use disappearing messages.

Consider Bruce's email to Eric Hannelius on September 9, 2021, which the government

contended was a central instance of tipping.  (DX34).  In that email, Bruce explains the various

types of DWAC securities and lays out, in a series of business-like bullet points Michael

Shvartsman's plans, including his plan to buy "$255 of [DWACU] in the open market over the

25

next four weeks." (*Id.*).  The jury may have concluded that this was an illegal tip.  But if it was a tip, it was not one Bruce thought he had to disguise.

Or consider the post-announcement messages between Bruce and Justin Friedberg—a colleague, but hardly a friend—that figured prominently at trial.  (GX750).  If Bruce believed he was guilty of securities fraud, then it is surprising that Bruce thought nothing about telling Friedberg—in writing—about his purchase of DWAC securities while serving on DWAC's board.  (*Id.*).

Perhaps most strikingly, Bruce disclosed his trades to his company's general counsel.  (DX37).  He did so *before* the merger announcement and *before* any internal or external inquiry had begun.  This is an extraordinarily unusual step.  Indeed, the undersigned is unaware of any other insider trading case in which a completely unprompted internal disclosure of problematic trades has occurred.  Again, none of this means Bruce is not culpable.  However, it goes some way to mitigate his culpability.

The government will point to Bruce's failure to file SEC Forms 4 and 5 as evidence of concealment.  However, Bruce had never been a director, received no training or guidance regarding his service on DWAC's board, and testified that while he had a general understanding that trades by insiders are publicly reported, he did not know about the forms he would need to fill out if he traded.  (Tr. 1144, 1360-61).  Bruce's failure to file Forms 4 and 5 was an honest mistake.  The government may also argue, as it did in summation, that the small size of Bruce's purchases was a way of "masking his trades."  (Tr. 1453).  But it is undisputed this was how Bruce *always* traded during the relevant period.  (Tr. 1238-39, 1248; GX303).  This was not concealment.

Given how frequently real evidence of concealment is seen in insider trading cases—or, when we consider the deletion of text messages between Wachter and Postolnikov, *in this case* (Tr. 388)—it is striking how far the government is required to stretch to find even flimsy allegations of concealment against Bruce.

D.    **Bruce Was An Employee Placed In A Difficult Situation With No Guidance**

We have no doubt that had Bruce not gone to work for Michael Shvartsman he would never have had any involvement in the criminal justice system.  His involvement in this case came about solely because Michael Shvartsman assigned him the duty of sitting on DWAC's board.  If a scheme existed, Bruce did not create it, he did not instigate it, and he did not profit from it.  He was an employee placed in a bad situation by his employer.  He should have known better, he should have made better choices.  But it was not a situation of his choosing.

Bruce's case also lacks the hallmarks of an insider trading case in which the tipper acts out of greed or desire for self-aggrandizement or in expectation of a kickback.  In the context of his professional background, Bruce was not a highly compensated employee.  His salary in 2021 and 2022 was $200,000.  In 2022 he received a bonus of $50,000.  There is no evidence of any discussions regarding a reward or kickback for his tips.  If such evidence existed, the government would have found it.  Rather than money, we would suggest that Bruce acted out of a desire to please a new employer.  Among the possible motives for insider trading, this is among the least culpable.

Michael Shvartsman's assignment of Bruce—his investment advisor—to sit on the DWAC board also created clear challenges, if not immediate conflicts of interest.  Yet Bruce, who had never previously served as a director of a public company, received no training on his role as a director, and no instruction, whether from DWAC or Rocket One, on how to navigate difficult situations when they inevitably arose.

27

This lack of fundamental corporate controls was unusual. Peter Melley, the FINRA witness, testified that public companies generally "employ procedures and controls" to ensure compliance with regulations and to "assist … directors and officers in determining when they can trade and when they cannot trade." (Tr. 869). For example, Melley testified, it is "customary" for companies to circulate notice of "blackout periods" when insiders should refrain from trading in the company's securities and notices lifting those blackout periods and announcing that "it's okay to trade." (Tr. 869-70). DWAC did none of these things. Should Bruce have known better based on his long experience in finance? Absolutely. Would Bruce have acted differently had DWAC had proper corporate controls, had he received a blackout notice, or even an email reminder that the board was currently in possession of MNPI? Almost certainly.

