

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 31, 2024

**BY ECF & EMAIL**

The Honorable Lewis J. Liman
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

      Re:   *United States v. Bruce Garelick*, S1 23 Cr. 307 (LJL)

Dear Judge Liman:

      The Government respectfully submits this memorandum in advance of the November 7, 2024 sentencing for defendant Bruce Garelick.

      The defendant was a director of Digital World Acquisition Corporation ("DWAC"), a publicly traded company. He was entrusted with valuable, confidential information about a potential merger between DWAC, a blank-check SPAC, and Trump Media. He then violated his duties to DWAC and misappropriated the inside information he obtained from DWAC to help his employer, Michael Shvartsman, make more than $18 million illegally trading in DWAC warrants. And he engaged in his own smaller-stakes insider trading, cutting himself in on the action. The defendant egregiously violated the duty of trust he owed as a public company director, a duty that he was well aware of as a long-standing financial professional who previously ran his own hedge fund. There is no explanation for the defendant's conduct besides ingratiating himself to his boss, without care for the consequences.

      Compounding matters, the defendant chose to testify at his own trial and lie. He concocted fanciful explanations for his and his employer's trading—for example, that he and Michael Shvartsman were executing a long-planned options strategy based on the Black-Scholes model—that not only contradicted the evidence presented to the jury, it also contradicted additional evidence the jury did not see, such as the notes of a Rocket One Capital employee stating that Shvartsman told him they purchased the DWAC warrants because DWAC's target was Trump Media, not because of some generic options strategy.

      For the reasons set forth below, the Government respectfully submits that a sentence of at least the 36 months' imprisonment, as recommended by the Probation Office, would be sufficient but not greater than necessary in light of the defendant's conduct.  Such a sentence would be a substantial downward variance from the applicable Guidelines Range of 97 to 121 months' imprisonment.

**I. Background**

    **A.    The Offense Conduct**

In or about June 2021, the defendant worked for Michael Shvartsman's venture capital firm, Rocket One Capital. The defendant held several titles, including Chief Strategy Officer and Chief Investment Officer.

At that time, DWAC's CEO, Patrick Orlando, approached Michael Shvartsman to pitch him to invest in DWAC, Orlando's new special purpose acquisition corporation, or "SPAC." Orlando came to Michael Shvartsman's offices in South Florida to present to Shvartsman and his brother, Gerald Shvartsman, in person. As Rocket One's Chief Investment Officer and an advisor to Michael Shvartsman, Bruce Garelick participated in at least one of these early pitch meetings by phone.

Unlike most blank-check SPACs, whose investors are generally unaware of potential merger targets, this pitch included the possibility of a desirable target. Orlando explained to Garelick and the Shvartsmans that Orlando had an existing business relationship with former President Donald J. Trump through another SPAC Orlando had established, Benessere. Orlando told Garelick and the Shvartsmans that, rather than Benessere, DWAC might be the company to profit from this relationship and could potentially merge with Trump's company, Trump Media and Technology Group, which owned the Truth Social social-media company.

Before receiving this highly confidential, highly valuable information, Garelick received confidentiality agreements with both DWAC and Benessere. Garelick executed those agreements. These confidentiality agreements stated, in sum and substance, that the defendant could use the information provided by Orlando only to decide whether to invest directly in the SPAC, that Garelick could not disclose material non-public information he learned from Benessere or DWAC to others, and that he could not use it to engage in securities trading on the open market.

Following the pitch meeting, Michael Shvartsman worked to assemble a consortium of investors in the SPAC. Garelick led the task of gathering this investment syndicate. Together, the group Garelick helped bring together invested millions in legitimate pre-IPO purchases of DWAC securities. In exchange for building this syndicate, Orlando granted Michael Shvartsman a DWAC board seat, and Shvartsman arranged for Garelick to be named as a director-nominee of DWAC board of directors. Shvartsman intended that, as a director, Garelick would tend to the Shvartsman brothers' investments and ensure that they would profit by focusing on the potential DWAC-Trump Media merger and informing Shvartsman of the negotiations' progress.

Garelick understood the tremendous possible upside to DWAC merging with TMTG. His positioning on the board would allow Garelick to ensure that DWAC completed this merger or, at a minimum, to have advance notice if the merger were obstructed. If the DWAC-TMTG merger did not occur, Garelick and Shvartsman intended to exercise the redemption rights included in the DWAC founders' shares. (GX 742.) These redemption rights, which were triggered by a number of events including a dissatisfactory merger, would allow Rocket One to redeem its initial investment at cost. As Garelick and Svhartsman saw it, this feature of the founders' shares position gave "downside protection." (GX 723.)