**E.      The Need To Avoid Sentencing Disparities**

For the reasons discussed above, Bruce is significantly less culpable than a number of other individuals involved in this case, including those who were never charged. Anton Postolnikov unquestionably traded on inside information and thereby realized approximately $14 million in illegal profits. Aric Gastwirth traded in the early morning of October 20 and made approximately $1.4 million. Eric Hannelius made $168,205. Lopez Torres and Suissa committed blatant insider trading, realizing profits of $404,000 and $16,000 respectively, and Lopez Torres wanted to do the same thing with BENE. Yet not one of these people has been charged. Eric Hannelius recently wrapped up a settlement with the SEC,[1] but was never charged criminally. Perhaps most striking, Patrick Orlando, whose now obvious criminality made him

---

[1] https://www.sec.gov/enforcement-litigation/administrative-proceedings/34-101210-s

unusable as a government witness, has been sued civilly by the SEC, but has not yet faced criminal charges.

Bruce also occupies a low rung on the ladder of insider trading culpability generally. Indeed, except for the sensational context and the extraordinary profits realized by the Shvartsman brothers, it is easy to imagine this case being dealt with civilly by the SEC. For example, *SEC v. Holzer*, 22 Civ. 8342 (S.D.N.Y.), and *SEC v. Moraes*, 22 Civ. 8343 (S.D.N.Y.), involved illegal options trading and tipping by the manager and former COO of a family office in violation of an NDA, realizing illegal profits of $96,091 and $8,842 respectively. The defendants also unlawfully tipped two other traders, who realized profits of $672,000 and $65,332 respectively. Both matters were resolved through consent decrees and the defendants were not charged criminally.[2] *SEC v. Van de Grift*, 23 Civ. 1491 (S.D.N.Y), involved a tip by a consultant at a private equity firm to his friend concerning the firm's agreement to acquire a payment systems company, allowing the tippee to make a profit of $300,000.[3] The SEC entered a consent decree with the tipper, and neither defendant was charged criminally.[4] *SEC v. Dobkin*, 21 Civ. 9285 (N.D. Cal.), involved tips by the founder and chief technology officer of a semiconductor company concerning an impending merger,[5] allowing the tippees to make $325,000. The tipper entered a consent decree, and none of the defendants were charged criminally.[6] *SEC v. Iberger*, 22 Civ. 10565 (D. Mass), involved a tip by the CFO of a medical diagnostics company to his son and another individual in advance of the announcement of a distribution deal for a Covid-19 antibody test, allowing the tippees to make profits of $69,223.

---

[2] https://www.sec.gov/enforcement-litigation/litigation-releases/lr-25578
[3] https://www.sec.gov/enforcement-litigation/litigation-releases/lr-25645
[4] https://www.sec.gov/enforcement-litigation/litigation-releases/lr-25976
[5] https://www.sec.gov/enforcement-litigation/litigation-releases/lr-25275
[6] https://www.sec.gov/files/judg21-cv-09285dobkin.pdf

That matter, too, was resolved through consent decrees, and the defendants were not charged criminally.[7]

Of course, Bruce was charged criminally, he put the government to its proof, and he was convicted. However, Bruce is significantly less culpable than many of the insider trading defendants convicted in this and neighboring districts who all received sentences of two years or less.

**_United States v. Chow_, 17 Cr. 667 (S.D.N.Y).** Chow was the managing director of an investment holding company. Over a period of several months, he repeatedly tipped a business acquaintance confidential information concerning the progress of the company's potential purchase of a semi-conductor manufacturer. _United States v. Chow_, 993 F.3d 125, 129-34 (2d Cir. 2021). The tips violated two separate NDAs, and involved, among other things, tips concerning the signing and extension of exclusivity agreements, including, on one occasion, a text stating that he was "making a deal" and on another that "[w]e should already be signing the contract soon." _Id._ at 139-40. The tippee made over $5 million. _Id._ at 129.