As DWAC went public in an initial public offering in September 2021, Rocket One acquired additional units in the IPO. Garelick and Shvartsman decided to approach their DWAC investments as "short term trader[s]," focused on capturing immediate profit with a merger announcement. (GX 745.) As a result, IPO units and, later, freely trading DWAC warrants were more desirable as compared to DWAC founder shares, which were subject to a lockup period.

As a director of now-public DWAC, Garelick learned additional material non-public information about DWAC's negotiations with Trump Media. Garelick violated his duties as a director and tipped others. For example, Garelick learned confidential information about the status of merger negotiations between DWAC and Trump Media, the timing of a letter of intent and merger agreement, deal terms, and a likely closing date. After learning this material non-public information through his role on DWAC's board, Garelick provided updates to Michael Shvartsman about the status of the DWAC-Trump Media merger negotiations and the timing of a public merger announcement. Garelick encouraged Michael Shvartsman and another insider, Eric Hannelius, to purchase additional DWAC warrants in the open market. Michael Shvartsman, in turn, passed Garelick's information on to Gerald Shvartsman. Both Michael Shvartsman and Gerald Shvartsman tipped others.

Garelick himself also made open market trades in DWAC. Between September 3, 2021 and September 23, 2021, Garelick placed six orders to buy a total of 5,320 DWAC units.

For each of these six trades, Garelick possessed material nonpublic information. By the last trade, Garelick had already attended a DWAC board meeting, in which the board resolved to negotiate a letter of intent with TMTG. (GX 118.) The day before Garelick's final DWAC purchase, the board (including Garelick) voted in favor of pursuing an exclusive letter of intent with TMTG. (GX 511.) And the letter of intent was signed the same day. With full knowledge of all this material, highly confidential information, Garelick executed his final purchase of DWAC units.

Garelick also never filed the necessary forms disclosing these trades, which he conducted as DWAC insider.

As for Garelick's tips to Michael Shvartsman, starting September 20, 2021, the day before the first DWAC board meeting, Garelick messaged Shvartsman to remind him to purchase more DWAC securities. (GX 962.) He continued to update Shvartsman as the merger agreement moved closer to signature. On October 1, 2021, Shvartsman placed an order to purchase 2 million DWAC warrants. Unlike DWAC shares, these warrants would expire worthless if DWAC failed to complete a merger and wound down.

And with respect to Garelick's tips to Hannelius, Garelick advised Hannelius to buy DWAC securities. In doing so, Garelick conveyed information concerning the timing of the merger agreement. Garelick told Hannelius the merger agreement was expected to be signed in six to ten weeks, material nonpublic information that the deal would take place much faster than is typical practice with SPACs.

Garelick's insider trading sparked a chain of tipping through Michael Shvartsman, whose tippees included his brother, Gerald Shvartsman. Gerald Shvartsman also tipped two of his

employees, who made their own tips. As the conspirators stockpiled DWAC warrants and shares, the public was entirely ignorant of DWAC's merger target. To the market, DWAC was just like many blank-check SPACs with unknown merger prospects.

On October 20, 2021, after the close of trading, a spokesperson for former President Trump posted a press release to Twitter announcing the planned merger of DWAC and Trump Media. After the public announcement of the DWAC-Trump Media merger agreement, the share and warrant prices of DWAC skyrocketed. DWAC warrants went from trading for less than a dollar prior to the merger announcement to a daily high of $14.49 on October 21 and a daily high of $79.22 on October 22. This was a more than 18,000% increase in a two-day span.

The day after the prospective merger was announced, as the market opened, Michael Shvartsman and his conspirators sold their stores of illegally purchased securities. Michael Shvartsman and Bruce Garelick sold the Rocket One DWAC warrants for approximately $18.2 million in illegal profits. Bruce Garelick sold the DWAC securities he had purchased directly on the open market for profits of approximately $49,702. On October 21, 2021, Garelick texted his now fiancée, "Big day today – my Trump SPAC traded up 400% today! We made $20 mil on it. The New York Times called me for comment . . . which I said no comment. Not publicity I need. Hahah!" (GX 751).

In total, the tipping chain from Bruce Garelick and his co-defendants netted nearly $40 million in illegal profits—a gargantuan sum. *Cf. United States v. Rajaratnam*, 09 Cr. 1184 (RJH) (attributing approximately $66 million in gains to Raj Rajartanam's insider trading scheme).[1] This figure includes Michael Shvartsman's friend and co-investor, Anton Postolnikov, who sold his open-market DWAC securities for a profit of approximately $14.5 million, and Hannelius, who sold his DWAC securities for illegal profits of approximately $168,000.