In a written response to a FINRA inquiry, Chow admitted that the tippee was a former colleague and social acquaintance but falsely denied discussing the target company with him. _Id._ at 131.

Chow went to trial and was convicted. Judge Woods found it "very hard to say that someone with a Ph.D running a $1.5 billion private equity fund was a dope." _United States v. Chow_, 17 Cr. 667, Doc. 161, at 82. Nonetheless, he found that Chow's "decision to participate in this criminal activity was inconsistent with his broader record" and that the tippee "may have been the ringmaster here." _Id._, at 75. Judge Woods took into consideration "the many adverse

---

[7] https://www.sec.gov/enforcement-litigation/litigation-releases/lr-25368

collateral consequences" Chow had suffered and his responsibilities as "a father with a family with young children" and elderly parents. *Id.*, at 82-83. Judge Woods sentenced Chow to three months' imprisonment, far below the Guidelines range of 63 to 78 months. *Id.*, at 72, 84.

*United States v. Kosinski*, **16 Cr. 148 (D. Conn.).** Kosinski was a cardiologist who was a principal investigator in a clinical trial for a heart-related drug developed by a publicly traded biopharmaceutical company. *United States v. Kosinski*, 976 F.3d 135, 139 (2d Cir. 2020). He was also "a sophisticated stock trader with a portfolio exceeding $11 million." *Id.* And he was bound by a contract requiring him to disclose any holdings in the drug's developer in excess of $50,000. *Id.* In violation of this agreement, he acquired a position in the company of approximately $250,000. *Id.* On learning that the study would be suspended due to safety concerns, he sold stock ahead of the announcement and avoided a loss of $160,000. *Id.* Then, when informed that a patient had died and the study was to be suspended indefinitely, he bet against the company's stock, making a profit of $3,300. *Id.* Despite admitting to the FBI that his trades were based on "greed and stupidity," he went to trial, and was convicted. *Id.* The district judge (Bryant, J.) sentenced him principally to six months' imprisonment, *id.*, significantly below the Guidelines range of 33 to 41 months.

Another relevant analogue is this Court's sentence in *United States v. Glassner*, **22 Cr. 451 (S.D.N.Y).** In that case, an executive compensation consultant pled guilty to trading on material non-public information concerning an upcoming merger involving a client. He traded multiple times over two weeks and made a personal profit of $368,000. *Id.*, Doc. No. 24, at 21-22. The Court sentenced him to a year and a day, significantly below the Guidelines range of 30 to 37 months. *Id.* at 5, 26.

31

Other cases that involve vastly greater culpability than this one nonetheless resulted in sentences of two years' or less imprisonment. The most significant marker on this landscape is *United States v. Gupta*, **12 Cr. 4448 (S.D.N.Y.)**.

Gupta was a former managing director of McKinsey & Company serving on the board of Goldman Sachs. He repeatedly tipped Rajaratnam, a close friend and business partner, to highly confidential and market moving information. *United States v. Gupta*, 747 F.3d 111, 116-21 (2d Cir. 2014). Gupta first tipped Rajaratnam to news of Warren Buffet's $5 billion investment in Goldman—news that caused Goldman's stock to jump 7%. *Id.* at 117-19. He did so within minutes of leaving board meetings, and, in one instance, in a manner specifically timed to permit Rajaratnam to take advantage of the final minutes of trading ahead of the announcement. *Id.* at 117. Then, a month later, Gupta left another Goldman board meeting and tipped Rajaratnam to Goldman's impending report of a quarterly loss—the first quarterly loss Goldman had experienced since becoming a public company. *Id.* at 119-21. Rajaratnam discussed Gupta's tips on wiretapped calls, one of which the district court described as "reek[ing] of knowledge [and] intent." *Id.* at 125. The tips enabled Rajaratnam to make approximately $5 million. *Id.* at 118-19.

While Gupta did not himself trade on the inside information, his motivation for tipping Rajaratnam went beyond mere friendship. Indeed, Gupta and Rajaratnam were heavily invested—to the tune of millions of dollars—in each other's investment funds. *Id.* at 121. In short, this was a staggering and overwhelmingly willful betrayal of trust by an executive at the very top of the industry.