B.  **The Defendant's Trial**

On February 6, 2024, the defendant was charged in the S1 superseding indictment (the "Indictment") in seven counts: one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 (Count One), five counts of Title 15 securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5 (Counts Two, Three, Four, Six, and Seven), and one count of Title 18 securities fraud, in violation of 18 U.S.C. § 1348 (Count Ten).

On April 29, 2024, the defendant's jury trial began. At trial the Government proceeded on five of the Indictment's counts.[2] The Government called fifteen witnesses. The defense called two

---

[1] The loss amount in the PSR of approximately $18.5 million (PSR ¶¶ 45, 54), reflects the profits attributable to the defendant personally, to Michael Shvartsman, and to Eric Hannelius as the fair approximation of "reasonably foreseeable pecuniary" loss attributable to the defendant. *See* U.S.S.G. § 2B1.1, application note 3(A)(iv).

[2] The Government did not seek a jury verdict on the substantive insider trading charges relating to Gerald Shvartsman's insider trading and Aric Gastwirth's insider trading.

witnesses, and Garelick also testified in his own defense. On May 9, 2024, the jury returned its verdict, convicting Garelick of all five counts.

## II. The Sentencing Guidelines and Section 3553(a) Factors

The Sentencing Guidelines promote the "basic aim" of "ensuring similar sentences for those who have committed similar crimes in similar ways," *United States v. Booker*, 543 U.S. 220, 252 (2005), and so "to secure nationwide consistency, the [Sentencing] Guidelines should be the starting point and the initial benchmark," *Gall v. United States*, 552 U.S. 38, 49 (2007). Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

## III. An Enhancement for Obstruction of Justice is Appropriate, and the Applicable Guidelines Range is 97 to 121 Months Imprisonment

Probation has calculated an offense level of 31, which is based on applying Section 2B1.1 of the Sentencing Guidelines. (PSR ¶¶ 51-62.) The Government respectfully submits that, because each of the defendant's counts of conviction relate to his participation in an insider trading scheme, the appropriate Guideline for all five counts of conviction is 2B1.4, which relates to insider trading offenses.

Although Appendix A to the Guidelines refers convictions under 18 U.S.C. § 1348 to Section 2B1.1, Section 2B1.1 states that where "the conduct set forth in the count of conviction establishes an offense specifically covered by another Guideline in Chapter Two," Courts are to calculate the Guidelines pursuant to the more specific Guideline. U.S.S.G. § 2B1.1(c)(3). Section 2B1.4 is the Guideline for insider trading offenses, and the background notes to that section

provide that, in addition to applying to violations of Rule 10b-5, Section 2B1.4 also applies to "[c]ertain other offenses . . . that involved misuse of inside information for personal gain."

Applying Section 2B1.4 to Garelick's Section 1348 conviction is consistent with the approach taken by other judges in this district. *See United States v. Chastain*, No. 22 Cr. 305 (JMF), Dkt. No. 159, at 5-6 (applying Section 2B1.4 to 18 U.S.C. § 1343 wire fraud conviction in scheme involving insider trading in NFTs); *United States v. Wahi*, No. 22 Cr. 392 (LAP), Dkt. No. 100, at 3 (applying 2B1.4 to Section 1343 wire fraud conviction in scheme involving insider trading in crypto assets); *United States v. Blaszczak*, No. 17 Cr. 357 (LAK), Dkt. No. 412, at 11 ("2B1.1(c)(3) in my judgment warrants the application of 2B1.4") (vacated on other grounds).

With Section 2B1.4 as the applicable Guideline for all five of Garelick's counts of conviction, the Government calculates an offense level of 30, as follows:

1. The Counts of conviction are grouped together, pursuant to U.S.S.G. § 3D1.2(d).

2. Pursuant to U.S.S.G. § 2B1.4(a), the base offense level is 8.

3. Pursuant to U.S.S.G. §§ 2B1.4(b)(1) and 2B1.1(b)(1)(K), 20 levels are added, as the total gain was approximately $18.5 million, which is greater than $9.5 million and less than $25 million.

4. Pursuant to U.S.S.G. § 3B1.3, 2 levels are added because the defendant abused a position of trust, as a director of a publicly traded company at the time of the offense.

5. Pursuant to U.S.S.G. § 3C1.1, 2 levels are added because the defendant obstructed justice by offering perjurious testimony at trial.

6. Pursuant to U.S.S.G. § 4C1.1, the offense level is reduced by 2 levels because the defendant is subject to the "Zero-Point-Offender" reduction.