Gupta went to trial and was convicted. Judge Rakoff imposed a sentence of 24 months' imprisonment, far below the Guidelines range of 78 to 97 months. We would respectfully submit

that, if avoidance of sentencing disparity is to mean anything, the sentence imposed on Bruce must be significantly lower than that imposed on Gupta, whose culpability was so much greater.

Other cases also involve far greater culpability than that seen here.

***United States v. Stewart***, **15 Cr. 287 (S.D.N.Y).**  Stewart, an investment banker, tipped his father to multiple upcoming mergers while working at two different banks and lied to his bank's compliance department in the context of a FINRA inquiry.  *United States v. Stewart*, 907 F.3d 677, 680-84 (2d Cir. 2018).  Stewart's tipping continued even after meeting with—and lying to—the compliance department at his first bank and allowed his father and his fathers' associates to reap $1.15 million in illegal profits.  *Id.* at 682.  Stewart testified at the first of his two trials and, at sentencing following his second trial, Judge Rakoff found that he had "engaged in knowing, intentional, purposeful, wholly unnecessary misconduct for years." *United States v. Stewart*, 15 Cr. 287 (S.D.N.Y.), Doc. No. 366, at 32.  Judge Rakoff sentenced Stewart to 24 months' imprisonment, far below the Guidelines range of 51 to 63 months.  *Id.* at 5, 34.

***United States v. Buyer***, **22 Cr. 397 (S.D.N.Y.).**  Steven Buyer, a former Congressman, misappropriated confidential information obtained through his consulting work in two separate schemes over two years, netting a $350,000 personal gain.  Buyer went to trial, testified, and was found to have "lied on the witness stand." *Id.*, Doc. No. 178, at 38-40.  Judge Berman sentenced him to 22 months' imprisonment, below the Guidelines range of 33 to 41 months.  *Id.* at 99.

***United States v. Blaszczak***, **17 Cr. 357 (S.D.N.Y.).**  Christopher Worrall, a CMS employee, repeatedly tipped confidential government information in expectation of job following government service, allowing traders to make $7 million.  Judge Kaplan sentenced him to 20 months' incarceration following trial, down from a Guidelines range of 78 to 97 months.

*United States v. Whitman*, **12 Cr. 125 (S.D.N.Y.).**  Whitman was a sophisticated investment professional who ran Whitman Capital, LLC.  As the district court summarized the evidence, "[t]he jury found that Whitman traded, or conspired to trade on, material non-public information related to three companies, Google, Inc., Polycom, Inc., and Marvell Technology Group, Ltd.  He relied on two intermediary direct tippees … to cultivate sources inside these company's and to serve as conduits for inside information."  *United States v. Whitman*, 115 F. Supp. 3d 439, 446 (S.D.N.Y. 2015).  Whitman's scheme extended over several years and his firm earned more than $900,000 in illegal profits.  Whitman testified at trial and was found to have "repeatedly perjured himself."  Sent. Tr., Jan. 24, 2013, at 4.  Judge Rakoff sentenced Whitman to 24 months in prison, far below the Guidelines range of 51 to 63 months.

*United States v. Pinto-Thomasz*, **18 Cr. 579 (S.D.N.Y.).**  Pinto-Thomasz, a credit ratings analyst at Standard & Poor's Global Ratings, tipped two friends to confidential information obtained in his work for the Sherwin-Williams Company on its anticipated acquisition of the Valspar Company.  The tips enabled the tippees to make approximately $300,000 in profits, and Pinto-Thomasz received an envelope containing $7,500 in cash as a kickback, representing 10% of one of this tippee's after-tax profits.  Later, in response to a FINRA inquiry, Pinto-Thomasz falsely denied knowing the tippees.  Two years later, Pinto-Thomasz passed a second tip concerning an upcoming merger to one of his original tippees.  Pinto-Thomasz went to trial and was convicted, putting on an alternative tipper defense that he admitted at sentencing lacked any basis.  18 Cr. 579, Doc. No. 154, at 6.  Judge Rakoff sentenced Pinto-Thomasz to 14 months' imprisonment, significantly below the Guidelines range of 33 to 41 months.  *Id.* at 13, 41-44.