Garelick has no criminal history and is subject to a Criminal History Category of I. Given an offense level of 30 and a Criminal History Category of I, Garelick is subject to a Guidelines Range of 97 to 121 Months' Imprisonment. The defendant mostly does not appear to contest the gain applicable or that he is entitled to an enhancement due to his role as a director. However, Garelick asserts that an obstruction of justice enhancement should not be applied. (PSR at 38.)

U.S.S.G. § 3C1.1 provides for a two-point increase in offense level where a defendant "willfully obstruct[s] or impede[s], or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution or sentencing of the instant offense of conviction." The application notes to the provision make clear that the enhancement applies when a defendant "commit[s], suborn[s], or attempt[s] to suborn perjury." U.S.S.G. § 3C1.1, Application Note 4(B).

"[A] defendant's right to testify does not include a right to commit perjury." *United States v. Dunnigan*, 507 U.S. 87, 96 (1993). "Under a proper determination that the accused has

committed perjury at trial, an enhancement of sentence is required by the Sentencing Guidelines." Id. at 98. "To base a § 3C1.1 enhancement for 'Obstructing or Impeding the Administration of Justice' upon the giving of perjured testimony, a sentencing court must find that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." *United States v. Salim*, 549 F.3d 67, 73 (2d Cir. 2008) (internal quotation marks and brackets omitted). Further, "[t]he facts necessary to support an obstruction-of-justice enhancement need be proven only by a preponderance of the evidence." *United States v. Cassiliano*, 137 F.3d 742, 747 (2d Cir. 1998). "In determining the intent with which a defendant acted, the district court is entitled to rely on circumstantial evidence and on all reasonable inferences that may be drawn from all of the evidence." *Id*.

As always, the "sentencing court is afforded broad discretion in resolving disputed factual issues." *United States v. Ambrosio*, 129 F.3d 114, 1997 WL 701368, at *2, n.1 (2d Cir. 1997) (summary order) (citing *United States v. Ibanez*, 924 F.2d 427, 430 (2d Cir. 1991)). The sentencing court "is entitled to rely on any type of information known to it" in resolving sentencing disputes. *United States v. Tracy*, 12 F.3d 1186, 1203 (2d Cir. 1993) (citing *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989)).

At trial, the defendant took the stand, swore to tell the jury the truth, and perjured himself many times. As examples of the defendant's perjury:

- Garelick testified that after his final purchase of DWAC securities on September 23, 2021, the "start of a drumbeat" began approaching material nonpublic information (Tr. 1241, 1259.) It was only after his final direct trade that "things were picking up." (Tr. 1246-47).

    o Garelick lied when he offered this testimony. As he testified, Garelick knew for some time that DWAC was a likely merger target, and Garelick's final purchase of securities took place after DWAC's board authorized, and DWAC signed, a mutually exclusive letter of intent with TMTG. (Tr. 1312).

- While Garelick acknowledged he was aware of a potential merger between TMTG and DWAC, he testified that he never knowingly traded while he was in possession of material nonpublic information and that he believed the information he had about the potential merger was immaterial. (Tr. 1250-52, 1306-07).

    o Garelick's testimony on this point was preposterous. As is clear from numerous exhibits and the trial testimony, the electric impact of the possibility of the TMTG merger was known to Garelick, the other board members, and the Shvartsmans. Once the merger announcement was made, the market reaction broadcast the power of this nonpublic information on investors. Garelick well understood what material nonpublic information and other insider trading terms meant. As he acknowledged in his testimony, Garelick "was well aware of the rules[,] in particular around material nonpublic information." (Tr. 1093). He testified that material information was information that would "have a meaningful impact on the stock. (Tr.

1093). Material nonpublic information was "sacred" and he "couldn't trade if [he] was in possession of it. . . . It was sacred and needed to be guarded carefully." (Tr. 1144). He testified that there's a "fairly clear definition of" material nonpublic information, and it would be prudent to stop trading when approaching it. (Tr. 1241). Garelick plainly knew better. He messaged a friend that he "wish[ed] he wasn't on the [board of directors]. Severely restricted what I could do." (GX 750). Garelick failed to disclose his subsequent insider trading purchase of securities, although he filed an initial Form 3 disclosing his opening position. (GX. 114A). Garelick was had a CFA certification and had been trained on, and passed tests relating to, identifying material nonpublic information and insider trading. Garelick's own failed financial firm had policies instituted by Garelick to ensure that employees did not engage in insider trading.

- Garelick testified that he never revealed material nonpublic information to others. (Tr. 1144).

  o Garelick lied when he offered this testimony. As described above, and as proven at trial, the defendant did so. Indeed, the jury's verdict requires the conclusion that Garelick did in fact share material nonpublic information with Michael Shvartsman and Eric Hannelius.