**F.**    **Deterrence Does Not Require A Long Sentence**

We respectfully submit that there is no further need for specific deterrence in this case. Bruce is a middle-aged professional with no prior criminal history. He is unlikely to ever again sit on the board of a public company or work in the financial industry. He is chastened by the experience of being charged, tried, and convicted. He has learned his lesson and never wants to go through anything similar again.

While the goal of general deterrence may call for *some* period of incarceration, it does not follow that a lengthy prison sentence is necessary. Indeed, "there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (Rakoff, J.). "[C]ommon sense suggests that most business executives fear even a modest prison term to a degree that more hardened types might not. Thus, a relatively modest prison term should be 'sufficient, but not more than necessary,'" to achieve general deterrence. *Gupta*, 904 F. Supp. 2d at 355.

This common-sense judicial insight is supported by a 2016 publication by the National Institute of Justice summarizing the state of empirical research on deterrence. In that publication, *Five Things About Deterrence*, the NIJ, the research and evaluation arm of the Department of Justice, explains that short prison sentences may act as a deterrent to future crime, but that increasingly lengthy prison sentences produce "at best a very modest deterrent effect." As the NIJ reports, "[r]esearch underscores the more significant role that certainty [of being caught and punished] pays in deterrence than severity [of sentence]."[8]

---

[8] https://nij.ojp.gov/topics/articles/five-things-about-deterrence#%E2%80%9Cincreasing-the-severity-of-punishment-does-little-to-deter-crim

**G.      The Collateral Effects Of Bruce's Conviction And Punishment**

In considering a just punishment, we would urge the Court to consider not just the effect of imprisonment on Bruce but also the collateral consequences Bruce has already suffered and will continue to suffer:  the loss of reputation, the loss of his ability to work in his industry, the anguish and shame of being criminally prosecuted.  These consequences are not unique to white collar defendants or those who have achieved a measure of success in life.  But they arguably fall heaviest on those with no prior involvement in the criminal justice system.

On this point, Carl de Jounge explains what we all know to be true:

> As someone who has worked my entire career in the investment industry, I know that Bruce's legal predicament has already permanently and severely damaged his reputation and remainder-of-life earnings power. Even being charged with securities fraud is likely career ending, and a conviction following a highly publicized trial makes him effectively unemployable in the industry.

(Exhibit E).

We would also urge the Court to consider the effect that a prolonged period of imprisonment will have on those nearest to Bruce:  his elderly mother, his two college-age children, and, perhaps most importantly, his fiancée, Deirdre, and their unborn daughter.

Bruce's brother, Jeff, writes:

> Bruce has also been a huge support for our mother.  I have lived on the West coast for several decades, and Bruce is the main supporter of our mother helping her navigate the modern world and involving her in his family and children.  Through Bruce's help, support and interest he has provided our mother with a bigger and more rewarding daily life and helped to keep her physically and emotionally healthy for many years.

(Exhibit C).

> Bruce's mother, Lynn, writes:
>
> I close with how sad and terribly concerned I am as Bruce's mother.  He is deeply anxious about the uncertainty of his life going forward.  He does not know what the future holds.  He does not know how

he will provide for his family.  He is worried about how this case will affect his family, including Dierdre and me.  I am 81, in the twilight of my life.  I will not always be able to travel to see Bruce if he is in a prison far away.

(Exhibit B).

Most poignantly, Bruce's fiancée, Deirdre, describes the impact of the case on Bruce and on herself and their unborn child and makes a direct plea for the Court's mercy:

> The events leading to Bruce's conviction have been devastating for all of us. Professionally, Bruce has lost consulting jobs, his CFA license, and the trust of financial institutions and his professional community. He has faced immense financial, occupational, and emotional hardships, with his reputation irreparably damaged. However, the impact of Bruce's conviction has extended far beyond his professional life. We had planned to buy our first home together and get married in Ireland, where he would finally meet my family. Unfortunately, the devastating blow of his conviction has meant that our plans to move on with our lives are now indefinitely on hold.