- Garelick testified that Rocket One's investment position in DWAC warrants was based on a Black Scholes model and an effort to arbitrage. (Tr. 1128, 1130-35).

  o Garelick lied when he offered this testimony. As the Court is aware, another Rocket One employee recorded notes that make clear that Rocket One's DWAC warrant position as based on the knowledge that TMTG was the merger target, not any legitimate investment thesis. (GX 477). And Garelick admitted that no notes or contemporaneous records exist to support the claim that he engaged in a Black-Scholes analysis to support buying DWAC warrants. (Tr. 1347). He also testified that Rocket One invested in no other SPACs, making clear that the position here was based on the valuable inside information, not any mappable investment thesis.

- Garelick testified that in the pre-IPO period, there was "no reality" to the prospect of DWAC merging with TMTG. (Tr. 1113-15.) Garelick otherwise minimized the belief he had that DWAC would merge with TMTG. (Tr. 1102-05).

  o Garelick lied when he offered this testimony. Numerous exhibits and trial testimony establish that Garelick believed DWAC's merger with TMTG was far more probable than his testimony indicated. Garelick repeatedly referred to DWAC as the "Trump SPAC" when he was assembling the investment syndicate. (GX 400, 402, 404, 405, 406, 408, 409, 742, 743). In a June 30, 2021 text message, while acknowledging there was "no guarantee," Garelick described DWAC as holding "an exclusive with the

> soon to launch Trump Media Group," with "huge" upside. (GX 743). And, also in June 2021, as Garelick submitted his paperwork to serve as a DWACT director nominee, Garelick proposed that Shvartsman's businesses could provide payment processing services for TMTG. (GX 412).

- Garelick testified that his direction to Hannelius, that DWAC's merger would be announced in six to ten weeks was a "loose guesstimate." (Tr. 1148).

  o Garelick lied when he offered this testimony. As trial witnesses, including Ben Reed, testified, six to ten weeks was extraordinarily fast for a newly IPO'd SPAC to announce a merger target. Garelick was able to provide this information because possessed material nonpublic information concerning DWAC's standing with TMTG. He knew that a merger announcement was imminent.

## IV. The Court Should Impose a Substantial, But Below-Guidelines Sentence of at Least 36 Months' Imprisonment

A sentence of imprisonment of at least 36 months' imprisonment, below the Guidelines range of 97 to 121 months' imprisonment, would be sufficient but not greater than necessary under the relevant Section 3553(a) factors.

### A. A Substantial Sentence Is Necessary in Light of the Nature and Seriousness of the Offense, the Need to Promote Respect for the Law, and the Need to Provide Just Punishment

A sentence of at least 36 months' imprisonment is necessary in light of the nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(1) & 3553(a)(2)(A).

The defendant, due to his wealth, status, and connections, was afforded an exclusive opportunity not available to ordinary investors. He was given the opportunity to make a pre-IPO investment in a SPAC with an inside track to merge with former President Trump's social medial company. That opportunity came to him through his role as the Chief Strategy Officer for Rocket One Capital, Michael Shvartsman's investment opportunity. Shvartsman tapped Garelick to assemble a consortium of investors in DWAC, and submitted him to DWAC as a director-nominee. DWAC accepted, as Garelick was named the director of a publicly traded company—a company he knew had an inside track to a merger with Trump Media. But these legal, exclusive opportunity was not enough.

Whether out of greed, losing sight of his moral compass, or merely, as the defendant suggests, caving to the implicit pressure of his employer, Garelick, working with Shvartsman, used the explosive, confidential information they obtained in connection with that investment opportunity to illegally add to Rocket One's profits by purchasing cheap, unrestricted open market

warrants that skyrocketed in value when the rest of the world learned what Garelick already knew was coming. And he advised Shvartsman's business associate, Eric Hannelius, to do the same.

The defendant breached his duties as a director of a publicly traded company. He misappropriated the confidential, valuable information that DWAC had entrusted to him. And he did so not only to help his employer make millions; he also decided to engage in a much smaller amount of illicit insider trading inconspicuously and on the side—netting himself approximately $50,000 in profit in his retirement account.

The defendant argues that he took no steps to conceal his actions (Def. Mem. 25-26), but ignores, for example, his decision not to file the Form 4s required for directors of publicly traded companies—forms, he acknowledged during his testimony, he knew were used to report insider sales by company insiders like directors. (Tr. 1360-61). Similarly, the defendant argues that that he disclosed his trades to *Rocket One's* general counsel (Def. Mem. 25) as evidence of his good faith. But that disclosure happened on October 19, 2021, weeks after his and Shvartsman's trades, and just the *day before* the Trump Media merger announcement, in a clear effort to create a post-hoc rationale for his and Shvartsman's trading. (DX 37). Indeed, Garelick *never* disclosed his trading to DWAC, the company he actually owed duties to as a director.