> Adding to our stress, I became pregnant through IVF just before Bruce's trial, after two years of trying to conceive. While we were initially filled with joy and optimism, our happiness quickly turned to anxiety and despair following the outcome of the trial.  As a first-time mother-to-be, I am deeply concerned about the future. I have no family in the United States and, having only lived in Florida for two years, my social support is minimal. I am due to give birth in early January and cannot imagine raising our child without Bruce by my side. The prospect of facing this alone is overwhelming.

> I am a licensed neuropsychologist and assistant professor at the University of Miami, a position I have worked incredibly hard to attain. However, without Bruce's support, it will be difficult for me to balance my career and the care of our unborn child, who deserves the presence and active love and support of both parents.

> My hope for some solace comes from the moment I recall in the courtroom when you read out the jury instructions, asking the jury not to be swayed by any potential punishment in their decision, as ultimately it would be at your discretion to decide on a suitable punishment.  I am now imploring you to use that discretion to determine that incarcerating Bruce would not be a suitable punishment and to consider the profound impact such a punishment would have on his family.

> Bruce is a good man who has already suffered significantly. He has faced financial ruin, professional disgrace, and emotional turmoil for the past two years. He has lost friends and opportunities, and his ability to provide for his family has been severely compromised. I am pleading with you to impose a punishment that allows Bruce to remain with his family, particularly as we welcome our child into the world.

(Exhibit A).

## H.    Forfeiture

In view of his conviction, Bruce intends to forfeit the proceeds of his trading before his sentencing proceeding.  Counsel has been in communication with the government to arrange for the transfer of funds in the most prompt and efficient manner.

## I.    The Probation Officer's Recommendation

We are grateful for the probation officer's thorough pre-sentence investigation and considered recommendation of a sentence of 36 months' imprisonment.  (PSR, at 43).  For the reasons outlined above, we believe this recommendation represents a greater than necessary punishment given the facts of this case and the sentences imposed in analogous cases within this Circuit.

That said, the probation officer's explanation for his recommendation is highly pertinent. As the probation officer notes, "[i]t is uncommon for the probation officer to recommend a variance" in cases such as this one.  (PSR, at 42).  Nonetheless, "the probation office contends that Garelick's case is atypical given the details of the offense, his role in the offense, and the minimal amount gained … when compared with his co-defendants and the co-conspirators." (*Id.*).  As the probation officer explains, "[i]t is reasonable to believe that Garelick was placed in an awkward position when Michael Shvartsman, his employer" arranged for his appointment to the DWAC board.  (*Id.*, at 41).  The probation officer notes that "[a]lthough no mitigating-role adjustment was applied … available facts show that Michael Shvartsman was the facilitator of

38

the offense, as he negotiated Garelick's appointment to the DWAC board of directors[.]" (*Id.*).

Accordingly, "it would be difficult to accept [Garelick] being sentenced to a longer term of

imprisonment than Michael Shvartsman, considering that Shvartsman was the facilitator of the

offense who gained, by far, the largest amount of funds from the offense." (*Id.*, at 42).   Indeed,

the probation officer notes that "it can be reasonably argued that [Garelick] was the least

culpable [of the three defendants] when comparing the amount of ill-gotten gain derived from the

offense, which is the primary goal of insider trading." (*Id.*, at 41).  The Probation Department

ultimately recommended a sentence 10 months shorter for Bruce than it did for Michael

Shvartsman, reflecting the office's view of their relative culpability.

## CONCLUSION

Bruce's co-defendants, Michael Shvartsman and Gerald Shvartsman, have been

sentenced to 28 months and 22 months' imprisonment.  We respectfully submit that for all the

reasons outlined in this memorandum, Bruce is the least culpable of the three and ask that the

Court sentence him accordingly.

Dated:      October 24, 2024
            New York, New York

                                               Respectfully submitted,

                                               /s/ Jonathan P. Bach

                                               Jonathan P. Bach
                                               Alexandra A.E. Shapiro
                                               Julian S. Brod
                                             Jason A. Driscoll
                                             SHAPIRO ARATO BACH LLP
                                           1140 Avenue of the Americas, 17th Floor
                                           New York, NY 10036
                                           (212) 257-4880

                                           *Counsel for Bruce Garelick*