The defendant is a sophisticated financial professional. He ran his own hedge fund for years, after an already successful career in the financial industry working for name-brand firms like State Street and Adage Capital. He had passed the rigorous qualifications to hold himself out as a Chartered Financial Analyst. And, at the time of the offense conduct, he was the Chief Investment Officer of Rocket One—a flush investment firm. There was no motivation for this crime other than advancing the interests of his employer, Michael Shvartsman, and through his service to Shvartsman, himself.

Garelick knew better.

This corruption—wealthy individuals further illegally enriching themselves when they have already been presented with opportunities beyond the reach of ordinary investors—is within the heartland of the kind of serious securities fraud that warrants a substantial sentence. Insider trading of this form "creates [the] perception in the public including, among investors and would be investors, that the market is somehow rigged or, at the very least, that certain individuals who have more access to information have the upper hand in terms of making investment decisions both whether to buy or to sell." *United States v. Collins*, No. 18 Cr. 567 (VSB) (Jan. 17, 2020), Sent. Tr. at 87-88. Insider trading also "appropriate[s] some part of the returns … at the expense of other shareholders" and "tends to discourage corporate investment and reduce the economic efficiency of corporate behavior." Michael Manove, *The Harm From Insider Trading and Informed Speculation*, The Quarterly Journal of Economics (Nov. 1989). Because of the economic harm caused by insider trading, and because "[o]ur markets are … such an important part of the fabric of our economic life," it is important to "punish those who would hurt the integrity of that system." *United States v. Wong*, No. 22 Cr. 395 (ER) (Jan. 26, 2024), Sent. Tr. at 24. Moreover, in addition to harming investors and the stock market generally, Shvartsman's misappropriation of confidential information from DWAC harmed the company itself, which, as Judge Rakoff has described, is "the functional equivalent of stabbing [the victim company] in the back." *United*

*States v. Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012). In short, the serious nature of the harm of insider trading demands punishment.

In light of the seriousness of the offense and the harm it caused, a punishment that is just and commensurate with the defendant's conduct is required. As "insider trading is not only a sophisticated form of cheating but also a fundamental breach of trust and confidence … meaningful punishment is … necessary to reaffirm society's deep-seated need to see justice triumphant," and "[n]o sentence of probation, or anything close to it, could serve this purpose." *Gupta*, 904 F. Supp. 2d at 355.

The need for a substantial sentence is only enhanced here by the defendant's decision to lie, under oath, to the jury at his trial.

The defense contends that the defendant was entitled to present his "version of events" to the jury. (Def. Mem. at 20-22). But the defendant did not merely take the stand to say he was innocent and did not act with a guilty mind. Rather, he chose to perjure himself blatantly and repeatedly. To take just one of the several examples discussed *supra*, Garelick concocted a false explanation for his trading plan with Shvartsman. Garelick tried to convince the jury that he and Shvartsman had decided, independent of knowing that Trump Media was a DWAC target, to trade in DWAC warrants, and DWAC warrants alone, as an options strategy based on the generic Black Scholes model applied to SPAC warrants like DWAC's. He produced no notes or emails of any Black Scholes calculation. And, as the Court is aware, that explanation is contrary not only to all the evidence the jury saw and convicted him of, but it also contradicted the evidence they did not see, such as that Rocket One employees were hearing on October 15, days *before* the merger announcement that Shvartsman and Garelick "bought 2m warrants b/c target is trump media." (GX 477).

This kind of brazen attempt to subvert the truth-seeking function of the justice system warrants additional punishment. Garelick willfully and intentionally gave false testimony as to a material matter—the reason for the Rocket One trades—with the specific purpose of misleading the jury and obstructing justice. He did so not only with respect to that matter, but with respect to all the other lies discussed *supra*. His perjury qualifies for the obstruction enhancement under § 3C1.1.

The defendant also suggests that he was pressured to commit the crime in order to please his boss and advance his professional position. But this attempt to place culpability for Garelick's crimes on Shvartsman rings hollow. The fact that, according to the PSR, Garelick continues to work for Shvartsman even now, three years after the crime, casts serious doubt on Garelick's claim that he was forced into an awkward position by a demanding boss.

Justice requires that Garelick be punished with a substantial incarceratory sentence.

### B. Deterrence Warrants an Incarceratory Sentence

General deterrence also supports the imposition of a substantial sentence. *See* 18 U.S.C. § 3553(a)(2)(B). The Second Circuit and courts in this district have noted the appropriateness of

significant sentences in the context of financial crimes, including specifically insider trading, committed by defendants who make the calculation that white collar crime is "a game worth playing." *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (quoting district court and affirming sentence of 66 months' imprisonment for insider trading offense); *Gupta*, 904 F. Supp. 2d at 355 ("As this Court has repeatedly noted in other cases, insider trading is an easy crime to commit but a difficult crime to catch. Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail."). Indeed, research shows that enforcement actions and punishment for insider trading is effective for achieving deterrence. *See, e.g.*, Fernan Restrepo, *The Impact of Insider Trading Doctrine on the Incidence of Insider Trading: An Analysis of the Effect of the Misappropriation Theory* (Nov. 8, 2023), https://ssrn.com/abstract=4627327 (finding that the adoption of the misappropriation theory of insider trading had a meaningful deterrent effect); Robert Davidson and Christo Pirinsky, *The Deterrent Effect of Insider Trading Enforcement Actions*, Accounting Review (May 2021) (concluding that insider trading convictions have a statistically significant effect on deterrence of future insider trading). And, as the Eleventh Circuit has noted, in passing the Sentencing Reform Act, "Congress was especially concerned that prior to the Sentencing Guidelines, [m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006); *see also id.* ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.").

For those reasons, it is important here to impose a sentence that will deter future insider trading. While a "relatively modest prison term" may be sufficient in some cases, non-incarceratory sentences "totally fail to send this message." *Gupta*, 904 F. Supp. 2d at 355. The potential messages that could be inferred from this case, depending on the sentence, illustrate the point. If, on the one hand, Shvartsman is sentenced to a term of incarceration, and one commensurate with the defendant's conduct, it will send a message to other individuals with access to confidential information that insider trading will result in prison time. But, on the other hand, a noncustodial or brief sentence may result in the wrong message: that insider trading is not serious or, even worse, that individuals with privileged access to confidential information are able to use their advantages to escape meaningful consequences. The fact that this case has resulted in press coverage does not alone serve a deterrent purpose. *United States v. Cutler*, 520 F.3d 136, 171 (2d Cir. 2008). Instead, "because the case had attracted an unusually large amount of publicity," it "could have a powerful general deterrent effect." *United States v. Ulbricht*, 858 F.3d 71, 94 (2d Cir. 2017).

In sum, deterrence is important in this case. Without a significant sentence attached to insider trading, the relative simplicity of committing the crime and the challenge of detecting it would incentivize those similarly situated to the defendant to engage in similar conduct. Shvartsman's sentence must also therefore reflect an emphasis on general deterrence that is commensurate with the difficulty of detecting and proving illegal insider trading. As Judge Rakoff cautioned in *Gupta*, defendants situated similarly to the defendant must be made aware that "when you get caught, you will go to jail." 904 F. Supp. 2d at 355. Only a serious sentence, one that

Case 1:23-cr-00307-LJL    Document 237    Filed 10/31/24    Page 13 of 15

Page 13

sends the message that insider trading will result in prison time, would adequately ensure that those who would be tempted by a similar path understand the true consequences of such conduct.

### C. A Sentence of at Least 36 Months' Imprisonment Is Necessary to Avoid Unwarranted Sentencing Disparities

Relative culpability and the defendant's personal characteristics also warrant a substantial sentence. "In imposing a sentence, the district court is required to consider, among other things, 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008) (quoting 18 U.S.C. § 3553(a)(6)). As the Second Circuit has repeatedly observed, however, sentencing disparities are not "unwarranted" where defendants are not "similarly situated." *United States v. Wills*, 476 F.3d 103, 109-10 (2d Cir. 2007).

Here, when comparing the defendant's case to other insider trading defendants *nationwide*, or at least across this district, the need to avoid unwarranted sentencing disparities requires the imposition of a substantial incarceratory sentence.

Most insider trading defendants are sentenced to prison. This includes defendants, who, like Garelick, did not make the millions in profits personally that his co-conspirators made. *See, e.g.*, *United States v. Viggiano*, No. 23 Cr. 497 (VEC) (defendant who received approximately $35,000 in kickbacks for illegal tips sentenced to 28 months' imprisonment following guilty plea); *United States v. Forlano*, No. 23 Cr. 497 (VEC) (defendant who realized approximately $100,000 in profits from insider trading scheme sentenced to 13 months' imprisonment following guilty plea); *United States v. Markin*, No. 22 Cr. 395 (ER) (tipper in insider trading scheme who realized profits of approximately $80,000 sentenced to 15 months' imprisonment following guilty plea); *United States v. Bhardwaj*, No. 22 Cr. 398 (GHW) (defendant sentenced to 24 months' imprisonment following guilty plea); *United States v. Kakkera*, No. 22 Cr. 398 (GHW) (18 month sentence after guilty plea); *United States v. Dikshit*, No. 21 Cr. 760 (CM) (defendant sentenced to 24 months' imprisonment following early guilty plea); *United States v. Malnik*, No. 19 Cr. 714 (VM) (defendant sentenced to 30 months' imprisonment following guilty plea); *United States v. Collins*, No. 18 Cr. 567 (VSB) (tipper sentenced to 26 months' imprisonment following guilty plea). And insider trading defendants who choose to obstruct justice by lying to the jury during their trials face serious jail time. *See United States v. Buyer*, No. 22 Cr. 397 (RMB) (defendant who realized approximately $476,000 in profits in insider trading scheme sentenced to 22 months' imprisonment following trial where court found defendant lied on the witness stand).

The Government seeks a sentence of 36 months' imprisonment, above the 28-month and 22-month sentences the Court imposed on Garelick's co-defendants, Michael and Gerald Shvartsman. To be sure, the defendant did not personally gain anywhere near as much as his co-defendants. But, as the Court has already noted in sentencing those defendants, it is not merely the numerical profit calculation that drives the appropriate sentence under Section 3553(a). Here, while the defendant made only $50,000 in profits—a tidy sum—he engaged in this conduct as a well-versed financial professional who was the sitting director of a publicly traded company. And he helped Michael Shvartsman make over $18 million in illegal profits in his position as Rocket One's Chief Investment Officer. Notwithstanding Garelick's efforts to shift blame to DWAC's

lack of training or the purported misdeeds of other, he was fundamentally in a different position than the Shvartsmans by virtue of his board seat and his duties to DWAC and its shareholders.

That said, in the absence of any additional information, the Government agrees that, purely from the position of offense conduct, Garelick is less culpable than Michael Shvartsman and no more culpable than Gerald Shvartsman. However, unlike the Shvartsmans, Garelick chose to obstruct justice by committing perjury on the stand in a federal courtroom. He did so in numerous ways, over and over, in a calculated effort to subvert the truth-seeking function of the trial. That additional misconduct places him in a different position than his co-defendants.

Moreover, unlike Michael and Gerald Shvartsman, the defendant is a U.S. citizen and is thus eligible to serve his prison time at a federal camp, not a correctional facility, is eligible for release to residential reentry facility, and does not face the deportation immigration consequences they face, all collateral consequences the Court factored in when deciding the appropriate sentences for the Shvartsmans.

The defendant's submission also tries to cast blame on others who have not faced criminal consequences, including Marc Wachter, Patrick Orlando, and Anton Postolinkov, repeating his trial defense about a hypothetical alternate tipping chain through Wachter or Orlando, and suggesting the Government may now give some credence to that theory. (Def. Mem. at 14-17). To be clear, the Government maintains this defense is ludicrous and has seen no evidence supporting it.[3] As Wachter testified to credibly at trial, Wachter never traded in open-market DWAC securities and engaged, with Orlando's knowledge, in private transactions that later hurt Wachter's ability to profit on the DWAC – Trump Media merger news. ████████ The defendant's attempt at misdirection should be ignored.

The defendant also points to uncharged downstream remote tippees such as Gastwirth, Hannelius, Lopez Torres, and Suissa in assessing relative culpability. (Def. Mem. at 28). None of these individuals sat on the board of DWAC. None of them had duties to DWAC shareholders and had access to real-time updates on the DWAC – Trump Media merger negotiations. Neither Lopez Torres nor Suissa knew how Gerald Shvartsman, their furniture store owner boss, had access to this information or whether he had breached duties of confidentiality in tipping them.

While the Government's charging decisions in any criminal case turn on a number of factors, the defendant's arguments regarding relative culpability are inapposite and fall flat. The

---

[3] The Government did not contest, as a matter of course, to the defendant's objections to the PSR seeking to include the defendant's theory of the case, not because it agreed that with theory.

defendant deserves a sentence commensurate to that of his co-defendants, and one that adjusts for his unique and purposeful choice to take the stand and brazenly perjure himself.

## V. Conclusion

For the reasons set forth above, the Government respectfully submits that a below-Guidelines sentence of at least 36 months' imprisonment would be sufficient but not greater than necessary to comply with the purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: /s/_____
Daniel G. Nessim/Matthew R. Shahabian
Assistant United States Attorneys
(212) 637-2486/-1046